# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

In the Matter of:

The Trusteeship Created by American Home Mortgage
Investment Trust 2005-2 relating to the issuance of
Mortgage-Backed Notes pursuant to an Indenture dated
as of October 1, 2007

**Case Type: Other**
**File No.** 27-TR-CV-14-14

---

## VERIFIED PETITION OF WELLS FARGO BANK, N.A., AS INTERESTED PERSON, FOR INSTRUCTIONS IN THE ADMINISTRATION OF A TRUST PURSUANT TO MINN. STAT. § 501B.16

TO THE DISTRICT COURT FOR THE FOURTH JUDICIAL DISTRICT:

1.         Petitioner Wells Fargo Bank, N.A., a national banking association ("Wells

Fargo"), solely in its capacity as Securities Administrator (in such capacity, the "Securities

Administrator") and not in its individual capacity, files this Verified Petition for trust instruction

(the "Petition") with the Court in connection with (a) the issuance of Mortgage-Backed Notes (the

"Notes") by American Home Mortgage Investment Trust 2005-2 (the "Issuer") pursuant to an

Indenture, dated as of June 22, 2005 (the "Indenture"), by and among the Issuer, the Securities

Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee, and (b) the

Trust Estate (as defined in the Indenture) created by the Indenture.  A copy of the Indenture is

attached hereto as Exhibit 1.[1]

2.         This Court has jurisdiction over this Petition for trust instruction pursuant to Minn.

Stat. § 501B.16(4) and (23), Minn. Stat. § 501B.17(2), and Minn. Stat. § 501B.24, because Wells

Fargo, as Securities Administrator of the Trust Estate, is an interested party under Minn. Stat. §

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Indenture.

501(B)(16), and Wells Fargo, as Securities Administrator, administers the Trust Estate in part from an office located in Hennepin County, Minnesota.

3.      Wells Fargo files this Petition because it is confronted with an inconsistency between the Indenture and the related Prospectus Supplement (as defined below, the "Prosupp") with respect to the allocation of Realized Losses to Holders.

4.      As set forth in greater detail below, Wells Fargo has become aware of a conflict between Section 3.38 of the Indenture and the Prosupp, with respect to the allocation of Realized Losses between Class I-A-2 and Class I-A-3 Notes.  As a result of what appears to be, upon information and belief, a drafting error, Section 3.38 of the Indenture provides that Realized Losses will be allocated to the Class I-A-2 Notes before the Class I-A-3 Notes, even though the Prosupp describes the Class I-A-2 Notes as senior to Class I-A-3 Notes and allocates Realized Losses to the Class I-A-3 Notes before the Class I-A-2 Notes.

5.      By this Petition, Wells Fargo seeks entry of an order (a) reforming Section 3.38 of the Indenture so that losses are allocated first to the Class I-A-3 Notes and then, sequentially, to the Class I-A-2 Notes, in accordance with the disclosure in the Prosupp or, in the alternative, (b) directing that any Realized Losses shall be allocated strictly pursuant to the existing terms of the Indenture.

## BACKGROUND

6.      Wells Fargo acts as Securities Administrator under the terms of the Indenture.

7.      Pursuant to the terms of the Indenture, the Issuer, a Delaware statutory trust, granted to the Indenture Trustee, as trustee for the benefit of the Holders of the Notes and the Insurer, all of the Issuer's right, title and interest in and to the Trust Estate (as more fully described in the Indenture).  (*See* Ex. 1. at 1.)  Pursuant to the terms of the Indenture, the Issuer also issued

Mortgage-Backed Notes ("Notes") in the aggregate Initial Note Principal Balance amount of $5,778,151,000.00.

8.      The Notes were issued in a number of classes, each having different terms, including different rates of interest and priorities in right of payment of interest and principal and different priorities in the allocation of Realized Losses.

9.      Pursuant to the terms of the Indenture, the Mortgage Loans underlying the Notes are organized into Group I, Group II-C, Group II-NC, Group III, Group IV, Group V, and Group VI Mortgage Loans.  (*See* Ex. 1, at Appendix A, Definitions.)

10.     The terms of the Notes and Indenture were described in the Prospectus Supplement dated June 20, 2005 to the Prospectus dated March 22, 2005 (the "Prosupp").  A copy of the Prosupp is attached hereto as Exhibit 2.

## THE INCONSISTENCY BETWEEN THE INDENTURE AND THE PROSUPP WITH RESPECT TO THE ALLOCATION OF REALIZED LOSSES

11.     As defined in the Indenture, a Realized Loss "with respect to a Mortgage Loan, other than a HELOC Mortgage Loan, and as reported by the RMBS Servicer to the RMBS Master Servicer, is (i) a Deficient Valuation, or (ii) as to any Liquidated Mortgage Loan, the unpaid principal balance thereof plus accrued and unpaid interest thereon at the Mortgage Rate through the last day of the month of liquidation less the Net Liquidation Proceeds with respect to such Mortgage Loan and the related Mortgaged Property."[2]  (Ex. 1 at Appendix A, p. 57.)

12.     Section 3.38 of the Indenture provides for the allocation of Realized Losses. Pursuant to this Section, "[a]ny Realized Losses on the Group I Loans, Group II Loans, Group III Loans and Group IV Loans will be allocated on any Payment Date[3], in accordance with the

---

[2] The Prosupp defines Realized Loss as "[a]ny loss on a mortgage loan attributable to the mortgagor's failure to make any payment of principal or interest as required under the mortgage note."  (Ex. 2 at S-142.)

[3] Payment Date is defined in the Indenture as "[t]he 25th day of each month, or if such day is not a Business Day, then

statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, as follows: . . . *ninth* (i) to the extent such Realized Losses are incurred with respect to the Group I Loans, to the Class I-A-2 Notes and Class I-A-3 Notes, in that order, in reduction of the Note Principal Balance thereof . . . ."

13.     However, in describing the allocation of Realized Losses, the Prosupp states: "Any Realized Losses on the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV will be allocated or covered on any payment date as follows: . . . ninth, (x) to the extent such Realized Losses are incurred with respect to the mortgage loans in Loan Group I, *to the Class I-A-3 Notes and Class I-A-2 Notes, in that order*, in reduction of the Note Principal Balance therefor, until reduced to zero . . . ."  (Ex. 2 at S-79-80; emphasis added.)

14.     The terms of the Indenture and the Prosupp are thus inconsistent as to the sequence for allocation of Realized Losses for Group I Loans as between Class I-A-3 Notes and Class I-A-2 Notes.

### WELLS FARGO'S ACTIONS IN RESPONSE TO CONFLICT BETWEEN THE INDENTURE AND THE PROSUPP

15.     In November 2010, a Class I-A-2 Noteholder wrote to Wells Fargo regarding the above-described discrepancy between the Indenture and the Prosupp, opining that Class 1-A-1 was intended to be the Super Senior Class, Class I-A-2 was intended to be the Senior Mezzanine Class, and Class I-A-3 was intended to be the Junior Mezzanine Class, as indicated by the order of Realized Loss allocation in the Prosupp, as well as by the interest rates and pricing for each of the Classes of Notes.  The Holder further stated that allocation in accordance with the Indenture would, in effect, demote the Class I-A-2 Notes from Senior Mezzanine to Junior Mezzanine, due to a drafting error in the Indenture.

---

the next Business Day, commencing in July 2005."  (Ex. 1 at Appendix A.)

16.     In response to the Holder, Wells Fargo acknowledged the discrepancy between the Indenture and the Prosupp and stated that it would allocate Realized Losses in accordance with the Indenture, absent an amendment to the Indenture.

17.     Wells Fargo further explained that the Indenture did not include a provision that would allow the parties to amend it to conform to the Prosupp without consent of all affected Holders.

18.     Subsequently, several other Class I-A-2 and Class I-A-3 Holders contacted Wells Fargo regarding the discrepancy between the Indenture and the Prosupp.

19.     On May 10, 2013, Wells Fargo sent Class I-A-2 and Class I-A-3 Holders an Informational Notice and Request for Consideration of Proposed Second Supplemental Indenture (the "Consent Request").  A copy of the Consent Request is attached hereto as Exhibit 3.

20.     In the Consent Request, Wells Fargo notified Holders of the conflict between Section 3.38 of the Indenture and the corresponding disclosure in the Prosupp.  Wells Fargo further notified Holders that an amendment to the Indenture to conform Section 3.38 to the sequence of Realized Loss allocation disclosed in the Prosupp would require the consent of 100% of Class I-A-2 and Class I-A-3 Holders.  Wells Fargo requested that Holders provide consent on or before July 10, 2013.  (*See* Ex. 3.)

21.     In the Consent Notice, Wells Fargo also notified Holders that it was reserving the right to take further action, including legal action, to resolve the conflict between the Indenture and the Prosupp.  (*See* Ex. 3 at 3.)

22.     Wells Fargo did not receive consent from 100% of the Class I-A-2 and Class I-A-3 Holders and, therefore, the Indenture was not amended.  Wells Fargo notified Holders that it had not received the consent required for an amendment by an Informational Notice Regarding

5

Proposed Second Supplemental Indenture, dated July 11, 2013 (the "Informational Notice"). A copy of the Informational Notice is attached hereto as Exhibit 4.

23.     In the Informational Notice, Wells Fargo again notified Holders that it was reserving the right to take further action, including legal action, to resolve the conflict between the Indenture and the Prosupp. (*See* Ex. 4 at 2.)

24.     Wells Fargo has not yet had to allocate Realized Losses to Holders of Class I-A-2 or Class I-A-3 Notes. However, it anticipates that within the next few months, Realized Losses will reach a level so that allocation to one or the other of such Classes will be required. Wells Fargo therefore seeks a ruling as to the correct sequence of allocation of Realized Losses to the Class I-A-2 and Class I-A-3 Notes.

## CONCLUSION

25.     Wells Fargo seeks an order: (i) (a) reforming Section 3.38 of the Indenture so that, beginning with the first Payment Date that occurs after the entry of such order, any Realized Losses are allocated first to the Class I-A-3 Notes and then, sequentially, to the Class I-A-2 Notes, in accordance with the disclosure in the Prosupp, and (b) directing that Wells Fargo as Securities Administrator has no duty to revise or restate any allocation of Realized Losses that occurred prior to the entry of such order, or, in the alternative, (ii) directing that any Realized Losses shall be allocated strictly pursuant to the existing terms of the Indenture despite the inconsistency of such terms with the corresponding disclosure in the Prosupp, and (iii) directing that Wells Fargo shall not be liable to any Noteholder or other third party for complying with the terms of such order.

26.     Nothing herein shall be construed as an assumption by Wells Fargo of duties exceeding those specifically provided for under the Indenture or the waiver of any rights thereunder.

6

**WHEREFORE,** under the provisions of Minn. Stat. § 501B.16 and all other applicable law, Petitioner Wells Fargo, as Securities Administrator, respectfully requests that this Court:

a.   Make and enter an Order designating the time and place when the respective parties-in-interest may be heard upon the matters set forth in this Petition, and that notice of the hearing be served in the manner specified in the accompanying order and as provided by Minn. Stat. § 501B.18;

b.   Undertake to represent all parties-in-interest who are unascertained or not in being, or who are minors or incapacitated, pursuant to the provisions of Minn. Stat. § 501B.19;

c.   At such designated time and place, make a further order as follows:

   (i)   (a) reforming Section 3.38 of the Indenture so that, beginning with the first Payment Date that occurs after the entry of such order, any Realized Losses are allocated first to the Class I-A-3 Notes and then, sequentially, to the Class I-A-2 Notes, in accordance with the disclosure in the Prosupp, and (b) directing that Wells Fargo as Securities Administrator has no duty to revise or restate any allocation of Realized Losses that occurred prior to the entry of such order; or, in the alternative, directing that any Realized Losses shall be allocated strictly pursuant to the existing terms of the Indenture despite the inconsistency of such terms with the corresponding disclosure in the Prosupp;

   (ii)   directing that the Trust Estate and Wells Fargo shall not be subject to the continuing supervision of the Court for purposes of Minn. Stat. § 501B.23 or General Rule of Practice 417.02; and

   (iii)   directing that Wells Fargo shall not be liable to any Noteholder or other third party for complying with the terms of such order;

7

d.    Grant such other and further relief as the Court may deem lawful, just and proper.

RESPECTFULLY SUBMITTED, this 17th day of January, 2014

FAEGRE BAKER DANIELS LLP

Michael M. Krauss, #0342002
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Wells Fargo Bank, N.A.*

ALSTON & BIRD LLP
Michael E. Johnson (pro hac vice pending)
Carolyn O'Leary (pro hac vice pending)
90 Park Avenue
New York, New York
(212) 210-9400

*Attorneys for Wells Fargo Bank, N.A.*

## ACKNOWLEDGEMENT REQUIRED BY
## MINN. STAT. § 549.211, SUBD. 1

The undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, Subd. 3, sanctions may be imposed if, after notice and a reasonable opportunity to respond, the Court determines that the undersigned has violated the provisions of Minn. Stat. § 549.211, Subd. 2.

Dated: January 17, 2014

FAEGRE BAKER DANIELS LLP

Michael M. Krauss, #0342002
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Wells Fargo Bank, N.A.*

dms.us.53507843.01

9

## VERIFICATION

I, _Daniel Cohen_, am a _Vice President_ for Wells Fargo Bank, N.A., and I have

reviewed the foregoing Verified Petition and exhibits thereto, and state, under the penalty of

perjury, that (a) I believe the factual statements to the Verified Petition to be true and correct based

on the information that is currently available to me, and (b) the exhibit attached hereto is a true and

correct copy of a document maintained by Wells Fargo Bank, N.A. in the ordinary course of

business.

Subscribed and sworn to before me this
__16th__ day of January, 2014.

_____
Notary Public

COLLEEN PERRY
Notary Public - Maryland
Baltimore County
My Commission Expires on
August 21, 2016

EXHIBIT 1

AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2

ISSUER

WELLS FARGO BANK, N.A.

SECURITIES ADMINISTRATOR

AND

DEUTSCHE BANK NATIONAL TRUST COMPANY

INDENTURE TRUSTEE

INDENTURE

DATED AS OF JUNE 22, 2005

MORTGAGE-BACKED NOTES

<u>TABLE OF CONTENTS</u>

<u>Page</u>

## ARTICLE I

### DEFINITIONS

Section 1.01  Definitions.................................................................................................3
Section 1.02  Incorporation by Reference of Trust Indenture Act..........................................3
Section 1.03  Rules of Construction .................................................................................3

## ARTICLE II

### ORIGINAL ISSUANCE OF NOTES

Section 2.01  Form..........................................................................................................5
Section 2.02  Execution, Authentication and Delivery.......................................................5
Section 2.03  Acceptance of Mortgage Loans by Indenture Trustee.....................................5
Section 2.04  Acceptance of Derivative Contracts by Indenture Trustee ..............................7
Section 2.05  Conveyance of the Group I Subsequent Mortgage Loans ................................7
Section 2.06  Conveyance of the Group II-C Subsequent Mortgage Loans..........................10
Section 2.07  Conveyance of the Group II-NC Subsequent Mortgage Loans .......................14
Section 2.08  Conveyance of the Group III Subsequent Mortgage Loans............................17
Section 2.09  Conveyance of the Group IV Subsequent Mortgage Loans ...........................20
Section 2.10  Conveyance of the Group V Subsequent Mortgage Loans.............................23
Section 2.11  Conveyance of the Group VI Subsequent HELOC Mortgage Loans .............26

## ARTICLE III

### COVENANTS

Section 3.01  Collection of Payments with respect to the Mortgage Loans and HELOC
              Mortgage Loans ........................................................................................29
Section 3.02  Maintenance of Office or Agency.................................................................29
Section 3.03  Money for Payments To Be Held in Trust; Paying Agent...............................30
Section 3.04  Existence ..................................................................................................31
Section 3.05  Payment of Group I, Group II-C, Group II-NC, Group III and Group IV
              Available Funds. .......................................................................................31
Section 3.06  Payment of Group V Available Funds...........................................................38
Section 3.07  Payment of Principal and Interest on the Class VI-A Notes............................42
Section 3.08  Rapid Amortization Events..........................................................................43
Section 3.09  Payments to the Class N Notes. ...................................................................44
Section 3.10  Other Matters With Respect to the Notes. .....................................................45
Section 3.11  Protection of Trust Estate............................................................................46
Section 3.12  Opinions as to Trust Estate. .........................................................................46
Section 3.13  Performance of Obligations. ........................................................................47

Section 3.14  Negative Covenants ..................................................................47
Section 3.15  Annual Statement as to Compliance .........................................48
Section 3.16  Representations and Warranties Concerning the Mortgage Loans .................48
Section 3.17  Amendments to Servicing Agreement .......................................49
Section 3.18  Servicers as Agent and Bailee of the Indenture Trustee ...............49
Section 3.19  Investment Company Act ..........................................................49
Section 3.20  Issuer May Consolidate, etc. .....................................................49
Section 3.21  Successor or Transferee. ...........................................................51
Section 3.22  No Other Business ....................................................................52
Section 3.23  No Borrowing ..........................................................................52
Section 3.24  Guarantees, Loans, Monthly Advances and Other Liabilities .........52
Section 3.25  Capital Expenditures ................................................................52
Section 3.26  Determination of Note Interest Rate .........................................52
Section 3.27  Restricted Payments .................................................................53
Section 3.28  Notice of Events of Default ......................................................53
Section 3.29  Further Instruments and Acts ...................................................53
Section 3.30  Statements to Noteholders ........................................................53
Section 3.31  Interest Coverage Accounts. .....................................................53
Section 3.32  The Pre-Funding Accounts .......................................................55
Section 3.33  Grant of the Subsequent Mortgage Loans and Subsequent HELOC Mortgage
              Loans ......................................................................................57
Section 3.34  Replacement Derivative Contracts.............................................57
Section 3.35  Payments Under the Insurance Policy .......................................57
Section 3.36  Suspension of Rights During Insurer Default .............................58
Section 3.37  Certain Representations Regarding the Trust Estate.....................58
Section 3.38  Allocation of Realized Losses....................................................60
Section 3.39  Obligations of the Securities Administrator with respect to the Derivative
              Contracts. ................................................................................61
Section 3.40  Reserve Fund ...........................................................................61
Section 3.41  Class N Reserve Fund ..............................................................62

ARTICLE IV

THE NOTES; SATISFACTION AND DISCHARGE OF INDENTURE

Section 4.01  The Notes .................................................................................63
Section 4.02  Registration of and Limitations on Transfer and Exchange of Notes;
              Appointment of Note Registrar and Certificate Registrar. .............63
Section 4.03  Mutilated, Destroyed, Lost or Stolen Notes................................66
Section 4.04  Persons Deemed Owners .........................................................67
Section 4.05  Cancellation ............................................................................67
Section 4.06  Book-Entry Notes ...................................................................67
Section 4.07  Notices to Depository ..............................................................68
Section 4.08  Definitive Notes ......................................................................68
Section 4.09  Tax Treatment .........................................................................68
Section 4.10  Satisfaction and Discharge of Indenture ...................................69
Section 4.11  Application of Trust Money.......................................................70

Section 4.12  Subrogation and Cooperation ................................................70
Section 4.13  Repayment of Monies Held by Paying Agent ................................71
Section 4.14  Temporary Notes ................................................71
Section 4.15  Representation Regarding ERISA ................................................71

ARTICLE V

DEFAULT AND REMEDIES

Section 5.01  Events of Default ................................................73
Section 5.02  Acceleration of Maturity; Rescission and Annulment ....................73
Section 5.03  Collection of Indebtedness and Suits for Enforcement by Indenture Trustee. 74
Section 5.04  Remedies; Priorities. ................................................76
Section 5.05  Optional Preservation of the Trust Estate ................................80
Section 5.06  Limitation of Suits ................................................80
Section 5.07  Unconditional Rights of Noteholders To Receive Principal and Interest........81
Section 5.08  Restoration of Rights and Remedies................................................81
Section 5.09  Rights and Remedies Cumulative ................................................81
Section 5.10  Delay or Omission Not a Waiver ................................................82
Section 5.11  Control By Noteholders ................................................82
Section 5.12  Waiver of Past Defaults ................................................82
Section 5.13  Undertaking for Costs ................................................83
Section 5.14  Waiver of Stay or Extension Laws ................................................83
Section 5.15  Sale of Trust Estate. ................................................83
Section 5.16  Action on Notes ................................................85
Section 5.17  Performance and Enforcement of Certain Obligations. ...................85

ARTICLE VI

THE INDENTURE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 6.01  Duties of Indenture Trustee and Securities Administrator............................87
Section 6.02  Rights of Indenture Trustee and the Securities Administrator........................88
Section 6.03  Individual Rights ................................................90
Section 6.04  Indenture Trustee's and Securities Administrator's Disclaimer....................90
Section 6.05  Notice of Event of Default ................................................90
Section 6.06  Reports by Securities Administrator to Holders and Tax Administration .......90
Section 6.07  Compensation and Indemnity ................................................90
Section 6.08  Replacement of Indenture Trustee and the Securities Administrator .............91
Section 6.09  Successor Indenture Trustee and Successor Securities Administrator by
                     Merger................................................92
Section 6.10  Appointment of Co-Indenture Trustee or Separate Indenture Trustee. ..........93
Section 6.11  Eligibility; Disqualification ................................................94
Section 6.12  Preferential Collection of Claims Against Issuer........................................94
Section 6.13  Representations and Warranties................................................94
Section 6.14  Directions to Indenture Trustee ................................................95
Section 6.15  The Agents ................................................95

-

Section 6.16  Administrative Duties. ...................................................................95
Section 6.17  Records ..........................................................................................97
Section 6.18  Additional Information to be Furnished .........................................97
Section 6.19  Execution of Derivative Contracts and other Documents................97
Section 6.20  Indenture Trustee's Application For Instructions From the Issuer. ...97
Section 6.21  Limitation of Liability....................................................................97
Section 6.22  Assignment of Rights, Not Assumption of Duties...........................98

## ARTICLE VII

## NOTEHOLDERS' LISTS AND REPORTS

Section 7.01  Issuer To Furnish Indenture Trustee Names and Addresses of Noteholders ...99
Section 7.02  Preservation of Information; Communications to Noteholders. .....................99
Section 7.03  Reports of Issuer. ...........................................................................99
Section 7.04  Reports by Indenture Trustee ........................................................100
Section 7.05  Statements to Noteholders ............................................................100

## ARTICLE VIII

## ACCOUNTS, DISBURSEMENTS AND RELEASES

Section 8.01  Collection of Money .....................................................................104
Section 8.02  Trust Accounts. .............................................................................104
Section 8.03  Officer's Certificate ......................................................................104
Section 8.04  Termination Upon Distribution to Noteholders .............................105
Section 8.05  Release of Trust Estate..................................................................105
Section 8.06  Surrender of Notes Upon Final Payment ......................................105
Section 8.07  Optional Redemption of the Notes. ..............................................105

## ARTICLE IX

## SUPPLEMENTAL INDENTURES

Section 9.01  Supplemental Indentures Without Consent of Noteholders..........................109
Section 9.02  Supplemental Indentures With Consent of Noteholders...............................110
Section 9.03  Execution of Supplemental Indentures .........................................112
Section 9.04  Effect of Supplemental Indenture .................................................112
Section 9.05  Conformity with Trust Indenture Act ...........................................112
Section 9.06  Reference in Notes to Supplemental Indentures ...........................112

## ARTICLE X

## MISCELLANEOUS

Section 10.01  Compliance Certificates and Opinions, etc..................................113
Section 10.02  Form of Documents Delivered to Indenture Trustee ...................114
Section 10.03  Acts of Noteholders. ...................................................................115

Section 10.04  Notices etc., to Indenture Trustee, Issuer, Securities Administrator, Note
Insurer, Insurer and Rating Agencies..........................................................115
Section 10.05  Notices to Noteholders; Waiver..................................................................117
Section 10.06  Conflict with Trust Indenture Act...............................................................117
Section 10.07  Effect of Headings .......................................................................................117
Section 10.08  Successors and Assigns................................................................................117
Section 10.09  Separability ..................................................................................................117
Section 10.10  Benefits of Indenture....................................................................................118
Section 10.11  Legal Holidays .............................................................................................118
Section 10.12  GOVERNING LAW.....................................................................................118
Section 10.13  Counterparts .................................................................................................118
Section 10.14  Recording of Indenture ................................................................................118
Section 10.15  Issuer Obligation..........................................................................................119
Section 10.16  No Petition ...................................................................................................119
Section 10.17  Inspection.....................................................................................................119

ARTICLE XI

CERTAIN MATTERS REGARDING THE NOTE INSURER

Section 11.01  Rights of the Note Insurer to Exercise the Rights of the Class
V-A-4 D Notes..........................................................................................120
Section 11.02  Claims Upon the Note Insurance Policy; Insurance Account.....................120
Section 11.03  Effect  of Payments by the Note Insurer; Subrogation ...............................121
Section 11.04  Notices and Information to the Note Insurer ..............................................121
Section 11.05  Trustee to Hold Note Insurance Policy.......................................................122

EXHIBITS

Exhibit A-1   —   Form of Class [_-A-_] Notes
Exhibit A-2   —   Form of Class [[___]-]M-[_] Notes
Exhibit A-3   —   Form of Class [[___]-]B Notes
Exhibit A-4   —   Form of Class N Notes
Exhibit B     —   Mortgage Loan Schedule
Exhibit C     —   Form of Cap Contract
Exhibit D     —   Form of Corridor Contract
Exhibit E     —   Form of Insurance Policy
Exhibit F     —   Form of Subsequent Transfer Instrument
Exhibit G     —   Form of Addition Notice
Exhibit H     —   Form of Initial Certification
Exhibit I     —   Form of Final Certification
Exhibit J     —   Form of Request for Release
Exhibit K     —   Form of Rule 144A Investment Representation
Exhibit L     —   Form of Certificate of Non-Foreign Status
Exhibit M     —   Form of Investment Letter
Exhibit N     —   Form of Transferor Certificate
Exhibit O     —   Form of ERISA Letter
Exhibit P     —   Form of Transferee Certificate
Exhibit Q     —   Form of Lender Transferor Certificate

Appendix A    —   Definitions

This Indenture, dated as of June 22, 2005, is entered into among American Home Mortgage Investment Trust 2005-2, a Delaware statutory trust, as Issuer (the "Issuer"), Deutsche Bank National Trust Company, a national banking association, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., a national banking association, as Securities Administrator (the "Securities Administrator").

WITNESSETH THAT:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Issuer's Mortgage-Backed Notes, Series 2005-2 (the "Notes").

GRANTING CLAUSE

The Issuer hereby Grants to the Indenture Trustee at the Closing Date, as trustee for the benefit of the Holders of the Notes and the Insurer, all of the Issuer's right, title and interest in and to, whether now existing or hereafter created, (a) the Mortgage Loans, Eligible Substitute Mortgage Loans and the proceeds thereof and all rights under the Related Documents; (b) the HELOC Mortgage Loans, related Eligible Substitute Mortgage Loans and the proceeds thereof and all rights under the Related Documents; (c) (i) with respect to the Holders of the Class VI-A Notes, the Insurance Policy, and (ii) with respect to the Holders of the Class V-A-4-D Notes, the Note Insurance Policy; (d) additional Draws under the HELOC Mortgage Loans conveyed to the Trust; (e) the rights of the Issuer under the Cap Contract and the Corridor Contract and all payments received under the Cap Contract and the Corridor Contract; (f) all funds on deposit from time to time in the Collection Account allocable to the Mortgage Loans and HELOC Mortgage Loans excluding any investment income from such funds; (g) all funds on deposit from time to time in the Payment Account and in all proceeds thereof; (h) all funds on deposit from time to time in the Pre-Funding Accounts and the Interest Coverage Accounts and in all proceeds thereof; (i) all rights under (I) the Mortgage Loan Purchase Agreement as assigned to the Issuer, with respect to the (a) Initial Mortgage Loans, and each Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loan Purchase Agreements as assigned to the Issuer, with respect to the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and (b) Initial HELOCs, and each Group VI Subsequent HELOC Mortgage Loan Purchase Agreements as assigned to the Issuer, with respect to the related Group VI Subsequent HELOC Mortgage Loans, (II) the Servicing Agreements and any Subservicing Agreements and (III) any title, hazard and primary insurance policies with respect to the Mortgaged Properties; and (j) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice (except as otherwise provided herein), priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The Indenture Trustee, as trustee on behalf of the Holders of the Notes and the Insurer, acknowledges such Grant, accepts the trust under this Indenture in accordance with the provisions hereof and agrees to perform its duties as Indenture Trustee as required herein.

The Indenture Trustee agrees that it will hold the Insurance Policy in trust and that it will hold any proceeds of any claim made upon the Insurance Policy solely for the use and benefit of the Holders of the Class VI-A Notes in accordance with the terms hereof and the terms of the Insurance Policy.

The Indenture Trustee agrees that it will hold the Note Insurance Policy in trust and that it will hold any proceeds of any claim made upon the Note Insurance Policy solely for the use and benefit of the Holders of the Class V-A-4-D Notes in accordance with the terms hereof and the terms of the Note Insurance Policy.

# ARTICLE I

## DEFINITIONS

Section 1.01   <u>Definitions</u>.   For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Definitions attached hereto as Appendix A which is incorporated by reference herein.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02   <u>Incorporation by Reference of Trust Indenture Act</u>.   Whenever this Indenture refers to a provision of the Trust Indenture Act (the "TIA"), the provision is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"Commission" means the Securities and Exchange Commission.

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rules have the meanings assigned to them by such definitions.

Section 1.03   <u>Rules of Construction</u>.  Unless the context otherwise requires:

(i)   a term has the meaning assigned to it;

(ii)   an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(iii)   "or" is not exclusive;

(iv)   "including" means including without limitation;

(v)   words in the singular include the plural and words in the plural include the singular; and

(vi)   any agreement, instrument, statute, regulation or rule defined or referred to herein or in any instrument or certificate delivered in connection herewith means such

agreement, instrument, statute, regulation or rule as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

## ARTICLE II

## ORIGINAL ISSUANCE OF NOTES

Section 2.01   Form.  The Class A, Class M, Class B, Class V-M, Class V-B and Class N Notes, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth in Exhibits A-1, A-2, A-3 and A-4 to this Indenture, respectively, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture.

The Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods (with or without steel engraved borders).

The terms of the Notes set forth in Exhibits A-1, A-2, A-3 and A-4 to this Indenture are part of the terms of this Indenture.

Section 2.02   Execution, Authentication and Delivery.  The Notes shall be executed on behalf of the Issuer by any of its Authorized Officers.  The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver each Class of Notes for original issue in an aggregate initial principal amount equal to the Initial Note Principal Balance for such Class of Notes.

Each of the Notes shall be dated the date of its authentication.  The Notes shall be issuable as registered Notes and shall be issuable in the minimum initial Note Principal Balances of $25,000 and in integral multiples of $1 in excess thereof, except with respect to the Class VI-A Notes.  The Class VI-A Notes shall be issuable in the minimum initial Note Principal Balances of $25,000 and in integral multiples of $1,000 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Section 2.03   Acceptance of Mortgage Loans by Indenture Trustee.

(a)      The Indenture Trustee shall acknowledge receipt of, subject to the exceptions the Indenture Trustee notes pursuant to the procedures described below, the documents (or certified copies thereof) referred to in Section 2.1(b) of the Mortgage Loan Purchase Agreement and the Subsequent Mortgage Loan Purchase Agreements, and to declare that it holds and will continue

to hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust Estate, in trust for the use and benefit of all present and future Holders of the Notes and the Insurer.  No later than the Closing Date, with respect to the Initial Mortgage Loans and Initial HELOCs or the applicable Subsequent Transfer Date, with respect to the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and the Group VI Subsequent HELOC Mortgage Loans (or, with respect to any Eligible Substitute Mortgage Loan, within 5 days after the receipt by the Indenture Trustee thereof and, with respect to any documents received after the Closing Date, promptly thereafter), the Indenture Trustee shall, for the benefit of the Noteholders and the Insurer, review each Mortgage File delivered to it and to execute and deliver, or cause to be executed and delivered, to the Seller, the Insurer, the RMBS Servicer, the HELOC Back-Up Servicer and the HELOC Servicer an Initial Certification in the form annexed hereto as Exhibit H.  In conducting such review, the Indenture Trustee shall ascertain whether all required documents described in Section 2.1(b)(i) to (v) (except clause (v)(ii)) of (a) the Mortgage Loan Purchase Agreement, with respect to the Initial Mortgage Loans and Initial HELOCs, and (b) the applicable Subsequent Mortgage Loan Purchase Agreement, with respect to the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans, have been executed and received and whether those documents relate, to the Mortgage Loans and HELOCs it has received, as identified in Exhibit B to this Indenture, as supplemented (*provided, however,* that with respect to those documents described in subclause (b)(vi) of such section, the Indenture Trustee's obligations shall extend only to documents actually delivered pursuant to such subclause).  In performing any such review, the Indenture Trustee may conclusively rely on the purported due execution and genuineness of any such document and on the purported genuineness of any signature thereon.  If the Indenture Trustee finds any document constituting part of the Mortgage File not to have been executed or received, or to be unrelated to the Mortgage Loans identified in Exhibit B to this Indenture or to not conform with the review criteria set forth in Exhibit H (a "defect"), the Indenture Trustee shall promptly notify the Seller and the Insurer or the Note Insurer, as applicable, of such finding and the Seller's obligation to cure such defect or repurchase or substitute for the related Mortgage Loan.  To the extent the Indenture Trustee has not received a Mortgage File with respect to any of the Initial Mortgage Loans or Initial HELOCs by the Closing Date, or any of the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans or Group VI Subsequent HELOC Mortgage Loans by the applicable Subsequent Transfer Date, the Indenture Trustee shall not require the deposit of cash into the Payment Account or any other account to cover the amount of that Mortgage Loan and shall solely treat such Mortgage Loan as if it were in breach of a representation or warranty; provided that the aggregate Stated Principal Balance of such Mortgage Loans does not exceed 1% of the (i) sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balances, in the case of the Mortgage Loans that are not HELOC Mortgage Loans and (ii) Group VI Cut-off Date Balance, with respect to the HELOC Mortgage Loans.

(i)     No later than 180 days after the Closing Date (with respect to the Initial Mortgage Loans and Initial HELOCs) or the applicable Subsequent Transfer Date (with respect to the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans), the Indenture Trustee will review, for the benefit of the Noteholders and the Insurer or the

Note Insurer, as applicable, the Mortgage Files and will execute and deliver or cause to be executed and delivered to the Seller, the Insurer, the RMBS Servicer, the HELOC Back-Up Servicer and the HELOC Servicer, a Final Certification in the form annexed hereto as Exhibit I.  In conducting such review, Indenture Trustee will ascertain whether an original of each document described in subclauses (b)(ii)-(iv) of Section 2.1 of the Mortgage Loan Purchase Agreement, with respect to the Initial Mortgage Loans and Initial HELOCs, and (b) the applicable Subsequent Mortgage Loan Purchase Agreement, with respect to the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans, required to be recorded has been returned from the applicable recording office with evidence of recording thereon or a certified copy has been obtained from such recording office.  If the Indenture Trustee finds any document constituting part of the Mortgage File has not been executed or received, or to be unrelated, to the Mortgage Loans and HELOC Mortgage Loans identified in Exhibit B to this Indenture or to appear defective on its face, the Indenture Trustee shall promptly notify the Seller and the Insurer.

(ii)     Upon deposit by the Seller of the Repurchase Price in the Payment Account, the Indenture Trustee shall release to the Seller or the RMBS Servicer, the HELOC Back-Up Servicer and the HELOC Servicer, as applicable, the related Mortgage File and the Indenture Trustee shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty, furnished to it by the Seller or the RMBS Servicer, the HELOC Back-Up Servicer and the HELOC Servicer, as applicable, as are necessary to vest in the Seller or the RMBS Servicer, the HELOC Back-Up Servicer and the HELOC Servicer, as applicable, title to and rights under the related Mortgage Loan or HELOC Mortgage Loan.  Such purchase shall be deemed to have occurred on the date on which the deposit of the Repurchase Price in the Payment Account was received by the Indenture Trustee.  The Indenture Trustee shall amend the applicable Mortgage Loan Schedule to reflect such repurchase and shall promptly notify the RMBS Servicer, the HELOC Back-Up Servicer, the RMBS Master Servicer and the HELOC Servicer, the Insurer or the Note Insurer, as applicable, and the Securities Administrator of such amendment.

Section 2.04   Acceptance of Derivative Contracts by Indenture Trustee.  The Indenture Trustee acknowledges receipt of the Corridor Contract and the Cap Contract and declares that it holds and will continue to hold these documents and any amendments, replacements or supplements thereto and all other assets of the Trust Estate as Indenture Trustee in trust for the use and benefit of all present and future Holders of the Notes.  The Indenture Trustee shall enforce the Corridor Contract and the Cap Contract in accordance with their terms.

Section 2.05   Conveyance of the Group I Subsequent Mortgage Loans.  (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group I Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this

Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group I Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group I Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group I Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group I Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group I Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date.  The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group I Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group I Subsequent Mortgage Loans by the Depositor to the Trust Estate.  The related Mortgage File for each Group I Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group I Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group I Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)     The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group I Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group I Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

(i)     the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto, and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group I Subsequent Mortgage Loans;

(ii)    the Depositor shall have delivered to the Indenture Trustee a duly executed Group I Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group I Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the applicable Subsequent Transfer Date;

(iii)   as of the applicable Subsequent Transfer Date, as evidenced by delivery of the related Group I Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)     (such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)     the Funding Period shall not have terminated;

(vi)     each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

(vii)     the Depositor shall not have selected the applicable Group I Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of  the Noteholders or the Note Insurer;

(viii)     the Depositor shall have delivered to the Indenture Trustee the related Group I Subsequent Transfer Instrument confirming the satisfaction of all of the conditions specified in this Section 2.05 and, pursuant to such Group I Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group I Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group I Subsequent Mortgage Loans;

(ix)     the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee and the Rating Agencies with respect to the transfer of the applicable Group I Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group I Subsequent Mortgage Loans; and

(x)     on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)     The obligation of the Trust Estate to purchase a Group I Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group I Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such Group I Subsequent Mortgage Loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such Group I Subsequent Mortgage Loan will be 480 months; (iii) each Group I Subsequent Mortgage Loan must be an adjustable-rate Mortgage Loan with a first lien on the related mortgaged property; (iv) no Group I Subsequent Mortgage Loan will have a first Payment Date occurring after September 1, 2005; (v) the latest maturity date of any Group I Subsequent Mortgage Loan will be no later than August 1, 2045; (vi) none of the Group I Subsequent Mortgage Loans will be a buydown loan; (vii) such Group I Subsequent Mortgage Loan will have a credit score of not less than 600; (viii) such Group I Subsequent

Mortgage Loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.000% per annum to approximately 8.00% per annum; (ix) none of the Group I Subsequent Mortgage Loans will be a New York State "high cost" loan; and (x) such Group I Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in the Prospectus Supplement.

(d)     In addition, following the purchase of any Group I Subsequent Mortgage Loan by the Trust, the applicable Group I Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: (i) have a weighted average Mortgage Rate ranging from 2.50% to 3.00% per annum; (ii) consist of Mortgage Loans with prepayment charges representing no less than approximately 45.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 720; (iv) have no more than 25.00% of such Mortgage Loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing Group I Subsequent Mortgage Loans be owner occupied; (vi) have no less than 59.00% of the mortgaged properties securing Group I Mortgage Loans be single family detached and no more than 25.00% of the mortgaged properties securing Group I Mortgage Loans be de minimis planned unit developments; (vii) have no more than 50.00% of the Group I Loans be cash-out refinance; (viii) not have any of such group of Group I Subsequent Mortgage Loans with a loan-to-value ratio greater than 80% not be covered by a Primary Insurance Policy; (ix) have no more than 0.00% of the Group I Loans be Mortgage Loans with an interest only period; (x) together with the Group I Mortgage Loans already included in the trust, have no more than 2.00% of such Group I Subsequent Mortgage Loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 50.00% of such Mortgage Loans will have a credit score less than 700; (xii) no less than 30.00% of such Mortgage Loans will have "full documentation"; (xii) such Mortgage Loans will have a weighted average loan to value ratio between 70.00% and 77.00% and (xiv) no more than 5.00% of such Mortgage Loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group I Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group I Subsequent Mortgage Loan would adversely affect the ratings of the Notes.  In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group I Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group I Subsequent Mortgage Loans is true and correct in all material respects.  The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such applicable Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above.  The Indenture Trustee shall not include any Group I Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group I Subsequent Mortgage Loans.

Section 2.06   Conveyance of the Group II-C Subsequent Mortgage Loans.  (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's

delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group II-C Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group II-C Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group II-C Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group II-C Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group II-C Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group II-C Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date.  The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group II-C Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group II-C Subsequent Mortgage Loans by the Depositor to the Trust Estate.  The related Mortgage File for each Group II-C Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group II-C Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group II-C Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)     The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group II-C Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group II-C Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

(i)     the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto,  and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group II-C Subsequent Mortgage Loans;

(ii)     the Depositor shall have delivered to the Indenture Trustee a duly executed Group II-C Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group II-C Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

11

(iii)    as of each applicable Subsequent Transfer Date, as evidenced by delivery of the related Group II-C Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)    such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)    the Funding Period shall not have terminated;

(vi)    each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

(vii)   the Depositor shall not have selected the applicable Group II-C Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of the Noteholders or the Note Insurer;

(viii)  the Depositor shall have delivered to the Indenture Trustee the related Group II-C Subsequent Transfer Instrument confirming the satisfaction of all of the conditions specified in this Section 2.06 and, pursuant to such Group II-C Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group II-C Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group II-C Subsequent Mortgage Loans;

(ix)    the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee and the Rating Agencies with respect to the transfer of the applicable Group II-C Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group II-C Subsequent Mortgage Loans; and

(x)    on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)    The obligation of the Trust Estate to purchase a Group II-C Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group II-C Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such Group II-C Subsequent Mortgage Loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such Group II-C Subsequent Mortgage Loan will be no more than 360 months; (iii) each Group II-C Subsequent Mortgage Loan must be an

12

adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no Group II-C Subsequent Mortgage Loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any Group II-C Subsequent Mortgage Loan will be no later than August 1, 2035; (vi) none of the Group II-C Subsequent Mortgage Loans will be a buydown loan; (vii) such Group II-C Subsequent Mortgage Loan will have a credit score of not less than 600; (viii) such Group II-C Subsequent Mortgage Loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.00% per annum to approximately 9.00% per annum; (ix) none of the Group II-C Subsequent Mortgage loans will be a New York State "high cost" loan; and (x) such Group II-C Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool— Underwriting Standards" in the Prospectus Supplement.

(d)    In addition, following the purchase of any Group II-C Subsequent Mortgage Loan by the Trust, the applicable Group II-C Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: (i) have a weighted average Mortgage Rate ranging from 5.00% to 5.75% per annum; (ii) consist of Group II-C Subsequent Mortgage Loans with prepayment charges representing no less than approximately 5.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 740; (iv) have no more than 33.00% of such Group II-C Subsequent Mortgage Loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing Group II-C Subsequent Mortgage Loans be owner occupied; (vi) have no less than 50.00% of the mortgaged properties securing Group II-C Subsequent Mortgage Loans be single family detached and no more than 25.00% planned unit developments; (vii) have no more than 25.00% of the Group II-C Subsequent Mortgage Loans be cash-out refinance; (viii) all of the Group II-C Subsequent Mortgage Loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 95.00% of the Group II-C Subsequent Mortgage Loans be mortgage loans with an interest only period; (x) together with the Group II-C loans already included in the trust, have no more than 2.00% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the Group II-C Subsequent Mortgage Loans will have a credit score less than 650; (xii) no less than 35.00% the Group II-C Subsequent Mortgage Loans will have "full documentation"; (xii) such Group II-C Subsequent Mortgage Loans will have a weighted average loan to value ratio between 70.00% and 80.00% and (xiv) no more than 1.00% of such Group II-C Subsequent Mortgage Loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group II-C Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group II-C Subsequent Mortgage Loan would adversely affect the ratings of the Notes.  In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group II-C Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group II-C Subsequent Mortgage Loans is true and correct in all material respects.  The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above.  The Indenture

Trustee shall not include any Group II-C Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group II-C Subsequent Mortgage Loans.

Section 2.07   <u>Conveyance of the Group II-NC Subsequent Mortgage Loans</u>.  (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group II-NC Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group II-NC Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group II-NC Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group II-NC Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group II-NC Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group II-NC Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date.  The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group II-NC Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group II-NC Subsequent Mortgage Loans by the Depositor to the Trust Estate.  The related Mortgage File for each Group II-NC Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group II-NC Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group II-NC Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)     The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group II-NC Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group II-NC Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

(i)     the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto,  and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group II-NC Subsequent Mortgage Loans;

14

(ii)      the Depositor shall have delivered to the Indenture Trustee a duly executed Group II-NC Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group II-NC Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

(iii)     as of each applicable Subsequent Transfer Date, as evidenced by delivery of the related Group II-NC Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)     such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)      the Funding Period shall not have terminated;

(vi)     each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

(vii)    the Depositor shall not have selected the applicable Group II-NC Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of the Noteholders or the Note Insurer;

(viii)   the Depositor shall have delivered to the Indenture Trustee the related Group II-NC Subsequent Transfer Instrument confirming the satisfaction of all of the conditions specified in this Section 2.06 and, pursuant to such Group II-NC Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group II-NC Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group II-NC Subsequent Mortgage Loans;

(ix)     the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee and the Rating Agencies with respect to the transfer of the applicable Group II-NC Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group II-NC Subsequent Mortgage Loans; and

(x)      on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)     The obligation of the Trust Estate to purchase a Group II-NC Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group II-NC Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such Group II-NC Subsequent Mortgage Loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such Group II-NC Subsequent Mortgage Loan will be no more than 360 months; (iii) each Group II-NC Subsequent Mortgage Loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no Group II-NC Subsequent Mortgage Loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any Group II-NC Subsequent Mortgage Loan will be no later than August 1, 2035; (vi) none of the Group II-NC Subsequent Mortgage Loans will be a buydown loan; (vii) such Group II-NC Subsequent Mortgage Loan will have a credit score of not less than 625; (viii) such Group II-NC Subsequent Mortgage Loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.00% per annum to approximately 10.00% per annum; (ix) none of the Group II-NC Subsequent Mortgage Loans will be a New York State "high cost" loan; and (x) such Group II-NC Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in the Prospectus Supplement.

(d)     In addition, following the purchase of any Group II-NC Subsequent Mortgage Loan by the Trust, the applicable Group II-NC Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: (i) have a weighted average Mortgage Rate ranging from 4.75% to 5.25% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 3.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 715 to 730; (iv) have no more than 54.00% of such mortgage loans concentrated in the state of California; (v) have no less than 84.00% of the mortgaged properties securing Group II-NC Subsequent Mortgage Loans be owner occupied; (vi) have no less than 60.00% of the mortgaged properties securing Group II-NC Subsequent Mortgage Loans be single family detached and no more than 28.00% planned unit developments; (vii) have no more than 32.00% of the Group II-NC Subsequent Mortgage Loans be cash-out refinance; (viii) all of the Group II-NC Subsequent Mortgage Loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 98.00% of the Group II-NC Subsequent Mortgage Loans be mortgage loans with an interest only period; (x) together with the Group II-NC Loans already included in the trust, have no more than 2.00% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 8.00% of the Group II-NC Subsequent Mortgage Loans will have a credit score less than 650; (xii) no less than 29.00% of the Group II-NC Subsequent Mortgage Loans will have "full documentation"; (xii) will have a weighted average loan to value ratio between 68.00% and 77.00% and (xiv) no more than 1.00% of such Group II-NC Subsequent Mortgage Loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group II-NC Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group II-NC Subsequent Mortgage Loan would adversely affect the ratings of the Notes.  In addition, minor variances from the

characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group II-NC Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group II-NC Subsequent Mortgage Loans is true and correct in all material respects.  The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above.  The Indenture Trustee shall not include any Group II-NC Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group II-NC Subsequent Mortgage Loans.

Section 2.08   Conveyance of the Group III Subsequent Mortgage Loans.  (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group III Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group III Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group III Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group III Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group III Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group III Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date.  The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group III Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group III Subsequent Mortgage Loans by the Depositor to the Trust Estate.  The related Mortgage File for each Group III Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group III Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group III Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)      The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group III Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such

applicable funds from the Group III Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

    (i)    the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto, and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group III Subsequent Mortgage Loans;

    (ii)    the Depositor shall have delivered to the Indenture Trustee a duly executed Group III Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group III Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

    (iii)    as of each applicable Subsequent Transfer Date, as evidenced by delivery of the related Group III Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

    (iv)    such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

    (v)    the Funding Period shall not have terminated;

    (vi)    each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

    (vii)    the Depositor shall not have selected the applicable Group III Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of the Noteholders or the Note Insurer;

    (viii)    the Depositor shall have delivered to the Indenture Trustee the related Group III Subsequent Transfer Instrument confirming the satisfaction of all of the conditions specified in this Section 2.07 and, pursuant to such Group III Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group III Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group III Subsequent Mortgage Loans;

    (ix)    the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee and the Rating Agencies with respect to the transfer of the applicable Group III Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group III Subsequent Mortgage Loans; and

(x)    on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)    The obligation of the Trust Estate to purchase a Group III Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group III Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each group III subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no Group III Subsequent Mortgage Loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group III subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the Group III Subsequent Mortgage Loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 625; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.00% per annum to approximately 8.00% per annum; (ix) none of the Group III Subsequent Mortgage loans will be a New York State "high cost" loan; and (x) such Group III Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in the Prospectus Supplement.

(d)    In addition, following the purchase of any Group III Subsequent Mortgage Loan by the Trust, the applicable Group III Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: (i) have a weighted average Mortgage Rate ranging from 5.75% to 6.30% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 5.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 725; (iv) have no more than 20.00% of such mortgage loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing Group III Subsequent Mortgage Loans be owner occupied; (vi) have no less than 45.00% of the mortgaged properties securing Group III Subsequent Mortgage Loans be single family detached and no more than 32.00% planned unit developments; (vii) have no more than 25.00% of the Group III Subsequent Mortgage Loans be cash-out refinance; (viii) all of the Group III Subsequent Mortgage Loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 94.00% of the Group III Subsequent Mortgage Loans be mortgage loans with an interest only period; (x) together with the Group III Loans already included in the trust, have no more than 1.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 11.00% of the Group III Subsequent Mortgage Loans will have a credit score less than 650; (xii) no less than 35.00% of the Group III Subsequent Mortgage Loans will have "full documentation"; (xii) will have a weighted average

loan to value ratio between 70.00% and 80.00% and (xiv) no more than 2.00% of such Group III Subsequent Mortgage Loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group III Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group III Subsequent Mortgage Loan would adversely affect the ratings of the Notes.   In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group III Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group III Subsequent Mortgage Loans is true and correct in all material respects.  The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above.  The Indenture Trustee shall not include any Group III Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group III Subsequent Mortgage Loans.

Section 2.09   <u>Conveyance of the Group IV Subsequent Mortgage Loans</u>.  (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group IV Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group IV Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group IV Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group IV Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group IV Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group IV Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date.  The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group IV Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group IV Subsequent Mortgage Loans by the Depositor to the Trust Estate.   The related Mortgage File for each Group IV Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group IV Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal

Balance of the Group IV Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)     The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group IV Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group IV Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the related Subsequent Transfer Date:

(i)     the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto, and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group IV Subsequent Mortgage Loans;

(ii)     the Depositor shall have delivered to the Indenture Trustee a duly executed Group IV Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group IV Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

(iii)     as of each related Subsequent Transfer Date, as evidenced by delivery of the related Group IV Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)     such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)     the Funding Period shall not have terminated;

(vi)     each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

(vii)     the Depositor shall not have selected the applicable Group IV Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of  the Noteholders or the Note Insurer;

(viii)     the Depositor shall have delivered to the Indenture Trustee the related Group IV Subsequent Transfer Instrument confirming the satisfaction of all of the conditions specified in this Section 2.08 and, pursuant to such Group IV Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group IV Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group IV Subsequent Mortgage Loans;

(ix)    the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee and the Rating Agencies with respect to the transfer of the applicable Group IV Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group IV Subsequent Mortgage Loans; and

(x)    on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)    The obligation of the Trust Estate to purchase a Group IV Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group IV Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each Group IV Subsequent Mortgage Loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no Group IV Subsequent Mortgage Loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any Group IV Subsequent Mortgage Loan will be no later than August 1, 2035; (vi) none of the Group IV Subsequent Mortgage Loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 635; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.50% per annum to approximately 8.00% per annum; (ix) none of the Group IV Subsequent Mortgage loans will be a New York State "high cost" loan; and (x) such Group IV Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool— Underwriting Standards" in the Prospectus Supplement.

(d)    In addition, following the purchase of any Group IV Subsequent Mortgage Loan by the Trust, the applicable Group IV Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: (i) have a weighted average Mortgage Rate ranging from 5.50% to 6.25% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 1.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 710 to 730; (iv) have no more than 36.00% of such mortgage loans concentrated in the state of California; (v) have no less than 85.00% of the mortgaged properties securing Group IV Subsequent Mortgage Loans be owner occupied; (vi) have no less than 50.00% of the mortgaged properties securing Group IV Subsequent Mortgage Loans be single family detached and no more than 36.00% planned unit developments; (vii) have no more than 30.00% of the Group IV Subsequent Mortgage Loans be cash-out refinance; (viii) all of the Group IV Subsequent Mortgage Loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 95.00% of the Group IV Subsequent Mortgage

22

Loans be mortgage loans with an interest only period; (x) together with the Group IV Loans already included in the trust, have no more than 2.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the Group IV Subsequent Mortgage Loans will have a credit score less than 650; (xii) no less than 49.00% of the Group IV Subsequent Mortgage Loans will have "full documentation"; (xii) will have a weighted average loan to value ratio between 70.00% and 80.00% and (xiv) no more than 1.00% of such mortgage loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group IV Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group IV Subsequent Mortgage Loan would adversely affect the ratings of the Notes. In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group IV Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group IV Subsequent Mortgage Loans is true and correct in all material respects. The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above. The Indenture Trustee shall not include any Group IV Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group IV Subsequent Mortgage Loans.

Section 2.10   Conveyance of the Group V Subsequent Mortgage Loans. (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group V Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group V Subsequent Mortgage Loans identified on the Mortgage Loan Schedule attached to the related Group V Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group V Subsequent Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group V Subsequent Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Group V Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date. The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group V Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group V Subsequent Mortgage Loans by the

Depositor to the Trust Estate.  The related Mortgage File for each Group V Subsequent Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group V Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group V Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)    The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group V Subsequent Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group V Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

(i)    the Depositor shall have provided the Securities Administrator, the Indenture Trustee, the Note Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto, and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group V Subsequent Mortgage Loans;

(ii)    the Depositor shall have delivered to the Indenture Trustee a duly executed Group V Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group V Subsequent Mortgage Loans, and the Seller shall have delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

(iii)    as of each related Subsequent Transfer Date, as evidenced by delivery of the related Group V Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)    such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)    the Funding Period shall not have terminated;

(vi)    each Mortgage Loan is being serviced by the RMBS Servicer under the related Servicing Agreement;

(vii)    the Depositor shall not have selected the applicable Group V Subsequent Mortgage Loans in a manner that it believed to be adverse to the interests of  the Noteholders or the Note Insurer;

(viii)    the Depositor shall have delivered to the Indenture Trustee the related Group V Subsequent Transfer Instrument confirming the satisfaction of all the conditions

specified in this Section 2.09 and, pursuant to such Group V Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Depositor, in, to and under the applicable Group V Subsequent Mortgage Loan Purchase Agreement, to the extent of the related Group V Subsequent Mortgage Loans;

(ix)    the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee, the Note Insurer and the Rating Agencies with respect to the transfer of the applicable Group V Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group V Subsequent Mortgage Loans; and

(x)    on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator and the RMBS Master Servicer a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator and the RMBS Master Servicer to perform their respective duties under the Basic Documents.

(c)    The obligation of the Trust Estate to purchase a Group V Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group V Subsequent Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be 360 months; (iii) each Group V Subsequent Mortgage Loan must be a fixed rate mortgage loan with a first lien on the related mortgaged property; (iv) no Group V Subsequent Mortgage Loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any Group V Subsequent Mortgage Loan will be no later than August 1, 2035; (vi) none of the Group V Subsequent Mortgage Loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 600; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.60% per annum to approximately 9.25% per annum; (ix) none of the Group V Subsequent Mortgage Loans will be a New York State "high cost" loan; and (x) such Group V Subsequent Mortgage Loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in the Prospectus Supplement.

(d)    In addition, following the purchase of any Group V Subsequent Mortgage Loan by the Trust, the applicable Group V Subsequent Mortgage Loans will as of the related Subsequent Cut-off Date: ((i) have a weighted average Mortgage Rate ranging from 6.25% to 6.75% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 3.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 685 to 715; (iv) have no more than 19.00% of such mortgage loans concentrated in the state of California; (v) have no less than 67.00% of the mortgaged properties securing Group V Subsequent Mortgage Loans be owner occupied; (vi) have no less than 54.00% of the

25

mortgaged properties securing Group V Subsequent Mortgage Loans be single family detached and no more than 24.00% planned unit developments; (vii) have no more than 42.00% of the Group V Subsequent Mortgage Loans be cash-out refinance; (viii) all of the Group V Subsequent Mortgage Loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 48.00% of the Group V Subsequent Mortgage Loans be mortgage loans with an interest only period; (x) together with the Group V Loans already included in the trust, have no more than 1.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the Group V Subsequent Mortgage Loans will have a credit score less than 625; (xii) no less than 15.00% of the Group V Subsequent Mortgage Loans will have "full documentation"; (xiii) will have a weighted average loan to value ratio between 68.00% and 77.00% and (xiv) no more than 1.00% of such mortgage loans will have a loan to value ratio of greater than 95%.

Notwithstanding the foregoing, any Group V Subsequent Mortgage Loan may be rejected by any Rating Agency if the inclusion of any such Group V Subsequent Mortgage Loan would adversely affect the ratings of the Notes without taking the Note Insurance Policy into account. In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors, and the consent of the Rating Agencies to any group of Group V Subsequent Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies in respect of such Group V Subsequent Mortgage Loans is true and correct in all material respects. The Seller shall deliver to each Rating Agency at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency describing the characteristics specified in subsections (c) and (d) above. The Indenture Trustee shall not include any Group V Subsequent Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group V Subsequent Mortgage Loans.

Section 2.11   Conveyance of the Group VI Subsequent HELOC Mortgage Loans.   (a) Subject to the conditions set forth in paragraph (b) below and in consideration of the Indenture Trustee's delivery on the applicable Subsequent Transfer Dates, to or upon the written order of the Depositor, of all or a portion of the balance of funds in the Group VI Pre-Funding Account, the Depositor shall, on the Subsequent Transfer Date, sell, transfer, assign, set over and convey without recourse to the Trust Estate, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to (i) the related Group VI Subsequent HELOC Mortgage Loans (including all Additional Balances resulting from Draws made pursuant to the terms of the related Group VI Subsequent HELOC Mortgage Loan prior to the termination of the Trust) identified on the Mortgage Loan Schedule attached to the related Group VI Subsequent Transfer Instrument delivered by the Depositor on the Subsequent Transfer Date, (ii) all interest accruing thereon on and after the Subsequent Cut-off Date (with respect to the Group VI Subsequent HELOC Mortgage Loans) and all collections in respect of interest and principal due after the Subsequent Cut-off Date and (iii) all items with respect to such Group VI Subsequent HELOC Mortgage Loans to be delivered pursuant to Section 2.03 and the other items in the related Mortgage Files; *provided, however*, that the Depositor reserves

and retains all right, title and interest in and to principal received and interest accruing on the Group VI Subsequent HELOC Mortgage Loans prior to the related Subsequent Cut-off Date. The transfer to the Indenture Trustee for deposit in the Trust Estate by the Depositor of the Group VI Subsequent HELOC Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale of the Group VI Subsequent HELOC Mortgage Loans by the Depositor to the Trust Estate. The related Mortgage File for each Group VI Subsequent HELOC Mortgage Loan shall be delivered to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date.

The purchase price paid by the Indenture Trustee from amounts released from the Group VI Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Stated Principal Balance of the Group VI Subsequent HELOC Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule provided by the Depositor).

(b)     The Depositor shall transfer to the Indenture Trustee for deposit in the Trust Estate the applicable Group VI Subsequent HELOC Mortgage Loans and the other property and rights related thereto as described in paragraph (a) above, and the Indenture Trustee shall release such applicable funds from the Group VI Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the Subsequent Transfer Date:

(i)     the Depositor shall have provided the Indenture Trustee, the Securities Administrator, the Insurer and the Rating Agencies with a timely Addition Notice, substantially in the form of Exhibit G hereto, and shall have provided any information reasonably requested by the Indenture Trustee with respect to the Group VI Subsequent HELOC Mortgage Loans;

(ii)     the Depositor shall have delivered to the Indenture Trustee a duly executed Group VI Subsequent Transfer Instrument (which the Indenture Trustee is hereby authorized to execute), which shall include a Mortgage Loan Schedule listing the Group VI Subsequent HELOC Mortgage Loans and shall have delivered or cause to be delivered a computer file containing such Mortgage Loan Schedule to the Indenture Trustee at least three (3) Business Days prior to the related Subsequent Transfer Date;

(iii)     as of each Subsequent Transfer Date, as evidenced by delivery of the related Group VI Subsequent Transfer Instrument, substantially in the form of Exhibit F, the Depositor shall not be insolvent nor shall it have been rendered insolvent by such transfer nor shall it be aware of any pending insolvency;

(iv)     such sale and transfer shall not result in a material adverse tax consequence to the Trust Estate or to the Noteholders;

(v)     the Funding Period shall not have terminated;

(vi)     each HELOC is being serviced by the HELOC Servicer under the related Servicing Agreement;

(vii)    the Depositor shall not have selected the applicable Group VI Subsequent HELOC Mortgage Loans in a manner that it believed to be adverse to the interests of the Noteholders or the Insurer;

(viii)   the Depositor shall have delivered to the Indenture Trustee the related Group VI Subsequent Transfer Instrument confirming the satisfaction of all the conditions specified in this Section 2.10 and, pursuant to such Group VI Subsequent Transfer Instrument, assigned to the Indenture Trustee without recourse for the benefit of the Class VI-A Noteholders and the Insurer all the right, title and interest of the Depositor, in, to and under the applicable Group VI Subsequent HELOC Mortgage Loan Purchase Agreement, to the extent of the related Group VI Subsequent HELOC Mortgage Loans;

(ix)    the Depositor shall have delivered to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee, the Insurer and the Rating Agencies with respect to the transfer of the applicable Group VI Subsequent HELOC Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee on the Closing Date regarding the validity of the conveyance and the true sale of such Group VI Subsequent HELOC Mortgage Loans; and

(x)     on or before the related Subsequent Transfer Date, the Depositor shall have delivered to the Securities Administrator a computer file containing the final Mortgage Loan Schedule with respect to such subsequent transfer and such additional information concerning the Mortgage Loans described therein as may be necessary to enable the Securities Administrator to perform its respective duties under the Basic Documents.

(c)     The obligation of the Trust Estate to purchase a Group VI Subsequent HELOC Mortgage Loan on any Subsequent Transfer Date is subject to the satisfaction of the conditions set forth in the immediately following paragraph and the accuracy of the following representations and warranties with respect to each such Group VI Subsequent HELOC Mortgage Loan determined as of the applicable Subsequent Cut-off Date: (i) such HELOC may not be 30 or more days delinquent as of the Subsequent Transfer Date; (ii) the remaining term to stated maturity of such HELOC will not exceed 300 months; (iii) such HELOC will be secured by a mortgage in a first or second lien position; (iv) such HELOC will have a fully-indexed margin between 0.000% and 7.000%; (v) each HELOC will have a credit limit less than $550,000; (vi) each HELOC will have a combined loan-to-value ratio less than or equal to 101%; (vii) each HELOC will have a credit limit utilization rate less than or equal to 101%; (viii) each HELOC will have a credit score greater than or equal to 600; (ix) no HELOC will provide for negative amortization; and (x) such HELOC Mortgage Loan shall have been underwritten substantially in accordance with the criteria set forth under "Description of the Mortgage Pool—Underwriting Standards" in the Prospectus.

(d)     In addition, following the purchase of any Group VI Subsequent HELOC Mortgage Loan by the Trust, the applicable Group VI Subsequent HELOC Mortgage Loans will as of the related Subsequent Cut-off Date: (i) a weighted average fully-indexed margin of at least 1.510%; (ii) a weighted average combined loan-to-value ratio of no more than 92.00%; (iii) a

28

weighted average credit score of 723 or greater; (iv) at least 60.00% of the Group VI Subsequent HELOC Mortgage Loans will be secured by a single family residence; (v) at least 95.00% of the Group VI Subsequent HELOC Mortgage Loans will be secured by an owner-occupied property; (vi) no more than 28.00% of the pool will have a loan purpose of cash-out refinance; (vii) cash-out refinance loans will have a maximum weighted average CLTV of 85.00%; (viii) no more than 7.00% of the pool will have a credit score less than 660; (ix) no less than 70.00% of the pool will have "full documentation"; (x) no more than 29.00% of the Group VI Subsequent HELOC Mortgage Loans will be in the state of California; and (xi) no more than 10.00% of the Group VI Subsequent HELOC Mortgage Loans will be in any state other than California.

Notwithstanding the foregoing, any Group VI Subsequent HELOC Mortgage Loan may be rejected by any Rating Agency or the Insurer if the inclusion of any such Group VI Subsequent HELOC Mortgage Loan would adversely affect the ratings of the Class VI-A Notes without taking the Insurance Policy into account. Also, the Insurer must approve the Group VI Subsequent HELOC Mortgage Loans, which consent shall not be unreasonably withheld. In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies and the Insurer so long as there are compensating factors, and the consent of the Rating Agencies and the Insurer to any group of Group VI Subsequent HELOC Mortgage Loans shall mean that the representations and warranties set forth in subsections (c) and (d) above are accurate; *provided, however*, that the information furnished to the Rating Agencies and the Insurer in respect of such Group VI Subsequent HELOC Mortgage Loans is true and correct in all material respects. The Seller shall deliver or caused to be delivered to each Rating Agency and the Insurer at least three (3) Business Days prior to such Subsequent Transfer Date a computer file acceptable to each Rating Agency and the Insurer describing the characteristics specified in subsections (c) and (d) above. The Indenture Trustee shall not include any Group VI Subsequent HELOC Mortgage Loans on the applicable Subsequent Transfer Date as to which it has received notice from any Rating Agency or the Insurer at least one (1) Business Day prior to such Subsequent Transfer Date that such Mortgage Loan should not be included in the Group VI Subsequent Mortgage Loans.

## ARTICLE III

## COVENANTS

Section 3.01   Collection of Payments with respect to the Mortgage Loans and HELOC Mortgage Loans. The Indenture Trustee shall establish and maintain an Eligible Account (the "Payment Account") in which the Indenture Trustee shall deposit, on the same day as it is received from the Securities Administrator or the HELOC Servicer, each remittance received by the Indenture Trustee with respect to the Mortgage Loans and HELOC Mortgage Loans. The Indenture Trustee shall make all payments of principal of and interest on the Notes, subject to Section 3.03, and as provided in Section 3.05 herein, from monies on deposit in the Payment Account. The Securities Administrator shall remit such funds to the Indenture Trustee no later than one Business Day prior to the Payment Date.

Section 3.02   Maintenance of Office or Agency. The Issuer will maintain an office or agency where, subject to satisfaction of conditions set forth herein, Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Issuer in

respect of the Notes and this Indenture may be served.  The Issuer hereby initially appoints the Indenture Trustee to serve as its agent for the foregoing purposes.  If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders may be made at the office of the Indenture Trustee located at c/o DTC Transfer Agent Services, 55 Water Street, Jeanette Park Entrance, New York, New York 10041, and notices and demands may be made or delivered at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

Section 3.03   <u>Money for Payments To Be Held in Trust; Paying Agent</u>.  (a) As provided in Section 3.01, all payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account pursuant to Section 3.01 shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Payment Account for payments of Notes shall be paid over to the Issuer except as provided in this Section 3.03.  The Issuer hereby appoints the Indenture Trustee as its Paying Agent.

The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent it hereby so agrees), subject to the provisions of this Section 3.03, that such Paying Agent will:

(a)      hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(b)      give the Indenture Trustee, the Note Insurer and the Insurer notice of any default by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(c)      at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(d)      immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(e)      comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; and

(f)      not commence a bankruptcy proceeding against the Issuer in connection with this Indenture.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Request direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note (other than amounts paid under the Note Insurance Policy or Insurance Policy) and remaining unclaimed for one year after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; *provided, however,* that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Issuer cause to be published once, in an Authorized Newspaper published in the English language, notice that such money remains unclaimed and that, after a date specified therein which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer. The Indenture Trustee, with the (i) written consent of the Insurer respecting the Class VI-A Notes, so long as the Insurer is not in default under the Insurance Policy and (ii) written consent of the Note Insurer respecting the Class V-A-4-D Notes, so long as the Note Insurer is not in default under the Note Insurance Policy, may also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Holder).

Section 3.04   Existence.   The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Mortgage Loans and each other instrument or agreement included in the Trust Estate.

Section 3.05   Payment of Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds.

(a)   On each Payment Date from amounts on deposit in the Payment Account in accordance with Section 8.02 hereof, the Indenture Trustee shall pay to the Persons specified below, to the extent provided therein in accordance with the statement furnished by the Securities Administrator pursuant to Section 7.05 hereof for such Payment Date, the Available Funds for such Payment Date.

(b)      On each Payment Date, the Indenture Trustee shall withdraw from the Payment Account the Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date and make the following payments in the order of priority described below, in each case to the extent of the related Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds remaining for such Payment Date:

    (i)      concurrently

        (A)      from the Group I Available Funds, concurrently to the Holders of the Class I-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such Classes for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date;

        (B)      from the Group II-C Available Funds, concurrently to the Holders of the Class II-A-1 Notes and Component II-A-3-C of the Class II-A-3 Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such Class or related Accrued Component Interest for such component for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date;

        (C)      from the Group II-NC Available Funds, concurrently to the Holders of the Class II-A-2 Notes and Component II-A-3-NC of the Class II-A-3 Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such Class or related Accrued Component Interest for such component for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date

        (D)      from the Group III Available Funds, to the Holders of the Class III-A Notes, the related Accrued Note Interest for such Class for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date; and

        (E)      from the Group IV Available Funds, concurrently to the holders of the Class IV-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such Classes for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date;

    (ii)      from the remaining Group 1, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components, pro rata, based on entitlement, any remaining unpaid Accrued Note Interest and Unpaid Interest Shortfall for such Payment Date;

    (iii)      from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Holders of the Class M-1 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(iv)     from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Holders of the Class M-2 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(v)     from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Holders of the Class M-3 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(vi)     from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Holders of the Class M-4 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(vii)     from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date, to the Holders of the Class M-5 Notes, the related Accrued Note Interest for such Class for such Payment Date; and

(viii)   any remainder (to the extent not included as a part of the related Principal Distribution Amount as provided in Section 3.05(c) and (d) below) shall be included in the related Net Monthly Excess Cashflow and allocated as described in Section 3.05(e) below.

(c)     On each Payment Date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event is in effect, the Holders of each Class of Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(i)     concurrently, the applicable Class A Principal Allocation Fraction of the related Principal Distribution Amount shall be allocated to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes, until the Note Principal Balances or Component Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(ii)     concurrently, any remaining related Principal Distribution Amount shall be distributed to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes on a pro rata basis, based on the Note Principal Balances or Component Principal Balances thereof, as applicable, until the Note Principal Balances thereof have been reduced to zero, with any

amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(iii)    any remaining related Principal Distribution Amount, to the Class M-1 Notes until the Note Principal Balance of such Class is reduced to zero;

(iv)    any remaining related Principal Distribution Amount, to the Class M-2 Notes until the Note Principal Balance of such Class is reduced to zero;

(v)    any remaining related Principal Distribution Amount, to the Class M-3 Notes until the Note Principal Balance of such Class is reduced to zero;

(vi)    any remaining related Principal Distribution Amount, to the Class M-4 Notes until the Note Principal Balance of such Class is reduced to zero;

(vii)    any remaining related Principal Distribution Amount, to the Class M-5 Notes until the Note Principal Balance of such Class is reduced to zero;

(viii)    any remaining related Principal Distribution Amount, to the Class B Notes until the Note Principal Balance of such Class is reduced to zero; and

(ix)    any remainder as part of the related Net Monthly Excess Cashflow to be allocated as described in Section 3.05(e) below.

(d)    On each Payment Date (a) on or after the related Stepdown Date and (b) on which a related Trigger Event is not in effect, the Holders of each Class of Class I-A, Class II-A, Class III-A, Class IV-A, Class M Notes and Class B Notes shall be entitled to receive payments in respect of principal to the extent of the Principal Distribution Amount in the following amounts and order of priority:

(i)    concurrently, the related Class A Principal Allocation Fraction of the Class A Principal Distribution Amount shall be allocated to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes, until the Note Principal Balances or Component Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC

34

payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(ii)     concurrently, any remaining Class A Principal Distribution Amount shall be distributed to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes on a pro rata basis, based on the Note Principal Balances or Component Principal Balances thereof, as applicable, until the Note Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(iii)    any remaining related Principal Distribution Amount shall be distributed to the Class M-1 Notes, in an amount up to the Class M-1 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(iv)    any remaining related Principal Distribution Amount shall be distributed to the Class M-2 Notes, in an amount up to the Class M-2 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(v)     any remaining related Principal Distribution Amount shall be distributed to the Class M-3 Notes, in an amount up to the Class M-3 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(vi)    any remaining related Principal Distribution Amount shall be distributed to the Class M-4 Notes, in an amount up to the Class M-4 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(vii)   any remaining related Principal Distribution Amount shall be distributed to the Class M-5 Notes, in an amount up to the Class M-5 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(viii)  any remaining related Principal Distribution Amount shall be distributed to the Class B Notes, in an amount up to the Class B Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero; and

(ix)    any remainder as part of the related Net Monthly Excess Cashflow to be allocated as described in Section 3.05(e) below.

(e)    On each Payment Date, any Net Monthly Excess Cashflow for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans shall be paid, in each case to the extent of remaining related Net Excess Monthly Cashflow, as follows:

(i)    to the Holders of the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class M and Class B Components and Class II-A-3 Components in an amount equal to the related Overcollateralization Increase Amount, payable to such Holders as part of the related Principal Distribution Amount as provided in 3.05(c) and (d) above;

(ii)    to the Holders of the Class I-A-2, Class I-A-3 and Class IV-A-3 Notes, on a pro rata basis, based on the amount of Allocated Realized Loss Amount for such Notes, an amount equal to the Allocated Realized Loss Amount for such Notes, to the extent not previously reimbursed

(iii)    to the Holders of the Class M-1 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(iv)    to the Holders of the Class M-2 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(v)    to the Holders of the Class M-3 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(vi)    to the Holders of the Class M-4 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(vii)    to the Holders of the Class M-5 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(viii)    to the Holders of the Class B Notes, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(ix)    to the Holders of the Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components, on a pro rata basis, based on the amount of any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes or Components on such Payment Date, any related Basis

36

Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes or Components on such Payment Date, to the extent not covered by the Corridor Contract or Excess Derivative Payment Amount and Cap Contract as provided in Section 3.05(g) and 3.06(f) below;

(x)  sequentially to the holders of the Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Notes, any related Basis Risk Shortfall Carry-Forward Amount for such Notes on such Payment Date, to the extent not covered by the Corridor Contract or Excess Derivative Payment Amount and Cap Contract as provided in Section 3.05(g) and 3.06(f) below;

(xi)  to the Note Insurer, the aggregate of all payments, if any, made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed or covered under Section 3.06(e) below;

(xii)  up to and including the Payment Date in September 2035, to the Class V-A, Class V-M and Class V-B Notes, to be included in the related Net Monthly Excess Cashflow as described in Section 3.06(e) below;

(xiii)  until the Note Principal Balances of the Class N Notes have been reduced to zero, to the Holders of the Class N Notes as provided in Section 3.09; and

(xiv)  any remaining amounts will be distributed to the Certificate Paying Agent, as designee of the Issuer, for the benefit of the Holders of the Trust Certificates, as provided herein and in the Trust Agreement.

(f)  On each Payment Date, any payments received from the Cap Contract Counterparty with respect to the Cap Contract with respect to such Payment Date will be allocated and paid in the following order of priority, in each case to the extent of amounts remaining:

(i)  the amount received from the Cap Contract shall be allocated and paid first to the Class V-A-2 Notes, in reduction of any related Basis Risk Shortfall Carry-Forward Amount for such Class for that Payment Date; and

(ii)  from any amounts remaining from the Cap Contract, as part of the Excess Derivative Payment Amount, to be paid as described in Section 3.05(g) below.

(g)  On each Payment Date, any payments received from the Corridor Contract Counterparty with respect to the Corridor Contract with respect to such Payment Date will be allocated and paid in the following order of priority, in each case to the extent of amounts remaining:

(i)  first, the amount received from the Corridor Contract will be allocated and paid to the Class II-A-1 Notes, Class II-A-2 Notes and Class II-A-3 Components, pro

rata, base don entitlement, in reduction of any related Basis Risk Shortfall Carry-Forward Amount for such Class for that Payment Date; and

(ii)     any remaining amounts from the Corridor Contract shall be included in the Excess Derivative Payment Amount and shall be paid as provided in the following paragraph.

On each Payment Date, the Excess Derivative Payment Amount shall be paid as follows, in each case to the extent of amounts remaining:

(i)     first, to the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class V-A Notes and the Class II-A-3 Components, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount, as applicable, for such Class or Classes or component or components for that Payment Date;

(ii)     second, to the Class M-1, Class V-M-1 and Class V-M-2 Notes, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Shortfall Carry-Forward Amount for such Class or Classes for that Payment Date;

(iii)     third, to the Class M-2, Class M-3 and Class V-M-3 Notes, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Carry-Forward Amount for such Class or Classes for that Payment Date; and

(iv)     fourth, any remaining amounts will be distributed to the Certificate Paying Agent, as designee of the Issuer, for the benefit of the Holders of the Trust Certificates, as provided herein and in the Trust Agreement.

Section 3.06     Payment of Group V Available Funds.

(a)     On each Payment Date from amounts on deposit in the Payment Account in accordance with Section 8.02 hereof, the Indenture Trustee shall pay to the Persons specified below, to the extent provided therein in accordance with the statement furnished by the Securities Administrator pursuant to Section 7.05 hereof for such Payment Date, the Group V Available Funds and Class V-A-4-D Insured Amount, if any, for such Payment Date.

(b)     On each Payment Date, the Indenture Trustee shall withdraw from the Payment Account the Group V Available Funds and Class V-A-4-D Insured Amount, if any, for such Payment Date and make the following payments in the manner and order of priority described below, in each case to the extent of the Group V Available Funds and Class V-A-4-D Insured Amount, if any, remaining for such Payment Date:

(i)     to the Holders of the Class V-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for each such Class for such Payment Date, plus any related Unpaid Interest Shortfall for such Payment Date; including, in the case of the Class V-A-4-D Notes, the Class V-A-4-D Insured Amount, if any;

(ii)     from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-M-1 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(iii)    from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-M-2 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(iv)    from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-M-3 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(v)     from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-M-4 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(vi)    from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-M-5 Notes, the related Accrued Note Interest for such Class for such Payment Date;

(vii)   from the remaining Group V Available Funds for such Payment Date, to the Holders of the Class V-B Notes, the related Accrued Note Interest for such Class for such Payment Date; and

(viii)  any remainder (to the extent not included as a part of the related Principal Distribution Amount as provided in Section 3.06(c) and (d) below) shall be included in the related Net Monthly Excess Cashflow and allocated as described in Section 3.06(e) below.

(c)     On each Payment Date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event is in effect, the Holders of each Class of Class V-A, Class V-M and Class V-B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(i)     from the related Principal Distribution Amount, the Class V-A-1 Priority Amount shall be distributed to the Class V-A-1 Notes until the Note Principal Balance thereof has been reduced to zero;

(ii)    any remaining related Principal Distribution Amount shall be distributed sequentially to the Class V-A-2, Class V-A-3, Class V-A-4 and Class V-A-1 Notes, in that order, in each until the Note Principal Balance thereof has been reduced to zero, with any amounts payable to the Class V-A-4 Notes payable to the Class V-A-4-A, Class V-A-4-B, Class V-A-4-C Notes and Class V-A-4-D Notes, pro rata, based on their respective Note Principal Balances;

(iii)   any remaining related Principal Distribution Amount, to the Class V-M-1 Notes until the Note Principal Balance of such Class is reduced to zero

(iv)   any remaining related Principal Distribution Amount, to the Class V-M-2 Notes until the Note Principal Balance of such Class is reduced to zero

(v)   any remaining related Principal Distribution Amount, to the Class V-M-3 Notes until the Note Principal Balance of such Class is reduced to zero;

(vi)   any remaining related Principal Distribution Amount, to the Class V-M-4 Notes until the Note Principal Balance of such Class is reduced to zero;

(vii)   any remaining related Principal Distribution Amount, to the Class V-M-5 Notes until the Note Principal Balance of such Class is reduced to zero;

(viii)   any remaining related Principal Distribution Amount, to the Class V-B Notes until the Note Principal Balance of such Class is reduced to zero; and

(ix)   any remainder as part of the related Net Monthly Excess Cashflow for the Group V Loans to be allocated as described Section 3.06(e) below.

(d)   On each Payment Date (a) on or after the related Stepdown Date and (b) on which a related Trigger Event is not in effect, the Holders of each Class of Class V-A, Class V-M and Class V-B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(i)   from the Class V-A Principal Distribution Amount, the Class V-A-1 Priority Amount shall be distributed to the Class V-A-1 Notes until the Note Principal Balance thereof has been reduced to zero;

(ii)   any remaining Class V-A Principal Distribution Amount shall be distributed sequentially to the Class V-A-2, Class V-A-3, Class V-A-4 and Class V-A-1 Notes, in that order, in each case until the Note Principal Balance thereof has been reduced to zero, with any amounts payable to the Class V-A-4 Notes payable to the Class V-A-4-A, Class V-A-4-B, Class V-A-4-C Notes and Class V-A-4-D Notes, pro rata, based on their respective Note Principal Balances;

(iii)   any remaining related Principal Distribution Amount shall be distributed to the Class V-M-1 Notes, in an amount up to the Class V-M-1 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(iv)   any remaining related Principal Distribution Amount shall be distributed to the Class V-M-2 Notes, in an amount up to the Class V-M-2 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(v)   any remaining related Principal Distribution Amount shall be distributed to the Class V-M-3 Notes, in an amount up to the Class V-M-3 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(vi)     any remaining related Principal Distribution Amount shall be distributed to the Class V-M-4 Notes, in an amount up to the Class V-M-4 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(vii)     any remaining related Principal Distribution Amount shall be distributed to the Class V-M-5 Notes, in an amount up to the Class V-M-5 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(viii)     any remaining related Principal Distribution Amount shall be distributed to the Class V-B Notes, in an amount up to the Class V-B Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero; and

(ix)     to any remainder as part of the Net Monthly Excess Cashflow for the Group VIII Loans to be allocated as described Section 3.06(e) below.

(e)     On each Payment Date, any Net Monthly Excess Cashflow for the Group V Loans shall be paid, in each case to the extent of remaining Net Excess Monthly Cashflow, as follows:

(i)     to the Note Insurer, the aggregate of all payments, if any, made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed;

(ii)     to the Holders of the Class V-A, Class V-M and Class V-B Notes in an amount equal to the related Overcollateralization Increase Amount, payable to such Holders as part of the related Principal Distribution Amount as provided in 3.06(c) and (d) above;

(iii)     to the holders of the Class V-A-4-B Notes, an amount equal to the Allocated Realized Loss Amount for such Notes, to the extent not previously reimbursed;

(iv)     to the Holders of the Class V-M-1 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(v)     to the Holders of the Class V-M-2 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(vi)     to the Holders of the Class V-M-3 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(vii)     to the Holders of the Class V-M-4 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any

related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(viii)   to the Holders of the Class V-M-5 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(ix)   to the Holders of the Class V-B Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(x)   to the holders of the Class V-A Notes, on a pro rata basis, based on the amount of any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes on such Payment Date, any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes on such Payment Date, to the extent not covered by the Corridor Contract or Excess Derivative Payment Amount and the Cap Contract as provided in Section 3.05(g) and 3.06(f) above, respectively;

(xi)   sequentially to the Holders of the Class V-M Notes, any related Basis Risk Shortfall Carry-Forward Amount for such Notes on such Payment Date, to the extent not covered by the Corridor Contract or Excess Derivative Payment Amount and Cap Contract as provided in Section 3.05(g) and 3.06(f) above;

(xii)   to the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes to be included in the related Net Monthly Excess Cashflow as provided in Section 3.05(e) above;

(xiii)   until the Note Principal Balances of the Class N Notes have been reduced to zero, to the Holders of the Class N Notes as provided in the Section 3.09 below; and

(xiv)   any remaining amounts will be distributed to the Certificate Paying Agent, as designee of the Issuer, for the benefit of the Holders of the Trust Certificates, as provided herein and in the Trust Agreement.

Section 3.07   <u>Payment of Principal and Interest on the Class VI-A Notes</u>.

(a)   On each Payment Date, the Investor Interest Collections, reduced by the HELOC Back-Up Servicing Fee, the HELOC Servicing Fee and any unreimbursed nonrecoverable servicing advances previously made, will be distributed in the following priority, in accordance with the statement furnished by the Securities Administrator pursuant to Section 7.05 hereof for such Payment Date:

(i)   to the Insurer, the Premium Amount;

(ii)     to the Holders of the Class VI-A Notes, accrued interest and unpaid interest, in each case accrued at a rate equal to the related Note Interest Rate;

(iii)    to the Holders of the Class VI-A Notes, as a payment of principal, Investor Charge-Off Amounts incurred during the preceding Due Period and the Investor Charge-Off Amounts incurred during previous periods that were not subsequently funded by Investor Interest Collections, overcollateralization or draws under the Insurance Policy;

(iv)    to the Insurer, as reimbursement for prior draws made under the Insurance Policy;

(v)     to the Holders of the Class VI-A Notes, as a payment of principal, the amount necessary to build the overcollateralization to the related Overcollateralization Target Amount;

(vi)    to the Insurer, any other amounts owed to the Insurer pursuant to the Insurance Agreement;

(vii)   to the Holders of the Class VI-A Notes, Basis Risk Shortfall Carry-Forward Amounts on the Class VI-A Notes for such Payment Date;

(viii)  to the owner of the Transferor Interest, any remaining amounts until the Transferor Interest Principal Balance is reduced to zero; and

(ix)    to the Holder of the Trust Certificates, any remaining amounts.

(b)     On each Payment Date, Principal Collections on the HELOC Mortgage Loans, will be distributed in the following priority:

(i)     to Holders of the Class VI-A Notes, the lesser of the outstanding Note Principal Balance of the Class VI-A Notes and the Investor Principal Distribution Amount;

(ii)    to the Insurer, as reimbursement for prior Draws made under the Insurance Policy, to the extent not paid pursuant to Section 3.07(a) above;

(iii)   to the owner of the Transferor Interest, any remaining amounts until the Transferor Interest Principal Balance is reduced to zero; and

(iv)    to the Holder of the Trust Certificates, any remaining amounts.

Section 3.08   Rapid Amortization Events.

A Rapid Amortization Event is any of the following events:

(a)     Investor Interest Collections or Principal Collections for any Payment Date are not enough to make any payment of interest or principal, respectively, in each case that is due on the Class VI-A Notes, and such failure continues for a period of five Business Days;

43

(b)      a declaration of bankruptcy or insolvency by any of the Trust, the Depositor or the HELOC Servicer;

(c)      the Trust becomes subject to the Investment Company Act of 1940;

(d)      failure on the part of the Trust, the Depositor, the Seller, the HELOC Servicer or the HELOC Back-Up Servicer to perform any of its other material obligations under the HELOC Back-Up Servicing Agreement, the Trust Agreement, the HELOC Servicing Agreement or the Indenture;

(e)      a draw on the Insurance Policy is unreimbursed for 90 days; or

(f)      the occurrence of a HELOC Servicer Termination Event.

If any event described in clause (a) or (d) occurs, a Rapid Amortization Event will occur only if, after the applicable grace period, the Insurer or the Indenture Trustee acting at the direction of the Noteholders holding notes evidencing more than 51% in principal amount of the Class VI-A Notes then outstanding, with the consent of the Insurer, by written notice to the Holder of the Transferor Interest, the Depositor and the HELOC Servicer (and to the Indenture Trustee, if given by the Insurer or the Noteholders) declare that a Rapid Amortization Event has occurred.  If any event described in clauses (b), (c), (e) or (f) occurs, a Rapid Amortization Event will occur without any notice or other action on the part of the Indenture Trustee, the Insurer or the Noteholders immediately on the occurrence of such event.

Notwithstanding the foregoing, if a conservator, receiver or trustee-in-bankruptcy is appointed for the HELOC Servicer, and no Rapid Amortization Event exists other than the conservatorship, receivership or insolvency of the HELOC Servicer, such conservator, receiver or trustee-in-bankruptcy may have the power to prevent the commencement of a Rapid Amortization Event.

Section 3.09   Payments to the Class N Notes.

(a)      On each Payment Date, the amounts payable to the Class N Notes pursuant to Section 3.05(e)(xii) and 3.06(e)(xi) and any prepayment penalties collected by the RMBS Servicer pursuant to the RMBS Servicing Agreement, will be distributed as follows, in accordance with the statement furnished by the Securities Administrator pursuant to Section 7.05 hereof for such Payment Date:

(i)      to the Holders of the Class N-1 Notes, the Accrued Note Interest for such Class for such Payment Date;

(ii)      to the Holders of the Class N-2 Notes, the Accrued Note Interest for such Class for such Payment Date;

(iii)      to the Class N Reserve Fund, the Required Reserve Fund Deposit for such Payment Date,

(iv)     sequentially to the Holders of the Class N-1 Notes and Class N-2 Notes, in that order, in reduction of the Note Principal Balance thereof, in each case until the Note Principal Balance thereof has been reduced to zero; and

(v)      any remaining amounts will be distributed to the Certificate Paying Agent, as designee of the Issuer, for the benefit of the Holders of the Trust Certificates, as provided herein and in the Trust Agreement.

Section 3.10     Other Matters With Respect to the Notes.

(a)      Each distribution with respect to a Book-Entry Note shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures.  Each Depository Participant shall be responsible for disbursing such distribution to the Note Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent.  Each brokerage firm shall be responsible for disbursing funds to the Note Owners that it represents.  None of the Indenture Trustee, the Note Registrar, the Paying Agent, the Depositor, the Securities Administrator, the RMBS Master Servicer or the related Servicer shall have any responsibility therefor except as otherwise provided by this Indenture or applicable law.

(b)      On each Payment Date, the Certificate Paying Agent shall deposit in the Certificate Distribution Account all amounts it received pursuant to Sections 3.05, 3.06, 3.07 and 3.08 for the purpose of distributing such funds to the Certificateholders.

(c)      Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall, if such Holder shall have so requested at least five Business Days prior to the related Record Date, be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or in all other cases or if no such instructions have been delivered to the Indenture Trustee, by check to such Noteholder mailed to such Holder's address as it appears in the Note Register in the amount required to be distributed to such Holder on such Payment Date pursuant to such Holder's Notes; *provided*, *however*, that the Indenture Trustee shall not pay to such Holders any amount required to be withheld from a payment to such Holder by the Code.

(d)      The principal of each Note shall be due and payable in full on the Final Scheduled Payment Date for such Note as provided in the forms of Note set forth in Exhibits A-1, A-2, A-3 and A-4 to this Indenture.  All principal payments on the Notes shall be made to the Noteholders entitled thereto in accordance with the Percentage Interests represented by such Notes.  Upon notice (such notice to include the Final Scheduled Payment Date) to the Indenture Trustee by the Issuer, the Indenture Trustee shall notify the Person in whose name a Note is registered at the close of business on the Record Date preceding the Final Scheduled Payment Date or other final Payment Date (including any final Payment Date resulting from any redemption pursuant to Section 8.07 hereof).  Such notice shall to the extent practicable be mailed no later than five Business Days prior to such Final Scheduled Payment Date or other final Payment Date and shall specify that payment of the principal amount and any interest due with respect to such Note at

the Final Scheduled Payment Date or other final Payment Date will be payable only upon presentation and surrender of such Note and shall specify the place where such Note may be presented and surrendered for such final payment.  No interest shall accrue on the Notes on or after the Final Scheduled Payment Date or any such other final Payment Date.

Section 3.11    Protection of Trust Estate.

(a)    The Issuer will from time to time prepare, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)    cause the Issuer or related Servicer to enforce any of the rights to the Mortgage Loans or the HELOC Mortgage Loans, as applicable; or

(iv)    preserve and defend title to the Trust Estate and the rights of the Indenture Trustee, the Insurer and the Noteholders in such Trust Estate against the claims of all persons and parties.

(b)    Except as otherwise provided in this Indenture, the Indenture Trustee shall not remove any portion of the Trust Estate that consists of money or is evidenced by an instrument, certificate or other writing from the jurisdiction in which it was held at the date of the most recent Opinion of Counsel delivered pursuant to Section 3.11 hereof (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered on the Closing Date pursuant to Section 3.11(a) hereof, if no Opinion of Counsel has yet been delivered pursuant to Section 3.11(b) hereof), unless the Indenture Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to sign any financing statement, continuation statement or other instrument required to be signed pursuant to this Section 3.11 upon the Issuer's preparation thereof and delivery to the Indenture Trustee.

Section 3.12    Opinions as to Trust Estate.

(a)    On the Closing Date, the Issuer shall furnish to the Indenture Trustee, the Insurer, the Note Insurer and the Owner Trustee an Opinion of Counsel either stating that, in the opinion of such counsel, such action has been taken with respect to the recording and filing of this Indenture, any indentures supplemental hereto, and any other requisite documents, and with respect to the execution and filing of any financing statements and continuation statements, as

46

are necessary to perfect and make effective the lien and first priority security interest in the Collateral and reciting the details of such action, or stating that, in the opinion of such counsel, no such action is necessary to make such lien and first priority security interest effective.

(b)    On or before April 15 in each calendar year, beginning in 2006, the Issuer shall furnish to the Note Insurer, the Indenture Trustee and the Insurer an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is necessary to maintain the lien and first priority security interest in the Collateral and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest.  Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the lien and security interest in the Collateral until December 31 in the following calendar year.

Section 3.13    Performance of Obligations.

(a)    The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)    The Issuer, with the consent of the Insurer so long as no Insurer Default exists, may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.

(c)    The Issuer will not take any action or permit any action to be taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans and HELOC Mortgage Loans or under any instrument included in the Trust Estate, or which would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Mortgage Loans and HELOC Mortgage Loans or any such instrument, except such actions as the related Servicer is expressly permitted to take in the related Servicing Agreement.  The Indenture Trustee, as pledgee of the Mortgage Loans and HELOC Mortgage Loans, may, with the consent of, or at the direction of, the Insurer, so long as no Insurer Default exists, exercise the rights of the Issuer to direct the actions of the RMBS Servicer pursuant to the RMBS Servicing Agreement and the HELOC Servicer pursuant to the HELOC Servicing Agreement.

Section 3.14    Negative Covenants.  So long as any Notes are Outstanding, the Issuer shall not:

(a)    except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the Trust Estate, unless directed to do so by the Insurer or the Indenture

Trustee, with the consent of the (i) Insurer, so long as no Insurer Default exists and (ii) Note Insurer, so long as no Note Insurer Default exists;

(b)     claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder, by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

(c)     (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (B) permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof or (C) permit the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(d)     waive or impair, or fail to assert rights under, the Mortgage Loans and HELOC Mortgage Loans, or impair or cause to be impaired the Issuer's interest in the Mortgage Loans and HELOC Mortgage Loans, the Mortgage Loan Purchase Agreement or in any Basic Document, if any such action would materially and adversely affect the interests of the Noteholders or the Insurer.

Section 3.15   Annual Statement as to Compliance.   The Issuer will deliver to the Indenture Trustee, the Note Insurer and the Insurer, by March 1 of each year commencing with the calendar year 2006, an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(a)     a review of the activities of the Issuer during the previous calendar year and of its performance under this Indenture has been made under such Authorized Officer's supervision; and

(b)     to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.16   Representations and Warranties Concerning the Mortgage Loans.   The Indenture Trustee, as pledgee of the Mortgage Loans and HELOC Mortgage Loans, shall have the benefit of the representations and warranties made by the Seller in (i) the Mortgage Loan Purchase Agreement concerning the Seller and the Initial Mortgage Loans and Initial HELOCs and (ii) any Group I, Group II-C, Group II-NC, Group III, Group IV and Group V and Group VI Subsequent Mortgage Loan Purchase Agreement concerning the Seller and the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans to the same extent as though such representations and warranties were made directly to the Indenture Trustee.  If a Responsible Officer of the Indenture Trustee has actual knowledge of any breach of any representation or

warranty made by the Seller in the Mortgage Loan Purchase Agreement, or in the applicable Group I, Group II-C, Group II-NC, Group III, Group IV, Group V Subsequent Mortgage Loan Purchase Agreement or Group VI Subsequent HELOC Mortgage Loan Purchase Agreement, the Indenture Trustee shall promptly notify the Seller, the Note Insurer and the Insurer, if applicable, of such finding and of the Seller's obligation to cure such defect or repurchase or substitute for the related Mortgage Loan or HELOC Mortgage Loan.

Section 3.17   <u>Amendments to Servicing Agreement</u>.   The Issuer covenants with the Indenture Trustee and the Insurer that it will not enter into any amendment or supplement to any Servicing Agreement without the prior written consent of the Indenture Trustee and the Insurer.

Section 3.18   <u>Servicers as Agent and Bailee of the Indenture Trustee</u>.   Solely for purposes of perfection under Section 9-305 of the Uniform Commercial Code or other similar applicable law, rule or regulation of the state in which such property is held by the related Servicer, the Issuer and the Indenture Trustee hereby acknowledge that the related Servicer is acting as bailee of the Indenture Trustee in holding amounts on deposit in the related Collection Account and the related Protected Account, as well as its bailee in holding any Related Documents released to the related Servicer, and any other items constituting a part of the Trust Estate which from time to time come into the possession of the related Servicer.   It is intended that, by the related Servicer's acceptance of such bailee arrangement, the Indenture Trustee, as a secured party of the Mortgage Loans or HELOC Mortgage Loans, as applicable, will be deemed to have possession of such Related Documents, such monies and such other items for purposes of Section 9-305 of the Uniform Commercial Code of the state in which such property is held by the related Servicer.   The Indenture Trustee shall not be liable with respect to such documents, monies or items while in possession of the related Servicer.

Section 3.19   <u>Investment Company Act</u>.   The Issuer shall not become an "investment company" or be under the "control" of an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); *provided, however,* that the Issuer shall be in compliance with this Section 3.19 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

Section 3.20   <u>Issuer May Consolidate, etc</u>.

(a)      The Issuer shall not consolidate or merge with or into any other Person, unless the Insurer consents thereto and:

(i)      the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee and the Insurer, the due and punctual payment of the principal of and interest on all Notes, and the payment of the Premium Amount to the Insurer, the Note Insurance Policy Premium Amount to the Note

Insurer, and all amounts payable to the Indenture Trustee, the Derivative Counterparty, the Insurer, the Note Insurer, the payment to the Certificate Paying Agent of all amounts due to the Certificateholders, and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iii)     the Rating Agencies shall have notified the Issuer, the Indenture Trustee and the Insurer, with respect to the Class VI-A Notes, that such transaction shall not cause the rating of the Notes to be reduced, qualified, suspended or withdrawn or to be considered by either Rating Agency to be below investment grade without taking into account the Insurance Policy;

(iv)     the Issuer shall have received an Opinion of Counsel (and shall have delivered a copy thereof to the Securities Administrator, the Indenture Trustee and the Insurer) to the effect that such transaction will not (A) result in a "substantial modification" of the Notes under Treasury Regulation section 1.1001-3, or adversely affect the status of the Notes as indebtedness for federal income tax purposes, or (B) if 100% of the Certificates and the Retained Notes (to the extent that such Retained Notes have not received a "will be debt" opinion) are not owned by American Home Mortgage Acceptance Inc., cause the Trust to be subject to an entity level tax for federal income tax purposes;

(v)     any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken;

(vi)     the Issuer shall have delivered to the Indenture Trustee and the Insurer an Officer's Certificate and an Opinion of Counsel each stating that such consolidation or merger and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for or relating to such transaction have been complied with (including any filing required by the Exchange Act), and that such supplemental indenture is enforceable; and

(vii)     the Insurer, so long as no Insurer Default exists, shall have given its prior consent.

(b)     The Issuer shall not convey or transfer any of its properties or assets, including those included in the Trust Estate, to any Person, unless:

(i)     the Person that acquires by conveyance or transfer the properties and assets of the Issuer, the conveyance or transfer of which is hereby restricted, shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state thereof, (B) expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee and the Insurer, in form satisfactory to the Indenture Trustee and, the due and punctual payment of the

principal of and interest on all Notes and the payment of the Premium Amount, Note Insurance Premium Amount and all other amounts payable to the Derivative Counterparty, the Insurer and the Note Insurer and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agree by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of the Holders of the Notes and the Insurer, (D) unless otherwise provided in such supplemental indenture, expressly agree to indemnify, defend and hold harmless the Securities Administrator, the Indenture Trustee, the Note Insurer and the Insurer against and from any loss, liability or expense arising under or related to this Indenture and the Notes and (E) expressly agree by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

(ii)      immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iii)      the Rating Agencies shall have notified the Issuer, the Indenture Trustee, the Note Insurer and the Insurer that such transaction shall not cause the rating of the Notes to be reduced, qualified, suspended or withdrawn (without taking either the Insurance Policy or Note Insurance Policy into account);

(iv)      the Issuer and the Insurer shall have received an Opinion of Counsel (and shall have delivered a copy thereof to the Securities Administrator, the Indenture Trustee and the Insurer) to the effect that such transaction will not (A) result in a "substantial modification" of the Notes under Treasury Regulation section 1.1001-3, or adversely affect the status of the Notes as indebtedness for federal income tax purposes, or (B) if 100% of the Certificates and the Retained Notes (to the extent that such Retained Notes have not received a "will be debt" opinion) are not owned by American Home Mortgage Acceptance Inc., cause the Trust to be subject to an entity level tax for federal income tax purposes;

(v)      any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken;

(vi)      the Issuer shall have delivered to the Indenture Trustee, the Note Insurer and the Insurer an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act); and

(vii)      the Insurer, so long as no Insurer Default exists, shall have given its prior written consent.

Section 3.21      Successor or Transferee.

(a)     Upon any consolidation or merger of the Issuer in accordance with Section 3.20(a), the Person formed by or surviving such consolidation or merger (if other than the Issuer) shall, following the Issuer's satisfaction of all of the conditions precedent set forth therein with respect thereto, succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein.

(b)     Upon a conveyance or transfer of all the assets and properties of the Issuer pursuant to Section 3.20(b), the Issuer, following its satisfaction of all of the conditions precedent set forth herein with respect thereto, will be released from every covenant and agreement of this Indenture to be observed or performed on the part of the Issuer with respect to the Notes immediately upon the delivery of written notice to the Indenture Trustee, the Note Insurer and the Insurer of such conveyance or transfer and approval of such transaction given by the Insurer and the Note Insurer to the Indenture Trustee.

Section 3.22   No Other Business.  The Issuer shall not engage in any business other than as set forth with respect thereto in the Trust Agreement and other than financing, purchasing, owning and selling and managing the Mortgage Loans and HELOC Mortgage Loans and the issuance of the Notes and Certificates in the manner contemplated by this Indenture and the Basic Documents and all activities incidental thereto.

Section 3.23   No Borrowing.  The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Notes under this Indenture.

Section 3.24   Guarantees, Loans, Monthly Advances and Other Liabilities.  Except as contemplated by this Indenture or the Basic Documents, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.25   Capital Expenditures.  The Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

Section 3.26   Determination of Note Interest Rate.  On each Interest Determination Date the Securities Administrator shall determine One-Month LIBOR and Six-Month LIBOR and the related Note Interest Rate for each Class of related Notes for the following Accrual Period and shall make such information available pursuant to Section 7.05 hereof to the Indenture Trustee, the Issuer, the related Servicer, the Insurer and the Depositor.  The establishment of One-Month LIBOR and Six-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator's calculation of the rate of interest applicable to each Class of applicable Notes for the related Accrual Period shall (in the absence of manifest error) be final and binding.

Section 3.27   <u>Restricted Payments</u>.  The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; *provided, however,* that the Issuer may make, or cause to be made, (x) distributions and payments to the Securities Administrator, the Owner Trustee, the Indenture Trustee, the Certificate Registrar, the Certificate Paying Agent, the Noteholders, the Certificateholders and the Insurer as contemplated by, and to the extent funds are available for such purpose under this Indenture and the Trust Agreement and (y) payments to the Servicers, the RMBS Master Servicer and the Subservicers pursuant to the terms of the related Servicing Agreement, RMBS Master Servicing Agreement or Subservicing Agreement.  The Issuer will not, directly or indirectly, make payments to or distributions from the Collection Account except in accordance with this Indenture and the Basic Documents.

Section 3.28   <u>Notice of Events of Default</u>.  The Issuer shall give the Indenture Trustee, the Note Insurer, the Insurer and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust Agreement.

Section 3.29   <u>Further Instruments and Acts</u>.  Upon request of the Indenture Trustee, the Note Insurer or the Insurer, the Issuer will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

Section 3.30   <u>Statements to Noteholders</u>.   On each Payment Date, the Securities Administrator shall make available on the Securities Administrator's website, www.ctslink.com (or deliver at the recipient's option), to the Note Insurer, the Insurer, each Noteholder and Certificateholder the statement prepared by the Securities Administrator pursuant to and in the manner provided for in Section 7.05 hereof.

Section 3.31   <u>Interest Coverage Accounts</u>.

(a)    No later than the Closing Date, the Indenture Trustee shall establish and maintain seven segregated trust accounts each of which is an Eligible Account, shall be titled "Group I Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group I Interest Coverage Account"), "Group II-C Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group II-C Interest Coverage Account"), "Group II-NC Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group II-NC Interest Coverage Account"), "Group III Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group III Interest Coverage Account"), "Group IV Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the

"Group IV Interest Coverage Account"); "Group V Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group V Interest Coverage Account"); and "Group VI Interest Coverage Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group VI Interest Coverage Account"), respectively.   The Indenture Trustee shall, promptly upon receipt, deposit in the related Interest Coverage Account and retain therein the related Interest Coverage Amount remitted on the Closing Date to the Indenture Trustee by the Depositor.  Funds deposited in the related  Interest Coverage Account shall be held in trust by the Indenture Trustee for the benefit of the related Noteholders and the Insurer for the uses and purposes set forth herein.

(b)     For federal income tax purposes, the Seller shall be the owner of the Interest Coverage Accounts and shall report all items of income, deduction, gain or loss arising therefrom.   All income and gain realized from investment of funds deposited in the related Interest Coverage Account, which investment shall be made solely upon the written direction of the Seller in Permitted Investments, shall be for the sole and exclusive benefit of the related Seller and shall be remitted by the Indenture Trustee to the Seller at the end of the Funding Period.  The Seller shall deposit in the related Interest Coverage Account the amount of any net loss incurred in respect of any such Permitted Investment immediately upon realization of such loss.

(c)     On each Payment Date during the Funding Period and on the Payment Date immediately following the end of the Funding Period, the Indenture Trustee shall withdraw, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, from the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Interest Coverage Accounts and deposit in the Payment Account an amount equal to 30 days' interest on the excess, if any, of the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Original Pre-Funded Amount over the aggregate Principal Balance of related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans that (in each case) both (i) had a Due Date during the Due Period relating to such Payment Date and (ii) had a Subsequent Cut-off Date prior to the first day of the month in which such Payment Date occurs, at a per annum rate equal to the related weighted average Net Mortgage Rate of the related Mortgage Loans.   In addition, on the first two Payment Dates, amounts shall be withdrawn from  the Group VI Interest Coverage Account in respect to shortfalls as a result of the HELOC Mortgage Loans with Mortgage Rates that were supposed to reset in the first Due Period but did not as identified in the Mortgage Loan Schedule.  Such withdrawal and deposit shall be treated as a contribution of cash by the Seller to the Trust Fund on the date thereof. Immediately following any such withdrawal and deposit, and immediately following the conveyance of any Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans or Group VI Subsequent HELOC Mortgage Loans to the Trust on any related Subsequent Transfer Date, the Indenture Trustee, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, shall withdraw from the related Interest Coverage Account and remit to the Seller or its designee an amount equal to the excess, if any, of the amount remaining in such Interest Coverage

Account over the amount that would be required to be withdrawn therefrom (assuming sufficient funds therein) pursuant to the preceding sentence on each subsequent Payment Date, if any, that will occur during the Funding Period or that will be the Payment Date immediately following the end of the Funding Period, if no related Group I Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans or Group VI Subsequent HELOC Mortgage Loans were acquired by the Trust Fund after the end of the Prepayment Period relating to the current Payment Date.

(d)     Upon the earliest of (i) the Payment Date immediately following the end of the Funding Period, (ii) the reduction of the Note Principal Balances of the Notes to zero or (iii) the termination of this Agreement in accordance with Section 8.04, any amount remaining on deposit in the related Interest Coverage Account after distributions pursuant to paragraph (c) above shall be withdrawn by the Indenture Trustee and paid to the Seller or its designee.

(e)     In addition, the Indenture Trustee shall withdraw $30,104.27, $41,527.06, $50,212.88, $173,189.57, $56,422.97, $165,077.23 and $405,126.04 from the Interest Coverage Account on the first Payment Date to be included in the Related Available Funds or Interest Collections, as applicable, with respect to the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Loans, respectively.

Section 3.32   The Pre-Funding Accounts.   (a) No later than the Closing Date, the Indenture Trustee shall establish and maintain six segregated trust accounts each of which is an Eligible Account, which shall be titled "Group I Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group I Pre-Funding Account"); "Group II-C Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group II-C Pre-Funding Account");  "Group II-NC Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group II-NC Pre-Funding Account"); "Group III Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group III Pre-Funding Account"); "Group IV Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group IV Pre-Funding Account"); "Group V Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group V Pre-Funding Account"); and "Group VI Pre-Funding Account, Deutsche Bank National Trust Company, as indenture trustee for the registered holders of American Home Mortgage Investment Trust Series 2005-2" (the "Group VI Pre-Funding Account"), respectively.   The Indenture Trustee shall, promptly upon receipt, deposit in the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Accounts and retain therein the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Original Pre-Funded Amount, respectively, remitted on the Closing Date to the Indenture Trustee by the Depositor.  Funds deposited in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account shall be held in trust by the Indenture Trustee for the benefit of the related

55

Noteholders, the Note Insurer, with respect to the Class V-A-4-D Notes, and the Insurer, with respect to the Class VI-A Notes, for the uses and purposes set forth herein.

(b)    The Indenture Trustee will invest funds deposited in the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account, as directed by the Seller in writing, in Eligible Investments with a maturity date (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Indenture, if a Person other than the Indenture Trustee or an Affiliate manages or advises such investment, (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Indenture, if the Indenture Trustee or an Affiliate manages or advises such investment or (iii) within one (1) Business Day of the Indenture Trustee's receipt thereof.   For federal income tax purposes, the Seller shall be the owner of the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account and shall report all items of income, deduction, gain or loss arising therefrom.   All income and gain realized from investment of funds deposited in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account shall be included in the related Available Funds at the following times: (i) on the Business Day immediately preceding each Payment Date, if a Person other than the Indenture Trustee or an Affiliate of the Indenture Trustee manages or advises such investment, or on each Payment Date, if the Indenture Trustee or an Affiliate of the Indenture Trustee manages or advises such investment, (ii) on the Business Day immediately preceding the related Subsequent Transfer Date, if a Person other than the Indenture Trustee or an Affiliate of the Indenture Trustee manages or advises such investment, or on the related Subsequent Transfer Date, if the Indenture Trustee or an Affiliate of the Indenture Trustee manages or advises such investment or (iii) within one (1) Business Day of the Indenture Trustee's receipt thereof.   The Seller shall deposit in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account the amount of any net loss incurred in respect of any such Eligible Investment immediately upon realization of such loss without any right of reimbursement therefor.

(c)    Amounts on deposit in the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account shall be withdrawn by the Indenture Trustee as follows:

(i)    On the related Subsequent Transfer Date, the Indenture Trustee shall withdraw from the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account an amount equal to 100% of the aggregate Stated Principal Balances of the related Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans transferred and assigned to the Indenture Trustee for deposit in the Mortgage Pool on the related Subsequent Transfer Date and pay such amount to or upon the order of the Issuer upon satisfaction of the conditions set forth in Sections 2.05, 2.06, 2.07, 2.08, 2.09, 2.10 or 2.11, as applicable, with respect to such transfer and assignment;

(ii)    If the amount on deposit in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account has not been reduced to zero during the Funding Period, on the day immediately following the termination of the

56

Funding Period, the Indenture Trustee shall deposit into the Payment Account any amounts remaining in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account for distribution in accordance with the terms hereof;

(iii)    To withdraw any amount not required to be deposited in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account or deposited therein in error; and

(iv)    To clear and terminate the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account upon the earlier to occur of (A) the Payment Date immediately following the end of the Funding Period and (B) the termination of this Indenture, with any amounts remaining on deposit therein being paid to the Holders of the Notes then entitled to distributions in respect of principal.

Section 3.33    Grant of the Subsequent Mortgage Loans and Subsequent HELOC Mortgage Loans.  In consideration of the delivery on the related Subsequent Transfer Date to or upon the order of the Issuer of all or a portion of the amount on deposit in the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account, the Depositor shall, to the extent of the availability thereof, on the related Subsequent Transfer Date during the Funding Period, grant to the Indenture Trustee all of its rights, title and interest in the related Group I, Group II-C, Group II-NC, Group III, Group IV or Group V Mortgage Loans or Group VI Subsequent HELOC Mortgage Loans and simultaneously with the Grant of the related Group I, Group II-C, Group II-NC, Group III, Group IV or Group V Mortgage Loans or Group VI Subsequent HELOC Mortgage Loans, the Depositor will cause the related Mortgage File to be delivered to the Indenture Trustee.

Section 3.34    Replacement Derivative Contracts.  In the event of an Event of Default or Termination Event (each, as defined in the related Derivative Contract) with respect to a Derivative Counterparty under a Derivative Contract (a "Derivative Contract Default"), the Issuer, at its expense, may, but shall not be required to, substitute a new derivative contract or any other form of similar coverage for basis risk shortfalls for such Derivative Contract; *provided*, *however*, that the timing and mechanism for receiving payments under such new derivative contract shall be reasonably acceptable to the Indenture Trustee.  It shall be a condition to substitution of any new derivative contract that there be delivered to the Indenture Trustee an Opinion of Counsel to the effect that such substitution would not (a) result in a "substantial modification" of the Notes under Treasury Regulation section 1.1001-3, or adversely affect the status of the Notes as indebtedness for federal income tax purposes, or (b) if 100% of the Certificates and the Retained Notes (to the extent that such Retained Notes have not received a "will be debt" opinion) are not owned by American Home Mortgage Acceptance Inc., cause the Trust to be subject to entity level tax for federal income tax purposes.

Section 3.35    Payments Under the Insurance Policy.  (a) (1) By 12:00 noon (New York Time) on the later of (i) the second Business Day following the Business Day on which the Insurer shall have received Notice (as defined in the Insurance Policy) that a Deficiency Amount is due in respect of the Class VI-A Notes and (ii) the Payment Date on which the related Deficiency Amount is payable to the Noteholders and (2)  at such time as the Indenture Trustee

shall deliver an acceleration notice to the Noteholders pursuant to Section 5.02, the Securities Administrator on behalf of the Class VI-A Noteholders, shall make a draw on the Insurance Policy in an amount, if any, equal to the Deficiency Amount.

(b)      If the Securities Administrator determines that a Deficiency Amount will exist for the following Payment Date, then the Securities Administrator shall submit a Notice (as defined in the Insurance Policy) for payment in the amount of the Deficiency Amount to the Insurer no later than 12:00 Noon, New York City time, on the second Business Day prior to the applicable Payment Date.  Upon receipt of such Deficiency Amount in accordance with the terms of the Insurance Policy, the Indenture Trustee shall deposit such Deficiency Amount in the Payment Account for distribution to the Class VI-A Noteholders pursuant to Section 3.07 hereof or with respect to an acceleration pursuant to Section 5.02 hereof.

In addition, according to the terms of the Insurance Policy (in the form attached hereto as Exhibit E), a draw may be made under the Insurance Policy in respect of any Preference Amount applicable to any of the Class VI-A Noteholders (as defined in and pursuant to the terms and conditions of the such Insurance Policy) and the Securities Administrator shall submit a Notice (as defined in such Insurance Policy) for payment with respect thereto together with the other documents required to be delivered to the Insurer pursuant to the Insurance Policy in connection with a draw in respect of any Preference Amount.

(c)      Upon its receipt of a Final Order (as defined in the Insurance Policy), the Indenture Trustee shall notify the Securities Administrator when a draw on the Insurance Policy is required to be made with respect to any Preference Amount and the Indenture Trustee shall furnish to the Securities Administrator, at the Issuer's expense, any documents, prepared for and received by the Indenture Trustee (provided, however, that any such documents shall not be prepared by the Securities Administrator) required to be delivered under the Insurance Policy (other than the Notice) for payment with respect to such Preference Amount.  The Indenture Trustee also shall furnish to the Securities Administrator the wire transfer instructions to be included in any Notice.

Section 3.36    Suspension of Rights During Insurer Default.  Upon the occurrence and continuation of an Insurer Default, any right of the Insurer to take or cause another Person to take any action relating to control or voting rights, or to give any consent, approval or waiver under this Indenture, shall be suspended (except as otherwise specifically provided herein) until such time as such Insurer Default shall have been cured or waived or otherwise ceased to continue.

Section 3.37    Certain Representations Regarding the Trust Estate.

(a)      With respect to that portion of the Collateral described in clauses (a) through (j) of the Granting Clause, the Issuer represents to the Indenture Trustee that:

(i)      This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Collateral in favor of the Indenture Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

58

(ii)    The Collateral constitutes "deposit accounts" or "instruments," as applicable, within the meaning of the applicable UCC.

(iii)    The Issuer owns and has good and marketable title to the Collateral, free and clear of any lien, claim or encumbrance of any Person.

(iv)    The Issuer has taken all steps necessary to cause the Indenture Trustee to become the account holder of the Collateral.

(v)    Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.

(vi)    The Collateral is not in the name of any Person other than the Issuer or the Indenture Trustee.  The Issuer has not consented to the bank maintaining the Collateral to comply with instructions of any Person other than the Indenture Trustee.

(b)    With respect to that portion of the Collateral described in clauses (i) and (j) of the Granting Clause, the Issuer represents to the Indenture Trustee that:

(i)    This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Collateral in favor of the Indenture Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Issuer.

(ii)    The Collateral constitutes "general intangibles" within the meaning of the applicable UCC.

(iii)    The Issuer owns and has good and marketable title to the Collateral, free and clear of any lien, claim or encumbrance of any Person.

(iv)    Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Collateral.

(c)    With respect to any Collateral in which a security interest may be perfected by filing, the Issuer has not authorized the filing of, and is not aware of any financing statements against, the Issuer, that include a description of collateral covering such Collateral, other than any financing statement relating to the security interest granted to the Indenture Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment or tax lien filings against the Issuer.

(d)    The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in all Collateral granted to the Indenture Trustee hereunder in which a security interest may be perfected by filing.  Any financing statement that is filed in connection with this Section 3.37 shall contain a statement

that a purchase or security interest in any collateral described therein will violate the rights of the secured party named in such financing statement.

(e)    The foregoing representations may not be waived and shall survive the issuance of the Notes.

Section 3.38    <u>Allocation of Realized Losses</u>.

(a)    Any Realized Losses on the Group I Loans, Group II Loans, Group III Loans and Group IV Loans will be allocated or covered on any Payment Date, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, as follows: *first*, to the related Net Monthly Excess Cashflow, by an increase in the related Overcollateralization Increase Amount for that Payment Date as provided in Section 3.05 of this Indenture; *second*, in reduction of the Overcollateralized Amount until reduced to zero (meaning, no losses will be allocated to the Class M Notes and Class B Notes until the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes equals the aggregate Stated Principal Balance of the Group I Loans, Group II Loans, Group III Loans and Group IV Loans; *third*, to the Class B Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *fourth*, Class M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *fifth*, to the Class M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *sixth*, to the Class M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *seventh*, to the Class M-2 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *eighth*, to the Class M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; and *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group I Loans, to the Class I-A-2 Notes and Class I-A-3 Notes, in that order, in reduction of the Note Principal Balance thereof and (ii) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group IV, to the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-2 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes, in reduction of the Note Principal Balance thereof, until reduced to zero.

(b)    Any Realized Losses on the Mortgage Loans in Loan Group V will be allocated or covered on any Payment Date, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, as follows: *first*, to the related Net Monthly Excess Cashflow, by an increase in the related Overcollateralization Increase Amount for that Payment Date as provided in Section 3.06 of this Indenture; *second*, in reduction of the related Overcollateralized Amount, until reduced to zero (meaning, no losses will be allocated to the Class V-M Notes and Class V-B Notes until the aggregate Note Principal Balance of Class V-A, Class V-M and Class V-B Notes equals the aggregate Stated Principal Balance of the Group V Loans); *third*, to the Class V-B Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *fourth*, to the Class V-M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *fifth*, to the Class V-M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *sixth*, to the Class V-M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *seventh*, to the Class V-M-2 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *eighth*, to the Class V-M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; and

*ninth*, to the Class V-A-4-B Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class V-A-4-A Notes and Class V-A-4-B Notes divided by (y) the aggregate Note Principal Balance of all of the Class V-A-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero.

Section 3.39   Obligations of the Securities Administrator with respect to the Derivative Contracts.

(a)   At least three (3) Business Days prior to each Floating Rate Payer Payment Date, the Securities Administrator shall make available to the Calculation Agent, on the Securities Administrator's secure internet website, a statement containing the amount specified in clause (b) of the definition of Floating Amount for the related Floating Rate Payer Payment Date.

(b)   For purposes of this Section 3.39, any capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Derivative Contracts.

Section 3.40   Reserve Fund.  The Indenture Trustee hereby acknowledges its obligations under Section 6.01 of the RMBS Servicing Agreement and Section 6.01 of the HELOC Servicing Agreement with respect to the Reserve Fund (as defined in the RMBS Servicing Agreement and HELOC Servicing Agreement) and the Indenture Trustee agrees to hold such Reserve Fund (as defined in the RMBS Servicing Agreement and HELOC Servicing Agreement) in trust for the benefit of the RMBS Master Servicer, the HELOC Back-Up Servicer and the Indenture Trustee and, upon the RMBS Master Servicer's or the HELOC Back-Up Servicer's request, as applicable, to promptly pay to the RMBS Master Servicer and the HELOC Back-Up Servicer any amounts to be reimbursed or paid from the Reserve Fund (as defined in the RMBS Servicing Agreement and HELOC Servicing Agreement) pursuant to the RMBS Servicing Agreement and the HELOC Servicing Agreement.

Amounts on deposit in the Reserve Fund will be invested by the Indenture Trustee in Eligible Investments at the direction of the Seller, and investment income thereon will be for the benefit of the Seller. The Indenture Trustee shall notify the Seller of the amount of any losses incurred with respect to any such investments.  The amount of any such losses shall be deposited in the Reserve Account by the Seller out of its own funds immediately as realized.  On each Payment Date, the Indenture Trustee will withdraw from the Reserve Fund any investment income on amounts on deposit in the Reserve Fund and make payment to the Seller.

The Trustee or its affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the investments, (ii) using affiliates to effect transactions in certain investments and (iii) effecting transactions in certain investments.  Such compensation is not payable or reimbursable under this Agreement.  The Trustee shall have no obligation to invest or reinvest any funds held in the Reserve Fund in the absence of timely written direction and shall not be liable for the selection of investments or for investment losses incurred thereon.

On each Payment Date, the Indenture Trustee will withdraw from the Reserve Fund any investment income on amounts on deposit in the Reserve Fund and make payment to the Seller

in accordance with Section 6.01 of the RMBS Servicing Agreement and Section 6.01 of the HELOC Servicing Agreement.

Section 3.41   <u>Class N Reserve Fund:</u>  On the Closing Date, the Indenture Trustee will establish the Class N Reserve Fund) for the benefit of the Class N Notes.  On the Closing Date there will be no amounts on deposit in the Class N Reserve Fund.  Amounts on deposit in the Reserve Fund will be invested at the written direction of the Seller (which may be standing instructions), and investment income thereon will be retained in the Reserve Fund for distribution as described below.

On each Payment Date, to the extent that amounts on deposit in the Class N Reserve Fund after required payments of interest to the Class N Notes on such date exceed the Required Reserve Fund Balance for such Payment Date, such amounts will be deposited into the Payment Account established by the Indenture Trustee pursuant to the Indenture in accordance with the statement from the Securities Administrator.  On each Payment Date, the Indenture Trustee will (if necessary) withdraw funds from the Class N Reserve Fund and make payments in the following order of priority, in accordance with the statement from the Securities Administrator: *first*, to the Class N-1 Notes, to the extent of any unpaid Accrued Note Interest, and *second*, to the Class N-2 Notes, to the extent of any unpaid Accrued Note Interest.  Any amounts remaining in the Class N Reserve Fund after the Note Principal Balances of the Class N-1 Notes and Class N-2 Notes have been reduced to zero shall be paid to the holder of the Owner Trust Certificates.

## ARTICLE IV

## THE NOTES; SATISFACTION AND DISCHARGE OF INDENTURE

Section 4.01    The Notes.  Each Class of Offered Notes shall be registered in the name of a nominee designated by the Depository.  With respect to the Offered Notes (other than the Class VI-A Notes), Beneficial Owners will hold interests in such Notes through the book-entry facilities of the Depository in minimum initial Note Principal Balances of $25,000 and integral multiples of $1 in excess thereof.  With respect to the Class VI-A Notes, Class Beneficial Owners will hold interests in such Notes through the book-entry facilities of the Depository in minimum initial Note Principal Balances of $25,000 and integral multiples of $1,000 in excess thereof.  The Non-Offered Notes will be issued in fully registered definitive physical form in minimum dollar denominations of $25,000 and integral multiples of $1 in excess thereof.

The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Offered Notes for the purposes of exercising the rights of Holders of the Notes hereunder.  Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Offered Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants.  Except as provided in Section 4.08 hereof, Beneficial Owners shall not be entitled to definitive certificates for the Offered Notes as to which they are the Beneficial Owners.  Requests and directions from, and votes of, the Depository as Holder of the Offered Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners.  The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date.  Without the consent of the Issuer and the Indenture Trustee, no Offered Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee with the approval of the Issuer may appoint a successor Depository.  If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Offered Notes it beneficially owns in the manner prescribed in Section 4.08.

The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee, authenticated by the Indenture Trustee and delivered by the Indenture Trustee to or upon an Issuer Request.

Section 4.02    Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Note Registrar and Certificate Registrar.

(a)    The Issuer shall cause to be kept at the Corporate Trust Office of the Note Registrar a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein provided.

Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the office designated by the Indenture Trustee, the Issuer shall execute and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Note Principal Balances evidencing the same Class and aggregate Percentage Interests.

Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other Notes of like tenor and in authorized initial Note Principal Balances evidencing the same Class and aggregate Percentage Interests upon surrender of the Notes to be exchanged at the office designated by the Note Registrar. Whenever any Notes are so surrendered for exchange, the Issuer shall execute and the Indenture Trustee shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to receive. Each Note presented or surrendered for registration of transfer or exchange shall (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Note Registrar duly executed by the Holder thereof or his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company located or having a correspondent located in the city of New York. Notes delivered upon any such transfer or exchange will evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes surrendered.

No service charge shall be made for any registration of transfer or exchange of Notes, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

The Issuer hereby appoints the Indenture Trustee as (i) Certificate Registrar to keep at its Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust Agreement and (ii) Note Registrar under this Indenture. The Indenture Trustee hereby accepts such appointments.

(b)    No Person shall become a Non-Offered Noteholder until it shall establish its non-foreign status by submitting to the Paying Agent an IRS Form W-9 and the Certificate of Non-Foreign Status set forth in Exhibit L hereto.

No transfer, sale, pledge or other disposition of a Non-Offered Note shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act and any applicable state securities laws or is made in accordance with said Act and laws. In the event of any such transfer, the Note Registrar or the Depositor shall prior to such transfer require the transferee to execute (A) either (i) (a) an investment letter in substantially the form attached hereto as Exhibit K (or in such form and substance reasonably satisfactory to the Note Registrar and the Depositor) which investment letter shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and which investment letter states that, among other things, such transferee (1) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under

64

Rule 144A, and (2) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A or (ii) (a) a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Note Registrar and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and (b) either (1) the transferee executes a representation letter, substantially in the form of Exhibit M hereto, and the transferor executes a representation letter, substantially in the form of Exhibit N hereto, each acceptable to and in form and substance satisfactory to the Note Registrar certifying the facts surrounding such transfer, which representation letters shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor or (2) an Opinion of Counsel has been rendered by nationally recognized tax counsel stating that such Notes will be treated as debt for federal income tax purposes and (B) the Certificate of Non-Foreign Status (in substantially the form attached hereto as Exhibit L) acceptable to and in form and substance reasonably satisfactory to the Note Registrar, which certificate shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor. The Holder of a Non-Offered Note desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Indenture Trustee, the Paying Agent, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No person shall become a Non-Offered Noteholder, so long as any Notes are Outstanding, until it shall establish its status as a real estate investment trust ("REIT") or as a "qualified REIT subsidiary" ("QRS") within the meaning of Section 856(a) or Section 856(i) of the Code, respectively, by submitting to the Note Registrar and the Transferee Certificate set forth in Exhibit P hereto.

No offer, sale, transfer, pledge, hypothecation or other disposition (including any pledge, sale or transfer under a repurchase transaction or securities loan) of any Non-Offered Note shall be made to any transferee unless, prior to such disposition, the proposed transferor delivers to the Note Registrar (i) an Opinion of Counsel, rendered by a law firm generally recognized to be qualified to opine concerning the tax aspects of asset securitization, to the effect that such transfer (including any disposition permitted following any default under any pledge or repurchase transaction) will not cause the Trust to be no longer be treated for federal income tax purposes as a "qualified REIT subsidiary" within the meaning of Section 856(i) of the Code and (ii) a certificate that stating that any Non-Offered Notes may be transferred by the related lender under any such related loan agreement or repurchase agreement upon a default under any such indebtedness, in which case the transferor shall deliver to the Note Registrar and the Indenture Trustee substantially in the form attached hereto as Exhibit Q certifying to such effect.

Notwithstanding the foregoing, the provisions of this paragraph shall not apply to the initial transfer of the Non-Offered Notes to the Depositor.

No offer, sale, transfer or other disposition (including pledge) of any Non-Offered Note shall be made to any affiliate of the Depositor or the Issuer, other than the initial transfer of the Non-Offered Notes to the Depositor.

With respect to the restriction on transfer of the Notes contained in this Section 4.02 and in Section 4.15, any transferor providing an Opinion of Counsel shall (i) deliver such opinion to the appropriate addressees, (ii) confirm the acceptability of such opinion with the applicable addressees and (iii) inform the Note Registrar of delivery and confirmation described in clause (i) and clause (ii).

Section 4.03    Mutilated, Destroyed, Lost or Stolen Notes.  If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be required by it to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, and provided that the requirements of Section 8-405 of the UCC are met, the Issuer shall execute, and upon Issuer Request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note; *provided*, *however*, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, instead of issuing a replacement Note, the Issuer may pay such destroyed, lost or stolen Note when so due or payable without surrender thereof.  If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 4.03, the Issuer may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

Every replacement Note issued pursuant to this Section 4.03 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 4.03 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 4.04   Persons Deemed Owners.   Prior to due presentment for registration of transfer of any Note, the Issuer, the Indenture Trustee, the Paying Agent and any agent of the Issuer, the Insurer or the Indenture Trustee or the Paying Agent may treat the Person in whose name any Note is registered (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and neither the Issuer, the Insurer, the Indenture Trustee, the Paying Agent nor any agent of the Issuer, the Insurer or the Indenture Trustee or the Paying Agent shall be affected by notice to the contrary.

Section 4.05   Cancellation.   All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee.   The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Indenture Trustee.   No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 4.05, except as expressly permitted by this Indenture.   All cancelled Notes may be held or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Request that they be destroyed or returned to it; *provided*, *however*, that such Issuer Request is timely and the Notes have not been previously disposed of by the Indenture Trustee.

Section 4.06   Book-Entry Notes.   The Offered Notes, upon original issuance, will be issued in the form of typewritten Notes representing the Book-Entry Notes, to be delivered to The Depository Trust Company, the initial Depository, or its designated custodian, by, or on behalf of, the Issuer.   The Offered Notes shall initially be registered on the Note Register in the name of Cede & Co., the nominee of the initial Depository, and no Beneficial Owner will receive a Definitive Note representing such Beneficial Owner's interest in such Note, except as provided in Section 4.08.   With respect to such Notes, unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to Section 4.08:

(i)      the provisions of this Section 4.06 shall be in full force and effect;

(ii)     the Note Registrar, the Paying Agent and the Indenture Trustee shall be entitled to deal with the Depository for all purposes of this Indenture (including the payment of principal of and interest on the Notes and the giving of instructions or directions hereunder) as the sole Holder of the Notes, and shall have no obligation to the Beneficial Owners of the Notes;

(iii)    to the extent that the provisions of this Section 4.06 conflict with any other provisions of this Indenture, the provisions of this Section 4.06 shall control;

(iv)    the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those established by law and agreements between such Owners of Notes and the Depository and/or the Depository Participants.  Unless and until Definitive Notes are issued pursuant to Section 4.08, the initial Depository will make book-entry transfers among the Depository Participants and receive and transmit payments of principal of and interest on the Notes to such Depository Participants; and

(v)    whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Holders of Notes evidencing a specified percentage of the Note Principal Balances of the Notes, the Depository shall be deemed to represent such percentage with respect to the Notes only to the extent that it has received instructions to such effect from Beneficial Owners and/or Depository Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

Section 4.07   Notices to Depository.  Whenever a notice or other communication to the Noteholders is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications specified herein to be given to Holders of the Offered Notes to the Depository, and shall have no obligation to the Beneficial Owners.

Section 4.08   Definitive Notes.  If (i) the Depositor advises the Indenture Trustee or the Note Registrar in writing that the Depository is no longer willing or able to properly discharge its responsibilities as clearing agency with respect to the Offered Notes and the Depositor is unable to locate a qualified successor within 30 days, (ii) the Depositor, at its option (with the consent of the Indenture Trustee, which consent shall not by unreasonably withheld), elects to terminate the book-entry system through the Depository or (iii) after the occurrence of an Event of Default, any Note Owner materially and adversely affected thereby may, at its option, request and receive a Definitive Note evidencing such Note Owner's Percentage Interest in the related Class of Offered Notes.  Upon surrender to the Indenture Trustee of the global Offered Note or definitive typewritten Notes representing the Book-Entry Notes by the Depository, accompanied by registration instructions, the Note Registrar will re-issue the Book-Entry Notes as Definitive Notes issued in the respective Note Principal Balances owned by individual Note Owners.  None of the Issuer, the Note Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.  Upon the issuance of Definitive Notes, the Indenture Trustee shall recognize the Holders of the Definitive Notes as Noteholders.

Section 4.09   Tax Treatment.  The Issuer has entered into this Indenture, and the Notes will be issued with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes (other than the Class I-A-3, Class B, Class V-M-4, Class V-M-5, Class V-B, Class N-1 and Class N-2 Notes or portions of the Class I-A-2, Class M-4, Class M-5, which at the time of issuance, American Home Mortgage Investment Corp. or one of its qualified REIT subsidiaries acquires beneficial ownership thereof) will qualify as indebtedness. The Issuer and the Indenture Trustee (in accordance with Section 6.06 hereof), by entering into this Indenture, and each Noteholder, by its acceptance of its Note (and each Beneficial Owner by

its acceptance of an interest in the applicable Book-Entry Note), agree to treat the Notes for federal, state and local income, single business and franchise tax purposes as indebtedness.

Section 4.10   <u>Satisfaction and Discharge of Indenture</u>.  This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders (and the (x) Note Insurer, as subrogee of the Class V-A-4-D Noteholders and (y) Insurer, as subrogee of the Class VI-A Noteholders) to receive payments of principal thereof and interest thereon, (iv) Sections 3.03, 3.04, 3.06, 3.09, 3.17, 3.19 and 3.20, (v) the rights and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under Section 6.07) and the obligations of the Indenture Trustee under Section 4.11 and (vi) the rights of Noteholders and the Insurer as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them, and the Indenture Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes and shall release and deliver the Collateral to or upon the Issuer Request, when

(A)   either

(1)   all Notes theretofore authenticated and delivered (other than (i) Notes that have been destroyed, lost or stolen and that have been replaced or paid as provided in Section 4.03 hereof and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 3.03) have been delivered to the Indenture Trustee for cancellation; or

(2)   all Notes not theretofore delivered to the Indenture Trustee for cancellation

a.   have become due and payable,

b.   will become due and payable at the Final Scheduled Payment Date within one year, or

c.   have been called for early redemption and the Trust has been terminated pursuant to Section 8.07 hereof,

and the Issuer, in the case of a. or b. above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes then outstanding not theretofore delivered to the Indenture Trustee for cancellation when due on the Final Scheduled Payment Date or other final Payment Date and has delivered to the Indenture Trustee and the Insurer a verification report with respect to such direct obligations or obligations guaranteed by the United States of America from a nationally recognized accounting firm certifying that the amounts deposited with the Indenture Trustee are sufficient to pay and discharge the entire indebtedness of such Notes, or, in the case of c.  above, the Issuer shall have complied with all requirements of Section 8.07 hereof,

(B)     the Issuer has paid or caused to be paid all other sums payable hereunder and under the Insurance Agreement by the Issuer as evidenced by the written consent of the Insurer; and

(C)     the Issuer has delivered to the Indenture Trustee, the Note Insurer and the Insurer an Officer's Certificate and an Opinion of Counsel, each meeting the applicable requirements of Section 10.01 hereof, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with and, if the Opinion of Counsel relates to a deposit made in connection with Section 4.10(A)(2)b. above, such opinion shall further be to the effect that such deposit will constitute an "in-substance defeasance" within the meaning of Revenue Ruling 85-42, 1985-1 C.B. 36, and in accordance therewith, the Issuer will be the owner of the assets deposited in trust for federal income tax purposes.

Section 4.11   Application of Trust Money.   All monies deposited with the Indenture Trustee pursuant to Section 4.10 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent or the Certificate Paying Agent as designee of the Issuer or the Insurer, as the Indenture Trustee may determine, to the Holders of Securities, of all sums due and to become due thereon for principal and interest or otherwise; but such monies need not be segregated from other funds except to the extent required herein or required by law.

Section 4.12   Subrogation and Cooperation.   (a) The Issuer and the Indenture Trustee acknowledge that (i) to the extent the Insurer makes payments under the Insurance Policy on account of principal of or interest on the Class VI-A Notes, the Insurer will be fully subrogated to the rights of such Holders to receive such principal and interest from the Issuer, and (ii) the Insurer shall be paid such principal and interest but only from the sources and in the manner provided herein and in the Insurance Agreement for the payment of such principal and interest.

(b)     The Indenture Trustee shall, so long as it is indemnified to its satisfaction, cooperate in all respects with any reasonable written request by the Insurer (unless a Insurer Default exists) for action to preserve or enforce the Insurer's rights or interest under this Indenture or the Insurance Agreement, consistent with this Indenture and without limiting the rights of the Noteholders as otherwise set forth in the Indenture, including, without limitation, upon the occurrence and continuance of a default under the Insurance Agreement, a request to take any one or more of the following actions:

(i)     institute Proceedings for the collection of all amounts then payable on the Class VI-A Notes, or under this Indenture in respect of the Class VI-A Notes and all amounts payable under the Insurance Agreement, enforce any judgment obtained and collect from the Issuer monies adjudged due;

(ii)     sell or cause to be sold the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private Sales (as defined in Section 5.15 (a) hereof) called and conducted in any manner permitted by law;

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

(iv)   exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Insurer hereunder;

provided, however, action shall be taken pursuant to this Section 4.12 by the Indenture Trustee to preserve the Insurer's rights or interest under this Agreement or the Insurance Agreement only to the extent such action is available to the Class VI-A Noteholders or the Insurer under other provisions of this Indenture.

Notwithstanding any provision of this Indenture to the contrary, so long as no Insurer Default exists, the Insurer shall at all times be treated as if it were the exclusive owner of all Class VI-A Notes Outstanding for the purposes of all approvals, consents, waivers and the institution of any action and the written direction of all remedies, and the Indenture Trustee shall act in accordance with the written directions of the Insurer so long as it is indemnified therefor to its reasonable satisfaction.

Section 4.13   Repayment of Monies Held by Paying Agent.   In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Person other than the Indenture Trustee under the provisions of this Indenture with respect to such Notes shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to Sections 3.05, 3.06 and 3.07 and thereupon such Person shall be released from all further liability with respect to such monies.

Section 4.14   Temporary Notes.   Pending the preparation of any Definitive Notes, the Issuer may execute and upon its written direction, the Indenture Trustee may authenticate and make available for delivery, temporary Notes that are printed, lithographed, typewritten, photocopied or otherwise produced, in any denomination, substantially of the tenor of the Definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Notes may determine, as evidenced by their execution of such Notes.

If temporary Notes are issued, the Issuer will cause Definitive Notes to be prepared without unreasonable delay.  After the preparation of the Definitive Notes, the temporary Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Notes at the office of the agent of the Indenture Trustee located at c/o DTC Transfer Agent Services, 55 Water Street, Jeanette Park Entrance, New York, New York 10041, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Notes, the Issuer shall execute and, upon Issuer Request, the Indenture Trustee shall authenticate and make available for delivery, in exchange therefor, Definitive Notes of authorized denominations and of like tenor, class and aggregate principal amount.  Until so exchanged, such temporary Notes shall in all respects be entitled to the same benefits under this Indenture as Definitive Notes.

Section 4.15   Representation Regarding ERISA.   By acquiring an Offered Note or interest therein, each Holder of such Note or Beneficial Owner of any such interest will be deemed to represent that either (1) it is not acquiring such Note with Plan Assets or (2) (A) the acquisition, holding and transfer of such Note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (B) the Offered Notes

are rated investment grade or better and such person believes that the Offered Notes are properly treated as indebtedness without substantial equity features for purposes of Department of Labor regulation 29 C.F.R. § 2510.3-101 (the "DOL Regulations"), and agrees to so treat the Notes. Alternatively, regardless of the rating of the Offered Notes, such person may provide the Indenture Trustee and the Owner Trustee with an opinion of counsel, which opinion of counsel will not be at the expense of the Issuer, the Seller, any Underwriter, the Owner Trustee, the Indenture Trustee, the related Servicer or any successor servicer which opines that the acquisition, holding and transfer of such Offered Note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Issuer, the Seller, the Depositor, any Underwriter, the Owner Trustee, the Indenture Trustee, the related Servicers, the RMBS Master Servicer or the Securities Administrator or any successor servicer to any obligation in addition to those undertaken in the Indenture.

No transfer of Non-Offered Notes or any interest therein shall be made to any Person unless the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the HELOC Back-Up Servicer, the HELOC Servicer and the RMBS Servicer are provided with an Opinion of Counsel which establishes to the satisfaction of the Note Registrar that the purchase of Non-Offered Notes, operation of the Trust and management of Trust assets are permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Owner Trustee, the Note Registrar, the Securities Administrator, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer or the Seller to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Securities Administrator, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer or the Seller. In lieu of such Opinion of Counsel, a Person acquiring such Non-Offered Notes may provide a certification in the form of Exhibit O hereto to the Depositor, the Owner Trustee and the Note Registrar, which the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Securities Administrator, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Seller may rely upon without further inquiry or investigation. Neither an Opinion of Counsel nor a certification will be required in connection with the initial transfer of any such Non-Offered Note by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall be deemed to have represented that such affiliate is not a Plan or a Person investing Plan Assets of any Plan) and the Owner Trustee and the Note Registrar shall be entitled to conclusively rely upon a representation (which, upon the request of the Owner Trustee or the Note Registrar, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.

## ARTICLE V

### DEFAULT AND REMEDIES

Section 5.01    Events of Default.  The Issuer shall deliver to the Indenture Trustee, the Note Insurer and the Insurer, within five days after learning of the occurrence of an Event of Default, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default under clause (c) or (d) of the definition of "Event of Default", its status and what action the Issuer is taking or proposes to take with respect thereto.  The Indenture Trustee shall not be deemed to have knowledge of any Event of Default unless a Responsible Officer has actual knowledge thereof or unless written notice of such Event of Default is received by a Responsible Officer and such notice references the Notes, the Trust Estate or this Indenture.

Section 5.02    Acceleration of Maturity; Rescission and Annulment.  If an Event of Default should occur and be continuing, then and in every such case the Indenture Trustee (i) with respect to the Notes, other than the Class VI-A Notes, at the written direction of the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes or (ii) with respect to the Class VI-A Notes, so long as the Insurer is not in default under the Insurance Policy, at the written direction of the Insurer or at the written direction of the Holder of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Insurer, may declare the related Notes to be immediately due and payable, by a notice in writing to the Issuer (and to the Indenture Trustee if such notice is given by Insurer or the Noteholders), and upon any such declaration the unpaid Note Principal Balance of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity with respect to an Event of Default has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, (i) with respect to the Notes, other than the Class VI-A Notes, the Holders of the Notes representing not less than a majority of the aggregate Note Principal Balance of each Class of Notes, other than the Class VI-A Notes, by written notice to the Issuer and the Indenture Trustee, or (ii) with respect to the Class VI-A Notes, the Insurer, so long as the Insurer is not in default under the Insurance Policy, or the Holder of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Insurer, by written notice to the Issuer and the Indenture Trustee,  may waive the related Event of Default and rescind and annul such declaration and its consequences if:

(a)      the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

(A)     all payments of principal of and interest on the Notes and all other amounts that would then be due hereunder or under the Notes if the Event of Default giving rise to such acceleration had not occurred;

(B)     all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; and

(C)     all amounts owed to the Insurer and the Note Insurer; and

(D)     all amounts owed to the Derivative Counterparty.

(b)     All Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in Section 5.12.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.03    Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.

(a)     The Issuer covenants that if (i) default is made in the payment of any interest on any Note when the same becomes due and payable, and such default continues for a period of five days, or (ii) default is made in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable, the Issuer shall, upon demand of the Indenture Trustee, (i) with respect to the Notes other than the Class VI-A Notes, at the written direction of the Holders of a majority of the aggregate Note Principal Balances of the Notes or (ii) with respect to the Class VI-A Notes, so long as the Insurer is not in default under the Insurance Policy, at the written direction of the Insurer or at the written direction of the Holder of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Insurer, pay to the Indenture Trustee, for the benefit of the Insurer, with respect to the Class VI-A Notes, or the Holders of Notes, the whole amount then due and payable on the related Notes for principal and interest, with interest at the applicable Note Interest Rate upon the overdue principal, and in addition thereto such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)     In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of Section 4.12 and Section 10.16 hereof, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor upon the Notes and collect in the manner provided by law out of the property of the Issuer or other obligor upon the Notes, wherever situated, the monies adjudged or decreed to be payable.

(c)     If an Event of Default occurs and is continuing, the Indenture Trustee, subject to the provisions of Section 4.12 and Section 10.16 hereof, may, as more particularly provided in Section 5.04 hereof, in its discretion, proceed to protect and enforce its rights and the rights of the Insurer and the Noteholders by such appropriate Proceedings as directed in writing by the Insurer or the Holders of a majority of the aggregate Note Principal Balances of each Class of Notes, to protect and enforce any such rights, whether for the specific enforcement of any

covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)   In case there shall be pending, relative to the Issuer or any other obligor upon the Notes or any Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Issuer or other obligor upon the Notes, or to the creditors or property of the Issuer or such other obligor, the Indenture Trustee, as directed in writing by the Insurer or the Holders of a majority of the aggregate Note Principal Balances of each Class of Notes, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)   to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad faith) and of the Noteholders allowed in such Proceedings;

(ii)   unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders and of the Indenture Trustee on their behalf, and

(iv)   to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes allowed in any judicial proceedings relative to the Issuer, its creditors and its property;

and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all

advances made, by the Indenture Trustee and each predecessor Indenture Trustee and all amounts due to the Note Insurer.

(e)     Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)     All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Holders of the Notes, subject to Section 5.05 hereof.

(g)     In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Noteholder a party to any such Proceedings.

(h)     When the Indenture Trustee incurs expenses or renders services in connection with an Event of Default specified in clause (e) of the definition thereof or any other related Proceedings the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable Federal or state bankruptcy, insolvency or other similar law.

Section 5.04   Remedies; Priorities.

(a)     If an Event of Default shall have occurred and be continuing and if an acceleration has been declared and not rescinded pursuant to Section 5.02 hereof, the Indenture Trustee, subject to the provisions of Section 10.16 hereof, may with the consent of the Insurer, and shall, (i) with respect to the Notes other than the Class VI-A Notes, at the written direction of the Holders of a majority of the aggregate Note Principal Balances of the Notes, or (ii) with respect to the Class VI-A Notes, so long as the Insurer is not in default under the Insurance Policy, at the written direction of the Insurer or the Holders of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Insurer, do one or more of the following (subject to Section 5.05 hereof):

(i)     institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Issuer and any other obligor upon such Notes monies adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes; and

(iv)    sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law;

*provided*, *however*, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following an Event of Default, unless (A) the Indenture Trustee receives the consent of the Insurer or the holders of 100% of the aggregate Note Principal Balance of the Notes then outstanding, (B) it is determined that the proceeds of such sale or liquidation distributable to the holders of the Notes are sufficient to discharge in full all amounts then due and unpaid upon such Notes for principal and interest and to reimburse the Note Insurer for any amounts drawn under the Note Insurance Policy and any other amounts due to the Note Insurer under the Note Insurance Policy or (C) it is determined that the mortgage loans and HELOCs will not continue to provide sufficient funds for the payment of principal of and interest on the applicable Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee, respecting the Class VI-A Notes, receives the consent of the Insurer or, respecting the Notes other than the Class VI-A Notes, the holders of 66 2/3% of the aggregate Note Principal Balance of the Notes then outstanding..   In determining such sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion (obtained at the expense of the Trust) of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.  Notwithstanding the foregoing, so long as an Event of Master Servicer Termination has not occurred, any Sale of the Trust Estate shall be made subject to the continued servicing of the Mortgage Loans by the related Servicer as provided in the related Servicing Agreement.

(b)    If the Indenture Trustee collects any money or property with respect to the Group I Loans, Group II Loans, Group III Loans or Group IV Loans, pursuant to this Article V, it shall pay out the money or property in the following order as determined by the Securities Administrator for each Loan Group:

FIRST: to the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer and RMBS Servicer for amounts due and not previously paid under the Basic Documents;

SECOND: to the Derivative Counterparty, any amounts due and unpaid to the Derivative Counterparty under the Derivative Contracts;

THIRD: to the related Noteholders (other than the Class N Noteholders), the amount of interest then due and unpaid on the related Notes (other than Basis Risk Shortfall Carry-Forward Amounts and Net WAC Shortfall Carry-Forward Amounts), first, to the related Class A Noteholders, the related Accrued Note Interest for such Class, plus any related Unpaid

Interest Shortfalls, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, with any amounts payable to the Class II-A Notes payable to the Class II-A-1, Class II-A-2 and Class II-A-3 Notes, pro rata, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, and second, to the Class M Noteholders and Class B Noteholders, sequentially, according to the amounts due and payable on such Notes for interest;

FOURTH: to the related Noteholders (other than the Class N Noteholders) the amount of principal then due and unpaid on the related Notes, and to each such Noteholder (other than the Class N Noteholders), pro rata, without preference or priority of any kind, until the Note Principal Balance of each such Class is reduced to zero;

FIFTH: to the Class I-A-2, Class I-A-3, Class IV-A-3, Class M and Class B Notes, in order of payment priority as set forth in Section 3.38, the amount of any related Allocated Realized Loss Amount not previously paid;

SIXTH: to the related Notes, in order of payment priority, the amount of any related Basis Risk Shortfall Carry-Forward Amounts or Net WAC Shortfall Carry-Forward Amounts, as applicable, not previously paid; and

SEVENTH: to the holders of the Class N Notes, any Accrued Note Interest for such Notes on such Payment Date;

EIGHTH: to the holders of the Class N Notes, pro rata, in reduction of the Note Principal Balances thereof, until reduced to zero; and

NINTH: to the payment of the remainder, if any, to the holders of the Trust Certificates on behalf of the Issuer.

(c)    If the Indenture Trustee collects any money or property with respect to the Group V Mortgage Loans pursuant to this Article V, it shall pay out the money or property in the following order as determined by the Securities Administrator for each Loan Group, provided, however that any amounts representing payments from the Note Insurer shall only be used to pay interest and principal to the Class V-A-4-D Noteholders pursuant to clauses FOURTH and FIFTH below:

FIRST: to the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer and RMBS Servicer for amounts due and not previously paid under the Basic Documents;

SECOND: to the Derivative Counterparty, any amounts due and unpaid to the Derivative Counterparty under the Derivative Contracts;

THIRD, to the Note Insurer, provided no Note Insurer Default exists, with respect to any Note Insurance Premium Amount then due to the extent unpaid;

FOURTH: to the related Noteholders (other than the Class N Noteholders), the amount of interest then due and unpaid on the related Notes (other than Basis Risk Shortfall

Carry-Forward Amounts and Net WAC Shortfall Carry-Forward Amounts), first, to the related Class V-A Noteholders, the related Accrued Note Interest for such Class, plus any related Unpaid Interest Shortfalls, pro rata, and second, to the Class V-M Noteholders and Class V-B Noteholders, sequentially, according to the amounts due and payable on such Notes for interest;

FIFTH: to the related Noteholders (other than the Class N Noteholders) the amount of principal then due and unpaid on the related Notes, and to each Noteholder (other than the Class N Noteholders), pro rata, without preference or priority of any kind, until the Note Principal Balance of each such Class is reduced to zero;

SIXTH: the payment of all amounts due and owing to the Note Insurer under the Note Insurance Policy (including any Note Insurance Policy Premium Amount not paid pursuant to clause THIRD above);

SEVENTH: to the Class V-A-4-B, V-M and Class V-B Notes, in order of payment priority as set forth in Section 3.38, the amount of any related Allocated Realized Loss Amount not previously paid;

EIGHTH: to the related Notes, in order of payment priority, the amount of any related  Basis Risk Shortfall Carry-Forward Amounts or Net WAC Shortfall Carry-Forward Amounts, as applicable, not previously paid; and

NINTH: to the holders of the Class N Notes, any Accrued Note Interest for such Notes on such Payment Date;

TENTH: to the holders of the Class N Notes, pro rata, in reduction of the Note Principal Balances thereof, until reduced to zero; and

ELEVENTH: to the payment of the remainder, if any, to the holders of the Trust Certificates on behalf of the Issuer.

(d)     If the Indenture Trustee collects any money or property with respect to the Group VI Loans pursuant to this Article V, it shall pay out the money or property in the following order as determined by the Securities Administrator for each Loan Group:

FIRST: to the Indenture Trustee, the Securities Administrator, the HELOC Back-Up Servicer and HELOC Servicer for amounts due and not previously under the Basic Documents;

SECOND: to the Class VI-A Noteholders, accrued interest and unpaid interest, in each case accrued at the rate equal to the related Note Interest Rate;

THIRD: to the Class VI-A Notes, the amount of principal then due and unpaid on the Class VI-A Notes pro rata, without preference or priority of any kind, until the Note Principal Balance of such Class is reduced to zero;

FOURTH: to the Insurer, provided that no Insurer Default exists, with respect to the reimbursement for prior draws made under the Insurance Policy and the payment of all amounts due and owing to the Insurer under the Insurance Agreement;

FIFTH: to the Class VI-A Noteholders, the amount of any related  Basis Risk Shortfall Carry-Forward Amounts not previously paid; and

SIXTH: to the payment of the remainder, if any, to the holders of the Trust Certificates on behalf of the Issuer.

The Indenture Trustee may fix a record date and Payment Date for any payment to Noteholders pursuant to this Section 5.04.  With respect to any acceleration at the direction of the Insurer, the first Payment Date after the acceleration shall be the first Payment Date after the acceleration.  At least 15 days before such record date, the Indenture Trustee shall mail to each Noteholder a notice that states the record date, the Payment Date and the amount to be paid.

Section 5.05   Optional Preservation of the Trust Estate.  If the Notes have been declared to be due and payable under Section 5.02 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Indenture Trustee may, with the consent of the Insurer (which consent shall not be required if an Insurer Default exists), and shall, at the written direction of the Insurer so long as no Insurer Default exists, elect to take and maintain possession of the Trust Estate.  It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes and other obligations of the Issuer, including payments to the Note Insurer, the Insurer and the Indenture Trustee, unless directed otherwise by the Note Insurer or Insurer, as applicable, shall take such desire into account when determining whether or not to take and maintain possession of the Trust Estate.  In determining whether to take and maintain possession of the Trust Estate, the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

Section 5.06   Limitation of Suits.  No Holder of any Note, other than the Insurer acting pursuant to Section 4.12 hereof, shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless and subject to the provisions of Section 10.16 hereof:

(i)      such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(ii)      the Holders of not less than 25% of the aggregate Note Principal Balances of the Notes have made a written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

(iii)      such Holder or Holders have offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in complying with such request;

(iv)    the Indenture Trustee, for 60 days after its receipt of such notice of request and offer of indemnity, has failed to institute such Proceedings;

(v)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Holders of a majority of the Note Principal Balances of the Notes; and

(vi)    such Holder or Holders have the written consent of the Insurer unless a Insurer Default exists

(vii)    It is understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided.

Subject to the last paragraph of Section 5.11 herein, in the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Notes, each representing less than a majority of the Note Principal Balances of the Notes, the Indenture Trustee shall take the action requested by the group of Holders representing the largest percentage of the Note Principal Balance.

Section 5.07    Unconditional Rights of Noteholders To Receive Principal and Interest. Notwithstanding any other provisions in this Indenture, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

Section 5.08    Restoration of Rights and Remedies.  If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee, the Insurer or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee, the Insurer and the Noteholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee, the Insurer and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.09    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Indenture Trustee, the Insurer or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.10   <u>Delay or Omission Not a Waiver</u>.  No delay or omission of the Indenture Trustee, the Insurer or any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article V or by law to the Indenture Trustee, the Insurer or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee, the Insurer or by the Noteholders, as the case may be.

Section 5.11   <u>Control By Noteholders</u>.  (i) With respect to the Notes other than the Class VI-A Notes, the Holders of a majority of the aggregate Note Principal Balances of Notes or (ii) with respect to the Class VI-A Notes, the Insurer, so long as the Insurer is not in default under the Insurance Policy, or the holders of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Insurer, shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the related Notes or exercising any trust or power conferred on the Indenture Trustee; provided that:

(a)      such direction shall not be in conflict with any rule of law or with this Indenture;

(b)      any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by Holders of Notes representing not less than 100% of the Note Principal Balances of the Notes; and

(c)      the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction of the Holders of Notes representing a majority of the Note Principal Balances of the Notes.

Notwithstanding the rights of Noteholders set forth in this Section 5.11 the Indenture Trustee need not take any action that it determines might involve it in liability.

Section 5.12   <u>Waiver of Past Defaults</u>.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02 hereof, (i) with respect to the Notes other than Class VI-A Notes, the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of each Class of Notes or (ii) with respect to the Class VI-A Notes, so long as the Insurer is not in default under the Insurance Policy, the Insurer or the Holder of the majority of the aggregate  Note Principal Balance of the Class VI-A Notes with the consent of the Insurer may waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes, or (b) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of the Holder of each Note or (c) the waiver of which would materially and adversely affect the interests of the Insurer or the Note Insurer or modify their obligations under the Insurance Policy and Note Insurance Policy, respectively.  In the case of any such waiver, the Issuer, the Indenture Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Section 5.13   Undertaking for Costs.   All parties to this Indenture agree, and each Holder of any Note and each Beneficial Owner of any interest therein by such Holder's or Beneficial Owner's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.13 shall not apply to (a) any suit instituted by the Indenture Trustee, (b) any suit instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate more than 10% of the Note Principal Balances of the Notes or (c) any suit instituted by any Noteholder for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

Section 5.14   Waiver of Stay or Extension Laws.   The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.15   Sale of Trust Estate.

(a)   The power to effect any sale or other disposition (a "Sale") of any portion of the Trust Estate pursuant to Section 5.04 hereof is expressly subject to the provisions of Sections 5.05 and 5.11(b) hereof and this Section 5.15.  The power to effect any such Sale shall not be exhausted by any one or more Sales as to any portion of the Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes and under this Indenture, the Insurance Policy and the Note Insurance Policy shall have been paid.  The Indenture Trustee may from time to time postpone any public Sale by public announcement made at the time and place of such Sale.  The Indenture Trustee, with the consent of the Insurer (which consent shall not be required if a Insurer Default exists), hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b)   The Indenture Trustee shall not in any private Sale sell the Trust Estate, or any portion thereof, unless

(1)   the Insurer, unless an Insurer Default exists, or the Holders of all Notes, if no Insurer Default exists, consent to or direct the Indenture Trustee to make, such Sale, or

(2)     the proceeds of such Sale would be not less than the entire amount which would be payable to the Noteholders under the Notes, the Insurer in respect to amounts drawn under the Insurance Policy and any other amounts due to the Insurer under the Insurance Agreement and the Note Insurer under the Note Insurance Policy, in full payment thereof in accordance with Section 5.02 hereof, on the Payment Date next succeeding the date of such Sale, or

(3)     the Indenture Trustee determines that the conditions for retention of the Trust Estate set forth in Section 5.05 hereof cannot be satisfied (in making any such determination, the Indenture Trustee may rely upon an opinion of an Independent investment banking firm obtained and delivered as provided in Section 5.05 hereof), and the Insurer consents to such Sale, or if a Insurer Default exits, the Holders of Notes representing at least 100% of the Note Principal Balances of the Notes consent to such Sale.

The purchase by the Indenture Trustee of all or any portion of the Trust Estate at a private Sale shall not be deemed a Sale or other disposition thereof for purposes of this Section 5.15(b).

(c)     [reserved]

(d)     In connection with a Sale of all or any portion of the Trust Estate,

(1)     any Holder or Holders of Notes may bid for and purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Notes or claims for interest thereon in lieu of cash up to the amount which shall, upon distribution of the net proceeds of such sale, be payable thereon, and such Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Holders thereof after being appropriately stamped to show such partial payment;

(2)     the Indenture Trustee, with the consent of the Insurer so long as no Insurer Default exists may, but is in no event obligated to, bid for and acquire the property offered for Sale in connection with any Sale thereof, and, subject to any requirements of, and to the extent permitted by, applicable law in connection therewith, may purchase all or any portion of the Trust Estate in a private sale, and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting the gross Sale price against the sum of (A) the amount which would be distributable to the Holders of the Notes and Holders of Certificates and amounts distributable to the Insurer and Note Insurer as a result of such Sale in accordance with Section 5.04(b) hereof on the Payment Date next succeeding the date of such Sale and (B) the expenses of the Sale and of any Proceedings in connection therewith which are reimbursable to it, without being required to produce the Notes in order to complete any such Sale or in order for the net Sale price to be credited against such Notes, and any property so acquired by the Indenture Trustee shall be held and dealt with by it in accordance with the provisions of this Indenture;

(3)     the Indenture Trustee shall execute and deliver an appropriate instrument of conveyance, prepared by the Issuer and satisfactory to the Indenture Trustee, transferring its interest in any portion of the Trust Estate in connection with a Sale thereof;

(4)     the Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-

fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof, and to take all action necessary to effect such Sale; and

(5)     no purchaser or transferee at such a Sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.16   <u>Action on Notes</u>.  The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer.  Any money or property collected by the Indenture Trustee shall be applied in accordance with Section 5.04(b) hereof.

Section 5.17   <u>Performance and Enforcement of Certain Obligations</u>.

(a)     Promptly following a request from the Indenture Trustee to do so, the Issuer in its capacity as holder of the Mortgage Loans and HELOC Mortgage Loans, shall take all such lawful action as the Indenture Trustee, the Note Insurer or the Insurer may request to cause the Issuer to compel or secure the performance and observance by the Seller and the related Servicer, as applicable, of each of their obligations to the Issuer under or in connection with the Mortgage Loan Purchase Agreement, any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent Mortgage Purchase Agreement, the Servicing Agreements, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Mortgage Loan Purchase Agreement, any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent Mortgage Purchase Agreement, the  Servicing Agreements to the extent and in the manner directed by the Indenture Trustee, as pledgee of the Mortgage Loans, including the transmission of notices of default on the part of the Seller or the related Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Seller or the related Servicer of each of their obligations under the Mortgage Loan Purchase Agreement, any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loan Purchase Agreement and the Servicing Agreements, as applicable.

(b)     The Indenture Trustee, as pledgee of the Mortgage Loans, subject to the rights of the (i) Insurer under this Agreement and the HELOC Servicing Agreement and (ii) Note Insurer under this Agreement and the RMBS Servicing Agreement, may, and at the direction (which direction shall be in writing) of the Insurer or if a Insurer Default exists, of  the Holders of 66-2/3% of the Note Principal Balances of the Notes, shall exercise all rights, remedies, powers, privileges and claims of the Issuer against the Seller or the related Servicer under or in connection with the Mortgage Loan Purchase Agreement, any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loan Purchase Agreement and the Servicing Agreements, including the right or power to take any action to compel or secure performance or observance by the Seller or the related Servicer, as the case may be, of each of their obligations to the Issuer thereunder and to give any consent, request,

notice, direction, approval, extension or waiver under the Mortgage Loan Purchase Agreement, any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loan Purchase Agreement and the Servicing Agreements, as the case may be, and any right of the Issuer to take such action shall not be suspended.

# ARTICLE VI

## THE INDENTURE TRUSTEE AND THE SECURITIES ADMINISTRATOR

Section 6.01    Duties of Indenture Trustee and Securities Administrator.

(a)    If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture Trustee and the Securities Administrator undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee or the Securities Administrator; and

(ii)    in the absence of bad faith on its part, the Indenture Trustee and the Securities Administrator may each conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, reports, documents, Issuer Requests or other instruments or opinions furnished to each of the Indenture Trustee and the Securities Administrator and conforming to the requirements of this Indenture; however, the Indenture Trustee and the Securities Administrator shall examine the certificates, reports, documents, Issuer Requests or other instruments and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)    The Indenture Trustee and the Securities Administrator may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section 6.01;

(ii)    neither the Indenture Trustee nor the Securities Administrator shall be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts;

(iii)    neither the Indenture Trustee nor the Securities Administrator shall be liable with respect to any action it takes or omits to take in good faith in accordance with a written direction received by it from Noteholders, the Certificateholders, the Insurer or the Issuer, which they are entitled to give under the Basic Documents;

(iv)    neither the Indenture Trustee nor the Securities Administrator shall be liable for interest or income on any money received by it, except, in the case of the Securities Administrator, as set forth in the Basic Documents;

(v)    money held in trust by the Indenture Trustee or the Securities Administrator need not be segregated from other trust funds except to the extent required by law or the terms of this Indenture or the Trust Agreement;

(vi)    no provision of this Indenture or other Basic Document shall require the Indenture Trustee or the Securities Administrator to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it;

(vii)    every provision of this Indenture or other Basic Document relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section and to the provisions of the TIA;

(viii)    the Indenture Trustee shall execute and act in accordance with each Servicing Agreement and the RMBS Master Servicing Agreement; in no event however, shall the Indenture Trustee or the Securities Administrator have any liability for any act or omission of the RMBS Master Servicer, the HELOC Servicer, the RMBS Servicer, any Subservicer or the Owner Trustee; and

(ix)    the Indenture Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default, any Servicer Default, Insurer Default or other event unless a Responsible Officer of the Indenture Trustee has actual knowledge thereof or unless written notice of any such event that is in fact an Event of Default, Default, Servicer Default, Insurer Default or other event is received by the Indenture Trustee at its Corporate Trust Office and such notice references the Notes or Certificates generally, the Issuer, the Trust Estate or this Indenture.

Section 6.02    Rights of Indenture Trustee and the Securities Administrator.

(a)    The Indenture Trustee and the Securities Administrator may rely conclusively on and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person, party or parties.  The Indenture Trustee and the Securities Administrator need not investigate any fact or matter stated in any such document.

(b)    Before the Indenture Trustee or the Securities Administrator acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel.  Neither the Indenture Trustee nor the Securities Administrator shall be liable for any action it takes or omits to take in good faith in reliance on and in accordance with an Officer's Certificate or Opinion of Counsel.

(c)     Subject to the provisions of Section 6.01(c), neither the Indenture Trustee nor the Securities Administrator shall be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers.

(d)     The Indenture Trustee  and the Securities Administrator may each consult with counsel of its selection, and the written advice or Opinion of Counsel with respect to legal matters relating to this Indenture and the Notes or any Basic Document shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the written advice or Opinion of such counsel.

(e)     For the limited purpose of effecting any action to be undertaken by each of the Indenture Trustee and the Securities Administrator, but not specifically as a duty of the Indenture Trustee or the Securities Administrator in the Indenture, each of the Indenture Trustee and the Securities Administrator may execute any of the trusts or powers hereunder or perform any duties hereunder, either directly or by or through agents, attorneys, custodians or nominees appointed with due care, and shall not be responsible for any willful misconduct or negligence on the part of any agent, attorney, custodian or nominee so appointed.

(f)     The Indenture Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Indenture Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments and (iii) effecting transactions in certain Eligible Investments.  Such compensation shall not be considered an amount, or effect a reduction in any amount, that is reimbursable or payable to the Indenture Trustee (i) as part of the Indenture Trustee Fee, (ii) pursuant to Sections 5.04(b), 6.07, 8.02(c), 8.05(a) or 8.07 hereunder or (iii) out of Available Funds.

(g)     In order to comply with its duties under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("U.S.A. Patriot Act"), the Indenture Trustee shall obtain and verify certain information and documentation from the other party to this Indenture, including, but not limited to, such party's name, address, and other identifying information.

(h)     Whenever in the administration of this Indenture the Indenture Trustee or the Securities Administrator shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Indenture Trustee or the Securities Administrator (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officer's Certificate of the Issuer.

(i)     The rights, privileges, protections, immunities and benefits given to the Indenture Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Indenture Trustee and the Securities Administrator in each of its capacities hereunder, and to each custodian employed to act hereunder.

(j)     The Indenture Trustee and the Securities Administrator may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

Section 6.03   Individual Rights.   Each of the Indenture Trustee and the Securities Administrator in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Indenture Trustee or Securities Administrator, as applicable,   subject to the requirements of the Trust Indenture Act.  Any Note Registrar, co-registrar or co-paying agent may do the same with like rights.  However, the Indenture Trustee must comply with Sections 6.11 and 6.12 hereof.

Section 6.04   Indenture Trustee's and Securities Administrator's Disclaimer.   The Indenture Trustee and the Securities Administrator shall not be responsible for and make no representation as to the validity or adequacy of this Indenture, the Notes or any other Basic Document, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer in the Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Indenture Trustee's certificate of authentication.

Section 6.05   Notice of Event of Default.  Subject to Section 5.01, the Indenture Trustee shall promptly mail to each Noteholder, the Note Insurer and the Insurer notice of the Event of Default after it is known to a Responsible Officer of the Indenture Trustee, unless such Event of Default shall have been waived or cured.  Except in the case of an Event of Default in payment of principal of or interest on any Note, the Indenture Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the best interests of Noteholders.

Section 6.06   Reports by Securities Administrator to Holders and Tax Administration.   The Securities Administrator shall deliver to each Noteholder such information as may be required to enable such holder to prepare its federal and state income tax returns.

The Securities Administrator shall prepare and file (or cause to be prepared and filed), on behalf of the Owner Trustee, all information reports on Form 1099 required to be provided to Noteholders and the Holder of the Certificates.  The Securities Administrator shall prepare and file all tax returns required to be filed on behalf of the Trust pursuant to Section 5.03 of the Trust Agreement.  All tax returns and information reports shall be signed by the Owner Trustee as provided in Section 5.03 of the Trust Agreement.

Section 6.07   Compensation and Indemnity.   The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall reimburse the Indenture Trustee and the Securities Administrator as provided in Section 8.02(c) for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to compensation for its services.  Such expenses shall include reasonable compensation

and expenses, disbursements and advances of the Indenture Trustee's or Securities Administrator's agents, counsel, accountants and experts.   The Issuer shall indemnify the Indenture Trustee and the Securities Administrator as provided in Section 8.02(c) and the Insurer against any and all loss, liability, claims, damage, costs or expense (including reasonable attorneys' fees and expenses) incurred by it in connection with the administration of this Trust and the performance of its duties hereunder and under the other Basic Documents.   The Indenture Trustee and the Securities Administrator shall notify the Issuer promptly of any claim for which it may seek indemnity.   Failure by the Indenture Trustee, the Securities Administrator or the Insurer to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.   The Issuer shall defend any such claim, and the Indenture Trustee and the Securities Administrator may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.   The Issuer is not obligated to reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee, the Securities Administrator or the Insurer or any of its agents, counsel, accountants or experts through the Indenture Trustee's or such agent's, counsel's, accountant's or expert's own willful misconduct, negligence or bad faith.

The Issuer's payment and indemnity obligations to the Indenture Trustee or the Securities Administrator pursuant to this Section 6.07 shall survive the discharge of this Indenture and the termination or resignation of the Indenture Trustee or the Securities Administrator.   If the Indenture Trustee or the Securities Administrator incurs expenses after the occurrence of an Event of Default with respect to the Issuer, the expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

Section 6.08   <u>Replacement of Indenture Trustee and the Securities Administrator</u>.   No resignation or removal of the Indenture Trustee or the Securities Administrator and no appointment of a successor Indenture Trustee or successor Securities Administrator shall become effective until the acceptance of appointment by the successor Indenture Trustee or successor Securities Administrator pursuant to this Section 6.08.   The Indenture Trustee or the Securities Administrator may resign at any time by so notifying the Issuer and the Insurer.   The Insurer or Holders of a majority of Note Principal Balances of each Class of Notes with consent of the Insurer may remove the Indenture Trustee or the Securities Administrator by so notifying the Indenture Trustee or the Securities Administrator and may appoint a successor Indenture Trustee or successor Securities Administrator.   The Issuer, with the consent of the Insurer, shall remove the Indenture Trustee or Securities Administrator , as applicable, if:

(i)   the Indenture Trustee fails to comply with or qualify pursuant to the provisions of Section 6.11 hereof;

(ii)   the Indenture Trustee or the Securities Administrator is adjudged a bankrupt or insolvent;

(iii)   a receiver or other public officer takes charge of the Indenture Trustee or the Securities Administrator or its property; or

(iv)   the Indenture Trustee or the Securities Administrator otherwise becomes incapable of acting.

(v)     If the Indenture Trustee or the Securities Administrator resigns or is removed or if a vacancy exists in the office of the Indenture Trustee or the Securities Administrator for any reason (the Indenture Trustee or the Securities Administrator in such event being referred to herein as the retiring Indenture Trustee or retiring Securities Administrator), the Issuer shall promptly appoint a successor Indenture Trustee or successor Securities Administrator acceptable to the Insurer.

Each of a successor Indenture Trustee or successor Securities Administrator shall deliver a written acceptance of its appointment to the retiring Indenture Trustee, retiring Securities Administrator and to the Issuer. Thereupon, the resignation or removal of the retiring Indenture Trustee or retiring Securities Administrator shall become effective, and the successor Indenture Trustee or successor Securities Administrator shall have all the rights, powers and duties of the Indenture Trustee or Securities Administrator under this Indenture.  Each of the successor Indenture Trustee and successor Securities Administrator shall mail a notice of its succession to Noteholders.  The retiring Indenture Trustee or retiring Securities Administrator shall promptly transfer all property held by it as Indenture Trustee or Securities Administrator to the successor Indenture Trustee or successor Securities Administrator.

If a successor Indenture Trustee or successor Securities Administrator does not take office within 60 days after the retiring Indenture Trustee or retiring Securities Administrator resigns or is removed, the retiring Indenture Trustee or retiring Securities Administrator, the successor Indenture Trustee or successor Securities Administrator, the Issuer or the Holders of a majority of Note Principal Balances of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee or successor Securities Administrator.

Notwithstanding the replacement of the Indenture Trustee or the Securities Administrator pursuant to this Section, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee or retiring Securities Administrator.

Section 6.09   Successor Indenture Trustee and Successor Securities Administrator by Merger.  If the Indenture Trustee or Securities Administrator consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets to, another corporation, company or banking association, the resulting, surviving or transferee corporation, without any further act, shall be the successor Indenture Trustee or successor Securities Administrator; provided, that, in the case of the Indenture Trustee, such corporation, company or banking association shall be otherwise qualified and eligible under Section 6.11 hereof.  The Indenture Trustee and Securities Administrator shall each provide the Rating Agencies, the Insurer and the Issuer with prior written notice, and the Noteholders with prompt written notice, of any such transaction.

If at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee or shall succeed to the trusts created by this Indenture and any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee and deliver such Notes so authenticated; and if at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any

predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which is in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.

(a)    Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located, the Indenture Trustee, with the consent of the Insurer, shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust Estate, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Trust Estate, or any part hereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable.   No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(iv)    Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.   Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI.   Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee.   Every such instrument shall be filed with the Indenture Trustee.

(v)     Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 6.11   Eligibility; Disqualification.   The Indenture Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and it or its parent shall have a long-term debt rating of Baa3 or better by Moody's and BBB or better by Standard & Poor's.  The Indenture Trustee shall comply with TIA § 310(b), including the optional provision permitted by the second sentence of TIA § 310(b)(9); *provided*, *however*, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 6.12   Preferential Collection of Claims Against Issuer.   The Indenture Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  An Indenture Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

Section 6.13   Representations and Warranties.  The Indenture Trustee hereby represents that:

(a)     The Indenture Trustee is duly organized and validly existing as a national banking association in good standing under the laws of the United States with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted;

(b)     The Indenture Trustee has the power and authority to execute and deliver this Indenture and to carry out its terms; and the execution, delivery and performance of this Indenture have been duly authorized by the Indenture Trustee by all necessary corporate action.

(c)     The consummation of the transactions contemplated by this Indenture and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the articles of association or bylaws of the Indenture Trustee or any material agreement or other instrument to which the Indenture Trustee is a party or by which it is bound which would adversely affect its performance under this Indenture; and

(d)     There are no proceedings or investigations pending or to, the Indenture Trustee's knowledge, threatened before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Indenture Trustee: (A) asserting the invalidity of this Indenture (B) seeking to prevent the consummation of any of the transactions contemplated by this Indenture or (C) seeking any determination or ruling that might materially

and adversely affect the performance by the Indenture Trustee of its obligations under, or the validity or enforceability of, this Indenture.

Section 6.14    Directions to Indenture Trustee.  The Indenture Trustee is hereby directed:

(a)    to accept the pledge of the Mortgage Loans and hold the assets of the Trust Estate in trust for the Noteholders;

(b)    to authenticate and deliver the Notes substantially in the form prescribed by Exhibits A-1, A-2, A-3 and A-4 to this Indenture in accordance with the terms of this Indenture; and

(c)    to take all other actions as shall be required to be taken by it under the terms of this Indenture.

Section 6.15    The Agents.  The provisions of this Indenture relating to the limitations of the Indenture Trustee's liability and to its indemnity, rights and protections shall inure also to the Paying Agent and Note Registrar.

Section 6.16    Administrative Duties.

(a)    The Indenture Trustee agrees to perform all of the duties of the Issuer under the Depository Agreement.  In addition to its duties performed under the Depository Agreement, the Indenture Trustee shall take all appropriate action that is the duty of the Issuer to take with respect to the following matters under the Trust Agreement, the Mortgage Loan Purchase Agreement and the Indenture (references are to sections of the Indenture):

(i)    The Indenture Trustee shall notify the Owner Trustee if the Indenture Trustee obtains actual knowledge or written notice that any withholding tax is imposed on the Trust's payments (or allocations of income) to a Certificateholder;

(ii)    the duty to cause the Note Register to be kept if the Issuer assumes the duties of Note Registrar, and to give the Indenture Trustee notice of any appointment of a new Note Registrar and the location, or change in location, of the Note Register (Section 4.02);

(iii)    causing the preparation of the Notes for execution by the Owner Trustee upon the registration of any transfer or exchange of the Notes or execution of a supplemental indenture (Sections 4.02, 4.03 and 9.06);

(iv)    [reserved];

(v)    causing the preparation of Definitive Notes in accordance with the instructions of any Clearing Agency (including the preparation of any temporary notes) (Section  4.14);

(vi)    the maintenance of an office for registration of transfer or exchange of Notes (Section 3.02);

95

(vii)     [reserved];

(viii)    [reserved];

(ix)      [reserved];

(x)      the notification to the Owner Trustee of the Issuer's non-compliance with its negative covenants or restricted payment covenants upon actual knowledge by the Indenture Trustee of such non-compliance (Sections 3.09 and 3.25);

(xi)      the furnishing of the Indenture Trustee with the names and addresses of Holders of Notes during any period when the Indenture Trustee is not the Note Registrar (Section 7.01).

(b)     In carrying out the foregoing duties or any of its other obligations under this Indenture, the Indenture Trustee may enter into transactions with or otherwise deal with any of its Affiliates; provided, however, that the terms of any such transactions or dealings shall be in accordance with any directions received from the Issuer and shall be, in the Indenture Trustee's opinion, no less favorable to the Issuer than would be available from unaffiliated parties.

(c)     The Indenture Trustee in its capacity as the Certificate Registrar, and upon a request received from the Owner Trustee, shall promptly notify the Certificateholders of (i) any change in the Corporate Trust Office of the Owner Trustee, (ii) any amendment to the Trust Agreement requiring notice be given to the Certificateholders and (iii) any other notice required to be given to the Certificateholders by the Owner Trustee under the Trust Agreement.

(d)     With respect to matters that in the reasonable judgment of the Indenture Trustee are non-ministerial, the Indenture Trustee shall not take any action pursuant to this Article VII unless within a reasonable time before the taking of such action, the Indenture Trustee shall have notified the Owner Trustee, the Note Insurer, the Insurer and the Rating Agencies of the proposed action and the Rating Agencies shall have notified the Issuer in writing that such transaction shall not cause their respective ratings of the Notes, to be reduced, qualified, suspended or withdrawn (without taking the Insurance Policy or Note Insurance Policy into account) and the Owner Trustee shall not have withheld consent or provided an alternative direction.  For the purpose of the preceding sentence, "non-ministerial matters" shall include:

(i)      the amendment of or any supplement to the Indenture;

(ii)     the initiation of any claim or lawsuit by the Issuer and the compromise of any action, claim or lawsuit brought by or against the Issuer (other than in connection with the collection of the Mortgage Loans);

(iii)    the amendment, change or modification of this Indenture or any of the other Basic Documents;

(iv)    the appointment of successor Paying Agents and successor Indenture Trustees pursuant to the Indenture or the appointment of a successor RMBS Master

Servicer or the consent to the assignment by the Certificate Registrar, Paying Agent or Indenture Trustee of its obligations under the Indenture; and

(v)      the removal of the Indenture Trustee;

provided, however, that the Owner Trustee shall receive notices of items pursuant to clause (i) above and with respect to clause (iii) above to the extent it is a party to the related Basic Document.

Section 6.17   Records.   The Indenture Trustee shall maintain appropriate books of account and records relating to services performed under this Indenture, which books of account and records shall be accessible for inspection by the Issuer at any time during normal business hours.

Section 6.18   Additional Information to be Furnished.   The Indenture Trustee shall furnish to the Issuer, the Note Insurer or the Insurer from time to time such additional information regarding the Mortgage Loans, the HELOC Mortgage Loans and the Notes as the Issuer, the Note Insurer or the Insurer shall reasonably request, to the extent such information is readily available to it.

Section 6.19   Execution of Derivative Contracts and other Documents.   The Issuer hereby directs the Indenture Trustee to enter into and execute the Corridor Contract and the Cap Contract and make all representations and warranties contained therein on behalf of the Trust. The Issuer hereby directs the Indenture Trustee to enter into and execute the Servicing Agreements and any related document. The Indenture Trustee hereby acknowledges receipt by it of the Corridor Contract and the Cap Contract. Upon receipt thereof from the Derivative Counterparty under the Corridor Contract and the Cap Contract, the Indenture Trustee shall deposit into the Payment Account an amount equal to all amounts actually received by it under the Corridor Contract and the Cap Contract, in each case not previously deposited into the Payment Account.

Section 6.20   Indenture Trustee's Application For Instructions From the Issuer.

Any application by the Indenture Trustee for written instructions from the Issuer may, at the option of the Indenture Trustee, set forth in writing any action proposed to be taken or omitted by the Indenture Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Indenture Trustee shall not be liable for any action taken by, or omission of, the Indenture Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any officer of the Issuer actually receives such application, unless any such officer shall have consented in writing to any earlier date) unless prior to taking any such action (or the effective date in the case of an omission), the Indenture Trustee shall have received written instructions in response to such application specifying the action to be taken or omitted.

Section 6.21   Limitation of Liability.

97

It is understood by the parties hereto other than Deutsche Bank National Trust Company (the "Bank") that the sole recourse of the parties hereto other than the Bank in respect of the obligations of the Trust hereunder and under the other documents contemplated thereby and related thereto to which it is a party shall be to the parties hereto other than the Bank. In addition, the Bank is entering into this Indenture and the other documents contemplated thereby and related thereto to which it is a party solely in its capacity as Indenture Trustee under the Indenture and not in its individual capacity (except as expressly stated herein) and in no case shall the Bank (or any Person acting as successor Indenture Trustee under the Indenture) be personally liable for or on account of any of the statements, representations, warranties, covenants or obligations stated to be those of the Issuer hereunder or thereunder, all such liability, if any, being expressly waived by the parties hereto and any person claiming by, through or under such party, provided, however, that the Bank (or any such successor Indenture Trustee) shall be personally liable hereunder and thereunder for its own negligence or willful misconduct or for its material breach of its covenants, representations and warranties contained herein or therein, to the extent expressly covenanted or made in its individual capacity. In no event shall the Indenture Trustee, in its capacity as Paying Agent, Note Registrar or in any other capacity hereunder, be liable under or in connection with this Indenture for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits, whether or not foreseeable, even if the Indenture Trustee has been advised of the possibility thereof and regardless of the form of action in which such damages are sought. The provisions of this section shall survive the termination of the Indenture and the resignation or removal of the Indenture Trustee.

Section 6.22   Assignment of Rights, Not Assumption of Duties.

Anything herein contained to the contrary notwithstanding, (a) the Issuer shall remain liable under this Indenture and each Basic Document to which it is a party to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Indenture had not been executed, (b) the exercise by the Indenture Trustee, the Insurer, the Note Insurer or any Holder of any of their rights, remedies or powers hereunder shall not release the Issuer from any of its duties or obligations under each of such documents to which it is a party and (c) none of any Holder, the Insurer, the Note Insurer nor the Indenture Trustee shall have any obligation or liability under any of such documents to which the Issuer is a party by reason of or arising out of this Indenture, nor shall any Holder, the Insurer, the Note Insurer or the Indenture Trustee be obligated to perform any of the obligations or duties of the Issuer thereunder or, except as expressly provided herein with respect to the Indenture Trustee, to take any action to collect or enforce any claim for payment assigned hereunder or otherwise.

## ARTICLE VII

## NOTEHOLDERS' LISTS AND REPORTS

Section 7.01    Issuer To Furnish Indenture Trustee Names and Addresses of Noteholders. The Issuer will furnish or cause to be furnished to the Indenture Trustee (a) not more than five days after each Record Date, a list, in such form as the Indenture Trustee may reasonably require, of the names and addresses of the Holders of Notes as of such Record Date, and (b) at such other times as the Indenture Trustee may request in writing, within 30 days after receipt by the Issuer of any such request, a list of similar form and content as of a date not more than 10 days prior to the time such list is furnished; *provided*, *however*, that so long as the Indenture Trustee is the Note Registrar, no such list shall be required to be furnished to the Indenture Trustee.

Section 7.02    Preservation of Information; Communications to Noteholders.

(a)    The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Holders of Notes contained in the most recent list furnished to the Indenture Trustee as provided in Section 7.01 hereof and the names and addresses of Holders of Notes received by the Indenture Trustee in its capacity as Note Registrar. The Indenture Trustee may destroy any list furnished to it as provided in such Section 7.01 upon receipt of a new list so furnished.

(b)    Noteholders may communicate pursuant to TIA § 312(b) with other Noteholders with respect to their rights under this Indenture or under the Notes.

(c)    The Issuer, the Indenture Trustee and the Note Registrar shall have the protection of TIA § 312(c).

Section 7.03    Reports of Issuer.

(a)    Subject to Section 4.06 of the RMBS Master Servicing Agreement, the Securities Administrator shall file with the Commission on behalf of the Issuer, with a copy to the Issuer and the Insurer, the annual reports and the information, documents and other reports (or such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) that the Issuer may be required to file with the Commission pursuant to Sections 13 or 15(d) of the Exchange Act.

(b)    The Indenture Trustee shall supply (and the Indenture Trustee shall transmit by mail to all Noteholders described in TIA § 313(c)) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to this Section 7.03(a) and by rules and regulations prescribed from time to time by the Commission.

(c)    Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04   <u>Reports by Indenture Trustee</u>.  If required by TIA § 313(a), within 60 days after each January 30 beginning with March 31, 2006, the Indenture Trustee shall mail to each Noteholder as required by TIA § 313(c) a brief report dated as of such date that complies with TIA § 313(a).  The Indenture Trustee also shall comply with TIA § 313(b).

A copy of each report at the time of its mailing to Noteholders shall be filed by the Securities Administrator with the Commission via EDGAR provided that a copy of such report is furnished to the Securities Administrator by the Indenture Trustee.

Section 7.05   <u>Statements to Noteholders</u>.   With respect to each Payment Date, the Securities Administrator shall make available via the Securities Administrator's website, initially located at www.ctslink.com, to each Noteholder and each Certificateholder, the Insurer, the Indenture Trustee, each Derivative Counterparty, the Note Insurer, the Depositor, the Owner Trustee, the Paying Agent and each Rating Agency, a statement setting forth the following information as to the Notes, to the extent applicable:

(i)       the aggregate amount of collections with respect to the Mortgage Loans;

(ii)      the Group I Available Funds, Group II-C Available Funds, Group II-NC Available Funds, Group III Available Funds, Group IV Available Funds and Group V Available Funds and Net Monthly Excess Cash Flow, with respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and with respect to the Group V Loans, payable to each Class of Noteholders for such Payment Date, the Basis Risk Shortfall Carry-Forward Amount and Net WAC Shortfall Carry-Forward Amount on each Class of Notes for such Payment Date and the aggregate Unpaid Interest Shortfall on each Class of Notes for such Payment Date;

(iii)     (a) the amount of such distribution to each Class of Notes applied to reduce the Note Principal Balance thereof and (b) the aggregate amount included therein representing Principal Prepayments;

(iv)     the Insured Payment, if any, paid by the Insurer under the Insurance Policy for such Payment Date and the aggregate Insured Payments for all prior Payment Dates paid by the Insurer under the Insurance Policy and not yet reimbursed;

(v)      the amount of such distribution to Holders of each Class of Notes allocable to interest;

(vi)     the amount of any distribution to the Certificates;

(vii)    if the distribution to the Holders of any Class of Notes is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall;

(viii)   the number and the aggregate Stated Principal Balance of the Mortgage Loans as of the end of the related Due Period, determined in the aggregate and separately

for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and Loan Group V;

(ix)     the aggregate Note Principal Balance of each Class of Notes, after giving effect to the amounts distributed on such Payment Date, separately identifying any reduction thereof due to Realized Losses and the aggregate Note Principal Balance of all of the Notes after giving effect to the distribution of principal on such Payment Date;

(x)     the number and aggregate Stated Principal Balances of Mortgage Loans (a) as to which the Monthly Payment is delinquent for 31-60 days, 61-90 days, 91 or more days, respectively, (b) in foreclosure and (c) that have become REO Property, in each case as of the end of the preceding calendar month, determined in the aggregate and separately for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and Loan Group V;

(xi)     the amount of payments from the Cap Contract and the Corridor Contract;

(xii)     the Overcollateralization Increase Amount with respect to each Loan Group, Overcollateralization Target Amount and Overcollateralized Amount, if any, in each case as the end of the related Payment Date, in each case as determined separately for each Loan Group;

(xiii)     the amount of any Advances and Compensating Interest payments;

(xiv)     the aggregate Realized Losses with respect to the related Payment Date and cumulative Realized Losses since the Closing Date;

(xv)     the number and aggregate Stated Principal Balance of Mortgage Loans repurchased pursuant to the Mortgage Loan Purchase Agreement for the related Payment Date and cumulatively since the Closing Date determined in the aggregate and separately for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and Loan Group V;

(xvi)     to the extent reported to the Securities Administrator, the book value of any REO Property;

(xvii)     the amount of any Prepayment Interest Shortfalls or Relief Act Shortfalls for such Payment Date;

(xviii)     the aggregate Stated Principal Balance of Mortgage Loans purchased pursuant to Section 3.18 of the Servicing Agreement for the related Payment Date and cumulatively since the Closing Date;

(xix)     the amounts withdrawn from the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account and used to make payments to Noteholders on that Payment Date, the amount remaining on deposit following such Payment Date, and the amount withdrawn from the related Group I,

101

Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account used to buy certain Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Subsequent Mortgage Loans and Group VI Subsequent HELOC Mortgage Loans prior to such Payment Date;

(xx)      the Floating Allocation Percentage of Loan Group VI;

(xxi)     the Investor Interest Collections of Loan Group VI for such Payment Date;

(xxii)    the HELOC Servicing Fee and RMBS Servicing Fee for such Payment Date;

(xxiii)   if a Stepdown Date has occurred on the related Loan Group;

(xxiv)    the Charged-Off Amount for the related Payment Date and the cumulative Charged-Off Amount since the Closing Date;

(xxv)     the Investor  Charge-Off Amount for such Payment Date;

(xxvi)    the percentage of cumulative losses under a Servicer Termination Event;

(xxvii)   the Group VI Excess Spread Percentage for such Payment Date;

(xxviii)  the Group VI Excess Spread Percentage on a rolling three-month average basis;

(xxix)    the number and aggregate Stated Principal Balances of HELOC Mortgage Loans (a) as to which the Monthly Payment are 100 days or more delinquent, (b) in foreclosure or (c) that have become REO Property;

(xxx)     the aggregated Stated Principal Balance of the three largest HELOC Mortgage Loans as of such Payment Date;

(xxxi)    the Overcollateralization Target Amount for the related Loan Group as of the preceding Payment Date;

(xxxii)   the Overcollateralization Target Amount for the related Loan Group for such Payment Date;

(xxxiii)  the Investor Principal Distribution Amount for such Payment Date;

(xxxiv)   the Invested Amount of Loan Group VI for such Payment Date;

(xxxv)    the Overcollateralization Reduction Amount for such Payment Date;

(xxxvi)   the Excess Overcollateralization Amount for such Payment Date; and

(xxxvii) the Class V-A-4-D Insured Amount, if any, paid by the Note Insurer under the Note Insurance Policy for such Payment Date and the aggregate Class V-A-4-D Insured Payments for all prior Payment Dates paid by the Note Insurer under the Note Insurance Policy and not yet reimbursed.

Items (iii) and (v) above shall be presented on the basis of a Note having a $1,000 denomination. In addition, by January 31 of each calendar year following any year during which the Notes are outstanding, the Securities Administrator shall furnish a report to each Noteholder of record if so requested in writing at any time during each calendar year as to the aggregate of amounts reported pursuant to (iii) and (v) with respect to the Notes for such calendar year.

The Securities Administrator may conclusively rely upon the Remittance Report provided by the RMBS Master Servicer and the HELOC Servicer to the Securities Administrator pursuant to the RMBS Master Servicing Agreement or Section 4.01 of the HELOC Servicing Agreement, as applicable, in its preparation of its Statement to Noteholders and on information provided to it by the Derivative Counterparty and the Insurer.

The Securities Administrator will make the monthly statements provided for in this Section (and, at its option, any additional files containing the same information in an alternative format) available each month to Noteholders, other parties to this Agreement and any other interested parties via the Securities Administrator's website. The Securities Administrator's website shall initially be located at www.ctslink.com. Parties that are unable to use the website are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk at 301-815-6600 and indicating such. The Securities Administrator may have the right to change the way the monthly statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes. The Securities Administrator shall also make such monthly statements and other information that the Indenture Trustee reasonably requires to make distributions hereunder and under the Trust Agreement available to the Indenture Trustee no later than two Business Days prior to each Payment Date.

The Securities Administrator shall be entitled to rely on but shall not be responsible for the content or accuracy of any information provided by third parties for purposes of preparing the monthly statement, and may affix thereto any disclaimer it deems appropriate in its reasonable discretion (without suggesting liability on the part of any other party hereto).

## ARTICLE VIII

## ACCOUNTS, DISBURSEMENTS AND RELEASES

Section 8.01   Collection of Money.  Except as otherwise expressly provided herein, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture.  The Indenture Trustee shall apply all such money received by it as provided in this Indenture.  Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under any agreement or instrument that is part of the Trust Estate, the Indenture Trustee may take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture and any right to proceed thereafter as provided in Article V.

Section 8.02   Trust Accounts.

(a)      On or prior to the Closing Date, the Issuer shall cause the Indenture Trustee to establish and maintain, in the name of the Indenture Trustee, for the benefit of the Noteholders, the Insurer and the Derivative Contract Counterparty, the Payment Account as provided in Section 3.01 hereof.

(b)      All monies deposited from time to time in the Payment Account and the Certificate Distribution Account and all deposits therein pursuant to this Indenture (other than deposits of any gain or income on investments thereof) are for the benefit of the Noteholders and the Certificateholders.  The funds in the Certificate Distribution Account and Payment Account shall be held uninvested.

(c)      On each Payment Date, the Indenture Trustee as Paying Agent, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05, shall be entitled to withdraw from the Payment Account the all amounts reimbursable by the Issuer or from the Payment Account to the Indenture Trustee or the Securities Administrator pursuant to any provision of any Basic Document, and shall, first, pay the Note Insurance Policy Premium Amount to the Note Insurer (provided, that no amounts payable to the Note Insurer shall be from Group VI Available Funds), and, second, distribute all remaining amounts on deposit in the Payment Account to the Noteholders in respect of the Notes and to such other persons in the order of priority set forth in Section 3.05, 3.06 and 3.07 hereof (except as otherwise provided in Section 5.04(b) hereof).

(d)      The Indenture Trustee shall not invest any funds in the Payment Account.

Section 8.03   Officer's Certificate.  The Indenture Trustee shall receive at least seven Business Days' notice when requested by the Issuer to take any action pursuant to Section 8.05(a) hereof, accompanied by copies of any instruments to be executed, and the Indenture Trustee shall also require, as a condition to such action, an Officer's Certificate, in form and substance satisfactory to the Indenture Trustee, stating the legal effect of any such action,

outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with.

Section 8.04    Termination Upon Distribution to Noteholders.  This Indenture and the respective obligations and responsibilities of the Issuer, the Securities Administrator and the Indenture Trustee created hereby shall terminate upon the distribution to Noteholders, the Insurer, the Note Insurer, the Certificate Paying Agent on behalf of the Certificateholders and the Indenture Trustee of all amounts required to be distributed pursuant to Article III; *provided, however,* that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P.  Kennedy, the late ambassador of the United States to the Court of St.  James, living on the date hereof.

Section 8.05    Release of Trust Estate.

(a)    Subject to the payment of its fees and expenses, the Indenture Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances that are not inconsistent with the provisions of this Indenture, including for the purposes of any repurchase by the RMBS Servicer of a Mortgage Loan pursuant to Section 3.18 of the related Servicing Agreement.  No party relying upon an instrument executed by the Indenture Trustee as provided in Article VIII hereunder shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

(b)    The Indenture Trustee shall, at such time as (i) there are no Notes Outstanding and (ii) all sums then due and unpaid to the Indenture Trustee, the Securities Administrator and the RMBS Master Servicer pursuant to this Indenture have been paid and (iii) all sums due to the Insurer and the Note Insurer have been paid, release any remaining portion of the Trust Estate that secured the Notes from the lien of this Indenture.

(c)    The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Section 8.05 only upon receipt of a request from the Issuer accompanied by an Officers' Certificate and an Opinion of Counsel stating that all applicable requirements have been satisfied, and a letter from the Insurer stating that the Insurer has no objection to such request from the Issuer, except as otherwise provided in clause (a).

Section 8.06    Surrender of Notes Upon Final Payment.  By acceptance of any Note, the Holder thereof agrees to surrender such Note to the Indenture Trustee promptly, prior to such Noteholder's receipt of the final payment thereon.

Section 8.07    Optional Redemption of the Notes.

(a)    The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and

properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.  The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M, Class B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.   The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.

(b)     The Majority Certificateholder shall have the option to purchase the HELOC Mortgage Loans and thereby redeem the Class VI-A Notes on any Payment Date on or after the Payment Date on which the Note Principal Balance of the Class VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.  If the Majority Certificateholder fails to exercise this right, the Insurer may purchase the HELOC Mortgage Loans 60 days after the Payment Date on which the Note Principal Balance of the Class VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.

(c)     The aggregate redemption price (the "Redemption Price") for the Notes in connection with any termination pursuant to clause (a) above will be equal to 100% of the

aggregate outstanding Note Principal Balance of the related Notes plus and accrued and unpaid interest thereon (including any related Unpaid Interest Shortfall, Net WAC Shortfall Carry-Forward Amount and Basis Risk Shortfall Carry-Forward Amount) at the Note Interest Rate through the date on which the Notes are redeemed in full together with all amounts due and owing to the RMBS Master Servicer, the Securities Administrator, the Indenture Trustee and the Note Insurer under this Indenture, the Note Insurance Policy or any other applicable Basic Document (which amounts shall be specified in writing upon request of the Issuer by the Indenture Trustee, the Securities Administrator, the related Servicer, the RMBS Master Servicer or the Note Insurer, as applicable).

(d)     The aggregate redemption price (the "Class VI-A Redemption Price") for the Notes in connection with any termination pursuant to clause (b) above will be equal to 100% of the aggregate outstanding Note Principal Balance of the related Notes plus and accrued and unpaid interest thereon (including any related Unpaid Interest Shortfall, Net WAC Shortfall Carry-Forward Amount and Basis Risk Shortfall Carry-Forward Amount) at the Note Interest Rate through the date on which the Notes are redeemed in full together with all amounts due and owing to the applicable Servicer, the Securities Administrator, the Indenture Trustee and the Insurer under this Indenture, the Insurance Policy or any other applicable Basic Document (which amounts shall be specified in writing upon request of the Issuer by the Indenture Trustee, the Securities Administrator, the related Servicer or the Insurer, as applicable).

(e)     In order to exercise the foregoing option with respect to the Notes other than the Class VI-A Notes, the Majority Certificateholder shall provide written notice of its exercise of such option and the Redemption Price to the Indenture Trustee, the Securities Administrator, the Issuer, the Owner Trustee, the RMBS Master Servicer and the applicable Servicer at least 15 days prior to its exercise.  Following receipt of the notice, the Indenture Trustee shall provide written notice to the applicable Noteholders of the final payment on the applicable Notes.  In addition, the Majority Certificateholder shall, not less than one Business Day prior to the proposed Payment Date on which such redemption is to be made, deposit the Redemption Price specified in (c) above with the Indenture Trustee, who shall deposit the Redemption Price into the Payment Account and shall, on the Payment Date after receipt of the funds, apply such funds to make final payments of principal and interest on the Notes in accordance with Sections 3.05 or 3.06, as applicable, hereof and payment to the Indenture Trustee and the RMBS Master Servicer as set forth in (c) above and payments in full to the Note Insurer for all amounts owing under the Note Insurance Policy, and this Indenture shall be discharged subject to the provisions of Section 4.10 hereof.  If for any reason the amount deposited by the Majority Certificateholder is not sufficient to make such redemption or as the Indenture Trustee is notified such redemption cannot be completed for any reason, (a) the amount so deposited by the Majority Certificateholder with the Indenture Trustee shall be immediately returned to the Majority Certificateholder in full and shall not be used for any other purpose or be deemed to be part of the Trust Estate and (b) the Note Principal Balance of the applicable Notes shall continue to bear interest at the related Note Interest Rate.

In order to exercise the foregoing option with respect to the Class VI-A Notes, the Majority Certificateholder shall provide written notice of its exercise of such option and the Class VI-A Redemption Price to the Indenture Trustee, the Securities Administrator, the Issuer,

the Owner Trustee, the HELOC Servicer and the HELOC Back-Up Servicer at least 15 days prior to its exercise. Following receipt of the notice, the Indenture Trustee shall provide written notice to the Class VI-A Noteholders of the final payment on the Class VI-A Notes. In addition, the Majority Certificateholder shall, not less than one Business Day prior to the proposed Payment Date on which such redemption is to be made, deposit the Class VI-A Redemption Price specified in (e) above with the Indenture Trustee, who shall deposit the Class VI-A Redemption Price into the Payment Account and shall, on the Payment Date after receipt of the funds, apply such funds to make final payments of principal and interest on the Notes in accordance with Section 3.07 hereof and payment to the Indenture Trustee and the HELOC Servicer as set forth in (e) above and payments in full to the Insurer for all amounts owing under the Insurance Policy, and this Indenture shall be discharged subject to the provisions of Section 4.10 hereof. If for any reason the amount deposited by the Majority Certificateholder is not sufficient to make such redemption or as the Indenture Trustee is notified such redemption cannot be completed for any reason, (a) the amount so deposited by the Majority Certificateholder with the Indenture Trustee shall be immediately returned to the Majority Certificateholder in full and shall not be used for any other purpose or be deemed to be part of the Trust Estate and (b) the Note Principal Balance of the Class VI-A Notes shall continue to bear interest at the related Note Interest Rate.

## ARTICLE IX

## SUPPLEMENTAL INDENTURES

Section 9.01    Supplemental Indentures Without Consent of Noteholders.

(a)    Without the consent of the Holders of any Notes but with prior written consent of the Insurer and the Note Insurer and prior notice to the Rating Agencies and the Owner Trustee, the Insurer, the Note Insurer, the Issuer, the Securities Administrator and the Indenture Trustee, when authorized by an Issuer Request, at any time and from time to time, may enter into one or more indentures supplemental hereto (which shall conform to the provisions of the TIA as in force at the date of the execution thereof), in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)    to evidence the succession, in compliance with the applicable provisions hereof, of another person to the Issuer, and the assumption by any such successor of the covenants of the Issuer herein and in the Notes contained;

(iii)    to add to the covenants of the Issuer, for the benefit of the Holders of the Notes or the Insurer, or to surrender any right or power herein conferred upon the Issuer;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)    to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture;

(vi)    to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; provided, that such action shall not materially and adversely affect the interests of the Insurer and the Holders of the Notes as evidenced by an Opinion of Counsel;

(vii)    to evidence and provide for the acceptance of the appointment hereunder by a successor trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one trustee, pursuant to the requirements of Article VI hereof; or

(viii)    to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualification of this Indenture under the TIA or under any similar federal statute hereafter enacted and to add to this Indenture such other

provisions as may be expressly required by the TIA as evidenced by an Opinion of Counsel;

*provided, however*, that no such indenture supplements shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel as to the enforceability of any such indenture supplement, and that, except for indenture supplements entered into for the purposes described in (v) and (viii) above, such indenture supplements shall not adversely affect in any material respect the interests of any Noteholder and to the effect that (i) such indenture supplement is permitted hereunder and (ii) entering into such indenture supplement will not result in a "substantial modification" of the Notes under Treasury Regulation Section 1.1001-3 or adversely affect the status of the Notes as indebtedness for federal income tax purposes.

The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)    The Issuer, the Securities Administrator and the Indenture Trustee, when authorized by an Issuer Request, may, also without the consent of any of the Holders of the Notes but with the prior written consent of the Insurer, the Note Insurer and prior notice to the Rating Agencies, the Note Insurer and the Insurer, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; *provided, however,* that such action as evidenced by an Opinion of Counsel, (i) is permitted by this Indenture, (ii) shall not adversely affect in any material respect the interests of any Noteholder and (iii) if 100% of the Certificates and the Retained Notes (to the extent that such Retained Notes have not received a "will be debt" opinion) are not owned by American Home Mortgage Acceptance Inc., cause the Issuer to be subject to an entity level tax for federal income tax purposes.

Section 9.02    <u>Supplemental Indentures With Consent of Noteholders</u>.    The Issuer, the Securities Administrator and the Indenture Trustee, when authorized by an Issuer Request, also may, with prior notice to the Rating Agencies and, with the prior written consent of the Insurer and the Note Insurer and with the consent of the Holders of not less than a majority of the Note Principal Balance of each Class of Notes affected thereby, by Act (as defined in Section 10.03 hereof) of such Holders, or the Insurer pursuant to Section 4.12 hereof, delivered to the Issuer, the Securities Administrator and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; *provided, however,* that no such supplemental indenture shall, without the consent of the Holder of each Note affected thereby:

(i)    change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof or the interest rate thereon, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the sale of, the Trust Estate and to payment of principal of or interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of the

provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof;

(ii)     reduce the percentage of the Note Principal Balances of the Notes, or any Class of Notes, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences provided for in this Indenture;

(iii)    modify or alter the provisions of the proviso to the definition of the term "Outstanding" or modify or alter the exception in the definition of the term "Holder";

(iv)    reduce the percentage of the Note Principal Balances of the Notes, or any Class of Notes, required to direct the Indenture Trustee to direct the Issuer to sell or liquidate the Trust Estate pursuant to Section 5.04 hereof;

(v)     modify any provision of this Section 9.02 except to increase any percentage specified herein or to provide that certain additional provisions of this Indenture or the Basic Documents cannot be modified or waived without the consent of the Holder of each Note affected thereby;

(vi)    modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation); or

(vii)   permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture;

and *provided, further*, that such action shall not, as evidenced by an Opinion of Counsel, cause the Issuer (if 100% of the Certificates and the Retained Notes (to the extent that such Retained Notes have not received a "will be debt" opinion) are not owned by American Home Mortgage Acceptance Inc.) to be subject to an entity level tax for federal income tax purposes.

Any such action shall not adversely affect in any material respect the interest of any Holder (other than a Holder who shall consent to such supplemental indenture) as evidenced by an Opinion of Counsel (provided by the Person requesting such supplemental indenture) delivered to the Indenture Trustee.

It shall not be necessary for any Act of Noteholders under this Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer, the Securities Administrator and the Indenture Trustee of any supplemental indenture pursuant to this Section 9.02, the Indenture Trustee shall mail to the Owner Trustee and the Holders of the Notes to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture.  Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 9.03   Execution of Supplemental Indentures.  In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article VI or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01 and 6.02 hereof, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent thereto have been complied with.  The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

Section 9.04   Effect of Supplemental Indenture.   Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer and the Holders of the Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture and the Notes for any and all purposes.

Section 9.05   Conformity with Trust Indenture Act.  Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article IX shall conform to the requirements of the Trust Indenture Act as then in effect so long as this Indenture shall then be qualified under the Trust Indenture Act.

Section 9.06   Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  If the Issuer or the Indenture Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

# ARTICLE X

# MISCELLANEOUS

Section 10.01 <u>Compliance Certificates and Opinions, etc</u>.  (a) Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)    a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with;

(4)    a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with; and

(5)    if the signatory of such certificate or opinion is required to be Independent, the statement required by the definition of the term "Independent".

(b)    Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in Section 10.01 (a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days prior to such deposit) to the Issuer of the Collateral or other property or securities to be so deposited and a report from a nationally recognized accounting firm verifying such value.

(c)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee an Independent Certificate from a nationally recognized accounting firm as to the same matters, if the fair value of the

securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the Note Principal Balances of the Notes, but such a certificate need not be furnished with respect to any securities so deposited, if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the then outstanding Note Principal Balances of the Notes.

(d)     Whenever any property or securities are to be released from the lien of this Indenture, the Issuer shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days prior to such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(e)     Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property or securities released from the lien of this Indenture since the commencement of the then-current calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the Note Principal Balances of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the then outstanding Note Principal Balances of the Notes.

Section 10.02  <u>Form of Documents Delivered to Indenture Trustee</u>.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Seller or the Issuer, stating that the information with respect to such factual matters is in the possession of the Seller or the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

Section 10.03  Acts of Noteholders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.01 hereof) conclusive in favor of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 10.03 hereof.

(b)     The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Registrar.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 10.04  Notices etc., to Indenture Trustee, Issuer, Securities Administrator, Note Insurer, Insurer and Rating Agencies.  Any request, demand, authorization, direction, notice, consent, waiver or act of Noteholders or other documents provided or permitted by this Indenture shall be in writing and if such request, demand, authorization, direction, notice, consent, waiver or act of Noteholders is to be made upon, given or furnished to or filed with:

(a)     the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Indenture Trustee at the Corporate Trust Office.  All notices to the Indenture Trustee shall be deemed effective only upon actual receipt.  The Indenture Trustee shall promptly transmit any material notice received by it from the Noteholders to the Issuer and the Insurer; or

(b)     the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing and mailed first-class, postage prepaid to the Issuer addressed to: American Home Mortgage Investment Trust 2005-2, in care of M&T Trust Company of Delaware, City of Wilmington, County of New Castle, State of Delaware at 1220 North Market Street, Suite 202, Wilmington, DE 19801, or at any other address previously furnished in writing to the Indenture Trustee by the Issuer.  The Issuer shall promptly transmit any notice received by it from the Noteholders to the Indenture Trustee and the Insurer; or

(c)     the Securities Administrator by the Indenture Trustee, any Noteholder or by the Issuer shall be sufficient if made, given, furnished or filed in writing and mailed first-class, postage prepaid to the Securities Administrator addressed to: P.O. Box 98, Columbia, MD 21046 or for overnight deliveries, 9062 Old Annapolis Road, Columbia, MD, 21045, Attention: AHM 2005-2, or at any other address previously furnished in writing to the Indenture Trustee by the Securities Administrator.  The Securities Administrator shall promptly transmit any notice received by it from the Noteholders to the Indenture Trustee, the Issuer and the Insurer; or

(d)     the Insurer by the Issuer, the Indenture Trustee or by any Noteholders shall be sufficient for every purpose hereunder if in writing and mailed first-class, postage prepaid, or personally delivered or telecopied to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Research and Risk Management and via electronic mail to SFSurveillance@fgic.com.  The Insurer shall promptly transmit any notice received by it from the Issuer, the Indenture Trustee or the Noteholders to the Issuer or Indenture Trustee as the case may be;

(e)     Notices required to be given to the Rating Agencies by the Issuer, the Indenture Trustee or the Owner Trustee shall be in writing, mailed first-class postage pre-paid, (i) to Standard & Poor's, at the following address: Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, Attention of Asset Backed Surveillance Department; and (ii) to Moody's, at the following address: Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007; or as to each of the foregoing, at such other address as shall be designated by written notice to the other parties; or

(f)     the Note Insurer by the Issuer, the Indenture Trustee or by any Noteholders shall be sufficient for every purpose hereunder if in writing and mailed, first-class postage pre-paid, or personally delivered or telecopied to: Ambac Assurance Corporation, One State Street Plaza, New York, New York 10004, Attention: Consumer Asset-Backed Securities Group, Telephone: (212) 208-3394, Telecopier: (212) 363-1459. The Note Insurer shall promptly transmit any notice received by it from the Issuer, the Indenture Trustee or the Noteholders to the Issuer or Indenture Trustee, as the case may be.

Section 10.05  <u>Notices to Noteholders; Waiver</u>.  Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if made, given, furnished or filed in writing and mailed, first-class, postage prepaid to each Noteholder affected by such event, at such Person's address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given regardless of whether such notice is in fact actually received.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

Section 10.06  <u>Conflict with Trust Indenture Act</u>.  If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the Trust Indenture Act, such required provision shall control.

The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 10.07  <u>Effect of Headings</u>.   The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 10.08  <u>Successors and Assigns</u>.  All covenants and agreements in this Indenture and the Notes by the Issuer shall bind its successors and assigns, whether so expressed or not.  All agreements of the Indenture Trustee in this Indenture shall bind its successors, co-trustees and agents.

Section 10.09  <u>Separability</u>.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 10.10  Benefits of Indenture.  The Insurer and the Note Insurer and its successors and assigns shall be a third-party beneficiary to the provisions of this Indenture.  To the extent that this Indenture confers upon or gives or grants to the Insurer any right, remedy or claim under or by reason of this Indenture, the Insurer and the Note Insurer may enforce any such right, remedy or claim conferred, given or granted hereunder.  Nothing in this Indenture or in the, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Noteholders, the Note Insurer and the Insurer, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 10.11  Legal Holidays.  In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 10.12  GOVERNING LAW.  THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS EXCEPT SECTIONS 5-1401 AND 5-1402 OF NEW YORK GENERAL OBLIGATIONS LAWS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

The parties to this Indenture each hereby irrevocably submits to the non exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, this Indenture or the transactions contemplated hereby, and all such parties hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court and hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.13  Counterparts.   This Indenture may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 10.14  Recording of Indenture.  If this Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel at its expense (which may be counsel to the Indenture Trustee or any other counsel reasonably acceptable to the Indenture Trustee) to the effect that such recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Indenture Trustee under this Indenture.

Section 10.15  Issuer Obligation.  No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.  For all purposes of this Indenture, in the performance of any duties or obligations of the Issuer hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Article VI, VII and VIII of the Trust Agreement.

Section 10.16  No Petition.  The Indenture Trustee, by entering into this Indenture, and each Noteholder, by accepting a Note, hereby covenant and agree that they will not at any time prior to one year from the date of termination hereof, institute against the Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Indenture or any of the Basic Documents, provided, however, that nothing herein shall prohibit the Indenture Trustee from filing proofs of claim.

Section 10.17  Inspection.  The Issuer agrees that, at its expense, on reasonable prior notice, it shall permit any representative of the Indenture Trustee, the Note Insurer and the Insurer, during the Issuer's normal business hours, to examine all the books of account, records, reports and other papers of the Issuer, to make copies and extracts therefrom, to cause such books to be audited by Independent certified public accountants, and to discuss the Issuer's affairs, finances and accounts with the Issuer's officers, employees, and Independent certified public accountants, all at such reasonable times and as often as may be reasonably requested. The Indenture Trustee, the Note Insurer and the Insurer shall cause its representatives to hold in confidence all such information except to the extent disclosure may be required by law, regulation, administrative or regulatory authority (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Indenture Trustee, the Note Insurer or the Insurer may reasonably determine that such disclosure is consistent with its obligations hereunder, provided, however, that the Indenture Trustee may disclose such information, on a confidential basis, to its agents, attorneys and auditors in connection with the performance of its responsibilities under this Indenture.

# ARTICLE XI

## CERTAIN MATTERS REGARDING THE NOTE INSURER

Section 11.01  <u>Rights of the Note Insurer to Exercise the Rights of the Class V-A-4 D Notes</u>.  By accepting its Note, each Class V-A-4-D Noteholder agrees that unless an Note Insurer Default exists, the Note Insurer shall have the right to exercise all consent, voting, direction and other control rights of the Class V-A-4-D Noteholders under this Indenture without any further consent of the Class V-A-4-D Noteholders.

Section 11.02  <u>Claims Upon the Note Insurance Policy; Insurance Account</u>.

(a)      If the Securities Administrator determines that (i) the funds that will be on deposit in the Securities Administrator Collection Account on the third Business Day prior to the related Payment Date, to the extent payable to the Class V-A-4-D Noteholders pursuant to Section 3.06, are insufficient to pay the Accrued Bond Interest on the Class V-A-4-D Notes for such Payment Date, net of any Prepayment Interest Shortfalls, Relief Act Shortfalls, any interest shortfalls during the Funding Period caused by limited interest earnings on the Group V Pre-Funding Account or Net WAC Shortfalls allocated to the Class V-A-4-D Notes or (ii) the funds available in connection with an optional redemption of the Notes pursuant to Section 8.07 or on the Final Scheduled Payment Date will be insufficient to reduce the Note Principal Balance of the Class V-A-4-D Notes to zero, the Securities Administrator shall give notice by telephone or telecopy of the aggregate amount of such deficiency, confirmed in writing in the form set forth as Exhibit A to the endorsement of the Note Insurance Policy, to the Note Insurer at or before 12:00 noon, New York City time, on the Business Day prior to such Payment Date.  If, subsequent to such notice, and prior to payment by the Note Insurer pursuant to such notice, additional amounts are deposited in the Securities Administrator Collection Account, the Securities Administrator shall reasonably promptly notify the Note Insurer and the Indenture Trustee and withdraw the notice or reduce the amount claimed, as appropriate.

(b)      The Indenture Trustee shall establish a separate special purpose non-interest bearing trust account for the benefit of Holders of the Class V-A-4-D Notes and the Note Insurer referred to herein as the "Insurance Account" over which the Indenture Trustee shall have exclusive control and sole right of withdrawal.  The Indenture Trustee shall deposit any amount paid to it under the Note Insurance Policy in the Insurance Account and distribute such amount only for purposes of payment to Holders of Class V-A-4-D Notes of the Class V-A-4-D Insured Amount for which a claim was made.  Such amount may not be applied to satisfy any costs, expenses or liabilities of the Securities Administrator, the Indenture Trustee or the Trust Estate. Amounts paid under the Note Insurance Policy shall be transferred to the Payment Account in accordance with the next succeeding paragraph and disbursed by the Indenture Trustee to Holders of Class V-A-4-D Notes in accordance with Section 3.06 or Section 8.04, as applicable. It shall not be necessary for such payments to be made by checks or wire transfers separate from the checks or wire transfers used to pay the Class V-A-4-D Insured Amount with other funds available to make such payment.  However, the amount of any payment of principal of or interest on the Class V-A-4-D Notes to be paid from funds transferred from the Insurance Account shall be noted as provided in paragraph (c) below and in the statement to be furnished to Holders of

the Notes and Certificates pursuant to Section 7.05.  Funds held in the Insurance Account shall be held uninvested by the Indenture Trustee.

On any Payment Date with respect to which a claim has been made under the Note Insurance Policy, the amount of any funds received by the Indenture Trustee as a result of any claim under the Note Insurance Policy, to the extent required to pay the Class V-A-4-D Insured Amount on such Payment Date, shall be withdrawn by the Indenture Trustee from the Insurance Account and deposited in the Payment Account and applied by the Indenture Trustee, together with the other funds to be distributed to the Class V-A-4-D Noteholders pursuant to Section 3.06, directly to the payment in full of the Insured Amount due on the Class V-A-4-D Notes.  Any funds remaining in the Insurance Account on the first Business Day following a Payment Date shall be remitted by the Indenture Trustee to the Note Insurer, pursuant to the written instructions of the Note Insurer, by the end of such Business Day.

(c)     The Indenture Trustee shall keep a complete and accurate record of the amount of interest and principal paid into the Insurance Account in respect of any Class V-A-4-D Notes from moneys received by the Indenture Trustee under the Note Insurance Policy.  The Note Insurer shall have the right to inspect such records at reasonable times during normal business hours upon two Business Day's prior written notice to the Indenture Trustee.

Section 11.03  Effect  of Payments by the Note Insurer; Subrogation.  Anything herein to the contrary notwithstanding, for purposes of this Section 11.03, any payment with respect to principal of or interest on the Class V-A-4-D Notes which is made with monies received pursuant to the terms of the Note Insurance Policy shall not be considered payment of the Class V-A-4-D Notes from the Trust Estate.  The Securities Administrator and the Indenture Trustee acknowledge, and each Holder by its acceptance of a Class V-A-4-D Note agrees, that without the need for any further action on the part of the Note Insurer, the Securities Administrator, the Indenture Trustee or the Certificate Registrar, to the extent the Note Insurer makes payments, directly or indirectly, on account of principal of or interest on the Class V-A-4-D Notes to the Holders of such Notes, the Note Insurer will be fully subrogated to, and each Class V-A-4-D Noteholder and the Indenture Trustee hereby delegate and assign to the Note Insurer, to the fullest extent permitted by law, the rights of such Holders to receive such principal and interest from the Trust Estate; provided that the Note Insurer shall be paid such amounts only from the sources and in the manner explicitly provided for herein.

The Indenture Trustee and the Securities Administrator shall cooperate in all respects with any reasonable request by the Note Insurer for action to preserve or enforce the Note Insurer's rights or interests under this Indenture without limiting the rights or affecting the interests of the Holders as otherwise set forth herein.

Section 11.04  Notices and Information to the Note Insurer.  All notices, statements, reports, certificates or opinions required by this Indenture  to be sent or made available to any other party  hereto or to the Noteholders or Certificateholders shall also be sent or made available to the Note Insurer.

Section 11.05 <u>Trustee to Hold Note Insurance Policy</u>.  The Indenture Trustee will hold the Note Insurance Policy in trust as agent for the Class V-A-4-D Noteholders  for the purpose of making claims thereon and distributing the proceeds thereof. Neither the Note Insurance Policy, nor the amounts paid on the Note Insurance Policy will constitute part of the Trust Estate.  Each Class V-A-4-D Noteholder, by accepting its Note, appoints the Indenture Trustee as attorney-in-fact for the purpose of making claims on the Note Insurance Policy.  The Indenture Trustee shall surrender the Note Insurance Policy to the Note Insurer for cancellation upon the expiration of the term of the Note Insurance Policy as provided in the Note Insurance Policy following the retirement of the Class V-A-4-D Notes.

IN WITNESS WHEREOF, the Issuer, the Securities Administrator and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

AMERICAN HOME MORTGAGE
INVESTMENT TRUST 2005-2, as Issuer
M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee

By: _____

Name:  Robert D. Brown

Title:  Vice President


WELLS FARGO BANK, N.A., as
Securities Administrator

By: _____
Name:
Title:


DEUTSCHE BANK, NATIONAL TRUST
COMPANY, not in its individual capacity
but solely as Indenture Trustee

By: _____
Name:
Title:


By: _____
Name:
Title:

IN WITNESS WHEREOF, the Issuer, the Securities Administrator and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2, as Issuer M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee

By: _____
Name:
Title:

WELLS FARGO BANK, N.A., as Securities Administrator

By: _____
Name:   Peter A. Gobell
Title:    Vice President

DEUTSCHE BANK, NATIONAL TRUST COMPANY, not in its individual capacity but solely as Indenture Trustee

By: _____
Name:
Title:

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Issuer, the Securities Administrator and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written

> AMERICAN HOME MORTGAGE
> INVESTMENT TRUST 2005-2, as Issuer
> M&T Trust Company of Delaware, not in its
> individual capacity but solely as Owner
> Trustee
>
> By: _____
> Name:
> Title:
>
> WELLS FARGO BANK, N.A., as
> Securities Administrator
>
> By: _____
> Name:
> Title:
>
> DEUTSCHE BANK, NATIONAL TRUST
> COMPANY, not in its individual capacity
> but solely as Indenture Trustee
>
> By: _____
> Name: Nicholas Gisler
> Title: Associate
>
> By: _____
> Name:
> Title: Ronaldo Reyes
>        Vice President

STATE OF DELAWARE    )
                         ) ss:
COUNTY OF NEW CASTLE  )


    On this the _____ day of June, 2005, before me personally appeared Robert D. Brown, to me known, who being by me duly sworn, did depose and say, that he is a Vice President of the Owner Trustee, one of the entities described in and which executed the above instrument; and that he signed his name thereto by like order.

                                   Notary Public

                                   Joan F. Wilson

**JOAN F. WILSON**
**Notary Public**
**State of Delaware**
**My Commission Expires on Sep 23, 2006**

STATE OF MARYLAND   )
                                    ) ss.:
COUNTY OF BALTIMORE )

On this _____ day of June, 2005, before me personally appeared Peter A. Gobell to me known, who being by me duly sworn, did depose and say, that he is a Vice President of the Securities Administrator, one of the corporations described in and which executed the above instrument; and that he signed his name thereto by like order.

```
DARRON C. WOODUS
NOTARY PUBLIC
BALTIMORE COUNTY
MARYLAND
MY COMMISSION EXPIRES DECEMBER 6, 2008
```

Notary Public


NOTARY PUBLIC


[NOTARIAL SEAL]

STATE OF California  )

                                    ) ss :

COUNTY OF Orange  )

On this  22nd  day of  June, 2005, before  me  personally  appeared
Nicholas Gisler to me known, who being by me duly sworn, did depose and say, that
he is the Associate of the Indenture Trustee, one of the corporations described in
and which executed the above instrument; and that he signed his name thereto by like order

Notary Public

MEI NGHIA
Commission # 1520861
Notary Public - California
Orange County
My Comm. Expires Nov 19, 2008

NOTARY PUBLIC  Mei Nghia

[NOTARIAL SEAL]

STATE OF California  )
                    ) ss :
COUNTY OF Orange  )

On this  22nd  day of  June,  2005,  before  me  personally  appeared Ronaldo Reyes to me known, who being by me duly sworn, did depose and say, that he is the Vice-President of the Indenture Trustee, one of the corporations described in and which executed the above instrument; and that he signed his name thereto by like order.

Notary Public

NOTARY PUBLIC  Mei Nghia

MEI NGHIA
Commission # 1520861
Notary Public - California
Orange County
My Comm. Expires Nov 19, 2008

[NOTARIAL SEAL]

EXHIBIT A-1

## CLASS [__-A-__] NOTES

**UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE INDENTURE TRUSTEE OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO.  OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

**THE HOLDER OF THIS NOTE OR BENEFICIAL OWNER OF ANY INTEREST HEREIN WILL BE DEEMED TO REPRESENT TO ONE OF THE REPRESENTATIONS CONTAINED IN SECTION 4.15 OF THE INDENTURE.**

**THIS NOTE IS A NON-RECOURSE OBLIGATION OF THE ISSUER, AND IS LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST ESTATE AS PROVIDED IN THE INDENTURE REFERRED TO BELOW.  THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE.**

**PRINCIPAL OF THIS NOTE IS PAYABLE OVER TIME AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.**

**AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2**
**MORTGAGE-BACKED NOTES, SERIES 2005-2**
**CLASS [__-A-__]**

AGGREGATE NOTE PRINCIPAL
BALANCE: $[_____]

NOTE INTEREST
RATE: [Adjustable Rate][__%]

INITIAL NOTE PRINCIPAL
BALANCE OF THIS NOTE: $[_____]

NOTE NO.  1

PERCENTAGE INTEREST: 100%

CUSIP NO: [_____]

American Home Mortgage Investment Trust 2005-2 (the "Issuer"), a Delaware statutory trust, for value received, hereby promises to pay to [_____].  or registered assigns, the principal sum of $[_____] in monthly installments on the twenty-fifth day of each month or, if such day is not a Business Day, the next succeeding Business Day (each a "Payment Date"), commencing in July 2005 and ending on or before the Payment Date occurring in _____ (the "Final Scheduled Payment Date") and to pay interest on the Note Principal Balance of this Note (this "Note") outstanding from time to time as provided below.

This Note is one of a duly authorized issue of the Issuer's Mortgage-Backed Notes, Series 2005-2 (the "Notes"), issued under an Indenture dated as of June 22, 2005 (the "Indenture"), between the Issuer, Deutsche Bank National Trust Company, as indenture trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as securities administrator (the "Securities Administrator") to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights thereunder of the Issuer, the Indenture Trustee, the Securities Administrator and the Holders of the Notes and the terms upon which the Notes are to be authenticated and delivered.  All terms used in this Note which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

Payments of principal and interest on this Note will be made on each Payment Date to the Noteholder of record as of the related Record Date.  The "Note Principal Balance" of a Note as of any date of determination is equal to the initial Note Principal Balance thereof, reduced by the aggregate of all amounts previously paid with respect to such Note on account of principal [and reduced by the aggregate amount of cumulative Realized Losses allocated to such Note on all prior Payment Dates, and increased by any Subsequent Recoveries allocated to such Note.]

[Financial Guaranty Insurance Company (the "Insurer"), in consideration of the payment of the premium and subject to the terms of the note guaranty insurance policy (the "Insurance Policy") issued thereby, has unconditionally and irrevocably guaranteed the payment of an amount equal to the Insured Payment with respect to the Class VI-A Notes with respect to each Payment Date.]

[Ambac Assurance Corporation (the "Note Insurer"), in consideration of the payment of the premium and subject to the terms of the certificate guaranty insurance policy (the "Note

Insurance Policy") issued thereby, has unconditionally and irrevocably guaranteed the payment of the Class V-A-4-D Insured Amount with respect to the Class V-A-4-D Notes with respect to each Payment Date. Such Note Insurance Policy will not cover any Prepayment Interest Shortfalls, Relief Act Shortfalls, any interest shortfalls during the Funding Period caused by limited interest earnings on the Group V Pre-Funding Account or Net WAC Shortfall Carry-Forward Amount.]

[Pursuant to the Indenture, unless a Note Insurer Default (as defined in the Indenture) exists (i) the Note Insurer shall be deemed to be the holder of the Class V-A-4-D Notes  for certain purposes specified in the Indenture (other than with respect to payment on the Class V-A-4-D Notes), and will be entitled to exercise all rights of the Notedholders thereunder, including the rights of Noteholders relating to the occurrence of, and the remedies with respect to, an Event of Default, without the consent of such Noteholders, and (ii) the Indenture Trustee may take actions which would otherwise be at its option or within its discretion, including actions relating to the occurrence of, and the remedies with respect to, an Event of Default, only at the direction, or with the consent, of the Note Insurer.]

The principal of, and interest on, this Note are due and payable as described in the Indenture, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be equal to this Note's pro rata share of the aggregate payments on all Class [__-A-__] Notes as described above, and shall be applied as between interest and principal as provided in the Indenture.

All principal and interest accrued on the Notes, if not previously paid, will become finally due and payable at the Final Scheduled Payment Date.

[The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.] [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M, Class B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed

and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]   [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.] [The Majority Certificateholder shall have the option to purchase the HELOC Mortgage Loans and thereby redeem the Class VI-A Notes on any Payment Date on or after the Payment Date on which the Note Principal Balance of the Class VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.  If the Majority Certificateholder fails to exercise this right, the Insurer may purchase the HELOC Mortgage Loans 60 days after the Payment Date on which the Note Principal Balance of the Class VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.]

The Issuer shall not be liable upon the indebtedness evidenced by the Notes except to the extent of amounts available from the Trust Estate which constitutes security for the payment of the Notes.  The assets included in the Trust Estate will be the sole source of payments on the Class [__-A-__] Notes, and each Holder hereof, by its acceptance of this Note, agrees that (i) such Note will be limited in right of payment to amounts available from the Trust Estate as provided in the Indenture and (ii) such Holder shall have no recourse to the Issuer, the Owner Trustee, the Indenture Trustee, the Depositor, the Seller, the Securities Administrator, the RMBS Master Servicer, any Servicer or any of their respective affiliates, or to the assets of any of the foregoing entities, except the assets of the Issuer pledged to secure the Class [__-A-__] Notes pursuant to the Indenture and the rights conveyed to the Issuer under the Indenture.

Any payment of principal or interest payable on this Note which is punctually paid on the applicable Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the Record Date for such Payment Date by check mailed to such person's address as it appears in the Note Register on such Record Date, except for the final installment of principal and interest payable with respect to such Note, which shall be payable as provided below.  Notwithstanding the foregoing, upon written request with appropriate instructions by the Holder of this Note delivered to the Indenture Trustee at least five Business Days prior to the Record Date, any payment of principal or interest, other than the final installment of principal or interest, shall be made by wire transfer to an account in the United States designated by such Holder.  All reductions in the principal amount of a Note effected by payments of principal made

on any Payment Date shall be binding upon all Holders of this Note and of any Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.  The final payment of this Note shall be payable upon presentation and surrender thereof on or after the Payment Date thereof at the office or agency designated by the Indenture Trustee and maintained by it for such purpose pursuant to Section 3.02 of the Indenture.

Subject to the foregoing provisions, each Note delivered under the Indenture, upon registration of transfer of or in exchange for or in lieu of any other Note, shall carry the right to unpaid principal and interest that were carried by such other Note.

If an Event of Default as defined in the Indenture shall occur and be continuing with respect to the Notes, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.  If any such acceleration of maturity occurs prior to the payment of the entire unpaid Note Principal Balance of the Notes, the amount payable to the Holder of this Note will be equal to the sum of the unpaid Note Principal Balance of this Note, together with accrued and unpaid interest thereon as described in the Indenture.  The Indenture provides that, notwithstanding the acceleration of the maturity of the Notes, under certain circumstances specified therein, all amounts collected as proceeds of the Trust Estate securing the Notes or otherwise shall continue to be applied to payments of principal of and interest on the Notes as if they had not been declared due and payable.

The failure to pay any Unpaid Interest Shortfall at any time when funds are not available to make such payment as provided in the Indenture shall not constitute an Event of Default under the Indenture.

The Holder of this Note or Beneficial Owner of any interest herein is deemed to represent that either (1) it is not acquiring the Note with Plan Assets or (2) (A) the acquisition, holding and transfer of a Note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (B) the Notes are rated investment grade or better and such person believes that the Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the Notes. Alternatively, regardless of the rating of the Notes, such person may provide the Indenture Trustee and the Owner Trustee with an opinion of counsel, which opinion of counsel will not be at the expense of the Issuer, the Seller, any Underwriter, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer or any servicer, which opines that the acquisition, holding and transfer of such Note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Issuer, the Seller, the Depositor, any Underwriter, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer or any servicer to any obligation in addition to those undertaken in the Indenture.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Note may be registered on the Note Register of the Issuer.  Upon surrender for registration of transfer of, or presentation of a written instrument of transfer for, this Note at the office or agency designated by the Issuer pursuant to the Indenture, accompanied by proper instruments of assignment in form satisfactory to the Indenture Trustee, one or more new Notes

of any authorized denominations and of a like aggregate then outstanding Note Principal Balance, will be issued to the designated transferee or transferees.

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name this Note is registered as the owner of such Note (i) on the applicable Record Date for the purpose of making payments and interest of such Note, and (ii) on any other date for all other purposes whatsoever, as the owner hereof, whether or not this Note be overdue, and neither the Issuer, the Indenture Trustee nor any such agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Holders of a majority of each Class of Notes affected thereby. The Indenture also contains provisions permitting the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes, to waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes, or (b) in respect of a covenant or provision of the Indenture which cannot be modified or amended without the consent of the Holder of each Note. Any such waiver by the Holder, at the time of the giving thereof, of this Note (or any one or more predecessor Notes) shall bind the Holder of every Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not notation of such consent or waiver is made upon such Note. The Indenture also permits the Issuer and the Indenture Trustee, following prior notice to the Rating Agencies, to amend or waive certain terms and conditions set forth in the Indenture without the consent of the Holders of the Notes issued thereunder.

Initially, the Notes will be registered in the name of Cede & Co. as nominee of DTC, acting in its capacity as the Depository for the Notes. The Notes will be delivered by the clearing agency in denominations as provided in the Indenture and subject to certain limitations therein set forth. The Notes are exchangeable for a like aggregate then outstanding Note Principal Balance of Notes of different authorized denominations, as requested by the Holder surrendering same.

Unless the Certificate of Authentication hereon has been executed by the Indenture Trustee by manual signature, this Note shall not be entitled to any benefit under the Indenture, or be valid or obligatory for any purpose.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, neither the Owner Trustee in its individual capacity, nor any of its respective partners, beneficiaries, agents, officers, directors, employees, or successors or assigns, shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note, it being expressly understood that said covenants, obligations and indemnifications have been made solely by the Trust to the extent of the assets of the Trust. The holder of this Note by the acceptance hereof agrees that, except as expressly provided in the Basic Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall

be taken to prevent recourse to, and enforcement against, the assets of the Trust Estate for any and all liabilities, obligations and undertakings contained in this Note.

AS PROVIDED IN THE INDENTURE, THIS NOTE AND THE INDENTURE CREATING THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed by M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee.

Dated: June 22, 2005

<div style="text-align:right">

AMERICAN HOME MORTGAGE
INVESTMENT TRUST 2005-2

BY:   M&T TRUST COMPANY OF
      DELAWARE, not in its individual
      capacity but solely in its capacity as
      Owner Trustee

By:   _____

      Authorized Signatory

</div>

INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Class [__-A-__] Notes referred to in the within-mentioned Indenture.

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Indenture Trustee

By:   _____
      Authorized Signatory

A-1-8

## ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of the Note, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | -- | as tenants in common |
| TEN ENT | -- | as tenants by the entireties |
| JT TEN | -- | as joint tenants with right of survivorship and not as tenants in common |
| UNIF GIFT MIN ACT | -- | _____ Custodian |

                                        _____

                                   (Cust)                  (Minor)

                                   under    Uniform    Gifts    to    Minor    Act

                                   _____

                                                 (State)

ADDITIONAL ABBREVIATIONS MAY ALSO BE USED THOUGH NOT IN THE ABOVE LIST.

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY SELLS, ASSIGNS AND TRANSFERS UNTO

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE:

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE)

_____
the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____      _____

Signature Guaranteed by      _____

      NOTICE: The signature(s) to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatsoever.  Signature(s) must be guaranteed by a commercial bank or by a member firm of the New York Stock Exchange or another national securities exchange.  Notarized or witnessed signatures are not acceptable.

EXHIBIT A-2
CLASS [[__-]M-__] NOTES

THIS NOTE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE CLASS [__A-__] NOTES AND [CLASS [[__-]M-__]] NOTES AS DESCRIBED IN THE INDENTURE.

[UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE INDENTURE TRUSTEE OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO.  OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

THE HOLDER OF THIS NOTE OR BENEFICIAL OWNER OF ANY INTEREST HEREIN WILL BE DEEMED TO REPRESENT TO ONE OF THE REPRESENTATIONS CONTAINED IN SECTION 4.15 OF THE INDENTURE.

THIS NOTE IS A NON-RECOURSE OBLIGATION OF THE ISSUER, AND IS LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST ESTATE AS PROVIDED IN THE INDENTURE REFERRED TO BELOW.  THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE.

PRINCIPAL OF THIS NOTE IS PAYABLE OVER TIME AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

[NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR SHALL HAVE RECEIVED A CERTIFICATE OF NON-FOREIGN STATUS CERTIFYING AS TO THE TRANSFEREE'S STATUS AS A U.S. PERSON OR CORPORATION UNDER U.S. LAW.

NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR HAS RECEIVED PROOF OF THE TRANSFEREE'S STATUS AS A REIT OR AS A QUALIFIED REIT SUBSIDIARY, WITHIN THE MEANING OF SECTION 856(a) OR SECTION 856(i) OF THE CODE, RESPECTIVELY.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND

IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 3.05 OF THE TRUST AGREEMENT REFERRED TO HEREIN.

NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR SHALL HAVE RECEIVED EITHER (i) A REPRESENTATION LETTER FROM THE TRANSFEREE OF THIS NOTE TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR A PERSON ACTING ON BEHALF OF ANY SUCH PLAN OR USING THE ASSETS OF ANY SUCH PLAN, OR (ii) IF THIS NOTE IS PRESENTED FOR REGISTRATION IN THE NAME OF A PLAN SUBJECT TO ERISA OR SECTION 4975 OF THE CODE (OR COMPARABLE PROVISIONS OF ANY SUBSEQUENT ENACTMENTS), OR A TRUSTEE OF ANY SUCH PLAN, OR ANY OTHER PERSON WHO IS USING THE ASSETS OF ANY SUCH PLAN TO EFFECT SUCH ACQUISITION, AN OPINION OF COUNSEL TO THE EFFECT THAT THE PURCHASE OF NOTES, OPERATION OF TRUST AND MANAGEMENT OF TRUST ASSETS ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE SECURITIES ADMINISTRATOR, THE RMBS MASTER SERVICER, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE TRUST AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE RMBS MASTER SERVICER, THE SECURITIES ADMINISTRATOR, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER.]

**AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2**
**MORTGAGE-BACKED NOTES, SERIES 2005-2**
**CLASS [[__-]M-__]**

| | |
|---|---|
| AGGREGATE NOTE PRINCIPAL BALANCE: $[_____] | NOTE INTEREST RATE: Adjustable Rate |
| INITIAL NOTE PRINCIPAL BALANCE OF THIS NOTE: $[_____] | NOTE NO.  1 |
| PERCENTAGE INTEREST: 100% | CUSIP NO: |

American Home Mortgage Investment Trust 2005-2 (the "Issuer"), a Delaware statutory trust, for value received, hereby promises to pay to [_____] or registered assigns, the principal sum of $[_____] in monthly installments on the twenty-fifth day of each month or, if such day is not a Business Day, the next succeeding Business Day (each a "Payment Date"), commencing in July 2005 and ending on or before the Payment Date occurring in _____ (the "Final Scheduled Payment Date") and to pay interest on the Note Principal Balance of this Note (this "Note") outstanding from time to time as provided below.

This Note is one of a duly authorized issue of the Issuer's Mortgage-Backed Notes, Series 2005-2 (the "Notes"), issued under an Indenture dated as of June 22, 2005 (the "Indenture"), between the Issuer, Deutsche Bank National Trust Company, as indenture trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as securities administrator (the "Securities Administrator"), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights thereunder of the Issuer, the Indenture Trustee, the Securities Administrator and the Holders of the Notes and the terms upon which the Notes are to be authenticated and delivered.  All terms used in this Note which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

Payments of principal and interest on this Note will be made on each Payment Date to the Noteholder of record as of the related Record Date.  The "Note Principal Balance" of a Note as of any date of determination is equal to the initial Note Principal Balance thereof, reduced by the aggregate of all amounts previously paid with respect to such Note on account of principal and the aggregate amount of cumulative Realized Losses allocated to such Note on all prior Payment Dates, and increased by any Subsequent Recoveries allocated to such Note.

The principal of, and interest on, this Note are due and payable as described in the Indenture, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be equal to this Note's pro rata share of the aggregate payments on all Class [[__-]M-__] Notes as described above, and shall be applied as between interest and principal as provided in the Indenture.

All principal and interest accrued on the Notes, if not previously paid, will become finally due and payable at the Final Scheduled Payment Date.

A-2-3

[The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.] [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M, Class B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]   [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]

The Issuer shall not be liable upon the indebtedness evidenced by the Notes except to the extent of amounts available from the Trust Estate which constitutes security for the payment of the Notes.  The assets included in the Trust Estate will be the sole source of payments on the Class [[__-]M-__] Notes, and each Holder hereof, by its acceptance of this Note, agrees that (i) such Note will be limited in right of payment to amounts available from the Trust Estate as provided in the Indenture and (ii) such Holder shall have no recourse to the Issuer, the Owner Trustee, the Indenture Trustee, the Depositor, the Securities Administrator,  the Seller, the

RMBS Master Servicer, any Servicer or any of their respective affiliates, or to the assets of any of the foregoing entities, except the assets of the Issuer pledged to secure Class [[__-]M-__] Notes pursuant to the Indenture and the rights conveyed to the Issuer under the Indenture.

Any payment of principal or interest payable on this Note which is punctually paid on the applicable Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the Record Date for such Payment Date by check mailed to such person's address as it appears in the Note Register on such Record Date, except for the final installment of principal and interest payable with respect to such Note, which shall be payable as provided below. Notwithstanding the foregoing, upon written request with appropriate instructions by the Holder of this Note delivered to the Indenture Trustee at least five Business Days prior to the Record Date, any payment of principal or interest, other than the final installment of principal or interest, shall be made by wire transfer to an account in the United States designated by such Holder. All reductions in the principal amount of a Note effected by payments of principal made on any Payment Date shall be binding upon all Holders of this Note and of any note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note. The final payment of this Note shall be payable upon presentation and surrender thereof on or after the Payment Date thereof at the office or agency designated by the Indenture Trustee and maintained by it for such purpose pursuant to Section 3.02 of the Indenture.

Subject to the foregoing provisions, each Note delivered under the Indenture, upon registration of transfer of or in exchange for or in lieu of any other Note, shall carry the right to unpaid principal and interest that were carried by such other Note.

If an Event of Default as defined in the Indenture shall occur and be continuing with respect to the Notes, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture. If any such acceleration of maturity occurs prior to the payment of the entire unpaid Note Principal Balance of the Notes, the amount payable to the Holder of this Note will be equal to the sum of the unpaid Note Principal Balance of this Note, together with accrued and unpaid interest thereon as described in the Indenture. The Indenture provides that, notwithstanding the acceleration of the maturity of the Notes, under certain circumstances specified therein, all amounts collected as proceeds of the Trust Estate securing the Notes or otherwise shall continue to be applied to payments of principal of and interest on the Notes as if they had not been declared due and payable.

The failure to pay any Unpaid Interest Shortfall at any time when funds are not available to make such payment as provided in the Indenture shall not constitute an Event of Default under the Indenture.

[The Holder of this Note or Beneficial Owner of any interest herein is deemed to represent that either (1) it is not acquiring the Note with Plan Assets or (2) (A) the acquisition, holding and transfer of a Note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (B) the Notes are rated investment grade or better and such person believes that the Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the Notes. Alternatively, regardless of the rating of the Notes, such person may provide the Indenture Trustee and the Owner Trustee with an opinion of counsel, which opinion of counsel will not be

at the expense of the Issuer, the Seller, any Underwriter, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer or any servicer, which opines that the acquisition, holding and transfer of such Note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Issuer, the Seller, the Depositor, any Underwriter, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer or any servicer to any obligation in addition to those undertaken in the Indenture.]

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Note may be registered on the Note Register of the Issuer.  Upon surrender for registration of transfer of, or presentation of a written instrument of transfer for, this Note at the office or agency designated by the Issuer pursuant to the Indenture, accompanied by proper instruments of assignment in form satisfactory to the Indenture Trustee, one or more new Notes of any authorized denominations and of a like aggregate then outstanding Note Principal Balance, will be issued to the designated transferee or transferees.

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name this Note is registered as the owner of such Note (i) on the applicable Record Date for the purpose of making payments and interest of such Note, and (ii) on any other date for all other purposes whatsoever, as the owner hereof, whether or not this Note be overdue, and neither the Issuer, the Indenture Trustee nor any such agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Holders of a majority of each Class of Notes affected thereby.  The Indenture also contains provisions permitting the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes, to waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes, or (b) in respect of a covenant or provision of the Indenture which cannot be modified or amended without the consent of the Holder of each Note.  Any such waiver by the Holder, at the time of the giving thereof, of this Note (or any one or more predecessor Notes) shall bind the Holder of every Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not notation of such consent or waiver is made upon such Note.  The Indenture also permits the Issuer and the Indenture Trustee, following prior notice to the Rating Agencies, to amend or waive certain terms and conditions set forth in the Indenture without the consent of the Holders of the Notes issued thereunder.

[Initially, the Notes will be registered in the name of _____- ] [Initially, the Notes will be registered in the name of Cede & Co. as nominee of DTC, acting in its capacity as the Depository for the Notes.  The Notes will be delivered by the clearing agency in denominations as provided in the Indenture and subject to certain limitations therein set forth.] The Notes are exchangeable for a like aggregate then outstanding Note Principal Balance of Notes of different authorized denominations, as requested by the Holder surrendering same.

[No transfer, sale, pledge or other disposition of a Non-Offered Note shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act and any applicable state securities laws or is made in accordance with said Act and laws. In the event of any such transfer, the Note Registrar or the Depositor shall prior to such transfer require the transferee to execute (A) either (i) (a) an investment letter in substantially the form attached to the Indenture as Exhibit K (or in such form and substance reasonably satisfactory to the Note Registrar and the Depositor) which investment letter shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and which investment letter states that, among other things, such transferee (1) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (2) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A or (ii) (a) a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Note Registrar and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and (b) either (1) the transferee executes a representation letter, substantially in the form of Exhibit M hereto, and the transferor executes a representation letter, substantially in the form of Exhibit N hereto, each acceptable to and in form and substance satisfactory to the Note Registrar certifying the facts surrounding such transfer, which representation letters shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor or (2) an Opinion of Counsel has been rendered by nationally recognized tax counsel stating that such Notes will be treated as debt for federal income tax purposes and (B) the Certificate of Non-Foreign Status (in substantially the form attached to the Indenture as Exhibit L) acceptable to and in form and substance reasonably satisfactory to the Note Registrar, which certificate shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor. The Holder of a Non-Offered Note desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Indenture Trustee, the Paying Agent, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of Non-Offered Notes or any interest therein shall be made to any Person unless the Depositor, the Owner Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller are provided with an Opinion of Counsel which establishes to the satisfaction of the Depositor, the Owner Trustee, the Indenture Trustee and the Note Registrar that the purchase of Non-Offered Notes is permissible under applicable law, will not constitute

or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Indenture, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller. In lieu of such Opinion of Counsel, a Person may provide a certification in the form of Exhibit G to the Indenture, which the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller may rely upon without further inquiry or investigation. Neither an Opinion of Counsel nor a certification will be required in connection with the initial transfer of any such Note by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall have deemed to have represented that such affiliate is not a Plan or a Person investing Plan Assets of any Plan) and the Owner Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Owner Trustee, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.

No person shall become a Non-Offered Noteholder, so long as any Notes are Outstanding, until it shall establish its status as a real estate investment trust ("REIT") or as a "qualified REIT subsidiary" ("QRS") within the meaning of Section 856(a) or Section 856(i) of the Code, respectively, by submitting to the Note Registrar and the Transferee Certificate set forth in Exhibit H to the Indenture.

No offer, sale, transfer, pledge, hypothecation or other disposition (including any pledge, sale or transfer under a repurchase transaction or securities loan) of any Non-Offered Note shall be made to any transferee unless, prior to such disposition, the proposed transferor delivers to the Note Registrar (i) an Opinion of Counsel, rendered by a law firm generally recognized to be qualified to opine concerning the tax aspects of asset securitization, to the effect that such transfer (including any disposition permitted following any default under any pledge or repurchase transaction) will not cause the Trust to be no longer be treated for federal income tax purposes as a "qualified REIT subsidiary" within the meaning of Section 856(i) of the Code and (ii) a certificate that stating that any Non-Offered Notes may be transferred by the related lender under any such related loan agreement or repurchase agreement upon a default under any such indebtedness, in which case the transferor shall deliver to the Note Registrar and the Indenture Trustee substantially in the form attached as Exhibit I to the Indenture certifying to such effect. Notwithstanding the foregoing, the provisions of this paragraph shall not apply to the initial transfer of the Non-Offered Notes to the Depositor.]

Unless the Certificate of Authentication hereon has been executed by the Indenture Trustee by manual signature, this Note shall not be entitled to any benefit under the Indenture, or be valid or obligatory for any purpose.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, neither the Owner Trustee in its individual capacity, nor any of its respective partners, beneficiaries, agents, officers, directors, employees, or successors or assigns, shall be

personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note, it being expressly understood that said covenants, obligations and indemnifications have been made solely by the Trust to the extent of the assets of the Trust.  The holder of this Note by the acceptance hereof agrees that, except as expressly provided in the Basic Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Trust Estate for any and all liabilities, obligations and undertakings contained in this Note.

AS PROVIDED IN THE INDENTURE, THIS NOTE AND THE INDENTURE CREATING THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed by M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee.

Dated: June 22, 2005

<div style="margin-left: 40%;">

AMERICAN HOME MORTGAGE
INVESTMENT TRUST 2005-2

BY:    WILMINGTON TRUST COMPANY, not in its individual capacity but solely in its capacity as Owner Trustee

By:    _____
       Authorized Signatory

</div>

<div style="text-align:center;">INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION</div>

This is one of the Class [[__-]M-__] Notes referred to in the within-mentioned Indenture.

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Indenture Trustee

By:    _____
       Authorized Signatory

<div style="text-align:center;">A-2-10</div>

## ABBREVIATIONS

The following abbreviations, when used in the inscription on the face of the Note, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | -- | as tenants in common |
| TEN ENT | -- | as tenants by the entireties |
| JT TEN | -- | as joint tenants with right of survivorship and not as tenants in common |
| UNIF GIFT MIN ACT | -- | _____ Custodian |

                                _____

                                  (Cust)                  (Minor)

                                  under Uniform Gifts to Minor Act

                                  _____

                                                (State)

ADDITIONAL ABBREVIATIONS MAY ALSO BE USED THOUGH NOT IN THE ABOVE LIST.

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY SELLS, ASSIGNS AND
TRANSFERS UNTO

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF
ASSIGNEE:

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF
ASSIGNEE)

_____
the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to transfer said Note on the books kept for registration
thereof, with full power of substitution in the premises.

Dated: _____          _____

Signature Guaranteed by _____

     NOTICE: The signature(s) to this assignment must correspond with the name as it
appears upon the face of the within Note in every particular, without alteration or enlargement or
any change whatsoever.  Signature(s) must be guaranteed by a commercial bank or by a member
firm of the New York Stock Exchange or another national securities exchange.  Notarized or
witnessed signatures are not acceptable.

EXHIBIT A-3
**CLASS [[V-]B] NOTES**

THIS NOTE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE CLASS [__A-__] NOTES AND CLASS [[__-]M-__] NOTES AS DESCRIBED IN THE INDENTURE.

THE HOLDER OF THIS NOTE OR BENEFICIAL OWNER OF ANY INTEREST HEREIN WILL BE DEEMED TO REPRESENT TO ONE OF THE REPRESENTATIONS CONTAINED IN SECTION 4.15 OF THE INDENTURE.

THIS NOTE IS A NON-RECOURSE OBLIGATION OF THE ISSUER, AND IS LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST ESTATE AS PROVIDED IN THE INDENTURE REFERRED TO BELOW.  THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE.

PRINCIPAL OF THIS NOTE IS PAYABLE OVER TIME AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR SHALL HAVE RECEIVED A CERTIFICATE OF NON-FOREIGN STATUS CERTIFYING AS TO THE TRANSFEREE'S STATUS AS A U.S. PERSON OR CORPORATION UNDER U.S. LAW.

NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR HAS RECEIVED PROOF OF THE TRANSFEREE'S STATUS AS A REIT OR AS A QUALIFIED REIT SUBSIDIARY, WITHIN THE MEANING OF SECTION 856(a) OR SECTION 856(i) OF THE CODE, RESPECTIVELY.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 3.05 OF THE TRUST AGREEMENT REFERRED TO HEREIN.

NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR SHALL HAVE RECEIVED EITHER (i) A REPRESENTATION LETTER FROM THE TRANSFEREE OF THIS NOTE TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR A PERSON ACTING ON BEHALF OF ANY SUCH PLAN OR USING THE ASSETS OF ANY SUCH PLAN, OR (ii) IF THIS NOTE IS PRESENTED FOR REGISTRATION IN THE NAME OF A PLAN SUBJECT TO ERISA

**OR SECTION 4975 OF THE CODE (OR COMPARABLE PROVISIONS OF ANY SUBSEQUENT ENACTMENTS), OR A TRUSTEE OF ANY SUCH PLAN, OR ANY OTHER PERSON WHO IS USING THE ASSETS OF ANY SUCH PLAN TO EFFECT SUCH ACQUISITION, AN OPINION OF COUNSEL TO THE EFFECT THAT THE PURCHASE OF NOTES, OPERATION OF TRUST AND MANAGEMENT OF TRUST ASSETS ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE SECURITIES ADMINISTRATOR, THE RMBS MASTER SERVICER, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE TRUST AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE RMBS MASTER SERVICER, THE SECURITIES ADMINISTRATOR, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER.**

## AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2
## MORTGAGE-BACKED NOTES, SERIES 2005-2
## CLASS [[V-]B]

AGGREGATE NOTE PRINCIPAL
BALANCE: $[_____]

NOTE INTEREST
RATE: [Adjustable Rate] [0.000%]

INITIAL NOTE PRINCIPAL
BALANCE OF THIS NOTE: $[_____]

NOTE NO.  1

PERCENTAGE INTEREST: 100%

CUSIP NO:

American Home Mortgage Investment Trust 2005-2 (the "Issuer"), a Delaware statutory trust, for value received, hereby promises to pay to [_____] or registered assigns, the principal sum of $[_____] in monthly installments on the twenty-fifth day of each month or, if such day is not a Business Day, the next succeeding Business Day (each a "Payment Date"), commencing in July 2005 and ending on or before the Payment Date occurring in _____ (the "Final Scheduled Payment Date") [and to pay interest on the Note Principal Balance of this Note (this "Note") outstanding from time to time as provided below.]

This Note is one of a duly authorized issue of the Issuer's Mortgage-Backed Notes, Series 2005-2 (the "Notes"), issued under an Indenture dated as of June 22, 2005 (the "Indenture"), between the Issuer, Deutsche Bank National Trust Company, as indenture trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as securities administrator (the "Securities Administrator"), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights thereunder of the Issuer, the Indenture Trustee and the Holders of the Notes and the terms upon which the Notes are to be authenticated and delivered.  All terms used in this Note which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

Payments of principal [and interest] on this Note will be made on each Payment Date to the Noteholder of record as of of the related Record Date.  The "Note Principal Balance" of a Note as of any date of determination is equal to the initial Note Principal Balance thereof, reduced by the aggregate of all amounts previously paid with respect to such Note on account of principal and the aggregate amount of cumulative Realized Losses allocated to such Note on all prior Payment Dates, and increased by any Subsequent Recoveries allocated to such Note.

The principal of[, and interest on,] this Note are due and payable as described in the Indenture, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be equal to this Note's pro rata share of the aggregate payments on all Class [[V-]B] Notes as described above, and shall be applied as between [interest and ]principal as provided in the Indenture.

All principal [and interest accrued] on the Notes, if not previously paid, will become finally due and payable at the Final Scheduled Payment Date.

[The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.] [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M, Class B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]   [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]

The Issuer shall not be liable upon the indebtedness evidenced by the Notes except to the extent of amounts available from the Trust Estate which constitutes security for the payment of the Notes.  The assets included in the Trust Estate will be the sole source of payments on the Class [[V-]B] Notes, and each Holder hereof, by its acceptance of this Note, agrees that (i) such Note will be limited in right of payment to amounts available from the Trust Estate as provided in the Indenture and (ii) such Holder shall have no recourse to the Issuer, the Owner Trustee, the Indenture Trustee, the Depositor, the Securities Administrator, the Seller, the RMBS Master

Servicer, any Servicer or any of their respective affiliates, or to the assets of any of the foregoing entities, except the assets of the Issuer pledged to secure the Class [[V-]B] Notes pursuant to the Indenture and the rights conveyed to the Issuer under the Indenture.

Any payment of principal [or interest] payable on this Note which is punctually paid on the applicable Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the Record Date for such Payment Date by check mailed to such person's address as it appears in the Note Register on such Record Date, except for the final installment of principal [and interest] payable with respect to such Note, which shall be payable as provided below.  Notwithstanding the foregoing, upon written request with appropriate instructions by the Holder of this Note delivered to the Indenture Trustee at least five Business Days prior to the Record Date, any payment of principal [or interest], other than the final installment of principal [or interest], shall be made by wire transfer to an account in the United States designated by such Holder.  All reductions in the principal amount of a Note effected by payments of principal made on any Payment Date shall be binding upon all Holders of this Note and of any note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note.  The final payment of this Note shall be payable upon presentation and surrender thereof on or after the Payment Date thereof at the office or agency designated by the Indenture Trustee and maintained by it for such purpose pursuant to Section 3.02 of the Indenture.

Subject to the foregoing provisions, each Note delivered under the Indenture, upon registration of transfer of or in exchange for or in lieu of any other Note, shall carry the right to unpaid principal [and interest] that were carried by such other Note.

If an Event of Default as defined in the Indenture shall occur and be continuing with respect to the Notes, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture.  If any such acceleration of maturity occurs prior to the payment of the entire unpaid Note Principal Balance of the Notes, the amount payable to the Holder of this Note will be equal to the sum of the unpaid Note Principal Balance of this Note[, together with accrued and unpaid interest thereon as described in the Indenture].  The Indenture provides that, notwithstanding the acceleration of the maturity of the Notes, under certain circumstances specified therein, all amounts collected as proceeds of the Trust Estate securing the Notes or otherwise shall continue to be applied to payments of principal of [and interest] on the Notes as if they had not been declared due and payable.

[The failure to pay any Unpaid Interest Shortfall at any time when funds are not available to make such payment as provided in the Indenture shall not constitute an Event of Default under the Indenture.]

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Note may be registered on the Note Register of the Issuer.  Upon surrender for registration of transfer of, or presentation of a written instrument of transfer for, this Note at the office or agency designated by the Issuer pursuant to the Indenture, accompanied by proper instruments of assignment in form satisfactory to the Indenture Trustee, one or more new Notes of any authorized denominations and of a like aggregate then outstanding Note Principal Balance, will be issued to the designated transferee or transferees.

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name this Note is registered as the owner of such Note (i) on the applicable Record Date for the purpose of making payments [and interest] of such Note, and (ii) on any other date for all other purposes whatsoever, as the owner hereof, whether or not this Note be overdue, and neither the Issuer, the Indenture Trustee nor any such agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Holders of a majority of each Class of Notes affected thereby.  The Indenture also contains provisions permitting the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes, to waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of [or interest] on any of the Notes, or (b) in respect of a covenant or provision of the Indenture which cannot be modified or amended without the consent of the Holder of each Note.  Any such waiver by the Holder, at the time of the giving thereof, of this Note (or any one or more predecessor Notes) shall bind the Holder of every Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not notation of such consent or waiver is made upon such Note.  The Indenture also permits the Issuer and the Indenture Trustee, following prior notice to the Rating Agencies, to amend or waive certain terms and conditions set forth in the Indenture without the consent of the Holders of the Notes issued thereunder.

Initially, the Notes will be registered in the name of _____.  The Notes are exchangeable for a like aggregate then outstanding Note Principal Balance of Notes of different authorized denominations, as requested by the Holder surrendering same.

No transfer, sale, pledge or other disposition of a Non-Offered Note shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act and any applicable state securities laws or is made in accordance with said Act and laws. In the event of any such transfer, the Note Registrar or the Depositor shall prior to such transfer require the transferee to execute (A) either (i) (a) an investment letter in substantially the form attached to the Indenture as Exhibit K (or in such form and substance reasonably satisfactory to the Note Registrar and the Depositor) which investment letter shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and which investment letter states that, among other things, such transferee (1) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (2) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A or (ii) (a) a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Note Registrar and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities

Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and (b) either (1) the transferee executes a representation letter, substantially in the form of Exhibit M hereto, and the transferor executes a representation letter, substantially in the form of Exhibit N hereto, each acceptable to and in form and substance satisfactory to the Note Registrar certifying the facts surrounding such transfer, which representation letters shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor or (2) an Opinion of Counsel has been rendered by nationally recognized tax counsel stating that such Notes will be treated as debt for federal income tax purposes and (B) the Certificate of Non-Foreign Status (in substantially the form attached to the Indenture as Exhibit L) acceptable to and in form and substance reasonably satisfactory to the Note Registrar, which certificate shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor. The Holder of a Non-Offered Note desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Indenture Trustee, the Paying Agent, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of Non-Offered Notes or any interest therein shall be made to any Person unless the Depositor, the Owner Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller are provided with an Opinion of Counsel which establishes to the satisfaction of the Depositor, the Owner Trustee, the Indenture Trustee and the Note Registrar that the purchase of Non-Offered Notes is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Indenture, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller. In lieu of such Opinion of Counsel, a Person may provide a certification in the form of Exhibit G to the Indenture, which the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Note Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller may rely upon without further inquiry or investigation. Neither an Opinion of Counsel nor a certification will be required in connection with the initial transfer of any such Note by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall have deemed to have represented that such affiliate is not a Plan or a Person investing Plan Assets of any Plan) and the Owner Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Owner Trustee, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.

No person shall become a Non-Offered Noteholder, so long as any Notes are Outstanding, until it shall establish its status as a real estate investment trust ("REIT") or as a "qualified REIT subsidiary" ("QRS") within the meaning of Section 856(a) or Section 856(i) of the Code, respectively, by submitting to the Note Registrar and the Owner Trustee and the Transferee Certificate set forth in Exhibit H to the Indenture.

No offer, sale, transfer, pledge, hypothecation or other disposition (including any pledge, sale or transfer under a repurchase transaction or securities loan) of any Non-Offered Note shall be made to any transferee unless, prior to such disposition, the proposed transferor delivers to the Note Registrar (i) an Opinion of Counsel, rendered by a law firm generally recognized to be qualified to opine concerning the tax aspects of asset securitization, to the effect that such transfer (including any disposition permitted following any default under any pledge or repurchase transaction) will not cause the Trust to be no longer be treated for federal income tax purposes as a "qualified REIT subsidiary" within the meaning of Section 856(i) of the Code and (ii) a certificate that stating that any Non-Offered Notes may be transferred by the related lender under any such related loan agreement or repurchase agreement upon a default under any such indebtedness, in which case the transferor shall deliver to the Note Registrar, the Owner Trustee and the Indenture Trustee substantially in the form attached as Exhibit I to the Indenture certifying to such effect. Notwithstanding the foregoing, the provisions of this paragraph shall not apply to the initial transfer of the Non-Offered Notes to the Depositor.

Unless the Certificate of Authentication hereon has been executed by the Indenture Trustee by manual signature, this Note shall not be entitled to any benefit under the Indenture, or be valid or obligatory for any purpose.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, neither the Owner Trustee in its individual capacity, nor any of its respective partners, beneficiaries, agents, officers, directors, employees, or successors or assigns, shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of [or interest on,] or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note, it being expressly understood that said covenants, obligations and indemnifications have been made solely by the Trust to the extent of the assets of the Trust. The holder of this Note by the acceptance hereof agrees that, except as expressly provided in the Basic Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Trust Estate for any and all liabilities, obligations and undertakings contained in this Note.

AS PROVIDED IN THE INDENTURE, THIS NOTE AND THE INDENTURE CREATING THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed by M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee.

Dated: June 22, 2005

AMERICAN HOME MORTGAGE
INVESTMENT TRUST 2005-2

BY:   WILMINGTON TRUST COMPANY, not in its individual capacity but solely in its capacity as Owner Trustee


By:  _____
     Authorized Signatory

INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Class [[V-]B] Notes referred to in the within-mentioned Indenture.

DEUTSCHE BANK NATIONAL TRUST COMPANY , as Indenture Trustee


By:  _____
    Authorized Signatory

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of the Note, shall be construed as though they were written out in full according to applicable laws or regulations:

| TEN COM | -- | as tenants in common |
| TEN ENT | -- | as tenants by the entireties |
| JT TEN | -- | as joint tenants with right of survivorship and not as tenants in common |
| UNIF GIFT MIN ACT | -- | _____ Custodian |

                                     _____

                                    (Cust)                         (Minor)

                                    under Uniform Gifts to Minor Act

                                    _____

                                                  (State)

ADDITIONAL ABBREVIATIONS MAY ALSO BE USED THOUGH NOT IN THE ABOVE LIST.

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY SELLS, ASSIGNS AND
TRANSFERS UNTO

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF
ASSIGNEE:

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF
ASSIGNEE)

_____
the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to transfer said Note on the books kept for registration
thereof, with full power of substitution in the premises.

Dated: _____          _____

Signature Guaranteed by _____

NOTICE: The signature(s) to this assignment must correspond with the name as it appears upon
the face of the within Note in every particular, without alteration or enlargement or any change
whatsoever.  Signature(s) must be guaranteed by a commercial bank or by a member firm of the
New York Stock Exchange or another national securities exchange.  Notarized or witnessed
signatures are not acceptable.

EXHIBIT A-4

## CLASS N-_ NOTES

**THIS NOTE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE CLASS A, CLASS M, CLASS B, CLASS V-M AND CLASS V-B NOTES AS DESCRIBED IN THE INDENTURE.**

**THE HOLDER OF THIS NOTE OR BENEFICIAL OWNER OF ANY INTEREST HEREIN WILL BE DEEMED TO REPRESENT TO ONE OF THE REPRESENTATIONS CONTAINED IN SECTION 4.15 OF THE INDENTURE.**

**THIS NOTE IS A NON-RECOURSE OBLIGATION OF THE ISSUER, AND IS LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST ESTATE AS PROVIDED IN THE INDENTURE REFERRED TO BELOW. THE ISSUER IS NOT OTHERWISE PERSONALLY LIABLE FOR PAYMENTS ON THIS NOTE.**

**PRINCIPAL OF THIS NOTE IS PAYABLE OVER TIME AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.**

**NO TRANSFER OF THIS NOTE SHALL BE MADE UNLESS THE NOTE REGISTRAR SHALL HAVE RECEIVED EITHER (i) A REPRESENTATION LETTER FROM THE TRANSFEREE OF THIS NOTE TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR A PERSON ACTING ON BEHALF OF ANY SUCH PLAN OR USING THE ASSETS OF ANY SUCH PLAN, OR (ii) IF THIS NOTE IS PRESENTED FOR REGISTRATION IN THE NAME OF A PLAN SUBJECT TO ERISA OR SECTION 4975 OF THE CODE (OR COMPARABLE PROVISIONS OF ANY SUBSEQUENT ENACTMENTS), OR A TRUSTEE OF ANY SUCH PLAN, OR ANY OTHER PERSON WHO IS USING THE ASSETS OF ANY SUCH PLAN TO EFFECT SUCH ACQUISITION, AN OPINION OF COUNSEL TO THE EFFECT THAT THE PURCHASE OF NOTES, OPERATION OF TRUST AND MANAGEMENT OF TRUST ASSETS ARE PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE SECURITIES ADMINISTRATOR, THE RMBS MASTER SERVICER, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE TRUST AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE DEPOSITOR, THE SELLER, THE OWNER TRUSTEE, THE INDENTURE TRUSTEE, THE NOTE REGISTRAR, THE**

**RMBS MASTER SERVICER, THE SECURITIES ADMINISTRATOR, THE HELOC BACK-UP SERVICER, THE RMBS SERVICER OR THE HELOC SERVICER.**

## AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2
## MORTGAGE-BACKED NOTES, SERIES 2005-2
## CLASS N-_

AGGREGATE NOTE PRINCIPAL                         NOTE INTEREST
BALANCE: $[_____]                     RATE: [_____]%

INITIAL NOTE PRINCIPAL                           NOTE NO.  1
BALANCE OF THIS NOTE: $[_____]

PERCENTAGE INTEREST: 100%                        CUSIP NO: [_____]

American Home Mortgage Investment Trust 2005-2 (the "Issuer"), a Delaware statutory trust, for value received, hereby promises to pay to [_____] or registered assigns, the principal sum of $[_____] in monthly installments on the twenty-fifth day of each month or, if such day is not a Business Day, the next succeeding Business Day (each a "Payment Date"), commencing in July 2005 and ending on or before the Payment Date occurring in _____ (the "Final Scheduled Payment Date") and to pay interest on the Note Principal Balance of this Note (this "Note") outstanding from time to time as provided below.

This Note is one of a duly authorized issue of the Issuer's Mortgage-Backed Notes, Series 2005-2 (the "Notes"), issued under an Indenture dated as of June 22, 2005 (the "Indenture"), between the Issuer, Deutsche Bank National Trust Company, as indenture trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as securities administrator (the "Securities Administrator"), to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights thereunder of the Issuer, the Indenture Trustee and the Holders of the Notes and the terms upon which the Notes are to be authenticated and delivered.  All terms used in this Note which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

To the extent of remaining related Net Monthly Excess Cashflow, payments of principal and interest on this Note will be made on each Payment Date to the Noteholder of record as of the related Record Date.  The "Note Principal Balance" of a Note as of any date of determination is equal to the initial Note Principal Balance thereof, reduced by the aggregate of all amounts previously paid with respect to such Note on account of principal.

The principal of, and interest on, this Note are due and payable as described in the Indenture, in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be equal to this Note's pro rata share of the aggregate payments on all Class N-_ Notes as described above, and shall be applied as between interest and principal as provided in the Indenture.

All principal and interest accrued on the Notes, if not previously paid, will become finally due and payable at the Final Scheduled Payment Date.

[The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.] [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M, Class B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]   [The Majority Certificateholder shall have the option to purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M, Class V-B and Class N Notes on or after the Payment Date on which the Stated Principal Balance of the related Mortgage Loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.]

The Issuer shall not be liable upon the indebtedness evidenced by the Notes except to the extent of amounts available from the Trust Estate which constitutes security for the payment of the Notes.  The assets included in the Trust Estate will be the sole source of payments on the Class N-_ Notes, and each Holder hereof, by its acceptance of this Note, agrees that (i) such Note will be limited in right of payment to amounts available from the Trust Estate as provided in the Indenture and (ii) such Holder shall have no recourse to the Issuer, the Owner Trustee, the Indenture Trustee, the Depositor, the Securities Administrator, the Seller, the RMBS Master

Servicer, any Servicer or any of their respective affiliates, or to the assets of any of the foregoing entities, except the assets of the Issuer pledged to secure the Class N-_ Notes pursuant to the Indenture and the rights conveyed to the Issuer under the Indenture.

Any payment of principal or interest payable on this Note which is punctually paid on the applicable Payment Date shall be paid to the Person in whose name such Note is registered at the close of business on the Record Date for such Payment Date by check mailed to such person's address as it appears in the Note Register on such Record Date, except for the final installment of principal and interest payable with respect to such Note, which shall be payable as provided below. Notwithstanding the foregoing, upon written request with appropriate instructions by the Holder of this Note delivered to the Indenture Trustee at least five Business Days prior to the Record Date, any payment of principal or interest, other than the final installment of principal or interest, shall be made by wire transfer to an account in the United States designated by such Holder. All reductions in the principal amount of a Note effected by payments of principal made on any Payment Date shall be binding upon all Holders of this Note and of any note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Note. The final payment of this Note shall be payable upon presentation and surrender thereof on or after the Payment Date thereof at the Corporate Trust Office or the office or agency of the Issuer maintained by it for such purpose pursuant to Section 3.02 of the Indenture.

Subject to the foregoing provisions, each Note delivered under the Indenture, upon registration of transfer of or in exchange for or in lieu of any other Note, shall carry the right to unpaid principal and interest that were carried by such other Note.

If an Event of Default as defined in the Indenture shall occur and be continuing with respect to the Notes, the Notes may become or be declared due and payable in the manner and with the effect provided in the Indenture. If any such acceleration of maturity occurs prior to the payment of the entire unpaid Note Principal Balance of the Notes, the amount payable to the Holder of this Note will be equal to the sum of the unpaid Note Principal Balance of this Note, together with accrued and unpaid interest thereon as described in the Indenture. The Indenture provides that, notwithstanding the acceleration of the maturity of the Notes, under certain circumstances specified therein, all amounts collected as proceeds of the Trust Estate securing the Notes or otherwise shall continue to be applied to payments of principal of and interest on the Notes as if they had not been declared due and payable.

As provided in the Indenture and subject to certain limitations therein set forth, the transfer of this Note may be registered on the Note Register of the Issuer. Upon surrender for registration of transfer of, or presentation of a written instrument of transfer for, this Note at the office or agency designated by the Issuer pursuant to the Indenture, accompanied by proper instruments of assignment in form satisfactory to the Indenture Trustee, one or more new Notes of any authorized denominations and of a like aggregate then outstanding Note Principal Balance, will be issued to the designated transferee or transferees.

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name this Note is registered as the owner of such Note (i) on the applicable Record Date for the purpose of making payments and interest of such Note, and (ii) on any other date for all

other purposes whatsoever, as the owner hereof, whether or not this Note be overdue, and neither the Issuer, the Indenture Trustee nor any such agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the rights of the Holders of the Notes under the Indenture at any time by the Issuer and the Holders of a majority of each Class of Notes affected thereby.  The Indenture also contains provisions permitting the Holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes, to waive any past Event of Default and its consequences except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes, or (b) in respect of a covenant or provision of the Indenture which cannot be modified or amended without the consent of the Holder of each Note.  Any such waiver by the Holder, at the time of the giving thereof, of this Note (or any one or more predecessor Notes) shall bind the Holder of every Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not notation of such consent or waiver is made upon such Note.  The Indenture also permits the Issuer and the Indenture Trustee, following prior notice to the Rating Agencies, to amend or waive certain terms and conditions set forth in the Indenture without the consent of the Holders of the Notes issued thereunder.

Initially, the Notes will be registered in the name of _____.  The Notes are exchangeable for a like aggregate then outstanding Note Principal Balance of Notes of different authorized denominations, as requested by the Holder surrendering same.

[No transfer, sale, pledge or other disposition of a Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act and any applicable state securities laws or is made in accordance with said Act and laws. In the event of any such transfer, the Certificate Registrar or the Depositor shall prior to such transfer require the transferee to execute (A) either (i) (a) an investment letter in substantially the form attached to the Agreement as Exhibit C (or in such form and substance reasonably satisfactory to the Certificate Registrar and the Depositor) which investment letter shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and which investment letter states that, among other things, such transferee (1) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (2) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A or (ii) (a) a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Certificate Registrar and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor and (b) the transferee executes a representation letter, substantially in the form of Exhibit D to the Indenture, and the transferor executes a representation letter,

substantially in the form of Exhibit E to the Indenture, each acceptable to and in form and substance satisfactory to the Indenture Trustee and the Depositor certifying the facts surrounding such transfer, which representation letters shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor acceptable to and in form and substance reasonably satisfactory to the Indenture Trustee and the Depositor, which certificate shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the Seller or the Depositor. The Holder of a Note desiring to effect such transfer shall, and does hereby agree to, indemnify the Trust, the Owner Trustee, the Indenture Trustee, the Certificate Paying Agent, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.]

[No transfer of Notes or any interest therein shall be made to any Person unless the Depositor, the Owner Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller are provided with an Opinion of Counsel which establishes to the satisfaction of the Depositor, the Owner Trustee, the Indenture Trustee and the Certificate Registrar that the purchase of Notes is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Trust Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or the Seller. In lieu of such Opinion of Counsel, a Person may provide a certification in the form of Exhibit G to the Agreement, which the Depositor, the Owner Trustee, the Indenture Trustee, the Securities Administrator, the Certificate Registrar, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Back-Up Servicer and the Seller may rely upon without further inquiry or investigation. Neither an Opinion of Counsel nor a certification will be required in connection with the initial transfer of any such Note by the Depositor to an affiliate of the Depositor (in which case, the Depositor or any affiliate thereof shall have deemed to have represented that such affiliate is not a Plan or a Person investing Plan Assets of any Plan) and the Owner Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Owner Trustee, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor.]

Unless the Certificate of Authentication hereon has been executed by the Indenture Trustee by manual signature, this Note shall not be entitled to any benefit under the Indenture, or be valid or obligatory for any purpose.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, neither the Owner Trustee in its individual capacity, nor any of its respective partners, beneficiaries, agents, officers, directors, employees, or successors or assigns, shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on, or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in this Note, it being expressly understood that said covenants, obligations and indemnifications have been made solely by the Trust to the extent of the assets of the Trust.  The holder of this Note by the acceptance hereof agrees that, except as expressly provided in the Basic Documents, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Trust Estate for any and all liabilities, obligations and undertakings contained in this Note.

AS PROVIDED IN THE INDENTURE, THIS NOTE AND THE INDENTURE CREATING THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN.

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed by M&T Trust Company of Delaware, not in its individual capacity but solely as Owner Trustee.

Dated: June 22, 2005

AMERICAN HOME MORTGAGE
INVESTMENT TRUST 2005-2

BY:  WILMINGTON TRUST COMPANY, not in its individual capacity but solely in its capacity as Owner Trustee

By:  _____
Authorized Signatory

INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Class N-_ Notes referred to in the within-mentioned Indenture.

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Indenture Trustee

By:  _____
Authorized Signatory

A-4-9

<u>ABBREVIATIONS</u>

The following abbreviations, when used in the inscription on the face of the Note, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | -- | as tenants in common |
| TEN ENT | -- | as tenants by the entireties |
| JT TEN | -- | as joint tenants with right of survivorship and not as tenants in common |
| UNIF GIFT MIN ACT | -- | _____ Custodian |

    _____

     (Cust)               (Minor)

    under Uniform Gifts to Minor Act

    _____

                         (State)

ADDITIONAL ABBREVIATIONS MAY ALSO BE USED THOUGH NOT IN THE ABOVE LIST.

EXHIBIT B

MORTGAGE LOAN SCHEDULE

(FILED MANUALLY)

EXHIBIT C

FORM OF CAP CONTRACT

[to be inserted]

EXHIBIT D

FORM OF CORRIDOR CONTRACT

[TO BE INSERTED]

EXHIBIT E

FORM OF INSURANCE POLICY

[TO BE INSERTED]

EXHIBIT F

FORM OF SUBSEQUENT TRANSFER INSTRUMENT

Pursuant to this Subsequent Transfer Instrument, dated   [_____], 2005 (the "Instrument"), between American Home Mortgage Securities LLC, as seller (the "Company"), and Deutsche Bank National Trust Company, as indenture trustee of the American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2, (the "Indenture Trustee"), on behalf of American Home Mortgage Investment Trust 2005-2 (the "Issuer"), as purchaser, and pursuant to the Indenture, dated as of June 22, 2005 (the "Indenture"), among the Issuer, the Indenture Trustee and Wells Fargo Bank, N.A., as the Securities Administrator, the Company and the Indenture Trustee agree to the sale by the Company and the purchase by the Indenture Trustee in trust, on behalf of the Trust, of the Group [__] Subsequent Mortgage Loans on the attached Schedule 1 of Mortgage Loans (the "Group [__] Subsequent Mortgage Loans").

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indenture.

Section 1.      Conveyance of Group [__] Subsequent Mortgage Loans; Acceptance of Mortgage Loans by the Indenture Trustee.

(a)      The Company does hereby sell, transfer, assign, set over and convey to the Indenture Trustee in trust, on behalf of the Trust, without recourse, all of its right, title and interest in and to the Group [__] Subsequent Mortgage Loans, including all amounts due on the Group [__] Subsequent Mortgage Loans after the related Subsequent Cut-off Date, and all items with respect to the Group I Subsequent Mortgage Loans to be delivered pursuant to Section 2. [__] of the Indenture; provided, however that the Company reserves and retains all right, title and interest in and to amounts due on the Group [__] Subsequent Mortgage Loans on or prior to the related Subsequent Cut-off Date.  The Company, contemporaneously with the delivery of this Agreement, has delivered or caused to be delivered to the Indenture Trustee each item set forth in Section 2.[__]of the Indenture.  The transfer to the Indenture Trustee by the Company of the Group [__] Subsequent Mortgage Loans identified on the Mortgage Loan Schedule shall be absolute and is intended by the Company, the [RMBS][HELOC] Master Servicer, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale by the Company to the Trust Fund.

(b)      The Company, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Indenture Trustee without recourse for the benefit of the Noteholders all the right, title and interest of the Company, in, to and under the Subsequent Mortgage Loan Purchase Agreement, dated [_____], 2005, between   the Company, as purchaser, and American Home Mortgage Acceptance Inc., as seller (the "Purchase Agreement").

(c)      The Indenture Trustee shall acknowledge receipt of, subject to the exceptions the Indenture Trustee notes pursuant to the procedures described in Section 2.03 of the Indenture, the documents (or certified copies thereof) referred to in Section 2.1(b) of the Subsequent Mortgage Loan Purchase Agreement, and declares that it holds and will continue to hold those documents

and any amendments, replacements or supplements thereto and all other assets of the Trust Estate in trust for the use and benefit of all present and future Holders of the Notes.

Additional terms of the sale are set forth on Attachment A hereto.

Section 2.      Representations and Warranties; Conditions Precedent.

(a)      The Company hereby confirms that each of the conditions and the representations and warranties set forth in Sections 2.05, 2.06, 2.07, 2.08, 2.09, 2.10, 2.11, 2.12 and 2.13, as applicable,  of the Indenture are satisfied as of the date hereof.

(b)      All terms and conditions of the Indenture are hereby ratified and confirmed; provided, however, that in the event of any conflict, the provisions of this Instrument shall control over the conflicting provisions of the Indenture.

Section 3.      Recordation of Instrument.

To the extent permitted by applicable law, this Instrument, or a memorandum thereof if permitted under applicable law, is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the [RMBS][HELOC] Master Servicer at the Noteholders' expense on direction of the related Noteholders, but only when accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Noteholders or is necessary for the administration or servicing of the Group [__] Subsequent Mortgage Loans.

Section 4.      Governing Law.

This Instrument shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, without giving effect to principles of conflicts of law.

Section 5.      Counterparts.

This Instrument may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same instrument.

Section 6.      Successors and Assigns.

This Instrument shall inure to the benefit of and be binding upon the Company and the Indenture Trustee and their respective successors and assigns.

AMERICAN HOME MORTGAGE SECURITIES LLC,
  as Seller


By:
Name:
Title:



DEUTSCHE BANK NATIONAL TRUST COMPANY,
  not in its individual capacity
  but solely as Indenture Trustee for the Trust.



By:
Name:
Title:

EXHIBIT G

FORM OF ADDITION NOTICE

[Date]

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705

Ambac Assurance Corporation
One State Street Plaza
New York, NY 10004

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017

Wells Fargo Bank, N.A.
P.O. Box 98
Columbia , Maryland 21046


  RE: Indenture, dated as of June 22, 2005 (the "Indenture"), between American Home Mortgage Investment Trust 2005-2, a Delaware business trust, as Issuer (the "Issuer"),  Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"), relating to American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2, Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent Transfer _____

Ladies and Gentlemen:

  Pursuant to Section 2.05 of the Indenture, Issuer has designated the Group I Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

  Pursuant to Section 2.06 of the Indenture, Issuer has designated the Group II-C Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

  Pursuant to Section 2.06 of the Indenture, Issuer has designated the Group II-NC Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

  Pursuant to Section 2.07 of the Indenture, Issuer has designated the Group III Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

Pursuant to Section 2.08 of the Indenture, Issuer has designated the Group IV Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

Pursuant to Section 2.09 of the Indenture, Issuer has designated the Group V Subsequent Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

Pursuant to Section 2.10 of the Indenture, Issuer has designated the Group VI Subsequent HELOC Mortgage Loans to be transferred to the Indenture Trustee on _____, 20__, with an approximate aggregate principal balance of $_____.

Capitalized terms not otherwise defined herein have the meaning set forth in the Indenture.

Please acknowledge your receipt of this notice by countersigning the enclosed copy in the space indicated below and returning it to the attention of the undersigned.

Very truly yours,

AMERICAN        HOME        MORTGAGE
INVESTMENT TRUST 2005-2, as Issuer
M&T Trust Company of Delaware, not in its
individual capacity but solely as Owner
Trustee

By: _____
Name:
Title:

ACKNOWLEDGED AND AGREED:

DEUTSCHE BANK NATIONAL TRUST COMPANY, not in its individual
capacity but solely as Indenture Trustee
for the Trust.

By:
Name:
Title:

EXHIBIT H

FORM OF INITIAL CERTIFICATION

, 200_

AMERICAN HOME MORTGAGE SECURITIES, LLC
538 Broadhollow Road
Melville, New York 11747

DEUTSCHE BANK NATIONAL TRUST COMPANY
1761 East St. Andrew Place
Santa Ana, California 92705

AMERICAN HOME MORTGAGE SERVICING, INC.
7142 Columbia Gateway Drive
Columbia, Maryland 21046

Attention: American Home Mortgage Investment Trust 2005-2

> Re: Indenture, dated as of June 22, 2005 (the "Indenture"), between American Home Mortgage Investment Trust 2005-2, a Delaware business trust, as Issuer (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator")

Ladies and Gentlemen:

In accordance with Section 2.03(a) of the Indenture and Section 2.1(b)(i)-(v) of the Mortgage Loan Purchase Agreement, dated as of June 22, 2005, between American Home Mortgage Acceptance, Inc. and American Home Mortgage Securities LLC (the "MLPA", and together with the Indenture, the "Agreements"), the undersigned, as Indenture Trustee, hereby certifies that as to each Mortgage Loan listed in the related Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the exception report attached hereto) it has reviewed the Mortgage File and the related Mortgage Loan Schedule and has determined that: (i) all documents required to be included in the Mortgage File pursuant to Section 2.1(b)(i)-(v) (except clause (v)(ii)) of the MLPA are in its possession; (ii) such documents have been reviewed by it and appear regular on their face and relate to such Mortgage Loan; and (iii) based on examination by it, and only as to such documents, the information set forth in items (iii) and (v) of the definition or description of "Mortgage Loan Schedule" is correct.

The Indenture Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Agreements. The Indenture Trustee makes no representation that any documents specified in clauses (v)(ii) and (vi) of Section 2.1 (b) of the MLPA should be included in any Mortgage File. The Indenture Trustee makes no representations as to and shall not be responsible to verify: (i) the validity, legality, sufficiency, enforceability, due authorization, recordability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans

H-1

identified on the related Mortgage Loan Schedule, (ii) the collectability, insurability, effectiveness, perfection, priority or suitability of any such Mortgage Loan, or (iii) the existence of any hazard insurance policy or assumption, modification, written assurance or substitution agreement with respect to any Mortgage File if no such documents appear in the Mortgage File delivered to the Indenture Trustee.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Indenture.

DEUTSCHE BANK NATIONAL
TRUST COMPANY,
As Indenture Trustee


By: _____
Name:
Title:

EXHIBIT I

FORM OF FINAL CERTIFICATION

, 200__

AMERICAN HOME MORTGAGE SECURITIES, LLC
538 Broadhollow Road
Melville, New York 11747

DEUTSCHE BANK NATIONAL TRUST COMPANY
1761 East St. Andrew Place
Santa Ana, California 92705

AMERICAN HOME MORTGAGE SERVICING, INC.
7142 Columbia Gateway Drive
Columbia, Maryland 21046

Attention: American Home Mortgage Investment Trust 2005-2

> Re:   Indenture, dated as of June 22, 2005 (the "Indenture"), between American Home Mortgage Investment Trust 2005-2, a Delaware business trust, as Issuer (the "Issuer"),   Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee") and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator")

Ladies and Gentlemen:

In accordance with Section 2.03(a) of the Indenture and Section 2.1(b)(i)-(v) of the Mortgage Loan Purchase Agreement, dated as of June 22, 2005, between American Home Mortgage Acceptance, Inc. and American Home Mortgage Securities LLC (the "MLPA", and together with the Indenture, the "Agreements"), the undersigned, as Indenture Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the exception report attached hereto) it has received the documents set forth in Section 2.1(b)(i)-(v) (except clause (v)(ii)) of the MLPA.

The Indenture Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Agreements. The Indenture Trustee makes no representation that any documents specified in clauses (v)(ii) and (vi) of Section 2.1 (b) should be included in any Mortgage File. The Indenture Trustee makes no representations as to and shall not be responsible to verify: (i) the validity, legality, sufficiency, enforceability, due authorization, recordability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the related Mortgage Loan Schedule, (ii) the collectability, insurability, effectiveness, perfection, priority or suitability of any such Mortgage Loan, or (iii) the existence of any hazard insurance policy or assumption, modification, written assurance or substitution agreement with respect to any Mortgage File if no such documents appear in the Mortgage File delivered to the Indenture Trustee.

I-1

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Indenture.

DEUTSCHE BANK NATIONAL
TRUST COMPANY,
as Indenture Trustee


By: _____
Name:
Title:

EXHIBIT J

FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:      REQUEST FOR RELEASE OF DOCUMENTS

In connection with your administration of the Mortgage Loans, we request the release of the Mortgage File described below.

Servicing Agreement Dated:
Series #:
Account #:
Pool #:
Loan #:
Borrower Name(s):
Reason for Document Request: (circle one)          Mortgage Loan Prepaid in Full
                                                   Other
                                                   Mortgage Loan Repurchased


PLEASE DELIVER THE MORTGAGE FILE TO

"We hereby certify that all amounts received or to be received in connection with such payments which are required to be deposited have been deposited as provided in the Servicing Agreement."

[Name of RMBS Master Servicer]
Authorized Signature
****************************************************************************
TO INDENTURE TRUSTEE:   Please acknowledge this request, and check off documents being enclosed with a copy of this form. You should retain this form for your files in accordance with the terms of the Indenture.

                          Enclosed Documents: [ ]      Promissory Note
                                              [ ]      Primary Insurance Policy
                                              [ ]      Mortgage or Deed of Trust
                                              [ ]      Assignment(s) of Mortgage or Deed of
                                                         Trust
                                              [ ]      Title Insurance Policy
                                              [ ]      Other:

_____
Name
_____
Title
_____
Date

EXHIBIT K

FORM OF RULE 144A INVESTMENT REPRESENTATION

Description of Rule 144A Securities, including numbers:

_____

_____

_____

_____

The undersigned seller, as registered holder (the "Seller"), intends to transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1.   In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller hereby certifies the following facts: Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2.   The Buyer warrants and represents to, and covenants with, the Owner Trustee, the Note Registrar and the Depositor (as defined in the Indenture (the "Agreement"), dated as of June 22, 2005, among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator") pursuant to Section 4.02 of the Agreement and Deutsche Bank National Trust Company, as indenture trustee, as follows:

a. The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

b. The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

c. The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Indenture Trustee, the Owner

Trustee, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer or the HELOC Servicer.

d. Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

e. The Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2. The Buyer is aware that the sale to it is being made in reliance on Rule 144A. The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule 144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

3. The Buyer warrants and represents to, and covenants with, the Seller, the Indenture Trustee, Owner Trustee, the Note Registrar, RMBS Master Servicer, the Securities Administrator, the HELOC Back-Up Servicer, the RMBS Servicer, the HELOC Servicer and the Depositor that either (1) the Buyer is (A) not an employee benefit plan (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), or a plan (within the meaning of Section 4975(e)(1) of the Internal Revenue Code of 1986 ("Code")), which (in either case) is subject to ERISA or Section 4975 of the Code (each, a "Plan"), and (B) is not directly or indirectly purchasing the Rule 144A Securities on behalf of, as investment manager of, as named fiduciary of, as trustee of, or with "plan assets" of a Plan, or (2) the Buyer understands that registration of transfer of any Rule 144A Securities to any Plan, or to any Person acting on behalf of any Plan, will not be made unless such Plan delivers an opinion of its counsel, addressed and satisfactory to the Note Registrar and the Depositor, to the effect (A) that the purchase and holding of the Rule 144A Securities by, on behalf of or with "plan assets" of any Plan, (B) operation of the Trust and (C) management of Trust assets are permissible under applicable law, would not constitute or result in a prohibited transaction under ERISA or Section 4975 of the Code, and would not subject the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Securities Administrator, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer or the HELOC Servicer to any obligation or liability (including liabilities under ERISA or Section 4975 of the Code) in addition

K-2

to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Depositor, the Owner Trustee, the Note Registrar, the Indenture Trustee, the Securities Administrator, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer or the HELOC Servicer.

4. This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.

IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.


_____          _____
Print Name of Seller                       Print Name of Buyer


By: _____            By: _____
    Name:                                      Name:
    Title:                                     Title:
Taxpayer Identification:                   Taxpayer Identification:
No. _____             No. _____
Date: _____             Date: _____

<u>ANNEX 1 TO EXHIBIT K</u>

<u>QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A</u>

[FOR BUYERS OTHER THAN REGISTERED INVESTMENT COMPANIES]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1.  As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2.  In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $_____$[1]    in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

\_\_\_\_   <u>Corporation, etc</u>. The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

\_\_\_\_   <u>Bank</u>. The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

\_\_\_\_   <u>Savings and Loan</u>. The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements.

\_\_\_\_   <u>Broker-Dealer</u>. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

---

[1]     Buyer must own and/or invest on a discretionary basis at least $100,000,000 in securities unless Buyer is a dealer, and, in that case, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities.

___ Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

___ State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

___ ERISA Plan. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

___ Investment Adviser. The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

___ SBIC. The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

___ Business Development Company. The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

___ Trust Fund. The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

3.   The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit Notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4.   For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5.   The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

_____          _____                   Will the Buyer be purchasing the Rule 144A
  Yes                No                     Securities only for the Buyer's own account?

6.   If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A. In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7.   The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.

_____
Print Name of Buyer

By:   _____
         Name:
         Title:

Date: _____

<u>ANNEX 2 TO EXHIBIT K</u>

<u>QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A</u>

[FOR BUYERS THAT ARE REGISTERED INVESTMENT COMPANIES]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

2. In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

_____    The Buyer owned $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

_____    The Buyer is part of a Family of Investment Companies which owned in the aggregate $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

3. The term "<u>Family of Investment Companies</u>" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

4. The term "<u>securities</u>" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) bank deposit Notes and certificates of deposit, (iii) loan participations, (iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and (vi) currency, interest rate and commodity swaps.

5. The Buyer is familiar with Rule 144A and understands that each of the parties to which this certification is made are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A. In addition, the Buyer will only purchase for the Buyer's own account.

6. The undersigned will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice, the Buyer's

purchase of Rule 144A Securities will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

_____

Print Name of Buyer


By: _____

     Name:

     Title:

IF AN ADVISER:

_____

Print Name of Buyer


Date: _____

EXHIBIT L

CERTIFICATE OF NON-FOREIGN STATUS

This Certificate of Non-Foreign Status ("certificate") is delivered pursuant to Section 4.02 of the Indenture, dated as of June 22, 2005 (the "Indenture"), among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"), in connection with the acquisition of, transfer to or possession by the undersigned, whether as beneficial owner for U.S. federal income tax purposes (the "Beneficial Owner"), or nominee on behalf of the Beneficial Owner of the Class ____ Notes, Series 2005-2 (the "Note"). Capitalized terms used but not defined in this certificate have the respective meanings given them in the Indenture.

Each holder must complete Part I, Part II (if the holder is a nominee), and in all cases sign and otherwise complete Part III.

In addition, each holder shall submit with the Certificate an IRS Form W-9 relating to such holder.

To confirm to the Trust that the provisions of Sections 871, 881 or 1446 of the Internal Revenue Code (relating to withholding tax on foreign partners) do not apply in respect of the Note held by the undersigned, the undersigned hereby certifies:

Part I -      Complete Either A or B

        A.      Individual as Beneficial Owner

                1.      I am (The Beneficial Owner is) not a non-resident alien for purposes of U.S. income taxation;

                2.      My (The Beneficial Owner's) name and home address are:

                        ; and

                3.      My (The Beneficial Owner's) U.S. taxpayer identification number (Social Security Number) is

        B.      Corporate, Partnership or Other Entity as Beneficial Owner

                1.      _____ (Name of the Beneficial Owner) is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and Treasury Regulations;

                2.      The Beneficial Owner's office address and place of incorporation (if applicable) is

                        ; and

3.     The Beneficial Owner's U.S. employer identification number is _____.

Part II -          Nominees

If the undersigned is the nominee for the Beneficial Owner, the undersigned certifies that this certificate has been made in reliance upon information contained in:

an IRS Form W-9

a form such as this or substantially similar

provided to the undersigned by an appropriate person and (i) the undersigned agrees to notify the Note Registrar at least thirty (30) days prior to the date that the form relied upon becomes obsolete, and (ii) in connection with change in Beneficial Owners, the undersigned agrees to submit a new Certificate of Non-Foreign Status to the Note Registrar promptly after such change.

Part III -          Declaration

The undersigned, as the Beneficial Owner or a nominee thereof, agrees to notify the Note Registrar within sixty (60) days of the date that the Beneficial Owner becomes a foreign person. The undersigned understands that this certificate may be disclosed to the Internal Revenue Service by the Note Registrar and any false statement contained therein could be punishable by fines, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief it is true, correct and complete and will further declare that I will inform the Trust of any change in the information provided above, and, if applicable, I further declare that I have the authority* to sign this document.

_____
Name

_____
Title (if applicable)

_____
Signature and Date

*Note: If signed pursuant to a power of attorney, the power of attorney must accompany this certificate.

EXHIBIT M

FORM OF INVESTMENT LETTER [NON-RULE 144A]

[DATE]

M&T Trust Company of Delaware, as Owner Trustee
[_____]

Deutsche Bank National Trust Company
1761 E. St. Andrew Place
Santa Ana, CA 92705

      Re:    American Home Mortgage Investment Trust 2005-2 Non-Offered Notes,
              Series 2005-2, Class [____] (the "Non-Offered Notes")

Ladies and Gentlemen:

In connection with our acquisition of the above-captioned Non-Offered Notes, we certify that (a) we understand that the Non-Offered Notes are not being registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws and are being transferred to us in a transaction that is exempt from the registration requirements of the Act and any such laws, (b) we are an "accredited investor," as defined in Regulation D under the Act, and have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of investments in the Non-Offered Notes, (c) we have had the opportunity to ask questions of and receive answers from the Depositor concerning the purchase of the Non-Offered Notes and all matters relating thereto or any additional information deemed necessary to our decision to purchase the Non-Offered Notes, (d) we are not an employee benefit plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, or a plan that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of any such plan, (e) we are acquiring the Non-Offered Notes for investment for our own account and not with a view to any distribution of such Non-Offered Notes (but without prejudice to our right at all times to sell or otherwise dispose of the Non-Offered Notes in accordance with clause (g) below), (f) we have not offered or sold any Non-Offered Notes to, or solicited offers to buy any Non-Offered Notes from, any person, or otherwise approached or negotiated with any person with respect thereto, or taken any other action which would result in a violation of Section 5 of the Act, and (g) we will not sell, transfer or otherwise dispose of any Non-Offered Notes unless (1) such sale, transfer or other disposition is made pursuant to an effective registration statement under the Act or is exempt from such registration requirements, and if requested, we will at our expense provide an opinion of counsel satisfactory to the addressees of this certificate that such sale, transfer or other disposition may be made pursuant to an exemption from the Act, (2) the purchaser or transferee of such Non-Offered Note has executed and delivered to you a certificate to substantially the same effect as this certificate, and (3) the purchaser or transferee has otherwise complied with any conditions for transfer set forth in the Indenture.

Very truly yours,

[TRANSFEREE]


By: _____
        Authorized Officer

EXHIBIT N

<u>TRANSFEROR CERTIFICATE</u>

M&T Trust Company of Delaware, as Owner Trustee
[_____]

Deutsche Bank National Trust Company
1761 E. St. Andrew Place
Santa Ana, CA 92705

      Re:    <u>Proposed Transfer of Non-Offered Notes, Class [____], American Home Mortgage</u>
                <u>Investment Trust 2005-2</u>

Gentlemen:

      This certification is being made by _____ (the "Transferor") in connection with the proposed Transfer to _____ (the "Transferee") of a non-offered note, Class [____] (the "Non-Offered Note") representing ___% fractional undivided interest in American Home Mortgage Investment Trust 2005-2 (the "Trust"), issued pursuant to an Indenture, dated as of June 22, 2005 (the "Indenture"), among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"). Initially capitalized terms used but not defined herein have the meanings assigned to them in Appendix A to the Indenture. The Transferor hereby certifies, represents and warrants to, and covenants with, the Company, the Owner Trustee and the Note Registrar that:

      Neither the Transferor nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Non-Offered Note, any interest in any Non-Offered Note or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Non-Offered Note, any interest in any Non-Offered Note or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Non-Offered Note, any interest in any Non-Offered Note or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Non-Offered Notes under the Securities Act of 1933 (the "Act"), that would render the disposition of any Non-Offered Note a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Transferor will not act in any manner set forth in the foregoing sentence with respect to any Non-Offered Note. The Transferor has not and will not sell or otherwise transfer any of the Non-Offered Notes, except in compliance with the provisions of the Indenture.

  Date: _____                   _____
                                          Name of Transferor

_____
Signature

_____
Name

_____
Title

EXHIBIT O

FORM OF ERISA LETTER

[DATE]

M&T Trust Company of Delaware, as Owner Trustee
[_____]

Deutsche Bank National Trust Company
1761 E. St. Andrew Place
Santa Ana, CA 92705

      Re:     Proposed Transfer of Non-Offered Notes, Class [_____],
            American Home Mortgage Investment Trust 2005-2 (the "Non-Offered Notes")

Gentlemen:

This certification is being made by _____ (the "Transferee") in connection with the proposed Transfer by _____ (the "Transferor") of non-offered note (the "Non-Offered Note") representing __% fractional undivided interest in American Home Mortgage Investment Trust 2005-2 (the "Trust"), issued pursuant to an Indenture, dated as of June 22, 2005 (the "Indenture"), among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"). Initially capitalized terms used but not defined herein have the meanings assigned to them in Appendix A to the Indenture. The Transferor hereby certifies, represents and warrants to, and covenants with, the Company, the Owner Trustee and the Note Registrar that:

(i)      either (a) or (b) is satisfied, as marked below:

      ___    a.     The Transferor is not any employee benefit plan or other plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986 (the "Code")(each, a "Plan"), a Person acting, directly or indirectly, on behalf of a Plan or any Person acquiring such Non-Offered Note with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. §2510.3-101; or

      ___    b.     The Transferor is a Plan, a Person acting, directly or indirectly, on behalf of a Plan or a Person acquiring such Certificates with "plan assets" of a Plan within the meaning of the Department of Labor regulation promulgated at 29 C.F.R. §2510.3-101 and has provided the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Seller, the HELOC Back-Up Servicer and the HELOC Servicer with an Opinion of Counsel, satisfactory to the Note Registrar to the effect (A) that the purchase and holding of a Non-Offered Note by or on behalf of the Transferor (B) operation of the Trust and (C) management of Trust assets are permissible under applicable law, will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent

enactments) and will not subject the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Seller, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer or the HELOC Servicer to any obligation or liability (including liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Indenture, which opinion of counsel shall not be an expense of the Depositor, the Owner Trustee, the Indenture Trustee, the Note Registrar, the Securities Administrator, the Seller, the RMBS Master Servicer, the HELOC Back-Up Servicer, the RMBS Servicer or the HELOC Servicer; and

(ii)   the Transferor is familiar with the prohibited transaction restrictions and fiduciary responsibility requirements of Sections 406 and 407 of ERISA and Section 4975 of the Code and understands that each of the parties to which this certification is made is relying and will continue to rely on the statements made in this paragraph.

Very truly yours,

By:   _____
Name:   _____
Title:   _____

EXHIBIT P

FORM OF TRANSFEREE CERTIFICATE

M&T Trust Company of Delaware, as Owner Trustee
[_____]

Deutsche Bank National Trust Company
1761 E. St. Andrew Place
Santa Ana, CA 92705

Re:   Proposed Transfer of Trust Non-Offered Notes, Class [_____],
      American Home Mortgage Investment Trust 2005-2 (the "Non-Offered Notes")

Gentlemen:

This certification is being made by _____ (the "Transferee") in connection with the proposed Transfer by _____ (the "Transferor") of a non-offered note (the "Non-Offered Note") representing __% fractional undivided interest in American Home Mortgage Investment Trust 2005-2 (the "Trust"), issued pursuant to an Indenture, dated as of June 22, 2005 (the "Indenture"), among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"). Initially capitalized terms used but not defined herein have the meanings assigned to them in Appendix A to the Indenture. The Transferor hereby certifies, represents and warrants to, and covenants with, the Company, the Owner Trustee and the Note Registrar that:

The Transferee is a REIT or a Qualified REIT Subsidiary within the meaning of Section 856(a) or Section 856(i) of the Code, respectively.

Date: _____

_____
Name of Transferee

_____
Signature

_____
Name

_____
Title

EXHIBIT Q

FORM OF LENDER TRANSFEROR CERTIFICATE

M&T Trust Company of Delaware, as Owner Trustee
[_____]

Deutsche Bank National Trust Company,
  as Indenture Trustee
1761 East St. Andrew Place
Santa Ana, California 92705

      Re:    Proposed Transfer of Non-Offered Notes, Class [_____],
           American Home Mortgage Investment Trust 2005-2 (the "Non-Offered Notes")

Gentlemen:

      This certification is being made by _____ (the "Transferor") in connection with the proposed pledge or transfer to _____ of Certificates representing __% fractional undivided interest in American Home Mortgage Investment Trust 2005-2, issued pursuant to an Indenture, dated as of June 22, 2005 (the "Indenture"), among American Home Mortgage Investment Trust 2005-2, (the "Issuer"), Deutsche Bank National Trust Company, as Indenture Trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as Securities Administrator (the "Securities Administrator"). Initially capitalized terms used but not defined herein have the meanings assigned to them in Appendix A to the Indenture. The Transferor hereby certifies, represents and warrants to, and covenants with, the Owner Trustee, the Indenture Trustee and the Note Registrar that:

      (a) The Non-Offered Notes are being pledged by the Transferor to secure indebtedness of [_____] or is the subject of a loan agreement or repurchase agreement treated as secured indebtedness of [_____] for federal income tax purposes as permitted under the Indenture; or

      (b) The Non-Offered Notes are being transferred by the related lender under a loan agreement or repurchase agreement upon a default under any such indebtedness as permitted under the Indenture.

Date:

                                           _____
                                                 Name of Transferor

                                           _____
                                                 Signature

                                           _____
                                                 Name

                                           _____
                                                 Title

APPENDIX A
DEFINITIONS

Accepted Master Servicing Practices: With respect to any Mortgage Loan other than a HELOC Mortgage Loan, those customary mortgage master servicing practices of prudent mortgage servicing institutions that master service mortgage loans of the same type and quality as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, to the extent applicable to the Indenture Trustee or the RMBS Master Servicer (except in its capacity as successor to the RMBS Servicer).

Accepted Servicing Practices:  The HELOC Servicer's normal servicing practices in servicing and administering revolving home equity line of credit Mortgage Loans for its own account, which in general will conform to the mortgage servicing practices of prudent mortgage lending institutions which service for their own account, Mortgage Loans of the same type as the HELOC Mortgage Loans in the jurisdictions in which the related Mortgaged Properties are located.

Accrual Period: With respect to any Payment Date and the Notes, other than Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes and the Class II-A-3 Components, the period from the preceding Payment Date (or in the case of the first Payment Date, from the Closing Date) through the day preceding such Payment Date.  With respect to any Payment Date and the Class III-A, Class IV-A, Class V-A-1, Class V-A-3, and Class V-A-4 Notes and the Class II-A-3 Components, the prior calendar month.  Accrued Note Interest for the Class I-A, Class V-A-2, Class VI-A, Class M, Class V-M and Class V-B Notes shall be calculated on the basis of the actual number of days in the Accrual Period and a 360-day year. Accrued Note Interest on the Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class V-A-1, Class V-A-3, and Class V-A-4 Notes and the Class II-A-3 Components shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

Accrued Component Interest: For any Payment Date the Class II-A-3 Components, interest accrued during the related Accrual Period at the then-applicable Component Interest Rate on the related Component Principal Balance thereof immediately prior to such Payment Date, plus any Accrued Component Interest remaining unpaid from any prior Payment Date with interest thereon at the related Component Interest Rate.

Accrued Note Interest: With respect to any Payment Date and each Class of Notes, other than the Class II-A-3 Notes, interest accrued during the related Accrual Period at the then-applicable Note Interest Rate on the related Note Principal Balance thereof immediately prior to such Payment Date, plus any Accrued Note Interest remaining unpaid from any prior Payment Date with interest thereon at the related Note Interest Rate.  For any Payment Date and the Class II-A-3 Notes, the sum of the Accrued Component Interest of the Class II-A-3 Components.

Additional Balance:  As to any HELOC Mortgage Loan and day, the aggregate amount of all Draws conveyed to the Trust pursuant to the Mortgage Loan Purchase Agreement.

Additional Negative Amortization Principal Amount: For any Payment Date, the excess, if any, of (x) the Negative Amortization Amount over (y) the Principal Remittance Amount for the Group I Loans (without regard to the last sentence of the definition thereof).

Addition Notice: With respect to the transfer of Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loans or HELOC Mortgage Loans, as applicable, to the Trust Estate pursuant to Sections 2.05 through 2.11, respectively, a notice of the Issuer's designation of the related Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loans or HELOC Mortgage Loans, as applicable, to be sold to the Trust Estate and the related aggregate Stated Principal Balance of such Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Subsequent HELOC Mortgage Loans or HELOC Mortgage Loans, as applicable, as of the related Subsequent Cut-off Date. The Addition Notice shall be given not later than three Business Days prior to the related Subsequent Transfer Date and shall be substantially in the form of Exhibit H to the Indenture.

Adjustment Fraction: For any Payment Date with respect to the Class I-A, Class II-A, Class III-A, Class IV-A Class M and Class B Notes, a fraction, (x) the numerator of which is the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans at the beginning of the related Due Period, and (y) the denominator of which is the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes immediately prior to that Payment Date. For any Payment Date with respect to the Class V-A, Class V-M and Class V-B Notes, a fraction, (x) the numerator of which is the aggregate Stated Principal Balance of the Group V Loans at the beginning of the related Due Period, and (y) the denominator of which is the aggregate Note Principal Balance of the Class V-A, Class V-M and Class V-B Notes immediately prior to that Payment Date.

Adjustment Date: As to each Mortgage Loan, each date set forth in the related Mortgage Note on which an adjustment to the interest rate on such Mortgage Loan becomes effective.

Affiliate: With respect to any Person, any other Person controlling, controlled by or under common control with such Person. For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise and "controlling" and "controlled" shall have meanings correlative to the foregoing.

Allocated Realized Loss Amount: With respect to any Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes and any Payment Date, an amount equal to the sum of any Realized Loss allocated to that Class of Notes on that Payment Date and any Allocated Realized Loss Amount for that Class remaining unpaid from the previous Payment Dates, in each case, with interest thereon at the applicable Note Interest Rate for such Payment Date for such Class for the related Accrual Period.

Appraised Value: The appraised value of a Mortgaged Property based upon the appraisal made by or for the Seller, in compliance with the Seller's underwriting criteria, of such Mortgaged Property at such time of origination. With respect to a Mortgage Loan, the proceeds

of which were used to refinance an existing Mortgage Loan, the appraised value of the Mortgaged Property based upon the appraisal obtained at the time of refinancing.

ARM Loans: At any time, collectively, all the Mortgage Loans, excluding HELOC Mortgage Loans, which have adjustable Mortgage Rates.

Assignment of Mortgage: An assignment of Mortgage, notice of transfer or equivalent instrument, in recordable form, which is sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law.

Authorized Newspaper: A newspaper of general circulation in the Borough of Manhattan, The City of New York, printed in the English language and customarily published on each Business Day, whether or not published on Saturdays, Sundays or holidays.

Authorized Officer: With respect to the Issuer, any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to the Issuer and who is identified on the list of Authorized Officers delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

Available Funds: The Group I, Group II-C, Group II-NC, Group III, Group IV or Group V Available Funds, as applicable.

Available Funds Rate: On any Payment Date and any Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and the Class II-A-3 Components, the per annum rate equal to (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates on the related Mortgage Loans included in the trust as of the end of the prior Due Period, weighted on the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) in the case of the Class I-A Notes only, a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction. In addition, the Available Funds Rate with respect to the Class I-A Notes will be reduced by the Additional Negative Amortization Principal Amount, expressed as a percentage of the aggregate Note Principal Balance of the Class I-A Notes. The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

On any Payment Date and any Class of Class M Notes, the per annum rate equal to (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates of the Mortgage Loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV included in the trust as of the end of the prior Due Period, weighted on

the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, weighted in proportion to the results of subtracting from the aggregate Stated Principal Balance of the Mortgage Loans of Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the aggregate Note Principal Balance or Component Principal Balance, as applicable, of the related Class I-A, Class II-A, Class III-A and Class IV-A Notes and Class II-A-3 Components, respectively, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction.  The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

On any Payment Date and any Class of Class V-A, Class V-M and Class V-B Notes, the per annum rate equal to the (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates of the Mortgage Loans in Loan Group V included in the trust as of the end of the prior Due Period, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) in the case of the Class V-A-2, Class V-M and Class V-B Notes only, a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction.  In addition, the Available Funds Rate with respect to the V-A-4-D Notes will be reduced by the Note Insurance Policy Premium Rate.  The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Basic Documents: The Trust Agreement, the Certificate of Trust, the Indenture, the Notes, the Trust Certificates, the HELOC Back-Up Servicing Agreement, the HELOC Servicing Agreement, the RMBS Master Servicing Agreement, the RMBS Servicing Agreement, the Mortgage Loan Purchase Agreement, the Cap Contract, the Corridor Contract, the Insurance Agreement, the Insurance Policy, the Note Insurance Policy and the other documents and certificates delivered in connection with any of the above.

Basic Principal Distribution Amount: With respect to any Payment Date and Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the lesser of (a) the excess of (i) the sum of the related Available Funds for such Payment Date over (ii) the aggregate amount of Accrued Note Interest or Accrued Component Interest for the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class M Notes and Class II-A-3 Components for such Payment Date and (b) the related Principal Remittance Amount for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans for such Payment Date.  With

4

respect to any Payment Date and Loan Group V, the lesser of (a) the excess of (i) the related Available Funds and the Class V-A-4-D Insured Amount, if any, for such Payment Date over (ii) the aggregate amount of Accrued Note Interest for the Class V-A, Class V-M and Class V-B Notes for such Payment Date and (b) the related Principal Remittance Amount for the Group V Loans for such Payment Date.

Basis Risk Amount: With respect to each Derivative Contract and each Payment Date, an amount equal to the sum of (x) the Basis Risk Shortfall Carry-Forward Amount for the related Class of Notes or Class II-A-3 Components for such Payment Date and (y) the product of (i) the Other Basis Risk Amount for such Payment Date and (ii) a fraction, the numerator of which is the Excess Basis Risk Capacity with respect to such Derivative Contract for such Payment Date and the denominator of which is the aggregate Excess Basis Risk Capacity with respect to all Derivative Contracts for such Payment Date.

Basis Risk Shortfall: With respect to any class of LIBOR Notes, other than the Class II-A -3 Notes and Class VI-A Notes, on each Payment Date where clause (iii) of the definition of "Note Interest Rate" is less than clauses (i) or (ii) of the definition of "Note Interest Rate," the excess, if any, of (x) the aggregate Accrued Note Interest thereon for such Payment Date calculated pursuant to the lesser of clause (i) or (ii) of the definition of Note Interest Rate over (y) Accrued Note Interest thereon for such Payment Date calculated at the related Available Funds Rate. With respect to the Class II-A-3 Components, on each Payment Date where clause (iii) of the definition of "Component Interest Rate" is less than clauses (i) or (ii) of the definition of "Component Interest Rate," the excess, if any, of (x) the aggregate Accrued Component Interest thereon for such Payment Date calculated pursuant to the lesser of clause (i) or (ii) of the definition of Component Interest Rate over (y) Accrued Component Interest thereon for such Payment Date calculated at the related Available Funds Rate. With respect to the Class VI-A Notes, on each Payment Date where the Note Interest Rate for the Class VI-A Notes is limited to the Net WAC Cap, any interest which would have accrued at the excess of (a) the lesser of (i) One-Month LIBOR plus the related Note Margin and (ii) the Maximum Rate over (b) the Net WAC Cap.

Basis Risk Shortfall Carry-Forward Amount: With respect to each class of LIBOR Notes and the Class II-A-3 Components, other than the Class II-A-3 Notes, and any Payment Date, as determined separately for each such Class of Notes or Class II-A-3 Components, an amount equal to the aggregate amount of Basis Risk Shortfall for such Notes or Class II-A-3 Components on such Payment Date, plus any unpaid Basis Risk Shortfall for such Class of Notes or Class II-A-3 Components from prior Payment Dates, plus interest thereon at the Note Interest Rate or Component Interest Rate, as applicable, or, in the case of the Class VI-A Notes, plus interest accrued thereon at the lesser of (i) One-Month LIBOR plus the related Note Margin and (ii) the Maximum Rate, for such Payment Date for such Class for the related Accrual Period, to the extent previously unreimbursed by the Net Monthly Excess Cashflow or payments received by the Indenture Trustee under the Cap Contract or Corridor Contract, as applicable.

Beneficial Owner: With respect to any Book-Entry Note, the Person who is the beneficial owner of such Note as reflected on the books of the Depository or on the books of a Person maintaining an account with such Depository (directly as a Depository Participant or indirectly through a Depository Participant, in accordance with the rules of such Depository).

Book-Entry Notes: Beneficial interests in the Offered Notes, ownership and transfers of which shall be made through book entries by the Depository as described in Section 4.06 of the Indenture.

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the States of Maryland, Minnesota, New York, Delaware or Maryland or in the city in which a Corporate Trust Office is located, is required or authorized by law to be closed.

Calendar Quarter: A calendar quarter shall consist of one of the following time periods in any given year: January 1 through March 31, April 1 through June 30, July 1 though September 30, and October 1 through December 31.

Cap Contract: The interest rate Cap Contract between the Owner Trustee (or assigned to the Owner Trustee) on behalf of the Trust and the Derivative Counterparty primarily for the benefit of the Class V-A-2 Notes.

Cap Rate: With respect to the Cap Contract and each Payment Date, the fixed rate set forth in the Cap Contract used to determine payments to the Indenture Trustee.

Cash Liquidation: As to any defaulted Mortgage Loan other than a Mortgage Loan as to which an REO Acquisition occurred, a determination by the RMBS Servicer evidenced in a certificate of a Servicing Officer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the RMBS Servicer reasonably and in good faith expects to be finally recoverable with respect to such Mortgage Loan.

Ceiling Rate: With respect to the Corridor Contract and each Payment Date, the fixed rate set forth in the Corridor Contract used to determine payments to the Indenture Trustee.

Certificate Distribution Account: The account or accounts created and maintained pursuant to Section 3.10(c) of the Trust Agreement. The Certificate Distribution Account shall be an Eligible Account.

Certificate Paying Agent: Initially, Deutsche Bank National Trust Company, in its capacity as Certificate Paying Agent, or any successor to Deutsche Bank National Trust Company in such capacity.

Certificate Percentage Interest: With respect to each Certificate, the Certificate Percentage Interest stated on the face thereof.

Certificate Register: The register maintained by the Certificate Registrar in which the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of Certificates.

Certificate Registrar: Initially, Deutsche Bank National Trust Company, in its capacity as Certificate Registrar, or any successor to Deutsche Bank National Trust Company in such capacity.

Certificate of Trust: The Certificate of Trust filed for the Trust pursuant to Section 3810(a) of the Statutory Trust Statute.

Certificates or Trust Certificates: The American Home Mortgage Investment Trust 2005-2 Trust Certificates, Series 2005-2, evidencing the beneficial ownership interest in the Issuer and executed by the Owner Trustee in substantially the form set forth in Exhibit A to the Trust Agreement.

Certificateholder or Holder: The Person in whose name a Certificate is registered in the Certificate Register. Owners of Certificates that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Certificate Registrar or the Owner Trustee, as the case may be, the pledgee's right so to act with respect to such Certificates and that the pledgee is not the Issuer, any other obligor upon the Certificates or any Affiliate of any of the foregoing Persons.

Charge-Off Amount: For any Charged-Off HELOC Mortgage Loan, the amount of the Stated Principal Balance that has been written down.

Charged-Off HELOC Mortgage Loan: A HELOC Mortgage Loan with a Stated Principal Balance that has been written down on the HELOC Servicer's servicing system in accordance with its policies and procedures and any HELOC Mortgage Loan that is more than 180 days past due.

Class: Any of the Class A, Class M, Class B, Class V-M, Class V-B or Class N Notes.

Class A Notes: The Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A and Class VI-A Notes in the form attached as Exhibit A-1 to the Indenture.

Class A Principal Allocation Fraction: For any Payment Date and (i) the Class I-A Notes, (ii) the Class II-A-1 Notes and Component II-A-3-C, (iii) the Class II-A-2 Notes and Component II-A-3-NC, (iv) the Class III-A Notes and (v) the Class IV-A Notes, as determined separately, a fraction, (x) the numerator of which is the Principal Remittance Amount with respect to the Mortgage Loans in the related Loan Group to be distributed on that Payment Date, and (y) the denominator of which is the Principal Remittance Amount for all of the Mortgage Loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV to be distributed on that Payment Date.

Class A Principal Distribution Amount: For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the lesser of (A) the related aggregate Principal Distribution Amount for such Payment Date and (B) the excess (if any) of (x) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related

7

Prepayment Period) multiplied by approximately 84.90% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class B Notes:  The Class B Notes in the form attached as Exhibit A-3 to the Indenture.

Class B Principal Distribution Amount:  For any applicable Payment Date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A and Class M Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class B Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 99.93% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class M Notes:  The Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Notes in the form attached as Exhibit A-2 to the Indenture.

Class M-1 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes (after taking into account the distribution of the Class A Principal Distribution Amount on such Payment Date) and (ii) the Note Principal Balance of the Class M-1 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 87.80% and (b) the amount, if any, by which (i)

the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class M-2 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A and Class M-1 Notes (after taking into account the distribution of the Class A and Class M-1 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class M-2 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 89.80% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class M-3 Principal Distribution Amount:  For any applicable Payment Date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1 and Class M-2 Notes (after taking into account the distribution of the Class A, Class M-1 and Class M-2 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class M-3 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 91.00% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related

9

Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class M-4 Principal Distribution Amount:  For any applicable Payment Date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1, Class M-2 and Class M-3 Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2 and Class M-3 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class M-4 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 92.84% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class M-5 Principal Distribution Amount:  For any applicable Payment Date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1, Class M-2, Class M-3 and Class M-4 Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2, Class M-3 and Class M-4 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class M-5 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 96.32% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

Class I-A Notes:  The Class I-A-1, Class I-A-2 and Class I-A-3 Notes.

Class II-A Notes:  The Class II-A-1, Class II-A-2 and Class II-A-3 Notes.

Class II-A-3 Components:  Component II-A-3-C and Component II-A-3-NC.

Class IV-A Notes:  The Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes.

Class V-A Notes:  The Class V-A-1, Class V-A-2, Class V-A-3 and Class V-A-4 Notes.

Class V-A-4 Notes:  The Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes.

Class V-A-1 Priority Amount:  For any Payment Date, the lesser of (i) the Note Principal Balance of the Class V-A-1 Notes immediately prior to such Payment Date and (ii) the product of (x)(A) with respect to any Payment Date prior to the related Stepdown Date or for which a related Trigger Event is in effect, the related Principal Distribution Amount, or (B) with respect to any Payment Date on or after the related Stepdown Date and for which Group V Trigger Event is not in effect, the Class V-A Principal Distribution Amount, (y) the Class V-A-1 Percentage and (z) the Class V-A-1 Shift Percentage.

Class V-A-1 Percentage:  For any Payment Date, the lesser of (i) 100% and (ii) the percentage obtained by dividing (x) the Note Principal Balance of the Class V-A-1 Notes immediately prior to such Payment Date by (y) the aggregate Note Principal Balance of the Class V-A Notes immediately prior to such Payment Date.

Class V-A-1 Shift Percentage: For any Payment Date occurring prior to the 37th Payment Date, 0%; for the 37th through 60th Payment Dates, 45%; for the 61st through 72nd Payment Dates, 80%; for the 73rd through 84th Payment Dates, 100%; and thereafter, 300%.

Class V-A-4-D Deficiency Amount:  With respect to each Payment Date prior to the Final Scheduled Payment Date and the Class V-A-4-D Notes, an amount equal to the sum of (i) the excess, if any, of (a) the amount of Accrued Note Interest on the Class V-A-4-D Notes for that Payment Date over (b) the Group V Available Funds for that Payment Date  multiplied by a fraction equal to (x) the Accrued Note Interest on the Class V-A-4-D Notes for that Payment Date over (y) the Accrued Note Interest on all of the Class V-A Notes for that Payment Date , and (ii) the Class V-A-4-D Insured Undercollateralization Amount. With respect to the Final Scheduled Payment Date and the Class V-A-4-D Notes, an amount equal to the sum of (i) the excess, if any, of (a) the amount of Accrued Note Interest on the Class V-A-4-D Notes for that Payment Date over (b) the Group V Available Funds for that Payment Date multiplied by a fraction equal to (x) the Accrued Note Interest on the Class V-A-4-D Notes for that Payment Date over (y) the Accrued Note Interest on all of the Class V-A Notes for that Payment Date and (ii) the excess, if any, of the Note Principal Balance of all outstanding Class V-A-4-D Notes due on such Final Scheduled Payment Date to the extent not paid from Group V Available Funds on that Payment Date. For the Class V-A-4-D Notes and any date on which the acceleration of the Notes has been directed or consented to by the Noteholders pursuant to the Indenture, the amount

11

required to pay the Note Principal Balance of the Class V-A-4-D Notes in full, together with accrued and unpaid interest thereon through the date of payment of the Class V-A-4-D Notes.

Class V-A-4-D Insured Amount:  The aggregate of Class V-A-4-D Deficiency Amounts and Class V-A-4-D Preference Amounts.

Class V-A-4-D Insured Undercollateralization Amount:  On any Payment Date, an amount equal to (x)(i) the aggregate Note Principal Balance of the Class V-A Notes over (ii) the aggregate Stated Principal Balance of the Group V Loans plus the Group V Pre-Funded Amount multiplied by (x) a fraction equal to (i) the aggregate Note Principal Balance of the Class V-A-4-D Notes over (ii) the aggregate Note Principal Balance of the Class V-A Notes.

Class V-A-4-D Preference Amount:  With respect to the Class V-A-4-D Notes, any amount previously distributed to a holder of a Class V-A-4-D Note that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code, as amended from time to time, in accordance with a final nonappealable order of a court having competent jurisdiction.

Class V-A Principal Distribution Amount: For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the lesser of (A) the related aggregate Principal Distribution Amount for such Payment Date and (B) the excess (if any) of (x) the aggregate Note Principal Balance of the Class V-A Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 85.40% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class V-B Notes:  The Class V-B Notes, in the form attached as Exhibit A-3 to the Indenture.

Class V-B Principal Distribution Amount: For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes and Class V-M Notes (after taking into account the distribution of the Class V-A, Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4 and Class V-M-5 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class V-B Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due

Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 99.30% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class V-M Notes:  The Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4 and Class V-M-5, in the form attached as Exhibit A-2 to the Indenture.

Class V-M-1 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes (after taking into account the distribution of the Class V-A Principal Distribution Amount on such Payment Date) and (ii) the Note Principal Balance of the Class V-M-1 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 88.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35 of the Group V Cut-off Date Balance.

Class V-M-2 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes and Class V-M-1 Notes (after taking into account the distribution of the Class V-A and Class V-M-1 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class V-M-2 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 90.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class V-M-3 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1 and Class V-M-2 Notes (after taking into account the distribution of the Class V-A, Class V-M-1 and Class V-M-2 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class V-M-3 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 91.50% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class V-M-4 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1, Class V-M-2 and Class V-M-3 Notes (after taking into account the distribution of the Class V-A, Class V-M-1, Class V-M-2 and Class V-M-3 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class V-M-4 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 95.00% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class V-M-5 Principal Distribution Amount:  For any applicable Payment Date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such Payment Date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes (after taking into account the distribution of the Class V-A, the Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Principal Distribution Amounts on such Payment Date) and (ii) the Note Principal Balance of the Class V-M-5 Notes immediately prior to such Payment Date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of

principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 97.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

Class VI-A Deficiency Amount:  With respect to any Payment Date and the Class VI-A Notes, as applicable, an amount, if any, equal to the sum of:

(1)     the amount by which the aggregate amount of accrued and unpaid interest on the Class VI-A Notes (which excludes any Relief Act Shortfalls, Basis Risk Shortfalls or Basis Risk Shortfall Carry-Forward Amounts for that Payment Date) at the Class VI-A Note Interest Rate relating to the Class VI-A Notes on that Payment Date exceeds the amounts available for interest distributions on the Class VI-A Notes on that Payment Date; and

(2)     (i) with respect to any Payment Date that is not the Final Payment Date, the excess, if any, by which (a) the Note Principal Balance relating to the Class VI-A Notes (after giving effect to all payments of principal on the Class VI-A Notes on such Payment Date, but without giving effect to payments under the Policy to be made on such Payment Date) exceeds (b) the Invested Amount as of the end of the related Due Period; or

(ii) on the Final Payment Date, the aggregate outstanding principal balance of the Class VI-A Notes to the extent otherwise not paid on that date.

Class VI-A Preference Amount: Any amount previously distributed to a Class VI-A Noteholder on the Class VI-A Notes that is recoverable and recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final nonappealable order of a court having competent jurisdiction.

Class N Reserve Fund: The segregated non-interest bearing trust account established pursuant to Section 3.41 of the Indenture by the Indenture Trustee on the Closing Date for the benefit of the Class N Notes.

Class N Notes: The Class N-1 Notes and Class N-2 Notes, in the form attached as Exhibit A-3 to the Indenture.

Clearing Agency: An organization registered as a "clearing agency" pursuant to Section 17A of the Securities and Exchange Act of 1934, as amended, which initially shall be the Depository.

Closing Date: June 22, 2005.

Code: The Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

Collateral: The meaning specified in the Granting Clause of the Indenture.

Collection Account: The account or accounts created and maintained by the HELOC Servicer pursuant to Section 3.06 of the HELOC Servicing Agreement. Each Collection Account shall be an Eligible Account.

Combined Loan-to-Value Ratio or CLTV: With respect to any HELOC Mortgage Loan, the sum of the Credit Limit of such HELOC Mortgage Loan at the time such HELOC Mortgage Loan was originated or at the time such HELOC Mortgage Loan is modified pursuant to Section 3.01 of the HELOC Servicing Agreement and the outstanding principal balance of the Senior Lien(s), if any, as of the date of origination of the HELOC Mortgage Loan, divided by the Appraised Value.

Commission: The Securities and Exchange Commission.

Compensating Interest: With respect to any Payment Date as determined separately for each Loan Group, the amount of any Prepayment Interest Shortfalls resulting from prepayments in full or in part during the preceding calendar month on the related Mortgage Loans, excluding HELOC Mortgage Loans, but only to the extent such Prepayment Interest Shortfalls do not exceed the RMBS Servicing Fee for such Payment Date for such Loan Group or amounts paid or required to be paid by the RMBS Master Servicer in respect of such shortfalls for such Payment Date pursuant to Section 4.05 of the RMBS Master Servicing Agreement in respect of such Loan Group. There shall be no obligation to pay Compensating Interest with respect to any HELOC Mortgage Loan.

Component II-A-3-C: The component of the Class II-A-3 Notes which receives principal and interest primarily from the Group II-C Loans.

Component II-A-3-NC: The component of the Class II-A-3 Notes which receives principal and interest primarily from the Group II-NC Loans.

Component Interest Rate: With respect to each Payment Date and Component II-A-3-C and Component II-A-3-NC, a floating rate equal to the least of (i) One-Month LIBOR plus the related Component Margin, (ii) the related Maximum Component Interest Rate and (iii) the related Available Funds Rate with respect to such Payment Date.

Component Margin: With respect to Component II-A-3-C, on any Payment Date prior to the Step-Up Date, 1.570% per annum, and on any Payment Date on and after the Step-Up Date, 3.140% per annum. With respect to Component II-A-3-NC, on any Payment Date prior to the Step-Up Date, 1.570% per annum, and on any Payment Date on and after the Step-Up Date, 3.140% per annum.

Component Principal Balance:  With respect to each of the Class II-A-3 Components, as of any Date of Determination, the initial Component Principal Balance as stated on the face thereof, minus all amounts distributed in respect of principal with respect to such Component.

Corporate Trust Office: With respect to the Indenture Trustee, the principal corporate trust office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of this instrument is located at 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Trust Administration AH0502.  The Indenture Trustee shall notify all Noteholders of any change in the location of the Corporate Trust Office.  With respect to the Owner Trustee, the principal corporate trust office of the Owner Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of the execution of this Trust Agreement is located at Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19801, Attention: American Home Mortgage Investment Trust 2005-2.

Corridor Contract:  The interest rate corridor contract between the Owner Trustee (or assigned to the Owner Trustee) on behalf of the Trust and the Derivative Counterparty primarily for the benefit of the Class II-A Notes.

CPR:   A constant rate of prepayment on the Mortgage Loans or HELOC Mortgage Loans.

Credit Enhancement Percentage:  With respect to the Class I-A, Class II-A, Class III-A and Class IV-A Notes and any Payment Date, the percentage equivalent of a fraction, the numerator of which is (a) the sum of the aggregate Note Principal Balance of the Class M Notes and Class B Notes and the related Overcollateralized Amount and the denominator of which is (b) the aggregate Stated Principal Balance of the related mortgage loans at the end of the related Due Period.  With respect to the Class V-A Notes and any Payment Date, the percentage equivalent of a fraction, the numerator of which is (a) the sum of the aggregate Note Principal Balance of the Class V-M Notes and Class V-B Notes and the related Overcollateralized Amount and the denominator of which is (b) the aggregate Stated Principal Balance of the related mortgage loans at the end of the related Due Period.

Credit Limit:  With respect to any HELOC Mortgage Loan, the maximum unpaid principal balance permitted under the terms of the related Mortgage Note.

Credit Line Agreement:  With respect to any HELOC Mortgage Loan, the credit line account agreement executed by the related Mortgagor and any amendment or modification thereof.

Cumulative Losses:  As to any Payment Date and the Mortgage Loans, the cumulative aggregate amount of Realized Losses on the Mortgage Loans from the Cut-off Date through the end of the calendar month immediately preceding such Payment Date.

Cut-off Date:  With respect to the initial Mortgage Loans, June 1, 2005, with respect to the initial HELOC Mortgage Loans, the close of business of June 7, 2005, and with respect to the

subsequent Mortgage Loans or subsequent HELOC Mortgage Loans, the applicable Subsequent Cut-off Date.

Cut-off Date Balance: The aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

Cut-off Date Principal Balance: With respect to any Mortgage Loan that is not a HELOC Mortgage Loan, the unpaid principal balance thereof as of the Cut-off Date after applying the principal portion of Monthly Payments due on or before such date, whether or not received, and without regard to any payments due after such date. With respect to any HELOC Mortgage Loan, the unpaid principal balance thereof as of the Cut-off Date.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Default: Any occurrence which with notice or the lapse of time or both would become an Event of Default.

Default Penalty Rate Balance: The Stated Principal Balance of any HELOC Mortgage Loan with respect to which the Default Penalty Rate Feature is in effect.

Default Penalty Rate Feature: An feature that permits the HELOC Servicer to increase the HELOC Loan Rate on a Delinquent HELOC Mortgage Loan.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Notes: The meaning specified in Section 4.06 of the Indenture.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced with an Eligible Substitute Mortgage Loan.

Delinquency Rate: For any month, the fraction, expressed as a percentage, the numerator of which is the aggregate outstanding principal balance of all Mortgage Loans 60 or more days delinquent, or, in the case of any HELOC Mortgage Loans, 90 or more days delinquent (including all foreclosures, Mortgage Loans subject to bankruptcy proceedings and REO Properties) as of the close of business on the last day of such month, as reported by the applicable Servicer to the Securities Administrator, and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans or HELOC Mortgage Loans, as applicable, as of the close of business on the last day of such month.

Delinquent HELOC Mortgage Loan: A HELOC Mortgage Loan is delinquent or is a Delinquent HELOC Mortgage Loan, as reported by the applicable Servicer to the Securities

18

Administrator, if the Monthly Payment due thereon is not received by the close of business on the day the related Monthly Payment is scheduled to be made in accordance with the related Mortgage Note and until such delinquency is subsequently cured.

Depositor: American Home Mortgage Securities LLC, a Delaware limited liability company, or its successor in interest.

Depository or Depository Agency: The Depository Trust Company or a successor appointed by the Indenture Trustee. Any successor to the Depository shall be an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the Securities and Exchange Commission thereunder.

Depository Agreement: With respect to the Class of Book-Entry Notes, the agreement among the Issuer, the Indenture Trustee and the initial Depository, dated as of the Closing Date.

Depository Participant: A Person for whom, from time to time, the Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Derivative Contracts: Any of the Cap Contract and the Corridor Contract.

Derivative Contract Formula Amount: With respect to the Cap Contract and any Payment Date, an amount determined by the Derivative Counterparty and provided to the Securities Administrator no later than 5 Business Days prior to each Payment Date, equal to the product of (i) the excess, if any, of (x) One-Month LIBOR (as determined pursuant to the Cap Contract) over (y) the Cap Rate for such Payment Date, and (ii) an amount equal to the notional balance for such Payment Date (which, in the case of payments to be made to the Class V-A-2 Notes, will be the lesser of (a) the notional balance on the schedule and (b) the Note Principal Balance of the Class V-A-2 Notes) and (iii) the actual number of days in the related Accrual Period, divided by 360.  With respect to the Corridor Contract and any Payment Date, an amount determined by the Derivative Counterparty and provided to the Securities Administrator no later than 5 Business Days prior to each Payment Date, equal to the product of (i) the excess, if any, of the lesser of (1) One-Month LIBOR (as determined pursuant to the Corridor Contract) over the Strike Rate for such Payment Date and (2) the Ceiling Rate for such Payment Date over the Strike Rate for such Payment Date, (ii) an amount equal to the notional balance for such Payment Date (which will be the lesser of (a) the notional balance on the schedule and (b) the aggregate Note Principal Balance of the Class II-A Notes) and (iii) 1/12.

Derivative Counterparty:  Bear Stearns Financial Products Inc.

Determination Date: With respect to any Payment Date, the 15th of the related month, or if the 15th day of such month is not a Business Day, the immediately preceding Business Day.

Draw:  With respect to any HELOC Mortgage Loan, an additional borrowing by the related Mortgagor subsequent to the Cut-off Date in accordance with the related Mortgage Note.

Draw Period:  With respect to any HELOC Mortgage Loan, the period during which the related Mortgagor is permitted to make Draws.

19

Due Date: With respect to each Mortgage Loan or HELOC Mortgage Loan, the date in each month on which its Monthly Payment is due, exclusive of any days of grace.

Due Period:  With respect to any Payment Date and the Mortgage Loans, the period commencing on the second day of the month immediately preceding the month in which such Payment Date occurs and ending on the first day of the month in which such Payment Date occurs.  With respect to any Payment Date and the HELOC Mortgage Loans, the period commencing on the 11th of the month immediately preceding the month in which such Payment Date occurs and ending on the 10th day of the month in which such Payment Date occurs, or, in the case of the first Due Period, the period commencing on June 8, 2005 and ending on July 10, 2005.

Eligible Account: An account that is any of the following: (i) a segregated account maintained with a federal or state chartered depository institution (A) the short-term obligations of which are rated A-1+ or better by Standard & Poor's and P-1 by Moody's at the time of any deposit therein or (B) fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to the Rating Agencies, the Insurer and the Note Insurer, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Indenture Trustee, the Note Insurer, the Insurer and the Rating Agencies) the Indenture Trustee has a claim with respect to the funds in such account or a perfected first security interest against any collateral (which shall be limited to Eligible Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, (ii) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company subject to regulations regarding fiduciary funds on deposit  similar to Title 12 of the Code of Federal Regulations Section 9.10(b), which, in either case, has corporate trust powers, acting in its fiduciary capacity, or (iii) in the case of the Collection Account or Servicing Account, either (A) a trust account or accounts maintained at the corporate trust department of the Indenture Trustee or the Securities Administrator or (B) an account or accounts maintained at the corporate trust department of the HELOC Back-Up Servicer or RMBS Master Servicer, as applicable (or an affiliate thereof), as long as their short term debt obligations are rated F-1 by Fitch Ratings, P-1 by Moody's and A-1 by Standard & Poor's or better and their long term debt obligations are rated A by Fitch Ratings, A2 by Moody's and A by Standard & Poor's or better, or (iv) an account or accounts of a depository institution acceptable to the Rating Agencies as evidenced in writing by the Rating Agencies that use of any such account as the Collection Account, Protected Account or the Payment Account will not reduce the rating assigned to any of the Securities by such Rating Agency below investment grade without taking into account the Note Insurance Policy and the Insurance Policy and acceptable to the Note Insurer and the Insurer as evidenced in writing.

Eligible Investments: One or more of the following:

(i)     obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)    repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by the Rating Agencies in their respective highest short-term rating available;

(iii)    federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company (or, if the only Rating Agency is Standard & Poor's, in the case of the principal depository institution in a depository institution holding company, debt obligations of the depository institution holding company) at the date of acquisition thereof have been rated by the Rating Agencies in their respective highest short-term rating available; and provided further that, if the only Rating Agency is Standard & Poor's and if the depository or trust company is a principal subsidiary of a bank holding company and the debt obligations of such subsidiary are not separately rated, the applicable rating shall be that of the bank holding company; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is the Rating Agency;

(iv)    commercial paper (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by Moody's and Standard & Poor's in their highest short-term ratings available; provided that such commercial paper shall have a remaining maturity of not more than 30 days;

(v)    a money market fund or a qualified investment fund rated by Moody's in its highest long-term ratings available and rated AAAm or AAAm-G by Standard & Poor's, including any such funds for which Deutsche Bank National Trust Company (or any successor Indenture Trustee) or the Securities Administrator or any affiliate thereof serves as an investment advisor, manager, administrator, shareholder, servicing agent, and/or custodian or sub-custodian; and

(vi)    other obligations or securities that are acceptable to each Rating Agency as a Permitted Investment hereunder and will not reduce the rating assigned to any Class of Notes (without taking the Note Insurance Policy or Insurance Policy into account) by such Rating Agency below the lower of the then-current rating or the rating assigned to such Notes as of the Closing Date by such Rating Agency, as evidenced in writing; and

(vii)    any investment approved in writing by each of the Rating Agencies, the Insurer and the Note Insurer.

Each of the Indenture Trustee and the Securities Administrator may purchase from or sell to itself or an affiliate, as principal or agent, the Eligible Investments listed above.

provided, however, that no instrument shall be an Eligible Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations.

Eligible Substitute Mortgage Loan: A Mortgage Loan substituted by the Seller for a Deleted Mortgage Loan which must, on the date of such substitution, as confirmed in an Officer's Certificate delivered to the Indenture Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the outstanding principal balance of the Deleted Mortgage Loan (the amount of any shortfall to be deposited by the Seller in the related Collection Account in the month of substitution); (ii) comply with each non-statistical representation and warranty set forth in Section 3.1(b) of the Mortgage Loan Purchase Agreement as of the date of substitution; (iii) have a Mortgage Rate no lower than and not more than 1% per annum higher than the Mortgage Rate of the Deleted Mortgage Loan as of the date of substitution; (iv) have a Loan-to-Value Ratio, or Combined-Loan-to-Value Ratio in the case of a HELOC Mortgage Loan, at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution; (v) have a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan; (vi) not be 30 days or more delinquent; (vii) be an adjustable-rate first lien Mortgage Loan, if being substituted for an ARM Loan; (viii) be a fixed-rate first lien Mortgage Loan, if being substituted for a Fixed Rate Loan; (ix) in the case of a HELOC Mortgage Loan, have a Maximum Mortgage Rate based on the Index, determined in accordance with then current underwriting standards; (x) in the case of a HELOC Mortgage Loan, have a Margin that is not less than the Margin of the Deleted Mortgage Loan and not more than 1% higher than the Margin for the Deleted Mortgage Loan and (xi) in the case of a HELOC Mortgage Loan, have a Mortgage of the same or higher level of priority as the Mortgage relating to the Deleted Mortgage Loan as of the date of substitution.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Event of Default: Any one of the following: (a) the failure by the Issuer to pay Accrued Note Interest on any Class of Notes, other than the Class N Notes, with respect to a Payment Date on such Payment Date; (b) a default by the Issuer in the observance of certain negative covenants in the Indenture; (c) a default by the Issuer in the observance of any other covenant of the Indenture, and the continuation of any such default for a period of thirty days after notice to the Issuer, Insurer and the Note Insurer by the Indenture Trustee or, if a Note Insurer Default, exists, by the Holders of at least 25% of the aggregate Note Principal Balance of the Notes, as applicable; (d) any representation or warranty made by the Issuer in the Indenture or in any Note or other writing delivered pursuant thereto having been incorrect in a material respect as of the time made, and the circumstance in respect of which such representation or warranty is incorrect

not having been cured within thirty days after notice thereof is given to the Issuer by the Indenture Trustee, Insurer or by the Holders of at least 25% of the aggregate Note Principal Balance of the Notes, as applicable; (e) certain events of bankruptcy, insolvency, receivership or reorganization of the Issuer; or (f) the failure by the Issuer on the Final Scheduled Payment Date to pay all Accrued Note Interest, all remaining Basis Risk Shortfall Carry-Forward Amounts or Net WAC Carry-Forward Shortfall Amounts, as applicable, and to reduce the Note Principal Balances of all of the Notes to zero.

Event of Master Servicer Termination: With respect to the RMBS Master Servicing Agreement, a Servicing Default as defined in Section 6.01 of the RMBS Master Servicing Agreement.

Excess Basis Risk Capacity: With respect to each Derivative Contract and any Payment Date, an amount equal to the excess, if any, of the Derivative Contract Formula Amount with respect to such Derivative Contract for such Payment Date over the Basis Risk Shortfall Carry-Forward Amount with respect to the related Class of Notes for such Payment Date.

Excess Basis Risk Shortfall Carry-Forward Amount: With respect to the Class II-A-1, Class II-A-2 and Class V-A-2 Notes and Class II-A-3 Components for any Payment Date, an amount equal to the excess, if any, of the Basis Risk Shortfall Carry-Forward Amount with respect to such Class of Notes or Class II-A-3 Components for such Payment Date over the Derivative Contract Formula Amount with respect to the related Derivative Contract for such Payment Date.

Excess Derivative Payment Amount: For any Payment Date, the sum of (a) the excess of amounts payable from the Corridor Contract on that Payment Date over the amount of Basis Risk Shortfall Carry-Forward Amounts payable to the Class II-A-1 Notes, Class II-A-2 Notes and Class II-A-3 Components on that Payment Date and (b) the excess of amounts payable from the Cap Contract on that Payment Date over the amount of Basis Risk Shortfall Carry-Forward Amounts payable to the related Class V-A-2 Notes on that Payment Date.

Excess Overcollateralization Amount: For any Payment Date and Loan Group VI the amount by which the related Overcollateralized Amount, assuming the full Investor Principal Distribution Amount was paid on the Class VI-A Notes for such Payment Date, exceeds the related Overcollateralization Target Amount; provided, however, that following the occurrence of a Rapid Amortization Event the Excess Overcollateralization Amount shall be zero.

Exchange Act: The Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Expenses: The meaning specified in Section 7.02 of the Trust Agreement.

Fannie Mae: Fannie Mae (formerly, the Federal National Mortgage Association), or any successor thereto.

FDIC: The Federal Deposit Insurance Corporation or any successor thereto.

23

Final Certification: The final certification delivered by the Custodian pursuant to Section 2.03(a)(i) of the Indenture and in the form attached as Exhibit Two thereto.

Final Payment Date: With respect to the Class VI-A Notes, the Payment Date occurring in August 2035.

Final Scheduled Payment Date: With respect to each Class of Notes, other than the Class V-A, Class V-M, Class V-B Notes and Class VI-A Notes, the Payment Date in September 2045. With respect to the Class V-A, Class V-M and the Class V-B Notes, the Payment Date in September 2035. With respect to the Class VI-A Notes, the Trust shall terminate upon notice to the Indenture Trustee of the later of (A) payment in full of all amounts owing on the Class VI-A Notes and to the Insurer unless the Insurer shall otherwise consent and (B) the earliest of (i) the final payment or other liquidation of the last HELOC Mortgage Loan remaining in the Trust; (ii) the optional purchase by the Insurer or Holder of the Trust Certificates, or, if there is no single Holder, the majority Holder of the Trust Certificates, of the HELOC Mortgage Loans and (iii) the Payment Date in August 2035.

Fixed Rate Loans: At any time, collectively, all the Mortgage Loans, excluding HELOC Mortgage Loans, which have fixed Mortgage Rates.

Fixed HELOC Mortgage Loan Rate Balances: The aggregate Stated Principal Balance of all Fixed Teaser Rate Balances.

Fixed Teaser Rate Balance:  The Stated Principal Balance of any HELOC Mortgage Loan with respect to which the Fixed Teaser Rate is in effect.

Fixed Teaser Rate:  With respect to any HELOC Mortgage Loan that permits the Mortgagor to pay an initial fixed rate of interest on such HELOC Mortgage Loan for three months prior to such HELOC Mortgage Loan converting to a variable rate of interest, the fixed interest rate in effect for such three month period.

Floating Allocation Percentage: For any Payment Date, the percentage equivalent of a fraction with a numerator of the Invested Amount at the end of the previous Due Period (in the case of the first Payment Date, the Invested Amount as of the Closing Date) and a denominator equal to the sum of (i) the Group VI Pool Balance and (ii) the Group VI Pre-Funded Amount, in each case at the end of the previous Due Period (in the case of the first Payment Date, the Group VI Cut-off Date Balance), provided such percentage shall not be greater than 100%.

Foreclosure Profit: With respect to a Liquidated Mortgage Loan that is not a HELOC Mortgage Loan, the amount, if any, by which (i) the aggregate of its Net Liquidation Proceeds exceeds (ii) the related Stated Principal Balance (plus accrued and unpaid interest thereon at the applicable Mortgage Rate from the date interest was last paid through the date of receipt of the final Liquidation Proceeds) of such Liquidated Mortgage Loan immediately prior to the final recovery of its Liquidation Proceeds.  With respect to a Liquidated Mortgage Loan that is a HELOC Mortgage Loan, the amount, if any, by which (i) the related aggregate Net Recoveries exceed (ii) the related Stated Principal Balance (without giving effect to any reduction thereto in respect of any prior Charge-Off Amounts) immediately prior to receipt of the final Recoveries

plus accrued and unpaid interest thereon at the applicable Mortgage Rate from the date interest was last paid through the date of receipt of the final Recoveries.

Freddie Mac: Freddie Mac (also known as the Federal Home Loan Mortgage Corporation), or any successor thereto.

Funding Period: With respect to the Group I Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group I Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer Servicing Default or (iii) July 31, 2005.  With respect to the Group II-C Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group II-C Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer Servicing Default or (iii) July 31, 2005. With respect to the Group II-NC Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group II-NC Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer Servicing Default or (iii) July 31, 2005.  With respect to the Group III Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group III Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer Servicing Default or (iii) July 31, 2005. With respect to the Group IV Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group IV Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer Servicing Default or (iii) July 31, 2005.  With respect to the Group V Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group V Pre-Funding Account is reduced to less than $50,000, (ii) RMBS Servicer Servicing Default or (iii) July 31, 2005.  With respect to the HELOC Mortgage Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group VI Pre-Funding Account is reduced to less than $50,000, (ii) a HELOC Servicer Servicing Default or (iii) July 31, 2005.

Grant: Pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of such collateral or other agreement or instrument and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

Gross Margin: With respect to any ARM Loan, the percentage set forth as the "Gross Margin" for such Mortgage Loan on the Mortgage Loan Schedule, as adjusted from time to time in accordance with the terms of the RMBS Servicing Agreement.

Group I Available Funds:  For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group I Loans.  The Group I Available Funds generally includes: (1) all previously

undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group I Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group I Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group I Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group I Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group I Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to, the Indenture Trustee, RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group I Loans, or, if any such reimbursable amounts are not allocable to the Group I Loans, then the Group I Loans' pro rata share of such amounts. For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group I Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group I Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group I Loans as of the Cut-off Date and (y) the Group I Original Pre-Funded Amount.

Group I Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class I-A Notes and Class M Notes. The amount to be deposited in the Group I Interest Coverage Account on the Closing Date will be $844,316.26.

Group I Loan: A Mortgage Loan in Loan Group I.

Group I Original Pre-Funded Amount: The amount deposited in the Group I Pre-Funding Account on the Closing Date by the Depositor, which will be $205,673,646.01.

Group I Pre-Funded Amount: The amount on deposit in the Group I Pre-Funding Account on any date of determination.

Group I Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Class I-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group I Original Pre-Funded Amount.

Group I Subsequent Mortgage Loan: A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.05 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group I Subsequent Transfer Instrument.

Group I Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the

Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group I Subsequent Mortgage Loans.

Group I Subsequent Transfer Instrument: With respect to the Group I Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group II-C Available Funds:  For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group II-C Loans. The Group II-C Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group II-C Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group II-C Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group II-C Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group II-C Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group II-C Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group II-C Loans, or, if any such reimbursable amounts are not allocable to the Group II-C Loans, then the Group II-C Loans' pro rata share of such amounts. For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group II-C Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group II-C Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group II-C Loans as of the Cut-off Date and (y) the Group II-C Original Pre-Funded Amount.

Group II-C Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class II-A-1 Notes, Class M Notes and Component II-A-3-C.  The amount to be deposited in the Group II-C Interest Coverage Account on the Closing date will be $728,655.66.

Group II-C Loan: A Mortgage Loan in Loan Group II-C.

Group II-C Original Pre-Funded Amount: The amount deposited in the Group II-C Pre-Funding Account on the Closing Date by the Depositor, which will be $131,138,973.25.

Group II-C Pre-Funded Amount: The amount on deposit in the Group II-C Pre-Funding Account on any date of determination.

27

Group II-C Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Class II-A-1, Class M and Class B Notes and Component II-A-3-C and funded on the Closing Date by the Depositor with the Group II-C Original Pre-Funded Amount.

Group II-C Subsequent Mortgage Loan:  A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.06 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group II-C Subsequent Transfer Instrument.

Group II-C Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group II-C Subsequent Mortgage Loans.

Group II-C Subsequent Transfer Instrument: With respect to the Group II-C Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities, LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group II-NC Available Funds:  For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group II-NC Loans. The Group II-NC Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group II-NC Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group II-NC Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group II-NC Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group II-NC Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group II-NC Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group II-NC Loans, or, if any such reimbursable amounts are not allocable to the Group II-NC Loans, then the Group II-NC Loans' pro rata share of such amounts.  For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group II-NC Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group II-NC Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group II-NC Loans as of the Cut-off Date and (y) the Group II-NC Original Pre-Funded Amount.

Group II-NC Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class II-A-2 Notes, Class M Notes and Component II-A-3-NC.  The amount to be deposited in the Group II-NC Interest Coverage Account on the Closing date will be $879,309.45.

Group II-NC Loan: A Mortgage Loan in Loan Group II-NC.

Group II-NC Original Pre-Funded Amount: The amount deposited in the Group II-NC Pre-Funding Account on the Closing Date by the Depositor, which will be $158,233,429.48.

Group II-NC Pre-Funded Amount: The amount on deposit in the Group II-NC Pre-Funding Account on any date of determination.

Group II-NC Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Class II-A-2, Class M and Class B Notes and Component II-A-3-NC and funded on the Closing Date by the Depositor with the Group II-NC Original Pre-Funded Amount.

Group II-NC Subsequent Mortgage Loan:  A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.07 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group II-NC Subsequent Transfer Instrument.

Group II-NC Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group II-NC Subsequent Mortgage Loans.

Group II-NC Subsequent Transfer Instrument: With respect to the Group II-NC Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities, LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group III Available Funds: For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group III Loans. The Group III Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group III Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group III Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group III Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group III Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group

III Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group III Loans, or, if any such reimbursable amounts are not allocable to the Group III Loans, then the Group III Loans' pro rata share of such amounts.  For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group III Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group III Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group III Loans as of the Cut-off Date and (y) the Group III Original Pre-Funded Amount.

Group III Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class III-A Notes and Class M Notes. The amount to be deposited in the Group III Interest Coverage Account on the Closing date will be $2,414,404.44.

Group III Loan: A Mortgage Loan in Loan Group III.

Group III Original Pre-Funded Amount: The amount deposited in the Group III Pre-Funding Account on the Closing Date by the Depositor, which will be $371,953,202.46.

Group III Pre-Funded Amount: The amount on deposit in the Group III Pre-Funding Account on any date of determination.

Group III Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Class III-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group III Original Pre-Funded Amount.

Group III Subsequent Mortgage Loan:  A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.08 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group III Subsequent Transfer Instrument.

Group III Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group III Subsequent Mortgage Loans.

Group III Subsequent Transfer Instrument: With respect to the Group III Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group IV Available Funds: For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group IV Loans. The Group IV Available Funds generally includes:  (1) all

previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group IV Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group IV Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group IV Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group IV Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group IV Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group IV Loans, or, if any such reimbursable amounts are not allocable to the Group IV Loans, then the Group IV Loans' pro rata share of such amounts.  For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group IV Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group IV Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group IV Loans as of the Cut-off Date and (y) the Group IV Original Pre-Funded Amount.

Group IV Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class IV-A Notes and Class M Notes.  The amount to be deposited in the Group IV Interest Coverage Account on the Closing date will be $1,073,128.38.

Group IV Loan: A Mortgage Loan in Loan Group IV.

Group IV Original Pre-Funded Amount: The amount deposited in the Group IV Pre-Funding Account on the Closing Date by the Depositor, which will be $168,046,230.95.

Group IV Pre-Funded Amount: The amount on deposit in the Group IV Pre-Funding Account on any date of determination.

Group IV Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Class IV-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group IV Original Pre-Funded Amount.

Group IV Subsequent Mortgage Loan:  A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.09 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group IV Subsequent Transfer Instrument.

Group IV Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the

Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group IV Subsequent Mortgage Loans.

Group IV Subsequent Transfer Instrument: With respect to the Group IV Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group V Available Funds: For any Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group V Loans. The Group V Available Funds generally includes: (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group V Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group V Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group V Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group V Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group V Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Basic Documents allocable to the Group V Loans and the Note Insurance Policy Premium Amount in respect of the Class V-A-4-D Notes, or, if any such reimbursable amounts are not allocable to the Group V Loans, then the Group V Loans' pro rata share of such amounts. For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group V Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Group V Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the Group V Loans as of the Cut-off Date and (y) the Group V Original Pre-Funded Amount.

Group V Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Class V-A Notes and Class M Notes. The amount to be deposited in the Group V Interest Coverage Account on the Closing date will be $1,845,589.96.

Group V Loan: A Mortgage Loan in Loan Group V.

Group V Original Pre-Funded Amount: The amount deposited in the Group V Pre-Funding Account on the Closing Date by the Depositor, which will be $344,864,400.27.

Group V Pre-Funded Amount: The amount on deposit in the Group V Pre-Funding Account on any date of determination.

Group V Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Note Insurer and the Class V-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group V Original Pre-Funded Amount.

Group V Subsequent Mortgage Loan:  A Mortgage Loan sold by the Depositor to the Trust Estate pursuant to Section 2.10 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group V Subsequent Transfer Instrument.

Group V Subsequent Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group V Subsequent Mortgage Loans.

Group V Subsequent Transfer Instrument: With respect to the Group V Subsequent Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

Group VI Cut-off Date Balance: The sum of (x) the aggregate Stated Principal Balance of the HELOC Mortgage Loans as of the Cut-off Date and (y) the Group VI Original Pre-Funded Amount.

Group VI Delinquent HELOC Amount: With respect to any Payment Date, the aggregate Stated Principal Balance of any Group VI Loans included in the Trust which are 180 days or more delinquent, REO, in bankruptcy or in foreclosure.

Group VI Excess Spread Percentage: With respect to any Payment Date, the percentage equivalent of a fraction, (A) the numerator of which is the product of (i) the excess of (x) Investor Interest Collections on the Group VI Loans for that Payment Date over (y) the sum of the Accrued Note Interest on the Group VI Loans, the premium due to the Insurer under the Insurance Policy, any Investor Charge-Off Amounts, any reimbursement amounts and other amounts payable to the Insurer pursuant to the Insurance Agreement, and the related servicing fee for such Payment Date and (ii) twelve (12), and (B) the denominator of which is the aggregate Stated Principal Balance of the Group VI Loans as of the beginning of the related Due Period.

Group VI Interest Coverage Account: A trust account that the Indenture Trustee will establish pursuant to Section 3.31 of the Indenture for the benefit of the Group VI Noteholders and the Insurer.  The amount to be deposited in the Group VI Interest Coverage Account on the Closing Date will be $646,930.04.

Group VI Loan: A HELOC Mortgage Loan in Loan Group VI.

Group VI Original Pre-Funded Amount: The amount deposited in the Group VI Pre-Funding Account on the Closing Date by the Depositor, which will be $60,060,491.16.

Group VI Pool Balance: For any Payment Date, an amount equal to the aggregate of the Principal Balances of the HELOC Mortgage Loans at the end of the related Due Period.

Group VI Pre-Funded Amount: The amount on deposit in the Group VI Pre-Funding Account on any date of determination.

Group VI Pre-Funding Account: An account established by the Indenture Trustee pursuant to Section 3.32 of the Indenture for the benefit of the Group VI Noteholders and the Insurer and funded on the Closing Date by the Depositor with the Group VI Original Pre-Funded Amount.

Group VI Subsequent HELOC Mortgage Loan:  A HELOC sold by the Depositor to the Trust Estate pursuant to Section 2.11 of the Indenture, such Mortgage Loan being identified on the related Mortgage Loan Schedule attached to the Group VI Subsequent Transfer Instrument.

Group VI Subsequent HELOC Mortgage Loan Purchase Agreement: The Subsequent Mortgage Loan Purchase Agreement, dated as of the applicable Subsequent Transfer Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Group VI Subsequent HELOC Mortgage Loans.

Group VI Subsequent Transfer Instrument: With respect to the Group VI subsequent HELOC Mortgage Loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between the Depositor and the Indenture Trustee.

Hazardous Materials: Any dangerous, toxic or hazardous pollutants, chemicals, wastes, or substances, including, without limitation, those so identified pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., or any other environmental laws now existing, and specifically including, without limitation, asbestos and asbestos-containing materials, polychlorinated biphenyls, radon gas, petroleum and petroleum products, urea formaldehyde and any substances classified as being "in inventory", "usable work in progress" or similar classification which would, if classified unusable, be included in the foregoing definition.

HELOC Balance: With respect to any HELOC Mortgage Loan, the portion, if any, of the Stated Principal Balance thereof subject to a variable Mortgage Rate.

HELOC Back-Up Servicer: GMAC Mortgage Corporation, a Pennsylvania corporation, and its successors and assigns.

HELOC Back-Up Servicing Agreement: The HELOC Back-Up Servicing Agreement dated as of June 22, 2005, among the HELOC Back-Up Servicer, Indenture Trustee and Issuer.

HELOC Back-Up Servicing Fee: With respect to each HELOC and any Payment Date, the fee payable monthly to the HELOC Back-Up Servicer pursuant to the HELOC Back-Up Servicing Agreement in respect of back-up servicing compensation that accrues at an annual rate equal to the HELOC Back-Up Servicing Fee Rate multiplied by the Stated Principal Balance of such HELOC as of the first day of the related Due Period.

HELOC Back-Up Servicing Fee Rate: With respect to any HELOC Mortgage Loan, 0.02% per annum.

HELOC Mortgage Loans:  The HELOC Mortgage Loans in Loan Group VI.

HELOC Mortgage Loan Schedule:  The schedule of HELOC Mortgage Loans attached as Exhibit A to the HELOC Servicing Agreement.

HELOC Servicer:  American Home Mortgage Servicing, Inc., a Maryland corporation, and its successors and assigns.

HELOC Servicer Remittance Date:  The twenty-second (22nd) calendar day of each month or, if such twenty-second (22nd) day is not a Business Day, then the Business Day immediately preceding such twenty-second (22nd) day of the month.

HELOC Servicer Termination Event:  A removal of the HELOC Servicer by the Insurer for "cause."  Cause shall mean any material breach of any obligation, covenant, or trigger under the transaction documents subject to cure provisions relating to such breach as agreed to by the parties.  In particular, HELOC Servicer Termination Events shall include:

(a)     The occurrence of a draw on the Insurance Policy which remains unreimbursed for a period of 90 days;

(b)     Cumulative Charge-Off Amounts, as a percentage of the Group VI Cut-off Date Balance, exceed the following:

| Months | Percentage |
|--------|------------|
| 0  – 12 | 1.00% |
| 13 – 24 | 2.00% |
| 25 - 36 | 3.00% |
| 37 – 48 | 4.00% |
| 49+ | 5.00% |

(c)     American Home Mortgage Investment Corp. fails to have a Tangible Net Worth of at least $530 million.

HELOC Servicing Agreement:  The Servicing Agreement, dated as of June 22, 2005, among the HELOC Servicer, HELOC Back-Up Servicer, Seller, Indenture Trustee and Issuer.

HELOC Servicing Fee: With respect to each HELOC Mortgage Loan and any Payment Date, the fee payable monthly to the HELOC Servicer in respect of servicing compensation that accrues at an annual rate equal to the HELOC Servicing Fee Rate multiplied by the Stated

35

Principal Balance of such HELOC Mortgage Loan as of the related Due Date in the related Due Period.

HELOC Servicing Fee Rate: With respect to any HELOC Mortgage Loan 0.50% per annum.

Indemnified Party: The meaning specified in Section 7.02 of the Trust Agreement.

Indemnification Agreement: The Indemnification Agreement dated as of June 22, 2005 between Lehman Brothers Inc. and the Insurer, including any amendments and supplements thereto in accordance with the terms thereof.

Indenture: The indenture dated as of June 22, 2005, between the Issuer, the Securities Administrator and the Indenture Trustee, relating to the American Home Mortgage Investment Trust 2005-2 Notes.

Indenture Trustee: Deutsche Bank National Trust Company, and its successors and assigns or any successor indenture trustee appointed pursuant to the terms of the Indenture.

Indenture Trustee Fee: All earnings on the funds from time to time in the Payment Account.

Independent: When used with respect to any specified Person, the Person (i) is in fact independent of the Issuer, any other obligor on the Notes, the Seller, the HELOC Back-Up Servicer, the RMBS Master Servicer, the Depositor, American Home Mortgage Investment Corp. and any Affiliate of any of the foregoing Persons, (ii) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the HELOC Back-Up Servicer, the RMBS Master Servicer, the Depositor, American Home Mortgage Investment Corp. or any Affiliate of any of the foregoing Persons and (iii) is not connected with the Issuer, any such other obligor, the Seller, the HELOC Back-Up Servicer, the RMBS Master Servicer, the Depositor, American Home Mortgage Investment Corp. or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Independent Certificate: A certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, made by an independent appraiser or other expert appointed by an Issuer Request and approved by the Indenture Trustee in the exercise of reasonable care, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

Index: With respect to any Mortgage Loan that is not a HELOC Mortgage Loan, the index for the adjustment of the Mortgage Rate set forth as such in the related Mortgage Note. With respect to any HELOC Mortgage Loan and any Adjustment Date, the highest "prime rate" most recently published in the Wall Street Journal. If the "prime rate" is no longer published, then the Index will be a comparable independent index selected by the Seller.

36

Initial HELOC: Any of the HELOC Mortgage Loans included in the Trust Estate as of the Closing Date.  The aggregate principal balance of the Initial HELOCs as of the Cut-off Date is equal to approximately $180,181,473.48.

Initial Mortgage Loan: Any of the Mortgage Loans (other than HELOC Mortgage Loans) included in the Trust Estate as of the Closing Date.  The aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date is equal to approximately $4,140,031,477.30.

Initial Note Principal Balance: The Notes shall have the following Initial Note Principal Balances:

| Class | Initial Note Principal Balance |
|---|---|
| I-A-1 | $ 456,354,000 |
| I-A-2 | $ 228,175,000 |
| I-A-3 | $ 76,058,000 |
| II-A-1 | $ 462,292,000 |
| II-A-2 | $ 557,806,000 |
| II-A-3 | $ 50,000,000 |
| III-A | $ 1,375,597,000 |
| IV-A-1 | $ 200,000,000 |
| IV-A-2 | $ 398,870,000 |
| IV-A-3 | $ 22,564,000 |
| V-A-1 | $ 127,900,000 |
| V-A-2 | $ 581,158,000 |
| V-A-3 | $ 243,690,000 |
| V-A-4-A | $ 88,000,000 |
| V-A-4-B | $ 6,827,000 |
| V-A-4-C | $ 115,717,000 |
| V-A-4-D | $ 115,717,000 |
| VI-A | $ 237,840,000 |
| M-1 | $ 60,041,000 |
| M-2 | $ 41,403,000 |
| M-3 | $ 24,841,000 |
| M-4 | $ 38,090,000 |
| M-5 | $ 72,041,000 |
| B | $ 61,690,000 |
| V-M-1 | $ 19,316,000 |
| V-M-2 | $ 13,797,000 |
| V-M-3 | $ 8,968,000 |
| V-M-4 | $ 24,145,000 |
| V-M-5 | $ 15,177,000 |

37

|       |    |            |
|-------|----|------------|
| V-B   | $  | 14,487,000 |
| N-1   | $  | 31,700,000 |
| N-2   | $  | 7,890,000  |

Initial Certification: The initial certification delivered by the Custodian pursuant to Section 2.03(a) of the Indenture and in the form attached thereto as Exhibit One thereto.

Insurance Account: The account created and maintained pursuant to Section 11.02 of the Indenture. The Insurance Account shall be an Eligible Account.

Insurance Agreement: The Insurance and Indemnity Agreement, dated as of June 22, 2005, among the Indenture Trustee, the Seller, the Issuer, American Home Mortgage Investment Corp., the HELOC Servicer, the HELOC Back-Up Servicer, the Depositor and the Insurer, including any amendments and supplements thereto in accordance with the terms thereof.

Insurance Policy: The note guaranty insurance policy (No. 05030037) with respect to the Class VI-A Notes and all endorsements thereto, if any, dated the Closing Date, issued by the Insurer for the benefit of the Holders of the Class VI-A Notes.

Insurance Proceeds: Proceeds paid by any insurer pursuant to any insurance policy covering a Mortgage Loan which are required to be remitted to the HELOC Servicer or the RMBS Servicer, as applicable, net of any component thereof,  released to the Mortgagor in accordance with the HELOC Servicer's or the RMBS Servicer's normal servicing procedures, as applicable.

Insured Payment: With respect to the Class VI-A Notes, (a) as of any Payment Date, any Class VI-A Deficiency Amount and (b) any Class VI-A Preference Amount.

Insurer: Financial Guaranty Insurance Company, a corporation organized and created under the laws of the State of New York, or any successor thereto.

Insurer Default: The existence and continuance of any of the following: (a) a failure by the Insurer to make a payment required under the Insurance Policy in accordance with its terms; or (b)(i) the Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or (ii) a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Insurer (or the taking of possession of all or any material portion of the property of the Insurer).

Interest Collections: For each Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of

the Group VI Loans, and consist of interest collected during the related Due Period on the HELOCs and allocated to interest in accordance with the terms of the related Credit Line Agreements, together with the interest portion of any Repurchase Price and substitution adjustment amount paid during the related Due Period, any Net Recoveries on HELOCs that were previously Charged-Off HELOCs and interest earned on amounts on deposit in the Group VI Pre-Funding Account,  and amounts transferred from the Group VI Interest Coverage Account, net of fees and other amounts reimbursable to the Owner Trustee, Indenture Trustee, Securities Administrator, HELOC Servicer and HELOC Back-Up Servicer as provided in the Basic Documents and allocable to the Group VI Loans, or, if such reimbursable amounts are not allocable to such Mortgage Loans, then the Group VI's pro rata share of such amounts.  For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group VI Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Interest Coverage Account: Each of the Group I Interest Coverage Account, Group II-C Interest Coverage Account, Group II-NC Interest Coverage Account, Group III Interest Coverage Account, Group IV Interest Coverage Account, Group V Interest Coverage Account and Group VI Interest Coverage Account.

Interest Coverage Amount: The Group I Interest Coverage Amount, Group II-C Interest Coverage Amount, Group II-NC Interest Coverage Amount, Group III Interest Coverage Amount, Group IV Interest Coverage Amount, Group V Interest Coverage Amount and Group VI Interest Coverage Amount is $844,316.26, $728,655.66, $879,309.45, $2,414,404.44, $1,073,128.38, $1,845,589.96 and $646,930.04, respectively.

Interest Determination Date: With respect each Class of LIBOR Notes, other than the Class II-A-1 Notes, Class II-A-2 Notes and the Class II-A-3 Components and (i) the first Accrual Period, the second LIBOR Business Day preceding the Closing Date, and (ii) with respect to each Accrual Period thereafter, the second LIBOR Business Day preceding the related Payment Date on which such Accrual Period commences.  With respect to the Class II-A-1 Notes, Class II-A-2 Notes and the Class II-A-3 Components and (i) the first Accrual Period, the second LIBOR Business Day preceding the Closing Date and (ii) each Accrual Period thereafter, the second LIBOR Business Day preceding the payment date occurring during the month of such Accrual Period.

Interest Rate Adjustment Date: With respect to each Mortgage Loan, the date or dates on which the Mortgage Rate is adjusted in accordance with the related Mortgage Note.

Interested Person: As of any date of determination, the Depositor, the HELOC Back-Up Servicer, the HELOC Servicer, the RMBS Master Servicer, the RMBS Servicer, the Indenture Trustee, American Home Mortgage Investment Corp., any Mortgagor, or any Person actually known to a Responsible Officer of the Trustee to be an Affiliate of any of them.

Investor Charge-Off Amount: For any Payment Date, the Floating Allocation Percentage of Charge-Off Amounts incurred during the related Due Period.

39

<u>Investor Interest Collections</u>: For any Payment Date, the Floating Allocation Percentage of Interest Collections for the related Due Period.

<u>Invested Amount</u>: For any Payment Date, the Invested Amount on the Closing Date reduced by (i) the aggregate amount of Investor Principal Distribution Amounts (before taking into account any Overcollateralization Reduction Amount) up to and including the related Payment Date and (ii) the aggregate of Investor Charge-Off Amounts up to and including such Payment Date.  The Invested Amount on the Closing Date is $240,241,964.64.

<u>Investor Principal Distribution Amount</u>:  On every Payment Date from the first Payment Date through and including the Payment Date in June 2015, unless a Rapid Amortization Event has occurred is equal to the excess, if any, of all Principal Collections received during the related Due Period over the amount of all Additional Balances resulting from Draws made pursuant to the related HELOC Mortgage Loan during the related Due Period; and on every Payment Date after the Payment Date in June 2015 or if a Rapid Amortization Event has previously occurred, is equal to all Principal Collections received during the related Due Period.  During the Managed Amortization Period, such amount will be reduced by the Overcollateralization Reduction Amount**.**

<u>Investment Company Act</u>: The Investment Company Act of 1940, as amended, and any amendments thereto.

<u>IRS</u>: The Internal Revenue Service.

<u>Issuer</u>: American Home Mortgage Investment Trust 2005-2, a Delaware statutory trust, or its successor in interest.

<u>Issuer Request</u>: A written order or request signed in the name of the Issuer by any one of its Authorized Officers and approved in writing by the Note Insurer, so long as no Note Insurer Default exists, and delivered to the Indenture Trustee.

<u>LIBOR Business Day</u>: A day on which banks are open for dealing in foreign currency and exchange in London and New York City.

<u>LIBOR Note</u>:  Any Class I-A, Class II-A, V-A-2, , Class VI-A, Class M, Class B, Class V-M or Class V-B Note, or any Class III-A Note or Class IV-A Note after the related Note Rate Change Date.

<u>Lien</u>: Any mortgage, deed of trust, pledge, conveyance, hypothecation, assignment, participation, deposit arrangement, encumbrance, lien (statutory or other), preference, priority right or interest or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing; <u>provided</u>, <u>however</u>, that any assignment pursuant to Section 6.02 of the HELOC

Servicing Agreement, HELOC Back-Up Servicing Agreement, RMBS Servicing Agreement or RMBS Master Servicing Agreement, as applicable, shall not be deemed to constitute a Lien.

Lifetime Rate Cap: With respect to each Mortgage Loan with respect to which the related Mortgage Note provides for a lifetime rate cap, the maximum Mortgage Rate permitted over the life of such Mortgage Loan under the terms of such Mortgage Note, as set forth in the Mortgage Loan Schedule.

Liquidated HELOC: Any HELOC Mortgage Loan that has become a Liquidated Mortgage Loan.

Liquidated Mortgage Loan: With respect to any Payment Date, any Mortgage Loan in respect of which the HELOC Servicer or RMBS Servicer, as applicable, has determined, in accordance with the servicing procedures specified in the HELOC Servicing Agreement or RMBS Servicing Agreement, as applicable, as of the end of the related Due Period that substantially all Liquidation Proceeds, and/or Recoveries with respect to a Charged-Off HELOC Mortgage Loan, which it reasonably expects to recover with respect to the disposition of the related Mortgaged Property or REO Property have been recovered.

Liquidation Expenses: Out-of-pocket expenses (exclusive of overhead) which are incurred by or on behalf of the HELOC Servicer or RMBS Servicer, as applicable, in connection with the liquidation of any Mortgage Loan and not recovered under any insurance policy, such expenses including, without limitation, legal fees and expenses, any unreimbursed amount expended respecting the related Mortgage Loan and any related and unreimbursed expenditures for real estate property taxes or for property restoration, preservation or insurance against casualty loss or damage.

Liquidation Proceeds: Proceeds (including Insurance Proceeds) received in connection with the liquidation of any Mortgage Loan or HELOC Mortgage Loan or related REO Property, whether through trustee's sale, foreclosure sale or otherwise.

Loan Group: Any of Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV, Loan Group V or Loan Group VI.

Loan Group I: The Group I Loans.

Loan Group II-C: The Group II-C Loans.

Loan Group II-NC: The Group II-NC Loans.

Loan Group III: The Group III Loans.

Loan Group IV: The Group IV Loans.

Loan Group V: The Group V Loans.

Loan Group VI: The Group VI Loans.

41

Loan-to-Value Ratio: With respect to any Mortgage Loan, as of any date of determination, a fraction expressed as a percentage, the numerator of which is the then current principal amount of the Mortgage Loan, and the denominator of which is the Appraised Value of the related Mortgaged Property.

Loan Year: With respect to any Mortgage Loan, the one-year period commencing on the day succeeding the origination of such Mortgage Loan and ending on the anniversary date of such Mortgage Loan, and each annual period thereafter.

Lost Note Affidavit: With respect to any Mortgage Loan as to which the original Mortgage Note has been lost or destroyed and has not been replaced, an affidavit from the Seller certifying that the original Mortgage Note has been lost, misplaced or destroyed (together with a copy of the related Mortgage Note).

Majority Certificateholder: A Holder of a 50.01% or greater Certificate Percentage Interest of the Certificates.

Managed Amortization Period: The period from the Cut-off Date to the earlier of (a) the Payment Date in June 2015 and (b) the occurrence of a Rapid Amortization Event.

Margin: With respect to each HELOC Mortgage Loan (other than any HELOC Mortgage Loan with a Fixed Teaser Rate in effect), the spread over the applicable Index, as specified in the related Mortgage Note.

Maximum Component Interest Rate: With respect to any Payment Date and Component II-A-3-C and Component II-A-3-NC, 11.00% per annum.

Maximum Note Interest Rate: With respect to any Payment Date and each class of the Class I-A, Class II-A-1, Class II-A-2 and Class M Notes, and with respect to the Class III-A Notes and Class IV-A Notes and any Payment Date after the related Note Rate Change Date, 11.00% per annum. With respect to Payment Date and each class of the Class V-A-2, Class V-M Notes and Class V-B Notes, 10.00% per annum.

Maximum Mortgage Rate: With respect to each ARM Loan and each HELOC Mortgage Loan, the maximum Mortgage Rate.

Maximum Rate: With respect to Payment Date and the Class VI-A Notes, (a) the weighted average of the Maximum Mortgage Rates of the HELOC Mortgage Loans, weighted on the basis of the related Stated Principal Balance of each HELOC Mortgage Loan as of the end of the related Due Period, minus (i) the HELOC Servicing Fee Rate and (ii) the premium due to the Insurer under the Policy expressed in dollars divided by aggregate Stated Principal Balance of the HELOC Mortgage Loans as of such Payment Date times (b) a fraction equal to (x) the number of days in the related Accrual Period over (y) 30.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System:   The system of recording transfers of Mortgages electronically maintained by MERS.

MIN:   The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

Minimum Mortgage Rate: With respect to each ARM Loan and each HELOC Mortgage Loan, the minimum Mortgage Rate.

Minimum Monthly Payment:   The minimum amount required to be paid by the mortgagor pursuant to the terms of a Group VI Mortgage Note.

Minimum Transferor Interest:  Zero.

MOM Loan:  With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Advance: As to any Mortgage Loan, other than a HELOC Mortgage Loan, any advance made by the RMBS Master Servicer pursuant to Section 4.04 of the RMBS Master Servicing Agreement or by the RMBS Servicer in respect of delinquent Monthly Payments of principal and interest pursuant to the RMBS Servicing Agreement.

Monthly Payment: With respect to any Mortgage Loan (including any REO Property) that is not a HELOC Mortgage Loan and any Due Date, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for partial Principal Prepayments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period, and after any adjustment required by the Relief Act).  With respect to any HELOC Mortgage Loan, the scheduled monthly payment of principal and/or interest required to be made by a Mortgagor on such HELOC Mortgage Loan.

Moody's: Moody' Investors Service, Inc. or its successor in interest.

Mortgage: The mortgage, deed of trust or other instrument creating a first, second or third lien on an estate in fee simple interest in real property securing a Mortgage Loan.

Mortgage File: The file containing the Related Documents pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to the Mortgage Loan Purchase Agreement or the HELOC Servicing Agreement or RMBS Servicing Agreement, as applicable.

Mortgage Loans: The Mortgage Loans and HELOC Mortgage Loans that will be transferred and assigned to the Trust pursuant to Section 2.03(a) of the Indenture, each Mortgage Loan so held being identified in the Mortgage Loan Schedule. The Mortgage Loans have been divided into seven groups, Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV, Loan Group V and Loan Group VI.

43

Mortgage Loan Purchase Agreement: The Mortgage Loan Purchase Agreement, dated as of the Closing Date, between the Seller, as seller, and the Purchaser, as purchaser, relating to the sale, transfer and assignment of the Mortgage Loans.

Mortgage Loan Schedule: With respect to any date, the schedule of Mortgage Loans held by the Issuer on such date. The schedule of Mortgage Loans as of the Cut-off Date is the schedule set forth in Exhibit B of the Indenture, which schedule sets forth as to each Mortgage Loan:

(i)      the loan number and name of the Mortgagor;

(ii)     the street address, city, state and zip code of the Mortgaged Property;

(iii)    the original Mortgage Rate;

(iv)     the maturity date;

(v)      the original principal balance;

(vi)     the first Payment Date;

(vii)    the type of Mortgaged Property;

(viii)   the Monthly Payment in effect as of the Cut-off Date;

(ix)     the Cut-off Date Principal Balance and with respect to each HELOC Mortgage Loan, separately indicating any HELOC Balance;

(x)      the Index and the Gross Margin, if applicable;

(xi)     the Adjustment Date frequency and Payment Date frequency, if applicable;

(xii)    the occupancy status;

(xiii)   the purpose of the Mortgage Loan;

(xiv)    the Appraised Value of the Mortgaged Property;

(xv)     the original term to maturity;

(xvi)    the paid-through date of the Mortgage Loan;

(xvii)   the Loan-to-Value Ratio;

(xviii)  whether or not the Mortgage Loan was underwritten pursuant to a limited documentation program;

(xix)    the Loan Group;

44

(xx)          whether the Mortgage Loan has a fixed interest rate or an adjustable interest rate;

(xxi)         with respect to each HELOC Mortgage Loan, the account number;

(xxii)        with respect to each HELOC Mortgage Loan, the Credit Limit;

(xxiii)       with respect to each HELOC Mortgage Loan, the CLTV as of the date of origination of the related HELOC Mortgage Loan;

(xxiv)        with respect to each HELOC Mortgage Loan, the Mortgage Rate as of the Cut-off Date, separately indicating the Mortgage Rates applicable to any HELOC Balance;

(xxv)         with respect to each HELOC Mortgage Loan, the debt-to-income ratio;

(xxvi)        with respect to each HELOC Mortgage Loan, the FICO;

(xxvii)       with respect to each HELOC Mortgage Loan whether the related Mortgage Rate was supposed to reset in the first Due Period but did not; and

(xxviii)      a code indicating if the Mortgage Loan is a Negative Amortization Mortgage Loan.

The Mortgage Loan Schedule shall also set forth the total of the amounts described under (ix) above for all of the Mortgage Loans.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan that is not a HELOC Mortgage Loan.  With respect to a HELOC Mortgage Loan, the related Credit Line Agreement executed by the related Mortgager and any amendment or modification thereof.

Mortgage Rate: With respect to any Mortgage Loan that is not a HELOC Mortgage Loan, the annual rate at which interest accrues on such Mortgage Loan.  With respect to any HELOC Mortgage Loan as of any day, the variable interest rate applicable under the related Mortgage Note, provided, that if the Fixed Teaser Rate is in effect with respect to a HELOC Mortgage Loan or any portion thereof, the Mortgage Rate for such HELOC Mortgage Loan or portion thereof shall be the resulting fixed interest rate.

Mortgaged Property: The underlying property, including real property and improvements thereon, securing a Mortgage Loan.

Mortgagor: The obligor or obligors under a Mortgage Note.

Negative Amortization Amount: With respect to any Payment Date, the aggregate amount of Negative Amortization with respect to the Group I Loans for the related Due Period.

<u>Negative Amortization</u>:  With respect to each Negative Amortization Mortgage Loan, that portion of interest accrued at the Mortgage Rate in any month which exceeds the Monthly Payment on the related Mortgage Loan for such month and which, pursuant to the terms of the Mortgage Note, is added to the principal balance of the Mortgage Loan.

<u>Negative Amortization Mortgage Loan</u>:  Each Mortgage Loan that is identified on the Mortgage Loan Schedule as a Mortgage Loan that may be subject to Negative Amortization.

<u>Net Liquidation Proceeds</u>: With respect to any Liquidated Mortgage Loan or Liquidated HELOC, Liquidation Proceeds and Subsequent Recoveries net of unreimbursed Servicing Advances by the HELOC Servicer or RMBS Servicer, as applicable, Monthly Advances and Liquidation Expenses.

<u>Net Monthly Excess Cashflow</u>: With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, as determined in the aggregate for any Payment Date, the sum of (1) the excess of (x) the Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such Payment Date over (y) the sum for such Payment Date of (A) the aggregate amount of Accrued Note Interest or Accrued Component Interest for the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class M Notes and the Class II-A-3 Components and (B) the Principal Remittance Amount used to make payments in respect of principal to these Notes or Class II-A-3 Components, and (2) amounts payable from the Net Monthly Excess Cashflow for the Group V Loans as provided in Section 3.06(e) of the Indenture.  With respect to Loan Group V, for any Payment Date and, the sum of (1) the excess of (x) the Group V Available Funds and the Class V-A-4-D Insured Amount, if any, for such Payment Date over (y) the sum for such Payment Date of (A) the aggregate amount of Accrued Note Interest for the Class V-A, Class V-M and Class V-B Notes and (B) the Principal Remittance Amount used to make payments in respect of principal to these Notes and (2) amounts payable from the Net Monthly Excess Cashflow for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as provided in Section 3.05(e).

<u>Net Mortgage Rate</u>: For any Mortgage Loan or HELOC Mortgage Loan, the then applicable Mortgage Rate thereon minus the RMBS Servicing Fee Rate, HELOC Back-Up Servicer Fee Rate, HELOC Servicing Fee Rate, as applicable, and, in the case of a Group VI Loan, less the premium due to the Insurer under the Insurance Policy, in each case expressed as a per annum rate.

<u>Net Recoveries</u>:  With respect to any Charged-Off HELOC Mortgage Loan, Recoveries net of unreimbursed HELOC Back-Up Servicing Fees and HELOC Servicing Fees with respect thereto.

<u>Net WAC Cap</u>: The weighted average of the Net Mortgage Rates of the HELOC Mortgage Loans included in the trust as of the end of the prior Due Period, weighted on the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, minus (i) the HELOC Servicing Fee Rate and the HELOC Back-Up Servicing Fee Rate and (ii) the premium due to the Insurer under the Policy, expressed in dollars, divided by the current Stated Principal Balance of the HELOC Mortgage Loans.

Net WAC Shortfall:  With respect to the Class III-A Notes and Class IV-A Notes, on or prior to the related Note Rate Change Date, and with respect to the Class V-A-1, Class V-A-3 and Class V-A-4 Notes on any Payment Date, as determined separately for each such Class of Notes, the excess, if any, of (x) the related Accrued Note Interest thereon for such Payment Date calculated pursuant to clause (i)(a) of the related definition of Note Interest Rate over (y) Accrued Note Interest thereon for such Payment Date calculated at the related Available Funds Rate.

Net WAC Shortfall Carry-Forward Amount:  With respect to the Class III-A Notes and Class IV-A Notes, on or prior to the related Note Rate Change Date, and with respect to the Class V-A-1, Class V-A-3 and Class V-A-4 Notes on any Payment Date, as determined separately for each such Class of Notes, an amount equal to the aggregate amount of Net WAC Shortfall for such Notes on such Payment Date, plus any unpaid Net WAC Shortfall for such Class of Notes from prior Payment Dates, plus interest thereon at the related Note Interest Rate for such Payment Date for such Class for the related Accrual Period, to the extent previously unreimbursed by Net Monthly Excess Cashflow.

Net Worth: With respect to any Person at any date, the excess of total assets over total liabilities of such Person, and its consolidated subsidiaries, on such date, each to be determined in accordance with generally accepted accounting principles (GAAP) as in effect in the United States from time to time.

Non-Offered Notes: The Class B, Class V-B, Class V-M-5 and Class N Notes.

Nonrecoverable Advance: Any Monthly Advance or any Servicing Advance (i) which was previously made or is proposed to be made by the HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable; and (ii) which, in the good faith judgment of the HELOC Servicer, RMBS Servicer or RMBS Master Servicer, will not or, in the case of a proposed advance, would not, be ultimately recoverable by the HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, from Liquidation Proceeds, Recoveries or future payments on any Mortgage Loan. The Indenture Trustee may conclusively rely on any determination of nonrecoverability made by the HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable.

Note: A Class A, Class M, Class B, Class V-M, Class V-B or Class N Note.

Note Insurance Policy:  The certificate guaranty insurance policy issued by the Note Insurer for the benefit of the Class V-A-4-D Noteholders.

Note Insurance Policy Premium Amount: The amount of premium due to the Note Insurer in accordance with the Note Insurance Policy.

Note Insurance Policy Premium Rate: With respect to any Payment Date, the rate per annum at which the Note Insurance Policy Premium Amount for the Note Insurance Policy accrues, as specified in a letter agreement, dated as of June 20, 2005, between the Note Insurer and American Home Mortgage Investment Corp.

Note Insurer: Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation, any successor thereto.

Note Insurer Default: The existence and continuance of any of the following: (a) a failure by the Note Insurer to make a payment required under the Note Insurance Policy in accordance with its terms; or (b)(i) the Note Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or (ii) a court of competent jurisdiction, the New York or Wisconsin Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Note Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Note Insurer (or the taking of possession of all or any material portion of the property of the Note Insurer).

Note Interest Rate: With respect to each Payment Date and the Class I-A, Class II-A-1, Class II-A-2, Class V-A-2, Class M, Class B, Class V-M or Class V-B Notes, a floating rate equal to the least of (i) One-Month LIBOR plus the related Note Margin, (ii) the related Maximum Note Interest Rate and (iii) the related Available Funds Rate with respect to such Payment Date.  With respect to each Payment Date and the Class III-A, Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, (i) prior to the related Note Rate Change Date, the lesser of (a) 5.6150%, 5.6600%, 5.6290% and 5.6290% per annum, respectively and (b) the related Available Funds Rate and (ii) on or after the related Note Rate Change Date, the least of (a) Six-Month LIBOR plus the related Note Margin, (b) the related Maximum Note Interest Rate and (c) the related Available Funds Rate.  With respect to each Payment Date prior to the Step-Up Date and the Class V-A-1, Class V-A-3, Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes, the lesser of (i) 5.0640%, 5.0770%, 5.3830%, 5.7550%, 5.4080% and 5.3280% per annum, respectively, and (ii) the related Available Funds Rate. With respect to each Payment Date on or after the Step-Up Date and the Class V-A-1, Class V-A-3, Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes, the lesser of (i) 5.5640%, 5.5770%, 5.8830%, 6.2550%, 5.9080% and 5.8280% per annum, respectively, and (ii) the related Available Funds Rate.  With respect to each Payment Date and the Class VI-A Notes, a rate equal to the least of (x) One-Month LIBOR plus the related Note Margin, (y) the Net WAC Cap and (z) the Maximum Rate.  With respect to each Payment Date and the Class N-1 Notes and Class N-2 Notes, 5.250% and 5.500%, respectively.

Note Margin: The Class I-A, Class II-A-1, Class II-A-2, Class V-A-2, Class M, Class V-M and Class V-B Notes shall have the following Note Margins:

| Class | Note Margin for any Payment Date prior to the Step-Up Date | Note Margin for any Payment Date on and after the Step-Up Date |
|---|---|---|
| I-A-1............ | 0.300% | 0.600% |
| I-A-2............ | 0.350% | 0.700% |

48

| | | |
|---|---|---|
| I-A-3............. | 0.380% | 0.760% |
| II-A-1 .......... | 1.570% | 3.140% |
| II-A-2 .......... | 1.570% | 3.140% |
| V-A-2 .......... | 0.150% | 0.300% |
| M-1............... | 0.520% | 0.780% |
| M-2............... | 0.570% | 0.855% |
| M-3............... | 0.600% | 0.900% |
| M-4............... | 0.750% | 1.125% |
| M-5............... | 1.200% | 1.800% |
| V-M-1.......... | 0.520% | 0.780% |
| V-M-2.......... | 0.570% | 0.855% |
| V-M-3.......... | 0.600% | 0.900% |
| V-M-4.......... | 0.750% | 1.125% |
| V-M-5.......... | 1.200% | 1.800% |
| V-B.............. | 2.350% | 3.525% |

With respect to each of the Class III-A Notes and Class IV-A Notes after the applicable Note Rate Change Date, 1.500%.

Note Owner: The Beneficial Owner of a Note.

Note Principal Balance: With respect to any Note, other than the Class II-A-3 Notes, as of any date of determination, the initial Note Principal Balance as stated on the face thereof, minus all amounts distributed in respect of principal with respect to such Note and (a) plus, in the case of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, any Subsequent Recoveries allocated thereto and (b) minus, in the case of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, the aggregate amount of any reductions in the Note Principal Balance thereof deemed to have occurred in connection with allocations of Realized Losses on all prior Payment Dates in accordance with Section 3.38 of the Indenture.  With respect to the Class II-A-3 Notes, the sum of the Component Principal Balances of the Class II-A-3 Components.

Note Rate Change Date:  With respect to the Class III-A Notes and Class IV-A Notes, the Payment Date in July 2010.

Note Register: The register maintained by the Note Registrar in which the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes.

Note Registrar: The Indenture Trustee, in its capacity as Note Registrar, or any successor to the Indenture Trustee in such capacity.

Noteholder or Holder: The Person in whose name a Note is registered in the Note Register, except that, any Note registered in the name of the Depositor, the Issuer, American Home Mortgage Investment Corp., the Indenture Trustee, the Securities Administrator, the

Seller, HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer or any Affiliate of any of them shall be deemed not to be a holder or holders, nor shall any so owned be considered outstanding, for purposes of giving any request, demand, authorization, direction, notice, consent or waiver under the Indenture or the Trust Agreement; provided that, in determining whether the Securities Administrator and the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Securities Administrator, the Indenture Trustee or the Owner Trustee actually knows to be so owned shall be so disregarded. Owners of Notes that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Securities Administrator, the Indenture Trustee or the Owner Trustee the pledge's right so to act with respect to such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes or any Affiliate of any of the foregoing Persons.  With respect to the Class V-A-4-D Notes, if payments are made under the Note Insurance Policy, such Notes shall be deemed Outstanding until the Note Insurer has been reimbursed with respect thereto and the Note Insurer shall be deemed the Noteholder thereof to the extent of such unreimbursed payment.

Offered Notes:  The Class A, Class M, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes.

Officer's Certificate: With respect to the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, a certificate signed by the President, Managing Director, a Director, a Vice President or an Assistant Vice President, of the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, and delivered to the Indenture Trustee, RMBS Master Servicer or the HELOC Back-Up Servicer, as applicable. With respect to the Issuer, a certificate signed by any Authorized Officer of the Issuer, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, and delivered to the Securities Administrator. Unless otherwise specified, any reference in the Indenture to an Officer's Certificate shall be to an Officer's Certificate of any Authorized Officer of the Issuer.

One-Month LIBOR: With respect to any Accrual Period, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the London interbank offered rate for one-month United States dollar deposits, as such rates appear on the Telerate Screen Page 3750, as of 11:00 a.m. (London time) on such Interest Determination Date.

In the event that on any Interest Determination Date, Telerate Screen Page 3750 fails to indicate the London interbank offered rate for one-month United States dollar deposits, then One-Month LIBOR for the related Accrual Period will be established by the Securities Administrator as follows:

(i)    If on such Interest Determination Date two or more Reference Banks provide such offered quotations, One-Month LIBOR for the related Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 1/16%).

(ii)     If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, One-Month LIBOR for the related Accrual Period shall be the higher of (i) One-Month LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate.

(iii)    If no such quotations can be obtained and no Reference Bank rate is available, One-Month LIBOR will be the One-Month LIBOR rate applicable to the preceding Accrual Period.

The establishment of One-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator's calculation of the applicable Note Interest Rate applicable for the related Accrual Period shall (in the absence of manifest error) be final and binding.

Opinion of Counsel: A written opinion of counsel acceptable to the Indenture Trustee, the Insurer, the RMBS Master Servicer, the Note Insurer or HELOC Back-Up Servicer, as applicable, in its reasonable discretion which counsel may be in-house counsel for the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer, the Note Insurer or RMBS Master Servicer, as applicable, if acceptable to the Indenture Trustee, the RMBS Master Servicer, the HELOC Back-Up Servicer, the Insurer, the Note Insurer and the Rating Agencies or counsel for the Depositor, as the case may be.

Original Pre-Funded Amount: The Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Original Pre-Funded Amount, as applicable.

Original Value: Except in the case of a refinanced Mortgage Loan, the lesser of the Appraised Value or sales price of Mortgaged Property at the time a Mortgage Loan is closed, and for a refinanced Mortgage Loan, the Original Value is the value of such property set forth in an appraisal acceptable to the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable.

Other Basis Risk Amount: With respect to any Payment Date, an amount equal to the sum of (i) the aggregate Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount, as applicable, with respect to the Class I-A, Class III-A, Class IV-A, Class VI-A, Class M, Class B, Class V-M or Class V-B Notes for such Payment Date and (ii) the aggregate Excess Basis Risk Shortfall Carry-Forward Amount with respect to the Class V-A-2 Notes and Class II-A Notes for such Payment Date.

Outstanding: With respect to the Notes, as of the date of determination, all Notes theretofore executed, authenticated and delivered under this Indenture except:

(i)     Notes theretofore canceled by the Note Registrar or delivered to the Indenture Trustee for cancellation; and

(ii)     Notes in exchange for or in lieu of which other Notes have been executed, authenticated and delivered pursuant to the Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a holder in due course.

51

Outstanding Mortgage Loan: As to any Due Date, a Mortgage Loan (including an REO Property but excluding a Charged-Off HELOC Mortgage Loan) which was not the subject of a Principal Prepayment in Full, Cash Liquidation or REO Disposition and which was not purchased, deleted or substituted for prior to such Due Date pursuant to the HELOC Servicing Agreement, RMBS Servicing Agreement or Mortgage Loan Purchase Agreement, as applicable.

Overcollateralization Increase Amount: With respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, with respect to any Payment Date, the lesser of (i) the related Net Monthly Excess Cashflow for such Payment Date after payments to the Note Insurer in as provided in Section 3.05(e) of the Indenture and (ii) the excess, if any, of (a) the related Overcollateralization Target Amount over (b) the related Overcollateralized Amount on such Payment Date (after taking into account payments to the related Notes of the related Basic Principal Distribution Amount on such Payment Date). With respect to the Group V Loans, with respect to any Payment Date, the lesser of (i) the related Net Monthly Excess Cashflow for such Payment Date after payments to the Note Insurer in as provided in Section 3.06(e) of the Indenture and (ii) the excess, if any, of (a) the related Overcollateralization Target Amount over (b) the related Overcollateralized Amount on such Payment Date (after taking into account payments to the related Notes of the related Basic Principal Distribution Amount on such Payment Date), and thereafter, the related Net Monthly Excess Cashflow for such Payment Date.

Overcollateralization Reduction Amount: With respect to Loan Group VI and any Payment Date, the lesser of (x) the related Excess Overcollateralization Amount for such Payment Date and (y) the Investor Principal Distribution Amount for such Payment Date (before taking into account the related Overcollateralization Reduction Amount).

Overcollateralization Target Amount: With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V, Group VI and Group VII Cut-off Date Balances plus the amount of any Additional Net Negative Amortization Amount.  With respect to Loan Group V, 0.35% of the Group V Cut-off Date Balance.  With respect to Loan Group VI, (1) prior to the related Stepdown Date, an amount equal to the sum of (a) the Group VI Delinquent HELOC Amount and (b) 3.65% of the Group VI Cut-off Date Balance and (2) on or after the related Stepdown Date, an amount equal to the sum of (a) the Group VI Delinquent HELOC Amount and (b) the greatest of (x) 7.30% of the Invested Amount, (y) 0.50% of the Group VI Cut-off Date Balance, and (z) the aggregate Stated Principal Balance of the three Group VI Loans with the greatest Stated Principal Balance; provided, however, that if a related Trigger Event is in effect for the Group VI Loans, then the Overcollateralization Target Amount for the Group VI Loans will be the same as on the prior Payment Date.

Overcollateralized Amount: For any Payment Date and Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the amount, if any, by which (i) the aggregate Stated Principal Balance of the related mortgage loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, including Realized Losses on the mortgage loans incurred during the related Prepayment Period) and the related Pre-Funded Amount, exceeds (ii) the sum of the aggregate Note Principal Balance of the related Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes as of such

Payment Date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on these Notes on such Payment Date). For any Payment Date and Loan Group V, the amount, if any, by which (i) the aggregate Stated Principal Balance of the related mortgage loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, including Realized Losses on the mortgage loans incurred during the related Prepayment Period) and the related Pre-Funded Amount, exceeds (ii) the aggregate Note Principal Balance of the Class V-A, Class V-M and Class V-B Notes as of such Payment Date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on these Notes on such Payment Date). For any Payment Date and Loan Group VI, the amount, if any, by which (i) the Invested Amount exceeds (ii) the Note Principal Balance of the Class VI-A Notes as of such Payment Date (after giving effect to all other distributions of principal on these Notes on such Payment Date). The initial amount of overcollateralization in the Group VI Loans is approximately 1.00% of the Group VI Cut-off Date Balance.

Owner Trust Estate: The corpus of the Issuer created by the Trust Agreement which consists of items referred to in Section 3.01 of the Trust Agreement.

Owner Trustee: M&T Trust Company of Delaware and its successors and assigns or any successor owner trustee appointed pursuant to the terms of the Trust Agreement.

Owner Trustee's Fee: A fee of $2,500 per annum payable to the Owner Trustee in advance on the Closing Date and a fee of $4,000 payable on each anniversary thereof by American Home Mortgage Servicing, Inc.; provided, however, that in the event of any removal or resignation of the Owner Trustee, the Owner Trustee will promptly remit to American Home Mortgage Servicing, Inc. the portion of the Owner Trustee Fee that would have been earned by the Owner Trustee during the remainder of such year had it not been removed or resigned or the Notes redeemed.

Paying Agent: Any paying agent or co-paying agent appointed pursuant to Section 3.03 of the Indenture, which initially shall be the Indenture Trustee.

Payment Account: The account established by the Indenture Trustee pursuant to Section 3.01 of the Indenture. The Payment Account shall be an Eligible Account.

Payment Date: The 25th day of each month, or if such day is not a Business Day, then the next Business Day, commencing in July 2005.

Percentage Interest: With respect to any Note, the percentage obtained by dividing the Note Principal Balance of such Note by the aggregate Note Principal Balances of all Notes of that Class. With respect to any Certificate, the percentage as stated on the face thereof.

Periodic Rate Cap: With respect to any ARM Loan, the maximum rate, if any, by which the Mortgage Rate on such Mortgage Loan can adjust on any Adjustment Date, as stated in the related Mortgage Note or Mortgage.

Person: Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Plan: Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA or Section 4975 of the Code.

Plan Assets: Assets of a Plan within the meaning of Department of Labor regulation 29 C.F.R. § 2510.3-101.

Pool Balance: With respect to any date of determination, the aggregate of the Stated Principal Balances of all Mortgage Loans as of such date.

Premium Amount:   The premium payable to the Insurer pursuant to the Insurance Agreement.

Pre-Funded Amount:  The amount on deposit in a Pre-Funding Account on any Date of Determination.

Pre-Funding Account:  The Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Pre-Funding Account, as applicable.

Prepayment Interest Shortfall: As to any Payment Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property or a HELOC Mortgage Loan) that was the subject of (a) a Principal Prepayment in Full during the related Prepayment Period, an amount equal to the excess of interest accrued during the related Prepayment Period at the Net Mortgage Rate on the Stated Principal Balance of such Mortgage Loan over the sum of the amount of interest paid by the Mortgagor for such Prepayment Period to the date of such Principal Prepayment in Full or (b) a partial Principal Prepayment during the related Prepayment Period, an amount equal to the interest at the Mortgage Rate (less the RMBS Servicing Fee Rate) during the related Prepayment Period on the amount of such partial Principal Prepayment.

Prepayment Period: With respect to each Mortgage Loan and any Payment Date, the calendar month immediately preceding the month in which such Payment Date occurs.

Primary Insurance Policy: Each primary policy of mortgage guaranty insurance issued by a Qualified Insurer or any replacement policy therefor.

Principal Collections: For each Payment Date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that Payment Date in respect of the Group VI Loans, and consist of amounts collected during the related Due Period on the HELOC Mortgage Loans and allocated to principal in accordance with the terms of the related Credit Line Agreement together with the principal portion of any Purchase Price or any Substitution Adjustment Amounts paid during the preceding Due Period and at the end of the Funding Period, any excess amounts transferred from the Group VI Pre-Funding Account, net of

fees and other amounts reimbursable to the Owner Trustee, Indenture Trustee, Securities Administrator, HELOC Servicer and HELOC Back-Up Servicer as provided in the Basic Documents and allocable to the Group VI Loans, or, if any such reimbursable amounts are not allocable to such Mortgage Loans, then the Group VI's pro rata share of such amounts, to the extent not paid or reimbursed from Interest Collections. For purposes of this definition, "pro rata share" shall be a fraction, the numerator of which is equal to the aggregate of the Stated Principal Balance of the Group VI Loans for such Payment Date and the denominator of which is equal to the Pool Balance for such Payment Date.

Principal Distribution Amount: For any Payment Date, as determined separately for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans collectively and for the Group V Loans, the sum of (a) the related Basic Principal Distribution Amount, and (b) the related Overcollateralization Increase Amount. In addition, the Principal Distribution Amount shall be reduced to the extent the Overcollateralized Amount for these Loan Groups exceeds the related Overcollateralization Target Amount, by the amount of such excess.

Principal Prepayment: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date to the extent that it is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment, including Insurance Proceeds and Repurchase Proceeds, but excluding the principal portion of Net Liquidation Proceeds received at the time a Mortgage Loan becomes a Liquidated Mortgage Loan or Liquidated HELOC, respectively.

Principal Remittance Amount: For any Payment Date and any Loan Group , other than Loan Group VI, or the Mortgage Loans, other than the HELOC Mortgage Loans, in the aggregate, as applicable, the sum of

1.    the principal portion of all scheduled monthly payments on the related Mortgage Loans due on the related Due Date, to the extent received or advanced;

2.    the principal portion of all proceeds of the repurchase of a Mortgage Loan in the related Loan Group (or, in the case of a substitution, certain amounts representing a principal adjustment) as required by the Mortgage Loan Purchase Agreement during the preceding calendar month;

3.    any amount remaining on deposit in the related Pre-Funding Account at the end of the Funding Period;

4.    the principal portion of all other unscheduled collections received during the preceding calendar month in respect of the related Mortgage Loans, including full and partial prepayments, the proceeds of any repurchase of such Mortgage Loans by the Seller or holder of the Trust Certificates, Liquidation Proceeds and Insurance Proceeds, in each case to the extent applied as recoveries of principal; and

5.      with respect to the Group V Loans, any portion of any Class V-A-4-D Insured Amount for such Payment Date representing a Class V-A-4-D Insured Undercollateralization Amount allocated to the Class V-A-4-D Notes.

In addition, with respect to the Group I Loans, the Principal Remittance Amount shall be reduced (to not less than zero) by the Negative Amortization Amount on the Group I Loans.

Principal Prepayment in Full: Any Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

Proceeding: Any suit in equity, action at law or other judicial or administrative proceeding.

Prospectus: The Prospectus Supplement, dated June 20, 2005, together with the attached Prospectus, dated March 22, 2005.

Protected Account: An account established and maintained for the benefit of Noteholders by the RMBS Servicer with respect to the related Mortgage Loans and with respect to REO Property pursuant to the RMBS Servicing Agreement.

Purchase Price: The meaning specified in Section 2.2(a) of the Mortgage Loan Purchase Agreement.

Purchaser: American Home Mortgage Securities LLC, a Delaware limited liability company, and its successors and assigns.

Qualified Insurer: A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over such insurer in connection with the insurance policy issued by such insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as an insurer by the HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, and as a Fannie Mae-approved mortgage insurer.

Rapid Amortization Event:  As defined in Section 3.08 in the Indenture.

Rapid Amortization Period:  Begins on the earlier of Payment Date in July 2015 or the occurrence of a Rapid Amortization Event.

Rating Agency: Any nationally recognized statistical rating organization, or its successor, that rated the Notes at the request of the Depositor at the time of the initial issuance of the Notes. Initially, Standard & Poor's and Moody's. If such organization or a successor is no longer in existence, "Rating Agency" with respect to the Notes shall be such nationally recognized statistical rating organization, or other comparable Person, designated by (i) with respect to the Notes other than the Class VI-A Notes, the Note Insurer so long as no Note Insurer Default exists or (ii) with respect to the Class VI-A Notes, the Insurer so long as no Insurer Default exists, notice of which designation shall be given to the Indenture Trustee, the HELOC Back-Up Servicer and the RMBS Master Servicer. References herein to the highest short term unsecured

rating category of a Rating Agency shall mean A-1 or better in the case of Standard & Poor's and P-1 or better in the case of Moody's and in the case of any other Rating Agency shall mean such equivalent ratings. References herein to the highest long-term rating category of a Rating Agency shall mean "AAA" in the case of Standard & Poor's and "Aaa" in the case of Moody's and in the case of any other Rating Agency, such equivalent rating.

Realized Loss: With respect to a Mortgage Loan, other than a HELOC Mortgage Loan, and as reported by the RMBS Servicer to the RMBS Master Servicer, is (i) a Deficient Valuation, or (ii) as to any Liquidated Mortgage Loan, the unpaid principal balance thereof plus accrued and unpaid interest thereon at the Mortgage Rate through the last day of the month of liquidation less the Net Liquidation Proceeds with respect to such Mortgage Loan and the related Mortgaged Property.

Record Date: For each class of Notes, other than the Class II-A, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes, and each Payment Date, will be the close of business on the Business Day immediately preceding such Payment Date; provided, however, if any such Note is no longer a Book-Entry Note, the "Record Date" for such class of Notes shall be the close of business on the last Business Day of the calendar month preceding such Payment Date.  For each class of the Class II-A, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes and each Payment Date, the close of business on the last Business Day of the calendar month preceding such Payment Date.

Recoveries:  With respect to a Charged-Off HELOC Mortgage Loan, the proceeds (including Released Mortgaged Property Proceeds but not including amounts drawn under the Insurance Policy) received by the HELOC Servicer in connection with such Charged-Off HELOC Mortgage Loan minus related Servicing Advances.

Reference Banks: Any leading banks selected by the Securities Administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) whose quotations appear on the Telerate Screen Page 3750 on the Interest Determination Date in question, (iii) which have been designated as such by the Securities Administrator after consultation with the Note Insurer and the Insurer, and (iv) which are not Affiliates of the Depositor, the Seller, the HELOC Back-Up Servicer, the HELOC Servicer, the RMBS Master Servicer or the RMBS Servicer.

Registered Holder: The Person in whose name a Note is registered in the Note Register on the applicable Record Date.

Related Documents: With respect to each Mortgage Loan, the documents specified in Section 2.1(b) of the Mortgage Loan Purchase Agreement, and the related Subsequent Mortgage Loan Purchase Agreement, and any documents required to be added to such documents pursuant to the Mortgage Loan Purchase Agreement, the Trust Agreement, Indenture, the HELOC Servicing Agreement or the RMBS Servicing Agreement.

Released Mortgaged Property Proceeds:  As to any HELOC Mortgage Loan, proceeds received by the HELOC Servicer in connection with (a) a taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation or (b) any release of part of the

Mortgaged Property from the lien of the related Mortgage, whether by partial condemnation, sale or otherwise, which are not released to the Mortgagor in accordance with (i) applicable law, (ii) Accepted Servicing Practices and (iii) the HELOC Servicing Agreement.

Relief Act: The Servicemember's Civil Relief Act.

Relief Act Shortfall: As to any Payment Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property), any shortfalls relating to the Relief Act or similar legislation or regulations.

Remittance Report: The report prepared by the HELOC Back-Up Servicer, HELOC Servicer or RMBS Servicer, as applicable, pursuant to Section 4.01 of the HELOC Servicing Agreement, HELOC Back-Up Servicing Agreement or RMBS Servicing Agreement.

REO Acquisition: The acquisition by the HELOC Servicer or RMBS Servicer, as applicable, on behalf of the Issuer for the benefit of the Noteholders and the Insurer of any REO Property pursuant to Section 3.13 of the HELOC Servicing Agreement or RMBS Servicing Agreement.

REO Disposition: As to any REO Property, a determination by the HELOC Servicer or RMBS Servicer, as applicable, that it has received substantially all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and recoveries (including proceeds of a final sale) which the HELOC Servicer or RMBS Servicer, as applicable, expects to be finally recoverable from the sale or other disposition of the REO Property.

REO Imputed Interest: As to any REO Property, for any period, an amount equivalent to interest (at the Net Mortgage Rate that would have been applicable to the related Mortgage Loan had it been Outstanding) on the unpaid principal balance of the Mortgage Loan as of the date of acquisition thereof for such period as such balance is reduced pursuant to Section 3.13 of the HELOC Servicing Agreement or RMBS Servicing Agreement, as applicable, by any income from the REO Property treated as a recovery of principal.

REO Proceeds: Proceeds, net of expenses, received in respect of any REO Property (including, without limitation, proceeds from the rental of the related Mortgaged Property) which proceeds are required to be deposited into the related Collection Account or Protected Account only upon the related REO Disposition.

REO Property: A Mortgaged Property that is acquired by the Trust by foreclosure or by deed in lieu of foreclosure.

Repurchase Price: With respect to any Mortgage Loan required to be repurchased by the Seller on any date pursuant to the Mortgage Loan Purchase Agreement or the HELOC Servicing Agreement or purchased by the RMBS Servicer or HELOC Servicer, as applicable, pursuant to the RMBS Servicing Agreement or the HELOC Servicing Agreement, as applicable, an amount equal to the sum, without duplication, of (i) 100% of the Stated Principal Balance thereof (without reduction for any amounts charged off) and (ii) unpaid accrued interest at the Mortgage Rate on the outstanding principal balance thereof from the Due Date to which interest was last

paid by the Mortgagor to the first day of the month following the month of purchase plus (iii) the amount of unreimbursed Monthly Advances or unreimbursed Servicing Advances made with respect to such Mortgage Loan plus (iv) any other amounts owed to the RMBS Master Servicer, RMBS Servicer, HELOC Servicer or HELOC Back-Up Servicer, as applicable, pursuant to the RMBS Master Servicing Agreement or related Servicing Agreement and not included in clause (iii) of this definition plus (v) any costs and damages incurred by the trust in connection with any violation by such loan of any predatory lending law.

Repurchase Proceeds: The Repurchase Price in connection with any repurchase of a Mortgage Loan by the Seller and any cash deposit in connection with the substitution of a Mortgage Loan.

Required Reserve Fund Balance: For any Payment Date will be an amount equal to three months' interest on the Note Principal Balance of the Class N Notes immediately preceding such Payment Date, calculated based on the Note Interest Rate thereon and three Accrual Periods consisting of 30 days each.

Required Reserve Fund Deposit: For any Payment Date will be equal to the amount necessary to cause the amount on deposit in the Class N Reserve Fund to equal to the Required Reserve Fund Balance for such Payment Date.

Reserve Interest Rate: With respect to any Interest Determination Date, the rate per annum that the Securities Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.0625%) of the one-month, six-month or one-year (as applicable) United States dollar lending rates which New York City banks selected by the Securities Administrator are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month, six-month or one-year (as applicable) United States dollar lending rate which New York City banks selected by the Securities Administrator are quoting on such Interest Determination Date to leading European banks.

Responsible Officer: With respect to the Indenture Trustee or the Securities Administrator, (a) any officer within the corporate trust department of the Indenture Trustee including any vice president, assistant vice president, treasurer, assistant treasurer, trust officer or any other officer of the Indenture Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and (b) who shall have direct responsibility for the administration of the applicable Agreement.

Retained Notes: The Class B, Class V-M-5 and Class V-B Notes.

RMBS Master Servicer: Wells Fargo Bank, N.A., a national banking association, and its successors and assigns.

RMBS Master Servicing Agreement: The Master Servicing Agreement dated as of June 22, 2005, among the RMBS Master Servicer, Securities Administrator, Indenture Trustee and Issuer.

RMBS Servicing Rights Pledgee: One or more lenders, selected by the RMBS Servicer, to which the RMBS Servicer may pledge and assign all of its right, title and interest in, to and under the RMBS Servicing Agreement, including Bank of America, N.A., as the representative of certain lenders.

RMBS Mortgage Loan Schedule: The schedule of Mortgage Loans attached as Exhibit A to the RMBS Servicing Agreement.

RMBS Servicer: American Home Mortgage Servicing, Inc., a Maryland corporation, and its successors and assigns.

RMBS Servicer Remittance Date: The third Business Day prior to the each Payment Date.

RMBS Servicing Agreement: The Servicing Agreement dated as of June 22, 2005, among the Seller, RMBS Servicer, RMBS Master Servicer, Issuer and Indenture Trustee.

RMBS Servicing Fee: With respect to each Mortgage Loan (other than a HELOC Mortgage Loan) and any Payment Date, the fee payable monthly to the RMBS Servicer in respect of servicing compensation that accrues at an annual rate equal to the RMBS Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the first day of the related Due Period.

RMBS Servicing Fee Rate: With respect to any adjustable rate Mortgage Loan with an original principal balance of less than or equal to $359,650, 0.375% per annum, with respect to any adjustable rate Mortgage Loan with an original principal balance of greater than $359,650, 0.25% per annum, with respect to any fixed rate Mortgage Loan, 0.25% per annum.

RMBS Servicing Trigger Event: An RMBS Servicing Trigger Event is in effect with respect to any Payment Date if either:

(a) the Rolling Three Month Delinquency Rate for the Mortgage Loans is greater than 6%; or

(b) the cumulative amount of Realized Losses incurred on the Mortgage Loans from the Cut-off Date through the end of the calendar month immediately preceding such Payment Date exceeds the applicable percentage set forth below of the aggregate Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance:

0.15% with respect to each month up to July 2006

0.15% with respect to August 2006, plus an additional 1/12th of 0.50% for each month thereafter until July 2007

0.65% with respect to August 2007, plus an additional 1/12th of 0.95%

60

for each month thereafter until July 2008

1.60% with respect to August 2008, plus an additional 1/12th of 0.80% for each month thereafter until July 2009

2.40% with respect to August 2009, plus an additional 1/12th of 0.75% for each month thereafter until July 2010

3.15% with respect to August 2010, plus an additional 1/12th of 0.55% for each month thereafter until July 2011

3.70% with respect to August 2011 and each month thereafter

provided, however, that if the RMBS Servicer is rated "SQ2-" or better by Moody's on any date, the RMBS Servicing Trigger Event will no longer be in effect with respect to any Payment Date thereafter.

Rolling Three Month Delinquency Rate:  With respect to any Payment Date, the average of the Delinquency Rates for each of the three (or one and two, in the case of the first and second Payment Dates, respectively) immediately preceding months.

Sarbanes Oxley Certification:  A written certification covering servicing of the Mortgage Loans by all Servicers and signed by an officer of the Depositor that complies with (i) the Sarbanes-Oxley Act of 2002, as amended from time to time, and (ii) the February 21, 2003 Statement by the Staff of the Division of Corporation Finance of the Securities and Exchange Commission Regarding Compliance by Asset-Backed Issuers with Exchange Act Rules 13a-14 and 15d-14, as in effect from time to time.

Securities Act: The Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

Securities Administrator: Wells Fargo Bank, N.A., a national banking association, and its successors and assigns.

Securities Administrator Collection Account: The account established by the Securities Administrator pursuant to Section 3.06 of the RMBS Master Servicing Agreement.

Securities Intermediary: Deutsche Bank National Trust Company, or its successors and assigns.

Security: Any of the Certificates or Notes.

Securityholder or Holder: Any Noteholder or a Certificateholder.

Security Instrument: A written instrument creating a valid first lien on a Mortgaged Property securing a Mortgage Note, which may be any applicable form of mortgage, deed of trust, deed to secure debt or security deed, including any riders or addenda thereto.

Seller: American Home Mortgage Acceptance, Inc., a Maryland corporation, and its successors and assigns.

Senior Lien:  With respect to any HELOC Mortgage Loan that is a second priority lien, the mortgage loan or mortgage loans relating to the corresponding Mortgaged Property having priority senior to that of such HELOC Mortgage Loan.

Servicer:  The RMBS Servicer, the HELOC Back-Up Servicer or the HELOC Servicer, as applicable.

Servicing Account: The separate trust account created and maintained by the RMBS Servicer, or each Subservicer with respect to the Mortgage Loans or REO Property, which shall be an Eligible Account, for collection of taxes, assessments, insurance premiums and comparable items as described in Section 3.08 of the RMBS Servicing Agreement.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or other unanticipated event in the performance by the HELOC Servicer, RMBS Servicer, as applicable, or any Subservicer of its servicing obligations, including, without duplication, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures and any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS® System, (iii) the management and liquidation of any REO Property, (iv) compliance with the obligations under Sections 3.10, 3.11, 3.13 of the RMBS Servicing Agreement, or Sections 3.11 and 3.13 of the HELOC Servicing Agreement (v) covering any expenses incurred by or on behalf of the HELOC Servicer or the RMBS Servicer, as applicable, in connection with obtaining Insurance Proceeds and (vi) that is applied to the restoration or repair of the related Mortgaged Property.

Servicing Agreement: Each of the RMBS Servicing Agreement, the HELOC Back-Up Servicing Agreement or the HELOC Servicing Agreement, as applicable.

Servicing Certificate: A certificate completed and executed by a Servicing Officer on behalf of the HELOC Back-Up Servicer, HELOC Servicer or RMBS Servicer, as applicable, in accordance with Section 4.01 of the HELOC Back-Up Servicing Agreement, HELOC Servicing Agreement or RMBS Servicing Agreement.

Servicing Default: The meaning assigned in Section 6.01 of the HELOC Back-Up Servicing Agreement, HELOC Servicing Agreement, RMBS Master Servicing Agreement or RMBS Servicing Agreement, as applicable.

Servicing Officer: Any officer of the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, involved in, or responsible for, the administration and servicing (or master servicing, as applicable) of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Indenture Trustee, the RMBS Master Servicer or the HELOC Back-Up Servicer, as applicable, by the HELOC Back-Up Servicer, HELOC Servicer, RMBS Servicer or RMBS Master Servicer, as applicable, on the Closing Date, as such list may be amended from time to time.

Six-Month LIBOR: With respect to any Accrual Period, the rate determined by the Securities Administrator on the related Interest Determination Date on the basis of the London

interbank offered rate for six-month United States dollar deposits, as such rates appear on the Telerate Screen Page 3750, as of 11:00 a.m. (London time) on such Interest Determination Date.

In the event that on any Interest Determination Date, Telerate Screen Page 3750 fails to indicate the London interbank offered rate for six-month United States dollar deposits, then Six-Month LIBOR for the related Accrual Period will be established by the Securities Administrator as follows:

(i)    If on such Interest Determination Date two or more Reference Banks provide such offered quotations, Six-Month LIBOR for the related Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 1/16%).

(ii)    If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, Six-Month LIBOR for the related Accrual Period shall be the higher of (i) Six-Month LIBOR as determined on the previous Interest Determination Date and (ii) the Reserve Interest Rate.

(iii)    If no such quotations can be obtained and no Reference Bank rate is available, Six-Month LIBOR will be the Six-Month LIBOR rate applicable to the preceding Accrual Period.

The establishment of Six-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator's calculation of the applicable Note Interest Rate applicable for the related Accrual Period shall (in the absence of manifest error) be final and binding.

Standard & Poor's: Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

Stated Principal Balance: With respect to any Mortgage Loan that is not a HELOC Mortgage Loan or related REO Property as of any date of determination, (i) the principal balance of the Mortgage Loan outstanding as of the Cut-off Date, after application of all scheduled Monthly Payments due on or before such date, whether or not received, minus (ii) the sum of (a) the principal portion of the Monthly Payments due with respect to such Mortgage Loan or REO Property during each Due Period ending prior to the most recent Payment Date which were received or with respect to which an Monthly Advance was made, (b) all Principal Prepayments with respect to such Mortgage Loan or REO Property, and all Insurance Proceeds, Liquidation Proceeds and REO Proceeds to the extent applied by the RMBS Servicer as recoveries of principal in accordance with Section 3.13 of the RMBS Servicing Agreement, with respect to such Mortgage Loan or REO Property, which were distributed pursuant to Section 3.05 of the Indenture on any previous Payment Date, and (c) the principal portion of any Realized Loss with respect thereto allocated pursuant to Section 3.38 of the Indenture for any previous Payment Date, plus (iii) the cumulative amount of any Negative Amortization; provided that the Stated Principal Balance of any Liquidated Mortgage Loan is zero.  With respect to any Mortgage Loan that is a HELOC Mortgage Loan, the principal balance of the HELOC Mortgage Loan as of the Cut-off Date, plus any Additional Balances in respect of such HELOC Mortgage Loan minus all

collections credited against the principal balance of such HELOC Mortgage Loan in accordance with the related Mortgage Note and minus all prior related Charge-Off Amounts.  The Stated Principal Balance of any Liquidated HELOC Mortgage Loan is zero.

Statutory Trust Statute: Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code §§3801 et seq., as the same may be amended from time to time.

Stepdown Date: With respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, the later to occur of (x) the Payment Date occurring in July 2008 and (y) the first Payment Date for which the Credit Enhancement Percentage for the Class I-A, Class II-A, Class III-A and Class IV-A Notes (calculated for this purposes only after taking into account distributions of principal on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, but prior to any payment of the Class A Principal Distribution Amount for these Notes then entitled to payments of principal on that Payment Date) is greater than or equal to approximately 15.10%.  With respect to the Group V Loans, the later to occur of (x) the Payment Date occurring in July 2008 and (y) the first Payment Date for which the Credit Enhancement Percentage for the Class V-A Notes (calculated for this purposes only after taking into account distributions of principal on the Group V Loans, but prior to any payment of the Class V-A Principal Distribution Amount for these Notes then entitled to payments of principal on that Payment Date) is greater than or equal to approximately 14.60%.  With respect to the Class VI-A Notes and Loan Group VI, the later to occur of (x) the Payment Date occurring in January 2008 and (y) the Payment Date on which the aggregate Investor Principal Distribution Amount actually distributed to the holders of the Class VI-A Notes equals or exceeds one-half of the Group VI Cut-off Date Balance.

Step-Up Date: With respect to the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class M and Class B Notes and the Class II-A-3 Components, the Payment Date occurring after the first Payment Date for which the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the end of the related Due Period and the related Pre-Funded Amount has been reduced to 10% or less of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances. With respect to the Class V-A, Class V-M and Class V-B Notes, the Payment Date occurring after the first Payment Date for which the aggregate Stated Principal Balance of the Group V Loans as of the end of the related Due Period and the related Pre-Funded Amount has been reduced to 10% or less of the Group V Cut-off Date Balance.  With respect to the Class VI-A Notes, the Payment Date occurring after the first Payment Date for which the Note Principal Balance of the Class VI-A Notes immediately preceding such Payment Date has been reduced to 10% or less of the initial Note Principal Balance of the Class VI-A Notes.

Strike Rate:  With respect to the Corridor Contract and each Payment Date, the fixed rate set forth in the Corridor Contract used to determine payments to the Indenture Trustee.

Subservicer: Any Person with whom the HELOC Servicer or RMBS Servicer, as applicable, has entered into a Subservicing Agreement as a Subservicer.

Subservicing Account: An Eligible Account established or maintained by a Subservicer as provided for in Section 3.06(e) of the HELOC Servicing Agreement and RMBS Servicing Agreement.

Subservicing Agreement: The written contract between the HELOC Servicer or RMBS Servicer, as applicable, and any Subservicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02 of the RMBS Servicing Agreement and HELOC Servicing Agreement.

Subsequent Recoveries: Unexpected recoveries, net of reimbursable expenses, with respect to a Liquidated Mortgage Loan or Liquidated HELOC that resulted in a Realized Loss in a month prior to the receipt of such recoveries.

Subsequent Cut-off Date: With respect to any Subsequent Mortgage Loan or Subsequent HELOC Mortgage Loans, the date, as designated by the Depositor, that is the later of (i) the first day of the month in which the related Subsequent Transfer Date occurs and (ii) the origination date of such Subsequent Mortgage Loan or Subsequent HELOC Mortgage Loan, as the cut-off date with respect to the related Subsequent Mortgage Loan or Subsequent HELOC Mortgage Loan.

Substitution Adjustment Amount: With respect to any Eligible Substitute Mortgage Loan, the amount as defined in Section 2.03 of the HELOC Servicing Agreement or RMBS Servicing Agreement, as applicable.

Subsequent Mortgage Loan Purchase Agreement: Any of the Group I Subsequent Mortgage Loan Purchase Agreement, Group II-C Subsequent Mortgage Loan Purchase Agreement, Group II-NC Subsequent Mortgage Loan Purchase Agreement, Group III Subsequent Mortgage Loan Purchase Agreement, Group IV Subsequent Mortgage Loan Purchase Agreement, Group V Subsequent Mortgage Loan Purchase Agreement and Group VI Subsequent HELOC Mortgage Loan Purchase Agreement.

Subsequent Transfer Date: With respect to any Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Mortgage Loan, the applicable date upon which such Mortgage Loan was purchased from the Seller with the amounts on deposit in the related Pre-Funding Account.

Tangible Net Worth: Net Worth, less the sum of the following (without duplication): (a) any other assets of American Home Mortgage Investment Corp. and its consolidated subsidiaries that would be treated as intangibles under GAAP including, without limitation, any write-up of assets (other than adjustments to market value to the extent required under GAAP with respect to excess servicing, residual interests in offerings of asset-backed securities and asset-backed securities that are interest-only securities), good-will, research and development costs, trade-marks, trade names, copyrights, patents and unamortized debt discount and expenses and (b) loans or other extensions of credit to officers of American Home Mortgage Investment Corp. or its consolidated subsidiaries other than Mortgage Loans made to such Persons in the ordinary course of business.

Telerate Screen Page 3750: The display designated as page 3750 on the Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks).

Transfer Date:  As defined in Section 3.20 of the HELOC Servicing Agreement.

Transfer Notice Date:  As defined in Section 3.20 of the HELOC Servicing Agreement.

Transferor:  The Holder of the Certificates as shown on the Certificate Register.

Transferor Interest:  Represents the pari passu interest in the HELOC Mortgage Loans equal to the cumulative amount of draws on the HELOC Mortgage Loans beginning with the Rapid Amortization Period. The Transferor Interest is calculated as the outstanding pool balance of the HELOCs at the end of the previous Due Period less the Invested Amount.  For purposes of the Basic Documents, the Transferor Interest shall be considered part of the Owner Trust Certificates and shall not be transferable or assignable separately.

Transferor Interest Principal Balance: With respect to any Payment Date, the amount by which the Pool Principal Balance exceeds the Invested Amount, in each case at the end of the related Due Period.

Transferor Percentage:  For any Payment Date, 100% minus the Floating Allocation Percentage for such Payment Date.

Treasury Regulations: Regulations, including proposed or temporary Regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

Trigger Event: With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, a Trigger Event is in effect with respect to any Payment Date on and after the related Stepdown Date if either

(a)     the Rolling Three Month Delinquency Rate for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the close of business on the last day of the preceding calendar month exceeds 40% of the aggregate Note Principal Balance of the Class M Notes and Class B Notes  plus the aggregate Overcollateralized Amount for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, divided by the aggregate Stated Principal Balance of Group I, Group II-C, Group II-NC, Group III and Group IV Loans; or

(b)     the cumulative amount of Realized Losses incurred on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans from the Cut-off Date through the end of the calendar month immediately preceding such Payment Date exceeds the applicable percentage set forth below of the

aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the Cut-off Date:

| | |
|---|---|
| July 2008 to June 2009 .................. | 1.75% |
| July 2009 and thereafter................. | 2.00% |

With respect to Loan Group V, a Trigger Event is in effect with respect to any Payment Date on and after the related Stepdown Date if either

(a)     the Rolling Three Month Delinquency Rate for the Group V Loans as of the close of business on the last day of the preceding calendar month exceeds 50% of the aggregate Note Principal Balance of the Class V-M Notes and Class V-B Notes plus the aggregate Overcollateralized Amount for Loan Group V, divided by the aggregate Stated Principal Balance of the Group V Loans; or

(b)     the cumulative amount of Realized Losses incurred on the Group V Loans from the Cut-off Date through the end of the calendar month immediately preceding such Payment Date exceeds the applicable percentage set forth below of the aggregate Stated Principal Balance of the Group V Loans as of the Cut-off Date:

| | |
|---|---|
| July 2008 to June 2009 .................. | 1.75% |
| July 2009 and thereafter................. | 2.00% |

With respect to Loan Group VI, a Trigger Event is in effect with respect to any Payment Date on and after the Stepdown Date if either:

1.     the average of the Group VI Excess Spread Percentage for that Payment Date and the prior two Payment Dates is less than or equal to 1.75% per annum;

2.     the Rolling Three Month Delinquency Rate for the Group VI Loans as of the close of business on the last day of the preceding Due Period exceeds 5.00% of aggregate Stated Principal Balance of Group VI Loans;

3.     the cumulative amount of Charge-Off Amounts incurred on the Group VI Loans from the Cut-off Date through the end of the calendar month immediately preceding such Payment Date exceeds the applicable percentage set forth below of the aggregate Stated Principal Balance of the Group VI Loans as of the Cut-off Date:

| | |
|---|---|
| December 2006 to June 2007......... | 2.50% |
| July 2007 to June 2008 .................. | 3.25% |
| July 2008 and thereafter................. | 4.00% |

Trust: The American Home Mortgage Investment Trust 2005-2 to be created pursuant to the Trust Agreement.

Trust Agreement: The Amended and Restated Trust Agreement dated as of June 22, 2005, among the Owner Trustee, the Depositor and Deutsche Bank National Trust Company, as Certificate Registrar and Certificate Paying Agent, relating to the Trust.

Trust Estate: The meaning specified in the Granting Clause of the Indenture.

Trust Indenture Act or TIA: The Trust Indenture Act of 1939, as amended from time to time, as in effect on any relevant date.

UCC: The Uniform Commercial Code, as amended from time to time, as in effect in any specified jurisdiction.

Underwriters: Lehman Brothers Inc., Bear, Stearns & Co. Inc., UBS Securities LLC, Greenwich Capital Markets, Inc. and Goldman, Sachs & Co. or their successors.

Uninsured Cause: Any cause of damage to property subject to a Mortgage that the complete restoration of such property is not fully reimbursable by the hazard insurance policies.

Unpaid Interest Shortfall: For each Class of Notes and any Payment Date, such Notes' pro rata share, based on the amount of Accrued Note Interest otherwise payable on such Note on such Payment Date, of (a) any Prepayment Interest Shortfalls, to the extent not covered by Compensating Interest, and (b) any Relief Act Shortfalls, in each case to the extent incurred with respect to the related Mortgage Loans.

EXHIBIT 2

Prospectus supplement dated June 20, 2005 (to prospectus dated March 22, 2005)

# $5,647,207,000
(Approximate)



# American Home Mortgage Investment Trust 2005-2
### Issuer

## American Home Mortgage Servicing, Inc.
### RMBS Servicer and HELOC Servicer

## American Home Mortgage Securities LLC
### Depositor

## American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2

---

*You should consider carefully the risk factors beginning on page S-18 in this prospectus supplement.*

**The Trust**

The trust will consist primarily of a pool of fixed-rate and adjustable-rate mortgage loans and adjustable-rate, revolving home equity lines of credit, divided into seven loan groups. The trust will issue thirty-two classes of notes, twenty-seven of which are offered under this prospectus supplement.

**Credit Enhancement**

The notes will have credit enhancement in the form of:

• excess interest and overcollateralization;

• subordination provided to some classes of notes by other classes of notes as described in this prospectus supplement;

• limited cross-collateralization as described in this prospectus supplement;

• a financial guaranty insurance policy issued by Financial Guaranty Insurance Company for the benefit of the Class VI-A Notes only; and

• a note guaranty insurance policy issued by Ambac Assurance Corporation for the benefit of the Class V-A-4-D Notes only.




In addition, derivatives will be included in the trust which will cover some basis risk shortfalls on some classes of notes.

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy of this prospectus. Any representation to the contrary is a criminal offense.*

*The Attorney General of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.*

Lehman Brothers Inc., Bear, Stearns & Co. Inc., UBS Securities LLC, Greenwich Capital Markets, Inc. and Goldman, Sachs & Co. will offer all of the Class I-A-1, Class II-A, Class III-A, Class IV-A, Class V-A, Class VI-A, Class M-1, Class M-2, Class M-3, Class V-M-1, Class V-M-2 and Class V-M-3 Notes to the public, and $118,000,000, $15,000,000 and $20,000,000 of the Class I-A-2, Class M-4 and Class M-5 Notes, respectively, at varying prices to be determined at the time of sale, provided, however, that UBS Securities LLC will not offer the Class V-A-2 Notes to the public. The proceeds to the depositor from these underwritten notes are expected to be approximately 100.75% of the aggregate note principal balance of these underwritten notes, plus interest from the cut-off date on the Class II-A, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes. The expenses of the depositor are estimated to be $1,000,000. There is no underwriting arrangement for the remaining classes or portions of classes of offered notes. See ''Method of Distribution'' in this prospectus supplement.

# LEHMAN BROTHERS INC.

## BEAR, STEARNS & CO. INC.

### UBS INVESTMENT BANK

#### RBS GREENWICH CAPITAL

##### GOLDMAN, SACHS & CO.

**Important notice about information presented in this prospectus supplement
and the accompanying prospectus**

**You should rely only on the information contained in this document. We have not authorized anyone to provide you with different information.**

**We provide information to you about the notes in two separate documents that progressively provide more detail:**

- the accompanying prospectus, which provides general information, some of which may not apply to this series of notes; and

- this prospectus supplement, which describes the specific terms of this series of notes.

**If the description of your notes in this prospectus supplement differs from the related description in the prospectus, you should rely on the information in this prospectus supplement.**

The depositor's principal executive offices are located at 538 Broadhollow Road, Melville, New York 11747 and its phone number is (877) 281-5500.

# TABLE OF CONTENTS

## PROSPECTUS SUPPLEMENT

| Caption | Page |
|---|---|

SUMMARY OF PROSPECTUS
SUPPLEMENT ............................................... S-5

RISK FACTORS ............................................. S-18

THE MORTGAGE POOL ........................... S-33
General ................................................... S-33
Indices on Certain of the Mortgage
Loans and HELOCs.................................. S-35
Initial Mortgage Loan and Initial
HELOC Characteristics ........................... S-37
The HELOCs ........................................... S-43

THE RMBS MASTER SERVICER
AND THE SERVICERS.............................. S-44
RMBS Master Servicer............................ S-44
RMBS Servicer and HELOC Servicer .... S-45
The HELOC Back-Up Servicer............... S-48
Conveyance of Subsequent Mortgage
Loans and HELOCs and the Pre-
Funding Accounts.................................... S-49

MORTGAGE LOAN ORIGINATION ....... S-54

HELOC ORIGINATION ............................. S-57

ADDITIONAL INFORMATION................ S-62

DESCRIPTION OF THE NOTES............... S-62
General .................................................... S-62
Book-Entry Notes .................................... S-64
Interest Payments on the Class V-A,
Class V-M and Class V-B Notes ............. S-67
Principal Payments on the Class I-A,
Class II-A, Class III-A, Class IV-A,
Class M and Class B Notes ..................... S-68
Principal Payments on the Class V-A,
Class V-M and Class V-B Notes ............. S-70
Overcollateralization Provisions for
Loan Group I, Loan Group II-C,
Loan Group II-NC, Loan Group III
and Loan Group IV.................................. S-72
Overcollateralization Provisions for
Loan Group V ......................................... S-73
Calculation of LIBOR for the LIBOR
Notes....................................................... S-74
Description of the Note Insurance
Policy...................................................... S-75
The Derivative Contracts......................... S-75
The Corridor Contract ............................. S-77

| Caption | Page |
|---|---|

Allocation of Losses on the Mortgage
Loans....................................................... S-79
Interest Coverage Accounts ..................... S-81
Payments on the Class VI-A Notes .......... S-81
Rapid Amortization Events ...................... S-82
The Policy ............................................... S-83

YIELD ON THE NOTES ............................ S-85
General .................................................... S-85
Prepayment Considerations...................... S-86
Allocation of Principal Payments............. S-89
Interest Shortfalls and Realized
Losses...................................................... S-90
Note Interest Rates .................................. S-90
Purchase Price ........................................ S-92
Class V-A-1 Notes Yield
Considerations......................................... S-92
Final Scheduled Payment Date ................ S-93
Optional Termination .............................. S-93
Removal of HELOCs ............................... S-94
Weighted Average Life ............................ S-95
Yield Sensitivity of the Class I-A-2,
Class I-A-3, Class IV-A-3, Class V-
A-4-D, Class M, Class B, Class V-M
and Class V-B Notes ............................... S-126

THE ISSUER.............................................. S-128

THE OWNER TRUSTEE .......................... S-128

THE INDENTURE TRUSTEE .................. S-129

THE SECURITIES
ADMINISTRATOR .................................... S-129

THE CREDIT ENHANCER ...................... S-130
The Credit Enhancer ............................... S-130
Financial Strength Ratings of the
Credit Enhancer....................................... S-131

THE NOTE INSURER............................... S-132

EXPERTS.................................................... S-133

THE RMBS MASTER SERVICING
AGREEMENT AND SERVICING
AGREEMENTS .......................................... S-134
Servicing and Other Compensation
And Payment of Expenses....................... S-134
Realization Upon Defaulted
Mortgage Loans and HELOCs............... S-134
The Protected Accounts .......................... S-135

| Caption | Page |
|---------|------|

The Collection Accounts ...................... S-135
Optional Repurchase of Defaulted
Mortgage Loans.................................... S-135
Pledge and Assignment of RMBS
Servicer's Rights ................................... S-135
THE INDENTURE.................................... S-136
General ................................................. S-136
Rights Upon Event of Default .............. S-136
Limitation on Suits ............................... S-137
Resignation and Removal of
Indenture Trustee.................................. S-137
Optional Termination ........................... S-138
ASSIGNMENT OF LOANS .................... S-139
General ................................................. S-139
FEDERAL INCOME TAX
CONSEQUENCES .................................... S-139
Tax Classification of the Trust and of
the Notes................................................ S-139
Tax Consequences to Holders of the
Notes...................................................... S-140
METHOD OF DISTRIBUTION .............. S-140
SECONDARY MARKET ......................... S-141
LEGAL OPINIONS.................................. S-141
RATINGS ................................................. S-141
LEGAL INVESTMENT ............................ S-142
ERISA CONSIDERATIONS ................... S-143
GLOSSARY ............................................. S-145
ANNEX S-I..............................................AX-1

## SUMMARY OF PROSPECTUS SUPPLEMENT

The following summary is a very broad overview of the notes and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the notes, read carefully this entire prospectus supplement and the entire accompanying prospectus. A glossary is included at the end of this prospectus supplement. Capitalized terms used but not defined in the glossary at the end of this prospectus supplement have the meanings assigned to them in the glossary at the end of the accompanying prospectus.

| | |
|---|---|
| Issuer or Trust | American Home Mortgage Investment Trust 2005-2. |
| Title of Series | Mortgage-Backed Notes, Series 2005-2. |
| Cut-off Date | With respect to the initial mortgage loans, June 1, 2005. With respect to the initial HELOCs, the close of business on June 7, 2005. With respect to the subsequent mortgage loans and subsequent HELOCs, the applicable subsequent cut-off date. |
| Closing Date | On or about June 22, 2005. |
| Depositor | American Home Mortgage Securities LLC. |
| Seller | American Home Mortgage Acceptance, Inc., an affiliate of the depositor, the RMBS servicer and the HELOC servicer. |
| RMBS Master Servicer | Wells Fargo Bank, National Association. |
| RMBS Servicer | American Home Mortgage Servicing, Inc. |
| HELOC Back-Up Servicer | GMAC Mortgage Corporation. |
| HELOC Servicer | American Home Mortgage Servicing, Inc. |
| Indenture Trustee | Deutsche Bank National Trust Company. |
| Owner Trustee | M&T Trust Company of Delaware. |
| Credit Enhancer | For the benefit of the Class VI-A Notes only, Financial Guaranty Insurance Company. |
| Note Insurer | For the benefit of the Class V-A-4-D Notes only, Ambac Assurance Corporation. |
| Securities Administrator | Wells Fargo Bank, National Association. |
| Payment Dates | Payments on the notes will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in July 2005. |
| Notes | The classes of notes and their note interest rates and initial note principal balances are set forth in the table below. |

**Offered Notes**

| Class | Note Interest Rate | | Initial Note Principal Balance | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|---|
| I-A-1 | Adjustable Rate | $ | 456,354,000 | AAA/Aaa | Super Senior/Adjustable Rate |
| I-A-2 | Adjustable Rate | $ | 228,175,000 | AAA/Aaa | Senior Support/Adjustable Rate |
| I-A-3 | Adjustable Rate | $ | 76,058,000 | AAA/Aaa | Senior Support/Adjustable Rate |
| II-A-1 | Adjustable Rate | $ | 462,292,000 | AAA/Aaa | Senior/Adjustable Rate |
| II-A-2 | Adjustable Rate | $ | 557,806,000 | AAA/Aaa | Senior/Adjustable Rate |
| II-A-3 | Adjustable Rate | $ | 50,000,000 | AAA/Aaa | Senior/Component/ Adjustable Rate |
| III-A | 5.6150% | $ | 1,375,597,000 | AAA/Aaa | Senior/Fixed Rate |
| IV-A-1 | 5.6600% | $ | 200,000,000 | AAA/Aaa | Senior/Fixed Rate |
| IV-A-2 | 5.6290% | $ | 398,870,000 | AAA/Aaa | Super Senior/Fixed Rate |
| IV-A-3 | 5.6290% | $ | 22,564,000 | AAA/NR | Senior Support/Fixed Rate |
| V-A-1 | 5.0640% | $ | 127,900,000 | AAA/Aaa | Non-Accelerating Senior/Fixed Rate |
| V-A-2 | Adjustable Rate | $ | 581,158,000 | AAA/Aaa | Senior/ Adjustable Rate |
| V-A-3 | 5.0770% | $ | 243,690,000 | AAA/Aaa | Senior/Fixed Rate |
| V-A-4-A | 5.3830% | $ | 88,000,000 | AAA/Aaa | Super Senior/Fixed Rate |
| V-A-4-B | 5.7550% | $ | 6,827,000 | AAA/NR | Senior Support/Fixed Rate |
| V-A-4-C | 5.4080% | $ | 115,717,000 | AAA/Aaa | Senior/Fixed Rate |
| V-A-4-D | 5.3280% | $ | 115,717,000 | AAA/Aaa | Senior/Insured/Fixed Rate |
| VI-A | Adjustable Rate | $ | 237,840,000 | AAA/Aaa | Senior/Insured/Adjustable Rate |
| M-1 | Adjustable Rate | $ | 60,041,000 | AA+/Aa1 | Mezzanine/Adjustable Rate |
| M-2 | Adjustable Rate | $ | 41,403,000 | AA/Aa2 | Mezzanine/Adjustable Rate |
| M-3 | Adjustable Rate | $ | 24,841,000 | AA/Aa3 | Mezzanine/Adjustable Rate |
| M-4 | Adjustable Rate | $ | 38,090,000 | AA/NR | Mezzanine/Adjustable Rate |
| M-5 | Adjustable Rate | $ | 72,041,000 | A/NR | Mezzanine/Adjustable Rate |
| V-M-1 | Adjustable Rate | $ | 19,316,000 | AA+/Aa1 | Mezzanine/Adjustable Rate |
| V-M-2 | Adjustable Rate | $ | 13,797,000 | AA+/Aa2 | Mezzanine/Adjustable Rate |
| V-M-3 | Adjustable Rate | $ | 8,968,000 | AA/Aa3 | Mezzanine/Adjustable Rate |
| V-M-4 | Adjustable Rate | $ | 24,145,000 | AA/NR | Mezzanine/Adjustable Rate |
| Total Offered Notes: | | $ | 5,647,207,000 | | |

**Non-Offered Notes**

| Class | Note Interest Rate | | Initial Note Principal Balance | Initial Rating (S&P/Moody's) | Designation |
|---|---|---|---|---|---|
| V-M-5 | Adjustable Rate | $ | 15,177,000 | A/NR | Mezzanine/Adjustable Rate |
| B | 0.00% | $ | 61,690,000 | BBB/NR | Mezzanine/Principal Only |
| V-B | Adjustable Rate | $ | 14,487,000 | BBB/NR | Mezzanine/Adjustable Rate |
| N-1 | 5.250% | $ | 31,700,000 | NR/Baa2 | Subordinate/Net Interest Margin |
| N-2 | 5.500% | $ | 7,890,000 | NR/Ba2 | Subordinate/Net Interest Margin |
| Total Non-Offered Notes: | | $ | 130,944,000 | | |

**Other Information:**

**Class I-A-1, Class I-A-2, Class I-A-3, Class II-A-1, Class II-A-2, Class V-A-2, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4, Class V-M-5 and Class V-B Notes:**

The note interest rates on these classes of notes will be equal to the least of:

- One-month LIBOR plus the related note margin set forth below,
- the maximum note interest rate described in this prospectus supplement, and
- the related available funds rate described in this prospectus supplement.

| Class | Note Margin | |
|---|---|---|
| | (1) | (2) |
| I-A-1 | 0.300% | 0.600% |
| I-A-2 | 0.350% | 0.700% |
| I-A-3 | 0.380% | 0.760% |
| II-A-1 | 1.570% | 3.140% |
| II-A-2 | 1.570% | 3.140% |
| V-A-2 | 0.150% | 0.300% |
| M-1 | 0.520% | 0.780% |
| M-2 | 0.570% | 0.855% |
| M-3 | 0.600% | 0.900% |
| M-4 | 0.750% | 1.125% |
| M-5 | 1.200% | 1.800% |
| V-M-1 | 0.520% | 0.780% |
| V-M-2 | 0.570% | 0.855% |
| V-M-3 | 0.600% | 0.900% |
| V-M-4 | 0.750% | 1.125% |
| V-M-5 | 1.200% | 1.800% |
| V-B | 2.350% | 3.525% |

_____
(1) Initially.
(2) On and after the step-up date as described in this prospectus supplement.

**Class II-A-3 Notes:**

The Class II-A-3 Notes will consist of two components, Component II-A-3-C and Component II-A-3-NC. The initial component principal balances of Component II-A-3-C and Component II-A-3-NC are equal to $22,659,000 and $27,341,000, respectively.  The amount of interest accrued on the Class II-A-3 Notes will equal the sum of the amount of interest accrued on Component II-A-3-C and Component II-A-3-NC.

The component interest rates on Component II-A-3-C and Component II-A-3-NC will be equal to the least of:

- One-month LIBOR plus the related component margin set forth below,
- the maximum component interest rate described in this prospectus supplement, and
- the related available funds rate described in this prospectus supplement.

| Component | Component Margin | |
| --- | --- | --- |
| | (1) | (2) |
| II-A-3-C............................................... | 1.570% | 3.140% |
| II-A-3-NC.............................................. | 1.570% | 3.140% |

_____

(1)      Initially.
(2)      On and after the step-up date as described in this prospectus supplement.

## Class III-A, Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes:

The note interest rates on these classes of notes will be initially equal to the related fixed rate indicated above and subject to the related available funds rate described in this prospectus supplement. However, on or after the related note rate change date, the note interest rate on these classes of notes will convert to an adjustable rate based on six-month LIBOR plus 1.500% and subject to the related maximum note interest rate and related available funds rate described in this prospectus supplement.

## Class V-A-1, Class V-A-3, Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes:

The note interest rates on these classes of notes will be initially equal to the related fixed rate indicated above subject to the related available funds rate described in this prospectus supplement. However, on and after the related step-up date as described in this prospectus supplement, the note interest rate on these classes of notes will increase by 0.500% subject to the related available funds rate described in this prospectus supplement.

## Class VI-A Notes:

The note interest rate on this class of notes will be equal to the least of:

- One-month LIBOR plus (a) initially, 0.180% and (b) on or after the step-up date, 0.360%,
- the net WAC cap described in this prospectus supplement, and
- the maximum rate described in this prospectus supplement.

## Class N-1 Notes and N-2 Notes:

The note interest rates, note principal balances, and ratings of these notes are those estimated as of the date of this prospectus supplement.  The actual values and ratings may be different on the closing date.

**The Trust**

The Depositor will establish American Home Mortgage Investment Trust 2005-2, a Delaware statutory trust, pursuant to a trust agreement among the Depositor, the Owner Trustee, and Deutsche Bank National Trust Company, as certificate registrar and certificate paying agent. Pursuant to the trust agreement, the Depositor will deposit into the trust on the closing date the initial mortgage loans, the initial HELOCs and the original pre-funded amount described below. On the closing date, pursuant to an indenture between the Trust, the Indenture Trustee and the Securities Administrator, the Trust will issue the notes.

Payments of interest and principal on the notes will be made only from payments received from the assets of the trust as described in this prospectus supplement.

The trust will also include a note guaranty insurance policy provided by Ambac Assurance Corporation, which will guarantee certain payments on the Class V-A-4-D Notes only.

The trust will also include a financial guaranty insurance policy provided by Financial Guaranty Insurance Company, which will guarantee certain payments on the Class VI-A Notes only.

The trust will also include derivatives, which will cover basis risk shortfalls on some classes of notes as described below under "Derivative Contracts."

The beneficial ownership interest in the trust will be represented by the trust certificates, which are not offered by this prospectus supplement. The trust will also issue the Class V-M-5, Class B, Class V-B, Class N-1 and Class N-2 Notes, which are not offered hereby.

See "Description of the Notes" in this prospectus supplement.

**The Mortgage Loans**

The trust will initially contain approximately 17,037 fixed-rate and adjustable-rate mortgage loans secured by first liens on one- to four-family residential real properties and approximately 2,884 adjustable-rate home equity revolving lines of credit secured primarily by junior liens on one- to four-family residential real properties, referred to in this prospectus supplement as the HELOCs. The initial mortgage loans and initial HELOCs have an aggregate principal balance of approximately $4,140,031,477 and $180,181,473, respectively, as of the Cut-off Date.

The interest rate on each adjustable-rate mortgage loan and each HELOC will be adjusted, in some cases after an initial fixed-rate period, monthly, semi-annually or annually to equal the related index plus a fixed percentage set forth in or computed in accordance with the related mortgage note subject to rounding and to certain other limitations, including a maximum lifetime mortgage rate, as more fully described under *"The Mortgage Pool" in this prospectus supplement and Schedule A, which is attached to and is part of this prospectus supplement. The related index is as described under "The Mortgage Pool—Indices on the Mortgage Loans" in this prospectus supplement*.

The portion of the mortgage pool related to the mortgage loans in each loan group will include initial mortgage loans and subsequent mortgage loans. The initial mortgage loans in each loan group will be the related mortgage loans deposited into the trust on the closing date. The subsequent mortgage loans in each loan group will be purchased with amounts on deposit in the related pre-funding account described in this prospectus supplement no later than July 31, 2005.

The loans will be divided into seven separate loan groups with characteristics as follows:

**The Group I Loans**

The group I mortgage loans will consist of adjustable-rate mortgage loans, with an initial fixed-rate period of one, three, six or twelve months. The index for the substantially all of the group I mortgage loans will be One-Year MTA, which is the 12-month moving average yield on United States Treasury Securities adjusted to a constant maturity of one year.

While the interest rate on each group I mortgage loan will adjust monthly (after an initial fixed-rate period), the minimum monthly payment on each mortgage loan generally will only adjust annually. On each annual payment

adjustment date, the minimum monthly payment generally will not increase or decrease by more than 7.5%. As a result, the interest due with respect to a mortgage loan in this loan group for any given month may, under certain circumstances, exceed the monthly payment for that month. In that case, payment of the excess of interest due over the monthly payment will be deferred and that excess will be added to the principal balance of that group I mortgage loan in the form of negative amortization. See "Description of the Mortgage Pool" in this prospectus supplement.

The following table summarizes the approximate characteristics of all of the group I initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans: | 1,899 |
| Aggregate stated principal balance: | $617,026,368.03 |
| Range of scheduled principal balances: | $29,287.15 to $6,993,243.30 |
| Average scheduled principal balance: | $324,921.73 |
| Range of mortgage rates: | 1.000% to 7.294% |
| Weighted average mortgage rate: | 2.744% |
| Range of remaining terms to stated maturity (months): | 355 to 480 months |
| Weighted average remaining terms to stated maturity (months): | 375 months |
| Weighted average loan-to-value ratio at origination: | 73.52% |
| Weighted average gross margin: | 3.101% |
| Weighted average maximum lifetime mortgage rate (per annum): | 10.038% |
| Weighted average months to next interest adjustment date (months): | 1 |
| Loan Index Type: | |
| 1 Year MTA | 99.98% |
| 1 Month MTA | 0.02% |

**The Group II-C Loans**

The group II-C mortgage loans will consist of adjustable-rate mortgage loans, some of which are hybrid mortgage loans with an initial fixed-rate period of two or three years. The group II-C mortgage loans are comprised of mortgage loans that conform to Freddie Mac and Fannie Mae loan balance limits.

The following table summarizes the approximate characteristics of all of the group II-C initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans: | 1,992 |
| Aggregate stated principal balance: | $393,416,919.76 |
| Range of scheduled principal balances: | $29,972.22 to $457,517.38 |
| Average scheduled principal balance: | $197,498.45 |
| Range of mortgage rates: | 1.000% to 8.375% |
| Weighted average mortgage rate: | 5.350% |
| Range of remaining terms to stated maturity (months) | 348 months to 360 months |
| Weighted average remaining terms to stated maturity (months): | 359 months |
| Weighted average loan-to-value ratio at origination: | 75.21% |
| Weighted average gross margin: | 2.930% |
| Weighted average maximum lifetime mortgage rate (per annum): | 11.272% |
| Weighted average months to next interest adjustment date (months): | 21 |
| Loan Index Type: | |
| 1 Year LIBOR | 48.61% |
| 6 Month LIBOR | 38.13% |
| 1 Year MTA | 7.12% |
| 1 Month LIBOR | 6.14% |

**The Group II-NC Loans**

The group II-NC mortgage loans will consist of adjustable-rate mortgage loans, some of which are hybrid mortgage loans with an initial fixed-rate period of two or three years. The group II-NC mortgage loans are comprised of mortgage loans that may or may not conform to Freddie Mac and Fannie Mae loan balance limits.

The following table summarizes the approximate characteristics of all of the group II-NC initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans: | 799 |
| Aggregate stated principal balance: | $474,700,288.45 |
| Range of scheduled principal balances: | $3,527.42 to $2,500,000.00 |
| Average scheduled principal balance: | $594,118.01 |
| Range of mortgage rates: | 1.000% to 9.500% |
| Weighted average mortgage rate: | 5.034% |
| Range of remaining terms to stated maturity (months): | 357 months to 360 months |
| Weighted average remaining terms to stated maturity (months): | 359 months |
| Weighted average loan-to-value ratio at origination: | 72.26% |
| Weighted average gross margin: | 2.530% |
| Weighted average maximum lifetime mortgage rate (per annum): | 11.295% |
| Weighted average months to next interest adjustment date (months): | 15 |
| Loan Index Type: | |
| 1 Year LIBOR | 66.29% |
| 6 Month LIBOR | 18.14% |
| 1 Year MTA | 8.61% |
| 1 Month LIBOR | 6.96% |

**The Group III Loans**

The group III mortgage loans will consist of adjustable-rate mortgage loans, all of which

are hybrid mortgage loans with an initial fixed-rate period of five years. The group III mortgage loans are comprised of mortgage loans that conform to Freddie Mac and Fannie Mae loan balance limits.

The following table summarizes the approximate characteristics of all of the group III initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans:.........................................5,911 | |
| Aggregate stated principal balance: ...................$1,115,952,757.39 | |
| Range of scheduled principal balances:........................$19,940.08 to | |
| ..................$528,000.00 | |
| Average scheduled principal balance:................................$188,792.55 | |
| Range of mortgage rates: ..............................4.125% to 7.875% | |
| Weighted average mortgage rate: ....................................6.123% | |
| Range of remaining terms to stated | |
|   maturity (months):............................................354 to 360 months | |
| Weighted average remaining terms to | |
|   stated maturity (months): .......................................359 months | |
| Weighted average loan-to-value ratio at | |
|   origination: ..............................................................75.77% | |
| Weighted average gross margin:...................................3.082% | |
| Weighted average maximum lifetime | |
|   mortgage rate (per annum):.....................................11.124% | |
| Weighted average months to next interest | |
|   adjustment date (months): ...........................................59 | |
| Loan Index Type: | |
| 6 Month LIBOR ..............................................................67.20% | |
| 1 Year LIBOR ................................................................32.80% | |

**The Group IV Loans**

The group IV mortgage loans will consist of adjustable-rate mortgage loans, all of which are hybrid mortgage loans with an initial fixed-rate period of five years.  The group IV mortgage loans are comprised of mortgage loans that may or may not conform to Freddie Mac and Fannie Mae loan balance limits.

The following table summarizes the approximate characteristics of all of the group IV initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans:.............................................927 | |
| Aggregate stated principal balance: ...................$504,138,692.86 | |
| Range of scheduled principal balances:......................$360,000.00 to | |
| ..................$2,500,000.00 | |
| Average scheduled principal balance:..........................$543,838.94 | |
| Range of mortgage rates: ..............................4.500% to 7.875% | |
| Weighted average mortgage rate: ....................................5.971% | |
| Range of remaining terms to stated | |
|   maturity (months):............................................312 to 360 months | |
| Weighted average remaining terms to | |
|   stated maturity (months):.........................................359 months | |
| Weighted average loan-to-value ratio at | |
|   origination: ..............................................................74.97% | |
| Weighted average gross margin:...................................2.754% | |
| Weighted average maximum lifetime | |
|   mortgage rate (per annum):.....................................10.973% | |
| Weighted average months to first interest | |
|   adjustment date (months): ...........................................59 | |
| Loan Index Type: | |
| 1 Year LIBOR ................................................................65.57% | |

| | |
|---|---|
| 6 Month LIBOR ..........................................................34.30% | |
| 1 Year CMT................................................................0.125 | |

**The Group V Loans**

The group V mortgage loans will consist of fixed-rate mortgage loans.

The following table summarizes the approximate characteristics of all of the group V initial mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans:.........................................5,509 | |
| Aggregate stated principal balance: ...................$1,034,796,450.81 | |
| Range of scheduled principal balances:......................$30,000.00 to | |
| ..................$2,495,467.70 | |
| Average scheduled principal balance: ..........................$187,837.44 | |
| Range of mortgage rates: ..............................4.750% to 9.000% | |
| Weighted average mortgage rate: ....................................6.515% | |
| Range of remaining terms to stated | |
|   maturity (months):............................................174 to 360 months | |
| Weighted average remaining terms to | |
|   stated maturity (months): .......................................354 months | |
| Weighted average loan-to-value ratio at | |
|   origination: ..............................................................72.72% | |

**The Group VI HELOCs**

The HELOCs will consist of home equity lines of credit loans made or to be made in the future under certain home equity loan revolving credit loan agreements secured primarily by junior lien mortgages on one- to four-family residential properties with an initial five-year draw period, with a possible five-year extension, with interest only payments, followed by a fifteen-year or twenty-year amortized repayment period.  During the applicable draw period, each borrower may borrow additional amounts from time to time up to the maximum amount of that borrower's line of credit.  If borrowed amounts are repaid, they may again be borrowed during the applicable draw period.  The principal balance of a HELOC on any day is equal to its cut-off date principal balance, plus any additional borrowings on that loan, minus all collections credited against the principal balance of that HELOC before that day.

The following table summarizes the approximate characteristics of all of the group VI initial HELOCs as of the Cut-off Date:

| | |
|---|---|
| Number of HELOCs:.......................................................2,884 | |
| Aggregate principal balance: ..........................$180,181,473.48 | |
| Average balance:............................................................$62,476.24 | |
| Average credit limit: ....................................................$66,350.10 | |
| Average credit limit utilization rate: .....................................94.16% | |
| Current weighted average coupon: ...............................5.749% | |
| Weighted average margin: ..........................................1.470% | |
| Weighted average seasoning (months): ................................1 | |
| Weighted average remaining term to stated | |
|   maturity (months):.......................................................299 | |

Weighted average remaining draw term to
   stated maturity (months): .......................................... 118
Weighted average combined loan-to-value
   ratio:....................................................................... 93.21%
Weighted current credit score: .................................... 728
Lien position (%first/% junior):......................... 0.43%/99.57%

*For additional information regarding the HELOCs, see "The Mortgage Pool" in this prospectus supplement and Schedule A, which is attached to and is part of this prospectus supplement.*

**Pre-Funding Accounts**

On or before July 31, 2005, the depositor may sell and the indenture trustee will be obligated to purchase, on behalf of the trust, from funds in the pre-funding accounts as described below, with respect to loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV and loan group V subsequent mortgage loans, and with respect to loan group VI, subsequent HELOCs, to be included in the mortgage pool.

On the closing date, the company will deposit in the pre-funding accounts to be maintained by the indenture trustee an amount equal to the difference between:

(1) the sum of the aggregate initial note principal balance of the notes, other than the Class N-1 Notes and Class N-2 Notes, and the initial overcollateralization amount with respect to loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV, loan group V and loan group VI and (2) the aggregate stated principal balance of the initial mortgage loans in loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV and loan group V and the initial HELOCs in loan group VI as of the cut-off date.

Such funds will be held by the indenture trustee in the loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV, loan group V and loan group VI pre-funding accounts, respectively. The amount on deposit in each pre-funding account will be reduced by the amount thereof used to purchase the subsequent mortgage loans or subsequent HELOCs, as applicable, in respect of the related loan group during the period from the closing date up to and including July 31, 2005, which we refer to herein as the funding period. Any amounts remaining in each pre-funding account after July 31, 2005 will be

distributed on the next payment date to the holders of the related notes.

**Interest Coverage Accounts**

On the closing date, the Depositor will deposit or cause to be deposited in interest coverage accounts with respect to each loan group, an amount which will be applied by the Indenture Trustee to cover shortfalls in the amounts of interest generated by the mortgage loans in loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV, loan group V and the HELOCs in loan group VI attributable to the pre-funding feature.

In addition, the interest coverage account for the HELOCs will include interest to cover shortfalls as a result of the pre-funding feature and as a result of a portion of the HELOCs having first payment dates after the first due period.

For additional information regarding the loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV, loan group V and loan group VI interest coverage accounts, see "Description of the Notes—Interest Coverage Account" in this prospectus supplement.

**Description of the Notes**

**Priority of Payments.**

*Interest Distributions on the Class I-A, Class II-A, Class III-A, Class IV-A and Class M Notes*

In general, on any payment date, funds available with respect to the mortgage loans in each of loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV, amounts in the related interest coverage accounts and investment income on amounts in the related pre-funding accounts, after the payment of certain fees and expenses, will be distributed first, to pay accrued note interest on the related Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and accrued component interest on the components of the Class II-A-3 Notes, plus any related unpaid interest shortfalls. Then any remaining funds available from loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV will be used to make payments as follows:

first, to pay accrued note interest on the Class M-1 Notes;

second, to pay accrued note interest on the Class M-2 Notes;

third, to pay accrued note interest on the Class M-3 Notes;

fourth, to pay accrued note interest on the Class M-4 Notes; and

fifth, to pay accrued note interest on the Class M-5 Notes.

In the event that an increase in the applicable MTA index causes interest to accrue on a group I mortgage loan for a given month in excess of the monthly payment for that group I mortgage loan, the excess interest will be added to the outstanding principal balance of that group I mortgage loan in the form of negative amortization. As a result, the note interest rate on the Class I-A Notes may be reduced to the related available funds rate. Any resulting interest shortfalls on the Class I-A Notes will carry forward with interest thereon.

*Principal Distributions on the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes*

Amounts available after paying interest on the Class I-A, Class II-A, Class III-A, Class IV-A and Class M Notes will be used to pay principal on such notes and the Class B Notes as described in this prospectus supplement, in the case of the Class I-A, Class II-A, Class III-A and Class IV-A Notes, generally in proportion to the extent of principal received on the related mortgage loans.

*Net Monthly Excess Cashflow Distributions from Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, and Loan Group IV.*

Amounts available after paying interest and principal, as applicable, to the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes, as described in this prospectus supplement will be net monthly excess cashflow and will be used for various purposes, including reimbursing the note insurer, paying principal on the Class I-A, Class II-A Class III-A, Class IV-A, Class M and Class B Notes to maintain the target amount of overcollateralization and covering some interest shortfalls, basis risk shortfalls and allocated realized loss amounts on such notes.

Any amounts available after paying the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes in full will be used to make payments on the Class V-A, Class V-M and Class V-B Notes as described in this prospectus supplement.

*See "Description of the Notes" in this prospectus supplement for additional information.*

*Interest Distributions on the Class V-A, Class V-M and Class V-B Notes*

In general, on any payment date, funds available with respect to the mortgage loans in loan group V, amounts in the related interest coverage account and investment income on amounts in the related pre-funding account, after the payment of certain fees and expenses, including the payment of the premium due the note insurer, will be distributed first, to pay accrued note interest on the Class V-A Notes, plus any related unpaid interest shortfalls. Then any remaining funds available from loan group V will be used to make payments as follows:

first, to pay accrued note interest on the Class V-M-1 Notes;

second, to pay accrued note interest on the Class V-M-2 Notes;

third, to pay accrued note interest on the Class V-M-3 Notes;

fourth, to pay accrued note interest on the Class V-M-4 Notes;

fifth, to pay accrued note interest on the Class V-M-5 Notes; and

sixth, to pay accrued note interest on the Class V-B Notes.

*Principal Distributions on the Class V-A, Class V-M and Class V-B Notes*

Amounts available after paying interest on the Class V-A, Class V-M and Class V-B Notes will be used to pay principal on such notes as described in this prospectus supplement to the extent of principal received on the related mortgage loans.

*Net Monthly Excess Cashflow Distributions from Loan Group V*

Amounts available after paying interest and principal to the Class V-A, Class V-M and

Class V-B Notes as described above will be net monthly excess cashflow and will be used for various purposes, including reimbursing the note insurer, paying principal on the Class V-A, Class V-M and Class V-B Notes to maintain the target amount of overcollateralization and covering some interest shortfalls, basis risk shortfalls and allocated realized loss amounts on such notes.

Any amounts available after paying the Class V-A, Class V-M and Class V-B Notes in full will be used to make payments on the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes as described in this prospectus supplement.

*See "Description of the Notes" in this prospectus supplement for additional information.*

*Interest Distributions on the Class VI-A Notes*

In general, on any payment date, the floating allocation percentage of interest collections with respect to the HELOCs in loan group VI, amounts in the related interest coverage account and investment income on amounts in the related pre-funding account after the payment of certain fees and expenses, including the premium due the credit enhancer, will be distributed to pay accrued note interest on the Class VI-A Notes.

*Principal Distributions on the Class VI-A Notes*

During the managed amortization period, holders of the Class VI-A Notes will receive aggregate principal collections on the HELOCs allocable to such period less aggregate draws on such HELOCs allocable to such period.

During the rapid amortization period, holders of the Class VI-A Notes will receive 100% of the principal collections on the HELOCs until the Class VI-A Notes are paid in full.

During the managed amortization period principal distributions will be reduced by the overcollateralization reduction amount, as described in this prospectus supplement.

Amounts available after paying interest and principal to the Class VI-A Notes as described above will be the net monthly excess cashflow and will be used for various purposes, including paying principal on the Class VI-A Notes, to make payments with respect to investor charge-off amounts, build and maintain the target

amount of overcollateralization, make certain payments to the credit enhancer and cover some interest shortfalls and basis risk shortfalls on the Class VI-A Notes.

Any amounts available after paying the Class VI-A Notes in full will be used to make payments with respect to interest and principal on the transferor interest and then to the owner trust certificates.

Amounts from the HELOCs in loan group VI will not be available to make payments to the notes related to loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV and loan group V and amounts from the mortgage loans will not be available to make payments on the Class VI-A Notes

**Credit Enhancement**

*Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes*

The credit enhancement provided for the benefit of the holders of the Class I-A, Class II-A, Class III-A, Class IV-A and Class V-A Notes consists of net monthly excess cashflow, overcollateralization and the subordination provided to the Class I-A, Class II-A, Class III-A and Class IV-A Notes by the Class M Notes and Class B Notes and provided to the Class V-A Notes by the Class V-M Notes and Class V-B Notes. Among the classes of Class M Notes and Class V-M Notes, each class of Class M Notes or Class V-M Notes with a higher numerical class designation will provide subordination to each class of Class M Notes or Class V-M Notes, respectively, with a lower numerical class designation. In addition, with respect to the Class V-A-4-D Notes only, a note guaranty insurance policy will be issued by Ambac Assurance Corporation for the benefit of the Class V-A-4-D Notes only.

In addition, cross-collateralization will be provided from loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV to the Notes related to loan group V, and cross-collateralization will be provided from loan group V to the notes related to loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV to the extent described in this prospectus supplement.

*See "Description of the Notes" in this prospectus supplement for additional information.*

*Class VI-A Notes*

The credit enhancement provided for the benefit of the holders of the Class VI-A Notes consists of net monthly excess cashflow, overcollateralization and the financial guaranty insurance policy provided for the benefit of the Class VI-A Notes only.

*See "Description of the Notes" in this prospectus supplement for additional information.*

**Advances**

*Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes*

The RMBS servicer will be obligated to make cash advances with respect to delinquent payments of scheduled interest and principal on the mortgage loans, in general, to the extent that the RMBS servicer reasonably believes that such cash advances can be repaid from future payments on the mortgage loans. If the RMBS servicer fails to make any required advances, the RMBS master servicer, as successor RMBS servicer, may be obligated to do so, as described in this prospectus supplement. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the notes and are not intended to guarantee or insure against losses.

The HELOC servicer will not advance delinquent payments of principal or interest.

**Derivative Contracts**

The trust will include a cap contract and a corridor contract.

The trust will include one cap contract. On the closing date, either the seller will assign to the depositor, and the depositor will assign to the trust primarily for the benefit of the Class V-A-2 Notes, its rights under the cap contract, or the depositor will cause the owner trustee to enter into the cap contract on behalf of the trust with the derivative counterparty. Payments under the cap contract will be made when One-Month LIBOR (as determined pursuant to the cap contract) exceeds a certain level. Such payments will be used primarily to cover basis risk shortfalls on the Class V-A-2 Notes. There can

be no assurance as to the extent of benefits, if any, that may be realized by the holders of the Class V-A-2 Notes as a result of the cap contract.

The trust will include an interest rate corridor contract. On the closing date, either the seller will assign to the depositor, and the depositor will assign to the trust primarily for the benefit of the Class II-A Notes its rights under the corridor contract, or the depositor will cause the owner trustee to enter into the corridor contract on behalf of the trust with the derivative counterparty. Payments under the corridor contract will be made pursuant to the formulas described in this prospectus supplement. Amounts paid under the corridor contract will be available primarily to cover basis risk shortfalls on the Class II-A Notes as described in this prospectus supplement.

Any amounts received from the cap contract and the corridor contract not used to cover basis risk shortfalls on the related notes shall be used to cover basis risk shortfalls on some of the other classes of notes as described in this prospectus supplement. However, these amounts are not expected to be material.

See "Description of the Notes — The Derivative Contracts" in this prospectus supplement.

**Optional Termination**

*Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes*

At its option, the holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates may purchase the assets of the trust related to loan group I, loan group II-C, loan group II-NC, loan group III, loan group IV and loan group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes after the payment date on which the aggregate stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the aggregate stated principal balance of the related mortgage loans as of the Cut-off Date and the aggregate amounts deposited into the group I, group II-C, group II-NC, group III, group IV and group V pre-funding account on the closing date. Any

such termination will be subject to the consent and reimbursement rights of the note insurer.

*Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes*

At its option, the holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates may purchase the assets of the trust related to loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes after the payment date on which the aggregate stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the aggregate stated principal balance of the related mortgage loans as of the Cut-off Date and the aggregate amounts deposited into the group I, group II-C, group II-NC, group III and group IV pre-funding account on the closing date, provided, however, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of notes currently outstanding. Any such termination will be subject to the consent and reimbursement rights of the note insurer.

*Class V-A, Class V-M and Class V-B Notes*

At its option, the holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates may purchase the assets of the trust related to loan group V and thereby redeem the Class V-A, Class V-M and Class V-B Notes after the payment date on which the aggregate stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the aggregate stated principal balance of the related mortgage loans as of the Cut-off Date and the amount deposited into the group V pre-funding account on the closing date, provided, however, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of notes currently outstanding. Any such termination will be

subject to the consent and reimbursement rights of the note insurer.

*Class VI-A Notes*

The holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates, may exercise its right to purchase the HELOCs on any payment date after the payment date on which the note principal balance of the Class VI-A Notes declines to 10% or less of the note principal balance of the Class VI-A Notes on the closing date. If such holder fails to exercise this right, the Credit Enhancer may purchase the HELOCs 60 days after the payment date on which the note principal balance of the Class VI-A Notes declines to 10% or less of the note principal balance of the Class VI-A Notes on the closing date.

*See "The Indenture— Optional Termination" in this prospectus supplement.*

**Federal Income Tax Consequences**

For federal income tax purposes the offered notes will be characterized as debt to the extent they are issued to parties unrelated to the owner of the trust certificates. Each noteholder that is unrelated to the owner of the trust certificates, by its acceptance of an offered note, will agree to treat the notes as debt.

The trust is classified as a taxable mortgage pool. The trust will not, however, be subject to federal income tax as a corporation as long as the trust certificates, the transferor interest and the Class N-1, Class N-2, Class V-M-5, Class B and Class V-B Notes are owned exclusively by a "real estate investment trust" or by a "qualified REIT subsidiary." American Home Mortgage Investment Corp. represents that it qualifies as a "real estate investment trust" and that it owns the trust certificates indirectly through a "qualified REIT subsidiary." Moreover, the trust agreement sets forth restrictions on the transferability of the trust certificates to ensure that it will only be held by a "real estate investment trust" or a "qualified REIT subsidiary."

*See "Risk Factors — The Trust May Be Taxable if the Seller Fails to Qualify As A REIT" in this prospectus supplement and "Federal Income Tax Consequences" in this prospectus supplement and in the accompanying prospectus for*

*additional information concerning the application of federal income tax laws to the notes.*

## Ratings

It is a condition to the issuance of the notes that they receive at least the following ratings from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which is referred to herein as S&P, and Moody's Investors Service, Inc., which is referred to herein as Moody's:

| Notes | S&P | Moody's |
|---|---|---|
| Class I-A-1 | AAA | Aaa |
| Class I-A-2 | AAA | Aaa |
| Class I-A-3 | AAA | Aaa |
| Class II-A-1 | AAA | Aaa |
| Class II-A-2 | AAA | Aaa |
| Class II-A-3 | AAA | Aaa |
| Class III-A | AAA | Aaa |
| Class IV-A-1 | AAA | Aaa |
| Class IV-A-2 | AAA | Aaa |
| Class IV-A-3 | AAA | NR |
| Class V-A-1 | AAA | Aaa |
| Class V-A-2 | AAA | Aaa |
| Class V-A-3 | AAA | Aaa |
| Class V-A-4-A | AAA | Aaa |
| Class V-A-4-B | AAA | NR |
| Class V-A-4-C | AAA | Aaa |
| Class V-A-4-D | AAA | Aaa |
| Class VI-A | AAA | Aaa |
| Class M-1 | AA+ | Aa1 |
| Class M-2 | AA | Aa2 |
| Class M-3 | AA | Aa3 |
| Class M-4 | AA | NR |
| Class M-5 | A | NR |
| Class B | BBB | NR |
| Class V-M-1 | AA+ | Aa1 |
| Class V-M-2 | AA+ | Aa2 |
| Class V-M-3 | AA | Aa3 |
| Class V-M-4 | AA | NR |
| Class V-M-5 | A | NR |
| Class V-B | BBB | NR |

The ratings on the notes address the likelihood that holders of the notes will receive all distributions on the mortgage loans or HELOCs to which they are entitled, other than some interest shortfalls. However, the ratings do not address the possibility that noteholders might suffer a lower than anticipated yield.

A security rating is not a recommendation to buy, sell or hold a security and is subject to change or withdrawal at any time by the assigning rating agency. The ratings also do not address the rate of principal prepayments on the mortgage loans or HELOCs.

In particular, the rate of prepayments, if different than originally anticipated, could adversely affect the yield realized by holders of the notes.

*See "Yield on the Notes" and "Ratings" in this prospectus supplement and "Yield Considerations" in the prospectus.*

## Legal Investment

When issued, the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M-1, Class M-2, Class M-3, Class M-4, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes will constitute "mortgage related securities" for purposes of SMMEA and all other classes of offered notes will not constitute "mortgage related securities" for purposes of SMMEA.

*See "Legal Investment" in this prospectus supplement and in the prospectus.*

## ERISA Considerations

The offered notes may be eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts, subject to important considerations. Plans should consult with their legal advisors before investing in the notes.

*See "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus.*

## RISK FACTORS

**You should carefully consider, among other things, the following factors in connection with the purchase of the notes:**

**The Notes Will Have Limited Liquidity, So You May Be Unable to Sell Your Securities or May Be Forced to Sell Them at a Discount from Their Fair Market Value.**

The underwriters intend to make a secondary market in the offered notes, other than the Class I-A-2, Class M-4 and Class M-5 Notes, however, none of them is obligated to do so. There is no underwriting arrangement for the remaining notes. There can be no assurance that a secondary market for the notes will develop or, if one does develop, that it will provide holders of the notes with liquidity of investment or that it will continue for the life of the notes. There are only a limited number of securitizations which include mortgage loans or HELOCs originated or purchased by the seller. As a result, the secondary market for the notes may be very limited. In addition, any resale prices that may be available for any note in any market that may develop may be at a discount from the initial offering price or the fair market value thereof. The notes will not be listed on any securities exchange.

**The Trust May Be Taxable if the Seller Fails to Qualify as a REIT.**

It is anticipated that the trust will be characterized as one or more taxable mortgage pools, or TMPs, for federal income tax purposes. In general, a TMP is treated as a separate corporation not includible with any other corporation in a consolidated income tax return, and is subject to corporate income taxation. However, it is anticipated that, for federal income tax purposes, the trust will be treated as being entirely owned by the seller or an affiliate, which is a "real estate investment trust," or REIT, or by a "qualified REIT subsidiary" and, consequently, the trust will be treated as a "qualified REIT subsidiary" of the seller. So long as the trust continues to be treated as being entirely owned by the seller for such purposes and so long as the seller continues to qualify as a REIT, classification of the trust as a TMP will not cause it to be subject to corporate income tax. Rather, the consequence of the classification of the trust as a TMP is that the shareholders of the seller will be required to treat a portion of the dividends they receive from the seller as though they were "excess inclusions" with respect to a residual interest in a "real estate mortgage investment conduit," or REMIC, within the meaning of Section 860D of the Code.

In the event that the trust is not treated as being wholly owned by a REIT for federal income tax purposes, it would become subject to federal income taxation as a corporation and would not be permitted to be included in a consolidated income tax return of another corporate entity. No transfer of the trust certificates will be permitted to an entity that is not a REIT or treated as a REIT for federal income tax purposes.

In the event that federal income taxes are imposed on the trust, the cash flow available to make payments on the offered notes would be reduced. In addition, the need for cash to pay such taxes could result in a liquidation of the trust, with a consequential redemption of the notes at a time earlier than anticipated.

**The Mortgage Loans and HELOCs Concentrated in a Specific Region May Present a Greater Risk of Loss with Respect to Such Mortgage Loans and HELOCs.**

As of the cut-off date, approximately 22.44%, 27.12%, 49.38%, 15.44%, 32.03% and 14.77% of the group I, group II-C, group II-NC, group III, group IV and group V initial mortgage loans, respectively, approximately 30.85% of the initial HELOCs and approximately 23.34% of the initial mortgage loans in the aggregate, are secured by properties in the State of California. Investors should note that some geographic regions of the United States from time to time will experience weaker regional economic conditions and housing markets, and, consequently, will experience higher rates of loss and delinquency than will be experienced on mortgage loans and HELOCs generally. For example, a region's

economic condition and housing market may be directly, or indirectly, adversely affected by natural disasters or civil disturbances such as earthquakes, hurricanes, floods, eruptions or riots. The economic impact of any of these types of events may also be felt in areas beyond the region immediately affected by the disaster or disturbance. The mortgage loans and HELOCs securing the notes may be concentrated in these regions, and any concentration may present risk considerations in addition to those generally present for similar mortgage-backed securities without this concentration. Any risks associated with mortgage loan and HELOC concentration may affect the yield to maturity of the notes to the extent losses caused by these risks which are not covered by credit enhancement are allocated to the notes.

**The Value of the Mortgage Loans and HELOCs May Be Affected By, Among Other Things, a Decline in Real Estate Values, Which May Result in Losses or Shortfalls Being Incurred on the Notes.**

No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans and HELOCs. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans or HELOCs, and any other financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. In some areas of the United States, real estate values have risen at a greater rate in recent years than in the past. In particular, mortgage loans or HELOCs with high principal balances or high combined loan-to-value ratios may be adversely affected by any decline in real estate values. Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area. Any decrease in the value of the mortgage properties related to the mortgage loans or HELOCs may result in the allocation of losses which are not covered by credit enhancement to the notes.

**Interest Generated by the Mortgage Loans and HELOCs and Amounts Contributed from the Interest Coverage Accounts May Be Insufficient to Create or Maintain Overcollateralization.**

The amount of interest generated by the mortgage loans and HELOCs (net of fees and expenses) in a loan group and amounts contributed from the related interest coverage account is expected to be higher than the amount of interest required to be paid to the related notes. Any such excess interest will be used to create or maintain the target or level of overcollateralization by covering current or previous realized losses on the mortgage loans or HELOCs. We cannot assure you, however, that enough excess interest will be available to maintain the required level of overcollateralization. The factors described below will affect the amount of excess interest that the mortgage loans and HELOCs will generate:

- Every time a mortgage loan or HELOC is prepaid in full, excess interest may be reduced because the mortgage loan or HELOC will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

- Every time a mortgage loan or HELOC is liquidated, excess interest may be reduced because such mortgage loans or HELOC will no longer be outstanding and generating interest.

- If the rates of delinquencies, defaults or losses on the mortgage loans or HELOCs turn out to be higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available on such date to make required payments on the notes.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans or HELOCs with relatively higher interest rates than on the mortgage loans or HELOCs with relatively lower interest rates, the amount of excess interest generated by the mortgage loans or HELOCs will be less than would otherwise be the case.

In addition, during the funding period, amounts on deposit in the group I, group II-C, group II-NC, group III, group IV, group V and group VI pre-funding accounts will earn a limited amount of interest which will be available to the related noteholders. The interest earned will be significantly less than interest generated by the mortgage loans and HELOCs in the trust, and amounts in the interest coverage accounts may not be sufficient to cover the shortfall.

**The Rate and Timing of Principal Distributions on the Notes Will Be Affected by Prepayment Speeds.**

Mortgagors may prepay their mortgage loans or HELOCs in whole or in part at any time. We cannot predict the rate at which borrowers will repay their loans. A prepayment of a mortgage loan or HELOC generally will result in a prepayment on the related notes:

- If you purchase your notes at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your notes at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The rate of prepayments on the mortgage loans and HELOCs will be sensitive to prevailing interest rates. Generally, if interest rates decline, mortgage loan and HELOC prepayments may increase due to the availability of other mortgage loans or HELOCs at lower interest rates. Conversely, if prevailing interest rates rise, the prepayments on mortgage loans and HELOCs may decrease.

- The seller will be required to purchase mortgage loans and HELOCs from the trust in the event certain breaches of representations and warranties occur and have not been cured. In addition, the seller has the option to purchase mortgage loans and HELOCs that become 90 days or more delinquent. These purchases will have the same effect on the holders of the notes as a prepayment in full of any such purchased mortgage loans or HELOCs.

- The overcollateralization provisions are intended to result in an accelerated rate of principal payments to holders of the classes of notes whenever overcollateralization is at a level below the required level. An earlier return of principal to the holders of the notes as a result of the overcollateralization provisions will influence the yield on the notes in a manner similar to the manner in which principal prepayments on the mortgage loans and HELOCs will influence the yield on the notes.

See "Yield on the Notes" in this prospectus supplement, including the tables entitled "Percent of Initial Note Principal Balance Outstanding at the Following CPR and Prepayment Assumption Percentages."

**If the One-Year MTA is Replaced, the Group I Mortgage Loan Margins May Be Adjusted.**

If One-Year MTA is no longer available, the RMBS servicer will choose a new index for the group I mortgage loans that is based on comparable information. When the RMBS servicer chooses a new index, it will increase or decrease the margin for each group I mortgage loan by the difference between the average of the old index for the final three years it was in effect and the average of the replacement index for the most recent three years. The new margin for each group I mortgage loan will be rounded up as provided in the related mortgage note.

**Negative Amortization May Increases Losses Applied to the Notes.**

When interest due on a group I mortgage loan is added to the principal balance of the group I mortgage loan through negative amortization, the mortgaged property provides proportionally less security for the repayment of the group I mortgage loan. Therefore, if the mortgagor defaults on the group I mortgage loan, there is a greater likelihood that a loss will be incurred upon the liquidation of the

mortgaged property. Furthermore, the loss will be larger than would otherwise have been in the absence of negative amortization. *The noteholders will bear these losses as described under "Description of the Notes — Allocation of Losses" in this prospectus supplement.*

**Allocation of Negative Amortization May Affect the Yield on the Notes.**

The amount of negative amortization, if any, with respect to all group I mortgage loans for a given month will reduce the amount of interest collected on the group I mortgage loans and available to be distributed as interest to the Class I-A Notes. As a result, the note interest rate on the Class I-A Notes may be reduced to the related available funds rate. The reduction in interest collections will be offset, in part, by applying principal payments received on the group I mortgage loans to interest distributions on the Class I-A Notes. Any remaining interest shortfalls on the Class I-A Notes will carry forward with interest thereon.

**The Class V-A-1 Notes May Not Receive Their Pro Rata Portion of Principal Payments.**

It is not expected that the Class V-A-1 Notes will receive any distributions of principal until the payment date in July 2008. Until the distribution date in July 2011, the Class V-A-1 Notes may receive a portion of principal payments that is smaller than its pro rata share of principal payments. On or after the distribution date in July 2012, the Class V-A-1 Notes will receive an amount greater than its pro rata share of principal payments.

**Junior Lien Positions May Cause a Payment Delay or a Loss on the Class VI-A Notes.**

Approximately 99.57% of the aggregate stated principal balance of the initial group VI HELOCs as of the cut-off date are secured by second mortgages or deeds of trust. The proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of the HELOCs in a junior lien position only to the extent that the claims of any senior mortgages have been satisfied in full. If it is uneconomical to foreclose on a mortgaged property, the HELOC servicer may write off the entire outstanding balance of the related HELOC as a bad debt. These risks are greater if a HELOC has a high combined loan-to-value ratio or low junior ratio because it is more likely that the HELOC servicer would determine foreclosure to be uneconomical. If the proceeds remaining from a sale of a mortgaged property are insufficient to satisfy the related HELOCs in the trust, the other forms of credit enhancement are insufficient to cover the loss and the credit enhancer fails to perform its obligations under the financial guaranty insurance policy, then:

There will be a delay in payments to holders of the Class VI-A Notes while a deficiency judgment against the borrower is sought; and

Holders of the Class VI-A Notes may incur a loss if a deficiency judgment cannot be obtained or is not realized upon.

**Removal of HELOCs May Extend the Maturity of the Class VI-A Notes.**

Upon notice to the Credit Enhancer and subject to the conditions of the related servicing agreement, on any payment date, the seller may, but shall not be obligated to, remove from the trust a portion of the HELOCs without notice to the noteholders. Upon any such removal, the seller's interest will be reduced by an amount equal to the aggregate principal balances of the HELOCs removed. Such removal may have the effect of reducing principal collections available to the Class VI-A Notes, thereby extending the expected maturity of the Class VI-A Notes.

**Some of the HELOCs Have Introductory Rates which May Result in Increased Delinquencies and Defaults on the HELOCs.**

The initial mortgage rate in effect on approximately 64.77% of the initial HELOCs will be an introductory or "teaser" rate that is lower, and may be significantly lower, than the mortgage rate that would have been in effect on those HELOCs based on the related index and gross margin. Therefore,

unless the related index declines after origination of a HELOC, the related mortgage rate will generally increase on the first adjustment date following origination of the HELOC subject to the maximum rate cap. Increased monthly payments on HELOCs may result in increased delinquencies and defaults on those HELOCs. The repayment of the HELOCs will be dependent on the ability of the mortgagors to make larger monthly payments or to refinance their HELOC following adjustments of the mortgage rate.

**The Note Rate on the Class VI-A Notes May Be Limited.**

The net WAC cap on the Class VI-A Notes is calculated by reference to the weighted average of the mortgage loan rates of the HELOCs. Therefore, the prepayment of the HELOCs with higher mortgage rates may result in a lower note rate on the notes. If the prime rate, which determines the interest rates on the HELOCs, is lower than anticipated by an investor, the net mortgage rates on the HELOCs will be lower than anticipated. If the interest on the Class VI-A Notes is limited by the weighted average of the net mortgage rates of the HELOCs, adjusted as described above, the difference between (a) the rate of one-month LIBOR plus the related note margin and (b) the weighted average of the net mortgage rates of the HELOCs, will create a basis risk shortfall carry-forward amount that will carry forward with interest thereon. Any basis risk shortfall carry-forward amount allocated to the Class VI-A Notes will not be covered by the policy issued by the credit enhancer and will only be payable from excess interest on the HELOCs to the extent available for that purpose in current and future periods. Any related basis risk shortfall carry-forward amounts may remain unpaid on the final payment date for the Class VI-A Notes.

**Payments on the HELOCs and the Financial Guaranty Insurance Policy Are the Sole Source of Payments on the Class VI-A Notes.**

Credit enhancement will be provided for the Class VI-A Notes in the form of excess interest collections allocable to the investors, as required and as described in this prospectus supplement, any overcollateralization that may be created and the financial guaranty insurance policy. None of the seller, the depositor, the underwriters, the indenture trustee, the HELOC servicer, the HELOC back-up servicer, the securities administrator, the credit enhancer or any of their affiliates will have any obligation to replace or supplement the credit enhancement, or take any other action to maintain any rating of the notes. To the extent that the investor's portion of any losses incurred on any of the HELOCs are not covered by the foregoing, the holders of the notes will bear all risk of such losses resulting from default by mortgagors.

**An Investor's Yield to Maturity on the Class VI-A Notes will Depend on Various Factors.**

The yield to maturity of the Class VI-A Notes will depend on a variety of factors, including:

- the rate and timing of principal payments on the HELOCs (including payments in excess of required installments, prepayments in full, liquidations and repurchases due to breaches of representations or warranties);
- the holder of the trust certificate's option to exercise its optional termination rights;
- the rate and timing of new draws on the HELOCs;
- the note rate;
- the availability of excess interest to cover any basis risk shortfall on the Class VI-A Notes; and
- the purchase price.

In general, if a Class VI-A Note is purchased at a price higher than its outstanding principal balance and principal payments occur more quickly or draws occur more slowly than assumed at the time of purchase, the yield will be lower than anticipated. Conversely, if a Class VI-A Note is purchased at a price lower than its outstanding principal balance and principal payments occur more slowly or draws occur more quickly than assumed at the time of purchase, the yield will be lower than anticipated.

The HELOC servicer will not advance delinquent payments of principal or interest.

**The Rate of Prepayments on the HELOCs will be Affected by Various Factors.**

Since mortgagors can generally prepay their HELOCs at any time, the rate and timing of principal payments on the Class VI-A Notes will be highly uncertain. The interest rates on the HELOCs are subject to adjustment based on changes in the prime rate, and are subject to certain limitations. Any increase in the interest rate on a HELOC may encourage a mortgagor to prepay the loan. The deductibility of interest payments for federal tax purposes, however, may act as a disincentive to prepayment, despite an increase in the interest rate. In addition, due to the revolving feature of the loans, the rate of principal payments may be unrelated to changes in market rates of interest. Refinancing programs, which may involve soliciting all or some of the mortgagors to refinance their HELOCs, may increase the rate of prepayments on the HELOCs.

**The Depositor Has Limited Information Regarding Prepayment History of the HELOCs.**

All of the HELOCs may be prepaid in whole or in part at any time. Neither the seller nor the HELOC servicer is aware of any publicly available studies or statistics on the rate of prepayment of home equity loans. HELOCs usually are not viewed by borrowers as permanent financing and may experience a higher rate of prepayment than traditional home equity loans. The trust's prepayment experience may be affected by a wide variety of factors, including:

- general economic conditions,
- interest rates,
- the availability of alternative financing,
- homeowner mobility, and
- changes affecting the ability to deduct interest payments on home equity lines of credit for federal income tax purposes.

We refer you to "Prepayment Considerations" in this prospectus supplement.

**Cash Flow Is Limited in Early Years of HELOCs.**

Each HELOC has a draw period that lasts up to ten years, and a repayment term following the draw period of fifteen or twenty years. No principal or a minimal amount of principal is due during the draw period although a borrower may voluntarily make a principal payment. Following the draw period, monthly principal payments during the repayment period are required in amounts that will amortize the amount outstanding at the commencement of the repayment period over the remaining term of the HELOC. Collections on the HELOCs may also vary due to seasonal purchasing and payment habits of borrowers. As a result there may be limited collections available to make payments to holders of the Class VI-A Notes and investors in those notes may receive payments of principal more slowly than anticipated.

**There Is an Increased Risk of Loss to Class VI-A Noteholders As Monthly Payments Increase at the End of the Draw Period.**

The HELOCs require no principal payments or minimal principal payments during the first ten years following origination. The HELOCs require repayment of the principal amount outstanding at the commencement of the repayment period over the remaining term in equal monthly installments. The HELOCs pose a special payment risk because the borrower must start making substantially higher monthly payments at the start of the repayment period. If the borrower is unable to make such increased payments, the borrower may default. Investors in the Class VI-A Notes may suffer a loss if the collateral for such loan, and the other forms of credit enhancement, are insufficient or unavailable to cover the loss and the credit enhancer fails to perform under the financial guaranty insurance policy.

**Class VI-A Note Rating is Based Primarily on the Financial Strength of the Credit Enhancer.**

The rating on the Class VI-A Notes depends primarily on an assessment by the rating agencies of the HELOCs and the financial strength of the credit enhancer. Any reduction of the rating assigned to the financial strength of the credit enhancer may cause a corresponding reduction in the rating assigned to the Class VI-A Notes. A reduction in the rating assigned to the Class VI-A Notes will reduce the market value of these notes and may affect the ability of investors in these notes to sell them.

**The HELOC Servicer Has Limited Ability to Change the Terms of the HELOCs.**

The HELOC servicer may agree to change the terms of a HELOC if the changes:

- do not materially and adversely affect the interests of the noteholders or the credit enhancer; and
- are consistent with prudent business practice.

In addition, the HELOC servicer, within certain limitations, may increase the credit limit and reduce the loan rate related to a HELOC. Any increase in credit limit related to a HELOC could increase the combined loan-to-value ratio of that HELOC, and, accordingly, may increase the likelihood and could increase the severity of loss in the event of a default under the HELOC. In addition, any reduction in the loan rate of a HELOC could reduce the excess cash flow available to absorb losses.

**The Incurrence of Debt by Borrowers Could Increase the Risk to Investors in the Class VI-A Notes.**

With respect to HELOCs that were used for debt consolidation, there can be no assurance that the borrower will not incur further debt. This reloading of debt could impair the ability of borrowers to service their debts, which in turn could result in higher rates of delinquency and loss on the HELOCs.

**Some Additional Risks Are Associated with the Notes (other than the Class VI-A Notes).**

The weighted average life of, and the yields to maturity on, the notes will be sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans are higher than those assumed by an investor in these related notes, the actual yield to maturity of these notes may be lower than assumed. The timing of losses on the mortgage loans will also affect an investor's actual yields to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the group I, group II-C, group II-NC, group III and group IV mortgage loans, to the extent they exceed the amount of the related overcollateralization following payments of principal on the related payment date, will reduce the note principal balance of the Class M Notes and Class B Notes. Realized losses on the group I mortgage loans, to the extent the amount of related overcollateralization has been reduced to zero and the aggregate note principal balance of the Class M Notes and Class B Notes has been reduced to zero, will reduce the note principal balance of the Class I-A-3 Notes and Class I-A-2 Notes, in that order. Realized losses on the group IV mortgage loans, to the extent the amount of related overcollateralization has been reduced to zero and the aggregate note principal balance of the Class M Notes and Class B Notes has been reduced to zero, will reduce the note principal balance of the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-2 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes. Realized losses on the group V mortgage loans, to the extent they exceed the amount of the related overcollateralization following payments of principal on the related payment date, will reduce the note principal balance of the Class V-M Notes and Class V-B Notes. Realized losses on the group V mortgage loans, to the extent the amount of related overcollateralization has been reduced to zero and the aggregate note principal balance of the Class V-M Notes and Class V-B Notes has been reduced to zero, will reduce the note principal balance of the Class V-A-4-B Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class V-A-4-A Notes and Class V-A-4-B Notes divided by

(y) the aggregate Note Principal Balance of all of the Class V-A-4 Notes. The indenture does not permit the allocation of realized losses to the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and to the Class II-A-3 Components. Investors in the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and Class II-A-3 Components should note that although realized losses will not be allocated to the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and Class II-A-3 Components, under certain loss scenarios there will not be enough principal and interest on the mortgage loans to pay the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and Class II-A-3 Components all interest and principal amounts to which they are then entitled.

Once a realized loss is allocated to a class of Class I-A-2, Class I-A-3, Class M, Class B, Class IV-A-3, Class V-A-4-B, Class V-M and Class V-B Notes, no amounts will be distributable with respect to such written-down amount. However, the amount of any realized losses allocated to the these notes may be repaid with interest to the holders thereof from the net monthly excess cashflow according to the priorities set forth under "*Description of the Notes — Overcollateralization Provisions with Respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV*" and "*Description of the Notes — Overcollateralization Provisions with Respect to Loan Group V*" *in this prospectus supplement*.

The yields to maturity on the notes will be extremely sensitive to losses due to defaults on the mortgage loans (and the timing thereof), to the extent such losses are not covered by excess interest or overcollateralization, or a class of notes subordinate thereto. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the notes may be adversely affected by losses even if such class of notes does not ultimately bear such loss.

Also, investors in the notes should be aware that after the related step-down date, if no related trigger event is in effect, the most subordinate class of Class M Notes or Class B Notes may receive more than such class' pro rata share of principal for that payment date. As a result, the note principal balance of the Class B Notes and/or the most subordinate class or classes of Class M Notes may be reduced to zero prior to the more senior class or classes of such notes.

Unless the aggregate note principal balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes is reduced to zero, it is not expected that the Class M Notes or Class B Notes will receive any payments of principal until the later of the payment date in July 2008 and the first payment date on which the aggregate note principal balance of the Class M Notes and Class B Notes and the related overcollateralized amount is greater than twice this amount as of the cut-off date, and provided further that certain loss and delinquency tests are satisfied. As a result, the weighted average lives of the Class M Notes and Class B Notes may be longer than would otherwise be the case.

Also, investors in the notes should be aware that after the related step-down date, if no related trigger event is in effect, the most subordinate class of Class V-M Notes or Class V-B Notes may receive more than such class' pro rata share of principal for that payment date. As a result, the note principal balance of the Class V-B Notes and/or the most subordinate class or classes of Class V-M Notes may be reduced to zero prior to the more senior class or classes of such notes.

Unless the aggregate note principal balance of the Class V-A Notes is reduced to zero, it is not expected that the Class V-M Notes or Class V-B Notes will receive any payments of principal until the later of the payment date in July 2008 and the first payment date on which the aggregate note principal balance of the Class V-M Notes and Class V-B Notes and the related overcollateralized amount is greater than twice this amount as of the cut-off date, and provided further that certain loss and delinquency tests

are satisfied. As a result, the weighted average lives of the Class V-M Notes and Class V-B Notes may be longer than would otherwise be the case.

**Statutory and Judicial Limitations on Foreclosure Procedures May Delay Recovery in Respect of the Mortgaged Property and, in Some Instances, Limit the Amount that May Be Recovered by the Foreclosing Lender, Resulting in Losses on the Mortgage Loans or HELOCs That Might be Allocated to the Notes.**

Foreclosure procedures may vary from state to state. Two primary methods of foreclosing a mortgage instrument are judicial foreclosure, involving court proceedings, and non-judicial foreclosure pursuant to a power of sale granted in the mortgage instrument. A foreclosure action is subject to most of the delays and expenses of other lawsuits if defenses are raised or counterclaims are asserted. Delays may also result from difficulties in locating necessary defendants. Non-judicial foreclosures may be subject to delays resulting from state laws mandating the recording of notice of default and notice of sale and, in some states, notice to any party having an interest of record in the real property, including junior lienholders. Some states have adopted "anti-deficiency" statutes that limit the ability of a lender to collect the full amount owed on a mortgage loan or HELOC if the property sells at foreclosure for less than the full amount owed. In addition, United States courts have traditionally imposed general equitable principles to limit the remedies available to lenders in foreclosure actions that are perceived by the court as harsh or unfair. The effect of these statutes and judicial principles may be to delay and/or reduce distributions in respect of the notes. *See "Legal Aspects of Mortgage Loans—Foreclosure on Mortgages and Some Contracts" in the accompanying prospectus.*

**Credit Enhancement Is Limited, and the Potential Inadequacy of the Credit Enhancement to Cover Losses on the Trust Assets May Result in Losses or Shortfalls Being Allocated to the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes.**

The credit enhancement features described in the summary of this prospectus supplement are intended to enhance the likelihood that holders of the Class I-A, Class II-A, Class III-A, Class IV-A and Class V-A Notes, and to a more limited extent, the holders of the Class M, Class B, Class V-M and Class V-B Notes, will receive regular payments of interest and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your notes as a result of delinquencies or defaults on the mortgage loans. On the closing date, the amount of overcollateralization with respect to loan group I, loan group II-C, loan group II-NC, loan group III and loan group IV will equal approximately 0.35% of the aggregate stated principal balance of the related mortgage loans as of the cut-off date plus the related original pre-funded amounts. On the closing date, the amount of overcollateralization with respect to loan group V will equal approximately 0.35% of the aggregate stated principal balance of the related mortgage loans as of the cut-off date plus the related original pre-funded amount.

If delinquencies or defaults occur on the mortgage loans, neither the RMBS servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if, in the good faith judgment of the RMBS servicer, these advances would not be ultimately recovered from the proceeds of the mortgage loan.

The ratings of the notes by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the mortgage loans in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis, or in the case of Class V-4-D Notes and Class VI-A Notes, by a change of the financial strength rating of the note insurer or credit enhancer, respectively. None of the depositor, the seller, the RMBS master servicer, RMBS servicer, the HELOC back-up servicer, the HELOC servicer, the indenture trustee, the owner trustee, the securities administrator or any of their respective affiliates will have any obligation to replace or supplement any credit enhancement, or to take any other action to maintain the ratings on the notes. *See "Description of Credit Enhancement— Reduction or Substitution of Credit Enhancement" in the accompanying prospectus.*

**The Difference Between the Interest Rates on the Notes (other than the Class VI-A Notes) and the Related Mortgage Loans May Result in Shortfalls with Respect to these Notes.**

The note interest rate with respect to the Class I-A, Class II-A-1, Class II-A-2 and Class M Notes and the components of the Class II-A-3 Notes adjusts each month and is based upon the value of an index of one-month LIBOR plus the related margin, limited by a maximum note interest rate or maximum component interest rate, as applicable, and the related available funds rate. However, the mortgage rate for the adjustable-rate mortgage loans is based upon the related index, in each case plus the related gross margin, and adjusts monthly, semi-annually or annually. The indices on the mortgage loans and the One-Month LIBOR Index may respond differently to economic and market factors, and there is not necessarily any correlation between them. Moreover, the related mortgage loans are subject to maximum mortgage rates and minimum mortgage rates. In particular, the group I loans are generally subject to a maximum mortgage rate of approximately 10% per annum. Thus, it is possible, for example, that one-month LIBOR may rise during periods in which the mortgage loan indices are stable or falling or that, even if each of the mortgage loan indices rise during the same period, one-month LIBOR may rise much more rapidly than the other loan indices. To the extent that the note interest rate or component interest rate on these notes and components is limited to the related available funds rate, basis risk shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

The note interest rate on the Class III-A Notes and Class IV-A Notes prior to the related note rate change date is a fixed interest rate subject to an available funds rate. Therefore the prepayment of the mortgage loans in the related loan group may result in a lower related available funds rate, which, in certain circumstances, could result in a lower note interest rate for these notes, resulting in interest shortfalls. In addition, on or after the related note rate change date, the note interest rate on the Class III-A Notes and Class IV-A Notes will adjust each month based upon the value of the least of (i) an index of six-month LIBOR plus the related note margin, (ii) the related maximum note interest rate and (iii) the related available funds rate. However, the mortgage rate for the related mortgage loans is based upon a similar or different mortgage index plus the related gross margin, and adjusts semi-annually or annually. The six-month LIBOR loan index and the mortgage indices may respond differently to economic and market factors, and there is not necessarily any correlation between them. Moreover, the related mortgage loans are subject to maximum mortgage rates and minimum mortgage rates. Thus, it is possible, for example, that the six-month LIBOR loan index may rise during periods in which the related mortgage indices are stable or falling or that, even if both the six-month LIBOR loan index and the related mortgage indices rise during the same period, the six-month LIBOR loan index may rise much more rapidly than the related mortgage indices. To the extent that the note interest rate on these notes is limited to the related available funds rate, net WAC shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

The note interest rate on the Class V-A-1, Class V-A-3 and Class V-A-4 Notes is a fixed rate subject to the related available funds rate. To the extent the available funds rate is paid to the Class V-A-1, Class V-A-3 and Class V-A-4 Notes, the difference between the available funds rate and the fixed note interest rate on the Class V-A-1, Class V-A-3 and Class V-A-4 Notes will create a shortfall that will carry forward with interest thereon. The note insurance policy will not cover net WAC shortfalls on the Class V-A-4-D Notes. *See "Description of the Notes – Interest Payments on the Notes" in this prospectus supplement.*

The note interest rate with respect to the Class V-A-2, Class V-M and Class V-B Notes adjusts each month and is based upon the value of an index of one-month LIBOR plus the related margin, limited by a maximum note interest rate and the related available funds rate. However, the mortgage rate for all of the Group V Loans is fixed. Thus, to the extent that the note interest rate on these notes is limited to the related available funds rate, basis risk shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

Net monthly excess cashflow may be used, subject to the priorities described in this prospectus supplement, to cover basis risk shortfalls or net WAC shortfalls. However, there can be no assurance that available net monthly excess cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the note interest rate on a class of notes is limited to the related available funds rate, there may be little or no net monthly excess cashflow.

The cap contract will be assigned to, or entered into by, the owner trustee on behalf of the trust and the net amounts payable from the contract will provide some protection against any basis risk shortfalls on the Class V-A-2 Notes. However, amounts payable under the cap contract is based on the parameters described in this prospectus supplement, and, to the extent the actual performance of the related mortgage loans differs from the expectations on which these parameters were based, the cap contract may provide insufficient funds to cover these shortfalls.

To the extent that amounts payable under the cap contract is insufficient to cover basis risk shortfalls on the Class V-A-2 Notes, net monthly excess cashflow may be used, subject to the priorities described in this prospectus supplement. However, there can be no assurance that available net monthly excess cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the note interest rate on the Class V-A-2 Notes is limited to the related available funds rate, there will be little or no net monthly excess cashflow.

The corridor contract will be assigned to, or entered into by, the owner trustee on behalf of the trust and the net amounts payable from this contract will provide some protection against any basis risk shortfalls on the Class II-A-1 Notes, Class II-A-2 Notes and the components of the Class II-A-3 Notes. However, amounts payable under the corridor contract are based on the parameters described in this prospectus supplement, and, to the extent the actual performance of the related mortgage loans differs from the expectations on which these parameters were based, the corridor contract may provide insufficient funds to cover these shortfalls. In addition, payments from the corridor contract are subject to a ceiling, which may limit the amount of payments from this contract to cover these shortfalls.

To the extent that amounts payable under the corridor contract are insufficient to cover basis risk shortfalls on the Class II-A-1 Notes, Class II-A-2 Notes and the components of the Class II-A-3 Notes, net monthly excess cashflow may be used, subject to the priorities described in this prospectus supplement. However, there can be no assurance that available net monthly excess cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the note interest rate on the Class II-A-1 Notes and Class II-A-2 Notes or the component interest rate on the components of the Class II-A-3 Notes is limited to the related available funds rate, there will be little or no net monthly excess cashflow.

**Some of the Mortgage Loans Were Underwritten to "Alt-A" Underwriting Standards, Which May Result in Losses or Shortfalls to Be Incurred on the Related Notes.**

Approximately 20.80%, 5.41%, 29.68%, 17.98% and 48.53% of the initial mortgage loans in loan group II-C, loan group II-NC, loan group III, loan group IV and loan group V and none of the initial mortgage loans in loan group I were underwritten generally in accordance with "Alt-A" underwriting standards. An "Alt-A" loan means a loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors. These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines. An "Alt-A" loan may or may not have a conforming principal balance at origination, and may satisfy the Fannie Mae or Freddie Mac underwriting guidelines for "A-" credit mortgagors.

These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, these loans are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors. In addition, the originators' underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the originators' first lien mortgage loan, or at any time thereafter, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originators' loan-to-value ratio determination. Any resulting losses, to the extent not covered by credit enhancement, will affect the yield to maturity of the notes. *For a description of the underwriting standards under which the mortgage loans were originated, see "Mortgage Loan Origination—Underwriting Guidelines" in this prospectus supplement.*

**The Mortgage Pool Includes Several Instances of Multiple Mortgage Loans Made to the Same Borrower.**

The mortgage pool includes several instances of multiple mortgage loans made to the same borrower. All of these mortgage loans are indicated with a loan purpose of "investment" or "investor" in the tables in this prospectus supplement. While these mortgage loans are not cross-defaulted, any default with respect to one of these mortgage loans may indicate an inability or unwillingness to pay on the part of the related borrower. In addition, many of these mortgage loans are located in mortgaged properties in adjacent or nearby locations. The greatest number of mortgage loans made to a single borrower is 37, with an aggregate stated principal balance as of the cut-off date of $1,335,651. However, the original principal balances of these mortgage loans are generally smaller than the other mortgage loans included in the trust.

**Some of the Mortgage Loans Have an Initial Interest Only Period, Which May Result in Increased Delinquencies and Losses.**

As of the cut-off date, none of the group I initial mortgage loans have an initial interest only period, approximately 16.02%, 53.86% and 20.49% of the group II-C initial mortgage loans have an initial interest only period of three years, five years and ten years, respectively, approximately 11.33%, 44.78% and 37.71% of the group II-NC initial mortgage loans have an initial interest only period of three years, five years and ten years, respectively, approximately 89.43% of the group III initial mortgage loans have an initial interest only period of five years, approximately 89.93% of the group IV initial mortgage loans have an initial interest only period of five years, approximately 43.60% of the group V initial mortgage loans have an initial interest only period of five years, and approximately 2.82%, 56.21% and 6.27% of the aggregate initial mortgage loans have an initial interest only period of three years, five years and ten years, respectively. During the applicable interest only period, the payment made by the related mortgagor will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by any principal portion of scheduled payments during this period. As a result, no principal payments will be made to the notes from these mortgage loans during their interest only period except in the case of a prepayment.

After the initial interest only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related mortgagors, particularly if interest rates have increased and the mortgagor is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of the mortgage loan not amortizing during the early years of these mortgage loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant. Any resulting delinquencies and losses, to the extent not

covered by credit enhancement, will be allocated to the related notes as described in this prospectus supplement.

Mortgage loans with an initial interest only period are relatively new in the mortgage marketplace.  The performance of these mortgage loans may be significantly different than mortgage loans that begin to amortize with their first monthly payment.  In particular, there may be a higher expectation by these mortgagors of refinancing their mortgage loans with a new mortgage loan, in particular one with an initial interest only period, which may result in higher or lower prepayment speeds than would otherwise be the case.  In addition, the failure to build equity in the property by the related mortgagor may affect the delinquency, loss and prepayment of these mortgage loans.

**The Ratings on the Notes are Not a Recommendation to Buy, Sell or Hold the Notes and are Subject to Withdrawal at any Time, Which May Affect the Liquidity or the Market Value of the Notes.**

It is a condition to the issuance of the notes that each class of notes be rated no lower than the ratings described in this prospectus supplement. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any note, and, accordingly, there can be no assurance that the rating assigned to any note on the date on which the notes are initially issued will not be lowered or withdrawn by either rating agency at any time thereafter. In the event any rating is revised or withdrawn, the liquidity or the market value of the related notes may be adversely affected.  *See "Ratings" in this prospectus supplement and in the prospectus.*

**The Mortgage Loans and HELOCs May Have Limited Recourse to the Related Borrower, Which May Result in Losses with Respect to These Mortgage Loans and HELOCs.**

The mortgage loans and HELOCs included in the trust may be nonrecourse loans or loans for which recourse may be restricted or unenforceable.  As to those loans, recourse in the event of mortgagor default will be limited to the specific real property and other assets, if any, that were pledged to secure the mortgage loan or HELOC.  However, even with respect to those loans that provide for recourse against the mortgagor and its assets generally, there can be no assurance that enforcement of the recourse provisions will be practicable, or that the other assets of the mortgagor will be sufficient to permit a recovery in respect of a defaulted mortgage loan or HELOC significantly in excess of the liquidation value of the related mortgaged property. Any risks associated with mortgage loans or HELOCS with no or limited recourse may adversely affect the yield to maturity of the notes to the extent losses caused by these risks which are not covered by credit enhancement are allocated to the related notes.

**The Mortgage Loans and HELOCs May Have Environmental Risks, Which May Result in Increased Losses with Respect to These Mortgage Loans and HELOCs.**

To the extent any related mortgaged property is contaminated with or affected by hazardous wastes or hazardous substances, these mortgage loans and HELOCs may incur losses.  *See "Servicing of Mortgage Loans—Realization Upon* or *Sale of Defaulted Mortgage Loans" and "Legal Aspects of Mortgage Loans—Environmental Legislation" in the accompanying prospectus.*  To the extent these environmental risks result in losses on the mortgage loans or HELOCs, the yield to maturity of the related notes, to the extent not covered by credit enhancement, may be affected.

**Violation of Various Federal, State and Local Laws May Result in Losses on the Mortgage Loans and HELOCs.**

Applicable state and local laws generally regulate interest rates and other charges, require specific disclosure, and require licensing of the originator.  In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans and HELOCs.

The mortgage loans and HELOCs are also subject to federal laws, including:

(a)   the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require specific disclosures to the borrowers regarding the terms of the mortgage loans and HELOCs;

(b)   the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

(c)   the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience.

Depending on the provisions of the applicable law and the specific facts and circumstances involved, violations of these federal or state laws, policies and principles may limit the ability of the trust to collect all or part of the principal of or interest on the mortgage loans and HELOCs, may entitle the borrower to a refund of amounts previously paid and, in addition, could subject the trust to damages and administrative enforcement.   *See "Legal Aspects of the Mortgage Loans" in the accompanying prospectus.*

On the closing date, the seller will represent, among other things, that each initial mortgage loan or initial HELOC, at the time it was made and as of the applicable transfer date, and with respect to subsequent mortgage loans and subsequent HELOCs, each such subsequent mortgage loan or subsequent HELOC at the time it was made, complied in all material respects with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all predatory lending laws, and each loan has been serviced in all material respects in accordance with applicable state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws.  In the event of a breach of this representation, the seller will be obligated to cure the breach or repurchase or replace the affected mortgage loan or HELOC in the manner described in the prospectus.

### The Servicing Operations of the RMBS Servicer and HELOC Servicer Are Being Transferred to Texas

As of the cut-off date, the primary servicing operations of the RMBS Servicer and HELOC Servicer are in the process of being moved from offices in Maryland, to offices in Texas. The RMBS Servicer and HELOC Servicer expect that the move will be completed by July 31, 2005. Investors should note, however, that when the offices associated with servicing are relocated, there may be a rise in delinquencies associated with such transfer.  Such increase in delinquencies may result in losses, which, to the extent they are not absorbed by credit enhancement will cause losses or shortfalls to be incurred by the holders of the notes.  An increase in the number of liquidations of defaulted mortgage loans or HELOCs will have the same effect as an increase in the rate of prepayments on the mortgage loans or HELOCs.

### There May Be Variations in the Subsequent Mortgage Loans and Subsequent HELOCs from the Initial Mortgage Loans and Initial HELOCs.

Each subsequent mortgage loan and subsequent HELOC generally will satisfy the eligibility criteria described in this prospectus supplement at the time of its sale to the trust.  The characteristics of the subsequent mortgage loans and subsequent HELOCS, however, may vary from the specific characteristics reflected in the statistical information relating to the initial mortgage loans and initial HELOCs presented in this prospectus supplement, although the extent of such variance is not expected to be material.  The final characteristics of the mortgage loans and HELOCs will be reflected in a Current Report on Form 8-K which will be filed by the Depositor within fifteen days of the end of the Funding Period.

**Failure to Use All Amounts on Deposit in the Pre-Funding Accounts May Result in a Mandatory Prepayment.**

To the extent that the amounts on deposit in the pre-funding accounts have not been fully applied to the purchase of subsequent mortgage loans and subsequent HELOCs on or before July 31, 2005, the holders of the related notes then entitled to principal distributions on the payment date immediately following July 31, 2005, will receive any amounts remaining in the related pre-funding accounts. Although no assurance can be given, the depositor intends that the principal amount of subsequent mortgage loans and subsequent HELOCs in each loan group sold to the indenture trustee on behalf of the trust will require the application of substantially all amounts on deposit in the related pre-funding account and that there will be no material principal payment to the holders of the related notes on such payment date.

**The Return on the Notes Could be Reduced by Shortfalls Due to the Application of the Servicemembers Civil Relief Act and Similar State Laws.**

The Servicemembers Civil Relief Act, or the Relief Act, and similar state laws provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active military service after the origination of their mortgage loans or HELOCs. The military operations by the United States in Iraq and Afghanistan have caused an increase in the number of citizens in active military duty, including those citizens previously in reserve status. Under the Relief Act the interest rate applicable to a mortgage loan or HELOC for which the related mortgagor is called to active military service will be reduced from the percentage stated in the related mortgage note to 6.00%. This interest rate reduction and any reduction provided under similar state laws will result in an interest shortfall because none of the RMBS master servicer, the RMBS servicer, the HELOC back-up servicer and the HELOC servicer will be able to collect the amount of interest which otherwise would be payable with respect to such mortgage loan or HELOC if the Relief Act or similar state law was not applicable thereto. This shortfall will not be paid by the mortgagor on future due dates or advanced by the RMBS master servicer, the RMBS servicer, the HELOC back-up servicer or the HELOC servicer and, therefore, will reduce the available funds for the noteholders on subsequent payment dates. We do not know how many mortgage loans or HELOCs in the mortgage pool have been or may be affected by the application of the Relief Act or similar state law. In addition, the Relief Act imposes limitations that would impair the ability of the RMBS servicer, the HELOC back-up servicer and the HELOC servicer to foreclose on an affected single family loan during the mortgagor's period of active duty status, and, under some circumstances, during an additional three month period thereafter. Thus, in the event that the Relief Act or similar legislation or regulations applies to any mortgage loan or HELOC which goes into default, there may be delays in payment and losses on the notes in connection therewith. Any other interest shortfalls, deferrals or forgiveness of payments on the mortgage loans or HELOCs resulting from similar legislation or regulations may result in delays in payments or losses to the holders of the notes. Any Relief Act shortfall respecting the Class V-A-4-D Notes will not be covered by the note insurance policy issued by the note insurer and will only be payable from excess interest on the mortgage loans to the extent available as described in this prospectus supplement. Any Relief Act shortfall respecting the Class VI-A Notes will not be covered by the policy issued by the credit enhancer and will only be payable from excess interest on the HELOCs to the extent available as described in this prospectus supplement.

## THE MORTGAGE POOL

**General**

References to percentages of the mortgage loans or HELOCs unless otherwise noted are calculated based on the aggregate unpaid principal balance of the initial mortgage loans or initial HELOCs, respectively, as of the Cut-off Date.

All of the initial mortgage loans and initial HELOCs will be acquired by the Depositor on the date of issuance of the Notes from American Home Mortgage Acceptance, Inc., an affiliate of the Depositor, the RMBS servicer and the HELOC servicer, pursuant to the Mortgage Loan Purchase Agreement. *See "Mortgage Loan Origination" in this prospectus supplement.*

The mortgage pool will initially consist of approximately 17,037 first lien fixed-rate and adjustable-rate mortgages secured primarily by one- to four-family residences and interests in shares issued by a cooperative apartment corporation and the related proprietary lease, which are referred to in this prospectus supplement as the mortgage loans, and approximately 2,884 adjustable-rate home equity lines of credit secured primarily by second liens on one- to four-family residential properties and interests in shares issued by a cooperative apartment corporation and the related proprietary lease, which are referred to in this prospectus supplement as the HELOCs. See "Legal Aspects of the Loans—Cooperative Mortgage Loans" in the prospectus. The initial mortgage loans and initial HELOCs have an initial aggregate unpaid principal balance as of the Cut-off Date of approximately $4,140,031,477 and $180,181,473, respectively, after application of scheduled payments due on or before the Cut-off Date whether or not received and subject to a permitted variance of plus or minus 10%. The mortgage pool will also include any additions made on or after the Cut-off Date as a result of new advances of money made pursuant to the home equity lines of credit. The initial mortgage loans have original terms to maturity of not greater than 40 years. The initial HELOCs have original terms to maturity of not greater than 30 years.

The mortgage pool, referred to herein as the Mortgage Pool, has been divided into seven loan groups, designated as Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV, Loan Group V and Loan Group VI as more fully described below and in Schedule A to this prospectus supplement. The initial and subsequent mortgage loans in Loan Group I are referred to herein as the Group I Loans, the initial and subsequent mortgage loans in Loan Group II-C are referred to herein as the Group II-C Loans, the initial and subsequent mortgage loans in Loan Group II-NC are referred to herein as the Group II-NC Loans, the initial and subsequent mortgage loans in Loan Group III are referred to herein as the Group III Loans, the initial and subsequent mortgage loans in Loan Group IV are referred to herein as the Group IV Loans, the initial and subsequent mortgage loans in Loan Group V are referred to herein as the Group V Loans and the initial and subsequent HELOCs are referred to herein as the Group VI HELOCs. Each group of mortgage loans and the group of HELOCs is referred to herein as a Loan Group.

All of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans are adjustable-rate mortgage loans. The interest rate borne by each of these mortgage loans will be adjusted, following in some cases an initial fixed-rate period, as follows:

- monthly based on the twelve-month moving average monthly yield on United States Treasury Securities adjusted to a constant maturity of one year;

- monthly based on the One-Month LIBOR Loan Index;

- semi-annually based on the Six-Month LIBOR Loan Index; or

- annually based on the One-Year LIBOR Loan Index or One-Year CMT Index,

each referred to in this prospectus supplement as an Index. The rate on each of these mortgage loans will be computed in accordance with the related mortgage note, plus (or minus) the related gross margin,

generally subject to rounding and to certain other limitations, including generally a maximum lifetime mortgage rate and in certain cases a minimum lifetime mortgage rate and in certain cases a maximum upward or downward adjustment on each interest adjustment date. All of the Group V Loans are fixed-rate mortgage loans. All of the Group VI HELOCs are home equity lines of credit, or HELOCs.

The mortgage pool will include the initial mortgage loans and the subsequent mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV, Loan Group V and the initial HELOCs and subsequent HELOCs in Loan Group VI. The initial mortgage loans and initial HELOCs will be deposited into the trust on the Closing Date. The subsequent mortgage loans and subsequent HELOCs will be purchased with amounts on deposit in the in the related Pre-Funding Account described in this prospectus supplement.

Each Group I Loan allows the related mortgagor to choose, each month after the initial fixed period, one of several payment options, which may include an amount less than, equal to or greater than a fully-amortizing monthly payment, referred to as the Minimum Monthly Payment in this prospectus supplement. The Minimum Monthly Payment for each Group I Loan will adjust annually, and on any Due Date on which the principal balance of the mortgage loan would otherwise exceed 110% (in the case of approximately 10.10% of the group I initial mortgage loans, as of the Cut-off Date) or 125% (in the case of approximately 89.90% of the group I initial mortgage loans, as of the Cut-off Date) of its original principal balance, to an amount which will fully amortize the Group I Loan at the then current mortgage interest rate in equal monthly installments over its remaining term to maturity. The Minimum Monthly Payment may not, however, increase or decrease on any adjustment date by an amount greater than 7.5% of the Minimum Monthly Payment in effect immediately before that adjustment date, or the payment cap, provided that this 7.5% limitation does not apply to the adjustment made on the fifth anniversary of the first Due Date and each fifth anniversary thereafter or if the principal balance of a Group I Loan would otherwise exceed 110% or 125% of its original principal balance. The final payment on each Group I Loan also is not subject to any limit on the change in the Minimum Monthly Payment. Depending on the amount and timing of increases to the principal balance of a Group I Loan due to negative amortization, the final payment on that Group I Loan may be substantially larger than the immediately preceding Minimum Monthly Payment.

Since the mortgage interest rate on each Group I Loan adjusts monthly and the Minimum Monthly Payment adjusts annually, subject to the limitations described above, and since the Minimum Monthly Payment may not be increased on most adjustment dates by an amount greater than 7.5%, increases in the One-Year MTA Index will cause a larger portion of the monthly payment to be allocated to interest and a smaller portion to principal. In some cases, the interest due on the Group I Loan may exceed the monthly payment. Any such excess will be added to the outstanding principal balance of the Group I Loan in the form of negative amortization. Decreases in the One-Year MTA Index, on the other hand, will cause a larger portion of the monthly payment to be allocated to principal and a smaller portion to interest.

In addition, for any month, if the RMBS Servicer receives a payment on a Group I Loan that is less than the Minimum Monthly Payment or if no payment is received at all, the RMBS Servicer will advance its own funds to cover the difference between the Minimum Monthly Payment scheduled to be received and the amount actually received with respect to that Group I Loan. However, the RMBS Servicer will not be required to make such advances if it determines that those advances will not be recoverable from future payments or collections on that Group I Loan. Failure by the RMBS Servicer to remit any required advance, which failure goes unremedied for the number of days specified in the RMBS Servicing Agreement, will constitute an event of default under such RMBS Servicing Agreement. Such event of default shall then obligate the RMBS Master Servicer, as successor RMBS Servicer, to advance such amounts to the Securities Administrator Collection Account to the extent provided in the RMBS Master Servicing Agreement. Any failure of the RMBS Master Servicer to make such advances would constitute an event of default by the RMBS Master Servicer under the RMBS Master Servicing

Agreement. The Indenture Trustee, as successor RMBS master servicer, will be required to make an advance which the RMBS Master Servicer is required to make but fails to do so.

The depositor will convey the initial mortgage loans and initial HELOCs to the trust on the Closing Date pursuant to the Trust Agreement. The depositor will convey the group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs to the trust during the Funding Period. The group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs will be acquired with amounts on deposit in the group I, group II-C, group II-NC, group III, group IV, group V and group VI Pre-Funding Accounts, respectively, pursuant to the group I, group II-C, group II-NC, group III, group IV, group V and group VI Subsequent Transfer Instruments.

The mortgage loans and HELOCs are being serviced by the RMBS Servicer and HELOC Servicer, respectively, as described below under "The Servicers." The mortgage loans and HELOCs were originated generally in accordance with the guidelines described in "Mortgage Loan Origination" in this prospectus supplement.

All of the mortgage loans have scheduled monthly payments due on the Due Date, and the scheduled monthly payments of the HELOCs will be deemed to be due on the Due Date. Each mortgage loan or HELOC will contain a customary "due-on-sale" clause or will be assumable as provided in the related mortgage note.

Substantially all of the initial mortgage loans with loan-to-value ratios in excess of 80.00% have primary mortgage insurance up to the required agency limits.

**Indices on Certain of the Mortgage Loans and HELOCs**

*One-Year MTA.* Substantially all of the Group I Loans, 7.12% of the Group II-C Loans and 8.61% of the Group II-NC Loans will adjust monthly based on the twelve-month moving average monthly yield on United States Treasury Securities adjusted to a constant maturity of one year, as published by the Federal Reserve Board in the Federal Reserve Statistical Release "Selected Interest Rates (H.15)", determined by averaging the monthly yields for the most recently available twelve months. The One-Year MTA figure used for each interest rate adjustment date will be the most recent One-Year MTA figure available as of fifteen days before that date.

If One-Year MTA is no longer available, the RMBS Servicer will choose a new Index that is based on comparable information. When the RMBS Servicer chooses a new Index, it will increase or decrease the Margin on each Group I Loan or applicable Group II-C Loan or Group II-NC Loan, as applicable by the difference between the average of One-Year MTA for the final three years it was in effect and the average of the replacement index for the most recent three years. The Margin will be increased by that difference if the average of One-Year MTA is greater than the average of the replacement index, and the Margin will be decreased by that difference if the average of the replacement index is greater than the average of One-Year MTA. The new Margin will be rounded up as provided in the related mortgage note.

Listed below are some historical values of One-Year MTA since January 1, 1998. The values of One-Year MTA shown are intended only to provide an historical summary of the movements in the One-Year MTA and may not be indicative of future rates. No assurances can be given as to the value of One-Year MTA on any interest rate adjustment date or during the life of any Group I Loan or applicable Group II-C Loan or Group II-NC Loan.

| | One-Year MTA | | | | | | |
|---|---|---|---|---|---|---|---|
| **Adjustment Date** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** |
| January 1 | 4.99% | 5.21% | 6.00% | 3.26% | 1.94% | 1.23% | 2.02% |
| February 1 | 4.94 | 5.34 | 5.87 | 3.06 | 1.86 | 1.23 | 2.17 |
| March 1 | 4.89 | 5.46 | 5.71 | 2.91 | 1.75 | 1.23 | 2.35 |
| April 1 | 4.83 | 5.58 | 5.53 | 2.79 | 1.65 | 1.24 | 2.35 |
| May 1 | 4.78 | 5.70 | 5.32 | 2.67 | 1.55 | 1.29 | 2.50 |
| June 1 | 4.76 | 5.79 | 5.10 | 2.55 | 1.45 | 1.38 | |
| July 1 | 4.73 | 5.88 | 4.90 | 2.41 | 1.38 | 1.46 | |
| August 1 | 4.73 | 5.96 | 4.67 | 2.27 | 1.34 | 1.52 | |
| September 1 | 4.77 | 6.04 | 4.40 | 2.18 | 1.30 | 1.60 | |
| October 1 | 4.88 | 6.08 | 4.09 | 2.12 | 1.27 | 1.68 | |
| November 1 | 4.97 | 6.13 | 3.76 | 2.07 | 1.26 | 1.77 | |
| December 1 | 5.08 | 6.11 | 3.48 | 2.00 | 1.24 | 1.89 | |

*Six-Month LIBOR.* Approximately 38.13%, 18.14%, 67.20% and 34.30% of the Group II-C, Group II-NC, Group III and Group IV initial mortgage loans, respectively will adjust semi-annually based on the Six-Month LIBOR Loan Index. The Six-Month LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and as are most recently available as of the time specified in the related mortgage note.

| | Six-Month LIBOR Loan Index | | | | | | |
|---|---|---|---|---|---|---|---|
| **Adjustment Date** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** |
| January 1 | 5.07% | 6.13% | 6.20% | 2.03% | 1.38% | 1.22% | 2.78% |
| February 1 | 4.97 | 6.29 | 5.26 | 2.08 | 1.35 | 1.21 | 2.97 |
| March 1 | 5.13 | 6.33 | 4.91 | 2.04 | 1.34 | 1.17 | 3.19 |
| April 1 | 5.06 | 6.53 | 4.71 | 2.36 | 1.23 | 1.16 | 3.39 |
| May 1 | 5.04 | 6.73 | 4.30 | 2.12 | 1.29 | 1.37 | 3.41 |
| June 1 | 5.25 | 7.11 | 3.98 | 2.08 | 1.21 | 1.61 | |
| July 1 | 5.65 | 7.00 | 3.91 | 1.95 | 1.12 | 1.90 | |
| August 1 | 5.71 | 6.89 | 3.69 | 1.87 | 1.21 | 1.94 | |
| September 1 | 5.92 | 6.83 | 3.45 | 1.80 | 1.20 | 1.98 | |
| October 1 | 5.96 | 6.76 | 2.52 | 1.71 | 1.14 | 2.20 | |
| November 1 | 6.12 | 6.72 | 2.15 | 1.60 | 1.23 | 2.62 | |
| December 1 | 6.06 | 6.64 | 2.03 | 1.47 | 1.27 | 2.63 | |

*One-Year LIBOR.* Approximately 48.61%, 66.29%, 32.80% and 65.57% of the Group II-C, Group II-NC, Group III and Group IV initial mortgage loans, respectively, will adjust annually based on One-Year LIBOR. The One-Year LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

| | One-Year LIBOR | | | | | | |
|---|---|---|---|---|---|---|---|
| Adjustment Date | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| January 1 ...................................... | 5.06% | 6.75% | 5.17% | 2.49% | 1.45% | 1.48% | 3.10% |
| February 1 .................................. | 5.40 | 6.76 | 4.88 | 2.43 | 1.38 | 1.37 | 3.27 |
| March 1 ...................................... | 5.25 | 6.94 | 4.67 | 3.00 | 1.28 | 1.34 | 3.57 |
| April 1 ........................................ | 5.23 | 7.10 | 4.44 | 2.63 | 1.36 | 1.81 | 3.81 |
| May 1 .......................................... | 5.56 | 7.50 | 4.24 | 2.59 | 1.21 | 2.08 | 3.69 |
| June 1 ......................................... | 5.84 | 7.18 | 4.18 | 2.28 | 1.19 | 2.11 | |
| July 1 .......................................... | 5.89 | 7.08 | 3.82 | 2.09 | 1.16 | 2.39 | |
| August 1 ..................................... | 6.06 | 6.97 | 3.56 | 1.90 | 1.44 | 2.35 | |
| September 1 ................................ | 6.04 | 6.80 | 2.64 | 1.73 | 1.45 | 2.26 | |
| October 1 .................................... | 6.25 | 6.73 | 2.27 | 1.64 | 1.24 | 2.49 | |
| November 1 ................................. | 6.27 | 6.56 | 2.39 | 1.73 | 1.48 | 2.54 | |
| December 1 ................................. | 6.50 | 6.00 | 2.44 | 1.45 | 1.60 | 2.96 | |

*WSJ Prime Rate*.  All of the Group VI HELOCs will adjust monthly based on the WSJ Prime Rate.  The WSJ Prime Rate will be a per annum rate as published in The Wall Street Journal on the first business day of each month and are most recently available as of the time specified in the related mortgage note.

| | WSJ Prime Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| Adjustment Date | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| January 1 ...................................... | 7.75% | 8.50% | 9.50% | 4.75% | 5.00% | 4.00% | 5.25% |
| February 1 .................................. | 7.75 | 8.50 | 8.50 | 4.75 | 5.00 | 4.00 | 5.25 |
| March 1 ...................................... | 7.75 | 8.75 | 8.50 | 4.75 | 5.00 | 4.00 | 5.50 |
| April 1 ........................................ | 7.75 | 9.00 | 8.00 | 4.75 | 5.00 | 4.00 | 5.75 |
| May 1 .......................................... | 7.75 | 9.00 | 7.50 | 4.75 | 5.00 | 4.00 | 5.75 |
| June 1 ......................................... | 7.75 | 9.50 | 7.50 | 4.75 | 5.00 | 4.00 | |
| July 1 .......................................... | 8.00 | 9.50 | 6.75 | 4.75 | 4.00 | 4.25 | |
| August 1 ..................................... | 8.00 | 9.50 | 6.75 | 4.75 | 4.00 | 4.25 | |
| September 1 ................................ | 8.25 | 9.50 | 6.50 | 4.75 | 4.00 | 4.50 | |
| October 1 .................................... | 8.25 | 9.50 | 6.00 | 4.75 | 4.00 | 4.75 | |
| November 1 ................................. | 8.25 | 9.50 | 5.50 | 4.75 | 4.00 | 4.75 | |
| December 1 ................................. | 8.50 | 9.50 | 5.00 | 4.75 | 4.00 | 5.00 | |

Approximately 0.12% of the Group IV mortgage loans will adjust annually based on One-Year CMT.  The One-Year CMT Index will be a per annum rate equal to the weekly or monthly average yields on U.S. Treasury securities adjusted to a constant maturity of one year as made available by the Federal Reserve in Federal Reserve Statistical Release H.15.

Approximately 6.14% and 6.96% of the Group II-C Loans and Group II-NC, respectively, will adjust annually based on One-Month LIBOR.  The One-Month LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for one-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

**Initial Mortgage Loan and Initial HELOC Characteristics**

*Initial Mortgage Loans and Initial HELOCs in the Aggregate*

The initial mortgage loans and initial HELOCs had an aggregate principal balance as of the Cut-off Date of approximately $4,140,031,477 and $180,181,473, respectively, after application of scheduled payments due on or before the Cut-off Date, whether or not received.  In the aggregate, all of the initial

mortgage loans and 0.43% of the initial HELOCs are secured by first liens on the related mortgaged property.

As of the Cut-off Date, the initial mortgage loans had mortgage rates ranging from approximately 1.000% per annum to approximately 9.500% per annum and the weighted-average mortgage rate will be approximately 5.501% per annum. As of the Cut-off Date, the initial HELOCs had mortgage rates ranging from approximately 4.250% per annum to approximately 11.500% per annum and the weighted-average mortgage rate will be approximately 5.749% per annum. The weighted average remaining term to stated maturity of the initial mortgage loans and initial HELOCs will be approximately 360 and 299 months, respectively, as of the Cut-off Date. None of the initial mortgage loans will have a first Due Date prior to July 1, 2001, or after August 1, 2005, or will have a remaining term to maturity of less than 174 months or greater than 480 months as of the Cut-off Date. None of the initial HELOCs will have a first Due Date prior to June 30, 2001, or after August 1, 2005, or will have a remaining term to maturity of less than 240 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any initial mortgage loan is July 1, 2045. The latest maturity date of any initial HELOC is May 20, 2035.

None of the mortgage loans will be a buydown mortgage loan.

None of the initial mortgage loans or initial HELOCs originated in Georgia will be subject to the Georgia Fair Lending Act.

None of the initial mortgage loans or initial HELOCs will be subject to the Home Ownership and Equity Protection Act of 1994 or any comparable state or local law.

*Initial Loan Group I*

The group I initial mortgage loans will have an aggregate principal balance as of the Cut-off Date of approximately $617,026,368, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group I initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group I initial mortgage loans at origination will be approximately $325,477. No group I initial mortgage loan had a principal balance at origination of greater than approximately $7,000,000 or less than approximately $30,000. The average principal balance of the group I initial mortgage loans as of the Cut-off Date will be approximately $324,922. No group I initial mortgage loan will have a principal balance as of the Cut-off Date of greater than approximately $6,993,243 or less than approximately $29,287.

As of the Cut-off Date, the group I initial mortgage loans will have mortgage rates ranging from approximately 1.000% per annum to approximately 7.294% per annum and the weighted average mortgage rate will be approximately 2.744% per annum. The weighted average remaining term to stated maturity of the group I initial mortgage loans will be approximately 375 months as of the Cut-off Date. None of the group I initial mortgage loans will have a first Due Date prior to February 1, 2005, or after August 1, 2005, or will have a remaining term to maturity of less than 355 months or greater than 480 months as of the Cut-off Date. The latest maturity date of any group I initial mortgage loan is July 1, 2045.

Approximately 64.43% of the group I initial mortgage loans will provide for prepayment charges.

The loan-to-value ratio of a mortgage loan secured by a first lien is equal to the ratio, expressed as a percentage, of the principal amount of the loan at origination, to the lesser of the appraised value of the related mortgaged property at the time of origination and the sales price. The weighted average of the loan-to-value ratios at origination of the group I initial mortgage loans was approximately 73.52%. No loan-to-value ratio at origination of any group I initial mortgage loan was greater than approximately 100.00% or less than approximately 21.18%.

*Initial Loan Group II-C*

The group II-C initial mortgage loans will have an aggregate principal balance as of the Cut-off Date of approximately $393,416,920, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group II-C initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group II-C initial mortgage loans at origination will be approximately $197,583. No group II-C initial mortgage loan had a principal balance at origination of greater than approximately $458,500 or less than approximately $30,000. The average principal balance of the group II-C initial mortgage loans as of the Cut-off Date will be approximately $197,498. No group II-C initial mortgage loan had a principal balance as of the Cut-off Date of greater than approximately $457,517 or less than approximately $29,972.

As of the Cut-off Date, the group II-C initial mortgage loans will have mortgage rates ranging from approximately 1.000% per annum to approximately 8.375% per annum and the weighted-average mortgage rate will be approximately 5.350% per annum. The weighted average remaining term to stated maturity of the group II-C initial mortgage loans will be approximately 359 months as of the Cut-off Date. None of the group II-C initial mortgage loans will have a first Due Date prior to July 1, 2004, or after August 1, 2005, or will have a remaining term to maturity of less than 348 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any group II-C initial mortgage loan is July 1, 2035.

Approximately 10.57% of the group II-C initial mortgage loans will provide for prepayment charges.

The loan-to-value ratio of a mortgage loan secured by a first lien is equal to the ratio, expressed as a percentage, of the principal amount of the loan at origination, to the lesser of the appraised value of the related mortgaged property at the time of origination and the sales price. The weighted average of the loan-to-value ratios at origination of the group II-C initial mortgage loans will be approximately 75.21%. No loan-to-value ratio at origination of any group II-C initial mortgage loan was greater than approximately 100.00% or less than approximately 13.67%.

*Initial Loan Group II-NC*

The group II-NC initial mortgage loans will have an aggregate principal balance as of the Cut-off Date of approximately $474,700,288, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group II-NC initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group II-NC initial mortgage loans at origination will be approximately $594,721. No group II-NC initial mortgage loan had a principal balance at origination of greater than approximately $2,500,000 or less than approximately $360,000. The average principal balance of the group II-NC initial mortgage loans as of the Cut-off Date will be approximately $594,118. No group II-NC initial mortgage loan had a principal balance as of the Cut-off Date of greater than approximately $2,500,000 or less than approximately $3,527.

As of the Cut-off Date, the group II-NC initial mortgage loans will have mortgage rates ranging from approximately 1.000% per annum to approximately 9.500% per annum and the weighted-average mortgage rate will be approximately 5.034% per annum. The weighted average remaining term to stated maturity of the group II-NC initial mortgage loans will be approximately 359 months as of the Cut-off Date. None of the group II-NC initial mortgage loans will have a first Due Date prior to April 1, 2005, or after August 1, 2005, or will have a remaining term to maturity of less than 357 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any group II-NC initial mortgage loan is July 1, 2035

Approximately 5.73% the group II-NC initial mortgage loans will provide for prepayment charges.

The loan-to-value ratio of a mortgage loan secured by a first lien is equal to the ratio, expressed as a percentage, of the principal amount of the loan at origination, to the lesser of the appraised value of the related mortgaged property at the time of origination and the sales price. The weighted average of the loan-to-value ratios at origination of the group II-NC initial mortgage loans will be approximately 72.26% loan-to-value ratio at origination of any group II-NC initial mortgage loan was greater than approximately 99.45% or less than approximately 17.17%.

### Initial Loan Group III

The group III initial mortgage loans had an aggregate principal balance as of the Cut-off Date of approximately $1,115,952,757, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group III initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group III initial mortgage loans at origination will be approximately $188,911. No group III initial mortgage loan had a principal balance at origination of greater than approximately $528,000 or less than approximately $20,000.  The average principal balance of the group III initial mortgage loans as of the Cut-off Date will be approximately $188,793.  No group III initial mortgage loan had a principal balance as of the Cut-off Date of greater than approximately $528,000 or less than approximately $19,940.

As of the Cut-off Date, the group III initial mortgage loans had mortgage rates ranging from approximately 4.125% per annum to approximately 7.875% per annum and the weighted-average mortgage rate will be approximately 6.123% per annum. The weighted average remaining term to stated maturity of the group III initial mortgage loans will be approximately 359 months as of the Cut-off Date. None of the group III initial mortgage loans will have a first Due Date prior to January 1, 2005, or after August 1, 2005, or will have a remaining term to maturity of less than 354 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any group III initial mortgage loan is July 1, 2035.

Approximately 7.14% of the group III initial mortgage loans provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the group III initial mortgage loans will be approximately 75.77%. No loan-to-value ratio at origination of any group III initial mortgage loan was greater than approximately 95.00% or less than approximately 10.34%.

### Initial Loan Group IV

The group IV initial mortgage loans will have an aggregate principal balance as of the Cut-off Date of approximately $504,138,693, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group IV initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group IV initial mortgage loans at origination will be approximately $544,707. No group IV initial mortgage loan had a principal balance at origination of greater than approximately $2,500,000 or less than approximately $360,000. The average principal balance of the group IV initial mortgage loans as of the Cut-off Date will be approximately $543,839. No group IV initial mortgage loan had a principal balance as of the Cut-off Date of greater than approximately $2,500,000 or less than approximately $360,000.

As of the Cut-off Date, the group IV initial mortgage loans will have mortgage rates ranging from approximately 4.500% per annum to approximately 7.875% per annum and the weighted average mortgage rate will be approximately 5.971% per annum. The weighted average remaining term to stated maturity of the group IV initial mortgage loans will be approximately 359 months as of the Cut-off Date.

None of the group IV initial mortgage loans will have a first Due Date prior to July 1, 2001, or after August 1, 2005, or will have a remaining term to maturity of less than 312 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any group IV initial mortgage loan is July 1, 2035.

Approximately 2.85% of the group IV initial mortgage loans will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the group IV initial mortgage loans will be approximately 74.97%. No loan-to-value ratio at origination of any group IV initial mortgage loan was greater than approximately 95.00% or less than approximately 31.02%.

*Initial Loan Group V*

The group V initial mortgage loans had an aggregate principal balance as of the Cut-off Date of approximately $1,034,796,451, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the group V initial mortgage loans are secured by first liens on the related mortgaged property.

The average principal balance of the group V initial mortgage loans at origination will be approximately $187,988. No group V initial mortgage loan had a principal balance at origination of greater than approximately $2,500,000 or less than approximately $30,000. The average principal balance of the group V initial mortgage loans as of the Cut-off Date will be approximately $187,837. No group V initial mortgage loan had a principal balance as of the Cut-off Date of greater than approximately $2,495,468 or less than approximately $30,000.

As of the Cut-off Date, the group V initial mortgage loans had mortgage rates ranging from approximately 4.750% per annum to approximately 9.000% per annum and the weighted-average mortgage rate will be approximately 6.515% per annum. The weighted average remaining term to stated maturity of the group V initial mortgage loans will be approximately 354 months as of the Cut-off Date. None of the group V initial mortgage loans will have a first Due Date prior to August 1, 2003, or after August 1, 2005, or will have a remaining term to maturity of less than 174 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any group V initial mortgage loan is July 1, 2035.

Approximately 7.29% of the group V initial mortgage loans provide for prepayment charges.

The loan-to-value ratio of a mortgage loan secured by a first lien is equal to the ratio, expressed as a percentage, of the principal amount of the loan at origination, to the lesser of the appraised value of the related mortgaged property at the time of origination and the sales price. The weighted average of the loan-to-value ratios at origination of the group V initial mortgage loans will be approximately 72.72%. No loan-to-value ratio at origination of any group V initial mortgage loan was greater than approximately 97.70% or less than approximately 9.65%.

*Initial Loan Group VI*

The group VI initial HELOCs had an aggregate principal balance as of the Cut-off Date of approximately $180,181,473, after application of payments due on or before the Cut-off Date, whether or not received.  Approximately 99.57% and 0.43% of the group VI initial HELOCs by aggregate principal balance as of the Cut-off Date are secured by second liens and first liens, respectively.

The average drawn balance of the group VI initial HELOCs as of the Cut-off Date will be approximately $62,476. No group VI initial HELOC had a principal balance as of the Cut-off Date of greater than approximately $530,400 or less than approximately $2.

As of the Cut-off Date, the group VI initial HELOCs had HELOC rates ranging from approximately 4.250% per annum to approximately 11.500% per annum and the weighted-average

HELOC rate will be approximately 5.749% per annum. The weighted average remaining term to stated maturity of the group VI initial HELOCs will be approximately 299 months as of the Cut-off Date. None of the group VI initial HELOCs will have a first Due Date prior to June 30, 2001, or after August 1, 2005, or will have a remaining term to maturity of less than 237 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any Group VI HELOC is May 20, 2035.

None of the group VI initial HELOCs provide for prepayment charges.

The initial HELOCs will have the following characteristics as of the Cut-off Date, unless otherwise indicated below:

- The average credit limit of the initial HELOCs is approximately $66,350.

- The weighted average margin of the initial HELOCs is approximately 1.470%.

- The weighted average seasoning of the initial HELOCs is 1 month.

- The weighted average remaining term of the initial HELOCs is 299 months.

- The weighted average remaining draw term of the initial HELOCs is 118 months.

- The weighted average credit score of the initial HELOCs as of the cut-off date is approximately 728.

- The average credit limit utilization rate based on the credit limits of the initial HELOCs is approximately 94.16%.

- The weighted average junior ratio of the initial HELOCs based on the related credit limit is approximately 22.26%.

- With respect to 30.85%, 7.53%, 6.83%, 5.83% and 5.54% of the initial HELOCs, the related mortgaged properties are located in California, Illinois, Arizona, Virginia and Maryland, respectively, and no other state or geographic location had a concentration of HELOCs in excess of 5% as of the Cut-off Date.

- The weighted average original term to maturity of the initial HELOCs as of the cut-off date will be approximately 300 months.

- Approximately 98.50% of the initial HELOCs will be secured by owner occupied property and 1.50% of the initial HELOCs will be secured by non-owner occupied property.

- The loan rates on approximately 64.77% of the initial HELOCs will be introductory or "teaser" rates. The weighted average months until the HELOCs reach their teaser expiration date is approximately 2 months.

- Approximately 67.94% of the initial HELOCs were originated under full documentation programs. The remainder of the initial HELOCs were originated under alternative documentation programs.

- No initial HELOC provides for deferred interest or negative amortization.

- As of the cut-off date, none of the initial HELOCs will be 12 or more days delinquent in payment of principal and interest.

With respect to each first lien HELOC, the combined loan-to-value ratio is equal to the ratio, expressed as a percentage, of the credit limit to the lesser of the appraised value and the purchase price. With respect to each second lien HELOC, the combined loan-to-value ratio is equal to the ratio, expressed as a percentage, of (A) the sum of (i) the credit limit and (ii) any outstanding principal balance, at the time of origination of such HELOC, of all other mortgage loans, if any, secured by senior liens on the related mortgaged property, to (B) (i) with respect to those second lien HELOCs for which the proceeds were used to purchase the related mortgaged property, the lesser of the appraised value and the purchase price, and (ii) with respect to all other second lien HELOCs, the appraised value.

**The HELOCs**

The initial HELOCs will consist of home equity lines of credit. Approximately 99.57% of the Cut-off Date principal balance of the initial HELOCs are secured by second liens and the remainder are secured by first liens. With respect to all of the initial HELOCs, the borrower represented at the time of origination that the related mortgaged property would be owner-occupied as a primary, second or vacation home.

*HELOC Terms*

Interest on each HELOC is calculated based on the average daily balance outstanding during the billing cycle. With respect to each HELOC, the billing cycle is the calendar month preceding the related due date.

The initial mortgage rate in effect on approximately 64.77% of the initial HELOCs will be an introductory or "teaser" rate that is lower, and may be significantly lower, than the mortgage rate that would have been in effect on those HELOCs based on the related index and gross margin. Therefore, unless the related index declines after origination of a HELOC, the related mortgage rate will generally increase on the first adjustment date following origination of the HELOC subject to the maximum rate cap. Increased monthly payments on HELOCs may result in increased delinquencies and defaults on those HELOCs. The repayment of the HELOCs will be dependent on the ability of the mortgagors to make larger monthly payments or to refinance their HELOC following adjustments of the mortgage rate.

Each initial HELOC has a loan rate that is subject to adjustments on each adjustment date to equal the sum of (a) the index and (b) the gross margin specified in the related credit line agreement; provided, however, that the loan rate will in no event be greater than the maximum loan rate set forth in the related credit line agreement and subject to the maximum rate permitted by applicable law. The adjustment date is the first day of each related billing cycle beginning on the date specified in the applicable credit line agreement. The index for any adjustment date will be the prime rate for corporate loans at United States commercial banks, as published in The Wall Street Journal on the first business day of the month in which the relevant billing cycle begins. If, on any day, more than one prime rate or a range of prime rates for corporate loans at United States commercial banks is published in The Wall Street Journal, the index on such day will be the highest of the prime rates.

Each HELOC had a term to maturity from the date of origination of not more than 360 months. The borrower for each HELOC may make a draw under the related credit line agreement at any time during the draw period. The draw period begins on the related origination date and will be 5 years, subject to an additional 5 year draw period at the option of the HELOC Servicer. The maximum amount of each draw under any HELOC is equal to the excess, if any, of the credit limit over the outstanding principal balance under such credit line agreement at the time of such draw, plus $500. Each HELOC may be prepaid in full or in part at any time and without penalty, but with respect to each HELOC, the related borrower will have the right during the related draw period to make a draw in the amount of any prepayment previously made with respect to such HELOC, up to the credit limit. Each borrower generally will have access to make draws with either checks or a credit card, subject to applicable law. The credit line agreement or mortgage related to each HELOC generally will contain a customary "due-on-sale" clause.

A borrower's rights to receive draws during the related draw period may be suspended, or the credit limit may be reduced for cause under a number of circumstances, including, but not limited to:

- a materially adverse change in the borrower's financial circumstances;
- a decline in the value of the mortgaged property significantly below its appraised value at origination; or
- a payment default by the borrower.

However, a suspension or reduction generally will not affect the payment terms for previously drawn balances. The HELOC Servicer will have no obligation to investigate as to whether any of those circumstances have occurred and may have no knowledge of their occurrence. Therefore, there can be no assurance that any borrower's ability to receive draws will be suspended or reduced if the foregoing circumstances occur. In the event of default under a revolving credit loan, the HELOC may be terminated and declared immediately due and payable in full. For this purpose, a default includes, but is not limited to:

- the borrower's failure to make any payment as required;

- any action or inaction by the borrower that adversely affects the mortgaged property or the rights in the mortgaged property; or

- fraud or material misrepresentation by the borrower in connection with the home equity line of credit.

Prior to the end of the related draw period, the borrower for each HELOC will be obligated to make monthly payments in a minimum amount that generally will be equal to the finance charge for each billing cycle. In addition, except as described below, after the related draw period, the borrower will be obligated to make monthly payments consisting of principal installments that would substantially amortize the principal balance by the maturity date, and to pay any current finance charges and additional charges.

The finance charge for each HELOC for any billing cycle will be an amount equal to the aggregate, as calculated for each day in the billing cycle, of the then-applicable loan rate divided by 360 multiplied by that day's principal balance. The account balance on any day generally will equal:

- the principal balance on that date, plus

- additional charges, if any, consisting of unpaid fees, insurance premiums and other charges, plus

- unpaid finance charges, plus

- draws funded on that day, minus

- all payments and credits applied to the repayment of the principal balance on that day.

Payments made by or on behalf of the borrower for each HELOC will be applied to any unpaid finance charges that are due thereon prior to application to any unpaid principal outstanding.

The principal balance of any HELOC, other than a Liquidated HELOC, on any day will be the cut-off date balance, plus (x) any additional balances relating to that HELOC conveyed to the trust minus (y) all collections credited against the principal balance of that home equity line of credit in accordance with the related credit line agreement prior to that day, exclusive of the pro rata portion attributable to additional balances not conveyed to the trust following a rapid amortization event and (z) all prior related Charge-Off Amounts. The principal balance of a Liquidated HELOC after final recovery of substantially all of the related liquidation proceeds which the HELOC Servicer reasonably expects to receive shall be zero.

The HELOC Servicer will have the option to allow an increase in the credit limit applicable to any HELOC under limited circumstances described in the HELOC Servicing Agreement.

## THE RMBS MASTER SERVICER AND THE SERVICERS

### RMBS Master Servicer

Wells Fargo Bank, National Association, referred to in this prospectus supplement as the RMBS Master Servicer, will act as the RMBS Master Servicer of the mortgage loans pursuant to the RMBS Master Servicing Agreement, dated as of the Closing Date, among the RMBS Master Servicer, Securities

Administrator, Indenture Trustee and Issuer. The RMBS Master Servicer is a national banking association, with its master servicing offices located in Columbia, Maryland. The RMBS Master Servicer is engaged in the business of master servicing single family residential mortgage loans secured by properties located in all 50 states and the District of Columbia.

The RMBS Master Servicer will, in accordance with the terms set forth in the RMBS Master Servicing Agreement, supervise the servicing of the mortgage loans by the RMBS Servicer under the RMBS Servicing Agreement. The RMBS Master Servicer will not ultimately be responsible for the performance of the servicing activities by the RMBS Servicer, except as otherwise described herein and the RMBS Master Servicing Agreement. If the RMBS Servicer fails to fulfill its obligations under the RMBS Servicing Agreement, then the RMBS Master Servicer is obligated to terminate the RMBS Servicer and either appoint a successor RMBS servicer, as provided in the RMBS Master Servicing Agreement or assume the obligations of the RMBS Servicer under the RMBS Servicing Agreement. The RMBS Master Servicer will have no obligation to oversee or supervise the activities of the HELOC Servicer or HELOC Back-Up Servicer in connection with the servicing of the HELOCs, and under no circumstances will the RMBS Master Servicer have any duty to become the successor to either the HELOC Servicer or the HELOC Back-Up Servicer. In accordance with the terms and conditions of the RMBS Servicing Agreement, the RMBS Servicer may not waive, modify or vary any term of any mortgage loan or consent to the postponement of any such term, or in any manner grant indulgence to any mortgagor unless the RMBS Servicer has obtained the prior written consent of the RMBS Master Servicer.

In addition, the RMBS Servicer shall be required to provide to the RMBS Master Servicer a liquidation report upon the foreclosure sale of any mortgaged property or the acquisition of a mortgaged property pursuant to a deed-in-lieu of foreclosure. If the RMBS Servicer has determined that there is a realized loss with respect to a mortgaged property, the RMBS Master Servicer shall review and approve all realized loss calculations contained in such liquidation report.

As compensation for its services under the RMBS Master Servicing Agreement, the RMBS Master Servicer shall be entitled to all investment income or other earnings on the funds on deposit in the Securities Administrator Collection Account. The RMBS Master Servicer will also be entitled to reimbursement from the Trust Estate for certain expenses and other amounts prior to the payment of any amounts to the Noteholders or certificateholders.

**RMBS Servicer and HELOC Servicer**

American Home Mortgage Servicing, Inc., referred to in this prospectus supplement as the RMBS Servicer, will act as the RMBS Servicer of the mortgage loans pursuant to the RMBS Servicing Agreement, dated as of the Closing Date, among the Seller, RMBS Servicer, RMBS Master Servicer, Issuer and Indenture Trustee. The RMBS Servicer is a Maryland corporation. The RMBS Servicer is engaged in the business of servicing single family residential mortgage loans secured by properties located in all 50 states and the District of Columbia. The RMBS Servicer is an affiliate of the Seller and the Depositor. The RMBS Servicer may use subservicers with respect to all or a portion of the mortgage loans.

The RMBS Servicer may be terminated upon the occurrence of an RMBS Servicing Trigger Event. The HELOC Servicer may be terminated upon the occurrence of a HELOC Servicer Termination Event. In addition, on the closing date, a reserve fund with an amount of $846,830 will be available to cover any expenses incurred by the RMBS Master Servicer or the HELOC Back-up Servicer, as applicable, in the event of a default by the RMBS Servicer or the HELOC Servicer. In addition, at the end of each calendar quarter, an amount will be released from the reserve fund and paid to the Seller equal to $30 times each mortgage loan which was released from the trust during such calendar quarter. This reserve fund may be removed if the RMBS Servicer and the HELOC Servicer is rated "SQ2-" or better by Moody's on any date.

American Home Mortgage Servicing, Inc., or the HELOC Servicer, will act as servicer with respect to the HELOCs. The HELOC Servicer has only been servicing HELOCs for a limited time. Accordingly, the HELOC Servicer does not have representative historical delinquency, bankruptcy, foreclosure or default experience that may be referred to for purposes of estimating the future delinquency and loss experience of the HELOCs. As a result, delinquencies and losses on the HELOCs may be higher than would otherwise be the case.

The servicing offices of the RMBS Servicer and the HELOC servicer are moving from Maryland to Texas. See "Risk Factors—The Servicing Operations of the RMBS Servicer and HELOC Servicer Are Being Transferred to Texas."

*Delinquency and Foreclosure Experience.*

The following tables set forth the delinquency and foreclosure experience of adjustable-rate and fixed-rate mortgage loans funded by American Home and serviced by the RMBS Servicer as of the dates indicated. The tables only set forth information for mortgage loans serviced for American Home by the RMBS Servicer. The table does not include information for mortgage loans which were originated by American Home but are serviced by servicers other than the RMBS Servicer. In addition, they do not include other mortgage loans serviced by the RMBS Servicer which were originated by other originators. As a result, there can be no assurance, and no representation is made, that the delinquency and foreclosure experience with respect to the mortgage loans will be similar to that reflected in the tables below, nor is any representation made as to the rate at which losses may be experienced on liquidation of defaulted mortgage loans. The actual loss and delinquency experience on the mortgage loans will depend, among other things, upon the value of the real estate securing such mortgage loans and the ability of borrowers to make required payments.

The information set forth in the following paragraphs with respect to the RMBS Servicer has been provided by the RMBS Servicer.

**Delinquency and Foreclosure Experience in American Home's
Adjustable Rate Mortgage Loan Portfolio**

| | As of September 30, 2004 | | | As of November 30, 2003 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance ................. | 39,291 | $ 8,232,798,967 | | 15,680 | $2,722,534,254 | |
| 30-59 Days.................... | 446 | $    81,680,044 | 0.99% | 272 | $  34,929,151 | 1.28% |
| 60-89 Days.................... | 79 | $    14,653,738 | 0.18% | 45 | $    5,943,734 | 0.22% |
| 90 Days or more............ | 73 | $    11,298,668 | 0.14% | 39 | $    3,743,110 | 0.14% |
| Delinquent/Bankruptcies . | 120 | $    11,806,973 | 0.14% | 115 | $    9,965,649 | 0.36% |
| Total Delinquencies ......... | 718 | $  119,439,423 | 1.45% | 471 | $  54,581,644 | 2.00% |
| Foreclosures Pending....... | 94 | $    12,677,963 | 0.15% | 88 | $    8,914,390 | 0.33% |
| Total Default................... | 812 | $  132,117,386 | 1.60% | 559 | $  63,496,034 | 2.33% |

| | As of December 31, 2004 | | | As of March 31, 2005 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | No. of Loans | No. of Loans | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance ................. | 47,738 | $10,680,668,217 | | 57,088 | $13,130,552,246 | |
| 30-59 Days.................... | 535 | $  109,713,803 | 1.02% | 845 | $  187,172,450 | 1.43% |
| 60-89 Days.................... | 94 | $    18,117,688 | 0.16% | 115 | $    25,726,643 | 0.20% |
| 90 Days or more............ | 38 | $      5,813,868 | 0.05% | 49 | $    10,338,718 | 0.08% |
| Delinquent/Bankruptcies . | 78 | $      7,072,773 | 0.06% | 76 | $      8,022,540 | 0.06% |
| Total Delinquencies ......... | 745 | $  140,072,131 | 1.31% | 1,085 | $  231,260,351 | 7.76% |
| Foreclosures Pending....... | 106 | $    20,815,426 | 0.19% | 165 | $  38,204,708 | 0.29% |
| Total Default................... | 851 | $  161,533,557 | 1.51% | 1,250 | $  269,465,058 | 2.05% |

**Delinquency and Foreclosure Experience in American Home's
Fixed Rate Mortgage Loan Portfolio**

| | As of December 31, 2004 | | | As of March 31, 2005 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance ................ | 52,683 | $ 6,009,988,813 | | 62,020 | $ 6,887,772,174 | |
| 30-59 Days.................. | 1,250 | $ 218,903,320 | 1.97% | 1,428 | $ 141,860,934 | 2.06% |
| 60-89 Days.................. | 262 | $ 24,919,320 | 0.41% | 243 | $ 27,014,989 | 0.39% |
| 90 Days or more............ | 232 | $ 19,411,083 | 0.32% | 187 | $ 16,189,501 | 0.24% |
| Delinquent/Bankruptcies . | 430 | $ 39,372,889 | 0.65% | 396 | $ 35,628,537 | 0.52% |
| Total Delinquencies......... | 2,154 | $ 249,863,302 | 3.37% | 2,254 | $ 220,693,961 | 3.20% |
| Foreclosures Pending....... | 314 | $ 31,155,164 | 0.51% | 315 | $ 32,355,052 | 0.47% |
| Total Default................... | 2,468 | $ 233,762,251 | 3.88% | 2,569 | $ 253,049,013 | 3.% |

**Delinquency and Foreclosure Experience in American Home's
Mortgage Loan Portfolio**

| | As of December 31, 2004 | | | As of March 31, 2005 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance ................ | 105,011 | $16,955,933,011 | | 119,108 | $20,019,898,650 | |
| 30-59 Days.................. | 1,882 | $ 233,710,634 | 1.37% | 2,273 | $ 329,033,384 | 1.64% |
| 60-89 Days.................. | 401 | $ 45,068,378 | 0.26% | 358 | $ 52,741,632 | 0.26% |
| 90 Days or more............ | 275 | $ 25,941,223 | 0.15% | 236 | $ 26,528,219 | 0.13% |
| Delinquent/Bankruptcies . | 508 | $ 46,445,663 | 0.27% | 472 | $ 43,651,076 | 0.22% |
| Total Delinquencies......... | 3,066 | $ 351,165,898 | 2.87% | 3,339 | $ 451,954,312 | 2.26% |
| Foreclosures Pending....... | 420 | $ 51,970,590 | 0.30% | 480 | $ 70,559,759 | 0.35% |
| Total Default................... | 3,486 | $ 403,136,488 | 2.37% | 3,819 | $ 522,514,071 | 2.61% |

While the above foreclosure and delinquency experience is typical of American Home's recent experience with respect to its fixed-rate and adjustable-rate mortgage loan portfolios master serviced by RMBS Servicer, there can be no assurance that experience on the mortgage loans will be similar. Accordingly, the information should not be considered to reflect the credit quality of the mortgage loans, or as a basis for assessing the likelihood, amount or severity of losses on the mortgage loans.  The mortgage loans may be more recently originated than, and are likely to have other characteristics which distinguish them from, the loans in the tables above.

**The HELOC Back-Up Servicer**

GMAC Mortgage Corporation, or GMACM, will be the HELOC Back-Up Servicer with respect to the HELOCs. GMACM is an indirect wholly-owned subsidiary of General Motors Acceptance Corporation and is one of the nation's largest mortgage bankers. GMACM is engaged in the mortgage

banking business, including the origination, purchase, sale and servicing of residential loans. The notes do not represent an interest in or an obligation of GMACM.

GMACM maintains its executive and principal offices at 100 Witmer Road, Horsham, Pennsylvania 19044. Its telephone number is (215) 682-1000.

In the event of a default by the HELOC Servicer under the HELOC Servicing Agreement, GMACM will be required to enforce any remedies against the HELOC Servicer, and shall either find a successor HELOC Servicer acceptable to the credit enhancer or shall assume primary servicing obligations for the HELOCs itself.

**Conveyance of Subsequent Mortgage Loans and HELOCs and the Pre-Funding Accounts**

Under and to the extent provided in the Indenture, the Indenture Trustee, on behalf of the Trust, will be obligated to purchase from the Depositor during the Funding Period, subject to the availability thereof and the funds on deposit in the related pre-funding account, group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs. The group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs will be transferred to the Indenture Trustee, on behalf of the Trust, on the related Subsequent Transfer Date pursuant to the related Subsequent Transfer Instrument between the Depositor and the Indenture Trustee. In connection with the purchase of group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs on such Subsequent Transfer Dates, the Indenture Trustee, on behalf of the Trust, will be required to pay to the Depositor solely from amounts on deposit in the related Pre-Funding Account, a cash purchase price of 100% of the principal balance of the group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs. The amount paid from the related Pre-Funding Account on each Subsequent Transfer Date will not include accrued interest on the related group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs. Following each Subsequent Transfer Date, the aggregate Stated Principal Balance of the mortgage loans or HELOCs, as applicable, will increase by an amount equal to the aggregate Stated Principal Balance of the related group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs so purchased and the amount in the related Pre-Funding Account will decrease accordingly.

The Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Accounts will be established to provide the Indenture Trustee, on behalf of the Trust with sufficient funds to purchase the group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and the group VI subsequent HELOCs, respectively. On the Closing Date, the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Original Pre-Funded Amounts will be deposited into the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Accounts, respectively, and thereafter used to purchase additional related mortgage loans or HELOCs during the period ending no later than July 31, 2005. On or about July 31, 2005, and otherwise during the Funding Period, the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Original Pre-Funded Amount will be reduced by the amount used to purchase the group I, group II-C, group II-NC, group III, group IV and group V subsequent mortgage loans and group VI subsequent HELOCs, respectively, for the mortgage pool in accordance with the Indenture. Any investment income on funds in the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Pre-Funding Account will be included in Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Available Funds and Interest Collections with respect to the Group VI HELOCs.

With respect to each group I, group II-C, group II-NC, group III, group IV or group V subsequent mortgage loan, (i) the principal balance of such subsequent mortgage loan, as of the related subsequent

cut-off date, shall not exceed $2,000,000 and (ii) the related mortgagor shall not have more than 2 other mortgage loans outstanding which are also included in the trust.

Any conveyance of group I subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 480 months; (iii) each group I subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no group I subsequent mortgage loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group I subsequent mortgage loan will be no later than August 1, 2045; (vi) none of the group I subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 600; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.00% per annum to approximately 8.00% per annum; (ix) none of the group I subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 2.50% to 3.00% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 45.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 720; (iv) have no more than 25.00% of such mortgage loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing group I loans be owner occupied; (vi) have no less than 59.00% of the mortgaged properties securing group I loans be single family detached and no more than 25.00% planned unit developments; (vii) have no more than 50.00% of the group I loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 0.00% of the group I loans be mortgage loans with an interest only period; (x) together with the group I loans already included in the trust, have no more than 2.00% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 50.00% of the pool will have a credit score less than 700; (xii) no less than 30.00% the pool will have "full documentation"; (xii) will have a weighted average loan to value ratio between 70.00% and 77.00% and (xiv) no more than 5.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group II-C subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each group II-C subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no group II-C subsequent mortgage loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group II-C subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the group II-C subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 600; (viii) such mortgage loan will

have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.00% per annum to approximately 9.00% per annum; (ix) none of the group II-C subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 5.00% to 5.75% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 5.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 740; (iv) have no more than 33.00% of such mortgage loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing group II-C loans be owner occupied; (vi) have no less than 50.00% of the mortgaged properties securing group II-C loans be single family detached and no more than 25.00% planned unit developments; (vii) have no more than 25.00% of the group II-C loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 95.00% of the group II-C loans be mortgage loans with an interest only period; (x) together with the group II-C loans already included in the trust, have no more than 2.00% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the pool will have a credit score less than 650; (xii) no less than 35.00% the pool will have "full documentation"; (xiii) will have a weighted average loan to value ratio between 70.00% and 80.00% and (xiv) no more than 1.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group II-NC subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each group II-NC subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no group II-NC subsequent mortgage loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group II-NC subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the group II-NC subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 625; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 1.00% per annum to approximately 10.00% per annum; (ix) none of the group II-NC subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool— Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 4.75% to 5.25% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 3.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 715 to 730; (iv) have no more than 54.00% of such mortgage loans concentrated in the state of California; (v) have no less than 84.00% of the mortgaged properties securing group II-NC loans be owner occupied; (vi) have no less than 60.00% of the mortgaged properties securing group II-NC loans be single family detached and no more than 28.00% planned unit developments; (vii) have no more than 32.00% of the group II-NC loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 98.00% of the group II-NC loans be mortgage loans with an interest only period; (x) together with the group II-NC loans already included in the trust, have no more than 2.00% of such mortgage loans

(by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 8.00% of the pool will have a credit score less than 650; (xii) no less than 29.00% the pool will have "full documentation"; (xii) will have a weighted average loan to value ratio between 68.00% and 77.00% and (xiv) no more than 1.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group III subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each group III subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no group III subsequent mortgage loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group III subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the group III subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 625; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.00% per annum to approximately 8.00% per annum; (ix) none of the group III subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 5.75% to 6.30% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 5.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 700 to 725; (iv) have no more than 20.00% of such mortgage loans concentrated in the state of California; (v) have no less than 70.00% of the mortgaged properties securing group III loans be owner occupied; (vi) have no less than 45.00% of the mortgaged properties securing group III loans be single family detached and no more than 32.00% planned unit developments; (vii) have no more than 25.00% of the group III loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 94.00% of the group III loans be mortgage loans with an interest only period; (x) together with the group III loans already included in the trust, have no more than 1.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 11.00% of the pool will have a credit score less than 650; (xii) no less than 35.00% the pool will have "full documentation"; (xii) will have a weighted average loan to value ratio between 70.00% and 80.00% and (xiv) no more than 2.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group IV subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be no more than 360 months; (iii) each group IV subsequent mortgage loan must be an adjustable-rate mortgage loan with a first lien on the related mortgaged property; (iv) no group IV subsequent mortgage loan will have a first payment date occurring

after September 1, 2005; (v) the latest maturity date of any group IV subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the group IV subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 635; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.50% per annum to approximately 8.00% per annum; (ix) none of the group IV subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 5.50% to 6.25% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 1.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 710 to 730; (iv) have no more than 36.00% of such mortgage loans concentrated in the state of California; (v) have no less than 85.00% of the mortgaged properties securing group IV loans be owner occupied; (vi) have no less than 50.00% of the mortgaged properties securing group IV loans be single family detached and no more than 36.00% planned unit developments; (vii) have no more than 30.00% of the group IV loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a Primary Insurance Policy; (ix) have no more than 95.00% of the group IV loans be mortgage loans with an interest only period; (x) together with the group IV loans already included in the trust, have no more than 2.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the pool will have a credit score less than 650; (xii) no less than 49.00% the pool will have "full documentation"; (xii) will have a weighted average loan to value ratio between 70.00% and 80.00% and (xiv) no more than 1.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group V subsequent mortgage loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such mortgage loan must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such mortgage loans in a manner that it believes to be adverse to the interests of the noteholders or the Note Insurer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such mortgage loans; (d) as of the related Subsequent Cut-off Date, each such mortgage loan will satisfy the following criteria: (i) such mortgage loan may not be 30 or more days delinquent as of the last day of the month preceding the Subsequent Cut-off Date; (ii) the original term to stated maturity of such mortgage loan will be 360 months; (iii) each group V subsequent mortgage loan must be a fixed rate mortgage loan with a first lien on the related mortgaged property; (iv) no group V subsequent mortgage loan will have a first payment date occurring after September 1, 2005; (v) the latest maturity date of any group V subsequent mortgage loan will be no later than August 1, 2035; (vi) none of the group V subsequent mortgage loans will be a buydown loan; (vii) such mortgage loan will have a credit score of not less than 600; (viii) such mortgage loan will have a Mortgage Rate as of the applicable Subsequent Cut-off Date ranging from approximately 4.60% per annum to approximately 9.25% per annum; (ix) none of the group V subsequent mortgage loans will be a New York State "high cost" loan; and (x) such mortgage loan shall have been underwritten in accordance with the criteria set forth under "The Mortgage Pool—Underwriting Standards" in this prospectus supplement; (e) as of the related Subsequent Cut-off Date, each group of such mortgage loans will satisfy the following criteria: (i) have a weighted average Mortgage Rate ranging from 6.25% to 6.75% per annum; (ii) consist of mortgage loans with prepayment charges representing no less than approximately 3.00% of the Pool Balance; (iii) have a weighted average credit score ranging from 685 to 715; (iv) have no more than 19.00% of such mortgage loans concentrated in the state of California; (v) have no less than 67.00% of the mortgaged properties securing group V loans be owner occupied; (vi) have no less than 54.00% of the mortgaged properties securing group V loans be single family detached and no more than 24.00% planned unit developments; (vii) have no more than 42.00% of the group V loans be cash-out refinance; (viii) all of the subsequent mortgage loans with a loan to value ratio greater than 80% will be covered by a

Primary Insurance Policy; (ix) have no more than 48.00% of the group V loans be mortgage loans with an interest only period; (x) together with the group V loans already included in the trust, have no more than 1.50% of such mortgage loans (by aggregate Stated Principal Balance as of the Subsequent Cut-off Date) secured by mortgaged properties located in any one zip code; (xi) no more than 10.00% of the pool will have a credit score less than 625; (xii) no less than 15.00% the pool will have "full documentation"; (xiii) will have a weighted average loan to value ratio between 68.00% and 77.00% and (xiv) no more than 1.00% will have a loan to value ratio of greater than 95%.

Any conveyance of group VI subsequent HELOCs on a Subsequent Transfer Date is subject to certain conditions including, but not limited to the following: (a) each such HELOC must satisfy the representations and warranties specified in the related Subsequent Transfer Instrument; (b) the depositor will not select such HELOCs in a manner that it believes to be adverse to the interests of the noteholders or the Credit Enhancer; (c) the depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such HELOCs; (d) as of the related Subsequent Cut-off Date, each such HELOC will satisfy the following criteria: (i) such HELOC may not be 30 or more days delinquent as of the Subsequent Transfer Date; (ii) the remaining term to stated maturity of such HELOC will not exceed 300 months; (iii) such HELOC will be secured by a mortgage in a first or second lien position; (iv) such HELOC will have a fully-indexed margin between 0.000% and 7.000%; (v) each HELOC will have a credit limit less than $550,000; (vi) each HELOC will have a combined loan-to-value ratio less than or equal to 101%; (vii) each HELOC will have a credit limit utilization rate less than or equal to 101%; (viii) each HELOC will have a credit score greater than or equal to 600; (ix) no HELOC will provide for negative amortization; and (x) such HELOC shall have been underwritten substantially in accordance with the criteria set forth under "Description of the Mortgage Pool—Underwriting Standards" in this prospectus supplement.

Such pool of subsequent HELOCs transferred will have the following characteristics: (i) a weighted average fully-indexed margin of at least 1.510%; (ii) a weighted average combined loan-to-value ratio of no more than 92.00%; (iii) a weighted average credit score of 723 or greater; (iv) at least 60.00% of the HELOCs in the pool will be secured by a single family residence; (v) at least 95.00% of the HELOCs in the pool will be secured by an owner-occupied property; (vi) no more than 28.00% of the pool will have a loan purpose of cash-out refinance; (vii) cash-out refinance loans will have a maximum weighted average CLTV of 85.00%; (viii) no more than 7.00% of the pool will have a credit score less than 660; (ix) no less than 70.00% of the pool will have "full documentation"; (x) no more than 29.00% of the pool will be in the state of California; and (xi) no more than 10.00% of the pool will be in any state other than California.

Notwithstanding the foregoing, any group I, group II-C, group II-NC, group III, group IV or group V subsequent mortgage loan or group VI subsequent HELOC may be rejected by any one of the Rating Agencies if the inclusion of such mortgage loan or HELOC would adversely affect the ratings on any class of Notes, without, in the case of the Class VI-A Notes, taking the Policy into account.  In addition, minor variances from the characteristics stated above will be permitted with the consent of the Rating Agencies so long as there are compensating factors.  The final characteristics of the mortgage loans and HELOCs will be reflected in a Form 8-K which will be filed by the Depositor within 15 days of the end of the Funding Period.

## MORTGAGE LOAN ORIGINATION

American Home Mortgage Investment Corp. and, together with its direct or indirect wholly-owned subsidiaries, collectively referred to herein as American Home, is in the business of investing in mortgage-backed securities resulting from the securitization of residential mortgage loans that its subsidiaries originate and service.  As of March 31, 2005, American Home's mortgage-backed securities holdings business held a leveraged portfolio of mortgage-backed securities in the amount of approximately $7.2 billion in order to generate net interest income.  American Home's loan origination

business offers a broad array of mortgage products and primarily makes loans to borrowers with good credit profiles.  American Home originated approximately $23.1 billion in aggregate principal amount of loans in 2004.  American Home conducts lending through retail and wholesale loan production offices as well as its direct-to-consumer channel supported by American Home's call center.  American Home operates more than 400 retail and wholesale loan production offices located in 44 states and makes loans throughout all 50 states and the District of Columbia.  American Home's servicing business services the loans American Home retains for investment as well as certain loans for third parties.  As of March 31, 2005, American Home serviced approximately 118,000 loans with an aggregate principal amount of approximately $19.9 billion.

The common stock of American Home Mortgage Investment Corp. is publicly traded on the New York Stock Exchange under the ticker symbol "AHM".  The principal executive offices of American Home are located at 538 Broadhollow Road, Melville, New York 11747. The information set forth in the following paragraphs with respect to American Home has been provided by American Home.

*Underwriting Guidelines*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting standards and its Alt-A underwriting guidelines.  All of the Group I Loans and approximately 79.20%, 94.59%, 70.32%, 82.02% and 51.47% of the Group II-C, Group II-NC, Group III, Group IV and Group V Loans, respectively, were generally written in accordance with American Home's "prime" underwriting guidelines.  None of the Group I Loans and approximately 20.80%, 5.41%, 29.68%, 17.98% and 48.53% of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Loans, respectively, were generally written in accordance with American Home's Alt-A underwriting guidelines.

The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), the US Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the Department of Veterans Affairs.

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

The non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification

documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both.   Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home obtains a credit report that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.   A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700.   For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last 12 months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over thirty days after the due date for the most recent twelve months. In general, for Alt-A loans the borrower may have no more than one payment that was made over thirty days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector automated underwriting systems or they have been manually underwritten by American Home underwriters. American Home's Alt-A loan products have been approved manually by contract underwriters provided by certain mortgage insurance companies. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all conventional loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels.  For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting.  Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation.  Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

## HELOC ORIGINATION

The HELOCs were originated in accordance with American Home's Underwriting Guidelines.

*Underwriting Guidelines*

The following information generally describes American Home's underwriting guidelines with respect to HELOCs originated pursuant to its HELOC Stated Income/Full Asset Verification Second Mortgage Loans Program and its HELOC Full/Alternative Documentation Second Mortgage Loans Program, referred to as the SIFA Program and the FIFA Program, respectively, in this prospectus supplement.

*Asset/Reserve, Income and Employment Verification*

Under the SIFA Program, verification of income is waived, but must be disclosed accurately and must be deemed reasonable and consistent with borrower's profession or occupation.  The SIFA Program is available for salaried and self employed borrowers, including borrowers with commission income. Salaried borrowers must have been in the same line of work for a minimum of two years and employment status must be verified verbally.  Self employed borrowers must have been in the same business at the same location for a minimum of two years, must own 25% or more of a business, or be the owner of a sole proprietorship, corporation or partnership.  Self employment must be verified by either (i) a valid business license reflecting a minimum of two years of self-employment or (ii) a neutral third party, such as a CPA, regulatory agency or professional organization.  The source of all unearned or passive income must be verified through Full/Alternative documentation if it constitutes 50% or more of the qualifying income.  If the amount of passive income constitutes less than 50% of the qualifying income, the source only need be stated and not verified, as long as the amount of income claimed is reasonable based on the profile of the borrower.

The borrower is required to provide six months principal interest, taxes and insurance (total housing payment, including first and second liens) in verified liquid assets after close of escrow.  The

borrower must also supply two months' bank statements.  Loan proceeds are not an acceptable source of reserves, and cash-out proceeds from a refinance may not be used to meet the reserve requirement.  Accounts in the name of a corporation or partnership, or other party, and stock in a closely held corporation are not acceptable assets.

Full documentation under the FIFA Program is available for salaried and self employed borrowers, including borrowers with commission income, and is generally documented to the requirements of Fannie Mae in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets and other liabilities, except that (A) salaried borrowers must (i) have been employed in the same field for two years, or if the borrower has an employment history less than two years and was in school or the military, a diploma or discharge papers must be provided, (ii) explain employment gaps of more than 30 days in writing and (iii) provide computer generated paystubs and W-2's and (B) self-employed borrowers must (i) submit two years' most recent personal and business tax returns to verify that the borrower has been in the same business, at the same location for a minimum of two years, (ii) submit a year-to-date profit and loss statement dated within five months of the time of closing and (iii) own 25% or more of a business, or be the owner of a sole proprietorship, corporation or partnership.

Alternative documentation is available for salaried borrowers only.  When originating an equity loan simultaneously with a conforming loan amount first mortgage that was underwritten through Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector and received an Approve/Eligible or Accept result, respectively, the equity loan may be delivered with the same documentation required by the automated underwriting system certificate for the first lien so long as a copy of the automated underwriting system approval and the HUD-1 from the first lien are included in the second mortgage file, except that property inspection waivers are not permitted.  When originating an equity loan simultaneously with a non-conforming loan amount first mortgage that has been approved by American Home, the documentation requirement guidelines of the first mortgage loan are followed for the equity loan.  When originating a stand alone equity loan, borrowers with credit scores of 680 or greater need only provide the following: (i) when salaried, one month's pay stub and verbal verification of a minimum of two years of employment history; (ii) when salaried with overtime or bonus, one month's pay stub and verbal verification of a minimum of two years of employment history and the most recent year's W-2 or a completed verification of employment with a breakdown of overtime and/or bonus income; (iii) when salaried with commission income, one month's pay stub and verbal verification of a minimum of two year's employment history and the most recent year's tax return and IRS form 4506T; or (iv) when self-employed, the most recent year's personal and business tax returns, verification of two years of self-employment and IRS form 4506T.

When the home equity line of credit is used as a first lien, two months of principal, interest, taxes and insurance reserves are required, and cash-out proceeds from a refinance may not be used to meet the reserve requirement.  Reserve requirements are not applicable to piggyback or stand alone transactions in a subordinate position.

*Credit Criteria*

The originator obtains a credit report that summarizes each borrower's credit history.  The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion.  These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.  A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan.  Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent

attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores.

Under the SIFA Program, the lowest middle score, or the lower of two scores, of all borrowers is used, and all borrowers must have a minimum credit score of 620.

Under the FIFA Program, the lower of two credit scores or the middle of three credit scores for the highest wage earner is used (or if borrowers' incomes are equal, the lowest score of all borrowers is used), and all borrowers must have a minimum credit score of 620.

Each borrower under both programs must meet the following criteria:

- Minimum established credit must cover at least two years of credit history;

- three trade lines must be established, and at least one of them must be currently open and not be a collection or a charge-off, and one of the three trade lines must have had activity in the last six months;

- for credit scores greater than or equal to 720, no foreclosures or bankruptcies within the last seven years, and for credit scores between 620 and 719, no foreclosures or bankruptcies within the last five years (all with a minimum of twenty-four months of re-established credit that must include 3 trade lines in addition to the existing first mortgage with satisfactory payment rating, excluding accounts opened prior to the bankruptcy or foreclosure, and there may be no delinquencies after the bankruptcy or foreclosure);

- borrower has not participated in a consumer credit counseling plan within the last two years (with a minimum of twenty-four months of re-established credit that must include 3 trade lines in addition to the existing first mortgage with satisfactory payment rating, excluding accounts opened prior to the bankruptcy or foreclosure, and there may be no delinquencies after the bankruptcy or foreclosure);

- for credit scores greater than or equal to 720, no mortgage payments thirty days or more delinquent within the last twenty-four months, and for credit scores between 680 and 719, no mortgage payments thirty days or more delinquent within the last twelve months, and under the SIFA Program, for credit scores between 620 and 679, no mortgage payments thirty days or more delinquent within the last twelve months, and under the FIFA Program, for credit scores between 620 and 679, no more than one mortgage payment thirty days or more delinquent within the last twelve months;

- for credit scores between 620 and 659, no more than three payment delinquencies of 30 days or more on any trade lines within the past year; and

- for major adverse credit that is open or has been paid within the last twelve months, which includes collections, charge-off accounts, judgments, liens, repossessions, garnishments and ninety-day delinquencies, for credit scores greater than or equal to 720, with prior approval only if over $200, and for credit scores between 620 and 719, with prior approval only if over $500 (and all must be paid at closing).

*Maximum LTV/CLTV*

The maximum loan-to-value and combined loan-to-value requirements are limited based on the loan amount, property type, borrower's credit score, and underwriting documentation used as specified below.

The SIFA Program

Loans made for the purpose of purchasing or refinancing one unit condos used as a residence have a maximum loan amount of $150,000 and a maximum loan-to-value ratio that depends on the

borrower's credit score.  A maximum total combined lien of $750,000 applies when the loan-to-value ratio is 100%.  Property value limits also vary with the borrower's credit score.

The FIFA Program

Loans made for the purpose of purchasing or refinancing PUDs and low-rise condos used as a primary residence have maximum loan amounts which range from $100,000 to $1,000,000 and vary based on the loan-to-value ratios and the borrower's credit score. of $150,000 and a maximum loan-to-value ratio that depends on the borrower's credit score.  Maximum total combined lien restrictions also apply.

Loans made for the purpose of purchasing or refinancing high-rise condos used as a primary residence have maximum loan amounts which range from $100,000 to $500,000 and vary based on loan-to-value ratios and the borrower's credit score.

Loans made for the purchasing or refinancing two-unit properties used as a primary residence have maximum loan amounts which range from $100,000 to $1,000,000.

Loans made for the purpose of purchasing or refinancing 3-4 unit properties used as a primary residence have a maximum loan amount of $150,000 with a permitted loan-to-value ratio that varies with the borrower's credit score.

Loans made for the purpose of purchasing or refinancing second homes or investment property have a maximum loan amount of $150,000 with a permitted loan-to-value ratio that varies with the borrower's credit score. Manufactured homes and 2-4 unit properties are not permitted second homes or investment properties under the program.

*First Mortgage Requirements*

For second lien HELOCs, the following additional requirements apply with respect to the first lien mortgage:

The first lien mortgage may be one of the following:

- Conventional loan;
- FHA or VA loan (for stand alone transactions only); or
- Balloon loan, as long as the balloon loan has at least 36 months remaining on its current term, amortizes over 30 years and is a seven-year balloon or a five-year balloon with respect to a piggyback or stand alone transaction, respectively.

The first lien mortgage may not be one of the following:

- private party first lien;
- contract for deed, a contract for purchase or a land contract;
- first lien HELOC;
- all inclusive trust deed;
- reverse mortgage or a loan that provides for future advances;
- recapture lien or bonds with recapture taxes;
- negative amortization;
- FNMA Flex 100 loan; or
- California Veteran loan.

*Appraisal Requirements*

The appraisal requirement for the SIFA Program is dependent upon the loan amount and is as follows:

| Max Loan Amount / Property Value | (> 720) | (680 – 719) | (640 - 679) | (620 – 639) |
|---|---|---|---|---|
| Loans ≤ $100,000 | 2055 Exterior | 2055 Exterior | 2055 Exterior | 2055 Exterior |
| Loans > $100,000 | Full Appraisal | Full Appraisal | Full Appraisal | Full Appraisal |
| Value > $800,000 | Full Appraisal | Full Appraisal | Full Appraisal | Full Appraisal |

The appraisal requirement for the FIFA Program is dependent upon the loan amount and is as follows:

| Max Loan Amount / Property Value | (≥ 720) | (680 – 719) | (640 - 679) | (620 – 639) |
|---|---|---|---|---|
| Loans ≤ $30,000 | Stated Value[2] or 2055 Exterior[3] | Stated Value[2] or 2055 Exterior[3] | 2055 Exterior | 2055 Exterior |
| Loans ≤ $100,000 | 2055 Exterior[1,3] | 2055 Exterior[1,3] | 2055 Exterior[1] | 2055 Exterior[1] |
| Loans > $100,000 | Full Appraisal | Full Appraisal | Full Appraisal | Full Appraisal |
| Value > $800,000 | Full Appraisal | Full Appraisal | Full Appraisal | Full Appraisal |

(1)      Two to four unit properties are not eligible for Form 2055 Exterior and must use Form 1025/72, Small Residential Income Property Appraisal Report.

(2)      Stated Value is allowed with the following restrictions and must be indicated on the Uniform Underwriting Transmittal Summary (1008):

- 100% CLTV pricing.

- Owner-occupied SFRs or detached PUDs only.

- Second homes are not allowed.

- First lien HELOC's are not allowed.

- Requires minimum twelve-month property seasoning.

- Must use tax assessed value if property is located in Kansas.

- Stated Value is not allowed in the States of New York and West Virginia.

(3)      Piggyback transactions may allow the use of FNMA or FHLMC reduced appraisal forms #2075 or #2070.  The simultaneously closing first lien must be a conforming loan amount, which must be underwritten through DU or LP and receive an Approve/Eligible or Accept result.  The reduced appraisal form's eligibility must be indicated on the AUS certificate for the first lien.

## ADDITIONAL INFORMATION

The description of the mortgage pool and the mortgaged properties in this prospectus supplement, including Schedule A hereto, is based upon the mortgage pool as constituted at the close of business on the Cut-off Date, as adjusted for the stated principal payments due on or before this date.  Prior to the issuance of the Notes, initial mortgage loans and initial HELOCs may be removed from the mortgage pool as a result of incomplete documentation or otherwise if the Depositor deems this removal necessary or desirable, and may be prepaid at any time.  A limited number of other initial mortgage loans and initial HELOCs may be included in the mortgage pool prior to the issuance of the Notes unless including these mortgage loans or HELOCs would materially alter the characteristics of the mortgage pool as described in this prospectus supplement.  The Depositor believes that the information set forth in this prospectus supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the Notes are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans and HELOCs may vary.  In no event, however, will more than 10% (by principal balance at the Cut-off Date) of the mortgage loans or HELOCs deviate from the characteristics of the mortgage loans and HELOCs set forth in this prospectus supplement.  Within 15 days of the end of the Funding Period, tables reflecting the composition of the final pool of mortgage loans and HELOCs, will be filed by the Depositor on a Current Report on Form 8-K with the Commission.

## DESCRIPTION OF THE NOTES

### General

The American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2, will consist of thirty-two classes of Notes, twenty-seven of which are offered pursuant to this prospectus supplement.  The Class V-M-5, Class B, Class V-B, Class N-1 and Class N-2 Notes are not offered pursuant to this prospectus supplement.

The Trust Certificates, which are not offered hereby, will be entitled to payments on any payment date only after all required payments have been made on the Notes.  The principal balance of the Trust Certificates as of any date of determination will be equal to the aggregate Stated Principal Balance of the mortgage loans and HELOCs minus the aggregate Note Principal Balance of all the Notes (other than the Class N-1 Notes and Class N-2 Notes).  The Trust Certificates will be entitled to payments as provided in the Agreements.

The Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class V-A Notes represent an interest primarily in the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Loans, respectively, and Component II-A-3-C and Component IIA-3-NC represent an interest primarily in the Group II-C Loans and Group II-NC Loans, respectively.  Payments of principal on the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class V-A Notes will be made first from payments received from the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Loans, respectively, and payments of principal on Component II-A-3-C and Component II-A-3-NC will be made first from payments received from the Group II-C Loans and Group II-NC Loans, respectively.  The Class II-A-3 Notes will receive payments of interest and principal equal to the sum of the interest and principal payments on Component II-A-3-C and Component II-A-3-NC.  Notwithstanding any other language in the Agreements, any potential for payment of principal amounts from a Loan Group to the non-related Notes or components is a type of credit enhancement only, which has the effect of providing limited cross-collateralization.

The Class II-A-3 Notes will consist of two components, Component II-A-3-C and Component II-A-3-NC.  Payments to the Class II-A-3 Notes will be the sum of payments to its components.  The components of the Class II-A-3 Notes are not separately transferable.

The Class VI-A Notes represent an interest solely in the Group VI HELOCs.  The Class VI-A Notes are not entitled to any payments from the mortgage loans, and the other classes of Notes are not entitled to payments from the HELOCs.

The Class N-1 Notes and Class N-2 Notes will be entitled to receive all prepayment penalties and charges.  Any such amounts will not be retained by the RMBS Servicer as additional compensation.

The Notes will be issued by the Trust, the assets of which on the Closing Date will consist of the following:

- all of the Issuer's right, title and interest in and to the initial mortgage loans and initial HELOCs and subsequent mortgage loans and subsequent HELOCs, the related mortgage notes, mortgages and other related documents, including all interest and principal due with respect to the initial mortgage loans and initial HELOCs and subsequent mortgage loans and subsequent HELOCs after the Cut-off Date, but excluding any payments of principal or interest due on or prior to the Cut-off Date;
- additional draws under the HELOCs conveyed to the trust;
- any mortgaged properties acquired on behalf of the trust by foreclosure or by deed in lieu of foreclosure, and any revenues received thereon;
- the financial guaranty insurance policy issued by the Credit Enhancer for the benefit of the Class VI-A Notes only;
- the note guaranty insurance policy issued by the Note Insurer for the benefit of the Class V-A-4-D Notes only;
- the Cap Contract, which will primarily cover basis risk shortfalls on the Class V-A-2 Notes;
- the Corridor Contract, which will primarily cover basis risk shortfalls on the Class II-A Notes;
- the rights of the trust under all insurance policies required to be maintained pursuant to the Servicing Agreements;
- the Pre-Funding Accounts and Interest Coverage Accounts;
- the rights of the Depositor under the Mortgage Loan Purchase Agreement;
- such assets relating to the mortgage loans and HELOCs as from time to time may be held in the Protected Account, the Collection Account, the Securities Administrator Collection Account and the Payment Account;
- the rights with respect to the Servicing Agreements, to the extent assigned to the Issuer; and
- any proceeds of the foregoing.

The aggregate Stated Principal Balance of the initial mortgage loans and the initial HELOCs as of the Cut-off Date, after application of scheduled payments due whether or not received, is approximately $4,140,031,477 and $180,181,473, respectively, subject to a permitted variance as described in this prospectus supplement under "Additional Information."

Each class of Notes will have the initial Note Principal Balance as set forth on page S-6 hereof and will have the Note Interest Rate as defined under "Glossary" in this prospectus supplement.

The Offered Notes will be issued, maintained and transferred on the book-entry records of DTC, Clearstream and Euroclear and their participants in minimum denominations representing Note Principal Balances of (1) in the case of the Offered Notes, other than the Class VI-A Notes, $25,000 and integral multiples of $1 in excess thereof and (2) in the case of the Class VI-A Notes, $25,000 and integral

multiples of $1,000 in excess thereof.  The Notes will be issued as global notes.  See "Description of the Securities—Form of Securities" and "—Global Securities" in the accompanying prospectus.

Amounts payable to the Notes shall be paid by the Indenture Trustee as paying agent based on a report provided to them by the Securities Administrator.

**Book-Entry Notes**

The Offered Notes will initially be issued in book-entry form and are referred to herein as the Book-entry Notes.  Holders of the Book-entry Notes may elect to hold their Notes through DTC in the United States, or Clearstream Banking, société anonyme, formerly known as Cedelbank SA, or Clearstream, or Euroclear, in Europe if they are participants of their systems, or indirectly through organizations which are participants in their systems.  The Book-entry Notes will be issued in one or more securities which equal the aggregate Note Principal Balance of the Notes and will initially be registered in the name of Cede & Co., the nominee of DTC.  Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold the positions in customers' securities accounts in the depositaries' names on the books of DTC.  Investors may hold the beneficial interests in the Book-entry Notes in minimum denominations of $25,000 and integral multiples of $1 in excess thereof, except for the Class VI-A Notes.  Investors in the Class VI-A Notes may hold the beneficial interests in the Book-entry Notes in minimum denominations of $25,000 and integral multiples of $1,000 in excess thereof.  Except as described below, no beneficial owner of the Book-entry Notes will be entitled to receive a physical note, or definitive note, representing the security.  Unless and until definitive notes are issued, it is anticipated that the only holder of the Book-entry Notes will be Cede & Co., as nominee of DTC.  Note Owners will not be holders as that term is used in the Agreements.

A Note Owner's ownership of a Book-entry Note will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary that maintains the Note Owner's account for that purpose.  In turn, the financial intermediary's ownership of the Book-entry Notes will be recorded on the records of DTC, or of a participating firm that acts as agent for the financial intermediary, whose interest will in turn be recorded on the records of DTC, if the Note Owner's financial intermediary is not a DTC participant and on the records of Clearstream or Euroclear, as appropriate.

Note Owners will receive all payments of principal and interest on the Book-Entry Notes from the Indenture Trustee through DTC and DTC participants.  While the Book-entry Notes are outstanding, except under the circumstances described below, under the DTC rules, regulations and procedures, DTC is required to make book-entry transfers among participants on whose behalf it acts in connection with the Book-entry Notes and is required to receive and transmit payments of principal and interest on the Book-entry Notes.

Participants and indirect participants with whom Note Owners have accounts for Notes are similarly required to make book-entry transfers and receive and transmit the payments on behalf of their respective Note Owners.  Accordingly, although Note Owners will not possess definitive notes, the DTC rules provide a mechanism by which Note Owners will receive payments and will be able to transfer their interest.

Note Owners will not receive or be entitled to receive definitive notes representing their respective interests in the Book-entry Notes, except under the limited circumstances described below.  Unless and until definitive notes are issued, Note Owners who are not participants may transfer ownership of Book-entry Notes only through participants and indirect participants by instructing the participants and indirect participants to transfer the Book-entry Notes, by book-entry transfer, through DTC for the account of the purchasers of the Book-entry Notes, which account is maintained with their respective participants.  Under the DTC rules and in accordance with DTC's normal procedures, transfers of ownership of Notes will be executed through DTC and the accounts of the respective participants at DTC

will be debited and credited.  Similarly, the participants and indirect participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing Note Owners.

Under a book-entry format, Note Owners may experience delays in their receipt of payments, since the payments will be made by the Indenture Trustee to Cede & Co., as nominee for DTC.  Payments on Book-entry Notes held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary.  The payments will be subject to tax reporting in accordance with relevant United States tax laws and regulations.  Because DTC can only act on behalf of financial intermediaries, the ability of a Note Owner to pledge Book-entry Notes to persons or entities that do not participate in the depositary system, or otherwise take actions relating to the Book-entry Notes, may be limited due to the lack of physical notes for the Book-entry Notes.  In addition, issuance of the Book-entry Notes in book-entry form may reduce the liquidity of the Book-entry Notes in the secondary market since some potential investors may be unwilling to purchase securities for which they cannot obtain physical notes.

DTC has advised the Indenture Trustee and the Note Registrar that, unless and until definitive notes are issued, DTC will take any action permitted to be taken by a Noteholder under the Agreements only at the direction of one or more financial intermediaries to whose DTC accounts the Book-entry Notes are credited, to the extent that the actions are taken on behalf of financial intermediaries whose holdings include the Book-entry Notes.  Clearstream or the Euroclear operator, as the case may be, will take any other action permitted to be taken by Noteholders under the Agreements on behalf of a Clearstream participant or Euroclear participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depositary to effect the actions on its behalf through DTC.  DTC may take actions, at the direction of the related participants, with respect to some Notes which conflict with actions taken relating to other Notes.

Definitive notes will be issued to Note Owners or their nominees, respectively, rather than to DTC or its nominee, only if (1) the Depositor advises the Indenture Trustee or the Note Registrar in writing that DTC is no longer willing or able to properly discharge its responsibilities as clearing agency with respect to the Book-Entry Notes and the Depositor is unable to locate a qualified successor within 30 days or (2) the Depositor, at its option (with the consent of the Indenture Trustee, such consent not to be unreasonably withheld), elects to terminate the book-entry system through DTC.  Additionally, after the occurrence of an event of default under the indenture, any Note Owner materially and adversely affected thereby may, at its option, request and, subject to the procedures set forth in the indenture, receive a definitive note evidencing such Note Owner's percentage interest in the related class of Notes.

Upon its receipt of notice of the occurrence of any event described in the immediately preceding paragraph, the Note Registrar is required to request that DTC notify all Note Owners through its participants of the availability of definitive notes.  Upon surrender by DTC of the global note or definitive notes representing the Book-entry Notes and receipt of instructions for re-registration, the Note Registrar will reissue the Book-entry Notes as definitive notes issued in the respective Note Principal Balances owned by individual Note Owners, and thereafter the Note Registrar will recognize the holders of definitive notes as Noteholders under the Agreements.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of Notes among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures and the procedures may be discontinued at any time.  See Annex I to this prospectus supplement.

The Depositor, the Issuer, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Seller, the Indenture Trustee, the Note Registrar, the Securities Administrator and the Owner Trustee will have no liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Book-entry Notes held by Cede & Co.,

as nominee for DTC, or for maintaining, supervising or reviewing any records relating to beneficial ownership interests or transfers thereof.

For additional information regarding DTC, Clearstream, Euroclear and the Notes, see "Description of the Securities—Form of Securities" and "—Global Securities" in the prospectus.

**Interest Payments on the Class I-A, Class II-A, Class III-A, Class IV-A and Class M Notes**

On each payment date, the Indenture Trustee shall withdraw from the Payment Account the Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date and make the following payments, in the order of priority described below, in each case to the extent of the related Available Funds remaining for such payment date:

(1)    (a)    from the Group I Available Funds, concurrently to the holders of the Class I-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such classes for such payment date, plus any related Unpaid Interest Shortfall for such payment date;

    (b)    from the Group II-C Available Funds, concurrently to the holders of the Class II-A-1 Notes and Component II-A-3-C of the Class II-A-3 Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such class or related Accrued Component Interest for such component for such payment date, plus any related Unpaid Interest Shortfall for such payment date;

    (c)    from the Group II-NC Available Funds, concurrently to the holders of the Class II-A-2 Notes and Component II-A-3-NC of the Class II-A-3 Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such class or related Accrued Component Interest for such component for such payment date, plus any related Unpaid Interest Shortfall for such payment date;

    (d)    from the Group III Available Funds, to the holders of the Class III-A Notes, the related Accrued Note Interest for such class for such payment date, plus any related Unpaid Interest Shortfall for such payment date;

    (e)    from the Group IV Available Funds, concurrently to the holders of the Class IV-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for such classes for such payment date, plus any related Unpaid Interest Shortfall for such payment date;

(2)    from the remaining Group 1, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components, pro rata, based on entitlement, any remaining unpaid Accrued Note Interest and Unpaid Interest Shortfall for such payment date;

(3)    from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the holders of the Class M-1 Notes, the related Accrued Note Interest for such class for such payment date;

(4)    from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the holders of the Class M-2 Notes, the related Accrued Note Interest for such class for such payment date;

(5)    from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the holders of the Class M-3 Notes, the related Accrued Note Interest for such class for such payment date;

(6)    from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the holders of the Class M-4 Notes, the related Accrued Note Interest for such class for such payment date;

(7)    from the remaining Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date, to the holders of the Class M-5 Notes, the related Accrued Note Interest for such class for such payment date; and

(8)    any remainder (to the extent not included as part of the related Principal Distribution Amount) as part of the Net Monthly Excess Cashflow to be allocated as described under "– Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" below.

### Interest Payments on the Class V-A, Class V-M and Class V-B Notes

On each payment date, the Indenture Trustee shall withdraw from the Payment Account the Group V Available Funds and Class V-A-4-D Insured Amount, if any, for such payment date and make the following payments, in the order of priority described below, in each case to the extent of the Group V Available Funds and Class V-A-4-D Insured Amount, if any, remaining for such payment date:

(1)    to the holders of the Class V-A Notes, pro rata, based on their respective entitlements, the related Accrued Note Interest for each such class for such payment date, plus any related Unpaid Interest Shortfall for such payment date, including, in the case of the Class V-A-4-D Notes, the Class V-A-4-D Insured Amount, if any;

(2)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-M-1 Notes, the related Accrued Note Interest for such class for such payment date;

(3)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-M-2 Notes, the related Accrued Note Interest for such class for such payment date;

(4)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-M-3 Notes, the related Accrued Note Interest for such class for such payment date;

(5)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-M-4 Notes, the related Accrued Note Interest for such class for such payment date;

(6)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-M-5 Notes, the related Accrued Note Interest for such class for such payment date;

(7)    from the remaining Group V Available Funds for such payment date, to the holders of the Class V-B Notes, the related Accrued Note Interest for such class for such payment date; and

(8)    any remainder (to the extent not included as part of the related Principal Distribution Amount) as part of the Net Monthly Excess Cashflow to be allocated as described under "– Overcollateralization Provisions for Loan Group V" below.

If on any Payment Date, the Group V Available Funds is insufficient to pay Accrued Note Interest on the Class V-A-4-D Notes, the related shortfalls will be covered by the Note Insurance Policy; provided, that to the extent such shortfalls are caused  by prepayment interest shortfalls, Relief Act Shortfalls or Net WAC Shortfalls with respect to the Group V Loans, they will not be covered by the Note Insurance Policy.  Shortfalls covered by the Note Insurance Policy could occur, for example, if

delinquencies on the Group V Loans were exceptionally high and were not covered by Monthly Advances.

**Principal Payments on the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes**

On each payment date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event is in effect, the holders of each class of Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(1)    concurrently, the applicable Class A Principal Allocation Fraction of the related Principal Distribution Amount shall be allocated to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes, until the Note Principal Balances or Component Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(2)    concurrently, any remaining related Principal Distribution Amount shall be distributed to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes on a pro rata basis, based on the Note Principal Balances or Component Principal Balances thereof, as applicable, until the Note Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(3)    any remaining related Principal Distribution Amount, to the Class M-1 Notes until the Note Principal Balance of such Class is reduced to zero;

(4)    any remaining related Principal Distribution Amount, to the Class M-2 Notes until the Note Principal Balance of such Class is reduced to zero;

(5)    any remaining related Principal Distribution Amount, to the Class M-3 Notes until the Note Principal Balance of such Class is reduced to zero;

(6)    any remaining related Principal Distribution Amount, to the Class M-4 Notes until the Note Principal Balance of such Class is reduced to zero;

(7)    any remaining related Principal Distribution Amount, to the Class M-5 Notes until the Note Principal Balance of such Class is reduced to zero;

(8)　　　any remaining related Principal Distribution Amount, to the Class B Notes until the Note Principal Balance of such Class is reduced to zero; and

(9)　　　any remainder as part of the Net Monthly Excess Cashflow to be allocated as described under "– Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" below.

On each payment date (a) on or after the related Stepdown Date and (b) on which a related Trigger Event is not in effect, the holders of each class of Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(1)　　　concurrently, the related Class A Principal Allocation Fraction of the Class A Principal Distribution Amount shall be allocated to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes, until the Note Principal Balances or Component Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(2)　　　concurrently, any remaining Class A Principal Distribution Amount shall be distributed to the Class I-A Notes, Class II-A-1 Notes and Component II-A-3-C, Class II-A-2 Notes and Component II-A-3-NC, Class III-A and Class IV-A Notes on a pro rata basis, based on the Note Principal Balances or Component Principal Balances thereof, as applicable, until the Note Principal Balances thereof have been reduced to zero, with any amounts payable to the Class I-A Notes payable to the Class I-A-1, Class I-A-2 and Class I-A-3 Notes, pro rata, based on their respective Note Principal Balances, with amounts payable to the Class II-A-1 Notes and Component II-A-3-C payable to the Class II-A-1 Notes and Component II-A-3-C, pro rata, based on their Note Principal Balance or Component Principal Balance, with amounts payable to the Class II-A-2 Notes and Component II-A-3-NC payable to the Class II-A-2 Notes and Component II-A-3-NC, pro rata, based on their Note Principal Balance or Component Principal Balance, and with any amounts payable to the Class IV-A Notes payable to the Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, pro rata, based on their respective Note Principal Balances;

(3)　　　any remaining related Principal Distribution Amount shall be distributed to the Class M-1 Notes, the Class M-1 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(4)　　　any remaining related Principal Distribution Amount shall be distributed to the Class M-2 Notes, the Class M-2 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(5)　　　any remaining related Principal Distribution Amount shall be distributed to the Class M-3 Notes, the Class M-3 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(6)    any remaining related Principal Distribution Amount shall be distributed to the Class M-4 Notes, the Class M-4 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(7)    any remaining related Principal Distribution Amount shall be distributed to the Class M-5 Notes, the Class M-5 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(8)    any remaining related Principal Distribution Amount shall be distributed to the Class B Notes, the Class B Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero; and

(9)    any remainder as part of the Net Monthly Excess Cashflow to be allocated as described under "– Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" below.

The allocation of distributions in respect of principal to the Class I-A, Class II-A, Class III-A and Class IV-A Notes on each payment date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event has occurred, will have the effect of accelerating the amortization of the Class I-A, Class II-A, Class III-A and Class IV-A Notes, while, in the absence of Realized Losses, increasing the respective percentage interest in the aggregate Stated Principal Balance of the mortgage loans evidenced by the Class M Notes and Class B Notes.  Increasing the respective percentage interest in the trust of the Class M Notes and Class B Notes relative to that of the Class I-A, Class II-A, Class III-A and Class IV-A Notes is intended to preserve the availability of the subordination provided by the Class M Notes and Class B Notes.

## Principal Payments on the Class V-A, Class V-M and Class V-B Notes

On each payment date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event is in effect, the holders of each class of Class V-A, Class V-M and Class V-B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(1)    from the related Principal Distribution Amount, the Class V-A-1 Priority Amount shall be distributed to the Class V-A-1 Notes until the Note Principal Balance thereof has been reduced to zero;

(2)    any remaining related Principal Distribution Amount shall be distributed sequentially to the Class V-A-2, Class V-A-3, Class V-A-4 and Class V-A-1 Notes, in that order, in each until the Note Principal Balance thereof has been reduced to zero, with any amounts payable to the Class V-A-4 Notes payable to the Class V-A-4-A, Class V-A-4-B, Class V-A-4-C Notes and Class V-A-4-D Notes, pro rata, based on their respective Note Principal Balances;

(3)    any remaining related Principal Distribution Amount, to the Class V-M-1 Notes until the Note Principal Balance of such Class is reduced to zero;

(4)    any remaining related Principal Distribution Amount, to the Class V-M-2 Notes until the Note Principal Balance of such Class is reduced to zero;

(5)    any remaining related Principal Distribution Amount, to the Class V-M-3 Notes until the Note Principal Balance of such Class is reduced to zero;

(6)    any remaining related Principal Distribution Amount, to the Class V-M-4 Notes until the Note Principal Balance of such Class is reduced to zero;

(7)    any remaining related Principal Distribution Amount, to the Class V-M-5 Notes until the Note Principal Balance of such Class is reduced to zero;

(8)    any remaining related Principal Distribution Amount, to the Class V-B Notes until the Note Principal Balance of such Class is reduced to zero; and

(9)    any remainder as part of the Net Monthly Excess Cashflow for the Group V Loans to be allocated as described under "– Overcollateralization Provisions for Loan Group V" below.

On each payment date (a) on or after the related Stepdown Date and (b) on which a related Trigger Event is not in effect, the holders of each class of Class V-A, Class V-M and Class V-B Notes shall be entitled to receive payments in respect of principal to the extent of the related Principal Distribution Amount in the following amounts and order of priority:

(1)    from the Class V-A Principal Distribution Amount, the Class V-A-1 Priority Amount shall be distributed to the Class V-A-1 Notes until the Note Principal Balance thereof has been reduced to zero;

(2)    any remaining Class V-A Principal Distribution Amount shall be distributed sequentially to the Class V-A-2, Class V-A-3, Class V-A-4 and Class V-A-1 Notes, in that order, in each case until the Note Principal Balance thereof has been reduced to zero, with any amounts payable to the Class V-A-4 Notes payable to the Class V-A-4-A, Class V-A-4-B, Class V-A-4-C Notes and Class V-A-4-D Notes, pro rata, based on their respective Note Principal Balances;

(3)    any remaining related Principal Distribution Amount shall be distributed to the Class V-M-1 Notes, the Class V-M-1 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(4)    any remaining related Principal Distribution Amount shall be distributed to the Class V-M-2 Notes, the Class V-M-2 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(5)    any remaining related Principal Distribution Amount shall be distributed to the Class V-M-3 Notes, the Class V-M-3 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(6)    any remaining related Principal Distribution Amount shall be distributed to the Class V-M-4 Notes, the Class V-M-4 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(7)    any remaining related Principal Distribution Amount shall be distributed to the Class V-M-5 Notes, the Class V-M-5 Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero;

(8)    any remaining related Principal Distribution Amount shall be distributed to the Class V-B Notes, the Class V-B Principal Distribution Amount, until the Note Principal Balance thereof has been reduced to zero; and

(9)    any remainder as part of the Net Monthly Excess Cashflow for the Group V Loans to be allocated as described under "– Overcollateralization Provisions for Loan Group V" below.

The allocation of distributions in respect of principal to the Class V-A Notes on each payment date (a) prior to the related Stepdown Date or (b) on which a related Trigger Event has occurred, will have the effect of accelerating the amortization of the Class V-A Notes, while, in the absence of Realized Losses, increasing the respective percentage interest in the aggregate Stated Principal Balance of the mortgage loans evidenced by the Class V-M Notes and Class V-B Notes.  Increasing the respective percentage interest in the trust of the Class V-M Notes and Class V-B Notes relative to that of the Class

V-A Notes is intended to preserve the availability of the subordination provided by the Class V-M Notes and Class V-B Notes.

**Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV**

With respect to any payment date, any Net Monthly Excess Cashflow for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans shall be paid as follows, in each case to the extent of remaining related Net Monthly Excess Cashflow:

(1) to the holders of the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class M and Class B Notes and Class II-A-3 Components in an amount equal to the related Overcollateralization Increase Amount, payable to such holders as part of the related Principal Distribution Amount in the same priority as described under "—Principal Payments on the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes" above;

(2) to the holders of the Class I-A-2, Class I-A-3 and Class IV-A-3 Notes, on a pro rata basis, based on the amount of Allocated Realized Loss Amount for such Notes, an amount equal to the Allocated Realized Loss Amount for such Notes, to the extent not previously reimbursed;

(3) to the holders of the Class M-1 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(4) to the holders of the Class M-2 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(5) to the holders of the Class M-3 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(6) to the holders of the Class M-4 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(7) to the holders of the Class M-5 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(8) to the holders of the Class B Notes, an amount equal to any related Allocated Realized Loss Amount for such Notes, to the extent not previously reimbursed;

(9) to the holders of the Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components, on a pro rata basis, based on the amount of any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes or Components on such payment date, any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes or Components on such payment date, to the extent not covered by the

Corridor Contract or the Cap Contract as described under "Description of the Notes—The Derivative Contracts" below;

(10) sequentially to the holders of the Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Notes, any related Basis Risk Shortfall Carry-Forward Amount for such Notes on such payment date, to the extent not covered by the Corridor Contract or the Cap Contract as described under "Description of the Notes—The Derivative Contracts" below;

(11) to the Note Insurer, the aggregate of all payments, if any, made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed or covered under clause (1) under "—Overcollateralization Provisions for Loan Group V" below;

(12) up to and including the payment date in September 2035, to the Class V-A, Class V-M and Class V-B Notes, to be included in the related Net Monthly Excess Cashflow as described under "—Overcollateralization Provisions for Loan Group V" below;

(13) to the holders of the Class N-1 Notes and Class N-2 Notes as provided in the Indenture; and

(14) to the holders of the Trust Certificates as provided in the Indenture and the Trust Agreement.

**Overcollateralization Provisions for Loan Group V**

With respect to any payment date, any Net Monthly Excess Cashflow for the Group V Loans shall be paid as follows, in each case to the extent of remaining related Net Monthly Excess Cashflow:

(1) to the Note Insurer, the aggregate of all payments, if any, made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed;

(2) to the holders of the Class V-A, Class V-M and Class V-B Notes in an amount equal to the related Overcollateralization Increase Amount, payable to such holders as part of the related Principal Distribution Amount in the same priority as described under "—Principal Payments on the Class V-A, Class V-M and Class V-B Notes" above;

(3) to the holders of the Class V-A-4-B Notes, an amount equal to the Allocated Realized Loss Amount for such Notes, to the extent not previously reimbursed;

(4) to the holders of the Class V-M-1 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(5) to the holders of the Class V-M-2 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(6) to the holders of the Class V-M-3 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(7) to the holders of the Class V-M-4 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated

Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(8)     to the holders of the Class V-M-5 Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(9)     to the holders of the Class V-B Notes, first, an amount equal to any related Unpaid Interest Shortfalls for such Notes, and second, an amount equal to any related Allocated Realized Loss Amount for such Notes, in each case to the extent not previously reimbursed;

(10)    to the holders of the Class V-A Notes, on a pro rata basis, based on the amount of any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes on such payment date, any related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount for such Notes on such payment date, to the extent not covered by the Corridor Contract or the Cap Contract as described under "Description of the Notes—The Derivative Contracts" below;

(11)    sequentially to the holders of the Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4, Class V-M-5 and Class V-B Notes, any related Basis Risk Shortfall Carry-Forward Amount for such Notes on such payment date; to the extent not covered by the Corridor Contract or the Cap Contract as described under "Description of the Notes—The Derivative Contracts" below;

(12)    to the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes, to be included in the related Net Monthly Excess Cashflow as described under "— Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" above;

(13)    to the holders of the Class N-1 Notes and Class N-2 Notes as provided in the Indenture; and

(14)    to the holders of the Trust Certificates as provided in the Indenture and the Trust Agreement.

**Calculation of LIBOR for the LIBOR Notes**

On each Interest Determination Date, the Securities Administrator will determine the London interbank offered rate for one-month United States dollar deposits, or One-Month LIBOR, and, after the related Note Rate Change Date, the London interbank offered rate for six-month United States dollar deposits, or Six-Month LIBOR, for the next Accrual Period for the LIBOR Notes on the basis of the offered rates of the Reference Banks for one-month, six-month or one-year United States dollar deposits, as applicable, as such rate appears on the Telerate Screen Page 3750, as of 11:00 a.m. (London time) on such Interest Determination Date.

On each Interest Determination Date, if the related LIBOR rate does not appear or is not available on Telerate Screen Page 3750, One-Month LIBOR or Six-Month LIBOR for the related Accrual Period for the LIBOR Notes will be established separately by the Securities Administrator as follows:

(1)     If on such Interest Determination Date two or more Reference Banks provide such offered quotations, One-Month LIBOR or Six-Month LIBOR for the related Accrual Period shall be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 0.0625%).

(2)     If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, One-Month LIBOR or Six-Month LIBOR for the related Accrual Period shall be the higher of (x) One-Month LIBOR or Six-Month LIBOR as determined on the previous Interest Determination Date and (y) the Reserve Interest Rate.

(3)     If no such quotations can be obtained and no Reference Bank rate is available, One-Month LIBOR or Six-Month LIBOR, as applicable, will be the One-Month LIBOR rate or Six-Month LIBOR rate applicable to the preceding Accrual Period.

The establishment of One-Month LIBOR and Six-Month LIBOR on each Interest Determination Date by the Securities Administrator and the Securities Administrator 's calculation of the rate of interest applicable to the LIBOR Notes for the related Accrual Period shall (in the absence of manifest error) be final and binding.

**Description of the Note Insurance Policy**

On the Closing Date, the Note Insurer will issue the Note Insurance Policy in favor of the Indenture Trustee on behalf of the holders of the Class V-A-4-D Notes. The Note Insurance Policy will unconditionally and irrevocably guarantee certain payments on the Class V-A-4-D Notes.  Provided that timely notice has been received by the Note Insurer, the Note Insurer will be required to forward the Class V-A-4-D Insured Amount, if any, to the Indenture Trustee by the related payment date. For purposes of the foregoing, amounts in the Payment Account available for interest payments on any payment date shall be deemed to include all amounts in the Payment Account for such payment date available for payment on such payment date. Notwithstanding the foregoing two sentences, the Note Insurer shall not be obligated to pay any Class V-A-4-D Preference Amount in respect of principal (other than principal paid in connection with Realized Losses) except on the final scheduled payment date or earlier termination of the trust pursuant to the terms of the Indenture.  Prepayment interest shortfalls, Net WAC Shortfalls and any Relief Act Shortfalls will not be covered by the Note Insurance Policy. The Note Insurance Policy also will not cover any shortfalls as a result of limited earnings in the Group V Pre-Funding Account. Pursuant to the terms of the Indenture, draws under the Note Insurance Policy in respect of any Class V-A-4-D Insured Undercollateralization Amount with respect to the Class V-A-4-D Notes will be paid to the holders of the Class V-A-4-D Notes by the Paying Agent as principal. In the absence of payments under the Note Insurance Policy, holders of the Class V-A-4-D Notes will directly bear the credit risks associated with their investment to the extent such risks are not covered by overcollateralization or otherwise.

**IN THE EVENT THAT THE NOTE INSURER WERE TO BECOME INSOLVENT, ANY CLAIMS ARISING UNDER THE POLICY WOULD BE EXCLUDED FROM COVERAGE BY THE CALIFORNIA INSURANCE GUARANTY ASSOCIATION, ESTABLISHED PURSUANT TO THE LAWS OF THE STATE OF CALIFORNIA.**

**The Derivative Contracts**

*The Derivative Counterparty*

The Derivative Counterparty is a bankruptcy remote derivatives product company based in New York, New York that has been established as a wholly-owned subsidiary of The Bear Stearns Companies Inc. The Derivative Counterparty maintains a ratings classification of "AAA" from Standard & Poor's and "Aaa" from Moody's. The Derivative Counterparty will provide upon request, without charge, to each person to whom this prospectus supplement is delivered, a copy of (i) the ratings analysis from each of Standard & Poor's and Moody's evidencing those respective ratings or (ii) the most recent audited annual financial statements of the Derivative Counterparty. Requests for such information should be directed to the DPC Manager of Bear Stearns Financial Products Inc. at (212) 272-4009 or in writing to 383 Madison Avenue, New York, New York 10179. The Derivative Counterparty is an affiliate of Bear, Stearns & Co. Inc.

*The Cap Contract*

On the Closing Date, either the Seller will assign to the Depositor, and the Depositor will assign to the Owner Trustee for the benefit of the notes, its rights under the Cap Contract, or the Depositor will cause the Owner Trustee, on behalf of the trust, to enter into the Cap Contract with the Derivative Counterparty.

The Cap Contract will contain a Cap Rate and provide for the calculation of One-Month LIBOR. The Cap Contract will provide for payments to be made to the Indenture Trustee if One-Month LIBOR (as determined pursuant to the Cap Contract) exceeds the related Cap Rate. The Cap Contract will primarily cover Basis Risk Shortfall Carry-Forward Amounts on the Class V-A-2 Notes. On any Payment Date, any amounts from the Cap Contract not paid to the Class V-A-2 Notes will be paid to the holders of some of the notes as described below and will not be available to make payments to the Class V-A-2 Notes on future Payment Dates.

Payments will be made with respect to the Cap Contract in accordance with a notional balance based on the schedule set forth therein. With respect to any payment date on or prior to the termination of the Cap Contract, the amount, if any, payable by the Derivative Counterparty under the Cap Contract will equal the product of (i) the excess, if any, of (x) One-Month LIBOR (as determined pursuant to the Cap Contract) over (y) the Cap Rate for such payment date, (ii) an amount equal to the notional balance for such payment date (which, in the case of payments to be made to the Class V-A-2 Notes, will be the lesser of (a) the notional balance on the schedule and (b) the Note Principal Balance of the Class V-A-2 Notes) and (iii) the actual number of days in the related Accrual Period, divided by 360.

The Cap Rates and scheduled notional balances of the Cap Contract are set forth in the following table:

| Period | Class V-A-2 Cap Notional Balance ($) | Class V-A-2 Cap Rate (%) |
|---|---|---|
| July 25, 2005............. | 581,158,000.00 | 4.76 |
| August 25, 2005........ | 572,829,408.35 | 5.88 |
| September 25, 2005 .. | 563,125,826.35 | 5.88 |
| October 25, 2005....... | 552,059,876.14 | 6.09 |
| November 25, 2005... | 539,647,802.53 | 5.88 |
| December 25, 2005 ... | 525,910,028.16 | 6.09 |
| January 25, 2006....... | 510,871,137.43 | 5.89 |
| February 25, 2006..... | 494,559,839.74 | 5.89 |
| March 25, 2006......... | 477,008,911.62 | 6.54 |
| April 25, 2006........... | 458,255,117.68 | 5.89 |
| May 25, 2006............. | 438,339,110.22 | 6.09 |
| June 25, 2006............ | 417,305,307.68 | 5.89 |
| July 25, 2006............. | 395,201,752.01 | 6.09 |
| August 25, 2006........ | 373,495,936.36 | 5.89 |
| September 25, 2006 .. | 352,180,752.22 | 5.89 |
| October 25, 2006....... | 331,249,217.56 | 6.09 |
| November 25, 2006... | 310,694,474.57 | 5.89 |
| December 25, 2006 ... | 290,509,787.45 | 6.09 |
| January 25, 2007....... | 270,688,540.23 | 5.89 |
| February 25, 2007..... | 251,224,234.71 | 5.89 |
| March 25, 2007......... | 232,110,488.28 | 6.55 |
| April 25, 2007........... | 213,341,031.94 | 5.89 |
| May 25, 2007............ | 194,909,708.26 | 6.10 |
| June 25, 2007............ | 176,810,469.41 | 5.90 |

S-76

| Period | Class V-A-2 Cap Notional Balance ($) | Class V-A-2 Cap Rate (%) |
|---|---|---|
| July 25, 2007............. | 159,037,375.18 | 6.10 |
| August 25, 2007........ | 141,584,591.12 | 5.90 |
| September 25, 2007 .. | 124,446,386.63 | 5.90 |
| October 25, 2007....... | 107,617,133.16 | 6.10 |
| November 25, 2007... | 91,091,302.31 | 5.90 |
| December 25, 2007... | 74,863,464.18 | 6.10 |
| January 25, 2008....... | 58,928,285.50 | 5.90 |
| February 25, 2008..... | 43,280,527.99 | 5.90 |
| March 25, 2008......... | 27,915,046.67 | 6.33 |
| April 25, 2008........... | 12,826,788.16 | 5.91 |

On each payment date, any payments received from the Derivative Counterparty with respect to such payment date from the Cap Contract will be allocated in the following order of priority:

(1)     the amount received from the Cap Contract will be allocated first to the Class V-A-2 Notes, in reduction of any related Basis Risk Shortfall Carry-Forward Amount for such class for that payment date; and

(2)     from any amounts remaining from the Cap Contract, as part of the Excess Derivative Payment Amount, to be paid as described under "—The Corridor Contract" below.

**The Corridor Contract**

On the Closing Date, either the Seller will assign to the Depositor, and the Depositor will assign to the Owner Trustee for the benefit of the Class II-A Notes, its rights under the Corridor Contract, or the Depositor will cause the Owner Trustee on behalf of the trust, to enter into the Corridor Contract with the Derivative Counterparty.

The Corridor Contract will contain a Strike Rate and Ceiling Rate and provide for the calculation of One-Month LIBOR.  The Corridor Contract will provide for payments to be made to the Indenture Trustee if One-Month LIBOR (as determined pursuant to the Corridor Contract, but not more than the Ceiling Rate) exceeds the related Strike Rate.  The Corridor Contract will primarily cover Basis Risk Shortfall Carry-Forward Amounts on the Class II-A Notes.  On any payment date, any amounts from the Corridor Contract not paid to the Class II-A Notes generally will be paid as part of Excess Derivative Payment Amount as described below and will not be available to make payments to the Class II-A Notes on future payment dates.

Payments will be made with respect to the Corridor Contract in accordance with a notional balance based on the schedule set forth therein.  With respect to any payment date on or prior to the termination of the Corridor Contract, the amount, if any, payable by the Derivative Counterparty under the Corridor Contract will equal the product of (i) the excess, if any, of the lesser of (1) One-Month LIBOR (as determined pursuant to the Corridor Contract) over the Strike Rate for such payment date and (2) the Ceiling Rate for such payment date over the Strike Rate for such payment date, (ii) an amount equal to the notional balance for such payment date (which will be the lesser of (a) the notional balance on the schedule and (b) the aggregate Note Principal Balance of the Class II-A Notes) and (iii) 1/12.

| Payment Date | Corridor Contract Notional Amount ($) | Strike Rate (%) | Ceiling Rate (%) |
|---|---|---|---|
| July 25, 2005 ............. | 1,070,098,000.00 | 3.64 | 8.00 |
| August 25, 2005 ........ | 1,038,761,389.29 | 3.89 | 8.00 |
| September 25, 2005 ... | 1,008,281,440.98 | 4.03 | 8.00 |
| October 25, 2005 ....... | 978,635,171.57 | 4.05 | 8.00 |
| November 25, 2005 ... | 949,800,162.47 | 4.07 | 8.00 |
| December 25, 2005 .... | 921,752,948.94 | 4.10 | 8.00 |
| January 25, 2006 ....... | 894,471,770.66 | 3.82 | 8.00 |
| February 25, 2006 ...... | 867,935,581.77 | 3.83 | 8.00 |
| March 25, 2006 ......... | 842,123,715.01 | 3.84 | 8.00 |
| April 25, 2006 ........... | 817,016,188.13 | 3.86 | 8.00 |
| May 25, 2006 ............. | 792,593,625.30 | 3.87 | 8.00 |
| June 25, 2006 ............. | 768,837,157.08 | 4.51 | 8.00 |
| July 25, 2006 ............. | 745,735,090.89 | 4.55 | 8.00 |
| August 25, 2006 ........ | 723,267,515.76 | 4.56 | 8.00 |
| September 25, 2006 ... | 701,411,859.13 | 4.56 | 8.00 |
| October 25, 2006 ....... | 680,151,405.74 | 4.57 | 8.00 |
| November 25, 2006 ... | 659,469,687.15 | 4.58 | 8.00 |
| December 25, 2006 .... | 639,350,799.85 | 4.59 | 8.00 |
| January 25, 2007 ....... | 619,779,281.56 | 4.59 | 8.00 |
| February 25, 2007 ...... | 600,740,116.46 | 4.60 | 8.00 |
| March 25, 2007 ......... | 582,218,687.67 | 4.61 | 8.00 |
| April 25, 2007 ........... | 564,200,733.00 | 4.61 | 8.00 |
| May 25, 2007 ............. | 546,672,460.00 | 4.62 | 8.00 |
| June 25, 2007 ............. | 529,620,427.75 | 5.70 | 9.00 |
| July 25, 2007 ............. | 509,523,502.17 | 5.69 | 9.00 |
| August 25, 2007 ........ | 490,159,109.49 | 5.68 | 9.00 |
| September 25, 2007 ... | 471,495,534.97 | 5.68 | 9.00 |
| October 25, 2007 ....... | 453,504,082.39 | 5.67 | 9.00 |
| November 25, 2007 ... | 436,157,364.91 | 5.66 | 9.00 |
| December 25, 2007 .... | 419,429,247.03 | 5.66 | 9.00 |
| January 25, 2008 ....... | 403,294,797.58 | 5.65 | 9.00 |
| February 25, 2008 ...... | 387,730,185.92 | 5.64 | 9.00 |
| March 25, 2008 ......... | 372,712,657.80 | 5.64 | 9.00 |
| April 25, 2008 ........... | 358,220,488.74 | 5.63 | 9.00 |
| May 25, 2008 ............. | 344,232,923.17 | 5.63 | 9.00 |

On each payment date, any payments received from the Derivative Counterparty with respect to the Corridor Contract will be allocated in the following order of priority:

(1)     first, the amount received from the Corridor Contract will be allocated to the Class II-A-1 Notes, the Class II-A-2 Notes, and the Class II-A-3 Components, pro rata, based on entitlement, in reduction of any related Basis Risk Shortfall Carry-Forward Amount for such class or component for that payment date; and

(2)     any remaining amounts from the Corridor Contract shall be included in the Excess Derivative Payment Amount and shall be paid as provided in the following paragraph.

On each payment date, the Excess Derivative Payment Amount shall be paid as follows, in each case to the extent of amounts remaining:

(1)    first, to the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class V-A Notes and the Class II-A-3 Components, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Shortfall Carry-Forward Amount or Net WAC Shortfall Carry-Forward Amount, as applicable, for such class or classes or component or components for that payment date;

(2)    second, to the Class M-1, Class V-M-1 and Class V-M-2 Notes, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Shortfall Carry-Forward Amount for such class or classes for that payment date;

(3)    third, to the Class M-2, Class M-3 and Class V-M-3 Notes, pro rata, based on entitlement, in reduction of any remaining related Basis Risk Carry-Forward Amount for such class or classes for that payment date; and

(4)    fourth, to the Trust Certificates as provided in the Indenture and the Trust Agreement.

It is not expected that the Excess Derivative Payment Amount will be material on any payment date.

**Allocation of Losses on the Mortgage Loans**

With respect to any defaulted mortgage loan that is finally liquidated through foreclosure sale, disposition of the related mortgaged property if acquired on behalf of the trust by deed-in-lieu of foreclosure or otherwise, the amount of loss realized, if any, will equal the portion of the unpaid principal balance remaining, if any, plus interest thereon through the last day of the month in which such mortgage loan was finally liquidated, after application of all amounts recovered (net of amounts reimbursable to the RMBS Servicer or RMBS Master Servicer for Monthly Advances and Servicing Fees, servicing advances and certain other amounts specified in the RMBS Servicing Agreement and RMBS Master Servicing Agreement, as applicable) towards interest and principal owing on the mortgage loan.  The amount of such loss realized on a mortgage loan, together with the amount of any Deficient Valuation, in respect of a mortgage loan is referred to in this prospectus supplement as a Realized Loss.

There are two types of Bankruptcy Losses that can occur with respect to a mortgage loan, Deficient Valuations and Debt Service Reductions.  In the case of a Deficient Valuation, the Trust would become an unsecured creditor to the extent of the difference between the unpaid principal balance of such mortgage loan and such reduced debt.  The principal portion of Debt Service Reductions will not be allocated in reduction of the Note Principal Balance of any class of Notes. However, regardless of when they occur, Debt Service Reductions may reduce the amount of related Available Funds that would otherwise be available for distribution on a payment date.

Any Realized Losses on the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV will be allocated or covered on any payment date as follows: first, to the related Net Monthly Excess Cashflow, by an increase in the related Overcollateralization Increase Amount for that payment date; second, in reduction of the related Overcollateralized Amount, until reduced to zero (meaning, no losses will be allocated to the Class B Notes or Class M Notes until the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A, Class M and Class B Notes equals the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV); third, to the Class B Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fourth, to the Class M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fifth, to the Class M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; sixth, to the Class M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; seventh, to the Class M-2 Notes, in

reduction of the Note Principal Balance thereof, until reduced to zero; eighth, to the Class M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; and ninth, (x) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group I, to the Class I-A-3 Notes and Class I-A-2 Notes, in that order, in reduction of the Note Principal Balance thereof, until reduced to zero and (y) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group IV, to the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-2 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes, in reduction of the Note Principal Balance thereof, until reduced to zero.

Any Realized Losses on the mortgage loans in Loan Group V will be allocated or covered on any payment date as follows: first, to the related Net Monthly Excess Cashflow, by an increase in the related Overcollateralization Increase Amount for that payment date; second, in reduction of the related Overcollateralized Amount, until reduced to zero; third, to the Class V-B Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fourth, to the Class V-M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fifth, to the Class V-M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; sixth, to the Class V-M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; seventh, to the Class V-M-2 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; eighth, to the Class V-M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero, and ninth, to the Class V-A-4-B Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class V-A-4-A Notes and Class V-A-4-B Notes divided by (y) the aggregate Note Principal Balance of all of the Class V-A-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero.

The Indenture does not permit the allocation of Realized Losses to the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and Class II-A-3 Components. Investors in the Class I-A-1, Class II-A-1, Class II-A-2, Class III-A, Class IV-A-1, Class IV-A-2, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-4-A, Class V-A-4-C, Class V-A-4-D Notes and Class II-A-3 Components should note that although Realized Losses will not be allocated to their Notes, under certain loss scenarios there will not be enough principal and interest on the mortgage loans to pay their Notes all interest and principal amounts to which they are then entitled.

Allocated Realized Loss Amounts may be repaid to the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes from Net Monthly Excess Cashflow, according to the priorities set forth under "—Overcollateralization Provisions" above.

Any allocation of a Realized Loss to a Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Note will be made by reducing the Note Principal Balance thereof by the amount so allocated as of the payment date in the month following the calendar month in which such Realized Loss was incurred. Notwithstanding anything to the contrary described in this prospectus supplement, in no event will the Note Principal Balance of any Note be reduced more than once in respect of any particular amount both (i) allocable to such Note in respect of Realized Losses and (ii) payable as principal to the holder of such Note from related Net Monthly Excess Cashflow.

In order to maximize the likelihood of a payment in full of amounts of interest and principal to be distributed to the holders of the Class I-A, Class II-A, Class III-A and Class IV-A Notes on each payment date, holders of the Class I-A, Class II-A, Class III-A and Class IV-A Notes have a right to payment of the related Available Funds that is prior to the rights of the holders of the Class M Notes and Class B Notes.  In order to maximize the likelihood of a payment in full of amounts of interest and principal to be distributed to the holders of the Class M Notes on each payment date, holders of the Class M Notes have a right to payment of the related Available Funds that is prior to the rights of the holders of the Class M Notes with a lower payment priority and the Class B Notes. In addition, overcollateralization and the

application of related Net Monthly Excess Cashflow will also increase the likelihood of payment in full of amounts of interest and principal to the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes on each payment date.

In order to maximize the likelihood of a payment in full of amounts of interest and principal to be distributed to the holders of the Class V-A Notes on each payment date, holders of the Class V-A Notes have a right to payment of the related Available Funds that is prior to the rights of the holders of the Class V-M Notes and Class V-B Notes.  In order to maximize the likelihood of a payment in full of amounts of interest and principal to be distributed to the holders of the Class V-M Notes on each payment date, holders of the Class V-M Notes have a right to payment of the related Available Funds that is prior to the rights of the holders of the Class V-M Notes with a lower payment priority and the Class V-B Notes. In addition, overcollateralization and the application of related Net Monthly Excess Cashflow will also increase the likelihood of payment in full of amounts of interest and principal to the Class V-A Notes and Class V-M Notes and Class V-B Notes on each payment date.

If, after taking into account Subsequent Recoveries, the amount of a Realized Loss is reduced, the amount of such Subsequent Recoveries will be applied to increase the Note Principal Balance of the class of Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, as applicable, with the highest payment priority to which Realized Losses have been allocated, but not by more than the amount of Realized Losses previously allocated to that class of Notes.  The amount of any remaining Subsequent Recoveries will be applied to increase the Note Principal Balance of the class of Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, as applicable, with the next highest payment priority, up to the amount of such Realized Losses previously allocated to that class of Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, as applicable, and so on. Holders of such Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class V-M and Class V-B Notes, as applicable, will not be entitled to any payment in respect of Accrued Note Interest on the amount of such increases for any Accrual Period preceding the Payment Date on which such increase occurs. Any such increases shall be applied to the Note Principal Balance of each Note of such class in accordance with its respective percentage interest.

**Interest Coverage Accounts**

On the Closing Date, the Depositor will deliver to the Indenture Trustee for deposit in the Interest Coverage Accounts a cash amount as specified in the Indenture.  On each payment date during the Funding Period and on the payment date immediately following the termination of the Funding Period, funds on deposit in the Interest Coverage Accounts will be applied by the Indenture Trustee to cover shortfalls in the amount of interest generated by the related assets in the trust attributable to the pre-funding feature.  The Indenture permits funds in the Interest Coverage Accounts, to the extent that they will not be needed to fund any shortfall of the kind described above, to be released by the Indenture Trustee to the Seller or its designee at the end of the pre-funding period as provided therein.

**Payments on the Class VI-A Notes**

On each Payment Date, the Investor Interest Collections, reduced by the HELOC Back-Up Servicing Fee, the HELOC Servicing Fee and any unreimbursed nonrecoverable servicing advances previously made, will be distributed in the following order of priority:

(1)     to the Credit Enhancer, the premium due for the Policy;

(2)     to the holders of the Class VI-A Notes, accrued interest and unpaid interest, in each case accrued at a rate equal to the related Note Interest Rate;

(3)     to the holders of the Class VI-A Notes, as a payment of principal, Investor Charge-Off Amounts incurred during the preceding Due Period and the Investor Charge-Off

Amounts incurred during previous periods that were not subsequently funded by Investor Interest Collections, overcollateralization or draws under the Policy;

(4)   to the Credit Enhancer, as reimbursement for prior draws made under the Policy;

(5)   to the holders of the Class VI-A Notes, as a payment of principal, the amount necessary to build the overcollateralization to the Overcollateralization Target Amount;

(6)   to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the Insurance Agreement;

(7)   to the holders of the Class VI-A Notes, Basis Risk Shortfall Carry-Forward Amounts for such Notes on such payment date;

(8)   to the owner of the Transferor Interest, any amounts required to be paid pursuant to the Agreements; and

(9)   to the holder of the Owner Trust Certificates, any remaining amounts.

On each Payment Date, Principal Collections on the HELOCs will be distributed in the following order of priority:

(1)   to the holders of the Class VI-A Notes, the lesser of the outstanding Note Principal Balance of the Class VI-A Notes and the Investor Principal Distribution Amount;

(2)   to the Credit Enhancer, as reimbursement for prior draws made under the Policy, to the extent not paid out of Investor Interest Collections;

(3)   to the owner of the Transferor Interest, any amounts required to be paid pursuant to the Agreements; and

(4)   to the holder of the Owner Trust Certificates, any remaining amounts.

**Rapid Amortization Events**

A Rapid Amortization Event is any of the following events:

(1)   Investor Interest Collections or Principal Collections for any Payment Date are not enough to make any required payment of interest or principal in each case that is due on the Class VI-A Notes, and such failure continues for a period of five Business Days;

(2)   a declaration of bankruptcy or insolvency by any of the Trust, the Depositor, or the HELOC Servicer;

(3)   the Trust becomes subject to the Investment Company Act of 1940;

(4)   failure on the part of the Trust, the Depositor, the Seller, the HELOC Back-Up Servicer or the HELOC Servicer to perform any of its other material obligations under the HELOC Servicing Agreement, the HELOC Back-Up Servicing Agreement, the Trust Agreement or the Indenture;

(5)   a draw on the Policy is unreimbursed for 90 days; or

(6)   the occurrence of a HELOC Servicer Termination Event.

If any event described in clause (1) or (4) occurs, a Rapid Amortization Event will occur only if, after the applicable grace period, either the Indenture Trustee, the Credit Enhancer, or the Indenture Trustee acting at the direction of the noteholders holding notes evidencing more than 51% in principal amount of the Class VI-A Notes then outstanding, with the consent of the Credit Enhancer, by written notice to the holder of the Transferor's Interest, the depositor and the HELOC Servicer (and to the Indenture Trustee, if given by the Credit Enhancer, or the noteholders) declare that a Rapid Amortization

Event has occurred. If any event described in clauses (2), (3), (5) or (6) occurs, a Rapid Amortization Event will occur without any notice or other action on the part of the Indenture Trustee, the Credit Enhancer or the noteholders immediately on the occurrence of such event.

Notwithstanding the foregoing, if a conservator, receiver or trustee-in-bankruptcy is appointed for the HELOC Servicer and no Rapid Amortization Event exists other than the conservatorship, receivership or insolvency of the HELOC Servicer, the conservator, receiver or trustee-in-bankruptcy may have the power to prevent the commencement of a Rapid Amortization Event.

**The Policy**

The following information has been supplied by the Credit Enhancer for inclusion in this prospectus supplement. The Credit Enhancer does not accept any responsibility for the accuracy or completeness of this prospectus supplement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the Policy and the Credit Enhancer set forth under the headings "Description of the Notes – The Policy" and "The Credit Enhancer" in this prospectus supplement. Additionally, the Credit Enhancer makes no representation regarding the Notes or the advisability of investing in the Notes.

The Credit Enhancer, in consideration of the payment of a premium and subject to the terms of the Policy, thereby unconditionally and irrevocably guarantees to any holder of the Class VI-A Notes that an amount equal to each full and complete Insured Payment will be received from the Credit Enhancer by the Indenture Trustee or its successors, as Indenture Trustee for the holders of the Class VI-A Notes, on behalf of the holders of the Class VI-A Notes, for distribution by the Indenture Trustee to each holder of a Class VI-A Note of that holder's proportionate share of the Insured Payment.

The Credit Enhancer will pay a Deficiency Amount with respect to the Class VI-A Notes by 12:00 noon (New York City Time) in immediately available funds to the Indenture Trustee on the later of (i) the second Business Day following the Business Day on which the Credit Enhancer shall have received Notice that a Deficiency Amount is due in respect of the Class VI-A Notes, and (ii) the payment date on which the related Deficiency Amount is payable to the holders of the Class VI-A Notes pursuant to the Indenture, for disbursement to the holders of the Class VI-A Notes in the same manner as other payments with respect to the Class VI-A Notes are required to be made. Any Notice received by the Credit Enhancer after 12:00 noon New York City time on a given Business Day or on any day that is not a Business Day shall be deemed to have been received by the Credit Enhancer on the next succeeding Business Day.

Upon payment of a Deficiency Amount, the Credit Enhancer shall be fully subrogated to the rights of the holders of the Class VI-A Notes to receive the amount so paid. The Credit Enhancer's obligations with respect to the Class VI-A Notes with respect to each Payment Date shall be discharged to the extent funds consisting of the related Deficiency Amount are received by the Indenture Trustee on behalf of the holders of the Class VI-A Notes for payment to such holders, as provided in the Indenture and herein, whether or not such funds are properly applied by the Indenture Trustee.

If any portion or all of any amount that is insured hereunder that was previously distributed to a holder of Class VI-A Notes is recoverable and recovered from such holder as a voidable preference by a trustee in bankruptcy pursuant to the U.S. Bankruptcy Code, pursuant to a final non-appealable order of a court exercising proper jurisdiction in an insolvency proceeding (a "Final Order") (such recovered amount, a "Preference Amount"), the Credit Enhancer will be required to pay as an Insured Payment an amount equal to each such Preference Amount by 12:00 noon on the second Business Day following receipt by the Credit Enhancer on a Business Day of (x) a certified copy of the Final Order, together with an opinion of counsel satisfactory to the Credit Enhancer that the order is final and not subject to appeal, (y) an assignment, in form reasonably satisfactory to the Credit Enhancer, irrevocably assigning to the Credit Enhancer all rights and claims of the Indenture Trustee and/or such holder of the Class VI-A Notes

relating to or arising under any Class VI-A Notes against the debtor who paid such Preference Amount and constituting an appropriate instrument, in form satisfactory to the Credit Enhancer, appointing the Credit Enhancer as the agent of the Indenture Trustee and/or such holder in respect of such Preference Amount, including without limitation in any legal proceeding related to the Preference Amount, and (z) a Notice appropriately completed and executed by the Securities Administrator or such holder, as the case may be.  Such payment shall be made to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in the Final Order and not to the Indenture Trustee or holder of the Class VI-A Notes directly (unless the holder has previously paid such amount to such receiver, conservator, debtor-in-possession or trustee named in such Final Order in which case payment shall be made to the Indenture Trustee for distribution to the holder upon delivery of proof of such payment reasonably satisfactory to the Credit Enhancer).  Notwithstanding the foregoing, in no event shall the Credit Enhancer be (i) required to make any payment under this Surety Bond in respect of any Preference Amount to the extent such Preference Amount is comprised of amounts previously paid by the Credit Enhancer hereunder, or (ii) obligated to make any payment in respect of any Preference Amount, which payment represents a payment of the principal amount of any Class VI-A Notes, prior to the time the Credit Enhancer otherwise would have been required to make a payment in respect of such principal, in which case the Credit Enhancer shall pay the balance of the Preference Amount when such amount otherwise would have been required.

Any of the documents required under clauses (x) through (z) of the preceding paragraph that are received by the Credit Enhancer after 12:00 noon, New York City time on a given business day or on any day that is not a business day shall be deemed to have been received by the Credit Enhancer on the next succeeding business day.  If any notice received by the Credit Enhancer is not in proper form or is otherwise insufficient for the purpose of making a claim under the Policy, it will be deemed not to have been received by the Credit Enhancer, and the Credit Enhancer will promptly so advise the Securities Administrator, and the Securities Administrator may submit an amended Notice.  All payments made by the Credit Enhancer hereunder in respect of Preference Amounts will be made with the Credit Enhancer's own funds.

As used in the Policy, the following terms shall have the following meanings:

"Deficiency Amount" means, with respect to any payment date and the Class VI-A Notes, as applicable, an amount, if any, equal to the sum of:

(1)     the amount by which the aggregate amount of accrued and unpaid interest on the Class VI-A Notes (which excludes any Relief Act Shortfalls, Basis Risk Shortfalls or Basis Risk Shortfall Carry-Forward Amounts for that Payment Date) at the Class VI-A Note Interest Rate relating to the Class VI-A Notes on that Payment Date exceeds the amounts available for interest distributions on the Class VI-A Notes on that Payment Date; and

(2)     (i) with respect to any Payment Date that is not the Final Payment Date, the excess, if any, by which (a) the Note Principal Balance relating to the Class VI-A Notes (after giving effect to all payments of principal on the Class VI-A Notes on such Payment Date, but without giving effect to payments under the Policy to be made on such Payment Date) exceeds (b) the Invested Amount as of the end of the related Due Period; or

(ii) on the Final Payment Date, the aggregate outstanding principal balance of the Class VI-A Notes to the extent otherwise not paid on that date.

"Final Payment Date" for the Class VI-A Notes means the Payment Date occurring in August 2035.

"Insured Payment" means (1) any Deficiency Amount for a payment date and (2) any Preference Amount to be paid pursuant to the terms of the Policy.

"Notice" means a written notice in the form attached as an exhibit to the Policy by registered or certified mail or telephonic or telegraphic notice, subsequently confirmed by written notice delivered via telecopy, telex or hand delivery from the Securities Administrator to the Credit Enhancer specifying the information set forth in the exhibit.

Capitalized terms used in the Policy and not otherwise defined in the Policy shall have the meanings set forth in the Indenture as of the date of execution of the Policy, without giving effect to any subsequent amendment or modification to the Indenture unless such amendment or modification has been approved in writing by the Credit Enhancer.

The Policy is non-cancelable for any reason, including nonpayment of any premium.  The premium on the Policy is not refundable for any reason, including the payment of the Class VI-A Notes prior to their respective maturities.  The Policy shall expire and terminate without any action on the part of the Credit Enhancer or any other person on the date that is the later of (i) the date that is one year and one day following the date on which the Class VI-A Notes shall have been paid in full and (ii) if any insolvency proceeding with respect to which the Issuer is the debtor has been commenced on or prior to the date specified in clause (i) in this paragraph, the 30th day after the entry of a final, non appealable order in resolution or settlement of such proceeding.

Notwithstanding the foregoing paragraph, the Policy does not cover Basis Risk Shortfalls, Basis Risk Carry-Forward Amounts, prepayment interest shortfalls or shortfalls caused by application of the relief act, as applicable, on the Class VI-A Notes, nor does the Policy guarantee to the holders of the Class VI-A Notes any particular rate of principal payment.  In addition, the Policy does not cover shortfalls, if any, attributable to the liability of the Depositor, the Trust, the Securities Administrator or the Indenture Trustee for withholding taxes, if any (including interest and penalties in respect of any liability for withholding taxes).  The Policy also does not cover the failure of the Indenture Trustee to make any payment required under Indenture to the holder of any Class VI-A Note.

The Policy is being issued under and pursuant to, and will be construed under, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  The proper venue for any action or proceeding on the Policy shall be the County of New York, State of New York.

**The insurance provided by the Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.**

In the event that payments under any Class VI-A Note are accelerated, nothing contained in the Policy shall obligate the Credit Enhancer to make any payment of principal or interest on such Class VI-A Note on an accelerated basis, unless such acceleration of payment by the Credit Enhancer is at the sole option of the Credit Enhancer; it being understood that a payment shortfall in respect of the redemption of any Class VI-A Note by reason of the repurchase of the Trust Estate pursuant to the terms of the Indenture does not constitute acceleration for the purposes hereof.

## YIELD ON THE NOTES

### General

The yield to maturity on and weighted average life of each class of Notes will be primarily affected by the rate, amount and timing of principal payments on the related mortgage loans and HELOCs, including prepayments, the allocation of principal payments on the mortgage loans and HELOCs among the related classes of Notes, Realized Losses and interest shortfalls on the related mortgage loans and HELOCs, the Note Interest Rate on such class of Notes, and the purchase price paid for such class of Notes.

## Prepayment Considerations

*The Mortgage Loans*

The rate of principal payments on each class of Class A Notes, the aggregate amount of distributions on each class of Class A Notes and the yield to maturity of each class of Class A Notes will be primarily related to the rate, amount and timing of payments of principal on the mortgage loans in the related Loan Group. The rate of principal payments on each class of Class M Notes and Class B Notes, the aggregate amount of distributions on each such class of Notes and the yield to maturity of each class of Class M Notes and Class B Notes will be related to the rate, amount and timing of payments of principal on all of the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV. The rate of principal payments on each such class of Class V-M Notes and Class V-B Notes, the aggregate amount of distributions on each such class of Notes and the yield to maturity of each class of Class V-M Notes and Class V-B Notes will be related to the rate, amount and timing of payments of principal on all of the mortgage loans in Loan Group V. The rate of principal payments on the mortgage loans will in turn be affected by the amortization schedules of the mortgage loans and by the rate, amount and timing of Principal Prepayments on the mortgage loans (including for this purpose payments resulting from refinancings, liquidations of the mortgage loans due to defaults, casualties, condemnations and repurchases, whether optional or required). The mortgage loans generally may be prepaid by the mortgagors at any time, subject in some cases to the payment of a prepayment charge. All of the mortgage loans contain due-on-sale clauses.

Principal Prepayments, liquidations and repurchases of the mortgage loans will result in payments in respect of principal to the holders of the Notes that otherwise would be distributed over the remaining terms of the mortgage loans. See "Maturity and Prepayment Considerations" in the prospectus. Since the rate, amount and timing of payments of principal on the mortgage loans will depend on future events and a variety of factors (as described more fully in the prospectus under "Yield Considerations" and "Maturity and Prepayment Considerations" and in this prospectus supplement), no assurance can be given as to the rate of Principal Prepayments. The extent to which the yield to maturity of any class of Notes may vary from the anticipated yield will depend upon the degree to which they are purchased at a discount or premium and the degree to which the timing of payments on the Notes is sensitive to prepayments on the mortgage loans. Further, an investor should consider, in the case of any Note purchased at a discount, the risk that a slower than anticipated rate of principal payments on the mortgage loans could result in an actual yield to an investor that is lower than the anticipated yield and, in the case of any Note purchased at a premium, the risk that a faster than anticipated rate of principal payments could result in an actual yield to the investor that is lower than the anticipated yield. In general, the earlier a prepayment of principal on the mortgage loans, the greater will be the effect on the investor's yield to maturity. As a result, the effect on an investor's yield of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the Notes would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

It is highly unlikely that the mortgage loans will prepay at any constant rate until maturity or that all of the mortgage loans will prepay at the same rate. Moreover, the timing of prepayments on the mortgage loans may significantly affect the actual yield to maturity on the Notes, even if the average rate of principal payments experienced over time is consistent with an investor's expectation.

The rate of payments (including prepayments) on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors. Because prevailing interest rates are subject to fluctuation, there can be no assurance that investors in the Notes will be able to reinvest the distributions thereon at yields equaling or exceeding the yields on the Notes. Yields on any such reinvestment may be lower, and may even be significantly lower, than yields on the Notes. If prevailing mortgage rates fall significantly below the mortgage rates on the mortgage loans, the rate of prepayment (and refinancing) would be expected to increase. Conversely, if prevailing mortgage rates rise significantly above the

mortgage rates on the mortgage loans, the rate of prepayment on the mortgage loans would be expected to decrease.  Other factors affecting prepayment of mortgage loans include changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties and servicing decisions.  In addition, the existence of the applicable maximum mortgage rate and minimum mortgage rate may effect the likelihood of prepayments resulting from refinancings.  Amounts received by virtue of liquidations of mortgage loans, repurchases of mortgage loans upon breach of representations or warranties and the optional termination of the trust also affect the receipt of principal on the mortgage loans.  In addition, the rates of prepayments will be affected by the rate and timing of the sale of mortgaged properties.  There can be no certainty as to the rate of prepayments on the mortgage loans during any period or over the life of the Notes.  See "Yield Considerations" and "Maturity and Prepayment Considerations" in the prospectus.

Negative amortization may increase the risk of default. The outstanding principal balance of a Group I Loan which is subject to negative amortization increases by the amount of interest which is deferred as described in this prospectus supplement. During periods in which the outstanding principal balance of a negative amortization loan is increasing due to the addition of deferred interest thereto, the increasing principal balance of the negative amortization loan may approach or exceed the value of the related mortgaged property, thus increasing the likelihood of defaults as well as the amount of any loss experienced with respect to any such negative amortization loan that is required to be liquidated. Furthermore, each negative amortization loan provides for the payment of any remaining unamortized principal balance of the negative amortization loan (due to the addition of deferred interest, if any, to the principal balance of the negative amortization loan) in a single payment at the maturity of the negative amortization loan. Because the mortgagors may be so required to make a larger single payment upon maturity, it is possible that the default risk associated with the negative amortization loans is greater than that associated with fully amortizing mortgage loans.

Some of the mortgage loans have an initial interest only period.  During this period, the payment made by the related mortgagor will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by the principal portion of scheduled monthly payments during this period.  As a result, no principal payments will be made to the Notes from the mortgage loans during their interest only period except in the case of a prepayment.

In general, defaults on mortgage loans are expected to occur with greater frequency in their early years. In addition, default rates generally are higher for mortgage loans used to refinance an existing mortgage loan. In the event of a mortgagor's default on a mortgage loan, there can be no assurance that recourse beyond the specific mortgaged property pledged as security for repayment will be available.

*The HELOCs*

The rate and timing of defaults on the HELOCs will affect the rate and timing of principal payments on the HELOCs and thus the yield on the Class VI-A Notes.  There can be no assurance as to the rate of losses or delinquencies on any of the HELOCs.  However, the rate of such losses and delinquencies are likely to be higher than those of traditional first lien mortgage loans, particularly in the case of HELOCs with high combined loan-to-value ratios or low junior lien ratios.  See "Risk Factors" in this prospectus supplement.  To the extent that any losses are incurred on any of the HELOCs that are not covered by excess interest allocable to investors or the Policy, Holders of the Class VI-A Notes will bear all risk of such losses resulting from default by Mortgagors.  Even where the Policy covers certain losses incurred on the HELOCs, the effect of losses may be to increase prepayment rates on the HELOCs, thus reducing the weighted average life and affecting the yield to maturity.  In addition, the rate of prepayments of the HELOCs and the yield to investors on the Class VI-A Notes may be affected by certain refinancing programs, which may include general or targeted solicitations. Principal Prepayments, liquidations and repurchases of the mortgage loans will result in payments in respect of principal to the holders of the Notes that otherwise would be distributed over the remaining terms of the mortgage loans.

See "Maturity and Prepayment Considerations" in the prospectus. Since the rate, amount and timing of payments of principal on the mortgage loans will depend on future events and a variety of factors (as described more fully in the prospectus under "Yield Considerations" and "Maturity and Prepayment Considerations" and in this prospectus supplement), no assurance can be given as to the rate of Principal Prepayments. The extent to which the yield to maturity of any class of Notes may vary from the anticipated yield will depend upon the degree to which they are purchased at a discount or premium and the degree to which the timing of payments on the Notes is sensitive to prepayments on the mortgage loans. Further, an investor should consider, in the case of any Note purchased at a discount, the risk that a slower than anticipated rate of principal payments on the mortgage loans could result in an actual yield to an investor that is lower than the anticipated yield and, in the case of any Note purchased at a premium, the risk that a faster than anticipated rate of principal payments could result in an actual yield to the investor that is lower than the anticipated yield. In general, the earlier a prepayment of principal on the mortgage loans, the greater will be the effect on the investor's yield to maturity. As a result, the effect on an investor's yield of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the Notes would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

It is highly unlikely that the HELOCs will prepay at any constant rate until maturity or that all of the HELOCs will prepay at the same rate. Moreover, the timing of prepayments on the HELOCs may significantly affect the actual yield to maturity on the Notes, even if the average rate of principal payments experienced over time is consistent with an investor's expectation.

The rate of payments (including prepayments) on pools of HELOCs is influenced by a variety of economic, geographic, social and other factors. Because prevailing interest rates are subject to fluctuation, there can be no assurance that investors in the Notes will be able to reinvest the distributions thereon at yields equaling or exceeding the yields on the Notes. Yields on any such reinvestment may be lower, and may even be significantly lower, than yields on the Notes. If prevailing mortgage rates fall significantly below the mortgage rates on the HELOCs, the rate of prepayment (and refinancing) would be expected to increase. Conversely, if prevailing mortgage rates rise significantly above the mortgage rates on the HELOCs, the rate of prepayment on the HELOCs would be expected to decrease. Other factors affecting prepayment of HELOCs include changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties, servicing decisions, seasonal purchasing and payment habits of borrowers. In addition, the existence of the applicable maximum mortgage rate and minimum mortgage rate may effect the likelihood of prepayments resulting from refinancings. Amounts received by virtue of liquidations of HELOCs, repurchases of HELOCs upon breach of representations or warranties and the optional termination of the trust also affect the receipt of principal on the HELOCs. In addition, the rates of prepayments will be affected by the rate and timing of the sale of mortgaged properties. There can be no certainty as to the rate of prepayments on the HELOCs during any period or over the life of the Notes. See "Yield Considerations" and "Maturity and Prepayment Considerations" in the accompanying prospectus.

Although all of the loan rates on the HELOCs are subject to adjustment, the loan rates on the HELOCs adjust based on the Prime Rate, while the Class VI-A Notes adjust based on one-month LIBOR. Changes in one-month LIBOR may not correlate with changes in the Prime Rate and may not correlate with prevailing interest rates. It is possible that an increased level of the Prime Rate could occur simultaneously with a lower level of prevailing interest rates, which would be expected to result in faster prepayments, thereby reducing the weighted average life of the Class VI-A Notes. Any Basis Risk Shortfall Carry-Forward Amount allocated to the Class VI-A Notes will not be covered by the Policy issued by the Credit Enhancer and will only be payable from excess interest on the HELOCs to the extent available for that purpose in current and future periods. Any related Basis Risk Shortfall Carry-Forward Amount may remain unpaid on the final payment date for the Class VI-A Notes.

There can be no assurance as to the rate of principal payments and Draws on the HELOCs. The rate of principal payments and the rate of Draws may fluctuate substantially from time to time.

Generally, HELOCs are not viewed by mortgagors as permanent financing. Due to the unpredictable nature of both principal payments and Draws, the rates of principal payments net of Draws on the HELOCs may be much more volatile than for typical first lien mortgage loans. See "Risk Factors" in this prospectus supplement.

**Allocation of Principal Payments**

The yields to maturity of the Class I-A, Class II-A, Class III-A and Class IV-A Notes will be affected by the allocation of principal payments among the Class I-A, Class II-A, Class III-A and Class IV-A Notes. The Class I-A, Class II-A, Class III-A and Class IV-A Notes are subject to priorities for payment of principal as described in this prospectus supplement. Payments of principal to the Class II-A-3 Notes will be made to the extent of payments to its two components. The yields to maturity of the Class V-A Notes will be affected by the allocation of principal payments among the Class V-A Notes. The Class V-A Notes are subject to priorities for payment of principal as described in this prospectus supplement. Distributions of principal on classes having an earlier priority of payment will be affected by the rates of prepayment of the related mortgage loans early in the life of the mortgage loan pool. The timing of commencement of principal distributions and the weighted average lives of the Notes with a later priority of payment will be affected by the rates of prepayment of the mortgage loans both before and after the commencement of principal distributions on those classes.

Also, investors in the Class I-A, Class II-A, Class III-A and Class IV-A Notes should be aware that on and after the related Stepdown Date, so long as no Trigger Event is in effect, the most subordinate class of Class M Notes or Class B Notes may receive more than such class' pro rata share of principal for that payment date. As a result, the Note Principal Balance of the most subordinate class of Class M Notes or Class B Notes may be reduced to zero prior to the more senior class or classes of Notes.

Also, investors in the Class V-A Notes should be aware that on and after the related Stepdown Date, so long as no Trigger Event is in effect, the most subordinate class of Class V-M Notes or Class V-B Notes then outstanding may receive more than such class' pro rata share of principal for that payment date. As a result, the Note Principal Balance of the most subordinate class of Class V-M Notes or Class V-B Notes may be reduced to zero prior to the more senior class or classes of Notes.

As described in this prospectus supplement, during certain periods all principal payments on the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV will be allocated among the related Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components. Unless the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes has been reduced to zero, the Class M Notes and Class B Notes will not be entitled to receive payments of principal until the related Stepdown Date. Furthermore, if a related Trigger Event is in effect, the Class M Notes and Class B Notes will not be entitled to receive payments in respect of principal until the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes has been reduced to zero. To the extent that no principal payments are distributed on the Class M Notes or Class B Notes, the subordination afforded the Class I-A, Class II-A, Class III-A and Class IV-A Notes by the Class M Notes and Class B Notes, together with the related overcollateralization, in the absence of offsetting related Realized Losses allocated thereto, will be increased, and the weighted average lives of the Class M Notes and Class B Notes will be extended.

As described in this prospectus supplement, during certain periods all principal payments on the mortgage loans in loan group V will be allocated among the Class V-A Notes. Unless the aggregate Note Principal Balance of the Class V-A Notes has been reduced to zero, the Class V-M Notes and Class V-B Notes will not be entitled to receive payments of principal until the related Stepdown Date. Furthermore, if a related Trigger Event is in effect, the Class V-M Notes and Class V-B Notes will not be entitled to

receive payments in respect of principal until the aggregate Note Principal Balance of the Class V-A Notes has been reduced to zero.  To the extent that no principal payments are distributed on the Class V-M Notes or Class V-B Notes, the subordination afforded the Class V-A Notes by the Class V-M Notes and Class V-B Notes, together with the related overcollateralization, in the absence of offsetting related Realized Losses allocated thereto, will be increased, and the weighted average lives of the Class V-M Notes and Class V-B Notes will be extended.

**Interest Shortfalls and Realized Losses**

When a principal prepayment in full is made on a mortgage loan, the mortgagor is charged interest only for the period from the Due Date of the preceding monthly payment up to the date of the Principal Prepayment, instead of for a full month.  When a partial Principal Prepayment is made on a mortgage loan, the mortgagor is not charged interest on the amount of the prepayment for the month in which the prepayment is made.  In addition, the application of the Relief Act or similar state law to any mortgage loan will adversely affect, for an indeterminate period of time, the ability of the RMBS Servicer and the HELOC Servicer to collect full amounts of interest on the mortgage loan.  See "Legal Aspects of the Mortgage Loans—Servicemembers Relief Act" in the prospectus.  Any interest shortfalls on the mortgage loans resulting from a Principal Prepayment in full or a partial Principal Prepayment are required to be paid by the RMBS Servicer, but only to the extent that such amount does not exceed the aggregate of the RMBS Servicing Fee on the mortgage loans serviced by it for the related Due Period. Interest shortfalls on the mortgage loans required to be funded but not funded by the RMBS Servicer are required to be paid by the RMBS Master Servicer, but only to the extent that such amount does not exceed the RMBS Master Servicer's investment income for the applicable Payment Date. Neither the HELOC Servicer nor the HELOC Back-Up Servicer will be required to pay interest shortfalls on the HELOCs as a result of a Principal Prepayment in full or a partial Principal Prepayment.  None of the HELOC Servicer, HELOC Back-Up Servicer, RMBS Servicer or RMBS Master Servicer is obligated to fund interest shortfalls resulting from the application of the Relief Act or similar state law.  See "The Servicing Agreements—Servicing and Other Compensation and Payment of Expenses" in this prospectus supplement and "Legal Aspects of the Mortgage Loans—Servicemembers Relief Act" in the prospectus. Accordingly, the effect of (1) any Principal Prepayments on the mortgage loans, to the extent that any resulting interest shortfall due to such Principal Prepayments exceeds any Compensating Interest or (2) any shortfalls resulting from the application of the Relief Act or similar state law, will be to reduce the aggregate amount of interest collected that is available for distribution to holders of the Notes. Prepayment interest shortfalls and Relief Act Shortfalls with respect to the Class V-A-4-D Notes will not be covered by the Note Insurance Policy.  Any resulting shortfalls will be allocated among the Notes as provided in this prospectus supplement under *"Description of the Notes — Interest Payments on the Notes."*

The yields to maturity and the aggregate amount of distributions on the Notes will be affected by the timing of mortgagor defaults resulting in Realized Losses.  The timing of Realized Losses on the mortgage loans and the allocation of Realized Losses to the offered notes could significantly affect the yield to an investor in the offered notes.  In addition, Realized Losses on the mortgage loans may affect the market value of the related notes, even if these losses are not allocated to these notes.  In general, defaults on the mortgage loans are expected to occur with greater frequency in their early years.  In addition, default rates generally are higher for mortgage loans used to refinance an existing mortgage loan.  In the event of a mortgagor's default on a mortgage loan, there can be no assurance that recourse beyond the specific mortgaged property pledged as security for repayment will be available.

**Note Interest Rates**

The effective yield to holders of the Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes and to the holders of the Class II-A-3 Notes in respect of the Class II-A-3 Components will be less than the yields otherwise produced by their respective Note Interest

Rates and Component Interest Rates and purchase prices because interest will not be distributed to these Noteholders until the 25th day, or if such day is not a business day, the following business day, of the month following the month in which interest accrues on the mortgage loans, without any additional distribution of interest or earnings thereon in respect of such delay.

The Note Interest Rate or Component Interest Rate with respect to the Class I-A, Class II-A, Class M Notes and Class II-A-3 Components adjusts each month and is based upon the value of an index of one-month LIBOR plus the related margin, limited by a maximum note interest rate or maximum component interest rate and the related Available Funds Rate. However, the mortgage rate for the related mortgage loans may adjust based on a different index, in each case plus the related gross margin, and adjusts monthly, semi-annually or annually, or may not adjust at all.. The mortgage loan indices and One-Month LIBOR may respond differently to economic and market factors, and there is not necessarily any correlation between them. Moreover, the related mortgage loans are subject to maximum mortgage rates and minimum mortgage rates. In particular, the Group I Loans are generally subject to a maximum mortgage rate of approximately 10% per annum. Thus, it is possible, for example, that one-month LIBOR may rise during periods in which mortgage loan indices are stable or falling or that, even if each of the mortgage loan indices rise during the same period, one-month LIBOR may rise much more rapidly than the other loan indices. To the extent that the Note Interest Rate on these notes is limited to the related Available Funds Rate, basis risk shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

The Note Interest Rate on the Class V-A-1, Class V-A-3 and Class V-A-4 Notes is a fixed rate subject to the related Available Funds Rate. To the extent the Available Funds Rate is paid to the Class V-A-1, Class V-A-3 and Class V-A-4 Notes, the difference between the Available Funds Rate and the fixed Note Interest Rate on the Class V-A-1, Class V-A-3 and Class V-A-4 Notes will create Net WAC Shortfall Carry-Forward Amounts that will carry forward with interest thereon. *See "Description of the Notes – Interest Payments on the Notes" in this prospectus supplement.*

The Note Interest Rate on the Class III-A Notes and Class IV-A Notes prior to the related Note Rate Change Date is a fixed interest rate subject to an Available Funds Rate. Therefore the prepayment of the mortgage loans in the related loan group may result in a lower related Available Funds Rate, which, in certain circumstances, could result in a lower note interest rate for these notes, resulting in interest shortfalls. In addition, on or after the related note rate change date, the note interest rate on the Class III-A Notes and Class IV-A Notes will adjust each month based upon the value of the least of (i) an index of six-month LIBOR plus the related Note Margin, (ii) the related Maximum Note Interest Rate, and (iii) the related Available Funds Rate. However, the mortgage rate for the related mortgage loans is based upon a similar or different mortgage index plus the related gross margin, and adjusts semi-annually or annually. The six-month LIBOR loan index and the mortgage indices may respond differently to economic and market factors, and there is not necessarily any correlation between them. Moreover, the related mortgage loans are subject to maximum mortgage rates and minimum mortgage rates. Thus, it is possible, for example, that the six-month LIBOR loan index may rise during periods in which the related mortgage indices are stable or falling or that, even if both the six-month LIBOR loan index and the related mortgage indices rise during the same period, the six-month LIBOR loan index may rise much more rapidly than the related mortgage indices. To the extent that the note interest rate on these notes is limited to the related Available Funds Rate, basis risk shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

The Note Interest Rate with respect to the Class V-A-2, Class V-M Notes and Class V-B Notes adjusts each month and is based upon the value of an index of one-month LIBOR plus the related margin, limited by a maximum note interest rate and the related Available Funds Rate. However, the mortgage rate for all of the Group V Loans is fixed. Thus, to the extent that the note interest rate on these notes is limited to the related Available Funds Rate, Basis Risk Shortfalls may occur. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

The Note Interest Rate with respect to the Class VI-A Notes adjusts each month based on one-month LIBOR plus the related Note Margin, limited by the Maximum Rate and the Net WAC Cap. However, the loan rates on the HELOCs adjust based on the Prime Rate. Changes in one-month LIBOR may not correlate with changes in the Prime Rate and may not correlate with prevailing interest rates. An increased level of the Prime Rate could occur simultaneously with a lower level of prevailing interest rates, which would be expected to result in faster prepayments, thereby reducing the weighted average life of the Class VI-A Notes. The Net WAC Cap on the Class VI-A Notes is calculated by reference to the weighted average of the net mortgage loan rates of the HELOCs. Therefore, the prepayment of the HELOCs with higher mortgage rates may result in a lower Note Interest Rate on the Class VI-A Notes. If the interest on the Class VI-A Notes is limited by the Net WAC Cap, the difference between (a) the lesser of (i) the rate of One-Month LIBOR plus the related Note Margin and (ii) the Maximum Rate and (b) the Net WAC Cap, will create Basis Risk Shortfalls. *See "Description of the Notes — Interest Payments on the Notes" in this prospectus supplement.*

Net Monthly Excess Cashflow may be used, subject to the priorities described in this prospectus supplement, to cover Basis Risk Shortfalls or Net WAC Shortfalls. However, there can be no assurance that available Net Monthly Excess Cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the Note Interest Rate on a class of Notes is limited to the related Available Funds Rate, there may be little or no Net Monthly Excess Cashflow. The Cap Contract will cover Basis Risk Shortfalls on the Class V-A-2 Notes and the Corridor Contract will cover Basis Risk Shortfalls on the Class II-A-1 Notes, Class II-A-2 Notes and Class II-A-3 Components. However, there can be no assurance that available amounts from these Derivative Contracts will be sufficient to cover these shortfalls. Further, the Note Insurance Policy will not cover Net WAC Shortfalls on the Class V-A-4-D Notes.

The yields to maturity on the Notes will be affected by their Note Interest Rates. The Note Interest Rates on the Notes, other than the Class V-A, Class V-M and Class V-B Notes, will be sensitive to the adjustable mortgage rates on the related mortgage loans. As a result, these Note Interest Rates will be sensitive to the indices on the related mortgage loans, any periodic caps, maximum and minimum rates, and the related gross margins.

**Purchase Price**

In addition, the yields to maturity on the Notes will depend on the price paid by the holders of the Notes. The extent to which the yield to maturity of an Note is sensitive to prepayments will depend, in part, upon the degree to which it is purchased at a discount or premium. In general, if a Note is purchased at a premium and principal distributions thereon occur at a rate faster than that assumed at the time of purchase, the investor's actual yield to maturity will be lower than that anticipated at the time of purchase. Conversely, if a Note is purchased at a discount and principal distributions thereon occur at a rate slower than that assumed at the time of purchase, the investor's actual yield to maturity will be lower than that anticipated at the time of purchase.

**Class V-A-1 Notes Yield Considerations**

Investors in the Class V-A-1 Notes should be aware that because it is expected that the Class V-A-1 Notes will not receive any payments of principal prior to the payment date occurring in July 2008 and will receive a disproportionately small portion of principal payments prior to the payment date occurring in July 2011 with respect to the Group V Loans, unless the Note Principal Balances of the Class V-A-2, Class V-A-3 and Class V-A-4 Notes have been reduced to zero, the weighted average life of the Class V-A-1 Notes will be longer than would otherwise be the case, and the effect on the market value of the Class V-A-1 Notes of changes in market interest rates or market yields for similar securities may be greater than for other classes of Class V-A Notes. On or after the payment date in July 2011 , if the aggregate Note Principal Balance of the Class V-A-1 Notes has not been reduced to zero, a disproportionately large

portion of principal payments, including mortgagor prepayments, on the Group V Loans will be allocated to the Class V-A-1 Notes.

**Final Scheduled Payment Date**

The final scheduled payment date for each class of Notes, other than the Class V-A, Class V-M, Class V-B and Class VI-A Notes, is the payment date in September 2045. The final scheduled payment date for the Class V-A, Class V-M and Class V-B Notes is the payment date in September 2035. The final scheduled payment date for the Class VI-A Notes is the payment date in August 2035. The final scheduled payment date in each case is the payment date in the month following the month of the latest scheduled maturity date of any of the related mortgage loans. Since the rate of payment (including prepayments) of principal on the mortgage loans can be expected to exceed the scheduled rate of payments, and could exceed the scheduled rate by a substantial amount, the disposition of the last remaining mortgage loan may be earlier, and could be substantially earlier, than the final scheduled payment date.

The Trust with respect to the Class VI-A Notes shall terminate upon notice to the Indenture Trustee and the Securities Administrator of the later of (A) payment in full of all amounts owing on the Class VI-A Notes and to the Credit Enhancer unless the Credit Enhancer shall otherwise consent and (B) the earliest of (i) the final payment or other liquidation of the last HELOC remaining in the Trust; (ii) the optional purchase by the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates, or by the Credit Enhancer as described below and (iii) the Payment Date in August 2035.

**Optional Termination**

*The Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes*

The holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates may, at its option, purchase all of the mortgage loans from Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and redeem the related Notes after any payment date on which the related aggregate Stated Principal Balance of the mortgage loans as of the end of the related Due Period is less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding. See "The Indenture—Optional Termination" herein and "The Agreements—Termination; Retirement of the Securities" in the prospectus.

*The Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes*

The holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates may, at its option, purchase all of the mortgage loans from Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV and Loan Group V and redeem the related Notes after any payment date on which the aggregate Stated Principal Balance of the related mortgage loans as of the end of the related Due Period is less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balances; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest

thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption. See "The Indenture—Optional Termination" herein and "The Agreements—Termination; Retirement of the Securities" in the prospectus.

*The Class V-A, Class V-M and Class V-B Notes*

The holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates may, at its option, purchase all of the mortgage loans from Loan Group V and redeem the related Notes after any payment date on which the aggregate Stated Principal Balance of the related mortgage loans as of the end of the related Due Period is less than 10% of the Group V Cut-off Date Balance, provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding. See "The Indenture—Optional Termination" herein and "The Agreements—Termination; Retirement of the Securities" in the prospectus.

*The Class VI-A Notes*

The HELOCs will be subject to optional purchase by (i) the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates, on any payment date after the outstanding Note Principal Balance of the Class VI-A Notes is reduced to an amount less than or equal to 10% of the Note Principal Balance of the Class VI-A Notes on the Closing Date or (ii) by the Credit Enhancer if the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates, fails to exercise the right 60 days after the 10% level occurs.

The optional purchase price payable upon optional termination as described for (i) the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes, (ii) the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes, (iii) the Class V-A, Class V-M and Class V-B Notes and (iv) the Class VI-A Notes, each as described above, will be equal to the lesser of (i) the fair market value of the mortgage loans or HELOCs, as applicable, and (ii) the sum of the outstanding principal balance of the mortgage loans or HELOCs, as applicable, and accrued and unpaid interest thereon at the weighted average of the loan rates through the day preceding the final payment date; provided that the option may only be exercised if the purchase price is sufficient to repay all outstanding principal and accrued and unpaid interest on the notes and all amounts owed to the Credit Enhancer, if applicable.

**Removal of HELOCs**

Upon notice to the Credit Enhancer and subject to the conditions of the Indenture and HELOC Servicing Agreement, on any payment date, the seller may, but shall not be obligated to, remove from the trust a portion of the HELOCs without notice to the Class VI-A Noteholders. The seller will randomly select the HELOCs to be removed. HELOCs to be removed will only be removed upon satisfaction of conditions specified in the HELOC Servicing Agreement, including:

- the seller representing and warranting that no selection procedures which are adverse to the interests of the Class VI-A Noteholders or the Credit Enhancer were used by the seller in selecting the HELOCs to be removed; and

- no Rapid Amortization Event has occurred or will occur as a result of the removal.

Upon any such removal, the Transferor Interest will be reduced by an amount equal to the aggregate principal balances of the HELOCs removed.

Such removal may have the effect of reducing principal collections available to the Class VI-A Notes, thereby extending the expected maturity of the Class VI-A Notes.

**Weighted Average Life**

*The Mortgage Loans*

Weighted average life refers to the amount of time that will elapse from the date of issuance of a security until each dollar of principal of the security will be repaid to the investor. The weighted average life of a Note is determined by (a) multiplying the amount of the reduction, if any, of the Note Principal Balance of such Note by the number of years from the date of issuance of such Note to the related payment date, (b) adding the results and (c) dividing the sum by the aggregate amount of the reductions in the Note Principal Balance of such Note referred to in clause (a). The weighted average life of the Notes of each class will be influenced by the rate at which principal on the mortgage loans is paid, which may be in the form of scheduled payments or prepayments (including prepayments of principal by the mortgagor as well as amounts received by virtue of condemnation, insurance or foreclosure with respect to the mortgage loans), and the timing thereof.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The prepayment model used in this prospectus supplement for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans assumes a constant rate of prepayment each month, or CPR relative to the then outstanding principal balance of a pool of mortgage loans similar to the mortgage loans in the mortgage pool. To assume a 25% CPR or any other CPR is to assume that the stated percentage of the outstanding principal balance of the related mortgage pool is prepaid over the course of a year. The prepayment model used in this prospectus supplement for the Group V Loans is the related Prepayment Assumption. No representation is made that the mortgage loans will prepay at these or any other rates.

The Notes were structured assuming, among other things, a 25% CPR for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, and 100% of the Prepayment Assumption for the Group V Loans. The prepayment assumption to be used for pricing purposes for the respective classes of Notes may vary as determined at the time of sale. The actual rate of prepayment may vary considerably from the rate used for any prepayment assumption.

The tables following the next paragraph indicate the percentages of the initial Note Principal Balance of each class of Notes that would be outstanding after each of the dates shown at various percentages of CPR and the Prepayment Assumption and the corresponding weighted average life of each class of Notes. The table is based on the following modeling assumptions:

(1) the mortgage pool consists of 101 mortgage loans with the characteristics set forth in the table below,

(2) the mortgage loans prepay at the specified percentages of the CPR or the Prepayment Assumption, as applicable,

(3) no defaults or delinquencies occur in the payment by mortgagors of principal and interest on the mortgage loans,

(4) scheduled payments on the mortgage loans are received, in cash, on the first day of each month, commencing in July 2005, and are computed prior to giving effect to prepayments received on the last day of the prior month,

(5) none of the mortgage loans are pre-funded,

(6) there are no interest shortfalls caused by (a) the application of the Relief Act or similar state law or (b) prepayments on the mortgage loans, which in the case of (b) have not

been covered by Compensating Interest, and prepayments represent prepayments in full of individual mortgage loans and are received on the last day of each month, commencing in June 2005,

(7)    scheduled Monthly Payments of principal and interest on the mortgage loans are calculated on their respective principal balances (prior to giving effect to prepayments received thereon during the preceding calendar month), mortgage rate and remaining terms to stated maturity such that the mortgage loans will fully amortize by their stated maturities (after any interest-only periods),

(8)    the levels of One-Month LIBOR, the One-Year CMT Index, the Six-Month LIBOR Loan Index, the One-Year LIBOR Loan Index and One-Year MTA remain constant at 3.26%, 3.38%, 3.64%, 3.87% and 2.633%, respectively,

(9)    the mortgage rate on each mortgage loan will be adjusted on each interest adjustment date (as necessary) to a rate equal to the applicable Index (as described in (8) above), plus the applicable gross margin, subject to maximum lifetime mortgage rates, minimum lifetime mortgage rates and periodic caps (as applicable),

(10)    scheduled Monthly Payments of principal and interest on each mortgage loan will be adjusted in the month immediately following each interest adjustment date (as necessary) for such mortgage loan to equal the fully amortizing payment described in (7) above, except with respect to the mortgage loans identified as belonging to Loan Group I which adjust in their next payment adjustment date subject to a Payment Cap of 7.50%,

(11)    payments in respect of the Notes are received in cash on the 25th day of each month, commencing in July 2005,

(12)    the Notes are purchased on June 22, 2005,

(13)    no amounts are received from the Derivative Contracts,

(14)    no investment income is received,

(15)    the RMBS Servicing Fee remains constant,

(16)    the Note Insurance Policy premium rate for the Class V-A-4-D Notes is 0.08%, and

(17)    the holder of the Trust Certificates does not exercise its option to purchase the Notes described under the caption "The Indenture—Optional Termination" except where indicated.  The optional termination date with respect to the notes related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV is the optional termination date where these loan groups collectively may first be terminated; the optional termination date with respect to the notes related to Loan Group V is the optional termination date where this loan group may first be terminated; and the optional termination date with respect to the Class VI-A Notes is the optional termination date where this loan group may first be terminated;

## MORTGAGE LOAN ASSUMPTIONS

| Loan Number | Loan Group | Current Balance($) | Mortgage Rate (%) | Net Mortgage Rate (%) | Original Term to Maturity (in months) | Remaining Term to Maturity (in months) | Gross Margin (%) | Maximum Mortgage Rate (%) | Negative Amortization Cap (%) | Number of Months to Next Payment Adjustment | Months Between Payment Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 245,505,550.20 | 2.6082357935 | 2.3071720996 | 380 | 380 | 2.882 | 10.047 | 125 | 13 | 12 |
| 2 | 1 | 316,482,257.09 | 2.7254602051 | 2.4235870343 | 374 | 373 | 2.984 | 10.051 | 125 | 12 | 12 |
| 3 | 1 | 212,614,961.41 | 2.9484625786 | 2.6487079653 | 376 | 375 | 3.621 | 10.011 | 125 | 12 | 12 |
| 4 | 1 | 193,680.41 | 6.2670000000 | 5.8920000000 | 360 | 358 | 3.920 | 10.550 | 125 | 11 | 12 |
| 5 | 1 | 47,112,048.83 | 2.6015844607 | 2.3225470276 | 369 | 369 | 2.686 | 10.009 | 110 | 13 | 12 |
| 6 | 1 | 793,326.09 | 5.2990000000 | 5.0490000000 | 360 | 359 | 2.795 | 10.350 | 110 | 12 | 12 |
| 7 | 2C | 73,271,280.13 | 6.4684603299 | 6.0980994828 | 360 | 359 | 3.761 | 11.476 | N/A | 24 | 6 |
| 8 | 2C | 9,591,883.44 | 6.8230995818 | 6.4560493132 | 360 | 359 | 4.516 | 11.833 | N/A | 24 | 6 |
| 9 | 2C | 1,646,133.33 | 6.0253219666 | 5.6503219666 | 360 | 358 | 3.614 | 12.025 | N/A | 23 | 6 |
| 10 | 2C | 382,519.95 | 5.8750000000 | 5.5000000000 | 360 | 350 | 4.000 | 11.875 | N/A | 15 | 6 |
| 11 | 2C | 13,143,613.33 | 6.6793790596 | 6.3043790596 | 360 | 359 | 4.654 | 11.898 | N/A | 24 | 6 |
| 12 | 2C | 3,115,878.53 | 7.1300876577 | 6.7550876577 | 360 | 359 | 5.000 | 12.130 | N/A | 24 | 6 |
| 13 | 2C | 117,333.33 | 7.5000000000 | 7.1250000000 | 360 | 359 | 5.000 | 12.500 | N/A | 24 | 6 |
| 14 | 2C | 303,070.76 | 7.7500000000 | 7.3750000000 | 360 | 360 | 5.330 | 12.750 | N/A | 25 | 6 |
| 15 | 2C | 163,200.00 | 6.5000000000 | 6.1250000000 | 360 | 359 | 5.000 | 11.500 | N/A | 24 | 6 |
| 16 | 2C | 270,414.23 | 7.6467853553 | 7.2717853553 | 360 | 359 | 5.129 | 12.647 | N/A | 24 | 6 |
| 17 | 2C | 84,013,273.55 | 5.3270331956 | 4.9536182626 | 360 | 359 | 2.252 | 11.327 | N/A | 36 | 12 |
| 18 | 2C | 6,637,030.59 | 5.2389069739 | 4.8639069739 | 360 | 359 | 2.258 | 11.239 | N/A | 36 | 12 |
| 19 | 2C | 71,884,443.15 | 6.0704402794 | 5.6980432998 | 360 | 359 | 3.076 | 11.078 | N/A | 36 | 6 |
| 20 | 2C | 8,732,162.53 | 6.4111007183 | 6.0430370127 | 360 | 359 | 3.829 | 11.411 | N/A | 36 | 6 |
| 21 | 2C | 340,000.00 | 6.1578431373 | 5.7828431373 | 360 | 359 | 3.408 | 11.954 | N/A | 36 | 6 |
| 22 | 2C | 9,957,730.15 | 6.0801424829 | 5.7125822641 | 360 | 359 | 5.000 | 11.080 | N/A | 36 | 6 |
| 23 | 2C | 3,016,858.51 | 6.5544743142 | 6.1794743142 | 360 | 359 | 4.876 | 11.678 | N/A | 36 | 6 |
| 24 | 2C | 304,260.40 | 6.5810606090 | 6.2060606090 | 360 | 358 | 5.000 | 11.581 | N/A | 35 | 6 |
| 25 | 2C | 273,600.00 | 6.4580896686 | 6.0830896686 | 360 | 359 | 5.000 | 11.458 | N/A | 36 | 6 |
| 26 | 2C | 16,938,082.33 | 2.3678527716 | 2.0003639524 | 360 | 359 | 2.902 | 10.162 | N/A | 2 | 1 |
| 27 | 2C | 16,089,926.07 | 2.5490596818 | 2.1740596818 | 360 | 359 | 2.894 | 10.086 | N/A | 2 | 1 |
| 28 | 2C | 4,324,626.53 | 2.4867321129 | 2.1117321129 | 360 | 360 | 3.850 | 10.257 | N/A | 2 | 1 |
| 29 | 2C | 30,534,894.19 | 4.8504113856 | 4.4778910623 | 360 | 359 | 3.288 | 12.000 | N/A | 3 | 1 |
| 30 | 2C | 1,650,397.40 | 4.6400244975 | 4.2650244975 | 360 | 359 | 3.091 | 12.000 | N/A | 3 | 1 |
| 31 | 2C | 147,478,780.12 | 5.0167198534 | 4.6440286601 | 360 | 359 | 2.255 | 11.316 | N/A | 12 | 12 |
| 32 | 2C | 16,077,770.24 | 4.0647468231 | 3.6897468231 | 360 | 360 | 2.377 | 10.336 | N/A | 13 | 12 |
| 33 | 2C | 321,647.56 | 5.5000000000 | 5.1250000000 | 360 | 360 | 2.250 | 11.500 | N/A | 12 | 12 |
| 34 | 2C | 452,200.00 | 5.7500000000 | 5.3750000000 | 360 | 360 | 2.250 | 11.750 | N/A | 13 | 12 |
| 35 | 2C | 1,520,976.00 | 6.0391893100 | 5.6641893100 | 360 | 359 | 2.924 | 12.000 | N/A | 6 | 6 |
| 36 | 2C | 788,573.33 | 6.0858237661 | 5.7108237661 | 360 | 359 | 3.625 | 12.086 | N/A | 6 | 6 |
| 37 | 2C | 746,666.67 | 5.7723214286 | 5.3973214286 | 360 | 360 | 4.000 | 11.772 | N/A | 7 | 6 |
| 38 | 2C | 466,666.67 | 4.5000000000 | 4.1250000000 | 360 | 360 | 2.750 | 10.500 | N/A | 6 | 6 |
| 39 | 2NC | 76,116,984.64 | 6.3969686888 | 6.1469686888 | 360 | 359 | 2.934 | 11.397 | N/A | 24 | 6 |

| Loan Number | Loan Group | Current Balance($) | Mortgage Rate (%) | Net Mortgage Rate (%) | Original Term to Maturity (in months) | Remaining Term to Maturity (in months) | Gross Margin (%) | Maximum Mortgage Rate (%) | Negative Amortization Cap (%) | Number of Months to Next Payment Adjustment | Months Between Payment Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 2NC | 4,433,801.71 | 7.1608724545 | 6.9108724545 | 360 | 360 | 4.541 | 12.161 | N/A | 25 | 6 |
| 41 | 2NC | 485,333.33 | 5.1250000000 | 4.8750000000 | 360 | 359 | 3.000 | 11.125 | N/A | 24 | 6 |
| 42 | 2NC | 501,237.81 | 9.5000000000 | 9.2500000000 | 360 | 358 | 5.000 | 14.500 | N/A | 23 | 6 |
| 43 | 2NC | 4,687,400.00 | 6.7821002404 | 6.5321002404 | 360 | 359 | 4.831 | 11.905 | N/A | 24 | 6 |
| 44 | 2NC | 71,684,515.96 | 5.3157426023 | 5.0657426023 | 360 | 359 | 2.252 | 11.316 | N/A | 36 | 12 |
| 45 | 2NC | 3,540,548.59 | 5.2138225960 | 4.9638225960 | 360 | 359 | 2.250 | 11.214 | N/A | 36 | 12 |
| 46 | 2NC | 21,999,522.65 | 6.4106072731 | 6.1606072731 | 360 | 359 | 2.637 | 11.411 | N/A | 36 | 6 |
| 47 | 2NC | 1,918,812.13 | 5.9605193154 | 5.7105193154 | 360 | 360 | 2.250 | 10.961 | N/A | 37 | 6 |
| 48 | 2NC | 502,133.33 | 5.3750000000 | 5.1250000000 | 360 | 360 | 3.375 | 11.375 | N/A | 37 | 6 |
| 49 | 2NC | 490,000.00 | 5.8750000000 | 5.6250000000 | 360 | 360 | 3.375 | 11.875 | N/A | 37 | 6 |
| 50 | 2NC | 1,837,733.33 | 6.6741275484 | 6.4241275484 | 360 | 359 | 5.000 | 11.674 | N/A | 36 | 6 |
| 51 | 2NC | 27,753,734.29 | 2.2549041202 | 2.0049041202 | 360 | 359 | 2.664 | 9.977 | N/A | 2 | 1 |
| 52 | 2NC | 21,304,101.00 | 2.7714929373 | 2.5214929373 | 360 | 359 | 2.779 | 9.995 | N/A | 2 | 1 |
| 53 | 2NC | 5,461,694.67 | 3.2611275826 | 3.0111275826 | 360 | 359 | 3.521 | 10.051 | N/A | 2 | 1 |
| 54 | 2NC | 40,696,802.13 | 4.8933399734 | 4.6433399734 | 360 | 359 | 3.416 | 12.000 | N/A | 3 | 1 |
| 55 | 2NC | 3,353,428.91 | 5.0744050205 | 4.8244050205 | 360 | 360 | 3.633 | 12.000 | N/A | 4 | 1 |
| 56 | 2NC | 319,519,077.77 | 4.9366846004 | 4.6866846004 | 360 | 359 | 2.256 | 11.358 | N/A | 12 | 12 |
| 57 | 2NC | 24,317,469.00 | 4.5820486070 | 4.3320486070 | 360 | 359 | 2.250 | 11.246 | N/A | 12 | 12 |
| 58 | 2NC | 480,000.00 | 6.1250000000 | 5.8750000000 | 360 | 360 | 2.250 | 12.125 | N/A | 13 | 12 |
| 59 | 2NC | 745,253.33 | 6.8750000000 | 6.6250000000 | 360 | 358 | 3.500 | 12.000 | N/A | 5 | 6 |
| 60 | 2NC | 576,800.00 | 5.8750000000 | 5.6250000000 | 360 | 360 | 4.000 | 11.875 | N/A | 7 | 6 |
| 61 | 2NC | 527,333.33 | 5.0000000000 | 4.7500000000 | 360 | 360 | 3.500 | 11.000 | N/A | 7 | 6 |
| 62 | 3 | 452,534,265.15 | 5.5991150340 | 5.2246032107 | 360 | 359 | 2.312 | 10.597 | N/A | 60 | 12 |
| 63 | 3 | 35,498,203.48 | 5.5084694917 | 5.1357020681 | 360 | 359 | 2.260 | 10.508 | N/A | 60 | 12 |
| 64 | 3 | 785,104,944.47 | 6.3128650024 | 5.9392944718 | 360 | 359 | 3.214 | 11.313 | N/A | 60 | 6 |
| 65 | 3 | 108,504,192.56 | 6.5904520856 | 6.2179788697 | 360 | 359 | 3.796 | 11.590 | N/A | 60 | 6 |
| 66 | 3 | 2,448,329.33 | 6.0418711372 | 5.6668711372 | 360 | 360 | 3.582 | 11.920 | N/A | 61 | 6 |
| 67 | 3 | 329,035.61 | 6.5000000000 | 6.1250000000 | 360 | 359 | 5.000 | 11.500 | N/A | 60 | 6 |
| 68 | 3 | 81,616,783.84 | 6.6999408857 | 6.3256760286 | 360 | 359 | 4.999 | 11.705 | N/A | 60 | 6 |
| 69 | 3 | 11,010,051.11 | 6.8753035260 | 6.5003035260 | 360 | 359 | 5.000 | 11.875 | N/A | 60 | 6 |
| 70 | 3 | 2,684,621.33 | 6.5268035939 | 6.1518035939 | 360 | 360 | 4.032 | 11.527 | N/A | 61 | 6 |
| 71 | 3 | 321,954.72 | 6.8122954474 | 6.4372954474 | 360 | 359 | 5.000 | 11.812 | N/A | 61 | 6 |
| 72 | 3 | 6,314,134.79 | 6.3600913361 | 5.9850913361 | 360 | 359 | 4.898 | 11.360 | N/A | 60 | 6 |
| 73 | 3 | 1,570,493.47 | 6.5506850352 | 6.1756850352 | 360 | 359 | 5.000 | 11.551 | N/A | 60 | 6 |
| 74 | 4 | 829,565.15 | 7.5000000000 | 7.2500000000 | 360 | 312 | 2.750 | 12.500 | N/A | 13 | 12 |
| 75 | 4 | 390,262,582.29 | 5.5625750562 | 5.3125750562 | 360 | 359 | 2.257 | 10.564 | N/A | 60 | 12 |
| 76 | 4 | 49,690,201.91 | 5.5891538910 | 5.3391538910 | 360 | 359 | 2.293 | 10.589 | N/A | 60 | 12 |
| 77 | 4 | 830,333.33 | 6.0000000000 | 5.7500000000 | 360 | 358 | 2.250 | 11.000 | N/A | 59 | 12 |
| 78 | 4 | 197,039,134.87 | 6.7300949944 | 6.4800949944 | 360 | 360 | 3.513 | 11.730 | N/A | 61 | 6 |
| 79 | 4 | 15,178,572.93 | 6.8485736514 | 6.5985736514 | 360 | 360 | 4.533 | 11.849 | N/A | 61 | 6 |
| 80 | 4 | 2,424,000.00 | 6.4385313531 | 6.1885313531 | 360 | 360 | 4.573 | 11.723 | N/A | 61 | 6 |

| Loan Number | Loan Group | Current Balance($) | Mortgage Rate (%) | Net Mortgage Rate (%) | Original Term to Maturity (in months) | Remaining Term to Maturity (in months) | Gross Margin (%) | Maximum Mortgage Rate (%) | Negative Amortization Cap (%) | Number of Months to Next Payment Adjustment | Months Between Payment Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 81 | 4 | 10,743,866.67 | 6.7385143772 | 6.4885143772 | 360 | 359 | 5.048 | 11.739 | N/A | 60 | 6 |
| 82 | 4 | 2,002,666.67 | 6.6246671105 | 6.3746671105 | 360 | 360 | 5.000 | 11.625 | N/A | 61 | 6 |
| 83 | 4 | 1,226,666.67 | 7.5000000000 | 7.2500000000 | 360 | 360 | 5.000 | 12.500 | N/A | 61 | 6 |
| 84 | 4 | 1,957,333.33 | 6.8920299728 | 6.6420299728 | 360 | 360 | 5.000 | 11.892 | N/A | 61 | 6 |
| 85 | 5 | 412,471,867.63 | 6.4765890226 | 6.2265890226 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 86 | 5 | 150,519,861.76 | 6.6515195946 | 6.4015195946 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 87 | 5 | 586,686,102.15 | 6.4921682187 | 6.2421682187 | 360 | 351 | N/A | N/A | N/A | N/A | N/A |
| 88 | 5 | 129,038,797.79 | 6.4555286586 | 6.2055286586 | 350 | 349 | N/A | N/A | N/A | N/A | N/A |
| 89 | 5 | 1,437,733.33 | 7.0157713531 | 6.7657713531 | 360 | 360 | N/A | N/A | N/A | N/A | N/A |
| 90 | 5 | 3,258,312.93 | 7.1557851963 | 6.9057851963 | 354 | 353 | N/A | N/A | N/A | N/A | N/A |
| 91 | 5 | 434,133.33 | 6.8750000000 | 6.6250000000 | 360 | 360 | N/A | N/A | N/A | N/A | N/A |
| 92 | 5 | 612,000.00 | 7.1421568627 | 6.8921568627 | 360 | 360 | N/A | N/A | N/A | N/A | N/A |
| 93 | 5 | 22,651,626.25 | 6.6387879998 | 6.3887879998 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 94 | 5 | 3,243,333.33 | 6.5896711202 | 6.3396711202 | 360 | 360 | N/A | N/A | N/A | N/A | N/A |
| 95 | 5 | 38,880,494.04 | 6.6168732146 | 6.3668732146 | 349 | 349 | N/A | N/A | N/A | N/A | N/A |
| 96 | 5 | 5,938,357.52 | 7.0523373063 | 6.8023373063 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 97 | 5 | 9,270,440.00 | 6.5676532074 | 6.3176532074 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 98 | 5 | 1,102,800.00 | 6.6250302261 | 6.3750302261 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 99 | 5 | 12,457,493.67 | 6.6829368652 | 6.4329368652 | 350 | 350 | N/A | N/A | N/A | N/A | N/A |
| 100 | 5 | 1,260,247.35 | 6.7500000000 | 6.5000000000 | 360 | 359 | N/A | N/A | N/A | N/A | N/A |
| 101 | 5 | 465,000.00 | 5.7500000000 | 5.5000000000 | 360 | 358 | N/A | N/A | N/A | N/A | N/A |

## MORTGAGE LOAN ASSUMPTIONS

| Loan Number | Loan Group | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Number of Months to Next Rate Adjustment | Months Between Rate Adjustment | Original Interest Only Term (in months) | Index |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 2.882 | N/A | N/A | 2 | 1 | 0 | 1 Year MTA |
| 2 | 1 | 2.984 | N/A | N/A | 1 | 1 | 0 | 1 Year MTA |
| 3 | 1 | 3.621 | N/A | N/A | 1 | 1 | 0 | 1 Year MTA |
| 4 | 1 | 3.920 | N/A | N/A | 1 | 1 | 0 | 1 Year MTA |
| 5 | 1 | 2.686 | N/A | N/A | 1 | 1 | 0 | 1 Year MTA |
| 6 | 1 | 2.795 | N/A | N/A | 1 | 1 | 0 | 1 Year MTA |
| 7 | 2C | 3.761 | 3.004 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 8 | 2C | 4.516 | 3.000 | 1.000 | 23 | 6 | 0 | 6 Month LIBOR |
| 9 | 2C | 3.614 | 3.000 | 1.000 | 22 | 6 | 60 | 6 Month LIBOR |
| 10 | 2C | 4.000 | 3.000 | 1.000 | 14 | 6 | 0 | 6 Month LIBOR |
| 11 | 2C | 4.654 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 12 | 2C | 5.000 | 3.000 | 1.000 | 23 | 6 | 0 | 6 Month LIBOR |
| 13 | 2C | 5.000 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 14 | 2C | 5.330 | 3.000 | 1.000 | 24 | 6 | 0 | 6 Month LIBOR |
| 15 | 2C | 5.000 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 16 | 2C | 5.129 | 3.000 | 1.000 | 23 | 6 | 0 | 6 Month LIBOR |
| 17 | 2C | 2.252 | 2.000 | 2.000 | 35 | 12 | 36 | 1 Year LIBOR |
| 18 | 2C | 2.258 | 2.000 | 2.000 | 35 | 12 | 0 | 1 Year LIBOR |
| 19 | 2C | 3.076 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 20 | 2C | 3.829 | 3.000 | 1.000 | 35 | 6 | 0 | 6 Month LIBOR |
| 21 | 2C | 3.408 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 22 | 2C | 5.000 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 23 | 2C | 4.876 | 3.000 | 1.000 | 35 | 6 | 0 | 6 Month LIBOR |
| 24 | 2C | 5.000 | 3.000 | 1.000 | 34 | 6 | 60 | 6 Month LIBOR |
| 25 | 2C | 5.000 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 26 | 2C | 2.902 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 27 | 2C | 2.894 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 28 | 2C | 3.850 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 29 | 2C | 3.288 | N/A | N/A | 2 | 1 | 66 | 1 Month LIBOR |
| 30 | 2C | 3.091 | N/A | N/A | 2 | 1 | 0 | 1 Month LIBOR |
| 31 | 2C | 2.255 | 2.000 | 2.000 | 11 | 12 | 87 | 1 Year LIBOR |
| 32 | 2C | 2.377 | 2.000 | 2.000 | 12 | 12 | 0 | 1 Year LIBOR |
| 33 | 2C | 2.250 | 2.000 | 2.000 | 11 | 12 | 0 | 1 Year LIBOR |
| 34 | 2C | 2.250 | 2.000 | 2.000 | 12 | 12 | 0 | 1 Year LIBOR |
| 35 | 2C | 2.924 | N/A | N/A | 5 | 6 | 103 | 6 Month LIBOR |
| 36 | 2C | 3.625 | 1.000 | 1.000 | 5 | 6 | 60 | 6 Month LIBOR |
| 37 | 2C | 4.000 | 1.000 | 1.000 | 6 | 6 | 60 | 6 Month LIBOR |
| 38 | 2C | 2.750 | 1.000 | 1.000 | 5 | 6 | 60 | 6 Month LIBOR |
| 39 | 2NC | 2.934 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 40 | 2NC | 4.541 | 3.000 | 1.000 | 24 | 6 | 0 | 6 Month LIBOR |

S-100

| Loan Number | Loan Group | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Number of Months to Next Rate Adjustment | Months Between Rate Adjustment | Original Interest Only Term (in months) | Index |
|---|---|---|---|---|---|---|---|---|
| 41 | 2NC | 3.000 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 42 | 2NC | 5.000 | 3.000 | 1.000 | 22 | 6 | 0 | 6 Month LIBOR |
| 43 | 2NC | 4.831 | 3.000 | 1.000 | 23 | 6 | 60 | 6 Month LIBOR |
| 44 | 2NC | 2.252 | 2.000 | 2.000 | 35 | 12 | 36 | 1 Year LIBOR |
| 45 | 2NC | 2.250 | 2.000 | 2.000 | 35 | 12 | 0 | 1 Year LIBOR |
| 46 | 2NC | 2.637 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 47 | 2NC | 2.250 | 3.000 | 1.000 | 36 | 6 | 0 | 6 Month LIBOR |
| 48 | 2NC | 3.375 | 3.000 | 1.000 | 36 | 6 | 60 | 6 Month LIBOR |
| 49 | 2NC | 3.375 | 3.000 | 1.000 | 36 | 6 | 0 | 6 Month LIBOR |
| 50 | 2NC | 5.000 | 3.000 | 1.000 | 35 | 6 | 60 | 6 Month LIBOR |
| 51 | 2NC | 2.664 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 52 | 2NC | 2.779 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 53 | 2NC | 3.521 | N/A | N/A | 1 | 1 | 120 | 1 Year MTA |
| 54 | 2NC | 3.416 | N/A | N/A | 2 | 1 | 70 | 1 Month LIBOR |
| 55 | 2NC | 3.633 | N/A | N/A | 3 | 1 | 0 | 1 Month LIBOR |
| 56 | 2NC | 2.256 | 2.000 | 2.000 | 11 | 12 | 93 | 1 Year LIBOR |
| 57 | 2NC | 2.250 | 2.000 | 2.000 | 11 | 12 | 0 | 1 Year LIBOR |
| 58 | 2NC | 2.250 | 2.000 | 2.000 | 12 | 12 | 60 | 1 Year LIBOR |
| 59 | 2NC | 3.500 | N/A | N/A | 4 | 6 | 60 | 6 Month LIBOR |
| 60 | 2NC | 4.000 | 1.000 | 1.000 | 6 | 6 | 0 | 6 Month LIBOR |
| 61 | 2NC | 3.500 | 1.000 | 1.000 | 6 | 6 | 60 | 6 Month LIBOR |
| 62 | 3 | 2.312 | 5.000 | 2.000 | 59 | 12 | 60 | 1 Year LIBOR |
| 63 | 3 | 2.260 | 5.000 | 2.000 | 59 | 12 | 0 | 1 Year LIBOR |
| 64 | 3 | 3.214 | 4.999 | 1.000 | 59 | 6 | 60 | 6 Month LIBOR |
| 65 | 3 | 3.796 | 5.000 | 1.000 | 59 | 6 | 0 | 6 Month LIBOR |
| 66 | 3 | 3.582 | 3.244 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 67 | 3 | 5.000 | 5.000 | 1.000 | 59 | 6 | 0 | 6 Month LIBOR |
| 68 | 3 | 4.999 | 4.990 | 1.000 | 59 | 6 | 60 | 6 Month LIBOR |
| 69 | 3 | 5.000 | 5.000 | 1.000 | 59 | 6 | 0 | 6 Month LIBOR |
| 70 | 3 | 4.032 | 5.000 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 71 | 3 | 5.000 | 5.000 | 1.000 | 60 | 6 | 0 | 6 Month LIBOR |
| 72 | 3 | 4.898 | 5.000 | 1.000 | 59 | 6 | 60 | 6 Month LIBOR |
| 73 | 3 | 5.000 | 5.000 | 1.000 | 59 | 6 | 0 | 6 Month LIBOR |
| 74 | 4 | 2.750 | 3.000 | 2.000 | 12 | 12 | 0 | 1 Year CMT |
| 75 | 4 | 2.257 | 4.996 | 2.000 | 59 | 12 | 60 | 1 Year LIBOR |
| 76 | 4 | 2.293 | 5.000 | 2.000 | 59 | 12 | 0 | 1 Year LIBOR |
| 77 | 4 | 2.250 | 5.000 | 2.000 | 58 | 12 | 60 | 1 Year LIBOR |
| 78 | 4 | 3.513 | 5.000 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 79 | 4 | 4.533 | 5.000 | 1.000 | 60 | 6 | 0 | 6 Month LIBOR |
| 80 | 4 | 4.573 | 4.430 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 81 | 4 | 5.048 | 5.000 | 1.000 | 59 | 6 | 60 | 6 Month LIBOR |
| 82 | 4 | 5.000 | 5.000 | 1.000 | 60 | 6 | 0 | 6 Month LIBOR |

| Loan Number | Loan Group | Minimum Mortgage Rate (%) | Initial Periodic Rate Cap (%) | Subsequent Periodic Rate Cap (%) | Number of Months to Next Rate Adjustment | Months Between Rate Adjustment | Original Interest Only Term (in months) | Index |
|---|---|---|---|---|---|---|---|---|
| 83 | 4 | 5.000 | 5.000 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 84 | 4 | 5.000 | 5.000 | 1.000 | 60 | 6 | 60 | 6 Month LIBOR |
| 85 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 86 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 87 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 88 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 89 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 90 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 91 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 92 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 93 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 94 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 95 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 96 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 97 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 98 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |
| 99 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 100 | 5 | N/A | N/A | N/A | N/A | N/A | 0 | N/A |
| 101 | 5 | N/A | N/A | N/A | N/A | N/A | 60 | N/A |

There will be discrepancies between the characteristics of the actual mortgage loans pledged and assigned to the Indenture Trustee and the characteristics assumed in preparing the tables below. Any discrepancy may have an effect upon the percentages of the initial Note Principal Balances outstanding (and the weighted average lives) of the classes of Notes set forth in the tables below. In addition, to the extent that the actual mortgage loans included in the mortgage pool have characteristics that differ from those assumed in preparing the tables below, the Notes may mature earlier or later than indicated by the tables below. Based on the foregoing assumptions, the tables below indicate the weighted average life of each class of Notes and set forth the percentage of the initial Note Principal Balance of each such class that would be outstanding after each of the payment dates shown, at specified percentages of CPR and the Prepayment Assumption. Neither the prepayment model used in this prospectus supplement nor any other prepayment model or assumption purports to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans included in the trust. Variations in the prepayment experience and the balance of the mortgage loans that prepay may increase or decrease the percentages of the initial principal balances (and weighted average lives) shown in the following tables. Variations may occur even if the average prepayment experience of all of the mortgage loans equals any of the specified percentages of CPR and the Prepayment Assumption.  The timing of changes in the rate of prepayment may significantly affect the actual yield to maturity to investors, even if the average rate of Principal Prepayments is consistent with the expectations of investors.

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

|  | Class I-A-1, Class I-A-2 and Class I-A-3 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 91 | 74 | 58 | 47 |
| June 2007 ............................... | 82 | 54 | 32 | 20 |
| June 2008 ............................... | 74 | 39 | 16 | 6 |
| June 2009 ............................... | 67 | 31 | 13 | 6 |
| June 2010 ............................... | 59 | 23 | 8 | 3 |
| June 2011 ............................... | 52 | 17 | 5 | 2 |
| June 2012 ............................... | 45 | 13 | 3 | 1 |
| June 2013 ............................... | 40 | 9 | 2 | * |
| June 2014 ............................... | 35 | 7 | 1 | 0 |
| June 2015 ............................... | 31 | 5 | * | 0 |
| June 2016 ............................... | 27 | 4 | 0 | 0 |
| June 2017 ............................... | 24 | 3 | 0 | 0 |
| June 2018 ............................... | 21 | 2 | 0 | 0 |
| June 2019 ............................... | 18 | 2 | 0 | 0 |
| June 2020 ............................... | 16 | 1 | 0 | 0 |
| June 2021 ............................... | 14 | 1 | 0 | 0 |
| June 2022 ............................... | 12 | * | 0 | 0 |
| June 2023 ............................... | 10 | * | 0 | 0 |
| June 2024 ............................... | 9 | 0 | 0 | 0 |
| June 2025 ............................... | 8 | 0 | 0 | 0 |
| June 2026 ............................... | 6 | 0 | 0 | 0 |
| June 2027 ............................... | 5 | 0 | 0 | 0 |
| June 2028 ............................... | 5 | 0 | 0 | 0 |
| June 2029 ............................... | 4 | 0 | 0 | 0 |
| June 2030 ............................... | 3 | 0 | 0 | 0 |
| June 2031 ............................... | 2 | 0 | 0 | 0 |
| June 2032 ............................... | 2 | 0 | 0 | 0 |
| June 2033 ............................... | 1 | 0 | 0 | 0 |
| June 2034 ............................... | * | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 8.19 | 3.40 | 1.89 | 1.33 |
| Weighted Average Life in years (to optional termination date)** | 7.70 | 3.10 | 1.71 | 1.21 |

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages**

| | Class II-A-1 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................. | 100 | 100 | 100 | 100 |
| June 2006 .............................. | 89 | 73 | 57 | 46 |
| June 2007 .............................. | 79 | 53 | 31 | 19 |
| June 2008 .............................. | 70 | 37 | 15 | 5 |
| June 2009 .............................. | 62 | 29 | 12 | 5 |
| June 2010 .............................. | 55 | 21 | 7 | 3 |
| June 2011 .............................. | 48 | 16 | 4 | 1 |
| June 2012 .............................. | 42 | 12 | 2 | * |
| June 2013 .............................. | 38 | 9 | 1 | 0 |
| June 2014 .............................. | 33 | 6 | 1 | 0 |
| June 2015 .............................. | 29 | 5 | * | 0 |
| June 2016 .............................. | 26 | 3 | 0 | 0 |
| June 2017 .............................. | 22 | 2 | 0 | 0 |
| June 2018 .............................. | 20 | 2 | 0 | 0 |
| June 2019 .............................. | 17 | 1 | 0 | 0 |
| June 2020 .............................. | 15 | 1 | 0 | 0 |
| June 2021 .............................. | 13 | * | 0 | 0 |
| June 2022 .............................. | 11 | * | 0 | 0 |
| June 2023 .............................. | 9 | 0 | 0 | 0 |
| June 2024 .............................. | 8 | 0 | 0 | 0 |
| June 2025 .............................. | 7 | 0 | 0 | 0 |
| June 2026 .............................. | 5 | 0 | 0 | 0 |
| June 2027 .............................. | 5 | 0 | 0 | 0 |
| June 2028 .............................. | 4 | 0 | 0 | 0 |
| June 2029 .............................. | 3 | 0 | 0 | 0 |
| June 2030 .............................. | 2 | 0 | 0 | 0 |
| June 2031 .............................. | 2 | 0 | 0 | 0 |
| June 2032 .............................. | 1 | 0 | 0 | 0 |
| June 2033 .............................. | * | 0 | 0 | 0 |
| June 2034 .............................. | 0 | 0 | 0 | 0 |
| June 2035 .............................. | 0 | 0 | 0 | 0 |
| June 2036 .............................. | 0 | 0 | 0 | 0 |
| June 2037 .............................. | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.68 | 3.23 | 1.82 | 1.29 |
| Weighted Average Life in years (to optional termination date)** | 7.30 | 2.98 | 1.67 | 1.19 |

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| CPR: | Class II-A-2 Notes | | | |
|---|---|---|---|---|
| | **10%** | **25%** | **40%** | **50%** |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 89 | 73 | 57 | 46 |
| June 2007 ............................... | 79 | 53 | 31 | 19 |
| June 2008 ............................... | 70 | 37 | 15 | 5 |
| June 2009 ............................... | 62 | 29 | 12 | 5 |
| June 2010 ............................... | 55 | 22 | 7 | 3 |
| June 2011 ............................... | 49 | 16 | 4 | 1 |
| June 2012 ............................... | 43 | 12 | 2 | * |
| June 2013 ............................... | 38 | 9 | 1 | 0 |
| June 2014 ............................... | 34 | 6 | 1 | 0 |
| June 2015 ............................... | 30 | 5 | * | 0 |
| June 2016 ............................... | 26 | 3 | 0 | 0 |
| June 2017 ............................... | 23 | 2 | 0 | 0 |
| June 2018 ............................... | 20 | 2 | 0 | 0 |
| June 2019 ............................... | 17 | 1 | 0 | 0 |
| June 2020 ............................... | 15 | 1 | 0 | 0 |
| June 2021 ............................... | 13 | * | 0 | 0 |
| June 2022 ............................... | 11 | * | 0 | 0 |
| June 2023 ............................... | 9 | 0 | 0 | 0 |
| June 2024 ............................... | 8 | 0 | 0 | 0 |
| June 2025 ............................... | 7 | 0 | 0 | 0 |
| June 2026 ............................... | 6 | 0 | 0 | 0 |
| June 2027 ............................... | 5 | 0 | 0 | 0 |
| June 2028 ............................... | 4 | 0 | 0 | 0 |
| June 2029 ............................... | 3 | 0 | 0 | 0 |
| June 2030 ............................... | 2 | 0 | 0 | 0 |
| June 2031 ............................... | 2 | 0 | 0 | 0 |
| June 2032 ............................... | 1 | 0 | 0 | 0 |
| June 2033 ............................... | * | 0 | 0 | 0 |
| June 2034 ............................... | 0 | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.74 | 3.25 | 1.82 | 1.29 |
| Weighted Average Life in years (to optional termination date)** | 7.36 | 2.99 | 1.67 | 1.19 |

(\*)     Indicates a number that is greater than zero but less than 0.5%.

(\*\*)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class II-A-3 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 89 | 73 | 57 | 46 |
| June 2007 ............................... | 79 | 53 | 31 | 19 |
| June 2008 ............................... | 70 | 37 | 15 | 5 |
| June 2009 ............................... | 62 | 29 | 12 | 5 |
| June 2010 ............................... | 55 | 22 | 7 | 3 |
| June 2011 ............................... | 48 | 16 | 4 | 1 |
| June 2012 ............................... | 43 | 12 | 2 | * |
| June 2013 ............................... | 38 | 9 | 1 | 0 |
| June 2014 ............................... | 33 | 6 | 1 | 0 |
| June 2015 ............................... | 29 | 5 | * | 0 |
| June 2016 ............................... | 26 | 3 | 0 | 0 |
| June 2017 ............................... | 23 | 2 | 0 | 0 |
| June 2018 ............................... | 20 | 2 | 0 | 0 |
| June 2019 ............................... | 17 | 1 | 0 | 0 |
| June 2020 ............................... | 15 | 1 | 0 | 0 |
| June 2021 ............................... | 13 | * | 0 | 0 |
| June 2022 ............................... | 11 | * | 0 | 0 |
| June 2023 ............................... | 9 | 0 | 0 | 0 |
| June 2024 ............................... | 8 | 0 | 0 | 0 |
| June 2025 ............................... | 7 | 0 | 0 | 0 |
| June 2026 ............................... | 6 | 0 | 0 | 0 |
| June 2027 ............................... | 5 | 0 | 0 | 0 |
| June 2028 ............................... | 4 | 0 | 0 | 0 |
| June 2029 ............................... | 3 | 0 | 0 | 0 |
| June 2030 ............................... | 2 | 0 | 0 | 0 |
| June 2031 ............................... | 2 | 0 | 0 | 0 |
| June 2032 ............................... | 1 | 0 | 0 | 0 |
| June 2033 ............................... | * | 0 | 0 | 0 |
| June 2034 ............................... | 0 | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.72 | 3.24 | 1.82 | 1.29 |
| Weighted Average Life in years (to optional termination date)** | 7.33 | 2.98 | 1.67 | 1.19 |

_____

(*)        Indicates a number that is greater than zero but less than 0.5%.

(**)      The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| CPR: | Class III-A Notes | | | |
|---|---|---|---|---|
| | **10%** | **25%** | **40%** | **50%** |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 89 | 73 | 57 | 46 |
| June 2007 ............................... | 79 | 53 | 31 | 19 |
| June 2008 ............................... | 70 | 37 | 15 | 5 |
| June 2009 ............................... | 62 | 29 | 12 | 5 |
| June 2010 ............................... | 55 | 22 | 7 | 3 |
| June 2011 ............................... | 48 | 16 | 4 | 1 |
| June 2012 ............................... | 42 | 12 | 2 | * |
| June 2013 ............................... | 37 | 9 | 1 | 0 |
| June 2014 ............................... | 33 | 6 | 1 | 0 |
| June 2015 ............................... | 29 | 5 | * | 0 |
| June 2016 ............................... | 25 | 3 | 0 | 0 |
| June 2017 ............................... | 22 | 2 | 0 | 0 |
| June 2018 ............................... | 19 | 2 | 0 | 0 |
| June 2019 ............................... | 17 | 1 | 0 | 0 |
| June 2020 ............................... | 15 | 1 | 0 | 0 |
| June 2021 ............................... | 13 | * | 0 | 0 |
| June 2022 ............................... | 11 | * | 0 | 0 |
| June 2023 ............................... | 9 | 0 | 0 | 0 |
| June 2024 ............................... | 8 | 0 | 0 | 0 |
| June 2025 ............................... | 7 | 0 | 0 | 0 |
| June 2026 ............................... | 5 | 0 | 0 | 0 |
| June 2027 ............................... | 4 | 0 | 0 | 0 |
| June 2028 ............................... | 4 | 0 | 0 | 0 |
| June 2029 ............................... | 3 | 0 | 0 | 0 |
| June 2030 ............................... | 2 | 0 | 0 | 0 |
| June 2031 ............................... | 1 | 0 | 0 | 0 |
| June 2032 ............................... | 1 | 0 | 0 | 0 |
| June 2033 ............................... | * | 0 | 0 | 0 |
| June 2034 ............................... | 0 | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.64 | 3.23 | 1.81 | 1.29 |
| Weighted Average Life in years (to optional termination date)** | 7.27 | 2.98 | 1.67 | 1.19 |

_____

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 .............................. | 89 | 73 | 57 | 46 |
| June 2007 .............................. | 79 | 53 | 31 | 19 |
| June 2008 .............................. | 70 | 37 | 15 | 5 |
| June 2009 .............................. | 62 | 29 | 12 | 5 |
| June 2010 .............................. | 55 | 22 | 7 | 3 |
| June 2011 .............................. | 48 | 16 | 4 | 1 |
| June 2012 .............................. | 42 | 12 | 2 | * |
| June 2013 .............................. | 37 | 9 | 1 | 0 |
| June 2014 .............................. | 33 | 6 | 1 | 0 |
| June 2015 .............................. | 29 | 5 | * | 0 |
| June 2016 .............................. | 25 | 3 | 0 | 0 |
| June 2017 .............................. | 22 | 2 | 0 | 0 |
| June 2018 .............................. | 19 | 2 | 0 | 0 |
| June 2019 .............................. | 17 | 1 | 0 | 0 |
| June 2020 .............................. | 14 | 1 | 0 | 0 |
| June 2021 .............................. | 12 | * | 0 | 0 |
| June 2022 .............................. | 11 | * | 0 | 0 |
| June 2023 .............................. | 9 | 0 | 0 | 0 |
| June 2024 .............................. | 8 | 0 | 0 | 0 |
| June 2025 .............................. | 6 | 0 | 0 | 0 |
| June 2026 .............................. | 5 | 0 | 0 | 0 |
| June 2027 .............................. | 4 | 0 | 0 | 0 |
| June 2028 .............................. | 4 | 0 | 0 | 0 |
| June 2029 .............................. | 3 | 0 | 0 | 0 |
| June 2030 .............................. | 2 | 0 | 0 | 0 |
| June 2031 .............................. | 1 | 0 | 0 | 0 |
| June 2032 .............................. | 1 | 0 | 0 | 0 |
| June 2033 .............................. | * | 0 | 0 | 0 |
| June 2034 .............................. | 0 | 0 | 0 | 0 |
| June 2035 .............................. | 0 | 0 | 0 | 0 |
| June 2036 .............................. | 0 | 0 | 0 | 0 |
| June 2037 .............................. | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.63 | 3.23 | 1.81 | 1.29 |
| Weighted Average Life in years (to optional termination date)** | 7.26 | 2.98 | 1.67 | 1.19 |

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the
Note Principal Balance by the number of years from the date of issuance of the Note to the related
payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of
the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-A-1 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | 50% | 100% | 150% | 200% |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ........................................ | 100 | 100 | 100 | 100 |
| June 2007 ........................................ | 100 | 100 | 100 | 100 |
| June 2008 ........................................ | 100 | 100 | 100 | 100 |
| June 2009 ........................................ | 93 | 88 | 86 | 85 |
| June 2010 ........................................ | 87 | 78 | 70 | 44 |
| June 2011 ........................................ | 77 | 62 | 49 | 22 |
| June 2012 ........................................ | 66 | 46 | 30 | 10 |
| June 2013 ........................................ | 42 | 19 | 14 | 3 |
| June 2014 ........................................ | 27 | 7 | 3 | 0 |
| June 2015 ........................................ | 17 | 3 | * | 0 |
| June 2016 ........................................ | 11 | 1 | * | 0 |
| June 2017 ........................................ | 7 | * | * | 0 |
| June 2018 ........................................ | 4 | * | 0 | 0 |
| June 2019 ........................................ | 2 | * | 0 | 0 |
| June 2020 ........................................ | 1 | * | 0 | 0 |
| June 2021 ........................................ | 1 | * | 0 | 0 |
| June 2022 ........................................ | 1 | * | 0 | 0 |
| June 2023 ........................................ | * | * | 0 | 0 |
| June 2024 ........................................ | * | 0 | 0 | 0 |
| June 2025 ........................................ | * | 0 | 0 | 0 |
| June 2026 ........................................ | * | 0 | 0 | 0 |
| June 2027 ........................................ | * | 0 | 0 | 0 |
| June 2028 ........................................ | * | 0 | 0 | 0 |
| June 2029 ........................................ | * | 0 | 0 | 0 |
| June 2030 ........................................ | * | 0 | 0 | 0 |
| June 2031 ........................................ | * | 0 | 0 | 0 |
| June 2032 ........................................ | * | 0 | 0 | 0 |
| June 2033 ........................................ | 0 | 0 | 0 | 0 |
| June 2034 ........................................ | 0 | 0 | 0 | 0 |
| June 2035 ........................................ | 0 | 0 | 0 | 0 |
| June 2036 ........................................ | 0 | 0 | 0 | 0 |
| June 2037 ........................................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 7.89 | 6.56 | 6.07 | 5.18 |
| Weighted Average Life in years (to optional termination date)** | 7.87 | 6.43 | 5.12 | 3.99 |

_____

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-A-2 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ........................................ | 79 | 60 | 41 | 21 |
| June 2007 ........................................ | 52 | 12 | 0 | 0 |
| June 2008 ........................................ | 28 | 0 | 0 | 0 |
| June 2009 ........................................ | 8 | 0 | 0 | 0 |
| June 2010 ........................................ | 0 | 0 | 0 | 0 |
| June 2011 ........................................ | 0 | 0 | 0 | 0 |
| June 2012 ........................................ | 0 | 0 | 0 | 0 |
| June 2013 ........................................ | 0 | 0 | 0 | 0 |
| June 2014 ........................................ | 0 | 0 | 0 | 0 |
| June 2015 ........................................ | 0 | 0 | 0 | 0 |
| June 2016 ........................................ | 0 | 0 | 0 | 0 |
| June 2017 ........................................ | 0 | 0 | 0 | 0 |
| June 2018 ........................................ | 0 | 0 | 0 | 0 |
| June 2019 ........................................ | 0 | 0 | 0 | 0 |
| June 2020 ........................................ | 0 | 0 | 0 | 0 |
| June 2021 ........................................ | 0 | 0 | 0 | 0 |
| June 2022 ........................................ | 0 | 0 | 0 | 0 |
| June 2023 ........................................ | 0 | 0 | 0 | 0 |
| June 2024 ........................................ | 0 | 0 | 0 | 0 |
| June 2025 ........................................ | 0 | 0 | 0 | 0 |
| June 2026 ........................................ | 0 | 0 | 0 | 0 |
| June 2027 ........................................ | 0 | 0 | 0 | 0 |
| June 2028 ........................................ | 0 | 0 | 0 | 0 |
| June 2029 ........................................ | 0 | 0 | 0 | 0 |
| June 2030 ........................................ | 0 | 0 | 0 | 0 |
| June 2031 ........................................ | 0 | 0 | 0 | 0 |
| June 2032 ........................................ | 0 | 0 | 0 | 0 |
| June 2033 ........................................ | 0 | 0 | 0 | 0 |
| June 2034 ........................................ | 0 | 0 | 0 | 0 |
| June 2035 ........................................ | 0 | 0 | 0 | 0 |
| June 2036 ........................................ | 0 | 0 | 0 | 0 |
| June 2037 ........................................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 2.22 | 1.25 | 0.91 | 0.74 |
| Weighted Average Life in years (to optional termination date)** | 2.22 | 1.25 | 0.91 | 0.74 |

_____

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-A-3 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ........................................ | 100 | 100 | 100 | 100 |
| June 2007 ........................................ | 100 | 100 | 43 | 0 |
| June 2008 ........................................ | 100 | 41 | 0 | 0 |
| June 2009 ........................................ | 100 | 0 | 0 | 0 |
| June 2010 ........................................ | 79 | 0 | 0 | 0 |
| June 2011 ........................................ | 47 | 0 | 0 | 0 |
| June 2012 ........................................ | 23 | 0 | 0 | 0 |
| June 2013 ........................................ | 9 | 0 | 0 | 0 |
| June 2014 ........................................ | 0 | 0 | 0 | 0 |
| June 2015 ........................................ | 0 | 0 | 0 | 0 |
| June 2016 ........................................ | 0 | 0 | 0 | 0 |
| June 2017 ........................................ | 0 | 0 | 0 | 0 |
| June 2018 ........................................ | 0 | 0 | 0 | 0 |
| June 2019 ........................................ | 0 | 0 | 0 | 0 |
| June 2020 ........................................ | 0 | 0 | 0 | 0 |
| June 2021 ........................................ | 0 | 0 | 0 | 0 |
| June 2022 ........................................ | 0 | 0 | 0 | 0 |
| June 2023 ........................................ | 0 | 0 | 0 | 0 |
| June 2024 ........................................ | 0 | 0 | 0 | 0 |
| June 2025 ........................................ | 0 | 0 | 0 | 0 |
| June 2026 ........................................ | 0 | 0 | 0 | 0 |
| June 2027 ........................................ | 0 | 0 | 0 | 0 |
| June 2028 ........................................ | 0 | 0 | 0 | 0 |
| June 2029 ........................................ | 0 | 0 | 0 | 0 |
| June 2030 ........................................ | 0 | 0 | 0 | 0 |
| June 2031 ........................................ | 0 | 0 | 0 | 0 |
| June 2032 ........................................ | 0 | 0 | 0 | 0 |
| June 2033 ........................................ | 0 | 0 | 0 | 0 |
| June 2034 ........................................ | 0 | 0 | 0 | 0 |
| June 2035 ........................................ | 0 | 0 | 0 | 0 |
| June 2036 ........................................ | 0 | 0 | 0 | 0 |
| June 2037 ........................................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 6.15 | 3.00 | 2.00 | 1.52 |
| Weighted Average Life in years (to optional termination date)** | 6.15 | 3.00 | 2.00 | 1.52 |

_____

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| Group V Prepayment Assumption: | Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes | | | |
|---|---|---|---|---|
| | 50% | 100% | 150% | 200% |
| **Payment Date** | | | | |
| Initial Percentage .......................... | 100 | 100 | 100 | 100 |
| June 2006 ...................................... | 100 | 100 | 100 | 100 |
| June 2007 ...................................... | 100 | 100 | 100 | 76 |
| June 2008 ...................................... | 100 | 100 | 58 | 5 |
| June 2009 ...................................... | 100 | 94 | 36 | 0 |
| June 2010 ...................................... | 100 | 67 | 16 | 0 |
| June 2011 ...................................... | 100 | 48 | 9 | 0 |
| June 2012 ...................................... | 100 | 36 | 5 | 0 |
| June 2013 ...................................... | 100 | 33 | 5 | 0 |
| June 2014 ...................................... | 96 | 27 | 5 | 0 |
| June 2015 ...................................... | 84 | 21 | 3 | 0 |
| June 2016 ...................................... | 74 | 16 | 2 | 0 |
| June 2017 ...................................... | 64 | 12 | * | 0 |
| June 2018 ...................................... | 55 | 9 | 0 | 0 |
| June 2019 ...................................... | 47 | 6 | 0 | 0 |
| June 2020 ...................................... | 40 | 4 | 0 | 0 |
| June 2021 ...................................... | 34 | 3 | 0 | 0 |
| June 2022 ...................................... | 29 | 1 | 0 | 0 |
| June 2023 ...................................... | 24 | 1 | 0 | 0 |
| June 2024 ...................................... | 20 | * | 0 | 0 |
| June 2025 ...................................... | 16 | 0 | 0 | 0 |
| June 2026 ...................................... | 13 | 0 | 0 | 0 |
| June 2027 ...................................... | 11 | 0 | 0 | 0 |
| June 2028 ...................................... | 8 | 0 | 0 | 0 |
| June 2029 ...................................... | 6 | 0 | 0 | 0 |
| June 2030 ...................................... | 4 | 0 | 0 | 0 |
| June 2031 ...................................... | 2 | 0 | 0 | 0 |
| June 2032 ...................................... | 1 | 0 | 0 | 0 |
| June 2033 ...................................... | 0 | 0 | 0 | 0 |
| June 2034 ...................................... | 0 | 0 | 0 | 0 |
| June 2035 ...................................... | 0 | 0 | 0 | 0 |
| June 2036 ...................................... | 0 | 0 | 0 | 0 |
| June 2037 ...................................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 14.84 | 7.34 | 4.04 | 2.42 |
| Weighted Average Life in years (to optional termination date)** | 13.27 | 6.33 | 3.73 | 2.42 |

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-1 Notes | | | |
|---|---|---|---|---|
| CPR: | **10%** | **25%** | **40%** | **50%** |
| **Payment Date** | | | | |
| Initial Percentage.................. | 100 | 100 | 100 | 100 |
| June 2006 ............................. | 100 | 100 | 100 | 100 |
| June 2007 ............................. | 100 | 100 | 100 | 100 |
| June 2008 ............................. | 100 | 100 | 100 | 100 |
| June 2009 ............................. | 100 | 64 | 26 | 35 |
| June 2010 ............................. | 100 | 48 | 16 | 6 |
| June 2011 ............................. | 100 | 35 | 9 | 0 |
| June 2012 ............................. | 93 | 26 | 4 | 0 |
| June 2013 ............................. | 82 | 19 | 0 | 0 |
| June 2014 ............................. | 73 | 14 | 0 | 0 |
| June 2015 ............................. | 64 | 10 | 0 | 0 |
| June 2016 ............................. | 56 | 8 | 0 | 0 |
| June 2017 ............................. | 49 | 5 | 0 | 0 |
| June 2018 ............................. | 43 | 0 | 0 | 0 |
| June 2019 ............................. | 37 | 0 | 0 | 0 |
| June 2020 ............................. | 32 | 0 | 0 | 0 |
| June 2021 ............................. | 28 | 0 | 0 | 0 |
| June 2022 ............................. | 24 | 0 | 0 | 0 |
| June 2023 ............................. | 21 | 0 | 0 | 0 |
| June 2024 ............................. | 17 | 0 | 0 | 0 |
| June 2025 ............................. | 15 | 0 | 0 | 0 |
| June 2026 ............................. | 12 | 0 | 0 | 0 |
| June 2027 ............................. | 10 | 0 | 0 | 0 |
| June 2028 ............................. | 8 | 0 | 0 | 0 |
| June 2029 ............................. | 7 | 0 | 0 | 0 |
| June 2030 ............................. | 3 | 0 | 0 | 0 |
| June 2031 ............................. | 0 | 0 | 0 | 0 |
| June 2032 ............................. | 0 | 0 | 0 | 0 |
| June 2033 ............................. | 0 | 0 | 0 | 0 |
| June 2034 ............................. | 0 | 0 | 0 | 0 |
| June 2035 ............................. | 0 | 0 | 0 | 0 |
| June 2036 ............................. | 0 | 0 | 0 | 0 |
| June 2037 ............................. | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 13.31 | 5.75 | 4.07 | 4.09 |
| Weighted Average Life in years (to optional termination date)** | 12.54 | 5.29 | 3.81 | 3.42 |

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| | Class M-2 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................. | 100 | 100 | 100 | 100 |
| June 2006 ............................ | 100 | 100 | 100 | 100 |
| June 2007 ............................ | 100 | 100 | 100 | 100 |
| June 2008 ............................ | 100 | 100 | 100 | 100 |
| June 2009 ............................ | 100 | 64 | 26 | 13 |
| June 2010 ............................ | 100 | 48 | 16 | 3 |
| June 2011 ............................ | 100 | 35 | 9 | 0 |
| June 2012 ............................ | 93 | 26 | 0 | 0 |
| June 2013 ............................ | 82 | 19 | 0 | 0 |
| June 2014 ............................ | 73 | 14 | 0 | 0 |
| June 2015 ............................ | 64 | 10 | 0 | 0 |
| June 2016 ............................ | 56 | 8 | 0 | 0 |
| June 2017 ............................ | 49 | 0 | 0 | 0 |
| June 2018 ............................ | 43 | 0 | 0 | 0 |
| June 2019 ............................ | 37 | 0 | 0 | 0 |
| June 2020 ............................ | 32 | 0 | 0 | 0 |
| June 2021 ............................ | 28 | 0 | 0 | 0 |
| June 2022 ............................ | 24 | 0 | 0 | 0 |
| June 2023 ............................ | 21 | 0 | 0 | 0 |
| June 2024 ............................ | 17 | 0 | 0 | 0 |
| June 2025 ............................ | 15 | 0 | 0 | 0 |
| June 2026 ............................ | 12 | 0 | 0 | 0 |
| June 2027 ............................ | 10 | 0 | 0 | 0 |
| June 2028 ............................ | 8 | 0 | 0 | 0 |
| June 2029 ............................ | 5 | 0 | 0 | 0 |
| June 2030 ............................ | 0 | 0 | 0 | 0 |
| June 2031 ............................ | 0 | 0 | 0 | 0 |
| June 2032 ............................ | 0 | 0 | 0 | 0 |
| June 2033 ............................ | 0 | 0 | 0 | 0 |
| June 2034 ............................ | 0 | 0 | 0 | 0 |
| June 2035 ............................ | 0 | 0 | 0 | 0 |
| June 2036 ............................ | 0 | 0 | 0 | 0 |
| June 2037 ............................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 13.26 | 5.71 | 3.99 | 3.87 |
| Weighted Average Life in years (to optional termination date)** | 12.54 | 5.28 | 3.74 | 3.43 |

(*)  Indicates a number that is greater than zero but less than 0.5%.

(**)  The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

## Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| | Class M-3 Notes | | | |
|---|---|---|---|---|
| **CPR:** | **10%** | **25%** | **40%** | **50%** |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 .............................. | 100 | 100 | 100 | 100 |
| June 2007 .............................. | 100 | 100 | 100 | 100 |
| June 2008 .............................. | 100 | 100 | 100 | 100 |
| June 2009 .............................. | 100 | 64 | 26 | 13 |
| June 2010 .............................. | 100 | 48 | 16 | 0 |
| June 2011 .............................. | 100 | 35 | 9 | 0 |
| June 2012 .............................. | 93 | 26 | 0 | 0 |
| June 2013 .............................. | 82 | 19 | 0 | 0 |
| June 2014 .............................. | 73 | 14 | 0 | 0 |
| June 2015 .............................. | 64 | 10 | 0 | 0 |
| June 2016 .............................. | 56 | 6 | 0 | 0 |
| June 2017 .............................. | 49 | 0 | 0 | 0 |
| June 2018 .............................. | 43 | 0 | 0 | 0 |
| June 2019 .............................. | 37 | 0 | 0 | 0 |
| June 2020 .............................. | 32 | 0 | 0 | 0 |
| June 2021 .............................. | 28 | 0 | 0 | 0 |
| June 2022 .............................. | 24 | 0 | 0 | 0 |
| June 2023 .............................. | 21 | 0 | 0 | 0 |
| June 2024 .............................. | 17 | 0 | 0 | 0 |
| June 2025 .............................. | 15 | 0 | 0 | 0 |
| June 2026 .............................. | 12 | 0 | 0 | 0 |
| June 2027 .............................. | 10 | 0 | 0 | 0 |
| June 2028 .............................. | 8 | 0 | 0 | 0 |
| June 2029 .............................. | 0 | 0 | 0 | 0 |
| June 2030 .............................. | 0 | 0 | 0 | 0 |
| June 2031 .............................. | 0 | 0 | 0 | 0 |
| June 2032 .............................. | 0 | 0 | 0 | 0 |
| June 2033 .............................. | 0 | 0 | 0 | 0 |
| June 2034 .............................. | 0 | 0 | 0 | 0 |
| June 2035 .............................. | 0 | 0 | 0 | 0 |
| June 2036 .............................. | 0 | 0 | 0 | 0 |
| June 2037 .............................. | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 13.22 | 5.67 | 3.93 | 3.74 |
| Weighted Average Life in years (to optional termination date)** | 12.54 | 5.28 | 3.70 | 3.43 |

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following CPR Percentages**

| | Class M-4 Notes | | | |
|---|---|---|---|---|
| CPR: | **10%** | **25%** | **40%** | **50%** |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 100 | 100 | 100 | 100 |
| June 2007 ............................... | 100 | 100 | 100 | 100 |
| June 2008 ............................... | 100 | 100 | 100 | 100 |
| June 2009 ............................... | 100 | 64 | 26 | 13 |
| June 2010 ............................... | 100 | 48 | 16 | 0 |
| June 2011 ............................... | 100 | 35 | 7 | 0 |
| June 2012 ............................... | 93 | 26 | 0 | 0 |
| June 2013 ............................... | 82 | 19 | 0 | 0 |
| June 2014 ............................... | 73 | 14 | 0 | 0 |
| June 2015 ............................... | 64 | 10 | 0 | 0 |
| June 2016 ............................... | 56 | 0 | 0 | 0 |
| June 2017 ............................... | 49 | 0 | 0 | 0 |
| June 2018 ............................... | 43 | 0 | 0 | 0 |
| June 2019 ............................... | 37 | 0 | 0 | 0 |
| June 2020 ............................... | 32 | 0 | 0 | 0 |
| June 2021 ............................... | 28 | 0 | 0 | 0 |
| June 2022 ............................... | 24 | 0 | 0 | 0 |
| June 2023 ............................... | 21 | 0 | 0 | 0 |
| June 2024 ............................... | 17 | 0 | 0 | 0 |
| June 2025 ............................... | 15 | 0 | 0 | 0 |
| June 2026 ............................... | 12 | 0 | 0 | 0 |
| June 2027 ............................... | 10 | 0 | 0 | 0 |
| June 2028 ............................... | 2 | 0 | 0 | 0 |
| June 2029 ............................... | 0 | 0 | 0 | 0 |
| June 2030 ............................... | 0 | 0 | 0 | 0 |
| June 2031 ............................... | 0 | 0 | 0 | 0 |
| June 2032 ............................... | 0 | 0 | 0 | 0 |
| June 2033 ............................... | 0 | 0 | 0 | 0 |
| June 2034 ............................... | 0 | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 13.15 | 5.63 | 3.86 | 3.63 |
| Weighted Average Life in years (to optional termination date)** | 12.54 | 5.28 | 3.67 | 3.43 |

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

### Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages

| | Class M-5 Notes | | | |
|---|---|---|---|---|
| CPR: | 10% | 25% | 40% | 50% |
| **Payment Date** | | | | |
| Initial Percentage.................... | 100 | 100 | 100 | 100 |
| June 2006 ............................... | 100 | 100 | 100 | 100 |
| June 2007 ............................... | 100 | 100 | 100 | 100 |
| June 2008 ............................... | 100 | 100 | 100 | 100 |
| June 2009 ............................... | 100 | 64 | 26 | 6 |
| June 2010 ............................... | 100 | 48 | 12 | 0 |
| June 2011 ............................... | 100 | 35 | 0 | 0 |
| June 2012 ............................... | 93 | 26 | 0 | 0 |
| June 2013 ............................... | 82 | 19 | 0 | 0 |
| June 2014 ............................... | 73 | 9 | 0 | 0 |
| June 2015 ............................... | 64 | 1 | 0 | 0 |
| June 2016 ............................... | 56 | 0 | 0 | 0 |
| June 2017 ............................... | 49 | 0 | 0 | 0 |
| June 2018 ............................... | 43 | 0 | 0 | 0 |
| June 2019 ............................... | 37 | 0 | 0 | 0 |
| June 2020 ............................... | 32 | 0 | 0 | 0 |
| June 2021 ............................... | 28 | 0 | 0 | 0 |
| June 2022 ............................... | 24 | 0 | 0 | 0 |
| June 2023 ............................... | 21 | 0 | 0 | 0 |
| June 2024 ............................... | 16 | 0 | 0 | 0 |
| June 2025 ............................... | 10 | 0 | 0 | 0 |
| June 2026 ............................... | 5 | 0 | 0 | 0 |
| June 2027 ............................... | 1 | 0 | 0 | 0 |
| June 2028 ............................... | 0 | 0 | 0 | 0 |
| June 2029 ............................... | 0 | 0 | 0 | 0 |
| June 2030 ............................... | 0 | 0 | 0 | 0 |
| June 2031 ............................... | 0 | 0 | 0 | 0 |
| June 2032 ............................... | 0 | 0 | 0 | 0 |
| June 2033 ............................... | 0 | 0 | 0 | 0 |
| June 2034 ............................... | 0 | 0 | 0 | 0 |
| June 2035 ............................... | 0 | 0 | 0 | 0 |
| June 2036 ............................... | 0 | 0 | 0 | 0 |
| June 2037 ............................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 12.91 | 5.47 | 3.73 | 3.43 |
| Weighted Average Life in years (to optional termination date)** | 12.54 | 5.28 | 3.62 | 3.35 |

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-M-1 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ........................... | 100 | 100 | 100 | 100 |
| June 2006 ...................................... | 100 | 100 | 100 | 100 |
| June 2007 ...................................... | 100 | 100 | 100 | 100 |
| June 2008 ...................................... | 100 | 100 | 100 | 100 |
| June 2009 ...................................... | 100 | 71 | 38 | 18 |
| June 2010 ...................................... | 100 | 54 | 24 | 9 |
| June 2011 ...................................... | 92 | 40 | 15 | * |
| June 2012 ...................................... | 79 | 30 | 10 | 0 |
| June 2013 ...................................... | 68 | 22 | 6 | 0 |
| June 2014 ...................................... | 59 | 17 | 0 | 0 |
| June 2015 ...................................... | 50 | 12 | 0 | 0 |
| June 2016 ...................................... | 43 | 9 | 0 | 0 |
| June 2017 ...................................... | 37 | 7 | 0 | 0 |
| June 2018 ...................................... | 31 | 1 | 0 | 0 |
| June 2019 ...................................... | 27 | 0 | 0 | 0 |
| June 2020 ...................................... | 23 | 0 | 0 | 0 |
| June 2021 ...................................... | 19 | 0 | 0 | 0 |
| June 2022 ...................................... | 16 | 0 | 0 | 0 |
| June 2023 ...................................... | 13 | 0 | 0 | 0 |
| June 2024 ...................................... | 11 | 0 | 0 | 0 |
| June 2025 ...................................... | 9 | 0 | 0 | 0 |
| June 2026 ...................................... | 7 | 0 | 0 | 0 |
| June 2027 ...................................... | 5 | 0 | 0 | 0 |
| June 2028 ...................................... | 0 | 0 | 0 | 0 |
| June 2029 ...................................... | 0 | 0 | 0 | 0 |
| June 2030 ...................................... | 0 | 0 | 0 | 0 |
| June 2031 ...................................... | 0 | 0 | 0 | 0 |
| June 2032 ...................................... | 0 | 0 | 0 | 0 |
| June 2033 ...................................... | 0 | 0 | 0 | 0 |
| June 2034 ...................................... | 0 | 0 | 0 | 0 |
| June 2035 ...................................... | 0 | 0 | 0 | 0 |
| June 2036 ...................................... | 0 | 0 | 0 | 0 |
| June 2037 ...................................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 11.46 | 6.14 | 4.35 | 3.85 |
| Weighted Average Life in years (to optional termination date)** | 10.71 | 5.67 | 4.06 | 3.65 |

_____

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-M-2 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ....................................... | 100 | 100 | 100 | 100 |
| June 2007 ....................................... | 100 | 100 | 100 | 100 |
| June 2008 ....................................... | 100 | 100 | 100 | 100 |
| June 2009 ....................................... | 100 | 71 | 38 | 18 |
| June 2010 ....................................... | 100 | 54 | 24 | 9 |
| June 2011 ....................................... | 92 | 40 | 15 | 0 |
| June 2012 ....................................... | 79 | 30 | 10 | 0 |
| June 2013 ....................................... | 68 | 22 | 1 | 0 |
| June 2014 ....................................... | 59 | 17 | 0 | 0 |
| June 2015 ....................................... | 50 | 12 | 0 | 0 |
| June 2016 ....................................... | 43 | 9 | 0 | 0 |
| June 2017 ....................................... | 37 | 5 | 0 | 0 |
| June 2018 ....................................... | 31 | 0 | 0 | 0 |
| June 2019 ....................................... | 27 | 0 | 0 | 0 |
| June 2020 ....................................... | 23 | 0 | 0 | 0 |
| June 2021 ....................................... | 19 | 0 | 0 | 0 |
| June 2022 ....................................... | 16 | 0 | 0 | 0 |
| June 2023 ....................................... | 13 | 0 | 0 | 0 |
| June 2024 ....................................... | 11 | 0 | 0 | 0 |
| June 2025 ....................................... | 9 | 0 | 0 | 0 |
| June 2026 ....................................... | 7 | 0 | 0 | 0 |
| June 2027 ....................................... | 0 | 0 | 0 | 0 |
| June 2028 ....................................... | 0 | 0 | 0 | 0 |
| June 2029 ....................................... | 0 | 0 | 0 | 0 |
| June 2030 ....................................... | 0 | 0 | 0 | 0 |
| June 2031 ....................................... | 0 | 0 | 0 | 0 |
| June 2032 ....................................... | 0 | 0 | 0 | 0 |
| June 2033 ....................................... | 0 | 0 | 0 | 0 |
| June 2034 ....................................... | 0 | 0 | 0 | 0 |
| June 2035 ....................................... | 0 | 0 | 0 | 0 |
| June 2036 ....................................... | 0 | 0 | 0 | 0 |
| June 2037 ....................................... | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 11.41 | 6.10 | 4.31 | 3.74 |
| Weighted Average Life in years (to optional termination date)** | 10.71 | 5.67 | 4.05 | 3.56 |

(*)  Indicates a number that is greater than zero but less than 0.5%.

(**)  The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-M-3 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ........................................ | 100 | 100 | 100 | 100 |
| June 2007 ........................................ | 100 | 100 | 100 | 100 |
| June 2008 ........................................ | 100 | 100 | 100 | 100 |
| June 2009 ........................................ | 100 | 71 | 38 | 18 |
| June 2010 ........................................ | 100 | 54 | 24 | 9 |
| June 2011 ........................................ | 92 | 40 | 15 | 0 |
| June 2012 ........................................ | 79 | 30 | 10 | 0 |
| June 2013 ........................................ | 68 | 22 | 0 | 0 |
| June 2014 ........................................ | 59 | 17 | 0 | 0 |
| June 2015 ........................................ | 50 | 12 | 0 | 0 |
| June 2016 ........................................ | 43 | 9 | 0 | 0 |
| June 2017 ........................................ | 37 | 0 | 0 | 0 |
| June 2018 ........................................ | 31 | 0 | 0 | 0 |
| June 2019 ........................................ | 27 | 0 | 0 | 0 |
| June 2020 ........................................ | 23 | 0 | 0 | 0 |
| June 2021 ........................................ | 19 | 0 | 0 | 0 |
| June 2022 ........................................ | 16 | 0 | 0 | 0 |
| June 2023 ........................................ | 13 | 0 | 0 | 0 |
| June 2024 ........................................ | 11 | 0 | 0 | 0 |
| June 2025 ........................................ | 9 | 0 | 0 | 0 |
| June 2026 ........................................ | 1 | 0 | 0 | 0 |
| June 2027 ........................................ | 0 | 0 | 0 | 0 |
| June 2028 ........................................ | 0 | 0 | 0 | 0 |
| June 2029 ........................................ | 0 | 0 | 0 | 0 |
| June 2030 ........................................ | 0 | 0 | 0 | 0 |
| June 2031 ........................................ | 0 | 0 | 0 | 0 |
| June 2032 ........................................ | 0 | 0 | 0 | 0 |
| June 2033 ........................................ | 0 | 0 | 0 | 0 |
| June 2034 ........................................ | 0 | 0 | 0 | 0 |
| June 2035 ........................................ | 0 | 0 | 0 | 0 |
| June 2036 ........................................ | 0 | 0 | 0 | 0 |
| June 2037 ........................................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 11.35 | 6.06 | 4.26 | 3.67 |
| Weighted Average Life in years (to optional termination date)** | 10.71 | 5.67 | 4.01 | 3.50 |

---

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note
Principal Balance by the number of years from the date of issuance of the Note to the related payment
date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note
Principal Balance described in (i) above.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class V-M-4 Notes | | | |
|---|---|---|---|---|
| Group V Prepayment Assumption: | **50%** | **100%** | **150%** | **200%** |
| **Payment Date** | | | | |
| Initial Percentage ............................ | 100 | 100 | 100 | 100 |
| June 2006 ........................................ | 100 | 100 | 100 | 100 |
| June 2007 ........................................ | 100 | 100 | 100 | 100 |
| June 2008 ........................................ | 100 | 100 | 100 | 100 |
| June 2009 ........................................ | 100 | 71 | 38 | 18 |
| June 2010 ........................................ | 100 | 54 | 24 | 3 |
| June 2011 ........................................ | 92 | 40 | 15 | 0 |
| June 2012 ........................................ | 79 | 30 | 3 | 0 |
| June 2013 ........................................ | 68 | 22 | 0 | 0 |
| June 2014 ........................................ | 59 | 17 | 0 | 0 |
| June 2015 ........................................ | 50 | 10 | 0 | 0 |
| June 2016 ........................................ | 43 | 2 | 0 | 0 |
| June 2017 ........................................ | 37 | 0 | 0 | 0 |
| June 2018 ........................................ | 31 | 0 | 0 | 0 |
| June 2019 ........................................ | 27 | 0 | 0 | 0 |
| June 2020 ........................................ | 23 | 0 | 0 | 0 |
| June 2021 ........................................ | 19 | 0 | 0 | 0 |
| June 2022 ........................................ | 16 | 0 | 0 | 0 |
| June 2023 ........................................ | 12 | 0 | 0 | 0 |
| June 2024 ........................................ | 7 | 0 | 0 | 0 |
| June 2025 ........................................ | 2 | 0 | 0 | 0 |
| June 2026 ........................................ | 0 | 0 | 0 | 0 |
| June 2027 ........................................ | 0 | 0 | 0 | 0 |
| June 2028 ........................................ | 0 | 0 | 0 | 0 |
| June 2029 ........................................ | 0 | 0 | 0 | 0 |
| June 2030 ........................................ | 0 | 0 | 0 | 0 |
| June 2031 ........................................ | 0 | 0 | 0 | 0 |
| June 2032 ........................................ | 0 | 0 | 0 | 0 |
| June 2033 ........................................ | 0 | 0 | 0 | 0 |
| June 2034 ........................................ | 0 | 0 | 0 | 0 |
| June 2035 ........................................ | 0 | 0 | 0 | 0 |
| June 2036 ........................................ | 0 | 0 | 0 | 0 |
| June 2037 ........................................ | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 11.21 | 5.97 | 4.19 | 3.57 |
| Weighted Average Life in years (to optional termination date)** | 10.71 | 5.67 | 4.01 | 3.45 |

---

(*)     Indicates a number that is greater than zero but less than 0.5%.

(**)    The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note
        Principal Balance by the number of years from the date of issuance of the Note to the related payment
        date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note
        Principal Balance described in (i) above.

*The HELOCs*

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of such security (assuming no losses). The weighted average life of the Class VI-A Notes will be influenced by, among other things, the rate of principal payments and draws on the HELOCs.

The prepayment model used in this prospectus supplement for the Group VI HELOCs is the related Prepayment Assumption. No representation is made that the HELOCs will prepay at that or any other rate. In addition, the model assumes that the amount of additional balances on the HELOCs drawn each month is drawn at a specified annual rate, referred to as the Constant Draw Rate in this prospectus supplement. This rate is converted to a constant monthly rate. No representation is made that draws will be made on the HELOCs at that or any other rate.

The table set forth below is based on the related Prepayment Assumption and optional redemption assumptions as indicated in the table below. For the following table, it was assumed that the HELOCs have been aggregated into five pools with the following characteristics:

| Loan Number | Current Balance ($) | Gross Rate (%) | Aggregate Fees (%) | Maximum Credit Limit ($) | Original Term to Maturity (in months) | Remaining Term to Maturity (in months) |
|---|---|---|---|---|---|---|
| 1 | 6,863,808.00 | 4.8896504681 | 0.520 | 6,915,675.57 | 300 | 300 |
| 2 | 56,469,267.81 | 4.8687550608 | 0.520 | 58,185,747.36 | 301 | 301 |
| 3 | 44,614,106.23 | 7.4468877664 | 0.520 | 47,588,379.98 | 300 | 297 |
| 4 | 65,964,948.01 | 4.9983143833 | 0.520 | 69,811,565.26 | 300 | 298 |
| 5 | 66,329,834.59 | 6.1921637940 | 0.520 | 72,642,464.78 | 300 | 298 |

| Loan Number | Remaining Draw Period (in months) | Gross Margin (%) | Maximum Rate (%) | Minimum Rate (%) | Months between Rate Adjustment | Months to Next Rate Adjustment | Index |
|---|---|---|---|---|---|---|---|
| 1 | 119 | 1.3632514196 | 18.0000000000 | 1.3632514196 | 1 | 3 | Prime |
| 2 | 119 | 1.2487560223 | 18.0000000000 | 1.2487560223 | 1 | 2 | Prime |
| 3 | 117 | 1.7415579909 | 18.0000000000 | 1.7415579909 | 1 | 0 | Prime |
| 4 | 118 | 1.3643524495 | 18.0000000000 | 1.3643524495 | 1 | 1 | Prime |
| 5 | 118 | 1.5907818835 | 18.0000000000 | 1.5907818835 | 1 | 0 | Prime |

In addition, in creating the tables below the following assumptions were made:

(1)     payments are made in accordance with the description set forth under "Description of the Notes,"

(2)     payments on the Class VI-A Notes will be made on the 25th day of each calendar month regardless of the day on which the Payment Date actually occurs, commencing in July 2005,

(3)     no extension past the scheduled maturity date of a HELOC is made,

(4)     no delinquencies or defaults occur,

(5)     monthly Draws are calculated under each of the assumptions as set forth in the tables below before giving effect to prepayments,

(6)     the HELOCs pay on the basis of a 30-day month and a 360-day year,

(7)     no Rapid Amortization Event occurs,

(8)     the Closing Date is June 22, 2005,

(9)     for each Payment Date, the Class VI-A Note Rate is equal to One-Month LIBOR plus 0.18% per annum,

(10)    the prime rate index with respect to the HELOCs remains constant at 6.00%, and one-month LIBOR remains constant at 3.26%,

(11)    the Policy premium rate is 0.18%,

(12)    there are no initial or subsequent periodic rate caps; and

(13)    the draw rate is 10%.

The actual characteristics and performance of the HELOCs will differ from the assumptions used in constructing the tables set forth below, which are hypothetical in nature and are provided only to give a general sense of how the principal cash flows might behave under varying prepayment and Draw scenarios.  For example, it is very unlikely that all of the HELOCs will prepay and that the HELOCs will experience Draws at a constant rate until maturity or that all of the HELOCs will prepay or that the HELOCs will experience Draws at the same rate.  Moreover, the diverse remaining terms to stated maturity and current loan rates of the HELOCs could produce slower or faster principal distributions than indicated in the tables at the various assumptions specified, even if the weighted average remaining terms to stated maturity and current loan rates of the HELOCs are as assumed.  Any difference between such assumptions and the actual characteristics and performance of the HELOCs, or actual prepayment experience, will affect the percentages of initial stated Principal Balance outstanding over time and the weighted average life of the Class VI-A Notes.

Subject to the foregoing discussion and assumptions, the following table indicates the weighted average life of the Class VI-A Notes, and sets forth the percentages of the initial stated Principal Balance of the Class VI-A Notes that would be outstanding after each of the Payment Dates shown at various percentages of the related Prepayment Assumption and Constant Draw Rates.

**Percent of Initial Note Principal Balance Outstanding at the
Following Prepayment Assumption Percentages**

| | Class VI-A Notes | | | | |
|---|---|---|---|---|---|
| Group VI Prepayment Assumption: | **50%** | **75%** | **100%** | **125%** | **150%** |
| **Payment Date** | | | | | |
| Initial Percentage ................................ | 100 | 100 | 100 | 100 | 100 |
| June 2006............................................. | 81 | 67 | 53 | 39 | 26 |
| June 2007............................................. | 67 | 45 | 28 | 14 | 4 |
| June 2008............................................. | 55 | 32 | 16 | 7 | 1 |
| June 2009............................................. | 45 | 22 | 9 | 3 | * |
| June 2010............................................. | 38 | 15 | 5 | 1 | 0 |
| June 2011............................................. | 32 | 11 | 3 | * | 0 |
| June 2012............................................. | 26 | 7 | 1 | 0 | 0 |
| June 2013............................................. | 22 | 5 | * | 0 | 0 |
| June 2014............................................. | 18 | 3 | * | 0 | 0 |
| June 2015............................................. | 15 | 2 | 0 | 0 | 0 |
| June 2016............................................. | 10 | 1 | 0 | 0 | 0 |
| June 2017............................................. | 7 | * | 0 | 0 | 0 |
| June 2018............................................. | 5 | * | 0 | 0 | 0 |
| June 2019............................................. | 3 | 0 | 0 | 0 | 0 |
| June 2020............................................. | 2 | 0 | 0 | 0 | 0 |
| June 2021............................................. | 1 | 0 | 0 | 0 | 0 |
| June 2022............................................. | 1 | 0 | 0 | 0 | 0 |
| June 2023............................................. | * | 0 | 0 | 0 | 0 |
| June 2024............................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in years (to Maturity)** | 4.83 | 2.63 | 1.65 | 1.11 | 0.75 |
| Weighted Average Life in years (to the optional termination date)** | 4.60 | 2.42 | 1.52 | 0.99 | 0.71 |

---

(*)      Indicates a number that is greater than zero but less than 0.5%.

(**)     The weighted average life of a Note is determined by (i) multiplying the net reduction, if any, of the Note Principal Balance by the number of years from the date of issuance of the Note to the related payment date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net reductions of the Note Principal Balance described in (i) above.

**Yield Sensitivity of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-D, Class M, Class B, Class V-M and Class V-B Notes**

If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans has been reduced to zero, the yield to maturity on the Class B Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class B Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the Note Principal Balance of the Class B Notes has been reduced to zero, the yield to maturity on the Class M-5 Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class M-5 Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the Note Principal Balance of the Class B Notes and Class M-5 Notes has been reduced to zero, the yield to maturity on the Class M-4 Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class M-4 Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the Note Principal Balance of the Class B, Class M-5 and Class M-4 Notes has been reduced to zero, the yield to maturity on the Class M-3 Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class M-3 Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the Note Principal Balance of the Class B, Class M-5, Class M-4 and Class M-3 Notes has been reduced to zero, the yield to maturity on the Class M-2 Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class M-2 Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the Note Principal Balance of the Class B, Class M-5, Class M-4, Class M-3 and Class M-2 Notes has been reduced to zero, the yield to maturity on the Class M-1 Notes will become extremely sensitive to Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class M-1 Notes.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the aggregate Note Principal Balance of the Class B, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 Notes has been reduced to zero, the yield to maturity on the Class I-A-2 Notes and Class I-A-3 Notes will become extremely sensitive to Realized Losses on the Group I Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group I Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class I-A-3 Notes and Class I-A-2 Notes, in that order.  If the amount of overcollateralization for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and the aggregate Note Principal Balance of the Class B, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 Notes has been reduced to zero, the yield to maturity on the Class IV-A-3 Notes will become extremely sensitive to Realized Losses on the Group IV Loans (and the timing thereof), because Realized Losses on the Group IV Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be

allocated to the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-2 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes. The initial undivided interest in the Group I, Group II-C, Group II-NC, Group III and Group IV, Loans evidenced by the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5 and Class B Notes on the Closing Date will be approximately 1.45%, 1.00%, 0.60%, 0.92%, 1.74% and 1.50%, respectively. The initial undivided interest in the Group I Loans evidenced by the Class I-A-2 Notes and Class I-A-3 Notes on the Closing Date will be approximately 27.73% and 9.24%, respectively. The initial undivided interest in the Group IV Loans evidenced by the Class IV-A-3 Notes on the Closing Date will be approximately 3.36%. The initial amount of overcollateralization in the Group I, Group II-C, Group II-NC, Group III and Group IV Loans is approximately 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances.

If the amount of overcollateralization for the Group V Loans has been reduced to zero, the yield to maturity on the Class V-B Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-B Notes. If the amount of overcollateralization for the Group V Loans and the Note Principal Balance of the Class V-B Notes has been reduced to zero, the yield to maturity on the Class V-M-5 Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-M-5 Notes. If the amount of overcollateralization for the Group V Loans and the Note Principal Balance of the Class V-B Notes and Class V-M-5 Notes has been reduced to zero, the yield to maturity on the Class V-M-4 Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-M-4 Notes. If the amount of overcollateralization for the Group V Loans and the aggregate Note Principal Balance of the Class V-B, Class V-M-5 and Class V-M-4 Notes has been reduced to zero, the yield to maturity on the Class V-M-3 Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-M-3 Notes. If the amount of overcollateralization for the Group V Loans and the aggregate Note Principal Balance of the Class V-B, Class V-M-5, Class V-M-4 and Class V-M-3 Notes has been reduced to zero, the yield to maturity on the Class V-M-2 Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-M-2 Notes. If the amount of overcollateralization for the Group V Loans and the aggregate Note Principal Balance of the Class V-B, Class V-M-5, Class V-M-4, Class V-M-3 and Class V-M-2 Notes has been reduced to zero, the yield to maturity on the Class V-M-1 Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because the entire amount of any Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-M-1 Notes. If the amount of overcollateralization for the Group V Loans and the aggregate Note Principal Balance of the Class V-B Notes and Class V-M Notes has been reduced to zero, the yield to maturity on the Class V-A-4-B Notes will become extremely sensitive to Realized Losses on the Group V Loans (and the timing thereof), because Realized Losses on the Group V Loans (to the extent not covered by the Net Monthly Excess Cashflow) will be allocated to the Class V-A-4-B Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class V-A-4-A Notes and Class V-A-4-B Notes divided by (y) the aggregate Note Principal Balance of all of the Class V-A-4 Notes. The initial undivided interest in the Group V Loans evidenced by the Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4, Class V-M-5 and Class V-B Notes on the Closing Date will be approximately 1.40%, 1.00%, 0.65%, 1.75%, 1.10% and 1.05%, respectively. The initial undivided interest in the Group V Loans evidenced by the Class V-A-4-B

Notes on the Closing Date will be approximately 0.49%.  The initial amount of overcollateralization in the Group V Loans is approximately 0.35% of the Group V Cut-off Date Balance.

Investors in the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes should fully consider the risk that Realized Losses on the related mortgage loans could result in the failure of such investors to fully recover their investments.  In addition, once Realized Losses have been allocated to the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, such amounts with respect to such Notes will not be reinstated thereafter.  However, Allocated Realized Loss Amounts may be paid to the holders of Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes from Net Monthly Excess Cashflow in the priority set forth under "Description of the Notes — Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" and "— Overcollateralization Provisions for Loan Group V" in this prospectus supplement.  In addition, the Note Principal Balances of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes may be increased to the extent of any Subsequent Recoveries received with respect to mortgage loans which incurred a Realized Loss which was allocated to such Notes.

## THE ISSUER

American Home Mortgage Investment Trust 2005-2 is a statutory trust formed under the laws of the State of Delaware pursuant to the Trust Agreement for the transactions described in this prospectus supplement. The Trust Agreement constitutes the "governing instrument" under the laws of the State of Delaware relating to statutory trusts. After its formation, the Issuer will not engage in any activity other than (i) acquiring and holding the mortgage loans and the proceeds therefrom, (ii) issuing the Notes and the Trust Certificates, (iii) making payments on the Notes and the Trust Certificates and (iv) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

The Issuer is not expected to have any significant assets other than the mortgage loans pledged to the Indenture Trustee as collateral to secure the Notes. The Issuer's principal offices are in Wilmington, Delaware, in care of Wilmington Trust Company, as Owner Trustee.  In accordance with the Agreements, certain duties of the Issuer under the Agreements will be performed by Deutsche Bank National Trust Company or, as described herein, the Securities Administrator and certain other duties will be performed by the Depositor or an affiliate of the Depositor.

## THE OWNER TRUSTEE

M&T Trust Company of Delaware is the Owner Trustee under the Trust Agreement. The Owner Trustee is a Delaware limited purpose trust company and its principal offices are located in the City of Wilmington, County of New Castle, State of Delaware at 1220 North Market Street, Suite 202, Wilmington , DE 19801.

Neither the Owner Trustee nor any director, officer or employee of the Owner Trustee will be under any liability to the Issuer or the Noteholders under the Trust Agreement under any circumstances, except for the Owner Trustee's own misconduct, gross negligence, bad faith or grossly negligent failure to act or in the case of the inaccuracy of a representation made by the Owner Trustee in the Trust Agreement. All persons into which the Owner Trustee may be merged or with which it may be consolidated or any person resulting from that merger or consolidation will be the successor of the Owner Trustee under the Trust Agreement.

The Owner Trustee's annual fee will be paid by American Home Mortgage Servicing, Inc.  To the extent that American Home Mortgage Servicing, Inc. fails to pay such fees, the Owner Trustee will be entitled to recover such fees from Available Funds on a first priority basis.  The Trust Agreement will

provide that the Owner Trustee will be entitled to recover from the Payment Account all reasonable out-of-pocket expenses, disbursements and advances and expenses of the Owner Trustee, in connection with any Event of Default, any breach of the Trust Agreement or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Owner Trustee in the administration of the Trust created by the Trust Agreement (including the reasonable compensation and disbursements of its counsel), other than any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Noteholders.

## THE INDENTURE TRUSTEE

Deutsche Bank National Trust Company will be the Indenture Trustee under the Indenture. The Indenture Trustee has designated the offices of its agent located at DTC Transfer Agent Services, 55 Water Street, Jeanette Park Entrance, New York, New York 10041 for purposes of the transfer and exchange of the Notes. For all other purposes, the Indenture Trustee's "Corporate Trust Office" is located at 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Trust Administration – AH 0502, or such other address as the Indenture Trustee may designate from time to time by notice to the Noteholders, the Depositor, the Owner Trustee, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer and the Securities Administrator. The Indenture Trustee will be entitled to compensation for its services on each payment date in an amount equal to earnings on amounts then on deposit in the Payment Account. The Indenture Trustee will also serve as Note Registrar and Note Payment Agent under the Indenture and Certificate Registrar and Certificate Paying Agent under the Trust Agreement.

The Indenture will provide that the Indenture Trustee will be entitled to recover from the Payment Account, prior to payments to Noteholders, all reasonable out-of-pocket expenses, disbursements and advances and expenses of the Indenture Trustee, in connection with the Agreements, any Event of Default or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Indenture Trustee in the administration of the Trust created pursuant to the Trust Agreement (including the reasonable compensation and disbursements of its counsel), other than any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Noteholders.

## THE SECURITIES ADMINISTRATOR

Wells Fargo Bank, National Association, a national banking association, will act as Securities Administrator for so long as it is also the RMBS Master Servicer. The Securities Administrator's office for notices under the Agreements is located at 9062 Old Annapolis Road, Columbia, Maryland 21045. As Securities Administrator, Wells Fargo Bank, N.A. will perform certain administrative duties with respect to the Notes and the Trust Certificates, on behalf of the Indenture Trustee and Owner Trustee, including preparing distribution statements and tax information for Noteholders, and preparing certain tax and SEC filings for the Trust.

The Agreements will provide that the Securities Administrator and any director, officer, employee or agent of the Securities Administrator will be entitled to recover from the Securities Administrator Collection Account all reasonable out-of pocket expenses, disbursements and advances and expenses of the Securities Administrator, in connection with any breach of any Agreement to which it is a party or any claim or legal action (including any pending or threatened claim or legal action), incurred or made by the Securities Administrator in the performance of its duties under the Agreements (including the reasonable compensation and disbursements of its counsel), other than any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Noteholders.

## THE CREDIT ENHANCER

The Credit Enhancer has supplied the following information for inclusion in this prospectus supplement.  No representation is made by the Issuer or the Underwriters as to the accuracy and completeness of this information.

**The Credit Enhancer**

The Credit Enhancer, a New York stock insurance corporation, is a direct, wholly-owned subsidiary of FGIC Corporation, a Delaware corporation, and provides financial guaranty insurance for public finance and structured finance obligations.  The Credit Enhancer is licensed to engage in financial guaranty insurance in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico and, through a branch, in the United Kingdom.

On December 18, 2003, an investor group consisting of The PMI Group, Inc. ("PMI"), affiliates of The Blackstone Group L.P. ("Blackstone"), affiliates of The Cypress Group L.L.C. ("Cypress") and affiliates of CIVC Partners L.P. ("CIVC") acquired FGIC Corporation (the "FGIC Acquisition") from a subsidiary of General Electric Capital Corporation ("GE Capital").  PMI, Blackstone, Cypress and CIVC acquired approximately 42%, 23%, 23% and 7%, respectively, of FGIC Corporation's common stock.  FGIC Corporation paid GE Capital approximately $284.3 million in pre-closing dividends from the proceeds of dividends it, in turn, had received from the Credit Enhancer, and GE Capital retained approximately $234.6 million in liquidation preference of FGIC Corporation's convertible participating preferred stock and approximately 5% of FGIC Corporation's common stock.  Neither FGIC Corporation nor any of its shareholders is obligated to pay any debts of the Credit Enhancer or any claims under any insurance policy, including the Policy, issued by the Credit Enhancer.

The Credit Enhancer is subject to the insurance laws and regulations of the State of New York, where the Credit Enhancer is domiciled, including Article 69 of the New York Insurance Law ("Article 69"), a comprehensive financial guaranty insurance statute.  The Credit Enhancer is also subject to the insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business.  The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction, but generally require insurance companies to maintain minimum standards of business conduct and solvency, to meet certain financial tests, to comply with requirements concerning permitted investments and the use of policy forms and premium rates and to file quarterly and annual financial statements on the basis of statutory accounting principles ("SAP") and other reports.  In addition, Article 69, among other things, limits the business of each financial guaranty Credit Enhancer to financial guaranty insurance and certain related lines.

For the three months ended March 31, 2005, and years ended December 31, 2004, and December 31, 2003, the Credit Enhancer had written directly or assumed through reinsurance, guaranties of approximately $14.8 billion, $59.5 billion and $42.4 billion par value of securities, respectively (of which approximately 71%, 56% and 79%, respectively, constituted guaranties of municipal bonds), for which it had collected gross premiums of approximately $84.4 million, $323.6 million and $260.3 million, respectively.  For the three months ended March 31, 2005, the Credit Enhancer had reinsured, through facultative and excess of loss arrangements, approximately 0.5% of the risks it had written.

The following table sets forth the capitalization of the Credit Enhancer as of December 31, 2003, December 31, 2004 and March 31, 2005, respectively, on the basis of generally accepted accounting principles ("GAAP").

### Financial Guaranty Insurance Company
### CAPITALIZATION TABLE
### (Dollars in Millions)

| | December 31, 2003 | December 31, 2004 | March 31, 2005 |
|---|---|---|---|
| Unearned Premiums | $    919 | $   1,043 | $   1,069 |
| Other Liabilities | 86 | 121 | 116 |
| Stockholder's Equity | | | |
| Common Stock | 15 | 15 | 15 |
| Additional Paid-in Capital | 1,858 | 1,883 | 1,891 |
| Accumulated Other Comprehensive Income (Loss) | 2 | 15 | (17) |
| Retained Earnings | 94 | 265 | 318 |
| Total Stockholder's Equity | 1,969 | 2,178 | 2,207 |
| Total Liabilities and Stockholder's Equity | $   2,974 | $   3,342 | $   3,392 |

The audited financial statements of the Credit Enhancer as of December 31, 2003 and 2004 and for each of the years in the three-year period ended December 31, 2004, which are included as Exhibit 99.1 and the unaudited financial statements of the Credit Enhancer as of March 31, 2005 and for the three month periods ended March 31, 2005 and 2004 which are included as Exhibit 99.2, in each case, to the Current Report on Form 8-K filed by the Depositor on June 20, 2005 (SEC file number 333-121581) in connection with the registration statement of which this prospectus supplement is a part, are hereby incorporated by reference in this prospectus supplement.  Any statement contained herein under the heading "The Credit Enhancer" or in such Exhibits 99.1 and 99.2, shall be modified or superseded to the extent required by any statement in any document subsequently incorporated by reference in this prospectus supplement with the approval of the Credit Enhancer, and shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus supplement.

All financial statements of the Credit Enhancer (if any) included in documents filed by the Issuer with the Securities and Exchange Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act, subsequent to the date of this prospectus supplement and prior to the termination of the offering of the Notes shall be deemed to be incorporated by reference into this prospectus supplement and to be a part hereof from the respective dates of filing of such documents.

Copies of the Credit Enhancer's GAAP and SAP financial statements are available upon request to:  Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY  10017, Attention: Corporate Communications Department.  The Credit Enhancer's telephone number is (212) 312-3000.

**Neither the Credit Enhancer nor any of its affiliates accepts any responsibility for the accuracy or completeness of, nor have they participated in the preparation of, the prospectus, the prospectus supplement or any information or disclosure that is provided to potential purchasers of the Series 2005-2 Notes, or omitted from such disclosure, other than with respect to the accuracy of information regarding the Credit Enhancer and the Policy set forth under the heading "The Credit Enhancer" and "Description of the Notes—The Policy" herein.  In addition, the Credit Enhancer makes no representation regarding the Series 2005-2 Notes or the advisability of investing in the Series 2005-2 Notes.**

### Financial Strength Ratings of the Credit Enhancer

The financial strength of the Credit Enhancer is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of the Credit Enhancer should be evaluated independently.  The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of the Credit Enhancer.  Any further explanation of any rating may be obtained only from the applicable rating agency.  These ratings

are not recommendations to buy, sell or hold the Series 2005-2 Notes, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Series 2005-2 Notes. The Credit Enhancer does not guarantee the market price or investment value of the Series 2005-2 Notes nor does it guarantee that the ratings on the Series 2005-2 Notes will not be revised or withdrawn.

## THE NOTE INSURER

The following information has been supplied by Ambac Assurance Corporation, the Note Insurer, for inclusion in this prospectus supplement. No representation is made by the Issuer or the Underwriters as to the accuracy and completeness of this information.

Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Territory of Guam and the U.S. Virgin Islands. Ambac Assurance Corporation primarily insures newly-issued municipal and structured finance obligations. Ambac Assurance Corporation is a wholly-owned subsidiary of Ambac Financial Group, Inc. (formerly, AMBAC, Inc.), a 100% publicly-held company. Moody's Investors Service, Inc., Standard & Poor's and Fitch Ratings have each assigned a triple-A financial strength rating to the Insurer.

The consolidated financial statements of Ambac Assurance Corporation and subsidiaries as of December 31, 2004 and December 31, 2003 and for each of the years in the three-year period ended December 31, 2004, prepared in accordance with U. S. generally accepted accounting principles, included in the Annual Report on Form 10-K of Ambac Financial Group, Inc. (which was filed with the Securities and Exchange Commission (the "Commission") on March 15, 2005; Commission File No. 1-10777), the unaudited consolidated financial statements of Ambac Assurance Corporation and subsidiaries as of March 31, 2005 and for the periods ended March 31, 2005 and March 31, 2004 included in the Quarterly Report on Form 10-Q of Ambac Financial Group, Inc. for the period ended March 31, 2005 (which was filed with the Commission on May 10, 2005), and the Current Reports on Form 8-K filed on April 11, 2005, April 20, 2005, and May 5, 2005, as they relate to Ambac Assurance Corporation, are hereby incorporated by reference into this prospectus supplement and shall be deemed to be a part hereof. Any statement contained in a document incorporated herein by reference shall be modified or superseded for the purposes of this prospectus supplement to the extent that a statement contained herein by reference herein also modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus supplement.

All consolidated financial statements of Ambac Assurance Corporation and subsidiaries included in documents filed by Ambac Financial Group, Inc. with the Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this prospectus supplement and prior to the termination of the offering of the Notes shall be deemed to be incorporated by reference into this prospectus supplement and to be a part hereof from the respective dates of filing such consolidated financial statements.

The following table sets forth the capitalization of Ambac Assurance Corporation and subsidiaries as of December 31, 2003, December 31, 2004 and March 31, 2005 in conformity with U. S. generally accepted accounting principles.

**Ambac Assurance Corporation and Subsidiaries**
**Consolidated Capitalization Table**
**(Dollars in Millions)**

| | December 31, 2003 | December 31, 2004 | March 31, 2005 (unaudited) |
|---|---|---|---|
| Unearned premiums | $ 2,553 | $ 2,783 | $ 2,794 |
| Long-term debt | 189 | 1,074 | 1,097 |
| Notes payable to affiliates | 84 | -- | -- |
| Other liabilities | 2,008 | 2,192 | 2,178 |
| Total liabilities | 4,834 | 6,049 | 6,069 |
| Stockholder's equity: | | | |
| Common stock | 82 | 82 | 82 |
| Additional paid-in capital | 1,144 | 1,233 | 1,239 |
| Accumulated other comprehensive income | 243 | 238 | 159 |
| Retained earnings | 3,430 | 4,094 | 4,258 |
| Total stockholder's equity | 4,899 | 5,647 | 5,738 |
| Total liabilities and stockholder's equity | $ 9,733 | $ 11,696 | $ 11,807 |

For additional financial information concerning Ambac Assurance Corporation, see the audited consolidated financial statements of Ambac Assurance Corporation incorporated by reference herein. Copies of the consolidated financial statements of Ambac Assurance Corporation incorporated by reference and copies of Ambac Assurance Corporation's annual statement for the year ended December 31, 2004 prepared on the basis of accounting practices prescribed or permitted by the State of Wisconsin Office of the Commissioner of Insurance, are available without charge from Ambac Assurance Corporation. The address of Ambac Assurance Corporation's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

## EXPERTS

The predecessor basis financial statements of Financial Guaranty Insurance Company for the year ended December 31, 2002 have been included in the Current Report on Form 8-K of the Depositor, which is incorporated by reference in the registration statement to which the prospectus supplement relates, in reliance upon the report of KPMG LLP, independent registered public accounting firm, which is also included therein, and upon the authority of said firm as experts in accounting and auditing.

The financial statements of Financial Guaranty Insurance Company as of December 31, 2004 and 2003 and for the year ended December 31, 2004 and the periods from December 18, 2003 through December 31, 2003, and from January 1, 2003 through December 17, 2003 appearing in the Current Report on Form 8-K of the Depositor, which are incorporated by reference, have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon included therein and incorporated herein by reference. Such financial statements are incorporated herein by reference in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of Ambac Assurance Corporation and subsidiaries as of December 31, 2004 and 2003, and for each of the years in the three-year period ended December 31, 2004, are incorporated by reference in this prospectus supplement and in the registration statement in reliance upon the report of KPMG LLP, independent registered public accounting firm, incorporated by reference in this prospectus supplement, and in the registration statement upon the authority of that firm as experts in accounting and auditing. The report of KPMG LLP refers to changes, in 2003, in Ambac

Assurance Corporation's methods of accounting for variable interest entities and stock-based compensation.

## THE RMBS MASTER SERVICING AGREEMENT AND SERVICING AGREEMENTS

The following summary describes a number of terms of the Servicing Agreements. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Servicing Agreements. The Depositor will provide to a prospective or actual Noteholder without charge, on written request, a copy (without exhibits) of the Servicing Agreements. Requests should be addressed to American Home Mortgage Securities LLC, 538 Broadhollow Road, Melville, New York 11747. See "The Agreements" in the accompanying prospectus.

**Servicing and Other Compensation And Payment of Expenses**

The RMBS Master Servicer will be entitled to retain as compensation for its activities under the RMBS Master Servicing Agreement the investment income on funds in the Securities Administrator Collection Account. The RMBS Master Servicing Agreement also will provide that the RMBS Master Servicer will be entitled to reimbursement from the Securities Administrator Collection Account for advances and certain expenses. The RMBS Servicer will be entitled to retain the RMBS Servicing Fee from collections on the related mortgage loans as compensation for its activities under the RMBS Servicing Agreement. As additional servicing compensation, the RMBS Servicer is entitled to retain any assumption fees and any late payment charges, to the extent collected from mortgagors, together with any interest or other income earned on funds held in the Protected Account and any escrow accounts in respect of the mortgage loans as provided in the RMBS Servicing Agreement. However, the RMBS Servicer is obligated to offset any Prepayment Interest Shortfall in respect of the related mortgage loans on any payment date with Compensating Interest. The RMBS Servicer is obligated to pay certain insurance premiums and ongoing expenses associated with the mortgage pool in respect of mortgage loans serviced by it and incurred by the RMBS Servicer in connection with its responsibilities under the RMBS Servicing Agreement. However, the RMBS Servicer is entitled to reimbursement therefor as provided in the RMBS Servicing Agreement.

The HELOC Back-Up Servicer will be entitled to retain the HELOC Back-Up Servicing Fee as compensation for its activities under the HELOC Back-Up Servicing Agreement. The HELOC Back-Up Servicing Agreement also will provide that the HELOC Back-Up Servicer will be entitled to reimbursement for advances and certain expenses. The HELOC Servicer will be entitled to retain the HELOC Servicing Fee from collections on the related HELOCs as compensation for its activities under the HELOC Servicing Agreement. As additional servicing compensation, the HELOC Servicer is entitled to retain any assumption fees and any late payment charges, to the extent collected from mortgagors, together with any interest or other income earned on funds held in the related Collection Account as provided in the HELOC Servicing Agreement. The HELOC Servicer is obligated to pay certain insurance premiums and ongoing expenses associated with the mortgage pool in respect of the HELOCs serviced by it and incurred by the HELOC Servicer in connection with its responsibilities under the HELOC Servicing Agreement. However, the HELOC Servicer is entitled to reimbursement therefor as provided in the HELOC Servicing Agreement.

**Realization Upon Defaulted Mortgage Loans and HELOCs**

The RMBS Servicer and the HELOC Servicer will take such action as they deem to be in the best interest of the trust with respect to defaulted mortgage loans and HELOCs and foreclose upon or otherwise comparably convert the ownership of properties securing defaulted mortgage loans and HELOCs as to which no satisfactory collection arrangements can be made. To the extent set forth in the RMBS Servicing Agreement and HELOC Servicing Agreement, the RMBS Servicer and the HELOC Servicer will service the property acquired by the trust through foreclosure or deed-in-lieu of foreclosure in accordance with procedures that such Servicer employs and exercises in servicing and administering

mortgage loans and HELOCs, as applicable, for its own account and which are in accordance with accepted mortgage servicing practices of prudent lending institutions.

**The Protected Accounts**

The RMBS Servicer will establish and maintain one or more accounts, referred to herein as the Protected Accounts, into which it will deposit daily all collections of principal and interest on any mortgage loans, including but not limited to Principal Prepayments, Insurance Proceeds, Liquidation Proceeds (less amounts reimbursable to the RMBS Servicer out of Liquidation Proceeds in accordance with the RMBS Servicing Agreement), the Repurchase Price for any mortgage loans repurchased, and advances made from the RMBS Servicer's own funds (less the RMBS Servicing Fee). All Protected Accounts and amounts at any time credited thereto shall comply with the requirements of the RMBS Servicing Agreement.

On the date specified in the RMBS Servicing Agreement, the RMBS Servicer will withdraw or cause to be withdrawn from the applicable Protected Accounts and any other permitted accounts and will remit to the Securities Administrator for deposit in the Securities Administrator Collection Account the amounts required for distribution for such Payment Date in accordance with the RMBS Servicing Agreement.

**The Collection Accounts**

The HELOC Servicer will establish and maintain one or more accounts, referred to herein as the Collection Accounts, into which it will deposit daily all collections of principal and interest on any HELOCs, including but not limited to Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, Recoveries (less amounts reimbursable to the HELOC Servicer out of Liquidation Proceeds or Recoveries in accordance with the HELOC Servicing Agreement), the Repurchase Price for any HELOCs repurchased, and advances made from the HELOC Servicer's own funds (less the HELOC Servicing Fee). All Collection Accounts and amounts at any time credited thereto shall comply with the requirements of the HELOC Servicing Agreement.

On the date specified in the HELOC Servicing Agreement, the HELOC Servicer will withdraw or cause to be withdrawn from the applicable Collection Accounts and any other permitted accounts and will remit to the Securities Administrator for deposit in the Securities Administrator Collection Account the amounts required for distribution for such Payment Date in accordance with the HELOC Servicing Agreement.

**Optional Repurchase of Defaulted Mortgage Loans**

Subject to the terms of the RMBS Servicing Agreement, the RMBS Servicer, on behalf of the Issuer, may purchase from the Issuer any mortgage loan that is 90 days or more delinquent at a price equal to the Repurchase Price.

Subject to the terms of the HELOC Servicing Agreement, the Seller, on behalf of the Issuer, may purchase from the Issuer any HELOC that is 90 days or more delinquent at a price equal to the Repurchase Price.

**Pledge and Assignment of RMBS Servicer's Rights**

On or after the Closing Date, the RMBS Servicer may pledge and assign all of its right, title and interest in, to and under the RMBS Servicing Agreement to one or more lenders (each referred to as an RMBS Servicing Rights Pledgee), selected by the RMBS Servicer, including Bank of America, N.A., as the representative of certain lenders. In the event of a default by the RMBS Servicer under the RMBS Servicing Agreement, the RMBS Servicing Agreement provides for the appointment of a RMBS Servicing Rights Pledgee or its designee as the successor RMBS servicer, provided that at the time of such appointment the RMBS Servicing Rights Pledgee or such designee meets the requirements of a successor servicer described in the RMBS Servicing Agreement (including being acceptable to the Rating

Agencies and the RMBS Master Servicer) and that the RMBS Servicing Rights Pledgee or such designee agrees to be subject to the terms of the RMBS Servicing Agreement.

In addition, any successor RMBS Servicer selected by the RMBS Servicing Rights Pledgee has a ten day period to decide whether or not to accept its appointment; if not, the RMBS Master Servicer or its designee would become the RMBS Servicer.

Investors in the Offered Notes should be aware that the RMBS Servicing Rights Pledgee will have certain rights in connection with an Event of Default under the RMBS Servicing Agreement, including the right to select a new RMBS Servicer.

## THE INDENTURE

The following summary describes some of the terms of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Trust Agreement and Indenture. Whenever particular defined terms of the Indenture are referred to, those defined terms are incorporated in this prospectus supplement by reference. The Depositor will provide to a prospective or actual Noteholder without charge, on written request, a copy (without exhibits) of the Indenture and the Trust Agreement. Requests should be addressed to American Home Mortgage Securities LLC, 538 Broadhollow Road, Melville, New York 11747. See "The Agreements" in the accompanying prospectus.

### General

The Notes will be issued pursuant to the Indenture, a form of which is filed as an exhibit to the registration statement. A Current Report on Form 8-K relating to the Notes containing a copy of the Indenture, the Trust Agreement and the Servicing Agreements as executed will be filed by the Depositor with the SEC within fifteen days of the initial issuance of the Notes. The final characteristics of the mortgage loans and HELOCs will be reflected in a Current Report on Form 8-K which will be filed by the Depositor within 15 days of the end of the Funding Period. Reference is made to the prospectus for important information in addition to that presented in this prospectus supplement regarding the Trust, the terms and conditions of the Indenture and the Trust Agreement and the Notes. The Notes will be transferable and exchangeable at the designated office of the Note Registrar's agent located at DTC Transfer Agent Services, 55 Water Street, Jeanette Park Entrance, New York, New York 10041. See "The Indenture Trustee" in this prospectus supplement.

### Rights Upon Event of Default

If an Event of Default should occur and be continuing, then and in every such case the Indenture Trustee (i) with respect to the Notes, other than the Class VI-A Notes, at the written direction of the holders of Notes representing not less than a majority of the aggregate Note Principal Balance of the Notes or (ii) with respect to the Class VI-A Notes, so long as the Credit Enhancer is not in default under the Insurance Policy, at the written direction of the Credit Enhancer or at the written direction of the holder of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Credit Enhancer, may declare the related class or classes of Notes to be immediately due and payable, and upon any such declaration the unpaid Note Principal Balance of the related class or classes of Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable. Such declaration may, under certain circumstances as described in the Indenture, be rescinded and annulled by (i) with respect to the Notes, other than the Class VI-A Notes, the holders of the Notes representing not less than a majority of the aggregate Note Principal Balance of each class of Notes, other than the Class VI-A Notes, or (ii) with respect to the Class VI-A Notes, the Credit Enhancer, so long as the Credit Enhancer is not in default under the Insurance Policy, or the holder of the majority of the aggregate Note Principal Balance of the Class VI-A Notes with the consent of the Credit Enhancer.

If, following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Notes have been declared to be due and payable, the Indenture Trustee may, with the consent of the Insurer (which consent shall not be required if an Insurer Default exists), and shall, at the written direction of the Insurer so long as no Insurer Default exists, elect to maintain possession of the collateral securing the Notes and to continue to apply payments on that collateral as if there had been no declaration of acceleration, as described in the Indenture. In addition, the Indenture Trustee may not sell or otherwise liquidate the collateral securing the Notes following an Event of Default, unless (A) the Indenture Trustee receives the consent of the Credit Enhancer or the holders of 100% of the aggregate Note Principal Balance of the Notes then outstanding, (B) it is determined that the proceeds of such sale or liquidation distributable to the holders of the Notes are sufficient to discharge in full all amounts then due and unpaid upon such Notes for principal and interest or (C) it is determined that the mortgage loans and HELOCs will not continue to provide sufficient funds for the payment of principal of and interest on the applicable Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee, respecting the Class VI-A Notes, receives the consent of the Credit Enhancer or, respecting the Notes other than the Class VI-A Notes, the holders of 66 2/3% of the aggregate Note Principal Balance of the Notes then outstanding.

If, following an Event of Default, in accordance with above paragraph, the Indenture Trustee sells or causes to be sold the assets included in the Trust, proceeds from the sale of such assets will be applied as provided in the Indenture.

Unless an Event of Default shall occur and be continuing, the Indenture Trustee shall be under no obligation to exercise any of the rights and powers under the Indenture at the request or direction of any of the Noteholders, unless such Noteholders shall have offered to the Indenture Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. Unless the Credit Enhancer is in default, the Credit Enhancer may exercise the rights of the Class VI-A Noteholders including the right to direct the Indenture Trustee in all matters with respect to the Class VI-A Notes and Loan Group VI under the Indenture.

So long as the Note Insurer is not in default, the Note Insurer has, and may exercise without the consent of the holder of the Class V-A-4-D Notes, all of the rights of the holder of the Class V-A-4-D Notes under the Indenture.

**Limitation on Suits**

No Noteholder will have any right to institute any proceedings with respect to the Indenture unless (1) such Noteholder has previously given written notice to the Indenture Trustee of a continuing Event of Default; (2) Noteholders representing not less than 25% of the aggregate Note Principal Balance of the Notes then outstanding have made written request to the Indenture Trustee to institute proceedings in respect of such Event of Default in its own name as Indenture Trustee, on behalf of the Noteholders; (3) such Noteholders have offered to the Indenture Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request; (4) for 60 days after its receipt of such notice, request and offer of indemnity the Indenture Trustee has failed to institute any such proceedings; and (5) no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Noteholders representing more than 50% of the aggregate Note Principal Balance of the Notes then outstanding.

**Resignation and Removal of Indenture Trustee**

The Indenture Trustee may resign at any time, or in the event that there is a conflict of interest with respect to the Indenture Trustee acting as Indenture Trustee for one or more classes of Notes, the Issuer will be obligated to appoint a successor Indenture Trustee for all of the Notes or such class of Notes with respect to which a conflict exists within the period specified in the Indenture. The Indenture Trustee may also be removed at any time by Noteholders representing more than 50% of the aggregate

Note Principal Balance of the Notes then outstanding if the Indenture Trustee ceases to be eligible to continue as such under the Indenture or if the Indenture Trustee becomes incapable of acting, bankrupt, insolvent or if a receiver or public officer takes charge of the Indenture Trustee or its property. Any resignation or removal of the Indenture Trustee will not become effective until the acceptance of the appointment by a successor Indenture Trustee.

**Optional Termination**

At its option, the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates may purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV and Loan Group V and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M, Class B, Class V-M and Class V-B Notes, after the payment date on which the aggregate stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balances; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption.  At its option, the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates may purchase the assets of the Trust related to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV and thereby redeem the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes after the payment date on which the aggregate stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.  At its option, the holder of the Trust Certificates, or, if there is no single holder, the majority holder of the Trust Certificates, may purchase the assets of the Trust related to Loan Group V and thereby redeem the Class V-A, Class V-M and Class V-B Notes after the payment date on which the stated principal balance of the related mortgage loans, and properties acquired in respect thereof has been reduced to less than 10% of the Group V Cut-off Date Balance; provided, however, that no such redemption shall occur unless (i) the Note Insurer is reimbursed for all payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, to the extent not previously paid or reimbursed and (ii) the Note Insurer is reimbursed for any payments made by the Note Insurer under the Note Insurance Policy with respect to the Class V-A-4-D Notes, including interest thereon, as a result of such redemption; and provided, further, that no such optional termination may be exercised unless an opinion has been rendered by nationally recognized tax counsel that such optional termination will not adversely affect the characterization as indebtedness of any class of Notes currently outstanding.  The holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates, may exercise its right to purchase the HELOCs on any Payment Date after the Payment Date on which the Note Principal Balance of the Class VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.  If the holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates, fails to exercise this right, the Credit Enhancer may purchase the HELOCs 60 days after the Payment Date on which the Note Principal Balance of the Class

VI-A Notes declines to 10% or less of the Note Principal Balance of the Class VI-A Notes on the Closing Date.

## ASSIGNMENT OF LOANS

**General**

On or prior to the date the Notes are issued, the Seller, pursuant to the Mortgage Loan Purchase Agreement, will convey each initial loan to the Depositor, and the Depositor, pursuant to the Trust Agreement, will in turn, convey each initial loan, together with all principal and interest due on or with respect to such loans after the Cut-off Date, to the Issuer; provided, however, that the Seller will reserve and retain all its right, title and interest in and to principal and interest due on each initial loan on or prior to the Cut-off Date (whether or not received on or prior to the Cut-off Date), and to prepayments received prior to the Cut-off Date.

At the time of issuance of the Notes, the Issuer will pledge all of its right, title and interest in and to the mortgage loans, including all principal and interest due on the mortgage loans after the Cut-off Date, without recourse, to the Indenture Trustee pursuant to the Indenture as collateral for the Notes. The Indenture Trustee, concurrently with that assignment, will authenticate and deliver the Notes at the direction of the Issuer in exchange for, among other things, the mortgage loans.

## FEDERAL INCOME TAX CONSEQUENCES

**Tax Classification of the Trust and of the Notes**

In the opinion of Thacher Proffitt & Wood LLP, assuming compliance with the Agreements, for U.S. federal income tax purposes, the Notes (other than those certain classes, or portions of certain classes, of Notes which, at the time of their issuance, AHMC or one of its qualified real estate investment trust, or REIT, subsidiaries acquires beneficial ownership thereof, referred to herein as the "Retained Notes"), will be classified as debt instruments. In addition, the Owner Trustee, on behalf of the Trust, will agree, and beneficial owners of the Notes will agree by their purchase of Notes, to treat the Notes as debt instruments for U.S. federal income tax purposes.

In the opinion of Thacher Proffitt & Wood LLP, assuming compliance with the Agreements, for U.S. federal income tax purposes, despite the fact that the Trust will be classified as a TMP, the Trust will not be subject to federal income tax as long as an entity that qualifies as a REIT under the Code holds, directly or indirectly, through one or more wholly owned qualified REIT subsidiaries, or QRS, 100% ownership interest in the Trust Certificates, the Transferor Interest and the Class N-1, Class N-2, Class V-M-5, Class B and Class V-B Notes.

AHMC will hold through AHM SPV III, LLC, its direct wholly-owned qualified REIT subsidiary, a 100% ownership interest in the Trust Certificates. AHMC represents it filed with its federal income tax return for its taxable year ended December 31, 2003 an election to be a REIT, that it has been organized in conformity with the requirements for REIT qualification set forth in the Code, that it has operated and will continue to operate in a manner that enables it to qualify as a REIT and that it will not undertake any action that would cause the Trust to be subject to federal income tax. In rendering its opinion, Thacher Proffitt & Wood LLP has not independently verified AHMC's qualification as a REIT, but instead has relied solely upon the representation made by AHMC concerning its REIT status. If AHMC were to fail to qualify as a REIT while it or its subsidiary owns the Trust Certificates, the Trust could become subject to federal income tax as a corporation and would not be allowed to file a consolidated federal income tax return with any other corporation. A tax imposed upon the Trust could reduce cash flow that would otherwise be available to make payments on the Notes. Any such failure of the holder of the Trust Certificates to qualify as a REIT or a QRS would constitute an Indenture Default.

At the issuance of the Notes, AHMC also will acquire the Retained Notes, including a 100% beneficial ownership of the Class N-1, Class N-2, Class V-M-5, Class B and Class V-B Notes. Because AHMC's qualified REIT subsidiary will own the Trust Certificates, the Retained Notes will not be considered issued and outstanding for federal income tax purposes. Thus, the Retained Notes will not be treated as debt instruments for federal income tax purposes while the same party or related parties hold both the Retained Notes and the Trust Certificates. If AHMC were to sell a Retained Note or the Trust Certificates to an unaffiliated party, then depending upon the circumstances existing at the time of the sale, the Retained Notes could become characterized as debt instruments for federal income tax purposes as of the time of the sale. The remainder of this discussion assumes that the Notes are properly characterized as debt instruments for federal income tax purposes.

**Tax Consequences to Holders of the Notes**

*Interest Income on the Offered Notes.* The Offered Notes will not be treated as having been issued with OID. The beneficial owner of a note must include any OID with respect to such note in income as it accrues on a constant yield method, regardless of whether the beneficial owner receives any cash currently attributable to such OID. See "Federal Income Tax Consequences – Notes" in the prospectus. The prepayment assumption that will be used in determining the accrual of any OID, market discount, or bond premium, if any, will be a rate equal to (i) 25% CPR with respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans and (ii) 100% of the Prepayment Assumption for the Group V Loans and Group VI HELOCs. See "Weighted Average Life" above. No representation, however, is made as to the rate at which principal payments or recoveries on the mortgage loans actually will occur.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in an underwriting agreement dated June 20, 2005, the Depositor has agreed to sell, and Lehman Brothers Inc. has agreed to purchase 70% and Bear, Stearns & Co. Inc., UBS Securities LLC, Greenwich Capital Markets, Inc. and Goldman, Sachs & Co. have each agreed to purchase (i) approximately 7.5% of each of the Class I-A-1, Class II-A, Class III-A, Class IV-A, Class V-A, Class VI-A, Class M-1, Class M-2, Class M-3, Class V-M-1, Class V-M-2 and Class V-M-3 Notes and (ii) approximately 51.71%, 39.38%, and 27.76% of the Class I-A-2, Class M-4 and Class M-5 Notes, provided, however, that UBS Securities LLC will not purchase the Class V-A-2 Notes. Distribution of these Notes will be made from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. Proceeds to the Depositor from the sale of these Notes, before deducting expenses payable by the Depositor, will be approximately 100.75% of the aggregate initial Note Principal Balance of these Notes, plus accrued interest on the Class II-A, Class III-A, Class IV-A and Class V-A-1, Class V-A-3 and Class V-A-4 Notes from the Cut-off Date.

The aggregate expenses payable by the Depositor in connection with the Notes are estimated to be $1,000,000.

In connection with the purchase and sale of the underwritten Notes, the Underwriters may be deemed to have received compensation from the Depositor in the form of underwriting discounts.

The underwritten Notes are offered subject to receipt and acceptance by the Underwriters, to prior sale and to the Underwriters' right to reject any order in whole or in part and to withdraw, cancel or modify the offer without notice. It is expected that delivery of the Notes will be made through the facilities of DTC, Clearstream, Luxembourg and the Euroclear System on or about the Closing Date.

The underwriting agreement provides that the Depositor and the Seller, jointly and severally, will indemnify the Underwriters against certain civil liabilities, including liabilities under the Securities Act of 1933, as amended, or will contribute to payments the Underwriters may be required to make in respect thereof.

The Class I-A-3, Class V-M-4 and Class V-M-5 Notes and the Class I-A-2, Class M-4 and Class M-5 Notes which are not being underwritten on the Closing Date may be offered by the Depositor from time to time directly or through an underwriter or agent in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. However, there is currently no underwriting arrangement in effect for these Notes. This prospectus supplement will be appropriately supplemented in connection with any future offering of these Notes. Proceeds to the Depositor from any sale of these Notes will equal the purchase price paid by their purchaser, net of any expenses payable by the Depositor and any compensation payable to any underwriter or agent. On the Closing Date, the Depositor intends to transfer these Notes to an affiliate of the Seller as partial consideration for the mortgage loans. The Seller or its affiliates may enter into repurchase or secured financing transactions with respect to the Notes so retained.

## SECONDARY MARKET

There can be no assurance that a secondary market for the Notes will develop or, if it does develop, that it will continue. The primary source of information available to investors concerning the Notes will be the monthly statements discussed in the prospectus under "Description of the Securities— Reports to Securityholders", which will include information as to the Note Principal Balance of the Notes and the status of the applicable form of credit enhancement. There can be no assurance that any additional information regarding the Notes will be available through any other source. In addition, the Depositor is not aware of any source through which price information about the Notes will be generally available on an ongoing basis. The limited nature of information regarding the Notes may adversely affect the liquidity of the Notes, even if a secondary market for the Notes becomes available.

## LEGAL OPINIONS

Legal matters relating to the Notes will be passed upon for the Issuer, the Depositor, the Seller and American Home by Thacher Proffitt & Wood LLP, New York, New York and for the Underwriters by McKee Nelson LLP, Washington, D.C.

## RATINGS

It is a condition to the issuance of the Notes that they receive at least the following ratings from S&P and Moody's:

| Notes | S&P | Moody's |
|---|---|---|
| Class I-A-1 | AAA | Aaa |
| Class I-A-2 | AAA | Aaa |
| Class I-A-3 | AAA | Aaa |
| Class II-A-1 | AAA | Aaa |
| Class II-A-2 | AAA | Aaa |
| Class II-A-3 | AAA | Aaa |
| Class III-A | AAA | Aaa |
| Class IV-A-1 | AAA | Aaa |
| Class IV-A-2 | AAA | Aaa |
| Class IV-A-3 | AAA | NR |
| Class V-A-1 | AAA | Aaa |
| Class V-A-2 | AAA | Aaa |
| Class V-A-3 | AAA | Aaa |
| Class V-A-4-A | AAA | Aaa |
| Class V-A-4-B | AAA | NR |

| Notes | S&P | Moody's |
|-------|-----|---------|
| Class V-A-4-C | AAA | Aaa |
| Class V-A-4-D | AAA | Aaa |
| Class VI-A | AAA | Aaa |
| Class M-1 | AA+ | Aa1 |
| Class M-2 | AA | Aa2 |
| Class M-3 | AA | Aa3 |
| Class M-4 | AA | NR |
| Class M-5 | A | NR |
| Class B | BBB | NR |
| Class V-M-1 | AA+ | Aa1 |
| Class V-M-2 | AA+ | Aa2 |
| Class V-M-3 | AA | Aa3 |
| Class V-M-4 | AA | NR |
| Class V-M-5 | A | NR |
| Class V-B | BBB | NR |

The ratings of S&P and Moody's assigned to mortgage-backed notes address the likelihood of the receipt by noteholders of all distributions to which the noteholders are entitled other than Basis Risk Shortfalls and Net WAC Shortfalls.  The rating process addresses structural and legal aspects associated with the Notes, including the nature of the underlying mortgage loans. The ratings assigned to mortgage-backed notes do not represent any assessment of the likelihood that principal prepayments will be made by the mortgagors or the degree to which the rate and timing principal prepayments will differ from that originally anticipated. The ratings do not address the possibility that noteholders might suffer a lower than anticipated yield due to non-credit events.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the Notes are subsequently lowered for any reason, no person or entity is obligated to provide any additional credit support or credit enhancement with respect to the Notes.

The Depositor has not requested that any rating agency rate any class of the Notes other than as stated above. However, there can be no assurance as to whether any other rating agency will rate any class of the Notes, or, if it does, what rating would be assigned by any other rating agency. A rating on any class of the Notes by another rating agency, if assigned at all, may be lower than the ratings assigned to the Notes as stated above.

## LEGAL INVESTMENT

The Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A, Class M-1, Class M-2, Class M-3, Class M-4, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes will constitute "mortgage related securities" for purposes of SMMEA for so long as they are rated not lower than the second highest rating category by the Rating Agency and, as such, will be legal investments for entities to the extent provided in SMMEA. SMMEA, however, provides for state limitation on the authority of these entities to invest in "mortgage related securities" provided that restrictive legislation by the state was enacted prior to October 3, 1991. Some states have enacted legislation which overrides the preemption provisions of SMMEA.  The Class VI-A, Class M-5 and Class V-M-5 Notes will not constitute "mortgage related securities" for purposes of SMMEA.

The Depositor makes no representations as to the proper characterization of any class of Notes for legal investment or other purposes, or as to the ability of particular investors to purchase any class of

Notes under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of Notes. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of Notes constitutes a legal investment or is subject to investment, capital or other restrictions.

See "Legal Investment" in the prospectus.

## ERISA CONSIDERATIONS

ERISA and Section 4975 of the Code impose certain requirements on Plans and on persons who are fiduciaries with respect to such Plans. Any Plan fiduciary which proposes to cause a Plan to acquire any of the Notes would be required to determine whether such an investment is permitted under the governing Plan instruments and is prudent and appropriate for the Plan in view of its overall investment policy and the composition and diversification of its portfolio. The DOL (as defined in the prospectus) has promulgated the DOL Regulations defining the term "Plan Assets" for purposes of applying the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code. Under the DOL Regulations, generally, when a Plan acquires an "equity interest" in another entity (such as the Trust), the underlying assets of that entity may be considered to be Plan Assets. The DOL Regulations provide that the term "equity interest" means any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no "substantial equity features."

As of the date hereof, it is anticipated that the ratings of the Offered Notes and the traditional debt features of the Offered Notes should cause the Offered Notes to be treated as debt with no "substantial equity features" under the DOL Regulations. There can be no assurance given, however, that the Offered Notes are or will be treated as debt and not "equity interests" under the DOL Regulations. Moreover, the debt treatment of the Offered Notes for ERISA purposes could change subsequent to their issuance; that is, they could be treated as equity interests, if, for example, the ratings of the Offered Notes change. If the Offered Notes were to be treated as equity interests, the mortgage loans and other assets of the Trust may be considered to be Plan Assets. Because of the factual nature of certain of the above-described provisions of ERISA, the Code and the DOL Regulations, Plans or persons investing Plan Assets should carefully consider whether such an investment might constitute or give rise to a prohibited transaction under ERISA or the Code.

In addition, ERISA and the Code prohibit certain transactions involving the assets of a Plan and Parties in Interest (as defined in the prospectus) who have certain specified relationships to the Plan. Accordingly, even if the Offered Notes are treated as indebtedness under the DOL Regulations, prior to making an investment in the Offered Notes, investing Plans should determine whether the Issuer, the Seller, the Depositor, the Underwriters, the Owner Trustee, the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator any other servicer, any administrator, any provider of credit support, including the Derivative Counterparty, any owner of the Trust Certificates, which could be transferred subsequent to the purchase of an Offered Note by a Plan, or any of their affiliates is a Party in Interest with respect to such Plan and, if so, whether such transaction is subject to one or more statutory, regulatory or administrative exemptions. Additionally, an investment of the assets of a Plan in certain securities may cause the assets of the issuer of those securities to be deemed "Plan Assets" of such Plan, and any person with certain specified relationships to such issuer to be deemed a Party in Interest with respect to the investing Plan.

By acquiring an Offered Note, each purchaser will be deemed to represent that either (1) it is not acquiring the Offered Note with the assets of a Plan; or (2) (A) the acquisition, holding and transfer of the Offered Note will not give rise to a nonexempt prohibited transaction under Section 406 of ERISA or

Section 4975 of the Code and (B) the Offered Notes are rated investment grade or better and such person believes that the Offered Notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the Offered Notes. Alternatively, regardless of the rating of the Offered Notes, such person may provide the Indenture Trustee and the Owner Trustee with an opinion of counsel, which opinion of counsel will not be at the expense of the Issuer, the Seller, the Depositor, the Underwriters, the Owner Trustee, the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator or any successor servicer which opines that the acquisition, holding and transfer of such Offered Note or interest therein is permissible under applicable law, will not constitute or result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Issuer, the Seller, the Depositor, the Underwriters, the Owner Trustee, the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator or any successor servicer to any obligation in addition to those undertaken in the Indenture.

Any Plan fiduciary which proposes to cause a Plan to acquire any of the Offered Notes should consult with its counsel with respect to the potential consequences under ERISA and the Code of the Plan's acquisition and ownership of such Offered Notes.

## GLOSSARY

**Accrual Period** — With respect to any payment date and the Notes, other than the Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class V-A-1, Class V-A-3, and Class V-A-4 Notes and the Class II-A-3 Components, the period from the preceding payment date (or in the case of the first payment date, from the Closing Date) through the day preceding such payment date. With respect to any payment date and the Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class V-A-1, Class V-A-3, and Class V-A-4 Notes and the Class II-A-3 Components, the prior calendar month. Accrued Note Interest for the Class I-A, Class V-A-2, Class VI-A, Class M, Class V-M and Class V-B Notes shall be calculated on the basis of the actual number of days in the Accrual Period and a 360-day year. Accrued Note Interest on the Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class V-A-1, Class V-A-3, and Class V-A-4 Notes and the Class II-A-3 Components shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

**Accrued Component Interest** — For any payment date the Class II-A-3 Components, interest accrued during the related accrual period at the then-applicable Component Interest Rate on the related Component Principal Balance thereof immediately prior to such payment date, plus any Accrued Component Interest remaining unpaid from any prior payment date with interest thereon at the related Component Interest Rate.

**Accrued Note Interest** — For any payment date and each class of Notes, other than the Class II-A-3 Notes, interest accrued during the related accrual period at the then-applicable Note Interest Rate on the related Note Principal Balance thereof immediately prior to such payment date, plus any Accrued Note Interest remaining unpaid from any prior payment date with interest thereon at the related Note Interest Rate. For any payment date and the Class II-A-3 Notes, the sum of the Accrued Component Interest of the Class II-A-3 Components.

**Additional Balance —** As to any HELOC Mortgage Loan and day, the aggregate amount of all Draws conveyed to the Trust pursuant to the Mortgage Loan Purchase Agreement.

**Adjustment Fraction** — For any Payment Date with respect to the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes, a fraction, (x) the numerator of which is the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans at the beginning of the related Due Period, and (y) the denominator of which is the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes immediately prior to that Payment Date. For any Payment Date with respect to the Class V-A, Class V-M and Class V-B Notes, a fraction, (x) the numerator of which is the aggregate Stated Principal Balance of the Group V Loans at the beginning of the related Due Period, and (y) the denominator of which is the aggregate Note Principal Balance of the Class V-A, Class V-M and Class V-B Notes immediately prior to that Payment Date.

**Additional Negative Amortization Principal Amount** — For any Payment Date, the excess, if any, of (x) the Negative Amortization Amount over (y) the Principal Remittance Amount for the Group I Loans (without regard to the last sentence of the definition thereof).

**Agreements** — The Servicing Agreements, the RMBS Master Servicing Agreement, the Indenture, the Trust Agreement, the Mortgage Loan Purchase Agreement, the Cap Contract, the Corridor Contract and the Insurance Policy.

**AHMC**— American Home Mortgage Investment Corp.

**Allocated Realized Loss Amount** — With respect to any class of Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes and any payment date, an amount equal to the sum of any Realized Loss allocated to that class of Notes on that payment date and any Allocated Realized Loss Amount for that class remaining unpaid from the previous payment dates, in

each case, with interest thereon at the applicable Note Interest Rate for such payment date for such class for the related Accrual Period.

**American Home** — American Home Mortgage Investment Corporation, together with its direct or indirect wholly-owned subsidiaries.

**Available Funds** – The Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Available Funds, as applicable.

**Available Funds Rate** – On any Payment Date and any class of Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and the Class II-A-3 Components, the per annum rate equal to (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates on the related mortgage loans included in the trust as of the end of the prior Due Period, weighted on the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) in the case of the Class I-A Notes only, a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction. In addition, the Available Funds Rate with respect to the Class I-A Notes will be reduced by the Additional Negative Amortization Principal Amount, expressed as a percentage of the aggregate Note Principal Balance of the Class I-A Notes. The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

On any Payment Date and any class of Class M Notes, the per annum rate equal to (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates of the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV included in the trust as of the end of the prior Due Period, weighted on the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, weighted in proportion to the results of subtracting from the aggregate Stated Principal Balance of the Mortgage Loans of Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the aggregate Note Principal Balance or Component Principal Balance, as applicable, of the related Class I-A, Class II-A-1, Class II-A-2, Class III-A and Class IV-A Notes and Class II-A-3 Components, respectively, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction.  The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

On any Payment Date and any class of Class V-A, Class V-M and Class V-B Notes, the per annum rate equal to the (a) the weighted average (as described below) of (1) the weighted average of the Net Mortgage Rates of the mortgage loans in Loan Group V included in the trust as of the end of the prior Due Period, and (2) the amount of interest earned on amounts on deposit in the related Pre-Funding Account from the prior Payment Date to the current Payment Date, expressed as a percentage of the related Pre-Funded Amount at the end of the prior Due Period and converted to a per annum rate, weighted on the basis of the related Pre-Funded Amount as of the end of the related Due Period, times (b) in the case of the Class V-A-2, Class V-M and Class V-B Notes only, a fraction equal to (x) 30 divided by (y) the number of days in the related Accrual Period and times (c) the related Adjustment Fraction.  In

addition, the Available Funds Rate with respect to the V-A-4-D Notes will be reduced by the Note Insurance Policy premium rate for the Note Insurer.  The weighted average of clauses (1) and (2) above shall be weighted on the basis of the aggregate Stated Principal Balance of the related Mortgage Loans as of the beginning of the related Due Period and the aggregate amount on deposit in the related Pre-Funding Account, respectively.

**Bankruptcy Loss** — Any loss resulting from a bankruptcy court, in connection with a personal bankruptcy of a mortgagor, (1) establishing the value of a mortgaged property at an amount less than the Outstanding Principal Balance of the mortgage loan secured by such mortgaged property or (2) reducing the amount of the Monthly Payment on the related mortgage loan.

**Basic Principal Distribution Amount** — With respect to any payment date and Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the lesser of (a) the excess of (i) the sum of the related Available Funds for such payment date over (ii) the aggregate amount of Accrued Note Interest or Accrued Component Interest for the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class M Notes and Class II-A-3 Components for such payment date and (b) the related Principal Remittance Amount for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans for such payment date.  With respect to any payment date and Loan Group V, the lesser of (a) the excess of (i) the related Available Funds and Class V-A-4-D Insured Amount, if any, for such payment date over (ii) the aggregate amount of Accrued Note Interest for the Class V-A, Class V-M and Class V-B Notes for such payment date and (b) the related Principal Remittance Amount for the Group V Loans for such payment date.

**Basis Risk Shortfall** — With respect to any class of LIBOR Notes, other than the Class II-A-3 Notes and Class VI-A Notes, on each payment date where clause (iii) of the definition of "Note Interest Rate" is less than clauses (i) or (ii) of the definition of "Note Interest Rate," the excess, if any, of (x) the aggregate Accrued Note Interest thereon for such payment date calculated pursuant to the lesser of clause (i) or (ii) of the definition of Note Interest Rate over (y) Accrued Note Interest thereon for such payment date calculated at the related Available Funds Rate.  With respect to the Class II-A-3 Components, on each payment date where clause (iii) of the definition of "Component Interest Rate" is less than clauses (i) or (ii) of the definition of "Component Interest Rate," the excess, if any, of (x) the aggregate Accrued Component Interest thereon for such payment date calculated pursuant to the lesser of clause (i) or (ii) of the definition of Component Interest Rate over (y) Accrued Component Interest thereon for such payment date calculated at the related Available Funds Rate.  With respect to the Class VI-A Notes, on each payment date where the Note Interest Rate for the Class VI-A Notes is limited to the Net WAC Cap, any interest which would have accrued at the excess of (a) the lesser of (i) One-Month LIBOR plus the related Note Margin and (ii) the Maximum Rate over (b) the Net WAC Cap.

**Basis Risk Shortfall Carry-Forward Amount** — With respect to each class of LIBOR Notes and the Class II-A-3 Components, other than the Class II-A-3 Notes, and any payment date, as determined separately for each such class of Notes or Class II-A-3 Components, an amount equal to the aggregate amount of Basis Risk Shortfall for such Notes or Class II-A-3 Components on such payment date, plus any unpaid Basis Risk Shortfall for such class of Notes or Class II-A-3 Components from prior payment dates, plus interest thereon at the Note Interest Rate or Component Interest Rate, as applicable, or, in the case of the Class VI-A Notes, plus interest accrued thereon at the lesser of (i) One-Month LIBOR plus the related Note Margin and (ii) the Maximum Rate, for such payment date for such class for the related Accrual Period, to the extent previously unreimbursed by the Net Monthly Excess Cashflow or payments received by the Indenture Trustee under the Cap Contract or Corridor Contract, as applicable.

**Book-entry Notes** — Each class of Notes issued, maintained and transferred at the DTC, Clearstream, Luxembourg or the Euroclear System.

**Cap Contract —** The interest rate Cap Contract between the Owner Trustee (or assigned to the Owner Trustee) on behalf of the Trust and the Derivative Counterparty primarily for the benefit of the Class V-A-2 Notes.

**Cap Rate —** With respect to the Cap Contract and each payment date, the fixed rate set forth in each Cap Contract used to determine payments to the Indenture Trustee.

**Ceiling Rate —**With respect to the Corridor Contract and each payment date, the fixed rate set forth in the Corridor Contract used to determine payments to the Indenture Trustee.

**Charge-Off Amount —** For any Charged-Off HELOC, the amount of the principal balance that has been written down.

**Charged-Off HELOC —** A HELOC with a balance that has been written down on the HELOC Servicer's servicing system in accordance with its policies and procedures and any HELOC that is more than 180 days past due.

**Class A Notes —** The Class I-A, Class II-A, Class III-A, Class IV-A, Class V-A and Class VI-A Notes.

**Class A Principal Allocation Fraction —** For any payment date and (i) the Class I-A Notes, (ii) the Class II-A-1 Notes and Component II-A-3-C, (iii) the Class II-A-2 Notes and Component II-A-3-NC, (iv) the Class III-A Notes and (v) the Class IV-A Notes, as determined separately, a fraction, (x) the numerator of which is the Principal Remittance Amount with respect to the mortgage loans in the related Loan Group to be distributed on that payment date, and (y) the denominator of which is the Principal Remittance Amount for all of the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV to be distributed on that payment date.

**Class A Principal Distribution Amount —** For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the lesser of (A) the related aggregate Principal Distribution Amount for such payment date and (B) the excess (if any) of (x) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 84.90% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class I-A Notes —** The Class I-A-1, Class I-A-2 and Class I-A-3 Notes.

**Class II-A-3 Components —** Component II-A-3-C and Component II-A-3-NC.

**Class II-A Notes —** The Class II-A-1, Class II-A-2 and Class II-A-3 Notes.

**Class IV-A Notes —** The Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes.

**Class M Notes —** The Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Notes.

**Class M-1 Principal Distribution Amount —** For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment

date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A Notes (after taking into account the distribution of the Class A Principal Distribution Amount on such payment date) and (ii) the Note Principal Balance of the Class M-1 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 87.80% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class M-2 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A and Class M-1 Notes (after taking into account the distribution of the Class A and Class M-1 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class M-2 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 89.80% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class M-3 Principal Distribution Amount** — For any applicable payment date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1 and Class M-2 Notes (after taking into account the distribution of the Class A, Class M-1 and Class M-2 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class M-3 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 91.00% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment

Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class M-4 Principal Distribution Amount** — For any applicable payment date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1, Class M-2 and Class M-3 Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2 and Class M-3 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class M-4 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 92.84% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class M-5 Principal Distribution Amount** — For any applicable payment date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A, Class M-1, Class M-2, Class M-3 and Class M-4 Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2, Class M-3 and Class M-4 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class M-5 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 96.32% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class B Principal Distribution Amount** — For any applicable payment date on or after the Stepdown Date as long as a Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A, Class IV-A and Class M Notes (after taking into account the distribution of the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class B Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by

approximately 99.30% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances and any Additional Negative Amortization Principal Amount.

**Class V-A Notes** — The Class V-A-1, Class V-A-2, Class V-A-3 and Class V-A-4 Notes.

**Class V-A Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the lesser of (A) the related aggregate Principal Distribution Amount for such payment date and (B) the excess (if any) of (x) the aggregate Note Principal Balance of the Class V-A Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 85.40% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balances.

**Class V-A-1 Priority Amount** — For any payment date, the lesser of (i) the Note Principal Balance of the Class V-A-1 Notes immediately prior to such payment date and (ii) the product of (x)(A) with respect to any payment date prior to the Group V Stepdown Date or for which a Group V Trigger Event is in effect, the related Principal Distribution Amount, or (B) with respect to any payment date on or after the Group V Stepdown Date and for which Group V Trigger Event is not in effect, the Class V-A Principal Distribution Amount, (y) the Class V-A-1 Percentage and (z) the Class V-A-1 Shift Percentage.

**Class V-A-1 Percentage** — For any payment date, the lesser of (i) 100% and (ii) the percentage obtained by dividing (x) the Note Principal Balance of the Class V-A-1 Notes immediately prior to such payment date by (y) the aggregate Note Principal Balance of the Class V-A Notes immediately prior to such payment date.

**Class V-A-1 Shift Percentage** — For any payment date occurring prior to the 37th payment date, 0%; for the 37th through 60th payment dates, 45%; for the 61st through 72nd payment dates, 80%; for the 73rd through 84th payment dates, 100%; and thereafter, 300%.

**Class V-A-4-D Deficiency Amount** – With respect to each payment date prior to the final scheduled payment date and the Class V-A-4-D Notes, an amount equal to the sum of (i) the excess, if any, of (a) the amount of Accrued Note Interest on the Class V-A-4-D Notes for that payment date over (b) the Group V Available Funds for that payment date  multiplied by a fraction equal to (x) the Accrued Note Interest on the Class V-A-4-D Notes for that payment date over (y) the Accrued Note Interest on all of the Class V-A Notes for that payment date , and (ii) the Class V-A-4-D Insured Undercollateralization Amount. With respect to the final scheduled payment date and the Class V-A-4-D Notes, an amount equal to the sum of (i) the excess, if any, of (a) the amount of Accrued Note Interest on the Class V-A-4-D Notes for that payment date over (b) the Group V Available Funds for that payment date multiplied by a fraction equal to (x) the Accrued Note Interest on the Class V-A-4-D Notes for that payment date over (y) the Accrued Note Interest on all of the Class V-A Notes for that payment date and (ii) the excess, if any, of the Note Principal Balance of all outstanding Class V-A-4-D Notes due on such final scheduled payment date to the extent not paid from Group V Available Funds on that payment date. For the Class

V-A-4-D Notes and any date on which the acceleration of the Notes has been directed or consented to by the Noteholders pursuant to the Indenture, the amount required to pay the Note Principal Balance of the Class V-A-4-D Notes in full, together with accrued and unpaid interest thereon through the date of payment of the Class V-A-4-D Notes.

**Class V-A-4-D Insured Amount** — The aggregate of Class V-A-4-D Deficiency Amounts and Class V-A-4-D Preference Amounts.

**Class V-A-4-D Insured Undercollateralization Amount** – On any payment date, an amount equal to (x)(i) the aggregate Note Principal Balance of the Class V-A Notes over (ii) the aggregate Stated Principal Balance of the Group V Loans plus the Group V pre-Funded Amount multiplied by (x) a fraction equal to (i) the aggregate Note Principal Balance of the Class V-A-4-D Notes over (ii) the aggregate Note Principal Balance of the Class V-A Notes.

**Class V-A-4-D Preference Amount** — With respect to the Class V-A-4-D Notes, any amount previously distributed to a holder of a Class V-A-4-D Note that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code, as amended from time to time, in accordance with a final nonappealable order of a court having competent jurisdiction.

**Class V-A-4 Notes** — The Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes.

**Class V-M Notes** — The Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4 and Class V-M-5 Notes.

**Class V-M-1 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes (after taking into account the distribution of the Class V-A Principal Distribution Amount on such payment date) and (ii) the Note Principal Balance of the Class V-M-1 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 88.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Class V-M-2 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes and Class V-M-1 Notes (after taking into account the distribution of the Class V-A and Class V-M-1 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class V-M-2 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 90.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled

payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Class V-M-3 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1 and Class V-M-2 Notes (after taking into account the distribution of Class V-A, Class V-M-1 and Class V-M-2 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class V-M-3 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 91.50% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Class V-M-4 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1, Class V-M-2 and Class V-M-3 Notes (after taking into account the distribution of the Class V-A, Class V-M-1, Class V-M-2 and Class V-M-3 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class V-M-4 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 95.00% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Class V-M-5 Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes (after taking into account the distribution of the Class V-A, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class V-M-5 Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 97.20% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments

of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Class V-B Principal Distribution Amount** — For any applicable payment date on or after the related Stepdown Date as long as a related Trigger Event has not occurred with respect to such payment date, an amount equal to the excess (if any) of (x) the sum of (i) the aggregate Note Principal Balance of the Class V-A Notes and Class V-M Notes (after taking into account the distribution of the Class V-A, Class V-M-1, Class V-M-2, Class V-M-3, Class V-M-4 and Class V-M-5 Principal Distribution Amounts on such payment date) and (ii) the Note Principal Balance of the Class V-B Notes immediately prior to such payment date over (y) the lesser of (a) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) multiplied by approximately 99.30% and (b) the amount, if any, by which (i) the aggregate Stated Principal Balance of the Group V Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, and after reduction for Realized Losses incurred during the related Prepayment Period) exceeds (ii) 0.35% of the Group V Cut-off Date Balance.

**Closing Date** — June 22, 2005.

**Collection Account** — The account or accounts created and maintained by the HELOC Servicer pursuant to the HELOC Servicing Agreement.

**Compensating Interest** — Any payments made by the RMBS Master Servicer or the RMBS Servicer, pursuant to the RMBS Master Servicing Agreement and RMBS Servicing Agreement, as applicable, to cover Prepayment Interest Shortfalls.

**Component II-A-3-C** — The component of the Class II-A-3 Notes which receives principal and interest primarily from the Group II-C Loans.

**Component II-A-3-NC** — The component of the Class II-A-3 Notes which receives principal and interest primarily from the Group II-NC Loans.

**Component Interest Rate** — With respect to each payment date and Component II-A-3-C and Component II-A-3-NC, a floating rate equal to the least of (i) One-Month LIBOR plus the related Component Margin, (ii) the related Maximum Component Interest Rate and (iii) the related Available Funds Rate with respect to such payment date.

**Component Margin** — With respect to Component II-A-3-C, on any payment date prior to the Step-Up Date, 1.570% per annum, and on any payment date on and after the Step-Up Date, 3.140% per annum. With respect to Component II-A-3-NC, on any payment date prior to the Step-Up Date, 1.570% per annum, and on any payment date on and after the Step-Up Date, 3.140% per annum.

**Component Principal Balance** — With respect to each of the Class II-A-3 Components, as of any date of determination, the initial Component Principal Balance as stated on the face thereof, minus all amounts distributed in respect of principal with respect to such Component.

**Corridor Contract** — The interest rate corridor contract between the Owner Trustee (or assigned to the Owner Trustee) on behalf of the Trust and the Derivative Counterparty primarily for the benefit of the Class II-A Notes.

**CPR** — A constant rate of prepayment on the mortgage loans or HELOCs.

**Credit Enhancement Percentage** — With respect to the Class I-A, Class II-A, Class III-A and Class IV-A Notes and any payment date, the percentage equivalent of a fraction, the numerator of which is (a) the sum of the aggregate Note Principal Balance of the Class M Notes and Class B Notes and the related Overcollateralized Amount and the denominator of which is (b) the aggregate Stated Principal Balance of the related mortgage loans at the end of the related Due Period.  With respect to the Class V-A Notes and any payment date, the percentage equivalent of a fraction, the numerator of which is (a) the sum of the aggregate Note Principal Balance of the Class V-M Notes and Class V-B Notes and the related Overcollateralized Amount and the denominator of which is (b) the aggregate Stated Principal Balance of the related mortgage loans at the end of the related Due Period.

**Credit Enhancer** — Financial Guaranty Insurance Company.

**Cut-Off Date** — With respect to the initial mortgage loans, June 1, 2005, with respect to the initial HELOCs, the close of business of June 7, 2005, and with respect to the subsequent mortgage loans or subsequent HELOCs, the applicable Subsequent Cut-off Date.

**Debt Service Reduction** — With respect to any mortgage loan, a reduction in the scheduled monthly payment for such mortgage loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

**Deficient Valuation** — With respect to any mortgage loan, a valuation by a court of competent jurisdiction of the related mortgaged property in an amount less than the then outstanding indebtedness under the mortgage loan, or any reduction in the amount of principal to be paid in connection with any scheduled monthly payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

**Delinquency Rate** — For any month, the fraction, expressed as a percentage, the numerator of which is the aggregate outstanding principal balance of all mortgage loans 60 or more days delinquent, or, in the case of any HELOC, 90 or more days delinquent, (including all foreclosures, mortgage loans subject to bankruptcy proceedings and REO properties) as of the close of business on the last day of such month, and the denominator of which is the aggregate Stated Principal Balance of the mortgage loans, or HELOCs, as applicable, as of the close of business on the last day of such month, or Due Period, as applicable.

**Depositor** — American Home Mortgage Securities LLC.

**Derivative Contracts** — Any of the Cap Contract or the Corridor Contract.

**Derivative Counterparty** — Bear Stearns Financial Products Inc.

**Determination Date** — With respect to any payment date, the 15th day of the related month or, if such day is not a business day, the immediately preceding business day.

**Draw** — With respect to any HELOC, an additional borrowing by the related mortgagor subsequent to the Cut-off Date in accordance with the related mortgage note.

**Draw Period** — With respect to any HELOC, the period during which the related mortgagor is permitted to make Draws.

**Due Date** — With respect to each mortgage loan or HELOC, the date in each month on which its Monthly Payment is due, exclusive of any days of grace.

**Due Period** — With respect to any payment date and the mortgage loans, the period commencing on the second day of the month immediately preceding the month in which such payment date occurs and ending on the first day of the month in which such payment date occurs.  With respect to any payment date and the Group VI HELOCs, the period commencing on the 11th of the month immediately preceding the month in which such payment date occurs and ending on the 10th day of the month in which such

payment date occurs, or, in the case of the first Due Period, the period commencing on June 8, 2005 and ending on July 10, 2005.

**Event of Default** — Any one of the following: (a) the failure by the Issuer to pay Accrued Note Interest on any Class of Notes, other than the Class N-1 Notes and Class N-2 Notes, with respect to a payment date on such payment date; (b) a default by the Issuer in the observance of certain negative covenants in the Indenture; (c) a default by the Issuer in the observance of any other covenant of the Indenture, and the continuation of any such default for a period of thirty days after notice to the Issuer by the Indenture Trustee or by the Holders of at least 25% of the aggregate Note Principal Balance of the Notes, as applicable; (d) any representation or warranty made by the Issuer in the Indenture or in any Note or other writing delivered pursuant thereto having been incorrect in a material respect as of the time made, and the circumstance in respect of which such representation or warranty is incorrect not having been cured within thirty days after notice thereof is given to the Issuer by the Indenture Trustee or by the Holders of at least 25% of the aggregate Note Principal Balance of the Notes, as applicable; (e) certain events of bankruptcy, insolvency, receivership or reorganization of the Issuer; or (f) the failure by the Issuer on the final scheduled payment date to pay all Accrued Note Interest, all remaining Basis Risk Shortfall Carry-Forward Amounts and to reduce the Note Principal Balances of all of the Notes to zero.

**Excess Derivative Payment Amount** — For any payment date, the sum of (a) the excess of amounts payable from the Corridor Contract on that payment date over the amount of Basis Risk Shortfall Carry-Forward Amounts payable to the Class II-A Notes on that payment date and (b) the excess of amounts payable from the Cap Contract on that payment date over the amount of Basis Risk Shortfall Carry-Forward Amounts payable to the Class V-A-2 Notes on that payment date.

**Excess Overcollateralization Amount** — For any payment date and Loan Group VI, the amount by which the related Overcollateralized Amount, assuming the full Investor Principal Distribution Amount was paid on the Class VI-A Notes for such payment date, exceeds the related Overcollateralization Target Amount; provided, however, that following the occurrence of a Rapid Amortization Event the Excess Overcollateralization Amount shall be zero.

**Floating Allocation Percentage** — For any payment date, the percentage equivalent of a fraction with a numerator of the Invested Amount at the end of the previous Due Period (in the case of the first payment date, the Invested Amount as of the Closing Date) and a denominator equal to the sum of (i) the Group VI Pool Balance and (ii) the Group VI Pre-Funded Amount, in each case at the end of the previous Due Period (in the case of the first payment date, the Group VI Cut-off Date Balance), provided such percentage shall not be greater than 100%.

**Funding Period** — With respect to the Group I Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group I Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group II-C Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group II Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group II-NC Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group II Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group III Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group III Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group IV Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group IV Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group V Loans, the period from the Closing Date until the earlier of (i) the date on which the amount on deposit in the Group V Pre-Funding Account is reduced to less than $50,000, (ii) an RMBS Servicer default or (iii) July 31, 2005. With respect to the Group VI HELOCs, the period from the Closing Date until the earlier of (i) the

date on which the amount on deposit in the Group VI Pre-Funding Account is reduced to less than $50,000, (ii) a HELOC Servicer default or (iii) July 31, 2005.

**Group I Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group I Loans.  The Group I Available Funds generally includes: (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group I Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group I Loans made by the RMBS Servicer for such Payment Date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group I Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group I Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group I Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to, the Indenture Trustee, RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Agreements allocable to the Group I Loans.

**Group I Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group I Loans as of the Cut-off Date and (y) the Group I Original Pre-Funded Amount.

**Group I Interest Coverage Account** — A trust account that the Indenture Trustee will establish for the benefit of the Class I-A Notes and Class M Notes.

**Group I Original Pre-Funded Amount** — The amount deposited in the Group I Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $205,673,646.01.

**Group I Pre-Funded Amount** — The amount on deposit in the Group I Pre-Funding Account on any date of determination.

**Group I Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class I-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group I Original Pre-Funded Amount.

**Group I Subsequent Transfer Instrument —** With respect to the Group I subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group II-C Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group II-C Loans. The Group II-C Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group II-C Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group II-C Loans made by the RMBS Servicer for such payment date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group II-C Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group II-C Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group II-C Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture

Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Agreements allocable to the Group II-C Loans.

**Group II-C Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group II-C Loans as of the Cut-off Date and (y) the Group II-C Original Pre-Funded Amount.

**Group II-C Interest Coverage Account** — An account established by the Indenture Trustee for the benefit of the Class II-A-1 Notes, Class M Notes and Component II-A-3-C and funded on the Closing Date by the Depositor with the Group II-C Original Pre-Funded Amount.

**Group II-C Original Pre-Funded Amount** — The amount deposited in the Group II-C Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $131,138,973.25.

**Group II-C Pre-Funded Amount** — The amount on deposit in the Group II-C Pre-Funding Account on any date of determination.

**Group II-C Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class II-A-1, Class M and Class B Notes and Component II-A-3C and funded on the Closing Date by the Depositor with the Group II-C Original Pre-Funded Amount.

**Group II-C Subsequent Transfer Instrument** — With respect to the Group II-C subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group II-NC Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group II-NC Loans. The Group II-NC Available Funds generally includes: (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group II-NC Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group II-NC Loans made by the RMBS Servicer for such payment date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection or Payment Account, as applicable, (4) amounts transferred from the Group II-NC Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group II-NC Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group II-NC Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Agreements allocable to the Group II-NC Loans.

**Group II-NC Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group II-NC Loans as of the Cut-off Date and (y) the Group II-NC Original Pre-Funded Amount.

**Group II-NC Interest Coverage Account** — An account established by the Indenture Trustee for the benefit of the Class II-A-2 Notes, Class M Notes and Component II-A-3-NC and funded on the Closing Date by the Depositor with the Group II-NC Original Pre-Funded Amount.

**Group II-NC Original Pre-Funded Amount** — The amount deposited in the Group II-NC Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $158,233,429.48.

**Group II-NC Pre-Funded Amount** — The amount on deposit in the Group II-NC Pre-Funding Account on any date of determination.

**Group II-NC Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class II-A-2, Class M and Class B Notes and Component II-A-3-NC and funded on the Closing Date by the Depositor with the Group II-NC Original Pre-Funded Amount.

**Group II-NC Subsequent Transfer Instrument** — With respect to the Group II-NC subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group III Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group III Loans. The Group III Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group III Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group III Loans made by the RMBS Servicer for such payment date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group III Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group III Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group III Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator, the Owner Trustee and other amounts as provided in the Agreements allocable to the Group III Loans.

**Group III Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group III Loans as of the Cut-off Date and (y) the Group III Original Pre-Funded Amount.

**Group III Interest Coverage Account —** An account established by the Indenture Trustee for the benefit of the Class III-A Notes and Class M Notes and funded on the Closing Date by the Depositor with the Group III Original Pre-Funded Amount.

**Group III Original Pre-Funded Amount —** The amount deposited in the Group III Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $371,953,202.46.

**Group III Pre-Funded Amount** — The amount on deposit in the Group III Pre-Funding Account on any date of determination.

**Group III Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class III-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group III Original Pre-Funded Amount.

**Group III Subsequent Transfer Instrument** — With respect to the Group III subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group IV Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group IV Loans. The Group IV Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group IV Loans and (2) any Monthly Advances and Compensating Interest

Payments on the Group IV Loans made by the RMBS Servicer for such payment date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group IV Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group IV Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group IV Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Agreements allocable to the Group IV Loans.

**Group IV Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group IV Loans as of the Cut-off Date and (y) the Group IV Original Pre-Funded Amount.

**Group IV Interest Coverage Account** — An account established by the Indenture Trustee for the benefit of the Class IV-A Notes and Class M Notes and funded on the Closing Date by the Depositor with the Group IV Original Pre-Funded Amount.

**Group IV Original Pre-Funded Amount** — The amount deposited in the Group IV Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $168,046,230.95.

**Group IV Pre-Funded Amount** — The amount on deposit in the Group IV Pre-Funding Account on any date of determination.

**Group IV Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class IV-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group IV Original Pre-Funded Amount.

**Group IV Subsequent Transfer Instrument** — With respect to the Group IV subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group V Available Funds** — For any payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group V Loans. The Group V Available Funds generally includes:  (1) all previously undistributed payments on account of principal (including the principal portion of Monthly Payments, Principal Prepayments and the principal amount of Net Liquidation Proceeds) and all previously undistributed payments on account of interest received after the Cut-Off Date and on or prior to the related Determination Date from the Group V Loans and (2) any Monthly Advances and Compensating Interest Payments on the Group V Loans made by the RMBS Servicer for such payment date and (3) any amounts reimbursed by the RMBS Servicer, the Indenture Trustee or the Securities Administrator in connection with losses on certain eligible investments in the Protected Accounts, Securities Administrator Collection Account or Payment Account, as applicable, (4) amounts transferred from the Group V Interest Coverage Account and, at the end of the Funding Period, any excess amounts transferred from the Group V Pre-Funding Account, and (5) interest earned on amounts on deposit in the Group V Pre-Funding Account, and is net of (6) fees payable to, and other amounts reimbursable to the Indenture Trustee, the RMBS Master Servicer, the RMBS Servicer, the Securities Administrator and the Owner Trustee and other amounts as provided in the Agreements allocable to the Group V Loans and the premium on the Note Insurance Policy in respect of the Class V-A-4-D Notes.

**Group V Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group V Loans as of the Cut-off Date and (y) the Group V Original Pre-Funded Amount.

**Group V Interest Coverage Account** — An account established by the Indenture Trustee for the benefit of the Class V-A, Class V-M and Class V-B Notes and funded on the Closing Date by the Depositor with the Group V Original Pre-Funded Amount.

**Group V Original Pre-Funded Amount** — The amount deposited in the Group V Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $344,864,400.27.

**Group V Pre-Funded Amount** — The amount on deposit in the Group V Pre-Funding Account on any date of determination.

**Group V Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class V-A, Class M and Class B Notes and funded on the Closing Date by the Depositor with the Group V Original Pre-Funded Amount.

**Group V Subsequent Transfer Instrument** — With respect to the Group V subsequent mortgage loans, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**Group VI Cut-off Date Balance** — The sum of (x) the aggregate Stated Principal Balance of the Group VI HELOCs as of the Cut-off Date and (y) the Group VI Original Pre-Funded Amount.

**Group VI Delinquent HELOC Amount** — With respect to any payment date, the aggregate Stated Principal Balance of any Group VI HELOCs which are 180 days or more delinquent, REO, in bankruptcy or in foreclosure.

**Group VI Excess Spread Percentage** — With respect to any payment date, the percentage equivalent of a fraction, (A) the numerator of which is the product of (i) the excess of (x) the Investor Interest Collections on the Group VI HELOCs for that payment date over (y) the sum of the Accrued Note Interest on the Group VI HELOCs, the premium due to the Credit Enhancer under the Policy, any Investor Charge-Off Amounts, any reimbursement amounts and other amounts payable to the Credit Enhancer pursuant to the Insurance Agreement, and the related servicing fee for such payment date and (ii) twelve (12), and (B) the denominator of which is the aggregate Stated Principal Balance of the Group VI HELOCs as of the beginning of the related Due Period.

**Group VI Interest Coverage Account** — A trust account that the Indenture Trustee will establish for the benefit of the Class VI-A Noteholders.

**Group VI Original Pre-Funded Amount** — The amount deposited in the Group VI Pre-Funding Account on the Closing Date by the Depositor, which will be approximately $60,060,491.16.

**Group VI Pool Balance** — For any payment date, an amount equal to the aggregate of the Principal Balances of the HELOCs at the end of the related Due Period.

**Group VI Pre-Funded Amount** — The amount on deposit in the Group VI Pre-Funding Account on any date of determination.

**Group VI Pre-Funding Account** — An account established by the Indenture Trustee for the benefit of the Class VI-A Noteholders and funded on the Closing Date by the Depositor with the Group VI Original Pre-Funded Amount.

**Group VI Subsequent Transfer Instrument** — With respect to the Group VI subsequent HELOCs, the subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee.

**HELOC Back-Up Servicer** – GMAC Mortgage Corporation or its successor in interest.

**HELOC Back-Up Servicing Agreement** — The HELOC Back-Up Servicing Agreement dated as of June 22, among the HELOC Back-Up Servicer, Indenture Trustee and Issuer.

**HELOC Back-Up Servicing Fee** — With respect to each HELOC and any payment date, the fee payable monthly to the HELOC Back-Up Servicer pursuant to the HELOC Back-Up Servicing Agreement in respect of back-up servicing compensation that accrues at an annual rate equal to the HELOC Back-Up Servicing Fee Rate multiplied by the Stated Principal Balance of such HELOC as of the first day of the related Due Period.

**HELOC Back-Up Servicing Fee Rate** — With respect to each HELOC, 0.02% per annum.

**HELOC Servicer** – American Home Mortgage Servicing, Inc., or its successor in interest.

**HELOC Servicing Agreement** — The Servicing Agreement, dated as of June 22, 2005, among the HELOC Servicer, HELOC Back-Up Servicer, Seller, Indenture Trustee and Issuer.

**HELOC Servicing Fee** – With respect to each HELOC and any payment date, the fee payable monthly to the HELOC Servicer in respect of servicing compensation that accrues at an annual rate equal to the HELOC Servicing Fee Rate multiplied by the Stated Principal Balance of such HELOC as of the first day of the related Due Period.

**HELOC Servicing Fee Rate** – With respect to each HELOC, 0.50% per annum.

**HELOC Servicer Termination Event** — A removal of the HELOC Servicer by the Credit Enhancer for "cause." Cause shall mean any material breach of any obligation, covenant, or trigger under the transaction documents subject to cure provisions relating to such breach as agreed to by the parties. In particular, HELOC Servicer Termination Events shall include:

(a)     The occurrence of a draw on the Policy which remains unreimbursed for a period of 90 days.;

(b)     Cumulative Charge-Off Amounts, as a percentage of the HELOC pool balance as of the Closing Date, exceed the following:

| Months | Percentage |
|--------|-----------|
| 0 – 12 | 1.00% |
| 13 – 24 | 2.00% |
| 25 – 36 | 3.00% |
| 37 – 48 | 4.00% |
| 49+ | 5.00% |

(c)     AHMC fails to have a tangible net worth of at least $530 million as described in the Agreements.

**Indenture** — The Indenture dated as of June 22, 2005, between the Issuer, the Securities Administrator and the Indenture Trustee.

**Indenture Trustee** — Deutsche Bank National Trust Company, and its successors and assigns or any successor indenture trustee appointed pursuant to the terms of the Indenture.

**Insurance Agreement** — The Insurance Agreement dated as of June 22, 2005 among the Indenture Trustee, the Seller, the Issuer, American Home Mortgage Investment Corp., the HELOC Servicer, the Depositor, the Owner Trustee and the Credit Enhancer, including any amendments and supplements thereto in accordance with the terms thereof.

**Insurance Proceeds** — Amounts paid by an insurer under any primary mortgage insurance policy, standard hazard insurance policy, flood insurance policy or title insurance policy covering any mortgage loan or mortgaged property other than amounts required to be paid over to the mortgagor

pursuant to law or the related mortgage note and other than amounts used to repair or restore the mortgaged property or to reimburse certain expenses.

**Interest Collections** — For each payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group VI HELOCs, and consist of interest collected during the related Due Period on the HELOCs and allocated to interest in accordance with the terms of the related Credit Line Agreements, together with the interest portion of any Repurchase Price and substitution adjustment amount paid during the related Due Period, any Net Recoveries on HELOCs that were previously Charged-Off HELOCs and interest earned on amounts on deposit in the Group VI Pre-Funding Account, net of fees and reimbursements to the Owner Trustee, Indenture Trustee, Securities Administrator, HELOC Servicer and HELOC Back-Up Servicer.

**Interest Determination Date** — With respect each class of LIBOR Notes, other than the Class II-A-1 Notes, Class II-A-2 Notes and the Class II-A-3 Components and (i) the first Accrual Period, the second LIBOR Business Day preceding the Closing Date, and (ii) with respect to each Accrual Period thereafter, the second LIBOR Business Day preceding the related payment date on which such Accrual Period commences.  With respect the Class II-A-1 Notes, Class II-A-2 Notes and the Class II-A-3 Components and (i) the first Accrual Period, May 27, 2005, and (ii) with respect to each Accrual Period thereafter, the second LIBOR Business Day preceding the beginning of the related Accrual Period.

**Invested Amount** — For any payment date, the Invested Amount on the Closing Date reduced by (i) the aggregate amount of Investor Principal Distribution Amounts (before taking into account any Overcollateralization Reduction Amount) up to and including the related payment date and (ii) the aggregate of Investor Charge-Off Amounts up to and including such payment date.  The Invested Amount on the Closing Date is $240,241,964.64.

**Investor Charge-Off Amount** — For any payment date, the Floating Allocation Percentage of Charge-Off Amounts incurred during the related Due Period.

**Investor Interest Collections** — For any payment date, the Floating Allocation Percentage of Interest Collections for the related Due Period.

**Investor Principal Distribution Amount**— On every payment date from the first payment date through and including the payment date in June 2015, unless a Rapid Amortization Event has occurred is equal to the excess, if any, of all Principal Collections received during the related Due Period over the amount of all additional balances drawn under the mortgage loans during the related Due Period; and on every payment date after the payment date in June 2015 or if a Rapid Amortization Event has previously occurred, is equal to all Principal Collections received during the related Due Period.  During the Managed Amortization Period, such amount will be reduced by the Overcollateralization Reduction Amount**.**

**Issuer —** American Home Mortgage Investment Trust 2005-2, a Delaware statutory trust, or its successor in interest.

**LIBOR Business Day** — A day on which banks are open for dealing in foreign currency and exchange in London and New York City.

**LIBOR Note** — Any Class I-A, Class II-A, Class V-A-2, Class VI-A, Class M, Class V-M or Class V-B Note, or any Class III-A Note or Class IV-A Note after the related Note Rate Change Date.

**Liquidated HELOC**— Any defaulted HELOC as to which the HELOC Servicer has determined that all amounts which it expects to recover from or on account of such HELOC have been recovered.

**Liquidated Mortgage Loan** — Any defaulted mortgage loan as to which the RMBS Servicer has determined that all amounts which it expects to recover from or on account of such mortgage loan have been recovered.

**Liquidation Proceeds** — Amounts received by the RMBS Servicer or HELOC Servicer in connection with the liquidation of a defaulted mortgage loan or HELOC whether through trustee's sale, foreclosure sale, proceeds of insurance policies, condemnation proceeds or otherwise.

**Loan Group** — Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III, Loan Group IV, Loan Group V or Loan Group VI as applicable.

**Managed Amortization Period** — Begins on the Cut-off Date and ends on the earlier of the Payment Date in June 2015 or the occurrence of a Rapid Amortization Event.

**Maximum Component Interest Rate** — With respect to any payment date and Component II-A-3-C and Component II-A-3-NC, 11.00% per annum.

**Maximum Note Interest Rate** — With respect to any payment date and each class of the Class I-A, Class II-A-1, Class II-A-2 and Class M Notes, and with respect to the Class III-A Notes and Class IV-A Notes and any payment date after the related Note Rate Change Date, 11.00% per annum. With respect to any payment date and each class of the Class V-A-2, Class V-M Notes and Class V-B Notes, 10.00% per annum.

**Maximum Rate** — With respect to payment date and the Class VI-A Notes, (a) the weighted average of the maximum loan rates of the Group VI HELOCs, weighted on the basis of the related Stated Principal Balance of each Group VI HELOC as of the end of the related Due Period, minus (i) the HELOC Servicing Fee Rate and (ii) the premium due to the Credit Enhancer under the Policy expressed in dollars divided by aggregate Stated Principal Balance of the Group VI HELOCs as of such payment date, times (b) a fraction equal to (x) the number of days in the related Accrual Period over (y) 30.

**Minimum Monthly Payment** — The minimum amount required to be paid by the mortgagor pursuant to the terms of a Group I mortgage note.

**Monthly Advance** — The aggregate of all payments of principal and interest, net of the RMBS Servicing Fee, that were due during the related Due Period on the mortgage loans and that were delinquent on the related Due Date (other than shortfalls in interest due to the application of the Relief Act or similar state law).

**Monthly Payments** — For any mortgage loan and any month, the scheduled payment or payments of principal and interest due during such month on such mortgage loan which either is payable by a mortgagor in such month under the related mortgage note, or in the case of any mortgaged property acquired through foreclosure or deed-in-lieu of foreclosure, would otherwise have been payable under the related mortgage note.

**Moody's** — Moody's Investors Service, Inc.

**Net Recoveries** — With respect to a HELOC, the aggregate of all amounts received upon liquidation of the HELOC, including, without limitation, insurance proceeds, reduced by related expenses.

**Net Liquidation Proceeds** — With respect to any Liquidated Mortgage Loan or Liquidated HELOC, Liquidation Proceeds and Subsequent Recoveries net of unreimbursed Servicing Advances by the HELOC Servicer or RMBS Servicer, as applicable, Monthly Advances and Liquidation Expenses.

**Net Monthly Excess Cashflow** — With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, as determined in the aggregate for any payment date, the sum of (1) the excess of (x) the Group I, Group II-C, Group II-NC, Group III and Group IV Available Funds for such payment date over (y) the sum for such payment date of (A) the aggregate amount of Accrued Note Interest or Accrued Component Interest for the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A and Class M Notes and the Class II-A-3 Components and (B) the Principal Remittance Amount used to make payments in respect of principal to these Notes or Class II-A-3 Components, and

(2) amounts payable from the Net Monthly Excess Cashflow for the Group V Loans as described in clause (11) of "Description of the Notes – Overcollateralization Provisions for Loan Group V" in this prospectus supplement.  With respect to Loan Group V, for any payment date and, the sum of (1) the excess of (x) the related Available Funds and the Class V-A-4-D Insured Amount, if any, for such payment date over (y) the sum for such payment date of (A) the aggregate amount of Accrued Note Interest for the Class V-A, Class V-M and Class V-B Notes and (B) the Principal Remittance Amount used to make payments in respect of principal to these Notes and (2) amounts payable from the Net Monthly Excess Cashflow for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as described in clause (12) of "Description of the Notes – Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" in this prospectus supplement.

**Net Mortgage Rate** — For any mortgage loan or HELOC, the then applicable mortgage rate thereon less the RMBS Servicing Fee, the HELOC Back-Up Servicing Fee Rate or the HELOC Servicing Fee Rate, as applicable, and, in the case of a Group VI HELOC, less the premium due to the Credit Enhancer under the Policy, in each case expressed as a per annum rate.

**Negative Amortization Amount** — With respect to any Payment Date, the aggregate amount of negative amortization with respect to the Group I Loans for the related Due Period.

**Net WAC Cap** — The weighted average of the Net Mortgage Rates of the Group VI HELOCs included in the trust as of the end of the prior Due Period, weighted on the basis of the Stated Principal Balances thereof as of the end of the prior Due Period, minus (i) the HELOC Servicing Fee Rate and the HELOC Back-Up Servicing Fee Rate and (ii) the premium due to the Credit Enhancer under the Policy, expressed in dollars, divided by the current Stated Principal Balance of the Group VI HELOCs.

**Net WAC Shortfall** — With respect to the Class III-A Notes and Class IV-A, on or prior to the related Note Rate Change Date, and with respect to any class of Class V-A-1, Class V-A-3 and Class V-A-4 Notes on any payment date, as determined separately for each such class of notes, the excess, if any, of (x) the related Accrued Note Interest thereon for such payment date calculated pursuant to clause (i)(a) of the related definition of Note Interest Rate over (y) Accrued Note Interest thereon for such payment date calculated at the related Available Funds Rate.

**Net WAC Shortfall Carry-Forward Amount** — With respect to the Class III-A Notes and Class IV-A Notes, on or prior to the related Note Rate Change Date, and with respect to any class of Class V-A-1, Class V-A-3 and Class V-A-4 Notes on any payment date, as determined separately for each such class of Notes, an amount equal to the aggregate amount of Net WAC Shortfall for such Notes on such payment date, plus any unpaid Net WAC Shortfall for such class of Notes from prior payment dates, plus interest thereon at the related Note Interest Rate for such payment date for such class for the related Accrual Period, to the extent previously unreimbursed by Net Monthly Excess Cashflow.

**Note** — Any Class A, Class M, Class B, Class V-M, Class V-B, Class N-1 or Class N-2 Note.

**Note Insurance Policy** — The note guaranty insurance policy issued by the Note Insurer for the benefit of the holders of the Class V-A-4-D Notes only.

**Note Insurer** — Ambac Assurance Corporation, a Wisconsin domiciled stock insurance corporation, or any successor thereto as provided in the Indenture.

**Note Interest Rate** — With respect to each payment date and the Class I-A, Class II-A-1, Class II-A-2, Class V-A-2, Class M, Class V-M or Class V-B Notes, a floating rate equal to the least of (i) One-Month LIBOR plus the related Note Margin, (ii) the related Maximum Note Interest Rate and (iii) the related Available Funds Rate with respect to such payment date.  With respect to each payment date and the Class III-A, Class IV-A-1, Class IV-A-2 and Class IV-A-3 Notes, (i) prior to the related Note Rate Change Date, the lesser of (a) 5.6150%, 5.6600%, 5.6290% and 5.6290% per annum, respectively and (b) the related Available Funds Rate and (ii) on or after the related Note Rate Change Date, the least of (a)

Six-Month LIBOR plus the related Note Margin, (b) the related Maximum Note Interest Rate and (c) the related Available Funds Rate.  With respect to each payment date prior to the Step-Up Date and the Class V-A-1, Class V-A-3, Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes, the lesser of (i) 5.0640%, 5.0770%, 5.3830%, 5.7550%, 5.4080% and 5.3280% per annum, respectively, and (ii) the related Available Funds Rate. With respect to each payment date on or after the Step-Up Date and the Class V-A-1, Class V-A-3, Class V-A-4-A, Class V-A-4-B, Class V-A-4-C and Class V-A-4-D Notes, the lesser of (i) 5.5640%, 5.5770%, 5.8830%, 6.2550%, 5.9080% and 5.8280% per annum, respectively, and (ii) the related Available Funds Rate.  With respect to each payment date and the Class VI-A Notes, a rate equal to the least of (x) One-Month LIBOR plus the related Note Margin, (y) the Net WAC Cap and (z) the Maximum Rate.

**Note Margin** — With respect to the Class I-A-1 Notes, on any payment date prior to the Step-Up Date, 0.300% per annum, and on any payment date on and after the Step-Up Date, 0.600% per annum. With respect to the Class I-A-2 Notes, on any payment date prior to the Step-Up Date, 0.350% per annum, and on any payment date on and after the Step-Up Date, 0.700% per annum.  With respect to the Class I-A-3 Notes, on any payment date prior to the Step-Up Date, 0.380% per annum, and on any payment date on and after the Step-Up Date, 0.760% per annum. With respect to the Class II-A-1 Notes, on any payment date prior to the Step-Up Date, 1.570% per annum, and on any payment date on and after the Step-Up Date, 3.140% per annum.  With respect to the Class II-A-2 Notes, on any payment date prior to the Step-Up Date, 1.570% per annum, and on any payment date on and after the Step-Up Date, 3.140% per annum. With respect to the Class V-A-2 Notes, on any payment date prior to the Step-Up Date, 0.150% per annum, and on any payment date on and after the Step-Up Date, 0.300% per annum. With respect to the Class M-1 Notes, on any payment date prior to the Step-Up Date, 0.520% per annum, and on any payment date on and after the Step-Up Date, 0.780% per annum.  With respect to the Class M-2 Notes, on any payment date prior to the Step-Up Date, 0.570% per annum, and on any payment date on and after the Step-Up Date, 0.855% per annum.  With respect to the Class M-3 Notes, on any payment date prior to the Step-Up Date, 0.600% per annum, and on any payment date on and after the Step-Up Date, 0.900% per annum.  With respect to the Class M-4 Notes, on any payment date prior to the Step-Up Date, 0.750% per annum, and on any payment date on and after the Step-Up Date, 1.125% per annum. With respect to the Class M-5 Notes, on any payment date prior to the Step-Up Date, 1.200% per annum, and on any payment date on and after the Step-Up Date, 1.800% per annum  With respect to the Class V-M-1 Notes, on any payment date prior to the Step-Up Date, 0.520% per annum, and on any payment date on and after the Step-Up Date, 0.780% per annum.  With respect to the Class V-M-2 Notes, on any payment date prior to the Step-Up Date, 0.570% per annum, and on any payment date on and after the Step-Up Date, 0.855% per annum.  With respect to the Class V-M-3 Notes, on any payment date prior to the Step-Up Date, 0.600% per annum, and on any payment date on and after the Step-Up Date, 0.900% per annum.  With respect to the Class V-M-4 Notes, on any payment date prior to the Step-Up Date, 0.750% per annum, and on any payment date on and after the Step-Up Date, 1.125% per annum.  With respect to the Class V-M-5 Notes, on any payment date prior to the Step-Up Date, 1.200% per annum, and on any payment date on and after the Step-Up Date, 1.800% per annum.  With respect to the Class V-B Notes, on any payment date prior to the Step-Up Date, 2.350% per annum, and on any payment date on and after the Step-Up Date, 3.525% per annum.  With respect to the Class VI-A Notes, on any payment date prior to the Step-Up Date, 0.180% per annum, and on any payment date on and after the Step-Up Date, 0.360% per annum.  With respect to each of the Class III-A Notes and Class IV-A Notes after the applicable Note Rate Change Date, 1.500% per annum.

**Note Owner** — Any person who is the beneficial owner of a Book-entry Note.

**Note Principal Balance** — With respect to any Note, other than the Class II-A-3 Notes, as of any date of determination, the initial Note Principal Balance as stated on the face thereof, minus all amounts distributed in respect of principal with respect to such Note and (a) plus, in the case of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, any

Subsequent Recoveries allocated thereto and (b) minus, in the case of the Class I-A-2, Class I-A-3, Class IV-A-3, Class V-A-4-B, Class M, Class B, Class V-M and Class V-B Notes, the aggregate amount of any reductions in the Note Principal Balance thereof deemed to have occurred in connection with allocations of Realized Losses on all prior payment dates as described in this prospectus supplement.  With respect to the Class II-A-3 Notes, the sum of the Component Principal Balances of the Class II-A-3 Components.

**Note Rate Change Date** — With respect to the Class III-A Notes and Class IV-A Notes, the payment date in July 2010.

**Noteholder** — A holder of a Note.

**Offered Notes** — The Class A, Class M, Class V-M-1, Class V-M-2, Class V-M-3 and Class V-M-4 Notes.

**Original Pre-Funded Amount** — The Group I, Group II-C, Group II-NC, Group III, Group IV, Group V or Group VI Original Pre-Funded Amount, as applicable.

**Outstanding Principal Balance** — With respect to a mortgage loan, the principal balance of such mortgage loan remaining to be paid by the mortgagor or, in the case of an REO Property, the principal balance of the related mortgage loan remaining to be paid by the mortgagor at the time such property was acquired by the trust.

**Overcollateralization Increase Amount** — With respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, with respect to any payment date, the lesser of (i) the related Net Monthly Excess Cashflow for such payment date after payments to the Note Insurer in respect of clause (11) of "Description of the Notes— Overcollateralization Provisions for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV" and (ii) the excess, if any, of (a) the related Overcollateralization Target Amount over (b) the related Overcollateralized Amount on such payment date (after taking into account payments to the related Notes of the related Basic Principal Distribution Amount on such payment date). With respect to the Group V Loans, with respect to any payment date, the lesser of (i) the related Net Monthly Excess Cashflow for such payment date, after payments to the Note Insurer in respect of clause (1) of "Description of the Notes— Overcollateralization Provisions for Loan Group V" and (ii) the excess, if any, of (a) the related Overcollateralization Target Amount over (b) the related Overcollateralized Amount on such payment date (after taking into account payments to the related Notes of the related Basic Principal Distribution Amount on such payment date).

**Overcollateralization Reduction Amount** — With respect to Loan Group VI and any payment date, the lesser of (x) the related Excess Overcollateralization Amount for such payment date and (y) the Investor Principal Distribution Amount for such payment date (before taking into account the related Overcollateralization Reduction Amount).

**Overcollateralization Target Amount** — With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, 0.35% of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances plus the amount of any Additional Net Negative Amortization Amount.  With respect to Loan Group V, 0.35% of the Group V Cut-off Date Balance. With respect to Loan Group VI, (1) prior to the related Stepdown Date, an amount equal to the sum of (a) the Group VI Delinquent HELOC Amount and (b) 3.65% of the Group VI Cut-off Date Balance and (2) on or after the related Stepdown Date, an amount equal to the sum of (a) the Group VI Delinquent HELOC Amount and (b) the greatest of (x) 7.30% of the Invested Amount, (y) 0.50% of the Group VI Cut-off Date Balance, and (z) the aggregate Stated Principal Balance of the three Group VI HELOCs with the greatest Stated Principal Balance; provided, however, that if a related Trigger Event is in effect for the Group VI HELOCs, then the Overcollateralization Target Amount for the Group VI HELOCs will be the same as on the prior payment date.

**Overcollateralized Amount** — For any payment date and Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, the amount, if any, by which (i) the aggregate Stated Principal Balance of the related mortgage loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, including Realized Losses on the mortgage loans incurred during the related Prepayment Period) and the related Pre-Funded Amount, exceeds (ii) the sum of the aggregate Note Principal Balance of the related Class I-A, Class II-A, Class III-A, Class IV-A, Class M and Class B Notes as of such payment date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on these Notes on such payment date). For any payment date and Loan Group V, the amount, if any, by which (i) the aggregate Stated Principal Balance of the related mortgage loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period, including Realized Losses on the mortgage loans incurred during the related Prepayment Period) and the related Pre-Funded Amount, exceeds (ii) the aggregate Note Principal Balance of the Class V-A, Class V-M and Class V-B Notes as of such payment date (assuming that 100% of the Principal Remittance Amount is applied as a principal payment on these Notes on such payment date). For any payment date and Loan Group VI, the amount, if any, by which (i) the Invested Amount exceeds (ii) the Note Principal Balance of the Class VI-A Notes as of such payment date (after giving effect to all other distributions of principal on these Notes on such payment date). The initial amount of overcollateralization in the Group VI HELOCs is approximately 1.00% of the Group VI Cut-off Date Balance.

**Owner Trustee** — M&T Trust Company of Delaware and its successors and assigns or any successor owner trustee appointed pursuant to the terms of the Trust Agreement.

**Payment Account** — The account established by the Indenture Trustee pursuant to Section 3.01 of the Indenture.

**Payment Cap** — 7.50% of the Minimum Monthly Payment.

**Payment Date** — In each month, the 25th day of the month or, if that day is not a business day, the next business day.

**Policy** — The note guaranty insurance policy (No. 05030037) with respect to the Class VI-A Notes and all endorsements thereto, if any, dated the Closing Date, issued by the Credit Enhancer for the benefit of the holders of the Class VI-A Notes only.

**Pre-Funded Amount** — The amount on deposit in a Pre-Funding Account on any date of determination.

**Pre-Funding Accounts** — The accounts established by the Indenture Trustee for the benefit of the Noteholders and funded on the Closing Date by the Depositor with the Group I, Group II-C, Group II-NC, Group III, Group IV, Group V and Group VI Original Pre-Funded Amounts.

**Prepayment Assumption** — With respect to the Group V Loans, a 100% Prepayment Assumption assumes an 8.00% CPR for the first Payment Date, an additional approximate 1.45% CPR for each month for the next 11 Payment Dates, and a 24% CPR with respect to the twelfth Payment Date and each Payment Date thereafter. With respect to the Group VI HELOCs, a 100% Prepayment Assumption assumes 50.00% CPR.

**Prepayment Period** — With respect to any payment date is the calendar month immediately preceding the month in which such payment date occurs.

**Principal Collections** — For each payment date, an amount equal to the amount received by the Indenture Trustee and available in the Payment Account on that payment date in respect of the Group VI HELOCs, and consist of amounts collected during the related Due Period on the HELOCs and allocated

to principal in accordance with the terms of the related credit line agreement together with the principal portion of any purchase price or any substitution adjustment amounts paid during the preceding Due Period and any Group VI Pre-Funded Amount to the distributed to the Class VI-A Noteholders pursuant to the Indenture, net of fees and reimbursements to the Owner Trustee, Indenture Trustee, Securities Administrator, HELOC Servicer and HELOC Back-Up Servicer.

**Principal Distribution Amount** — For any payment date, as determined separately for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans collectively and for the Group V Loans, the sum of (a) the related Basic Principal Distribution Amount, and (b) the related Overcollateralization Increase Amount.

**Principal Prepayment** — Any payment or other recovery of principal on a mortgage loan or HELOC which is received in advance of its scheduled Due Date to the extent that it is not accompanied by an amount as to interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment, including Insurance Proceeds and Repurchase Proceeds, but excluding the principal portion of Net Liquidation Proceeds received at the time a mortgage loan or HELOC becomes a Liquidated Mortgage Loan or Liquidated HELOC, respectively.

**Principal Remittance Amount** — For any payment date and any Loan Group, other than Loan Group VI, or the mortgage loans, other than the Group VI HELOCs, in the aggregate, as applicable, the sum of

    (i)    the principal portion of all scheduled monthly payments on the related mortgage loans due on the related Due Date, to the extent received or advanced;

    (ii)    the principal portion of all proceeds of the repurchase of a mortgage loan in the related Loan Group (or, in the case of a substitution, certain amounts representing a principal adjustment) as required by the Mortgage Loan Purchase Agreement during the preceding calendar month;

    (iii)    any amount remaining on deposit in the related Pre-Funding Account at the end of the Funding Period;

    (iv)    the principal portion of all other unscheduled collections received during the preceding calendar month in respect of the related mortgage loans, including full and partial prepayments, the proceeds of any repurchase of such mortgage loans by the Seller or holder of the Trust Certificates, Liquidation Proceeds and Insurance Proceeds, in each case to the extent applied as recoveries of principal; and

    (v)    with respect to the Group V Loans, any portion of any Class V-A-4-D Insured Amount for such payment date representing a Class V-A-4-D Insured Undercollateralization Amount allocated to the Class V-A-4-D Notes.

In addition, with respect to the Group I Loans, the Principal Remittance Amount shall be reduced (to not less than zero) by the Negative Amortization Amount on the Group I Loans.

**Protected Account** — An account established and maintained for the benefit of Noteholders by the RMBS Servicer with respect to the related Mortgage Loans and with respect to REO Property pursuant to the RMBS Servicing Agreement.

**RMBS Master Servicer** — Wells Fargo Bank, National Association, or its successor in interest.

**RMBS Master Servicing Agreement**: — The Master Servicing Agreement dated as of June 22, 2005, among the RMBS Master Servicer, Securities Administrator, Indenture Trustee and Issuer.

**RMBS Servicing Fee** — With respect to each mortgage loan and any payment date, the fee payable monthly to the RMBS Servicer in respect of servicing compensation that accrues at an annual rate

equal to the RMBS Servicing Fee Rate multiplied by the Stated Principal Balance of such mortgage loan as of the first day of the related Due Period.

**RMBS Servicing Fee Rate** — With respect to any adjustable rate mortgage loan with an original principal balance of less than or equal to $359,650, 0.375% per annum, with respect to any adjustable rate mortgage loan with an original principal balance of greater than $359,650, 0.25% per annum, with respect to any fixed rate mortgage loan, 0.25% per annum.

**RMBS Servicing Rights Pledgee**: — One or more lenders, selected by the RMBS Servicer, to which the RMBS Servicer may pledge and assign all of its right, title and interest in, to and under the RMBS Servicing Agreement, including Bank of America, N.A., as the representative of certain lenders.

**RMBS Servicer** – American Home Mortgage Servicing, Inc., or its successor in interest.

**RMBS Servicing Agreement** — The Servicing Agreement dated as of June 22, 2005, among the Seller, RMBS Servicer, RMBS Master Servicer, Issuer and Indenture Trustee.

**RMBS Servicing Trigger Event** — An RMBS Servicing Trigger Event is in effect with respect to any payment date if either

(a)      the Rolling Three Month Delinquency Rate for the mortgage loans is greater than 6%; or

(b)      the cumulative amount of Realized Losses incurred on the mortgage loans from the Cut-off Date through the end of the calendar month immediately preceding such payment date exceeds the applicable percentage set forth below of the aggregate Group I, Group II-C, Group II-NC, Group III, Group IV and Group V Cut-off Date Balance:

0.15% with respect to each month up to July 2006

0.15% with respect to August 2006, plus an additional 1/12th of 0.50% for each month thereafter until July 2007

0.65% with respect to August 2007, plus an additional 1/12th of 0.95% for each month thereafter until July 2008

1.60% with respect to August 2008, plus an additional 1/12th of 0.80% for each month thereafter until July 2009

2.40% with respect to August 2009, plus an additional 1/12th of 0.75% for each month thereafter until July 2010

3.15% with respect to August 2010, plus an additional 1/12th of 0.55% for each month thereafter until July 2011

3.70% with respect to August 2011 and each month thereafter

provided, however, that if the RMBS Servicer is rated "SQ2-" or better by Moody's on any date, the RMBS Servicing Trigger Event will no longer be in effect with respect to any payment date thereafter.

**Rapid Amortization Event** — Any of the events described in "Description of the Notes – Rapid Amortization Events" in this prospectus supplement.

**Rapid Amortization Period** — Begins on the earlier of Payment Date in July 2015 or the occurrence of a Rapid Amortization Event.

**Rating Agencies** — Standard and Poor's, a division of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.

**Realized Loss** — With respect to a mortgage loan is (1) a Deficient Valuation, or (2) as to any Liquidated Mortgage Loan, the unpaid principal balance thereof plus accrued and unpaid interest thereon

at the mortgage rate through the last day of the month of liquidation less the Net Liquidation Proceeds with respect to such mortgage loan and the related mortgaged property.

**Record Date** — For each class of Notes, other than the Class II-A, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes, and each payment date, will be the close of business on the business day immediately preceding such payment date; provided, however, if any such Note is no longer a Book-Entry Note, the "Record Date" for such class of Notes shall be the close of business on the last business day of the calendar month preceding such payment date. For each class of the Class II-A, Class III-A, Class IV-A, Class V-A-1, Class V-A-3 and Class V-A-4 Notes and each payment date, the close of business on the last business day of the calendar month preceding such payment date.

**REO Property** — A mortgage property acquired by the trust through foreclosure or deed-in-lieu of foreclosure.

**Reference Banks** — Leading banks selected by the Securities Administrator and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) whose quotations appear on the Telerate Screen Page 3750 on the Interest Determination Date in question, (iii) which have been designated as such by the Securities Administrator and (iv) not controlling, controlled by, or under common control with, the Depositor, the Seller, the RMSB Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer or HELOC Servicer.

**Relief Act Shortfall** — For any payment date and any mortgage loan, any shortfalls relating to the Relief Act or similar legislation or regulations.

**Repurchase Price** — With respect to any mortgage loan required to be repurchased, an amount equal to the sum of the following: (i) 100% of the Stated Principal Balance thereof (without reduction for any amounts charged off), (ii) unpaid accrued interest at the Mortgage Rate on the outstanding principal balance thereof from the Due Date for which interest was last paid by the Mortgagor to the first day of the month following the month of purchase, (iii) the amount of unreimbursed Monthly Advances or unreimbursed servicing advances made with respect to such Mortgage Loan, (iv) any other amounts owed to the RMBS Servicer, RMBS Master Servicer, HELOC Servicer or HELOC Back-Up Servicer pursuant to the RMBS Master Servicing Agreement or related Servicing Agreement and not included in clause (iii) of this definition plus (v) any costs and damages incurred by the trust in connection with any violation of such loan of any predatory lending law.

**Repurchase Proceeds** — The Repurchase Price in connection with any repurchase of a mortgage loan by the Seller and any cash deposit in connection with the substitution of a mortgage loan. See "Description of the Securities — Assignment of Trust Fund Assets" in the prospectus.

**Reserve Interest Rate** — With respect to any Interest Determination Date, the rate per annum that the Securities Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.0625%) of the one-month, six-month or one-year United States dollar lending rates, as applicable, which New York City banks selected by the Securities Administrator are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Securities Administrator can determine no such arithmetic mean, the lowest one-month, six-month or one-year United States dollar lending rate, as applicable, which New York City banks selected by the Securities Administrator are quoting on such Interest Determination Date to leading European banks.

**Rolling Three Month Delinquency Rate** — With respect to any payment date, the average of the Delinquency Rates for each of the three (or one and two, in the case of the first and second payment dates, respectively) immediately preceding months.

**S&P** — Standard and Poor's, a division of The McGraw-Hill Companies, Inc.

**Securities Administrator** — Wells Fargo Bank, National Association, or its successor in interest.

**Securities Administrator Collection Account** — The account established by the Securities Administrator pursuant to Section 3.01 of the Indenture and Section 3.06 of the RMBS Master Servicing Agreement.

**Seller** — American Home Mortgage Acceptance, Inc., an affiliate of the RMBS Servicer, the HELOC Servicer and the Depositor.

**Servicing Agreement** — Any of the RMBS Servicing Agreement, the HELOC Back-Up Servicing Agreement or the HELOC Servicing Agreement, as applicable.

**Stated Principal Balance** — With respect to any mortgage loan, other than a HELOC, and any payment date (1) the unpaid principal balance of such mortgage loan as of the close of business on the related Due Date (taking account of the principal payment to be made on such Due Date and irrespective of any delinquency in its payment), as specified in the amortization schedule at the time relating thereto (before any adjustment to such amortization schedule by reason of any bankruptcy or similar proceeding occurring after the Cut-off Date (other than a Deficient Valuation) or any moratorium or similar waiver or grace period) less (2) any Principal Prepayments and the principal portion of any Net Liquidation Proceeds received during or prior to the immediately preceding Prepayment Period; provided that the Stated Principal Balance of any Liquidated Mortgage Loan is zero. With respect to any HELOC, the principal balance of the HELOC as of the Cut-off Date, plus any Additional Balances in respect of such HELOC minus all collections credited against the principal balance of such HELOC in accordance with the related mortgage note and minus all prior related Charge-Off Amounts. The Stated Principal Balance of any Liquidated HELOC is zero.

**Stepdown Date** — With respect to the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, the later to occur of (x) the payment date occurring in July 2008 and (y) the first payment date for which the Credit Enhancement Percentage for the Class I-A, Class II-A, Class III-A and Class IV-A Notes (calculated for this purposes only after taking into account distributions of principal on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans, but prior to any payment of the Class A Principal Distribution Amount for these notes then entitled to payments of principal on that payment date) is greater than or equal to approximately 15.10%. With respect to the Group V Loans, the later to occur of (x) the payment date occurring in July 2008 and (y) the first payment date for which the Credit Enhancement Percentage for the Class V-A Notes (calculated for this purposes only after taking into account distributions of principal on the Group V Loans, but prior to any payment of the Class V-A Principal Distribution Amount for these notes then entitled to payments of principal on that payment date) is greater than or equal to approximately 14.60%. With respect to the Class VI-A Notes and Loan Group VI, the later to occur of (x) the payment date occurring in January 2008 and (y) the payment date on which the aggregate Investor Principal Distribution Amount actually distributed to the holders of the Class VI-A Notes equals or exceeds one-half of the Group VI Cut-off Date Balance.

**Step-Up Date** — With respect to the Class I-A, Class II-A-1, Class II-A-2, Class III-A, Class IV-A, Class M and Class B Notes and the Class II-A-3 Components, the payment date occurring after the first payment date for which the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the end of the related Due Period and the related Pre-Funded Amount has been reduced to 10% or less of the sum of the Group I, Group II-C, Group II-NC, Group III and Group IV Cut-off Date Balances. With respect to the Class V-A, Class V-M and Class V-B Notes, the payment date occurring after the first payment date for which the aggregate Stated Principal Balance of the Group V Loans as of the end of the related Due Period and the related Pre-Funded Amount has been reduced to 10% or less of the Group V Cut-off Date Balance. With respect to the Class VI-A Notes, the Payment Date occurring after the first Payment Date for which the Note Principal Balance of the Class VI-A Notes immediately preceding such payment date has been reduced to 10% or less of the initial Note Principal Balance of the Class VI-A Notes.

**Strike Rate** — With respect to the Corridor Contract and each payment date, the fixed rate set forth in the Corridor Contract used to determine payments to the Indenture Trustee.

**Subsequent Cut-off Date** — With respect to any subsequent mortgage loan or subsequent HELOC, the date, as designated by the Depositor, that is the later of (i) the first day of the month in which the related Subsequent Transfer Date occurs and (ii) the origination date of such subsequent mortgage loan or subsequent HELOC, as the cut-off date with respect to the related subsequent mortgage loan or subsequent HELOC.

**Subsequent Recoveries** — Any liquidation proceeds received after the final liquidation of a mortgage loan or HELOC.

**Subsequent Transfer Date** — With respect to any subsequent mortgage loan or subsequent HELOC, the applicable date upon which such mortgage loan was purchased from the Seller with amounts on deposit in the related Pre-Funding Account.

**Subsequent Transfer Instrument** — The subsequent transfer instrument, dated as of the applicable Subsequent Transfer Date, between American Home Mortgage Securities LLC, as depositor, and Deutsche Bank National Trust Company, as indenture trustee, or such other instrument as agreed upon by the company and the Indenture Trustee.

**Telerate Screen Page 3750** — The display designated as page 3750 on the Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks).

**Transferor Interest** — Represents the pari passu interest in the Group VI HELOCs equal to the cumulative amount of draws on the HELOCs beginning with the Rapid Amortization Period as defined herein. The Transferor Interest is calculated as the outstanding pool balance of the HELOCs at the end of the previous Due Period less the Invested Amount.

**Trigger Event —** With respect to Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, a Trigger Event is in effect with respect to any payment date on and after the related Stepdown Date if either

(a)    the Rolling Three Month Delinquency Rate for the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the close of business on the last day of the preceding calendar month exceeds 40% of the aggregate Note Principal Balance of the Class M Notes and Class B Notes plus the aggregate Overcollateralized Amount for Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV, divided by the aggregate Stated Principal Balance of Group I, Group II-C, Group II-NC, Group III and Group IV; or

(b)    the cumulative amount of Realized Losses incurred on the Group I, Group II-C, Group II-NC, Group III and Group IV Loans from the Cut-off Date through the end of the calendar month immediately preceding such payment date exceeds the applicable percentage set forth below of the aggregate Stated Principal Balance of the Group I, Group II-C, Group II-NC, Group III and Group IV Loans as of the Cut-off Date:

| | |
|---|---|
| July 2008 to June 2009 .................. | 1.75% |
| July 2009 and thereafter................. | 2.00% |

With respect to Loan Group V, a Trigger Event is in effect with respect to any payment date on and after the related Stepdown Date if either

(a)    the Rolling Three Month Delinquency Rate for the Group V Loans as of the close of business on the last day of the preceding calendar month exceeds 50% of the aggregate Note Principal

Balance of the Class V-M Notes and Class V-B Notes plus the aggregate Overcollateralized Amount for Loan Group V, divided by the aggregate Stated Principal Balance of the Group V Loans; or

(b)      the cumulative amount of Realized Losses incurred on the Group V Loans from the Cut-off Date through the end of the calendar month immediately preceding such payment date exceeds the applicable percentage set forth below of the aggregate Stated Principal Balance of the Group V Loans as of the Cut-off Date:

| | |
|---|---|
| July 2008 to June 2009 .................. | 1.75% |
| July 2009 and thereafter................. | 2.00% |

With respect to Loan Group VI, a Trigger Event is in effect with respect to any payment date on and after the Stepdown Date if either

(a)      the average of the Group VI Excess Spread Percentage for that payment date and the prior two payment dates is less than or equal to 1.75% per annum;

(b)      the Rolling Three Month Delinquency Rate for the Group VI HELOCs as of the close of business on the last day of the preceding Due Period exceeds 5.00% of aggregate Stated Principal Balance of Group VI HELOCs;

(c)      the cumulative amount of Charge-Off Amounts incurred on the Group VI HELOCs from the Cut-off Date through the end of the calendar month immediately preceding such payment date exceeds the applicable percentage set forth below of the aggregate Stated Principal Balance of the Group VI HELOCs as of the Cut-off Date:

| | |
|---|---|
| December 2006 to June 2007......... | 2.50% |
| July 2007 to June 2008 .................. | 3.25% |
| July 2008 and thereafter................. | 4.00% |

**Trust Agreement** — The Amended and Restated Trust Agreement dated as of June 22, 2005, among the Owner Trustee, the Depositor and Deutsche Bank National Trust Company, as certificate registrar and certificate paying agent.

**Trust Certificates** — The owner trust certificates issued pursuant to the Trust Agreement, representing the beneficial ownership interest in the Trust.

**Unpaid Interest Shortfalls** — With respect to the mortgage loans, (a) any Prepayment Interest Shortfalls, to the extent not covered by Compensating Interest, and (b) any Relief Act Shortfalls.

ANNEX I

**GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES**

Except in certain limited circumstances, the Notes offered by this prospectus supplement, which are referred to as the global securities, will be available only in book-entry form. Investors in the global securities may hold interests in these global securities through any of DTC, Clearstream or Euroclear. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding interests in global securities through Clearstream and Euroclear will be conducted in accordance with their normal rules and operating procedures and in accordance with conventional eurobond practice. Secondary market trading between investors holding interests in global securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between investors holding interests in global securities through Clearstream or Euroclear and investors holding interests in global securities through DTC participants will be effected on a delivery-against-payment basis through the respective depositories of Clearstream and Euroclear, in such capacity, and other DTC participants.

Although DTC, Euroclear and Clearstream are expected to follow the procedures described below in order to facilitate transfers of interests in the global securities among participants of DTC, Euroclear and Clearstream, they are under no obligation to perform or continue to perform those procedures, and those procedures may be discontinued at any time. Neither the Depositor, the Issuer, the RMSB Master Servicer, the RMBS Servicer, the HELOC Back-Up Servicer, the HELOC Servicer, the Securities Administrator nor the Indenture Trustee will have any responsibility for the performance by DTC, Euroclear and Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their obligations.

Non-U.S. holders of global securities will be subject to U.S. withholding taxes unless those holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

**Initial Settlement**

The global securities will be registered in the name of Cede & Co. as nominee of DTC. Investors' interests in the global securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. Clearstream and Euroclear will hold positions on behalf of their participants through their respective depositories, which in turn will hold such positions in accounts as DTC participants.

Investors electing to hold interests in global securities through DTC participants, rather than through Clearstream or Euroclear accounts, will be subject to the settlement practices applicable to similar issues of mortgage-backed notes. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold interests in global securities through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Interests in global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

**Secondary Market Trading**

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Transfers between DTC Participants*. Secondary market trading between DTC participants will be settled using the DTC procedures applicable to similar issues of notes in same-day funds.

*Transfers between Clearstream and/or Euroclear Participants*. Secondary market trading between Clearstream participants or Euroclear participants and/or investors holding interests in global securities through them will be settled using the procedures applicable to conventional eurobonds in same-day funds.

*Transfers between DTC Seller and Clearstream or Euroclear Purchaser*. When interests in global securities are to be transferred on behalf of a seller from the account of a DTC participant to the account of a Clearstream participant or a Euroclear participant for a purchaser, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day prior to settlement. Clearstream or the Euroclear operator will instruct its respective depository to receive an interest in the global securities against payment. Payment will include interest accrued on the global securities from and including the last payment date to but excluding the settlement date. Payment will then be made by the respective depository to the DTC participant's account against delivery of an interest in the global securities. After this settlement has been completed, the interest will be credited to the respective clearing system, and by the clearing system, in accordance with its usual procedures, to the Clearstream participant's or Euroclear participant's account. The credit of this interest will appear on the next business day and the cash debit will be back-valued to, and the interest on the global securities will accrue from, the value date, which would be the preceding day when settlement occurred in New York. If settlement is not completed through DTC on the intended value date, i.e., the trade fails, the Clearstream or Euroclear cash debit will be valued instead as of the actual settlement date.

Clearstream participants and Euroclear participants will need to make available to the respective clearing system the funds necessary to process same-day funds settlement. The most direct means of doing so is to pre-position funds for settlement from cash on hand, in which case the Clearstream participants or Euroclear participants will take on credit exposure to Clearstream or the Euroclear operator until interests in the global securities are credited to their accounts one day later.

As an alternative, if Clearstream or the Euroclear operator has extended a line of credit to them, Clearstream participants or Euroclear participants can elect not to pre-position funds and allow that credit line to be drawn upon. Under this procedure, Clearstream participants or Euroclear participants receiving interests in global securities for purchasers would incur overdraft charges for one day, to the extent they cleared the overdraft when interests in the global securities were credited to their accounts. However, interest on the global securities would accrue from the value date. Therefore, the investment income on the interest in the global securities earned during that one-day period would tend to offset the amount of these overdraft charges, although this result will depend on each Clearstream participant's or Euroclear participant's particular cost of funds.

Since the settlement through DTC will take place during New York business hours, DTC participants are subject to DTC procedures for transferring interests in global securities to the respective depository of Clearstream or Euroclear for the benefit of Clearstream participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the seller settling the sale through a DTC participant, a cross-market transaction will settle no differently than a sale to a purchaser settling through a DTC participant.

Finally, intra-day traders that use Clearstream participants or Euroclear participants to purchase interests in global securities from DTC participants or sellers settling through them for delivery to Clearstream participants or Euroclear participants should note that these trades will automatically fail on the sale side unless affirmative action is taken. At least three techniques should be available to eliminate this potential condition:

(a)     borrowing interests in global securities through Clearstream or Euroclear for one day, until the purchase side of the intra-day trade is reflected in the relevant Clearstream or Euroclear accounts, in accordance with the clearing system's customary procedures;

(b)     borrowing interests in global securities in the United States from a DTC participant no later than one day prior to settlement, which would give sufficient time for such interests to be reflected in the relevant Clearstream or Euroclear accounts in order to settle the sale side of the trade; or

(c)     staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Clearstream participant or Euroclear participant.

*Transfers between Clearstream or Euroclear Seller and DTC Purchaser*. Due to time zone differences in their favor, Clearstream participants and Euroclear participants may employ their customary procedures for transactions in which interests in global securities are to be transferred by the respective clearing system, through the respective depository, to a DTC participant. The seller will send instructions to Clearstream or the Euroclear operator through a Clearstream participant or Euroclear participant at least one business day prior to settlement. Clearstream or Euroclear will instruct its respective depository, to credit an interest in the global securities to the DTC participant's account against payment. Payment will include interest accrued on the global securities from and including the last payment date to but excluding the settlement date. The payment will then be reflected in the account of the Clearstream participant or Euroclear participant the following business day, and receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would be back-valued to the value date, which would be the preceding day, when settlement occurred through DTC in New York. If settlement is not completed on the intended value date, i.e., the trade fails, receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would instead be valued as of the actual settlement date.

**Certain U.S. Federal Income Tax Documentation Requirements**

A beneficial owner who is an individual or corporation holding the global security on its own behalf of global securities holding securities through Clearstream or Euroclear, or through DTC if the holder has an address outside the U.S., will be subject to the 30% U.S. withholding tax that typically applies to payments of interest, including original issue discount, on registered debt issued by U.S. persons, unless:

(d)     each clearing system, bank or other institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between the beneficial owner or a foreign corporation or foreign trust and the U.S. entity required to withhold tax complies with applicable certification requirements; and

(e)     the beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

(f)     Exemption for Non-U.S. Persons—Form W-8BEN. Beneficial holders of global securities that are Non-U.S. persons generally can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN, or Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding.  Non-U.S. persons residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate, depending on the treaty terms, by filing Form W-8BEN.  If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change.

(g)     Exemption for Non-U.S. persons with effectively connected income—Form W-8ECI. A Non-U.S. person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an

**SCHEDULE A**

**CERTAIN CHARACTERISTICS OF THE INITIAL MORTGAGE LOANS AND INITIAL HELOCS**

The description herein of the Initial Mortgage Loans and the Initial HELOCs is based upon the estimates of the composition thereof as of the Cut-Off Date, as adjusted to reflect the Scheduled Principal Balances as of the Cut-Off Date.  Prior to the issuance of the Notes, Mortgage Loans and the HELOCs may be removed as a result of (i) Principal Prepayments thereof in full prior to June 1, 2005, (ii) requirements of the Rating Agencies, (iii) delinquencies or otherwise.  In any such event, other mortgage loans or HELOCs may be included in the Trust.  American Home Mortgage Investment Trust 2005-2 believes that the estimated information set forth herein with respect to the Initial Mortgage Loans and Initial HELOCs as presently constituted is representative of the characteristics thereof at the time the Notes are issues, although certain characteristics of the Mortgage Loans and HELOCs may vary.

## Principal Balances of the Mortgage Loans at Origination in Group I

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $        0  – $   100,000 .................. | 301 | $    20,490,712.64 | 3.32% |
| $   100,001  – $   200,000 .................. | 520 | 78,907,545.03 | 12.79 |
| $   200,001  – $   300,000 .................. | 369 | 92,017,764.71 | 14.91 |
| $   300,001  – $   350,000 .................. | 130 | 42,394,460.20 | 6.87 |
| $   350,001  – $   400,000 .................. | 133 | 49,787,199.47 | 8.07 |
| $   400,001  – $   450,000 .................. | 85 | 36,088,303.28 | 5.85 |
| $   450,001  – $   500,000 .................. | 62 | 29,574,483.97 | 4.79 |
| $   500,001  – $   550,000 .................. | 52 | 27,274,006.55 | 4.42 |
| $   550,001  – $   600,000 .................. | 39 | 22,456,283.04 | 3.64 |
| $   600,001  – $   650,000 .................. | 42 | 26,508,013.22 | 4.30 |
| $   650,001  – $   700,000 .................. | 21 | 14,189,349.11 | 2.30 |
| $   700,001  – $   800,000 .................. | 35 | 25,933,435.52 | 4.20 |
| $   800,001  – $   900,000 .................. | 20 | 17,195,956.27 | 2.79 |
| $   900,001  – $1,000,000 .................. | 26 | 25,059,847.48 | 4.06 |
| $1,000,001  – $1,100,000 .................. | 9 | 9,554,202.78 | 1.55 |
| $1,100,001  – $1,200,000 .................. | 5 | 5,881,867.33 | 0.95 |
| $1,200,001  – $1,300,000 .................. | 10 | 12,212,647.70 | 1.98 |
| $1,300,001  – $1,400,000 .................. | 7 | 9,437,511.15 | 1.53 |
| $1,400,001  – $1,500,000 .................. | 12 | 17,667,595.93 | 2.86 |
| $1,500,001 or more ........................... | 21 | 54,395,182.65 | 8.82 |
| Total ........................................... | 1,899 | $  617,026,368.03 | 100.00% |

Minimum Original Principal Balance:      $        30,000
Maximum Original Principal Balance:      $   7,000,000
Average Original Principal Balance:       $      325,477

**Scheduled Principal Balances of the Mortgage Loans as of the
Cut-Off Date in Group I**

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $          0 – $    100,000 ..................... | 301 | $     20,490,712.64 | 3.32% |
| $   100,001 – $    200,000 ..................... | 520 | 78,907,545.03 | 12.79 |
| $   200,001 – $    300,000 ..................... | 369 | 92,017,764.71 | 14.91 |
| $   300,001 – $    350,000 ..................... | 131 | 42,743,614.14 | 6.93 |
| $   350,001 – $    400,000 ..................... | 132 | 49,438,045.53 | 8.01 |
| $   400,001 – $    450,000 ..................... | 84 | 35,638,289.43 | 5.78 |
| $   450,001 – $    500,000 ..................... | 63 | 30,024,497.82 | 4.87 |
| $   500,001 – $    550,000 ..................... | 52 | 27,274,006.55 | 4.42 |
| $   550,001 – $    600,000 ..................... | 39 | 22,456,283.04 | 3.64 |
| $   600,001 – $    650,000 ..................... | 42 | 26,508,013.22 | 4.30 |
| $   650,001 – $    700,000 ..................... | 21 | 14,189,349.11 | 2.30 |
| $   700,001 – $    800,000 ..................... | 35 | 25,933,435.52 | 4.20 |
| $   800,001 – $    900,000 ..................... | 20 | 17,195,956.27 | 2.79 |
| $   900,001 – $ 1,000,000 ..................... | 27 | 25,961,717.47 | 4.21 |
| $ 1,000,001 – $ 1,100,000 ..................... | 9 | 9,554,202.78 | 1.55 |
| $ 1,100,001 – $ 1,200,000 ..................... | 5 | 5,881,867.33 | 0.95 |
| $ 1,200,001 – $ 1,300,000 ..................... | 9 | 11,310,777.71 | 1.83 |
| $ 1,300,001 – $ 1,400,000 ..................... | 7 | 9,437,511.15 | 1.53 |
| $ 1,400,001 – $ 1,500,000 ..................... | 12 | 17,667,595.93 | 2.86 |
| $ 1,500,001 or more................................ | 21 | 54,395,182.65 | 8.82 |
| Total.............................................. | 1,899 | $  617,026,368.03 | 100.00% |

Minimum Scheduled Principal Balance:          $       29,287
Maximum Scheduled Principal Balance:          $  6,993,243
Average Scheduled Principal Balance:           $     324,922

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group I**

| Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.751 - 1.000 ................................................ | 582 | $   224,265,586.18 | 36.35% |
| 1.001 - 1.250 ................................................ | 8 | 12,469,954.72 | 2.02 |
| 1.251 - 1.500 ................................................ | 374 | 103,336,931.94 | 16.75 |
| 1.501 - 1.750 ................................................ | 39 | 19,445,222.37 | 3.15 |
| 1.751 - 2.000 ................................................ | 56 | 16,804,516.79 | 2.72 |
| 2.001 - 2.250 ................................................ | 19 | 5,239,497.03 | 0.85 |
| 2.251 - 2.500 ................................................ | 6 | 1,941,076.98 | 0.31 |
| 2.501 - 2.750 ................................................ | 31 | 8,965,874.69 | 1.45 |
| 2.751 - 3.000 ................................................ | 18 | 3,783,178.26 | 0.61 |
| 3.251 - 3.500 ................................................ | 5 | 831,200.00 | 0.13 |
| 3.501 - 3.750 ................................................ | 18 | 3,561,465.01 | 0.58 |
| 3.751 - 4.000 ................................................ | 46 | 10,497,273.00 | 1.70 |
| 4.001 - 4.250 ................................................ | 5 | 1,490,569.92 | 0.24 |
| 4.251 - 4.500 ................................................ | 18 | 6,023,847.76 | 0.98 |
| 4.501 - 4.750 ................................................ | 17 | 6,458,641.31 | 1.05 |
| 4.751 - 5.000 ................................................ | 51 | 20,457,777.53 | 3.32 |
| 5.001 - 5.250 ................................................ | 88 | 33,284,511.10 | 5.39 |
| 5.251 - 5.500 ................................................ | 180 | 53,884,052.47 | 8.73 |
| 5.501 - 5.750 ................................................ | 83 | 21,319,264.73 | 3.46 |
| 5.751 - 6.000 ................................................ | 92 | 24,393,184.53 | 3.95 |
| 6.001 - 6.250 ................................................ | 94 | 24,438,248.10 | 3.96 |
| 6.251 - 6.500 ................................................ | 36 | 8,621,945.84 | 1.40 |
| 6.501 - 6.750 ................................................ | 16 | 1,824,860.86 | 0.30 |
| 6.751 - 7.000 ................................................ | 11 | 2,500,314.44 | 0.41 |
| 7.001 - 7.250 ................................................ | 4 | 710,008.72 | 0.12 |
| 7.251 - 7.500 ................................................ | 2 | 477,363.75 | 0.08 |
| Total................................................ | 1,899 | $   617,026,368.03 | 100.00% |

Minimum Mortgage Interest Rate:             1.000%
Maximum Mortgage Interest Rate:             7.294%
Weighted Average Mortgage Interest Rate:    2.744%

** Not final – some rates may change.

**Original Loan-to-Value Ratios\*of the Mortgage Loans in Group I**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.01% – 30.00% ............................. | 10 | $ 1,996,800.65 | 0.32% |
| 30.01% – 40.00% ............................. | 22 | 12,090,947.50 | 1.96 |
| 40.01% – 50.00% ............................. | 43 | 22,286,548.35 | 3.61 |
| 50.01% – 55.00% ............................. | 29 | 14,233,680.73 | 2.31 |
| 55.01% – 60.00% ............................. | 48 | 22,899,099.46 | 3.71 |
| 60.01% – 65.00% ............................. | 121 | 39,415,389.25 | 6.39 |
| 65.01% – 70.00% ............................. | 240 | 86,240,986.94 | 13.98 |
| 70.01% – 75.00% ............................. | 375 | 137,393,174.13 | 22.27 |
| 75.01% – 80.00% ............................. | 773 | 225,721,162.89 | 36.58 |
| 80.01% – 85.00% ............................. | 9 | 2,461,598.22 | 0.40 |
| 85.01% – 90.00% ............................. | 79 | 19,956,799.36 | 3.23 |
| 90.01% – 95.00% ............................. | 61 | 12,114,204.96 | 1.96 |
| 95.01% – 100.00% ............................. | 89 | 20,215,975.59 | 3.28 |
| Total............................................... | 1,899 | $ 617,026,368.03 | 100.00% |

Weighted Average Original Loan-to-Value Ratio: 73.52%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

**Geographic Distribution\* of the Mortgage Properties in Group I**

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Alabama | 1 | $ 70,179.36 | 0.01% |
| Arizona | 32 | 9,126,455.95 | 1.48 |
| California | 293 | 138,449,137.70 | 22.44 |
| Colorado | 15 | 8,660,530.73 | 1.40 |
| Connecticut | 23 | 13,438,444.87 | 2.18 |
| Delaware | 55 | 12,532,071.80 | 2.03 |
| District of Columbia | 5 | 1,938,692.01 | 0.31 |
| Florida | 302 | 91,231,615.60 | 14.79 |
| Georgia | 63 | 16,026,445.46 | 2.60 |
| Idaho | 1 | 1,213,600.00 | 0.20 |
| Illinois | 92 | 29,721,205.53 | 4.82 |
| Indiana | 3 | 512,102.95 | 0.08 |
| Kansas | 3 | 572,238.51 | 0.09 |
| Kentucky | 43 | 3,096,756.48 | 0.50 |
| Louisiana | 1 | 195,532.92 | 0.03 |
| Maryland | 61 | 21,034,984.17 | 3.41 |
| Massachusetts | 46 | 24,835,985.90 | 4.03 |
| Michigan | 119 | 26,958,221.21 | 4.37 |
| Missouri | 14 | 2,685,431.35 | 0.44 |
| Montana | 5 | 1,449,840.89 | 0.23 |
| Nevada | 43 | 14,346,817.26 | 2.33 |
| New Jersey | 66 | 22,196,552.45 | 3.60 |
| New York | 68 | 35,929,031.19 | 5.82 |
| North Carolina | 164 | 37,029,461.17 | 6.00 |
| Ohio | 97 | 10,628,200.73 | 1.72 |
| Oregon | 21 | 6,256,969.93 | 1.01 |
| Pennsylvania | 49 | 10,382,430.21 | 1.68 |
| Rhode Island | 2 | 475,363.28 | 0.08 |
| South Carolina | 46 | 14,966,925.62 | 2.43 |
| Tennessee | 7 | 2,812,048.63 | 0.46 |
| Texas | 17 | 3,827,492.65 | 0.62 |
| Utah | 10 | 6,237,313.28 | 1.01 |
| Virginia | 123 | 45,957,928.12 | 7.45 |
| Washington | 7 | 1,548,975.41 | 0.25 |
| Wisconsin | 1 | 154,384.71 | 0.03 |
| Wyoming | 1 | 527,000.00 | 0.09 |
| Total | 1,899 | $ 617,026,368.03 | 100.00% |

\*No more than approximately 1.13% of Loan Group I by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group I**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Not Available | 5 | $ 1,040,204.13 | 0.17% |
| 501 - 525 | 1 | 1,359,248.47 | 0.22 |
| 526 - 550 | 2 | 255,427.39 | 0.04 |
| 551 - 575 | 2 | 421,651.07 | 0.07 |
| 576 - 600 | 17 | 1,224,789.03 | 0.20 |
| 601 - 625 | 33 | 12,648,755.80 | 2.05 |
| 626 - 650 | 198 | 55,451,272.67 | 8.99 |
| 651 - 675 | 247 | 77,486,514.52 | 12.56 |
| 676 - 700 | 347 | 128,967,643.32 | 20.90 |
| 701 - 725 | 318 | 110,126,649.30 | 17.85 |
| 726 - 750 | 300 | 96,052,058.29 | 15.57 |
| 751 - 775 | 237 | 81,359,513.06 | 13.19 |
| 776 - 800 | 148 | 39,295,143.50 | 6.37 |
| 801 - 825 | 44 | 11,337,497.48 | 1.84 |
| Total | 1,899 | $ 617,026,368.03 | 100.00% |

Weighted Average Credit Score: 709
(where credit scores were available)

**Property Types of the Mortgage Properties in Group I**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family | 1,167 | $ 393,018,874.91 | 63.70% |
| PUD | 338 | 123,500,504.42 | 20.02 |
| Condominium | 290 | 75,792,915.79 | 12.28 |
| 2-4 Family | 99 | 22,619,599.77 | 3.67 |
| CO-OP | 5 | 2,094,473.14 | 0.34 |
| Total | 1,899 | $ 617,026,368.03 | 100.00% |

**Occupancy Status of Mortgage Properties in Group I**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Owner Occupied | 1,164 | $ 461,229,536.53 | 74.75% |
| Second Home | 220 | 78,627,233.19 | 12.74 |
| Investor | 515 | 77,169,598.31 | 12.51 |
| Total | 1,899 | $ 617,026,368.03 | 100.00% |

### Loan Purpose of the Mortgage Loans in Group I

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Cash-Out Refinance ................................. | 750 | $ 285,814,964.81 | 46.32% |
| Purchase .................................................. | 787 | 243,578,799.26 | 39.48 |
| Rate/Term Refinance ............................... | 362 | 87,632,603.96 | 14.20 |
| Total................................................. | 1,899 | $ 617,026,368.03 | 100.00% |

### Documentation Type of the Mortgage Loans in Group I

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Stated Income/Verified Assets ................. | 791 | $ 334,346,342.46 | 54.19% |
| Verified Income/Verified Assets............... | 894 | 213,998,836.57 | 34.68 |
| Stated Income/No Assets ......................... | 214 | 68,681,189.00 | 11.13 |
| Total................................................. | 1,899 | $ 617,026,368.03 | 100.00% |

### Original Terms to Stated Maturity of the Mortgage Loans in Group I

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months ............................................. | 1,684 | $ 535,258,290.25 | 86.75% |
| 480 Months ............................................. | 215 | 81,768,077.78 | 13.25 |
| Total............................................. | 1,899 | $ 617,026,368.03 | 100.00% |

Minimum Original Term to Stated Maturity (Months): 360
Maximum Original Term to Stated Maturity (Months): 480
Weighted Average Orig. Term to Stated Mat. (Months): 376

### Remaining Terms to Stated Maturity of the Mortgage Loans as of the Cut Off Date in Group I

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months .................................... | 900 | $ 286,009,119.34 | 46.35% |
| 360 – 360 Months .................................... | 784 | 249,249,170.91 | 40.40 |
| 361 or more Months................................. | 215 | 81,768,077.78 | 13.25 |
| Total................................................. | 1,899 | $ 617,026,368.03 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months): 355
Maximum Remaining Term to Stated Maturity (Months): 480
Weighted Average Remaining Term to Stated Mat. (Months): 375

### Index of the Mortgage Loans in Group I

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Year MTA ................................................ | 1,898 | $ 616,881,107.72 | 99.98% |
| 1 Month MTA ......................................... | 1 | 145,260.31 | 0.02 |
| Total................................................ | 1,899 | $ 617,026,368.03 | 100.00% |

### Months to Next Rate Adjustment* of the Mortgage Loans in Group I

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 – 3 Months ........................................... | 1,849 | $ 598,116,894.03 | 96.94% |
| 4 – 6 Months ........................................... | 13 | 6,711,943.55 | 1.09 |
| 10 – 12 Months ....................................... | 36 | 9,870,030.45 | 1.60 |
| 13 – 15 Months ....................................... | 1 | 2,327,500.00 | 0.38 |
| Total................................................ | 1,899 | $ 617,026,368.03 | 100.00% |

Weighted Average Next Rate Adjustment (Month): 1

*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

### Rate Adjustment Frequency of the Mortgage Loans in Group I

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Month ...................................................... | 1,899 | $ 617,026,368.03 | 100.00% |
| Total ............................................ | 1,899 | $ 617,026,368.03 | 100.00% |

### Maximum Lifetime Mortgage Rate of the Mortgage Loans in Group I

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 9.751%  –  10.000% ................................ | 1,223 | $ 500,766,306.14 | 81.16% |
| 10.251%  –  10.500% ................................ | 508 | 78,426,769.82 | 12.71 |
| 10.501%  –  10.750% ................................ | 168 | 37,833,292.07 | 6.13 |
| Total................................................ | 1,899 | $ 617,026,368.03 | 100.00% |

Weighted Average Maximum Mortgage Rate:          10.038%

**Gross Margin of the Mortgage Loans in Group I**

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 2.001% – 2.250% .............................. | 13 | $ 7,997,831.61 | 1.30% |
| 2.251% – 2.500% .............................. | 84 | 27,949,285.45 | 4.53 |
| 2.501% – 2.750% .............................. | 231 | 92,976,617.58 | 15.07 |
| 2.751% – 3.000% .............................. | 579 | 204,734,195.47 | 33.18 |
| 3.001% – 3.250% .............................. | 242 | 82,867,444.15 | 13.43 |
| 3.251% – 3.500% .............................. | 209 | 56,954,028.73 | 9.23 |
| 3.501% – 3.750% .............................. | 321 | 85,919,828.98 | 13.92 |
| 3.751% – 4.000% .............................. | 132 | 40,139,332.16 | 6.51 |
| 4.001% – 4.250% .............................. | 46 | 7,992,642.61 | 1.30 |
| 4.251% – 4.500% .............................. | 20 | 4,415,160.29 | 0.72 |
| 4.501% – 4.750% .............................. | 14 | 3,232,350.27 | 0.52 |
| 4.751% – 5.000% .............................. | 7 | 1,682,946.20 | 0.27 |
| 5.251% – 5.500% .............................. | 1 | 164,704.53 | 0.03 |
| Total.............................................. | 1,899 | $ 617,026,368.03 | 100.00% |

Weighted Average Gross Margin:  3.101%

**Prepayment Penalty of the Mortgage Loans in Group I**

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty.............................. | 673 | $ 219,463,199.27 | 35.57% |
| 0.5 Year...................................................... | 1 | 594,994.57 | 0.10 |
| 1 Year......................................................... | 738 | 237,506,953.13 | 38.49 |
| 3 Years ....................................................... | 487 | 159,461,221.06 | 25.84 |
| Total.............................................. | 1,899 | $ 617,026,368.03 | 100.00% |

**Product Type of the Mortgage Loans in Group I**

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| MTA ARM................................................ | 1,899 | 617,026,368.03 | 100.00% |
| Total.............................................. | 1,899 | $ 617,026,368.03 | 100.00% |

**Interest Only Feature of the Mortgage Loans in Group I**

| Interest Only Feature | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO ...................................................... | 1,899 | $ 617,026,368.03 | 100.00% |
| Total.............................................. | 1,899 | $ 617,026,368.03 | 100.00% |

### Principal Balances of the Mortgage Loans at Origination in Group II-C

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $      0 – $ 100,000................... | 292 | $    20,799,884.49 | 5.29% |
| $ 100,001 – $ 200,000................... | 774 | 116,776,665.63 | 29.68 |
| $ 200,001 – $ 300,000................... | 607 | 149,383,855.29 | 37.97 |
| $ 300,001 – $ 350,000................... | 255 | 82,664,704.34 | 21.01 |
| $ 350,001 – $ 400,000................... | 55 | 19,851,492.63 | 5.05 |
| $ 400,001 – $ 450,000................... | 6 | 2,573,500.00 | 0.65 |
| $ 450,001 – $ 500,000................... | 3 | 1,366,817.38 | 0.35 |
| Total............................ | 1,992 | $  393,416,919.76 | 100.00% |

| | |
|---|---|
| Minimum Original Principal Balance: | $ 30,000 |
| Maximum Original Principal Balance: | $ 458,500 |
| Average Original Principal Balance: | $ 197,583 |

### Scheduled Principal Balances of the Mortgage Loans as of the Cut-Off Date in Group II-C

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $      0 – $ 100,000................... | 292 | $    20,799,884.49 | 5.29% |
| $ 100,001 – $ 200,000................... | 775 | 116,959,619.19 | 29.73 |
| $ 200,001 – $ 300,000................... | 606 | 149,200,901.73 | 37.92 |
| $ 300,001 – $ 350,000................... | 256 | 83,009,903.96 | 21.10 |
| $ 350,001 – $ 400,000................... | 54 | 19,506,293.01 | 4.96 |
| $ 400,001 – $ 450,000................... | 6 | 2,573,500.00 | 0.65 |
| $ 450,001 – $ 500,000................... | 3 | 1,366,817.38 | 0.35 |
| Total............................ | 1,992 | $  393,416,919.76 | 100.00% |

| | |
|---|---|
| Minimum Scheduled Principal Balance: | $    29,972 |
| Maximum Scheduled Principal Balance: | $   457,517 |
| Average Scheduled Principal Balance: | $   197,498 |

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group II-C**

| Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.751 - 1.000 ............................................ | 46 | $ 9,669,660.00 | 2.46% |
| 1.251 - 1.500 ............................................ | 73 | 8,458,814.00 | 2.15 |
| 1.501 - 1.750 ............................................ | 1 | 284,000.00 | 0.07 |
| 1.751 - 2.000 ............................................ | 2 | 315,200.00 | 0.08 |
| 2.501 - 2.750 ............................................ | 9 | 1,840,670.07 | 0.47 |
| 2.751 - 3.000 ............................................ | 3 | 699,750.00 | 0.18 |
| 3.001 - 3.250 ............................................ | 2 | 547,000.00 | 0.14 |
| 3.251 - 3.500 ............................................ | 6 | 1,500,429.94 | 0.38 |
| 3.501 - 3.750 ............................................ | 9 | 2,163,536.31 | 0.55 |
| 3.751 - 4.000 ............................................ | 78 | 18,544,093.69 | 4.71 |
| 4.001 - 4.250 ............................................ | 100 | 21,514,086.18 | 5.47 |
| 4.251 - 4.500 ............................................ | 79 | 16,554,947.67 | 4.21 |
| 4.501 - 4.750 ............................................ | 66 | 15,246,116.73 | 3.88 |
| 4.751 - 5.000 ............................................ | 110 | 24,716,993.26 | 6.28 |
| 5.001 - 5.250 ............................................ | 139 | 29,964,490.61 | 7.62 |
| 5.251 - 5.500 ............................................ | 246 | 51,800,027.12 | 13.17 |
| 5.501 - 5.750 ............................................ | 226 | 46,119,830.82 | 11.72 |
| 5.751 - 6.000 ............................................ | 242 | 50,223,155.21 | 12.77 |
| 6.001 - 6.250 ............................................ | 131 | 24,011,094.73 | 6.10 |
| 6.251 - 6.500 ............................................ | 110 | 19,435,801.08 | 4.94 |
| 6.501 - 6.750 ............................................ | 70 | 11,925,430.59 | 3.03 |
| 6.751 - 7.000 ............................................ | 69 | 11,059,966.42 | 2.81 |
| 7.001 - 7.250 ............................................ | 47 | 7,144,134.28 | 1.82 |
| 7.251 - 7.500 ............................................ | 55 | 9,159,033.40 | 2.33 |
| 7.501 - 7.750 ............................................ | 70 | 10,396,357.65 | 2.64 |
| 7.751 - 8.000 ............................................ | 2 | 78,300.00 | 0.02 |
| 8.251 - 8.500 ............................................ | 1 | 44,000.00 | 0.01 |
| Total............................................ | 1,992 | $ 393,416,919.76 | 100.00% |

| | |
|---|---|
| Minimum Interest Rate: | 1.000% |
| Maximum Interest Rate: | 8.375% |
| Weighted Average Interest Rate: | 5.350% |

** Not final – some rates may change.

**Original Loan-to-Value Ratios\* of the Mortgage Loans in Group II-C**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.01%  –  30.00% ............................... | 12 | $      1,514,898.04 | 0.39% |
| 30.01%  –  40.00% ............................... | 6 | 1,153,978.13 | 0.29 |
| 40.01%  –  50.00% ............................... | 23 | 4,447,887.83 | 1.13 |
| 50.01%  –  55.00% ............................... | 20 | 3,852,590.02 | 0.98 |
| 55.01%  –  60.00% ............................... | 31 | 6,744,601.01 | 1.71 |
| 60.01%  –  65.00% ............................... | 41 | 8,522,875.50 | 2.17 |
| 65.01%  –  70.00% ............................... | 604 | 119,094,963.56 | 30.27 |
| 70.01%  –  75.00% ............................... | 152 | 30,613,222.82 | 7.78 |
| 75.01%  –  80.00% ............................... | 992 | 197,553,373.81 | 50.21 |
| 80.01%  –  85.00% ............................... | 9 | 1,437,421.39 | 0.37 |
| 85.01%  –  90.00% ............................... | 57 | 9,178,739.01 | 2.33 |
| 90.01%  –  95.00% ............................... | 40 | 8,311,798.74 | 2.11 |
| 95.01%  –  100.00% ............................... | 5 | 990,569.90 | 0.25 |
| Total............................... | 1,992 | $      393,416,919.76 | 100.00% |

Weighted Average Original Loan-to-Value Ratio: 75.21%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

## Geographic Distribution* of the Mortgage Properties in Group II-C

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Arizona | 100 | $ 17,827,734.97 | 4.53% |
| California | 414 | 106,680,452.36 | 27.12 |
| Colorado | 72 | 11,885,990.23 | 3.02 |
| Connecticut | 3 | 776,199.60 | 0.20 |
| Delaware | 13 | 1,874,624.66 | 0.48 |
| District Of Columbia | 4 | 1,109,733.32 | 0.28 |
| Florida | 153 | 29,915,313.74 | 7.60 |
| Georgia | 28 | 4,142,699.33 | 1.05 |
| Hawaii | 5 | 1,168,949.99 | 0.30 |
| Idaho | 10 | 1,303,256.22 | 0.33 |
| Illinois | 211 | 44,114,321.07 | 11.21 |
| Indiana | 21 | 3,094,096.11 | 0.79 |
| Iowa | 3 | 273,980.00 | 0.07 |
| Kansas | 4 | 720,910.00 | 0.18 |
| Kentucky | 20 | 2,832,444.41 | 0.72 |
| Louisiana | 4 | 745,600.00 | 0.19 |
| Maine | 2 | 492,800.00 | 0.13 |
| Maryland | 89 | 16,887,656.91 | 4.29 |
| Massachusetts | 31 | 7,853,205.79 | 2.00 |
| Michigan | 80 | 9,705,566.82 | 2.47 |
| Minnesota | 7 | 1,159,366.17 | 0.29 |
| Missouri | 35 | 4,825,498.67 | 1.23 |
| Montana | 13 | 1,922,879.99 | 0.49 |
| Nevada | 80 | 17,506,632.95 | 4.45 |
| New Hampshire | 16 | 3,003,854.95 | 0.76 |
| New Jersey | 35 | 7,647,476.28 | 1.94 |
| New Mexico | 1 | 276,000.00 | 0.07 |
| New York | 34 | 10,008,394.90 | 2.54 |
| North Carolina | 74 | 10,823,613.32 | 2.75 |
| Ohio | 91 | 9,476,017.85 | 2.41 |
| Oklahoma | 1 | 82,400.00 | 0.02 |
| Oregon | 38 | 6,481,208.13 | 1.65 |
| Pennsylvania | 27 | 4,256,883.11 | 1.08 |
| Rhode Island | 10 | 2,196,720.00 | 0.56 |
| South Carolina | 41 | 6,385,564.40 | 1.62 |
| South Dakota | 1 | 133,000.00 | 0.03 |
| Tennessee | 8 | 1,423,652.38 | 0.36 |
| Texas | 34 | 4,225,800.87 | 1.07 |
| Utah | 29 | 4,751,295.88 | 1.21 |
| Virginia | 99 | 23,756,286.31 | 6.04 |
| Washington | 42 | 7,746,048.07 | 1.97 |
| West Virginia | 1 | 92,700.00 | 0.02 |
| Wisconsin | 6 | 1,394,970.00 | 0.35 |
| Wyoming | 2 | 435,120.00 | 0.11 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

*No more than approximately 0.58% of Loan Group II-C by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group II-C**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Not Available | 2 | $ 274,495.76 | 0.07% |
| 576 - 600 | 3 | 745,550.00 | 0.19 |
| 601 - 625 | 28 | 4,903,974.12 | 1.25 |
| 626 - 650 | 136 | 25,631,364.07 | 6.52 |
| 651 - 675 | 266 | 51,008,951.62 | 12.97 |
| 676 - 700 | 387 | 76,860,438.40 | 19.54 |
| 701 - 725 | 395 | 75,800,168.98 | 19.27 |
| 726 - 750 | 326 | 68,010,035.19 | 17.29 |
| 751 - 775 | 247 | 49,447,476.49 | 12.57 |
| 776 - 800 | 156 | 31,182,736.76 | 7.93 |
| 801 - 825 | 46 | 9,551,728.37 | 2.43 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

Weighted Average Credit Score: 714
(where credit scores were available)

**Property Types of the Mortgage Properties in Group II-C**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family | 1,160 | $ 219,323,551.21 | 55.75% |
| PUD | 395 | 82,870,419.75 | 21.06 |
| Condominium | 324 | 66,022,990.17 | 16.78 |
| 2-4 Family | 112 | 24,923,958.63 | 6.34 |
| CO-OP | 1 | 276,000.00 | 0.07 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

**Occupancy Status of Mortgage Properties in Group II-C**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Primary Home | 1,328 | $ 289,339,127.97 | 73.55% |
| Investment | 565 | 83,569,579.87 | 21.24 |
| Second Home | 99 | 20,508,211.92 | 5.21 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

**Loan Purpose of the Mortgage Loans in Group II-C**

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase ..................................... | 1,383 | $   271,669,298.60 | 69.05% |
| Cash-Out Refinance ................................. | 397 | 80,660,591.41 | 20.50 |
| Rate/Term Refinance ................................. | 212 | 41,087,029.75 | 10.44 |
| Total................................................. | 1,992 | $   393,416,919.76 | 100.00% |

**Documentation Type of the Mortgage Loans in Group II-C**

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Verified Income / Verified Asset .............. | 793 | $   160,339,253.48 | 40.76% |
| Stated Income / Verified Asset.................. | 662 | 129,165,831.52 | 32.83 |
| No Income / No Asset ............................... | 249 | 47,139,442.40 | 11.98 |
| No Income / Verified Asset...................... | 168 | 34,150,935.25 | 8.68 |
| Stated Income / No Asset ......................... | 116 | 21,804,657.11 | 5.54 |
| Verified Income / No Asset...................... | 4 | 816,800.00 | 0.21 |
| Total................................................. | 1,992 | $   393,416,919.76 | 100.00% |

**Original Terms to Stated Maturity of the Mortgage Loans in Group II-C**

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months .................................... | 1,992 | $   393,416,919.76 | 100.00% |
| Total................................................. | 1,992 | $   393,416,919.76 | 100.00% |

Minimum Original Term to Stated Maturity (Months):          360
Maximum Original Term to Stated Maturity (Months):         360
Weighted Average Orig. Term to Stated Mat. (Months):      360

**Remaining Terms to Stated Maturity of the Mortgage Loans as of the Cut Off Date in Group II-C**

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months .................................... | 1,128 | $   223,118,686.55 | 56.71% |
| 360  Months ............................................ | 864 | 170,298,233.21 | 43.29 |
| Total................................................. | 1,992 | $   393,416,919.76 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months):          348
Maximum Remaining Term to Stated Maturity (Months):         360
Weighted Average Remaining Term to Stated Mat. (Months):     359

### Index of the Mortgage Loans in Group II-C

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Year LIBOR (WSJ/1 Mo Lead) ............. | 879 | $ 191,235,526.54 | 48.61% |
| 6 Month LIBOR (Wall St) ....................... | 807 | 150,027,948.33 | 38.13 |
| 1 Year MTA.......................................... | 169 | 28,014,476.20 | 7.12 |
| 1 Month LIBOR..................................... | 137 | 24,138,968.69 | 6.14 |
| Total.............................................. | 1,992 | $ 393,416,919.76 | 100.00% |

### Months to Next Rate Adjustment* of the Mortgage Loans in Group II-C

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 - 3 Months........................................... | 303 | $ 51,393,244.89 | 13.06% |
| 4 - 6 Months........................................... | 14 | 3,402,362.00 | 0.86 |
| 7 - 9 Months........................................... | 2 | 116,456.24 | 0.03 |
| 10 - 12 Months......................................... | 540 | 120,091,825.14 | 30.53 |
| 13 - 15 Months......................................... | 16 | 3,592,889.96 | 0.91 |
| 19 - 21 Months......................................... | 3 | 392,963.66 | 0.10 |
| 22 - 24 Months......................................... | 402 | 73,787,986.72 | 18.76 |
| 25 - 27 Months......................................... | 13 | 1,769,672.00 | 0.45 |
| 31 - 33 Months......................................... | 2 | 249,200.00 | 0.06 |
| 34 - 36 Months......................................... | 677 | 135,135,003.15 | 34.35 |
| 37 - 39 Months......................................... | 20 | 3,485,316.00 | 0.89 |
| Total.............................................. | 1,992 | $ 393,416,919.76 | 100.00% |

Weighted Average Next Rate Adjustment (Months): 21

*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

### Rate Adjustment Frequency of the Mortgage Loans in Group II-C

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Month................................................... | 306 | $ 52,153,444.89 | 13.26% |
| 6 Months ................................................. | 807 | 150,027,948.33 | 38.13 |
| 12 Months ............................................... | 879 | 191,235,526.54 | 48.61 |
| Total.............................................. | 1,992 | $ 393,416,919.76 | 100.00% |

**Maximum Lifetime Mortgage Rate of the Mortgage Loans in Group II-C**

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| <=9.750% ................................ | 19 | $ 4,362,108.31 | 1.11% |
| 9.751%  –  10.000% ................................ | 93 | 19,573,313.48 | 4.98 |
| 10.001%  –  10.250% ................................ | 16 | 3,565,497.33 | 0.91 |
| 10.251%  –  10.500% ................................ | 156 | 25,243,554.23 | 6.42 |
| 10.501%  –  10.750% ................................ | 103 | 22,475,550.18 | 5.71 |
| 10.751%  –  11.000% ................................ | 433 | 99,183,987.30 | 25.21 |
| 11.001%  –  11.250% ................................ | 193 | 37,872,913.65 | 9.63 |
| 11.251%  –  11.500% ................................ | 255 | 50,557,140.81 | 12.85 |
| 11.501%  –  11.750% ................................ | 203 | 39,496,297.74 | 10.04 |
| 11.751%  –  12.000% ................................ | 303 | 54,260,925.27 | 13.79 |
| 12.001%  –  12.250% ................................ | 79 | 13,900,390.41 | 3.53 |
| 12.251%  –  12.500% ................................ | 63 | 11,381,123.40 | 2.89 |
| 12.501%  –  12.750% ................................ | 72 | 10,465,517.65 | 2.66 |
| 12.751%  –  13.000% ................................ | 2 | 646,600.00 | 0.16 |
| 13.001%  –  13.250% ................................ | 1 | 108,000.00 | 0.03 |
| 13.501%  –  13.750% ................................ | 1 | 324,000.00 | 0.08 |
| Total ................................ | 1,992 | $ 393,416,919.76 | 100.00% |

Weighted Average Maximum Mortgage Rate: 11.272%

**Periodic Rate Cap of the Mortgage Loans in Group II-C**

| Periodic Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap ..................................................... | 312 | $ 53,294,176.89 | 13.55% |
| 1.000% ..................................................... | 801 | 148,887,216.33 | 37.84 |
| 2.000% ..................................................... | 879 | 191,235,526.54 | 48.61 |
| Total............................................... | 1,992 | $ 393,416,919.76 | 100.00% |

Non Zero Weighted Average Periodic Rate Cap: 1.562%

**Initial Rate Cap of the Mortgage Loans in Group II-C**

| Initial Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap ..................................................... | 312 | $ 53,294,176.89 | 13.55% |
| 1.000% ..................................................... | 5 | 1,501,430.00 | 0.38 |
| 2.000% ..................................................... | 879 | 191,235,526.54 | 48.61 |
| 3.000% ..................................................... | 795 | 147,263,286.33 | 37.43 |
| 5.000% ..................................................... | 1 | 122,500.00 | 0.03 |
| Total............................................... | 1,992 | $ 393,416,919.76 | 100.00% |

Non Zero Weighted Average Initial Cap Rate: 2.430%

**Gross Margin of the Mortgage Loans in Group II-C**

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1.751%  – 2.000% ................................ | 9 | $ 1,344,202.62 | 0.34% |
| 2.001%  – 2.250% ................................ | 1,170 | 250,166,041.41 | 63.59 |
| 2.251%  – 2.500% ................................ | 50 | 10,604,077.66 | 2.70 |
| 2.501%  – 2.750% ................................ | 40 | 8,619,394.96 | 2.19 |
| 2.751%  – 3.000% ................................ | 102 | 18,978,573.08 | 4.82 |
| 3.001%  – 3.250% ................................ | 42 | 8,542,893.51 | 2.17 |
| 3.251%  – 3.500% ................................ | 20 | 3,247,952.00 | 0.83 |
| 3.501%  – 3.750% ................................ | 29 | 5,331,147.60 | 1.36 |
| 3.751%  – 4.000% ................................ | 45 | 5,055,300.23 | 1.28 |
| 4.001%  – 4.250% ................................ | 14 | 2,469,106.00 | 0.63 |
| 4.251%  – 4.500% ................................ | 12 | 1,950,015.00 | 0.50 |
| 4.501%  – 4.750% ................................ | 6 | 942,998.38 | 0.24 |
| 4.751%  – 5.000% ................................ | 437 | 74,519,098.45 | 18.94 |
| 5.001%  – 5.250% ................................ | 2 | 90,500.00 | 0.02 |
| 5.251%  – 5.500% ................................ | 4 | 279,460.00 | 0.07 |
| 5.501%  – 5.750% ................................ | 8 | 1,091,010.47 | 0.28 |
| 5.751%  – 6.000% ................................ | 1 | 38,250.00 | 0.01 |
| 6.001% + ................................ | 1 | 146,898.39 | 0.04 |
| Total............................................... | 1,992 | $ 393,416,919.76 | 100.00% |

Weighted Average Gross Margin: 2.930%

## Prepayment Penalty of the Mortgage Loans in Group II-C

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty | 1,733 | $ 351,839,660.25 | 89.43% |
| 1 Year | 73 | 14,645,170.18 | 3.72 |
| 2 Years | 135 | 22,275,560.39 | 5.66 |
| 3 Years | 42 | 3,786,968.27 | 0.96 |
| 5 Years | 9 | 869,560.67 | 0.22 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

## Product Type of the Mortgage Loans in Group II-C

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 MO ARM | 6 | $ 1,237,798.05 | 0.31% |
| 1 MO ARM IO | 300 | 50,915,646.84 | 12.94 |
| 1 YR ARM | 65 | 12,638,713.35 | 3.21 |
| 1 YR ARM IO | 490 | 110,609,085.09 | 28.11 |
| 2/6 ARM | 78 | 10,247,825.18 | 2.60 |
| 2/6 ARM IO | 343 | 66,256,170.10 | 16.84 |
| 3/1 ARM | 27 | 4,977,772.94 | 1.27 |
| 3/1 ARM IO | 297 | 63,009,955.16 | 16.02 |
| 3/6 ARM | 54 | 8,811,765.78 | 2.24 |
| 3/6 ARM IO | 321 | 62,070,025.27 | 15.78 |
| 6MO ARM IO | 11 | 2,642,162.00 | 0.67 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

## Interest Only Feature of the Mortgage Loans in Group II-C

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO | 230 | $ 37,913,875.30 | 9.64% |
| 36 | 297 | 63,009,955.16 | 16.02 |
| 60 | 1,077 | 211,892,554.78 | 53.86 |
| 120 | 388 | 80,600,534.52 | 20.49 |
| Total | 1,992 | $ 393,416,919.76 | 100.00% |

**Principal Balances of the Mortgage Loans at Origination in Group II-NC**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $   350,001 – $   400,000.................... | 137 | $     52,047,165.23 | 10.96% |
| $   400,001 – $   450,000.................... | 147 | 62,004,829.44 | 13.06 |
| $   450,001 – $   500,000.................... | 139 | 66,364,352.28 | 13.98 |
| $   500,001 – $   550,000.................... | 72 | 37,926,082.48 | 7.99 |
| $   550,001 – $   600,000.................... | 74 | 42,374,202.49 | 8.93 |
| $   600,001 – $   650,000.................... | 54 | 33,967,709.52 | 7.16 |
| $   650,001 – $   700,000.................... | 19 | 12,860,869.50 | 2.71 |
| $   700,001 – $   800,000.................... | 39 | 29,044,698.92 | 6.12 |
| $   800,001 – $   900,000.................... | 22 | 18,850,744.00 | 3.97 |
| $   900,001 – $1,000,000.................... | 42 | 40,749,104.63 | 8.58 |
| $1,000,001 – $1,100,000.................... | 4 | 4,306,000.00 | 0.91 |
| $1,100,001 – $1,200,000.................... | 9 | 10,439,500.00 | 2.20 |
| $1,200,001 – $1,300,000.................... | 9 | 11,417,813.99 | 2.41 |
| $1,300,001 – $1,400,000.................... | 8 | 10,794,300.00 | 2.27 |
| $1,400,001 – $1,500,000.................... | 11 | 16,250,100.00 | 3.42 |
| $1,500,001 or more............................ | 13 | 25,302,815.97 | 5.33 |
| Total............................................ | 799 | $   474,700,288.45 | 100.00% |

| | | |
|---|---|---|
| Minimum Original Principal Balance: | $ | 360,000 |
| Maximum Original Principal Balance: | $ | 2,500,000 |
| Average Original Principal Balance: | $ | 594,721 |

## Scheduled Principal Balances of the Mortgage Loans as of the
## Cut-Off Date in Group II-NC

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $        0  – $  100,000.................... | 1 | $            3,527.42 | 0.00% |
| $   350,001  – $  400,000.................... | 137 | 52,047,165.23 | 10.96 |
| $   400,001  – $  450,000.................... | 146 | 62,001,302.02 | 13.06 |
| $   450,001  – $  500,000.................... | 139 | 66,364,352.28 | 13.98 |
| $   500,001  – $  550,000.................... | 72 | 37,926,082.48 | 7.99 |
| $   550,001  – $  600,000.................... | 74 | 42,374,202.49 | 8.93 |
| $   600,001  – $  650,000.................... | 54 | 33,967,709.52 | 7.16 |
| $   650,001  – $  700,000.................... | 19 | 12,860,869.50 | 2.71 |
| $   700,001  – $  800,000.................... | 39 | 29,044,698.92 | 6.12 |
| $   800,001  – $  900,000.................... | 22 | 18,850,744.00 | 3.97 |
| $   900,001  – $1,000,000.................... | 42 | 40,749,104.63 | 8.58 |
| $1,000,001  – $1,100,000.................... | 4 | 4,306,000.00 | 0.91 |
| $1,100,001  – $1,200,000.................... | 9 | 10,439,500.00 | 2.20 |
| $1,200,001  – $1,300,000.................... | 9 | 11,417,813.99 | 2.41 |
| $1,300,001  – $1,400,000.................... | 8 | 10,794,300.00 | 2.27 |
| $1,400,001  – $1,500,000.................... | 11 | 16,250,100.00 | 3.42 |
| $1,500,001 or more.............................. | 13 | 25,302,815.97 | 5.33 |
| Total............................................. | 799 | $   474,700,288.45 | 100.00% |

Minimum Scheduled Principal Balance:      $        3,527
Maximum Scheduled Principal Balance:      $   2,500,000
Average Scheduled Principal Balance:      $      594,118

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group II-NC**

| Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.751 - 1.000 ............................... | 25 | $     16,539,309.94 | 3.48% |
| 1.001 - 1.250 ............................... | 3 | 4,241,610.00 | 0.89 |
| 1.251 - 1.500 ............................... | 2 | 1,606,500.00 | 0.34 |
| 1.501 - 1.750 ............................... | 2 | 988,750.00 | 0.21 |
| 1.751 - 2.000 ............................... | 2 | 3,300,000.00 | 0.70 |
| 3.251 - 3.500 ............................... | 3 | 1,410,650.00 | 0.30 |
| 3.501 - 3.750 ............................... | 7 | 3,532,900.00 | 0.74 |
| 3.751 - 4.000 ............................... | 91 | 52,012,319.68 | 10.96 |
| 4.001 - 4.250 ............................... | 91 | 56,551,355.65 | 11.91 |
| 4.251 - 4.500 ............................... | 41 | 26,662,557.73 | 5.62 |
| 4.501 - 4.750 ............................... | 33 | 18,357,659.79 | 3.87 |
| 4.751 - 5.000 ............................... | 49 | 26,141,308.01 | 5.51 |
| 5.001 - 5.250 ............................... | 58 | 31,010,204.26 | 6.53 |
| 5.251 - 5.500 ............................... | 90 | 49,879,984.71 | 10.51 |
| 5.501 - 5.750 ............................... | 70 | 37,491,197.58 | 7.90 |
| 5.751 - 6.000 ............................... | 87 | 47,833,497.57 | 10.08 |
| 6.001 - 6.250 ............................... | 70 | 50,589,931.78 | 10.66 |
| 6.251 - 6.500 ............................... | 25 | 14,147,819.00 | 2.98 |
| 6.501 - 6.750 ............................... | 14 | 8,602,250.00 | 1.81 |
| 6.751 - 7.000 ............................... | 14 | 11,337,416.39 | 2.39 |
| 7.001 - 7.250 ............................... | 2 | 1,368,000.00 | 0.29 |
| 7.251 - 7.500 ............................... | 13 | 7,794,638.00 | 1.64 |
| 7.501 - 7.750 ............................... | 5 | 2,420,500.00 | 0.51 |
| 8.251 - 8.500 ............................... | 1 | 504,000.00 | 0.11 |
| 9.251 - 9.500 ............................... | 1 | 375,928.36 | 0.08 |
| Total............................... | 799 | $     474,700,288.45 | 100.00% |

Minimum Interest Rate:              1.000%
Maximum Interest Rate:             9.500%
Weighted Average Interest Rate:   5.034%

** Not final – some rates may change.

**Original Loan-to-Value Ratios\* of the Mortgage Loans in Group II-NC**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| <=30.00% ................................. | 4 | $    2,061,423.67 | 0.43% |
| 30.01%   –   40.00% .............................. | 4 | 3,514,000.00 | 0.74 |
| 40.01%   –   50.00% .............................. | 12 | 6,729,319.38 | 1.42 |
| 50.01%   –   55.00% .............................. | 9 | 7,829,810.00 | 1.65 |
| 55.01%   –   60.00% .............................. | 28 | 21,331,547.34 | 4.49 |
| 60.01%   –   65.00% .............................. | 46 | 38,480,440.75 | 8.11 |
| 65.01%   –   70.00% .............................. | 209 | 130,027,856.77 | 27.39 |
| 70.01%   –   75.00% .............................. | 136 | 87,601,659.86 | 18.45 |
| 75.01%   –   80.00% .............................. | 342 | 173,205,783.73 | 36.49 |
| 80.01%   –   85.00% .............................. | 1 | 480,000.00 | 0.10 |
| 85.01%   –   90.00% .............................. | 4 | 1,869,046.95 | 0.39 |
| 90.01%   –   95.00% .............................. | 3 | 1,206,400.00 | 0.25 |
| 95.01%   – 100.00% .............................. | 1 | 363,000.00 | 0.08 |
| Total............................................... | 799 | $    474,700,288.45 | 100.00% |

Weighted Average Original Loan-to-Value Ratio:  72.26%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

### Geographic Distribution* of the Mortgage Properties in Group II-NC

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Arizona | 30 | $ 17,657,352.30 | 3.72% |
| California | 413 | 234,421,644.08 | 49.38 |
| Colorado | 17 | 9,992,310.84 | 2.10 |
| Connecticut | 4 | 4,285,000.00 | 0.90 |
| Delaware | 1 | 416,000.00 | 0.09 |
| District Of Columbia | 4 | 1,907,750.00 | 0.40 |
| Florida | 42 | 31,110,720.00 | 6.55 |
| Georgia | 7 | 3,853,500.00 | 0.81 |
| Idaho | 1 | 386,250.00 | 0.08 |
| Illinois | 80 | 50,723,522.90 | 10.69 |
| Indiana | 2 | 918,000.00 | 0.19 |
| Kentucky | 2 | 933,000.00 | 0.20 |
| Maine | 1 | 820,000.00 | 0.17 |
| Maryland | 25 | 11,858,919.15 | 2.50 |
| Massachusetts | 9 | 7,041,230.83 | 1.48 |
| Michigan | 12 | 8,208,971.00 | 1.73 |
| Minnesota | 1 | 430,000.00 | 0.09 |
| Missouri | 5 | 2,341,862.91 | 0.49 |
| Nevada | 9 | 4,615,919.00 | 0.97 |
| New Hampshire | 2 | 977,997.30 | 0.21 |
| New Jersey | 13 | 7,315,090.79 | 1.54 |
| New Mexico | 2 | 1,146,100.00 | 0.24 |
| New York | 20 | 13,817,149.71 | 2.91 |
| North Carolina | 14 | 7,908,456.96 | 1.67 |
| Ohio | 2 | 1,420,000.00 | 0.30 |
| Oregon | 2 | 992,300.00 | 0.21 |
| Pennsylvania | 2 | 1,299,700.00 | 0.27 |
| Rhode Island | 2 | 1,255,000.00 | 0.26 |
| South Carolina | 9 | 4,912,812.00 | 1.03 |
| Tennessee | 1 | 375,000.00 | 0.08 |
| Texas | 6 | 7,433,364.75 | 1.57 |
| Utah | 2 | 841,600.00 | 0.18 |
| Virginia | 44 | 25,586,679.76 | 5.39 |
| Washington | 12 | 7,041,100.00 | 1.48 |
| Wisconsin | 1 | 455,984.17 | 0.10 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

*No more than approximately 1.14% of Loan Group II-NC by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group II-NC**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 551 - 575 | 1 | $ 375,928.36 | 0.08% |
| 601 - 625 | 4 | 1,946,000.00 | 0.41 |
| 626 - 650 | 20 | 11,170,438.00 | 2.35 |
| 651 - 675 | 81 | 45,220,171.78 | 9.53 |
| 676 - 700 | 155 | 97,970,897.94 | 20.64 |
| 701 - 725 | 171 | 98,937,350.36 | 20.84 |
| 726 - 750 | 147 | 89,253,635.12 | 18.80 |
| 751 - 775 | 137 | 82,589,129.27 | 17.40 |
| 776 - 800 | 63 | 37,335,188.28 | 7.87 |
| 801 - 825 | 20 | 9,901,549.34 | 2.09 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

Weighted Average Credit Score: 723
(where credit scores were available)

**Property Types of the Mortgage Properties in Group II-NC**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family | 511 | $ 307,833,822.42 | 64.85% |
| PUD | 199 | 113,343,092.64 | 23.88 |
| Condominium | 55 | 30,374,983.62 | 6.40 |
| 2-4 Family | 34 | 23,148,389.77 | 4.88 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Occupancy Status of Mortgage Properties in Group II-NC**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Primary Home | 707 | $ 418,396,515.40 | 88.14% |
| Investment | 62 | 34,456,960.37 | 7.26 |
| Second Home | 30 | 21,846,812.68 | 4.60 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Loan Purpose of the Mortgage Loans in Group II-NC**

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase | 479 | $ 267,519,831.80 | 56.36% |
| Cash-Out Refinance | 197 | 130,972,100.03 | 27.59 |
| Rate/Term Refinance | 123 | 76,208,356.62 | 16.05 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

## Documentation Type of the Mortgage Loans in Group II-NC

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Stated Income/Verified Asset | 353 | $ 215,614,369.54 | 45.42% |
| Verified Income/Verified Asset | 275 | 158,654,784.64 | 33.42 |
| No Income/No Asset | 73 | 47,239,339.96 | 9.95 |
| No Income/Verified Asset | 70 | 35,867,091.58 | 7.56 |
| Stated Income/No Asset | 26 | 15,787,202.73 | 3.33 |
| Verified Income/No Asset | 2 | 1,537,500.00 | 0.32 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

## Original Terms to Stated Maturity of the Mortgage Loans in Group II-NC

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months | 799 | $ 474,700,288.45 | 100.00% |
| Total | 799 | $ 474,700,288.45 | 100.00% |

Minimum Original Term to Stated Maturity (Months): 360
Maximum Original Term to Stated Maturity (Months): 360
Weighted Average Orig. Term to Stated Mat. (Months): 360

## Remaining Terms to Stated Maturity of the Mortgage Loans as of the Cut Off Date in Group II-NC

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months | 423 | $ 249,638,193.03 | 52.59% |
| 360 Months | 376 | 225,062,095.42 | 47.41 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months): 357
Maximum Remaining Term to Stated Maturity (Months): 360
Weighted Average Remaining Term to Stated Mat. (Months): 359

## Index of the Mortgage Loans in Group II-NC

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Year LIBOR (WSJ/1 Mo Lead) | 539 | $ 314,656,208.49 | 66.29% |
| 6 Month LIBOR (Wall St) | 157 | 86,116,759.21 | 18.14 |
| 1 Year MTA | 56 | 40,889,647.47 | 8.61 |
| 1 Month LIBOR | 47 | 33,037,673.28 | 6.96 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Months to Next Rate Adjustment\* of the Mortgage Loans in Group II-NC**

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 - 3 Months | 102 | $ 72,597,320.75 | 15.29% |
| 4 - 6 Months | 4 | 2,717,040.00 | 0.57 |
| 9 - 12 Months | 409 | 250,449,710.08 | 52.76 |
| 13 - 15 Months | 14 | 7,787,700.00 | 1.64 |
| 19 - 21 Months | 1 | 483,000.00 | 0.10 |
| 22 - 24 Months | 112 | 61,999,318.12 | 13.06 |
| 25 - 27 Months | 5 | 2,186,250.00 | 0.46 |
| 34 - 36 Months | 151 | 76,111,949.50 | 16.03 |
| 37 - 39 Months | 1 | 368,000.00 | 0.08 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

Weighted Average Next Rate Adjustment (Months): 15

\*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

**Rate Adjustment Frequency of the Mortgage Loans in Group II-NC**

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Month | 103 | $ 73,927,320.75 | 15.57% |
| 6 Months | 157 | 86,116,759.21 | 18.14 |
| 12 Months | 539 | 314,656,208.49 | 66.29 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Maximum Lifetime Mortgage Rate of the Mortgage Loans in Group II-NC**

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 9.751%  –  10.000% | 50 | $    37,437,497.47 | 7.89% |
| 10.001%  –  10.250% | 1 | 421,750.00 | 0.09 |
| 10.251%  –  10.500% | 19 | 10,373,434.05 | 2.19 |
| 10.501%  –  10.750% | 21 | 10,133,150.00 | 2.13 |
| 10.751%  –  11.000% | 294 | 170,471,805.35 | 35.91 |
| 11.001%  –  11.250% | 72 | 35,085,516.05 | 7.39 |
| 11.251%  –  11.500% | 94 | 49,167,731.04 | 10.36 |
| 11.501%  –  11.750% | 66 | 36,250,126.58 | 7.64 |
| 11.751%  –  12.000% | 114 | 74,542,917.66 | 15.70 |
| 12.001%  –  12.250% | 47 | 39,289,293.89 | 8.28 |
| 12.251%  –  12.500% | 13 | 7,794,638.00 | 1.64 |
| 12.501%  –  12.750% | 5 | 2,420,500.00 | 0.51 |
| 12.751%  –  13.000% | 1 | 432,000.00 | 0.09 |
| 13.251%  –  13.500% | 1 | 504,000.00 | 0.11 |
| 14.001% or more | 1 | 375,928.36 | 0.08 |
| Total | 799 | $   474,700,288.45 | 100.00% |

Weighted Average Maximum Mortgage Rate: 11.295%

**Periodic Rate Cap of the Mortgage Loans in Group II-NC**

| Periodic Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap | 104 | $    74,486,260.75 | 15.69% |
| 1.000% | 156 | 85,557,819.21 | 18.02 |
| 2.000% | 539 | 314,656,208.49 | 66.29 |
| Total | 799 | $   474,700,288.45 | 100.00% |

Non Zero Weighted Average Periodic Rate Cap: 1.786%

**Initial Rate Cap of the Mortgage Loans in Group II-NC**

| Initial Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap | 104 | $    74,486,260.75 | 15.69% |
| 1.000% | 2 | 828,100.00 | 0.17 |
| 2.000% | 539 | 314,656,208.49 | 66.29 |
| 3.000% | 154 | 84,729,719.21 | 17.85 |
| Total | 799 | $   474,700,288.45 | 100.00% |

Non Zero Weighted Average Initial Cap Rate: 2.210%

### Gross Margin of the Mortgage Loans in Group II-NC

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1.501%  –  1.750% ..................................... | 2 | $ 1,141,600.00 | 0.24% |
| 2.001%  –  2.250% ..................................... | 639 | 370,112,080.78 | 77.97 |
| 2.251%  –  2.500% ..................................... | 16 | 12,111,669.72 | 2.55 |
| 2.501%  –  2.750% ..................................... | 22 | 16,272,541.00 | 3.43 |
| 2.751%  –  3.000% ..................................... | 25 | 15,658,484.92 | 3.30 |
| 3.001%  –  3.250% ..................................... | 10 | 7,008,748.42 | 1.48 |
| 3.251%  –  3.500% ..................................... | 16 | 10,014,696.00 | 2.11 |
| 3.501%  –  3.750% ..................................... | 9 | 5,738,588.68 | 1.21 |
| 3.751%  –  4.000% ..................................... | 9 | 8,684,051.18 | 1.83 |
| 4.001%  –  4.250% ..................................... | 1 | 363,000.00 | 0.08 |
| 4.251%  –  4.500% ..................................... | 4 | 3,500,700.00 | 0.74 |
| 4.751%  –  5.000% ..................................... | 45 | 23,590,127.75 | 4.97 |
| 5.001%      5.250% ..................................... | 1 | 504,000.00 | 0.11 |
| Total ................................... | 799 | $ 474,700,288.45 | 100.00% |

Weighted Average Gross Margin: 2.530%

### Prepayment Penalty of the Mortgage Loans in Group II-NC

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty ............................. | 753 | $ 447,492,563.34 | 94.27% |
| 1 Year.................................................. | 26 | 17,462,104.11 | 3.68 |
| 2 Years................................................. | 12 | 5,289,350.00 | 1.11 |
| 3 Years................................................. | 7 | 4,096,271.00 | 0.86 |
| 5 Years................................................. | 1 | 360,000.00 | 0.08 |
| Total.................................................. | 799 | $ 474,700,288.45 | 100.00% |

### Product Type of the Mortgage Loans in Group II-NC

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 MO ARM .................................................. | 3 | $ 2,515,071.68 | 0.53% |
| 1 MO ARM IO............................................... | 100 | 71,412,249.07 | 15.04 |
| 1 YR ARM .................................................... | 30 | 18,238,101.75 | 3.84 |
| 1 YR ARM IO................................................ | 393 | 239,999,308.33 | 50.56 |
| 2/6 ARM ...................................................... | 8 | 3,701,279.64 | 0.78 |
| 2/6 ARM IO .................................................. | 110 | 60,967,288.48 | 12.84 |
| 3/1 ARM ...................................................... | 5 | 2,655,411.44 | 0.56 |
| 3/1 ARM IO .................................................. | 111 | 53,763,386.97 | 11.33 |
| 3/6 ARM ...................................................... | 4 | 1,806,609.10 | 0.38 |
| 3/6 ARM IO .................................................. | 32 | 18,254,541.99 | 3.85 |
| 6MO ARM .................................................... | 1 | 432,600.00 | 0.09 |
| 6MO ARM IO................................................ | 2 | 954,440.00 | 0.20 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Interest Only Feature of the Mortgage Loans in Group II-NC**

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO | 51 | $ 29,349,073.61 | 6.18% |
| 36 | 111 | 53,763,386.97 | 11.33 |
| 60 | 351 | 212,555,903.05 | 44.78 |
| 120 | 286 | 179,031,924.82 | 37.71 |
| Total | 799 | $ 474,700,288.45 | 100.00% |

**Principal Balances of the Mortgage Loans at Origination in Group III**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $ 0 – $ 100,000 | 786 | $ 59,970,505.18 | 5.37% |
| $ 100,001 – $ 200,000 | 2,737 | 407,387,584.83 | 36.51 |
| $ 200,001 – $ 300,000 | 1,687 | 413,989,381.80 | 37.10 |
| $ 300,001 – $ 350,000 | 536 | 174,032,162.08 | 15.59 |
| $ 350,001 – $ 400,000 | 148 | 53,111,808.80 | 4.76 |
| $ 400,001 – $ 450,000 | 11 | 4,621,800.00 | 0.41 |
| $ 450,001 – $ 500,000 | 5 | 2,311,514.70 | 0.21 |
| $ 500,001 – $ 550,000 | 1 | 528,000.00 | 0.05 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

| | | |
|---|---|---|
| Minimum Original Principal Balance: | $ | 20,000 |
| Maximum Original Principal Balance: | $ | 528,000 |
| Average Original Principal Balance: | $ | 188,911 |

**Scheduled Principal Balances of the Mortgage Loans as of the Cut-Off Date in Group III**

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $ 0 – $ 100,000 | 789 | $ 60,130,835.18 | 5.39% |
| $ 100,001 – $ 200,000 | 2,736 | 407,439,639.70 | 36.51 |
| $ 200,001 – $ 300,000 | 1,687 | 414,103,890.01 | 37.11 |
| $ 300,001 – $ 350,000 | 534 | 173,705,269.00 | 15.57 |
| $ 350,001 – $ 400,000 | 148 | 53,111,808.80 | 4.76 |
| $ 400,001 – $ 450,000 | 11 | 4,621,800.00 | 0.41 |
| $ 450,001 – $ 500,000 | 5 | 2,311,514.70 | 0.21 |
| $ 500,001 – $ 550,000 | 1 | 528,000.00 | 0.05 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

| | | |
|---|---|---|
| Minimum Scheduled Principal Balance: | $ | 19,940 |
| Maximum Scheduled Principal Balance: | $ | 528,000 |
| Average Scheduled Principal Balance: | $ | 188,793 |

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group III**

| Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 4.001 - 4.250 ............................................. | 2 | $ 441,050.00 | 0.04% |
| 4.251 - 4.500 ............................................. | 6 | 1,051,209.90 | 0.09 |
| 4.501 - 4.750 ............................................. | 14 | 3,574,104.98 | 0.32 |
| 4.751 - 5.000 ............................................. | 96 | 21,512,887.58 | 1.93 |
| 5.001 - 5.250 ............................................. | 262 | 54,319,260.07 | 4.87 |
| 5.251 - 5.500 ............................................. | 642 | 134,010,176.60 | 12.01 |
| 5.501 - 5.750 ............................................. | 927 | 191,666,187.27 | 17.18 |
| 5.751 - 6.000 ............................................. | 1,163 | 226,677,529.37 | 20.31 |
| 6.001 - 6.250 ............................................. | 685 | 123,204,086.39 | 11.04 |
| 6.251 - 6.500 ............................................. | 528 | 93,667,858.94 | 8.39 |
| 6.501 - 6.750 ............................................. | 377 | 67,682,276.17 | 6.06 |
| 6.751 - 7.000 ............................................. | 440 | 73,051,563.57 | 6.55 |
| 7.001 - 7.250 ............................................. | 257 | 44,028,276.99 | 3.95 |
| 7.251 - 7.500 ............................................. | 285 | 46,674,532.24 | 4.18 |
| 7.501 - 7.750 ............................................. | 167 | 25,593,909.23 | 2.29 |
| 7.751 - 8.000 ............................................. | 60 | 8,797,848.09 | 0.79 |
| Total.................................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Minimum Interest Rate:            4.125%
Maximum Interest Rate:            7.875%
Weighted Average Interest Rate:   6.123%

** Not final – some rates may change.

**Original Loan-to-Value Ratios* of the Mortgage Loans in Group III**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.00%  –  30.00% ............................... | 20 | $ 2,507,289.38 | 0.22% |
| 30.01%  –  40.00% ............................... | 32 | 5,191,624.12 | 0.47 |
| 40.01%  –  50.00% ............................... | 64 | 11,987,600.09 | 1.07 |
| 50.01%  –  55.00% ............................... | 51 | 10,005,141.14 | 0.90 |
| 55.01%  –  60.00% ............................... | 81 | 15,330,478.07 | 1.37 |
| 60.01%  –  65.00% ............................... | 142 | 30,425,167.45 | 2.73 |
| 65.01%  –  70.00% ............................... | 1,589 | 285,338,773.65 | 25.57 |
| 70.01%  –  75.00% ............................... | 384 | 77,314,285.91 | 6.93 |
| 75.01%  –  80.00% ............................... | 3,222 | 619,711,543.15 | 55.53 |
| 80.01%  –  85.00% ............................... | 25 | 4,287,427.53 | 0.38 |
| 85.01%  –  90.00% ............................... | 152 | 27,712,487.92 | 2.48 |
| 90.01%  –  95.00% ............................... | 149 | 26,140,938.98 | 2.34 |
| Total.................................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Weighted Average Original Loan-to-Value Ratio:    75.77%

*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

**Geographic Distribution\* of the Mortgage Properties in Group III**

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Alabama | 1 | $ 164,800.00 | 0.01% |
| Alaska | 1 | 268,000.00 | 0.02 |
| Arizona | 633 | 115,035,718.12 | 10.31 |
| Arkansas | 5 | 592,800.00 | 0.05 |
| California | 668 | 172,311,510.18 | 15.44 |
| Colorado | 284 | 49,880,860.74 | 4.47 |
| Connecticut | 32 | 6,286,641.53 | 0.56 |
| Delaware | 17 | 3,360,233.00 | 0.30 |
| District Of Columbia | 37 | 9,612,955.00 | 0.86 |
| Florida | 603 | 104,440,238.45 | 9.36 |
| Georgia | 147 | 22,849,239.88 | 2.05 |
| Hawaii | 5 | 1,474,454.58 | 0.13 |
| Idaho | 54 | 6,833,585.41 | 0.61 |
| Illinois | 597 | 113,889,882.12 | 10.21 |
| Indiana | 26 | 3,073,723.39 | 0.28 |
| Iowa | 23 | 3,192,245.18 | 0.29 |
| Kansas | 34 | 4,599,529.61 | 0.41 |
| Kentucky | 32 | 4,833,091.50 | 0.43 |
| Louisiana | 11 | 1,862,572.36 | 0.17 |
| Maine | 6 | 1,185,420.00 | 0.11 |
| Maryland | 311 | 65,496,460.43 | 5.87 |
| Massachusetts | 99 | 25,114,661.76 | 2.25 |
| Michigan | 221 | 27,837,682.33 | 2.49 |
| Minnesota | 20 | 3,022,282.07 | 0.27 |
| Mississippi | 1 | 75,145.00 | 0.01 |
| Missouri | 68 | 8,754,594.40 | 0.78 |
| Montana | 12 | 2,367,188.97 | 0.21 |
| Nebraska | 3 | 228,740.08 | 0.02 |
| Nevada | 244 | 52,948,993.92 | 4.74 |
| New Hampshire | 32 | 6,220,871.82 | 0.56 |
| New Jersey | 103 | 23,609,242.83 | 2.12 |
| New Mexico | 8 | 1,177,025.00 | 0.11 |
| New York | 71 | 18,388,436.91 | 1.65 |
| North Carolina | 256 | 36,061,021.17 | 3.23 |
| Ohio | 146 | 17,840,330.25 | 1.60 |
| Oklahoma | 7 | 1,146,430.00 | 0.10 |
| Oregon | 162 | 27,797,904.28 | 2.49 |
| Pennsylvania | 76 | 11,768,737.68 | 1.05 |
| Rhode Island | 19 | 3,775,019.27 | 0.34 |
| South Carolina | 125 | 19,584,743.24 | 1.75 |
| South Dakota | 16 | 1,724,440.00 | 0.15 |
| Tennessee | 45 | 6,131,529.11 | 0.55 |
| Texas | 83 | 12,219,583.39 | 1.09 |
| Utah | 99 | 14,813,673.36 | 1.33 |
| Vermont | 5 | 1,003,373.76 | 0.09 |
| Virginia | 296 | 69,969,769.75 | 6.27 |
| Washington | 141 | 26,832,903.41 | 2.40 |
| West Virginia | 6 | 1,039,400.00 | 0.09 |
| Wisconsin | 13 | 2,269,589.42 | 0.20 |
| Wyoming | 7 | 985,482.73 | 0.09 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

\*No more than approximately 0.56% of Loan Group III by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group III**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Not Available ............................................ | 3 | $ 673,354.04 | 0.06% |
| 551 - 575 ................................................. | 2 | 401,005.07 | 0.04 |
| 601 - 625 ................................................. | 84 | 15,655,608.42 | 1.40 |
| 626 - 650 ................................................. | 355 | 65,184,322.61 | 5.84 |
| 651 - 675 ................................................. | 795 | 148,482,953.53 | 13.31 |
| 676 - 700 ................................................. | 1,194 | 218,910,352.45 | 19.62 |
| 701 - 725 ................................................. | 1,149 | 218,419,954.45 | 19.57 |
| 726 - 750 ................................................. | 917 | 176,123,663.76 | 15.78 |
| 751 - 775 ................................................. | 853 | 164,328,611.57 | 14.73 |
| 776 - 800 ................................................. | 450 | 87,115,114.88 | 7.81 |
| 801 - 825 ................................................. | 109 | 20,657,816.61 | 1.85 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Weighted Average Credit Score: 715
(where credit scores were available)

**Property Types of the Mortgage Properties in Group III**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family ............................................ | 3,000 | $ 543,235,174.67 | 48.68% |
| PUD ......................................................... | 1,558 | 313,862,676.72 | 28.13 |
| Condominium ........................................... | 969 | 177,400,780.08 | 15.90 |
| 2-4 Family................................................ | 378 | 80,141,353.36 | 7.18 |
| Co-Op....................................................... | 6 | 1,312,772.56 | 0.12 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

**Occupancy Status of Mortgage Properties in Group III**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Owner Occupied ...................................... | 4,021 | $ 821,333,359.60 | 73.60% |
| Investor .................................................... | 1,625 | 245,018,938.09 | 21.96 |
| Second Home ........................................... | 265 | 49,600,459.70 | 4.44 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

### Loan Purpose of the Mortgage Loans in Group III

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase | 4,222 | $ 792,688,396.52 | 71.03% |
| Cash-Out Refinance | 1,185 | 230,224,035.98 | 20.63 |
| Rate-Term Refinance | 504 | 93,040,324.89 | 8.34 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

### Documentation Type of the Mortgage Loans in Group III

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Verified Income/Verified Assets | 2,343 | $ 450,460,609.94 | 40.37% |
| Stated Income /Verified Assets | 1,649 | 320,526,384.08 | 28.72 |
| No Income/Verified Asset | 1,083 | 189,998,799.04 | 17.03 |
| No Income/No Asset | 532 | 100,748,403.28 | 9.03 |
| Stated Income/No Asset | 279 | 50,583,251.57 | 4.53 |
| Verified Income/No Asset | 25 | 3,635,309.48 | 0.33 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

### Original Terms to Stated Maturity of the Mortgage Loans in Group III

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months | 5,911 | $1,115,952,757.39 | 100.00% |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

Minimum Original Term to Stated Maturity (Months): 360
Maximum Original Term to Stated Maturity (Months): 360
Weighted Average Orig. Term to Stated Mat. (Months): 360

### Stated Remaining Term to Maturity of the Mortgage Loans as of the Cut Off Date in Group III

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months | 2,953 | $ 552,044,759.16 | 49.47% |
| 360 Months | 2,958 | 563,907,998.23 | 50.53 |
| Total | 5,911 | $1,115,952,757.39 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months): 354
Maximum Remaining Term to Stated Maturity (Months): 360
Weighted Average Remaining Term to Stated Mat. (Months): 359

### Index of the Mortgage Loans in Group III

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 6 Month LIBOR (Wall St) ........................ | 4,160 | $ 749,928,405.92 | 67.20% |
| 1 Year LIBOR (WSJ/1 Mo Lead) ............. | 1,751 | 366,024,351.47 | 32.80 |
| Total................................................. | 5,911 | $1,115,952,757.39 | 100.00% |

### Months to Next Rate Adjustment* of the Mortgage Loans in Group III

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 52 – 54 Months ........................................ | 2 | $ 274,750.00 | 0.02% |
| 55 – 57 Months ........................................ | 38 | 5,218,796.82 | 0.47 |
| 58 – 60 Months ........................................ | 5,670 | 1,074,225,163.07 | 96.26 |
| 61 >= Months............................................ | 201 | 36,234,047.50 | 3.25 |
| Total................................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Weighted Average Next Rate Adjustment (Months):          59

*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

### Rate Adjustment Frequency of the Mortgage Loans in Group III

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 6 Months .................................................... | 4,160 | $ 749,928,405.92 | 67.20% |
| 12 Months .................................................. | 1,751 | 366,024,351.47 | 32.80 |
| Total................................................. | 5,911 | $1,115,952,757.39 | 100.00% |

**Maximum Lifetime Mortgage Rate of the Mortgage Loans in Group III**

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| <= 9.750% ................................................. | 22 | $ 5,066,364.88 | 0.45% |
| 9.751%  – 10.000% ............................... | 96 | 21,512,887.58 | 1.93 |
| 10.001%  – 10.250% ............................... | 262 | 54,319,260.07 | 4.87 |
| 10.251%  – 10.500% ............................... | 641 | 133,843,391.60 | 11.99 |
| 10.501%  – 10.750% ............................... | 927 | 191,661,215.27 | 17.17 |
| 10.751%  – 11.000% ............................... | 1,160 | 226,023,629.37 | 20.25 |
| 11.001%  – 11.250% ............................... | 680 | 122,375,656.39 | 10.97 |
| 11.251%  – 11.500% ............................... | 527 | 93,621,483.94 | 8.39 |
| 11.501%  – 11.750% ............................... | 377 | 67,691,248.17 | 6.07 |
| 11.751%  – 12.000% ............................... | 442 | 73,481,463.57 | 6.58 |
| 12.001%  – 12.250% ............................... | 262 | 44,856,706.99 | 4.02 |
| 12.251%  – 12.500% ............................... | 288 | 47,107,692.24 | 4.22 |
| 12.501%  – 12.750% ............................... | 167 | 25,593,909.23 | 2.29 |
| 12.751%  – 13.000% ............................... | 60 | 8,797,848.09 | 0.79 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Weighted Average Maximum Mortgage Rate: 11.124%

**Periodic Rate Cap of the Mortgage Loans in Group III**

| Periodic Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1.000% ................................................. | 4,160 | $ 749,928,405.92 | 67.20% |
| 2.000% ................................................. | 1,751 | 366,024,351.47 | 32.80 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Non Zero Weighted Average Periodic Rate Cap: 1.328%

**Initial Rate Cap of the Mortgage Loans in Group III**

| Initial Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 3.000% ................................................. | 4,160 | $ 749,928,405.92 | 67.20% |
| 5.000% ................................................. | 1,751 | 366,024,351.47 | 32.80 |
| Total.............................................. | 5,911 | $1,115,952,757.39 | 100.00% |

Non Zero Weighted Average Initial Rate Cap: 4.996%

## Gross Margin of the Mortgage Loans in Group III

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 2.001%  –  2.250% ................................ | 3,600 | $    703,984,919.34 | 63.08% |
| 2.251%  –  2.500% ................................ | 346 | 76,180,806.26 | 6.83 |
| 2.501%  –  2.750% ................................ | 15 | 2,782,208.50 | 0.25 |
| 2.751%  –  3.000% ................................ | 5 | 863,998.42 | 0.08 |
| 3.001%  –  3.250% ................................ | 11 | 1,686,482.59 | 0.15 |
| 3.251%  –  3.500% ................................ | 7 | 1,120,775.00 | 0.10 |
| 3.501%  –  3.750% ................................ | 3 | 594,660.00 | 0.05 |
| 4.751%  –  5.000% ................................ | 1,922 | 328,638,057.28 | 29.45 |
| 5.751%  –  6.000% ................................ | 1 | 30,450.00 | 0.00 |
| 6.001%  + ............................................. | 1 | 70,400.00 | 0.01 |
| Total.......................................... | 5,911 | $1,115,952,757.39 | 100.00% |

Weighted Average Gross Margin: 3.082%

## Prepayment Penalty of the Mortgage Loans in Group III

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty .............................. | 5,414 | $  1,036,231,204.24 | 92.86% |
| 1 Year..................................................... | 12 | 2,083,023.71 | 0.19 |
| 2 Years ................................................... | 432 | 69,470,126.21 | 6.23 |
| 3 Years ................................................... | 15 | 2,254,932.04 | 0.20 |
| 5 Years ................................................... | 38 | 5,913,471.19 | 0.53 |
| Total.............................................. | 5,911 | $  1,115,952,757.39 | 100.00% |

**Product Type of the Mortgage Loans in Group III**

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 5/1 ................................................ | 148 | $ 26,623,652.61 | 2.39% |
| 5/1 IO ............................................ | 1,603 | 339,400,698.86 | 30.41 |
| 5/6 ................................................ | 573 | 91,301,795.60 | 8.18 |
| 5/6 IO ............................................ | 3,587 | 658,626,610.32 | 59.02 |
| Total............................................ | 5,911 | $1,115,952,757.39 | 100.00% |

**Interest Only Feature of the Mortgage Loans in Group III**

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO ...................................................... | 721 | $ 117,925,448.21 | 10.57% |
| 60 ............................................................ | 5,190 | 998,027,309.18 | 89.43 |
| Total........................................... | 5,911 | $1,115,952,757.39 | 100.00% |

**Principal Balances of the Mortgage Loans at Origination in Group IV**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $     350,000  –  $     400,000 ..................... | 170 | $     65,384,793.47 | 12.97% |
| $     400,001  –  $     450,000 ..................... | 172 | 73,558,963.21 | 14.59 |
| $     450,001  –  $     500,000 ..................... | 172 | 81,952,257.15 | 16.26 |
| $     500,001  –  $     550,000 ..................... | 109 | 57,282,469.56 | 11.36 |
| $     550,001  –  $     600,000 ..................... | 87 | 50,108,929.15 | 9.94 |
| $     600,001  –  $     650,000 ..................... | 70 | 44,211,475.86 | 8.77 |
| $     650,001  –  $     700,000 ..................... | 34 | 23,049,871.87 | 4.57 |
| $     700,001  –  $     800,000 ..................... | 40 | 30,035,014.96 | 5.96 |
| $     800,001  –  $     900,000 ..................... | 21 | 17,977,000.00 | 3.57 |
| $     900,001  –  $  1,000,000 ..................... | 30 | 29,309,431.06 | 5.81 |
| $  1,000,001  –  $  1,100,000 ..................... | 5 | 5,375,250.00 | 1.07 |
| $  1,100,001  –  $  1,200,000 ..................... | 3 | 3,437,826.50 | 0.68 |
| $  1,200,001  –  $  1,300,000 ..................... | 3 | 3,819,750.00 | 0.76 |
| $  1,300,001  –  $  1,400,000 ..................... | 3 | 4,098,200.00 | 0.81 |
| $  1,400,001  –  $  1,500,000 ..................... | 2 | 2,906,000.00 | 0.58 |
| $  1,500,001 or more................................. | 6 | 11,631,460.07 | 2.31 |
| Total............................................. | 927 | $   504,138,692.86 | 100.00% |

Minimum Original Principal Balance:          $     360,000
Maximum Original Principal Balance:          $  2,500,000
Average Original Principal Balance:          $     544,707

**Scheduled Principal Balances of the Mortgage Loans as of the Cut-Off Date in Group IV**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $     350,000  –  $     400,000 ..................... | 171 | $     65,782,788.17 | 13.05% |
| $     400,001  –  $     450,000 ..................... | 171 | 73,160,968.51 | 14.51 |
| $     450,001  –  $     500,000 ..................... | 172 | 81,952,257.15 | 16.26 |
| $     500,001  –  $     550,000 ..................... | 109 | 57,282,469.56 | 11.36 |
| $     550,001  –  $     600,000 ..................... | 87 | 50,108,929.15 | 9.94 |
| $     600,001  –  $     650,000 ..................... | 70 | 44,211,475.86 | 8.77 |
| $     650,001  –  $     700,000 ..................... | 34 | 23,049,871.87 | 4.57 |
| $     700,001  –  $     800,000 ..................... | 40 | 30,035,014.96 | 5.96 |
| $     800,001  –  $     900,000 ..................... | 22 | 18,875,948.83 | 3.74 |
| $     900,001  –  $  1,000,000 ..................... | 30 | 29,309,431.06 | 5.81 |
| $  1,000,001  –  $  1,100,000 ..................... | 5 | 5,375,250.00 | 1.07 |
| $  1,100,001  –  $  1,200,000 ..................... | 3 | 3,437,826.50 | 0.68 |
| $  1,200,001  –  $  1,300,000 ..................... | 3 | 3,819,750.00 | 0.76 |
| $  1,300,001  –  $  1,400,000 ..................... | 3 | 4,098,200.00 | 0.81 |
| $  1,400,001  –  $  1,500,000 ..................... | 2 | 2,906,000.00 | 0.58 |
| $  1,500,001 or more................................. | 5 | 10,732,511.24 | 2.13 |
| Total............................................. | 927 | $   504,138,692.86 | 100.00% |

Minimum Scheduled Principal Balance:          $     360,000
Maximum Scheduled Principal Balance:          $  2,500,000
Average Scheduled Principal Balance:          $     543,839

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group IV**

| Mortgage Interest Rates | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 4.251% – 4.500% | 2 | $ 2,990,000.00 | 0.59% |
| 4.501% – 4.750% | 6 | 3,914,334.00 | 0.78 |
| 4.751% – 5.000% | 31 | 16,952,188.88 | 3.36 |
| 5.001% – 5.250% | 79 | 40,583,841.29 | 8.05 |
| 5.251% – 5.500% | 186 | 100,242,927.11 | 19.88 |
| 5.501% – 5.750% | 173 | 92,240,952.39 | 18.30 |
| 5.751% – 6.000% | 150 | 78,588,960.76 | 15.59 |
| 6.001% – 6.250% | 62 | 34,203,522.62 | 6.78 |
| 6.251% – 6.500% | 60 | 35,062,002.79 | 6.95 |
| 6.501% – 6.750% | 34 | 19,633,282.87 | 3.89 |
| 6.751% – 7.000% | 45 | 27,105,273.08 | 5.38 |
| 7.001% – 7.250% | 38 | 19,950,965.00 | 3.96 |
| 7.251% – 7.500% | 32 | 16,875,388.31 | 3.35 |
| 7.501% – 7.750% | 16 | 8,736,037.00 | 1.73 |
| 7.751% – 8.000% | 13 | 7,059,016.76 | 1.40 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

Minimum Interest Rate:          4.500%
Maximum Interest Rate:          7.875%
Weighted Average Interest Rate: 5.971%

**Original Loan-to-Value Ratios\* of the Mortgage Loans in Group IV**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 30.01% – 40.00% | 1 | $ 380,000.00 | 0.08% |
| 40.01% – 50.00% | 13 | 9,476,061.69 | 1.88 |
| 50.01% – 55.00% | 9 | 5,223,304.69 | 1.04 |
| 55.01% – 60.00% | 18 | 10,954,257.41 | 2.17 |
| 60.01% – 65.00% | 42 | 28,604,349.05 | 5.67 |
| 65.01% – 70.00% | 146 | 81,490,580.15 | 16.16 |
| 70.01% – 75.00% | 124 | 74,699,541.42 | 14.82 |
| 75.01% – 80.00% | 550 | 283,108,254.54 | 56.16 |
| 80.01% – 85.00% | 1 | 400,000.00 | 0.08 |
| 85.01% – 90.00% | 15 | 6,587,151.97 | 1.31 |
| 90.01% – 95.00% | 8 | 3,215,191.94 | 0.64 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Original Loan-to-Value Ratio:   74.97%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

### Geographic Distribution* of the Mortgage Properties in Group IV

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Alabama | 2 | $ 869,600.00 | 0.17% |
| Arizona | 62 | 36,493,561.94 | 7.24 |
| California | 299 | 161,476,802.89 | 32.03 |
| Colorado | 15 | 9,355,600.00 | 1.86 |
| Connecticut | 5 | 2,840,948.32 | 0.56 |
| District of Columbia | 22 | 10,943,881.10 | 2.17 |
| Florida | 47 | 29,780,992.58 | 5.91 |
| Georgia | 15 | 7,893,500.00 | 1.57 |
| Idaho | 2 | 919,147.01 | 0.18 |
| Illinois | 97 | 51,502,399.74 | 10.22 |
| Indiana | 1 | 448,000.00 | 0.09 |
| Iowa | 1 | 462,400.00 | 0.09 |
| Kentucky | 2 | 904,000.00 | 0.18 |
| Louisiana | 1 | 404,000.00 | 0.08 |
| Maine | 4 | 1,986,700.00 | 0.39 |
| Maryland | 62 | 31,409,973.49 | 6.23 |
| Massachusetts | 24 | 11,612,830.34 | 2.30 |
| Michigan | 8 | 4,269,740.00 | 0.85 |
| Missouri | 1 | 500,000.00 | 0.10 |
| Nevada | 22 | 13,096,406.30 | 2.60 |
| New Hampshire | 3 | 1,310,750.00 | 0.26 |
| New Jersey | 25 | 16,528,579.02 | 3.28 |
| New York | 28 | 17,072,573.04 | 3.39 |
| North Carolina | 17 | 9,292,021.78 | 1.84 |
| Ohio | 3 | 1,567,500.00 | 0.31 |
| Oklahoma | 1 | 549,439.25 | 0.11 |
| Oregon | 10 | 5,120,150.00 | 1.02 |
| Pennsylvania | 7 | 4,482,574.75 | 0.89 |
| Rhode Island | 1 | 480,000.00 | 0.10 |
| South Carolina | 6 | 3,256,200.00 | 0.65 |
| South Dakota | 1 | 543,750.00 | 0.11 |
| Tennessee | 3 | 2,078,100.00 | 0.41 |
| Texas | 6 | 2,846,200.00 | 0.56 |
| Utah | 2 | 973,000.00 | 0.19 |
| Virginia | 112 | 55,752,138.80 | 11.06 |
| Washington | 8 | 4,200,272.64 | 0.83 |
| West Virginia | 1 | 467,920.00 | 0.09 |
| Wyoming | 1 | 447,039.87 | 0.09 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

*No more than approximately 1.36% of Loan Group IV by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group IV**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 551 – 575 | 1 | $ 622,173.86 | 0.12% |
| 601 – 625 | 4 | 2,205,203.00 | 0.44 |
| 626 – 650 | 60 | 30,172,558.30 | 5.98 |
| 651 – 675 | 103 | 56,326,339.59 | 11.17 |
| 676 – 700 | 181 | 98,140,158.77 | 19.47 |
| 701 – 725 | 173 | 92,156,186.84 | 18.28 |
| 726 – 750 | 137 | 76,128,412.10 | 15.10 |
| 751 – 775 | 143 | 78,598,319.34 | 15.59 |
| 776 – 800 | 102 | 57,143,985.76 | 11.33 |
| 801 – 825 | 23 | 12,645,355.30 | 2.51 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Credit Score: 720

**Property Types of the Mortgage Properties in Group IV**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family | 516 | $ 281,140,707.05 | 55.77% |
| PUD | 290 | 159,895,919.51 | 31.72 |
| Condominium | 84 | 41,037,846.89 | 8.14 |
| 2 - 4 Family | 34 | 20,282,077.52 | 4.02 |
| CO-OP | 3 | 1,782,141.89 | 0.35 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

**Occupancy Status of Mortgage Properties in Group IV**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Primary Home | 827 | $ 449,581,981.82 | 89.18% |
| Investment | 58 | 29,402,695.03 | 5.83 |
| Second Home | 42 | 25,154,016.01 | 4.99 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

**Loan Purpose of the Mortgage Loans in Group IV**

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase | 606 | $ 329,183,912.07 | 65.30% |
| Cash-Out Refinance | 235 | 127,523,651.33 | 25.30 |
| Rate/Term Refinance | 86 | 47,431,129.46 | 9.41 |
| Total | 927 | $ 504,138,692.86 | 100.00% |

### Documentation Type of the Mortgage Loans in Group IV

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Verified Income /Verified Asset ............... | 494 | $  268,291,408.71 | 53.22% |
| Stated Income /Verified Asset.................. | 270 | 150,526,874.63 | 29.86 |
| No Income / No Asset .............................. | 104 | 55,991,756.15 | 11.11 |
| No Income / Asset .................................... | 39 | 19,698,960.79 | 3.91 |
| Stated Income / No Asset ......................... | 20 | 9,629,692.58 | 1.91 |
| Total................................................ | 927 | $  504,138,692.86 | 100.00% |

### Original Terms to Stated Maturity of the Mortgage Loans in Group IV

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months ............................................ | 927 | $  504,138,692.86 | 100.00% |
| Total................................................ | 927 | $  504,138,692.86 | 100.00% |

Minimum Original Term to Stated Maturity (Months): 360
Maximum Original Term to Stated Maturity (Months): 360
Weighted Average Orig. Term to Stated Mat. (Months): 360

### Remaining Terms to Stated Maturity of the Mortgage Loans as of the Cut Off Date in Group IV

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months ...................................... | 433 | $  234,155,959.04 | 46.45% |
| 360 Months ............................................ | 494 | 269,982,733.82 | 53.55 |
| Total................................................ | 927 | $  504,138,692.86 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months): 312
Maximum Remaining Term to Stated Maturity (Months): 360
Weighted Average Remaining Term to Stated Mat. (Months): 359

### Index of the Mortgage Loans in Group IV

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Year  LIBOR ............................................ | 612 | $  330,587,338.15 | 65.57% |
| 6 Month LIBOR ............................................ | 314 | 172,929,180.85 | 34.30 |
| 1 Year CMT ............................................ | 1 | 622,173.86 | 0.12 |
| Total................................................ | 927 | $  504,138,692.86 | 100.00% |

### Months to Next Rate Adjustment* of the Mortgage Loans in Group IV

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 10-12 Months ............................................ | 1 | $ 622,173.86 | 0.12% |
| 52 – 54 Months ......................................... | 1 | 450,000.00 | 0.09 |
| 58 – 60 Months ......................................... | 901 | 490,914,874.00 | 97.38 |
| 61 >= Months ........................................... | 24 | 12,151,645.00 | 2.41 |
| Total ............................................. | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Next Rate Adjustment (Months): 59

*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

### Rate Adjustment Frequency of the Mortgage Loans in Group IV

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 6 Months ................................................. | 314 | $ 172,929,180.85 | 34.30% |
| 12 Months ............................................... | 613 | 331,209,512.01 | 65.70 |
| Total ............................................. | 927 | $ 504,138,692.86 | 100.00% |

### Maximum Lifetime Mortgage Rate of the Mortgage Loans in Group IV

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| <=9.750% ................................................ | 8 | $ 6,904,334.00 | 1.37% |
| 9.751% – 10.000% ................................ | 31 | 16,952,188.88 | 3.36 |
| 10.001% – 10.250% .............................. | 79 | 40,583,841.29 | 8.05 |
| 10.251% – 10.500% .............................. | 185 | 99,724,927.11 | 19.78 |
| 10.501% – 10.750% .............................. | 173 | 92,240,952.39 | 18.30 |
| 10.751% – 11.000% .............................. | 149 | 78,169,030.76 | 15.51 |
| 11.001% – 11.250% .............................. | 62 | 34,203,522.62 | 6.78 |
| 11.251% – 11.500% .............................. | 61 | 35,580,002.79 | 7.06 |
| 11.501% – 11.750% .............................. | 34 | 19,633,282.87 | 3.89 |
| 11.751% – 12.000% .............................. | 46 | 27,525,203.08 | 5.46 |
| 12.001% – 12.250% .............................. | 38 | 19,950,965.00 | 3.96 |
| 12.251% – 12.500% .............................. | 32 | 16,875,388.31 | 3.35 |
| 12.501% – 12.750% .............................. | 16 | 8,736,037.00 | 1.73 |
| 12.751% – 13.000% .............................. | 13 | 7,059,016.76 | 1.40 |
| Total ............................................. | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Maximum Mortgage Rate: 10.973%

## Periodic Rate Cap of the Mortgage Loans in Group IV

| Periodic Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1.000% ...................................................... | 314 | $ 172,929,180.85 | 34.30% |
| 2.000% ...................................................... | 613 | 331,209,512.01 | 65.70 |
| Total................................................ | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Periodic Rate Cap: 1.657%

## Initial Rate Cap of the Mortgage Loans in Group IV

| Initial Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 2.000% ...................................................... | 1 | $ 419,930.00 | 0.08% |
| 3.000% ...................................................... | 2 | 1,140,173.86 | 0.23 |
| 5.000% ...................................................... | 924 | 502,578,589.00 | 99.69 |
| Total................................................ | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Periodic Rate Cap: 4.993%

## Gross Margin of the Mortgage Loans in Group IV

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 2.001%   – 2.250% ................................ | 738 | $ 400,207,192.11 | 79.38% |
| 2.251%   – 2.500% ................................ | 7 | 4,908,000.00 | 0.97 |
| 2.501%   – 2.750% ................................ | 8 | 7,729,452.21 | 1.53 |
| 3.001%   – 3.250% ................................ | 1 | 665,000.00 | 0.13 |
| 3.251%   – 3.500% ................................ | 1 | 518,000.00 | 0.10 |
| 4.751%   – 5.000% ................................ | 171 | 89,703,048.54 | 17.79 |
| 5.751%   – 6.000% ................................ | 1 | 408,000.00 | 0.08 |
| Total................................................ | 927 | $ 504,138,692.86 | 100.00% |

Weighted Average Gross Margin: 2.754%

### Prepayment Penalty of the Mortgage Loans in Group IV

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty | 901 | $  489,750,042.86 | 97.15% |
| 1 Years | 4 | 2,440,750.00 | 0.48 |
| 2 Years | 18 | 9,559,900.00 | 1.90 |
| 3 Years | 1 | 920,000.00 | 0.18 |
| 5 Years | 3 | 1,468,000.00 | 0.29 |
| Total | 927 | $  504,138,692.86 | 100.00% |

### Product Type of the Mortgage Loans in Group IV

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 5/1 | 66 | $   37,889,825.29 | 7.52% |
| 5/1 IO | 546 | 292,899,756.72 | 58.10 |
| 5/6 | 25 | 12,885,929.70 | 2.56 |
| 5/6 IO | 290 | 160,463,181.15 | 31.83 |
| Total | 927 | $  504,138,692.86 | 100.00% |

### Interest Only Feature of the Mortgage Loans in Group IV

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO | 91 | $   50,775,754.99 | 10.07% |
| 60 | 836 | 453,362,937.87 | 89.93 |
| Total | 927 | $  504,138,692.86 | 100.00% |

**Principal Balances of the Mortgage Loans
at Origination in Groups I through IV**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $        0 - $100,000 ............................. | 1,379 | $   101,261,102.31 | 3.26% |
| $   100,001 - $200,000 ............................. | 4,031 | 603,071,795.49 | 19.42 |
| $   200,001 - $300,000 ............................. | 2,663 | 655,391,001.80 | 21.11 |
| $   300,001 - $350,000 ............................. | 921 | 299,091,326.62 | 9.63 |
| $   350,001 - $400,000 ............................. | 643 | 240,182,459.60 | 7.73 |
| $   400,001 - $450,000 ............................. | 421 | 178,847,395.93 | 5.76 |
| $   450,001 - $500,000 ............................. | 381 | 181,569,425.48 | 5.85 |
| $   500,001 - $550,000 ............................. | 234 | 123,010,558.59 | 3.96 |
| $   550,001 - $600,000 ............................. | 200 | 114,939,414.68 | 3.70 |
| $   600,001 - $650,000 ............................. | 166 | 104,687,198.60 | 3.37 |
| $   650,001 - $700,000 ............................. | 74 | 50,100,090.48 | 1.61 |
| $   700,001 - $800,000 ............................. | 114 | 85,013,149.40 | 2.74 |
| $   800,001 - $900,000 ............................. | 63 | 54,023,700.27 | 1.74 |
| $   900,001 - $1,000,000 ............................. | 98 | 95,118,383.17 | 3.06 |
| $1,000,001 - $1,100,000 ............................. | 18 | 19,235,452.78 | 0.62 |
| $1,100,001 - $1,200,000 ............................. | 17 | 19,759,193.83 | 0.64 |
| $1,200,001 - $1,300,000 ............................. | 22 | 27,450,211.69 | 0.88 |
| $1,300,001 - $1,400,000 ............................. | 18 | 24,330,011.15 | 0.78 |
| $1,400,001 - $1,500,000 ............................. | 25 | 36,823,695.93 | 1.19 |
| $1,500,001 >= ............................. | 40 | 91,329,458.69 | 2.94 |
| Total............................................. | 11,528 | $3,105,235,026.49 | 100.00% |

| | | |
|---|---|---|
| Minimum Original Principal Balance: | $        20,000 | |
| Maximum Original Principal Balance: | $   7,000,000 | |
| Average Original Principal Balance: | $      269,643 | |

**Scheduled Principal Balances of the Mortgage Loans as of the**

**Cut-Off Date in Groups I through IV**

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $      0.00 - $ 100,000 ............................ | 1,383 | $    101,424,959.73 | 3.27% |
| $   100,001 - $ 200,000 ............................ | 4,031 | 603,306,803.92 | 19.43 |
| $   200,001 - $ 300,000 ............................ | 2,662 | 655,322,556.45 | 21.10 |
| $   300,001 - $ 350,000 ............................ | 921 | 299,458,787.10 | 9.64 |
| $   350,001 - $ 400,000 ............................ | 642 | 239,886,100.74 | 7.73 |
| $   400,001 - $ 450,000 ............................ | 418 | 177,995,859.96 | 5.73 |
| $   450,001 - $ 500,000 ............................ | 382 | 182,019,439.33 | 5.86 |
| $   500,001 - $ 550,000 ............................ | 234 | 123,010,558.59 | 3.96 |
| $   550,001 - $ 600,000 ............................ | 200 | 114,939,414.68 | 3.70 |
| $   600,001 - $ 650,000 ............................ | 166 | 104,687,198.60 | 3.37 |
| $   650,001 - $ 700,000 ............................ | 74 | 50,100,090.48 | 1.61 |
| $   700,001 - $ 800,000 ............................ | 114 | 85,013,149.40 | 2.74 |
| $   800,001 - $ 900,000 ............................ | 64 | 54,922,649.10 | 1.77 |
| $   900,001 - $1,000,000............................ | 99 | 96,020,253.16 | 3.09 |
| $ 1,000,001 - $1,100,000............................ | 18 | 19,235,452.78 | 0.62 |
| $ 1,100,001 - $1,200,000............................ | 17 | 19,759,193.83 | 0.64 |
| $ 1,200,001 - $1,300,000............................ | 21 | 26,548,341.70 | 0.85 |
| $ 1,300,001 - $1,400,000............................ | 18 | 24,330,011.15 | 0.78 |
| $ 1,400,001 - $1,500,000............................ | 25 | 36,823,695.93 | 1.19 |
| $ 1,500,001 >=.............................................. | 39 | 90,430,509.86 | 2.91 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

| | | |
|---|---|---|
| Minimum Scheduled Principal Balance: | $         3,527 | |
| Maximum Scheduled Principal Balance: | $     6,993,243 | |
| Average Scheduled Principal Balance: | $       269,365 | |

## Mortgage Rates of the Mortgage Loans
## as of the Cut-Off Date in Groups I through IV

| Mortgage Interest Rates | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.751% - 1.000% | 653 | $ 250,474,556.12 | 8.07% |
| 1.001% - 1.250% | 11 | 16,711,564.72 | 0.54 |
| 1.251% - 1.500% | 449 | 113,402,245.94 | 3.65 |
| 1.501% - 1.750% | 42 | 20,717,972.37 | 0.67 |
| 1.751% - 2.000% | 60 | 20,419,716.79 | 0.66 |
| 2.001% - 2.250% | 19 | 5,239,497.03 | 0.17 |
| 2.251% - 2.500% | 6 | 1,941,076.98 | 0.06 |
| 2.501% - 2.750% | 40 | 10,806,544.76 | 0.35 |
| 2.751% - 3.000% | 21 | 4,482,928.26 | 0.14 |
| 3.001% - 3.250% | 2 | 547,000.00 | 0.02 |
| 3.251% - 3.500% | 14 | 3,742,279.94 | 0.12 |
| 3.501% - 3.750% | 34 | 9,257,901.32 | 0.30 |
| 3.751% - 4.000% | 215 | 81,053,686.37 | 2.61 |
| 4.001% - 4.250% | 198 | 79,997,061.75 | 2.58 |
| 4.251% - 4.500% | 146 | 53,282,563.06 | 1.72 |
| 4.501% - 4.750% | 136 | 47,550,856.81 | 1.53 |
| 4.751% - 5.000% | 337 | 109,781,155.26 | 3.54 |
| 5.001% - 5.250% | 626 | 189,162,307.33 | 6.09 |
| 5.251% - 5.500% | 1,344 | 389,817,168.01 | 12.55 |
| 5.501% - 5.750% | 1,479 | 388,837,432.79 | 12.52 |
| 5.751% - 6.000% | 1,734 | 427,716,327.44 | 13.77 |
| 6.001% - 6.250% | 1,042 | 256,446,883.62 | 8.26 |
| 6.251% - 6.500% | 759 | 170,935,427.65 | 5.50 |
| 6.501% - 6.750% | 511 | 109,668,100.49 | 3.53 |
| 6.751% - 7.000% | 579 | 125,054,533.90 | 4.03 |
| 7.001% - 7.250% | 348 | 73,201,384.99 | 2.36 |
| 7.251% - 7.500% | 387 | 80,980,955.70 | 2.61 |
| 7.501% - 7.750% | 258 | 47,146,803.88 | 1.52 |
| 7.751% - 8.000% | 75 | 15,935,164.85 | 0.51 |
| 8.251% - 8.500% | 2 | 548,000.00 | 0.02 |
| 9.251% - 9.500% | 1 | 375,928.36 | 0.01 |
| Total | 11,528 | $3,105,235,026.49 | 100.00% |

Minimum Interest Rate:          1.000%
Maximum Interest Rate:          9.500%
Weighted Average Interest Rate: 5.162%

**Original Loan-to-Value Ratios\* of the Mortgage Loans
in Groups I through IV**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.00% - 30.00% | 46 | $ 8,080,411.74 | 0.26% |
| 30.01% - 40.00% | 65 | 22,330,549.75 | 0.72 |
| 40.01% - 50.00% | 155 | 54,927,417.34 | 1.77 |
| 50.01% - 55.00% | 118 | 41,144,526.58 | 1.33 |
| 55.01% - 60.00% | 206 | 77,259,983.29 | 2.49 |
| 60.01% - 65.00% | 392 | 145,448,222.00 | 4.68 |
| 65.01% - 70.00% | 2,788 | 702,193,161.07 | 22.61 |
| 70.01% - 75.00% | 1,171 | 407,621,884.14 | 13.13 |
| 75.01% - 80.00% | 5,879 | 1,499,300,118.12 | 48.28 |
| 80.01% - 85.00% | 45 | 9,066,447.14 | 0.29 |
| 85.01% - 90.00% | 307 | 65,304,225.21 | 2.10 |
| 90.01% - 95.00% | 261 | 50,988,534.62 | 1.64 |
| 95.01% -100.00% | 95 | 21,569,545.49 | 0.69 |
| Total | 11,528 | $3,105,235,026.49 | 100.00% |

Weighted Average Original Loan-to-Value: 74.59%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

### Geographic Distribution* of the Mortgage Properties in Groups I through IV

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Alabama | 4 | $ 1,104,579.36 | 0.04% |
| Alaska | 1 | 268,000.00 | 0.01 |
| Arizona | 857 | 196,140,823.28 | 6.32 |
| Arkansas | 5 | 592,800.00 | 0.02 |
| California | 2,087 | 813,339,547.21 | 26.19 |
| Colorado | 403 | 89,775,292.54 | 2.89 |
| Connecticut | 67 | 27,627,234.32 | 0.89 |
| Delaware | 86 | 18,182,929.46 | 0.59 |
| District of Columbia | 72 | 25,513,011.43 | 0.82 |
| Florida | 1,147 | 286,478,880.37 | 9.23 |
| Georgia | 260 | 54,765,384.67 | 1.76 |
| Hawaii | 10 | 2,643,404.57 | 0.09 |
| Idaho | 68 | 10,655,838.64 | 0.34 |
| Illinois | 1,077 | 289,951,331.36 | 9.34 |
| Indiana | 53 | 8,045,922.45 | 0.26 |
| Iowa | 27 | 3,928,625.18 | 0.13 |
| Kansas | 41 | 5,892,678.12 | 0.19 |
| Kentucky | 99 | 12,599,292.39 | 0.41 |
| Louisiana | 17 | 3,207,705.28 | 0.10 |
| Maine | 13 | 4,484,920.00 | 0.14 |
| Maryland | 548 | 146,687,994.15 | 4.72 |
| Massachusetts | 209 | 76,457,914.62 | 2.46 |
| Michigan | 440 | 76,980,181.36 | 2.48 |
| Minnesota | 28 | 4,611,648.24 | 0.15 |
| Mississippi | 1 | 75,145.00 | 0.00 |
| Missouri | 123 | 19,107,387.33 | 0.62 |
| Montana | 30 | 5,739,909.85 | 0.18 |
| Nebraska | 3 | 228,740.08 | 0.01 |
| Nevada | 398 | 102,514,769.43 | 3.30 |
| New Hampshire | 53 | 11,513,474.07 | 0.37 |
| New Jersey | 242 | 77,296,941.37 | 2.49 |
| New Mexico | 11 | 2,599,125.00 | 0.08 |
| New York | 221 | 95,215,585.75 | 3.07 |
| North Carolina | 525 | 101,114,574.40 | 3.26 |
| Ohio | 339 | 40,932,048.83 | 1.32 |
| Oklahoma | 9 | 1,778,269.25 | 0.06 |
| Oregon | 233 | 46,648,532.34 | 1.50 |
| Pennsylvania | 161 | 32,190,325.75 | 1.04 |
| Rhode Island | 34 | 8,182,102.55 | 0.26 |
| South Carolina | 227 | 49,106,245.26 | 1.58 |
| South Dakota | 18 | 2,401,190.00 | 0.08 |
| Tennessee | 64 | 12,820,330.12 | 0.41 |
| Texas | 146 | 30,552,441.66 | 0.98 |
| Utah | 142 | 27,616,882.52 | 0.89 |
| Vermont | 5 | 1,003,373.76 | 0.03 |
| Virginia | 674 | 221,022,802.74 | 7.12 |
| Washington | 210 | 47,369,299.53 | 1.53 |
| West Virginia | 8 | 1,600,020.00 | 0.05 |
| Wisconsin | 21 | 4,274,928.30 | 0.14 |
| Wyoming | 11 | 2,394,642.60 | 0.08 |
| Total | 11,528 | $3,105,235,026.49 | 100.00% |

*No more than approximately 0.38% of Loan Groups I through IV by cut-off date principal balance will be secured by properties located in any one zip code area.

## Credit Scores as of the Date of Origination
## of the Mortgage Loans in Groups I through IV

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Not Available ............................................ | 10 | $ 1,988,053.93 | 0.06% |
| 501 – 525 ................................................. | 1 | 1,359,248.47 | 0.04 |
| 526 – 550 ................................................. | 2 | 255,427.39 | 0.01 |
| 551 – 575 ................................................. | 6 | 1,820,758.36 | 0.06 |
| 576 – 600 ................................................. | 20 | 1,970,339.03 | 0.06 |
| 601 – 625 ................................................. | 153 | 37,359,541.34 | 1.20 |
| 626 – 650 ................................................. | 769 | 187,609,955.65 | 6.04 |
| 651 – 675 ................................................. | 1,492 | 378,524,931.04 | 12.19 |
| 676 – 700 ................................................. | 2,264 | 620,849,490.88 | 19.99 |
| 701 – 725 ................................................. | 2,206 | 595,440,309.93 | 19.18 |
| 726 – 750 ................................................. | 1,827 | 505,567,804.46 | 16.28 |
| 751 – 775 ................................................. | 1,617 | 456,323,049.73 | 14.70 |
| 776 – 800 ................................................. | 919 | 252,072,169.18 | 8.12 |
| 801 – 825 ................................................. | 242 | 64,093,947.10 | 2.06 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

Weighted Average Credit Score: 715
(where credit scores were available)

## Property Types of the Mortgage Properties
## of the Mortgage Loans in Groups I through IV

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family ............................................ | 6,354 | $1,744,552,130.26 | 56.18% |
| PUD ......................................................... | 2,780 | 793,472,613.04 | 25.55 |
| Condominium ............................................ | 1,722 | 390,629,516.55 | 12.58 |
| 2 – 4 Family ............................................. | 657 | 171,115,379.05 | 5.51 |
| CO-OP ...................................................... | 15 | 5,465,387.59 | 0.18 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

## Occupancy Status of Mortgage Properties
## of the Mortgage Loans in Groups I through IV

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Primary Home ............................................ | 8,047 | $2,439,880,521.32 | 78.57% |
| Investment ................................................. | 2,825 | 469,617,771.67 | 15.12 |
| Second Home ............................................ | 656 | 195,736,733.50 | 6.30 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

### Loan Purpose of the Mortgage Loans
### in Groups I through IV

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase .................................................... | 7,477 | $1,904,640,238.25 | 61.34% |
| Cash Out Refinance.................................. | 2,765 | 857,695,343.56 | 27.62 |
| Rate/Term Refinance .............................. | 1,286 | 342,899,444.68 | 11.04 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

### Documentation Type of the Mortgage Loans
### in Groups I through IV

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Verified Income /Verified Asset .............. | 4,799 | $1,251,744,893.34 | 40.31% |
| Stated Income / Verified Asset................. | 3,725 | 1,150,179,802.23 | 37.04 |
| No Income / No Asset .............................. | 1,509 | 340,369,337.55 | 10.96 |
| No Income / Verified Asset...................... | 809 | 190,465,390.90 | 6.13 |
| Stated Income / No Asset ........................ | 655 | 166,485,992.99 | 5.36 |
| Verified Income / No Asset...................... | 31 | 5,989,609.48 | 0.19 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

### Original Terms to Stated Maturity of the Mortgage Loans
### in Groups I through IV

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 360 Months ................................. | 11,313 | $3,023,466,948.71 | 97.37% |
| 480 Months ................................. | 215 | 81,768,077.78 | 2.63 |
| Total .......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

| | |
|---|---|
| Minimum Original Term to Stated Maturity (Months): | 360 |
| Maximum Original Term to Stated Maturity (Months): | 480 |
| Weighted Average Orig. Term to Stated Mat. (Months): | 363 |

**Remaining Terms to Stated Maturity of the Mortgage Loans
as of the Cut Off Date in Groups I through IV**

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 300 – 359 Months ..................................... | 5,837 | $1,544,966,717.12 | 49.75% |
| 360 – 360 Months ..................................... | 5,476 | 1,478,500,231.59 | 47.61 |
| 361 >= Months ......................................... | 215 | 81,768,077.78 | 2.63 |
| Total ......................................... | 11,528 | $3,105,235,026.49 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months):           312
Maximum Remaining Term to Stated Maturity (Months):           480
Weighted Average Remaining Term to Stated Mat. (Months):           363

**Index of the Mortgage Loans
in Groups I through IV**

| Index | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Year LIBOR ......................................... | 3,781 | $ 1,202,503,424.65 | 38.73% |
| 6 Month LIBOR ......................................... | 5,438 | 1,159,002,294.31 | 37.32 |
| 1 Year MTA ............................................. | 2,123 | 685,785,231.39 | 22.08 |
| 1 Month LIBOR ......................................... | 184 | 57,176,641.97 | 1.84 |
| 1 Year CMT / Weekly ............................... | 1 | 622,173.86 | 0.02 |
| 1 Month MTA ........................................... | 1 | 145,260.31 | 0.00 |
| Total ......................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

**Months to Next Rate Adjustment\* of the Mortgage Loans
in Groups I through IV**

| Next Rate Adjustment | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0 – 3 Months ........................................ | 2,254 | $ 722,107,459.67 | 23.25% |
| 4 – 6 Months ........................................ | 29 | 11,630,786.55 | 0.37 |
| 7 – 9 Months ........................................ | 2 | 116,456.24 | 0.00 |
| 10 – 12 Months ...................................... | 986 | 381,033,739.53 | 12.27 |
| 13 – 15 Months ...................................... | 31 | 13,708,089.96 | 0.44 |
| 19 – 21 Months ...................................... | 4 | 875,963.66 | 0.03 |
| 22 – 24 Months ...................................... | 514 | 135,787,304.84 | 4.37 |
| 25 – 27 Months ...................................... | 18 | 3,955,922.00 | 0.13 |
| 31 – 33 Months ...................................... | 2 | 249,200.00 | 0.01 |
| 34 – 36 Months ...................................... | 828 | 211,246,952.65 | 6.80 |
| 37 – 39 Months ...................................... | 21 | 3,853,316.00 | 0.12 |
| 52 – 54 Months ...................................... | 3 | 724,750.00 | 0.02 |
| 55 – 57 Months ...................................... | 38 | 5,218,796.82 | 0.17 |
| 58 – 60 Months ...................................... | 6,573 | 1,566,340,596.07 | 50.44 |
| 61 >= Months ........................................ | 225 | 48,385,692.50 | 1.56 |
| Total ......................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

Weighted Average Next Rate Adjustment (Months):  36

\*Months to next rate adjustment is calculated by using the first rate adjustment date for the loans still in a hybrid period and by using next rate adjustment for loans that are fully indexed.

**Rate Adjustment Frequency of the Mortgage Loans
in Groups I through IV**

| Rate Adjustment Frequency | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Month................................................... | 2,308 | $ 743,107,133.67 | 23.93% |
| 6 Months ............................................... | 5,438 | 1,159,002,294.31 | 37.32 |
| 12 Months .............................................. | 3,782 | 1,203,125,598.51 | 38.75 |
| Total ......................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

## Maximum Lifetime Mortgage Rate of the Mortgage Loans
## of the Mortgage Loans in Groups I through IV

| Maximum Mortgage Rate | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| <= 9.750% | 49 | $ 16,332,807.19 | 0.53% |
| 9.751% - 10.000% | 1,493 | 596,242,193.55 | 19.20 |
| 10.001% - 10.250% | 358 | 98,890,348.69 | 3.18 |
| 10.251% - 10.500% | 1,509 | 347,612,076.81 | 11.19 |
| 10.501% - 10.750% | 1,392 | 354,344,159.91 | 11.41 |
| 10.751% - 11.000% | 2,036 | 573,848,452.78 | 18.48 |
| 11.001% - 11.250% | 1,007 | 229,537,608.71 | 7.39 |
| 11.251% - 11.500% | 937 | 228,926,358.58 | 7.37 |
| 11.501% - 11.750% | 680 | 163,070,955.36 | 5.25 |
| 11.751% - 12.000% | 905 | 229,810,509.58 | 7.40 |
| 12.001% - 12.250% | 426 | 117,997,356.29 | 3.80 |
| 12.251% - 12.500% | 396 | 83,158,841.95 | 2.68 |
| 12.501% - 12.750% | 260 | 47,215,963.88 | 1.52 |
| 12.751% - 13.000% | 76 | 16,935,464.85 | 0.55 |
| 13.001% - 13.250% | 1 | 108,000.00 | 0.00 |
| 13.251% - 13.500% | 1 | 504,000.00 | 0.02 |
| 13.501% - 13.750% | 1 | 324,000.00 | 0.01 |
| 14.001% >= | 1 | 375,928.36 | 0.01 |
| Total | 11,528 | $ 3,105,235,026.49 | 100.00% |

Weighted Average Maximum Mortgage Rate: 10.929%

## Periodic Rate Cap of the Mortgage Loans
## in Groups I through IV

| Periodic Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap | 2,315 | $ 744,806,805.67 | 23.99% |
| 1.000% | 5,431 | 1,157,302,622.31 | 37.27 |
| 2.000% | 3,782 | 1,203,125,598.51 | 38.75 |
| Total | 11,528 | $ 3,105,235,026.49 | 100.00% |

Non Zero Weighted Average Periodic Rate Cap: 1.510%

**Cumulative Initial Rate Cap of the Mortgage Loans
in Groups I through IV**

| Initial Rate Cap | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Cap ........................................ | 2,315 | $    744,806,805.67 | 23.99% |
| 1.000% ........................................ | 7 | 2,329,530.00 | 0.08 |
| 2.000% ........................................ | 1,419 | 506,311,665.03 | 16.31 |
| 3.000% ........................................ | 963 | 235,220,426.40 | 7.57 |
| 5.000% ........................................ | 6,824 | 1,616,566,599.39 | 52.06 |
| Total ........................................ | 11,528 | $ 3,105,235,026.49 | 100.00% |

Non Zero Weighted Average Periodic Rate Cap: 4.153%

**Gross Margin of the Mortgage Loans
in Groups I through IV**

| Gross Margin | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1.501% - 1.750% ........................................ | 2 | $    1,141,600.00 | 0.04% |
| 1.751% - 2.000% ........................................ | 9 | 1,344,202.62 | 0.04 |
| 2.001% - 2.250% ........................................ | 6,160 | 1,732,468,065.25 | 55.79 |
| 2.251% - 2.500% ........................................ | 503 | 131,753,839.09 | 4.24 |
| 2.501% - 2.750% ........................................ | 316 | 128,380,214.25 | 4.13 |
| 2.751% - 3.000% ........................................ | 711 | 240,235,251.89 | 7.74 |
| 3.001% - 3.250% ........................................ | 306 | 100,770,568.67 | 3.25 |
| 3.251% - 3.500% ........................................ | 253 | 71,855,451.73 | 2.31 |
| 3.501% - 3.750% ........................................ | 362 | 97,584,225.26 | 3.14 |
| 3.751% - 4.000% ........................................ | 186 | 53,878,683.57 | 1.74 |
| 4.001% - 4.250% ........................................ | 61 | 10,824,748.61 | 0.35 |
| 4.251% - 4.500% ........................................ | 36 | 9,865,875.29 | 0.32 |
| 4.501% - 4.750% ........................................ | 20 | 4,175,348.65 | 0.13 |
| 4.751% - 5.000% ........................................ | 2,582 | 518,133,278.22 | 16.69 |
| 5.001% - 5.250% ........................................ | 3 | 594,500.00 | 0.02 |
| 5.251% - 5.500% ........................................ | 5 | 444,164.53 | 0.01 |
| 5.501% - 5.750% ........................................ | 8 | 1,091,010.47 | 0.04 |
| 5.751% - 6.000% ........................................ | 3 | 476,700.00 | 0.02 |
| 6.001% >= ........................................ | 2 | 217,298.39 | 0.01 |
| Total ........................................ | 11,528 | $ 3,105,235,026.49 | 100.00% |

Weighted Average Gross Margin: 2.929%

**Prepayment Penalty of the Mortgage Loans
in Groups I through IV**

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty ............................ | 9,474 | $ 2,544,776,669.96 | 81.95% |
| 0.5 Year .................................................... | 1 | 594,994.57 | 0.02 |
| 1 Year ....................................................... | 853 | 274,138,001.13 | 8.83 |
| 2 Years ..................................................... | 597 | 106,594,936.60 | 3.43 |
| 3 Years ..................................................... | 552 | 170,519,392.37 | 5.49 |
| 5 Years ..................................................... | 51 | 8,611,031.86 | 0.28 |
| Total ........................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

**Product Type
of the Mortgage Loans in Groups I through IV**

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 1 Month ARM............................................ | 10 | $ 4,220,869.73 | 0.14% |
| 1 Month ARM IO....................................... | 400 | 122,327,895.91 | 3.94 |
| 1 Year ARM............................................... | 95 | 30,876,815.10 | 0.99 |
| 1 Year ARM IO.......................................... | 883 | 350,608,393.42 | 11.29 |
| 2/6 ARM ................................................... | 86 | 13,949,104.82 | 0.45 |
| 2/6 ARM IO .............................................. | 453 | 127,223,458.58 | 4.10 |
| 3/1 ARM ................................................... | 32 | 7,633,184.38 | 0.25 |
| 3/1 ARM IO .............................................. | 408 | 116,773,342.13 | 3.76 |
| 3/6 ARM ................................................... | 58 | 10,618,374.88 | 0.34 |
| 3/6 ARM IO .............................................. | 353 | 80,324,567.26 | 2.59 |
| 5/1 ........................................................... | 214 | 64,513,477.90 | 2.08 |
| 5/1 IO ...................................................... | 2,149 | 632,300,455.58 | 20.36 |
| 5/6 ........................................................... | 598 | 104,187,725.30 | 3.36 |
| 5/6 IO ...................................................... | 3,877 | 819,089,791.47 | 26.38 |
| 6 Month ARM............................................ | 1 | 432,600.00 | 0.01 |
| 6 Month ARM IO....................................... | 13 | 3,596,602.00 | 0.12 |
| MTA.......................................................... | 1,898 | 616,558,368.03 | 19.86 |
| Total ........................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

**Interest Only Feature of the Mortgage Loans
in Groups I through IV**

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO ..................................................... | 2,992 | $ 852,990,520.14 | 27.47% |
| 36 ............................................................. | 408 | 116,773,342.13 | 3.76 |
| 60 ............................................................. | 7,454 | 1,875,838,704.88 | 60.41 |
| 120 ........................................................... | 674 | 259,632,459.34 | 8.36 |
| Total ........................................... | 11,528 | $ 3,105,235,026.49 | 100.00% |

**Principal Balances of the Mortgage Loans at Origination in Group V**

| Original Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $         0  –  $    100,000 ................... | 1,398 | $        99,657,928.17 | 9.63% |
| $   100,001  –  $    200,000 ................... | 2,346 | 340,473,828.99 | 32.90 |
| $   200,001  –  $    300,000 ................... | 997 | 243,347,115.13 | 23.52 |
| $   300,001  –  $    350,000 ................... | 264 | 86,056,722.73 | 8.32 |
| $   350,001  –  $    400,000 ................... | 175 | 64,607,909.84 | 6.24 |
| $   400,001  –  $    450,000 ................... | 73 | 30,975,932.79 | 2.99 |
| $   450,001  –  $    500,000 ................... | 64 | 30,360,253.63 | 2.93 |
| $   500,001  –  $    550,000 ................... | 46 | 24,127,112.51 | 2.33 |
| $   550,001  –  $    600,000 ................... | 41 | 23,775,236.91 | 2.30 |
| $   600,001  –  $    650,000 ................... | 26 | 16,438,560.33 | 1.59 |
| $   650,001  –  $    700,000 ................... | 7 | 4,765,682.92 | 0.46 |
| $   700,001  –  $    800,000 ................... | 22 | 16,895,247.57 | 1.63 |
| $   800,001  –  $    900,000 ................... | 16 | 13,744,114.95 | 1.33 |
| $   900,001  –  $ 1,000,000 ................... | 23 | 22,323,356.52 | 2.16 |
| $ 1,200,001  –  $ 1,300,000 ................... | 2 | 2,508,643.21 | 0.24 |
| $ 1,300,001  –  $ 1,400,000 ................... | 4 | 5,430,000.00 | 0.52 |
| $ 1,400,001  –  $ 1,500,000 ................... | 2 | 2,930,000.00 | 0.28 |
| $ 1,500,001 >= ......................................... | 3 | 6,378,804.61 | 0.62 |
| Total............................................... | 5,509 | $ 1,034,796,450.81 | 100.00% |

| | | |
|---|---|---|
| Minimum Original Principal Balance: | $ | 30,000 |
| Maximum Original Principal Balance: | $ | 2,500,000 |
| Average Original Principal Balance: | $ | 187,988 |

**Scheduled Principal Balances of the Mortgage Loans as of the Cut-Off Date in Group V**

| Scheduled Principal Balance | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| $        0 – $   100,000 ..................... | 1,400 | $    99,856,894.12 | 9.65% |
| $   100,001 – $   200,000 ..................... | 2,345 | 340,417,763.04 | 32.90 |
| $   200,001 – $   300,000 ..................... | 996 | 243,204,215.13 | 23.50 |
| $   300,001 – $   350,000 ..................... | 264 | 86,056,722.73 | 8.32 |
| $   350,001 – $   400,000 ..................... | 175 | 64,607,909.84 | 6.24 |
| $   400,001 – $   450,000 ..................... | 73 | 30,975,932.79 | 2.99 |
| $   450,001 – $   500,000 ..................... | 64 | 30,360,253.63 | 2.93 |
| $   500,001 – $   550,000 ..................... | 46 | 24,127,112.51 | 2.33 |
| $   550,001 – $   600,000 ..................... | 41 | 23,775,236.91 | 2.30 |
| $   600,001 – $   650,000 ..................... | 26 | 16,438,560.33 | 1.59 |
| $   650,001 – $   700,000 ..................... | 7 | 4,765,682.92 | 0.46 |
| $   700,001 – $   800,000 ..................... | 22 | 16,895,247.57 | 1.63 |
| $   800,001 – $   900,000 ..................... | 16 | 13,744,114.95 | 1.33 |
| $   900,001 – $ 1,000,000 ..................... | 23 | 22,323,356.52 | 2.16 |
| $ 1,200,001 – $ 1,300,000 ..................... | 2 | 2,508,643.21 | 0.24 |
| $ 1,300,001 – $ 1,400,000 ..................... | 4 | 5,430,000.00 | 0.52 |
| $ 1,400,001 – $ 1,500,000 ..................... | 2 | 2,930,000.00 | 0.28 |
| $ 1,500,001 >= ..................... | 3 | 6,378,804.61 | 0.62 |
| Total............................................ | 5,509 | $ 1,034,796,450.81 | 100.00% |

Minimum Scheduled Principal Balance:        $        30,000
Maximum Scheduled Principal Balance:        $   2,495,468
Average Scheduled Principal Balance:         $      187,837

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date in Group V**

| Mortgage Interest Rates | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 4.501% - 4.750%......................................... | 1 | $        98,239.04 | 0.01% |
| 4.751% - 5.000%......................................... | 1 | 127,516.10 | 0.01 |
| 5.001% - 5.250%......................................... | 7 | 626,826.80 | 0.06 |
| 5.251% - 5.500%......................................... | 55 | 11,178,176.93 | 1.08 |
| 5.501% - 5.750%......................................... | 223 | 45,867,508.89 | 4.43 |
| 5.751% - 6.000%......................................... | 767 | 148,637,263.49 | 14.36 |
| 6.001% - 6.250%......................................... | 954 | 191,908,844.96 | 18.55 |
| 6.251% - 6.500%......................................... | 1,279 | 255,201,483.18 | 24.66 |
| 6.501% - 6.750%......................................... | 756 | 144,655,404.66 | 13.98 |
| 6.751% - 7.000%......................................... | 502 | 84,830,066.74 | 8.20 |
| 7.001% - 7.250%......................................... | 261 | 41,269,095.69 | 3.99 |
| 7.251% - 7.500%......................................... | 341 | 60,750,315.91 | 5.87 |
| 7.501% - 7.750%......................................... | 191 | 26,908,278.28 | 2.60 |
| 7.751% - 8.000%......................................... | 88 | 10,091,052.82 | 0.98 |
| 8.001% - 8.250%......................................... | 33 | 4,318,509.17 | 0.42 |
| 8.251% - 8.500%......................................... | 17 | 2,092,510.69 | 0.20 |
| 8.501% - 8.750%......................................... | 12 | 1,829,047.52 | 0.18 |
| 8.751% - 9.000%......................................... | 21 | 4,406,309.94 | 0.43 |
| Total ......................................... | 5,509 | $ 1,034,796,450.81 | 100.00% |

Minimum Interest Rate:              4.750%
Maximum Interest Rate:             9.000%
Weighted Average Interest Rate:    6.515%

61

**Original Loan-to-Value Ratios\* of the Mortgage Loans in Group V**

| Original Loan-to-Value Ratios | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0.00% - 30.00% .......................................... | 54 | $ 6,582,344.41 | 0.64% |
| 30.01% - 40.00% ........................................ | 72 | 11,411,390.21 | 1.10 |
| 40.01% - 50.00% ........................................ | 174 | 29,396,242.53 | 2.84 |
| 50.01% - 55.00% ........................................ | 108 | 22,941,957.58 | 2.22 |
| 55.01% - 60.00% ........................................ | 137 | 29,481,260.64 | 2.85 |
| 60.01% - 65.00% ........................................ | 263 | 73,053,639.45 | 7.06 |
| 65.01% - 70.00% ........................................ | 1,572 | 308,198,718.71 | 29.78 |
| 70.01% - 75.00% ........................................ | 297 | 59,356,526.54 | 5.74 |
| 75.01% - 80.00% ........................................ | 2,503 | 445,147,876.34 | 43.02 |
| 80.01% - 85.00% ........................................ | 57 | 7,971,284.25 | 0.77 |
| 85.01% - 90.00% ........................................ | 166 | 25,109,622.14 | 2.43 |
| 90.01% - 95.00% ........................................ | 100 | 15,647,577.54 | 1.51 |
| 95.01% -100.00% ........................................ | 6 | 498,010.47 | 0.05 |
| Total............................................ | 5,509 | $ 1,034,796,450.81 | 100.00% |

Weighted Average Original Loan-to-Value: 72.72%

\*Original Loan-to-value ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

## Geographic Distribution* of the Mortgage Properties in Group V

| Geographic Distribution | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Alabama | 3 | $ 344,650.60 | 0.03% |
| Arizona | 313 | 56,364,666.91 | 5.45 |
| Arkansas | 2 | 171,489.42 | 0.02 |
| California | 495 | 152,846,093.93 | 14.77 |
| Colorado | 122 | 22,578,418.44 | 2.18 |
| Connecticut | 84 | 20,140,793.07 | 1.95 |
| Delaware | 27 | 6,038,824.68 | 0.58 |
| District of Columbia | 40 | 10,005,145.70 | 0.97 |
| Florida | 484 | 85,018,426.57 | 8.22 |
| Georgia | 105 | 17,346,666.38 | 1.68 |
| Hawaii | 4 | 1,246,498.41 | 0.12 |
| Idaho | 67 | 8,502,596.78 | 0.82 |
| Illinois | 438 | 93,511,888.48 | 9.04 |
| Indiana | 59 | 6,729,809.77 | 0.65 |
| Iowa | 21 | 2,171,717.84 | 0.21 |
| Kansas | 29 | 3,340,178.71 | 0.32 |
| Kentucky | 59 | 6,084,046.13 | 0.59 |
| Louisiana | 70 | 8,654,338.47 | 0.84 |
| Maine | 37 | 6,754,177.48 | 0.65 |
| Maryland | 239 | 56,290,101.92 | 5.44 |
| Massachusetts | 104 | 26,495,243.20 | 2.56 |
| Michigan | 151 | 16,909,397.59 | 1.63 |
| Minnesota | 16 | 2,356,207.86 | 0.23 |
| Mississippi | 7 | 1,320,854.21 | 0.13 |
| Missouri | 78 | 7,872,652.98 | 0.76 |
| Montana | 11 | 2,145,088.58 | 0.21 |
| Nebraska | 1 | 42,308.11 | 0.00 |
| Nevada | 110 | 26,854,724.91 | 2.60 |
| New Hampshire | 68 | 13,376,388.91 | 1.29 |
| New Jersey | 87 | 19,820,705.20 | 1.92 |
| New Mexico | 14 | 1,985,273.77 | 0.19 |
| New York | 211 | 69,768,281.91 | 6.74 |
| North Carolina | 305 | 43,057,827.06 | 4.16 |
| Ohio | 189 | 17,744,292.94 | 1.71 |
| Oklahoma | 23 | 2,139,549.98 | 0.21 |
| Oregon | 200 | 31,305,477.08 | 3.03 |
| Pennsylvania | 182 | 19,809,114.13 | 1.91 |
| Rhode Island | 61 | 12,915,833.15 | 1.25 |
| South Carolina | 185 | 24,822,618.60 | 2.40 |
| South Dakota | 10 | 745,194.46 | 0.07 |
| Tennessee | 88 | 11,091,056.67 | 1.07 |
| Texas | 284 | 39,219,844.32 | 3.79 |
| Utah | 92 | 13,747,598.71 | 1.33 |
| Vermont | 7 | 1,196,473.22 | 0.12 |
| Virginia | 195 | 41,654,621.43 | 4.03 |
| Washington | 101 | 17,028,511.05 | 1.65 |
| West Virginia | 4 | 580,951.52 | 0.06 |
| Wisconsin | 17 | 3,325,649.16 | 0.32 |
| Wyoming | 10 | 1,324,180.41 | 0.13 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

*No more than approximately 0.34% of Loan Group V by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the Mortgage Loans in Group V**

| Range of Credit Scores | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Not Available | 2 | $ 1,086,700.00 | 0.11% |
| 551 – 575 | 2 | 359,000.00 | 0.03 |
| 576 – 600 | 30 | 4,195,498.95 | 0.41 |
| 601 – 625 | 247 | 44,599,706.24 | 4.31 |
| 626 – 650 | 663 | 122,302,903.60 | 11.82 |
| 651 – 675 | 887 | 162,881,078.23 | 15.74 |
| 676 – 700 | 1,092 | 204,231,715.46 | 19.74 |
| 701 – 725 | 803 | 153,717,550.04 | 14.85 |
| 726 – 750 | 733 | 136,108,206.44 | 13.15 |
| 751 – 775 | 600 | 115,369,213.02 | 11.15 |
| 776 – 800 | 363 | 75,311,948.42 | 7.28 |
| 801 – 825 | 87 | 14,632,930.41 | 1.41 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

Weighted Average Credit Score: 702
(where credit scores were available)

**Property Types of the Mortgage Properties in Group V**

| Property Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Single Family | 3,414 | $ 604,290,012.06 | 58.40% |
| PUD | 957 | 200,321,681.77 | 19.36 |
| 2 – 4 Family | 768 | 168,042,071.30 | 16.24 |
| Condominium | 366 | 60,778,465.72 | 5.87 |
| CO-OP | 4 | 1,364,219.96 | 0.13 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Occupancy Status of Mortgage Properties in Group V**

| Occupancy Status | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Primary Home | 3,526 | $ 739,562,719.29 | 71.47% |
| Investment | 1,825 | 257,102,440.70 | 24.85 |
| Second Home | 158 | 38,131,290.82 | 3.68 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Loan Purpose of the Mortgage Loans in Group V**

| Loan Purpose | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Purchase .................................................. | 2,959 | $ 536,244,244.54 | 51.82% |
| Cash Out Refinance................................... | 1,927 | 391,414,562.41 | 37.83 |
| Rate/Term Refinance ................................ | 623 | 107,137,643.86 | 10.35 |
| Total .......................................... | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Documentation Type of the Mortgage Loans in Group V**

| Documentation Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Stated Income / Verified Asset................. | 1,717 | $ 345,802,090.98 | 33.42% |
| No Income / No Asset .............................. | 1,646 | 316,789,234.95 | 30.61 |
| Income / Verified Asset ........................... | 1,267 | 204,399,404.12 | 19.75 |
| No Income / Verified Asset...................... | 446 | 88,900,163.40 | 8.59 |
| Stated Income / No Asset ........................ | 390 | 72,177,216.43 | 6.98 |
| Verified Income / No Asset...................... | 43 | 6,728,340.93 | 0.65 |
| Total .......................................... | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Original Terms to Stated Maturity of the Mortgage Loans in Group V**

| Stated Original Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 180 Months ............................................. | 208 | $ 30,734,443.35 | 2.97% |
| 240 Months ............................................. | 1 | 54,540.98 | 0.01 |
| 360 Months ............................................. | 5,300 | 1,004,007,466.48 | 97.02 |
| Total............................................... | 5,509 | $ 1,034,796,450.81 | 100.00% |

Minimum Original Term to Stated Maturity (Months):     180
Maximum Original Term to Stated Maturity (Months):     360
Weighted Average Orig. Term to Stated Mat. (Months):     355

**Remaining Terms to Stated Maturity of the Mortgage Loans as of the Cut Off Date in Group V**

| Stated Remaining Term | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 120 – 179 months | 136 | $ 20,063,471.35 | 1.94% |
| 180 – 239 months | 73 | 10,725,512.98 | 1.04 |
| 300 – 359 months | 3,050 | 572,659,035.67 | 55.34 |
| 360 months | 2,250 | 431,348,430.81 | 41.68 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

Minimum Remaining Term to Stated Maturity (Months): 174
Maximum Remaining Term to Stated Maturity (Months): 360
Weighted Average Remaining Term to Stated Mat. (Months): 354

**Prepayment Penalty of the Mortgage Loans in Group V**

| Prepayment Penalty | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| No Prepayment Penalty | 5,023 | $ 959,386,221.99 | 92.71% |
| 1 Year | 27 | 3,522,034.70 | 0.34 |
| 2 Years | 3 | 784,600.00 | 0.08 |
| 3 Years | 336 | 53,035,358.36 | 5.13 |
| 5 Years | 120 | 18,068,235.76 | 1.75 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Product Type of the Mortgage Loans in Group V**

| Product Type | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Fixed | 3,404 | $ 583,598,854.08 | 56.40% |
| Fixed IO | 2,105 | 451,197,596.73 | 43.60 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Interest Only Feature of the Mortgage Loans in Group V**

| Interest Only Feature (Months) | Number of Mortgage Loans | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| Non-IO | 3,404 | $ 583,598,854.08 | 56.40% |
| 60 | 2,105 | 451,197,596.73 | 43.60 |
| Total | 5,509 | $ 1,034,796,450.81 | 100.00% |

**Credit Limit of the HELOCs as of the Cut-Off Date in Group VI**

| Credit Limit | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| $5,000.01 - $7,500.00 ................................. | 1 | $ 5,970.00 | 0.00% |
| $7,500.01 - $10,000.00 .............................. | 17 | 169,935.64 | 0.09 |
| $10,000.01 - $20,000.00 ............................ | 130 | 2,054,856.16 | 1.14 |
| $20,000.01 - $30,000.00 ............................ | 382 | 9,640,687.23 | 5.35 |
| $30,000.01 - $40,000.00 ............................ | 396 | 13,927,955.74 | 7.73 |
| $40,000.01 - $50,000.00 ............................ | 376 | 16,851,672.26 | 9.35 |
| $50,000.01 - $60,000.00 ............................ | 356 | 19,067,658.32 | 10.58 |
| $60,000.01 - $70,000.00 ............................ | 258 | 16,376,110.53 | 9.09 |
| $70,000.01 - $80,000.00 ............................ | 196 | 14,139,586.85 | 7.85 |
| $80,000.01 - $90,000.00 ............................ | 160 | 13,000,795.04 | 7.22 |
| $90,000.01 - $100,000.00............................ | 157 | 13,622,469.64 | 7.56 |
| $100,000.01 - $150,000.00.......................... | 361 | 43,033,777.32 | 23.88 |
| $150,000.01 - $200,000.00.......................... | 53 | 8,361,930.80 | 4.64 |
| $200,000.01 - $250,000.00.......................... | 19 | 3,773,934.61 | 2.09 |
| $250,000.01 - $300,000.00.......................... | 10 | 2,130,023.20 | 1.18 |
| $300,000.01 - $350,000.00.......................... | 5 | 1,649,710.54 | 0.92 |
| $350,000.01 - $400,000.00.......................... | 2 | 796,000.00 | 0.44 |
| $400,000.01 - $500,000.00.......................... | 3 | 947,999.60 | 0.53 |
| $500,000.01 - $600,000.00.......................... | 2 | 630,400.00 | 0.35 |
| Total................................................ | 2,884 | $ 180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Credit Limit: | $ 5,970 |
| Maximum Credit Limit: | $ 600,000 |
| Average Credit Limit: | $ 66,350 |

**Principal Balances of the HELOCs as of the Cut Off Date in Group VI**

| Current Principal Balance | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| $0.01 - $2,500.00 ........................................ | 8 | $ 3,815.91 | 0.00% |
| $2,500.01 - $5,000.00 ............................... | 3 | 11,777.64 | 0.01 |
| $5,000.01 - $7,500.00 ............................... | 3 | 17,184.65 | 0.01 |
| $7,500.01 - $10,000.00 ............................. | 64 | 636,726.95 | 0.35 |
| $10,000.01 - $20,000.00 ........................... | 143 | 2,323,090.72 | 1.29 |
| $20,000.01 - $30,000.00 ........................... | 393 | 10,161,024.78 | 5.64 |
| $30,000.01 - $40,000.00 ........................... | 408 | 14,433,252.72 | 8.01 |
| $40,000.01 - $50,000.00 ........................... | 370 | 17,058,907.85 | 9.47 |
| $50,000.01 - $60,000.00 ........................... | 350 | 19,243,152.87 | 10.68 |
| $60,000.01 - $70,000.00 ........................... | 253 | 16,459,664.80 | 9.14 |
| $70,000.01 - $80,000.00 ........................... | 190 | 14,325,524.00 | 7.95 |
| $80,000.01 - $90,000.00 ........................... | 153 | 13,003,109.66 | 7.22 |
| $90,000.01 - $100,000.00........................... | 136 | 13,125,266.78 | 7.28 |
| $100,000.01 - $150,000.00......................... | 334 | 42,155,738.16 | 23.40 |
| $150,000.01 - $200,000.00......................... | 43 | 7,675,106.32 | 4.26 |
| $200,000.01 - $250,000.00......................... | 16 | 3,640,362.00 | 2.02 |
| $250,000.01 - $300,000.00......................... | 7 | 2,019,157.53 | 1.12 |
| $300,000.01 - $350,000.00......................... | 5 | 1,649,710.54 | 0.92 |
| $350,000.01 - $400,000.00......................... | 2 | 796,000.00 | 0.44 |
| $400,000.01 - $450,000.00......................... | 1 | 412,499.60 | 0.23 |
| $450,000.01 - $500,000.00......................... | 1 | 500,000.00 | 0.28 |
| $500,000.01 - $550,000.00......................... | 1 | 530,400.00 | 0.29 |
| Total............................................... | 2,884 | $ 180,181,473.48 | 100.00% |

| | | |
|---|---|---|
| Minimum Current Principal Balance: | $ | 2 |
| Maximum Current Principal Balance: | $ | 530,400 |
| Average Current Principal Balance: | $ | 62,476 |

**Occupancy Status of Mortgage Properties in Group VI**

| Occupancy Status | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| Owner Occupied ...................................... | 2,821 | $ 177,470,044.09 | 98.50% |
| Second Home ........................................... | 47 | 2,089,145.39 | 1.16 |
| Investor ................................................... | 16 | 622,284.00 | 0.35 |
| Total............................................... | 2,884 | $ 180,181,473.48 | 100.00% |

**Combined Loan-to-Value Ratios\* of the HELOCs in Group VI**

| Combined Loan-to-Value Ratios (%) | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 15.01 - 20.00 | 3 | $ 182,500.00 | 0.10% |
| 20.01 - 25.00 | 6 | 536,726.00 | 0.30 |
| 25.01 - 30.00 | 3 | 242,928.06 | 0.13 |
| 30.01 - 35.00 | 2 | 110,000.00 | 0.06 |
| 35.01 - 40.00 | 2 | 200,000.00 | 0.11 |
| 40.01 - 45.00 | 4 | 255,419.45 | 0.14 |
| 45.01 - 50.00 | 8 | 349,198.40 | 0.19 |
| 50.01 - 55.00 | 5 | 334,823.56 | 0.19 |
| 55.01 - 60.00 | 12 | 1,119,993.84 | 0.62 |
| 60.01 - 65.00 | 10 | 878,700.00 | 0.49 |
| 65.01 - 70.00 | 23 | 1,776,891.94 | 0.99 |
| 70.01 - 75.00 | 45 | 4,434,887.28 | 2.46 |
| 75.01 - 80.00 | 94 | 7,716,442.09 | 4.28 |
| 80.01 - 85.00 | 86 | 4,211,833.30 | 2.34 |
| 85.01 - 90.00 | 790 | 42,606,348.75 | 23.65 |
| 90.01 - 95.00 | 454 | 26,499,995.58 | 14.71 |
| 95.01 - 100.00 | 1,337 | 88,724,785.23 | 49.24 |
| Total | 2,884 | $ 180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Combined Loan-to-Value Ratio: | 19.72% |
| Maximum Combined Loan-to-Value Ratio: | 100.00% |
| Weighted Average Combined Loan-to-Value Ratio: | 93.21% |

\*Combined Loan-to-value ratios are calculated by taking the Original Principal Balance plus any senior Lien Balance and dividing by the lesser of the original appraised value and sell price of the property.

**Loan Purpose of the HELOCs in Group VI**

| Loan Purpose | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| Purchase | 2,126 | $ 134,857,272.29 | 74.85% |
| Cash-Out Refinance | 681 | 41,668,042.87 | 23.13 |
| Rate/Term Refinance | 77 | 3,656,158.32 | 2.03 |
| Total | 2,884 | $ 180,181,473.48 | 100.00% |

**Property Types of the Mortgage Properties in Group VI**

| Property Type | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| Single Family | 1,704 | $ 106,889,830.57 | 59.32% |
| PUD | 724 | 48,194,244.23 | 26.75 |
| Condominium | 432 | 23,380,281.46 | 12.98 |
| 2-4 Family | 24 | 1,717,117.22 | 0.95 |
| Total | 2,884 | $ 180,181,473.48 | 100.00% |

## Geographic Distribution* of the Mortgage Properties in Group VI

| Geographic Distribution | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| California | 658 | $ 55,584,999.71 | 30.85% |
| Illinois | 232 | 13,561,965.50 | 7.53 |
| Arizona | 195 | 12,314,342.55 | 6.83 |
| Virginia | 149 | 10,496,356.22 | 5.83 |
| Maryland | 178 | 9,989,487.03 | 5.54 |
| New York | 102 | 7,479,735.77 | 4.15 |
| Florida | 127 | 6,820,059.73 | 3.79 |
| Nevada | 96 | 6,149,456.84 | 3.41 |
| Colorado | 113 | 6,140,946.33 | 3.41 |
| New Jersey | 71 | 5,613,617.72 | 3.12 |
| Massachusetts | 71 | 4,338,354.56 | 2.41 |
| North Caroline | 98 | 4,168,109.35 | 2.31 |
| Washington | 71 | 4,158,323.65 | 2.31 |
| Michigan | 81 | 3,072,680.78 | 1.71 |
| Oregon | 58 | 3,025,188.47 | 1.68 |
| Ohio | 74 | 2,887,578.25 | 1.60 |
| Georgia | 56 | 2,853,218.57 | 1.58 |
| Pennsylvania | 49 | 2,668,086.92 | 1.48 |
| South Caroline | 53 | 2,604,463.62 | 1.45 |
| Utah | 40 | 1,730,578.67 | 0.96 |
| District of Columbia | 21 | 1,553,936.11 | 0.86 |
| Missouri | 37 | 1,380,326.38 | 0.77 |
| Connecticut | 18 | 1,178,855.00 | 0.65 |
| New Hampshire | 23 | 1,093,742.05 | 0.61 |
| Kentucky | 27 | 1,082,386.00 | 0.60 |
| Kansas | 21 | 906,558.16 | 0.50 |
| Oklahoma | 14 | 756,895.27 | 0.42 |
| Idaho | 19 | 683,865.78 | 0.38 |
| Iowa | 22 | 648,448.88 | 0.36 |
| Montana | 8 | 588,250.00 | 0.33 |
| Minnesota | 14 | 570,178.63 | 0.32 |
| Maine | 12 | 551,550.39 | 0.31 |
| Rhode Island | 10 | 544,300.00 | 0.30 |
| Indiana | 13 | 532,420.00 | 0.30 |
| Delaware | 11 | 490,193.67 | 0.27 |
| Tennessee | 14 | 452,588.33 | 0.25 |
| Louisiana | 2 | 296,000.00 | 0.16 |
| Wisconsin | 7 | 290,140.30 | 0.16 |
| South Dakota | 6 | 264,498.29 | 0.15 |
| New Mexico | 3 | 216,500.00 | 0.12 |
| Alabama | 2 | 179,000.00 | 0.10 |
| Wyoming | 4 | 166,390.00 | 0.09 |
| West Virginia | 2 | 47,400.00 | 0.03 |
| Hawaii | 1 | 39,300.00 | 0.02 |
| Nebraska | 1 | 10,200.00 | 0.01 |
| Total | 2,884 | $ 180,181,473.48 | 100.00% |

*No more than approximately 0.75% of Loan Group VI by cut-off date principal balance will be secured by properties located in any one zip code area.

**Credit Scores as of the Date of Origination of the HELOCs in Group VI**

| Range of Credit Scores | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 561 - 580 ............................................ | 1 | $ 65,000.00 | 0.04% |
| 581 - 600 ............................................ | 1 | 15,990.00 | 0.01 |
| 601 - 620 ............................................ | 2 | 114,251.54 | 0.06 |
| 621 - 640 ............................................ | 44 | 2,513,009.96 | 1.39 |
| 641 - 660 ............................................ | 134 | 7,053,043.36 | 3.91 |
| 661 - 680 ............................................ | 252 | 14,670,695.50 | 8.14 |
| 681 - 700 ............................................ | 402 | 23,737,388.30 | 13.17 |
| 701 - 720 ............................................ | 489 | 31,049,906.96 | 17.23 |
| 721 - 740 ............................................ | 455 | 30,211,830.99 | 16.77 |
| 741 - 760 ............................................ | 416 | 25,682,073.17 | 14.25 |
| 761 - 780 ............................................ | 372 | 24,050,339.75 | 13.35 |
| 781 - 800 ............................................ | 233 | 15,016,338.04 | 8.33 |
| 801 - 820 ............................................ | 83 | 6,001,605.91 | 3.33 |
| Total............................................ | 2,884 | $ 180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Credit Score: | 577 |
| Maximum Credit Score: | 817 |
| Weighted Average Credit Score: | 728 |

**Utilization Rates of the HELOCs in Group VI**

| Utilization Rate | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 0.000% - 0.000% ...................................... | 2 | $ 96,002.20 | 0.05% |
| 0.001% - 10.000% ...................................... | 27 | 232,637.63 | 0.13 |
| 10.001% - 20.000% ...................................... | 24 | 390,945.15 | 0.22 |
| 20.001% - 30.000% ...................................... | 14 | 384,655.79 | 0.21 |
| 30.001% - 40.000% ...................................... | 21 | 555,752.43 | 0.31 |
| 40.001% - 50.000% ...................................... | 23 | 896,161.96 | 0.50 |
| 50.001% - 60.000% ...................................... | 16 | 716,032.75 | 0.40 |
| 60.001% - 70.000% ...................................... | 16 | 890,099.99 | 0.49 |
| 70.001% - 80.000% ...................................... | 18 | 859,005.63 | 0.48 |
| 80.001% - 90.000% ...................................... | 19 | 1,169,777.82 | 0.65 |
| 90.001% - 100.000% ...................................... | 2,704 | 173,990,402.13 | 96.56 |
| Total............................................ | 2,884 | $ 180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Utilization Rate: | 0.00% |
| Maximum Utilization Rate: | 100.00% |
| Weighted Average Utilization Rate: | 94.16% |

### Original Terms to Stated Maturity of the HELOCs in Group VI

| Stated Original Term | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 240 Months ................................................. | 15 | $          480,331.49 | 0.27% |
| 300 Months ................................................. | 2,866 | 179,095,141.99 | 99.40 |
| 360 Months ................................................. | 3 | 606,000.00 | 0.34 |
| Total.............................................. | 2,884 | $     180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Original Term to Stated Maturity (Months): | 240 |
| Maximum Original Term to Stated Maturity (Months): | 360 |
| Weighted Average Orig. Term to Stated Mat. (Months): | 300 |

### Stated Remaining Term of the HELOCs in Group VI

| Stated Remaining Term | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 236 - 240 ................................................. | 15 | $          480,331.49 | 0.27% |
| 251 - 255 ................................................. | 1 | 60,250.00 | 0.03 |
| 281 - 285 ................................................. | 1 | 53,460.00 | 0.03 |
| 286 - 290 ................................................. | 6 | 399,049.08 | 0.22 |
| 291 - 295 ................................................. | 10 | 688,095.34 | 0.38 |
| 296 - 300 ................................................. | 2,848 | 177,894,287.57 | 98.73 |
| 356 - 360 ................................................. | 3 | 606,000.00 | 0.34 |
| Total.............................................. | 2,884 | $     180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Remaining Term to Stated Maturity (Months): | 237 |
| Maximum Remaining Term to Stated Maturity (Months): | 360 |
| Weighted Average Remaining Term to Stated Maturity (Months): | 299 |

### Draw Period of the HELOCs in Group VI

| Draw Period | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 0-120 Months ........................................... | 2,884 | $     180,181,473.48 | 100.00% |
| Total.............................................. | 2,884 | $     180,181,473.48 | 100.00% |

| | |
|---|---|
| Minimum Draw Period (Months): | 120 |
| Maximum Draw Period (Months): | 120 |
| Weighted Average Draw Period (Months): | 120 |

## Remaining Draw Period of the HELOCs in Group VI

| Remaining Draw Period | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 71 - 75 ...................................... | 1 | $        60,250.00 | 0.03 |
| 101 - 105 .................................... | 1 | 53,460.00 | 0.03 |
| 106 - 110 .................................... | 6 | 399,049.08 | 0.22 |
| 111 - 115 .................................... | 12 | 848,462.30 | 0.47 |
| 116 - 120 .................................... | 2,864 | 178,820,252.10 | 99.24 |
| Total.......................... | 2,884 | $   180,181,473.48 | 100.00% |

Minimum Remaining Draw Period (Months):          71
Maximum Remaining Draw Period (Months):          120
Weighted Average Remaining Draw Period (Months):          118

## Gross Margin of the HELOCs in Group VI

| Gross Margin (%) | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| <= ⁻0.251 ...................................... | 4 | $        374,776.54 | 0.21% |
| ⁻0.250 - ⁻0.001 ........................... | 15 | 1,041,175.01 | 0.58 |
| 0.000 - 0.249 ................................ | 70 | 5,711,941.08 | 3.17 |
| 0.250 - 0.499 ................................ | 109 | 9,211,555.42 | 5.11 |
| 0.500 - 0.749 ................................ | 233 | 17,104,595.70 | 9.49 |
| 0.750 - 0.999 ................................ | 246 | 18,348,275.23 | 10.18 |
| 1.000 - 1.249 ................................ | 327 | 21,870,186.38 | 12.14 |
| 1.250 - 1.499 ................................ | 335 | 18,883,207.65 | 10.48 |
| 1.500 - 1.749 ................................ | 365 | 23,607,990.52 | 13.10 |
| 1.750 - 1.999 ................................ | 235 | 13,202,794.37 | 7.33 |
| 2.000 - 2.249 ................................ | 242 | 13,596,965.90 | 7.55 |
| 2.250 - 2.499 ................................ | 243 | 12,691,923.76 | 7.04 |
| 2.500 - 2.749 ................................ | 184 | 11,580,109.07 | 6.43 |
| 2.750 - 2.999 ................................ | 94 | 4,847,646.15 | 2.69 |
| 3.000 - 3.249 ................................ | 49 | 2,261,034.85 | 1.25 |
| 3.250 - 3.499 ................................ | 48 | 2,130,866.83 | 1.18 |
| 3.500 - 3.999 ................................ | 63 | 2,973,928.02 | 1.65 |
| 4.000 - 4.499 ................................ | 18 | 663,051.00 | 0.37 |
| 4.500 - 4.999 ................................ | 2 | 54,850.00 | 0.03 |
| 5.000 - 5.499 ................................ | 1 | 12,000.00 | 0.01 |
| 5.500 - 5.999 ................................ | 1 | 12,600.00 | 0.01 |
| Total.......................... | 2,884 | $   180,181,473.48 | 100.00% |

Minimum Gross Margin:          0.50%
Maximum Gross Margin:          5.50%
Weighted Average Gross Margin:          1.470%

## Mortgage Rates of HELOCs as of the Cutoff Date in Group VI

| Mortgage Interest Rates (%) | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 4.001 - 4.500 ............................................. | 609 | $ 32,957,278.75 | 18.29% |
| 4.501 - 5.000 ............................................. | 1,383 | 82,258,072.66 | 45.65 |
| 5.001 - 5.500 ............................................. | 3 | 535,499.60 | 0.30 |
| 5.501 - 6.000 ............................................. | 17 | 1,584,178.74 | 0.88 |
| 6.001 - 6.500 ............................................. | 73 | 5,218,485.23 | 2.90 |
| 6.501 - 7.000 ............................................. | 157 | 11,307,917.82 | 6.28 |
| 7.001 - 7.500 ............................................. | 192 | 13,201,339.37 | 7.33 |
| 7.501 - 8.000 ............................................. | 196 | 15,597,581.41 | 8.66 |
| 8.001 - 8.500 ............................................. | 156 | 11,174,597.23 | 6.20 |
| 8.501 - 9.000 ............................................. | 71 | 4,846,402.54 | 2.69 |
| 9.001 - 9.500 ............................................. | 17 | 1,091,005.13 | 0.61 |
| 9.501 - 10.000 ............................................. | 7 | 279,065.00 | 0.15 |
| 10.001 - 10.500 ............................................. | 2 | 47,050.00 | 0.03 |
| 11.001 - 11.500 ............................................. | 1 | 83,000.00 | 0.05 |
| Total ......................................... | 2,884 | $ 180,181,473.48 | 100.00% |

Minimum Mortgage Interest Rate:    4.250%
Maximum Mortgage Interest Rate:    11.500%
Weighted Average Mortgage Interest Rate:    5.749%

## Maximum Lifetime Mortgage Rate of the HELOCs in Group VI

| Maximum Mortgage Rate (%) | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 18.000 ..................................................... | 2,884 | $ 180,181,473.48 | 100.00% |
| Total................................................ | 2,884 | $ 180,181,473.48 | 100.00% |

Weighted Average Maximum Mortgage Rate:    18.000%
Minimum Maximum Mortgage Rate:    18.000%
Maximum Maximum Mortgage Rate:    18.000%

## Origination Year of the HELOCs in Group VI

| Origination Year | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 2001 ..................................................... | 1 | $ 60,250.00 | 0.03% |
| 2004 ..................................................... | 14 | 868,939.88 | 0.48 |
| 2005 ..................................................... | 2,869 | 179,252,283.60 | 99.48 |
| Total................................................ | 2,884 | $ 180,181,473.48 | 100.00% |

### Lien Position of the HELOCs in Group VI

| Lien Position | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| 1st Lien ...................................................... | 12 | $ 779,276.00 | 0.43% |
| 2nd Lien ..................................................... | 2,872 | 179,402,197.48 | 99.57 |
| Total................................................. | 2,884 | $ 180,181,473.48 | 100.00% |

### HELOCs In Teaser Period in Group VI

| In Teaser Period | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| Not In Teaser Period ................................. | 882 | $ 63,469,418.87 | 35.23% |
| In Teaser Period ...................................... | 2,002 | 116,712,054.61 | 64.77 |
| Total................................................. | 2,884 | $ 180,181,473.48 | 100.00% |

### Documentation Type of the HELOCs in Group VI

| Documentation Type | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding As of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| Full.......................................................... | 2,114 | $ 122,422,313.73 | 67.94% |
| Stated ..................................................... | 768 | 57,667,559.75 | 32.01 |
| No Documentation .................................... | 2 | 91,600.00 | 0.05 |
| Total .......................................... | 2,884 | $ 180,181,473.48 | 100.00% |

### Teaser Expiration Months of the HELOCs in Group VI

| Teaser Expiration Date | Number of HELOCs | Aggregate Scheduled Principal Balance Outstanding as of Cut-Off Date | % of HELOCs |
|---|---|---|---|
| No Teaser................................................. | 1,331 | $ 87,637,051.61 | 48.64% |
| July 2005 ................................................. | 759 | 45,044,615.01 | 25.00 |
| August 2005.............................................. | 703 | 42,351,950.86 | 23.51 |
| September 2005 ......................................... | 85 | 4,856,906.00 | 2.70 |
| October 2005 ............................................ | 6 | 290,950.00 | 0.16 |
| Total............................................. | 2,884 | $ 180,181,473.48 | 100.00% |

exemption from the withholding tax by filing Form W-8ECI, or Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States.

(h)      Exemption for U.S. Persons—Form W-9. U.S. persons can obtain a complete exemption from the withholding tax by filing Form W-9, or Payer's Request for Taxpayer Identification Number and Certification.

*U.S. Federal Income Tax Reporting Procedure.* The holder of a global security or, in the case of a Form W-8BEN or Form W-8ECI filer, his agent, files by submitting the appropriate form to the person through whom it holds the security—the clearing agency, in the case of persons holding directly on the books of the clearing agency. Form W-8BEN and Form W-8ECI generally are effective until the third succeeding calendar year from the date the form is signed. However, the W-8BEN and W-8ECI with a taxpayer identification number will remain effective until a change in circumstances makes any information on the form incorrect, provided that the withholding agent reports at least annually to the beneficial owner on Form 1042-S.  The term "U.S. person" means:

(i)      a citizen or resident of the United States;

(j)      a corporation, partnership or other entity treated as a corporation or a partnership for United States federal income tax purposes, organized in or under the laws of the United States or any state thereof, including for this purpose the District of Columbia, unless, in the case of a partnership, future Treasury regulations provide otherwise;

(k)      an estate that is subject to U.S. federal income tax regardless of the source of its income; or

(l)      a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.

If the information shown on Form W-8BEN or Form W-8ECI changes, a new Form W-8BEN or Form W-8ECI, as applicable, must be filed within 30 days of the change. Certain trusts not described in the final bullet of the preceding sentence in existence on August 20, 1996 that elect to be treated as a United States Person will also be a U.S. person. The term "Non-U.S. person" means any person who is not a U.S. person. This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the global securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the global securities.

**AMERICAN HOME MORTGAGE SECURITIES LLC**
Company

*MORTGAGE PASS-THROUGH CERTIFICATES*
*MORTGAGE-BACKED NOTES*

| **You should consider carefully the risk factors in the prospectus supplement.** |
| --- |

**The Offered Securities**

The company proposes to establish one or more trusts to issue and sell from time to time one or more classes of offered securities, which will be mortgage pass-through certificates or mortgage-backed notes.

**The Trust Fund**

Each series of securities will be secured by a trust fund consisting primarily of a segregated pool of mortgage loans, including:

- mortgage loans secured by first and junior liens on the related mortgage property;

- home equity revolving lines of credit;

- mortgage loans where the borrower has little or no equity in the related mortgaged property;

- mortgage loans secured by one-to-four-family residential properties;

- mortgage loans secured by multifamily properties, commercial properties and mixed residential and commercial properties, provided that the concentration of these properties is less than 10% of the pool; and

- manufactured housing conditional sales contracts and installment loan agreements or interests therein.

in each case acquired by the company from one or more affiliated or unaffiliated institutions.

**Credit Enhancement**

If so specified in the related prospectus supplement, the trust for a series of securities may include any one or any combination of a financial guaranty insurance policy, mortgage pool insurance policy, letter of credit, special hazard insurance policy or reserve fund, currency or interest rate exchange agreements or other type of credit enhancement described in this prospectus. In addition to or in lieu of the foregoing, credit enhancement may be provided by means of subordination of one or more classes of securities, by cross-collateralization or by overcollateralization.

The offered securities may be offered to the public through different methods as described in "Methods of Distribution" in this prospectus.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities offered hereby or determined that this prospectus or the prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is March 22, 2005.

# TABLE OF CONTENTS

| Caption | Page |
|---|---|
| INTRODUCTION | 4 |
| General | 4 |
| THE MORTGAGE POOLS | 5 |
| General | 5 |
| The Mortgage Loans | 7 |
| Underwriting Standards | 12 |
| Qualifications of Originators and Sellers | 14 |
| Representations by Sellers | 15 |
| Optional Purchase of Defaulted Mortgage Loans | 18 |
| SERVICING OF MORTGAGE LOANS | 18 |
| General | 18 |
| The Master Servicer | 19 |
| The Servicers | 19 |
| Collection and Other Servicing Procedures; Mortgage Loan Modifications | 19 |
| Special Servicers | 22 |
| Realization Upon or Sale of Defaulted Mortgage Loans | 22 |
| Servicing and Other Compensation and Payment of Expenses; Retained Interest | 25 |
| Evidence as to Compliance | 27 |
| DESCRIPTION OF THE SECURITIES | 27 |
| General | 27 |
| Form of Securities | 29 |
| Global Securities | 30 |
| Assignment of Trust Fund Assets | 34 |
| Distribution Account | 37 |
| Distributions | 41 |
| Distributions of Interest and Principal on the Securities | 42 |
| Pre-Funding Account | 43 |
| Distributions on the Securities in Respect of Prepayment Premiums | 44 |
| Allocation of Losses and Shortfalls | 44 |
| Advances | 44 |
| Reports to Securityholders | 45 |
| DESCRIPTION OF CREDIT ENHANCEMENT | 46 |
| General | 46 |
| Subordinate Securities | 47 |
| Cross-Collateralization | 47 |
| Overcollateralization | 47 |
| Financial Guaranty Insurance Policy | 48 |
| Mortgage Pool Insurance Policies | 48 |
| Letter of Credit | 48 |
| Special Hazard Insurance Policies | 49 |
| Reserve Funds | 50 |
| Cash Flow Agreements | 50 |

| Caption | Page |
|---|---|
| Maintenance of Credit Enhancement | 50 |
| Reduction or Substitution of Credit Enhancement | 52 |
| OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES | 53 |
| Swaps and Yield Supplement Agreements | 53 |
| Purchase Obligations | 54 |
| DESCRIPTION OF PRIMARY MORTGAGE INSURANCE, HAZARD INSURANCE; CLAIMS THEREUNDER | 54 |
| General | 54 |
| Primary Mortgage Insurance Policies | 54 |
| Hazard Insurance Policies | 56 |
| FHA Mortgage Insurance | 57 |
| VA Mortgage Guaranty | 58 |
| THE COMPANY | 58 |
| THE AGREEMENTS | 59 |
| General | 59 |
| Certain Matters Regarding the Master Servicer and the Company | 59 |
| Events of Default and Rights Upon Event of Default | 60 |
| Amendment | 64 |
| Termination; Retirement of Securities | 65 |
| The Trustee | 67 |
| Duties of the Trustee | 67 |
| Some Matters Regarding the Trustee | 67 |
| Resignation and Removal of the Trustee | 67 |
| YIELD CONSIDERATIONS | 68 |
| MATURITY AND PREPAYMENT CONSIDERATIONS | 71 |
| LEGAL ASPECTS OF MORTGAGE LOANS | 72 |
| Mortgages | 72 |
| Cooperative Mortgage Loans | 73 |
| Tax Aspects of Cooperative Ownership | 74 |
| Leases and Rents | 75 |
| Contracts | 75 |
| Foreclosure on Mortgages and Some Contracts | 77 |
| Foreclosure on Shares of Cooperatives | 78 |
| Repossession with respect to Contracts | 80 |
| Rights of Redemption | 81 |
| Anti-Deficiency Legislation and Other Limitations on Lenders | 82 |
| Environmental Legislation | 84 |
| Consumer Protection Laws | 85 |
| Homeownership Act and Similar State Laws | 85 |
| Additional Consumer Protections Laws with Respect to Contracts | 86 |

Enforceability of Certain Provisions .................. 87
Subordinate Financing ............................... 88
Installment Contracts ................................ 88
Applicability of Usury Laws .......................... 89
Alternative Mortgage Instruments .................... 89
Formaldehyde Litigation with Respect to
    Contracts ....................................... 90
Servicemembers Relief Act ........................... 90
Forfeitures in Drug and RICO Proceedings ........ 91
Junior Mortgages .................................... 91
Negative Amortization Loans ......................... 92
FEDERAL INCOME TAX CONSEQUENCES .. 92
General ............................................. 92
REMICS ............................................. 93
Notes .............................................. 111
Grantor Trust Funds ................................ 112
STATE AND OTHER TAX CONSEQUENCES 122

ERISA CONSIDERATIONS ....................... 122
Underwriter Exemption .............................. 123
Other Exemptions ................................... 127
ERISA Considerations Relating to Notes ............. 128
Tax Exempt Investors ............................... 130
Consultation with Counsel .......................... 130
LEGAL INVESTMENT MATTERS ......... 131
USE OF PROCEEDS ................................ 132
METHODS OF DISTRIBUTION .............. 132
LEGAL MATTERS ................................. 133
FINANCIAL INFORMATION ................... 133
RATING ........................................... 134
AVAILABLE INFORMATION ................... 134
REPORTS TO SECURITYHOLDERS ........ 134
INCORPORATION OF INFORMATION BY
REFERENCE ...................................... 134
GLOSSARY ....................................... 136

# INTRODUCTION

**All capitalized terms in this prospectus are defined in the glossary at the end.**

**General**

The mortgage pass-through certificates or mortgage-backed notes offered by this prospectus and the related prospectus supplement will be offered from time to time in series. The securities of each series will consist of the offered securities of the series, together with any other mortgage pass-through certificates or mortgage-backed notes of the series.

Each series of certificates will represent in the aggregate the entire beneficial ownership interest in, and each series of notes will represent indebtedness of, a trust fund to be established by the company. Each trust fund will consist primarily of a pool of mortgage loans or interests therein, which may include mortgage securities, acquired or purchased by the company from one or more affiliated or unaffiliated sellers. See "The Company" and "The Mortgage Pools." The trust fund assets, may also include, if applicable, reinvestment income, reserve funds, cash accounts, swaps and other derivatives and various forms of credit enhancement as described in this prospectus and will be held in trust for the benefit of the related securityholders pursuant to: (1) with respect to each series of certificates, a pooling and servicing agreement or other agreement, or (2) with respect to each series of notes, an indenture, in each case as more fully described in this prospectus and in the related prospectus supplement.  Information regarding the offered securities of a series, and the general characteristics of the mortgage loans and other trust fund assets in the related trust fund, will be set forth in the related prospectus supplement.

Each series of securities will include one or more classes. Each class of securities of any series will represent the right, which right may be senior or subordinate to the rights of one or more of the other classes of the securities, to receive a specified portion of payments of principal or interest or both on the mortgage loans and the other trust fund assets in the related trust fund in the manner described in this prospectus under "Description of the Securities" and in the related prospectus supplement. A series may include one or more classes of securities entitled to principal distributions, with disproportionate, nominal or no interest distributions, or to interest distributions, with disproportionate, nominal or no principal distributions. A series may include two or more classes of securities which differ as to the timing, sequential order, priority of payment, pass-through rate or amount of distributions of principal or interest or both.

The company's only obligations with respect to a series of securities will be pursuant to representations and warranties made by the company, except as provided in the related prospectus supplement. The master servicer and each principal servicer for any series of securities will be named in the related prospectus supplement. The principal obligations of the master servicer will be pursuant to its contractual servicing obligations, which include its limited obligation to make advances in the event of delinquencies in payments on the related mortgage loans if the servicer of a mortgage loan fails to make such advance. See "Description of the Securities."

If so specified in the related prospectus supplement, the trust fund for a series of securities may include any one or any combination of a financial guaranty insurance policy, mortgage pool insurance policy, letter of credit, special hazard insurance policy, reserve fund, currency or interest rate exchange agreements or any other type of credit enhancement specified in the related prospectus supplement described in this prospectus. In addition to or in lieu of the foregoing, credit enhancement may be

4

provided by means of subordination of one or more classes of securities, by cross-collateralization or by overcollateralization. See "Description of Credit Enhancement."

The rate of payment of principal of each class of securities entitled to a portion of principal payments on the mortgage loans in the related mortgage pool and the trust fund assets will depend on the priority of payment of the class and the rate and timing of principal payments on the mortgage loans and other trust fund assets, including by reason of prepayments, defaults, liquidations and repurchases of mortgage loans. A rate of principal payments lower or faster than that anticipated may affect the yield on a class of securities in the manner described in this prospectus and in the related prospectus supplement. See "Yield Considerations."

With respect to each series of securities, one or more separate elections may be made to treat the related trust fund or a designated portion thereof as a REMIC for federal income tax purposes. If applicable, the prospectus supplement for a series of securities will specify which class or classes of the securities will be considered to be regular interests in the related REMIC and which class of securities or other interests will be designated as the residual interest in the related REMIC. See "Federal Income Tax Consequences" in this prospectus.

The offered securities may be offered through one or more different methods, including offerings through underwriters, as more fully described under "Methods of Distribution" and in the related prospectus supplement.

There will be no secondary market for the offered securities of any series prior to the offering thereof. There can be no assurance that a secondary market for any of the offered securities will develop or, if it does develop, that it will continue. The offered securities will not be listed on any securities exchange, unless so specified in the related prospectus supplement.

## THE MORTGAGE POOLS

### General

Each mortgage pool will consist primarily of mortgage loans, minus any interest retained by the company or any affiliate of the company. The mortgage loans may consist of single family loans, multifamily loans, commercial loans, mixed-use loans and Contracts, each as described below.

The single family loans will be evidenced by mortgage notes and secured by mortgages that, in each case, create a first or junior lien on the related mortgagor's fee or leasehold interest in the related mortgaged property. The related mortgaged property for a single family loan may be owner-occupied or may be a vacation, second or non-owner-occupied home.

If specified in the related prospectus supplement relating to a series of securities, the single family loans may include cooperative apartment loans evidenced by a mortgage note secured by security interests in the related mortgaged property including shares issued by cooperatives and in the related proprietary leases or occupancy agreements granting exclusive rights to occupy specific dwelling units in the related buildings.

The multifamily loans will be evidenced by mortgage notes and secured by mortgages that create a first or junior lien on residential properties consisting of five or more dwelling units in high-rise, mid-rise or garden apartment structures or projects.

The commercial loans will be evidenced by mortgage notes and secured mortgages that create a first or junior lien on commercial properties including office building, retail building and a variety of other commercial properties as may be described in the related prospectus supplement.

The mixed-use loans will be evidenced by mortgage loans and secured by mortgages that create a first or junior lien on properties consisting of mixed residential and commercial structures.

The aggregate concentration by original principal balance of commercial, multifamily and mixed-use loans in any mortgage pool will be less than 10% of the original principal balance of the mortgage pool.

Mortgaged properties may be located in any one of the 50 states, the District of Columbia or the Commonwealth of Puerto Rico.

The mortgage loans will not be guaranteed or insured by the company or any of its affiliates. However, if so specified in the related prospectus supplement, mortgage loans may be insured by the FHA or guaranteed by the VA. See "Description of Primary Insurance Policies—FHA Insurance" and "—VA Mortgage Guaranty."

A mortgage pool may include mortgage loans that are delinquent as of the date the related series of securities is issued. In that case, the related prospectus supplement will set forth, as to each mortgage loan, available information as to the period of delinquency and any other information relevant for a prospective investor to make an investment decision. No mortgage loan in a mortgage pool shall be non-performing. Mortgage loans which are more than 30 days delinquent included in any mortgage pool will have delinquency data relating to them included in the related prospectus supplement. No mortgage pool will include a concentration of mortgage loans which is more than 30 days delinquent of 20% or more.

A mortgage pool may contain more than one mortgage loan made to the same borrower with respect to a single mortgaged property, and may contain multiple mortgage loans made to the same borrower on several mortgaged properties.

The mortgage loans may include "sub-prime" mortgage loans. "Sub-prime" mortgage loans will be underwritten in accordance with underwriting standards which are less stringent than guidelines for "A" quality borrowers. Mortgagors may have a record of outstanding judgments, prior bankruptcies and other credit items that do not satisfy the guidelines for "A" quality borrowers. They may have had past debts written off by past lenders.

A mortgage pool may include mortgage loans that do not meet the purchase requirements of Fannie Mae and Freddie Mac. These mortgage loans are known as nonconforming loans. The mortgage loans may be nonconforming because they exceed the maximum principal balance of mortgage loans purchased by Fannie Mae and Freddie Mac, known as jumbo loans, because the mortgage loan may have been originated with limited or no documentation, because they are sub-prime loans, or because of some other failure to meet the purchase criteria of Fannie Mae and Freddie Mac for these programs. The related prospectus supplement will detail to what extent the mortgage loans are nonconforming mortgage loans.

Each mortgage loan will be selected by the company or its affiliates for inclusion in a mortgage pool from among those purchased by the company, either directly or through its affiliates, from Unaffiliated Sellers or Affiliated Sellers. If a mortgage pool is composed of mortgage loans acquired by the company directly from Unaffiliated Sellers, the related prospectus supplement will specify the extent

of mortgage loans so acquired. The characteristics of the mortgage loans will be as described in the related prospectus supplement. Other mortgage loans available for purchase by the company may have characteristics which would make them eligible for inclusion in a mortgage pool but were not selected for inclusion in the mortgage pool.

The mortgage loans may be delivered to the trust fund pursuant to a Designated Seller Transaction, concurrently with the issuance of the related series of securities. These securities may be sold in whole or in part to the Seller in exchange for the related mortgage loans, or may be offered under any of the other methods described in this prospectus under "Methods of Distribution." The related prospectus supplement for a mortgage pool composed of mortgage loans acquired by the company pursuant to a Designated Seller Transaction will generally include information, provided by the related Seller, about the Seller, the mortgage loans and the underwriting standards applicable to the mortgage loans.

If specified in the related prospectus supplement, the trust fund for a series of securities may include participations in mortgage loans or mortgage securities, as described in this prospectus. The mortgage securities may have been issued previously by the company or an affiliate thereof, a financial institution or other entity engaged generally in the business of mortgage lending or a limited purpose corporation organized for the purpose of, among other things, acquiring and depositing mortgage loans into trusts, and selling beneficial interests in trusts. The mortgage securities will be generally similar to securities offered under this prospectus. However, any mortgage securities included in a trust fund will (1) either have been (a) previously registered under the Securities Act, or (b) eligible for sale under Rule 144(k) under the Exchange Act; and (2) be acquired in bona fide secondary market transactions. As to any series of mortgage securities, the related prospectus supplement will include a description of (1) the mortgage securities and any related credit enhancement, and (2) the mortgage loans underlying the mortgage securities.

**The Mortgage Loans**

Each of the mortgage loans will be a type of mortgage loan described or referred to below, with any variations described in the related prospectus supplement:

- Fixed-rate, fully-amortizing mortgage loans (which may include mortgage loans converted from adjustable-rate mortgage loans or otherwise modified) providing for level monthly payments of principal and interest and terms at origination or modification of not more than approximately 30 years;

- Fixed-rate, fully-amortizing mortgage loans (which may include mortgage loans converted from adjustable-rate mortgage loans or otherwise modified) providing for level monthly payments of principal and interest and terms at origination or modification of more than 15 years, but not more than approximately 40 years;

- Fully-amortizing ARM Loans having an original or modified term to maturity of not more than approximately 40 years with a related mortgage rate which generally adjusts initially either three months, six months or one, two, three, five, seven or ten years or other intervals subsequent to the initial payment date, and thereafter at either three-month, six-month, one-year or other intervals (with corresponding adjustments in the amount of monthly payments) over the term of the mortgage loan to equal the sum of the related Note Margin and the Note Index. The related prospectus supplement will set forth

the relevant Index and the highest, lowest and weighted average Note Margin with respect to the ARM Loans in the related mortgage pool. The related prospectus supplement will also indicate any periodic or lifetime limitations on changes in any per annum mortgage rate at the time of any adjustment. If specified in the related prospectus supplement, an ARM Loan may include a provision that allows the mortgagor to convert the adjustable mortgage rate to a fixed rate at some point during the term of the ARM Loan generally not later than six to ten years subsequent to the initial payment date;

- Negatively-amortizing ARM Loans having original or modified terms to maturity of not more than approximately 40 years with mortgage rates which generally adjust initially on the payment date referred to in the related prospectus supplement, and on each of specified periodic payment dates thereafter, to equal the sum of the Note Margin and the Index. The scheduled monthly payment will be adjusted as and when described in the related prospectus supplement to an amount that would fully amortize the mortgage loan over its remaining term on a level debt service basis; provided that increases in the scheduled monthly payment may be subject to limitations as specified in the related prospectus supplement. Any Deferred Interest will be added to the principal balance of the mortgage loan;

- Fixed-rate, graduated payment mortgage loans having original or modified terms to maturity of not more than approximately 30 years with monthly payments during the first year calculated on the basis of an assumed interest rate which is a specified percentage below the mortgage rate on the mortgage loan. Monthly payments on these mortgage loans increase at the beginning of the second year by a specified percentage of the monthly payment during the preceding year and each year thereafter to the extent necessary to amortize the mortgage loan over the remainder of its approximately 30-year term.  Deferred Interest, if any, will be added to the principal balance of these mortgage loans;

- Fixed-rate, graduated payment mortgage loans having original or modified terms to maturity of not more than approximately 30 years with monthly payments during the first year calculated on the basis of an assumed interest rate which is a specified percentage below the mortgage rate on the mortgage loan. Monthly payments on these mortgage loans increase at the beginning of the second year by a specified percentage of the monthly payment during the preceding year and each year thereafter to the extent necessary to fully amortize the mortgage loan over the remainder of its approximately 30-year term. Deferred Interest, if any, will be added to the principal balance of these mortgage loans;

- Balloon loans having payment terms similar to those described in one of the preceding paragraphs, calculated on the basis of an assumed amortization term, but providing for a balloon payment of all outstanding principal and interest to be made at the end of a specified term that is shorter than the assumed amortization term;

- Mortgage loans that provide for a line of credit pursuant to which amounts may be advanced to the borrower from time to time;

- Mortgage loans that require that each monthly payment consist of an installment of interest which is calculated according to the simple interest method.  This method

calculates interest using the outstanding principal balance of the mortgage loan multiplied by the loan rate and further multiplied by a fraction, the numerator of which is the number of days in the period elapsed since the preceding payment of interest was made and the denominator of which is the number of days in the annual period for which interest accrues on the mortgage loan. As payments are received on simple interest mortgage loans, the amount received is applied first to interest accrued to the date of payment and the balance is applied to reduce the unpaid principal balance of the mortgage loan;

- Mortgage loans which provide for an interest only period and do not provide for the payment of principal for the number of years specified in the related prospectus supplement; or

- Another type of mortgage loan described in the related prospectus supplement.

The mortgage pool may contain mortgage loans secured by junior liens.  The related senior lien, which may have been made at the same time as the first lien, may or may not be included in the mortgage pool as well. The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior liens to satisfy fully both the senior liens and the mortgage loan secured by a junior lien. In the event that a holder of a senior lien forecloses on a mortgaged property, the proceeds of the foreclosure or similar sale will be applied first to the payment of court costs and fees in connection with the foreclosure, second to real estate taxes, third in satisfaction of all principal, interest, prepayment or acceleration penalties, if any, and any other sums due and owing to the holder of the senior liens. The claims of the holders of the senior liens will be satisfied in full out of proceeds of the liquidation of the related mortgaged property, if the proceeds are sufficient, before the trust fund as holder of the junior lien receives any payments in respect of the mortgage loan. If the master servicer or a servicer were to foreclose on a mortgage loan secured by a junior lien, it would do so subject to any related senior liens. In order for the debt related to the mortgage loan to be paid in full at the sale, a bidder at the foreclosure sale of the mortgage loan would have to bid an amount sufficient to pay off all sums due under the mortgage loan and the senior liens or purchase the mortgaged property subject to the senior liens. In the event that the proceeds from a foreclosure or similar sale of the related mortgaged property are insufficient to satisfy all senior liens and the mortgage loan in the aggregate, the trust fund, as the holder of the junior lien, and, accordingly, holders of one or more classes of the securities of the related series bear (1) the risk of delay in distributions while a deficiency judgment against the borrower is sought and (2) the risk of loss if the deficiency judgment is not realized upon. Moreover, deficiency judgments may not be available in some jurisdictions or the mortgage loan may be nonrecourse. In addition, a junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgages.

A mortgage loan may require payment of a prepayment charge or penalty, the terms of which will be more fully described in the prospectus supplement.  Prepayment penalties may apply if the borrower makes a substantial prepayment, or may apply only if the borrower refinances the mortgage loans. A multifamily, commercial or mixed-use loan may also contain a prohibition on prepayment or lock-out period.

A multifamily, commercial or mixed-use loan may contain a provision that entitles the lender to a share of profits realized from the operation or disposition of the related mortgaged property. If the holders of any class or classes of offered securities of a series will be entitled to all or a portion of this type of

9

equity participation, the related prospectus supplement will describe the equity participation and the method or methods by which distributions in respect thereof will be made to such holders.

The mortgage loans may be "equity refinance" mortgage loans, as to which a portion of the proceeds are used to refinance an existing mortgage loan, and the remaining proceeds may be retained by the mortgagor or used for purposes unrelated to the mortgaged property. Alternatively, the mortgage loans may be "rate and term refinance" mortgage loans, as to which substantially all of the proceeds (net of related costs incurred by the mortgagor) are used to refinance an existing mortgage loan or loans (which may include a junior lien) primarily in order to change the interest rate or other terms thereof. The mortgage loans may be mortgage loans which have been consolidated and/or have had various terms changed, mortgage loans which have been converted from adjustable rate mortgage loans to fixed rate mortgage loans, or construction loans which have been converted to permanent mortgage loans. In addition, a mortgaged property may be subject to secondary financing at the time of origination of the mortgage loan or thereafter. In addition, some or all of the single family loans secured by junior liens may be High LTV Loans.

If provided for in the related prospectus supplement, a mortgage pool may contain convertible mortgage loans which allow the mortgagors to convert the interest rates on these mortgage loans from a fixed rate to an adjustable rate, or an adjustable rate to a fixed rate, at some point during the life of these mortgage loans.  In addition, if provided for in the related prospectus supplement, a mortgage pool may contain mortgage loans which may provide for modification to other fixed rate or adjustable rate programs offered by the Seller.  If specified in the related prospectus supplement, upon any conversion or modification, the depositor, the related master servicer, the related servicer, the applicable Seller or a third party will repurchase the converted or modified mortgage loan as and to the extent set forth in the related prospectus supplement. Upon the failure of any party so obligated to repurchase any converted or modified mortgage loan, it will remain in the mortgage pool.

If provided for in the related prospectus supplement, the mortgage loans may include buydown mortgage loans. Under the terms of a buydown mortgage loan, the monthly payments made by the mortgagor during the early years of the mortgage loan will be less than the scheduled monthly payments on the mortgage loan. The resulting difference will be made up from:

- funds contributed by the seller of the mortgaged property or another source and placed in a custodial account,

- if funds contributed by the seller are contributed on a present value basis, investment earnings on these funds or

- additional funds to be contributed over time by the mortgagor's employer or another source.

See "Description of the Securities—Payments on Mortgage Loans; Deposits to Distribution Account."

Generally, the mortgagor under each buydown mortgage loan will be qualified at the applicable lower monthly payment. Accordingly, the repayment of a buydown mortgage loan is dependent on the ability of the mortgagor to make larger level monthly payments after the Buydown Funds have been depleted and, for some buydown mortgage loans, during the Buydown Period.

The prospectus supplement for each series of securities will contain information, to the extent known or reasonably ascertainable, as to the loss and delinquency experience of the Seller and/or the master servicer (if the master servicer is directly servicing the mortgage loans) and/or one or more of the servicers, with respect to mortgage loans similar to those included in the trust fund. Information generally will be provided when the Seller and/or master servicer (if the master servicer is directly servicing the mortgage loans) and/or a servicer (in the case of servicers directly servicing mortgage loans in a trust fund in excess of 10% of the total) have a seasoned portfolio of mortgage loans similar to those included in the trust.

The prospectus supplement for each series of securities will contain information as to the type of mortgage loans that will be included in the related mortgage pool. Each prospectus supplement applicable to a series of securities will include information, generally as of the cut-off date and to the extent then available to the company, on an approximate basis, as to the following:

- the aggregate principal balance of the mortgage loans,

- the type of property securing the mortgage loans,

- the original or modified terms to maturity of the mortgage loans,

- the range of principal balances of the mortgage loans at origination or modification,

- the earliest origination or modification date and latest maturity date of the mortgage loans,

- the Loan-to-Value Ratios of the mortgage loans,

- the mortgage rate or range of mortgage rates borne by the mortgage loans,

- if any of the mortgage loans are ARM Loans, the applicable Index, the range of Note Margins and the weighted average Note Margin,

- the geographical distribution of the mortgage loans,

- the percentage of buydown mortgage loans, if applicable, and

- the percent of ARM Loans which are convertible to fixed-rate mortgage loans, if applicable.

A Current Report on Form 8-K will be available upon request to holders of the related series of securities and will be filed, together with the related pooling and servicing agreement, with respect to each series of certificates, or the related servicing agreement, owner trust agreement and indenture, with respect to each series of notes, with the Commission within fifteen days after the initial issuance of the securities. In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement, the addition or deletion will be noted in the Current Report on Form 8-K. In no event, however, will more than 5% (by principal balance at the cut-off date) of the mortgage loans or mortgage securities deviate from the characteristics of the mortgage loans or mortgage securities set forth in the related prospectus supplement.

The company will cause the mortgage loans included in each mortgage pool, or mortgage securities evidencing interests therein, to be assigned, without recourse, to the trustee named in the related prospectus supplement, for the benefit of the holders of the securities of a series. Except to the extent that servicing of any mortgage loan is to be transferred to a special servicer, the master servicer named in the related prospectus supplement will service the mortgage loans, directly or through servicers, pursuant to a pooling and servicing agreement, with respect to each series of certificates, or a servicing agreement, with respect to each series of notes, and will receive a fee for these services. See "Servicing of Mortgage Loans," "Description of the Securities" and "The Agreements." The master servicer's obligations with respect to the mortgage loans will consist principally of its contractual servicing obligations under the related pooling and servicing agreement or servicing agreement (including its obligation to supervise, monitor and oversee the obligations of the servicers to service and administer their respective mortgage loans in accordance with the terms of the applicable servicing agreements), as more fully described in this prospectus under "Servicing of Mortgage Loans—Servicers," and, if and to the extent set forth in the related prospectus supplement, its obligation to make cash advances in the event of delinquencies in payments on or with respect to the mortgage loans as described in this prospectus under "Description of the Securities—Advances") or pursuant to the terms of any mortgage securities. The obligations of a master servicer to make advances may be subject to limitations, to the extent this prospectus and the related prospectus supplement so provides.

**Underwriting Standards**

Mortgage loans to be included in a mortgage pool will be purchased on the closing date by the company either directly or indirectly from Affiliated Sellers or Unaffiliated Sellers. The company will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate, depending to some extent on the company's or its affiliates' prior experience with the Seller and the servicer, as well as the company's prior experience with a particular type of mortgage loan or with mortgage loans relating to mortgaged properties in a particular geographical region. A standard approach to re-underwriting is to compare loan file information and information that is represented to the company on a tape with respect to a percentage of the mortgage loans the company deems appropriate in the circumstances. The company will not undertake any independent investigations of the creditworthiness of particular obligors.

The mortgage loans, as well as mortgage loans underlying mortgage securities, unless otherwise disclosed in the related prospectus supplement, will have been originated in accordance with underwriting standards described below.

The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan.

The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses. However, the Loan-to-Value Ratio of the mortgage loan is another critical factor. In addition, a mortgagor's credit history and repayment ability, as well as the type and use of the mortgaged property, are also considerations.

High LTV Loans are underwritten with an emphasis on the creditworthiness of the related mortgagor. High LTV Loans are underwritten with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property.

In the case of the multifamily loans, commercial loans or mixed-use loans, lenders typically look to the debt service coverage ratio of a loan as an important measure of the risk of default on that loan. Unless otherwise defined in the related prospectus supplement, the debt service coverage ratio of a multifamily loan, commercial loan or mixed-use loan at any given time is the ratio of (1) the net operating income of the related mortgaged property for a twelve-month period to (2) the annualized scheduled payments on the mortgage loan and on any other loan that is secured by a lien on the mortgaged property prior to the lien of the related mortgage. The net operating income of a mortgaged property is the total operating revenues derived from a multifamily, commercial or mixed-use property, as applicable, during that period, minus the total operating expenses incurred in respect of that property during that period other than (a) non-cash items such as depreciation and amortization, (b) capital expenditures and (c) debt service on loans (including the related mortgage loan) secured by liens on that property. The net operating income of a multifamily, commercial or mixed-use property, as applicable, will fluctuate over time and may or may not be sufficient to cover debt service on the related mortgage loan at any given time. As the primary source of the operating revenues of a multifamily, commercial or mixed-use property, as applicable, rental income (and maintenance payments from tenant-stockholders of a cooperatively owned multifamily property) may be affected by the condition of the applicable real estate market and/or area economy. Increases in operating expenses due to the general economic climate or economic conditions in a locality or industry segment, such as increases in interest rates, real estate tax rates, energy costs, labor costs and other operating expenses, and/or to changes in governmental rules, regulations and fiscal policies, may also affect the risk of default on a multifamily, commercial or mixed-use loan. Lenders also look to the Loan-to-Value Ratio of a multifamily, commercial or mixed-use loan as a measure of risk of loss if a property must be liquidated following a default.

Each prospective mortgagor will generally complete a mortgage loan application that includes information on the applicant's liabilities, income, credit history, employment history and personal information. One or more credit reports on each applicant from national credit reporting companies generally will be required. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments. In the case of a multifamily loan, commercial loan or mixed-use loan, the mortgagor will also be required to provide certain information regarding the related mortgaged property, including a current rent roll and operating income statements (which may be pro forma and unaudited). In addition, the originator will generally also consider the location of the mortgaged property, the availability of competitive lease space and rental income of comparable properties in the relevant market area, the overall economy and demographic features of the geographic area and the mortgagor's prior experience in owning and operating properties similar to the multifamily properties or commercial properties, as the case may be.

Mortgaged properties generally will be appraised by licensed appraisers or through an automated valuation system. A licensed appraiser will generally address neighborhood conditions, site and zoning status and condition and valuation of improvements. In the case of mortgaged properties secured by single family loans, the appraisal report will generally include a reproduction cost analysis (when appropriate) based on the current cost of constructing a similar home and a market value analysis based on recent sales of comparable homes in the area. With respect to multifamily properties, commercial properties and mixed-use properties, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a property's projected

13

net cash flow, capitalization and other operational information in determining the property's value. The market approach to value analyzes the prices paid for the purchase of similar properties in the property's area, with adjustments made for variations between those other properties and the property being appraised. The cost approach to value requires the appraiser to make an estimate of land value and then determine the current cost of reproducing the improvements less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must support, and support in the future, the outstanding loan balance. All appraisals by licensed appraisers are required to be on forms acceptable to Fannie Mae or Freddie Mac.  Automated valuation systems generally rely on publicly available information regarding property values and will be described more fully in the related prospectus supplement.  An appraisal for purposes of determining the Value of a mortgaged property may include an automated valuation.

Notwithstanding the foregoing, Loan-to-Value Ratios will not necessarily provide an accurate measure of the risk of liquidation loss in a pool of mortgage loans. For example, the value of a mortgaged property as of the date of initial issuance of the related series of securities may be less than the Value determined at loan origination, and will likely continue to fluctuate from time to time based upon changes in economic conditions and the real estate market. Mortgage loans which are subject to negative amortization will have Loan-to-Value Ratios which will increase after origination as a result of negative amortization. Also, even when current, an appraisal is not necessarily a reliable estimate of value for a multifamily property or commercial property.  As stated above, appraised values of multifamily, commercial and mixed-use properties are generally based on the market analysis, the cost analysis, the income analysis, or upon a selection from or interpolation of the values derived from those approaches. Each of these appraisal methods can present analytical difficulties. It is often difficult to find truly comparable properties that have recently been sold; the replacement cost of a property may have little to do with its current market value; and income capitalization is inherently based on inexact projections of income and expenses and the selection of an appropriate capitalization rate. Where more than one of these appraisal methods are used and provide significantly different results, an accurate determination of value and, correspondingly, a reliable analysis of default and loss risks, is even more difficult.

If so specified in the related prospectus supplement, the underwriting of a multifamily loan, commercial loan or mixed-use loan may also include environmental testing. Under the laws of some states, contamination of real property may give rise to a lien on the property to assure the costs of cleanup.  In several states, this type of lien has priority over an existing mortgage lien on that property. In addition, under the laws of some states and under CERCLA, a lender may be liable, as an "owner" or "operator", for costs of addressing releases or threatened releases of hazardous substances at a property, if agents or employees of the lender have become sufficiently involved in the operations of the borrower, regardless of whether or not the environmental damage or threat was caused by the borrower or a prior owner. A lender also risks such liability on foreclosure of the mortgage as described under "Legal Aspects of Mortgage Loans—Environmental Legislation" in this prospectus.

With respect to any FHA loan or VA loans the mortgage loan Seller will be required to represent that it has complied with the applicable underwriting policies of the FHA or VA, respectively. See "Description of Primary Insurance Policies—FHA Insurance" and "—VA Insurance" in this prospectus.

**Qualifications of Originators and Sellers**

Each mortgage loan generally will be originated, directly or through mortgage brokers and correspondents, by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or similar institution which is supervised and examined by a federal or state

authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the Housing Act, unless otherwise provided in the related prospectus supplement.

**Representations by Sellers**

Each Seller will have made representations and warranties in respect of the mortgage loans and/or mortgage securities sold by the Seller and evidenced by a series of securities. In the case of mortgage loans, representations and warranties will generally include, among other things, that as to each mortgage loan:

- with respect to each mortgage loan other than a Contract or a cooperative mortgage loan, if required, (A) a title insurance policy, binder, or other assurance of title customary in the relevant jurisdiction insuring (subject only to permissible title insurance exceptions) the lien status of the mortgage was effective at the origination of the mortgage loan and the policy remained in effect on the date of purchase of the mortgage loan from the Seller by the company, (B) if the mortgaged property securing the mortgage loan is located in an area where these policies are generally not available, there is in the related mortgage file an attorney's certificate of title indicating (subject to permissible exceptions set forth therein) the lien status of the mortgage or (C) with respect to a mortgage loan which is a refinanced mortgage loan, a title search was done by the Seller or some other type of "short-form" title insurance was obtained;

- the Seller has good title to the mortgage loan and the mortgage loan was subject to no offsets, defenses or counterclaims except as may be provided under the Relief Act and except to the extent that any buydown agreement exists for a buydown mortgage loan;

- there are no mechanics' liens or claims for work, labor or material affecting the related mortgaged property which are, or may be a lien prior to, or equal with, the lien of the related mortgage (subject only to permissible title insurance exceptions);

- the mortgage loan constituted a valid first or other applicable lien on, or a perfected security interest with respect to, the mortgaged property (subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the Agreement) and the related mortgaged property is free from damage and in good repair;

- there are no delinquent tax or assessment liens against the related mortgaged property;

- the mortgage loan is not more than 90 days delinquent as to any scheduled payment of principal and/or interest; and

- to the best of the Seller's knowledge, each mortgage loan at the time it was made complied in all material respects with applicable federal, state and local laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws; and, to the best of the Seller's knowledge, each mortgage loan has been serviced in all material respects in accordance with applicable federal, state and local laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and the terms of the related mortgage note, the mortgage and other loan documents.

If the mortgage loans include cooperative mortgage loans, representations and warranties with respect to title insurance or hazard insurance may not be given. Generally, the cooperative itself is responsible for the maintenance of hazard insurance for property owned by the cooperative, and the borrowers (tenant-stockholders) of the cooperative do not maintain hazard insurance on their individual dwelling units. In the case of mortgage securities, representations and warranties will generally include, among other things, that as to each mortgage security, the Seller has good title to the mortgage security free of any liens. In the event of a breach of a Seller's representation or warranty that materially adversely affects the interests of the securityholders in a mortgage loan or mortgage security, the related Seller will be obligated to cure the breach or repurchase or, if permitted, replace the mortgage loan or mortgage security as described below. However, there can be no assurance that a Seller will honor its obligation to repurchase or, if permitted, replace any mortgage loan or mortgage security as to which a breach of a representation or warranty arises.

All of the representations and warranties of a Seller in respect of a mortgage loan or mortgage security will have been made as of the date on which the mortgage loan or mortgage security was purchased from the Seller by or on behalf of the company, unless a specific representation or warranty relates to an earlier date, in which case such representation or warranty shall be made as of such earlier date. As a result, the date as of which the representations and warranties were made may be a date prior to the date of initial issuance of the related series of securities or, in the case of a Designated Seller Transaction, will be the date of closing of the related sale by the applicable Seller. A substantial period of time may have elapsed between the date as of which the representations and warranties were made and the later date of initial issuance of the related series of securities. Accordingly, the Seller's repurchase obligation (or, if specified in the related prospectus supplement, limited replacement option) described below will not arise if, during the period commencing on the date of sale of a mortgage loan or mortgage security by the Seller, an event occurs that would have given rise to a repurchase obligation had the event occurred prior to sale of the affected mortgage loan or mortgage security, as the case may be. The only representations and warranties to be made for the benefit of holders of securities in respect of any related mortgage loan or mortgage security relating to the period commencing on the date of sale of the mortgage loan or mortgage security by the Seller to or on behalf of the company will be the limited corporate representations of the company and the master servicer described under "Description of the Securities—Assignment of Trust Fund Assets" below.

The company will assign to the trustee for the benefit of the holders of the related series of securities all of its right, title and interest in each purchase agreement by which it purchased a mortgage loan or mortgage security from a Seller insofar as the purchase agreement relates to the representations and warranties made by the Seller in respect of the mortgage loan or mortgage security and any remedies provided for with respect to any breach of representations and warranties with respect to the mortgage loan or mortgage security. If a Seller cannot cure a breach of any representation or warranty made by it in respect of a mortgage loan or mortgage security which materially and adversely affects the interests of the securityholders therein within a specified period after having discovered or received notice of a breach, then, the Seller will be obligated to repurchase the mortgage loan or mortgage security at a purchase price set forth in the related pooling and servicing agreement or other agreement which purchase price generally will be equal to the principal balance thereof as of the date of repurchase plus accrued and unpaid interest through or about the date of repurchase at the related mortgage rate or pass-through rate, as applicable (net of any portion of this interest payable to the Seller in respect of master servicing compensation, special servicing compensation or servicing compensation, as applicable, and any interest retained by the company).

As to any mortgage loan required to be repurchased by a Seller as provided above, rather than repurchase the mortgage loan, the Seller, if so specified in the related prospectus supplement, will be entitled, at its sole option, to remove the Deleted Mortgage Loan from the trust fund and substitute in its place a Qualified Substitute Mortgage Loan; however, with respect to a series of certificates for which no REMIC election is to be made, the substitution must be effected within 120 days of the date of the initial issuance of the related series of certificates. With respect to a trust fund for which a REMIC election is to be made, the substitution of a defective mortgage loan must be effected within two years of the date of the initial issuance of the related series of certificates, and may not be made if the substitution would cause the trust fund, or any portion thereof, to fail to qualify as a REMIC or result in a Prohibited Transaction Tax under the Code. Any Qualified Substitute Mortgage Loan generally will, on the date of substitution:

- have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution, not in excess of the outstanding principal balance of the Deleted Mortgage Loan (the amount of any shortfall to be deposited in the Distribution Account by the related Seller or the master servicer in the month of substitution for distribution to the securityholders),

- have a mortgage rate and a Net Mortgage Rate not less than (and not materially greater than) the mortgage rate and Net Mortgage Rate, respectively, of the Deleted Mortgage Loan as of the date of substitution,

- have a Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution,

- have a remaining term to maturity not materially earlier or later than (and not later than the latest maturity date of any mortgage loan) that of the Deleted Mortgage Loan and

- comply with all of the representations and warranties made by the Seller as of the date of substitution.

The related mortgage loan purchase agreement may include additional requirements relating to ARM Loans or other specific types of mortgage loans, or additional provisions relating to meeting the foregoing requirements on an aggregate basis where a number of substitutions occur contemporaneously. A Seller will have an option to substitute for a mortgage security that it is obligated to repurchase in connection with a breach of a representation and warranty only if it satisfies the criteria set forth in the related prospectus supplement.

The master servicer or the trustee will be required under the applicable pooling and servicing agreement or servicing agreement to use reasonable efforts to enforce this repurchase or substitution obligation for the benefit of the trustee and the securityholders, following those practices it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities; provided, however, that this repurchase or substitution obligation will not become an obligation of the master servicer in the event the applicable Seller fails to honor the obligation. In instances where a Seller is unable, or disputes its obligation, to repurchase affected mortgage loans and/or mortgage securities, the master servicer or the trustee, employing the standards set forth in the preceding sentence, may negotiate and enter into one or more settlement agreements with the related Seller that could provide for the repurchase of only a portion of the affected mortgage loans and/or mortgage securities. Any settlement could lead to losses on the mortgage loans and/or mortgage securities which would be borne by the related securities. In accordance with the above described practices, the master servicer or trustee will

17

not be required to enforce any repurchase obligation of a Seller arising from any misrepresentation by the Seller, if the master servicer determines in the reasonable exercise of its business judgment that the matters related to the misrepresentation did not directly cause or are not likely to directly cause a loss on the related mortgage loan or mortgage security. If the Seller fails to repurchase and no breach of any other party's representations has occurred, the Seller's repurchase obligation will not become an obligation of the company or any other party. In the case of a Designated Seller Transaction where the Seller fails to repurchase a mortgage loan or mortgage security and neither the company nor any other entity has assumed the representations and warranties, the repurchase obligation of the Seller will not become an obligation of the company or any other party. The foregoing obligations will constitute the sole remedies available to securityholders or the trustee for a breach of any representation by a Seller or for any other event giving rise to the obligations as described above.

Neither the company nor the master servicer will be obligated to repurchase a mortgage loan or mortgage security if a Seller defaults on its obligation to do so, and no assurance can be given that the Sellers will carryout their repurchase obligations. A default by a Seller is not a default by the company or by the master servicer. However, to the extent that a breach of the representations and warranties of a Seller also constitutes a breach of a representation made by the company or the master servicer, as described below under "Description of the Securities—Assignment of Trust Fund Assets," the company or the master servicer may have a repurchase or substitution obligation. Any mortgage loan or mortgage security not so repurchased or substituted for will remain in the related trust fund and any losses related thereto will be allocated to the related credit enhancement, to the extent available, and otherwise to one or more classes of the related series of securities.

If a person other than a Seller makes the representations and warranties referred to in the first paragraph of this "—Representations by Sellers" section, or a person other than a Seller is responsible for repurchasing or replacing any mortgage loan or mortgage security for a breach of those representations and warranties, the identity of that person will be specified in the related prospectus supplement.

**Optional Purchase of Defaulted Mortgage Loans**

If the related prospectus supplement so specifies, the master servicer or another entity identified in such prospectus supplement may, at its option, purchase from the trust fund any mortgage loan which is delinquent in payment by 90 days or more or is an REO Mortgage Loan as the date of such purchase. Any such purchase shall be at the price described in the related prospectus supplement.

## SERVICING OF MORTGAGE LOANS

**General**

The mortgage loans and mortgage securities included in each mortgage pool will be serviced and administered pursuant to either a pooling and servicing agreement or a servicing agreement. A form of pooling and servicing agreement and a form of servicing agreement have each been filed as an exhibit to the registration statement of which this prospectus is a part. However, the provisions of each pooling and servicing agreement or servicing agreement will vary depending upon the nature of the related mortgage pool. The following summaries describe the material servicing-related provisions that may appear in a pooling and servicing agreement or servicing agreement for a mortgage pool that includes mortgage loans. The related prospectus supplement will describe any servicing-related provision of its related pooling and servicing agreement or servicing agreement that materially differs from the description thereof contained in this prospectus. If the related mortgage pool includes mortgage securities, the related

18

prospectus supplement will summarize the material provisions of the related pooling and servicing agreement and identify the responsibilities of the parties to that pooling and servicing agreement.

With respect to any series of securities as to which the related mortgage pool includes mortgage securities, the servicing and administration of the mortgage loans underlying any mortgage securities will be pursuant to the terms of those mortgage securities. Mortgage loans underlying mortgage securities in a mortgage pool will be serviced and administered generally in the same manner as mortgage loans included in a mortgage pool, however, there can be no assurance that this will be the case, particularly if the mortgage securities are issued by an entity other than the company or any of its affiliates.

**The Master Servicer**

The master servicer, if any, for a series of securities will be named in the related prospectus supplement and may be an affiliate of the company. The master servicer is required to maintain a fidelity bond and errors and omissions policy with respect to its officers and employees and other persons acting on behalf of the master servicer in connection with its activities under a pooling and servicing agreement or a servicing agreement.

The master servicer shall supervise, monitor and oversee the obligation of the servicers to service and administer their respective mortgage loans in accordance with the terms of the applicable servicing agreements and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In addition, the Master Servicer shall oversee and consult with each servicer as necessary from time-to-time to carry out the master servicer's obligations under the pooling and servicing agreement or servicing agreement, shall receive, review and evaluate all reports, information and other data provided to the master servicer by each servicer and shall cause each servicer to perform and observe the covenants, obligations and conditions to be performed or observed by such servicer under its applicable servicing agreement. Each pooling and servicing agreement or servicing agreement, as applicable, for a series of securities, will provide that in the event a servicer fails to perform its obligations in accordance with its servicing agreement, the master servicer shall terminate such servicer and act as servicer of the related mortgage loans or cause the trustee to enter into a new servicing agreement with a successor servicer selected by the master servicer.

**The Servicers**

Each of the servicers, if any, for a series of securities will be named in the related prospectus supplement and may be an affiliate of the company or the Seller of the mortgage loans for which it is acting as servicer. Each servicer will servicer the mortgage loans pursuant to a servicing agreement between the master servicer and the related servicer, which servicing agreement will not contain any terms which are inconsistent with the related agreement. Each servicer is required to maintain a fidelity bond and errors and omissions policy with respect to its officers and employees and other persons acting on behalf of the servicer in connection with its activities under a servicing agreement.

**Collection and Other Servicing Procedures; Mortgage Loan Modifications**

The master servicer for any mortgage pool will be obligated under the pooling and servicing agreement or servicing agreement to supervise, monitor and oversee the obligations of the servicers to service and administer their respective mortgage loans in the mortgage pool for the benefit of the related securityholders, in accordance with applicable law, the terms of the pooling and servicing agreement or servicing agreement, the mortgage loans and any instrument of credit enhancement included in the related

trust fund, and, to the extent consistent with the foregoing, the customs and standards of prudent institutional mortgage lenders servicing comparable mortgage loans for their own account in the jurisdictions where the related mortgaged properties are located. Subject to the foregoing, the master servicer will have full power and authority to do any and all things in connection with servicing and administration that it may deem necessary and desirable.

As part of its servicing duties, the master servicer will be required to, and to cause each of the servicers to, make reasonable efforts to collect all payments called for under the terms and provisions of the mortgage loans that it services. The master servicer and each servicer will be obligated to follow the same collection procedures as it would follow for comparable mortgage loans held for its own account, so long as these procedures are consistent with the servicing standard of and the terms of the related pooling and servicing agreement or servicing agreement and the servicing standard generally described in the preceding paragraph, and do not impair recovery under any instrument of credit enhancement included in the related trust fund. Consistent with the foregoing, the master servicer or any servicer will be permitted, in its discretion, to waive any prepayment premium, late payment charge or other charge in connection with any mortgage loan.

Under a pooling and servicing agreement or a servicing agreement, a master servicer and each servicer will be granted discretion to extend relief to mortgagors whose payments become delinquent. In the case of single family loans and Contracts, a master servicer or servicer may, for example, grant a period of temporary indulgence to a mortgagor or may enter into a liquidating plan providing for repayment of delinquent amounts within a specified period from the date of execution of the plan. However, the master servicer or servicer must first determine that any waiver or extension will not impair the coverage of any related insurance policy or materially adversely affect the security for the mortgage loan. In addition, unless otherwise specified in the related prospectus supplement, if a material default occurs or a payment default is reasonably foreseeable with respect to a multifamily loan, commercial loan or mixed-use loan, the master servicer or servicer will be permitted, subject to any specific limitations set forth in the related pooling and servicing agreement or servicing agreement and described in the related prospectus supplement, to modify, waive or amend any term of such mortgage loan, including deferring payments, extending the stated maturity date or otherwise adjusting the payment schedule, provided that the modification, waiver or amendment (1) is reasonably likely to produce a greater recovery with respect to that mortgage loan on a present value basis than would liquidation and (2) will not adversely affect the coverage under any applicable instrument of credit enhancement.

In the case of multifamily loans, commercial loans and mixed-use loans, a mortgagor's failure to make required mortgage loan payments may mean that operating income is insufficient to service the mortgage debt, or may reflect the diversion of that income from the servicing of the mortgage debt. In addition, a mortgagor under a multifamily, commercial or mixed-use loan that is unable to make mortgage loan payments may also be unable to make timely payment of taxes and otherwise to maintain and insure the related mortgaged property. Generally, the related master servicer or servicer will be required to monitor any multifamily loan or commercial loan that is in default, evaluate whether the causes of the default can be corrected over a reasonable period without significant impairment of the value of the related mortgaged property, initiate corrective action in cooperation with the mortgagor if cure is likely, inspect the related mortgaged property and take any other actions as are consistent with the servicing standard described above and in the pooling and servicing agreement or servicing agreement. A significant period of time may elapse before the master servicer or servicer is able to assess the success of any such corrective action or the need for additional initiatives. The time within which the master servicer or servicer can make the initial determination of appropriate action, evaluate the success of corrective action, develop additional initiatives, institute foreclosure proceedings and actually foreclose (or accept a

20

deed to a mortgaged property in lieu of foreclosure) on behalf of the securityholders of the related series may vary considerably depending on the particular multifamily, commercial or mixed-use loan, the mortgaged property, the mortgagor, the presence of an acceptable party to assume that loan and the laws of the jurisdiction in which the mortgaged property is located. If a mortgagor files a bankruptcy petition, the master servicer or servicer may not be permitted to accelerate the maturity of the related multifamily, commercial or mixed-use loan or to foreclose on the mortgaged property for a considerable period of time. See "Legal Aspects of Mortgage Loans."

Some or all of the mortgage loans in a mortgage pool may contain a due-on-sale clause that entitles the lender to accelerate payment of the mortgage loan upon any sale or other transfer of the related mortgaged property made without the lender's consent. In any case in which a mortgaged property is being conveyed by the mortgagor, the master servicer will in general be obligated, to the extent it has knowledge of the conveyance, to exercise its rights, or cause the servicer of the mortgage loan to exercise its rights, to accelerate the maturity of the related mortgage loan under any due-on-sale clause applicable thereto, but only if the exercise of these rights is permitted by applicable law and only to the extent it would not adversely affect or jeopardize coverage under any Primary Insurance Policy or applicable credit enhancement arrangements. If applicable law prevents the master servicer or servicer from enforcing a due-on-sale or due-on-encumbrance clause or if the master servicer or servicer determines that it is reasonably likely that the related mortgagor would institute a legal action to avoid enforcement of a due-on-sale or due-on-encumbrance clause, the master servicer or servicer may enter into (1) an assumption and modification agreement with the person to whom the property has been or is about to be conveyed, pursuant to which this person becomes liable under the mortgage note subject to specified conditions and the mortgagor, to the extent permitted by applicable law, remains liable thereon or (2) a substitution of liability agreement pursuant to which the original mortgagor is released from liability and the person to whom the property has been or is about to be conveyed is substituted for the original mortgagor and becomes liable under the mortgage note, subject to specified conditions.  The original mortgagor may be released from liability on a single family loan if the master servicer or servicer shall have determined in good faith that the release will not adversely affect the collectability of the mortgage loan. The master servicer or servicer will determine whether to exercise any right the trustee may have under any due-on-sale or due-on-encumbrance provision in a multifamily loan, commercial loan or mixed-use loan in a manner consistent with the servicing standard. The master servicer or servicer generally will be entitled to retain as additional servicing compensation any fee collected in connection with the permitted transfer of a mortgaged property.  See "Legal Aspects of Mortgage Loans— Enforceability of Certain Provisions." FHA loans do not contain due-on-sale or due-on-encumbrance clauses and may be assumed by the purchaser of the mortgaged property.

Mortgagors may, from time to time, request partial releases of the mortgaged properties, easements, consents to alteration or demolition and other similar matters. The master servicer or the servicer may approve a request if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related mortgage loan, that approval will not adversely affect the security for, or the timely and full collectability of, the related mortgage loan. Any fee collected by the master servicer or servicer for processing these requests will be retained by the master servicer or servicer, as the case may be, as additional servicing compensation.

In the case of mortgage loans secured by junior liens on the related mortgaged properties, the master servicer will be required to file, or cause the servicer of the mortgage loans to file, of record a request for notice of any action by a superior lienholder under the senior lien for the protection of the related trustee's interest, where permitted by local law and whenever applicable state law does not require that a junior lienholder be named as a party defendant in foreclosure proceedings in order to foreclose the

21

junior lienholder's equity of redemption.  The master servicer also will be required to notify, or cause the servicer of the mortgage loan to notify, any superior lienholder in writing of the existence of the mortgage loan and request notification of any action (as described below) to be taken against the mortgagor or the mortgaged property by the superior lienholder. If the master servicer or a servicer is notified that any superior lienholder has accelerated or intends to accelerate the obligations secured by the related senior lien, or has declared or intends to declare a default under the mortgage or the promissory note secured thereby, or has filed or intends to file an election to have the related mortgaged property sold or foreclosed, then, the master servicer will be required to take, or cause the servicer of the related mortgaged property to take, on behalf of the related trust fund, whatever actions are necessary to protect the interests of the related securityholders, and/or to preserve the security of the related mortgage loan, subject to the REMIC Provisions, if applicable. The master servicer will be required to advance, or cause the servicer of the mortgage loan to advance, the necessary funds to cure the default or reinstate the superior lien, if the advance is in the best interests of the related securityholders and the master servicer or the servicer, as the case may be, determines the advances are recoverable out of payments on or proceeds of the related mortgage loan.

The master servicer for any mortgage pool will also be required to perform, or cause the servicers of the mortgage loans in the mortgage pool to perform, other customary functions of a servicer of comparable loans, including maintaining escrow or impound accounts for payment of taxes, insurance premiums and similar items, or otherwise monitoring the timely payment of those items; adjusting mortgage rates on ARM Loans; maintaining Buydown Accounts; supervising foreclosures and similar proceedings; managing REO properties; and maintaining servicing records relating to the mortgage loans in the mortgage pool. The master servicer will be responsible for filing and settling claims in respect of particular mortgage loans under any applicable instrument of credit enhancement.  See "Description of Credit Enhancement."

**Special Servicers**

If and to the extent specified in the related prospectus supplement, a special servicer may be a party to the related pooling and servicing agreement or servicing agreement or may be appointed by the master servicer or another specified party to perform specified duties in respect of servicing the related mortgage loans that would otherwise be performed by the master servicer (for example, the workout and/or foreclosure of defaulted mortgage loans). The rights and obligations of any special servicer will be specified in the related prospectus supplement, and the master servicer will be liable for the performance of a special servicer only if, and to the extent, set forth in that prospectus supplement.

**Realization Upon or Sale of Defaulted Mortgage Loans**

Except as described below, the master servicer will be required, in a manner consistent with the servicing standard, to, or to cause the servicers of the mortgage loans to, foreclose upon or otherwise comparably convert the ownership of properties securing any mortgage loans in the related mortgage pool that come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. Generally, the foreclosure process will commence no later than 90 days after delinquency of the related mortgage loan. The master servicer and each servicer will be authorized to institute foreclosure proceedings, exercise any power of sale contained in the related mortgage, obtain a deed in lieu of foreclosure, or otherwise acquire title to the related mortgaged property, by operation of law or otherwise, if the action is consistent with the servicing standard. The master servicer's or applicable servicer's actions in this regard must be conducted, however, in a manner that will permit recovery under any instrument of credit enhancement included in the related trust fund. In

22

addition, neither the master servicer nor any other servicer will be required to expend its own funds in connection with any foreclosure or to restore any damaged property unless it shall determine that (1) the foreclosure and/or restoration will increase the proceeds of liquidation of the mortgage loan to the related securityholders after reimbursement to itself for these expenses and (2) these expenses will be recoverable to it from related Insurance Proceeds, Liquidation Proceeds or amounts drawn out of any fund or under any instrument constituting credit enhancement (respecting which it shall have priority for purposes of withdrawal from the Distribution Account in accordance with the pooling and servicing agreement or servicing agreement).

However, unless otherwise specified in the related prospectus supplement, neither the master servicer nor any other servicer may acquire title to any multifamily property or commercial property securing a mortgage loan or take any other action that would cause the related trustee, for the benefit of securityholders of the related series, or any other specified person to be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or an "operator" of such mortgaged property within the meaning of federal environmental laws, unless the master servicer or the servicer of the mortgage loan has previously determined, based on a report prepared by a person who regularly conducts environmental audits (which report will be an expense of the trust fund), that either:

> (1)      the mortgaged property is in compliance with applicable environmental laws and regulations or, if not, that taking actions as are necessary to bring the mortgaged property into compliance with these laws is reasonably likely to produce a greater recovery on a present value basis than not taking those actions; and

> (2)      there are no circumstances or conditions present at the mortgaged property that have resulted in any contamination for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any applicable environmental laws and regulations or, if those circumstances or conditions are present for which any such action could be required, taking those actions with respect to the mortgaged property is reasonably likely to produce a greater recovery on a present value basis than not taking those actions. See "Legal Aspects of Mortgage Loans—Environmental Legislation."

Neither the master servicer nor any other servicer will be obligated to foreclose upon or otherwise convert the ownership of any mortgaged property securing a single family loan if it has received notice or has actual knowledge that the property may be contaminated with or affected by hazardous wastes or hazardous substances; however, environmental testing will not be required. The master servicer or servicer, as applicable, will not be liable to the securityholders of the related series if, based on its belief that no such contamination or effect exists, the master servicer or such servicer forecloses on a mortgaged property and takes title to the mortgaged property, and thereafter the mortgaged property is determined to be so contaminated or affected.

With respect to a mortgage loan in default, the master servicer or servicer of the mortgage loan may pursue foreclosure (or similar remedies) concurrently with pursuing any remedy for a breach of a representation and warranty. However, neither the master servicer nor the servicer of the mortgage loan is required to continue to pursue both remedies if it determines that one remedy is more likely than the other to result in a greater recovery. Upon the first to occur of final liquidation (by foreclosure or otherwise) or a repurchase or substitution pursuant to a breach of a representation and warranty, the mortgage loan will be removed from the related trust fund if it has not been removed previously. The master servicer or servicer may elect to treat a defaulted mortgage loan as having been finally liquidated if a substantial portion or all of the amounts expected to be received from that mortgage loan have been received. Any

23

additional liquidation expenses relating to the mortgage loan thereafter incurred will be reimbursable to the master servicer or servicer, as applicable, from any amounts otherwise distributable to holders of securities of the related series, or may be offset by any subsequent recovery related to the mortgage loan. Alternatively, for purposes of determining the amount of related Liquidation Proceeds to be distributed to securityholders, the amount of any Realized Loss or the amount required to be drawn under any applicable form of credit support, the master servicer and servicer may take into account minimal amounts of additional receipts expected to be received, as well as estimated additional liquidation expenses expected to be incurred in connection with the defaulted mortgage loan.

As provided above, the master servicer or a servicer may pass through less than the full amount it expects to receive from the related mortgage loan; however, the master servicer or servicer may only do this if the master servicer or servicer reasonably believes it will maximize the proceeds to the securityholders in the aggregate. To the extent the master servicer or servicer receives additional recoveries following liquidation, the amount of the Realized Loss will be restated, and the additional recoveries will be passed through the trust as Liquidation Proceeds. In the event the amount of the Realized Loss is restated, the amount of overcollateralization or the principal balance of the most subordinate class of securities in the trust may be increased. However, the holders of any securities whose principal balance is increased will not be reimbursed interest for the period during which the principal balance of their securities was lower.

With respect to a series of securities, if so provided in the related prospectus supplement, the applicable form of credit enhancement may provide, to the extent of coverage, that a defaulted mortgage loan will be removed from the trust fund prior to the final liquidation thereof. In addition, a pooling and servicing agreement or servicing agreement may grant to the company, an affiliate of the company, the master servicer, a special servicer, a provider of credit enhancement and/or the holder or holders of specified classes of securities of the related series a right of first refusal to purchase from the trust fund, at a predetermined purchase price, any mortgage loan as to which a specified number of scheduled payments are delinquent. If the purchase price is insufficient to fully fund the entitlements of securityholders to principal and interest, it will be specified in the related prospectus supplement. Furthermore, a pooling and servicing agreement or a servicing agreement may authorize the master servicer or servicer of the mortgage loan to sell any defaulted mortgage loan if and when the master servicer or servicer determines, consistent with the servicing standard, that the sale would produce a greater recovery to securityholders on a present value basis than would liquidation of the related mortgaged property.

In the event that title to any mortgaged property is acquired by foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale will be issued to the trustee or to its nominee on behalf of securityholders of the related series. Notwithstanding any acquisition of title and cancellation of the related mortgage loan, the REO Mortgage Loan will be considered for most purposes to be an outstanding mortgage loan held in the trust fund until the mortgaged property is sold and all recoverable Liquidation Proceeds and Insurance Proceeds have been received with respect to the defaulted mortgage loan. For purposes of calculations of amounts distributable to securityholders in respect of an REO Mortgage Loan, the amortization schedule in effect at the time of any acquisition of title (before any adjustment thereto by reason of any bankruptcy or any similar proceeding or any moratorium or similar waiver or grace period) will be deemed to have continued in effect (and, in the case of an ARM Loan, the amortization schedule will be deemed to have adjusted in accordance with any interest rate changes occurring on any adjustment date therefor) so long as the REO Mortgage Loan is considered to remain in the trust fund.

If title to any mortgaged property is acquired by a trust fund as to which a REMIC election has been made, the master servicer, on behalf of the trust fund, will be required to sell, or cause the servicer of

24

the mortgage loan to sell, the mortgaged property within three years of acquisition, unless (1) the IRS grants an extension of time to sell the property or (2) the trustee receives an opinion of independent counsel to the effect that the holding of the property by the trust fund for more than three years after its acquisition will not result in the imposition of a tax on the trust fund or cause the trust fund to fail to qualify as a REMIC under the Code at any time that any certificate is outstanding. Subject to the foregoing and any other tax-related constraints, the master servicer generally will be required to solicit bids, or to cause a servicer to solicit bids, for any mortgaged property so acquired in a manner as will be reasonably likely to realize a fair price for the property. If title to any mortgaged property is acquired by a trust fund as to which a REMIC election has been made, the master servicer will also be required to ensure that the mortgaged property is administered so that it constitutes "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at all times, that the sale of the property does not result in the receipt by the trust fund of any income from non-permitted assets as described in Section 860F(a)(2)(B) of the Code, and that the trust fund does not derive any "net income from foreclosure property" within the meaning of Section 860G(c)(2) of the Code with respect to the property.

If Liquidation Proceeds collected with respect to a defaulted mortgage loan are less than the outstanding principal balance of the defaulted mortgage loan plus accrued interest plus the aggregate amount of reimbursable expenses incurred by the master servicer or the servicer, as applicable, with respect to the mortgage loan, and the shortfall is not covered under any applicable instrument or fund constituting credit enhancement, the trust fund will realize a loss in the amount of the difference. The master servicer or servicer, as applicable, will be entitled to reimburse itself from the Liquidation Proceeds recovered on any defaulted mortgage loan, prior to the distribution of Liquidation Proceeds to securityholders, amounts that represent unpaid servicing compensation in respect of the mortgage loan, unreimbursed servicing expenses incurred with respect to the mortgage loan and any unreimbursed advances of delinquent payments made with respect to the mortgage loan. If so provided in the related prospectus supplement, the applicable form of credit enhancement may provide for reinstatement subject to specified conditions in the event that, following the final liquidation of a mortgage loan and a draw under the credit enhancement, subsequent recoveries are received. In addition, if a gain results from the final liquidation of a defaulted mortgage loan or an REO Mortgage Loan which is not required by law to be remitted to the related mortgagor, the master servicer or servicer, as applicable, will be entitled to retain the gain as additional servicing compensation unless the related prospectus supplement provides otherwise. For a description of the master servicer's (or other specified person's) obligations to maintain and make claims under applicable forms of credit enhancement and insurance relating to the mortgage loans, see "Description of Credit Enhancement" and "Description of Primary Mortgage Insurance, Hazard Insurance; Claims Thereunder."

**Servicing and Other Compensation and Payment of Expenses; Retained Interest**

The principal servicing compensation to be paid to the master servicer in respect of its master servicing activities for a series of securities will be equal to the percentage or range of percentages per annum described in the related prospectus supplement of the outstanding principal balance of each mortgage loan, and this compensation will be retained by it on a monthly or other periodic basis from collections of interest on each mortgage loan in the related trust fund at the time the collections are deposited into the applicable Distribution Account. This portion of the servicing fee will be calculated with respect to each mortgage loan by multiplying the fee by the principal balance of the mortgage loan. In addition, to the extent not permitted to be retained by the servicer of the mortgage loan, the master servicer may retain all prepayment premiums, assumption fees and late payment charges, to the extent collected from mortgagors, and any benefit which may accrue as a result of the investment of funds in the

25

applicable Distribution Account. Any additional servicing compensation will be described in the related prospectus supplement.

The principal servicing compensation to be paid to each servicer in respect of its servicing activities for a series of securities will be equal to the percentage or range of percentages per annum described in the related prospectus supplement of the outstanding principal balance of each mortgage loan serviced by such servicer, and this compensation will be retained by it on a monthly or other periodic basis from collections of interest on each mortgage loan in the related trust fund at the time the collections are deposited into such servicer's Protected Account. This portion of the servicing fee will be calculated with respect to each mortgage loan serviced by a servicer by multiplying the fee by the principal balance of the mortgage loan. In addition, each servicer may retain all prepayment premiums, assumption fees and late payment charges, to the extent collected from mortgagors, and any benefit which may accrue as a result of the investment of funds in its Protected Account. Any additional servicing compensation will be described in the related prospectus supplement.

The master servicer will pay or cause to be paid some of the ongoing expenses associated with each trust fund and incurred by it in connection with its responsibilities under the pooling and servicing agreement or servicing agreement, including, if so specified in the related prospectus supplement, payment of any fee or other amount payable in respect of any alternative credit enhancement arrangements, payment of the fees and disbursements of the trustee, any custodian appointed by the trustee and the security registrar, and payment of expenses incurred in enforcing the obligations of the servicers and the Sellers. The master servicer will be entitled to reimbursement of expenses incurred in enforcing the obligations of the servicers and the Sellers under limited circumstances. In addition, the master servicer and each servicer will be entitled to reimbursements for some of its expenses incurred in connection with liquidated mortgage loans and in connection with the restoration of mortgaged properties, this right of reimbursement being prior to the rights of securityholders to receive any related Liquidation Proceeds or Insurance Proceeds. If and to the extent so provided in the related prospectus supplement, the master servicer and each servicer will be entitled to receive interest on amounts advanced to cover reimbursable expenses for the period that the advances are outstanding at the rate specified in the prospectus supplement, and the master servicer and each servicer will be entitled to payment of the interest periodically from general collections on the mortgage loans in the related trust fund prior to any payment to securityholders or as otherwise provided in the related pooling and servicing agreement or servicing agreement and described in the prospectus supplement.

The prospectus supplement for a series of securities will specify whether there will be any interest in the mortgage loans retained by the company. Any retained interest will be a specified portion of the interest payable on each mortgage loan in a mortgage pool and will not be part of the related trust fund. Any retained interest will be established on a loan-by-loan basis and the amount thereof with respect to each mortgage loan in a mortgage pool will be specified on an exhibit to the related pooling and servicing agreement or servicing agreement. Any partial recovery of interest in respect of a mortgage loan will be allocated between the owners of any retained interest and the holders of classes of securities entitled to payments of interest as provided in the related prospectus supplement and the applicable pooling and servicing agreement or servicing agreement.

If and to the extent provided in the related prospectus supplement, the master servicer and the servicers may be required to apply a portion of the servicing compensation otherwise payable to it in respect of any period to any Prepayment Interest Shortfalls resulting from mortgagor prepayments during that period. See "Yield Considerations."

26

**Evidence as to Compliance**

Each pooling and servicing agreement and servicing agreement will provide that on or before a specified date in each year, beginning the first such date that is at least a specified number of months after the cut-off date, a firm of independent public accountants will furnish a statement to the company and the trustee (and to the master servicer if such statement is being furnished with respect to a servicer) to the effect that, on the basis of an examination by the firm conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for mortgages serviced for Freddie Mac, the servicing of mortgage loans under agreements (including the related pooling and servicing agreement or servicing agreement) substantially similar to each other was conducted in compliance with the agreements except for significant exceptions or errors in records that, in the opinion of the firm, the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for mortgages serviced for Freddie Mac requires it to report. In rendering its statement the firm may rely, as to the matters relating to the direct servicing of mortgage loans by subservicers, upon comparable statements for examinations conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Program for mortgages serviced for Freddie Mac (rendered within one year of the statement) of firms of independent public accountants with respect to those subservicers which also have been the subject of this type of examination. If the master servicer has not, during the course of a fiscal year, directly serviced any of the mortgage loans, such accountants statement will only be provided with respect to the servicers of the mortgage loans and no such accountants statement will be provided with respect to the master servicer.

Each pooling and servicing agreement and servicing agreement will also provide for delivery to the trustee, on or before a specified date in each year, of an annual statement signed by one or more officers of the master servicer to the effect that, to the best knowledge of each officer, the master servicer has fulfilled in all material respects its obligations under the pooling and servicing agreement or servicing agreement throughout the preceding year or, if there has been a material default in the fulfillment of any obligation, the statement shall specify each known default and the nature and status thereof.  This statement may be provided as a single form making the required statements as to more than one pooling and servicing agreement or servicing agreement. In addition, pursuant to its respective servicing agreement, one or more officers of each servicer will also be required to provide the foregoing annual statement to the master servicer prior to the time that the master servicer is required to deliver its annual statement to the trustee.

Copies of the annual accountants' statement and the annual statement of officers of a master servicer may be obtained by securityholders without charge upon written request to the master servicer or trustee.

## DESCRIPTION OF THE SECURITIES

**General**

The securities will be issued in series. Each series of certificates (or, in some instances, two or more series of certificates) will be issued pursuant to a pooling and servicing agreement, similar to one of the forms filed as an exhibit to the registration statement of which this prospectus is a part.  Each pooling and servicing agreement will be filed with the Commission as an exhibit to a Current Report on Form 8-K. Each series of notes (or, in some instances, two or more series of notes) will be issued pursuant to an indenture between the related Issuer and the trustee, similar to the form filed as an exhibit to the registration statement of which this prospectus is a part. The trust fund will be created pursuant to an

owner trust agreement between the company and the owner trustee. Each indenture, along with the related servicing agreement and owner trust agreement, will be filed with the Commission as an exhibit to a Current Report on Form 8-K. Qualified counsel will render an opinion to the effect that the trust fund's assets will not be considered assets of the Seller or the company in the event of the bankruptcy of the Seller or the company. The following summaries (together with additional summaries under "The Agreements" below) describe the material provisions relating to the securities common to each Agreement.

Certificates of each series covered by a particular pooling and servicing agreement will evidence specified beneficial ownership interests in a separate trust fund created pursuant to the pooling and servicing agreement. Each series of notes covered by a particular indenture will evidence indebtedness of a separate trust fund created pursuant to the related owner trust agreement. A trust fund will consist of, to the extent provided in the pooling and servicing agreement or owner trust agreement:

- the mortgage loans (and the related mortgage documents) or interests therein (including any mortgage securities) underlying a particular series of securities as from time to time are subject to the pooling and servicing agreement or servicing agreement, exclusive of, if specified in the related prospectus supplement, any interest retained by the company or any of its affiliates with respect to each mortgage loan;

- all payments and collections in respect of the mortgage loans or mortgage securities due after the related cut-off date, as from time to time are identified as deposited in respect thereof in the related Protected Account, Distribution Account or any other account established pursuant to the Agreement as described below;

- any property acquired in respect of mortgage loans in the trust fund, whether through foreclosure of a mortgage loan or by deed in lieu of foreclosure;

- hazard insurance policies, Primary Insurance Policies, FHA insurance policies and VA guarantees, if any, maintained in respect of mortgage loans in the trust fund and the proceeds of these policies;

- the rights of the company under any mortgage loan purchase agreement, including in respect of any representations and warranties therein; and

- any combination, as and to the extent specified in the related prospectus supplement, of a financial guaranty insurance policy, mortgage pool insurance policy, letter of credit, special hazard insurance policy, or currency or interest rate exchange agreements as described under "Description of Credit Enhancement" or any other form of credit enhancement as may be described in the related prospectus supplement.

If provided in the related prospectus supplement, the original principal amount of a series of securities may exceed the principal balance of the mortgage loans or mortgage securities initially being delivered to the trustee. Cash in an amount equal to this difference will be deposited into a pre-funding account maintained with the trustee. During the period set forth in the related prospectus supplement, amounts on deposit in the pre-funding account may be used to purchase additional mortgage loans or mortgage securities for the related trust fund. Any amounts remaining in the pre-funding account at the end of the period will be distributed as a principal prepayment to the holders of the related series of securities at the time and in the manner set forth in the related prospectus supplement.

Each series of securities may consist of any one or a combination of the following:

- a single class of securities;

- two or more classes of securities, one or more classes of which may be senior in right of payment to one or more of the other classes, and as to which some classes of senior (or subordinate) securities may be senior to other classes of senior (or subordinate) securities, as described in the respective prospectus supplement;

- two or more classes of securities, one or more classes of which will be Strip Securities;

- two or more classes of securities which differ as to the timing, sequential order, rate, pass-through rate or amount of distributions of principal or interest or both, or as to which distributions of principal or interest or both on a class may be made upon the occurrence of specified events, in accordance with a schedule or formula (including "planned amortization classes" and "targeted amortization classes"), or on the basis of collections from designated portions of the mortgage pool, and which classes may include one or more classes of Accrual Securities; or

- other types of classes of securities, as described in the related prospectus supplement.

With respect to any series of notes, the related Equity Certificates, insofar as they represent the beneficial ownership interest in the Issuer, will be subordinate to the related notes. As to each series, the offered securities will be rated in one of the four highest rating categories by one or more Rating Agencies. Credit support for the offered securities of each series may be provided by a financial guaranty insurance policy, mortgage pool insurance policy, letter of credit, reserve fund, currency or interest rate exchange agreement, overcollateralization, cross-collateralization or by the subordination of one or more other classes of securities, each, as described under "Description of Credit Enhancement," or by any combination of the foregoing.

If so specified in the prospectus supplement relating to a series of certificates, one or more elections may be made to treat the related trust fund, or a designated portion thereof, as a REMIC. If an election is made with respect to a series of certificates, one of the classes of certificates in the series will be designated as evidencing the sole class of "residual interests" in each related REMIC, as defined in the Code; alternatively, a separate class of ownership interests will evidence the residual interests. All other classes of certificates in the series will constitute "regular interests" in the related REMIC, as defined in the Code. As to each series of certificates as to which a REMIC election is to be made, the master servicer, trustee or other specified person will be obligated to take specified actions required in order to comply with applicable laws and regulations.

**Form of Securities**

Except as described below, the offered securities of each series will be issued as physical certificates or notes in fully registered form only in the denominations specified in the related prospectus supplement, and will be transferable and exchangeable at the corporate trust office of the registrar named in the related prospectus supplement. No service charge will be made for any registration of exchange or transfer of offered securities, but the trustee may require payment of a sum sufficient to cover any tax or other governmental charge. A "securityholder" or "holder" is the entity whose name appears on the

29

records of the registrar (consisting of or including the security register) as the registered holder of a security.

If so specified in the related prospectus supplement, specified classes of a series of securities will be initially issued through the book-entry facilities of DTC. As to any class of DTC Registered Securities, the recordholder of the securities will be DTC's nominee. DTC is a limited-purpose trust company organized under the laws of the State of New York, which holds securities for its participants and facilitates the clearance and settlement of securities transactions between participants through electronic book-entry changes in the accounts of participants. Intermediaries have indirect access to DTC's clearance system.

If securities are issued as DTC Registered Securities, no Beneficial Owner will be entitled to receive a security representing its interest in registered, certificated form, unless either (1) DTC ceases to act as depository in respect thereof and a successor depository is not obtained, or (2) the company elects in its sole discretion to discontinue the registration of the securities through DTC. Prior to one of these events, Beneficial Owners will not be recognized by the trustee or the master servicer as holders of the related securities for purposes of the related pooling and servicing agreement or indenture, and Beneficial Owners will be able to exercise their rights as owners of the securities only indirectly through DTC, participants and Intermediaries. Any Beneficial Owner that desires to purchase, sell or otherwise transfer any interest in DTC Registered Securities may do so only through DTC, either directly if the Beneficial Owner is a participant or indirectly through participants and, if applicable, Intermediaries. Pursuant to the procedures of DTC, transfers of the beneficial ownership of any DTC Registered Securities will be required to be made in minimum denominations specified in the related prospectus supplement.  The ability of a Beneficial Owner to pledge DTC Registered Securities to persons or entities that are not participants in the DTC system, or to otherwise act with respect to the securities, may be limited because of the lack of physical certificates or notes evidencing the securities and because DTC may act only on behalf of participants.

Distributions in respect of the DTC Registered Securities will be forwarded by the trustee or other specified person to DTC, and DTC will be responsible for forwarding the payments to participants, each of which will be responsible for disbursing the payments to the Beneficial Owners it represents or, if applicable, to Intermediaries. Accordingly, Beneficial Owners may experience delays in the receipt of payments in respect of their securities.  Under DTC's procedures, DTC will take actions permitted to be taken by holders of any class of DTC Registered Securities under the pooling and servicing agreement or indenture only at the direction of one or more participants to whose account the DTC Registered Securities are credited and whose aggregate holdings represent no less than any minimum amount of Percentage Interests or voting rights required therefor. DTC may take conflicting actions with respect to any action of holders of securities of any class to the extent that participants authorize these actions. None of the master servicer, the company, the trustee or any of their respective affiliates will have any liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the DTC Registered Securities, or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

**Global Securities**

Some of the offered securities may be Global Securities. Except in some limited circumstances, the Global Securities will be available only in book-entry form. Investors in the Global Securities may hold those Global Securities through any of DTC, Clearstream, or Euroclear System (in Europe). The

Global Securities will be traceable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors through Clearstream and Euroclear System will be conducted in the ordinary way in accordance with the normal rules and operating procedures of Clearstream and Euroclear System and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors through DTC will be conducted according to DTC's rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between Clearstream or Euroclear System and DTC participants holding interests in Global Securities will be effected on a delivery-against-payment basis through the respective depositaries of Clearstream and Euroclear System (in that capacity) and as DTC participants.

Non-U.S. holders (as described below) of interests in Global Securities will be subject to U.S. withholding taxes unless those holders meet various requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. As a result, Clearstream and Euroclear System will hold positions on behalf of their participants through their relevant depositary which in turn will hold those positions in their accounts as DTC participants.

Investors electing to hold their interests in Global Securities through DTC will follow DTC settlement practices. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their interests in Global Securities through Clearstream or Euroclear System accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

Secondary market trading between DTC participants will occur in accordance with DTC rules. Secondary market trading between Clearstream participants or Euroclear System participants will be settled using the procedures applicable to conventional eurobonds in same-day funds. When Global Securities are to be transferred from the account of a DTC participant to the account of a Clearstream participant or a Euroclear System participant, the purchaser will send instructions to Clearstream or Euroclear System through a Clearstream participant or Euroclear System participant at least one business day prior to settlement. Clearstream or Euroclear System will instruct the relevant depositary, as the case may be, to receive the Global Securities against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date, on the basis of the actual number of days in that accrual period and a year assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding

31

the first day of the following month. Payment will then be made by the relevant depositary to the DTC participant's account against delivery of the Global Securities. After settlement has been completed, the Global Securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream participant's or Euroclear System participant's account. The securities credit will appear the next day (European time) and the cash debit will be back-valued to, and the interest on the Global Securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails),the Clearstream or Euroclear System cash debit will be valued instead as of the actual settlement date.

Clearstream participants and Euroclear System participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream or Euroclear System. Under this approach, they may take on credit exposure to Clearstream or Euroclear System until the Global Securities are credited to their account one day later. As an alternative, if Clearstream or Euroclear System has extended a line of credit to them, Clearstream participants or Euroclear System participants can elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Clearstream participants or Euroclear System participants purchasing Global Securities would incur overdraft charges for one day, assuming they cleared the overdraft when the Global Securities were credited to their accounts. However, interest on the Global Securities would accrue from the value date. Therefore, in many cases the investment income on the Global Securities earned during that one-day period may substantially reduce or offset the amount of those overdraft charges, although the result will depend on each Clearstream participant's or Euroclear System participant's particular cost of funds. Since the settlement is taking place during New York business hours, DTC participants can employ their usual procedures for crediting Global Securities to the respective European depositary for the benefit of Clearstream participants or Euroclear System participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participants a cross-market transaction will settle no differently than a trade between two DTC participants.

Due to time zone differences in their favor, Clearstream participants and Euroclear System participants may employ their customary procedures for transactions in which Global Securities are to be transferred by the respective clearing system, through the respective depositary, to a DTC participant. The seller will send instructions to Clearstream or Euroclear System through a Clearstream participant or Euroclear System participant at least one business day prior to settlement. In these cases Clearstream or Euroclear System will instruct the respective depositary, as appropriate, to credit the Global Securities to the DTC participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in that accrual period and a year assumed to consist to 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of Clearstream participant or Euroclear System participant the following day, and receipt of the cash proceeds in the Clearstream participant's or Euroclear System participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream participant or Euroclear System participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream participant's or Euroclear System participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream or Euroclear System and that purchase interests in Global Securities from DTC participants for delivery to Clearstream participants or Euroclear System participants should note that these trades would automatically fail on the sale side unless affirmative action is taken. At least three techniques should be readily available to eliminate this potential problem:

- borrowing through Clearstream or Euroclear System for one day (until the purchase side of the trade is reflected in their Clearstream or Euroclear System accounts) in accordance with the clearing system's customary procedures;

- borrowing the Global Securities in the U.S. from a DTC participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Clearstream or Euroclear System account in order to settle the sale side of the trade; or

- staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Clearstream participant or Euroclear System participant.

A beneficial owner of interests in Global Securities holding securities through Clearstream or Euroclear System (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons (as defined below), unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between that beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) that beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate: Exemption for Non-U.S. Persons (Form W-8BEN). Beneficial holders of interests in Global Securities that are Non-U.S. Persons (as defined below) can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of that change.

A Non-U.S. Person (as defined below), including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Exemption from Withholding of Tax on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

Non-U.S. Persons residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (Holdership, Exemption or Reduced Rate Certificate). Form W-8BEN may be filed by Noteholders or their agent.

U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

The holder of an interest in a Global Security or, in the case of a Form W-8BEN or a Form W-8ECI filer, his agent, files by submitting the appropriate form to the person through whom it holds the security (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are effective for three calendar years. The term "U.S. Person" means a citizen or resident of the United States, a corporation, partnership or other entity created or organized in,

or under the laws of, the United States or any political subdivision thereof (except, in the case of a partnership, to the extent provided in regulations), or an estate whose income is subject to United States federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States Persons have the authority to control all substantial decisions of the trust. The term "Non-U.S. Person" means any person who is not a U.S. Person. This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Global Securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

**Assignment of Trust Fund Assets**

At the time of issuance of a series of securities, the company will assign, or cause to be assigned, to the related trustee (or its nominee),without recourse, the mortgage loans or mortgage securities being included in the related trust fund, together with, all principal and interest received on or with respect to the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date. If specified in the related prospectus supplement, the company or any of its affiliates may retain an interest in the trust fund assets, if any, for itself or transfer the same to others. The trustee will, concurrently with the assignment, deliver the securities of the series to or at the direction of the company in exchange for the mortgage loans and/or mortgage securities in the related trust fund. Each mortgage loan will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement or servicing agreement. The schedule will include, among other things, information as to the principal balance of each mortgage loan in the related trust fund as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the Loan-to-Value Ratio at origination or modification (without regard to any secondary financing).

In addition, the company will, as to each mortgage loan, other than (1) mortgage loans underlying any mortgage securities and (2) Contracts, deliver, or cause to be delivered, to the related trustee (or to the custodian described below) the following documents:

- the mortgage note endorsed, without recourse, either in blank or to the order of the trustee (or its nominee),

- the mortgage with evidence of recording indicated on the mortgage (except for any mortgage not returned from the public recording office) or, in the case of a cooperative mortgage loan, on the related financing statement,

- an assignment of the mortgage in blank or to the trustee (or its nominee) in recordable form (or, with respect to a cooperative mortgage loan, an assignment of the respective security agreements, any applicable UCC financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements),

- any intervening assignments of the mortgage with evidence of recording on the assignment (except for any assignment not returned from the public recording office),

- if applicable, any riders or modifications to the mortgage note and mortgage,

34

- if the mortgage loan is secured by additional collateral, certain security and assignment documents relating to the pledge of the additional collateral, and

- any other documents set forth in the related pooling and servicing agreement, mortgage loan purchase agreement or servicing agreement.

The assignments may be blanket assignments covering mortgages on mortgaged properties located in the same county, if permitted by law.

Notwithstanding the foregoing, a trust fund may include mortgage loans where the original mortgage note is not delivered to the trustee if the company delivers, or causes to be delivered, to the related trustee (or the custodian) a copy or a duplicate original of the mortgage note, together with an affidavit certifying that the original thereof has been lost or destroyed. In addition, if the company cannot deliver, with respect to any mortgage loan, the mortgage or any intervening assignment with evidence of recording on the assignment concurrently with the execution and delivery of the related pooling and servicing agreement or servicing agreement because of a delay caused by the public recording office, the company will deliver, or cause to be delivered, to the related trustee (or the custodian) a true and correct photocopy of the mortgage or assignment as submitted for recording within one year. The company will deliver, or cause to be delivered, to the related trustee (or the custodian) the mortgage or assignment with evidence of recording indicated on the assignment after receipt thereof from the public recording office. If the depositor cannot deliver, with respect to any mortgage loan, the mortgage or any intervening assignment with evidence of recording on the mortgage or assignment concurrently with the execution and delivery of the related pooling and servicing agreement or servicing agreement because the mortgage or assignment has been lost, the depositor will deliver, or cause to be delivered, to the related trustee (or the custodian) a true and correct photocopy of the mortgage or assignment with evidence of recording on the mortgage or assignment.  If the company cannot deliver, with respect to any mortgage loan, the mortgage or any intervening assignment with evidence of recording on the mortgage or assignment because the applicable jurisdiction retains the originals of such documents, the depositor will deliver photocopies of such documents containing an original certification by the judicial or other governmental authority of the jurisdiction where such documents were recorded.  Assignments of the mortgage loans to the trustee (or its nominee) will be recorded in the appropriate public recording office, except (1) where recordation is not required by the Rating Agencies rating the applicable securities, (2) in states where, in the opinion of counsel acceptable to the trustee, recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the company or the originator of the mortgage loan or (3) where Mortgage Electronic Registration Systems, Inc. is identified on the mortgage or a properly recorded assignment of mortgage as the mortgagee of record solely as nominee for a Seller and its successors and assigns. In addition, the depositor shall not be required to deliver intervening assignments or mortgage note endorsements between the underlying sellers of the mortgage loans and the Seller, between the Seller and the company and between the company and the trustee.

As to each Contract, the company will deliver, or cause to be delivered, to the related trustee (or the custodian) the following documents:

- the original Contract endorsed, without recourse, to the order of the trustee,

- copies of documents and instruments related to the Contract and the security interest in the Manufactured Home securing the Contract, and

35

- a blanket assignment to the trustee of all Contracts in the related trust fund and the related documents and instruments.

In order to give notice of the right, title and interest of the securityholders to the Contracts, the company will cause to be executed and delivered to the trustee a UCC-1 financing statement identifying the trustee as the secured party and identifying all Contracts as collateral.

The company will, as to each mortgage security included in a mortgage pool, deliver, or cause to be delivered, to the related trustee (or the custodian), either (1) cause an electronic transfer of that security or (2) provide a physical certificate or note evidencing the mortgage security, registered in the name of the related trustee (or its nominee), or endorsed in blank or to the related trustee (or its nominee), or accompanied by transfer documents sufficient to effect a transfer to the trustee (or its nominee).

The trustee (or the custodian) will hold the documents in trust for the benefit of the related securityholders, and generally will review the documents within 180 days after receipt thereof in the case of documents delivered concurrently with the execution and delivery of the related pooling and servicing agreement or indenture, and within the time period specified in the related pooling and servicing agreement or indenture in the case of all other documents delivered. If any document is found to be missing or defective in any material respect, the trustee (or the custodian) will be required to promptly so notify the master servicer, the company, and the related Seller. If the related Seller does not cure the omission or defect within a specified period after notice is given thereto by the trustee, and the omission or defect materially and adversely affects the interests of securityholders in the affected mortgage loan or mortgage security, then, the related Seller will be obligated to repurchase the mortgage loan or mortgage security from the trustee at its purchase price (or, if and to the extent it would otherwise be permitted to do so for a breach of representation and warranty as described under "The Mortgage Pools—Representations of Sellers," to substitute for the mortgage loan or mortgage security). The trustee will be obligated to enforce this obligation of the Seller to the extent described above under "The Mortgage Pools—Representations by Sellers," but there can be no assurance that the applicable Seller will fulfill its obligation to repurchase (or substitute for) the affected mortgage loan or mortgage security as described above. The company will not be obligated to repurchase or substitute for the mortgage loan or mortgage security if the Seller defaults on its obligation to do so. This repurchase or substitution obligation constitutes the sole remedy available to the related securityholders and the related trustee for omission of, or a material defect in, a constituent document. Any affected mortgage loan or mortgage security not so repurchased or substituted for shall remain in the related trust fund.

The trustee will be authorized at any time to appoint one or more custodians pursuant to a custodial agreement to hold title to the mortgage loans and/or mortgage securities in any mortgage pool, and to maintain possession of and, if applicable, to review, the documents relating to the mortgage loans and/or mortgage securities, in any case as the agent of the trustee. The identity of any custodian to be appointed on the date of initial issuance of the securities will be set forth in the related prospectus supplement. A custodian may be an affiliate of the company or the master servicer.

Except as to mortgage loans underlying any mortgage securities, the Seller will make representations and warranties as to the types and geographical concentrations of the mortgage loans and as to the accuracy of some of the information furnished to the related trustee in respect of each mortgage loan (for example, the original Loan-to-Value Ratio, the principal balance as of the cut-off date, the mortgage rate and maturity). Upon a breach of any of these representations which materially and adversely affects the interests of the securityholders in a mortgage loan, the Seller will be obligated to cure the breach in all material respects, to repurchase the mortgage loan at its purchase price or, to

36

substitute for the mortgage loan a Qualified Substitute Mortgage Loan in accordance with the provisions for substitution by Sellers as described above under "The Mortgage Pools—Representations by Sellers." This repurchase or substitution obligation constitutes the sole remedy available to securityholders or the trustee for a breach of a representation by the company. Any mortgage loan not so repurchased or substituted for shall remain in the related trust fund.

Pursuant to the related pooling and servicing agreement or servicing agreement, the master servicer for any mortgage pool, either directly or through servicers, will service and administer the mortgage loans included in the mortgage pool and assigned to the related trustee as more fully set forth under "Servicing of Mortgage Loans." Each of the company and the master servicer will make limited representations and warranties regarding its authority to enter into, and its ability to perform its obligations under, the pooling and servicing agreement or servicing agreement.

**Distribution Account**

*General*.  The master servicer and/or the trustee will, as to each trust fund, establish and maintain or cause to be established and maintained a Distribution Account, which will be established so as to comply with the standards of each Rating Agency that has rated any one or more classes of securities of the related series. A Distribution Account shall be maintained as an Eligible Account, and the funds held therein may be held as cash or invested in Permitted Investments. Any Permitted Investments shall not cause the company to register under the Investment Company Act of 1940. Any interest or other income earned on funds in the Distribution Account will be paid to the related master servicer or trustee as additional compensation or will be available for payments on the securities as provided in the prospectus supplement. If permitted by the Rating Agency or Agencies and so specified in the related prospectus supplement, a Distribution Account may contain funds relating to more than one series of mortgage pass-through certificates and may contain other funds representing payments on mortgage loans owned by the related master servicer or serviced by it on behalf of others.

*Deposits*. With respect to each series of securities, the related master servicer, servicer, trustee or special servicer will be required to deposit or cause to be deposited in the Distribution Account for the related trust fund within a period following receipt (in the case of collections and payments), the following payments and collections received, or advances made, by the master servicer, the trustee or any special servicer subsequent to the cut-off date with respect to the mortgage loans and/or mortgage securities in the trust fund (other than payments due on or before the cut-off date):

- all payments on account of principal, including principal prepayments, on the mortgage loans;

- all payments on account of interest on the mortgage loans, including any default interest collected, in each case net of any portion thereof retained by the master servicer, any servicer, or any special servicer as its servicing compensation or as compensation to the trustee, and further net of any retained interest of the company;

- all payments on the mortgage securities;

- all Insurance Proceeds and Liquidation Proceeds;

- any amounts paid under any instrument or drawn from any fund that constitutes credit enhancement for the related series of securities as described under "Description of Credit Enhancement";

- any advances made as described under "—Advances" below;

- any Buydown Funds (and, if applicable, investment earnings on the Buydown Funds) required to be paid to securityholders, as described below;

- any amounts paid by the master servicer and the servicers to cover Prepayment Interest Shortfalls arising out of the prepayment of mortgage loans as described under "Servicing of Mortgage Loans—Servicing and Other Compensation and Payment of Expenses; Retained Interest";

- to the extent that any item does not constitute additional servicing compensation to the master servicer, a servicer or a special servicer, any payments on account of modification or assumption fees, late payment charges or prepayment premiums on the mortgage loans;

- any amount required to be deposited by the master servicer or the trustee in connection with losses realized on investments for the benefit of the master servicer or the trustee, as the case may be, of funds held in the Distribution Account; and

- any other amounts required to be deposited in the Distribution Account as provided in the related pooling and servicing agreement or the related servicing agreement and indenture and described in this prospectus or in the related prospectus supplement.

With respect to each buydown mortgage loan, the master servicer will be required to deposit, or cause the related servicer to deposit, the related Buydown Funds provided to it in a Buydown Account which will comply with the requirements set forth in this prospectus with respect to the Distribution Account. The terms of all buydown mortgage loans provide for the contribution of Buydown Funds in an amount equal to or exceeding either (1) the total payments to be made from the funds pursuant to the related buydown plan or (2) if the Buydown Funds are to be deposited on a discounted basis, that amount of Buydown Funds which, together with investment earnings on the Buydown Funds at a rate as will support the scheduled level of payments due under the buydown mortgage loan. Neither the master servicer, any servicer nor the company will be obligated to add to any discounted Buydown Funds any of its own funds should investment earnings prove insufficient to maintain the scheduled level of payments. To the extent that any insufficiency is not recoverable from the mortgagor or, in an appropriate case, from the Seller, distributions to securityholders may be affected. With respect to each buydown mortgage loan, the master servicer will be required monthly to withdraw from the Buydown Account and deposit, or cause the related servicer to withdraw from the Buydown Account and deposit, in the Distribution Account as described above the amount, if any, of the Buydown Funds (and, if applicable, investment earnings on the Buydown Funds) for each buydown mortgage loan that, when added to the amount due from the mortgagor on the buydown mortgage loan, equals the full monthly payment which would be due on the buydown mortgage loan if it were not subject to the buydown plan.

If the mortgagor on a buydown mortgage loan prepays the mortgage loan in its entirety during the Buydown Period, the master servicer or servicer of the mortgage loan will be required to withdraw from the Buydown Account and remit to the mortgagor or the other designated party in

accordance with the related buydown plan any Buydown Funds remaining in the Buydown Account. If a prepayment by a mortgagor during the Buydown Period together with Buydown Funds will result in full prepayment of a buydown mortgage loan, the master servicer or servicer of the mortgage loan generally will be required to withdraw from the Buydown Account and deposit in the Distribution Account the Buydown Funds and investment earnings on the Buydown Funds, if any, which together with the prepayment will result in a prepayment in full; provided that Buydown Funds may not be available to cover a prepayment under some mortgage loan programs. Any Buydown Funds so remitted to the master servicer or the servicer of the mortgage loan in connection with a prepayment described in the preceding sentence will be deemed to reduce the amount that would be required to be paid by the mortgagor to repay fully the related mortgage loan if the mortgage loan were not subject to the buydown plan. Any investment earnings remaining in the Buydown Account after prepayment or after termination of the Buydown Period will be remitted to the related mortgagor or the other designated party pursuant to the Buydown Agreement relating to each buydown mortgage loan. If the mortgagor defaults during the Buydown Period with respect to a buydown mortgage loan and the property securing the buydown mortgage loan is sold in liquidation (either by the master servicer, the servicer of the mortgage loan, the primary insurer, any pool insurer or any other insurer), the master servicer or related servicer will be required to withdraw from the Buydown Account the Buydown Funds and all investment earnings on the Buydown Funds, if any, and either deposit the same in the Distribution Account or, alternatively, pay the same to the primary insurer or the pool insurer, as the case may be, if the mortgaged property is transferred to the insurer and the insurer pays all of the loss incurred in respect of the default.

Prior to the deposit of funds into the Distribution Account, as described under "—Deposits" above, funds related to the mortgage loans serviced by a master servicer or a servicer may be maintained by a master servicer or a servicer in a Protected Account which will be established so as to comply with the standards of each Rating Agency that has rated any one or more classes of securities of the related series. Each Protected Account shall be maintained as an Eligible Account, and the funds held therein may be held as cash or invested in Permitted Investments. Any interest or other income earned on funds in a Protected Account will be paid to the master servicer or servicer, as applicable, as additional compensation. If permitted by the Rating Agency or Agencies and so specified in the related prospectus supplement, a Protected Account may contain funds relating to more than one series of mortgage pass-through certificates and may contain other funds representing payments on mortgage loans owned by the related master servicer or serviced by it on behalf of others. In the event that a trust fund has multiple servicers, funds from the Protected Accounts may first be remitted to a Master Servicer Collection Account, meeting the same eligibility standards as the Protected Accounts, prior to being deposited into the Distribution Account.

*Withdrawals.* With respect to each series of securities, the master servicer, trustee or special servicer generally may make withdrawals from the Distribution Account for the related trust fund for any one or more of the following purposes, unless otherwise provided in the related agreement and described in the related prospectus supplement:

(1)     to make distributions to the related securityholders on each distribution date;

(2)     to reimburse the master servicer, any servicer or any other specified person for unreimbursed amounts advanced by it in respect of mortgage loans in the trust fund as described under "—Advances" below, these reimbursements to be made out of amounts received which were identified and applied by the master servicer or a servicer as late collections of interest (net of related servicing fees) on and principal of the particular

mortgage loans with respect to which the advances were made or out of amounts drawn under any form of credit enhancement with respect to the mortgage loans;

(3)     to reimburse the master servicer, a servicer or a special servicer for unpaid servicing fees earned by it and some unreimbursed servicing expenses incurred by it with respect to mortgage loans in the trust fund and properties acquired in respect thereof, these reimbursement to be made out of amounts that represent Liquidation Proceeds and Insurance Proceeds collected on the particular mortgage loans and properties, and net income collected on the particular properties, with respect to which the fees were earned or the expenses were incurred or out of amounts drawn under any form of credit enhancement with respect to the mortgage loans and properties;

(4)     to reimburse the master servicer, a servicer or any other specified person for any advances described in clause (2) above made by it and any servicing expenses referred to in clause (3) above incurred by it which, in the good faith judgment of the master servicer, the applicable servicer or the other person, will not be recoverable from the amounts described in clauses (2) and (3), respectively, the reimbursement to be made from amounts collected on other mortgage loans in the trust fund or, if and to the extent so provided by the related pooling and servicing agreement or the related servicing agreement and indenture and described in the related prospectus supplement, only from that portion of amounts collected on the other mortgage loans that is otherwise distributable on one or more classes of subordinate securities of the related series;

(5)     if and to the extent described in the related prospectus supplement, to pay the master servicer, a servicer, a special servicer or another specified entity (including a provider of credit enhancement) interest accrued on the advances described in clause (2) above made by it and the servicing expenses described in clause (3) above incurred by it while these remain outstanding and unreimbursed;

(6)     to reimburse the master servicer, a servicer, the depositor, or any of their respective directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "The Agreements—Certain Matters Regarding the Master Servicer and the Company";

(7)     if and to the extent described in the related prospectus supplement, to pay the fees of the trustee;

(8)     to reimburse the trustee or any of its directors, officers, employees and agents, as the case may be, for expenses, costs and liabilities incurred thereby, as and to the extent described under "The Agreements—Certain Matters Regarding the Trustee";

(9)     to pay the master servicer or the trustee, as additional compensation, interest and investment income earned in respect of amounts held in the Distribution Account;

(10)    to pay (generally from related income) the master servicer, a servicer or a special servicer for costs incurred in connection with the operation, management and maintenance of any mortgaged property acquired by the trust fund by foreclosure or by deed in lieu of foreclosure;

(11)    if one or more elections have been made to treat the trust fund or designated portions thereof as a REMIC, to pay any federal, state or local taxes imposed on the trust fund or its assets or transactions, as and to the extent described under "Federal Income Tax Consequences—REMICS—Prohibited Transactions and Other Possible REMIC Taxes";

(12)    to pay for the cost of an independent appraiser or other expert in real estate matters retained to determine a fair sale price for a defaulted mortgage loan or a property acquired in respect thereof in connection with the liquidation of the mortgage loan or property;

(13)    to pay for the cost of various opinions of counsel obtained pursuant to the related pooling and servicing agreement or the related servicing agreement and indenture for the benefit of the related securityholders;

(14)    to pay to itself, the company, a Seller or any other appropriate person all amounts received with respect to each mortgage loan purchased, repurchased or removed from the trust fund pursuant to the terms of the related pooling and servicing agreement or the related servicing agreement and indenture and not required to be distributed as of the date on which the related purchase price is determined;

(15)    to make any other withdrawals permitted by the related pooling and servicing agreement or the related servicing agreement and indenture and described in the related prospectus supplement;

(16)    to pay for costs and expenses incurred by the trust fund for environmental site assessments performed with respect to multifamily or commercial properties that constitute security for defaulted mortgage loans, and for any containment, clean-up or remediation of hazardous wastes and materials present on that mortgaged properties, as described under "Servicing of Mortgage Loans—Realization Upon or Sale of Defaulted Mortgage Loans"; and

(17)    to clear and terminate the Distribution Account upon the termination of the trust fund.

## Distributions

Distributions on the securities of each series will be made by or on behalf of the related trustee on each distribution date as specified in the related prospectus supplement from the available funds for the series and the distribution date. The available funds for any series of securities and any distribution date will generally refer to the total of all payments or other collections (or advances in lieu thereof) on, under or in respect of the mortgage loans and/or mortgage securities and any other assets included in the related trust fund that are available for distribution to the securityholders of the series on that date.  The particular components of the available funds for any series on each distribution date will be more specifically described in the related prospectus supplement.

Distributions on the securities of each series (other than the final distribution in retirement of any certificate) will be made to the persons in whose names the securities are registered on the Record Date, and the amount of each distribution will be determined as of the Determination Date. All distributions with respect to each class of securities on each distribution date will be allocated in accordance with the holder's Percentage Interest in a particular class. Payments will be made either by wire transfer in

immediately available funds to the account of a securityholder at a bank or other entity having appropriate facilities therefor, if the securityholder has provided the trustee or other person required to make the payments with wiring instructions no later than five business days prior to the related Record Date or other date specified in the related prospectus supplement (and, if so provided in the related prospectus supplement, the securityholder holds securities in any requisite amount or denomination specified therein), or by check mailed to the address of the securityholder as it appears on the security register; provided, however, that the final distribution in retirement of any class of securities will be made only upon presentation and surrender of the securities at the location specified in the notice to securityholders of the final distribution.

## Distributions of Interest and Principal on the Securities

Each class of securities of each series, other than Strip Securities and REMIC Residual Certificates that have no security interest rate, may have a different per annum rate at which interest accrues on that class of securities, which may be fixed, variable or adjustable, or any combination of rates. The related prospectus supplement will specify the security interest rate or, in the case of a variable or adjustable security interest rate, the method for determining the security interest rate, for each class. The related prospectus supplement will specify whether interest on the securities of the series will be calculated on the basis of a 360-day year consisting of twelve 30-day months or on a different method.

Distributions of interest in respect of the securities of any class, other than any class of Accrual Securities, Strip Securities or REMIC Residual Certificates that is not entitled to any distributions of interest, will be made on each distribution date based on the accrued interest for the class and the distribution date, subject to the sufficiency of the portion of the available funds allocable to the class on the distribution date. Prior to the time interest is distributable on any class of Accrual Securities, the amount of accrued interest otherwise distributable on the class will be added to the principal balance thereof on each distribution date. With respect to each class of interest-bearing securities, accrued interest for each distribution date will be equal to interest at the applicable security interest rate accrued for a specified period (generally one month) on the outstanding principal balance thereof immediately prior to the distribution date. Accrued interest for each distribution date on Strip Securities entitled to distributions of interest will be similarly calculated except that it will accrue on a notional amount that is based on either (1) the principal balances of some or all of the mortgage loans and/or mortgage securities in the related trust fund or (2) the principal balances of one or more other classes of securities of the same series. Reference to a notional amount with respect to a class of Strip Securities is solely for convenience in making calculations of accrued interest and does not represent the right to receive any distribution of principal. If so specified in the related prospectus supplement, the amount of accrued interest that is otherwise distributable on (or, in the case of Accrual Securities, that may otherwise be added to the principal balance of) one or more classes of the securities of a series will be reduced to the extent that any Prepayment Interest Shortfalls, as described under "Yield Considerations", exceed the amount of any sums (including, if and to the extent specified in the related prospectus supplement, the master servicer's or applicable servicer's servicing compensation) that are applied to offset the shortfalls. The particular manner in which the shortfalls will be allocated among some or all of the classes of securities of that series will be specified in the related prospectus supplement. The related prospectus supplement will also describe the extent to which the amount of accrued interest that is otherwise distributable on (or, in the case of Accrual Securities, that may otherwise be added to the principal balance of) a class of offered securities may be reduced as a result of any other contingencies, including delinquencies, losses and Deferred Interest on or in respect of the related mortgage loans or application of the Relief Act with respect to the mortgage loans. Any reduction in the amount of accrued interest otherwise distributable on a class of securities by reason of the allocation to the class of a portion of any Deferred Interest on or in

42

respect of the related mortgage loans will result in a corresponding increase in the principal balance of the class.

As and to the extent described in the related prospectus supplement, distributions of principal with respect to a series of securities will be made on each distribution date to the holders of the class or classes of securities of the series entitled thereto until the principal balance or balances of the securities have been reduced to zero. In the case of a series of securities which includes two or more classes of securities, the timing, order, priority of payment or amount of distributions in respect of principal, and any schedule or formula or other provisions applicable to the determination thereof (including distributions among multiple classes of senior securities or subordinate securities), shall be as set forth in the related prospectus supplement. Distributions of principal with respect to one or more classes of securities may be made at a rate that is faster (and, in some cases, substantially faster) than the rate at which payments or other collections of principal are received on the mortgage loans and/or mortgage securities in the related trust fund, may not commence until the occurrence of events such as the retirement of one or more other classes of securities of the same series, or may be made at a rate that is slower (and, in some cases, substantially slower) than the rate at which payments or other collections of principal are received on the mortgage loans and/or mortgage securities. In addition, distributions of principal with respect to one or more classes of securities may be made, subject to available funds, based on a specified principal payment schedule and, with respect to one or more classes of securities, may be contingent on the specified principal payment schedule for another class of the same series and the rate at which payments and other collections of principal on the mortgage loans and/or mortgage securities in the related trust fund are received.

**Pre-Funding Account**

If so specified in the related prospectus supplement, the pooling and servicing agreement or other agreement may provide for the transfer by the Sellers of additional mortgage loans to the related trust after the Closing Date. The additional mortgage loans will be required to conform to the requirements set forth in the related pooling and servicing agreement or other agreement providing for the transfer, and will be underwritten to the same standards as the mortgage loans initially included in the trust fund as described in the prospectus supplement. As specified in the related prospectus supplement, the transfer may be funded by the establishment of a pre-funding account established with the trustee. If a pre-funding account is established, all or a portion of the proceeds of the sale of one or more classes of securities of the related series will be deposited in the account to be released as additional mortgage loans are transferred. A pre-funding account will be required to be maintained as an Eligible Account, the amounts therein may be required to be invested in Permitted Investments and the amount held therein shall at no time exceed 40% of the aggregate outstanding principal balance of the related securities. The related pooling and servicing agreement or other agreement providing for the transfer of additional mortgage loans generally will provide that the transfers must be made within up to three months (with respect to any series of certificates) or up to one year (with respect to any series of notes) after the Closing Date, and that amounts set aside to fund the transfers (whether in a pre-funding account or otherwise) and not so applied within the required period of time will be deemed to be principal prepayments and applied in the manner set forth in the prospectus supplement. To the extent amounts in any pre-funding account have not been used to purchase additional mortgage loans, holders of the securities may receive an additional prepayment, which may affect their yield to maturity. In addition, securityholders may not be able to reinvest amounts received from any pre-funding account in comparable securities, or may only be able to do so at a lower interest rate.

**Distributions on the Securities in Respect of Prepayment Premiums**

Prepayment premiums will generally be retained by the master servicer, a servicer, or by the Seller as additional compensation. However, if so provided in the related prospectus supplement, prepayment premiums received on or in connection with the mortgage loans or mortgage securities in any trust fund will be distributed on each distribution date to the holders of the class or classes of securities of the related series entitled thereto in accordance with the provisions described in the prospectus supplement.

**Allocation of Losses and Shortfalls**

The amount of any losses or shortfalls in collections on the mortgage loans and/or mortgage securities in any trust fund (to the extent not covered or offset by draws on any reserve fund or under any instrument of credit enhancement or applied against overcollateralization) will be allocated among the respective classes of securities of the related series in the priority and manner, and subject to the limitations, specified in the related prospectus supplement. As described in the related prospectus supplement, these allocations may result in reductions in the entitlements to interest and/or principal balances of one or more classes of securities, or may be effected simply by a prioritization of payments among classes of securities.

**Advances**

If and to the extent provided in the related prospectus supplement, and subject to any limitations specified therein, the related master servicer or any servicer will be obligated to advance, or have the option of advancing, on or before each distribution date, from its own funds or from excess funds held in the related Master Servicing Collection Account or Protected Account that are not part of the available funds for the related series of securities for that distribution date, an amount up to the aggregate of any scheduled payments of interest (and, if specified in the related prospectus supplement, principal) on the mortgage loans that were delinquent on, or not received by, the related Determination Date (or such other date specified in the Agreement, but in any event prior to the related distribution date). No notice will be given to the certificateholders of these advances. Advances are intended to maintain a regular flow of scheduled interest and principal payments to holders of the class or classes of securities entitled thereto, rather than to guarantee or insure against losses. Accordingly, all advances made from the master servicer's or a servicer's own funds will be reimbursable out of related recoveries on the mortgage loans (including, to the extent described in the prospectus supplement, amounts received under any fund or instrument constituting credit enhancement) respecting which advances were made and other specific sources as may be identified in the related prospectus supplement, including amounts which would otherwise be payable to the offered securities. No Nonrecoverable Advance will be required to be made by the master servicer or a servicer; and, if previously made by a master servicer or a servicer, a Nonrecoverable Advance will be reimbursable from any amounts in the related Master Servicer Collection Account or Protected Account prior to any distributions being made to the related series of securityholders. If advances have been made from excess funds in a Master Servicer Collection Account, the master servicer will be required to replace the funds in such account on any future distribution date to the extent that funds then in such account are insufficient to permit full distributions to securityholders on that date. If so specified in the related prospectus supplement, the obligation of a master servicer or a servicer to make advances may be secured by a cash advance reserve fund or a surety bond. If applicable, information regarding the characteristics of, and the identity of any obligor on, a surety bond, will be set forth in the related prospectus supplement. If any person other than the master servicer has any obligation to make advances as described above, the related prospectus supplement will identify the person. If and to

44

the extent so provided in the related prospectus supplement, any entity making advances will be entitled to receive interest on the advances for the period that the advances are outstanding at the rate specified in the prospectus supplement, and the entity will be entitled to payment of the interest periodically from general collections on the mortgage loans in the related trust fund prior to any payment to securityholders or as otherwise provided in the related pooling and servicing agreement or servicing agreement and described in the prospectus supplement. As specified in the related prospectus supplement with respect to any series of securities as to which the trust fund includes mortgage securities, the advancing obligations with respect to the underlying mortgage loans will be pursuant to the terms of the mortgage securities, as may be supplemented by the terms of the applicable pooling and servicing agreements or servicing agreements for such mortgage securities, and may differ from the provisions described above.

**Reports to Securityholders**

With each distribution to securityholders of a particular class of offered securities, the related master servicer, trustee or other specified person will make available to each holder of record of the class of securities a statement or statements with respect to the related trust fund setting forth the information specifically described in the related pooling and servicing agreement or the related servicing agreement or indenture, which generally will include the following as applicable except as otherwise provided therein:

- the amount, if any, of the distribution allocable to principal;

- the amount, if any, of the distribution allocable to interest;

- the outstanding principal balance or notional amount of each class after giving effect to the distribution of principal on the distribution date;

- the amount of servicing compensation received by the related master servicer (and, if payable directly out of the related trust fund, by any special servicer and any subservicer);

- the aggregate amount of advances included in the distributions on the distribution date, and the aggregate amount of unreimbursed advances at the close of business on the distribution date;

- the aggregate principal balance of the mortgage loans in the related mortgage pool on, or as of a specified date shortly prior to, the distribution date;

- the number and aggregate principal balance of any mortgage loans in the related mortgage pool in respect of which (A) one scheduled payment is delinquent, (B) two scheduled payments are delinquent, (C) three or more scheduled payments are delinquent and (D) foreclosure proceedings have been commenced;

- the balance of the reserve fund, if any, at the close of business on the distribution date;

- the amount of coverage remaining under any financial guaranty insurance policy, mortgage pool insurance policy or letter of credit covering default risk and a description of any credit enhancement substituted therefor;

- the Special Hazard Amount, Fraud Loss Amount and Bankruptcy Amount, if applicable, as of the close of business on the applicable distribution date and a description of any change in the calculation of these amounts; and

- with respect to any series of securities as to which the trust fund includes mortgage securities, additional information as required under the related Agreement and specified in the related prospectus supplement.

In the case of information furnished pursuant to the first two items above, the amounts will be expressed as a dollar amount per minimum denomination of the relevant class of offered securities or per a specified portion of the minimum denomination. In addition to the information described above, reports to securityholders will contain other information as is set forth in the applicable pooling and servicing agreement or the applicable servicing agreement or indenture, which may include prepayments, reimbursements to subservicers and the master servicer and losses borne by the related trust fund. In addition, within a reasonable period of time after the end of each calendar year, the master servicer or trustee will furnish a report to each holder of record of a class of offered securities at any time during the calendar year which, for example, will include information as to the aggregate of amounts reported pursuant to the first three items above for the calendar year or, in the event the person was a holder of record of a class of securities during a portion of the calendar year, for the applicable portion of the year.

## DESCRIPTION OF CREDIT ENHANCEMENT

**General**

As set forth below and in the applicable prospectus supplement, credit enhancement may be provided by one or more of a financial guaranty insurance policy, a special hazard insurance policy, a mortgage pool insurance policy or a letter of credit. In addition, if provided in the applicable prospectus supplement, in lieu of or in addition to any or all of the foregoing arrangements, credit enhancement may be in the form of a reserve fund to cover the losses, subordination of one or more classes of subordinate securities for the benefit of one or more classes of senior securities, of cross-collateralization or overcollateralization, or a combination of the foregoing. The credit support may be provided by an assignment of the right to receive specified cash amounts, a deposit of cash into a reserve fund or other pledged assets, or by guarantees provided by a third-party or any combination thereof identified in the applicable prospectus supplement. Each component will have limitations and will provide coverage with respect to Realized Losses on the related mortgage loans. Credit support will cover Defaulted Mortgage Losses, but coverage may be limited or unavailable with respect to Special Hazard Losses, Fraud Losses, Bankruptcy Losses and Extraordinary Losses. To the extent that the credit support for the offered securities of any series is exhausted, the holders thereof will bear all further risk of loss.

The amounts and types of credit enhancement arrangements as well as the providers thereof, if applicable, with respect to the offered securities of each series will be set forth in the related prospectus supplement. To the extent provided in the applicable prospectus supplement and the pooling and servicing agreement or indenture, the credit enhancement arrangements may be periodically modified, reduced and substituted for based on the aggregate outstanding principal balance of the mortgage loans covered thereby or the principal amount or interest due on one or more classes of securities. See "Description of Credit Enhancement—Reduction or Substitution of Credit Enhancement." If specified in the applicable prospectus supplement, credit support for the offered securities of one series may cover the offered securities of one or more other series.

The amounts and type of credit enhancement arrangement as well as the provider thereof, if applicable, with respect to the offered securities of each series will be set forth in the related prospectus supplement. To the extent provided in the applicable prospectus supplement and the pooling and servicing agreement or indenture, the credit enhancement arrangements may be periodically modified, reduced and substituted for based on the aggregate outstanding principal balance of the mortgage loans covered thereby. See "Description of Credit Enhancement—Reduction or Substitution of Credit Enhancement." If specified in the applicable prospectus supplement, credit support for the offered securities of one series may cover the offered securities of one or more other series.

In general, references to "mortgage loans" under this "Description of Credit Enhancement" section are to mortgage loans in a trust fund. However, if so provided in the prospectus supplement for a series of securities, any mortgage securities included in the related trust fund and/or the related underlying mortgage loans may be covered by one or more of the types of credit support described in this prospectus. The related prospectus supplement will specify, as to each form of credit support, the information indicated below with respect thereto, to the extent the information is material and available.

## Subordinate Securities

If so specified in the related prospectus supplement, one or more classes of securities of a series may be subordinate securities. Subordinate securities may be offered securities. To the extent specified in the related prospectus supplement, the rights of the holders of subordinate securities to receive distributions from the Distribution Account on any distribution date will be subordinated to the corresponding rights of the holders of senior securities. In addition, as provided in the prospectus supplement, losses or shortfalls will be allocated to subordinate securities before they are allocated to more senior securities. If so provided in the related prospectus supplement, the subordination of a class may apply only in the event of (or may be limited to) some types of losses or shortfalls. The related prospectus supplement will set forth information concerning the manner and amount of subordination provided by a class or classes of subordinate securities in a series and the circumstances under which the subordination will be available.

## Cross-Collateralization

If the mortgage loans and/or mortgage securities in any trust fund are divided into separate groups, each supporting a separate class or classes of securities of the related series, credit enhancement may be provided by cross-collateralization support provisions requiring that distributions be made on senior securities evidencing interests in one group of mortgage loans and/or mortgage securities prior to distributions on subordinate securities evidencing interests in a different group of mortgage loans and/or mortgage securities within the trust fund. The prospectus supplement for a series that includes a cross-collateralization provision will describe the manner and conditions for applying the provisions.

## Overcollateralization

If so specified in the related prospectus supplement, interest collections on the mortgage loans may exceed interest payments on the offered securities for the related distribution date. The excess interest may be deposited into a reserve fund or applied as a payment of principal on the securities. To the extent excess interest is applied as principal payments on the securities, the effect will be to reduce the principal balance of the securities relative to the outstanding balance of the mortgage loans, thereby creating overcollateralization and additional protection to the securityholders, as specified in the related prospectus supplement. If so provided in the related prospectus supplement, overcollateralization may

also be provided as to any series of securities by the issuance of securities in an initial aggregate principal amount which is less than the aggregate principal amount of the related mortgage loans.

**Financial Guaranty Insurance Policy**

If so specified in the related prospectus supplement, a financial guaranty insurance policy may be obtained and maintained for a class or series of securities. The insurer with respect to a financial guaranty insurance policy will be described in the related prospectus supplement.

A financial guaranty insurance policy will be unconditional and irrevocable and will guarantee to holders of the applicable securities that an amount equal to the full amount of payments due to the holders will be received by the trustee or its agent on behalf of the holders for payment on each distribution date. The specific terms of any financial guaranty insurance policy will be set forth in the related prospectus supplement. A financial guaranty insurance policy may have limitations and generally will not insure the obligation of the Sellers or the master servicer to repurchase or substitute for a defective mortgage loan, will not insure Prepayment Interest Shortfalls or interest shortfalls due to the application of the Relief Act and will not guarantee any specific rate of principal payments. The insurer will be subrogated to the rights of each holder to the extent the insurer makes payments under the financial guaranty insurance policy.

**Mortgage Pool Insurance Policies**

Any mortgage pool insurance policy obtained by the company for a trust fund will be issued by the insurer named in the applicable prospectus supplement. Each mortgage pool insurance policy will cover Defaulted Mortgage Losses in an amount equal to a percentage specified in the applicable prospectus supplement of the aggregate principal balance of the mortgage loans on the cut-off date, or will cover a portion of Defaulted Mortgage Losses on any mortgage up to a specified percentage of the Value of that mortgage loan. As set forth under "Maintenance of Credit Enhancement," the master servicer will use reasonable efforts to maintain, or cause the servicers to maintain, any mortgage pool insurance policy and to present claims thereunder to the insurer on behalf of itself, the related trustee and the related securityholders. The mortgage pool insurance policies, however, are not blanket policies against loss, since claims thereunder may only be made respecting particular defaulted mortgage loans and only upon satisfaction of the terms of the related policy.  Any exceptions to coverage will be described in the related prospectus supplement.  Unless specified in the related prospectus supplement, the mortgage pool insurance policies may not cover losses due to a failure to pay or denial of a claim under a Primary Insurance Policy, irrespective of the reason therefor.

**Letter of Credit**

If any component of credit enhancement as to the offered securities of a series is to be provided by a letter of credit, a bank will deliver to the related trustee an irrevocable letter of credit. The letter of credit may provide direct coverage with respect to the mortgage loans. The bank that delivered the letter of credit, as well as the amount available under the letter of credit with respect to each component of credit enhancement, will be specified in the applicable prospectus supplement. If so specified in the related prospectus supplement, the letter of credit may permit draws only in the event of certain types of losses and shortfalls. The letter of credit may also provide for the payment of required advances which the master servicer or any servicer fails to make. The amount available under the letter of credit will, in all cases, be reduced to the extent of any unreimbursed payments thereunder and may otherwise be reduced as described in the related prospectus supplement. The letter of credit will expire on the expiration date

48

set forth in the related prospectus supplement, unless earlier terminated or extended in accordance with its terms.

**Special Hazard Insurance Policies**

Any special hazard insurance policy covering Special Hazard Losses obtained by the company for a trust fund will be issued by the insurer named in the applicable prospectus supplement. Each special hazard insurance policy will, subject to limitations described below, protect holders of the related series of securities from Special Hazard Losses. See "Description of Primary Mortgage Insurance, Hazard Insurance; Claims Thereunder." However, a special hazard insurance policy will not cover losses occasioned by war, civil insurrection, some governmental actions, errors in design, faulty workmanship or materials (except under some circumstances), nuclear reaction, chemical contamination, waste by the mortgagor and other risks. Aggregate claims under a special hazard insurance policy will be limited to the amount set forth in the related prospectus supplement and will be subject to reduction as described in the related prospectus supplement.

Subject to the foregoing limitations, a special hazard insurance policy will provide that, where there has been damage to property securing a foreclosed mortgage loan (title to which has been acquired by the insured) and to the extent the damage is not covered by the hazard insurance policy or flood insurance policy, if any, maintained by the mortgagor or the master servicer, special servicer or the servicer, the insurer will pay the lesser of (1) the cost of repair or replacement of the property or (2) upon transfer of the property to the insurer, the unpaid principal balance of the mortgage loan at the time of acquisition of the property by foreclosure or deed in lieu of foreclosure, plus accrued interest at the mortgage rate to the date of claim settlement and expenses incurred by the master servicer, special servicer or servicer with respect to the property. If the property is transferred to a third party in a sale approved by the issuer of the special hazard insurance policy, the amount that the issuer will pay will be the amount under (2) above reduced by the net proceeds of the sale of the property. No claim may be validly presented under the special hazard insurance policy unless hazard insurance on the property securing a defaulted mortgage loan has been kept in force and other reimbursable protection, preservation and foreclosure expenses have been paid (all of which must be approved in advance by the issuer of the special hazard insurance policy). If the unpaid principal balance plus accrued interest and expenses is paid by the insurer, the amount of further coverage under the related special hazard insurance policy will be reduced by that amount less any net proceeds from the sale of the property. Any amount paid as the cost of repair of the property will further reduce coverage by that amount. Restoration of the property with the proceeds described under (1) above will satisfy the condition under each mortgage pool insurance policy that the property be restored before a claim under the mortgage pool insurance policy may be validly presented with respect to the defaulted mortgage loan secured by the property. The payment described under (2) above will render presentation of a claim in respect of the mortgage loan under the related mortgage pool insurance policy unnecessary. Therefore, so long as a mortgage pool insurance policy remains in effect, the payment by the insurer under a special hazard insurance policy of the cost of repair or of the unpaid principal balance of the related mortgage loan plus accrued interest and expenses will not affect the total Insurance Proceeds paid to securityholders, but will affect the relative amounts of coverage remaining under the related special hazard insurance policy and mortgage pool insurance policy.

As and to the extent set forth in the applicable prospectus supplement, coverage in respect of Special Hazard Losses for a series of securities may be provided, in whole or in part, by a type of instrument other than a special hazard insurance policy or by means of a special hazard representation of the Seller or the company.

**Reserve Funds**

If so provided in the related prospectus supplement, the company will deposit or cause to be deposited in a reserve fund any combination of cash, one or more irrevocable letters of credit or one or more Permitted Investments in specified amounts, or any other instrument satisfactory to the relevant Rating Agency or Agencies, which will be applied and maintained in the manner and under the conditions specified in the prospectus supplement. In the alternative or in addition to the deposit, to the extent described in the related prospectus supplement, a reserve fund may be funded through application of all or a portion of amounts otherwise payable on any related subordinate securities, from the retained interest of the company or otherwise. To the extent that the funding of the reserve fund is dependent on amounts otherwise payable on related subordinate securities, any retained interest of the company or other cash flows attributable to the related mortgage loans or reinvestment income, the reserve fund may provide less coverage than initially expected if the cash flows or reinvestment income on which the funding is dependent are lower than anticipated. In addition, with respect to any series of securities as to which credit enhancement includes a letter of credit, if so specified in the related prospectus supplement, if specified conditions are met, the remaining amount of the letter of credit may be drawn by the trustee and deposited in a reserve fund. Amounts in a reserve fund may be distributed to securityholders, or applied to reimburse the master servicer or a servicer for outstanding advances, or may be used for other purposes, in the manner and to the extent specified in the related prospectus supplement. The related prospectus supplement will disclose whether a reserve fund is part of the related trust fund. If set forth in the related prospectus supplement, a reserve fund may provide coverage to more than one series of securities.

In connection with the establishment of any reserve fund, the reserve fund will be structured so that the trustee will have a perfected security interest for the benefit of the securityholders in the assets in the reserve fund. However, to the extent that the company, any affiliate thereof or any other entity has an interest in any reserve fund, in the event of the bankruptcy, receivership or insolvency of that entity, there could be delays in withdrawals from the reserve fund and corresponding payments to the securityholders which could adversely affect the yield to investors on the related securities.

Amounts deposited in any reserve fund for a series will be invested in Permitted Investments by, or at the direction of, and for the benefit of the master servicer or any other person named in the related prospectus supplement.

**Cash Flow Agreements**

If so provided in the related prospectus supplement, the trust fund may include guaranteed investment contracts pursuant to which moneys held in the funds and accounts established for the related series will be invested at a specified rate. The principal terms of a guaranteed investment contract or other cash flow agreement, and the identity of the obligor, will be described in the prospectus supplement for a series of notes.

**Maintenance of Credit Enhancement**

To the extent that the applicable prospectus supplement does not expressly provide for alternative credit enhancement arrangements in lieu of some or all of the arrangements mentioned below, the following paragraphs shall apply.

If a financial guaranty insurance policy has been obtained for one or more classes of securities of a series, the trustee will be obligated to exercise reasonable efforts to keep the financial guaranty

50

insurance policy in full force and effect throughout the term of the applicable pooling and servicing agreement or servicing agreement, until the specified class or classes of securities have been paid in full, unless coverage thereunder has been exhausted through payment of claims, or until the financial guaranty insurance policy is replaced in accordance with the terms of the applicable pooling and servicing agreement or servicing agreement. The trustee will agree to remit the premiums for each financial guaranty insurance policy, from available funds of the related trust, in accordance with the provisions and priorities set forth in the applicable pooling and servicing agreement or servicing agreement, on a timely basis. In the event the insurer ceases to be a qualified insurer as described in the related prospectus supplement, or fails to make a required payment under the related financial guaranty insurance policy, neither the trustee nor any other person will have any obligation to replace the insurer. Any losses associated with any reduction or withdrawal in rating by an applicable Rating Agency shall be borne by the related securityholders.

If a mortgage pool insurance policy has been obtained for some or all of the mortgage loans related to a series of securities, the master servicer will be obligated to exercise reasonable efforts to keep the mortgage pool insurance policy (or an alternate form of credit support) in full force and effect throughout the term of the applicable pooling and servicing agreement or servicing agreement to the extent provided in the related prospectus supplement. The master servicer will agree to pay the premiums for each mortgage pool insurance policy on a timely basis. In the event the pool insurer ceases to be a qualified insurer because it ceases to be qualified by law to transact pool insurance business or coverage is terminated for any reason other than exhaustion of the coverage, the master servicer will use reasonable efforts to obtain from another qualified insurer a replacement insurance policy comparable to the mortgage pool insurance policy with a total coverage equal to the then outstanding coverage of the mortgage pool insurance policy, provided that, if the cost of the replacement policy is greater than the cost of the mortgage pool insurance policy, the coverage of the replacement policy will, unless otherwise agreed to by the company, be reduced to a level such that its premium rate does not exceed the premium rate on the mortgage pool insurance policy.

If a letter of credit or alternate form of credit enhancement has been obtained for a series of securities, the trustee will be obligated to exercise reasonable efforts cause to be kept or to keep the letter of credit (or an alternate form of credit support) in full force and effect throughout the term of the applicable pooling and servicing agreement or indenture, unless coverage thereunder has been exhausted through payment of claims or otherwise, or substitution therefor is made as described below under "—Reduction or Substitution of Credit Enhancement." Unless otherwise specified in the applicable prospectus supplement, if a letter of credit obtained for a series of securities is scheduled to expire prior to the date the final distribution on the securities is made and coverage under the letter of credit has not been exhausted and no substitution has occurred, the trustee will draw the amount available under the letter of credit and maintain the amount in trust for the securityholders.

If a special hazard insurance policy has been obtained for the mortgage loans related to a series of securities, the master servicer will also be obligated to exercise reasonable efforts to maintain and keep the policy in full force and effect throughout the term of the applicable pooling and servicing agreement or servicing agreement, unless coverage thereunder has been exhausted through payment of claims or otherwise or substitution therefor is made as described below under "—Reduction or Substitution of Credit Enhancement." If coverage for Special Hazard Losses takes the form of a special hazard insurance policy, the policy will provide coverage against risks of the type described in this prospectus under "Description of Credit Enhancement—Special Hazard Insurance Policies." The master servicer may obtain a substitute policy for the existing special hazard insurance policy if prior to the substitution the master servicer obtains written confirmation from the Rating Agency or Agencies that rated the related

51

securities that the substitution shall not adversely affect the then-current ratings assigned to the securities by the Rating Agency or Agencies.

The master servicer, on behalf of itself, the trustee and securityholders, will provide the trustee information required for the trustee to draw under the letter of credit and will present claims to each pool insurer, to the issuer of each special hazard insurance policy, and, in respect of defaulted mortgage loans for which there is no servicer, to each primary insurer and take any reasonable steps as are necessary to permit recovery under the letter of credit, insurance policies or comparable coverage respecting defaulted mortgage loans or mortgage loans which are the subject of a bankruptcy proceeding. As set forth above, all collections by the master servicer under any mortgage pool insurance policy or any Primary Insurance Policy and, where the related property has not been restored, a special hazard insurance policy, are to be deposited in the related Distribution Account, subject to withdrawal as described above. All draws under any letter of credit are also to be deposited in the related Distribution Account. In those cases in which a mortgage loan is serviced by a servicer, the servicer, on behalf of itself, the trustee and the securityholders will present claims to the primary insurer, and all paid claims shall initially be deposited in a Protected Account prior to being delivered to the master servicer for ultimate deposit to the related Distribution Account.

If any property securing a defaulted mortgage loan is damaged and proceeds, if any, from the related hazard insurance policy or any applicable special hazard insurance policy are insufficient to restore the damaged property to a condition sufficient to permit recovery under any financial guaranty insurance policy, mortgage pool insurance policy, letter of credit or any related Primary Insurance Policy, neither the master servicer nor any servicer is required to expend its own funds to restore the damaged property unless it determines (1) that the restoration will increase the proceeds to one or more classes of securityholders on liquidation of the mortgage loan after reimbursement of the master servicer for its expenses and (2) that the expenses will be recoverable by it through liquidation Proceeds or Insurance Proceeds. If recovery under any financial guaranty insurance policy, mortgage pool insurance policy, letter of credit or any related Primary Insurance Policy is not available because the master servicer or servicer has been unable to make the above determinations, has made the determinations incorrectly or recovery is not available for any other reason, the master servicer and each servicer is nevertheless obligated to follow the normal practices and procedures (subject to the preceding sentence) as it deems necessary or advisable to realize upon the defaulted mortgage loan and in the event the determinations have been incorrectly made, is entitled to reimbursement of its expenses in connection with the restoration.

## Reduction or Substitution of Credit Enhancement

The amount of credit support provided pursuant to any form of credit enhancement may be reduced. In most cases, the amount available pursuant to any form of credit enhancement will be subject to periodic reduction in accordance with a schedule or formula on a nondiscretionary basis pursuant to the terms of the related pooling and servicing agreement or indenture. Additionally, in most cases, the form of credit support (and any replacements therefor) may be replaced, reduced or terminated, and the formula used in calculating the amount of coverage with respect to Bankruptcy Losses, Special Hazard Losses or Fraud losses may be changed, without the consent of the securityholders, upon the written assurance from each applicable Rating Agency that its then-current rating of the related series of securities will not be adversely affected. Furthermore, in the event that the credit rating of any obligor under any applicable credit enhancement is downgraded, the credit rating or ratings of the related series of securities may be downgraded to a corresponding level, and, neither the master servicer nor any other person will be obligated to obtain replacement credit support in order to restore the rating or ratings of the related series

52

of securities. The master servicer will also be permitted to replace the credit support with other credit enhancement instruments issued by obligors whose credit ratings are equivalent to the downgraded level and in lower amounts which would satisfy the downgraded level, provided that the then-current rating or ratings of the related series of securities are maintained. Where the credit support is in the form of a reserve fund, a permitted reduction in the amount of credit enhancement will result in a release of all or a portion of the assets in the reserve fund to the company, the master servicer or the other person that is entitled thereto. Any assets so released will not be available for distributions in future periods.

## OTHER FINANCIAL OBLIGATIONS RELATED TO THE SECURITIES

**Swaps and Yield Supplement Agreements**

The trustee on behalf of a trust fund may enter into interest rate or other swaps and related caps, floors and collars to minimize the risk to securityholders from adverse changes in interest rates or to provide credit support, which are collectively referred to as swaps, and other yield supplement agreements or similar yield maintenance arrangements that do not involve swap agreements or other notional principal contracts, which are collectively referred to as yield supplement agreements.

An interest rate swap is an agreement between two parties to exchange a stream of interest payments on an agreed hypothetical or "notional" principal amount. No principal amount is exchanged between the counterparties to an interest rate swap. In the typical swap, one party agrees to pay a fixed rate on a notional principal amount, while the counterparty pays a floating rate based on one or more reference interest rates including the London Interbank Offered Rate, or LIBOR, a specified bank's prime rate or U.S. Treasury Bill rates. Interest rate swaps also permit counterparties to exchange a floating rate obligation based upon one reference interest rate, such as LIBOR, for a floating rate obligation based upon another referenced interest rate, such as U.S. Treasury Bill rates.

Swaps may include "total return swaps," where all or a portion of the total amount of interest and principal on a security is paid by a third-party in exchange for an up front payment or a stated periodic payment, and "credit derivatives" where credit enhancement is provided in the form of a swap agreement, and which may include a "credit support annex" where securities, rights, or other amounts are pledged as collateral for the performance of the counterparty.  Additionally, agreements relating to other types of derivative products that are designed to provide credit enhancement to the related series may be entered into by a trustee and one or more counterparties. The terms of total return swaps, credit derivatives and any other derivative product agreement and any counterparties will be described in the accompanying prospectus supplement.

Yield supplement agreements may be entered into to supplement the interest rate or other rates on one or more classes of the securities of any series.

There can be no assurance that the trustee will be able to enter into or offset swaps or enter into yield supplement agreements or other derivative product agreements at any specific time or at prices or on other terms that are advantageous. In addition, although the terms of the swaps and yield supplement agreements may provide for termination under various circumstances, there can be no assurance that the trustee will be able to terminate a swap or yield supplement agreement when it would be economically advantageous to the trust fund to do so.

**Purchase Obligations**

Some types of trust assets and some classes of securities of any series, as specified in the related prospectus supplement, may be subject to a purchase obligation that would become applicable on one or more specified dates, or upon the occurrence of one or more specified events, or on demand made by or on behalf of the applicable securityholders. A purchase obligation may be in the form of a conditional or unconditional purchase commitment, liquidity facility, remarketing agreement, maturity guaranty, put option or demand feature. The terms and conditions of each purchase obligation, including the purchase price, timing and payment procedure, will be described in the accompanying prospectus supplement. A purchase obligation relating to trust assets may apply to those trust assets or to the related securities. Each purchase obligation may be a secured or unsecured obligation of the provider thereof, which may include a bank or other financial institution or an insurance company. Each purchase obligation will be evidenced by an instrument delivered to the trustee for the benefit of the applicable securityholders of the related series. As specified in the accompanying prospectus supplement, each purchase obligation relating to trust assets will be payable solely to the trustee for the benefit of the securityholders of the related series. Other purchase obligations may be payable to the trustee or directly to the holders of the securities to which that obligation relate.

## DESCRIPTION OF PRIMARY MORTGAGE INSURANCE, HAZARD INSURANCE; CLAIMS THEREUNDER

**General**

The mortgaged property with respect to each mortgage loan will be required to be covered by a hazard insurance policy and, if required as described below, a Primary Insurance Policy. The following is only a brief description of these insurance policies and does not purport to summarize or describe all of the provisions of these policies. The insurance is subject to underwriting and approval of individual mortgage loans by the respective insurers.

**Primary Mortgage Insurance Policies**

In a securitization of single family loans, single family loans included in the related mortgage pool having a Loan-to-Value Ratio at origination of over 80% (or other percentage as described in the related prospectus supplement) may be required by the company to be covered by a Primary Insurance Policy. The Primary Insurance Policy will insure against default on a mortgage loan as to at least the principal amount thereof exceeding 75% of the Value of the related mortgaged property (or other percentage as described in the related prospectus supplement) at origination of the mortgage loan, unless and until the principal balance of the mortgage loan is reduced to a level that would produce a Loan-to-Value Ratio equal to or less than at least 80% (or other percentage as described in the prospectus supplement). This type of mortgage loan will not be considered to be an exception to the foregoing standard if no Primary Insurance Policy was obtained at origination but the mortgage loan has amortized to below the above Loan-to-Value Ratio percentage as of the applicable cut-off date. Mortgage loans which are subject to negative amortization will only be covered by a Primary Insurance Policy if the coverage was so required upon their origination, notwithstanding that subsequent negative amortization may cause the mortgage loan's Loan-to-Value Ratio, based on the then-current balance, to subsequently exceed the limits which would have required the coverage upon their origination. Multifamily, commercial and mixed-use loans will not be covered by a Primary Insurance Policy, regardless of the related Loan-to-Value Ratio.

While the terms and conditions of the Primary Insurance Policies issued by a primary insurer will differ from those in Primary Insurance Policies issued by other primary insurers, each Primary Insurance Policy will in general cover the Primary Insurance Covered Loss. The primary insurer generally will be required to pay:

- the insured percentage of the Primary Insurance Covered Loss;

- the entire amount of the Primary Insurance Covered Loss, after receipt by the primary insurer of good and merchantable title to, and possession of, the mortgaged property; or

- at the option of the primary insurer, the sum of the delinquent monthly payments plus any advances made by the insured, both to the date of the claim payment and, thereafter, monthly payments in the amount that would have become due under the mortgage loan if it had not been discharged plus any advances made by the insured until the earlier of (1) the date the mortgage loan would have been discharged in full if the default had not occurred or (2) an approved sale.

- As conditions precedent to the filing or payment of a claim under a Primary Insurance Policy, in the event of default by the mortgagor, the insured will typically be required, among other things, to:

- advance or discharge (1) hazard insurance premiums and (2) as necessary and approved in advance by the primary insurer, real estate taxes, protection and preservation expenses and foreclosure and related costs;

- in the event of any physical loss or damage to the mortgaged property, have the mortgaged property restored to at least its condition at the effective date of the Primary Insurance Policy (ordinary wear and tear excepted); and

- tender to the primary insurer good and merchantable title to, and possession of, the mortgaged property.

For any single family loan for which the coverage is required under the standard described above, the master servicer will maintain, or will cause each servicer to maintain, in full force and effect and to the extent coverage is available a Primary Insurance Policy with regard to each single family loan, provided that the Primary Insurance Policy was in place as of the cut-off date and the company had knowledge of the Primary Insurance Policy. The master servicer or the Seller will not cancel or refuse to renew a Primary Insurance Policy in effect at the time of the initial issuance of a series of securities that is required to be kept in force under the applicable pooling and servicing agreement or indenture unless the replacement Primary Insurance Policy for the canceled or non-renewed policy is maintained with an insurer whose claims-paying ability is acceptable to the Rating Agency or Agencies that rated the series of securities for mortgage pass-through certificates having a rating equal to or better than the highest then-current rating of any class of the series of securities. For further information regarding the extent of coverage under any mortgage pool insurance policy or primary Insurance Policy, see "Description of Credit Enhancement—Mortgage Pool insurance Policies."

**Hazard Insurance Policies**

The terms of the mortgage loans require each mortgagor to maintain a hazard insurance policy for their mortgage loan. Additionally, the pooling and servicing agreement or servicing agreement will require the master servicer to cause to be maintained for each mortgage loan a hazard insurance policy providing for no less than the coverage of the standard form of fire insurance policy with extended coverage customary in the state in which the property is located. The coverage generally will be in an amount equal to the lesser of the principal balance owing on the mortgage loan and 100% of the insurable value of the improvements securing the mortgage loan; provided, that in any case, such amount shall be sufficient to prevent the mortgagor and/or mortgagee from becoming a co-insurer. The ability of the master servicer to ensure that hazard insurance proceeds are appropriately applied may be dependent on it, or the servicer of the mortgage loan, being named as an additional insured under any hazard insurance policy and under any flood insurance policy referred to below, or upon the extent to which information in this regard is furnished to the master servicer by mortgagors or servicers.

As set forth above, all amounts collected by the master servicer or a servicer under any hazard policy (except for amounts to be applied to the restoration or repair of the mortgaged property or released to the mortgagor in accordance with teamster servicer's normal servicing procedures) will be deposited in the related Distribution Account. The pooling and servicing agreement or servicing agreement will provide that the master servicer may satisfy its obligation to cause hazard policies to be maintained by maintaining, or causing a servicer to maintain, a blanket policy insuring against losses on the mortgage loans. If the blanket policy contains a deductible clause, the master servicer will deposit, or will cause the applicable servicer to deposit, in the related Distribution Account all sums which would have been deposited therein but for the clause.

In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of the improvements on the property by fire, lightning, explosion, smoke, windstorm, hail, riot, strike and civil commotion, subject to the conditions and exclusions specified in each policy. Although the policies relating to the mortgage loans will be underwritten by different insurers under different state laws in accordance with different applicable state forms and therefore will not contain identical terms and conditions, the basic terms thereof are dictated by respective state laws, and most of these policies typically do not cover any physical damage resulting from the following: war, revolution, governmental actions, floods and other water-related causes, earth movement (including earthquakes, landslides and mudflows), nuclear reactions, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, depending on the case, vandalism. The foregoing list is merely indicative of the kinds of uninsured risks and is not intended to be all-inclusive. Where the improvements securing a mortgage loan are located in a federally designated flood area at the time of origination of the mortgage loan, the pooling and servicing agreement or servicing agreement requires the master servicer to cause to be maintained for this mortgage loan, flood insurance (to the extent available) in an amount equal in general to the lesser of the amount required to compensate for any loss or damage on a replacement cost basis or the maximum insurance available under the federal flood insurance program.

The hazard insurance policies covering the mortgaged properties typically contain a co-insurance clause which in effect requires the insured at all times to carry insurance of a specified percentage (generally 80% to 90%) of the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, the clause generally provides that the insurer's liability in the event of partial loss does not exceed the greater of (1) the replacement cost of the improvements damaged or destroyed less physical depreciation

56

or (2) the proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of the improvements.

Since the amount of hazard insurance that mortgagors are required to maintain on the improvements securing the mortgage loans may decline as the principal balances of the related mortgage loans decrease, and since residential properties have historically appreciated in value over time, hazard insurance proceeds could be insufficient to restore fully the damaged property in the event of a partial loss. See "Description of Credit Enhancement—Special Hazard Insurance Policies" for a description of the limited protection afforded by any special hazard insurance policy against losses occasioned by hazards which are otherwise uninsured against (including losses caused by the application of the co-insurance clause described in the preceding paragraph).

Under the terms of the mortgage loans, mortgagors are generally required to present claims to insurers under hazard insurance policies maintained on the mortgaged properties. The master servicer, on behalf of the trustee and securityholders, is obligated to present claims, or cause the servicer of the mortgage loans to present claims, under any special hazard insurance policy and any blanket insurance policy insuring against hazard losses on the mortgaged properties. However, the ability of the master servicer or servicer to present the claims is dependent upon the extent to which information in this regard is furnished to the master servicer or the servicers by mortgagors.

**FHA Mortgage Insurance**

The Housing Act authorizes various FHA mortgage insurance programs. Some of the mortgage loans may be insured under either Section 203(b), Section 221, Section 223, Section 234 or Section 235 of the Housing Act. Under Section 203(b), FHA insures mortgage loans of up to 30 years' duration for the purchase of one- to four-family dwelling units. Mortgage loans for the purchase of multifamily residential rental properties are insured by the FHA under Section 221 and Section 223. Mortgage loans for the purchase of condominium units are insured by FHA under Section 234. Trust assets insured under these programs must bear interest at a rate not exceeding the maximum rate in effect at the time the loan is made, as established by HUD, and may not exceed specified percentages of the lesser of the appraised value of the property and the sales price, less seller-paid closing costs for the property, up to certain specified maximums. In addition, FHA imposes initial investment minimums and other requirements on mortgage loans insured under the Section 203(b) and Section 234 programs.

Under Section 235, assistance payments are paid by HUD to the mortgagee on behalf of eligible borrowers for as long as the borrowers continue to be eligible for the payments. To be eligible, a borrower must be part of a family, have income within the limits prescribed by HUD at the time of initial occupancy, occupy the property and meet requirements for recertification at least annually.

The regulations governing these programs provide that insurance benefits are payable either on foreclosure, or other acquisition of possession, and conveyance of the mortgaged premises to HUD or on assignment of the defaulted mortgage loan to HUD. The FHA insurance that may be provided under these programs on the conveyance of the home to HUD is equal to 100% of the outstanding principal balance of the mortgage loan, plus accrued interest, as described below, and certain additional costs and expenses. When entitlement to insurance benefits results from assignment of the mortgage loan to HUD, the insurance payment is computed as of the date of the assignment and includes the unpaid principal amount of the mortgage loan plus mortgage interest accrued and unpaid to the assignment date.

When entitlement to insurance benefits results from foreclosure (or other acquisition of possession) and conveyance, the insurance payment is equal to the unpaid principal amount of the mortgage loan, adjusted to reimburse the mortgagee for certain tax, insurance and similar payments made by it and to deduct certain amounts received or retained by the mortgagee after default, plus reimbursement not to exceed two-thirds of the mortgagee's foreclosure costs. Any FHA insurance relating to the mortgage loans underlying a series of securities will be described in the related prospectus supplement.

The mortgage loans may also be insured under Title I Program of the FHA.  The applicable provisions of this program will be described in the related prospectus supplement. The master servicer will be required to take steps, or cause the servicers of the mortgage loans to take steps, reasonably necessary to keep any FHA insurance in full force and effect.

## VA Mortgage Guaranty

The Servicemen's Readjustment Act of 1944, as amended, permits a veteran or, in some instances, his or her spouse, to obtain a mortgage loan guaranty by the VA covering mortgage financing of the purchase of a one-to four-family dwelling unit to be occupied as the veteran's home at an interest rate not exceeding the maximum rate in effect at the time the loan is made, as established by the VA. The program has no limit on the amount of a mortgage loan, requires no down payment for the purchaser and permits the guaranty of mortgage loans with terms, limited by the estimated economic life of the property, up to 30 years. The maximum guaranty that may be issued by the VA under this program is 50% of the original principal amount of the mortgage loan up to a dollar limit established by the VA. Loans with higher original principal balances may be guaranteed by the VA at lower rates.  The liability on the guaranty is reduced or increased pro rata with any reduction or increase in amount of indebtedness, but in no event will the amount payable on the guaranty exceed the amount of the original guaranty. Notwithstanding the dollar and percentage limitations of the guaranty, a mortgagee will ordinarily suffer a monetary loss only when the difference between the unsatisfied indebtedness and the proceeds of a foreclosure sale of mortgaged premises is greater than the original guaranty as adjusted. The VA may, at its option, and without regard to the guaranty, make full payment to a mortgagee of the unsatisfied indebtedness on a mortgage upon its assignment to the VA.

Since there is no limit imposed by the VA on the principal amount of a VA-guaranteed mortgage loan but there is a limit on the amount of the VA guaranty, additional coverage under a Primary Mortgage Insurance Policy may be required by the company for VA loans in excess of amounts specified by the VA. The amount of the additional coverage will be set forth in the related prospectus supplement. Any VA guaranty relating to Contracts underlying a series of certificates will be described in the related prospectus supplement.

## THE COMPANY

The company is American Home Mortgage Securities LLC.  The company was formed in the State of Delaware on January 26, 2004 as a wholly-owned subsidiary of American Home Mortgage Investment Corp., a Maryland corporation electing to be treated as a real estate investment trust.  The company was organized for the purpose of serving as a private secondary mortgage market conduit. The company does not have, nor is it expected in the future to have, any significant assets.

The company maintains its principal office at 538 Broadhollow Road, Melville, New York, 11747. Its telephone number is (516) 396-7700.

# THE AGREEMENTS

## General

Each series of certificates will be issued pursuant to a pooling and servicing agreement or other agreement specified in the related prospectus supplement. In general, the parties to a pooling and servicing agreement will include the company, the trustee, the master servicer and, in some cases, a special servicer. However, a pooling and servicing agreement that relates to a trust fund that includes mortgage securities may include a party solely responsible for the administration of the mortgage securities, and a pooling and servicing agreement that relates to a trust fund that consists solely of mortgage securities may not include a master servicer, special servicer or other servicer as a party. All parties to each pooling and servicing agreement under which securities of a series are issued will be identified in the related prospectus supplement. Each series of notes will be issued pursuant to an indenture. The parties to each indenture will be the related Issuer and the trustee. The Issuer will be created pursuant to an owner trust agreement between the company and the owner trustee and the mortgage loans or mortgage securities securing the notes will be serviced pursuant to a servicing agreement between the Issuer and the master servicer.

Forms of the Agreements have been filed as exhibits to the registration statement of which this prospectus is a part. However, the provisions of each Agreement will vary depending upon the nature of the related securities and the nature of the related trust fund. The following summaries describe provisions that may appear in a pooling and servicing agreement with respect to a series of certificates or in either the servicing agreement or indenture with respect to a series of notes. The prospectus supplement for a series of securities will describe material provisions of the related Agreements that differ from the description thereof set forth below. The company will provide a copy of each Agreement (without exhibits) that relates to any series of securities without charge upon written request of a holder of an offered security of the series addressed to it at its principal executive offices specified in this prospectus under "The Company".

## Certain Matters Regarding the Master Servicer and the Company

The pooling and servicing agreement or servicing agreement for each series of securities will provide that the master servicer may not resign from its obligations and duties except upon a determination that performance of the duties is no longer permissible under applicable law or except (1) in connection with a permitted transfer of servicing or (2) upon appointment of a successor servicer reasonably acceptable to the trustee and upon receipt by the trustee of letter from each Rating Agency generally to the effect that the resignation and appointment will not, in and of itself, result in a downgrading of the securities. No resignation will become effective until the trustee or a successor servicer has assumed the master servicer's responsibilities, duties, liabilities and obligations under the pooling and servicing agreement or servicing agreement.

Each pooling and servicing agreement and servicing agreement will also provide that the master servicer, the company and their directors, officers, employees or agents will not be under any liability to the trust fund or the securityholders for any action taken or for refraining from the taking of any action in good faith, or for errors in judgment, unless the liability which would otherwise be imposed was by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties. Each pooling and servicing agreement and servicing agreement will further provide that the master servicer, the company, and any director, officer, employee or agent of the master servicer or the company are entitled to indemnification by the trust fund and will be

held harmless against any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred in connection with any legal action relating to the pooling and servicing agreement or servicing agreement or the related series of securities, other than any loss, liability or expense related to any specific mortgage loan or mortgage loans (except a loss, liability or expense otherwise reimbursable pursuant to the pooling and servicing agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of reckless disregard of obligations and duties. In addition, each pooling and servicing agreement and servicing agreement will provide that neither the master servicer nor the company will be under any obligation to appear in, prosecute or defend any legal or administrative action that is not incidental to its respective duties under the pooling and servicing agreement or servicing agreement and which in its opinion may involve it in any expense or liability. The master servicer or the company may, however, in its discretion undertake any action which it may deem necessary or desirable with respect to the pooling and servicing agreement or servicing agreement and the rights and duties of the parties to that agreement and the interests of the securityholders. The legal expenses and costs of the action and any resulting liability will be expenses, costs and liabilities of the trust fund, and the master servicer or the company, as the case may be, will be entitled reimbursement from funds otherwise distributable to securityholders.

Any person into which the master servicer may be merged or consolidated, any person resulting from any merger or consolidation to which the master servicer is a party or any person succeeding to the business of the master servicer will be the successor of the master servicer under the related pooling and servicing agreement or servicing agreement, provided that (1) the person is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac and (2) the merger, consolidation or succession does not adversely affect the then-current ratings of the classes of securities of the related series that have been rated. In addition, notwithstanding the prohibition on its resignation, the master servicer may assign its rights under a pooling and servicing agreement or servicing agreement, provided clauses (1) and (2) above are satisfied and the person is reasonably satisfactory to the company and the trustee. In the case of an assignment, the master servicer will be released from its obligations under the pooling and servicing agreement or servicing agreement, exclusive of liabilities and obligations incurred by it prior to the time of the assignment.

## Events of Default and Rights Upon Event of Default

### Pooling and Servicing Agreement

Events of default under the pooling and servicing agreement in respect of a series of certificates, unless otherwise specified in the prospectus supplement, will include:

- any failure by the master servicer to make a required deposit to the Distribution Account which continues unremedied for 5 days (or other time period described in the related prospectus supplement) after the giving of written notice of the failure to the master servicer by the trustee or the company, or to the master servicer, the company and the trustee by the holders of certificates evidencing not less than 25% of the aggregate undivided interests (or, if applicable, voting rights) in the related trust fund;

- any failure by the master servicer to observe or perform in any material respect any other of its material covenants or agreements in the pooling and servicing agreement with respect to the series of certificates which continues unremedied for 30 days (15 days in the case of a failure to pay the premium for any insurance policy which is required to be maintained under the pooling and servicing agreement) after the giving of written notice

of the failure to the master servicer by the trustee or the company, or to the master servicer, the company and the trustee by the holders of certificates evidencing not less than 25% of the aggregate undivided interests (or, if applicable, voting rights) in the related trust fund;

- events of insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings regarding the master servicer and some actions by the master servicer indicating its insolvency or inability to pay its obligations, as specified in the related pooling and servicing agreement; and

- any failure of the master servicer to make advances as described in this prospectus under "Description of the Securities—Advances," by the date and time set forth in the pooling and servicing agreement.

Additional events of default will be described in the related prospectus supplement. A default pursuant to the terms of any mortgage securities included in any trust fund will not constitute an event of default under the related pooling and servicing agreement.

So long as an event of default remains unremedied, either the company or the trustee may, and at the direction of the holders of certificates evidencing not less than 51% of the aggregate undivided interests (or, if applicable, voting rights) in the related trust fund the trustee shall, by written notification to the master servicer and to the company or the trustee, as applicable, terminate all of the rights and obligations of the master servicer under the pooling and servicing agreement (other than any rights of the master servicer as certificateholder) covering the trust fund and in and to the mortgage loans and the proceeds thereof, whereupon the trustee or, upon notice to the company and with the company's consent, its designee will succeed to all responsibilities, duties and liabilities of the master servicer under the pooling and servicing agreement (other than any obligation to purchase mortgage loans) and will be entitled to similar compensation arrangements. In the event that the trustee would be obligated to succeed the master servicer but is unwilling so to act, it may appoint (or if it is unable so to act, it shall appoint) or petition a court of competent jurisdiction for the appointment of, an established mortgage loan servicing institution with a net worth of at least $15,000,000 to act as successor to the master servicer under the pooling and servicing agreement (unless otherwise set forth in the pooling and servicing agreement). Pending an appointment, the trustee is obligated to act as master servicer. The trustee and the successor may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation to the initial master servicer under the pooling and servicing agreement.

No certificateholder will have any right under a pooling and servicing agreement to institute any proceeding with respect to the pooling and servicing agreement unless (1) that holder previously gave the trustee written notice of a default that is continuing, (2) the holders of certificates evidencing not less than 25% of the aggregate undivided interests (or, if applicable, voting rights)in the related trust fund requested the trustee in writing to institute the proceeding in its own name as trustee, (3) the trustee receives reasonable security or indemnity against the costs, expenses and liabilities that may be incurred in or because of the proceeding and (4) the trustee for a reasonable time after receipt of the request and indemnity has neglected or refused to institute any proceeding.

The holders of certificates representing at least 66% of the aggregate undivided interests (or, if applicable, voting rights) evidenced by those certificates affected by a default or event of default may waive the default or event of default (other than a failure by the master servicer to make an advance); provided, however, that (1) a default or event of default under the first or fourth items listed under "—

Events of Default" above may be waived only by all of the holders of certificates affected by the default or event of default and (2) no waiver shall reduce in any manner the amount of, or delay the timing of, payments received on mortgage loans which are required to be distributed to, or otherwise materially adversely affect, any non-consenting certificateholder.

*Servicing Agreement*

For a series of notes, a servicing default under the related servicing agreement generally will include:

- any failure by the master servicer to make a required deposit to the Distribution Account or, if the master servicer is so required, to distribute to the holders of any class of notes or Equity Certificates of the series any required payment which continues unremedied for 5 business days (or other period of time described in the related prospectus supplement) after the giving of written notice of the failure to the master servicer by the trustee or the Issuer;

- any failure by the master servicer duly to observe or perform in any material respect any other of its covenants or agreements in the servicing agreement with respect to the series of securities which continues unremedied for 45 days after the giving of written notice of the failure to the master servicer by the trustee or the Issuer;

- events of insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings regarding the master servicer and some actions by the master servicer indicating its insolvency or inability to pay its obligations, as specified in the related servicing agreement; and

- any other servicing default as set forth in the servicing agreement.

So long as a servicing default remains unremedied, either the company or the trustee may, by written notification to the master servicer and to the Issuer or the trustee or trust fund, as applicable, terminate all of the rights and obligations of the master servicer under the servicing agreement (other than any right of the master servicer as noteholder or as holder of the Equity Certificates and other than the right to receive servicing compensation and expenses for master servicing the mortgage loans during any period prior to the date of the termination), whereupon the trustee will succeed to all responsibilities, duties and liabilities of the master servicer under the servicing agreement (other than any obligation to purchase mortgage loans) and will be entitled to similar compensation arrangements. In the event that the trustee would be obligated to succeed the master servicer but is unwilling so to act, it may appoint (or if it is unable so to act, it shall appoint) or petition a court of competent jurisdiction for the appointment of an approved mortgage servicing institution with a net worth of at least $15,000,000 to act as successor to the master servicer under the servicing agreement (unless otherwise set forth in the servicing agreement). Pending the appointment, the trustee is obligated to act in the capacity. The trustee and the successor may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation to the initial master servicer under the servicing agreement.

*Indenture*

For a series of notes, an event of default under the indenture generally will include:

62

- a default for five days or more (or other period of time described in the related prospectus supplement) in the payment of any principal of or interest on any note of the series;

- failure to perform any other covenant of the Issuer in the indenture which continues for a period of thirty days after notice thereof is given in accordance with the procedures described in the related indenture;

- any representation or warranty made by the Issuer in the indenture or in any certificate or other writing delivered pursuant thereto or in connection therewith with respect to or affecting the series having been incorrect in a material respect as of the time made, and the breach is not cured within thirty days after notice thereof is given in accordance with the procedures described in the related indenture;

- events of bankruptcy, insolvency, receivership or liquidation of the Issuer, as specified in the related indenture; or

- any other event of default provided with respect to notes of that series.

If an event of default with respect to the notes of any series at the time outstanding occurs and is continuing, the trustee or the holders of a majority of the then aggregate outstanding amount of the notes of the series may declare the principal amount of all the notes of the series to be due and payable immediately. The declaration may, in some circumstances, be rescinded and annulled by the holders of a majority in aggregate outstanding amount of the related notes.

If following an event of default with respect to any series of notes, the notes of the series have been declared to be due and payable, the trustee may, in its discretion, notwithstanding the acceleration, elect to maintain possession of the collateral securing the notes of the series and to continue to apply payments on the collateral as if there had been no declaration of acceleration if the collateral continues to provide sufficient funds for the payment of principal of and interest on the notes of the series as they would have become due if there had not been a declaration. In addition, the trustee may not sell or otherwise liquidate the collateral securing the notes of a series following an event of default, unless (1) the holders of 100% of the then aggregate outstanding amount of the notes of the series consent to the sale, (2) the proceeds of the sale or liquidation are sufficient to pay in full the principal of and accrued interest, due and unpaid, on the outstanding notes of the series at the date of the sale or (3) the trustee determines that the collateral would not be sufficient on an ongoing basis to make all payments on the notes as the payments would have become due if the notes had not been declared due and payable, and the trustee obtains the consent of the holders of 66 2/3% of the then aggregate outstanding amount of the notes of the series.

In the event that the trustee liquidates the collateral in connection with an event of default, the indenture provides that the trustee will have a prior lien on the proceeds of the liquidation for unpaid fees and expenses. As a result, upon the occurrence of an event of default, the amount available for payments to the noteholders would be less than would otherwise be the case.  However, the trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the indenture for the benefit of the noteholders after the occurrence of the event of default.

In the event the principal of the notes of a series is declared due and payable, as described above, the holders of the notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount thereof less the amount of the discount that is unamortized.

No noteholder or holder of an Equity Certificate generally will have any right under an owner trust agreement or indenture to institute any proceeding with respect to the Agreement unless (1) that holder previously has given to the trustee written notice of default and the continuance thereof, (2) the holders of notes or Equity Certificates of any class evidencing not less than 25% of the aggregate Percentage Interests constituting that class (a) have made written request upon the trustee to institute the proceeding in its own name as trustee and (b) have offered to the trustee reasonable security or indemnity against the costs, expenses and liabilities that may be incurred in or because of the proceeding, (3) the trustee has neglected or refused to institute the proceeding for 60 days after receipt of the request and indemnity and (4) no direction inconsistent with the written request has been given to the trustee during the 60 day period by the holders of a majority of the aggregate Percentage Interests constituting that class.

**Amendment**

Each pooling and servicing agreement may be amended by the parties thereto, without the consent of any of the holders of certificates covered by the pooling and servicing agreement,

- to cure any ambiguity,

- o correct or supplement any provision therein which may be defective or inconsistent with any other provision therein,

- to change the timing and/or nature of deposits in the Distribution Account, provided that (1) the change would not adversely affect in any material respect the interests of any certificateholder, as evidenced by an opinion of counsel, and (2) the change would not adversely affect the then-current rating of any rated classes of certificates, as evidenced by a letter from each applicable Rating Agency,

- if a REMIC election has been made with respect to the related trust fund, to modify, eliminate or add to any of its provisions (A) to the extent as shall be necessary to maintain the qualification of the trust fund as a REMIC or to avoid or minimize the risk of imposition of any tax on the related trust fund, provided that the trustee has received an opinion of counsel to the effect that (1) the action is necessary or desirable to maintain the qualification or to avoid or minimize the risk, and (2) the action will not adversely affect in any material respect the interests of any holder of certificates covered by the pooling and servicing agreement, or (B) to restrict the transfer of the REMIC Residual Certificates, provided that the company has determined that the then-current ratings of the classes of the certificates that have been rated will not be adversely affected, as evidenced by a letter from each applicable Rating Agency, and that the amendment will not give rise to any tax with respect to the transfer of the REMIC Residual Certificates to a non-permitted transferee,

- to make any other provisions with respect to matters or questions arising under the pooling and servicing agreement which are not materially inconsistent with the provisions thereof, provided that the action will not adversely affect in any material respect the interests of any certificateholder, or

- to amend specified provisions that are not material to holders of any class of certificates offered under this prospectus.

The pooling and servicing agreement may also be amended by the parties thereto with the consent of the holders of certificates of each class affected thereby evidencing, in each case, at least 66% of the aggregate Percentage Interests constituting the class for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the pooling and servicing agreement or of modifying in any manner the rights of the holders of certificates covered by the pooling and servicing agreement, except that the amendment may not (1) reduce in any manner the amount of, or delay the timing of, payments received on mortgage loans which are required to be distributed on a certificate of any class without the consent of the holder of the certificate or (2) reduce the aforesaid percentage of certificates of any class the holders of which are required to consent to the amendment without the consent of the holders of all certificates of the class covered by the pooling and servicing agreement then outstanding.

Notwithstanding the foregoing, if a REMIC election has been made with respect to the related trust fund, the trustee will not be entitled to consent to any amendment to a pooling and servicing agreement without having first received an opinion of counsel to the effect that the amendment or the exercise of any power granted to the master servicer, the company, the trustee or any other specified person in accordance with the amendment will not result in the imposition of a tax on the related trust fund or cause the trust fund to fail to qualify as a REMIC.

With respect to each series of notes, each related servicing agreement or indenture may be amended by the parties thereto without the consent of any of the holders of the notes covered by the Agreement, to cure any ambiguity, to correct, modify or supplement any provision therein, or to make any other provisions with respect to matters or questions arising under the Agreement which are not inconsistent with the provisions thereof, provided that the action will not adversely affect in any material respect the interests of any holder of notes covered by the Agreement. Each Agreement may also be amended by the parties thereto with the consent of the holders of notes evidencing not less than 66% of the voting rights, for any purpose; provided, however, that the amendment may not:

(1)     reduce in any manner the amount of or delay the timing of, payments received on trust fund assets which are required to be distributed on any certificate without the consent of the holder of the certificate,

(2)     adversely affect in any material respect the interests of the holders of any class of notes in a manner other than as described in (1), without the consent of the holders of notes of the class evidencing not less than 66% of the aggregate voting rights of the class or

(3)     reduce the aforesaid percentage of voting rights required for the consent to the amendment without the consent of the holders of all notes covered by the Agreement then outstanding.

The voting rights evidenced by any security will be the portion of the voting rights of all of the securities in the related series allocated in the manner described in the related prospectus supplement.

## Termination; Retirement of Securities

The obligations created by the related Agreements for each series of securities (other than the limited payment and notice obligations of the trustee) will terminate upon the payment to securityholders of that series of all amounts held in the Distribution Account or by the master servicer and required to be paid to them pursuant to the Agreements following the earlier of (1) the final payment or other liquidation

or disposition (or any advance with respect thereto) of the last mortgage loan, REO property and/or mortgage security subject thereto and (2) the purchase by (a) the master servicer, a servicer, the company or its designee, (b) if specified in the related prospectus supplement with respect to each series of certificates, by the holder of the REMIC Residual Certificates (see "Federal Income Tax Consequences" below) or (c) if specified in the prospectus supplement with respect to each series of notes, by the holder of the Equity Certificates, from the trust fund for the series of all remaining mortgage loans, REO properties and/or mortgage securities. In addition to the foregoing, the master servicer, a servicer, the company or its designee will have the option to purchase, in whole but not in part, the securities specified in the related prospectus supplement in the manner set forth in the related prospectus supplement. With respect to any series of certificates which provides for such purchase, the purchase shall not be made unless either: (1) the aggregate principal balance of the certificates as of the date is equal to or less than the percentage specified in the related prospectus supplement (which shall not be greater than 25%) of the aggregate principal balance of the certificates as of the Closing Date or (2) the aggregate principal balance of the mortgage loans as of the date is equal to or less than the percentage specified in the related prospectus supplement (which shall not be greater than 25%) of the aggregate principal balance of the mortgage loans as of the cut-off date. With respect to any series of notes which provides for such purchase, the purchase shall not be made unless the aggregate principal balance of the notes as of the date is equal to or less than the percentage specified in the related prospectus supplement (which shall not be greater than 25%) of the aggregate principal balance of the notes as of the Closing Date or a period specified in the related prospectus supplement has elapsed since the initial distribution date. Upon the purchase of the securities or at any time thereafter, at the option of the master servicer, a servicer, the company or its designee, the assets of the trust fund may be sold, thereby effecting a retirement of the securities and the termination of the trust fund, or the securities so purchased may be held or resold by the master servicer, a servicer, the company or its designee. In no event, however, unless otherwise provided in the prospectus supplement, will a trust created by a pooling and servicing agreement continue beyond the expiration of 21 years from the death of the survivor of the persons named in the pooling and servicing agreement. Written notice of termination of the pooling and servicing agreement will be given to each securityholder, and the final distribution will be made only upon surrender and cancellation of the securities at an office or agency appointed by the trustee which will be specified in the notice of termination. If the securityholders are permitted to terminate the trust under the applicable pooling and servicing agreement, a penalty may be imposed upon the securityholders based upon the fee that would be foregone by the master servicer because of the termination.

The purchase of mortgage loans and property acquired in respect of mortgage loans evidenced by a series of securities shall be made at the option of the master servicer, a servicer, the company, its designee or, if applicable, the holder of the REMIC Residual Certificates or Equity Certificates at the price specified in the related prospectus supplement. The exercise of the right will effect early retirement of the securities of that series, but the right of the master servicer, the company or, if applicable, the holder to so purchase is subject to the aggregate principal balance of the mortgage loans and/or mortgage securities in the trust fund for that series as of the distribution date on which the purchase is to occur being less than the percentage specified in the related prospectus supplement of the aggregate principal balance of the mortgage loans and/or mortgage securities for that series at the cut-off date or closing date, as specified in the prospectus supplement. The prospectus supplement for each series of securities will set forth the amounts that the holders of the securities will be entitled to receive upon the early retirement. The early termination may adversely affect the yield to holders of the securities. With respect to any series of certificates, an optional purchase of the mortgage loans in the related trust fund may not result in the related certificates receiving an amount equal to the principal balance thereof plus accrued and unpaid interest and any undistributed shortfall on the related certificates. If a REMIC election has been made, the

termination of the related trust fund will be effected in a manner consistent with applicable federal income tax regulations and its status as a REMIC.

Following any optional termination, there will be no continuing direct or indirect liability of the trust fund or any securityholder as sellers of the assets of the trust fund.

## The Trustee

The trustee under each pooling and servicing agreement and indenture will be named in the related prospectus supplement. The commercial bank, national banking association, banking corporation or trust company that serves as trustee may have typical banking relationships with the company and its affiliates. The trustee shall at all times be a corporation or an association organized and doing business under the laws of any state or the United States of America, authorized under the laws to exercise corporate trust powers, having a combined capital and surplus of at least $15,000,000 and subject to supervision or examination by federal or state authority.

## Duties of the Trustee

The trustee for each series of securities will make no representation as to the validity or sufficiency of the related Agreements, the securities or any underlying mortgage loan, mortgage security or related document and will not be accountable for the use or application by or on behalf of any master servicer, servicer or special servicer of any funds paid to the master servicer, servicer or special servicer in respect of the securities or the underlying mortgage loans or mortgage securities, or any funds deposited into or withdrawn from the Distribution Account for the series or any other account by or on behalf of the master servicer, servicer or special servicer. If no event of default has occurred and is continuing, the trustee for each series of securities will be required to perform only those duties specifically required under the related pooling and servicing agreement or indenture. However, upon receipt of any of the various certificates, reports or other instruments required to be furnished to it pursuant to the related Agreement, a trustee will be required to examine the documents and to determine whether they conform to the requirements of the agreement.

## Some Matters Regarding the Trustee

As and to the extent described in the related prospectus supplement, the fees and normal disbursements of any trustee may be the expense of the related master servicer or other specified person or may be required to be borne by the related trust fund.

The trustee for each series of securities generally will be entitled to indemnification, from amounts held in the Distribution Account for the series, for any loss, liability or expense incurred by the trustee in connection with the trustee's acceptance or administration of its trusts under the related pooling and servicing agreement or indenture unless the loss, liability, cost or expense was incurred by reason of willful misfeasance, bad faith or gross negligence on the part of the trustee in the performance of its obligations and duties, or by reason of its reckless disregard of its obligations or duties.

## Resignation and Removal of the Trustee

The trustee may resign at any time, in which event the company will be obligated to appoint a successor trustee. The company may also remove the trustee if the trustee ceases to be eligible to continue under the pooling and servicing agreement or if the trustee becomes insolvent. Upon becoming aware of

the circumstances, the company will be obligated to appoint a successor trustee. The trustee may also be removed at any time by the holders of securities evidencing not less than 51% of the aggregate undivided interests (or, if applicable, voting rights) in the related trust fund. Any resignation or removal of the trustee and appointment of a successor trustee will not become effective until acceptance of the appointment by the successor trustee.

## YIELD CONSIDERATIONS

The yield to maturity of an offered security will depend on the price paid by the holder for the security, the security interest rate on a security entitled to payments of interest (which security interest rate may vary if so specified in the related prospectus supplement) and the rate and timing of principal payments (including prepayments, defaults, liquidations and repurchases) on the mortgage loans and the allocation thereof to reduce the principal balance of the security (or notional amount thereof if applicable) and other factors.

A class of securities may be entitled to payments of interest at a fixed security interest rate, a variable security interest rate or adjustable security interest rate, or any combination of security interest rates, each as specified in the related prospectus supplement. A variable security interest rate may be calculated based on the weighted average of the Net Mortgage Rates of the related mortgage loans, or the weighted average of the interest rates (which may be net of trustee fees) of the related mortgage securities, for the month preceding the distribution date if so specified in the related prospectus supplement. As will be described in the related prospectus supplement, the aggregate payments of interest on a class of securities, and their yield to maturity, will be affected by the rate of payment of principal on the securities (or the rate of reduction in the notional balance of securities entitled only to payments of interest), in the case of securities evidencing interests in ARM Loans, by changes in the Net Mortgage Rates on the ARM Loans, and in the case of securities evidencing interests in mortgage securities with floating or variable rates, by changes in such rates and the indices on which they are based. See "Maturity and Prepayment Considerations" below. The yield on the securities will also be affected by liquidations of mortgage loans following mortgagor defaults and by purchases of mortgage loans in the event of breaches of representations and warranties made in respect of the mortgage loans by the company, the master servicer and others, or conversions of ARM Loans to a fixed interest rate. See "The Mortgage Pools—Representations by Sellers" and "Descriptions of the Securities—Assignment of Trust Fund Assets" above. Holders of Strip Securities or a class of securities having a security interest rate that varies based on the weighted average mortgage rate of the underlying mortgage loans may be affected by disproportionate prepayments and repurchases of mortgage loans having higher Net Mortgage Rates or rates applicable to the Strip Securities, as applicable.

With respect to any series of securities, a period of time will elapse between the date upon which payments on the related mortgage loans are due and the distribution date on which the payments are passed through to securityholders. That delay will effectively reduce the yield that would otherwise be produced if payments on the mortgage loans were distributed to securityholders on or near the date they were due.

In general, if a class of securities is purchased at initial issuance at a premium and payments of principal on the related mortgage loans occur at a rate faster than anticipated at the time of purchase, the purchaser's actual yield to maturity will be lower than that assumed at the time of purchase. Similarly, if a class of securities is purchased at initial issuance at a discount and payments of principal on the related mortgage loans occur at a rate slower than that assumed at the time of purchase, the purchaser's actual yield to maturity will be lower than that originally anticipated. The effect of principal prepayments,

68

liquidations and purchases on yield will be particularly significant in the case of a series of securities having a class entitled to payments of interest only or to payments of interest that are disproportionately high relative to the principal payments to which the class is entitled. Such a class will likely be sold at a substantial premium to its principal balance and any faster than anticipated rate of prepayments will adversely affect the yield to its holders. Extremely rapid prepayments may result in the failure of such holders to recoup their original investment. In addition, the yield to maturity on other types of classes of securities, including Accrual Securities and securities with a security interest rate which fluctuates inversely with or at a multiple of an index, may be relatively more sensitive to the rate of prepayment on the related mortgage loans than other classes of securities.

The timing of changes in the rate of principal payments on or repurchases of the mortgage loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments experienced over time is consistent with an investor's expectation. In general, the earlier a prepayment of principal on the underlying mortgage loans or a repurchase thereof, the greater will be the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal payments and repurchases occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of a series of securities would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

When a principal prepayment in full is made on a mortgage loan, the borrower is generally charged interest only for the period from the due date of the preceding scheduled payment up to the date of the prepayment, instead of for the full accrual period, that is, the period from the due date of the preceding scheduled payment up to the due date for the next scheduled payment. In addition, a partial principal prepayment may likewise be applied as of a date prior to the next scheduled due date (and, accordingly, be accompanied by accrued interest for less than the full accrual period). However, interest accrued and distributable on any series of securities on any distribution date will generally correspond to interest accrued on the principal balance of mortgage loans for their respective full accrual periods. Consequently, if a prepayment on any mortgage loan is distributable to securityholders on a particular distribution date, but the prepayment is not accompanied by accrued interest for the full accrual period, the interest charged to the borrower (net of servicing and administrative fees and any retained interest of the company) may be less than the corresponding amount of interest accrued and otherwise payable on the related mortgage loan, and a Prepayment Interest Shortfall will result. If and to the extent that the shortfall is allocated to a class of offered securities, its yield will be adversely affected. The prospectus supplement for a series of securities will describe the manner in which the shortfalls will be allocated among the classes of the securities. If so specified in the related prospectus supplement, the master servicer or related servicer will be required to apply some or all of its servicing compensation for the corresponding period to offset the amount of the shortfalls. The related prospectus supplement will also describe any other amounts available to off set the shortfalls. See "Servicing of Mortgage Loans—Servicing and Other Compensation and Payment of Expenses; Retained Interest".

The trust fund with respect to any series may include ARM Loans. As is the case with conventional, fixed-rate mortgage loans originated in a high interest rate environment which may be subject to a greater rate of principal prepayments when interest rates decrease, ARM Loans may be subject to a greater rate of principal prepayments (or purchases by the related servicer or the master servicer) due to their refinancing in a low interest rate environment. For example, if prevailing interest rates fall significantly, ARM Loans could be subject to higher prepayment rates than if prevailing interest rates remain constant because the availability of fixed-rate or other adjustable-rate mortgage loans at competitive interest rates may encourage mortgagors to refinance their adjustable-rate mortgages to "lock in" a lower fixed interest rate or to take advantage of the availability of other adjustable-rate mortgage

loans. A rising interest rate environment may also result in an increase in the rate of defaults on the mortgage loans.

The trust fund with respect to any series may include convertible ARM Loans. Convertible ARM Loans may be subject to a greater rate of principal prepayments (or purchases by the related servicer or the master servicer) due to their conversion to fixed interest rate loans in a low interest rate environment. The conversion feature may also be exercised in a rising interest rate environment as mortgagors attempt to limit their risk of higher rates. A rising interest rate environment may also result in an increase in the rate of defaults on these mortgage loans. If the related servicer or the master servicer purchases convertible ARM Loans, a mortgagor's exercise of the conversion option will result in a distribution of the principal portion thereof to the securityholders, as described in this prospectus. Alternatively, to the extent a servicer or the master servicer fails to purchase converting ARM Loans, the mortgage pool will include fixed-rate mortgage loans.

The rate of defaults on the mortgage loans will also affect the rate and timing of principal payments on the mortgage loans and thus the yield on the securities. In general, defaults on single family loans are expected to occur with greater frequency in their early years. The rate of default on single family loans which are refinanced or limited documentation mortgage loans, and on mortgage loans, with high Loan-to-Value Ratios, may be higher than for other types of mortgage loans. Furthermore, the rate and timing of prepayments, defaults and liquidations on the mortgage loans will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values.

With respect to some mortgage loans in a mortgage pool, the mortgage rate at origination may be below the rate that would result if the index and margin relating thereto were applied at origination. Under the applicable underwriting standards, the mortgagor under each mortgage loan generally will be qualified, or the mortgage loan otherwise approved, on the basis of the mortgage rate in effect at origination. The repayment of the mortgage loan may thus be dependent on the ability of the mortgagor to make larger level monthly payments following the adjustment of the mortgage rate. In addition, the periodic increase in the amount paid by the mortgagor of a buydown mortgage loan during or at the end of the applicable Buydown Period may create a greater financial burden for the mortgagor, who might not have otherwise qualified for a mortgage under applicable underwriting guidelines, and may accordingly increase the risk of default with respect to the related mortgage loan.

The mortgage rates on ARM Loans subject to negative amortization generally adjust monthly and their amortization schedules adjust less frequently. During a period of rising interest rates as well as immediately after origination (initial mortgage rates are generally lower than the sum of the Indices applicable at origination and the related Note Margins), the amount of interest accruing on the principal balance of the mortgage loans may exceed the amount of their minimum scheduled monthly payment. As a result, a portion of the accrued interest on negatively amortizing mortgage loans may become Deferred Interest which will be added to the principal balance thereof and will bear interest at the applicable mortgage rate. The addition of the Deferred Interest to the principal balance of any related class or classes of securities will lengthen the weighted average life thereof and may adversely affect yield to holders thereof, depending upon the price at which the securities were purchased. In addition, with respect to ARM Loans subject to negative amortization, during a period of declining interest rates, it might be expected that each minimum scheduled monthly payment on the mortgage loan would exceed the amount of scheduled principal and accrued interest on the principal balance thereof, and since the excess will be

70

applied to reduce the principal balance of the related class or classes of securities, the weighted average life of the securities will be reduced and may adversely affect the yield to holders thereof, depending upon the price at which the securities were purchased.

## MATURITY AND PREPAYMENT CONSIDERATIONS

As indicated above under "The Mortgage Pools," the original terms to maturity of the mortgage loans in a given mortgage pool will vary depending upon the type of mortgage loans included in the mortgage pool. The prospectus supplement for a series of securities will contain information with respect to the types and maturities of the mortgage loans in the related mortgage pool. The prepayment experience with respect to the mortgage loans in a mortgage pool will affect the life and yield of the related series of securities.

With respect to balloon loans, payment of the balloon payment (which, based on the amortization schedule of the mortgage loans, is expected to be a substantial amount) will generally depend on the mortgagor's ability to obtain refinancing of the mortgage loans or to sell the mortgaged property prior to the maturity of the balloon loan. The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including real estate values, the mortgagor's financial situation, prevailing mortgage loan interest rates, the mortgagor's equity in the related mortgaged property, tax laws and prevailing general economic conditions. None of the company, the master servicer, a servicer or any of their affiliates will be obligated to refinance or repurchase any mortgage loan or to sell the mortgaged property.

The extent of prepayments of principal of the mortgage loans may be affected by a number of factors, including solicitations and the availability of mortgage credit, the relative economic vitality of the area in which the mortgaged properties are located and, in the case of multifamily, commercial and mixed-use loans, the quality of management of the mortgage properties, the servicing of the mortgage loans, possible changes in tax laws and other opportunities for investment. In addition, the rate of principal payments on the mortgage loans may be affected by the existence of lock-out periods and requirements that principal prepayments be accompanied by prepayment premiums, as well as due-on-sale and due-on-encumbrance provisions, and by the extent to which the provisions may be practicably enforced. See "Servicing of Mortgage Loans—Collection and Other Servicing Procedures" and "Legal Aspects of the Mortgage Loans—Enforceability of Certain Provisions" for a description of provisions of the pooling and servicing agreement and legal aspects of mortgage loans that may affect the prepayment experience on the mortgage loans.

The rate of prepayment on a pool of mortgage loans is also affected by prevailing market interest rates for mortgage loans of a comparable type, term and risk level. When the prevailing market interest rate is below a mortgage coupon, a borrower may have an increased incentive to refinance its mortgage loan. In addition, as prevailing market interest rates decline, even borrowers with ARM Loans that have experienced a corresponding interest rate decline may have an increased incentive to refinance for purposes of either (1) converting to a fixed rate loan and thereby "locking in" the rate or (2) taking advantage of the initial "teaser rate" (a mortgage interest rate below what it would otherwise be if the applicable index and gross margin were applied) on another adjustable rate mortgage loan. Moreover, although the mortgage rates on ARM Loans will be subject to periodic adjustments, the adjustments generally will not increase or decrease the mortgage rates by more than a fixed percentage amount on each adjustment date, will not increase the mortgage rates over a fixed percentage amount during the life of any ARM Loan and will be based on an index (which may not rise and fall consistently with mortgage interest rates) plus the related Note Margin (which may be different from margins being used at the time

for newly originated adjustable rate mortgage loans). As a result, the mortgage rates on the ARM Loans at any time may not equal the prevailing rates for similar, newly originated adjustable rate mortgage loans. In high interest rate environments, the prevailing rates on fixed-rate mortgage loans may be sufficiently high in relation to the then-current mortgage rates on newly originated ARM Loans that the rate of prepayment may increase as a result of refinancings. There can be no assurance as to the rate of prepayments on the mortgage loans during any period or over the life of any series of securities.

If the applicable pooling and servicing agreement for a series of securities provides for a pre-funding account or other means of funding the transfer of additional mortgage loans to the related trust fund, as described under "Description of the Securities—Pre-Funding Account" in this prospectus, and the trust fund is unable to acquire the additional mortgage loans within any applicable time limit, the amounts set aside for the purpose may be applied as principal payments on one or more classes of securities of the series. See "Yield Considerations."

There can be no assurance as to the rate of prepayment of the mortgage loans. The company is not aware of any publicly available statistics relating to the principal prepayment experience of diverse portfolios of mortgage loans such as the mortgage loans over an extended period of time. All statistics known to the company that have been compiled with respect to prepayment experience on mortgage loans indicate that while some mortgage loans may remain outstanding until their stated maturities, a substantial number will be paid prior to their respective stated maturities. No representation is made as to the particular factors that will affect the prepayment of the mortgage loans or as to the relative importance of these factors.

As described in this prospectus and in the prospectus supplement, the master servicer, a servicer, the company or a person specified in the related prospectus supplement (other than holder of any class of offered certificates, other than the REMIC Residual Certificates, if offered) may have the option to purchase the assets in a trust fund and effect early retirement of the related series of securities. See "The Agreements—Termination; Retirement of Securities."

## LEGAL ASPECTS OF MORTGAGE LOANS

The following discussion summarizes legal aspects of mortgage loans that is general in nature. The summaries do not purport to be complete. They do not reflect the laws of any particular state nor the laws of all states in which the mortgaged properties may be situated. This is because these legal aspects are governed in part by the law of the state that applies to a particular mortgaged property and the laws of the states may vary substantially. You should refer to the applicable federal and state laws governing the mortgage loans.

### Mortgages

Each single family, multifamily, commercial and mixed-use loan and, if applicable, the Contracts (in each case other than cooperative mortgage loans),will be evidenced by a note or bond and secured by an instrument granting a security interest in real property, which may be a mortgage, deed of trust or a deed to secure debt, depending upon the prevailing practice and law in the state in which the related mortgaged property is located, and may have first, second or third priority. Mortgages and deeds to secure debt are referred to as "mortgages." Contracts evidence both the obligation of the obligor to repay the loan evidenced thereby and grant a security interest in the related Manufactured Homes to secure repayment of the loan. However, as Manufactured Homes have become larger and often have been attached to their sites without any apparent intention by the borrowers to move them, courts in many

states have held that Manufactured Homes may become subject to real estate title and recording laws. See "—Contracts" below. In some states, a mortgage or deed of trust creates a lien upon the real property encumbered by the mortgage or deed of trust. However, in other states, the mortgage or deed of trust conveys legal title to the property respectively, to the mortgagee or to a trustee for the benefit of the mortgagee subject to a condition subsequent (i.e., the payment of the indebtedness secured thereby). The lien created by the mortgage or deed of trust is not prior to the lien for real estate taxes and assessments and other charges imposed under governmental police powers. Priority between mortgages depends on their terms or on the terms of separate subordination or inter-creditor or agreements, the knowledge of the parties in some cases and generally on the order of recordation of the mortgage in the appropriate recording office. There are two parties to a mortgage, the mortgagor, who is the borrower and homeowner, and the mortgagee, who is the lender. Under the mortgage instrument, the mortgagor delivers to the mortgagee a note or bond and the mortgage. In the case of a land trust, there are three parties because title to the property is held by a land trustee under a land trust agreement of which the borrower is the beneficiary; at origination of a mortgage loan, the borrower executes a separate undertaking to make payments on the mortgage note. Although a deed of trust is similar to a mortgage, a deed of trust has three parties: the trustor who is the borrower-homeowner; the beneficiary who is the lender; and a third-party grantee called the trustee. Under a deed of trust, the borrower grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the obligation. The trustee's authority under a deed of trust, the grantee's authority under a deed to secure debt and the mortgagee's authority under a mortgage are governed by the law of the state in which the real property is located, the express provisions of the deed of trustor mortgage, and, in deed of trust transactions, the directions of the beneficiary.

## Cooperative Mortgage Loans

If specified in the prospectus supplement relating to a series of certificates, the mortgage loans and Contracts may include cooperative mortgage loans. Each mortgage note evidencing a cooperative mortgage loan will be secured by a security interest in shares issued by the related Cooperative, and in the related proprietary lease or occupancy agreement granting exclusive rights to occupy a specific dwelling unit in the Cooperative's building. The security agreement will create a lien upon the shares of the Cooperative, the priority of which will depend on, among other things, the terms of the particular security agreement as well as the order of recordation and/or filing of the agreement (or financing statements related thereto) in the appropriate recording office.

Cooperative buildings relating to the cooperative mortgage loans are located primarily in the State of New York. Generally, each Cooperative owns in fee or has a long-term leasehold interest in all the real property and owns in fee or leases the building and all separate dwelling units therein. The Cooperative is directly responsible for property management and, in most cases, payment of real estate taxes, other governmental impositions and hazard and liability insurance. If there is an underlying mortgage (or mortgages) on the Cooperative's building or underlying land, as is generally the case, or an underlying lease of the land, as is the case in some instances, the Cooperative, as mortgagor or lessor, as the case may be, is also responsible for fulfilling the mortgage or rental obligations. An underlying mortgage loan is ordinarily obtained by the Cooperative in connection with either the construction or purchase of the Cooperative's building or the obtaining of capital by the Cooperative. The interest of the occupant under proprietary leases or occupancy agreements as to which that Cooperative is the landlord is generally subordinate to the interest of the holder of an underlying mortgage and to the interest of the holder of a land lease. If the Cooperative is unable to meet the payment obligations (1) arising under an underlying mortgage, the mortgagee holding an underlying mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements or (2) arising under its land

73

lease, the holder of the landlord's interest under the land lease could terminate it and all subordinate proprietary leases and occupancy agreements. In addition, an underlying mortgage on a Cooperative may provide financing in the form of a mortgage that does not fully amortize, with a significant portion of principal being due in one final payment at maturity. The inability of the Cooperative to refinance a mortgage and its consequent inability to make the final payment could lead to foreclosure by the mortgagee. Similarly, a land lease has an expiration date and the inability of the Cooperative to extend its term or, in the alternative, to purchase the land, could lead to termination of the Cooperative's interest in the property and termination of all proprietary leases and occupancy agreements. In either event, a foreclosure by the holder of an underlying mortgage or the termination of the underlying lease could eliminate or significantly diminish the value of any collateral held by the mortgagee who financed the purchase by an individual tenant-stockholder of shares of the Cooperative or, in the case of the mortgage loans, the collateral securing the cooperative mortgage loans.

Each Cooperative is owned by shareholders (referred to as tenant-stockholders) who, through ownership of stock or shares in the Cooperative, receive proprietary leases or occupancy agreements which confer exclusive rights to occupy specific dwellings. Generally, a tenant-stockholder of a Cooperative must make a monthly payment to the Cooperative pursuant to the proprietary lease, which payment represents the tenant-stockholder's proportional share of the Cooperative's payments for its underlying mortgage, real property taxes, maintenance expenses and other capital or ordinary expenses. An ownership interest in a Cooperative and accompanying occupancy rights may be financed through a cooperative mortgage loan evidenced by a mortgage note and secured by an assignment of and a security interest in the occupancy agreement or proprietary lease and a security interest in the related shares of the related Cooperative. The mortgagee generally takes possession of the share certificate and a counterpart of the proprietary lease or occupancy agreement and a financing statement covering the proprietary lease or occupancy agreement and the Cooperative shares is filed in the appropriate state and local offices to perfect the mortgagee's interest in its collateral. Subject to the limitations discussed below, upon default of the tenant-stockholder, the lender may sue for judgment on the mortgage note, dispose of the collateral at a public or private sale or otherwise proceed against the collateral or tenant-stockholder as an individual as provided in the security agreement covering the assignment of the proprietary lease or occupancy agreement and the pledge of Cooperative shares. See "—Foreclosure on Shares of Cooperatives" below.

## Tax Aspects of Cooperative Ownership

In general, a "tenant-stockholder" (as defined in Section 216(b)(2) of the Code) of a corporation that qualifies as a "cooperative housing corporation" within the meaning of Section 216(b)(1) of the Code is allowed a deduction for amounts paid or accrued within his taxable year to the corporation representing his proportionate share of interest expenses and real estate taxes allowable as a deduction under Section 216(a) of the Code to the corporation under Sections 163 and 164 of the Code. In order for a corporation to qualify under Section 216(b)(1) of the Code for its taxable year in which the items are allowable as a deduction to the corporation, that section requires, among other things, that at least 80% of the gross income of the corporation be derived from its tenant-stockholders. By virtue of this requirement, the status of a corporation for purposes of Section 216(b)(1) of the Code must be determined on a year-to-year basis. Consequently, there can be no assurance that Cooperatives relating to the cooperative mortgage loans will qualify under the section for any particular year. In the event that the Cooperative fails to qualify for one or more years, the value of the collateral securing any related cooperative mortgage loans could be significantly impaired because no deduction would be allowable to tenant-stockholders under Section 216(a) of the Code with respect to those years. In view of the significance of

the tax benefits accorded tenant-stockholders of a corporation that qualifies under Section 216(b)(1) of the Code, the likelihood that a failure would be permitted to continue over a period of years appears remote.

**Leases and Rents**

Mortgages that encumber income-producing multifamily and commercial properties often contain an assignment of rents and leases, pursuant to which the borrower assigns to the lender the borrower's right, title and interest as landlord under each lease and the income derived therefrom, while (unless rents are to be paid directly to the lender) retaining a revocable license to collect the rents for so long as there is no default. If the borrower defaults, the license terminates and the lender is entitled to collect the rents. Local law may require that the lender take possession of the property and/or obtain a court-appointed receiver before becoming entitled to collect the rents.

**Contracts**

Under the laws of most states, manufactured housing constitutes personal property and is subject to the motor vehicle registration laws of the state or other jurisdiction in which the unit is located. In a few states, where certificates of title are not required for manufactured homes, security interests are perfected by the filing of a financing statement under Article 9 of the UCC which has been adopted by all states. Financing statements are effective for five years and must be renewed prior to the end of each five year period. The certificate of title laws adopted by the majority of states provide that ownership of motor vehicles and manufactured housing shall be evidenced by a certificate of title issued by the motor vehicles department (or a similar entity) of the state. In the states that have enacted certificate of title laws, a security interest in a unit of manufactured housing, so long as it is not attached to land in so permanent a fashion as to become a fixture, is generally perfected by the recording of the interest on the certificate of title to the unit in the appropriate motor vehicle registration office or by delivery of the required documents and payment of a fee to the appropriate motor vehicle registration office, depending on state law.

The master servicer will be required under the related pooling and servicing agreement or servicing agreement to, or to cause the servicer of the Contract to, effect the notation or delivery of the required documents and fees, and to obtain possession of the certificate of title, as appropriate under the laws of the state in which any Manufactured Home is registered. In the event the master servicer or servicer, as applicable, fails, due to clerical errors or otherwise, to effect the notation or delivery, or files the security interest under the wrong law (for example, under a motor vehicle title statute rather than under the UCC, in a few states), the trustee may not have a first priority security interest in the Manufactured Home securing a Contract. As Manufactured Homes have become larger and often have been attached to their sites without any apparent intention by the borrowers to move them, courts in many states have held that Manufactured Homes may become subject to real estate title and recording laws. As a result, a security interest in a Manufactured Home could be rendered subordinate to the interests of other parties claiming an interest in the home under applicable state real estate law. In order to perfect a security interest in a Manufactured Home under real estate laws, the holder of the security interest must file either a "fixture filing" under the provisions of the UCC or a real estate mortgage under the real estate laws of the state where the home is located. These filings must be made in the real estate records office of the county where the home is located. Generally, Contracts will contain provisions prohibiting the obligor from permanently attaching the Manufactured Home to its site. So long as the obligor does not violate this agreement, a security interest in the Manufactured Home will be governed by the certificate of title laws or the UCC, and the notation of the security interest on the certificate of title or the filing of a UCC financing statement will be effective to maintain the priority of the security interest in the Manufactured

Home. If, however, a Manufactured Home is permanently attached to its site, other parties could obtain an interest in the Manufactured Home that is prior to the security interest originally retained by the Seller and transferred to the depositor.

The company will assign or cause to be assigned a security interest in the Manufactured Homes to the trustee, on behalf of the securityholders. Neither the company, the master servicer, any servicer, nor the trustee will amend the certificates of title to identify the trustee, on behalf of the securityholders, as the new secured party and, accordingly, the company or the Seller will continue to be named as the secured party on the certificates of title relating to the Manufactured Homes. In most states, the assignment is an effective conveyance of the security interest without amendment of any lien noted on the related certificate of title and the new secured party succeeds to the company's rights as the secured party. However, in some states there exists a risk that, in the absence of an amendment to the certificate of title, the assignment of the security interest might not be held effective against creditors of the company or Seller.

In the absence of fraud, forgery or permanent affixation of the Manufactured Home to its site by the Manufactured Home owner, or administrative error by state recording officials, the notation of the lien of the company on the certificate of title or delivery of the required documents and fees will be sufficient to protect the trustee against the rights of subsequent purchasers of a Manufactured Home or subsequent lenders who take a security interest in the Manufactured Home. If there are any Manufactured Homes as to which the company has failed to perfect or cause to be perfected the security interest assigned to the trust fund, the security interest would be subordinate to, among others, subsequent purchasers for value of Manufactured Homes and holders of perfected security interests. There also exists a risk in not identifying the trustee, on behalf of the securityholders, as the new secured party on the certificate of title that, through fraud or negligence, the security interest of the trustee could be released.

In the event that the owner of a Manufactured Home moves it to a state other than the state in which the Manufactured Home initially is registered, under the laws of most states the perfected security interest in the Manufactured Home would continue for four months after the relocation and thereafter until the owner re-registers the Manufactured Home in the state of relocation. If the owner were to relocate a Manufactured Home to another state and re-register the Manufactured Home in that state, and if the company did not take steps to re-perfect its security interest in that state, the security interest in the Manufactured Home would cease to be perfected. A majority of states generally require surrender of a certificate of title to re-register a Manufactured Home; accordingly, the company must surrender possession if it holds the certificate of title to the Manufactured Home or, in the case of Manufactured Homes registered in states that provide for notation of lien, the company would receive notice of surrender if the security interest in the Manufactured Home is noted on the certificate of title. Accordingly, the company would have the opportunity to re-perfect its security interest in the Manufactured Home in the state of relocation. In states that do not require a certificate of title for registration of a Manufactured Home, re-registration could defeat perfection. Similarly, when an obligor under a manufactured housing conditional sales contract sells a Manufactured Home, the obligee must surrender possession of the certificate of title or it will receive notice as a result of its lien noted thereon and accordingly will have an opportunity to require satisfaction of the related manufactured housing conditional sales contract before release of the lien. Under each related pooling and servicing agreement or servicing agreement, the master servicer will be obligated to, or to cause each of the servicers to, take these steps, at the master servicer's or servicer's expense, as are necessary to maintain perfection of security interests in the Manufactured Homes.

Under the laws of most states, liens for repairs performed on a Manufactured Home take priority even over a perfected security interest. The company will obtain the representation of the related Seller that it has no knowledge of any of these liens with respect to any Manufactured Home securing a Contract. However, these liens could arise at any time during the term of a Contract. No notice will be given to the trustee or securityholders in the event this type of lien arises.

## Foreclosure on Mortgages and Some Contracts

Foreclosure of a deed of trust is generally accomplished by a non-judicial trustee's sale under a specific provision in the deed of trust which authorizes the trustee to sell the property upon any default by the borrower under the terms of the note or deed of trust. In addition to any notice requirements contained in a deed of trust, in some states, the trustee must record a notice of default and send a copy to the borrower-trustor and to any person who has recorded a request for a copy of notice of default and notice of sale. In addition, the trustee must provide notice in some states to any other individual having an interest of record in the real property, including any junior lienholders. If the deed of trust is not reinstated within a specified period, a notice of sale must be posted in a public place and, in most states, published for a specific period of time in one or more newspapers in a specified manner prior to the date of trustee's sale. In addition, some state laws require that a copy of the notice of sale be posted on the property and sent to all parties having an interest of record in the real property.

In some states, the borrower-trustor has the right to reinstate the loan at any time following default until shortly before the trustee's sale. In general, in these states, the borrower, or any other person having a junior encumbrance on the real estate, may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and expenses incurred in enforcing the obligation.

Foreclosure of a mortgage is generally accomplished by judicial action. Generally, the action is initiated by the service of legal pleadings upon all parties having an interest of record in the real property. Delays in completion of the foreclosure may occasionally result from difficulties in locating necessary parties. Judicial foreclosure proceedings are often not contested by any of the applicable parties. If the mortgagee's right to foreclose is contested, the legal proceedings necessary to resolve the issue can be time-consuming.

In the case of foreclosure under either a mortgage or a deed of trust, the sale by the referee or other designated officer or by the trustee is a public sale. However, because of the difficulty a potential buyer at the sale would have in determining the exact status of title and because the physical condition of the property may have deteriorated during the foreclosure proceedings, it is uncommon for a third party to purchase the property at a foreclosure sale. Rather, it is common for the lender to purchase the property from the trustee or referee for a credit bid less than or equal to the unpaid principal amount of the note plus the accrued and unpaid interest and the expense of foreclosure, in which case the mortgagor's debt will be extinguished unless the lender purchases the property for a lesser amount in order to preserve its right against a borrower to seek a deficiency judgment and the remedy is available under state law and the related loan documents. In the same states, there is a statutory minimum purchase price which the lender may offer for the property and generally, state law controls the amount of foreclosure costs and expenses, including attorneys' fees, which may be recovered by a lender. Thereafter, subject to the right of the borrower in some states to remain in possession during the redemption period, the lender will assume the burdens of ownership, including obtaining hazard insurance, paying taxes and making the repairs at its own expense as are necessary to render the property suitable for sale. Generally, the lender will obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not

equal the lender's investment in the property and, in some states, the lender may be entitled to a deficiency judgment. Any loss may be reduced by the receipt of any mortgage insurance proceeds or other forms of credit enhancement for a series of certificates. See "Description of Credit Enhancement".

A junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgages. The junior mortgagee must either pay the entire amount due on the senior mortgages prior to or at the time of the foreclosure sale or undertake to pay on any senior mortgages on which the mortgagor is currently in default. Under either course of action, the junior mortgagee may add the amounts paid to the balance due on the junior loan, and may be subrogated to the rights of the senior mortgagees. In addition, in the event that the foreclosure of a junior mortgage triggers the enforcement of a "due-on-sale" clause, the junior mortgagee may be required to pay the full amount of the senior mortgages to the senior mortgagees. Accordingly, with respect to those single family loans which are junior mortgage loans, if the lender purchases the property, the lender's title will be subject to all senior liens and claims and governmental liens. The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale and then in satisfaction of the indebtedness secured by the mortgage or deed of trust under which the sale was conducted. Any remaining proceeds are generally payable to the holders of junior mortgages or deeds of trust and other liens and claims in order of their priority, whether or not the borrower is in default. Any additional proceeds are generally payable to the mortgagor or trustor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgagee or may require the institution of separate legal proceeds.

In foreclosure, courts have imposed general equitable principles. The equitable principles are generally designed to relieve the borrower from the legal effect of its defaults under the loan documents. Examples of judicial remedies that have been fashioned include judicial requirements that the lender undertake affirmative and expensive actions to determine the causes for the borrower's default and the likelihood that the borrower will be able to reinstate the loan. In some cases, courts have substituted their judgment for the lender's judgment and have required that lenders reinstate loans or recast payment schedules in order to accommodate borrowers who are suffering from temporary financial disability. In other cases, courts have limited the right of the lender to foreclose if the default under the mortgage instrument is not monetary, such as the borrower's failure to adequately maintain the property or the borrower's execution of a second mortgage or deed of trust affecting the property. Finally, some courts have been faced with the issue of whether or not federal or state constitutional provisions reflecting due process concerns for adequate notice require that borrowers under deeds of trust or mortgages receive notices in addition to the statutorily-prescribed minimums. For the most part, these cases have upheld the notice provisions as being reasonable or have found that the sale by a trustee under a deed of trust, or under a mortgage having a power of sale, does not involve sufficient state action to afford constitutional protection to the borrower.

**Foreclosure on Shares of Cooperatives**

The Cooperative shares owned by the tenant-stockholder, together with the rights of the tenant-stockholder under the proprietary lease or occupancy agreement, are pledged to the lender and are, in almost all cases, subject to restrictions on transfer as set forth in the Cooperative's certificate of incorporation and by-laws, as well as in the proprietary lease or occupancy agreement. The Cooperative may cancel the proprietary lease or occupancy agreement, even while pledged, for failure by the tenant-stockholder to pay the obligations or charges owed by the tenant-stockholder, including mechanics' liens against the Cooperative's building incurred by the tenant-stockholder. Generally, obligations and charges arising under a proprietary lease or occupancy agreement which are owed to the Cooperative are made

78

liens upon the shares to which the proprietary lease or occupancy agreement relates. In addition, the Cooperative may generally terminate a proprietary lease or occupancy agreement in the event the borrower breaches its covenants in the proprietary lease or occupancy agreement. Typically, the lender and the Cooperative enter into a recognition agreement which, together with any lender protection provisions contained in the proprietary lease or occupancy agreement, establishes the rights and obligations of both parties in the event of a default by the tenant-stockholder on its obligations under the proprietary lease or occupancy agreement. A default by the tenant-stockholder under the proprietary lease or occupancy agreement will usually constitute a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, in the event that the tenant-stockholder has defaulted under the proprietary lease or occupancy agreement, the Cooperative will take no action to terminate the lease or agreement until the lender has been provided with notice of and an opportunity to cure the default. The recognition agreement typically provides that if the proprietary lease or occupancy agreement is terminated, the Cooperative will recognize the lender's lien against proceeds from a sale of the shares and the proprietary lease or occupancy agreement allocated to the dwelling, subject, however, to the Cooperative's right to sums due under the proprietary lease or occupancy agreement or which have become liens on the shares relating to the proprietary lease or occupancy agreement. The total amount owed to the Cooperative by the tenant-stockholder, which the lender generally cannot restrict and does not monitor, could reduce the amount realized upon a sale of the collateral below the outstanding principal balance of the cooperative mortgage loan and accrued and unpaid interest on the loan.

Recognition agreements also generally provide that in the event the lender succeeds to the tenant-shareholder's shares and proprietary lease or occupancy agreement as the result of realizing upon its collateral for a cooperative mortgage loan, the lender must obtain the approval or consent of the board of directors of the Cooperative as required by the proprietary lease before transferring the Cooperative shares or assigning the proprietary lease. The approval or consent is usually based on the prospective purchaser's income and net worth, among other factors, and may significantly reduce the number of potential purchasers, which could limit the ability of the lender to sell and realize upon the value of the collateral. Generally, the lender is not limited in any rights it may have to dispossess the tenant-stockholder.

Because of the nature of cooperative mortgage loans, lenders do not require the tenant-stockholder (i.e., the borrower) to obtain title insurance of any type. Consequently, the existence of any prior liens or other imperfections of title affecting the Cooperative's building or real estate also may adversely affect the marketability of the shares allocated to the dwelling unit in the event of foreclosure.

In New York, foreclosure on the Cooperative shares is accomplished by public sale in accordance with the provisions of Article 9 of the New York UCC and the security agreement relating to those shares. Article 9 of the New York UCC requires that a sale be conducted in a "commercially reasonable" manner. Whether a sale has been conducted in a "commercially reasonable" manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the sale and the sale price. Generally, a sale conducted according to the usual practice of banks selling similar collateral in the same area will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to

79

the right of the Cooperative corporation to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency. See "—Anti-Deficiency Legislation and other Limitations on Lenders" below.

## Repossession with respect to Contracts

*General*. Repossession of manufactured housing is governed by state law. A few states have enacted legislation that requires that the debtor be given an opportunity to cure its default (typically 30 days to bring the account current) before repossession can commence. So long as a manufactured home has not become so attached to real estate that it would be treated as a part of the real estate under the law of the state where it is located, repossession of the home in the event of a default by the obligor generally will be governed by the UCC (except in Louisiana). Article 9 of the UCC provides the statutory framework for the repossession of manufactured housing. While the UCC as adopted by the various states may vary in small particulars, the general repossession procedure established by the UCC is as follows:

- Except in those states where the debtor must receive notice of the right to cure a default, repossession can commence immediately upon default without prior notice. Repossession may be effected either through self-help (peaceable retaking without court order), voluntary repossession or through judicial process (repossession pursuant to court-issued writ of replevin). The self-help and/or voluntary repossession methods are more commonly employed, and are accomplished simply by retaking possession of the manufactured home. In cases in which the debtor objects or raises a defense to repossession, a court order must be obtained from the appropriate state court, and the manufactured home must then be repossessed in accordance with that order. Whether the method employed is self-help, voluntary repossession or judicial repossession, the repossession can be accomplished either by an actual physical removal of the manufactured home to a secure location for refurbishment and resale or by removing the occupants and their belongings from the manufactured home and maintaining possession of the manufactured home on the location where the occupants were residing. Various factors may affect whether the manufactured home is physically removed or left on location, such as the nature and term of the lease of the site on which it is located and the condition of the unit. In many cases, leaving the manufactured home on location is preferable, in the event that the home is already set up, because the expenses of retaking and redelivery will be saved. However, in those cases where the home is left on location, expenses for site rentals will usually be incurred.

- Once repossession has been achieved, preparation for the subsequent disposition of the manufactured home can commence. The disposition may be by public or private sale provided the method, manner, time, place and terms of the sale are commercially reasonable.

- Sale proceeds are to be applied first to repossession expenses (expenses incurred in retaking, storage, preparing for sale to include refurbishing costs and selling) and then to satisfaction of the indebtedness. While some states impose prohibitions or limitations on deficiency judgments if the net proceeds from resale do not cover the full amount of the indebtedness, the remainder may be sought from the debtor in the form of a deficiency judgment in those states that do not prohibit or limit deficiency judgments. The

deficiency judgment is a personal judgment against the debtor for the shortfall. Occasionally, after resale of a manufactured home and payment of all expenses and indebtedness, there is a surplus of funds. In that case, the UCC requires the party suing for the deficiency judgment to remit the surplus to the debtor. Because the defaulting owner of a manufactured home generally has very little capital or income available following repossession, a deficiency judgment may not be sought in many cases or, if obtained, will be settled at a significant discount in light of the defaulting owner's strained financial condition.

*Louisiana Law*. Any contract secured by a manufactured home located in Louisiana will be governed by Louisiana law rather than Article 9 of the UCC. Louisiana laws provide similar mechanisms for perfection and enforcement of security interests in manufactured housing used as collateral for an installment sale contract or installment loan agreement.

Under Louisiana law, a manufactured home that has been permanently affixed to real estate will nevertheless remain subject to the motor vehicle registration laws unless the obligor and any holder of a security interest in the property execute and file in the real estate records for the parish in which the property is located a document converting the unit into real property. A manufactured home that is converted into real property but is then removed from its site can be converted back to personal property governed by the motor vehicle registration laws if the obligor executes and files various documents in the appropriate real estate records and all mortgagees under real estate mortgages on the property and the land to which it was affixed file releases with the motor vehicle commission.

So long as a manufactured home remains subject to the Louisiana motor vehicle laws, liens are recorded on the certificate of title by the motor vehicle commissioner and repossession can be accomplished by voluntary consent of the obligor, executory process (repossession proceedings which must be initiated through the courts but which involve minimal court supervision) or a civil suit for possession. In connection with a voluntary surrender, the obligor must be given a full release from liability for all amounts due under the contract. In executory process repossessions, a sheriff's sale (without court supervision) is permitted, unless the obligor brings suit to enjoin the sale, and the lender is prohibited from seeking a deficiency judgment against the obligor unless the lender obtained an appraisal of the manufactured home prior to the sale and the property was sold for at least two-thirds of its appraised value.

## Rights of Redemption

*Single Family, Multifamily and Commercial Properties*. The purposes of a foreclosure action in respect of a mortgaged property is to enable the lender to realize upon its security and to bar the borrower, and all persons who have interests in the property that are subordinate to that of the foreclosing lender, from exercise of their "equity of redemption". The doctrine of equity of redemption provides that, until the property encumbered by a mortgage has been sold in accordance with a properly conducted foreclosure and foreclosure sale, those having interests that are subordinate to that of the foreclosing lender have an equity of redemption and may redeem the property by paying the entire debt with interest. Those having an equity of redemption must generally be made parties and joined in the foreclosure proceeding in order for their equity of redemption to be terminated.

The equity of redemption is a common-law (non-statutory) right which should be distinguished from post-sale statutory rights of redemption. In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the borrower and foreclosed junior lienors are given a statutory period in

81

which to redeem the property. In some states, statutory redemption may occur only upon payment of the foreclosure sale price. In other states, redemption may be permitted if the former borrower pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property because the exercise of a right of redemption would defeat the title of any purchase through a foreclosure. Consequently, the practical effect of the redemption right is to force the lender to maintain the property and pay the expenses of ownership until the redemption period has expired. In some states, a post-sale statutory right of redemption may exist following a judicial foreclosure, but not following a trustee's sale under a deed of trust.

*Manufactured Homes*. While state laws do not usually require notice to be given to debtors prior to repossession, many states do require delivery of a notice of default and of the debtor's right to cure defaults before repossession. The law in most states also requires that the debtor be given notice of sale prior to the resale of the home so that the owner may redeem at or before resale. In addition, the sale must comply with the requirements of the UCC.

## Anti-Deficiency Legislation and Other Limitations on Lenders

*Single Family, Multifamily and Commercial Loans*. Some states have imposed statutory prohibitions which limit the remedies of a beneficiary under a deed of trust or a mortgagee under a mortgage. In some states (including California), statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following non-judicial foreclosure by power of sale. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. In the case of a mortgage loan secured by a property owned by a trust where the mortgage note is executed on behalf of the trust, a deficiency judgment against the trust following foreclosure or sale under a deed of trust, even if obtainable under applicable law, may be of little value to the mortgagee or beneficiary if there are no trust assets against which the deficiency judgment may be executed. Some state statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. In other states, the lender has the option of bringing a personal action against the borrower on the debt without first exhausting the security; however in some of these states, the lender, following judgment on the personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. Consequently, the practical effect of the election requirement, in those states permitting the election, is that lenders will usually proceed against the security first rather than bringing a personal action against the borrower. Finally, in some states, statutory provisions limit any deficiency judgment against the former borrower following a foreclosure to the excess of the outstanding debt over the fair value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the judicial sale.

Generally, Article 9 of the UCC governs foreclosure on Cooperative Shares and the related proprietary lease or occupancy agreement. Some courts have interpreted Article 9 to prohibit or limit a deficiency award in some circumstances, including circumstances where the disposition of the collateral (which, in the case of a cooperative mortgage loan, would be the shares of the Cooperative and the related proprietary lease or occupancy agreement) was not conducted in a commercially reasonable manner.

In addition to laws limiting or prohibiting deficiency judgments, numerous other federal and state statutory provisions, including the federal bankruptcy laws and state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon collateral or enforce a

deficiency judgment. For example, under the federal Bankruptcy Code, virtually all actions (including foreclosure actions and deficiency judgment proceedings) to collect a debt are automatically stayed upon the filing of the bankruptcy petition and, often, no interest or principal payments are made during the course of the bankruptcy case. The delay and the consequences thereof caused by the automatic stay can be significant. Also, under the Bankruptcy Code, the filing of a petition in a bankruptcy by or on behalf of a junior lienor may stay the senior lender from taking action to foreclose out the junior lien. Moreover, with respect to federal bankruptcy law, a court with federal bankruptcy jurisdiction may permit a debtor through his or her Chapter 11 or Chapter 13 rehabilitative plan to cure a monetary default in respect of a mortgage loan on a debtor's residence by paying arrearage within a reasonable time period and reinstating the original mortgage loan payment schedule even though the lender accelerated the mortgage loan and final judgment of foreclosure had been entered in state court (provided no sale of the residence had yet occurred) prior to the filing of the debtor's petition. Some courts with federal bankruptcy jurisdiction have approved plans, based on the particular facts of the reorganization case, that effected the curing of a mortgage loan default by paying arrearage over a number of years.

Courts with federal bankruptcy jurisdiction have also indicated that the terms of a mortgage loan secured by property of the debtor may be modified. These courts have allowed modifications that include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule, forgiving all or a portion of the debt and reducing the lender's security interest to the value of the residence, thus leaving the lender a general unsecured creditor for the difference between the value of the residence and the outstanding balance of the loan. Generally, however, the terms of a mortgage loan secured only by a mortgage on real property that is the debtor's principal residence may not be modified pursuant to a plan confirmed pursuant to Chapter 13 except with respect to mortgage payment arrearages, which may be cured within a reasonable time period.

In the case of income-producing multifamily properties, federal bankruptcy law may also have the effect of interfering with or affecting the ability of the secured lender to enforce the borrower's assignment of rents and leases related to the mortgaged property. Under Section 362 of the Bankruptcy Code, the lender will be stayed from enforcing the assignment, and the legal proceedings necessary to resolve the issue could be time-consuming, with resulting delays in the lender's receipt of the rents.

Tax liens arising under the Code may have priority over the lien of a mortgage or deed of trust. In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws. These laws include the federal Truth-in-Lending Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the mortgage loans.  See "—Consumer Protection Laws" and "—Homeownership Act and Similar State Laws."

*Contracts*. In addition to the laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including federal bankruptcy laws and related state laws, may interfere with or affect the ability of a lender to realize upon collateral and/or enforce a deficiency judgment. For example, in a Chapter 13 proceeding under the federal bankruptcy law, a court may prevent a lender from repossessing a home, and, as part of the rehabilitation plan, reduce the amount of the secured indebtedness to the market value of the home at the time of bankruptcy (as determined by the court), leaving the party providing financing as a general unsecured creditor for the remainder of the indebtedness. A bankruptcy court may also reduce the monthly payments due under a contract or change the rate of interest and time of repayment of the indebtedness.

**Environmental Legislation**

Under CERCLA, and under state law in some states, a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property may become liable for the costs of cleaning up hazardous substances regardless of whether they have contaminated the property. CERCLA imposes strict, as well as joint and several, liability on several classes of potentially responsible parties, including current owners and operators of the property who did not cause or contribute to the contamination. Furthermore, liability under CERCLA is not limited to the original or unamortized principal balance of a loan or to the value of the property securing a loan. Lenders may be held liable under CERCLA as owners or operators unless they qualify for the secured creditor exemption to CERCLA. This exemption exempts from the definition of owners and operators those who, without participating in the management of a facility, hold indicia of ownership primarily to protect a security interest in the facility.

The Conservation Act amended, among other things, the provisions of CERCLA with respect to lender liability and the secured creditor exemption. The Conservation Act offers substantial protection to lenders by defining the activities in which a lender can engage and still have the benefit of the secured creditor exemption. In order for lender to be deemed to have participated in the management of a mortgaged property, the lender must actually participate in the operational affairs of the property of the borrower. The Conservation Act provides that "merely having the capacity to influence, or unexercised right to control" operations does not constitute participation in management. A lender will lose the protection of the secured creditor exemption only if it exercises decision-making control over the borrower's environmental compliance and hazardous substance handling and disposal practices, or assumes day-to-day management of all operational functions of the mortgaged property.    The Conservation Act also provides that a lender will continue to have the benefit of the secured creditor exemption even if it forecloses on a mortgaged property, purchases it at a foreclosure sale or accepts a deed-in-lieu of foreclosure provided that the lender seeks to sell the mortgaged property at the earliest practicable commercially reasonable time on commercially reasonable terms.

Other federal and state laws may impose liability on a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property on which contaminants other than CERCLA hazardous substances are present, including petroleum, agricultural chemicals, hazardous wastes, asbestos, radon, and lead-based paint. The cleanup costs may be substantial. It is possible that the cleanup costs could become a liability of a trust fund and reduce the amounts otherwise distributable to the holders of the related series of certificates. Moreover, federal statutes and states by statute may impose a lien for any cleanup costs incurred by the state on the property that is the subject of the cleanup costs. All subsequent liens on the property generally are subordinated to the lien and, in some states, even prior recorded liens are subordinated to such lien. In the latter states, the security interest of the trustee in a related parcel of real property that is subject to the lien could be adversely affected.

Traditionally, many residential mortgage lenders have not taken steps to evaluate whether contaminants are present with respect to any mortgaged property prior to the origination of the mortgage loan or prior to foreclosure or accepting a deed-in-lieu of foreclosure. Accordingly, the company has not made and will not make the evaluations prior to the origination of the secured contracts. Neither the company, the master servicer, nor any servicer will be required by any Agreement to undertake these evaluations prior to foreclosure or accepting a deed-in-lieu of foreclosure. The company does not make any representations or warranties or assume any liability with respect to the absence or effect of contaminants on any related real property or any casualty resulting from the presence or effect of

84

contaminants. However, neither the master servicer nor any servicer will be obligated to foreclose on related real property or accept a deed-in-lieu of foreclosure if it knows or reasonably believes that there are material contaminated conditions on the property. A failure so to foreclose may reduce the amounts otherwise available to certificateholders of the related series.

## Consumer Protection Laws

In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws. These laws include TILA, as implemented by Regulation Z, Real Estate Settlement Procedures Act, as implemented by Regulation X, Equal Credit Opportunity Act, as implemented by Regulation B, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the mortgage loans. In particular, an originator's failure to comply with certain requirements of the federal TILA, as implemented by Regulation Z, could subject both originators and assignees of such obligations to monetary penalties and could result in obligors' rescinding the mortgage loans either against the originators or assignees. Further, the failure of the borrower to use the correct form of notice of right to cancel in connection with non-purchase money transactions could subject the originator and assignees to extended borrower rescission rights.

## Homeownership Act and Similar State Laws

Some of the mortgage loans, known as High Cost Loans, may be subject to special rules, disclosure requirements and other provisions that were added to the federal TILA by the Homeownership Act, if such trust assets were originated after October 1, 1995, are not loans made to finance the purchase of the mortgaged property and have interest rates or origination costs in excess of certain prescribed levels. The Homeownership Act requires certain additional disclosures, specifies the timing of those disclosures and limits or prohibits the inclusion of certain provisions in mortgages subject to the Homeownership Act. Purchasers or assignees of any High Cost Loan, including any trust, could be liable under federal law for all claims and subject to all defenses that the borrower could assert against the originator of the High Cost Loan under the federal TILA or any other law, unless the purchaser or assignee did not know and could not with reasonable diligence have determined that the mortgage loan was subject to the provisions of the Homeownership Act. Remedies available to the borrower include monetary penalties, as well as rescission rights if the appropriate disclosures were not given as required or if the particular mortgage includes provisions prohibited by law. The maximum damages that may be recovered under these provisions from an assignee, including the trust, is the remaining amount of indebtedness plus the total amount paid by the borrower in connection with the mortgage loan.

In addition to the Homeownership Act, a number of legislative proposals have been introduced at the federal, state and local level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of the mortgage loans. In some cases, state or local law may impose requirements and restrictions greater than those in the Homeownership Act. An originators' failure to comply with these laws could subject the trust (and other assignees of the mortgage loans) to monetary penalties and could result in the borrowers rescinding the mortgage loans against either the trust or subsequent holders of the mortgage loans.

Under the anti-predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if the originator reasonably believed that the test was satisfied. Any determination by a court that the mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the related seller will be required to purchase that mortgage loan from the trust.

Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law allegedly committed by the originator. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

## Additional Consumer Protections Laws with Respect to Contracts

Contracts often contain provisions obligating the obligor to pay late charges if payments are not timely made. Federal and state law may specifically limit the amount of late charges that may be collected. Under the related pooling and servicing agreement or servicing agreement, late charges will be retained by the master servicer or servicer as additional servicing compensation, and any inability to collect these amounts will not affect payments to Securityholders.

Courts have imposed general equitable principles upon repossession and litigation involving deficiency balances. These equitable principles are generally designed to relieve a consumer from the legal consequences of a default.

In several cases, consumers have asserted that the remedies provided to secured parties under the UCC and related laws violate the due process protections provided under the 14th Amendment to the Constitution of the United States. For the most part, courts have upheld the notice provisions of the UCC and related laws as reasonable or have found that the repossession and resale by the creditor does not involve sufficient state action to afford constitutional protection to consumers.

The FTC Rule has the effect of subjecting a seller (and some related creditors and their assignees) in a consumer credit transaction and any assignee of the creditor to all claims and defenses which the debtor in the transaction could assert against the seller of the goods. Liability under the FTC Rule is limited to the amounts paid by a debtor on the Contract, and the holder of the Contract may also be unable to collect amounts still due under the Contract. Most of the Contracts in a trust fund will be subject to the requirements of the FTC Rule. Accordingly, the trust fund, as holder of the Contracts, will be subject to any claims or defenses that the purchaser of the related Manufactured Home may assert against the seller of the Manufactured Home, subject to a maximum liability equal to the amounts paid by the obligor on the Contract. If an obligor is successful in asserting the claim or defense, and if the Seller had or should have had knowledge of the claim or defense, the master servicer will have the right to require the Seller to repurchase the Contract because of breach of its Seller's representation and warranty that no claims or defenses exist that would affect the obligor's obligation to make the required payments under the Contract. The Seller would then have the right to require the originating dealer to repurchase the Contract from it and might also have the right to recover from the dealer any losses suffered by the Seller with respect to which the dealer would have been primarily liable to the obligor.

**Enforceability of Certain Provisions**

*Transfer of Mortgaged Properties*. Unless the related prospectus supplement indicates otherwise, the mortgage loans generally contain due-on-sale clauses. These clauses permit the lender to accelerate the maturity of the loan if the borrower sells, transfers or conveys the property without the prior consent of the lender. The enforceability of these clauses has been the subject of legislation or litigation in many states, and in some cases the enforceability of these clauses was limited or denied. However, Garn-St Germain Act preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses and permits lenders to enforce these clauses in accordance with their terms, subject to limited exceptions. The Garn-St Germain Act does "encourage" lenders to permit assumption of loans at the original rate of interest or at some other rate less than the average of the original rate and the market rate.

The Garn-St Germain Act also sets forth nine specific instances in which a mortgage lender covered by the Garn-St Germain Act may not exercise a due-on-sale clause, notwithstanding the fact that a transfer of the property may have occurred. These include, amongst others, intra-family transfers, some transfers by operation of law, leases of fewer than three years and the creation of a junior encumbrance. Regulations promulgated under the Garn-St Germain Act also prohibit the imposition of a prepayment penalty upon the acceleration of a loan pursuant to a due-on-sale clause.

The inability to enforce a due-on-sale clause may result in a mortgage loan bearing an interest rate below the current market rate being assumed by the buyer rather than being paid off, which may have an impact upon the average life of the mortgage loans and the number of mortgage loans which may be outstanding until maturity.

*Transfer of Manufactured Homes*. Generally, Contracts contain provisions prohibiting the sale or transfer of the related Manufactured Home without the consent of the obligee on the Contract and permitting the acceleration of the maturity of the Contracts by the obligee on the Contract upon a sale or transfer that is not consented to. The master servicer will, or will cause the servicer of the Contract, to the extent it has knowledge of the conveyance or proposed conveyance, to exercise or cause to be exercised its rights to accelerate the maturity of the related Contracts through enforcement of due-on-sale clauses, subject to applicable state law. In some cases, the transfer may be made by a delinquent obligor in order to avoid a repossession proceeding with respect to a Manufactured Home.

In the case of a transfer of a Manufactured Home as to which the master servicer or the servicer of the Contract desires to accelerate the maturity of the related Contract, the master servicer's or servicer's ability to do so will depend on the enforceability under state law of the due-on-sale clause. The Garn-St Germain Act preempts, subject to certain exceptions and conditions, state laws prohibiting enforcement of due-on-sale clauses applicable to the Manufactured Homes. Consequently, in some cases the master servicer or servicer may be prohibited from enforcing a due-on-sale clause in respect of a Manufactured Home.

*Late Payment Charges and Prepayment Restrictions*. Notes and mortgages, as well as manufactured housing conditional sales contracts and installment loan agreements, may contain provisions that obligate the borrower to pay a late charge or additional interest if payments are not timely made, and in some circumstances, may prohibit prepayments for a specified period and/or condition prepayments upon the borrower's payment of prepayment fees or yield maintenance penalties. In some states, there are or may be specific limitations upon the late charges which a lender may collect from a borrower for delinquent payments. Some states also limit the amounts that a lender may collect from a

borrower as an additional charge if the loan is prepaid. In addition, the enforceability of provisions that provide for prepayment fees or penalties upon an involuntary prepayment is unclear under the laws of many states.

**Subordinate Financing**

When the mortgagor encumbers mortgaged property with one or more junior liens, the senior lender is subjected to additional risk. First, the mortgagor may have difficulty servicing and repaying multiple loans. In addition, if the junior loan permits recourse to the mortgagor (as junior loans often do) and the senior loan does not, a mortgagor may be more likely to repay sums due on the junior loan than those on the senior loan. Second, acts of the senior lender that prejudice the junior lender or impair the junior lender's security may create a superior equity in favor of the junior lender. For example, if the mortgagor and the senior lender agree to an increase in the principal amount of or the interest rate payable on the senior loan, the senior lender may lose its priority to the extent an existing junior lender is harmed or the mortgagor is additionally burdened. Third, if the mortgagor defaults on the senior loan and/or any junior loan or loans, the existence of junior loans and actions taken by junior lenders can impair the security available to the senior lender and can interfere with or delay the taking of action by the senior lender. Moreover, the bankruptcy of a junior lender may operate to stay foreclosure or similar proceedings by the senior lender.

**Installment Contracts**

The trust fund assets may also consist of installment sales contracts. Under an installment contract the seller (referred to in this section as the "lender") retains legal title to the property and enters into an agreement with the purchaser (referred to in this section as the "borrower") for the payment of the purchase price, plus interest, over the term of the contract. Only after full performance by the borrower of the installment contract is the lender obligated to convey title to the property to the purchaser. As with mortgage or deed of trust financing, during the effective period of the installment contract, the borrower is generally responsible for the maintaining the property in good condition and for paying real estate taxes, assessments and hazard insurance premiums associated with the property.

The method of enforcing the rights of the lender under an installment contract varies on a state-by- state basis depending upon the extent to which state courts are willing, or able pursuant to state statute, to enforce the contract strictly according to its terms. The terms of installment contracts generally provide that upon a default by the borrower, the borrower loses his or her right to occupy the property, the entire indebtedness is accelerated and the buyer's equitable interest in the property is forfeited. The lender in this situation is not required to foreclose in order to obtain title to the property, although in some cases a quiet title action is in order if the borrower has filed the installment contract in local land records and an ejectment action may be necessary to recover possession. In a few states, particularly in cases of borrower default during the early years of an installment contract, the courts will permit ejectment of the buyer and a forfeiture of his or her interest in the property. However, most state legislatures have enacted provisions by analogy to mortgage law protecting borrowers under installment contracts from the harsh consequences of forfeiture. Under these statutes, a judicial or nonjudicial foreclosure may be required, the lender may be required to give notice of default and the borrower may be granted some grace period during which the installment contract may be reinstated upon full payment of the defaulted amount and the borrower may have a post-foreclosure statutory redemption right. In other states, courts in equity may permit a borrower with significant investment in the property under an installment contract for the sale of real estate to share in the proceeds of sale of the property after the indebtedness is repaid or may otherwise refuse to enforce the forfeiture clause. Nevertheless, the lender's procedures for obtaining

possession and clear title under an installment contract in a given state are simpler and less time consuming and costly than are the procedures for foreclosing and obtaining clear title to a property subject to one or more liens.

## Applicability of Usury Laws

Title V provides that state usury limitations shall not apply to some types of residential first mortgage loans originated by some lenders after March 31,1980. A similar federal statute was in effect with respect to mortgage loans made during the first three months of 1980. The Office of Thrift Supervision is authorized to issue rules and regulations and to publish interpretations governing implementation of Title V. The statute authorized any state to reimpose interest rate limits by adopting, before April 1, 1983, a law or constitutional provision which expressly rejects application of the federal law. In addition, even where Title V is not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on mortgage loans covered by Title V. Some states have taken action to reimpose interest rate limits or to limit discount points or other charges.

Title V also provides that, subject to the following conditions, state usury limitations shall not apply to any loan that is secured by a first lien on some kinds of Manufactured Housing. Contracts would be covered if they satisfy conditions including, among other things, terms governing any prepayments, late charges and deferral fees and requiring a 30-day notice period prior to instituting any action leading to repossession of or foreclosure with respect to the related unit. Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting before April 1,1983 a law or constitutional provision which expressly rejects application of the federal law. Fifteen states adopted this type of law prior to the April 1,1983 deadline. In addition, even where Title V was not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on loans covered by Title V. In any state in which application of Title V was expressly rejected or a provision limiting discount points or other charges has been adopted, no Contract which imposes finance charges or provides for discount points or charges in excess of permitted levels has been included in the trust fund.

Usury limits apply to junior mortgage loans in many states. Any applicable usury limits in effect at origination will be reflected in the maximum mortgage rates for ARM Loans, as set forth in the related prospectus supplement.

As indicated above under "The Mortgage Pools—Representations by Sellers," each Seller of a mortgage loan will have represented that the mortgage loan was originated in compliance with then applicable state laws, including usury laws, in all material respects. However, the mortgage rates on the mortgage loans will be subject to applicable usury laws as in effect from time to time.

## Alternative Mortgage Instruments

Alternative mortgage instruments, including adjustable rate mortgage loans and early ownership mortgage loans, originated by non-federally chartered lenders historically have been subjected to a variety of restrictions. The restrictions differed from state to state, resulting in difficulties in determining whether a particular alternative mortgage instrument originated by a state-chartered lender was in compliance with applicable law. These difficulties were alleviated substantially as a result of the enactment of Title VIII. Title VIII provides that, notwithstanding any state law to the contrary, (1) state-chartered banks may originate alternative mortgage instruments in accordance with regulations promulgated by the Comptroller of the Currency with respect to origination of alternative mortgage instruments by national banks,(2) state-chartered credit unions may originate alternative mortgage instruments in accordance with

regulations promulgated by the National Credit Union Administration with respect to origination of alternative mortgage instruments by federal credit unions, and (3) all other non-federally chartered housing creditors, including state-chartered savings and loan associations, state-chartered savings banks and mutual savings banks and mortgage banking companies, may originate alternative mortgage instruments in accordance with the regulations promulgated by the Federal Home Loan Bank Board, predecessor to the Office of Thrift Supervision, with respect to origination of alternative mortgage instruments by federal savings and loan associations. Title VIII provides that any state may reject applicability of the provisions of Title VIII by adopting, prior to October 15, 1985, a law or constitutional provision expressly rejecting the applicability of the provisions. Some states have taken this action.

**Formaldehyde Litigation with Respect to Contracts**

A number of lawsuits are pending in the United States alleging personal injury from exposure to the chemical formaldehyde, which is present in many building materials, including components of manufactured housing such as plywood flooring and wall paneling. Some of these lawsuits are pending against manufacturers of manufactured housing, suppliers of component parts, and related persons in the distribution process. The company is aware of a limited number of cases in which plaintiffs have won judgments in these lawsuits.

Under the FTC Rule, which is described above under "Consumer Protection Laws", the holder of any Contract secured by a Manufactured Home with respect to which a formaldehyde claim has been successfully asserted may be liable to the obligor for the amount paid by the obligor on the related Contract and may be unable to collect amounts still due under the Contract. In the event an obligor is successful in asserting this claim, the related securityholders could suffer a loss if (1) the related Seller fails or cannot be required to repurchase the affected Contract for a breach of representation and warranty and (2) the master servicer, the servicer of the Contract or the trustee were unsuccessful in asserting any claim of contribution or subornation on behalf of the securityholders against the manufacturer or other persons who were directly liable to the plaintiff for the damages. Typical products liability insurance policies held by manufacturers and component suppliers of manufactured homes may not cover liabilities arising from formaldehyde in manufactured housing, with the result that recoveries from these manufacturers, suppliers or other persons may be limited to their corporate assets without the benefit of insurance.

**Servicemembers Relief Act**

Under the terms of the Relief Act, a mortgagor who enters military service after the origination of the mortgagor's mortgage loan (including a mortgagor who was in reserve status and is called to active duty after origination of the mortgage loan), may not be charged interest (including fees and charges) above an annual rate of 6% during the period of the mortgagor's active duty status, unless a court orders otherwise upon application of the lender. The Relief Act applies to mortgagors who are members of the Army, Navy, Air Force, Marines, National Guard, active duty Reserves, Coast Guard, the commissioned corps of the National Oceanic and Atmospheric Administration and officers of the U.S. Public Health Service assigned to duty with the military. Because the Relief Act applies to mortgagors who enter military service, including reservists who are called to active duty, after origination of the related mortgage loan, no information can be provided as to the number of loans that may be affected by the Relief Act.  With respect to any mortgage loan subject to the Relief Act with an interest rate in excess of 6% per annum, application of the Relief Act would adversely affect, for an indeterminate period of time, the ability of the master servicer or servicer to collect full amounts of interest on that mortgage loan. Any shortfall in interest collections resulting from the application of the Relief Act or similar legislation or

regulations, which would not be recoverable from the related mortgage loans, would result in a reduction of the amounts distributable to the holders of the related securities, and would not be covered by advances by the master servicer, any servicer or other entity or by any form of credit enhancement provided in connection with the related series of securities, unless described in the prospectus supplement. In addition, the Relief Act imposes limitations that would impair the ability of the master servicer or servicer to foreclose on an affected single family loan or enforce rights under a Contract during the mortgagor's period of active duty status, and, under some circumstances, during an additional three month period thereafter. Thus, in the event that the Relief Act or similar legislation or regulations applies to any mortgage loan which goes into default, there may be delays in payment and losses on the related securities in connection therewith. Any other interest shortfalls, deferrals or forgiveness of payments on the mortgage loans resulting from similar legislation or regulations may result in delays in payments or losses to securityholders of the related series.

Certain states have enacted or may enact their own versions of the Relief Act which may provide for more enhanced consumer protection provisions than those set forth in the Relief Act. The Relief Act may not preempt those state laws.

**Forfeitures in Drug and RICO Proceedings**

Federal law provides that property owned by persons convicted of drug-related crimes or of criminal violations of RICO can be seized by the government if the property was used in, or purchased with the proceeds of, these crimes. Under procedures contained in the Crime Control Act, the government may seize the property even before conviction. The government must publish notice of the forfeiture proceeding and may give notice to all parties "known to have an alleged interest in the property", including the holders of mortgage loans.

A lender may avoid forfeiture of its interest in the property if it establishes that: (1) its mortgage was executed and recorded before commission of the crime upon which the forfeiture is based, or (2) the lender was, at the time of execution of the mortgage, "reasonably without cause to believe" that the property was used in, or purchased with the proceeds of, illegal drug or RICO activities.

**Junior Mortgages**

Some of the mortgage loans may be secured by mortgages or deeds of trust which are junior to senior mortgages or deeds of trust which are not part of the trust fund. The rights of the securityholders, as mortgagee under a junior mortgage, are subordinate to those of the mortgagee under the senior mortgage, including the prior rights of the senior mortgagee to receive hazard insurance and condemnation proceeds and to cause the property securing the mortgage loan to be sold upon default of the mortgagor, which may extinguish the junior mortgagee's lien unless the junior mortgagee asserts its subordinate interest in the property in foreclosure litigation and, in some cases, either reinitiates or satisfies the defaulted senior loan or loans. A junior mortgagee may satisfy a defaulted senior loan in full or, in some states, may cure the default and bring the senior loan current thereby reinstating the senior loan, in either event usually adding the amounts expended to the balance due on the junior loan. In most states, absent a provision in the mortgage or deed of trust, no notice of default is required to be given to a junior mortgagee. Where applicable law or the terms of the senior mortgage or deed of trust do not require notice of default to the junior mortgagee, the lack of this notice may prevent the junior mortgagee from exercising any right to reinstate the loan which applicable law may provide.

The standard form of the mortgage or deed of trust used by most institutional lenders confers on the mortgagee the right both to receive all proceeds collected under any hazard insurance policy and all awards made in connection with condemnation proceedings, and to apply the proceeds and awards to any indebtedness secured by the mortgage or deed of trust, in the order the mortgagee may determine. Thus, in the event improvements on the property are damaged or destroyed by fire or other casualty, or in the event the property is taken by condemnation, the mortgagee or beneficiary under underlying senior mortgages will have the prior right to collect any insurance proceeds payable under a hazard insurance policy and any award of damages in connection with the condemnation and to apply the same to the indebtedness secured by the senior mortgages. Proceeds in excess of the amount of senior mortgage indebtedness, in most cases, may be applied to the indebtedness of junior mortgages in the order of their priority.

Another provision sometimes found in the form of the mortgage or deed of trust used by institutional lenders obligates the mortgagor to pay before delinquency all taxes and assessments on the property and, when due, all encumbrances, charges and liens on the property which are prior to the mortgage or deed of trust, to provide and maintain fire insurance on the property, to maintain and repair the property and not to commit or permit any waste thereof, and to appear in and defend any action or proceeding purporting to affect the property or the rights of the mortgagee under the mortgage. Upon a failure of the mortgagor to perform any of these obligations, the mortgagee or beneficiary is given the right under some mortgages or deeds of trust to perform the obligation itself, at its election, with the mortgagor agreeing to reimburse the mortgagee for any sums expended by the mortgagee on behalf of the mortgagor. All sums so expended by a senior mortgagee become part of the indebtedness secured by the senior mortgage.

**Negative Amortization Loans**

A notable case decided by the United States Court of Appeals, First Circuit, held that state restrictions on the compounding of interest are not preempted by the provisions of the DIDMC and as a result, a mortgage loan that provided for negative amortization violated New Hampshire's requirement that first mortgage loans provide for computation of interest on a simple interest basis. The holding was limited to the effect of DIDMC on state laws regarding the compounding of interest and the court did not address the applicability of the Alternative Mortgage Transaction Parity Act of 1982, which authorizes lender to make residential mortgage loans that provide for negative amortization. The First Circuit's decision is binding authority only on Federal District Courts in Maine, New Hampshire, Massachusetts, Rhode Island and Puerto Rico.

## FEDERAL INCOME TAX CONSEQUENCES

**General**

The following discussion is the opinion of Thacher Proffitt & Wood LLP, counsel to the company, with respect to the anticipated material federal income tax consequences of the purchase, ownership and disposition of offered securities offered under this prospectus and the prospectus supplement insofar as it relates to matters of law or legal conclusions with respect thereto. This discussion is directed solely to securityholders that hold the securities as capital assets within the meaning of Section 1221 of the Code and does not purport to discuss all federal income tax consequences that may be applicable to the individual circumstances of particular categories of investors, some of which (such as banks, insurance companies and foreign investors) may be subject special treatment under the Code. Further, the authorities on which this discussion, and the opinion referred to below, are based are subject to change or

differing interpretations, which could apply retroactively. Prospective investors should note that no rulings have been or will be sought from the IRS with respect to any of the federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Taxpayers and preparers of tax returns (including those filed by any REMIC or other issuer) should be aware that under applicable Treasury regulations a provider of advice on specific issues of law is not considered an income tax return preparer unless the advice (1) is given with respect to events that have occurred at the time the advice is rendered and is not given with respect to the consequences of contemplated actions, and (2) is directly relevant to the determination of an entry on a tax return. Accordingly, taxpayers should consult their own tax advisors and tax return preparers regarding the preparation of any item on a tax return, even where the anticipated tax treatment has been discussed in this prospectus. In addition to the federal income tax consequences described in this prospectus, potential investors should consider the state and local tax consequences, if any, of the purchase, ownership and disposition of the securities. See "State and Other Tax Consequences."

The following discussion addresses securities of three general types:

- REMIC Certificates representing interests in a trust fund, or a portion thereof, that the REMIC Administrator will elect to have treated as a REMIC under the REMIC Provisions of the Code,

- notes representing indebtedness of a trust fund as to which no REMIC election will be made, and

- Grantor Trust Certificates representing interests in a Grantor Trust Fund as to which no REMIC election will be made.

The prospectus supplement for each series of certificates will indicate whether a REMIC election (or elections) will be made for the related trust fund and, if this election is to be made, will identify all "regular interests" and "residual interests" in the REMIC. For purposes of this tax discussion, references to a "securityholder," "certificateholder" or a "holder" are to the beneficial owner of a security or certificate, as the case may be.

The following discussion is based in part upon the OID Regulations and in part upon REMIC Regulations. The OID Regulations do not adequately address issues relevant to securities such as the offered securities. In some instances, the OID Regulations provide that they are not applicable to securities such as the offered securities.

## REMICS

*Classification of REMICS.* On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of REMIC Certificates, Thacher Proffitt & Wood LLP, counsel to the company, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the related pooling and servicing agreement, for federal income tax purposes, the related trust fund (or each applicable portion thereof) will qualify as a REMIC and the REMIC Certificates offered with respect thereto will be considered to evidence ownership of REMIC Regular Certificates or REMIC Residual Certificates in that REMIC within the meaning of the REMIC Provisions.

If an entity electing to be treated as a REMIC fails to comply with one or more of the ongoing requirements of the Code for status as a REMIC during any taxable year, the Code provides that the entity

will not be treated as a REMIC for that year and thereafter. In that event, the entity may be taxable as a corporation under Treasury regulations, and the related REMIC Certificates may not be accorded the status or given the tax treatment described below. Although the Code authorizes the Treasury Department to issue regulations providing relief in the event of an inadvertent termination of REMIC status, no such regulations have been issued. Any such relief, moreover, may be accompanied by sanctions, such as the imposition of a corporate tax on all or a portion of the REMIC's income for the period in which the requirements for status as a REMIC are not satisfied. The pooling and servicing agreement with respect to each REMIC will include provisions designed to maintain the related trust fund's status as a REMIC under the REMIC Provisions. It is not anticipated that the status of any trust fund as a REMIC will be inadvertently terminated.

*Characterization of Investments in REMIC Certificates.*  In general, the REMIC Certificates will be "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code and assets described in Section 7701(a)(19)(C) of the Code in the same proportion that the assets of the REMIC underlying the certificates would be so treated. Moreover, if 95% or more of the assets of the REMIC qualify for any of the foregoing treatments at all times during a calendar year, the REMIC Certificates will qualify for the corresponding status in their entirety for that calendar year. Interest (including original issue discount) on the REMIC Regular Certificates and income allocated to the class of REMIC Residual Certificates will be interest described in Section 856(c)(3)(B) of the Code to the extent that the certificates are treated as "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code. In addition, the REMIC Regular Certificates will be "qualified mortgages" within the meaning of Section 860G(a)(3) of the Code if transferred to another REMIC on its startup day in exchange for regular or residual interests therein. The determination as to the percentage of the REMIC's assets that constitute assets described in the foregoing sections of the Code will be made with respect to each calendar quarter based on the average adjusted basis of each category of the assets held by the REMIC during the calendar quarter. The REMIC Administrator will report those determinations to certificateholders in the manner and at the times required by applicable Treasury regulations.

The assets of the REMIC will include, in addition to mortgage loans, payments on mortgage loans held pending distribution on the REMIC Certificates and any property acquired by foreclosure held pending sale, and may include amounts in reserve accounts. It is unclear whether property acquired by foreclosure held pending sale and amounts in reserve accounts would be considered to be part of the mortgage loans, or whether the assets (to the extent not invested in assets described in the foregoing sections) otherwise would receive the same treatment as the mortgage loans for purposes of all of the Code sections mentioned in the immediately preceding paragraph. In addition, in some instances mortgage loans may not be treated entirely as assets described in the foregoing sections of the Code. If so, the related prospectus supplement will describe the mortgage loans that may not be so treated. The REMIC Regulations do provide, however, that cash received from payments on mortgage loans held pending distribution is considered part of the mortgage loans for purposes of Section 856(c)(4)(A) of the Code. Furthermore, foreclosure property will qualify as "real estate assets" under Section 856(c)(4)(A) of the Code.

*Tiered REMIC Structures.* For some series of REMIC Certificates, two or more separate elections may be made to treat designated portions of the related trust fund as REMICs for federal income tax purposes. As to each such series of REMIC Certificates, in the opinion of counsel to the company, assuming compliance with all provisions of the related pooling and servicing agreement, each of the REMICs in that trust fund will qualify as a REMIC and the REMIC Certificates issued by these REMICs will be considered to evidence ownership of REMIC Regular Certificates or REMIC Residual Certificates in the related REMIC within the meaning of the REMIC Provisions.

Solely for purposes of determining whether the REMIC Certificates will be "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code, and "loans secured by an interest in real property" under Section 7701(a)(19)(C) of the Code, and whether the income on the certificates is interest described in Section 856(c)(3)(B) of the Code, all of the REMICs in that trust fund will be treated as one REMIC.

*Taxation of Owners of REMIC Regular Certificates.*

General. Except as otherwise stated in this discussion, REMIC Regular Certificates will be treated for federal income tax purposes as debt instruments issued by the REMIC and not as ownership interests in the REMIC or its assets. Moreover, holders of REMIC Regular Certificates that otherwise report income under a cash method of accounting will be required to report income with respect to REMIC Regular Certificates under an accrual method.

Original Issue Discount. A REMIC Regular Certificate may be issued with "original issue discount" within the meaning of Section 1273(a) of the Code. Any holder of a REMIC Regular Certificate issued with original issue discount generally will be required to include original issue discount in income as it accrues, in accordance with the "constant yield" method described below, in advance of the receipt of the cash attributable to that income. In addition, Section 1272(a)(6) of the Code provides special rules applicable to REMIC Regular Certificates and some other debt instruments issued with original issue discount. Regulations have not been issued under that section.

The Code requires that a reasonable prepayment assumption be used with respect to mortgage loans held by a REMIC in computing the accrual of original issue discount on REMIC Regular Certificates issued by that REMIC, and that adjustments be made in the amount and rate of accrual of that discount to reflect differences between the actual prepayment rate and the prepayment assumption. The prepayment assumption is to be determined in a manner prescribed in Treasury regulations; as noted above, those regulations have not been issued.  The Committee Report indicates that the regulations will provide that the prepayment assumption used with respect to a REMIC Regular Certificate must be the same as that used in pricing the initial offering of the REMIC Regular Certificate. The Prepayment Assumption used in reporting original issue discount for each series of REMIC Regular Certificates will be consistent with this standard and will be disclosed in the related prospectus supplement. However, none of the company, the master servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or at any other rate.

The original issue discount, if any, on a REMIC Regular Certificate will be the excess of its stated redemption price at maturity over its issue price. The issue price of a particular class of REMIC Regular Certificates will be the first cash price at which a substantial amount of REMIC Regular Certificates of that class is sold (excluding sales to bond houses, brokers and underwriters).  If less than a substantial amount of a particular class of REMIC Regular Certificates is sold for cash on or prior to the Closing Date, the issue price for that class will be the fair market value of that class on the Closing Date. Under the OID Regulations, the stated redemption price of a REMIC Regular Certificate is equal to the total of all payments to be made on the certificate other than "qualified stated interest." "Qualified stated interest" is interest that is unconditionally payable at least annually (during the entire term of the instrument) at a single fixed rate, or at a "qualified floating rate," an "objective rate," a combination of a single fixed rate and one or more "qualified floating rates" or one "qualified inverse floating rate," or a combination of "qualified floating rates" that does not operate in a manner that accelerates or defers interest payments on the REMIC Regular Certificate.

In the case of REMIC Regular Certificates bearing adjustable interest rates, the determination of the total amount of original issue discount and the timing of the inclusion thereof will vary according to the characteristics of the REMIC Regular Certificates. If the original issue discount rules apply to the certificates in a particular series, the related prospectus supplement will describe the manner in which these rules will be applied with respect to the certificates in that series that bear an adjustable interest rate in preparing information returns to the certificateholders and the IRS.

The first interest payment on a REMIC Regular Certificate may be made more than one month after the date of issuance, which is a period longer than the subsequent monthly intervals between interest payments. Assuming the "accrual period" (as defined below) for original issue discount is each monthly period that ends on the day prior to each distribution date, in some cases, as a consequence of this "long first accrual period," some or all interest payments may be required to be included in the stated redemption price of the REMIC Regular Certificate and accounted for as original issue discount. Because interest on REMIC Regular Certificates must in any event be accounted for under an accrual method, applying this analysis would result in only a slight difference in the timing of the inclusion in income of the yield on the REMIC Regular Certificates.

In addition, if the accrued interest to be paid on the first distribution date is computed with respect to a period that begins prior to the Closing Date, a portion of the purchase price paid for a REMIC Regular Certificate will reflect the accrued interest. In such cases, information returns to the certificateholders and the IRS will be based on the position that the portion of the purchase price paid for the interest accrued with respect to periods prior to the Closing Date is treated as part of the overall cost of the REMIC Regular Certificate (and not as a separate asset the cost of which is recovered entirely out of interest received on the next distribution date) and that portion of the interest paid on the first distribution date in excess of interest accrued for a number of days corresponding to the number of days from the Closing Date to the first distribution date should be included in the stated redemption price of the REMIC Regular Certificate. However, the OID Regulations state that all or some portion of the accrued interest may be treated as a separate asset the cost of which is recovered entirely out of interest paid on the first distribution date.  It is unclear how an election to do so would be made under the OID Regulations and whether such an election could be made unilaterally by a certificateholder.

Notwithstanding the general definition of original issue discount, original issue discount on a REMIC Regular Certificate will be considered to be de minimis if it is less than 0.25% of the stated redemption price of the REMIC Regular Certificate multiplied by its weighted average life. For this purpose, the weighted average life of a REMIC Regular Certificate is computed as the sum of the amounts determined, as to each payment included in the stated redemption price of the REMIC Regular Certificate, by multiplying (1) the number of complete years (rounding down for partial years) from the issue date until that payment is expected to be made (presumably taking into account the Prepayment Assumption) by (2) a fraction, the numerator of which is the amount of the payment, and the denominator of which is the stated redemption price at maturity of the REMIC Regular Certificate. Under the OID Regulations, original issue discount of only a de minimis amount (other than de minimis original issue discount attributable to a so-called "teaser" interest rate or an initial interest holiday) will be included in income as each payment of stated principal is made, based on the product of the total amount of de minimis original issue discount attributable to that certificate and a fraction, the numerator of which is the amount of the principal payment and the denominator of which is the outstanding stated principal amount of the REMIC Regular Certificate. The OID Regulations also would permit a certificateholder to elect to accrue de minimis original issue discount into income currently based on a constant yield method. See "Taxation of Owners of REMIC Regular Certificates—Market Discount" for a description of this election under the OID Regulations.

If original issue discount on a REMIC Regular Certificate is in excess of a de minimis amount, the holder of the certificate must include in ordinary gross income the sum of the "daily portions" of original issue discount for each day during its taxable year on which it held the REMIC Regular Certificate, including the purchase date but excluding the disposition date. In the case of an original holder of a REMIC Regular Certificate, the daily portions of original issue discount will be determined as follows.

As to each "accrual period," that is, each period that ends on a date that corresponds to the day prior to each distribution date and begins on the first day following the immediately preceding accrual period (or in the case of the first such period, begins on the Closing Date), a calculation will be made of the portion of the original issue discount that accrued during the accrual period. The portion of original issue discount that accrues in any accrual period will equal the excess, if any, of (1) the sum of (a) the present value, as of the end of the accrual period, of all of the distributions remaining to be made on the REMIC Regular Certificate, if any, in future periods and (b) the distributions made on the REMIC Regular Certificate during the accrual period of amounts included in the stated redemption price, over (2) the adjusted issue price of the REMIC Regular Certificate at the beginning of the accrual period. The present value of the remaining distributions referred to in the preceding sentence will be calculated (1) assuming that distributions on the REMIC Regular Certificate will be received in future periods based on the mortgage loans being prepaid at a rate equal to the Prepayment Assumption, (2) using a discount rate equal to the original yield to maturity of the certificate and (3) taking into account events (including actual prepayments) that have occurred before the close of the accrual period. For these purposes, the original yield to maturity of the certificate will be calculated based on its issue price and assuming that distributions on the certificate will be made in all accrual periods based on the mortgage loans being prepaid at a rate equal to the Prepayment Assumption. The adjusted issue price of a REMIC Regular Certificate at the beginning of any accrual period will equal the issue price of the certificate, increased by the aggregate amount of original issue discount that accrued with respect to the certificate in prior accrual periods, and reduced by the amount of any distributions made on the certificate in prior accrual periods of amounts included in the stated redemption price. The original issue discount accruing during any accrual period, computed as described above, will be allocated ratably to each day during the accrual period to determine the daily portion of original issue discount for that day.

A subsequent purchaser of a REMIC Regular Certificate that purchases a certificate that is treated as having been issued with original issue discount at a cost (excluding any portion of the cost attributable to accrued qualified stated interest) less than its remaining stated redemption price will also be required to include in gross income the daily portions of any original issue discount with respect to the certificate. However, each such daily portion will be reduced, if the cost of the certificate is in excess of its "adjusted issue price," in proportion to the ratio the excess bears to the aggregate original issue discount remaining to be accrued on the REMIC Regular Certificate. The adjusted issue price of a REMIC Regular Certificate on any given day equals the sum of (1) the adjusted issue price (or, in the case of the first accrual period, the issue price) of the certificate at the beginning of the accrual period which includes that day and (2) the daily portions of original issue discount for all days during the accrual period prior to that day.

Market Discount. A certificateholder that purchases a REMIC Regular Certificate at a market discount, that is, in the case of a REMIC Regular Certificate issued without original issue discount, at a purchase price less than its remaining stated principal amount, or in the case of a REMIC Regular Certificate issued with original issue discount, at a purchase price less than its adjusted issue price will recognize gain upon receipt of each distribution representing stated redemption price. In particular, under Section 1276 of the Code such a certificateholder generally will be required to allocate the portion of each

97

distribution representing stated redemption price first to accrued market discount not previously included in income, and to recognize ordinary income to that extent. A certificateholder may elect to include market discount in income currently as it accrues rather than including it on a deferred basis in accordance with the foregoing. If made, the election will apply to all market discount bonds acquired by the certificateholder on or after the first day of the first taxable year to which the election applies. In addition, the OID Regulations permit a certificateholder to elect to accrue all interest, discount (including de minimis market or original issue discount) in income as interest, and to amortize premium, based on a constant yield method. If such an election were made with respect to a REMIC Regular Certificate with market discount, the certificateholder would be deemed to have made an election to include currently market discount in income with respect to all other debt instruments having market discount that the certificateholder acquires during the taxable year of the election or thereafter, and possibly previously acquired instruments.  Similarly, a certificateholder that made this election for a certificate that is acquired at a premium would be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that the certificateholder owns or acquires. See "Taxation of Owners of REMIC Regular Certificates—Premium" below. Each of these elections to accrue interest, discount and premium with respect to a certificate on a constant yield method or as interest would be irrevocable, except with the approval of the IRS.

However, market discount with respect to a REMIC Regular Certificate will be considered to be de minimis for purposes of Section 1276 of the Code if the market discount is less than 0.25% of the remaining stated redemption price of the REMIC Regular Certificate multiplied by the number of complete years to maturity remaining after the date of its purchase. In interpreting a similar rule with respect to original issue discount on obligations payable in installments, the OID Regulations refer to the weighted average maturity of obligations, and it is likely that the same rule will be applied with respect to market discount, presumably taking into account the Prepayment Assumption. If market discount is treated as de minimis under this rule, it appears that the actual discount would be treated in a manner similar to original issue discount of a de minimis amount. See "Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" above. This treatment would result in discount being included in income at a slower rate than discount would be required to be included in income using the method described above.

Section 1276(b)(3) of the Code specifically authorizes the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, the principal of which is payable in more than one installment. Until regulations are issued by the Treasury Department, the rules described in the Committee Report apply. The Committee Report indicates that in each accrual period market discount on REMIC Regular Certificates should accrue, at the certificateholder's option: (1) on the basis of a constant yield method, (2) in the case of a REMIC Regular Certificate issued without original issue discount, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total amount of stated interest remaining to be paid on the REMIC Regular Certificate as of the beginning of the accrual period, or (3) in the case of a REMIC Regular Certificate issued with original issue discount, in an amount that bears the same ratio to the total remaining market discount as the original issue discount accrued in the accrual period bears to the total original issue discount remaining on the REMIC Regular Certificate at the beginning of the accrual period. Moreover, the Prepayment Assumption used in calculating the accrual of original issue discount is also used in calculating the accrual of market discount. Because the regulations referred to in this paragraph have not been issued, it is not possible to predict what effect these regulations might have on the tax treatment of a REMIC Regular Certificate purchased at a discount in the secondary market.

To the extent that REMIC Regular Certificates provide for monthly or other periodic distributions throughout their term, the effect of these rules may be to require market discount to be includible in income at a rate that is not significantly slower than the rate at which the discount would accrue if it were original issue discount. Moreover, in any event a holder of a REMIC Regular Certificate generally will be required to treat a portion of any gain on the sale or exchange of the certificate as ordinary income to the extent of the market discount accrued to the date of disposition under one of the foregoing methods, less any accrued market discount previously reported as ordinary income.

Further, under Section 1277 of the Code a holder of a REMIC Regular Certificate may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry a REMIC Regular Certificate purchased with market discount. For these purposes, the de minimis rule referred to above applies. Any such deferred interest expense would not exceed the market discount that accrues during the taxable year and is, in general, allowed as a deduction not later than the year in which the market discount is includible in income. If a holder elects to include market discount in income currently as it accrues on all market discount instruments acquired by the holder in that taxable year or thereafter, the interest deferral rule described above will not apply.

Premium. A REMIC Regular Certificate purchased at a cost (excluding any portion of the cost attributable to accrued qualified stated interest) greater than its remaining stated redemption price will be considered to be purchased at a premium. The holder of a REMIC Regular Certificate may elect under Section 171 of the Code to amortize the premium under the constant yield method over the life of the certificate. If made, the election will apply to all debt instruments having amortizable bond premium that the holder owns or subsequently acquires. Amortizable premium will be treated as an offset to interest income on the related debt instrument, rather than as a separate interest deduction. The OID Regulations also permit certificateholders to elect to include all interest, discount and premium in income based on a constant yield method, further treating the certificateholder as having made the election to amortize premium generally. See "Taxation of Owners of REMIC Regular Certificates—Market Discount" above. The Committee Report states that the same rules that apply to accrual of market discount (which rules will require use of a Prepayment Assumption in accruing market discount with respect to REMIC Regular Certificates without regard to whether the certificates have original issue discount) will also apply in amortizing bond premium under Section 171 of the Code. The use of an assumption that there will be no prepayments may be required.

Realized Losses. Under Section 166 of the Code, both corporate holders of the REMIC Regular Certificates and non-corporate holders of the REMIC Regular Certificates that acquire the certificates in connection with a trade or business should be allowed to deduct, as ordinary losses, any losses sustained during a taxable year in which their certificates become wholly or partially worthless as the result of one or more realized losses on the mortgage loans. However, it appears that a non-corporate holder that does not acquire a REMIC Regular Certificate in connection with a trade or business will not be entitled to deduct a loss under Section 166 of the Code until the holder's certificate becomes wholly worthless (i.e., until its outstanding principal balance has been reduced to zero) and that the loss will be characterized as a short-term capital loss.

Each holder of a REMIC Regular Certificate will be required to accrue interest and original issue discount with respect to the certificate, without giving effect to any reductions in distributions attributable to defaults or delinquencies on the mortgage loans or the certificate underlying the REMIC Certificates, as the case may be, until it can be established that the reduction ultimately will not be recoverable. As a result, the amount of taxable income reported in any period by the holder of a REMIC Regular Certificate could exceed the amount of economic income actually realized by that holder in the period. Although the

holder of a REMIC Regular Certificate eventually will recognize a loss or reduction in income attributable to previously accrued and included income that as the result of a realized loss ultimately will not be realized, the law is unclear with respect to the timing and character of this loss or reduction in income.

*Taxation of Owners of REMIC Residual Certificates*

General.  Although a REMIC is a separate entity for federal income tax purposes, a REMIC generally is not subject to entity-level taxation, except with regard to prohibited transactions and some other transactions. See "—Prohibited Transactions and Other Possible REMIC Taxes" below. Rather, the taxable income or net loss of a REMIC is generally taken into account by the holder of the REMIC Residual Certificates. Accordingly, the REMIC Residual Certificates will be subject to tax rules that differ significantly from those that would apply if the REMIC Residual Certificates were treated for federal income tax purposes as direct ownership interests in the mortgage loans or as debt instruments issued by the REMIC.

A holder of a REMIC Residual Certificate generally will be required to report its daily portion of the taxable income or, subject to the limitations noted in this discussion, the net loss of the REMIC for each day during a calendar quarter that the holder owned the REMIC Residual Certificate. For this purpose, the taxable income or net loss of the REMIC will be allocated to each day in the calendar quarter ratably using a "30 days per month/90 days per quarter/360 days per year" convention unless otherwise disclosed in the related prospectus supplement. The daily amounts so allocated will then be allocated among the REMIC Residual Certificateholders in proportion to their respective ownership interests on that day. Any amount included in the gross income or allowed as a loss of any REMIC Residual Certificateholder by virtue of this paragraph will be treated as ordinary income or loss. The taxable income of the REMIC will be determined under the rules described below in "Taxable Income of the REMIC" and will be taxable to the REMIC Residual Certificateholders without regard to the timing or amount of cash distributions by the REMIC. Ordinary income derived from REMIC Residual Certificates will be "portfolio income" for purposes of the taxation of taxpayers subject to limitations under Section 469 of the Code on the deductibility of "passive losses."

A holder of a REMIC Residual Certificate that purchased the certificate from a prior holder of that certificate also will be required to report on its federal income tax return amounts representing its daily share of the taxable income (or net loss) of the REMIC for each day that it holds the REMIC Residual Certificate. Those daily amounts generally will equal the amounts of taxable income or net loss determined as described above. The Committee Report indicates that some modifications of the general rules may be made, by regulations, legislation or otherwise to reduce (or increase) the income of a REMIC Residual Certificateholder that purchased the REMIC Residual Certificate from a prior holder of the certificate at a price greater than (or less than) the adjusted basis (as defined below) the REMIC Residual Certificate would have had in the hands of an original holder of the certificate. The REMIC Regulations, however, do not provide for any such modifications.

Any payments received by a holder of a REMIC Residual Certificate in connection with the acquisition of the REMIC Residual Certificate will be taken into account in determining the income of the holder for federal income tax purposes. Although it appears likely that any of these payments would be includible in income immediately upon its receipt, the IRS might assert that these payments should be included in income over time according to an amortization schedule or according to some other method. Because of the uncertainty concerning the treatment of these payments, holders of REMIC Residual

100

Certificates should consult their tax advisors concerning the treatment of these payments for income tax purposes.

The amount of income REMIC Residual Certificateholders will be required to report (or the tax liability associated with the income) may exceed the amount of cash distributions received from the REMIC for the corresponding period. Consequently, REMIC Residual Certificateholders should have other sources of funds sufficient to pay any federal income taxes due as a result of their ownership of REMIC Residual Certificates or unrelated deductions against which income may be offset, subject to the rules relating to "excess inclusions" and "noneconomic" residual interests discussed below. The fact that the tax liability associated with the income allocated to REMIC Residual Certificateholders may exceed the cash distributions received by the REMIC Residual Certificateholders for the corresponding period may significantly adversely affect the REMIC Residual Certificateholders' after-tax rate of return. This disparity between income and distributions may not be offset by corresponding losses or reductions of income attributable to the REMIC Residual Certificateholder until subsequent tax years and, then, may not be completely offset due to changes in the Code, tax rates or character of the income or loss.

Taxable Income of the REMIC. The taxable income of the REMIC will equal the income from the mortgage loans and other assets of the REMIC plus any cancellation of indebtedness income due to the allocation of realized losses to REMIC Regular Certificates, less the deductions allowed to the REMIC for interest (including original issue discount and reduced by any income from premium on issuance) on the REMIC Regular Certificates (and any other class of REMIC Certificates constituting "regular interests" in the REMIC not offered by the prospectus), amortization of any premium on the mortgage loans, bad debt losses with respect to the mortgage loans and, except as described below, for servicing, administrative and other expenses.

For purposes of determining its taxable income, the REMIC will have an initial aggregate basis in its assets equal to the sum of the issue prices of all REMIC Certificates (or, if a class of REMIC Certificates is not sold initially, their fair market values). The aggregate basis will be allocated among the mortgage loans and the other assets of the REMIC in proportion to their respective fair market values. The issue price of any offered REMIC Certificates will be determined in the manner described above under "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount." The issue price of a REMIC Certificate received in exchange for an interest in the mortgage loans or other property will equal the fair market value of the interests in the mortgage loans or other property. Accordingly, if one or more classes of REMIC Certificates are retained initially rather than sold, the REMIC Administrator may be required to estimate the fair market value of the interests in order to determine the basis of the REMIC in the mortgage loans and other property held by the REMIC.

Subject to possible application of the de minimis rules, the method of accrual by the REMIC of original issue discount income and market discount income with respect to mortgage loans that it holds will be equivalent to the method for accruing original issue discount income for holders of REMIC Regular Certificates (that is, under the constant yield method taking into account the Prepayment Assumption). However, a REMIC that acquires loans at a market discount must include the market discount in income currently, as it accrues, on a constant yield basis. See "—Taxation of Owners of REMIC Regular Certificates" above, which describes a method for accruing discount income that is analogous to that required to be used by a REMIC as to mortgage loans with market discount that it holds.

A mortgage loan will be deemed to have been acquired with discount (or premium) to the extent that the REMIC's basis therein, determined as described in the preceding paragraph, is less than (or greater than) its stated redemption price. Any such discount will be includible in the income of the

REMIC as it accrues, in advance of receipt of the cash attributable to the income, under a method similar to the method described above for accruing original issue discount on the REMIC Regular Certificates. It is anticipated that each REMIC will elect under Section 171 of the Code to amortize any premium on the mortgage loans. Premium on any mortgage loan to which the election applies may be amortized under a constant yield method, presumably taking into account a Prepayment Assumption. Further, such an election would not apply to any mortgage loan originated on or before September 27, 1985. Instead, premium on such a mortgage loan should be allocated among the principal payments thereon and be deductible by the REMIC as those payments become due or upon the prepayment of the mortgage loan.

A REMIC will be allowed deductions for interest (including original issue discount) on the REMIC Regular Certificates (including any other class of REMIC Certificates constituting "regular interests" in the REMIC not offered by this prospectus) equal to the deductions that would be allowed if the REMIC Regular Certificates (including any other class of REMIC Certificates constituting "regular interests" in the REMIC not offered by this prospectus) were indebtedness of the REMIC. Original issue discount will be considered to accrue for this purpose as described above under "—Taxation of Owners of REMIC Regular certificates—Original Issue Discount," except that the de minimis rule and the adjustments for subsequent holders of REMIC Regular Certificates (including any other class of REMIC Certificates constituting "regular interests" in the REMIC not offered by this prospectus) described therein will not apply.

If a class of REMIC Regular Certificates is issued with Issue Premium, the net amount of interest deductions that are allowed the REMIC in each taxable year with respect to the REMIC Regular Certificates of that class will be reduced by an amount equal to the portion of the Issue Premium that is considered to be amortized or repaid in that year. Although the matter is not entirely clear, it is likely that Issue Premium would be amortized under a constant yield method in a manner analogous to the method of accruing original issue discount described above under "—Taxation of Owners of REMIC Regular certificates—Original Issue Discount."

As a general rule, the taxable income of a REMIC will be determined in the same manner as if the REMIC were an individual having the calendar year as its taxable year and using the accrual method of accounting. However, no item of income, gain, loss or deduction allocable to a prohibited transaction will be taken into account. See "—Prohibited Transactions and Other Possible REMIC Taxes" below. Further, the limitation on miscellaneous itemized deductions imposed on individuals by Section 67 of the Code (which allows these deductions only to the extent they exceed in the aggregate two percent of the taxpayer's adjusted gross income) will not be applied at the REMIC level so that the REMIC will be allowed deductions for servicing, administrative and other non-interest expenses in determining its taxable income. All such expenses will be allocated as a separate item to the holders of REMIC Certificates, subject to the limitation of Section 67 of the Code. See "—Possible Pass-Through of Miscellaneous Itemized Deductions" below. If the deductions allowed to the REMIC exceed its gross income for a calendar quarter, the excess will be the net loss for the REMIC for that calendar quarter.

Basis Rules, Net Losses and Distributions. The adjusted basis of a REMIC Residual Certificate will be equal to the amount paid for the REMIC Residual Certificate, increased by amounts included in the income of the REMIC Residual Certificateholder and decreased (but not below zero) by distributions made, and by net losses allocated, to the REMIC Residual Certificateholder.

A REMIC Residual Certificateholder is not allowed to take into account any net loss for any calendar quarter to the extent the net loss exceeds the REMIC Residual Certificateholder's adjusted basis in its REMIC Residual Certificate as of the close of the calendar quarter (determined without regard to the

net loss). Any loss that is not currently deductible by reason of this limitation may be carried forward indefinitely to future calendar quarters and, subject to the same limitation, may be used only to offset income from the REMIC Residual Certificate. The ability of REMIC Residual Certificateholders to deduct net losses may be subject to additional limitations under the Code, as to which REMIC Residual Certificateholders should consult their tax advisors.

Any distribution on a REMIC Residual Certificate will be treated as a non-taxable return of capital to the extent it does not exceed the holder's adjusted basis in the REMIC Residual Certificate. To the extent a distribution on a REMIC Residual Certificate exceeds the adjusted basis, it will be treated as gain from the sale of the REMIC Residual Certificate. Holders of REMIC Residual Certificates may be entitled to distributions early in the term of the related REMIC under circumstances in which their bases in the REMIC Residual Certificates will not be sufficiently large that the distributions will be treated as nontaxable returns of capital. Their bases in the REMIC Residual Certificates will initially equal the amount paid for the REMIC Residual Certificates and will be increased by their allocable shares of taxable income of the REMIC. However, these bases increases may not occur until the end of the calendar quarter, or perhaps the end of the calendar year, with respect to which the REMIC taxable income is allocated to the REMIC Residual Certificateholders. To the extent the REMIC Residual Certificateholders' initial bases are less than the distributions to the REMIC Residual Certificateholders, and increases in initial bases either occur after the distributions or (together with their initial bases) are less than the amount of the distributions, gain will be recognized to the REMIC Residual Certificateholders on these distributions and will be treated as gain from the sale of their REMIC Residual Certificates.

The effect of these rules is that a REMIC Residual Certificateholder may not amortize its basis in a REMIC Residual Certificate, but may only recover its basis through distributions, through the deduction of any net losses of the REMIC or upon the sale of its REMIC Residual Certificate. See "—Sales of REMIC Certificates" below. For a discussion of possible modifications of these rules that may require adjustments to income of a holder of a REMIC Residual Certificate other than an original holder in order to reflect any difference between the cost of the REMIC Residual Certificate to the REMIC Residual Certificateholder and the adjusted basis the REMIC Residual Certificate would have in the hands of an original holder, see "—Taxation of Owners of REMIC Residual Certificates—General" above.

<u>Excess Inclusions</u>. Any "excess inclusions" with respect to a REMIC Residual Certificate will be subject to federal income tax in all events. In general, the "excess inclusions" with respect to a REMIC Residual Certificate for any calendar quarter will be the excess, if any, of (1) the daily portions of REMIC taxable income allocable to the REMIC Residual Certificate over (2) the sum of the "daily accruals" (as defined below) for each day during the quarter that the REMIC Residual Certificate was held by the REMIC Residual Certificateholder. The daily accruals of a REMIC Residual Certificateholder will be determined by allocating to each day during a calendar quarter its ratable portion of the product of the "adjusted issue price" of the REMIC Residual Certificate at the beginning of the calendar quarter and 120% of the "long-term Federal rate" in effect on the Closing Date. For this purpose, the adjusted issue price of a REMIC Residual Certificate as of the beginning of any calendar quarter will be equal to the issue price of the REMIC Residual Certificate, increased by the sum of the daily accruals for all prior quarters and decreased (but not below zero) by any distributions made with respect to the REMIC Residual Certificate before the beginning of that quarter. The issue price of a REMIC Residual Certificate is the initial offering price to the public (excluding bond houses and brokers) at which a substantial amount of the REMIC Residual Certificates were sold. The "long-term Federal rate" is an average of current yields on Treasury securities with a remaining term of greater than nine years, computed and published monthly by the IRS. Although it has not done so, the Treasury has authority to issue regulations

103

that would treat the entire amount of income accruing on a REMIC Residual Certificate as an excess inclusion if the REMIC Residual Certificates are not considered to have "significant value."

For REMIC Residual Certificateholders, an excess inclusion (1) will not be permitted to be offset by deductions, losses or loss carryovers from other activities, (2) will be treated as "unrelated business taxable income" to an otherwise tax-exempt organization and (3) will not be eligible for any rate reduction or exemption under any applicable tax treaty with respect to the 30% United States withholding tax imposed on distributions to REMIC Residual Certificateholders that are foreign investors. See, however, "—Foreign investors in REMIC Certificates," below.

Furthermore, for purposes of the alternative minimum tax, excess inclusions will not be permitted to be offset by the alternative tax net operating loss deduction and alternative minimum taxable income may not be less than the taxpayer's excess inclusions. The latter rule has the effect of preventing nonrefundable tax credits from reducing the taxpayer's income tax to an amount lower than the tentative minimum tax on excess inclusions.

In the case of any REMIC Residual Certificates held by a real estate investment trust, the aggregate excess inclusions with respect to the REMIC Residual Certificates, reduced (but not below zero) by the real estate investment trust taxable income (within the meaning of Section 857(b)(2) of the Code, excluding any net capital gain), will be allocated among the shareholders of the trust in proportion to the dividends received by the shareholders from the trust, and any amount so allocated will be treated as an excess inclusion with respect to a REMIC Residual Certificate as if held directly by the shareholder. Treasury regulations yet to be issued could apply a similar rule to regulated investment companies, common trust funds and cooperatives; the REMIC Regulations currently do not address this subject.

Noneconomic REMIC Residual Certificates. Under the REMIC Regulations, transfers of "noneconomic" REMIC Residual Certificates will be disregarded for all federal income tax purposes if "a significant purpose of the transfer was to enable the transferor to impede the assessment or collection of tax." If the transfer is disregarded, the purported transferor will continue to remain liable for any taxes due with respect to the income on the "non-economic" REMIC Residual Certificate. The REMIC Regulations provide that a REMIC Residual Certificate is non-economic unless, based on the Prepayment Assumption and on any required or permitted clean up calls, or required liquidation provided for in the REMIC's organizational documents, (1) the present value of the expected future distributions (discounted using the "applicable Federal rate" for obligations whose term ends on the close of the last quarter in which excess inclusions are expected to accrue with respect to the REMIC Residual Certificate, which rate is computed and published monthly by the IRS) on the REMIC Residual Certificate equals at least the present value of the expected tax on the anticipated excess inclusions, and (2) the transferor reasonably expects that the transferee will receive distributions with respect to the REMIC Residual Certificate at or after the time the taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes. Accordingly, all transfers of REMIC Residual Certificates that may constitute non-economic residual interests will be subject to restrictions under the terms of the related pooling and servicing agreement that are intended to reduce the possibility of any such transfer being disregarded. These restrictions will require each party to a transfer to provide an affidavit that no purpose of the transfer is to impede the assessment or collection of tax, including representations as to the financial condition of the prospective transferee, as to which the transferor is also required to make a reasonable investigation to determine the transferee's historic payment of its debts and ability to continue to pay its debts as they come due in the future. The IRS has issued final REMIC regulations that add to the conditions necessary to assure that a transfer of a non-economic residual interest would be respected. The additional conditions require that in order to qualify as a safe harbor transfer of a residual, the transferee

represent that it will not cause the income "to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer" and either (i) the amount received by the transferee be no less on a present value basis than the present value of the net tax detriment attributable to holding the residual interest reduced by the present value of the projected payments to be received on the residual interest or (ii) the transfer is to a domestic taxable corporation with specified large amounts of gross and net assets and that meets certain other requirements where agreement is made that all future transfers will be to taxable domestic corporations in transactions that qualify for the same "safe harbor" provision. Eligibility for the safe harbor requires, among other things, that the facts and circumstances known to the transferor at the time of transfer not indicate to a reasonable person that the taxes with respect to the residual interest will not be paid, with an unreasonably low cost for the transfer specifically mentioned as negating eligibility. Prior to purchasing a REMIC Residual Certificate, prospective purchasers should consider the possibility that a purported transfer of the REMIC Residual Certificate by such a purchaser to another purchaser at some future day may be disregarded in accordance with the above described rules which would result in the retention of tax liability by that purchaser.

The related prospectus supplement will disclose whether offered REMIC Residual Certificates may be considered "noneconomic" residual interests under the REMIC Regulations; provided, however, that any disclosure that a REMIC Residual Certificate will not be considered "non-economic" will be based upon assumptions, and the depositor will make no representation that a REMIC Residual Certificate will not be considered "non-economic" for purposes of the above-described rules. See "—Foreign Investors in REMIC Certificates—REMIC Residual Certificates" below for additional restrictions applicable to transfers of REMIC Residual Certificates to foreign persons.

Mark-to-Market Rules. In general, all securities owned by a dealer, except to the extent that the dealer has specifically identified a security as held for investment, must be marked to market in accordance with the applicable Code provision and the related regulations. However, the IRS has issued regulations which provide that for purposes of this mark-to-market requirement, a REMIC Residual Certificate is not treated as a security and thus may not be marked to market.

Possible Pass-Through of Miscellaneous Itemized Deductions. Fees and expenses of a REMIC generally will be allocated to the holders of the related REMIC Residual Certificates. The applicable Treasury regulations indicate, however, that in the case of a REMIC that is similar to a single class grantor trust, all or a portion of these fees and expenses should be allocated to the holders of the related REMIC Regular Certificates. Except as stated in the related prospectus supplement, these fees and expenses will be allocated to holders of the related REMIC Residual Certificates in their entirety and not to the holders of the related REMIC Regular Certificates.

With respect to REMIC Residual Certificates or REMIC Regular Certificates the holders of which receive an allocation of fees and expenses in accordance with the preceding discussion, if any holder thereof is an individual, estate or trust, or a "pass-through entity" beneficially owned by one or more individuals, estates or trusts, (1) an amount equal to the individual's, estate's or trust's share of the fees and expenses will be added to the gross income of the holder and (2) the individual's, estate's or trust's share of the fees and expenses will be treated as a miscellaneous itemized deduction allowable subject to the limitation of Section 67 of the Code, which permits these deductions only to the extent they exceed in the aggregate two percent of taxpayer's adjusted gross income. In addition, Section 68 of the Code provides that the amount of itemized deductions otherwise allowable for an individual whose adjusted gross income exceeds a specified amount will be reduced by the lesser of (1) 3% of the excess of the individual's adjusted gross income over the amount or (2) 80% of the amount of itemized deductions

otherwise allowable for the taxable year. The amount of additional taxable income reportable by REMIC Certificateholders that are subject to the limitations of either Section 67 or Section 68 of the Code may be substantial. Furthermore, in determining the alternative minimum taxable income of such a holder of a REMIC Certificate that is an individual, estate or trust, or a "pass-through entity" beneficially owned by one or more individuals, estates or trusts, no deduction will be allowed for the holder's allocable portion of servicing fees and other miscellaneous itemized deductions of the REMIC, even though an amount equal to the amount of the fees and other deductions will be included in the holder's gross income. Accordingly, these REMIC Certificates may not be appropriate investments for individuals, estates, or trusts, or pass-through entities beneficially owned by one or more individuals, estates or trusts. Prospective investors should consult with their tax advisors prior to making an investment in the certificates.

*Sales of REMIC Certificates*. If a REMIC Certificate is sold, the selling Certificateholder will recognize gain or loss equal to the difference between the amount realized on the sale and its adjusted basis in the REMIC Certificate. The adjusted basis of a REMIC Regular Certificate generally will equal the cost of the REMIC Regular Certificate to the certificateholder, increased by income reported by the certificateholder with respect to the REMIC Regular Certificate (including original issue discount and market discount income) and reduced (but not below zero) by distributions on the REMIC Regular Certificate received by the certificateholder and by any amortized premium. The adjusted basis of a REMIC Residual Certificate will be determined as described under "—Taxation of Owners of REMIC Residual Certificates—Basis Rules, Net Losses and Distributions." Except as provided in the following four paragraphs, any such gain or loss will be capital gain or loss, provided the REMIC Certificate is held as a capital asset (generally, property held for investment) within the meaning of Section 1221 of the Code.

Gain from the sale of a REMIC Regular Certificate that might otherwise be capital gain will be treated as ordinary income to the extent the gain does not exceed the excess, if any, of (1) the amount that would have been includible in the seller's income with respect to the REMIC Regular Certificate assuming that income had accrued thereon at a rate equal to 110% of the "applicable Federal rate" (generally, a rate based on an average of current yields on Treasury securities having a maturity comparable to that of the certificate based on the application of the Prepayment Assumption applicable to the certificate, which rate is computed and published monthly by the IRS), determined as of the date of purchase of the REMIC Regular Certificate, over (2) the amount of ordinary income actually includible in the seller's income prior to the sale. In addition, gain recognized on the sale of a REMIC Regular Certificate by a seller who purchased the REMIC Regular Certificate at a market discount will be taxable as ordinary income in an amount not exceeding the portion of the discount that accrued during the period the REMIC Certificate was held by the holder, reduced by any market discount included in income under the rules described above under "—Taxation of Owners of REMIC Regular Certificates—Market Discount" and"—Premium."

REMIC Certificates will be "evidences of indebtedness" within the meaning of Section 582(c)(1) of the Code, so that gain or loss recognized from the sale of a REMIC Certificate by a bank or thrift institution to which this section applies will be ordinary income or loss.

A portion of any gain from the sale of a REMIC Regular Certificate that might otherwise be capital gain may be treated as ordinary income to the extent that the certificate is held as part of a "conversion transaction" within the meaning of Section 1258 of the Code. A conversion transaction generally is one in which the taxpayer has taken two or more positions in the same or similar property that reduce or eliminate market risk, if substantially all of the taxpayer's return is attributable to the time value

106

of the taxpayer's net investment in the transaction. The amount of gain so realized in a conversion transaction that is recharacterized as ordinary income generally will not exceed the amount of interest that would have accrued on the taxpayer's net investment at 120% of the appropriate "applicable Federal rate" (which rate is computed and published monthly by the IRS) at the time the taxpayer enters into the conversion transaction, subject to appropriate reduction for prior inclusion of interest and other ordinary income items from the transaction.

Finally, a taxpayer may elect to have net capital gain taxed at ordinary income rates rather than capital gains rates in order to include the net capital gain in total net investment income for the taxable year, for purposes of the rule that limits the deduction of interest on indebtedness incurred to purchase or carry property held for investment to a taxpayer's net investment income.

Except as may be provided in Treasury regulations yet to be issued, if the seller of a REMIC Residual Certificate reacquires the REMIC Residual Certificate, or acquires any other residual interest in a REMIC or any similar interest in a "taxable mortgage pool" (as defined in Section 7701(i) of the Code) during the period beginning six months before, and ending six months after, the date of the sale, such sale will be subject to the "wash sale" rules of Section 1091 of the Code. In that event, any loss realized by the REMIC Residual Certificateholder on the sale will not be deductible, but instead will be added to the REMIC Residual Certificateholder's adjusted basis in the newly-acquired asset.

Losses on the sale of a REMIC Residual Certificate in excess of a threshold amount (which amount could need to be aggregated with similar or previous losses) may require disclosure of such loss on an IRS Form 8886. Investors should consult with their tax advisors as to the need to file such form.

*Prohibited Transactions and Other Possible REMIC Taxes.* In the event a REMIC engages in a prohibited transaction, the Code imposes a 100% tax on the income derived by the REMIC from the prohibited transaction. In general, subject to specified exceptions, a prohibited transaction means the disposition of a mortgage loan, the receipt of income from a source other than a mortgage loan or other permitted investments, the receipt of compensation for services, or gain from the disposition of an asset purchased with the payments on the mortgage loans for temporary investment pending distribution on the REMIC Certificates. It is not anticipated that any REMIC will engage in any prohibited transactions in which it would recognize a material amount of net income.

In addition, a contribution to a REMIC made after the day on which the REMIC issues all of its interests could result in the imposition on the REMIC of a tax equal to 100% of the value of the contributed property. Each pooling and servicing agreement will include provisions designed to prevent the acceptance of any contributions that would be subject to this tax.

REMICs also are subject to federal income tax at the highest corporate rate on "net income from foreclosure property," determined by reference to the rules applicable to real estate investment trusts. "Net income from foreclosure property" generally means gain from the sale of a foreclosure property that is inventory property and gross income from foreclosure property other than qualifying rents and other qualifying income for a real estate investment trust. It is not anticipated that any REMIC will recognize "net income from foreclosure property" subject to federal income tax.

To the extent permitted by then applicable laws, any tax resulting from a prohibited transaction, tax resulting from a contribution made after the Closing Date, tax on "net income from foreclosure property" or state or local income or franchise tax that may be imposed on the REMIC will be borne by the related master servicer or trustee in either case out of its own funds, provided that the master servicer

or the trustee, as the case may be, has sufficient assets to do so, and provided further that the tax arises out of a breach of the master servicer's or the trustee's obligations, as the case may be, under the related pooling and servicing agreement and in respect of compliance with applicable laws and regulations. Any such tax not borne by the master servicer or the trustee will be charged against the related trust fund resulting in a reduction in amounts payable to holders of the related REMIC Certificates.

*Tax and Restrictions on Transfers of REMIC Residual Certificates to Certain Organizations.* If a REMIC Residual Certificate is transferred to a "disqualified organization" (as defined below), a tax would be imposed in an amount (determined under the REMIC Regulations) equal to the product of (1) the present value (discounted using the "applicable Federal rate" for obligations whose term ends on the close of the last quarter in which excess inclusions are expected to accrue with respect to the REMIC Residual Certificate, which rate is computed and published monthly by the IRS) of the total anticipated excess inclusions with respect to the REMIC Residual Certificate for periods after the transfer and (2) the highest marginal federal income tax rate applicable to corporations. The anticipated excess inclusions must be determined as of the date that the REMIC Residual Certificate is transferred and must be based on events that have occurred up to the time of the transfer, the Prepayment Assumption and any required or permitted clean up calls or required liquidation provided for in the REMIC's organizational documents. Such a tax generally would be imposed on the transferor of the REMIC Residual Certificate, except that where the transfer is through an agent for a disqualified organization, the tax would instead be imposed on the agent. However, a transferor of a REMIC Residual Certificate would in no event be liable for the tax with respect to a transfer if the transferee furnishes to the transferor an affidavit that the transferee is not a disqualified organization and, as of the time of the transfer, the transferor does not have actual knowledge that the affidavit is false. Moreover, an entity will not qualify as a REMIC unless there are reasonable arrangements designed to ensure that (1) residual interests in the entity are not held by disqualified organizations and (2) information necessary for the application of the tax described herein will be made available. Restrictions on the transfer of REMIC Residual Certificates and other provisions that are intended to meet this requirement will be included in the pooling and servicing agreement, and will be discussed more fully in any prospectus supplement relating to the offering of any REMIC Residual Certificate.

In addition, if a "pass-through entity" (as defined below) includes in income excess inclusions with respect to a REMIC Residual Certificate, and a disqualified organization is the record holder of an interest in the entity, then a tax will be imposed on the entity equal to the product of (1) the amount of excess inclusions on the REMIC Residual Certificate that are allocable to the interest in the pass-through entity held by the disqualified organization and (2) the highest marginal federal income tax rate imposed on corporations. A pass-through entity will not be subject to this tax for any period, however, if each record holder of an interest in the pass-through entity furnishes to the pass-through entity (1) the holder's social security number and a statement under penalties of perjury that the social security number is that of the recordholder or (2) a statement under penalties of perjury that the record holder is not a disqualified organization. Notwithstanding the preceding two sentences, in the case of a REMIC Residual Certificate held by an "electing large partnership," all interests in the partnership shall be treated as held by disqualified organizations (without regard to whether the record holders of the partnership furnish statements described in the preceding sentence) and the amount that is subject to tax under the second preceding sentence is excluded from the gross income of the partnership allocated to the partners (in lieu of allocating to the partners a deduction for the tax paid by the partnership).

108

For these purposes, a "disqualified organization" means:

- the United States, any State or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of the foregoing (but would not include instrumentalities described in Section 168(h)(2)(D) of the Code or Freddie Mac),

- any organization (other than a cooperative described in Section 521 of the Code) that is exempt from federal income tax, unless it is subject to the tax imposed by Section 511 of the Code, or

- any organization described in Section 1381(a)(2)(C) of the Code.

For these purposes, a "pass-through entity" means any regulated investment company, real estate investment trust, trust, partnership or certain other entities described in Section 860E(e)(6) of the Code. In addition, a person holding an interest in a pass-through entity as a nominee for another person will, with respect to the interest, be treated as a pass-through entity.

*Termination*. A REMIC will terminate immediately after the distribution date following receipt by the REMIC of the final payment in respect of the mortgage loans or upon a sale of the REMIC's assets following the adoption by the REMIC of a plan of complete liquidation. The last distribution on a REMIC Regular Certificate will be treated as a payment in retirement of a debt instrument. In the case of a REMIC Residual Certificate, if the last distribution on the REMIC Residual Certificate is less than the REMIC Residual Certificateholder's adjusted basis in the certificate, the REMIC Residual Certificateholder should (but may not) be treated as realizing a loss equal to the amount of the difference, and the loss may be treated as a capital loss.

*Reporting and Other Administrative Matters*. Solely for purposes of the administrative provisions of the Code, the REMIC will be treated as a partnership and REMIC Residual Certificateholders will be treated as partners. The REMIC Administrator (or other party described in the related prospectus supplement) will file REMIC federal income tax returns on behalf of the related REMIC, and under the terms of the related Agreement will either (1) be irrevocably appointed by the holders of the largest percentage interest in the related REMIC Residual Certificates as their agent to perform all of the duties of the "tax matters person" with respect to the REMIC in all respects or (2) will be designated as and will act as the "tax matters person" with respect to the related REMIC in all respects and will hold at least a nominal amount of REMIC Residual Certificates.

The REMIC Administrator, as the tax matters person or as agent for the tax matters person, subject to notice requirements and various restrictions and limitations, generally will have the authority to act on behalf of the REMIC and the REMIC Residual Certificateholders in connection with the administrative and judicial review of items of income, deduction, gain or loss of the REMIC, as well as the REMIC's classification. REMIC Residual Certificateholders generally will be required to report these REMIC items consistently with their treatment on the REMIC's tax return and may in some circumstances be bound by a settlement agreement between the REMIC Administrator, as either tax matters person or as agent for the tax matters person, and the IRS concerning any such REMIC item. Adjustments made to the REMIC tax return may require a REMIC Residual Certificateholder to make corresponding adjustments on its return, and an audit of the REMIC's tax return, or the adjustments resulting from such an audit, could result in an audit of a REMIC Residual Certificateholder's return. Any person that holds a REMIC Residual Certificate as a nominee for another person may be required to

furnish the REMIC, in a manner to be provided in Treasury regulations, with the name and address of the person and other information.

Reporting of interest income, including any original issue discount, with respect to REMIC Regular Certificates is required annually, and may be required more frequently under Treasury regulations. These information reports generally are required to be sent to individual holders of REMIC Regular Interests and the IRS; holders of REMIC Regular Certificates that are corporations, trusts, securities dealers and some other non-individuals will be provided interest and original issue discount income information and the information set forth in the following paragraph upon request in accordance with the requirements of the applicable regulations. The information may be provided by the later of 30 days after the end of the quarter for which the information was requested, or two weeks after the receipt of the request. The REMIC must also comply with rules requiring a REMIC Regular Certificate issued with original issue discount to disclose the information to the IRS. Reporting with respect to the REMIC Residual Certificates, including income, excess inclusions, investment expenses and relevant information regarding qualification of the REMIC's assets will be made as required under the Treasury regulations, generally on a quarterly basis.

As applicable, the REMIC Regular Certificate information reports will include a statement of the adjusted issue price of the REMIC Regular Certificate at the beginning of each accrual period. In addition, the reports will include information required by regulations with respect to computing the accrual of any market discount. Because exact computation of the accrual of market discount on a constant yield method would require information relating to the holder's purchase price that the REMIC may not have, Treasury regulations only require that information pertaining to the appropriate proportionate method of accruing market discount be provided. See "—Taxation of Owners of REMIC Regular certificates—Market Discount."

The responsibility for complying with the foregoing reporting rules will be borne by the REMIC Administrator or other party designated in the related prospectus supplement.

*Backup Withholding With Respect to REMIC Certificates*. Payments of interest and principal, as well as payments of proceeds from the sale of REMIC Certificates, may be subject to the "backup withholding tax" under Section 3406 of the Code if recipients of the payments fail to furnish to the payor certain information, including their taxpayer identification numbers, or otherwise fail to establish an exemption from the backup withholding tax. Any amounts deducted and withheld from a distribution to a recipient would be allowed as a credit against the recipient's federal income tax. Furthermore, penalties may be imposed by the IRS on a recipient of payments that is required to supply information but that does not do so in the proper manner.

*Foreign Investors in REMIC Certificates*. A REMIC Regular Certificateholder that is not a United States Person and is not subject to federal income tax as a result of any direct or indirect connection to the United States in addition to its ownership of a REMIC Regular Certificate will not be subject to United States federal income or withholding tax in respect of a distribution on a REMIC Regular Certificate, provided that the holder complies to the extent necessary with identification requirements, including delivery of a statement, signed by the certificateholder under penalties of perjury, certifying that the certificateholder is not a United States person and providing the name and address of the certificateholder. This statement is generally made on IRS Form W-8BEN and must be updated whenever required information has changed or within 3 calendar years after the statement is first delivered. It is possible that the IRS may assert that the foregoing tax exemption should not apply with respect to a REMIC Regular Certificate held by a REMIC Residual Certificateholder that owns directly or

indirectly a 10% or greater interest in the REMIC Residual Certificates. If the holder does not qualify for exemption, distributions of interest, including distributions in respect of accrued original issue discount, to the holder may be subject to a tax rate of 30%, subject to reduction under any applicable tax treaty.

Special rules apply to partnerships, estates and trusts, and in certain circumstances certifications as to foreign status and other matters may be required to be provided by partners and beneficiaries thereof.

In addition, in certain circumstances the foregoing rules will not apply to exempt a United States shareholder of a controlled foreign corporation from taxation on the United States shareholder's allocable portion of the interest income received by the controlled foreign corporation.

Further, it appears that a REMIC Regular Certificate would not be included in the estate of a non-resident alien individual and would not be subject to United States estate taxes. However, certificateholders who are non-resident alien individuals should consult their tax advisors concerning this question.

Except as stated in the related prospectus supplement, transfers of REMIC Residual Certificates to investors that are not United States persons will be prohibited under the related pooling and servicing agreement.

On May 11, 2004, the Internal Revenue Service issued final regulations relating to the federal income tax treatment of "inducement fees" received by transferees of non-economic REMIC residual interests.  The regulations provide tax accounting rules for the inclusion of such fees in income over an appropriate period, and clarify that inducement fees represent income from sources within the United States. These rules apply to taxable years ending on or after May 11, 2004.  On the same date, the IRS issued administrative guidance addressing the procedures by which transferees of such REMIC residual interests may obtain consent to change the method of accounting for REMIC inducement fee income to one of the methods provided in the regulations. Prospective purchasers of REMIC residual certificates should consult with their tax advisors regarding the effect of these regulations and the related administrative guidance.

## Notes

On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of notes, Thacher Proffitt & Wood LLP, counsel to the company, will deliver its opinion to the effect that, assuming compliance with all provisions of the indenture, owner trust agreement and other related documents, for federal income tax purposes (1) the Notes (other than those certain classes, or portions of certain classes, of Notes which, at the time of their issuance, AHMC or one of its qualified real estate investment trust, or REIT, subsidiaries acquires beneficial ownership thereof), will be classified as debt instruments and (2) depending on the structure of the transaction, either (A) the Issuer, as created pursuant to the terms and conditions of the owner trust agreement, will not be characterized as an association (or publicly traded partnership) taxable as a corporation or as a taxable mortgage pool or (B) assuming compliance with the related agreements, for U.S. federal income tax purposes, despite the fact that the Trust will be classified as a TMP, the Trust will not be subject to federal income tax as long as an entity that qualifies as a REIT under the Code holds, directly or indirectly, through one or more wholly owned qualified REIT subsidiaries, 100% ownership interest in the Trust Certificates. For purposes of this tax discussion, references to a "noteholder" or a "holder" are to the beneficial owner of a note.

*Status as Real Property Loans*

(1)     Notes held by a domestic building and loan association will not constitute "loans . . . secured by an interest in real property" within the meaning of Code section 7701(a)(19)(C)(v); and (2) notes held by a real estate investment trust will not constitute "real estate assets" within the meaning of Code section 856(c)(4)(A) and interest on notes will not be considered "interest on obligations secured by mortgages on real property" within the meaning of Code section 856(c)(3)(B).

*Taxation of Noteholders*

Notes generally will be subject to the same rules of taxation as REMIC Regular Certificates issued by a REMIC, as described above, except that (1) income reportable on the notes is not required to be reported under the accrual method unless the holder otherwise uses the accrual method and (2) the special rule treating a portion of the gain on sale or exchange of a REMIC Regular Certificate as ordinary income is inapplicable to the notes. See "—REMICs—Taxation of Owners of REMIC Regular Certificates" and "—Sales of REMIC Certificates."

## Grantor Trust Funds

*Classification of Grantor Trust Funds*. On or prior to the date of the related prospectus supplement with respect to the proposed issuance of each series of Grantor Trust Certificates, Thacher Proffitt & Wood LLP, counsel to the company, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the related pooling and servicing agreement, the related Grantor Trust Fund will be classified as a grantor trust under subpart E, part I of subchapter J of Chapter 1 of the Code and not as a partnership or an association taxable as a corporation.

*Characterization of Investments in Grantor Trust Certificates.*

*Grantor Trust Fractional Interest Certificates*. In the case of Grantor Trust Fractional Interest Certificates, except as disclosed in the related prospectus supplement, counsel to the company will deliver an opinion that, in general, Grantor Trust Fractional Interest Certificates will represent interests in (1) "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code; (2) "obligation[s] (including any participation or Certificate of beneficial ownership therein) which [are] principally secured by an interest in real property" within the meaning of Section 860G(a)(3) of the Code; and (3) "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code. In addition, counsel to the company will deliver an opinion that interest on Grantor Trust Fractional Interest Certificates will to the same extent be considered "interest on obligations secured by mortgages on real property or on interests in real property" within the meaning of Section 856(c)(3)(B) of the Code.

*Grantor Trust Strip Certificates*. Even if Grantor Trust Strip Certificates evidence an interest in a Grantor Trust Fund consisting of mortgage loans that are "loans . . . secured by an interest in real property" within the meaning of Section 7701(a)(19)(C)(v) of the Code, and "real estate assets" within the meaning of Section 856(c)(4)(A) of the Code, and the interest on which is "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code, it is unclear whether the Grantor Trust Strip Certificates, and the income therefrom, will be so characterized. However, the policies underlying these sections (namely, to encourage or require investments in mortgage loans by thrift institutions and real estate investment trusts) may suggest that this characterization is appropriate. Counsel to the company will not deliver any opinion on these questions. Prospective purchasers to which the characterization of an investment in Grantor Trust Strip Certificates is material

should consult their tax advisors regarding whether the Grantor Trust Strip Certificates, and the income therefrom, will be so characterized.

The Grantor Trust Strip Certificates will be "obligation[s] (including any participation or Certificate of beneficial ownership therein) which . . .[are] principally secured by an interest in real property" within the meaning of Section 860G(a)(3)(A) of the Code.

*Taxation of Owners of Grantor Trust Fractional Interest Certificates*. Holders of a particular series of Grantor Trust Fractional Interest Certificates generally will be required to report on their federal income tax returns their shares of the entire income from the mortgage loans (including amounts used to pay reasonable servicing fees and other expenses) and will be entitled to deduct their shares of any such reasonable servicing fees and other expenses. Because of stripped interests, market or original issue discount, or premium, the amount includible in income on account of a Grantor Trust Fractional Interest Certificate may differ significantly from the amount distributable thereon representing interest on the mortgage loans. Under Section 67 of the Code, an individual, estate or trust holding a Grantor Trust Fractional Interest Certificate directly or through some pass-through entities will be allowed a deduction for the reasonable servicing fees and expenses only to the extent that the aggregate of the holder's miscellaneous itemized deductions exceeds two percent of the holder's adjusted gross income. In addition, Section 68 of the Code provides that the amount of itemized deductions otherwise allowable for an individual whose adjusted gross income exceeds a specified amount will be reduced by the lesser of (1) 3% of the excess of the individual's adjusted gross income over the amount or (2) 80% of the amount of itemized deductions otherwise allowable for the taxable year. The amount of additional taxable income reportable by holders of Grantor Trust Fractional Interest Certificates who are subject to the limitations of either Section 67 or Section 68 of the Code may be substantial. Further, certificateholders (other than corporations) subject to the alternative minimum tax may not deduct miscellaneous itemized deductions in determining the holder's alternative minimum taxable income. Although it is not entirely clear, it appears that in transactions in which multiple classes of Grantor Trust Certificates (including Grantor Trust Strip Certificates) are issued, the fees and expenses should be allocated among the classes of Grantor Trust Certificates using a method that recognizes that each such class benefits from the related services. In the absence of statutory or administrative clarification as to the method to be used, it currently is intended to base information returns or reports to the IRS and certificateholders on a method that allocates the expenses among classes of Grantor Trust Certificates with respect to each period based on the distributions made to each such class during that period.

The federal income tax treatment of Grantor Trust Fractional Interest Certificates of any series will depend on whether they are subject to the "stripped bond" rules of Section 1286 of the Code. Grantor Trust Fractional Interest Certificates may be subject to those rules if (1) a class of Grantor Trust Strip Certificates is issued as part of the same series of certificates or (2) the company or any of its affiliates retains (for its own account or for purposes of resale) a right to receive a specified portion of the interest payable on the mortgage loans. Further, the IRS has ruled that an unreasonably high servicing fee retained by a seller or servicer will be treated as a retained ownership interest in mortgages that constitutes a stripped coupon. For purposes of determining what constitutes reasonable servicing fees for various types of mortgages the IRS has established "safe harbors." The servicing fees paid with respect to the mortgage loans for a series of Grantor Trust Certificates may be higher than the "safe harbors" and, accordingly, may not constitute reasonable servicing compensation. The related prospectus supplement will include information regarding servicing fees paid to the master servicer, any subservicer or their respective affiliates necessary to determine whether the preceding "safe harbor" rules apply.

113

*If Stripped Bond Rules Apply*. If the stripped bond rules apply, each Grantor Trust Fractional Interest Certificate will be treated as having been issued with "original issue discount" within the meaning of Section 1273(a) of the Code, subject, however, to the discussion below regarding the treatment of some stripped bonds as market discount bonds and the discussion regarding de minimis market discount. See "—Taxation of Owners of Grantor Trust Fractional Interest Certificates—Market Discount" below. Under the stripped bond rules, the holder of a Grantor Trust Fractional Interest Certificate (whether a cash or accrual method taxpayer) will be required to report interest income from its Grantor Trust Fractional Interest Certificate for each month in an amount equal to the income that accrues on the certificate in that month calculated under a constant yield method, in accordance with the rules of the Code relating to original issue discount.

The original issue discount on a Grantor Trust Fractional Interest Certificate will be the excess of the certificate's stated redemption price over its issue price. The issue price of a Grantor Trust Fractional Interest Certificate as to any purchaser will be equal to the price paid by the purchaser for the Grantor Trust Fractional Interest Certificate. The stated redemption price of a Grantor Trust Fractional Interest Certificate will be the sum of all payments to be made on the certificate, other than "qualified stated interest," if any, as well as the certificate's share of reasonable servicing fees and other expenses. See "—Taxation of Owners of Grantor Trust Fractional Interest Certificates—If Stripped Bond Rules Do Not Apply" for a definition of "qualified stated interest." In general, the amount of the income that accrues in any month would equal the product of the holder's adjusted basis in the Grantor Trust Fractional Interest Certificate at the beginning of the month (see "Sales of Grantor Trust Certificates") and the yield of the Grantor Trust Fractional Interest Certificate to the holder. This yield would be computed at the rate (compounded based on the regular interval between distribution dates) that, if used to discount the holder's share of future payments on the mortgage loans, would cause the present value of those future payments to equal the price at which the holder purchased the certificate. In computing yield under the stripped bond rules, a certificateholder's share of future payments on the mortgage loans will not include any payments made in respect of any ownership interest in the mortgage loans retained by the company, the master servicer, any subservicer or their respective affiliates, but will include the certificateholder's share of any reasonable servicing fees and other expenses.

To the extent the Grantor Trust Fractional Interest Certificates represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, for taxable years beginning after August 5, 1997, Section 1272(a)(6) of the Code requires (1) the use of a reasonable prepayment assumption in accruing original issue discount and (2) adjustments in the accrual of original issue discount when prepayments do not conform to the prepayment assumption. It is unclear whether those provisions would be applicable to the Grantor Trust Fractional Interest Certificates that do not represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, or for taxable years beginning prior to August 5, 1997 or whether use of a reasonable prepayment assumption may be required or permitted without reliance on these rules. It is also uncertain, if a prepayment assumption is used, whether the assumed prepayment rate would be determined based on conditions at the time of the first sale of the Grantor Trust Fractional Interest Certificate or, with respect to any holder, at the time of purchase of the Grantor Trust Fractional Interest Certificate by that holder. Certificateholders are advised to consult their own tax advisors concerning reporting original issue discount with respect to Grantor Trust Fractional Interest Certificates and, in particular, whether a prepayment assumption should be used in reporting original issue discount.

In the case of a Grantor Trust Fractional Interest Certificate acquired at a price equal to the principal amount of the mortgage loans allocable to the certificate, the use of a prepayment assumption generally would not have any significant effect on the yield used in calculating accruals of interest

114

income.  In the case, however, of a Grantor Trust Fractional Interest Certificate acquired at a discount or premium (that is, at a price less than or greater than the principal amount, respectively), the use of a reasonable prepayment assumption would increase or decrease the yield, and thus accelerate or decelerate, respectively, the reporting of income.

If a prepayment assumption is not used, then when a mortgage loan prepays in full, the holder of a Grantor Trust Fractional Interest Certificate acquired at a discount or a premium generally will recognize ordinary income or loss equal to the difference between the portion of the prepaid principal amount of the mortgage loan that is allocable to the certificate and the portion of the adjusted basis of the certificate that is allocable to the certificateholder's interest in the mortgage loan. If a prepayment assumption is used, it appears that no separate item of income or loss should be recognized upon a prepayment.  Instead, a prepayment should be treated as a partial payment of the stated redemption price of the Grantor Trust Fractional Interest Certificate and accounted for under a method similar to that described for taking account of original issue discount on REMIC Regular Certificates. See "— REMICs—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount." It is unclear whether any other adjustments would be required to reflect differences between an assumed prepayment rate and the actual rate of prepayments.

It is currently intended to base information reports or returns to the IRS and certificateholders in transactions subject to the stripped bond rules on a Prepayment Assumption that will be disclosed in the related prospectus supplement and on a constant yield computed using a representative initial offering price for each class of certificates. However, none of the company, the master servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or any other rate and certificateholders should bear in mind that the use of a representative initial offering price will mean that the information returns or reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders of each series who bought at that price.

Under Treasury regulation Section 1.1286-1, some stripped bonds are to be treated as market discount bonds and, accordingly, any purchaser of such a bond is to account for any discount on the bond as market discount rather than original issue discount. This treatment only applies, however, if immediately after the most recent disposition of the bond by a person stripping one or more coupons from the bond and disposing of the bond or coupon (1) there is no original issue discount (or only a de minimis amount of original issue discount) or (2) the annual stated rate of interest payable on the original bond is no more than one percentage point lower than the gross interest rate payable on the original mortgage loan (before subtracting any servicing fee or any stripped coupon). If interest payable on a Grantor Trust Fractional Interest Certificate is more than one percentage point lower than the gross interest rate payable on the mortgage loans, the related prospectus supplement will disclose that fact.  If the original issue discount or market discount on a Grantor Trust Fractional Interest Certificate determined under the stripped bond rules is less than 0.25% of the stated redemption price multiplied by the weighted average maturity of the mortgage loans, then that original issue discount or market discount will be considered to be de minimis. Original issue discount or market discount of only a de minimis amount will be included in income in the same manner as de minimis original issue and market discount described in "Characteristics of Investments in Grantor Trust Certificates—If Stripped Bond Rules Do Not Apply" and"—Market Discount" below.

*If Stripped Bond Rules Do Not Apply*. Subject to the discussion below on original issue discount, if the stripped bond rules do not apply to a Grantor Trust Fractional Interest Certificate, the certificateholder will be required to report its share of the interest income on the mortgage loans in

accordance with the certificateholder's normal method of accounting. The original issue discount rules will apply to a Grantor Trust Fractional Interest Certificate to the extent it evidences an interest in mortgage loans issued with original issue discount.

The original issue discount, if any, on the mortgage loans will equal the difference between the stated redemption price of the mortgage loans and their issue price. Under the OID Regulations, the stated redemption price is equal to the total of all payments to be made on the mortgage loan other than "qualified stated interest." "Qualified stated interest" is interest that is unconditionally payable at least annually at a single fixed rate, or at a "qualified floating rate," an "objective rate," a combination of a single fixed rate and one or more "qualified floating rates" or one "qualified inverse floating rate," or a combination of "qualified floating rates" that does not operate in a manner that accelerates or defers interest payments on the mortgage loan. In general, the issue price of a mortgage loan will be the amount received by the borrower from the lender under the terms of the mortgage loan, less any "points" paid by the borrower, and the stated redemption price of a mortgage loan will equal its principal amount, unless the mortgage loan provides for an initial below-market rate of interest or the acceleration or the deferral of interest payments. The determination as to whether original issue discount will be considered to be de minimis will be calculated using the same test described in the REMIC discussion. See "—Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" above.

In the case of mortgage loans bearing adjustable or variable interest rates, the related prospectus supplement will describe the manner in which the rules will be applied with respect to those mortgage loans by the master servicer or the trustee in preparing information returns to the certificateholders and the IRS.

If original issue discount is in excess of a de minimis amount, all original issue discount with respect to a mortgage loan will be required to be accrued and reported in income each month, based on a constant yield. Section 1272(a)(6) of the Code requires that a prepayment assumption be made in computing yield with respect to any pool of debt instruments the yield on which may be affected by reason of prepayments. Accordingly, for certificates backed by these pools, it is intended to base information reports and returns to the IRS and certificateholders on the use of a prepayment assumption. Certificateholders are advised to consult their own tax advisors concerning whether a prepayment assumption should be used in reporting original issue discount with respect to Grantor Trust Fractional Interest Certificates. Certificateholders should refer to the related prospectus supplement with respect to each series to determine whether and in what manner the original issue discount rules will apply to mortgage loans in the series.

A purchaser of a Grantor Trust Fractional Interest Certificate that purchases the Grantor Trust Fractional Interest Certificate at a cost less than the certificate's allocable portion of the aggregate remaining stated redemption price of the mortgage loans held in the related trust fund will also be required to include in gross income the certificate's daily portions of any original issue discount with respect to the mortgage loans. However, each such daily portion will be reduced, if the cost of the Grantor Trust Fractional Interest Certificate to the purchaser is in excess of the certificate's allocable portion of the aggregate "adjusted issue prices" of the mortgage loans held in the related trust fund, approximately in proportion to the ratio the excess bears to the certificate's allocable portion of the aggregate original issue discount remaining to be accrued on the mortgage loans. The adjusted issue price of a mortgage loan on any given day equals the sum of (1) the adjusted issue price (or, in the case of the first accrual period, the issue price) of the mortgage loan at the beginning of the accrual period that includes the day and (2) the daily portions of original issue discount for all days during the accrual period prior to the day. The adjusted issue price of a mortgage loan at the beginning of any accrual period will equal the issue price of

116

the mortgage loan, increased by the aggregate amount of original issue discount with respect to the mortgage loan that accrued in prior accrual periods, and reduced by the amount of any payments made on the mortgage loan in prior accrual periods of amounts included in its stated redemption price.

In addition to its regular reports, the master servicer or the trustee, except as provided in the related prospectus supplement, will provide to any holder of a Grantor Trust Fractional Interest Certificate such information as the holder may reasonably request from time to time with respect to original issue discount accruing on Grantor Trust Fractional Interest Certificates. See "Grantor Trust Reporting" below.

*Market Discount*. If the stripped bond rules do not apply to the Grantor Trust Fractional Interest Certificate, a certificateholder may be subject to the market discount rules of Sections 1276 through 1278 of the Code to the extent an interest in a mortgage loan is considered to have been purchased at a "market discount," that is, in the case of a mortgage loan issued without original issue discount, at a purchase price less than its remaining stated redemption price (as defined above), or in the case of a mortgage loan issued with original issue discount, at a purchase price less than its adjusted issue price (as defined above). If market discount is in excess of a de minimis amount (as described below), the holder generally will be required to include in income in each month the amount of the discount that has accrued (under the rules described in the next paragraph) through the month that has not previously been included in income, but limited, in the case of the portion of the discount that is allocable to any mortgage loan, to the payment of stated redemption price on the mortgage loan that is received by (or, in the case of accrual basis certificateholders, due to) the trust fund in that month. A certificateholder may elect to include market discount in income currently as it accrues (under a constant yield method based on the yield of the certificate to the holder) rather than including it on a deferred basis in accordance with the foregoing under rules similar to those described in "—Taxation of Owners of REMIC Regular Certificates—Market Discount" above.

Section 1276(b)(3) of the Code authorized the Treasury Department to issue regulations providing for the method for accruing market discount on debt instruments, the principal of which is payable in more than one installment.  Until such time as regulations are issued by the Treasury Department, some rules described in the Committee Report will apply. Under those rules, in each accrual period market discount on the mortgage loans should accrue, at the certificateholder's option: (1) on the basis of a constant yield method, (2) in the case of a mortgage loan issued without original issue discount, in an amount that bears the same ratio to the total remaining market discount as the stated interest paid in the accrual period bears to the total stated interest remaining to be paid on the mortgage loan as of the beginning of the accrual period, or (3) in the case of a mortgage loan issued with original issue discount, in an amount that bears the same ratio to the total remaining market discount as the original issue discount accrued in the accrual period bears to the total original issue discount remaining at the beginning of the accrual period. The prepayment assumption, if any, used in calculating the accrual of original issue discount is to be used in calculating the accrual of market discount. The effect of using a prepayment assumption could be to accelerate the reporting of the discount income.

Because the mortgage loans will provide for periodic payments of stated redemption price, the market discount may be required to be included in income at a rate that is not significantly slower than the rate at which the discount would be included in income if it were original issue discount.

Market discount with respect to mortgage loans may be considered to be de minimis and, if so, will be includible in income under de minimis rules similar to those described above in "—REMICs— Taxation of Owners of REMIC Regular Certificates—Original Issue Discount" with the exception that it

117

is less likely that a prepayment assumption will be used for purposes of these rules with respect to the mortgage loans.

Further, under the rules described in "—REMICs—Taxation of Owners of REMIC Regular Certificates—Market Discount," above, any discount that is not original issue discount and exceeds a de minimis amount may require the deferral of interest expense deductions attributable to accrued market discount not yet includible in income, unless an election has been made to report market discount currently as it accrues. This rule applies without regard to the origination dates of the mortgage loans.

*Premium*. If a certificateholder is treated as acquiring the underlying mortgage loans at a premium, that is, at a price in excess of their remaining stated redemption price, the certificateholder may elect under Section 171 of the Code to amortize using a constant yield method the portion of the premium allocable to mortgage loans originated after September 27, 1985. Amortizable premium is treated as an offset to interest income on the related debt instrument, rather than as a separate interest deduction. However, premium allocable to mortgage loans originated before September 28, 1985 or to mortgage loans for which an amortization election is not made, should be allocated among the payments of stated redemption price on the mortgage loan and be allowed as a deduction as these payments are made (or, for a certificateholder using the accrual method of accounting, when the payments of stated redemption price are due).

It is unclear whether a prepayment assumption should be used in computing amortization of premium allowable under Section 171 of the Code. If premium is not subject to amortization using a prepayment assumption and a mortgage loan prepays in full, the holder of a Grantor Trust Fractional Interest Certificate acquired at a premium should recognize a loss, equal to the difference between the portion of the prepaid principal amount of the mortgage loan that is allocable to the certificate and the portion of the adjusted basis of the certificate that is allocable to the mortgage loan. If a prepayment assumption is used to amortize premium, it appears that such a loss would be unavailable. Instead, if a prepayment assumption is used, a prepayment should be treated as a partial payment of the stated redemption price of the Grantor Trust Fractional Interest Certificate and accounted for under a method similar to that described for taking account of original issue discount on REMIC Regular Certificates. See "REMICs—Taxation of Owners of REMIC Regular Certificates—Original Issue discount." It is unclear whether any other adjustments would be required to reflect differences between the prepayment assumption used, and the actual rate of prepayments.

*Taxation of Owners of Grantor Trust Strip Certificates*. The "stripped coupon" rules of Section 1286 of the Code will apply to the Grantor Trust Strip Certificates. Except as described above in "Characterization of Investments in Grantor Trust Certificates—If Stripped Bond Rules Apply," no regulations or published rulings under Section 1286 of the Code have been issued and some uncertainty exists as to how it will be applied to securities such as the Grantor Trust Strip Certificates. Accordingly, holders of Grantor Trust Strip Certificates should consult their own tax advisors concerning the method to be used in reporting income or loss with respect to the certificates.

The OID Regulations do not apply to "stripped coupons," although they provide general guidance as to how the original issue discount sections of the Code will be applied. In addition, the discussion below is subject to the discussion under "—Possible Application of Contingent Payment Rules" and assumes that the holder of a Grantor Trust Strip Certificate will not own any Grantor Trust Fractional Interest Certificates.

118

Under the stripped coupon rules, it appears that original issue discount will be required to be accrued in each month on the Grantor Trust Strip Certificates based on a constant yield method. In effect, each holder of Grantor Trust Strip Certificates would include as interest income in each month an amount equal to the product of the holder's adjusted basis in the Grantor Trust Strip Certificate at the beginning of that month and the yield of the Grantor Trust Strip Certificate to the holder. The yield would be calculated based on the price paid for that Grantor Trust Strip Certificate by its holder and the payments remaining to be made thereon at the time of the purchase, plus an allocable portion of the servicing fees and expenses to be paid with respect to the mortgage loans. See "Characterization of Investments in Grantor Trust Certificates—If Stripped Bond Rules Apply" above.

As noted above, Section 1272(a)(6) of the Code requires that a prepayment assumption be used in computing the accrual of original issue discount with respect to some categories of debt instruments, and that adjustments be made in the amount and rate of accrual of the discount when prepayments do not conform to the prepayment assumption. To the extent the Grantor Trust Strip Certificates represent an interest in any pool of debt instruments the yield on which may be affected by reason of prepayments, those provisions will apply to the Grantor Trust Strip Certificates. It is unclear whether those provisions would be applicable to the Grantor Trust Strip Certificates that do not represent an interest in any such pool, or whether use of a prepayment assumption may be required or permitted in the absence of these provisions. It is also uncertain, if a prepayment assumption is used, whether the assumed prepayment rate would be determined based on conditions at the time of the first sale of the Grantor Trust Strip Certificate or, with respect to any subsequent holder, at the time of purchase of the Grantor Trust Strip Certificate by that holder.

The accrual of income on the Grantor Trust Strip Certificates will be significantly slower if a prepayment assumption is permitted to be made than if yield is computed assuming no prepayments. It currently is intended to base information returns or reports to the IRS and certificateholders on the Prepayment Assumption disclosed in the related prospectus supplement and on a constant yield computed using a representative initial offering price for each class of certificates. However, none of the company, the master servicer or the trustee will make any representation that the mortgage loans will in fact prepay at a rate conforming to the Prepayment Assumption or at any other rate and certificateholders should bear in mind that the use of a representative initial offering price will mean that the information returns or reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders of each series who bought at that price. Prospective purchasers of the Grantor Trust Strip Certificates should consult their own tax advisors regarding the use of the Prepayment Assumption.

It is unclear under what circumstances, if any, the prepayment of a mortgage loan will give rise to a loss to the holder of a Grantor Trust Strip Certificate. If a Grantor Trust Strip Certificate is treated as a single instrument (rather than an interest in discrete mortgage loans) and the effect of prepayments is taken into account in computing yield with respect to the Grantor Trust Strip Certificate, it appears that no loss may be available as a result of any particular prepayment, except possibly if prepayments occur at a rate faster than the Prepayment Assumption. However, if a Grantor Trust Strip Certificate is treated as an interest in discrete mortgage loans, or if the Prepayment Assumption is not used, then when a mortgage loan is prepaid, the holder of a Grantor Trust Strip Certificate should be able to recognize a loss equal to the portion of the adjusted issue price of the Grantor Trust Strip Certificate that is allocable to the mortgage loan.

*Possible Application of Contingent Payment Rules.* The coupon stripping rules' general treatment of stripped coupons is to regard them as newly issued debt instruments in the hands of each purchaser. To

119

the extent that payments on the Grantor Trust Strip Certificates would cease if the mortgage loans were prepaid in full, the Grantor Trust Strip Certificates could be considered to be debt instruments providing for contingent payments. Under the OID Regulations, debt instruments providing for contingent payments are not subject to the same rules as debt instruments providing for noncontingent payments. Regulations were promulgated, regarding contingent payment debt instruments (the "Contingent Payment Regulations"), but it appears that Grantor Trust Strip Certificates, to the extent subject to Section 1272(a)(6) of the Code, as described above, or due to their similarity to other mortgage-backed securities(such as REMIC regular interests and debt instruments subject to Section 1272(a)(6) of the Code) that are expressly excepted from the application of the Contingent Payment Regulations, are or may be excepted from these regulations. Like the OID Regulations, the Contingent Payment Regulations do not specifically address securities, such as the Grantor Trust Strip Certificates, that are subject to the stripped bond rules of Section 1286 of the Code.

If the contingent payment rules under the Contingent Payment Regulations were to apply, the holder of a Grantor Trust Strip Certificate would be required to apply the "noncontingent bond method." Under the "noncontingent bond method," the issuer of a Grantor Trust Strip Certificate determines a projected payment schedule on which interest will accrue. Holders of Grantor Trust Strip Certificates are bound by the issuer's projected payment schedule. The projected payment schedule consists of all noncontingent payments and a projected amount for each contingent payment based on the projected yield (as described below) of the Grantor Trust Strip Certificate. The projected amount of each payment is determined so that the projected payment schedule reflects the projected yield. The projected amount of each payment must reasonably reflect the relative expected values of the payments to be received by the holder of a Grantor Trust Strip Certificate. The projected yield referred to above is a reasonable rate, not less than the "applicable Federal rate" that, as of the issue date, reflects general market conditions, the credit quality of the issuer, and the terms and conditions of the mortgage loans. The holder of a Grantor Trust Strip Certificate would be required to include as interest income in each month the adjusted issue price of the Grantor Trust Strip Certificate at the beginning of the period multiplied by the projected yield, and would add to, or subtract from, the income any variation between the payment actually received in that month and the payment originally projected to be made in that month.

Assuming that a prepayment assumption were used, if the Contingent Payment Regulations or their principles were applied to Grantor Trust Strip Certificates, the amount of income reported with respect thereto would be substantially similar to that described under "Taxation of Owners of Grantor Trust Strip Certificates". Certificateholders should consult their tax advisors concerning the possible application of the contingent payment rules to the Grantor Trust Strip Certificates.

*Sales of Grantor Trust Certificates*. Any gain or loss equal to the difference between the amount realized on the sale or exchange of a Grantor Trust Certificate and its adjusted basis, recognized on the sale or exchange of a Grantor Trust Certificate by an investor who holds the Grantor Trust Certificate as a capital asset, will be capital gain or loss, except to the extent of accrued and unrecognized market discount, which will be treated as ordinary income, and (in the case of banks and other financial institutions) except as provided under Section 582(c) of the Code. The adjusted basis of a Grantor Trust Certificate generally will equal its cost, increased by any income reported by the seller (including original issue discount and market discount income) and reduced (but not below zero) by any previously reported losses, any amortized premium and by any distributions with respect to the Grantor Trust Certificate.

Gain or loss from the sale of a Grantor Trust Certificate may be partially or wholly ordinary and not capital in some circumstances. Gain attributable to accrued and unrecognized market discount will be treated as ordinary income, as will gain or loss recognized by banks and other financial institutions

120

subject Section 582(c) of the Code. Furthermore, a portion of any gain that might otherwise be capital gain may be treated as ordinary income to the extent that the Grantor Trust Certificate is held as part of a "conversion transaction" within the meaning of Section 1258 of the Code. A conversion transaction generally is one in which the taxpayer has taken two or more positions in the same or similar property that reduce or eliminate market risk, if substantially all of the taxpayer's return is attributable to the time value of the taxpayer's net investment in the transaction. The amount of gain realized in a conversion transaction that is recharacterized as ordinary income generally will not exceed the amount of interest that would have accrued on the taxpayer's net investment at 120% of the appropriate "applicable Federal rate" (which rate is computed and published monthly by the IRS) at the time the taxpayer enters into the conversion transaction, subject to appropriate reduction for prior inclusion of interest and other ordinary income items from the transaction. Finally, a taxpayer may elect to have net capital gain taxed at ordinary income rates rather than capital gains rates in order to include the net capital gain in total net investment income for that taxable year, for purposes of the rule that limits the deduction of interest on indebtedness incurred to purchase or carry property held for investment to a taxpayer's net investment income.

*Grantor Trust Reporting*. The master servicer or the trustee will furnish to each holder of a Grantor Trust Fractional Interest Certificate with each distribution a statement setting forth the amount of the distribution allocable to principal on the underlying mortgage loans and to interest thereon at the related pass-through rate. In addition, the master servicer or the trustee will furnish, within a reasonable time after the end of each calendar year, to each holder of a Grantor Trust Certificate who was a holder at any time during that year, information regarding the amount of servicing compensation received by the master servicer and subservicer (if any) and any other customary factual information as the master servicer or the trustee deems necessary or desirable to enable holders of Grantor Trust Certificates to prepare their tax returns and will furnish comparable information to the IRS as and when required by law to do so. Because the rules for accruing discount and amortizing premium with respect to the Grantor Trust Certificates are uncertain in various respects, there is no assurance the IRS will agree with the trust fund's information reports of these items of income and expense. Moreover, these information reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial certificateholders that bought their certificates at the representative initial offering price used in preparing the reports.

Except as disclosed in the related prospectus supplement, the responsibility for complying with the foregoing reporting rules will be borne by the master servicer or the trustee.

*Backup Withholding*. In general, the rules described in "—REMICS—Backup Withholding with Respect to REMIC Certificates" will also apply to Grantor Trust Certificates.

*Foreign Investors*. In general, the discussion with respect to REMIC Regular certificates in "REMICS—Foreign Investors in REMIC Certificates" applies to Grantor Trust Certificates except that Grantor Trust Certificates will, except as disclosed in the related prospectus supplement, be eligible for exemption from U.S. withholding tax, subject to the conditions described in the discussion.

To the extent that interest on a Grantor Trust Certificate would be exempt under Sections 871(h)(1) and 881(c) of the Code from United States withholding tax, and the Grantor Trust Certificate is not held in connection with a certificateholder's trade or business in the United States, the Grantor Trust Certificate will not be subject to United States estate taxes in the estate of a non-resident alien individual.

## STATE AND OTHER TAX CONSEQUENCES

In addition to the federal income tax consequences described in "Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the securities offered under this prospectus and the prospectus supplement. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their own tax advisors with respect to the various state and other tax consequences of investments in the securities offered under this prospectus and the prospectus supplement.

## ERISA CONSIDERATIONS

Sections 404 and 406 of ERISA impose fiduciary and prohibited transaction restrictions on ERISA Plans and on various other retirement plans and arrangements, including bank collective investment funds and insurance company general and separate accounts in which ERISA Plans are invested. Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on Tax Favored Plans. ERISA and the Code prohibit a broad range of transactions involving assets of Plans and Parties in Interest, unless a statutory or administrative exemption is available with respect to any such transaction.

Some employee benefit plans, including governmental plans (as defined in Section 3(32) of ERISA), and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA) are not subject the ERISA requirements. Accordingly, assets of these plans may be invested in the securities without regard to the ERISA considerations described below, subject to the provisions of other applicable federal, state and local law. Any such plan which is qualified and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in Section 503 of the Code.

ERISA generally imposes on Plan fiduciaries general fiduciary requirements, including those of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. Any person who has discretionary authority or control with respect to the management or disposition of a Plan's assets, or "Plan Assets," and any person who provides investment advice with respect to Plan Assets for a fee is a fiduciary of the investing Plan. If the mortgage loans and other assets included in the trust fund were to constitute Plan Assets, then any party exercising management or discretionary control with respect to those Plan Assets may be deemed to be a Plan "fiduciary," and thus subject to the fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code with respect to any investing Plan. In addition, the acquisition or holding of securities by or on behalf of a Plan or with Plan Assets, as well as the operation of the trust fund, may constitute or involve a prohibited transaction under ERISA and the Code unless a statutory or administrative exemption is available. Further, ERISA and the Code prohibit a broad range of transactions involving Plan Assets and persons, having certain specified relationships to a Plan called Parties in Interest, unless a statutory or administrative exemption is available. Some Parties in Interest that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed under Section 502(i) of ERISA or Section 4975 of the Code, unless a statutory or administrative exemption is available with respect to any transaction of this sort.

Some transactions involving the trust fund might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchases the securities, if the mortgage loans and

other assets included in a trust fund are deemed to be assets of the Plan. The DOL has promulgated the DOL Regulations concerning whether or not a Plan's assets would be deemed to include an interest in the underlying assets of an entity, including a trust fund, for purposes of applying the general fiduciary responsibility provisions of ERISA and the prohibited transaction provisions of ERISA and the Code. Under the DOL Regulations, generally, when a Plan acquires an "equity interest" in another entity (such as the trust fund), the underlying assets of that entity may be considered to be Plan Assets unless an exception applies. Exceptions contained in the DOL Regulations provide that Plan Assets will not include an undivided interest in each asset of an entity in which the Plan makes an equity investment if: (1) the entity is an operating company; (2) the equity investment made by the Plan is either a "publicly-offered security" that is "widely held," both as defined in the DOL Regulations, or a security issued by an investment company registered under the Investment Company Act of 1940, as amended; or (3) Benefit Plan Investors do not own 25% or more in value of any class of equity securities issued by the entity. In addition, the DOL Regulations provide that the term "equity interest" means any interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no "substantial equity features." Under the DOL Regulations, Plan Assets will be deemed to include an interest in the instrument evidencing the equity interest of a Plan (such as a certificate or a note with "substantial equity features"), and, because of the factual nature of some of the rules set forth in the DOL Regulations, Plan Assets may be deemed to include an interest in the underlying assets of the entity in which a Plan acquires an interest (such as the trust fund). Without regard to whether the notes or certificates are characterized as equity interests, the purchase, sale and holding of notes or certificates by or on behalf of a Plan could be considered to give rise to a prohibited transaction if the Issuer, the trustee or any of their respective affiliates is or becomes a Party in Interest with respect to the Plan. Neither Plans nor persons investing Plan Assets should acquire or hold securities solely in reliance upon the availability of any exception under the DOL Regulations.

## Underwriter Exemption

The DOL has issued Exemptions to some underwriters, which generally exempt from the application of the prohibited transaction provisions of Section 406 of ERISA, and the excise taxes imposed on those prohibited transactions pursuant to Section 4975(a) and (b) of the Code, some transactions, among others, relating to the servicing and operation of mortgage pools and the initial purchase, holding and subsequent resale of mortgage pass-through certificates or other "securities" underwritten by an Underwriter, as defined below, provided that the conditions set forth in the Exemption are satisfied. For purposes of this section "ERISA Considerations", the term "Underwriter" includes (1) the underwriter, (2) any person directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the underwriter and (3) any member of the underwriting syndicate or selling group of which a person described in (1) or (2) is a manager or co-manager with respect to a class of securities.

*General Conditions of Exemption*. The Exemption sets forth six general conditions which must be satisfied for the Exemption to apply.

First, the acquisition of securities by a Plan or with Plan Assets must be on terms that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party.

Second, the Exemption applies only to securities evidencing rights and interests that are not subordinated to the rights and interests evidenced by other securities of the same trust, unless none of the mortgage loans has a Loan-to-Value Ratio at the date of issuance of the securities that exceeds 100%.

123

Third, the securities at the time of acquisition by a Plan or with Plan Assets must be rated in one of the four highest generic rating categories by an Exemption Rating Agency. However, the securities must be rated in one of the two highest generic categories by an Exemption Rating Agency if the Loan-to-Value Ratio of any one- to four-family residential mortgage loan or home equity loan held in the trust exceeds 100% but does not exceed 125% at the date of issuance of the securities, and in that case the Exemption will not apply: (1) to any of the securities if any mortgage loan or other asset held in the trust (other than a one- to four-family residential mortgage loan or home equity loan) has a Loan-to-Value Ratio that exceeds 100% at the Closing Date or (2) to any subordinate securities.

Fourth, the trustee cannot be an affiliate of any member of the "Restricted Group" other than the Underwriter. The Restricted Group consists of any Underwriter, the depositor, the master servicer, the special servicer, any servicer and any obligor with respect to assets included in the trust fund constituting more than 5% of the aggregate unamortized principal balance of the assets in the trust fund as of the date of initial issuance of the securities.

Fifth, the sum of all payments made to and retained by the Underwriter or Underwriters must represent not more than reasonable compensation for underwriting the securities; the sum of all payments made to and retained by the depositor pursuant to the assignment of the assets to the related trust fund must represent not more than the fair market value of the obligations; and the sum of all payments made to and retained by the master servicer, the special servicer and any servicer must represent not more than reasonable compensation for the person's services under the related Agreement and reimbursement of the person's reasonable expenses in connection therewith.

Sixth, the investing Plan or Plan Asset investor must be an accredited investor as defined in Rule 501(a)(1) of Regulation D of the Commission under the securities Act.

The Exemption permits an interest rate swap or cap or yield maintenance agreement to be held by the trust if it meets the conditions of the Exemption.

Permitted trust funds include owner-trusts, as well as grantor-trusts, REMICs and FASITs. Owner-trusts are subject to certain restrictions in their governing documents to ensure that their assets may not be reached by creditors of the company in the event of bankruptcy or other insolvency and must provide certain legal opinions.

The Exemption also requires that the trust fund meet the following requirements: (1) the trust fund must consist solely of assets of the type that have been included in other investment pools; (2) securities evidencing interests in the other investment pools must have been rated in one of the four highest generic categories of one of the Exemption Rating Agencies for at least one year prior to the acquisition of securities by or on behalf of a Plan or with Plan Assets; and (3) securities evidencing interests in the other investment pools must have been purchased by investors other than Plans for at least one year prior to any acquisition of securities by or on behalf of a Plan or with Plan Assets.

A fiduciary of a Plan or any person investing Plan Assets to purchase a security must make its own determination that the conditions set forth above will be satisfied with respect to the security.

If the general conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a) and 407(a) of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Sections 4975(c)(1)(A) through (D) of the Code, in connection with the direct or indirect sale, exchange or transfer of securities in the initial

124

issuance of the securities or the direct or indirect acquisition or disposition in the secondary market of securities by a Plan or with Plan Assets or the continued holding of securities acquired by a Plan or with Plan Assets pursuant to either of the foregoing. However, no exemption is provided from the restrictions of Sections 406(a)(1)(E), 406(a)(2) and 407 of ERISA for the acquisition or holding of a security on behalf of an "Excluded Plan" by any person who has discretionary authority or renders investment advice with respect to the assets of an Excluded Plan. For purposes of the securities, an Excluded Plan is a Plan sponsored by any member of the Restricted Group.

If the specific conditions of the Exemption are also satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(b)(1) and (b)(2) of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c)(1)(E) of the Code, in connection with (1) the direct or indirect sale, exchange or transfer of securities in the initial issuance of securities between the company or an Underwriter and a Plan when the person who has discretionary authority or renders investment advice with respect to the investment of Plan Assets in the securities is (a) a mortgagor with respect to 5% or less of the fair market value of the trust fund assets or (b) an affiliate of such a person, (2) the direct or indirect acquisition or disposition in the secondary market of securities by a Plan or with Plan Assets and (3) the continued holding of securities acquired by a Plan or with Plan Assets pursuant to either of the foregoing.

Further, if the specific conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by Sections 406(a), 406(b) and 407 of ERISA, and the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code for transactions in connection with the servicing, management and operation of the trust fund. The company expects that the specific conditions of the Exemption required for this purpose will be satisfied with respect to the securities so that the Exemption would provide an exemption from the restrictions imposed by Sections 406(a) and (b) of ERISA (as well as the excise taxes imposed by Sections 4975(a) and (b) of the Code by reason of Section 4975(c) of the Code) for transactions in connection with the servicing, management and operation of the trust fund, provided that the general conditions of the Exemption are satisfied.

The Exemption also may provide an exemption from the application of the prohibited transaction provisions of Sections 406(a) and 407(a) of ERISA, and the excise taxes imposed by Section 4975(a) and (b) of the Code by reason of Sections 4975(c)(1)(A) through (D) of the Code if the restrictions are deemed to otherwise apply merely because a person is deemed to be a Party in Interest with respect to an investing Plan by virtue of providing services to the Plan (or by virtue of having a specified relationship to such a person) solely as a result of the Plan's ownership of securities.

The Exemption extends exemptive relief to mortgage-backed and asset-backed securities transactions using pre-funding accounts for trusts issuing securities. With respect to the securities, the Exemption will generally allow mortgage loans supporting payments to securityholders, and having a value equal to no more than 25% of the total principal amount of the securities being offered by a trust fund, to be transferred to the trust fund within the Pre-Funding Period instead of requiring that all the mortgage loans be either identified or transferred on or before the Closing Date. In general, the relief applies to the purchase, sale and holding of securities which otherwise qualify for the Exemption, provided that the following general conditions are met:

- as mentioned, the ratio of the amount allocated to the pre-funding account to the total principal amount of the securities being offered must be less than or equal to 25%;

125

- all additional mortgage loans transferred to the related trust fund after the Closing Date must meet the same terms and conditions for eligibility as the original mortgage loans used to create the trust fund, which terms and conditions have been approved by one of the Exemption Rating Agencies;

- the transfer of the additional mortgage loans to the trust fund during the Pre-Funding Period must not result in the securities to be covered by the Exemptions receiving a lower credit rating from an Exemption Rating Agency upon termination of the Pre-Funding Period than the rating that was obtained at the time of the initial issuance of the securities by the trust fund;

- solely as a result of the use of pre-funding, the weighted average annual percentage interest rate for the mortgage loans included in the related trust fund on the Closing Date and all additional mortgage loans transferred to the related trust fund after the Closing Date at the end of the Pre-Funding Period must not be more than 100 basis points lower than the rate for the mortgage loans which were transferred to the trust fund on the Closing Date;

- either:

  (1)    the characteristics of the additional mortgage loans transferred to the related trust fund after the Closing Date must be monitored by an insurer or other credit support provider which is independent of the company; or

  (2)    an independent accountant retained by the company must provide the company with a letter (with copies provided to the Exemption Rating Agency rating the securities, the Underwriter and the trustee) stating whether or not the characteristics of the additional mortgage loans transferred to the related trust fund after the Closing Date conform to the characteristics described in the prospectus or prospectus supplement and/or agreement. In preparing the letter, the independent accountant must use the same type of procedures as were applicable to the mortgage loans which were transferred to the trust fund as of the Closing Date;

- the Pre-Funding Period must end no later than three months or 90 days after the Closing Date or earlier in some circumstances if the pre-funding accounts falls below the minimum level specified in the Agreement or an event of default occurs;

- amounts transferred to any pre-funding accounts and/or capitalized interest account used in connection with the pre-funding may be invested only in investments which are permitted by the Exemption Rating Agencies rating the securities and must:

  (1)    be direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality thereof (provided that the obligations are backed by the full faith and credit of the United States); or

  (2)    have been rated (or the obligor has been rated) in one of the three highest generic rating categories by one of the Exemption Rating Agencies ("ERISA Permitted Investments");

126

- the prospectus or prospectus supplement must describe the duration of the Pre-Funding Period;

- the trustee (or any agent with which the trustee contracts to provide trust services) must be a substantial financial institution or trust company experienced in trust activities and familiar with its duties, responsibilities and liabilities with ERISA. The trustee, as legal owner of the trust fund, must enforce all the rights created in favor of securityholders of the trust fund, including employee benefit plans subject to ERISA.

**Other Exemptions**

Insurance companies contemplating the investment of general account assets in the securities should consult with their legal advisors with respect to the applicability of Section 401(c) of ERISA.

*Prohibited Transaction Class Exemption 83-1*.  The U.S. Department of Labor has issued an administrative exemption, Prohibited Transaction Class Exemption 83-1 ("PTCE 83-1"), which, under certain conditions, exempts from the application of the prohibited transaction rules of ERISA and the excise tax provisions of Section 4975 of the Code transactions involving a Plan in connection with the operation of a "mortgage pool" and the purchase, sale and holding of "mortgage pool pass-through certificates." A "mortgage pool" is defined as an investment pool, consisting solely of interest bearing obligations secured by first or second mortgages or deeds of trust on single-family residential property, property acquired in foreclosure and undistributed cash.  A "mortgage pool pass-through certificate" is defined as a certificate which represents a beneficial undivided interest in a mortgage pool which entitles the holder to pass-through payments of principal and interest from the mortgage loans.

For the exemption to apply, PTCE 83-1 requires that:

- the depositor and the trustee maintain a system of insurance or other protection for the mortgage loans and the property securing such mortgage loans, and for indemnifying holders of certificates against reductions in pass-through payments due to defaults in loan payments or property damage in an amount at least equal to the greater of 1% of the aggregate principal balance of the mortgage loans, or 1% of the principal balance of the largest covered pooled mortgage loan;

- the trustee may not be an affiliate of the depositor;

- and the payments made and retained by the depositor in connection with the trust fund, together with all funds inuring to the depositor's benefit for administering the trust fund, represent no more than "adequate consideration" for selling the mortgage loans, plus reasonable compensation for services provided to the trust fund.

In addition, if it is applicable, PTCE 83-1 exempts the initial sale of certificates to a Plan with respect to which the depositor, the special hazard insurer, the pool insurer, the master servicer, or other servicer, or the trustee are or is a party in interest if the Plan does not pay more than fair market value for such certificate and the rights and interests evidenced by such certificate are not subordinated to the rights and interests evidenced by other certificates of the same pool.  PTCE 83-1 also exempts from the prohibited transaction rules any transactions in connection with the servicing and operation of the mortgage pool, provided that any payments made to the master servicer in connection with the servicing

of the trust fund are made in accordance with a binding agreement, copies of which must be made available to prospective investors.

In the case of any Plan with respect to which the depositor, the master servicer, the special hazard insurer, the pool insurer, or the trustee is a fiduciary, PTCE 83-1 will only apply if, in addition to the other requirements:

- the initial sale, exchange or transfer of certificates is expressly approved by an independent fiduciary who has authority to manage and control those plan assets being invested in certificates;

- the Plan pays no more for the certificates than would be paid in an arm's length transaction;

- no investment management, advisory or underwriting fee, sale commission, or similar compensation is paid to the depositor with regard to the sale, exchange or transfer of certificates to the Plan;

- the total value of the certificates purchased by such Plan does not exceed 25% of the amount issued; and

- at least 50% of the aggregate amount of certificates is acquired by persons independent of the depositor, the trustee, the master servicer, and the special hazard insurer or pool insurer.

Before purchasing certificates, a fiduciary of a Plan should confirm that the trust fund is a "mortgage pool," that the certificates constitute "mortgage pool pass-through certificates," and that the conditions set forth in PTCE 83-1 would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in PTCE 83-1, the Plan fiduciary should consider the availability of any other prohibited transaction exemptions. The Plan fiduciary also should consider its general fiduciary obligations under ERISA in determining whether to purchase any certificates on behalf of a Plan.

**ERISA Considerations Relating to Notes**

Under the DOL Regulations, the assets of the trust fund would be treated as "plan assets" of a Plan for the purposes of ERISA and the Code only if the Plan acquires an "equity interest" in the trust fund and none of the exceptions contained in the DOL Regulations is applicable. An equity interest is defined under the DOL Regulations as an interest other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Assuming that the notes are treated as indebtedness without substantial equity features for purposes of the DOL Regulations, then such notes will be eligible for purchase by Plans. However, without regard to whether the notes are treated as an "equity interest" for such purposes, the acquisition or holding of notes by or on behalf of a Plan could be considered to give rise to a prohibited transaction if the trust fund or any of its affiliates is or becomes a party in interest or disqualified person with respect to such Plan, or in the event that a note is purchased in the secondary market and such purchase constitutes a sale or exchange between a Plan and a party in interest or disqualified person with respect to such Plan. There can be no assurance that the trust fund or any of its affiliates will not be or become a party in interest or a disqualified person with respect to a Plan that acquires notes.

128

The Exemption permits trust funds which are grantor trusts, owner-trusts, REMICs or FASITs to issue notes, as well as certificates, provided a legal opinion is received to the effect that the noteholders have a perfected security interest in the trust fund's assets.  The exemptive relief provided under the Exemption for any prohibited transactions which could be caused as a result of the operation, management or servicing of the trust fund and its assets would not be necessary with respect to notes with no substantial equity features which are issued as obligations of the trust fund.  Nevertheless, because other prohibited transactions might be involved, the Exemption would provide prohibited transaction exemptive relief, provided that the same conditions of the Exemption described above relating to certificates are met with respect to the notes.  The same limitations of such exemptive relief relating to acquisitions of certificates by fiduciaries with respect to Excluded Plans would also be applicable to the notes as described herein.

In the event that the Exemption is not applicable to the notes, one or more other prohibited transactions exemptions may be available to Plans purchasing or transferring the notes depending in part upon the type of Plan fiduciary making the decision to acquire the notes and the circumstances under which such decision is made.  These exemptions include, but are not limited to, Prohibited Transaction Class Exemption 90-1 (regarding investments by insurance company pooled separate accounts), Prohibited Transaction Class Exemption 91-38 (regarding investments by bank collective investments funds), PTCE 84-14 (regarding transactions effected by "qualified professional asset managers"), PTCE 95-60 (regarding investments by insurance company general accounts) and PTCE 96-23 (regarding transactions effected by "in-house asset managers") (collectively, the "Investor-Based Exemptions"). However, even if the conditions specified in these Investor-Based Exemptions are met, the scope of the relief provided under such Exemptions might or might not cover all acts which might be construed as prohibited transactions.

In the event that the Exemption is not applicable to the notes, there can be no assurance that any class of notes will be treated as indebtedness without substantial equity features for purposes of the DOL Regulations. There is increased uncertainty regarding the characterization of debt instruments that do not carry an investment grade rating.  Consequently, in the event of a withdrawal or downgrade to below investment grade of the rating of a class of notes, the subsequent transfer of such notes or any interest therein to a Plan trustee or other person acting on behalf of a Plan, or using Plan assets to effect such transfer, will be restricted. Unless otherwise stated in the related prospectus supplement, by acquiring a note, each purchaser will be deemed to represent that either (1) it is not acquiring the note with plan assets; or (2) to the acquisition and holding of the note by such purchaser will not result in a prohibited transaction under Section 4975 of the Code or Section 406 of ERISA and (B) the notes are rated investment grade or better and such person believes that the notes are properly treated as indebtedness without substantial equity features for purposes of the DOL Regulations, and agrees to so treat the notes. Alternatively, regardless of the rating of the notes, such person may provide the trustee with an opinion of counsel on which the issuer, depositor, trustee, master servicer and any other servicer may rely, which opinion of counsel will not be at the expense of the issuer, the depositor, the trustee, the master servicer or any other servicer, which opines that the purchase, holding and transfer of such note or interest therein is permissible under applicable law, will not constitute or result in a non exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the issuer, the depositor, the trustee, the master servicer or any other servicer to any obligation in addition to those undertaken in the indenture.

EACH PROSPECTUS SUPPLEMENT WILL CONTAIN INFORMATION CONCERNING CONSIDERATIONS RELATING TO ERISA AND THE CODE THAT ARE APPLICABLE TO THE RELATED SECURITIES.  BEFORE PURCHASING SECURITIES IN RELIANCE ON PTCE 83-1, THE EXEMPTION, THE INVESTOR-BASED EXEMPTIONS OR ANY OTHER EXEMPTION, A

FIDUCIARY OF A PLAN SHOULD ITSELF CONFIRM THAT REQUIREMENTS SET FORTH IN SUCH EXEMPTION WOULD BE SATISFIED.

ANY PLAN INVESTOR WHO PROPOSES TO USE "PLAN ASSETS" OF ANY PLAN TO PURCHASE SECURITIES OF ANY SERIES OR CLASS SHOULD CONSULT WITH ITS COUNSEL WITH RESPECT TO THE POTENTIAL CONSEQUENCES UNDER ERISA AND SECTION 4975 OF THE CODE OF THE ACQUISITION AND OWNERSHIP OF SUCH SECURITIES.

**Tax Exempt Investors**

A Plan that is exempt from federal income taxation pursuant to Section 501 of the Code nonetheless will be subject to federal income taxation to the extent that its income is "unrelated business taxable income" within the meaning of Section 512 of the Code. All "excess inclusion" of a REMIC allocated to a REMIC Residual Certificate and held by such an investor will be considered "unrelated business taxable income" and thus will be subject to federal income tax. See "Federal Income Tax Consequences—Taxation of Owners of REMIC Residual Certificates—Excess Inclusions."

**Consultation with Counsel**

There can be no assurance that the Exemptions or any other DOL exemption will apply with respect to any particular Plan that acquires the securities or, even if all the conditions specified therein were satisfied, that any such exemption would apply to transactions involving the trust fund. Prospective Plan investors should consult with their legal counsel concerning the impact of ERISA and the Code and the potential consequences to their specific circumstances prior to making an investment in the securities. Neither the company, the trustees, the master servicer nor any of their respective affiliates will make any representation to the effect that the securities satisfy all legal requirements with respect to the investment therein by Plans generally or any particular Plan or to the effect that the securities are an appropriate investment for Plans generally or any particular Plan.

**Before purchasing an offered security in reliance on the Exemption, a PTCE or an investor-based exemption, a fiduciary of a plan or other plan asset investor should itself confirm that (a) all the specific and general conditions set forth in the Exemption, PTCE 83-1 one of the class exemptions or section 401(c) of ERISA would be satisfied and (b) in the case of a security purchased under the Exemption, the security constitutes a "security" for purposes of the exemption. In addition to making its own determination as to the availability of the exemptive relief provided in the exemption, one of the class exemptions or section 401(c) of ERISA, the plan fiduciary should consider its general fiduciary obligations under ERISA in determining whether to purchase the securities on behalf of a plan.**

A governmental plan as defined in Section 3(32) of ERISA is not subject to ERISA, or Code Section 4975. However, such governmental plan may be subject to federal, state and local law, which is, to a material extent, similar to the provisions of ERISA or a Code Section 4975. A fiduciary of a governmental plan should make its own determination as to the propriety of such investment under applicable fiduciary or other investment standards, and the need for the availability of any exemptive relief under any similar law.

## LEGAL INVESTMENT MATTERS

Each class of certificates offered by this prospectus and by the related prospectus supplement will be rated at the date of issuance in one of the four highest rating categories by at least one Rating Agency. If so specified in the related prospectus supplement, each such class that is rated in one of the two highest rating categories by at least one Rating Agency will constitute "mortgage related securities" for purposes of SMMEA, and, as such, will be legal investments for persons, trusts, corporations, partnerships, associations, business trusts and business entities (including depository institutions, life insurance companies and pension funds) created pursuant to or existing under the laws of the United States or of any State whose authorized investments are subject to state regulation to the same extent that, under applicable law, obligations issued by or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof constitute legal investments for the entities. Under SMMEA, if a State enacted legislation on or prior to October 3, 1991 specifically limiting the legal investment authority of any such entities with respect to "mortgage related securities," such securities will constitute legal investments for entities subject to the legislation only to the extent provided therein. Some States have enacted legislation which overrides the preemption provisions of SMMEA. SMMEA provides, however, that in no event will the enactment of any such legislation affect the validity of any contractual commitment to purchase, hold or invest in "mortgage related securities," or require the sale or other disposition of the securities, so long as the contractual commitment was made or the securities acquired prior to the enactment of the legislation.

SMMEA also amended the legal investment authority of federally-chartered depository institutions as follows: federal savings and loan associations and federal savings banks may invest in, sell or otherwise deal with "mortgage related securities" without limitation as to the percentage of their assets represented thereby, federal credit unions may invest in the securities, and national banks may purchase the securities for their own account without regard to the limitations generally applicable to investment securities set forth in 12 U.S.C. 24 (Seventh), subject in each case to such regulations as the applicable federal regulatory authority may prescribe.

The Federal Financial Institutions Examination Council has issued a supervisory policy statement applicable to all depository institutions, setting forth guidelines for and significant restrictions on investments in "high-risk mortgage securities." The policy statement has been adopted by the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC and the OTS with an effective date of February 10, 1992. The policy statement generally indicates that a mortgage derivative product will be deemed to be high risk if it exhibits greater price volatility than a standard fixed rate thirty-year mortgage security. According to the policy statement, prior to purchase, a depository institution will be required to determine whether a mortgage derivative product that it is considering acquiring is high-risk, and if so that the proposed acquisition would reduce the institution's overall interest rate risk. Reliance on analysis and documentation obtained from a securities dealer or other outside party without internal analysis by the institution would be unacceptable. There can be no assurance as to which classes of offered securities will be treated as high-risk under the policy statement.

The predecessor to the OTS issued a bulletin, entitled, "Mortgage Derivative Products and Mortgage Swaps", which is applicable to thrift institutions regulated by the OTS. The bulletin established guidelines for the investment by savings institutions in certain "high-risk" mortgage derivative securities and limitations on the use of the securities by insolvent, undercapitalized or otherwise "troubled" institutions. According to the bulletin, such "high-risk" mortgage derivative securities include securities having specified characteristics, which may include some classes of offered securities. In addition, the National Credit Union Administration has issued regulations governing federal credit union investments

131

which prohibit investment in specified types of securities, which may include some classes of offered securities. Similar policy statements have been issued by regulators having jurisdiction over other types of depository institutions.

Any class of securities that is not rated in one of the two highest rating categories by at least one Rating Agency, and any other class of securities specified in the related prospectus supplement, will not constitute "mortgage related securities" for purposes of SMMEA. Prospective investors in these classes of securities, in particular, should consider the matters discussed in the following paragraph.

There may be other restrictions on the ability of investors either to purchase some classes of offered securities or to purchase any class of offered securities representing more than a specified percentage of the investors' assets. The company will make no representations as to the proper characterization of any class of offered securities for legal investment or other purposes, or as to the ability of particular investors to purchase any class of certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of certificates. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own legal advisors in determining whether and to what extent the offered securities of any class thereof constitute legal investments or are subject to investment, capital or other restrictions, and, if applicable, whether SMMEA has been overridden in any jurisdiction relevant to the investor.

## USE OF PROCEEDS

Substantially all of the net proceeds to be received from the sale of certificates will be applied by the company to finance the purchase of, or to repay short-term loans incurred to finance the purchase of, the mortgage loans and/or mortgage securities in the respective mortgage pools and to pay other expenses. The company expects that it will make additional sales of securities similar to the offered securities from time to time, but the timing and amount of any such additional offerings will be dependent upon a number of factors, including, but not limited to, the volume of mortgage loans purchased by the company, prevailing interest rates, availability of funds and general market conditions.

## METHODS OF DISTRIBUTION

The certificates offered by this prospectus and by the related prospectus supplements will be offered in series through one or more of the methods described below. The prospectus supplement prepared for each series will describe the method of offering being utilized for that series and will state the net proceeds to the company from the sale.

The company intends that offered securities will be offered through the following methods from time to time and that offerings may be made concurrently through more than one of these methods or that an offering of the offered securities of a particular series may be made through a combination of two or more of these methods. The methods are as follows:

- By negotiated firm commitment or best efforts underwriting and public re-offering by underwriters;

- By placements by the company with institutional investors through dealers; and

- By direct placements by the company with institutional investors.

If underwriters are used in a sale of any offered securities (other than in connection with an underwriting on a best efforts basis), the securities will be acquired by the underwriters for their own account and may be resold from time to time in one or more transactions, including negotiated transactions, at fixed public offering prices or at varying prices to be determined at the time of sale or at the time of commitment therefor. The underwriters may be broker-dealers affiliated with the company whose identities and relationships to the company will be as set forth in the related prospectus supplement. The managing underwriter or underwriters with respect to the offer and sale of the offered securities of a particular series will be set forth on the cover of the prospectus supplement relating to the series and the members of the underwriting syndicate, if any, will be named in the prospectus supplement.

In connection with the sale of the offered securities, underwriters may receive compensation from the company or from purchasers of the certificates in the form of discounts, concessions or commissions. Underwriters and dealers participating in the distribution of the offered securities may be deemed to be underwriters in connection with the certificates, and any discounts or commissions received by them from the company and any profit on the resale of offered securities by them may be deemed to be underwriting discounts and commissions under the Securities Act.

It is anticipated that the underwriting agreement pertaining to the sale of offered securities of any series will provide that the obligations of the underwriters will be subject to conditions precedent, that the underwriters will be obligated to purchase all such securities if any are purchased (other than in connection with an underwriting on a best efforts basis) and that, in limited circumstances, the company will indemnify the several underwriters and the underwriters will indemnify the company against specified civil liabilities, including liabilities under the Securities Act or will contribute to payments required to be made in respect thereof.

The prospectus supplement with respect to any series offered by placements through dealers will contain information regarding the nature of the offering and any agreements to be entered into between the company and purchasers of offered securities of the series.

The company anticipates that the securities offered by this prospectus and the prospectus supplement will be sold primarily to institutional investors or sophisticated non-institutional investors. Purchasers of offered securities, including dealers, may, depending on the facts and circumstances of the purchases, be deemed to be "underwriters" within the meaning of the Securities Act in connection with reoffers and sales by them of the certificates. Holders of offered securities should consult with their legal advisors in this regard prior to any such reoffer or sale.

## LEGAL MATTERS

Legal matters, including federal income tax matters, in connection with the securities of each series will be passed upon for the company by Thacher Proffitt & Wood LLP, New York, New York.

## FINANCIAL INFORMATION

With respect to each series, a new trust fund will be formed, and no trust fund will engage in any business activities or have any assets or obligations prior to the issuance of the related series. Accordingly, no financial statements with respect to any trust fund will be included in this prospectus or in the related prospectus supplement.

# RATING

It is a condition to the issuance of any class of offered securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by at least one Rating Agency.

Ratings on mortgage pass-through certificates and mortgage-backed notes address the likelihood of receipt by the holders thereof of all collections on the underlying mortgage assets to which the holders are entitled. These ratings address the structural, legal and issuer-related aspects associated with the certificates and notes, the nature of the underlying mortgage assets and the credit quality of the guarantor, if any. Ratings on mortgage pass-through certificates and mortgage-backed notes do not represent any assessment of the likelihood of principal prepayments by borrowers or of the degree by which the prepayments might differ from those originally anticipated. As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of stripped interest securities in extreme cases might fail to recoup their initial investments.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

# AVAILABLE INFORMATION

The company is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the Commission. Reports and other information filed by the company can be inspected and copied at the public reference facilities maintained by the Commission at 450 Fifth Street, N.W., Washington, D.C. 20549, and its Regional Offices located as follows: Chicago Regional Office, 500 West Madison, 14th Floor, Chicago, Illinois 60661; and New York Regional Office, 233 Broadway, New York, New York 10279. Copies of the material can also be obtained from the Public Reference Section of the Commission, 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates, and electronically through the Commission's Electronic Data Gathering, Analysis and Retrieval system at the Commission's Website (http://www.sec.gov), free of charge. The company does not intend to send any financial reports to securityholders.

This prospectus does not contain all of the information set forth in the registration statement (of which this prospectus forms a part) and exhibits thereto which the company has filed with the Commission under the Securities Act and to which reference is hereby made.

# REPORTS TO SECURITYHOLDERS

The master servicer or another designated person will be required to provide periodic unaudited reports concerning each trust fund to all registered holders of offered securities of the related series with respect to each trust fund as are required under the Exchange Act and the Commission's related rules and regulations. See "Description of the Securities—Reports to Securityholders."

# INCORPORATION OF INFORMATION BY REFERENCE

There are incorporated in this prospectus and in the related prospectus supplement by reference all documents and reports filed or caused to be filed by the company with respect to a trust fund pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, prior to the termination of the offering of the offered securities of the related series. The company will provide or cause to be provided without charge

to each person to whom this prospectus is delivered in connection with the offering of one or more classes of offered securities, upon written or oral request of the person, a copy of any or all the reports incorporated in this prospectus by reference, in each case to the extent the reports relate to one or more of such classes of the offered securities, other than the exhibits to the documents, unless the exhibits are specifically incorporated by reference in the documents. Requests should be directed in writing to American Home Mortgage Securities LLC, 538 Broadhollow Road, Melville, New York, 11747, Attention: Investor Relations, or by telephone at (516) 396-7700. The company has determined that its financial statements will not be material to the offering of any offered securities.

135

## GLOSSARY

**Accrual Security** — A security with respect to which some or all of its accrued interest will not be distributed as interest but rather an amount equal to that interest will be added to the principal balance thereof on each distribution date for the period described in the related prospectus supplement.

**Affiliated Seller** — American Home Mortgage Investment Corp., a Maryland corporation and the parent of the company, or any of its affiliates.

**Agreement** — An owner trust agreement, servicing agreement, indenture or pooling and servicing agreement.

**ARM Loan** — A mortgage loan with an adjustable interest rate.

**Bankruptcy Amount** – The amount of Bankruptcy Losses that may be allocated to the credit enhancement of the related series.

**Bankruptcy Code** — Title 11 of the United States Code, as amended from time to time.

**Bankruptcy Loss** — A Realized Loss attributable to certain actions which may be taken by a bankruptcy court in connection with a mortgage loan, including a reduction by a bankruptcy court of the principal balance of or the mortgage rate on a mortgage loan or an extension of its maturity.

**Beneficial Owner** — A person acquiring an interest in any DTC Registered Security.

**Benefit Plan Investors** — Plans, as well as any "employee benefit plan" (as defined in Section 3(3) or ERISA) which is not subject to Title I of ERISA, such as governmental plans (as defined in Section 3(32) of ERISA) and church plans(as defined in Section 3(33) of ERISA) which have not made an election under Section 410(d) of the Code, and any entity whose underlying assets include Plan Assets by reason of a Plan's investment in the entity.

**Buydown Account** — With respect to a buydown mortgage loan, the custodial account where the Buydown Funds are placed.

**Buydown Funds** — With respect a buydown mortgage loan, the amount contributed by the seller of the mortgaged property or another source and placed in the Buydown Account.

**Buydown Period —** The period during which funds on a buydown mortgage loan are made up for from the Buydown Account.

**CERCLA** — The federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

**Clearstream** – Clearstream Banking, société anonyme, formerly known as Cedelbank SA.

**Closing Date** — With respect to any series of securities, the date on which the securities are issued.

**Code** — The Internal Revenue Code of 1986.

136

**Commission** — The Securities and Exchange Commission.

**Committee Report** — The Conference Committee Report accompanying the Tax Reform Act of 1986.

**Conservation Act** — The Asset Conservation, Lender Liability and Deposit Insurance Act of 1996.

**Contract** — Manufactured housing conditional sales contracts and installment loan agreements each secured by a Manufactured Home.

**Contributions Tax** — With respect to specific contributions to a REMIC made after the Closing Date, a tax on the REMIC equal to 100% of the value of the contributed property.

**Cooperative** — With respect to a cooperative mortgage loan, the corporation that owns the related apartment building.

**Crime Control Act** — The Comprehensive Crime Control Act of 1984.

**Defaulted Mortgage Loss** — A Realized Loss other than a Special Hazard Loss, Extraordinary Loss or other losses resulting from damage to a mortgaged property, Bankruptcy Loss or Fraud Loss.

**Deferred Interest —** If an adjustment to the mortgage rate on a mortgage loan has caused the amount of accrued interest on the mortgage loan in any month to exceed the scheduled monthly payment on the mortgage loan, the resulting amount of interest that has accrued but is not then payable;

**Deleted Mortgage Loan —** A mortgage loan which has been removed from the related trust fund.

**Designated Seller Transaction** — A series of securities where the related mortgage loans are provided either directly or indirectly to the company by one or more Sellers identified in the related prospectus supplement.

**Determination Date —** The close of business on the date on which the amount of each distribution to securityholders will be determined, which shall be stated in each prospectus supplement.

**DIDMC** — The Depository Institutions Deregulation and Monetary Control Act of 1980.

**Distribution Account** — One or more separate accounts for the collection of payments on the related mortgage loans and/or mortgage securities constituting the related trust fund, which may be a Master Servicer Collection Account.

**DOL** — The U.S. Department of Labor.

**DOL Regulations** — Regulations by the DOL promulgated at 29 C.F.R.ss.2510.3-101.

**DTC** – The Depository Trust Company.

**DTC Registered Security** — Any security initially issued through the book-entry facilities of the DTC.

**Eligible Account —** An account maintained with a federal or state chartered depository institution (i) the short-term obligations of which are rated by each of the Rating Agencies in its highest rating at the time of any deposit therein, or (ii) insured by the FDIC (to the limits established by the FDIC), the uninsured deposits in which account are otherwise secured such that, as evidenced by an opinion of counsel (obtained by and at the expense of the person requesting that the account be held pursuant to this clause (ii)) delivered to the trustee prior to the establishment of the account, the securityholders will have a claim with respect to the funds in the account and a perfected first priority security interest against any collateral (which shall be limited to Permitted Instruments) securing the funds that is superior to claims of any other depositors or general creditors of the depository institution with which the account is maintained or (iii) a trust account or accounts maintained with a federal or state chartered depository institution or trust company with trust powers acting in its fiduciary capacity or (iv) an account or accounts of a depository institution acceptable to the Rating Agencies (as evidenced in writing by the Rating Agencies that use of any such account as the Distribution Account will not have an adverse effect on the then-current ratings assigned to the classes of the securities then rated by the Rating Agencies). Eligible Accounts may or may not bear interest.

**Equity Certificates —** With respect to any series of notes, the certificate or certificates representing a beneficial ownership interest in the related issuer.

**ERISA** — The Employee Retirement Income Security Act of 1974, as amended.

**ERISA Plans** — Employee pension and welfare benefit plans subject to ERISA.

**Exemption** — An individual prohibited transactions exemption issued by the DOL to an underwriter, as amended by PTE 97-34, 62 Fed. Reg. 39021 (July 21,1997), and PTE 2000-58, 65 Fed. Reg. 67765 (November 13, 2000).

**Exemption Rating Agency —** Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., or Fitch, Inc.

**Exchange Act —** The Securities Exchange Act of 1934, as amended.

**Extraordinary Loss —** Any Realized Loss occasioned by war, civil insurrection, certain governmental actions, nuclear reaction and certain other risks.

**Fraud Loss —** A Realized Loss incurred on a defaulted mortgage loan as to which there was fraud in the origination of the mortgage loan.

**Fraud Loss Amount** – The amount of Fraud Losses that may be allocated to the credit enhancement of the related series.

**FTC Rule —** The so-called "Holder-in-Due-Course" Rule of the Federal Trade Commission.

**Garn-St Germain Act** — The Garn-St Germain Depository Institutions Act of 1982.

**Global Securities —** The certificated securities registered in the name of DTC, its nominee or another depository representing interests in the class or classes specified in the related prospectus supplement which are held in book-entry form.

**Grantor Trust Certificate** — A certificate representing an interest in a Grantor Trust Fund.

**Grantor Trust Fractional Interest Certificate** — A Grantor Trust Certificate representing an undivided equitable ownership interest in the principal of the mortgage loans constituting the related Grantor Trust Fund, together with interest on the Grantor Trust Certificates at a pass-through rate.

**Grantor Trust Strip Certificate** — A certificate representing ownership of all or a portion of the difference between interest paid on the mortgage loans constituting the related Grantor Trust Fund (net of normal administration fees and any retained interest of the company) and interest paid to the holders of Grantor Trust Fractional Interest Certificates issued with respect to the Grantor Trust Fund. A Grantor Trust Strip Certificate may also evidence a nominal ownership interest in the principal of the mortgage loans constituting the related Grantor Trust Fund.

**Grantor Trust Fund** — A trust fund as to which no REMIC election will be made and which qualifies as a "grantor trust" within the meaning of Subpart E, part I of subchapter J of the Code.

**High Cost Loans** — Mortgage loans subject to the Homeownership Act, which amended TILA to provide new requirements applicable to loans that exceed certain interest rate and/or points and fees thresholds.

**High LTV Loans** — Mortgage loans with Loan-to-Value Ratios in excess of 80% and as high as 150% and which are not be insured by a Primary Insurance Policy.

**Homeownership Act** — The Home Ownership and Equity Protection Act of 1994.

**Housing Act** — The National Housing Act of 1934, as amended.

**Index** — With respect to an ARM Loan, the related index, which will be specified in the related prospectus supplement and may include one of the following indexes: (1) the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of either six months or one year, (2) the weekly auction average investment yield of U.S. Treasury bills of six months, (3) the daily Bank Prime Loan rate made available by the Federal Reserve Board, (4) the cost of funds of member institutions for the Federal Home Loan Bank of San Francisco, (5) the interbank offered rates for U.S. dollar deposits in the London market, each calculated as of a date prior to each scheduled interest rate adjustment date which will be specified in the related prospectus supplement or (6) any other index described in the related prospectus supplement.

**Insurance Proceeds** — Proceeds received under any hazard, title, primary mortgage, FHA or other insurance policy that provides coverage with respect to a particular mortgaged property or the related mortgage loan (other than proceeds applied to the restoration of the property or released to the related borrower in accordance with the customary servicing practices of the master servicer (or, if applicable, a special servicer) and/or the terms and conditions of the related mortgage.

**Intermediary** — An institution that is not a participant in the DTC but clears through or maintains a custodial relationship with a participant.

**IRS** — The Internal Revenue Service.

139

**Issue Premium** — The excess of the issue price of a REMIC Regular Certificate over its stated redemption price.

**Issuer** — With respect to a series of notes, the Delaware statutory trust or other trust, created pursuant to the owner trust agreement, that issues the notes.

**Liquidation Proceeds** — (1) All amounts, other than Insurance Proceeds received and retained in connection with the liquidation of defaulted mortgage loans or property acquired in respect thereof, by foreclosure or otherwise, together with the net operating income (less reasonable reserves for future expenses) derived from the operation of any mortgaged properties acquired by the trust fund through foreclosure or otherwise and (2) all proceeds of any mortgage loan or mortgage security purchased (or, in the case of a substitution, amounts representing a principal adjustment) by the master servicer, the company, a Seller or any other person pursuant to the terms of the related pooling and servicing agreement or servicing agreement as described under "The Mortgage Pools—Representations by Sellers," "Servicing of Mortgage Loans—Realization Upon and Sale of Defaulted Mortgage Loans," "—Assignment of Trust Fund Assets" above and "The Agreements—Termination."

**Loan-to-Value Ratio** — With respect to any mortgage loan at any given time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan plus the principal balance of any senior mortgage loan to the Value of the related mortgaged property.

**Manufactured Home** — Manufactured homes within the meaning of 42 United States Code, Section 5402(6), which defines a "manufactured home" as "a structure, transportable in one or more sections, which in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning, and electrical systems contained therein; except that the term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary of Housing and Urban Development and complies with the standards established under this chapter."

**Master Servicer Collection Account** — One or more separate accounts established by a master servicer, into which each of the related servicers are required to remit collections of payments on the related mortgage loans included in the related trust fund.

**Net Mortgage Rate** — With respect to a mortgage loan, the mortgage rate net of the per annum rate or rates applicable to the calculation of servicing and administrative fees and any retained interest of the company.

**Nonrecoverable Advance** — An advance which, in the good faith judgment of the master servicer, will not be recoverable from recoveries on the related mortgage loan or another specifically identified source.

**Note Margin** — With respect to an ARM Loan, the fixed percentage set forth in the related mortgage note, which when added to the related Index, provides the mortgage rate for the ARM Loan.

**OID Regulations** — The rules governing original issue discount that are set forth in Sections 1271-1273 and 1275 of the Code and in the related Treasury regulations.

140

**OTS** — The Office of Thrift Supervision.

**Parties in Interest —** With respect to a Plan, persons who have specified relationships to the Plans, either "Parties in Interest" within the meaning of ERISA or "Disqualified Persons" within the meaning of the Code.

**Percentage Interest —** With respect to a security of a particular class, the percentage obtained by dividing the initial principal balance or notional amount of the security by the aggregate initial amount or notional balance of all the securities of the class.

**Permitted Investments —** United States government securities and other investment grade obligations specified in the related pooling and servicing agreement or the related servicing agreement and indenture.

**Plan Assets —** "Plan assets" of a Plan, within the meaning of the DOL Regulations.

**Plans —** ERISA Plans and Tax Favored Plans.

**Prepayment Assumption —** With respect to a REMIC Regular Certificate or a Grantor Trust Certificate, the prepayment assumption used in pricing the initial offering of that security.

**Prepayment Interest Shortfall** — With respect to any mortgage loan with a prepayment in part or in full the excess, if any, of interest accrued and otherwise payable on the related mortgage loan over the interest charged to the borrower (net of servicing and administrative fees and any retained interest of the company).

**Primary Insurance Covered Loss —** With respect to a mortgage loan covered by a Primary Insurance Policy, the amount of the related loss covered pursuant to the terms of the Primary Insurance Policy, which will generally consist of the unpaid principal amount of the mortgage loan and accrued and unpaid interest on the mortgage loan and reimbursement of specific expenses, less (1) rents or other payments collected or received by the insured (other than the proceeds of hazard insurance) that are derived from the related mortgaged property, (2) hazard insurance proceeds in excess of the amount required to restore the related mortgaged property and which have not been applied to the payment of the mortgage loan, (3) amounts expended but not approved by the primary insurer, (4) claim payments previously made on the mortgage loan and (5) unpaid premiums and other specific amounts.

**Primary Insurance Policy** — A primary mortgage guaranty insurance policy.

**Primary Insurer** — An issuer of a Primary Insurance Policy.

**Protected Account** — One or more separate accounts established by each servicer servicing the mortgage loans, for the collection of payments on the related mortgage loans included in the related trust fund.

**PTCE** — Prohibited Transaction Class Exemption.

**Qualified Substitute Mortgage Loan** — A mortgage loan substituted for a Deleted Mortgage Loan, meeting the requirements described under "The Mortgage Pools— Representations by Sellers" in this prospectus.

**Rating Agency —** A "nationally recognized statistical rating organization" within the meaning of Section 3(a)(41) of the Exchange Act.

**Realized Loss —** Any loss on a mortgage loan attributable to the mortgagor's failure to make any payment of principal or interest as required under the mortgage note.

**Record Date —** The close of business on the last business day of the month preceding the month in which the applicable distribution date occurs.

**Relief Act** — The Servicemembers Relief Act, as amended.

**REMIC** — A real estate mortgage investment conduit as defined in Sections 860A through 860G of the Code.

**REMIC Administrator** — The trustee, the master servicer or another specified party who administers the related REMIC.

**REMIC Certificates** — Certificates evidencing interests in a trust fund as to which a REMIC election has been made.

**REMIC Provisions —** Sections 860A through 860G of the Code.

**REMIC Regular Certificate** — A REMIC Certificate designated as a "regular interest" in the related REMIC.

**REMIC Regular Certificateholder** — A holder of a REMIC Regular Certificate.

**REMIC Residual Certificate** — A REMIC Certificate designated as a "residual interest" in the related REMIC.

**REMIC Residual Certificateholder** — A holder of a REMIC Residual Certificate.

**REMIC Regulations** — The REMIC Provisions and the related Treasury regulations.

**REO Mortgage Loan** — A mortgage loan where title to the related mortgaged property has been obtained by the trustee or to its nominee on behalf of securityholders of the related series.

**RICO** — The Racketeer Influenced and Corrupt Organizations statute.

**Securities Act** — The Securities Act of 1933, as amended.

**Seller** — The seller of the mortgage loans or mortgage securities included in a trust fund to the company with respect a series of securities, who shall be an Affiliated Seller or an Unaffiliated Seller.

**Single Family Property —** An attached or detached one-family dwelling unit, two-to four-family dwelling unit, condominium, townhouse, row house, individual unit in a planned-unit development and other individual dwelling units.

**SMMEA** — The Secondary Mortgage Market Enhancement Act of 1984.

**Special Hazard Amount** – The amount of Special Hazard Losses that may be allocated to the credit enhancement of the related series.

**Special Hazard Loss —** (1) losses due to direct physical damage to a mortgaged property other than any loss of a type covered by a hazard insurance policy or a flood insurance policy, if applicable, and (2) losses from partial damage caused by reason of the application of the co-insurance clauses contained in hazard insurance policies.

**Strip Security —** A security which will be entitled to (1) principal distributions, with disproportionate, nominal or no interest distributions or (2) interest distributions, with disproportionate, nominal or no principal distributions.

**Tax Favored Plans —** Tax-qualified retirement plans described in Section 401(a) of the Code and on individual retirement accounts described in Section 408 of the Code.

**TILA —** The Federal Truth-in-Lending Act.

**Title V** — Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980, enacted in March 1980.

**Title VIII** — Title VIII of the Garn-St Germain Act.

**Unaffiliated Sellers —** Banks, savings and loan associations, mortgage bankers, mortgage brokers, investment banking firms, the Resolution Trust Corporation, the FDIC and other mortgage loan originators or sellers not affiliated with the company.

**United States Person —** A citizen or resident of the United States, a corporation or partnership (including an entity treated as a corporation or partnership for federal income tax purposes) created or organized in, or under the laws of, the United States or any state thereof or the District of Columbia (except, in the case of a partnership, to the extent provided in regulations),or an estate whose income is subject to United States federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. To the extent prescribed in regulations by the Secretary of the Treasury, which have not yet been issued, a trust which was in existence on August 20, 1996 (other than a trust treated as owned by the grantor under subpart E of part I of subchapter J of chapter 1 of the Code), and which was treated as a United States person on August 20, 1996 may elect to continue to be treated as a United States person notwithstanding the previous sentence.

**Value** — With respect to a mortgaged property securing a single family, multifamily, commercial or mixed-use loan, the lesser of (x) the appraised value determined in an appraisal obtained at origination of the mortgage loan, if any, or, if the related mortgaged property has been appraised subsequent to origination, the value determined in the subsequent appraisal and (y) the sales price for the related mortgaged property (except in circumstances in which there has been a subsequent appraisal). However, in the case of refinanced, modified or converted single family, multifamily, commercial or mixed-use loans, the "Value" of the related mortgaged property will be equal to the lesser of (x) the appraised value of the related mortgaged property determined at origination or in an appraisal, if any, obtained at the time of refinancing, modification or conversion and (y) the sales price of the related mortgaged property or, if the mortgage loan is not a rate and term refinance mortgage loan and if the mortgaged property was owned for a relatively short period of time prior to refinancing, modification or conversion, the sum of the

143

sales price of the related mortgaged property plus the added value of any improvements. With respect to a new Manufactured Home, the "Value" is no greater than the sum of a fixed percentage of the list price of the unit actually billed by the manufacturer to the dealer (exclusive of freight to the dealer site), including "accessories" identified in the invoice, plus the actual cost of any accessories purchased from the dealer, a delivery and set-up allowance, depending on the size of the unit, and the cost of state and local taxes, filing fees and up to three years prepaid hazard insurance premiums.   With respect to a used Manufactured Home, a "Value" is the least of the sale price, the appraised value, and the National Automobile Dealer's Association book value plus prepaid taxes and hazard insurance premiums. The appraised value of a Manufactured Home is based upon the age and condition of the manufactured housing unit and the quality and condition of the mobile home park in which it is situated, if applicable. An appraisal for purposes of determining the Value of a mortgaged property may include an automated valuation.

$5,647,207,000
(Approximate)

# American Home Mortgage Securities LLC
Depositor

# American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2

---

PROSPECTUS SUPPLEMENT

---

# LEHMAN BROTHERS INC.

## BEAR, STEARNS & CO. INC.

## UBS INVESTMENT BANK

## RBS GREENWICH CAPITAL

## GOLDMAN, SACHS & CO.

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the notes in any state where the offer is not permitted. Dealers will be required to deliver a prospectus supplement and prospectus when acting as underwriters of the notes offered by this prospectus supplement and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the notes, whether or not participating in this offering, may be required to deliver a prospectus supplement and prospectus for 90 days after the date of this prospectus supplement.

# EXHIBIT 3

**INFORMATIONAL NOTICE AND REQUEST FOR CLASS I-A-2 AND I-A-3 NOTEHOLDER CONSIDERATION OF PROPOSED SECOND SUPPLEMENTAL INDENTURE**

Date:  May 10, 2013

To:  Beneficial Owners of the American Home Mortgage Investment Trust 2005-2, Class I-A-1, I-A-2 and I-A-3 Mortgage-Backed Notes (the "<u>**Noteholders**</u>")

| Class | CUSIP[1] |
|-------|----------|
| I-A-1 | 02660TEK5 |
| I-A-2 | 02660TEL3 |
| I-A-3 | 02660TEM1 |

**THIS INFORMATIONAL NOTICE AND REQUEST FOR CLASS I-A-2 AND I-A-3 NOTEHOLDER CONSIDERATION OF PROPOSED SECOND SUPPLEMENTAL INDENTURE ("<u>NOTICE</u>") CONTAINS IMPORTANT INFORMATION THAT IS OF INTEREST TO THE BENEFICIAL OWNERS OF THE ABOVE-LISTED NOTES. IF APPLICABLE, ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE REQUESTED TO EXPEDITE RETRANSMITTAL OF THIS NOTICE TO SUCH BENEFICIAL OWNERS IMMEDIATELY. YOUR FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH THIS PARAGRAPH MAY IMPAIR THE CHANCE OF THE BENEFICIAL OWNERS ON WHOSE BEHALF YOU ACT TO CONSIDER THE MATTERS DESCRIBED IN THIS NOTICE IN A TIMELY FASHION.**

<u>**Background**</u>

Reference is made to that certain Indenture dated June 22, 2005 (as amended, the "<u>Indenture</u>"), by and among American Home Mortgage Investment Trust 2005-2, as issuer (the "<u>Issuer</u>"), Deutsche Bank National Trust Company, as indenture trustee (the "<u>Indenture Trustee</u>"), and Wells Fargo Bank, N.A., as securities administrator ("<u>Securities Administrator</u>") the Issuer, the Indenture Trustee, and the Securities Administrator, as amended by the First Supplemental Indenture dated August 31, 2009 by and among the Issuer, the Securities Administrator, the Indenture Trustee, acknowledged and consented to by Financial Guaranty Insurance Company, as insurer (the "<u>Insurer</u>"), and Ambac Assurance Corporation, as note insurer (the "<u>Note Insurer</u>"), and acknowledged by American Home Mortgage Servicing, Inc., as RMBS servicer and GMAC Mortgage, LLC as HELOC servicer, and relating to the American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2 (the "<u>Notes</u>"). Reference is further made to: (i) the Amended and Restated Trust Agreement dated June 22, 2005 (the "<u>ARTA</u>"), by and among American Home Mortgage Securities LLC, as depositor (the "<u>Depositor</u>"), Wilmington Trust, National Association, successor by merger to M&T Trust Company of Delaware, as owner trustee (the "<u>Owner Trustee</u>"), and the Indenture Trustee, and

---

[1] NOTE:  No representation is made as to the correctness of the CUSIPs either as printed on the Notes or as contained in this revised notice. Such numbers are included solely for the convenience of the Beneficial Owners.

(ii) the Prospectus Supplement dated June 20, 2005 (the "Prosupp") to the prospectus dated March 22, 2005 relating to the offering of the Notes. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Indenture.

Certain Holders of the Class I-A-2 Notes have advised the Securities Administrator of an inconsistency between the Indenture and the Prosupp, and have requested that certain provisions in the Indenture be amended to conform to the related provisions in the Prosupp.

Specifically, Section 3.38(a), clause nine of the Indenture reads as follows:

> "Any Realized Losses on the Group I Loans, Group II Loans, Group III Loans and Group IV Loans will be allocated or covered on any Payment Date, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, as follows: …and *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group I Loans, *to the Class I-A-2 Notes and Class I-A-3 Notes, in that order*, in reduction of the Note Principal Balance thereof and (ii)…." [emphasis added]

In contrast, pages S-79 through S-80 of the Prosupp read as follows:

> "Any Realized Losses on the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV will be allocated or covered on any payment date as follows: …and ninth, (x) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group I, *to the Class I-A-3 Notes and Class I-A-2 Notes, in that order*, in reduction of the Note Principal Balance thereof, until reduced to zero and (y)…."  (see S-79 through S-80) [emphasis added]

In consultation with the Indenture Trustee and the Owner Trustee, the Securities Administrator has determined that an amendment to the Indenture pursuant to section 9.02 thereof to conform Section 3.38(a) of the Indenture to the Prosupp requires the consent of 100% of the Class I-A-2 and I-A-3 Noteholders.  The Securities Administrator does not believe the parties to the Indenture can amend the Indenture pursuant to section 9.01 thereof without the consent of 100% of such Classes since the amendment will affect the order in which such Classes are allocated Realized Losses.

In addition to being addressed to the Class I-A-2 and I-A-3 Noteholders, this Notice is addressed to the Class I-A-1 Noteholders, but only for informational purposes as the consent of the Class I-A-1 Noteholders for the proposed Second Supplemental Indenture is not required since they are not affected by it.

### Request to Class I-A-2 and I-A-3 Noteholders Regarding Proposed Second Supplemental Indenture

Pursuant to section 9.02(vi) of the Indenture, consent of 100% of the Noteholders of the Class I-A-2 and I-A-3 Notes is required to amend the Indenture by entering into a Second Supplemental Indenture that amends Section 3.38(a) clause nine of the Indenture as follows:

> "Any Realized Losses on the Group I Loans, Group II Loans, Group III Loans and Group IV Loans will be allocated or covered on any Payment Date, in accordance with the statement for such Payment Date provided by the Securities Administrator pursuant to Section 7.05 hereof, as follows: …and *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group I Loans, **to the Class I-A-3 Notes and Class I-A-2 Notes**, in that order, in reduction of the Note Principal Balance thereof and (ii)…." (emphasis added)

### HOLDERS OF THE CLASS I-A-2 AND I-A-3 NOTES ARE ASKED TO CONSIDER THE PROPOSED SECOND SUPPLEMENTAL INDENTURE AND RESPOND TO THIS NOTICE NO LATER THAN JULY 10, 2013.

To provide consent to the proposed Second Supplemental Indenture, please complete the Beneficial Holder Information Form attached hereto as Exhibit A and the Consent Form attached hereto as Exhibit B and return both forms to Daniel Cohen at the Securities Administrator at the address provided therein **on or before July 10, 2013**.

If the consent of 100% of the Class I-A-2 and Class I-A-3 Noteholders is received, the proposed Second Supplemental Indenture may be entered into if all other relevant requirements to amend the Indenture with Noteholder consent are satisfied, including but not limited to the delivery of all required opinions of counsel, delivery of an Issuer Request and the consent of the Insurer and the Note Insurer.

If the consent of 100% of the Class I-A-2 and Class I-A-3 Noteholders is not received, the Issuer, Indenture Trustee and Securities Administrator reserve the right (but assume no obligation) to take further action to resolve the inconsistency between the Indenture and the Prosupp, including legal action.

### Disclaimer

**This Notice and the matters described herein do not constitute and shall not be construed as any investment, accounting, financial, legal or tax advice by or on behalf of the Securities Administrator or Wells Fargo Bank, N.A., or any of its directors, officers, agents, attorneys or employees.  Noteholders should consult their own professionals regarding matters related to the contents of this Notice.  The Securities Administrator makes no recommendations and gives no investment advice herein or as to the Notes generally**.

## **Miscellaneous**

      The Securities Administrator hereby reserves all of its rights, powers and remedies under the legal documents related to the Trust and applicable law, and may, at any time from time to time, without notice, demand or take any other action, and exercise any and all rights, powers, and remedies available to it under such governing documents, as well as those available at law, equity or otherwise, whether with respect to the events or circumstances referred to above or otherwise.  The reservation effected by the preceding sentence of this paragraph shall be deemed to be included in any other communication from the Securities Administrator whether or not it (or any similar reservation) is in fact included in such communication.

      Questions or responses to the matters described herein may be directed to the Securities Administrator by contacting Daniel Cohen via (1) email at daniel.cohen@wellsfargo.com; (2) telephone at 443-367-3925; or (2) mail addressed to Wells Fargo Bank, N.A., 9062 Old Annapolis Road, MAC: R1204-010, Columbia, Maryland 21045, Attn: Corporate Trust Services—Daniel M. Cohen—Default & Restructuring; or (3) fax to (866) 671-5543.


                        **WELLS FARGO BANK, N.A.,**
                        as Securities Administrator


cc:  The Parties Set Forth on Schedule A

## **Schedule A**

Financial Guaranty Insurance Company (Insurer)
125 Park Avenue
New York, New York 10017
Attention: Research and Risk Management

Ambac Assurance Corporation (Note Insurer)
One State Street Plaza
New York, New York 10004
Attention:  Consumer Asset-Backed Securities Group

Standard & Poor's
55 Water Street, 41st Floor
New York, New York 10041
Attention: Asset Backed Surveillance Department

Moody's Investors Service, Inc.
99 Church Street
New York, New York 10007

Deutsche Bank National Trust Company, as Indenture Trustee
1761 East St. Andrew Place
Santa Ana, CA 92705
Attn:  Trust Administration – AHMIT 2005-2

Wilmington Trust, National Association, successor by merger to M&T Trust Company of
Delaware, not in its individual capacity but solely as Owner Trustee
1100 North Market Street
Mail Code:  MD1-WD22
Wilmington, DE 19801-1243

**<u>Exhibit A</u>**
**Beneficial Holder Information Form**


**[See Attached]**

## BENEFICIAL HOLDER INFORMATION FORM

**For Holders of:**
**AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2,**
**MORTGAGE-BACKED NOTES, SERIES 2005-2**

**Please complete the following and return to:**

Wells Fargo Bank, N.A.
9062 Old Annapolis Road, MAC: R1204-010
Columbia, Maryland  21045
Attn: Corporate Trust Services—Daniel M. Cohen—Default & Restructuring
daniel.cohen@wellsfargo.com
Fax:  (866) 671-5543

**Please check one.**

\_\_\_      ***Beneficial Owner.***  The undersigned hereby represents and warrants that it is a beneficial owner of the Notes, that the undersigned is authorized to provide direction for their pro rata portion owned and that such power has not been granted nor assigned to any other party or person.

\_\_\_      ***Nominee or Advisor.***  The undersigned hereby represents and warrants that it is a nominee or advisor for the beneficial owner, that the undersigned is authorized to provide direction for their pro rata portion owned and that such power has not been granted nor assigned to any other party or person.

**CLASS:** _____

**CUSIP:** _____     **ORIGINAL FACE AMOUNT:** $_____

                                        **CURRENT PRINCIPAL BALANCE:** $_____

**NOMINEE NAME:** _____

**NOMINEE BANK (DTC Participant # if Applicable):** _____

*(The following information is important to facilitate conference calls, if needed)*

**Beneficiary Company Name:** _____
Contact Name**:**

**Address**:        _____

                  _____

**Phone**: _____      **Facsimile**: _____
**E-mail**: _____

**Signature:** _____      **Date:** _____

**<u>Exhibit B</u>**
**Consent Form**


**[See Attached]**

## CONSENT FORM

**For Holders of:**
**AMERICAN HOME MORTGAGE INVESTMENT TRUST 2005-2,**
**MORTGAGE-BACKED NOTES, SERIES 2005-2**

Pursuant to the Informational Notice and Request for Class I-A-2 AND I-A-3 Noteholder Consideration of Proposed Second Supplemental Indenture dated May 10, 2013 (the "**Notice**"), the undersigned, as the Holder of the Note Class represented on the attached Beneficial Holder Information Form, hereby:

*Mark One Box:*

☐      (i) Consents to the Second Supplemental Indenture proposed in the Notice, (ii) declares this consent to be an "Act" of Noteholders as contemplated by Section 10.03 of the Indenture, and (iii) accordingly directs this consent to be delivered to the Indenture Trustee and the Issuer as required by Section 10.03 of the Indenture.

☐      Does not consent to the Second Supplemental Indenture proposed in the Notice.

***THIS CONSENT FORM WILL ONLY BE VALID UPON COMPLETION OF ALL THE REQUESTED INFORMATION CONTAINED HEREIN AND WHEN RETURNED TO THE SECURITIES ADMINISTRATOR WITH A COMPLETED BENEFICIAL HOLDER INFORMATION FORM NO LATER THAN JULY 10, 2013***

**Beneficiary Company Name:** _____
Contact Name**:**

**Address**:      _____

             _____

**Phone**: _____      **Facsimile**: _____
**E-mail**: _____

**Signature:** _____      **Date:** _____

Please complete and return this Consent Form to Daniel Cohen via: (1) email at daniel.cohen@wellsfargo.com, or (2) mail addressed to Wells Fargo Bank, N.A., 9062 Old Annapolis Road, MAC: R1204-010, Columbia, Maryland 21045, Attn: Corporate Trust Services—Daniel M. Cohen—Default & Restructuring; or (3) fax to (866) 671-5543.

EXHIBIT 4

## INFORMATIONAL NOTICE REGARDING PROPOSED
## SECOND SUPPLEMENTAL INDENTURE

Date:   July 11, 2013

To:   Beneficial Owners of the American Home Mortgage Investment Trust 2005-2, Class I-A-1, I-A-2 and I-A-3 Mortgage-Backed Notes (the "**Noteholders**")

| Class | CUSIP[1] |
|-------|----------|
| I-A-1 | 02660TEK5 |
| I-A-2 | 02660TEL3 |
| I-A-3 | 02660TEM1 |

**THIS INFORMATIONAL NOTICE REGARDING PROPOSED SECOND SUPPLEMENTAL INDENTURE ("NOTICE") CONTAINS IMPORTANT INFORMATION THAT IS OF INTEREST TO THE BENEFICIAL OWNERS OF THE ABOVE-LISTED NOTES.  IF APPLICABLE, ALL DEPOSITORIES, CUSTODIANS AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE REQUESTED TO EXPEDITE RETRANSMITTAL OF THIS NOTICE TO SUCH BENEFICIAL OWNERS IMMEDIATELY.**

## Background

Reference is made to the Informational Notice and Request for Class I-A-2 and I-A-3 Noteholder Consideration of Proposed Second Supplemental Indenture dated May 10, 2013 (the "May Notice," attached hereto as Exhibit A).  Reference is further made to that certain Indenture dated June 22, 2005 (as amended, the "Indenture"), by and among American Home Mortgage Investment Trust 2005-2, as issuer (the "Issuer"), Deutsche Bank National Trust Company, as indenture trustee (the "Indenture Trustee"), and Wells Fargo Bank, N.A., as securities administrator ("Securities Administrator"), as amended by the First Supplemental Indenture dated August 31, 2009 by and among the Issuer, the Securities Administrator, the Indenture Trustee, acknowledged and consented to by Financial Guaranty Insurance Company, as insurer (the "Insurer"), and Ambac Assurance Corporation, as note insurer (the "Note Insurer"), and acknowledged by American Home Mortgage Servicing, Inc., as RMBS servicer and GMAC Mortgage, LLC as HELOC servicer, and relating to the American Home Mortgage Investment Trust 2005-2, Mortgage-Backed Notes, Series 2005-2 (the "Notes").  Reference is further made to: (i) the Amended and Restated Trust Agreement dated June 22, 2005 (the "ARTA"), by and among American Home Mortgage Securities LLC, as depositor (the "Depositor"), Wilmington Trust, National Association, successor by merger to M&T Trust Company of Delaware, as owner trustee (the "Owner Trustee"), and the Indenture Trustee, and (ii) the Prospectus Supplement dated June 20, 2005 (the "Prosupp") to the prospectus dated March 22, 2005 relating to the offering of the Notes.  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Indenture.

---

[1] NOTE:  No representation is made as to the correctness of the CUSIPs either as printed on the Notes or as contained in this revised notice. Such numbers are included solely for the convenience of the Beneficial Owners.

In the May Notice, the Securities Administrator informed Noteholders of an inconsistency identified by certain Holders of the Class I-A-2 Notes between the Prosupp and the Indenture relating to Section 3.38(a) of the Indenture.   In the May Notice, the Securities Administrator advised Noteholders that in consultation with the Indenture Trustee and the Owner Trustee, it had determined that an amendment to the Indenture pursuant to section 9.02 thereof to conform Section 3.38(a) of the Indenture to the Prosupp would require the consent of 100% of the Class I-A-2 and I-A-3 Noteholders.  A response to the May Notice was requested by July 10, 2013.

As of July 10, 2013, the Securities Administrator has received an objection to the proposed amendment of the Indenture from a Holder of the Class I-A-3 Notes.  Since the consent of 100% of the Class I-A-3 Noteholders has not been received, the Indenture cannot be amended pursuant to Section 9.02.

The Issuer, Indenture Trustee and Securities Administrator reserve the right (but assume no obligation) to take further action to resolve the inconsistency between the Indenture and the Prosupp, including legal action.

## Disclaimer

**This Notice and the matters described herein do not constitute and shall not be construed as any investment, accounting, financial, legal or tax advice by or on behalf of the Securities Administrator or Wells Fargo Bank, N.A., or any of its directors, officers, agents, attorneys or employees.  Noteholders should consult their own professionals regarding matters related to the contents of this Notice.  The Securities Administrator makes no recommendations and gives no investment advice herein or as to the Notes generally**.

## Miscellaneous

The Securities Administrator hereby reserves all of its rights, powers and remedies under the legal documents related to the Trust and applicable law, and may, at any time from time to time, without notice, demand or take any other action, and exercise any and all rights, powers, and remedies available to it under such governing documents, as well as those available at law, equity or otherwise, whether with respect to the events or circumstances referred to above or otherwise.  The reservation effected by the preceding sentence of this paragraph shall be deemed to be included in any other communication from the Securities Administrator whether or not it (or any similar reservation) is in fact included in such communication.

Questions related to the matters described herein may be directed to the Securities Administrator by contacting Daniel Cohen via (1) email at daniel.cohen@wellsfargo.com; (2) telephone at 443-367-3925; or (2) mail addressed to Wells Fargo Bank, N.A., 9062 Old Annapolis Road, MAC: R1204-010, Columbia, Maryland 21045, Attn: Corporate Trust Services—Daniel M. Cohen—Default & Restructuring; or (3) fax to (866) 671-5543.

**WELLS FARGO BANK, N.A.,**
as Securities Administrator

cc: The Parties Set Forth on Schedule A

## Schedule A

Financial Guaranty Insurance Company (Insurer)
125 Park Avenue
New York, New York 10017
Attention: Research and Risk Management

Ambac Assurance Corporation (Note Insurer)
One State Street Plaza
New York, New York 10004
Attention:  Consumer Asset-Backed Securities Group

Standard & Poor's
55 Water Street, 41st Floor
New York, New York 10041
Attention: Asset Backed Surveillance Department

Moody's Investors Service, Inc.
99 Church Street
New York, New York 10007

Deutsche Bank National Trust Company, as Indenture Trustee
1761 East St. Andrew Place
Santa Ana, CA 92705
Attn:  Trust Administration – AHMIT 2005-2

Wilmington Trust, National Association, successor by merger to M&T Trust Company of
Delaware, not in its individual capacity but solely as Owner Trustee
1100 North Market Street
Mail Code:  MD1-WD22
Wilmington, DE 19801-1243

## **Exhibit A**

[May 10, 2013 Notice]

# EXHIBIT B

State of Minnesota
Hennepin County

District Court
Fourth Judicial District
Court File Number: **27-TR-CV-14-14**
Case Type: Trust

**Notice of Judicial
Assignment**

MICHAEL KRAUSS
FAEGRE BAKER DANIELS
2200 WELLS FARGO CENTER
90 SOUTH SEVENTH STREET
MINNEAPOLIS MN  55402-3901

**In the Matter of: The Trusteeship Created by American Home Mortgage Investment
Trust 2005-2 relating to the issuance of Mortgage-Backed Notes pursuant to an
Indenture dated as of October 1, 2007**

This case is assigned to:

Referee Dean Maus
C-400, 300 South Sixth Street
Minneapolis Minnesota  55487-0340
612-348-3244

All future hearings shall be scheduled before this judicial officer.

Please note that a notice to remove this judicial officer must comply with Minnesota Rules of
Civil Procedure 63.03 and Minnesota Statute § 542.16.

Dated: January 23, 2014

Mark S. Thompson
Court Administrator
Hennepin County District Court

cc:

# EXHIBIT C

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED

14 JAN 23  AM 11: 39

BY: PROBATE/MENTAL HEALTH
FOURTH DISTRICT COURT

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

In the Matter of:

The Trusteeship Created by American Home Mortgage
Investment Trust 2005-2 relating to the issuance of
Mortgage-Backed Notes pursuant to an Indenture
dated as of October 1, 2007

**Case Type: Other**
**File No. 27-TR-CV-14-14**

## ORDER FOR HEARING ON PETITION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, AS INTERESTED PERSON, FOR INSTRUCTIONS IN THE ADMINISTRATION OF A TRUST PURSUANT TO MINN. STAT. § 501B.16

TO THE DISTRICT COURT FOR THE FOURTH JUDICIAL DISTRICT:

Petitioner Wells Fargo Bank, National Association, solely in its capacity as Securities

Administrator, an interested person herein, having filed its Verified Petition for Instruction in the

Administration of a Trust Pursuant to Minn. Stat. § 501B.16, and the Court having assumed

jurisdiction of the proceeding in rem under Minn. Stat. § 501B.24, now upon motion of attorneys

for Petitioner,

IT IS ORDERED:

1.      Hearing upon said Petition be had by this Court at a special term thereof to be

held in Room No. C400 of the Hennepin County Government Center, 300 South Sixth Street,

Minneapolis, Minnesota, on March 5, 2014, at 2:30 p.m.

2.      Notice of such hearing to be given by publishing a copy of this Order one time in

a legal newspaper of Hennepin County, Minnesota, at least 20 days before the date of the hearing

and by (a) mailing a copy this Order together with a copy of the Verified Petition to each party in

interest at his or her last known address at least 15 days prior to said date, (b) distributing a copy

1

dms.us.53112432.01

of this Order together with a copy of the Verified Petition via the DTC Lens System at

LensNotice@DTCC.com at least 15 days prior to said date, and (c) posting a copy of this Order

and a copy of the Verified Petition via the CTSLink System at ctslink.com least 15 days prior to

said date.

       3.     The parties in interest are hereby referred to the Verified Petition provided to

them and on file in the office of the Court Administrator for a specification of the matters to be

considered at said hearing.

Dated:  <u>January 22, 2014</u>

<div style="text-align:right">

<u>Jamie L Anderson</u>

Judge of the District Court

<br>

<u>Mark S Thompson</u>

District Court Administrator

</div>

Prepared by:

    FAEGRE BAKER DANIELS LLP

    Stephen M. Mertz, #212131

    Michael M. Krauss, #0342002

    2200 Wells Fargo Center

    90 South Seventh Street

    Minneapolis, Minnesota 55402-3901

    Telephone: (612) 766-7000

dms.us.53112432.01

# EXHIBIT D

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

In the Matter of:

The Trusteeship Created by American Home Mortgage
Investment Trust 2005-2 relating to the issuance of
Mortgage-Backed Notes pursuant to an Indenture
dated as of October 1, 2007

**Case Type: Other**
**File No. 27-TR-CV-14-14**

---

## STATEMENT REGARDING INTERESTED PARTIES

Petitioner Wells Fargo Bank, National Association, a national banking association
("Wells Fargo Bank"), solely in its capacity as Securities Administrator (the "Securities
Administrator"), as an interested person herein, submits this Statement Regarding Interested
Parties accompanying its petition for trust instructions under Minn. Stat. § 501B.16 (the
"Petition") in connection with (a) the issuance of Mortgage-Backed Notes (the "Notes") by
American Home Mortgage Investment Trust 2005-2 (the "Issuer") pursuant to an Indenture,
dated as of June 22, 2005 (the "Indenture"), by and among the Issuer, the Securities
Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee, and (b) the
Trust Estate (as defined in the Indenture) created by the Indenture.

The only interested parties, other than the Securities Administrator, are the Trustee and
the Holders of the Notes issued by the Issuer (as defined in the Petition). The Securities
Administrator is aware of the identity of only those Holders that have registered their holdings
with the Securities Administrator or that have disclosed this information to the Securities
Administrator. Even to the extent known, the identity of individual Holders is confidential and is
not subject to public disclosure by the Securities Administrator.

The Indenture Trustee's name and address information is as follows: Deutsche Bank National Trust Company, 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: Trust Administration – AH 0502.

The Securities Administrator's name and address information is as follows: Wells Fargo Bank, National Association, Corporate Trust Services, Sixth Street and Marquette Avenue, Minneapolis, MN 55479.

Dated: January 22, 2014                                 FAEGRE BAKER DANIELS LLP

                                                        */s/Michael M. Krauss*
                                                        Stephen M. Mertz, #212131
                                                        Michael M. Krauss, #0342002
                                                        2200 Wells Fargo Center
                                                        90 South Seventh Street
                                                        Minneapolis, Minnesota 55402-3901
                                                        Telephone: (612) 766-7000
                                                        Facsimile: (612) 766-1600

                                                        Attorneys for Wells Fargo Bank, National
                                                        Association, as Securities Administrator

dms.us.53522164.01