IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Trusteeship Created by American Home Mortgage Investment Trust 2005-2 relating to the issuance of Mortgage-Backed Notes pursuant to an Indenture dated as of October 1, 2007. | Case No. 1:14-cv-02494-AKH |

**PARTY IN INTEREST SCEPTRE, LLC'S MEMORANDUM OF LAW
IN OPPOSITION TO SEMPER CAPITAL MANAGEMENT, LP'S
<u>MOTION TO DISMISS THE VERIFIED PETITION</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................3

I.       The AHM 2005-2 Mortgage-Backed Notes .......................................................3

II.      The Class I-A Notes And The Drafting Error In Section 3.38 ............................5

III.     Wells Fargo's Commencement Of This Action In Minnesota State Court .......................8

ARGUMENT.............................................................................................................9

I.       Well-Established Principles Of New York Contract Law Support Reforming The
         Indenture To Correct A Scrivener's Error ...........................................................9

II.      The Pleading Requirements For A Reformation Claim Are Established .........................11

III.     Neither The Indenture Nor The Trust Indenture Act Bars Reformation Of The
         Indenture To Correct A Scrivener's Error ...........................................................14

IV.      Wells Fargo Has Not Pled A Contract Claim, So SCM's Arguments Regarding
         Ambiguity In The Indenture And The Parol Evidence Rule Are Irrelevant.....................18

CONCLUSION.........................................................................................................19

**EXHIBITS**

Exhibit E:    Term Sheet dated as of June 13, 2005 for the American Home Mortgage
              Investment Trust Mortgage-Backed Notes, Series 2005-2, Groups I – IV.

Exhibit F:    Monthly Report for the American Home Mortgage Investment Trust Mortgage-
              Backed Notes, Series 2005-2, compiled by Wells Fargo Bank, N.A., and
              distributed on March 25, 2014.

Exhibit G:    Email from Michael E. Johnson to Jonathan E. Pickhardt, dated April 15, 2014.

TABLE OF AUTHORITIES

**Page**

## Cases

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005)............................................................10, 11, 17

*In re Bd. of Dirs. of Multicanal S.A.*,
 307 B.R. 384 (Bankr. S.D.N.Y. 2004)................................................................................17

*Bank of Julius Baer & Co., Ltd. v. Waxfield Ltd.*,
 424 F. 3d 278, 283 (2d Cir. 2005)....................................................................................16

*Born v. Schrenkeisen*,
 110 N.Y. 55, 59 (1888) ....................................................................................................9

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*,
 957 F. Supp. 2d 316 (S.D.N.Y. 2013)..............................................................................16

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*,
 724 F. Supp. 2d 407 (S.D.N.Y. 2010)..............................................................................11

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999).......................................................................18

*George Backer Mgmt. Corp. v. Acme Quilting Co.*,
 46 N.Y. 211 (N.Y. 1978) ..................................................................................................13

*House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
 2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) ...................................................................12

*McCarthy v. Dun & Bradstreet Corp.*,
 482 F.3d 184 (2d Cir. 2007)...............................................................................................3

*Precimed Inc. v. ECA Med. Instruments*,
 2014 WL 317086 (W.D.N.Y. Jan. 28, 2014)....................................................................13

*Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.*,
 2 F.R.D. 305 (S.D.N.Y.1942) ..........................................................................................13

*Sira v. Morton*,
 380 F.3d 57 (2d Cir. 2004)...............................................................................................12

*Stonebridge Capital, LLC v. Nomura Int'l PLC*,
 24 Misc. 3d 1218(A) (N.Y. Sup. N.Y. Cnty. July 6, 2009) ...............................................9

*Upic & Co. v. Kinder Care Learning Centers, Inc.*,
 793 F. Supp. 448, 452-453 (S.D.N.Y. 1992) .............................................................16, 17, 18

*U.S. Russia Inv. Fund v. Neal & Co., Inc.*, ,
 1998 WL 557606 (S.D.N.Y. Sept. 2, 1998)....................................................................9, 10

*Vasilakos v. Gouvis,*
    296 A.D.2d 668 (N.Y. App. Div. 3d Dep't 2002) ........................................................9

*YRC Worldwide Inc. v. Deutsche Bank Trust Co. Ams.,*
    2010 WL 2680336 (D. Kan. July 1, 2010) ..........................................................17

### **Rules / Statutes**

12 U.S.C. § 632 ..............................................................................................................9

15 U.S.C. §77ppp(b) .....................................................................................................16

28 U.S.C. §1331 ..............................................................................................................9

28 U.S.C. §1332 ..............................................................................................................9

28 U.S.C. §1348 ..............................................................................................................9

28 U.S.C. §1441(b) .........................................................................................................9

28 U.S.C. §1441(c) .........................................................................................................9

28 U.S.C. §1446 ..............................................................................................................9

Minn. Stat. §501B.16 ....................................................................................................11

Minn. Stat. §501B.16(23) .............................................................................................11

Minn. Stat. §501B.16(4) ...............................................................................................11

Party In Interest Sceptre, LLC ("Sceptre") respectfully submits this memorandum of law in Opposition to the Motion to Dismiss the Verified Petition filed by Semper Capital Management, LP ("SCM").

## PRELIMINARY STATEMENT

This trust instruction proceeding presents a textbook example of a scrivener's error where a written memorialization of an agreement does not reflect the terms actually agreed upon by the drafting parties.  In this case, the error is a transposition of two digits in the Trust Indenture governing mortgage backed Notes issued by American Home Mortgage Investment Trust 2005-2 (the "Indenture") that has the effect of mistakenly inverting the seniority of two tranches of those Notes.  Specifically, Section 3.38 of the Indenture, governing the allocation of Realized Losses, erroneously directs that losses be allocated to the I-A-2 Notes before being allocated to I-A-3 Notes. As all of the other payment terms in the Indenture pertaining to these two tranches of Notes are identical, this error has the effect of mistakenly subordinating the I-A-2 Notes to the I-A-3 Notes, which is the exact opposite of what was intended by the drafting parties.

Even without discovery, the evidence is overwhelming that the actual intent was for the I-A-2 Notes to be senior to the I-A-3 Notes.  *First*, the Indenture provides for the I-A-2 Notes to receive a lower interest rate than the I-A-3 Notes which can only mean that the I-A-2 Notes were intended to bear less risk of loss than the I-A-3 Notes, as all other payment terms of the I-A-2 and I-A-3 Notes are identical.  *Second*, every other tranche of Notes issued pursuant to the Indenture (like mortgage backed notes in the industry more generally) is structured such that Realized Losses are allocated in reverse sequential order, with the I-A-2 and I-A-3 Notes being the only exception.  *Third*, all of the materials that were used to market the Notes—including a detailed term sheet and a Prospectus Supplement—stated that the I-A-3 Notes would bear losses before the I-A-2 Notes, *i.e.*, the exact opposite of how Section 3.38 is drafted.  Indeed, other than the terms of Section 3.38 itself, there is

*zero* basis in fact or logic from which one could conclude that it was the intent of the drafters that Realized Losses be allocated to I-A-2 Notes before I-A-3 Notes.  As a result, Wells Fargo Bank, N.A. ("Wells Fargo"), as the Securities Administrator, filed this trust instruction proceeding before any Realized Losses have been allocated pursuant to the erroneous provision, requesting that the Court resolve whether the Indenture should be reformed.

Notwithstanding the overwhelming weight of the evidence favoring reformation, SCM—a holder of I-A-3 Notes that is poised to receive a windfall if Section 3.38 of the Indenture is enforced as erroneously drafted—has moved to dismiss this action.  SCM raises several novel arguments in support of its motion, none of which have merit.  *First*, SCM argues that scrivener's error doctrine does not support reforming the Indenture.  This argument is easily rebutted by a review of New York case law, which shows that this is a *quintessential* example of scrivener's error warranting reformation.  *Second*, SCM argues that Wells Fargo's pleadings are deficient.  To the contrary, Wells Fargo has clearly set forth the elements for a reformation claim, including the existence of an agreement that is at odds with its written memorialization and the presence of mutual mistake. Moreover, regardless of the contents of Wells Fargo's pleadings, the elements of mutual mistake are apparent on the face of the Indenture and marketing materials that are attached to the Petition and properly considered by the Court on this motion.  *Third*, SCM argues that Indenture provisions addressing amendments of the Indenture—including Sections 9.01(a) and 9.02(iv)—bar the relief that Wells Fargo is seeking.  However, these provisions are irrelevant because Wells Fargo is seeking reformation, not an amendment, and reformation is a remedy preserved under the clear terms of the Indenture's "governing law" clause.[1]  *Fourth*, SCM argues that provisions in the Indenture and

---

[1]  Moreover, as discussed *infra* at 14-15, SCM misreads Section 9.01, because the limitation on amendments that is quoted does not apply to the subparagraph covering amendments to correct ambiguities.

2

the Trust Indenture Act ("TIA") providing Noteholders with an absolute right to payment of principal and interest on their Notes bar reformation of the Indenture.  But reformation of the Indenture to reflect the actual intent of the parties does not "impair" any Noteholder's rights, since it is a remedy preserved by the clear terms of the Indenture itself, and applying TIA to block contract reformation would violate not only its terms, but its intent.  SCM's remaining arguments about the lack of ambiguity in the Indenture and the parol evidence rule are irrelevant because Wells Fargo has not asked this Court to interpret any ambiguous Indenture terms and the parol evidence rule does not apply to reformation claims.  Because SCM's arguments for dismissal are meritless, irrelevant, or both, its motion to dismiss should be denied.

## STATEMENT OF FACTS[2]

### I.     The AHM 2005-2 Mortgage-Backed Notes

American Home Mortgage Investment Trust 2005-2 ("AHM 2005-2") is a special purpose vehicle created to issue mortgage-backed Notes to investors pursuant to the Indenture, dated as of June 22, 2005, amongst AHM 2005-2, as Issuer, Wells Fargo, as Securities Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.  *See* Indenture at 1 (Exh. B, Dkt.1-1 at 12).[3]  The Notes were marketed and sold pursuant to a Prospectus Supplement dated June 20, 2005 (the "ProSupp") and a Term Sheet dated June 13, 2005 (together, the "Offering Documents"). (Exh. C, Dkt.1-1 at 295 & Declaration of Jonathan E. Pickhardt (Pickhardt Decl.) Exh. E, respectively.)  Holders of the Notes are entitled to payments of principle and interest from the Issuer. To secure payment on the Notes, the Issuer holds collateral—here, mortgage loans and home equity

---

[2]   For the purposes of this motion, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F. 3d 184, 191 (2d Cir. 2007).

[3]   Citations to "Dkt._" refer to the ECF stamp on documents filed in this case, No. 1:14-cv-02494-AKH (S.D.N.Y.).

lines of credit ("HELOCs").  ProSupp S-9 – S-12.  The Notes are paid out of income derived from that collateral—*i.e.*, cash paid to AHM 2005-2 as repayment of the underlying mortgage loans and HELOCs that it holds.  The collateral is organized into six separate "Loan Groups," each of which has its own unique eligibility criteria.  *See id.* (describing the collateral in each of the different Loan Groups).

The Notes issued by AHM 2005-2 do not all have the same level of risk.  Rather, the Notes are issued in different "Classes," which rely on different collateral pools for repayment.  Specifically each Class of Notes receives income derived from the collateral of one or more designated Loan Groups, and applies that income to payment of interest and repayment of principal.  Indenture §§ 3.05-3.07.  Likewise, the Realized Losses on the collateral in each Loan Group are designated for allocation among one or more Classes of Notes.  Indenture § 3.38.

In addition, Notes within a Class have varying levels of risk.  Specifically, all but one of the Classes of Notes (the Class III-A Notes) are issued with multiple "tranches" representing an unequal interest in the cash-flows received by each Class.  This priority of interest may be reflected in two ways.  *First*, "senior" tranches in some Classes are entitled to payment of principle and interest before "junior" tranches, such that when there is insufficient income to pay all obligations on that Class of Notes, the senior tranches get paid before the junior tranches.  Indenture §§ 3.05-3.07.  *Second*, when the collateral held in a Loan Group suffers "Realized Losses"—*e.g.*, because one or more of its mortgage loans is foreclosed upon and the foreclosure proceeds are less than the outstanding amount of the loan—those Realized Losses are allocated to the junior tranches in the corresponding Class of Notes first, such that more senior tranches do not sustain any Realized Losses until junior tranches have been fully written down.  Indenture § 3.38.  The allocation of Realized Losses to a tranche of Notes reduces the payments holders of those Notes will receive from

future income distributions, as holders are not entitled to any distributions in respect of the portion of their Notes that have been written down until all principal on the other outstanding Notes has been paid in full.

In light of these varying degrees of risk, holders of Notes at different seniority levels are compensated at different interest rates. *See* Indenture, Appendix A at 48-49 (definition of "Note Margin"). This includes an initial interest rate applicable to each tranche of Notes, as well as a "step up" rate that applies after the principal remaining in each Loan Group is reduced below certain levels. *Id.*

## II.     The Class I-A Notes And The Drafting Error In Section 3.38

The Notes at issue in this litigation are the Class I-A Notes. The Class I-A Notes are separated into three tranches: the I-A-1 Notes, the I-A-2 Notes, and the I-A-3 Notes. They receive income derived from the collateral held in Loan Groups I through IV. *See* Indenture § 3.05. For every distribution of principal or interest to Class I-A Notes, each tranche receives a *pro rata* share of the distribution, equal to that tranche's percentage of the outstanding notional value of all Class I-A Notes. *Id.* Thus, the distribution of interest and principal, standing alone, is *pari passu* and creates no difference in the risk profile among the three tranches of Class I-A Notes. Indeed, absent the allocation of Realized Losses, the I-A-1, I-A-2, and I-A-3 Notes are treated identically under the Indenture as regards their rights to payment.

However, the Class I-A Notes are subject to different risks of repayment on account of the way they are allocated Realized Losses pursuant to Section 3.38 of the Indenture. That provision, entitled "ALLOCATION OF REALIZED LOSSES," includes numbered lists setting forth the priority order in which Realized Losses are allocated in respect of different Loan Groups. Pursuant to Section 3.38(a), the only Realized Losses allocated to the Class I-A Notes are those accruing on collateral held in Loan Group I. For the six tranches of Notes junior to the Class I-A Notes, Section

3.38(a) provides that such Realized Losses be allocated in reverse sequential order with more junior notes bearing losses before more senior notes, as is a standard structure in mortgage backed securities.[4]   However, as to the Class I-A Notes, Section 3.38(a) includes the following clause that, as drafted, would have the effect of reversing course to start allocating Realized Losses in sequential order, with the more senior I-A-2 Notes bearing losses before the more junior I-A-3 Notes:

> … and *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group I Loans, ***to the Class I-A-2 Notes and Class I-A-3 Notes, in that order***, in reduction of the Note Principal Balance thereof …

Section 3.38(a) (emphasis added).  It is beyond reasonable dispute, however, that the "2" and "3" in that clause were mistakenly transposed and the intent of the provision was actually to allocate Realized Losses to Class I-A-**3** Notes and Class I-A-**2** Notes, in that order.  This is evident for several reasons.

*First,* the interest rates payable on the Class I-A-2 and Class I-A-3 Notes pursuant to the Indenture reflect the intent that the Class I-A-2 Notes bear losses after the Class I-A-3 Notes. Specifically, the Indenture provides that I-A-2 Notes pay an initial interest rate of Libor plus 0.350% and a "step-up" interest rate of Libor plus 0.700%, whereas the I-A-3 Notes pay a higher initial interest rate of Libor plus 0.380% and a higher "step-up" interest rate of Libor plus 0.760%.  *See* Indenture, Appendix A at 48-49.  As the I-A-2 Notes and I-A-3 Notes are identical in all material respects other than the allocation of Realized Losses, the only logical explanation for the I-A-3's entitlement to a higher interest rate is that it was intended that I-A-3 Notes also bear Realized Losses before the I-A-2 Notes—*i.e.,* the opposite of what Section 3.38(a) provides as drafted.

---

[4]   Section 3.38(a) provides that Realized Losses from Loan Group I are allocated to subordinate Notes in the following order of priority:  (1) Class B Notes; (2) Class M-5 Notes; (3) Class M-4 Notes; (4) Class M-3 Notes; (5) Class M-2 Notes; and (6) Class M-1 Notes.

*Second*, the way in which Realized Losses are allocated among the other tranches of Notes pursuant to Section 3.38 also reflects the intent that the I-A-2 Notes bear losses after the I-A-3 Notes. Indeed, in *every* other instance pursuant to Section 3.38, Realized Losses are allocated to securities in reverse sequential order and in reverse order of their respective interest rates.  For example, the chart below sets forth the order in which Section 3.38(a) provides for the allocation of Realized Losses for collateral in Loan Group I:

| Rank Order | Class | Initial Interest Rate | Step Up Interest Rate |
|------------|-------|----------------------|----------------------|
| 1 | B | N/A (not offered) | N/A (not offered) |
| 2 | M-5 | 1.200% | 1.800% |
| 3 | M-4 | 0.750% | 1.125% |
| 4 | M-3 | 0.600% | 0.900% |
| 5 | M-2 | 0.570% | 0.855% |
| 6 | M-1 | 0.520% | 0.780% |
| 7 | I-A-2 | 0.350% | 0.700% |
| 8 | I-A-3 | 0.380% | 0.760% |
| 9[5] | I-A-1 | 0.300% | 0.600% |

The fact that the I-A-2 Notes and I-A-3 Notes, shaded above, are the *only* Notes for which Realized Losses are allocated in a fashion that is inverse to how Realized Losses are allocated to all of the other Notes provides further evidence of the drafting error in Section 3.38.

*Third*, the Offering Materials used to market the Notes include repeated statements describing the actual intended allocation of Realized Losses to the I-A-3 Notes before the I-A-2 Notes.  Indeed, there are at least *five* express statements in the marketing materials reflecting the intent that I-A-3 Notes bear Realized Losses before the I-A-2 Notes, and *no* statements suggesting otherwise.  For example, the ProSupp provides that Realized Losses "incurred in respect of the mortgage loans in Loan Group I," are to be allocated "to the Class I-A-3 Notes and Class I-A-2 Notes, ***in that order***, in reduction of the Note Principal Balance thereof."  ProSupp at S-80 (emphasis

---

[5]   Class I-A-1 Notes are never allocated Realized Losses.

added); *see also id.* at S-126 ("the entire amount of any Realized Losses on the Group I Loans … will be allocated to the class I-A-3 Notes and Class I-A-2 Notes, ***in that order***" (emphasis added)). The Term Sheet similarly provides that "[a]ny losses allocable to the Class I-A Notes will first be allocated to the Class I-A-3 Notes and next to the Class I-A-2 Notes, in that order, until reduced to zero."   Term Sheet at 3 n.10 (Pickhardt Decl. Exh. E); *see also id.* (describing the "credit enhancement percentage" of the I-A-2 Notes, meaning the percentage of subordinate Notes protecting the I-A-2 Notes from Realized Losses, as including the notional value of the I-A-3 Notes); *id.* at 19 (noting that that Realized Losses "will be allocated to the Class I-A-3 Notes and Class I-A-2 Notes ***reverse sequentially, in that order***, until reduced to zero" (emphasis added)).

## III.   **Wells Fargo's Commencement Of This Action In Minnesota State Court**

Notwithstanding the overwhelming evidence of a drafting error in Section 3.38 of the Indenture with regard to the allocation of Realized Losses, until recently, there has been no occasion to address the error because no Realized Losses have reached the Class I-A Notes.  However, as of the March 2014 Monthly Report, the B and M-5 through M-2 Notes have been written down to zero, and only $3.4 million of outstanding M-1 Notes protect the Class I-A Notes from Realized Losses. *See* March 2014 Monthly Report at 1 (Pickhardt Decl. Exh. F).  Wells Fargo projects that the Class I-A Notes will begin accumulating Realized Losses over the next few months.  *See* Letter from M. Johnson to J. Pickhardt, dated April 15, 2014 (Pickhardt Decl. Exh. G).  As a result, the drafting error in Section 3.38 is now critically relevant.  If not reformed, the I-A-3 Noteholders, who have been compensated at a higher interest rate throughout the life of the deal, will be permitted to jump the intended line of priority, and shift Realized Losses intended for their Notes to the more senior I-A-2 Notes.

To address the impending dispute, on January 17, 2014, Wells Fargo filed this action in the Probate and Mental Health Division of the Minnesota District Court, Fourth Judicial District, County

of Hennepin, seeking a trust instruction clarifying the proper priority for allocation of Realized Losses. Petition ¶ 5 (Exh. A, Dkt.1-1 at 1). Specifically, Wells Fargo "seeks entry of an order (a) reforming Section 3.38 of the Indenture so that losses are allocated first to the Class I-A-3 Notes and then, sequentially, to the Class I-A-2 Notes, in accordance with the disclosure in the [ProSupp] or, in the alternative, (b) directing that any Realized Losses shall be allocated strictly pursuant to the existing terms of the Indenture." *Id.* Wells Fargo has not taken a position as to the proper outcome of this case.

On February 18, 2014, Party In Interest Sceptre removed the Action to the United States District Court for the District of Minnesota pursuant to 12 U.S.C. § 632 and 28 U.S.C. §§ 1331, 1332, 1348, 1441(b) and (c) and 1446. (Dkt.1.) On April 3, 2014, Wells Fargo, Sceptre, and SCM filed a Stipulation to Transfer Venue to this Court, and on April 7, 2014, the Action was transferred in accordance with that Stipulation. (Dkt.22 & 25, respectively.) Immediately prior to the Stipulation to Transfer Venue, SCM filed this Motion to Dismiss. (Dkt.18.)

## ARGUMENT

## I.   Well-Established Principles Of New York Contract Law Support Reforming The Indenture To Correct A Scrivener's Error

SCM's argument that "scrivener's error doctrine cannot support reforming the Indenture" (Br. 14-15) is belied by more than a century of case law providing that "'[w]here there is no mistake about the agreement, *and the only mistake alleged is in the reduction of that agreement to writing*, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.'" *Stonebridge Capital, LLC v. Nomura Int'l PLC*, 24 Misc. 3d 1218(A), at*4 (N.Y. Sup. N.Y. Cnty. July 6, 2009) (quoting *Born v. Schrenkeisen*, 110 N.Y. 55, 59 (1888)) (emphasis in original); *see also Vasilakos v. Gouvis*, 296 A.D. 2d 668, 669 (N.Y. App. Div. 3d Dep't 2002) (same). Reformation is available to correct a "scrivener's error" where, like here, "the parties have reached a

real and existing agreement on particular terms and subsequently find themselves bound to a writing which does not accurately express their agreement." *U.S. Russia Inv. Fund. v. Neal & Co., Inc.*, 1998 WL 557606, at *4 (S.D.N.Y. Sept. 2, 1998) (quotations omitted).  The existence of a scrivener's error must be shown by "clear and convincing evidence." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).  However, the parol evidence rule does *not* apply, and courts may look at extrinsic evidence to evaluate whether the disputed writing includes a drafting error.  *Id.*

Section 3.38 of the Indenture is a quintessential example of scrivener's error in which two digits were mistakenly transposed.  The *actual* intent of the drafting parties—*i.e.*, to allocate Realized Losses first to I-A-3 Notes, and then to I-A-2 Notes—is beyond reasonable dispute.  While the provision, as written, states "to the extent such Realized Losses are incurred in respect of the Group I Loans, [they are allocated] to the Class I-A-**2** Notes and Class I-A-**3** Notes, in that order" (Indenture §3.38(a)(*ninth*)), the drafting parties intended to provide that "to the extent such Realized Losses are incurred in respect of the Group I Loans, [they are allocated] to the Class I-A-**3** Notes and Class I-A-**2** Notes, in that order."  In its motion, SCM never once claims otherwise.

As described above, the existence of a scrivener's error is apparent from the transaction documents for at least three reasons.  *First*, the provision of a higher interest rate on the I-A-3 Notes is explicable for no reason other than it reflecting the intent that the I-A-3 Notes bear risk of loss before the I-A-2 Notes.

*Second,* as is standard in mortgage backed securities, every other class of Notes in the Indenture allocates Realized Losses in reverse sequential order, with the I-A-2 Notes and I-A-3 Notes being the only exception.

*Third*, every discussion of loss allocation in the Offering Documents—which were created contemporaneously to the Indenture and are intended to explain its contents to investors—describe the Indenture as allocating Realized Losses first to the I-A-3 Notes, and then afterwards, to the I-A-2 Notes.[6]  In contrast, other than the (erroneous) language of Section 3.38 itself, there is zero evidence that the intent was to subordinate the more senior I-A-2 Notes to the I-A-3 Notes.

Because reformation is a well-established remedy for scrivener's error under New York contract law, and there is overwhelming evidence of a scrivener's error in the Indenture, SCM's argument that the remedy of reformation is unavailable to correct the allocation provisions in Section 3.38 should be rejected.

## II.   The Pleading Requirements For A Reformation Claim Are Established

Next, SCM argues that, notwithstanding the overwhelming evidence of a scrivener's error, "Wells Fargo has not pleaded sufficient facts to support its drafting error claim."  (Br. 15.)  Once again, SCM's argument is without legal support.  A claim for reformation requires pleading three elements: "(1) an agreement other than that expressed in the instrument; (2) the written instrument sought to be reformed; and (3) mutual mistake of the parties."  *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 415 (S.D.N.Y. 2010).  Wells Fargo has pled all three.

*First*, Wells Fargo has alleged an agreement other than that expressed in the instruments.  Specifically, Wells Fargo alleges that the "terms of the Indenture and the Prosupp are … inconsistent as to the sequence for allocation of Realized Losses for Group I Loans as between Class I-A-3 Notes and Class I-A-2 Notes" and includes the allegation (although not taking a position on its ultimate

---

[6]   As noted (*supra* at 10), the parol evidence rule does not apply to contract reformation actions to correct a scrivener's error.  SCM does not dispute this point.  SCM's argument (Br. 10-14) that parol evidence is inadmissible to alter the interpretation of an otherwise unambiguous, written agreement does not apply to the scrivener's error claims at issue in this case.  *See Aristocrat Leisure Ltd.*, 2005 WL 1950116, at *4 ("Parol evidence is admissible to correct a mutual mistake.").

merits)[7] that "Class I-A-2 was intended to be the Senior Mezzanine Class, and Class I-A-3 was intended to be the Junior Mezzanine Class, as indicated by the order of Realized Loss allocation in the Prosupp, as well as by the interest rates and pricing for each of the Classes of Notes." Petition ¶¶ 14 & 15. *Second*, Wells Fargo has alleged the written instrument to be reformed. Specifically, among the alternate forms of relief sought, Wells Fargo includes a request for "reform[ation] [of] Section 3.38 of the Indenture." Petition ¶ 25. *Third*, Wells Fargo has alleged a mutual mistake of the parties. Specifically, Wells Fargo includes the allegation (again, without taking a position the merits) that the allocation of Realized Losses appearing in Section 3.38 of the Indenture was the result of "a drafting error." Petition ¶ 15.

Standing alone, these allegations defeat SCM's challenge to the pleadings, but the Court need not restrict itself to the contents of the Petition. "On a motion to dismiss, the court may consider, in addition to the complaint itself, 'any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.'" *House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *3 (S.D.N.Y. Mar. 31, 2014) (quoting *Sira v. Morton*, 380 F. 3d 57, 67 (2d Cir. 2004)). As discussed at length above, the existence of a scrivener's error is apparent on the face of the Indenture, and by comparison of Section 3.38 to the description of the Indenture's allocation of Realized Losses appearing in the ProSupp. *See supra* at 5-8. Both the Indenture and ProSupp are attached to the Petition, and may properly be considered by the Court in deciding this motion. Thus, regardless of the pleadings in the Petition, the documents attached thereto not only adequately

---

[7] This action is brought as a trust instruction proceeding pursuant to Minn. Stat. § 501B.16 *et seq.*, which permits an interested party, such as Wells Fargo, to seek an "instruct[tion]" as to "any matter relating to the administration of [a] trust" (*id.* § 501B.16(23))— including "reform[ation]" of a trust (*id.* § 501B.16(4))—and does not require the party bringing the Petition to take a position on the merits of the case.

support the "plausibility" of a scrivener's error in Section 3.38 of the Indenture, but establish that error with clear and convincing evidence.  SCM's challenge to the pleadings fails for that reason as well.

The additional allegations that SCM claims are missing from Wells Fargo's Petition (Br. 14-16) are not required, nor does SCM provide any authority to plausibly suggest they are.  Citing *George Backer Management Corp. v. Acme Quilting Co.*, 46 N.Y. 211, 219-20 (N.Y. 1978), SCM asserts that Wells Fargo was required to (1) "plead 'clear, positive and convincing evidence' demonstrating 'not the probability [but] the certainty of error in the making of the contract'" and (2) "plead[] … that the party claiming error had no awareness of the loss allocation priority as set forth in the Indenture." (Br. 14-15.)  However, the Court in *George Backer* was reviewing an appeal of a summary judgment decision based on a well-developed factual record, and never mentioned, or even considered, pleading requirements.  46 N.Y. 2d at 217.[8]  When discussing the "clear, positive and convincing" standard, the Court was explicitly referring to the "*evidence* … required" *at summary judgment*.  *Id.* at 219-220 (emphasis added).[9]   (In any event, though not required for pleading purposes, as discussed above, the Petition does attach documents that do establish clear and convincing evidence of a scrivener's error.) Likewise, the Court's statement that "[t]he history of the lease negotiations between [the parties] discloses continuing awareness" of the disputed contract provision was made in the context of evaluating the evidential support *for a summary judgment*.  *Id.* at 220.  Since *George Backer* says nothing about pleading requirements, SCM's arguments that Wells Fargo's pleadings are inadequate in light of *George Backer* fail.

---

[8]   Indeed, the decision devotes two full pages to recounting the course of negotiations on the very provision that the plaintiff sought to reform.  *Id.* at 215-16.

[9]   In fact, SCM's effort to superimpose this standard on the pleadings lacks logical coherence, because pleadings are not evidence.  *Precimed Inc. v. ECA Med. Instruments*, 2014 WL 317086, at *21 (W.D.N.Y. Jan. 28, 2014) (quoting *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.,* 2 F.R.D. 305, 306 (S.D.N.Y.1942)).

### III.   Neither The Indenture Nor The Trust Indenture Act Bars Reformation Of The Indenture To Correct A Scrivener's Error

SCM fares no better in contending (Br. 5-10 & 15) that the terms of the Indenture and the Trust Indenture Act preclude Wells Fargo from bringing an action to reform the Indenture to correct for a scrivenor's error.  To the contrary, the provisions to which SCM cites impose no limitations on the filing of a reformation claim and SCM ignores the applicable provision of the Indenture which grants that right to Wells Fargo.

For example, SCM cites to provisions under the Indenture that limit the circumstances in which the Indenture can be amended—including Section 9.02(vi) which prohibits amendments that modify payment provisions without the consent of all affected Noteholders (Br. 9) and Section 9.01(a)(v) which "confers upon Wells Fargo … the *limited* ability to correct certain ambiguities … when the amendment does 'not adversely affect in any material respect the interests of any Noteholder'" (Br. 15)—as suggesting that reformation is precluded under the terms of the Indenture without SCM's consent.  SCM's argument is unconvincing for multiple reasons.

*First*, Wells Fargo is not seeking an amendment of the Indenture and the provisions to which SCM cites—which say nothing about claims for reformation—simply have no relevance here.

*Second*, even if the provisions to which SCM cites were instructive as to the expectations of the drafters, SCM mischaracterizes the effect of those provisions.  Specifically, SCM is mistaken when it contends that Wells Fargo is able to amend the Indenture to correct an ambiguity only if doing so would "not adversely affect in any material respect the interests of any Noteholder."  (Br. 15.)  In fact, that quoted limitation does not apply to the amendment of ambiguous clauses, which is covered in subparagraph (v) of Section 9.01(a).[10]  Properly quoted, the proviso to Section 9.01(a)

---

[10]   While SCM fails to specifically cite any particular provision in Section 9.01 for the proposition that the Indenture confers "the *limited* ability to correct certain ambiguities," it must

states that "*except for indenture supplements entered into for the purposes described in (v) [i.e., those covering amendments to cure ambiguities]* and (viii) above, [amendments under Section 9.01(a)] shall not adversely affect in any material respect the interests of any Noteholder." Indenture § 9.01 (emphasis added). Thus, contrary to SCM's suggestion, the Indenture is clear that corrections may be made to its provisions without Noteholder consent even if they adversely affect the interests of certain Noteholders.

*Third,* SCM's argument that reformation is unavailable is contradicted by the Indenture's "governing law" provision which, in fact, preserves Wells Fargo's ability to seek the remedy of reformation in respect of any scrivener's errors. Specifically, Section 10.12 of the Indenture states:

> THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK … AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Indenture § 10.12 (capitalization in original). By preserving to Wells Fargo all "remedies" available under New York law, the Indenture preserved Wells Fargo's ability to seek reformation, which is the well-established remedy under New York law for correcting a scrivener's errors.

SCM is no more convincing in citing to provisions of the Indenture and TIA that provide Noteholders with an absolute right to payment of principal and interest on their Notes. Specifically, SCM points to Section 5.07 of the Indenture which provides that Noteholders' "absolute and unconditional [right] to receive payment of the principal [] and interest … shall not be impaired without consent of such a Holder" (Br. at 8-9) and Section 316(b) of TIA which provides that that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security … shall not be impaired or affected without the consent of such holder"

---

be referring to Section 9.01(a)(v), because that is the provision on the page 109 of the Indenture (Dkt.1-1 at 128) that addresses amendments "to cure" ambiguities in the Indenture.

(Br. at 6; 15 U.S.C. §77ppp(b) (2014)).  These provisions also cannot be reasonably construed as prohibiting Wells Fargo's claim for reformation for numerous reasons.

*First*, in no way can the reformation of the Indenture to reflect the actual intent of the parties be considered an "impairment" of Noteholder rights.  To the contrary, under the facts of this case, reformation is a remedy available to Wells Fargo pursuant to the Indenture and is necessary to *avoid* impairing the rights of the I-A-2 Noteholders to receive their intended principal and interest payments.  Thus, if anything, the provisions to which SCM cites support reformation in this case.

*Second,* considered more broadly, SCM's argument that errors in the payment provisions under an indenture cannot be reformed without the consent of the affected noteholders would lead to absurd results.  For example, it is hard to imagine anyone contending that reformation would be unavailable to rectify an Indenture's payment provisions where an inadvertently omitted decimal point would result in certain noteholders receiving a 50% interest rate rather than the intended 5.0% simply because the noteholders poised to receive a windfall refused to consent to the reformation.  Yet, that is precisely the effect of what SCM is arguing here.  Neither the Indenture nor TIA should be interpreted to create such an absurd result.  *See Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 957 F. Supp. 2d 316, 334 (S.D.N.Y. 2013) ("'absurd results' are 'forbidden by canons of construction'") (quoting *Bank of Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F. 3d 278, 283 (2d Cir. 2005)).

*Third*, an interpretation of TIA Section 316(b) to preclude Wells Fargo from seeking to reform the Indenture to accord with the intent of the parties would be inconsistent with the purpose and intent of TIA.  In *Upic & Co. v. Kinder Care Learning Centers, Inc.*, on which SCM relies (Br. 6), the Court explained that Section 316(b) "proscribes certain so-called 'majority action clauses' in indentures to be qualified under the [TIA]" and "expressly prohibits use of an indenture that permits

16

modification *by majority securityholder vote* of any core term of the indenture" in order to prevent "insiders and quasi-insiders [from using such procedures to] damage bondholders." 793 F. Supp. 448, 452-453 (S.D.N.Y. 1992) (emphasis added); *see also In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391-92 (Bankr. S.D.N.Y. 2004) ("[T]he Trust Indenture Act governs the rights of individual holders under a qualified indenture and provides that certain of these rights cannot be impaired *by a majority or supermajority of other holders*.") (emphasis added).  This suit does not seek to override SCM's rights by a majority vote.  Instead, Wells Fargo's request for reformation merely employs a remedy preserved for the drafting parties under the Indenture's "governing law" clause.  There is no risk that scrivener's error doctrine will be used by "insiders" to negatively impact the rights of "dispersed individual bondholders," since reformation based on scrivener's error, unlike an amendment, is narrowly constrained, requires Court involvement, and the circumstances giving rise to reformation must exist at the inception of the contract, so they cannot be "created" to frustrate bondholder expectations.

*Fourth*, SCM's conclusory assertion (Br. 1) that "black letter law" bars reformation of a scrivener's error in an Indenture covered by TIA lacks even a modicum of precedential support. Quite to the contrary, courts in this District have reformed Indentures subject to the Trust Indenture Act where they inaccurately reflect the agreement of the parties due to a drafting error.  *See, e.g.*, *Aristocrat Leisure Ltd.*, 2005 WL 1950116, at *4 (reforming bond Indenture to correct scrivener's error reversing exchange rate between U.S. dollars and Australian dollars).  SCM does not, because it cannot, cite a single case where a court has refused to correct a scrivener's error based on TIA. The cases that SCM does cite address efforts by a majority of bondholders (or an issuer) to amend or alter the established and undisputed rights of minority bondholders, and are inapposite.  *See YRC Worldwide Inc. v. Deutsche Bank Trust Co. Ams.*, 2010 WL 2680336, at *4-6 (D. Kan. July 1, 2010)

17

(rejecting issuer's effort to eliminate repurchase operations, despite supermajority (90%) vote in favor of amendment, because majority vote cannot override right to payment of interest and principal under TIA); *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999) (granting preliminary injunction blocking consent solicitation approved by 77% of bondholders that would have paid out consenting bondholders at a discount, while impairing the rights of nonconsenting bondholders by leaving them to seek recourse on their bonds from an assetless shell company); *Upic & Co.*, 793 F. Supp. at 452 (rejecting effort by bond issuer to unilaterally block redemption rights provided to bondholders under the Indenture, after determining that bondholders in fact had such redemption rights under the Indenture, contrary to the interpretation put forth by the issuer).  None of these cases stand for the proposition that TIA bars a legal remedy preserved by the clear terms of the Indenture.

## IV. Wells Fargo Has Not Pled A Contract Claim, So SCM's Arguments Regarding Ambiguity In The Indenture And The Parol Evidence Rule Are Irrelevant

SCM's argument (Br. 10-14) that the Indenture must be interpreted according to its unambiguous terms, and parol evidence is inadmissible to interpret an unambiguous contract, attack a straw man because Wells Fargo has not asked the Court to resolve an ambiguity through contractual interpretation.[11]  To the contrary, Wells Fargo has requested one of two forms of relief: either (a) reformation of the Indenture or (b) a declaratory judgment that it may allocate Realized Losses in accordance with the terms appearing in the written Indenture.  Reformation turns on mutual mistake, not ambiguity in the contract.  And, as discussed above (*see supra* at 9), it is well settled that parol evidence is admissible to determine whether there was a mutual mistake.  Thus the

---

[11]   Sceptre reserves the right to argue, in this case or in a future action, that the Indenture, read in the context of the other transactional documents, is ambiguous and should be construed as allocating Realized Losses in the order intended by the drafting parties.

ambiguity of the contract and the parol evidence rule have no bearing on the action currently before the Court.

## **CONCLUSION**

For the foregoing reasons, Sceptre respectfully requests that the Court deny SCM's motion to dismiss.

DATED:   New York, New York           Respectfully submitted,
               April 25, 2014

                                      QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP

By: _____
      Jonathan E. Pickhardt
      jonpickhardt@quinnemanuel.com

      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      (212) 849-7000

      *Attorneys for Party-In-Interest*
      *Sceptre, LLC*