IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Trusteeship Created by American Home Mortgage Investment Trust 2005-2 relating to the issuance of Mortgage-Backed Notes pursuant to an Indenture dated as of October 1, 2007. | Case No. 1:14-cv-02494-AKH |

**MEMORANDUM OF LAW IN SUPPORT OF PARTY IN INTEREST SCEPTRE, LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS OR IN THE ALTERNATIVE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jonathan E. Pickhardt
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Party In Interest
Sceptre, LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ......................................................................................5

    A.    The AHM 2005-2 Mortgage-Backed Notes ...........................................5

    B.    The Class I-A Notes And The Drafting Error In Section 3.38 ...............7

    C.    AHM 2005-2 Is Insolvent And Allocation Of Realized Losses To The
           Class I-A Notes Is Imminent....................................................................10

    D.    Wells Fargo's Commencement Of The Trust Instruction Proceeding...................11

ARGUMENT ........................................................................................................12

I.    SCEPTRE'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE
     GRANTED .......................................................................................12

    A.    Wells Fargo's Request For Reformation Should Be Granted On The
           Pleadings Because The Presence Of A Scrivener's Error In Section 3.38
           Of The Indenture Is Beyond Plausible Dispute. ....................................12

    B.    The Remedy Of Reformation Is Available To Wells Fargo .................15

    C.    Legal Arguments Raised By SCM In Its Motion To Dismiss The Petition
           Are Meritless, And Do Not Block The Relief Sought On This Motion ...............15

          1.    The Indenture Provisions Governing Amendments Of The
                 Indenture Do Not Bar Reformation. .........................................15

          2.    The Trust Indenture Act And Indenture Provisions Guaranteeing
                 Payments On The Notes Do Not Bar Reformation...............16

II.    IN THE ALTERNATIVE, SCEPTRE IS ENTITLED TO TEMPORARY AND
      PRELIMINARY RELIEF TO PREVENT IRREPARABLE HARM .............................19

    A.    Sceptre Is Likely To Prevail On The Merits.........................................19

    B.    Sceptre Will Suffer Irreparable Harm Absent A Preliminary Injunction .............19

    C.    At A Minimum, Sceptre Has Shown Sufficiently Serious Questions Going
           To The Merits, And The Balance Of Hardships Tips Decidedly In
           Sceptre's Favor ..............................................................................22

CONCLUSION..................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ...........................................................13, 14, 18

*BLT Rest. Grp. LLC v. Tourondel*,
 855 F. Supp. 2d 4 (S.D.N.Y. 2012) ...........................................................................................12

*Bank of Julius Baer & Co., Ltd. v. Waxfield Ltd.*,
 424 F.3d 278 (2d Cir. 2005) .......................................................................................................17

*In re Bd. of Dirs. of Multicanal S.A.*,
 307 B.R. 384 (Bankr. S.D.N.Y. 2004) ......................................................................................17

*Born v. Schrenkeisen*,
 110 N.Y. 55 (1888) ...........................................................................................................13, 15

*Brenntag Int'l Chems., Inc. v. Bank of India*,
 175 F.3d 245 (2d Cir. 1999) ..............................................................................................19, 20

*Carballo ex rel. Cortes v. Apfel*,
 34 F. Supp. 2d 208 (S.D.N.Y. 1999) .........................................................................................12

*Chambers v. Time Warner, Inc.*,
 282 F.3d 147 (2d Cir. 2002) ........................................................................................................5

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*,
 957 F. Supp. 2d 316 (S.D.N.Y. 2013) ................................................................................16, 17

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*,
 724 F. Supp. 2d 407 (S.D.N.Y. 2010) .......................................................................................12

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
 598 F.3d 30 (2d Cir. 2010) .........................................................................................................19

*Davidson v. Flynn*,
 32 F.3d 27 (2d Cir. 1994) ...........................................................................................................12

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ..............................................................................18

*Godfrey v. Linn*,
 No. 4:07-cv-00026 (S.D. Tex. Jan. 18, 2007) ...........................................................................20

*III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*,
 1999 WL 461808 (S.D.N.Y. July 2, 1999) .........................................................................20, 21

*Int'l Controls Corp. v. Vesco*,
 490 F.2d 1334 (2d Cir. 1974) .....................................................................................................23

*Jackson v. Johnson*,
  962 F. Supp. 391 (S.D.N.Y. 1997) ....................................................................................19

*Johnson v. Rowley*,
  569 F.3d 40 (2d Cir. 2009)..............................................................................................12

*Juster Assocs. v. Rutland*,
  901 F.2d 266 (2d Cir. 1990)............................................................................................12

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007)..............................................................................................12

*U.S. Russia Inv. Fund. v. Neal & Co., Inc.*,
  1998 WL 557606 (S.D.N.Y. Sept. 2, 1998).....................................................................13

*Savanna Auto Sales v. Mediterranean Shipping Co., S.A.*,
  2013 WL 3753155 (S.D.N.Y. July 16, 2013) ..................................................................12

*Stonebridge Capital, LLC v. Nomura Int'l PLC*,
  24 Misc. 3d 1218(A) (N.Y. Sup. N.Y. Cnty. July 6, 2009) .......................................13, 15

*Tradescape.com v. Shivaram*,
  77 F. Supp. 2d 408 (S.D.N.Y.).........................................................................................22

*Upic & Co. v. Kinder Care Learning Centers, Inc.*
  793 F. Supp. 448 (S.D.N.Y. 1992) ..............................................................................17, 18

*Vann v. Fischer*,
  2011 WL 6788404 (S.D.N.Y. Dec. 19, 2011) .................................................................19

*Vasilakos v. Gouvis*,
  296 A.D.2d 668 (N.Y. App. Div. 3d Dep't 2002) ...........................................................13

*Wachovia Corp. v. Citigroup, Inc.*,
  634 F. Supp. 2d 445 (S.D.N.Y. 2009)..............................................................................12

*YRC Worldwide Inc. v. Deutsche Bank Trust Co. Ams.*,
  2010 WL 2680336 (D. Kan. July 1, 2010) ......................................................................18

## <u>Statutes</u>

12 U.S.C. § 632......................................................................................................................11

15 U.S.C. §77ppp(b) (2014) ..................................................................................................16

28 U.S.C. § 1331....................................................................................................................11

28 U.S.C. § 1332....................................................................................................................11

28 U.S.C. § 1348....................................................................................................................11

28 U.S.C. § 1441(b) ...............................................................................................................11

28 U.S.C. § 1441(c) ................................................................................................11

28 U.S.C. § 1446 ....................................................................................................11

Party In Interest Sceptre, LLC ("Sceptre") respectfully submits this memorandum of law in support of its Motion for Judgment on the Pleadings, or in the alternative, for a Temporary Restraining Order and Preliminary Injunction in this proceeding against Petitioner Wells Fargo Bank, National Association ("Wells Fargo").

## PRELIMINARY STATEMENT

This motion is brought by Party In Interest Sceptre to expeditiously resolve the proper allocation of Realized Losses among the Class I-A-2 and I-A-3 Notes issued by American Home Mortgage Investment Trust 2005-2 ("AHM 2005-2" or "Issuer") at issue in this trust instruction proceeding or, in the alternative, to obtain a preliminary injunction to prevent any allocation of such Realized Losses and maintain the status quo until this dispute is resolved.  Absent the relief sought in this motion, Wells Fargo, AHM 2005-2's Securities Administrator, will shortly begin implementing a provision of the AHM 2005-2 Indenture that contains a clear scrivener's error that reverses the intended allocation of Realized Losses among the I-A-2 Notes and I-A-3 Notes. If Wells Fargo is permitted to implement the Indenture provision as erroneously drafted, it will dissipate the assets of AHM 2005-2—which is presently insolvent and unable to repay the full obligations to all of its Noteholders—leaving Sceptre and other holders of I-A-2 Notes irreparably harmed as they will have no adequate remedy to recoup damages resulting from their Notes being improperly written down over the course of this litigation.  Sceptre therefore respectfully requests that the Court either grant its motion for a judgment on the pleadings reforming the Indenture to read as clearly intended or, in the alternative, to issue a preliminary injunction to maintain the status quo until the case is adjudicated.

As the grounds for reformation of the Indenture are beyond reasonable dispute, this is a case that can be readily resolved on the pleadings.  The Indenture provision at issue, Section 3.38 governing the allocation of Realized Losses, contains a textbook example of a scrivener's error.

1

In this case, the error is a transposition of two digits that has the effect of mistakenly inverting the seniority of two tranches of the Notes, such that Realized Losses are allocated to the more senior I-A-2 Notes before being allocated to more junior I-A-3 Notes.  As all of the other payment terms in the Indenture pertaining to these two tranches of Notes are identical, this error subordinates the I-A-2 Notes to the I-A-3 Notes, which is the exact opposite of what was intended by the drafting parties.

Documents attached or incorporated into the pleadings make apparent that the actual intent was for the I-A-2 Notes to be senior to the I-A-3 Notes.  *First*, the Indenture provides for the I-A-2 Notes to receive a lower interest rate than the I-A-3 Notes which can only mean that the I-A-2 Notes were intended to bear less risk of loss than the I-A-3 Notes, as all other payment terms of the I-A-2 and I-A-3 Notes are identical.  *Second*, every other tranche of Notes issued pursuant to the Indenture (like mortgage-backed notes in the industry more generally) is structured such that Realized Losses are allocated in reverse sequential order, with the I-A-2 and I-A-3 Notes being the only exception.  *Third*, all of the materials that were used to market the Notes—including a detailed term sheet and a Prospectus Supplement—stated that the I-A-3 Notes would bear losses before the I-A-2 Notes, *i.e.*, the exact opposite of how Section 3.38 is drafted.  Indeed, other than the terms of Section 3.38 itself, there is no plausible basis in fact or logic from which the Court could conclude that it was the intent of the drafters that Realized Losses be allocated to I-A-2 Notes before I-A-3 Notes.

Semper Capital Management, LP ("SCM")—the other Party In Interest appearing in this action, and a holder of I-A-3 Notes that is poised to receive a windfall if Section 3.38 of the Indenture is enforced as erroneously drafted—has taken the position that reformation is an unavailable remedy in a separate motion to dismiss.  However, SCM's arguments lack any merit

and do not forestall the Court's ability to order reformation from the face of the pleadings. As discussed below, the Indenture's "governing law" clause specifically preserves to Wells Fargo all legal remedies under New York law, which includes the well-established remedy of reformation to correct a scrivener's error. SCM's argument that reformation is implicitly prohibited by Indenture provisions governing amendment of the Indenture or the Trust Indenture Act ("TIA") ignore the "governing law" clause, the distinction between a contractual amendment and the legal remedy of reformation, and the purpose of TIA. Tellingly, SCM's arguments lack even a modicum of precedential support. Since SCM has no plausible factual arguments, and its legal arguments are meritless, reformation should be granted on the pleadings, in advance of any improper implementation of the Realized Loss provisions under Section 3.38(a).

If the Court is not prepared to rule on the ultimate merits of the action at this stage, Sceptre respectfully requests that the Court maintain the status quo by temporarily and preliminarily enjoining Wells Fargo from allocating Realized Losses to the I-A-2 Notes or distributing any of the disputed cash flows during the pendency this case. Such relief is justified by the high likelihood of reformation ultimately being granted as well as the irreparable harm the I-A-2 Noteholders will face absent such relief.

Sceptre (and all the other I-A-2 Noteholders) will face irreparable harm for several reasons. *First*, pursuant to the terms of the Indenture, Sceptre's only recourse for payment on its I-A-2 Notes are the assets of AHM 2005-2, and an erroneous distribution by Wells Fargo will deplete this finite source of funds. *Second*, as evidenced by the fact that the principal balance of all Notes subordinate to the Class I-A Notes have been (or shortly will be) written down to zero, AHM 2005-2 is insolvent and unable to satisfy a money judgment to recover improperly distributed funds. *Third*, it is unclear how, if at all, an erroneous distribution could be clawed

back pursuant to the terms of the Indenture, or through employment of powers granted to Wells Fargo, as Securities Administrator.  Even if such a recovery were possible, it is clear that Sceptre's legal claims are far simpler and much stronger before an erroneous distribution. *Fourth*, regardless of Sceptre's ability to recover shortfalls on distributions affected by the mistaken allocation of Realized Losses under Section 3.38, it will be unable to recover losses resulting from the harm to the market value of its Notes caused by publication of write-downs that never should have occurred.

At the same time, the requested remedy will have no material impact on Wells Fargo, who will merely be required to escrow the funds.  Indeed, Wells Fargo has already requested leave to amend its complaint in order to refile this case as an interpleader action—which would require the very same escrowing of disputed funds—were the Court inclined to grant SCM's motion to dismiss based on a pleading deficiency.  Moreover, any harm to SCM, or other I-A-3 Noteholders, resulting from a delay in payment on their Notes would be far outweighed by the irreparable harm that will be suffered by the I-A-2 Noteholders absent an injunction.

For these reasons, which are explained more fully below, Sceptre respectfully requests that the Court (1) grant Sceptre's motion for judgment on the pleadings in advance of the next Payment Date occurring on May 25, 2014[1] or, in the alternative, (2) grant Sceptre's application for a temporary restraining order and preliminary injunction enjoining Wells Fargo from allocating Realized Losses to the I-A-2 Notes or distributing any disputed funds during the pendency of this matter.  Sceptre's argument in support of its motion for judgment on the

---

[1]   Wells Fargo has represented to Sceptre and SCM that May 18, 2014 is the last date on which it is able to adjust the allocation of Realized Losses for the Payment Date on May 25, 2014.

pleadings is presented in Section I.   Sceptre's argument in support of its application for preliminary relief is presented in Section II.

## STATEMENT OF FACTS

### A.      The AHM 2005-2 Mortgage-Backed Notes

American Home Mortgage Investment Trust 2005-2 ("AHM 2005-2") is a special purpose vehicle created to issue mortgage-backed Notes to investors pursuant to the Indenture, dated as of June 22, 2005, amongst AHM 2005-2, as Issuer, Wells Fargo, as Securities Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.   *See* Indenture at 1 (Declaration of Jonathan E. Pickhardt ("Pickhardt Decl.") Exh. B).   The Notes were marketed and sold pursuant to a Prospectus Supplement dated June 20, 2005 (the "ProSupp") and a Term Sheet dated June 13, 2005 (together, the "Offering Documents").   (Pickhardt Decl. Exh. C & D, respectively.)[2]   Holders of the Notes are entitled to payments of principal and interest from the Issuer.   To secure payment on the Notes, the Issuer holds collateral—here, mortgage loans and home equity lines of credit ("HELOCs").   ProSupp S-9 – S-12.   The Notes are paid out of income derived from that collateral—*i.e.*, cash paid to AHM 2005-2 as repayment of the underlying mortgage loans and HELOCs that it holds.   The collateral is organized into six separate "Loan Groups," each of which has its own unique eligibility criteria.   *See id.* (describing the collateral in each of the different Loan Groups).

---

[2]    While the Term Sheet is not expressly referred to in the Petition, it is properly considered by the Court on a motion for judgment on the pleadings because it constituted a portion of the official marketing materials for the Notes issued by AHM 2005-2 that (according to the Petition) gave rise to the dispute that this trust instruction proceeding brings before the Court, and therefore necessarily was relied upon by Wells Fargo.   *See Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153 (2d Cir. 2002) (court may consider documents outside the pleadings that are in the pleading party's possession, and were relied upon by the pleading party in bringing suit).   In any event, the Term Sheet constitutes evidence that can be considered by the Court in connection with the motions for temporary and preliminary injunctive relief.

The Notes issued by AHM 2005-2 do not all have the same level of risk.  Rather, the Notes are issued in different "Classes," which rely on different collateral pools for repayment.  Specifically each Class of Notes receives income derived from the collateral of one or more designated Loan Groups, and applies that income to payment of interest and repayment of principal.  Indenture §§ 3.05-3.07.  Likewise, the Realized Losses on the collateral in each Loan Group are designated for allocation among one or more Classes of Notes.  Indenture § 3.38.

In addition, Notes within a Class have varying levels of risk.  Specifically, all but one of the Classes of Notes (the Class III-A Notes) are issued with multiple "tranches" representing an unequal interest in the cash-flows received by each Class.  This priority of interest may be reflected in two ways.  *First*, "senior" tranches in some Classes are entitled to payment of principal and interest before "junior" tranches, such that when there is insufficient income to pay all obligations on that Class of Notes, the senior tranches get paid before the junior tranches.  Indenture §§ 3.05-3.07.  *Second*, when the collateral held in a Loan Group suffers "Realized Losses"—*e.g.*, because one or more of its mortgage loans is foreclosed upon and the foreclosure proceeds are less than the outstanding amount of the loan—those Realized Losses are allocated to the junior tranches in the corresponding Class of Notes first, such that more senior tranches do not sustain any Realized Losses until junior tranches have been fully written down.  Indenture § 3.38.  The allocation of Realized Losses to a tranche of Notes reduces the payments holders of those Notes will receive from future income distributions, as holders are not entitled to any distributions in respect of the portion of their Notes that have been written down until all principal on the other outstanding Notes has been paid in full.

In light of these varying degrees of risk, holders of Notes at different seniority levels are compensated at different interest rates.  *See* Indenture, Appendix A at 48-49 (definition of "Note

Margin"). This includes an initial interest rate applicable to each tranche of Notes, as well as a "step up" rate that applies after the principal remaining in each Loan Group is reduced below certain levels. *Id.*

### B.     The Class I-A Notes And The Drafting Error In Section 3.38

The Notes at issue in this litigation are the Class I-A Notes. The Class I-A Notes are separated into three tranches: the I-A-1 Notes, the I-A-2 Notes, and the I-A-3 Notes. They receive income derived from the collateral held in Loan Groups I through IV. *See* Indenture § 3.05. For every distribution of principal or interest to Class I-A Notes, each tranche receives a *pro rata* share of the distribution, equal to that tranche's percentage of the outstanding notional value of all Class I-A Notes. *Id.* Thus, the distribution of interest and principal, standing alone, is *pari passu* and creates no difference in the risk profile among the three tranches of Class I-A Notes. Indeed, absent the allocation of Realized Losses, the I-A-1, I-A-2, and I-A-3 Notes are treated identically under the Indenture as regards their rights to payment.

However, the Class I-A Notes are subject to different risks of repayment on account of the way they are allocated Realized Losses pursuant to Section 3.38 of the Indenture. That provision, entitled "ALLOCATION OF REALIZED LOSSES," includes numbered lists setting forth the priority order in which Realized Losses are allocated in respect of different Loan Groups. Pursuant to Section 3.38(a), the only Realized Losses allocated to the Class I-A Notes are those accruing on collateral held in Loan Group I. For the six tranches of Notes junior to the Class I-A Notes, Section 3.38(a) provides that such Realized Losses be allocated in reverse sequential order with more junior notes bearing losses before more senior notes, as is a standard

structure in mortgage-backed securities.[3]   However, as to the Class I-A Notes, Section 3.38(a) includes the following clause that, as drafted, would have the effect of reversing this standard structure, with the nonsensical result that the senior I-A-2 Notes bear losses before the more junior I-A-3 Notes:

> Any Realized Losses on the Group I Loans, Group II Loans, Group III Loans and Group IV Loans will be allocated or covered on any Payment Date … as follows: … *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group I Loans, ***to the Class I-A-2 Notes and Class I-A-3 Notes, in that order***, in reduction of the Note Principal Balance thereof …

Section 3.38(a) (emphasis added).  It is beyond reasonable dispute, however, that the "2" and "3" in that clause were mistakenly transposed and the intent of the provision was actually to allocate Realized Losses to Class I-A-**3** Notes and Class I-A-**2** Notes, in that order.  (Pickhardt Decl. ¶¶ 6-12.)  This is evident for several reasons.

*First,* the interest rates payable on the Class I-A-2 and Class I-A-3 Notes pursuant to the Indenture reflect the intent that the Class I-A-2 Notes bear losses after the Class I-A-3 Notes.  *Id.* ¶¶ 7 & 8.  Specifically, the Indenture provides that I-A-2 Notes pay an initial interest rate of Libor plus 0.350% and a "step-up" interest rate of Libor plus 0.700%, whereas the I-A-3 Notes pay a higher initial interest rate of Libor plus 0.380% and a higher "step-up" interest rate of Libor plus 0.760%.  *See* Indenture, Appendix A at 48-49.  As the I-A-2 Notes and I-A-3 Notes are identical in all material respects other than the allocation of Realized Losses, the only logical explanation for the I-A-3's entitlement to a higher interest rate is that it was intended that I-A-3 Notes also bear Realized Losses before the I-A-2 Notes—*i.e.,* the opposite of what Section 3.38(a) provides as drafted.

---

[3]   Section 3.38(a) provides that Realized Losses from Loan Group I are allocated to subordinate Notes in the following order of priority:  (1) Class B Notes; (2) Class M-5 Notes; (3) Class M-4 Notes; (4) Class M-3 Notes; (5) Class M-2 Notes; and (6) Class M-1 Notes.

*Second*, the way in which Realized Losses are allocated among the other tranches of Notes pursuant to Section 3.38 also reflects the intent that the I-A-2 Notes bear losses after the I-A-3 Notes.  (Pickhardt Decl. ¶ 9.)  Indeed, in *every* other instance pursuant to Section 3.38, Realized Losses are allocated to securities in reverse sequential order and in reverse order of their respective interest rates.  For example, the chart below sets forth the order in which Section 3.38(a) provides for the allocation of Realized Losses for collateral in Loan Group I:

| Rank Order | Class | Initial Interest Rate | Step Up Interest Rate |
|------------|-------|-----------------------|-----------------------|
| 1 | B | N/A (not offered) | N/A (not offered) |
| 2 | M-5 | 1.200% | 1.800% |
| 3 | M-4 | 0.750% | 1.125% |
| 4 | M-3 | 0.600% | 0.900% |
| 5 | M-2 | 0.570% | 0.855% |
| 6 | M-1 | 0.520% | 0.780% |
| 7 | I-A-2 | 0.350% | 0.700% |
| 8 | I-A-3 | 0.380% | 0.760% |
| 9[4] | I-A-1 | 0.300% | 0.600% |

*See id.*  The fact that the I-A-2 Notes and I-A-3 Notes, shaded above, are the *only* Notes for which Realized Losses are allocated in a fashion that is inverse to how Realized Losses are allocated to all of the other Notes provides further evidence of the drafting error in Section 3.38.

*Third*, the Offering Materials used to market the Notes include repeated statements describing the actual intended allocation of Realized Losses to the I-A-3 Notes before the I-A-2 Notes.  (Pickhardt Decl. ¶¶ 10-12.)  Indeed, there are at least *five* express statements in the marketing materials reflecting the intent that I-A-3 Notes bear Realized Losses before the I-A-2 Notes, and *no* statements suggesting otherwise.  For example, the ProSupp provides that Realized Losses "incurred in respect of the mortgage loans in Loan Group I," are to be allocated "to the Class I-A-3 Notes and Class I-A-2 Notes, ***in that order***, in reduction of the Note Principal

---

[4]   Class I-A-1 Notes are never allocated Realized Losses.

Balance thereof."  ProSupp at S-80 (emphasis added); *see also id.* at S-126 ("the entire amount of any Realized Losses on the Group I Loans … will be allocated to the class I-A-3 Notes and Class I-A-2 Notes, ***in that order***" (emphasis added)).  The Term Sheet similarly provides that "[a]ny losses allocable to the Class I-A Notes will first be allocated to the Class I-A-3 Notes and next to the Class I-A-2 Notes, in that order, until reduced to zero."  Term Sheet at 3 n.10; *see also id.* (describing the "credit enhancement percentage" of the I-A-2 Notes, meaning the percentage of subordinate Notes protecting the I-A-2 Notes from Realized Losses, as including the notional value of the I-A-3 Notes); *id.* at 19 (noting that that Realized Losses "will be allocated to the Class I-A-3 Notes and Class I-A-2 Notes ***reverse sequentially, in that order***, until reduced to zero" (emphasis added)).

### C.  AHM 2005-2 Is Insolvent And Allocation Of Realized Losses To The Class I-A Notes Is Imminent

Income derived from AHM 2005-2's Notes has been inadequate to repay obligations to its Noteholders.  (Pickhardt Decl. ¶ 13.)  Over the life of the deal, AHM 2005-2 has allocated more than $290 million in Realized Losses to Notes that are subordinate to the Class I-A Notes.  AHM 2005-2 March 2014 Monthly Report (Pickhardt Decl. Exh. E).  Having depleted all Notes junior to the Class I-A Notes, Wells Fargo now projects that the Class I-A Notes will begin sustaining Realized Losses on the upcoming Payment Date, occurring on May 25, 2014.  Letter from M. Johnson to J. Pickhardt, dated April 15, 2014 (Pickhardt Decl. Exh. F).  As a result, the drafting error in Section 3.38 is now critically relevant.  If not reformed, the I-A-3 Noteholders, who have been compensated at a higher interest rate throughout the life of the deal, will be permitted to jump the intended line of priority, and shift Realized Losses intended for their Notes to the more senior I-A-2 Notes.

### D.     Wells Fargo's Commencement Of The Trust Instruction Proceeding

To address the impending dispute, on January 17, 2014, Wells Fargo filed this action in the Probate and Mental Health Division of the Minnesota District Court, Fourth Judicial District, County of Hennepin, seeking a trust instruction clarifying the proper priority for allocation of Realized Losses.  Petition ¶ 5 (Pickhardt Decl. Exh. A).  Specifically, Wells Fargo "seeks entry of an order (a) reforming Section 3.38 of the Indenture so that losses are allocated first to the Class I-A-3 Notes and then, sequentially, to the Class I-A-2 Notes, in accordance with the disclosure in the [ProSupp] or, in the alternative, (b) directing that any Realized Losses shall be allocated strictly pursuant to the existing terms of the Indenture."  *Id.*  Wells Fargo has not taken a position as to the proper outcome of this case.

On February 18, 2014, Party In Interest Sceptre removed the Action to the United States District Court for the District of Minnesota pursuant to 12 U.S.C. § 632 and 28 U.S.C. §§ 1331, 1332, 1348, 1441(b) and (c) and 1446.  (Dkt.1.)[5]  On April 3, 2014, Wells Fargo, Sceptre, and SCM filed a Stipulation to Transfer Venue to this Court, and on April 7, 2014, the Action was transferred in accordance with that Stipulation.  (Dkt.22 & 25, respectively.)  Immediately prior to the Stipulation to Transfer Venue, SCM filed a motion to dismiss.  (Dkt.18.)  Because that motion is not likely to be resolved before Realized Losses reach the Class I-A Notes, and will not resolve the ultimate merits of this case, Sceptre now moves this Court for relief to prevent the irreparable harm that would result from the erroneous write-down of the I-A-2 Notes.

---

[5]   Citations to "Dkt.__" refer to the ECF stamp on documents filed in this case, No. 1:14-cv-02494-AKH (S.D.N.Y.).

## ARGUMENT

### I.   SCEPTRE'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED

A party is entitled to judgment on the pleadings "if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999) (citing *Juster Assocs. v. Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)).[6]  The "[c]ourt must 'view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party.'" *Savanna Auto Sales v. Mediterranean Shipping Co., S.A.*, 2013 WL 3753155, at *1 (S.D.N.Y. July 16, 2013) (quoting *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994).  "Nevertheless, the court need not accord '[l]egal conclusions, deductions or opinions couched as factual allegations … a presumption of truthfulness.'" *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 450 (S.D.N.Y. 2009) (quoting *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)).  And the court is "not required to draw unreasonable inferences" in favor of the nonmoving party. *BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012).  Ultimately, the party opposing judgment on the pleadings must show that it is plausibly entitled to prevail on the ultimate merits of the case, *i.e.*, that its likelihood of success is "more than a sheer possibility." *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 207, 415 (S.D.N.Y. 2010).

### A.   Wells Fargo's Request For Reformation Should Be Granted On The Pleadings Because The Presence Of A Scrivener's Error In Section 3.38 Of The Indenture Is Beyond Plausible Dispute.

The standard for reformation to correct a scrivener's error is well established under New York law: "'[w]here there is no mistake about the agreement, *and the only mistake alleged is in*

---

[6]   The standard for determining whether to grant a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as that governing a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).  *See Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir. 2009).

*the reduction of that agreement to writing*, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.'" *Stonebridge Capital, LLC v. Nomura Int'l PLC*, 24 Misc. 3d 1218(A), at*4 (N.Y. Sup. N.Y. Cnty. July 6, 2009) (quoting *Born v. Schrenkeisen*, 110 N.Y. 55, 59 (1888)) (emphasis in original); *see also Vasilakos v. Gouvis*, 296 A.D. 2d 668, 669 (N.Y. App. Div. 3d Dep't 2002) (same).   Reformation is available to correct a "scrivener's error" where, like here, "the parties have reached a real and existing agreement on particular terms and subsequently find themselves bound to a writing which does not accurately express their agreement." *U.S. Russia Inv. Fund. v. Neal & Co., Inc.*, 1998 WL 557606, at *4 (S.D.N.Y. Sept. 2, 1998) (quotations omitted).   The existence of a scrivener's error must be shown by "clear and convincing evidence." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).   However, the parol evidence rule does *not* apply, and courts may look at extrinsic evidence to evaluate whether the disputed writing includes a drafting error.   *Id.*

Section 3.38 of the Indenture contains a quintessential example of scrivener's error in which two digits were mistakenly transposed.   The *actual* intent of the drafting parties—*i.e.*, to allocate Realized Losses first to I-A-3 Notes, and then to I-A-2 Notes—is beyond reasonable dispute.   While the provision, as written, states "to the extent such Realized Losses are incurred in respect of the Group I Loans, [they are allocated] to the Class I-A-**2** Notes and Class I-A-**3** Notes, in that order"  (Indenture §3.38(a)(*ninth*)), the drafting parties intended to provide that "to the extent such Realized Losses are incurred in respect of the Group I Loans, [they are allocated] to the Class I-A-**3** Notes and Class I-A-**2** Notes, in that order."   As described above, *see supra* at 7-10, the existence of a scrivener's error is apparent from the transaction documents for at least three reasons.

*First*, the provision of a higher interest rate on the I-A-3 Notes is explicable for no reason other than it reflecting the intent that the I-A-3 Notes bear risk of loss before the I-A-2 Notes.

*Second,* as is standard in mortgage backed securities, every other class of Notes in the Indenture allocates Realized Losses in reverse sequential order, with the I-A-2 Notes and I-A-3 Notes being the only exception.

*Third*, every discussion of loss allocation in the Offering Documents—which were created contemporaneously to the Indenture and are intended to explain its contents to investors—describes the Indenture as allocating Realized Losses first to the I-A-3 Notes, and then afterwards, to the I-A-2 Notes.[7]

More fundamentally, aside from scrivener's error, there is no other plausible explanation for the allocation of Realized Losses appearing in Section 3.38.  Based on the facts before this Court, there is not even a "sheer possibility" (let alone a plausible inference) that the drafting parties intended to subordinate senior I-A-2 Notes to junior I-A-3 Notes, while still compensating I-A-3 Notes at higher interest rate.  Since the only plausible interpretation of Section 3.38 supports reformation of the Indenture, Sceptre's motion for judgment on the pleadings should be granted.

---

[7]   As noted (*supra* at 13), the parol evidence rule does not apply to contract reformation actions to correct a scrivener's error.  SCM does not dispute this point.  SCM's argument in its motion to dismiss (SCM's Brief In Support of Motion to Dismiss ("SCM Br.") at 10-14) that parol evidence is inadmissible to alter the interpretation of an otherwise unambiguous, written agreement does not apply to the scrivener's error claims at issue in this case.  *See Aristocrat Leisure Ltd.*, 2005 WL 1950116, at *4 ("Parol evidence is admissible to correct a mutual mistake.").

**B.     The Remedy Of Reformation Is Available To Wells Fargo**

It is equally beyond reasonable dispute that the remedy of reformation is available to Wells Fargo.   The Indenture's "governing law" clause clearly and unambiguously preserves Wells Fargo's remedies under New York contract law.[8]   Specifically, the Indenture states:

> THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK … AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Indenture § 10.12 (capitalization in original).   One of those remedies is reformation to correct a scrivener's error, which has been recognized by New York courts for more than a century.   *See, e.g., Stonebridge Capital, LLC*, 24 Misc. 3d 1218(A), at*4 (citing *Born*, 110 N.Y. at 59).   There is no plausible reading of the "governing law" clause other than an intent that such well-established remedies be available to Wells Fargo.   *See Chesepeake Energy Corp.*, 957 F. Supp. 2d at 333 ("Language is to be afforded it reasonable and ordinary meaning.") (emphasis omitted).

**C.     Legal Arguments Raised By SCM In Its Motion To Dismiss The Petition Are Meritless, And Do Not Block The Relief Sought On This Motion**

**1.     The Indenture Provisions Governing Amendments Of The Indenture Do Not Bar Reformation.**

SCM's argument in support of its motion to dismiss that provisions under the Indenture limiting the circumstances in which the Indenture can be amended[9] somehow implicitly bar the remedy of reformation, notwithstanding the explicit preservation of New York law remedies in

---

[8]   When interpreting a contract, such as the Indenture, judgment as a matter of law is appropriate "if the language of the contract is wholly unambiguous." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 957 F. Supp. 2d 316, 330 (S.D.N.Y. 2013) (quotations omitted).

[9]   Specifically, SCM relied on Section 9.02(vi) which prohibits amendments to the Indenture that modify payment provisions without the consent of all affected Noteholders (SCM Br. 9) and Section 9.01(a)(v) which permits amendments to the Indenture correcting certain ambiguities without the consent of Noteholders (SCM Br. 15).

the "governing law" clause, is meritless.  Wells Fargo is not seeking an amendment of the

Indenture, but instead, is seeking the legal remedy of reformation.  The provisions to which SCM

cites say nothing about Wells Fargo's right to this legal remedy, and therefore, simply have no

relevance here.  It would be unreasonable to construe a provision that never mentions, or even

contemplates legal remedies, as altering or qualifying a provision that specifically addresses

Wells Fargo's legal remedies and is crystal clear in its preservation of Wells Fargo's right to seek

reformation.  *See Chesapeake Energy Corp.*, 957 F. Supp. 2d at 333 ("Specific language controls

general language.") (emphasis omitted).

> **2.    The Trust Indenture Act And Indenture Provisions Guaranteeing
> Payments On The Notes Do Not Bar Reformation.**

Similarly, SCM's argument in support of its motion to dismiss that provisions of the

Indenture and TIA guaranteeing payment on the Notes bar reformation also fails.[10]  *First*, in no

way can the reformation of the Indenture to reflect the actual intent of the parties be considered

an "impairment" of Noteholder rights.  To the contrary, under the clear terms of the Indenture,

the legal remedy of  reformation has been preserved and is necessary to *avoid* impairing the

rights of the I-A-2 Noteholders to receive their intended principal and interest payments.  Thus,

if anything, the provisions to which SCM cites in its motion to dismiss support reformation in

this case.

*Second,* considered more broadly, SCM's argument that errors in the payment provisions

under an indenture cannot be reformed without the consent of the affected noteholders would

---

[10]    Specifically, SCM pointed to Section 5.07 of the Indenture which provides that
Noteholders' "absolute and unconditional [right] to receive payment of the principal [] and
interest … shall not be impaired without consent of such a Holder" (SCM Br. at 8-9) and Section
316(b) of TIA which provides that  that "the right of any holder of any indenture security to
receive payment of the principal of and interest on such indenture security … shall not be
impaired or affected without the consent of such holder" (SCM Br. at 6; 15 U.S.C. §77ppp(b)
(2014)).

16

lead to absurd results.  For example, it is hard to imagine anyone contending that reformation would be unavailable to rectify an Indenture's payment provisions where an inadvertently omitted decimal point would result in certain noteholders receiving a 50% interest rate rather than the intended 5.0% simply because the noteholders poised to receive a windfall refused to consent to the reformation.  Yet, that is precisely the interpretation that SCM appears to have endorsed in support of its motion to dismiss.  Neither the Indenture nor TIA should be construed to create such an absurd result.  *See Chesapeake Energy Corp.*, 957 F. Supp. at 334 ("'absurd results' are 'forbidden by canons of construction'") (quoting *Bank of Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F. 3d 278, 283 (2d Cir. 2005)).

*Third*, an interpretation of Section 316(b) of TIA to preclude Wells Fargo from seeking to reform the Indenture to accord with the intent of the parties would be inconsistent with the purpose and intent of TIA.  In *Upic & Co. v. Kinder Care Learning Centers, Inc.*, on which SCM relied in its motion to dismiss (SCM Br. 6), the Court explained that Section 316(b) "proscribes certain so-called 'majority action clauses' in indentures to be qualified under [TIA]" and "expressly prohibits use of an indenture that permits modification *by majority securityholder vote* of any core term of the indenture" in order to prevent "insiders and quasi-insiders [from using such procedures to] damage bondholders."  793 F. Supp. 448, 452-453 (S.D.N.Y. 1992) (emphasis added); *see also In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391-92 (Bankr. S.D.N.Y. 2004) ("[T]he Trust Indenture Act governs the rights of individual holders under a qualified indenture and provides that certain of these rights cannot be impaired *by a majority or supermajority of other holders*.") (emphasis added).  This suit does not seek to override SCM's rights by a majority vote.  Instead, Wells Fargo's request for reformation merely employs a remedy preserved for the drafting parties under the Indenture's "governing law" clause.  There is

no risk that scrivener's error doctrine will be used by "insiders" to negatively impact the rights of "dispersed individual bondholders," since reformation based on scrivener's error, unlike an amendment, is narrowly constrained, requires Court involvement, and the circumstances giving rise to reformation must exist at the inception of the contract, so they cannot later be "created" to frustrate bondholder expectations.

*Fourth,* SCM's proposed interpretation of TIA as barring reformation of a scrivener's error lacks even a modicum of precedential support.  To the contrary, courts in this district have reformed Indentures subject to TIA where they inaccurately reflect the agreement of the parties due to a drafting error.  *See, e.g.*, *Aristocrat Leisure Ltd.*, 2005 WL 1950116, at *4 (reforming bond indenture to correct scrivener's error reversing exchange rate between U.S. dollars and Australian dollars).  In its motion to dismiss, SCM did not, because it could not, cite a single case where a court has refused to correct a scrivener's error based on TIA.  The cases that SCM did cite address efforts by a majority of bondholders (or an issuer) to amend or alter the established and undisputed rights of minority bondholders, and are inapposite.  *See YRC Worldwide Inc. v. Deutsche Bank Trust Co. Ams.*, 2010 WL 2680336, at *4-6 (D. Kan. July 1, 2010) (rejecting issuer's effort to eliminate repurchase operations, despite supermajority (90%) vote in favor of amendment, because majority vote cannot override right to payment of interest and principal under TIA); *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, 1999 WL 993648, at *7 (S.D.N.Y.  Nov. 2, 1999) (granting preliminary injunction blocking consent solicitation approved by 77% of bondholders that would have paid out consenting bondholders at a discount, while impairing the rights of nonconsenting bondholders by leaving them to seek recourse on their bonds from an assetless shell company); *Upic & Co.*, 793 F. Supp. at 452 (rejecting effort by bond issuer to unilaterally block redemption rights provided to bondholders under the

18

indenture, after determining that bondholders in fact had such redemption rights under the indenture, contrary to the interpretation put forth by the issuer).  None of these cases stand for the proposition that TIA bars a legal remedy preserved by the clear terms of the Indenture.

## II.      IN THE ALTERNATIVE, SCEPTRE IS ENTITLED TO TEMPORARY AND PRELIMINARY RELIEF TO PREVENT IRREPARABLE HARM

"In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction."  *Vann v. Fischer*, 2011 WL 6788404, at *1 (S.D.N.Y. Dec. 19, 2011) (quoting *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997)).  Sceptre is entitled to both if it can show: (1) the injunction is necessary to prevent irreparable harm; and (2) either (a) Sceptre is likely to prevail on the merits, or (b) Sceptre has shown sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of the hardships tips decidedly in Sceptre's favor.  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  Sceptre satisfies these requirements for the following reasons.

### A.      Sceptre Is Likely To Prevail On The Merits

Were this Court not prepared to grant Sceptre judgment on the pleadings, the facts set forth above (*supra* at 7-10 & 12-15) at the very least establish a likelihood—indeed, an overwhelming one—that Sceptre will prevail on the merits in this trust instruction proceeding. Therefore, this prerequisite for preliminary relief is satisfied.

### B.      Sceptre Will Suffer Irreparable Harm Absent A Preliminary Injunction

The critical test for irreparable harm is whether, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (citation omitted).  Consistent with this standard, courts in this

district have found a threat of irreparable harm where a creditor seeks to prevent dissipation or transfer of collateral on a nonrecourse debt, "coupled with the apparent inability of [the debtor] to satisfy an eventual judgment in the event [the creditor] ultimately prevails" due to the debtor's insolvency.  *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *6 (S.D.N.Y. July 2, 1999).  Likewise, courts have found a threat of irreparable harm where a party applying for preliminary relief would be forced to forego "far simpler and much stronger" legal claims than those that would remain after distribution.  *Brenntag Int'l Chems., Inc.*, 175 F. 3d at 250 (2d Cir. 1999) (affirming a district court's holding that a debtor's "insolvency, together with the weaker claims [the creditor] would have against [other parties] … was sufficient to bring this case within the insolvency exception"); *see also Godfrey v. Linn*, No. 4:07-cv-00026, at *4 (S.D. Tex. Jan. 18, 2007), ECF No. 24 (preliminary injunction freezing distribution of trust assets warranted because "exculpatory provisions" in security trust "ma[d]e recovery of monetary damages from [the trustee] unlikely").

Here, Sceptre faces a substantial likelihood that, absent a preliminary injunction, it will be unable to obtain a resolution returning it to the position it currently (and properly) occupies. *First*, if Wells Fargo proceeds with the erroneous allocation of Realized Losses to the I-A-2 Notes instead of the I-A-3 Notes, it will end up improperly distributing amounts to the I-A-3 Notes that deplete the assets comprising the only security for payment of the Issuer's obligations under the I-A-2 Notes.  Each Note issued by AHM 2005-2 specifically provides that it is "A NON-RECOURSE OBLIGATION OF THE ISSUER, AND IS LIMITED IN RIGHT OF PAYMENT TO AMOUNTS AVAILABLE FROM THE TRUST ESTATE."  Indenture Exh. A-1-1 (capitalization in original); *see also id.* § 10.15 ("No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer … on the Notes or under this Indenture …

against (i) the Indenture Trustee … or (ii) any owner of a beneficial interest in the Issuer or [several other listed parties] except as any such Person may have expressly agreed.").  Moreover, as noted above (*supra* at 10-11), AHM 2005-2 is insolvent, and therefore unlikely to be able to satisfy an eventual judgment in favor of I-A-2 Noteholders seeking to recover losses resulting from the improper depletion of their security and source of payment.  Thus Sceptre (like the plaintiff in *III Finance Ltd.*) faces a threat of irreparable harm because its only contractual (and *de facto*) source of payment on the obligations of an insolvent debtor would be irreversibly diminished absent preliminary relief.

*Second*, Sceptre is unlikely to be able to secure return of the improper distributions from the I-A-3 Noteholders, or replacement of those amounts from Wells Fargo, as would be necesssary to return the I-A-2 Notes to "the positions they previously occupied."  At the very least, its legal claims are "far simpler and much stronger" before an erroneous distribution.  Due to the non-recourse provisions of the Indenture, Sceptre's claims against the I-A-3 Noteholders who would receive erroneous distributions of trust funds face significant challenges.  *See* Indenture § 10.15 ("[n]o recourse may be taken … with respect to the obligations of the Issuer … against … any owner of a beneficial interest in the Issuer").  Likewise, Sceptre's recovery against Wells Fargo would be complicated by exculpatory provision in the Indenture that limit the Securities Administrator's liability to damages caused by "its own negligent action" or "its own negligent failure to act."  *Id.* § 6.01(c).  Prevailing on claims against either of these parties is clearly more challenging than proving the existence of scrivener's error, which, as noted above, is beyond reasonable dispute.  This, too, supports a finding of irreparable harm.

*Third*, regardless of its effect on the distribution of funds, the erroneous allocation of Realized Losses will irreparably harm Sceptre by writing down the principal of the I-A-2 Notes

that Sceptre holds, and diminishing their market value.  These write-downs, whether or not they are ultimately reversed, irreparably harm Sceptre.  For example, write-downs reduce the market value of Sceptre's investment, and any sales during the pendency of this litigation would be at a diminished price with no recourse to recover the loss.[11]  Similarly, such write-downs would also decrease the value that Sceptre could obtain through any efforts to finance its position during the course of the action through, by example, a repurchase agreement facility which turns on the market value of the Notes.  Together, the impact to resale value and financing cost have a real, immediate, and irreparable impact on the value of holding the Notes.  Not only does Sceptre have no apparent recourse under the Indenture to recover such amounts, but it would be very difficult for Sceptre to calculate the harm with adequate certainty to recover damages even if it did.

### C.    At A Minimum, Sceptre Has Shown Sufficiently Serious Questions Going To The Merits, And The Balance Of Hardships Tips Decidedly In Sceptre's Favor

Even if Sceptre could not establish a likelihood of success on the merits, it would nevertheless be appropriate for the Court to grant Sceptre's application for temporary and preliminary relief, because there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in Sceptre's favor.  *See Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y.) ("the balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided").  *First*, preliminary relief will cause *no* hardship to Wells Fargo, and, in fact, is quite similar to the alternative relief *requested* by Wells Fargo in its opposition to SCM's motion to dismiss for leave to restyle its Petition as an interpleader.  (Wells Fargo's

---

[11]    It is not sufficient that at some point in the future, the Notes' proper resale value might be restored, since the near-term illiquidity (*i.e.*, the inability to sell the Notes at fair value) has an immediate and irreparable impact on the value of Sceptre's investment.

Opposition to SCM's Motion to Dismiss ("WF Opp.") at 15-16.)  The preliminary injunction sought here, like an interpleader, would merely require Wells Fargo to withhold distribution of disputed funds pending resolution of the merits in this case.  *Second¸* any harm to SCM would be marginal—a mere delay in receipt of certain funds it claims it is owed—and clearly outweighed by the irreparable harm faced by Sceptre should the collateral securing payments on its Notes be irreversibly depleted (*see supra*, Section II).  *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347-1348 (2d Cir. 1974) (affirming preliminary injunction prohibiting sale of aircraft, where "sale might well result in the dissipation of an important asset, leaving little for [plaintiff] to recapture if it should eventually succeed in [the] lawsuit").[12]

## CONCLUSION

For the foregoing reasons, Sceptre respectfully requests that the Court grant its motion for judgment on the pleadings or, alternatively, enter a temporary restraining order and preliminary injunction prohibiting allocation of Realized Losses to the I-A-2 Notes pending resolution of this

---

[12]   Since the preliminary relief sought by Sceptre would cause no harm to Wells Fargo, and any harm to SCM will be *de minimis*, Sceptre should not be required to post any bond.  (*See* Pickhardt Decl. ¶ 15.)

Action and requiring Wells Fargo to withhold and place in escrow sufficient funds to cover the

disputed portion of future distributions of principal and interest to I-A-2 and I-A-3 Noteholders.

DATED:   New York, New York              Respectfully submitted,
         May 2, 2014
                                         QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP


                                         By: _____
                                             Jonathan E. Pickhardt
                                             jonpickhardt@quinnemanuel.com

                                             51 Madison Avenue, 22nd Floor
                                             New York, New York 10010
                                             (212) 849-7000

                                             *Attorneys for Party-In-Interest
                                             Sceptre, LLC*

24