IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Trusteeship Created by American Home Mortgage Investment Trust 2005-2 relating to the issuance of Mortgage-Backed Notes pursuant to an Indenture dated as of October 1, 2007 | Case No. 1:14-cv-02494-AKH<br><br>ECF Case<br><br>**SEMPER CAPITAL MANAGEMENT, L.P.'S ANSWER TO THE VERIFIED PETITION AND COUNTERCLAIMS AND CROSS-CLAIMS** |

## ANSWER

Party-in-interest, Semper Capital Management, L.P., as Investment Manager for Semper MIDAS Fund, L.P. ("SCM"), by and through its undersigned attorneys, Jones & Keller, P.C., answer, upon knowledge as to itself and its own acts, and otherwise upon information and belief, the Verified Petition of Wells Fargo Bank, N.A. ("Wells Fargo"), as follows:

1.      SCM admits the allegations contained in Paragraph 1 of the Verified Petition.

2.      SCM admits that at the time Wells Fargo filed the Verified Petition in the Probate and Mental Health Court in Hennepin County, Minnesota, it did so under a claim of jurisdiction pursuant to Minn. Stat. § 501B.16(4) and (23), Minn. Stat. §501B.17(2), and Minn. Stat. § 501B.24, as an interested party under Minn. Stat. § 501(B)(16), but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 2 and therefore denies same.

3.      SCM admits that there is an inconsistency between the Indenture Agreement, dated June 22, 2005 ("Indenture") and the Prospectus Supplement, dated June 20, 2005

("Prosupp"'), but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in Paragraph 3 and therefore denies same.

4.     SCM admits that Wells Fargo is aware of an inconsistency between Section 3.38 of the Indenture and the Prosupp, but denies that there is a "conflict" to the extent that term suggests that the loss allocation as stated in the Prosupp is on equal footing with the loss allocation guaranteed by the Indenture and the Trust Indenture Act.  SCM admits Section 3.38 of the Indenture provides that Realized Losses will be allocated to the Class I-A-2 Notes before the Class I-A-3 Notes.  SCM admits the Prosupp describes the Class I-A-2 Notes as senior to Class I-A-3 Notes. SCM denies the remaining allegations in Paragraph 4 of the Verified Petition. SCM does not adopt the statement, "As set forth in greater detail below…."

5.     SCM admits the allegations in Paragraph 5 of the Verified Petition.

6.     SCM admits that Wells Fargo was appointed Securities Administrator under the Indenture but lacks sufficient knowledge and information to either admit or deny whether it acts as such, and therefore denies same, and specifically denies that Wells Fargo's actions in this matter are "under the terms of the Indenture."

7.     SCM admits the allegations in Paragraph 7 of the Verified Petition.

8.     SCM admits the allegations in Paragraph 8 of the Verified Petition.

9.     SCM admits the allegations in Paragraph 9 of the Verified Petition to the extent that is what the Indenture states.  SCM lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 9 of the Verified Petition and therefore denies same.

10.     SCM admits the allegations in Paragraph 10 of the Verified Petition.

11.     SCM admits the allegations in Paragraph 11 of the Verified Petition.

12.     SCM admits the allegations in Paragraph 12 of the Verified Petition.

13.     SCM admits the allegations in Paragraph 13 of the Verified Petition.

14.     SCM admits that the loss allocation priority as stated in the Prosupp is inconsistent with that of the Indenture.  SCM denies any additional allegations in Paragraph 14 of the Verified Petition.

15.     SCM denies any characterizations or opinions offered by the "Holder."  SCM lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 15 of the Verified Petition and therefore denies same.

16.     SCM admits that it was and remains Wells Fargo's obligation to allocate Realized Losses in accordance with the Indenture and that Wells Fargo may not alter that allocation absent amendment to the Indenture.  SCM lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 16 of the Verified Petition and therefore denies same.

17.     SCM admits that the Indenture does not include a provision that would allow the parties to amend it without consent of all affected Noteholders.  SCM denies any allegation suggesting that the Indenture should "conform" to the Prosupp.  SCM lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 17 of the Verified Petition and therefore denies same.

18.     If the allegation in Paragraph 18 is intended to include that SCM contacted Wells Fargo to confirm that Wells Fargo would follow the Indenture, SCM admits to that extent.  SCM lacks sufficient knowledge and information to either admit or deny the remaining allegations in Paragraph 18 of the Verified Petition and therefore denies same.

19.     SCM admits the allegations in Paragraph 19 of the Verified Petition.

20.     SCM admits the allegations in Paragraph 20 of the Verified Petition to the extent the Consent Notice contains this information.  To the extent Paragraph 20 of the Verified Petition contains additional allegations, SCM lacks sufficient knowledge and information to either confirm or deny the remaining allegations in Paragraph 20 and therefore denies same.  SCM denies that there is a "conflict" to the extent that term suggests that the loss allocation as stated in the Prosupp is on equal footing with the loss allocation guaranteed by the Indenture and the Trust Indenture Act.

21.     SCM admits the allegations in Paragraph 21 of the Verified Petition to the extent the Consent Notice contains this information, but denies that Wells Fargo has the right to take further action, including legal action, to reverse the Indenture loss allocation absent consent of all affected Noteholders, and denies that Wells Fargo's "reservation" of rights creates rights that otherwise do not exist.  SCM further denies that there is a "conflict" to the extent that term suggests that the loss allocation as stated in the Prosupp is on equal footing with the loss allocation guaranteed by the Indenture and the Trust Indenture Act.

22.     SCM admits the allegations in Paragraph 22 of the Verified Petition.

23.     SCM admits the allegations in Paragraph 23 of the Verified Petition to the extent the Information Notice contains this information, but denies that Wells Fargo has the right to take further action, including legal action, to reverse the Indenture loss allocation absent consent of all affected Noteholders, and denies that Wells Fargo's "reservation" of rights creates rights that otherwise do not exist.  SCM further denies that there is a "conflict" to the extent that term suggests that the loss allocation as stated in the Prosupp is on equal footing with the loss allocation guaranteed by the Indenture and the Trust Indenture Act.

24.     SCM admits the allegations in Paragraph 24 of the Verified Petition except to the extent they suggest that allocating Realized Losses to the Class I-A-3 Notes before the Class I-A-2 Notes absent consent from all affected Noteholders is a legal option, and further denies the allegations to the extent they states that Wells Fargo is in need of a court ruling telling it how to allocate the Realized Losses.

25.     SCM admits that Wells Fargo seeks the specified order in this matter.  SCM denies that Wells Fargo is entitled to the relief set forth in subsections (i)(a) and (iii).

26.     SCM denies the allegations in Paragraph 26 of the Verified Petition, except that SCM admits that Wells Fargo does have duties under the Indenture.

27.     SCM denies all relief requested under the "Wherefore" clause except, without conceding the necessity of such an order, that portion of section (c)(i) seeking an order directing that Realized Losses be allocated in accordance with the Indenture.

28.     All allegations not specifically addressed in the foregoing Paragraphs 1-27 are denied.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters where that burden rests on Wells Fargo or Party-in-interest Sceptre, LLC ("Sceptre"), SCM alleges the following facts upon knowledge as to itself and its own acts, and otherwise upon information and belief, and asserts the following defenses with respect to the Verified Petition:

### FIRST AFFIRMATIVE DEFENSE
(Illegality-Trust Indenture Act and Trust Indenture Bar Reformation)

Wells Fargo's request to reform the Indenture is barred under the Trust Indenture Act and the provisions of the Indenture.

### SECOND AFFIRMATIVE DEFENSE
(Statute of Limitations)

Wells Fargo's request to reform the Indenture based on a claim of mistake is barred by the statute of limitations.

### THIRD AFFIRMATIVE DEFENSE
(Laches)

Wells Fargo's claim is barred by the equitable doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE
(Estoppel)

Wells Fargo's claim is barred by the equitable doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE
(Unclean Hands)

Wells Fargo's claim is barred by the equitable doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE
(Unjust Enrichment)

Wells Fargo's claim is barred in that the requested relief would work to effect unjust enrichment.

### SEVENTH AFFIRMATIVE DEFENSE
(Failure to State a Claim)

Wells Fargo has failed to state a claim upon which relief may be granted.

### EIGHTH AFFIRMATIVE DEFENSE
(Indemnity)

Wells Fargo has an obligation to indemnify SCM for any damages incurred as a result of Wells Fargo's actions and inactions.

### NINTH AFFIRMATIVE DEFENSE
(Contrary to Public Policy)

Wells Fargo's claim fails because the relief requested is contrary to public policy.

{JK00579631.1 }

### TENTH AFFIRMATIVE DEFENSE
(Failure to Join an Indispensable Party)

Wells Fargo's claim is barred because the party responsible for drafting the Indenture is not a party to this action.

### ELEVENTH AFFIRMATIVE DEFENSE
(Bona Fide Purchaser for Value)

Wells Fargo's claim fails because SCM is a bona fide purchaser for value.

### TWELFTH AFFIRMATIVE DEFENSE
(Preemption)

Wells Fargo's state law claim is preempted by federal law.

### RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSE

SCM gives notice that it intends to rely upon such other further defenses as may become available during pretrial proceedings in this action and hereby reserves all rights to amend this Answer and all such defenses.

/

/

/

Remainder of page intentionally left blank

/

/

/

/

/

/

/

## COUNTERCLAIMS AND CROSS-CLAIMS[1]

1.      SCM, by and through its undersigned attorneys, Jones & Keller, P.C., for its Counterclaims against Wells Fargo and Cross-Claims against Sceptre, alleges upon knowledge as to itself and its own acts, and otherwise upon information and belief, as follows:

### NATURE OF THE ACTION

2.      Nine years after the Trust was created, Wells Fargo petitions the Court for clarity about whether it should allocate Realized Losses between the I-A-2 and I-A-3 in accordance with the Indenture or the Prospectus Supplement ("Prosupp").   But Wells Fargo's neutrality is feigned.  The law tells Wells Fargo that it must allocate the Realized Losses in accordance with the Indenture and, in fact, it is a violation of law not to do so.  There is no question about what Wells Fargo is required to do as a matter of law.

3.      Properly viewed, Wells Fargo is before the Court as an agent of Sceptre, an investor who purchased the I-A-2 Notes and either did not diligence its loss priority position and is unhappy with the deal it struck, or is engaging in arbitrage-investing-by-litigation, seeking to convert its lower value, lower priced Notes into higher value, higher priced Notes through a reformation of the loss allocation priority.

4.      On the other side is SCM, a bona fide purchaser of the I-A-3 Notes who paid fair market value for Notes in a senior loss position relative to the Class I-A-2.  At the time SCM purchased its Notes, the credit ratings, Intex cashflow model, Bloomberg credit enhancement levels, and market pricing data for the I-A-3 Notes showed that the market validated the loss priority set forth in the Indenture.

---

[1] These claims may be pled as third party claims.  In light of the expedited proceedings, SCM asks the Court to accept them as counterclaims and/or cross-claims.  If the Court prefers, SCM will file a third party complaint forthwith.

{JK00579631.1 }

5.      Wells Fargo is responsible for publishing at least some of the information that fed the ratings and market valuation, including informing the ratings agencies that Wells Fargo would follow the loss allocation set forth in the Indenture.

6.      Wells Fargo also expressly confirmed for SCM that Wells Fargo would follow the Indenture unless it received unanimous consent from all affected Noteholders to the contrary.

7.      Wells Fargo subsequently sought, but failed to receive, unanimous consent.

8.      At least since November 2010, Wells Fargo knew of the discrepancy between the Indenture and the Prosupp.

9.      Between November 2010 and the January 2014 filing of this action, investors relied on Wells Fargo's statements, the Indenture, and market data demonstrating the I-A-3 Notes' seniority in making investment decisions.  They traded in the Notes, held the Notes, and used the Notes as collateral or otherwise in connection with other investments.

10.     If Wells Fargo truly believed the Indenture needed clarification, it should have sought it in November 2010, which would have been before SCM purchased its Notes.

11.     Basic due diligence as the Securities Administrator, as well as performance of its duties, functions, and responsibilities under the Indenture, should have caused Wells Fargo to learn of the discrepancy between the Prosupp and Indenture even earlier.

12.     Wells Fargo's position that the impending allocation of Realized Losses is what triggered the need for Court action ignores that the value of the Notes now reflects the market's view of the loss allocation priority, and that the Notes have been trading accordingly.

13.     Wells Fargo's delay was unjustified and prejudicial.

14.     While this matter arises out of Wells Fargo's claimed quest for clarity in connection with the allocation of Realized Losses among the Class I-A-2 and I-A-3 Notes, Wells

Fargo and Sceptre actually know or should know that the proposed reformation they place before the Court would: circumvent the express language of the Indenture and the requirements of the Trust Indenture Act; harm SCM, a trust beneficiary; and create uncertainty in the market.

15.     Wells Fargo and Sceptre also know or should know that the request for reformation is barred by the applicable statute of limitations, is untimely under the doctrine of laches, and is barred under other equitable doctrines.  Nevertheless, Wells Fargo and Sceptre invoke the jurisdiction of the Court to perform an unlawful act to the detriment of SCM, causing SCM to appear and defend itself and suffer unjustified harm.

16.     The reformation Wells Fargo and Sceptre seek would not only cause harm to SCM, but would unjustly enrich Sceptre by converting the Class I-A-2 into a more valuable asset than Sceptre likely paid for.

17.     Reversing the two Classes' relative loss positions would confer a benefit on Sceptre, to the detriment of SCM.

18.     Wells Fargo's acquiescence in the scheme—under the guise of seeking clarification—is a breach of Wells Fargo's contractual, statutory, and common law duties to SCM.

19.     SCM has already suffered harm.  Wells Fargo and Sceptre have already thrown the value of the Notes into question, which is necessarily felt in the market's valuation of the Notes, and SCM has been required to incur legal fees and expenses to defend against claims that are prohibited by law.

20.     SCM stands to suffer substantial additional harm if Wells Fargo and Sceptre are permitted to syphon the value from SCM's Notes for Sceptre's benefit.  By these counterclaims

and cross-claims, SCM seeks to recover any and all such unjustified losses from Wells Fargo and Sceptre, as set forth herein.

## THE PARTIES

21.    Party-in-interest and Counterclaimant/Cross-Claimant SCM is an investment manager for Semper MIDAS Fund, L.P., on whose behalf SCM owns or holds approximately 1/3 of the Class I-A-3 Notes.  SCM is a limited partnership with its principal place of business in New York, New York.

22.    Petitioner and Counter-Defendant Wells Fargo is a national banking association organized under the laws of the United States with its principal place of business in South Dakota.  Wells Fargo serves as Securities Administrator for the Trust.

23.    Party-in-interest and Cross-Defendant Sceptre, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Sceptre has stated that it owns Class I-A-2 Notes in the Trust.

24.    Parties that are either indispensable or who will otherwise be affected by this action, including the remaining Class I-A-3 Noteholders, are not before the Court; and, on information and belief, those indispensable parties have not been served with process in accordance with the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

### Formation of the Trust

25.    In 2005, American Home Mortgage Investment Trust, Series 2005-2 (the "Trust") issued a series of Notes backed by residential home mortgages.

26.     The Notes represent an interest in the principal and interest payments of the mortgagors, and holders of the Notes are entitled to payments of principal and interest as set forth in the Indenture.

27.     Initially, the Notes were marketed in conjunction with the offering documents, which included the Prosupp and a Term Sheet dated June 13, 2005.

28.     On June 22, 2005, the Indenture for the Trust was executed among American Home Mortgage, as Issuer, Wells Fargo as Securities Administrator, and Deutsche Bank National Trust Company as Indenture Trustee.

**The Trust Indenture**

29.     The Indenture is a publicly-available document, which any prospective investor can read before deciding whether, how much, and at what level of the capital structure to invest.

30.     The Indenture spells out the priority in which those payments will be allocated among the various Classes of Noteholders.

31.     The Indenture also establishes the sequence in which Realized Losses are to be allocated among the Classes.

32.     Under the loss allocation priority set out in Section 3.38 of the Indenture, the Class I-A-2 Notes will absorb Realized Losses before the Class I-A-3 Notes.

33.     The Indenture is subject to the Trust Indenture Act of 1939, 15 U.S.C. §77aaa *et seq*. ("TIA").

34.     The TIA was enacted to protect investors.

35.     Sections 310-317 of the TIA are expressly incorporated into the Indenture.

36.     Section 316(b) of the TIA mandates that the right of any Noteholder to receive payment of principal and interest, "shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b) (2014).

37.     Section 5.07 of the Indenture guarantees a Noteholder's *absolute and unconditional* right to receive payment of principal and interest, and provides that such right shall not be impaired without consent of such holder.

38.     Section 9.02 of the Indenture precludes modifying any Indenture term in a way that affects the calculation of payment, unless each affected Noteholder consents to such modification.

39.     Section 9.05 of the Indenture provides that any amendment executed under Section 9 of the Indenture must conform to the requirements of the TIA.

40.     Section 10.06 of the Indenture provides that to the extent any provision of the Indenture limits, qualifies, or conflicts with another provision that is required by the TIA, the required provision will control.

41.     Further, Section 5.06 of the Indenture mandates that, "no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided."

42.     Under Article VI of the Indenture, Wells Fargo as Securities Administrator is required, along with the Trustee, to perform the duties required by the Indenture, and may be held liable for negligent or willful misconduct in the administration of the Trust.

### By At Least November, 2010, Wells Fargo Had Knowledge of
### The Discrepancy Between the Prosupp And The Indenture

43.    In November 2010, a Class I-A-2 Noteholder informed Wells Fargo that there was a discrepancy between the Indenture and the Prosupp regarding the loss allocation priority.

44.    The discrepancy was that while Section 3.38 requires that losses be passed to the Class I-A-2 Noteholders before being passed to the Class I-A-3 Noteholders, the Prosupp indicates the inverse.

45.    Thereafter, Wells Fargo had additional communications with other Noteholders about the discrepancy.

### Wells Fargo And Its Counsel Determined And Stated
### That Losses Must Be Allocated In Accordance With The Indenture

46.    Wells Fargo's response to the Noteholders that inquired about the discrepancy as far back as 2010 was that Wells Fargo would not reverse the loss priority in the Indenture absent unanimous consent of affected Noteholders and amendment to the Indenture.

47.    In 2010, Wells Fargo advised ratings agencies, including Moody's and S&P, that it would follow the Indenture unless it received unanimous consent from affected Noteholders.

48.    In 2012, Wells Fargo again determined and stated that the loss allocation priority set forth in the Indenture could not be altered absent unanimous consent of affected Noteholders.

### SCM Purchased I-A-3 Notes For A Price That Reflected the Loss Priority In The Indenture

49.    In September 2012, SCM purchased approximately one-third of the Class I-A-3 Notes in the Trust, on behalf of Semper MIDAS Fund, L.P.

50.    Before the purchase of the I-A-3 Notes, SCM reviewed the terms of the Indenture.

51.    The review confirmed that the loss allocation priority of the I-A-3 Notes pursuant to Section 3.38 was senior to that of the I-A-2 Notes.

52.     In addition to relying on the information in the Indenture relating to loss allocation priority, the decision to purchase the I-A-3 Notes was also based on a review of the market price of the Notes.

53.     At the time of purchase, SCM paid a price that reflected the market value based in part on the loss allocation priority in the Indenture.

**<u>Wells Fargo Assured SCM That Wells Fargo Would Follow The Indenture</u>**

54.     After the purchase of the I-A-3 Notes, SCM approached Wells Fargo to confirm the loss allocation priority as set forth in the Indenture.

55.     On October 3, 2012, SCM emailed Wells Fargo about the loss allocation priorities of the Class I-A-3 and I-A-2 Notes, in response to which Wells Fargo confirmed it would follow the loss allocation priority set forth in the Indenture unless it was amended.

56.     SCM followed up with Wells Fargo and asked what would trigger an amendment. On October 4, 2012, Wells Fargo told SCM that Wells Fargo had conferred with outside counsel on this issue and did not believe an amendment without Noteholder consent under 9.01(a)(v) of the Indenture was possible in this case.

57.     Wells Fargo expressly told SCM, "*the* method available to conform the Indenture in this case would therefore be an amendment with consent of 100% of the I-A-3 holders because the I-A-3 holders would be directly and adversely affected by an amendment to conform the Indenture to the Prosupp." (emphasis added).

58.     At that time, Wells Fargo gave no indication that it would or could seek reformation.

59.     Wells Fargo did not tell SCM that there were multiple methods by which to conform the Indenture, but rather that *the* method to conform the Indenture in this case would be amendment with consent.

60.     SCM reasonably relied on Wells Fargo's assurances in making its decision to continue to hold the I-A-3 Notes from early October 2012 until today.

## Wells Fargo's Delay And Failure To Obtain Consent

61.     Despite its awareness of the discrepancy at least as early as November, 2010 (currently the earliest record of Wells Fargo receiving notice of the discrepancy), Wells Fargo did not take any action in furtherance of amendment until May, 2013 and did not initiate any trust instruction proceeding until January, 2014.[2]

62.     On May 10, 2013, almost eight years after the Indenture was executed, Wells Fargo sought consent from the affected Noteholders to amend the Indenture ("Consent Notice").

63.     In the Consent Notice, Wells Fargo informed Noteholders of the inconsistency between the governing Indenture and the Prosupp.

64.     Wells Fargo further notified Noteholders that an amendment to the Indenture would require consent of 100% of the Class I-A-3 and I-A-2 Noteholders.

65.     Wells Fargo did not receive consent from 100% of the Class I-A-3 and I-A-2 Noteholders.

66.     In an Informational Notice dated July 11, 2013, Wells Fargo informed Noteholders that it had not received the requisite consent and therefore the attempt to alter the Indenture and loss allocation priority therein had failed.

---

[2] As set forth in SCM's defenses, there was no time during which Wells Fargo was permitted to amend or reform Section 3.38 of the Indenture without consent of 100% of the affected Noteholders, which it requested but did not obtain.  Nevertheless, Wells Fargo's unreasonable delay in addressing and clarifying the discrepancy has caused significant harm to SCM.

**After Inquiries From Sceptre, Wells Fargo Filed A Verified Petition**

67.     At some point in time that is unknown to SCM, Sceptre purchased Notes in the I-A-2 class.

68.     SCM has yet to determine what information Sceptre considered in making this purchase, but it is clear the Indenture governed the Trust and was available to any potential purchaser at the time Sceptre purchased the I-A-2 Notes.

69.     Sceptre contacted Wells Fargo regarding the Indenture loss priority and, on information and belief, requested, directed, or instructed that Wells Fargo pursue reversal of the Indenture loss priority, which would shift the I-A-2 Noteholders, including Sceptre, to a position senior to the I-A-3 Noteholders, including SCM.

70.     Reformation, if granted, will, on information and belief, result in a windfall to Sceptre, by increasing the value of its investment.

71.     Such reversal would convert SCM's value in the I-A-3 Notes for the benefit of Sceptre.

72.     If the loss allocation priority in the Indenture is reversed, Wells Fargo will have facilitated reformation in favor of Sceptre, giving Sceptre a greater benefit than what it bargained for at the time it purchased the Notes and depriving SCM of the benefit of its bargain when it purchased and held the Notes.

### FIRST COUNTERCLAIM
(Breach of the Implied Duty of Good Faith and Fair Dealing, Against Wells Fargo)

73.     SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

74.     The Indenture is a contract setting forth the duties of Wells Fargo as Securities Administrator for the Trust.

{JK00579631.1 }

75.     SCM is a third party beneficiary to the Indenture and upon purchase of the Notes, reasonably expected to obtain the rights, benefits and protections set forth in the Indenture.

76.     Pursuant to the Indenture and the Notes, SCM is entitled to the rights, benefits and protections set forth in the Indenture, including in Sections 3.38, 5.06, 5.07, 9.01, 9.02, 9.05, and 10.06.

77.     Wells Fargo also owes SCM an implied duty of good faith and fair dealing, implied in every contract under New York law.

78.     Wells Fargo has breached its implied duty of good faith and fair dealing by seeking to deprive SCM of the rights, benefits and protections as set forth in the Indenture, by initiating a process to circumvent the express terms of the Indenture, and/or by reversing its previous assurances that it would not alter the loss allocation priority in the Indenture absent Noteholder consent.

79.     As a result, SCM has been deprived of investment value in the Notes, including lost opportunity, has been required to expend legal fees to protect its investment in the I-A-3 Notes, and faces further monetary damages should reformation through the Court succeed.

80.     SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

### SECOND COUNTERCLAIM
(Detrimental Reliance, Against Wells Fargo)

81.     SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

82.     Prior to SCM's purchase of the Notes, Wells Fargo published or caused to be published in the public domain information that it (1) was aware of the loss allocation

discrepancy and (2) would follow the terms of the Indenture, and specifically the loss allocation priority set forth in Section 3.38 of the Indenture.

83.     After SCM purchased Class I-A-3 Notes, Wells Fargo told SCM that it would administer the Trust in accordance with the Indenture.  Specifically, Wells Fargo confirmed that the loss allocation priority was binding on all affected Noteholders as set out in the Indenture.

84.     Wells Fargo further confirmed that, after conferring with outside counsel, reformation of the loss allocation priority in the Indenture would require consent of 100% of the I-A-3 Noteholders.

85.     After Wells Fargo failed to receive unanimous consent from all affected Noteholders for an amendment of Section 3.38 of the Indenture, Wells Fargo again informed Noteholders that Section 3.38 of the Indenture would not be amended.

86.     In reasonable reliance on this information, some of which Wells Fargo provided directly to SCM, SCM purchased and continued to hold its investment in the I-A-3 Notes.

87.     By seeking to reform the loss allocation priority at this time, Well Fargo's actions work prejudice on SCM and impact the value of SCM's investment in the I-A-3 Notes.

88.     Wells Fargo seeks to reverse its position, and reverse its express representations to SCM, and in doing so deprives SCM of the rightful benefit of its investment, while at the same time giving Sceptre an opportunity to obtain greater benefit than it bargained for.

89.     As a result, SCM has been deprived of investment value, including lost opportunity, in the Notes and if reformation is allowed, will suffer additional damages.

90.     Additionally, SCM has been required to expend resources to defend against efforts to deprive it of the value of the Notes.

91.    SCM has suffered harm and may suffer additional harm as a result of Wells Fargo's conduct and therefore, SCM is entitled to damages.

92.    SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

### THIRD COUNTERCLAIM
(Negligence/Breach of the Duty of Care, Against Wells Fargo)

93.    SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94.    Wells Fargo in its administration of the Trust, owes SCM a duty to proceed with due care.

95.    Wells Fargo breached this duty when it failed to take action upon becoming aware of the discrepancy.

96.    Additionally, at the time Wells Fargo told SCM that Wells Fargo would honor the Indenture, Wells Fargo negligently failed to inform SCM that it may take some other action in furtherance of modification of the Indenture.

97.    As a result, SCM has been deprived of investment value, including lost opportunity, in the Notes and if reformation is allowed, will suffer additional damages.

98.    Additionally, SCM has been required to expend resources to defend against efforts to deprive it of the value of the Notes.

99.    SCM has suffered harm and may suffer additional harm as a result of Wells Fargo's conduct and therefore, SCM is entitled to damages.

100.   SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

## FIRST CROSS-CLAIM
(Unjust Enrichment, Against Party-in-Interest, Sceptre)

101.    SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

102.    Reformation of the loss allocation priority in the Indenture will unjustly enrich Sceptre at the expense of SCM.

103.    Equity and good conscience militate against permitting Sceptre to recover at the expense of SCM.

104.    SCM requests damages and/or disgorgement in an amount to be proved at trial together with such equitable relief as the Court may find just.

## SECOND CROSS-CLAIM
(Breach of Contract, Against Party-in-Interest, Sceptre)

105.    SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

106.    The Indenture is a contract setting forth the relative rights and responsibilities of the parties subject to its terms.

107.    When Sceptre purchased its Notes, it acknowledged that the relative rights of the Noteholders are as set forth in the Indenture, and that it is bound by the covenants set forth therein, including Section 5.06 which precludes Noteholders from availing themselves of any provision of the Indenture to "affect, disturb or prejudice the rights of any other [Noteholder] or to obtain or seek to obtain priority or preference over any other [Noteholder] . . . ."

108.    Sceptre breached the Indenture when it sought to reverse the loss allocation priority and disturb and prejudice SCM's rights, and when it sought to obtain priority and preference over SCM.

109.     As a result, SCM has been deprived of investment value, including lost opportunity, in the Notes and if reformation is allowed, will suffer additional damages.

110.     Additionally, SCM has been required to expend resources to defend against efforts to deprive it of the value of the Notes.

111.     SCM has suffered harm and may suffer additional harm as a result of Sceptre's conduct and therefore, SCM is entitled to damages.

112.     SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

## THIRD CROSS-CLAIM
(Breach of the Implied Duty of Good Faith and Fair Dealing, Against Party-in-Interest, Sceptre)

113.     SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

114.     Pursuant to the Indenture and the Notes, SCM is entitled to the rights, benefits and protections as set forth in the Indenture, including in Sections 3.38, 5.06, 5.07, 9.01, 9.02, 9.05, and 10.06.

115.     At the time Sceptre requested that Wells Fargo seek amendment or reformation of the Indenture, Sceptre had knowledge of the existence of the Indenture and the fact that other Noteholders such as SCM are entitled to the rights and remedies as set forth in the Indenture.

116.     Sceptre directly or indirectly seeks to deprive SCM of the rights, benefits and protections set forth in the Indenture, and reverse the loss allocation priority despite the lack of Noteholder consent.

117.     As a result, SCM has been deprived of investment value, including lost opportunity, in the Notes and if reformation is allowed, will suffer additional damages.

118.    Additionally, SCM has been required to expend resources to defend against efforts to deprive it of the value of the Notes.

119.    SCM has suffered harm and may suffer additional harm as a result of Sceptre's conduct and therefore, SCM is entitled to damages.

120.    SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

**FOURTH CROSS-CLAIM**
(Tortious Interference with Contract Rights, Against Party-in-Interest, Sceptre)

121.    SCM repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

122.    As noted above, SCM is a third-party beneficiary under the Indenture, which is a valid contract to which Wells Fargo is a party.

123.    Pursuant to the Indenture and the Notes, SCM is entitled to the rights, benefits and protections as set forth in the Indenture, including in Sections 3.38, 5.06, 5.07, 9.01, 9.02, 9.05, and 10.06.

124.    Additionally, and as set forth above, Wells Fargo owes SCM an implied duty of good faith and fair dealing.

125.    At the time Sceptre requested that Wells Fargo seek amendment or reformation of the Indenture, Sceptre had knowledge of the existence of the Indenture, the fact that Wells Fargo is a party to the Indenture, and the fact that other Noteholders such as SCM are entitled to the rights, benefits and protections as set forth in the Indenture, including Wells Fargo's implied duty of good faith and fair dealing.

126.    Sceptre sought to have Wells Fargo breach the Indenture, including Wells Fargo's implied duty of good faith and fair dealing, when, upon information and belief, it directed or encouraged Wells Fargo to seek reformation.

127.    As set forth above, Wells Fargo did breach its implied duty of good faith and fair dealing.

128.    As a result, SCM has been deprived of investment value, including lost opportunity, in the Notes and if reformation is allowed, will suffer additional damages.

129.    Additionally, SCM has been required to expend resources to defend against efforts to deprive it of the value of the Notes.

130.    SCM has suffered harm and may suffer additional harm as a result of Sceptre's conduct and therefore, SCM is entitled to damages.

131.    SCM requests damages in an amount to be proved at trial together with such equitable relief as the Court may find just.

## RESERVATION OF ADDITIONAL COUNTERCLAIMS, CROSS-CLAIMS & THIRD PARTY CLAIMS

132.    SCM gives notice that it intends to rely upon such other counterclaims, cross-claims, and third party claims as may become available during pretrial proceedings in this action and hereby reserves all rights to amend its counterclaims and cross-claims.

## REQUEST FOR RELIEF

WHEREFORE, SCM respectfully requests that Wells Fargo and/or Sceptre, jointly and severally, be required to compensate and/or indemnify SCM against all harm suffered as a result of their actions and/or inactions, including without limitation, for attorney's fees and expenses, diminution of market value of the SCM Notes, lost cash flows to the SCM Notes, and for any

other remedy in law or in equity that the Court determines just.


Respectfully submitted, this 13th day of May, 2014



s/ Michael A. Rollin
Michael A. Rollin
JONES & KELLER, P.C.
1999 Broadway, Suite 3150
Denver, Colorado  80202
Telephone: (303) 573-1600
Facsimile: (303) 573-8133

*Attorneys for Semper Capital Management, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2014, a true and correct copy of the foregoing Semper Capital Management, L.P.'s Answer to the Verified Petition and Counterclaims and Cross-Claims was served via CM/ECF, on the following:

Michael E. Johnson
Carolyn O'Leary
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
michael.johnson@alston.com
carolyn.oleary@alston.com

*Attorneys for Petitioner Wells Fargo Bank,*
*N.A., solely in its capacity as Securities*
*Administrator*

Jonathan E. Pickhardt
Blair Adams
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
jonpickhardt@quinnemanuel.com
blairadams@quinnemanuel.com

*Attorneys for Party-in-Interest Sceptre, LLC*

By: <u>s/ Shannon Coggins</u>
Shannon Coggins