E77JTRU1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN THE MATTER OF THE TRUSTEESHIP
     CREATED BY AMERICAN HOME MORTGAGE
4    INVESTMENT TRUST 2005-2 related to        14 Civ. 2494 AKH
     the issuance of Mortgage-Backed
5    Notes pursuant to an Indenture dated
     as of October 1, 2007,
6

7    WELLS FARGO BANK, N.A.,

8                     Petitioner,

9    ------------------------------x

10

11                                            July 7, 2014
                                              10:17 a.m.
12

13

14

15   Before:

16                    HON. ALVIN K. HELLERSTEIN,

17                                            District Judge

18

19

20                          APPEARANCES

21

     ALSTON & BIRD, LLP
22        Attorneys for Wells Fargo Bank
     BY:  CAROLYN R. O'LEARY, Esq.
23        MICHAEL EDWARD JOHNSON, Esq.

24

25

E77JTRU1                        Trial

(APPEARANCES CONTINUED)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Attorneys for Sceptre, LLC
BY:   JONATHAN E. PICKHARDT, Esq.
      MAAREN A. SHAH, Esq.
      BLAIR A. ADAMS, Esq.
                 Of counsel


JONES & KELLER
      Attorneys for Semper Capital Mgmt.
BY:   MICHAEL A. ROLLIN, Esq.
      MARITZA DOMINGUEZ BRASWELL, Esq.
      TARA K. WILLIAMS, Esq.
                 Of counsel

E77JTRU1                          Trial

1              (In open court)

2              THE COURT:  All right.  So this is in the matter of

3     the trusteeship created by American Home Mortgage Investment

4     Trust 2005-7 related to issuance of Mortgage-Backed Notes, 14

5     Cv. 494.

6              (Case called)

7              THE COURT:  What will be the order of presentation?  I

8     take it Mr. Johnson will go first.

9              MR. JOHNSON:  I believe that's what we are

10    anticipating, your Honor.

11             THE COURT:  And what is Sceptre's role going to be?

12             MR. PICKHARDT:  We anticipate making a presentation

13    after the securities administrator, by agreement of the

14    parties, and we will be putting in proof with respect to the

15    reformation claim wells Sceptre's claim for construction of the

16    indenture.

17             THE COURT:  But not --

18             MR. PICKHARDT:  We will be putting in --

19             THE COURT:  But not to repeat.

20             MR. PICKHARDT:  That's correct, we are not going to

21    repeat.  We anticipate the securities administrator will not be

22    putting on any witnesses or presenting evidence.

23             THE COURT:  However you divide is not my concern.  I

24    just have a concern against repetition.  Sceptre is in the

25    position of the adverse party, correct, Mr. Rollin?

E77JTRU1                        Trial

1           MR. ROLLIN:  That's correct, your Honor.

2           THE COURT:  Let's start with the motion that is made

3    by Sceptre, and then we'll follow that with openings.

4           MR. ROLLIN:  Thank your Honor.

5           May it please the court?

6           THE COURT:  Yes.

7           MR. ROLLIN:  Your Honor, I'll refer to Sceptre Capital

8    Management as SCM through the course of the day and trial to

9    avoid.

10          THE COURT:  Try calling it Sceptre.  I follow it

11   better.

12          MR. ROLLIN:  Yes, your Honor.  I'll do my best.

13          Your Honor, Sceptre has filed a motion for judgment on

14   the pleadings or in the alternative on summary judgment on the

15   narrow issue at this time of statute of limitations.

16          Statute of limitations counseled that this case should

17   be dismissed as to any claims based on mistake in the indenture

18   which are both of the claims asserted in the affirmative claims

19   in the res filed by Sceptre and the sole claim although in the

20   alternative filed by Wells Fargo.

21          I want right at the very beginning to address a point

22   that the securities administrator has raised, and that is if

23   the statute of limitations applies, then we are depriving or

24   the law deprives the securities administrator of the right to

25   bring a trust interpretation.

1              THE COURT:  The microphone doesn't work.  You might as

2      well put it aside and speak to me loudly.

3              MR. ROLLIN:  Very well.  Thanks, your Honor.

4              Nothing about the statute of limitations defense in

5      and of itself bars the securities administrator or another

6      appropriate trust officer from bringing a trust instruction

7      proceeding in court.

8              It limits the available remedies under the applicable

9      state law, and that will become clear during the course of my

10     presentation, but I want to dispel that notion at the very

11     beginning.  The statute of limitations applies to bar these

12     claims and these forms of relief.  It does not necessarily bar

13     the court from entering another trust instruction appropriate

14     under the governing and applicable law.

15             Wells Fargo's claims should be dismissed because

16     they're time-barred.  Under New York law there is a six-year

17     statute of limitations for all claims based on mistake

18     whether --

19             THE COURT:  How do I get to New York law?

20             MR. ROLLIN:  The governing law provision.

21             THE COURT:  There are steps before it, aren't there?

22             MR. ROLLIN:  I am not sure I follow what you mean.

23             THE COURT:  I'm the transferee court, right?

24             MR. ROLLIN:  You are a transferee court.

25             THE COURT:  So I am required to apply the complex law

1    of the transferor court, right?

2              MR. ROLLIN:  I believe so, your Honor.

3              THE COURT:  The transferor court is required, by

4    Classen against Stentour and other cases, Guaranty against

5    York, to apply the statute of limitations rules and all the

6    procedure rules of the state court, right?

7              MR. ROLLIN:  I believe.

8              THE COURT:  Not all procedural rules, but certainly

9    statute of limitations.

10             MR. ROLLIN:  The statute of limitations of New York

11   applies because the parties have specifically set forth --

12             THE COURT:  Only if Minnesota law so provided.

13             MR. ROLLIN:  There is no conflict among the parties.

14             In fact, the claims sound in the reformation claim

15   that has been brought and it is clear from all the papers filed

16   by security administrator and Sceptre sounds in New York law.

17             THE COURT:  It may well be.  It may work out that way,

18   but before I get to it, I have to go through some

19   self-discipline, and the first self-discipline as transferor

20   court is to apply the law of transferrer court.

21             The second discipline is as a transferrer court, in a

22   diversity case, I must order, in any kind of state case, I must

23   apply the law of the state which is Minnesota.  What does

24   Minnesota say in terms of the conflict in terms of statute of

25   limitations, statute of limitations are procedural in New York

E77JTRU1                              Trial

1   and Minnesota?

2           MR. ROLLIN:  Before we get there --

3           THE COURT:  There is nothing before.  That is the

4   first step.

5           MR. ROLLIN:  None of the parties, and certainly not

6   the two parties raising a claim for relief --

7           THE COURT:  But the judge says so, the judge is

8   applying the law.

9           MR. ROLLIN:  I understand.

10          THE COURT:  It is my conscience at stake, not yours.

11          MR. ROLLIN:  I understand.

12          THE COURT:  I have to apply the law, and the law is

13  that the transferee court applies the law that the transferor

14  court would apply, which is Minnesota law in terms of

15  procedural choice of law and statutes of limitations.  What is

16  the statute of limitations in Minnesota?

17          MR. ROLLIN:  The statute of limitation in the

18  Minnesota reformation claim as of today I do not know.  There

19  is case law in the brief --

20          THE COURT:  What about, why not apply it to a question

21  of a proceeding brought before a trustee to obtain an

22  interpretation?  What does that prove?

23          MR. ROLLIN:  The fact the trustee brought a proceeding

24  under Minnesota law, the fact the trustee brought a proceeding

25  to interpret a trust does not eliminate, and that is the

```
 1   December 31, 1974 case in the Minnesota Court of Appeals, does

 2   not invalidate the applicable statute of limitations.

 3              THE COURT:  What is the applicable statute of

 4   limitations?

 5              MR. ROLLIN:  Your Honor, we believe even the Minnesota

 6   court would apply the clear intention of the parties to be

 7   bound by New York law.

 8              THE COURT:  That is substantive.

 9              MR. ROLLIN:  It would be procedural for the Minnesota

10   court to make a determination where there is clear intent by

11   governing law provision that New York law applies and Minnesota

12   law would apply New York law.  New York law imposes a six-year

13   statute of limitations, and it does not matter --

14              THE COURT:  New York law has nothing to say on a trust

15   interpretation.  We don't really have a -- it is not an action

16   for reformation; it is an action by the trustee to the court.

17              Tell me what my guides are.

18              MR. ROLLIN:  Your Honor, under --

19              THE COURT:  It could not have been brought until there

20   was a case in controversy, which means it could not have been

21   brought until there was a shortage of interest.

22              MR. ROLLIN:  That is an important point.  I am glad

23   you mentioned it.

24              Mr. Cohen, who was Wells Fargo's corporate designee,

25   testified even in 2010 when Wells Fargo says they first found
```

1    out about this issue, they knew the losses would eventually

2    hit.  So it is not a situation --

3              THE COURT:  When did they know that?

4              MR. ROLLIN:  At least when they found out in 2010.

5              THE COURT:  And the lawsuit was brought in 2014.  That

6    is four years.

7              MR. ROLLIN:  Yes, your Honor, that's correct.

8              That is not how the statute of limitations works under

9    New York law.

10             THE COURT:  If it is an action for reformation.  If it

11   is an action for interpretation, for guidance, the trustee

12   seeks guidance from the court, the trustee is really a

13   stakeholder and wants to do something in conformance with law.

14             Here we have conflict between two instruments, a

15   notice instrument by which people bought and sold, and the

16   trust indenture by which people bought and sold.  They

17   conflict, and we have to make the right choice.  So the trustee

18   comes to the court and says tell me what to do.  That is how

19   the action began in Minnesota.  It might be a question if it is

20   a case in controversy, but we are past that.

21             It certainly became a case in controversy when you

22   entered the picture because there was diversity of interest.  I

23   am not clear in my mind what kind of an action this really is.

24   The Restatement puts forth a standard or criterion the action

25   could not have been brought unless and until there was a real

E77JTRU1                    Trial

1  case in controversy, which means 2010.  It is brought in 2010,

2  it is not too late.

3          Anyway, I am not deciding this motion at this point in

4  time.  I think it will benefit by development of the record.  I

5  will see about a better picture of it, and both parties -- the

6  three parties, will have a chance to brief the issue given the

7  full discipline that I need to pursue.

8          The decision is reserved.

9          MR. ROLLIN:  Yes, your Honor.

10          THE COURT:  Let's get to openings.

11          MR. PICKHARD:  Before we commence with opening, there

12  are a couple of housekeeping issues we would like to address,

13  now or later point?

14          THE COURT:  Go ahead.

15          MR. PICKHARDT:  There are amended submissions,

16  including amended pretrial briefs that now include trial

17  exhibit numbers.

18          THE COURT:  Just hand them up.

19          MR. PICKHARDT:  We will hand those up.

20          THE COURT:  Has everything been marked in advance?

21          MR. PICKHARDT:  Yes, your Honor, everything is marked.

22  There are still some disputes over whether things will be

23  admitted into evidence, but everything has been marked.

24          THE COURT:  Every document that is to be used will be

25  moved into evidence in the regular way, and I'll hear

1    objections and then rule.  Don't assume because it is marked,

2    it is an exhibit.  It is an exhibit only if I receive it as

3    such.

4              MR. PICKHARDT:  Would your Honor like for us to at

5    this point also hand up the binders that contain the exhibits?

6              THE COURT:  Yes.  How many sets?  How many different

7    offering parties will there be?

8              MR. PICKHARDT:  I believe there will be three offering

9    parties, and my understanding is that the court wanted, is it

10   correct, three sets of exhibits?

11             THE COURT:  I don't need three sets.  I would like two

12   sets, but I am dismayed there are three offering parties.

13             MR. PICKHARDT:  There is no overlap between the

14   submissions.  There are joint submissions submitted by the

15   securities administrator and both of the parties in interest

16   have submissions.

17             THE COURT:  How are they designated?

18             MR. PICKHARDT:  They are designated starting at TX-1

19   with the joint exhibits by the securities administrator.

20   Sceptre's exhibits continue in the TX numbering scheme, and

21   then Sceptre's exhibits start with TX and then letter scheme.

22             THE COURT:  Okay.  I can deal with that.  I don't

23   think I have approved the pretrial order yet.  Are you going to

24   be putting the exhibits on the screen as we go along?

25             MR. PICKHARDT:  Yes, your Honor, we will.

E77JTRU1                        Trial

1           THE COURT:  If you hand up the original, I'll sign it.

2   Who has the original of the pretrial order?

3           MS. SHAH:  Your Honor, we may have a copy of it.

4           THE COURT:  Do you have an extra copy?

5           (Off-the-record discussion)

6           THE COURT:  I have signed it and we'll file it.

7           Let's begin.

8           MR. PICKHARDT:  There is one other housekeeping issue.

9           Last Wednesday Sceptre filed a motion in limine with

10  respect to anticipated testimony and exhibits that would be

11  sought to be entered by Semper.  We would be happy to address

12  that whenever the court would like to, but given the

13  intervening holiday, we wanted to make sure the court was aware

14  of the fact we do have a motion in limine that is pending.

15          THE COURT:  Let's argue it.

16          MR. PICKHARDT:  Argue the motion, your Honor?

17          THE COURT:  Argue it now.

18          MR. PICKHARDT:  Mr. Adams will be arguing this motion,

19  your Honor.

20          THE COURT:  Let's move it.

21          MR. ADAMS:  Good morning, your Honor.

22          This motion in limine concerns two exhibits that

23  Semper introduced during a deposition testimony on June 26th.

24  They were introduced for the first time on June 26th, and we

25  are objecting to those exhibits and seeking to preclude them

E77JTRU1                          Trial

1    based on the fact that they are improper expert testimony that

2    has not been introduced in compliance with --

3              THE COURT:  Are these going to be offered?

4              MR. ADAMS:  We believe they will, your Honor.

5              THE COURT:  May I see the exhibits.

6              MR. ADAMS:  Yes, your Honor.  May I approach?

7              THE COURT:  Yes.

8              (Pause).

9              MR. ADAMS:  The exhibits are Exhibit M and N behind

10   the motion.

11             THE COURT:  Who is offering this exhibit?

12             MS. BRASWELL:  Semper is.

13             THE COURT:  Louder, please.

14             MS. BRASWELL:  We have not decided whether we will

15   actually offer these exhibits.  It depends entirely how the

16   evidence develops prior to Mr. Peresechensky taking the stand,

17   but to the extent they're offered, they will be offered by

18   Semper.

19             THE COURT:  What is the point of the exhibit?

20             MS. BRASWELL:  The exhibits show the harm that would

21   result to Semper as a result of the reformation, and they were

22   produced during the deposition of Mr. Peresechensky in response

23   to a question that opposing counsel posed.

24             THE COURT:  I'll deal with this as it comes up.

25             MR. ADAMS:  Thank your Honor.

1           THE COURT:  Let's proceed.

2           MR. JOHNSON:  Good morning, your Honor.

3           Michael Johnson for Wells Fargo Bank in its capacity

4    here as securities administrator.

5           As your Honor noted already this morning, the

6    securities administrator commenced this action to seek judicial

7    resolution in respect of an ambiguity that has arisen in the

8    AHM 2005-2 transaction.  As securities administrator, Wells

9    Fargo is responsible for certain functions that are generally

10   described in the indenture governing this transaction.

11          Those functions include making payments to holders of

12   securities that are issued and also in this transaction

13   allocating losses to classes of securities in the transaction.

14          What is at issue in this case, your Honor, is how

15   losses are to be allocated to one class in particular.  That

16   class is the Class 1-A.  The securities administrator is faced

17   with a discrepancy that has arisen in terms of how to allocate

18   losses between two classes within that group, Class 1-A-2 notes

19   and Class 1-A-3 notes.

20          In the indenture governing the transaction, it

21   prescribes the losses are first to be assigned to the Class

22   1-A-2 notes and then to the Class 1-A-3 notes.  In the

23   prospectus supplement, however, that was created and

24   distributed to prospective investors at the time the

25   transaction closed, it's reversed, and so losses in the ProSupp

1    are assigned first to the Class 1-A-3 notes and then to the

2    Class 1-A-2 notes.

3            After this discrepancy became apparent to the trustee,

4    after trying to seek a consensual amendment of the indenture

5    and after realizing that losses were likely to hit one of these

6    two affected classes this year, the securities administrator

7    commenced an action seeking a judicial instruction in Minnesota

8    state court.

9            The securities administrator filed its petition in the

10   Minnesota state court pursuant to Minnesota Statute 501 b.16,

11   which authorizes a trustee or similarly-situated party, which

12   the securities administrator is, to commence an action seeking

13   the construction interpretation or reformation of the terms of

14   a trust instrument.

15           The relief that the securities administrator is

16   seeking here is in the alternative.  The trustee seeks either a

17   order reforming the indenture so as to conform the order of

18   application of losses to that set forth in the ProSupp or,

19   alternatively, a clear instruction that the securities

20   administrator must follow the order of allocation of losses as

21   set forth in the indenture.

22           Your Honor, to be clear, in terms of which of those

23   two alternatives, the securities administrator here is neutral

24   as to the relief that is to be awarded.  We, therefore, do not

25   anticipate taking a significant role here in this action.

E77JTRU1                    Opening – Mr. Johnson

1    There are two interested parties who have come forward.

2              THE COURT:  Why don't I hear the interested parties.

3              MR. JOHNSON:  Okay, your Honor.

4              Before we do that, your Honor, there are two things I

5    would briefly like to address that are of specific interest to

6    the securities administrator that will only take me a couple of

7    minutes to address those.

8              THE COURT:  Go ahead.

9              MR. JOHNSON:  There are a number of affirmative

10   defenses that have been asserted by each of the two interested

11   parties, and I am not going to address all those because I

12   think in large part those affirmative defenses really go to

13   which of those two forms of relief the securities administrator

14   should have to follow.

15             A couple of the affirmative defenses, though, the

16   securities administrator feels need to be addressed because the

17   record needs to be set straight precisely what the securities

18   administrator's role is here.  This is evidence that you will

19   hear, your Honor, but I want to preview it now.

20             It has been alleged in one of Semper's affirmative

21   defenses that there has been some sort of inequitable conduct

22   in the form of collusion here between the securities

23   administrator and Sceptre, one of the other interested parties.

24   The record simply will not support that, your Honor.

25             THE COURT:  I don't think you need to waste any time

E77JTRU1                         Opening – Mr. Johnson

1    on that.

2              MR. JOHNSON:  Okay.  The second thing, your Honor,

3    that we did want to address in advance -- and you will hear

4    evidence on this -- is there is an affirmative defense that has

5    been raised by Semper in this action, where there has been some

6    argument made in this action that Wells Fargo has somehow acted

7    improperly or inequitably in charging the costs of bringing

8    this action to the trust.

9              Your Honor, the evidence will show that the indenture

10   in this action explicitly permits the securities administrator

11   to be reimbursed for all expenses that are incurred in

12   connection with bringing this action to administer the

13   instruments.

14             THE COURT:  You will point out the relevant clause

15   when we get into that.

16             MR. JOHNSON:  Okay.  Before I sit down and let the

17   real action begin, there are, as Mr. Pickhardt alluded to,

18   several exhibits, nine in total, that we were denominating them

19   as joint exhibits.  They have been marked here as TX-1 through

20   9.  I am prepared now to move them into evidence.

21             THE COURT:  Let's finish with the openings before you

22   start doing that.

23             MR. JOHNSON:  Fair enough.  Thank you very much.

24             THE COURT:  Let me hear from Mr. Pickhardt.

25             MR. PICKHARDT:  Your Honor, may I approach to provide

E77JTRU1                        Opening - Mr. Johnson

1    a copy of slides that I intend to use during my opening?

2              THE COURT:  Sure.  I much prefer you spend less time

3    in the opening and give me a picture what is happening.  I

4    would rather not have slides now.  Do that with the exhibits.

5    Give me a picture.  15 minutes what the evidence will be and

6    what the issues are going to be.

7              MR. PICKHARDT:  Your Honor, as the securities

8    administrator indicated, there are claims that are being raised

9    by the securities administrator in this case, seeking trust

10   instruction as to whether Section 3.38 of the indenture here

11   should be reformed or whether it should be directed to simply

12   follow the indenture as drafted.

13             In addition to those claims, Sceptre has also

14   independently filed its own claim to the res.  Those claims

15   include also a claim for reformation or separately a claim to

16   reform Section 3.38 of the indenture to accurately reflect the

17   intent of the parties.

18             The deal at issue is the American Home Mortgage

19   Investment Trust 2005-2.  There was a 2005 issuance of $5.8

20   billion in publicly and privately offered RMBS.  The players at

21   issue in this case included the lead underwriter, Lehman

22   Brothers, and you will hear testimony from the lead banker at

23   Lehman Brothers.  It also included American Home Mortgage

24   Securities, LLC who was the depositor, and they were

25   represented by deal counsel at Thacher Proffitt & Wood.  You

1   will hear testimony from the lead deal lawyer at Thacher

2   Proffitt & Wood.  The securities administrator, as you

3   understand, is Wells Fargo and the trustee was Deutsche Bank.

4          Now, the structure of this deal is important, your

5   Honor.  There were 26 classes of publicly-offered notes and

6   five classes of privately-offered notes.  Those notes were

7   securitized or collateralized by seven different groups of

8   loans.  So each tranche of notes, each class of notes bore risk

9   based on three different factors.

10          The first factor is what class of loans, what group of

11   loans it was backed by.

12          Secondly, to the extent that group of loans generated

13   cash because the mortgages were getting paid down, what the

14   order of priority was for distribution of that cash to

15   different classes; and

16          Third and most importantly for this case, the priority

17   which realized the losses were allocated from those relevant

18   loan groups, realized losses being, for example, if there was a

19   foreclosure on one of the underlying mortgage loans and a loss

20   was taken, that loss would then have a corresponding allocation

21   to particular classes of notes that would result in a

22   write-down.

23          This case particularly concerns the Class 1-A notes,

24   and there are three classes within that category of notes.

25   Those were referred to as the super senior notes, meaning

1    they're at the absolute top of the capture structure backed by

2    Group I loans, the group that collateralized them.

3         Distribution to each of those three classes was pro

4    rata, meaning that there was no different right to the cash

5    that would get distributed from proceeds on those mortgages,

6    which means the only thing that was changing the risk among

7    those three super senior classes was the way in which realized

8    losses were allocated among them.

9         It is also important to note there was a difference in

10   the coupon or the interest rate that each of those classes was

11   to receive with the 1-A-1 notes getting the lowest interest

12   rate, the 1-A-2 notes getting the second lowest interest rate,

13   and the 1-A-3 note -- 1-A-2 notes getting the second highest

14   interest rate and the 1-A-3 notes getting the highest interest

15   rate among those three classes.

16        With respect to realized losses, which is what this

17   trial is about, the Class 1-A-1 notes, the one at the top,

18   never get allocated realized losses.  The realized losses get

19   allocated only to 1-A-2 and 3 notes.  The issue, as your Honor

20   understands, there is a discrepancy in the transaction

21   documents which of those two classes gets realized losses

22   first.

23        The evidence will be clear and convincing that the

24   intent of this deal was for losses to be borne first by the

25   1-A-3 notes and then by the 1-A-2 notes.  You are going to

E77JTRU1                    Opening - Mr. Pickhardt

1    receive evidence in a number of different forms to support that

2    standard.  First --

3             THE COURT:  I suppose the lower interest rate, the

4    higher the priority?

5             MR. PICKHARDT:  That's correct.  You will hear that.

6             You will hear from Richard Simonds, the lead deal

7    lawyer on this, that the interest rates follows risk.  You do

8    not need a witness to tell you that.  Interest rates follow

9    risk.  If the only difference between these notes are how

10   realized losses are allocated, and you have 1-A-3 notes are

11   getting the highest interest rate, that means they're bearing

12   more risk.  The only way that is applicable is the way they

13   were getting losses first.

14            Your Honor, there is also evidence beyond the

15   structure, evidence looking at what the final documents say.

16   There is a whole suite of documents I am sure you know or would

17   anticipate with respect to this type of deal.  If you look in

18   the ProSupp, the final ProSupp, it states --

19            THE COURT:  What?

20            MR. PICKHARDT:  Final prospectus supplement.  The

21   prospectus supplement is the primary marketing document for

22   this deal.  That document includes in three different places

23   statements with respect to the order in which the realized

24   losses are supposed to be allocated.  In each and every

25   instance, it says they're supposed to be allocated to 1-A-3

1   before the 1-A-2s.

2          There also was a term sheet that was prepared for

3   this.  The term sheet is the primary marketing document before

4   the ProSupp.  It is what the bankers use to go out and test the

5   market.

6          THE COURT:  Try not to use jargon.  I never was a

7   mortgage lawyer, never wanted to be.  Therefore, I am not privy

8   to the jargon.

9          MR. PICKHARDT:  Okay.

10          THE COURT:  We have a prospectus and term sheet?

11          MR. PICKHARDT:  That's correct.  That's correct.  The

12   term sheet comes first.

13          THE COURT:  The term sheet, consistent with the

14   prospectus?

15          MR. PICKHARDT:  That is right.

16          Also the final term sheet says in three places that

17   the order in which losses are supposed to be allocated is first

18   to 1-A-3 and then 1-A-2.  It describes it both in text and

19   describes it by talking about the principle of what is called

20   credit enhancement or CE percentage, as you see actually on the

21   term sheet.  What that is is a way of describing the buffer

22   that a class of notes has to losses.  How much of the structure

23   is below them?

24          If you see in the CE percentage in the final term

25   sheet, it says the 1-A-3 has a CE percentage or a buffer to

1    losses of 7.55 percent, whereas the 1-A-2 notes have a CE

2    percentage or buffer to losses of 17.55 percent.

3              THE COURT:  I don't understand, "buffer."

4              MR. PICKHARDT:  It means how far, how far losses have

5    to go up in the capital structure before they're going to hit

6    your class of notes.  For an investor, this is an important

7    concept because you want to know how bad do the losses have to

8    be before I start getting losses?

9              What the term sheet was telling people who were

10   thinking about investing in the 1-A-3 notes, the losses only

11   have to get to 7.55 percent and then you, 1-A-3 notes are going

12   to start bearing losses.  The 1-A-2 notes say something

13   different.  The losses have to get to 17.55 percent before

14   you're going to bear losses.  It is a demonstration of

15   seniority within the capital structure, and that the 1-A-3

16   notes were supposed to get losses before the 1-A-2 notes.

17             Your Honor, there is another final document which

18   speaks to this issue, and that is an offering memorandum.  The

19   prospectus supplement covers publicly-offered notes.  As I

20   referred to earlier, there also were privately-offered notes.

21   In the offering memorandum is the marketing document for the

22   privately-offered notes.

23             THE COURT:  It should be equivalent to the prospectus.

24             MR. PICKHARDT:  That's correct, your Honor.

25             It is slightly different in form, but in substance on

1   this point it is exactly the same.  The offering memorandum

2   says in two different places that the losses are supposed to go

3   to 1-A-3 notes before the 1-A-2 notes.  You have three final

4   documents which say in eight places that the 1-A-3 notes will

5   bear losses before the 1-A-2 notes.  By comparison, there is

6   only one statement anywhere in the entire suite of final

7   transaction documents that says the contrary, and that is in

8   the indenture.

9          Now, your Honor, in addition to the final documents

10  suggesting that the indenture is the outlier and was a mistake,

11  the structure of the transaction also demonstrates that.  The

12  nomenclature used here is relevant.  It is 1-A-1, 1-A-2, 1-A-3,

13  which is suggestive of the priority of those three notes.

14         If someone was arguing that the 1-A-3s were supposed

15  to be senior, they would suggest that the seniority went 1, 3,

16  2 as opposed to 1, 2, 3.  Also if you look at how realized

17  losses are allocated to other classes of notes, in every single

18  other instance among those 26 classes, they start at the

19  numerical bottom and go up to the top.  This would be the only

20  anomaly, which again suggests this was error.

21         You also hear from the lead deal lawyer there is also

22  an inference to be drawn from the size of the tranches.  1-A-3

23  is smaller than 1-A-2, and that is a sign that it was meant to

24  provide credit support or meant to be junior to the 1-A-2

25  tranche.  You will hear from the lead lawyer on that.  We also

E77JTRU1                           Opening – Mr. Pickhardt

1    talk about the coupons and the interest rates are indicative of

2    the fact that the 1-A-3 notes were supposed to bear more risk

3    than the 1-A-2 notes.

4          We are not relying purely just on the structure and on

5    the final documents.  We also now have the drafting history.

6    The drafting history was actually produced both by Lehman

7    Brothers, lead underwriter in this case, as well as by JP

8    Morgan.  We got it two different times.

9          What those documents show is that this deal was

10   drafted over a span of 20 days.  What you will see from those

11   drafts is that it is absolutely clear that the intent was for

12   losses to be allocated to the 1-A-3 notes before the 1-A-2

13   notes, and the contrary statement in the indenture was an

14   error.

15         The first document that was circulated was the term

16   sheet that I referred to earlier.  This was circulated by

17   Lehman Brothers, who prepares the term sheet for the purposes

18   of marking the deal.  From day one it included a statement that

19   losses would go first to 1-A-3 notes.  Day One of this process,

20   your Honor, that term sheet is finalized and is distributed

21   among all of the underwriters who marketed this deal.

22         THE COURT:  I think I get the understanding of this.

23   Tell me about how many witnesses you'll have.

24         MR. PICKHARDT:  There are going to be two witnesses.

25   There is actually going to be three witnesses, but two

E77JTRU1                    Opening - Mr. Pickhardt

1    witnesses on this particular issue.  Mary Stone, who is the

2    lead banker at Lehman is going to testify.  She will testify by

3    deposition designation, so we will read her testimony into the

4    record.

5              We also are going to have Richard Simonds, the lead

6    deal lawyer also testify.  He will testify live, your Honor.

7    We are also prepared to have Akeel --

8              THE COURT:  What is his firm?

9              MR. PICKHARDT:  He is currently at Alston & Bird.

10             THE COURT:  Then?

11             MR. PICKHARDT:  At Thacher Proffitt & Wood, and

12   Thacher Proffitt & Wood was the lead deal counsel.

13             THE COURT:  Okay.

14             MR. PICKHARDT:  Your Honor, the important part from

15   the drafting history.

16             THE COURT:  The third witness?

17             MR. PICKHARDT:  Going to be Akeel Mago, M A G O.

18   Akeel Mago is an executive managing director at Ochdiff, which

19   is an affiliate of Sceptre, LLC.

20             THE COURT:  The firm, the company?

21             MR. PICKHARDT:  O C H D I F F, Ochdiff Capital

22   Management.

23             THE COURT:  What will she testify to?

24             MR. PICKHARDT:  To be frank, Mr. Mago does not have

25   anything to tell this Court with respect to reformation or

1    construction of the contract.  The only reason why we are

2    intending to call Mr. Mago is because Semper has asserted a

3    number of affirmative defenses, claiming that Sceptre and

4    Ochdiff have somehow acted improperly.

5             THE COURT:  Save them for rebuttal if you need to.

6             MR. PICKHARDT:  Your Honor, what you will hear --

7             THE COURT:  We have two witnesses?

8             MR. PICKHARDT:  Yes, your Honor, okay?

9             THE COURT:  Who were the scriveners?

10            MR. PICKHARDT:  The scriveners were Thacher Proffitt &

11   Wood.  Those were the lawyers.

12            THE COURT:  Simonds was in charge?

13            MR. PICKHARDT:  Yes, he was the supervising attorney

14   for the drafting process.  Their drafts circulated by three

15   different associates at Thacher Proffitt & Wood under Mr.

16   Simonds' supervision.

17            THE COURT:  Are they going to testify?

18            MR. PICKHARDT:  The associates are not going to

19   testify, your Honor.

20            THE COURT:  Wouldn't they be relevant?

21            MR. PICKHARDT:  I believe when the court reviews what

22   the negotiating history was, we don't believe that the court is

23   going to believe it will be necessary to hear from the

24   associates for a couple of reasons.

25            One, what you will see when we get into the documents,

1   your Honor, is that the prospectus supplement was finalized

2   before the other documents were finalized.

3                   (Continued on next page)

1              MR. PICKHARDT:  And that there were then conforming

2     edits that were intended to be made in other documents and that

3     there was a flurry of activity between the 19th day of the

4     drafting process when the Pro Supp was finalized -- I'm sorry,

5     the Prospectus Supplement was finalized -- and the next day,

6     which was the closing for this transaction.  And over the span

7     of 12 hours, after you had the Prospectus Supplement that was

8     finalized that stated in three different places how these

9     losses were to be allocated within that span of 12 hours, you

10    had three other documents that were circulated that included

11    conforming edits.

12             The first document was a private placement memorandum,

13    which is again another fancy word for the same thing, an

14    offering document, which included in multiple places the exact

15    same words that were in the Prospectus Supplement.  Then, at

16    1:11 a.m. in the morning, your Honor, the indenture was

17    circulated.  The indenture included some conforming edits to

18    the Pro Supp, but there's one edit that was omitted.  The edit

19    that was omitted -- and your Honor will see this when we go

20    through the documents -- is that in the Pro Supp, because of

21    some changes that were made in order to streamline the

22    provision, you would have to swap a two and a three.  And you

23    see that edit made in the Prospectus Supplement, you see that

24    edit made in the private placement memorandum.  That edit

25    doesn't get made in the indenture but --

1            THE COURT:  Some associate must have been doing it.

2            MR. PICKHARDT:  Your Honor, this was a period of time,

3    as you will hear, where this industry was very, very busy.

4    Associates were working late into the evening, documents are

5    being circulated, in this case, 1:11 in the morning on the day

6    of closing.

7            THE COURT:  But someone made the mistake?

8            MR. PICKHARDT:  That's correct, your Honor.

9            THE COURT:  So shouldn't that someone be a witness?

10           MR. PICKHARDT:  Your Honor, the person, the associate

11   who made the mistake, my understanding, is outside of the

12   100-mile radius of this Court, your Honor, and there was not

13   one associate who could speak to all of these documents.  But,

14   your Honor, the important testimony, the most important

15   testimony, is actually Mary Stone, who was the lead deal lawyer

16   at Lehman Brothers.

17           THE COURT:  Okay.  I got the picture, let me hear what

18   Semper says.

19           MR. PICKHARDT:  All right.  Thank you, your Honor.

20           THE COURT:  Semper.  Yes, Mr. Rollin?

21           MR. ROLLIN:  Thank you.

22           THE COURT:  I really don't need this.  Just talk to

23   me.

24           MR. ROLLIN:  Very well, your Honor.  Thank you.  I may

25   need to orient myself a little bit, but I appreciate that I

1    will try to minimize the visuals and describe for the Court

2    what the evidence is.  And allow me to begin, your Honor, with

3    this, if Scepter were the initial purchaser of the notes and

4    was looking at the marketing materials, the Prospectus

5    Supplement and the other documents that Mr. Pickhardt was

6    talking about and they were the victim of a mistake that was

7    made, that would be one case.  But that is not this case.

8            In this case, what's really going on is there is an

9    intentional effort by Scepter to transfer value from the A-3

10   notes.  And the reason the A-3 notes have value, a particular

11   value, is because the market adjusted to the indenture,

12   beginning with ratings in about 2010 and later was pricing

13   beginning in about 2011, so that all of the indicators of

14   seniority and the actual money that investors were paying in

15   order to obtain the notes was indicated and demonstrated that

16   the threes were being treated senior to the twos.

17           THE COURT:  When did you become investors?

18           MR. ROLLIN:  In 2012, September of 2012.  And so this

19   is really about -- and there is an internal note.  I would like

20   to show Exhibit BN, Page 4, Lines 19 and 20, because this is

21   what's really going on.

22           THE COURT:  So this deal had its origin in 2005?

23           MR. ROLLIN:  Yes, your Honor.

24           THE COURT:  And when you become investors, what

25   documentary material is executed at that time?

1           MR. ROLLIN:  Right.  When we become investors, the

2     ratings have flipped to make the A-3 have a higher credit

3     rating than the A-2.  The pricing information available in the

4     market shows that the A-3 is more expensive than the A-2, but

5     here's the really important one.

6           As our trader, Mr. Peresechensky, will testify, as he

7     sees these notes come up on a bid list on September 26th, 2012,

8     he notices an anomaly.  He sees that the A-3s are -- appear to

9     be senior to the A-2s, and he knows that the numbering doesn't

10    usually work that way, and that will be his testimony.  And so

11    he goes through a series of checks.

12          First, he looks at Bloomberg, and he looks at the

13    credit enhancement and he sees, yes, that A-3 is being treated

14    as senior.

15          THE COURT:  So your client bought on the basis of

16    secondary sources?

17          MR. ROLLIN:  No.  I'm not there yet, your Honor.  It

18    starts with secondary sources, but he finally confirms with the

19    indenture, the one document that matters, the one governing

20    document, not a marketing material.  He opens it up on his

21    screen, he looks at it, and he sees that the losses will be

22    allocated first to the A-2 and then to the A-3, and on that

23    basis, he buys.

24          But, the next day -- later that day or the next day, I

25    don't recall as I stand here, he's talking to another trader

1    about this trade, and the trader says, whoa, there's a problem.

2    It looks like there's a discrepancy between the Prospectus

3    Supplement and the indenture, and he knows that because he has

4    access to a different application called Intext.

5    Mr. Peresechensky was using JP Morgan Bond Studio application.

6              Intex showed that there was a discrepancy between the

7    Prospectus Supplement and the indenture.  And what does he do?

8    He contacts the one person that matters, the securities

9    administrator at Wells Fargo and writes an e-mail and says -- I

10   won't put it up.  And he says, essentially:  Are you going to

11   follow the indenture?  What are you going to do here?  And the

12   securities administrator writes back and says:  We will follow

13   the indenture, absent an amendment.  If there's no amendment,

14   we will follow the indenture.

15             So Mr. Peresechensky writes back and says:  Well, what

16   would cause you to amend?  And Wells Fargo writes back and

17   says:  We will only amend if there is -- they say, the method

18   to amend is for consent of 100 percent of the affected note

19   holders, the class A-3 note holders.  The method amendment with

20   consent.  Not a method, not one of the methods, not we might

21   seek reformation, not we have an interpretation --

22             THE COURT:  I have the picture.

23             MR. ROLLIN:  Thank you.

24             THE COURT:  What's the position of Prospectus

25   Supplement?  What date does that have?

1          MR. ROLLIN:  The date of the Prospectus Supplement is

2     June 20th, 2005.  The indenture is June 22nd, 2005.

3          THE COURT:  Got it.

4          MR. ROLLIN:  Now, your Honor, as I was saying, what's

5     really going on here is reflected in the one document that I'd

6     like to show you.  This is an internal document that --

7          THE COURT:  So one could argue that your client

8     assumed the arbitrage risk.

9          MR. ROLLIN:  Your Honor, I don't believe so at all.

10    Our client looked at the indenture --

11         THE COURT:  The client appreciates that there's a

12    discrepancy.

13         MR. ROLLIN:  Only after the purchase.  Only after the

14    purchase, your Honor.  But when he does become aware of it, he

15    does due diligence and he contacts the paying agent, Wells

16    Fargo.  Wells Fargo says we're going to follow the indenture,

17    and on that basis, my client continues to hold the notes.

18         THE COURT:  I don't know if an oral statement like

19    that can be --

20         MR. ROLLIN:  It's actually in an e-mail exchange.

21         THE COURT:  Or even that.

22         MR. ROLLIN:  Well, your Honor, that's what Wells Fargo

23    says.  That's the representation that they made to the client

24    in writing in an e-mail, and on that basis, they continue to

25    hold the notes.

1           THE COURT:  Okay.  Got it.

2           MR. ROLLIN:  Thank you.

3           THE COURT:  So who will be your witnesses?

4           MR. ROLLIN:  Your Honor, I first would like to talk

5    about their witnesses.

6           THE COURT:  Talk about yours.  This is not closing.

7    This is an opening.  Who are your witnesses?

8           MR. ROLLIN:  Well, your Honor, we have several

9    witnesses.

10           THE COURT:  Tell me.

11           MR. ROLLIN:  One of whom will be Mr. Peresechensky,

12    who made the trade.  He will testify as to the issues that I

13    just raised, and he will also demonstrate that, in the event of

14    a reversal, there will be a massive windfall to Scepter, which

15    is precisely the point, which is exactly why we're here.

16           THE COURT:  I forgot to ask.  Mr. Pickhardt, when did

17    your client become invested?

18           MR. PICKHARDT:  We invested in January of 2012, your

19    Honor.

20           THE COURT:  Both of you are 2012 indentures?

21           MR. PICKHARDT:  That's right, January and then

22    September for Semper.

23           MR. ROLLIN:  The difference, your Honor, is you will

24    find that, through Mr. Mago's testimony, is that Scepter was

25    completely aware of the discrepancy and, in fact, purchased

E77PTRU2                      Opening - Mr. Pickhardt

1    into the notes on three separate occasions, even after the

2    commencement of this litigation in order to arbitrage.

3              THE COURT:  I understand that one party will lose and

4    one party will gain.

5              MR. ROLLIN:  Not necessarily.  Both parties will be

6    fine.

7              THE COURT:  Not necessarily?

8              MR. ROLLIN:  Both parties have offered --

9              THE COURT:  If the mortgage pools perform, you'll both

10   be fine, but if they don't perform, you'll both lose.

11             MR. ROLLIN:  If I may clarify, because the notes have

12   appreciated in value; so both Scepter and Semper will have

13   realized the investment gain from that appreciation in the

14   event that the indenture is followed.  Right?

15             If the instruction that Wells Fargo gets is that it

16   should follow the indenture, then both parties will have

17   appreciated that value.  They got what they bought.  If the

18   Court reverses, there will be a massive windfall to Scepter and

19   a massive loss to Semper.

20             THE COURT:  Okay.  Who else will be a witness?

21             MR. ROLLIN:  Your Honor, we're going to call Ms. Ria

22   Davis.  Ria Davis is our general counsel.  She's seated at the

23   counsel table here.

24             THE COURT:  What's she going to say?

25             MR. ROLLIN:  She will speak, I think, just to advise

E77PTRU2                      Opening – Mr. Pickhardt

1    the Court –– if the give the Court some context about Semper

2    and about who Semper is and what Semper does, most generally.

3    Ms. Davis also has ––

4              THE COURT:  You're an investor.  I don't think I need

5    to know anything more than that.

6              MR. ROLLIN:  And Ms. Davis handled aspects of dealing

7    with the consent solicitation and Semper's response to the

8    consent solicitation.

9              THE COURT:  I don't think that's relevant.  Okay.  You

10   got Mr. Peresechensky.  Anybody else?

11             MR. ROLLIN:  We have Mr. Mago.  Mr. Mago is Scepter's

12   witness, Scepter's employee, who was their 30(b)(6) witness,

13   and we're going to put him on the stand to address certain very

14   important issues about the motivations and the relative risks

15   and rewards of the situation.  We will call, by deposition,

16   Mr. Cohen.

17             THE COURT:  I don't think that's going to be relevant

18   either.

19             MR. ROLLIN:  We will call Mr. Cohen, Wells Fargo's

20   representative by deposition, and we will also be, although

21   they ––

22             THE COURT:  Is he the one that gave you the advice?

23             MR. ROLLIN:  He is the supervisor and one of the

24   participants in those discussions, yes.

25             The other thing that I want to point out, your

1    Honor --

2              THE COURT:  I don't understand how, with written

3    documents, you can get advice.  Seems to me that you're trading

4    on inside information at that time.

5              MR. ROLLIN:  First of all, the trade was made.

6              THE COURT:  I don't really understand how Cohen can be

7    a witness, or how you could bring in evidence of a private

8    conversation with Wells Fargo that's not available throughout

9    the market.

10             MR. ROLLIN:  Again, the conversations with Wells Fargo

11   are many and multi-faceted.

12             THE COURT:  I don't understand how you could do it.

13   Any kind of a conversation that's material with someone like

14   Wells Fargo about what they're going to do in the future

15   provides market information that is not generally available.

16             MR. ROLLIN:  All they're saying is they're confirming

17   the indenture, which is publicly available --

18             THE COURT:  Then you rely on the indenture, and that's

19   your reliance.

20             MR. ROLLIN:  Well, we did rely on the indenture.

21             THE COURT:  I don't think that conversation is going

22   to be coming in.

23             MR. ROLLIN:  Your Honor --

24             THE COURT:  That's inside information.

25             MR. ROLLIN:  I understand your Honor's point.  Let me

1    make another with respect to a couple of witnesses.

2              THE COURT:  Who else are your witnesses?

3              MR. ROLLIN:  Although they are initially calling

4    Mr. Simonds and Ms. Stone, they have some information that

5    bears on their claim for reformation, but most importantly,

6    they actually have no information that bears on the intent of

7    the parties.

8              Your Honor's question earlier was at who are the

9    scriveners and should they be here?  You will hear from

10   Mr. Simonds that he has no recollection whatsoever and that he

11   has no idea what the intent of the parties was, at all.  He is

12   not the drafter.  The associates are the drafters, and the fact

13   that one of them may reside elsewhere --

14             THE COURT:  You will make objections.

15             MR. ROLLIN:  I certainly will.

16             And with respect to Ms. Stone, what you'll find is she

17   also has no recollection, not even of her own intent, much less

18   the intent of anybody else and the deposition --

19             THE COURT:  Let's not proceed.  I think I have a

20   picture.  The openings are finished.  Let's go on to the

21   testimony.

22             MR. PICKHARDT:  Your Honor, just one point, if I may.

23   If Semper is intending to call Mr. Mago --

24             THE COURT:  Mr. Pickhardt, it's not a deposition.

25             MR. PICKHARDT:  Okay, your Honor.

1           THE COURT:  Call your witness.

2           MR. PICKHARDT:  Your Honor, we're going to call Mary

3    Stone by deposition designation, and the way that we have

4    agreed with Semper to proceed is to actually have Ms. Shah take

5    the witness stand so that we can do question and answer.  We

6    figured that would be easier for the Court to follow, and then

7    whichever attorney questioned Ms. Stone at deposition will

8    actually pose the question.

9           MR. ROLLIN:  Your Honor, may I pose an objection?

10           THE COURT:  To do what?

11           MR. ROLLIN:  I have an objection with respect to the

12    manner in which the deposition will be read and I'd like to

13    explain.

14           THE COURT:  Overruled.  Take the stand, Ms. Shah.

15           MR. PICKHARDT:  Would your Honor like a written copy

16    of the designations?

17           THE COURT:  Yes.  Let's move quickly.  Ms. Shah, come

18    up.  We'll mark this.  What is it that I have in my hand?

19           MR. PICKHARDT:  Your Honor, this is a compilation of

20    the designations that we will be reading into the record.

21           THE COURT:  It's marked for identification.

22           MR. PICKHARDT:  We will mark this, your Honor, for

23    identification as Exhibit TX262.

24           THE COURT:  262?

25           MR. PICKHARDT:  I apologize, 268.

1    THE COURT:  268.  Okay.  Let's go.

2    DIRECT EXAMINATION

3    BY MR. PICKHARDT:

4    "Q. Will you please state your full name for the record?

5    "A. Mary Catherine Stone.

6        THE COURT:  Do it loudly, please.

7    "A. Mary Catherine Stone.

8    "Q. Okay.  Do you understand you're under oath today to provide

9    truthful answers?

10   "A. Yes.

11   "Q. Miss Stone, what is your occupation?

12   "A. I'm a managing director in the RMBS banking group at Bank

13   of America, Merrill Lynch.

14   "Q. And could you take me through what your professional

15   experience is since graduating from William and Mary in '98?

16   "A. My first job was at a regional accounting firm called

17   Keiter Stephens in Richmond, Virginia.  I did valuation of

18   closely held companies there for just under a year.  I then

19   went to Pricewaterhouse Coopers in June of '99.  I was an

20   associate in their securitization practice.

21        "In January of '01, I started at Lehman Brothers in

22   their RMBS banking team.  I left there in October of '02 to go

23   to Morgan Stanley into a similar role, and then I returned to

24   Lehman in March of '03, back into the RMBS banking group.  I

25   stayed there until May of 2008.

E77PTRU2                              "Stone"

1              In September '09, I started a firm called ICP Capital.

2      I was there until June of 2010, and then I started in the RMBS

3      banking group at Bank of America in July -- No, I'm sorry, June

4      of 2009.  And then I started in the RMBS banking group at Bank

5      of America in June of 2010.

6      "Q. And what was your title when you re-joined Lehman in 2003?

7      "A. I believe I was still an associate.

8      "Q. Did that title change at some point?

9      "A. At the end of that year, I was promoted to vice president.

10     "Q. At the end of 2003?

11     "A. Yes.

12     "Q. And did your title change from vice president at any point

13     between 2003 and 2009, when you left?

14     "A. Yes.  At the end of 2006, I was promoted to senior vice

15     president.  End of 2006?  End of 2007.

16     "Q. End of 2007?

17     "A. Yes.

18     "Q. In the entire period that you were at Lehman, were you

19     still in the residential mortgage-backed security group?

20     "A. Yes.

21     "Q. And what were your responsibilities in that group?

22     "A. Putting together and managing securitization of residential

23     mortgage assets.

24     "Q. Can you provide a little bit more detail as to what that

25     role entailed on RMBS securitizations?

E77PTRU2                          "Stone"

1      "A. Sure.  So we would -- I would work with either our trading

2      desk or third-party customers, depending on who was issuing the

3      transaction to -- you know, along with my team to come up with

4      a structure for the transaction, which would often be, you

5      know, closely informed by either the customer or the trading

6      desk.

7             "Prepare marketing materials, work with the rating

8      agencies and work with counsel to prepare or review documents

9      in connection with the transaction.  And then work with our

10     sales and trading team to market and distribute the

11     transactions, and then all the operational elements of closing

12     the deal.

13     "Q. And were these responsibilities that Lehman had as a lead

14     underwriter on RMBS securitizations, or did it play a different

15     role?

16     "A. Yes, as underwriter.

17     "Q. Now, on deals for which Lehman was lead underwriter, were

18     you involved in helping to determine what the structure of the

19     transactions were?

20     "A. Yes.

21     "Q. And in what way were you involved?

22     "A. I would typically be a sort of go-between, say, like the

23     lawyers and the trading desk or the customers, who had views on

24     sort of what their objectives might be.  And, you know, we

25     would all work collaboratively to come up with a structure that

E77PTRU2                          "Stone"

1    both met the customer's objectives, would be received well by

2    the market, and, you know, would fit whatever tax restrictions

3    and other restrictions we might have to manage.

4              "So in our role as banker, we sort of are the

5    quarterback of all the information, if you will.

6    "Q. When you refer to customer, who was -- did you view as

7    being Lehman's customer when you were acting as lead

8    underwriter for an RMBS securitization?

9    "A. So if it was a third-party transaction, like the

10   transaction we're talking about, American Home would be the

11   customer.  If it was our own proprietary Lehman Brothers

12   issuance, our trading desk would be our customer.

13   "Q. And you also talked about counsel.  And which counsel,

14   counsel for whom were you normally dealing with?

15   "A. We would deal with both the issuer's counsel and

16   underwriter's counsel.  I would typically deal with whichever

17   was doing more of the heavy lifting on the drafting, on a more

18   day-to-day kind of regular basis.  But we dealt with both.

19   "Q. And in the deal that we are talking about here, AHMIT

20   2005-2, do you have an understanding that it was issuer's

21   counsel that was taking a lead in drafting?

22   "A. Okay.  So I don't remember, per se, but after reviewing

23   materials, I now can see that it was issuer's counsel.

24   "Q. Okay.  So from the materials that you reviewed, you

25   understand that it was issuer's counsel that was taking the

E77PTRU2                        "Stone"

1     lead on the drafting of the documents?

2     "A. Yes.

3     "Q. Is it correct you joined B of A in June 2010?

4     "A. 2009.

5     "Q. 2009."

6              THE COURT:  Will you stop a moment?  I have a

7     question.  I don't know who can answer it.  American Home

8     Product is supposed to be the issuer?

9              MR. PICKHARDT:  The American Home Products, LLC, is

10    actually the depositor or what's sometimes referred to as the

11    sponsor.  They are the ones that provide the underlying loans.

12    The actual issuer of the securities is --

13             THE COURT:  They're taken out by the public?

14             MR. PICKHARDT:  Excuse me, your Honor?

15             THE COURT:  They're taken out; they're not by whoever

16    ultimately invests in the deal?

17             MR. PICKHARDT:  Yes, yes.

18             THE COURT:  So they're like a bridge lender?

19             MR. PICKHARDT:  Well, not exactly.

20             THE COURT:  As that term is used?

21             MR. PICKHARDT:  They provide the loans, which go into

22    a trust.  The trust is the American Home Mortgage Investment

23    Trust 2005-2.  That's the actual issuer of the securities that

24    the people in the market actually invest in.

25             THE COURT:  So what happens here is that American Home

E77PTRU2                          "Stone"

1   Products puts up the money to fund the mortgages, but the

2   intent is that the entire ownership of the loan will be passed

3   to whoever buys in the tranches that are developed.

4          MR. PICKHARDT:  That's exactly right.

5          THE COURT:  So American Home Products is taken out of

6   it?  It makes its fee, and its taken out?  It has no more

7   residual risk?

8          MR. PICKHARDT:  That's right.  This is a way for them

9   to the transfer the risk to the public.

10          THE COURT:  So the lawyer in this deal really has no

11   client other than the underwriter in the deal or the issuer in

12   the deal, and the fact that there are two law firms, one

13   representing the underwriter and one representing the sponsor,

14   doesn't create any adverse relationship at all in the real

15   sense?

16          MR. PICKHARDT:  That is correct, your Honor, and

17   especially on the issue that's pertinent here, which is the

18   structure of the securitization.  That is a special role that

19   the underwriter plays because that's what they do.  They figure

20   out, how can we go out and market this to the public, and they

21   handle creating the structure that will allow that to happen.

22          That's not something that American Home is, frankly,

23   going to care about.  It is something that the underwriters

24   care about because they are concerned that this deal be

25   marketable so that they can find investors in the transaction

E77PTRU2                          "Stone"

1    that they are underwriting.

2           THE COURT:  And the choice of whether it's

3    underwriter's counsel or issuer's counsel is really a

4    meaningless choice in terms of who the client is.  The both

5    clients here, whether it be the underwriter or the issuer, are

6    not going to have any residual risk except for mistakes.

7           MR. PICKHARDT:  They certainly have -- may have some

8    residual risk with respect to mistakes.  The underwriters may

9    have some residual risk to the extent that they are unable to

10   sell the bonds.

11          THE COURT:  Right.

12          MR. PICKHARDT:  Because they are the ones seeking to

13   make a market in those bonds, and if they can't sell them, they

14   could be stuck with the risk on those.

15          THE COURT:  That depends on the deal between the

16   underwriter and the issuer.

17          MR. PICKHARDT:  That's probably right, your Honor.

18   We're not going to have any evidence about that, other than

19   it's the underwriter who has primary responsibility with

20   respect to the structuring of the transaction.

21          THE COURT:  Mr. Rollin, you wanted to say?

22          MR. ROLLIN:  Point of clarification, your Honor.

23   There are many parties to the transaction, including Wells

24   Fargo, for example, all of whom were represented by separate

25   counsel and who --

1          THE COURT:  But they come later, don't they?

2          MR. ROLLIN:  During the course of structuring and

3   approving the transaction, all of those parties are involved,

4   and all of those parties are represented by counsel.

5          THE COURT:  That has to be right.  Well, the trustee

6   will have to be involved because this goes to succeed

7   somebody's position or take some kind of position, but I don't

8   know if anybody else is going to be in that early stage.

9          MR. ROLLIN:  As well as the securities administrator.

10  The securities administrator, for example, is the party

11  responsible for making the payments, which is why it filed this

12  case.  And so it participates in that process, and there is

13  evidence that they would have had to model the cash flows, for

14  example, looking at the disputed indenture provision.  And so I

15  want to make sure it's clear, there are --

16         THE COURT:  It's not clear at this point.  We'll need

17  another witness.

18         MR. ROLLIN:  Okay.  I just wanted to clarify that the

19  number of parties and the fact that counsel represented the

20  various parties that participated in the transaction --

21         THE COURT:  It varies.  At this point, you just have

22  an issuer and an underwriter.  If securities administrator or

23  trustee is selected, they may well be a part of this deal, but

24  they may not be part of this deal.  It depends on the business

25  practices of those entities.

1              MR. ROLLIN:  There happen to be --

2              THE COURT:  You can add to this.  I think I have

3     enough of a basic understanding of what's going on.

4              MR. ROLLIN:  Your Honor, if I may, just one point you

5     made and that there's an underwriter.  There are actually five,

6     I believe, underwriters on this deal.

7              THE COURT:  Right.  There are sub underwriters.

8     Lehman's the lead, and they have others to follow, and most to

9     follow also have their counsel poking around.

10             MR. ROLLIN:  Right.

11             THE COURT:  Continue.

12    BY MR. PICKHARDT:

13    "Q. Miss Stone, is it correct you joined B of A in June 2010?

14    "A. Yes.  2009.

15    "Q. 2009.  Did your -- I understand your title changed at some

16    point from director to managing director?

17    "A. Yes.

18    "Q. When did that occur?

19    "A. December of 2012.

20    "Q. The entire time that you've been" --

21             THE COURT:  I think we can skip what comes here.

22             MR. PICKHARDT:  We can skip to --

23             THE COURT:  Go to 28, Line 7, Page 7 of the exhibit.

24    "Q. Okay.  So is it fair to characterize it that you are the

25    primary day-to-day person running the transaction at Lehman?

E77PTRU2                              "Stone"

1   "A. Yes.

2   "Q. Now, as the banker at Lehman with the primary day-to-day

3   responsibility on this transaction, what would that mean in

4   practice, as far as your responsibilities?

5   "A. Just the information would funnel through me.  Whether it

6   was coming from the trading desk or coming from counsel or

7   coming from the junior people working on the deal, I would be

8   kind of the primary coordinator making sure that the deal was

9   coordinated.

10  "Q. Would you be involved in helping to structure the

11  transaction?

12  "A. Yes.

13  "Q. So you'd be involved in helping to determine what the

14  financial terms were of the transaction?

15  "A. Yes.

16  "Q. And do you have an understanding that this action concerns

17  the order in which realized losses are allocated to different

18  tranches of notes in this transaction?

19  "A. Yes.

20  "Q. Is it -- Are those terms that you would have been aware of

21  at the time?

22  "A. Yes.

23  "Q. And why is that?

24  "A. Because we would need to make sure that the disclosures

25  were reflective of the loss allocation.

E77PTRU2                          "Stone"

1    "Q. And why did the disclosures need to reflect the loss

2    allocation?

3    "A. So that investors would know how the transaction worked.

4    "Q. And is one of the pieces of information that was important

5    to investors how losses were allocated?

6    "A. Yes.

7    "Q. Were you also reviewing disclosure documents in your role

8    as leading the day-to-day operations on the deal?

9    "A. Yes.

10   "Q. In fact, was that an important part of your role?

11   "A. Yes.

12   "Q. Do you have an understanding as to what the dispute is in

13   this case?

14   "A. Yes.

15   "Q. What is your understanding?

16   "A. That there was a super senior created for which losses

17   would go to it, would be allocated to other senior tranches,

18   and there's a disagreement about which one of those two gets

19   allocated first.

20   "Q. And do you understand that there is a discrepancy between

21   the indenture and the offering materials with respect to how

22   the realized loss allocation is described?

23   "A. Yes.

24   "Q. Do you understand that the indenture describes realized

25   losses as being allocated first to the class 1-A-2 notes?

E77PTRU2                          "Stone"

1    "A. Based on reviewing the documents, yes.

2    "Q. And do you have an understanding that the marketing

3    materials described the losses as being allocated first to the

4    class 1-A-3 note?

5    "A. Yes.  Again, based on they reviewing the documents."

6            MR. ROLLIN:  Objection, hearsay, best evidence.

7            THE COURT:  Where are we?  What line?

8            MR. PICKHARDT:  We are at 34, 14, your Honor.

9            MR. ROLLIN:  Describing the contents of the documents.

10           THE COURT:  One minute.  That's technically correct,

11   but it really doesn't make any difference here.  Objection

12   overruled.

13           MS. SHAH:  Could you repeat the question, please.

14           MR. PICKHARDT:  Yes.

15   "Q. And do you have an understanding that the marketing

16   materials describe the losses as being allocated first to the

17   class 1-A-3 notes?

18   "A. Yes.  Again, based on reviewing the documents.

19   "Q. And based upon your experience and the documents you have

20   reviewed so far, have you formed a view as to which of those

21   two loss -- realized loss allocations was intended at the time?

22   "A. Yes."

23           THE COURT:  Objection sustained.

24           MR. ROLLIN:  Thank you.

25           THE COURT:  That answer will not come into the record.

E77PTRU2                              "Stone"

1    The question and the answer is stricken.  So what is stricken

2    goes down to 35, Line 23.  So from 34, 20 to 35, 23, the

3    questions and answers are stricken.  Objection sustained.

4    BY MR. PICKHARDT:

5    "Q. I'm putting some documents in front of you that were

6    previously marked.  The first document in front of you that was

7    marked as TX219C.  Do you recognize this as an indenture for

8    the AHMIT 2005-2 deal?"

9              MR. ROLLIN:  Objection, lacks foundation.  This

10   witness is not --

11             THE COURT:  There's no dispute what is the indenture.

12   The indenture comes in, doesn't it?

13             MR. ROLLIN:  The final indenture comes in.  As to any

14   drafts --

15             THE COURT:  This is a draft?

16             MR. PICKHARDT:  No, your Honor.  This is the final

17   indenture.

18             MR. ROLLIN:  No objections to final.

19             THE COURT:  Okay.  So TX219C is admitted into

20   evidence.

21             (Plaintiff's Exhibit 219C received in evidence)

22   BY MR. PICKHARDT:

23   "Q. Do you recognize this as the indenture for the AHMIT 2005-2

24   deal?

25   "A. Yes.

E77PTRU2                          "Stone"

1   "Q. And I'll represent to you that the next three documents I'm

2   going to show you were all produced by Wells Fargo as coming

3   from the closing set for this transaction.  If you would turn

4   to TX219, 67 of this document?"

5            THE COURT:  67 is the page number?

6            MR. PICKHARDT:  Correct, your Honor.

7            THE COURT:  By TX219, do you mean 219C?

8            MS. SHAH:  No.  Actually, sorry, if I could interject.

9   The "C" is just a confidentiality designation.

10           THE COURT:  Okay.

11           MR. PICKHARDT:  I apologize.

12           THE COURT:  We're not going to have confidentiality.

13   All this is public.  Confidentiality is gone.

14           MR. PICKHARDT:  The only issue, your Honor, that could

15   raise confidentiality issues is that nothing concerning what

16   we're talking about now, the drafting history --

17           THE COURT:  You'll rise it to me before we get into

18   that, but we're not having any confidentiality on any of this.

19           MR. PICKHARDT:  Okay, your Honor.  And we will

20   substitute -- when we are reading exhibits, we will try and

21   substitute in my reading the reference to the page and exhibit

22   number in the trial exhibits.

23           THE COURT:  As you've been doing, correct?

24           MR. PICKHARDT:  Correct, your Honor.

25           THE COURT:  Okay.  So Page 67, section 3.38 entitled

E77PTRU2                          "Stone"

1    Allocation of Realized Losses.

2    "Q. Do you see that this is a provision that sets out the order

3    in which losses are allocated among certain tranches of notes?

4    "A. Yes.

5    "Q. And the order is numbered in that -- in the section

6    numbered 9 that refers to allocation of losses between class

7    1-A-2 and class 1-A-3 notes?

8    "A. Yes.

9    "Q. And does this provision, as drafted, provide as we

10   discussed earlier the allocation of losses first to the class

11   1-A-2 notes before the class 1-A-3 notes?

12   "A. Yeah, that's what it says here, yes.

13   "Q. You can set that document aside.  If you would turn to the

14   document that is marked as TX221, which was also produced by

15   Wells Fargo as coming from the closing set or closing binder

16   for this transaction.  Is that a term sheet you're familiar

17   with?

18   "A. Yes.

19   "Q. And this includes a Prospectus Supplement, a two-page

20   Prospectus Supplement on the top, followed by a much longer

21   Prospectus Supplement below.  Do you recognize this as the two

22   Prospectus Supplements for the AHMIT 2005-2 transactions?

23   "A. I'm not sure what the first thing is.  It might be a

24   sticker.

25   Q.  Okay.  And what is a sticker?

E77PTRU2                          "Stone"

1    "A. If there is a mistake in the offering memo, or if there is

2    a change, it will be updated in the sticker.

3    "Q. And why is that done?

4    "A. To correct the disclosure.

5    "Q. And as you see, that the supplement on the top page is

6    dated July 6th, 2005, and then the Prospectus Supplement that

7    is appended to it is dated June 20th, 2005?

8    "A. Yes.

9    "Q. And is a much longer document?

10   "A. Yes.

11   "Q. So does this appear to be the primary Prospectus Supplement

12   for AHMIT 2005-2 in a sticker as of approximately three weeks

13   later?

14   "A. That's what it looks like.

15   "Q. Okay.  Is this one of the documents that Lehman Brothers

16   was prepared -- was involved in reviewing?

17   "A. Yes.

18   "Q. Is the accuracy of the Prospectus Supplement an issue of

19   importance to Lehman Brothers?

20   "A. Yes.

21   "Q. And why is that?

22   "A. Because as underwriter, we have liability if the

23   disclosures are not accurate.

24   "Q. And so ensuring the accuracy of these disclosures in the

25   Prospectus Supplement was of paramount importance in connection

E77PTRU2                          "Stone"

1    with these transactions, right?

2    "A. Yes.

3    "Q. Now, if you would turn to Page" --

4              THE COURT:  At this point, you want to offer 221?

5              MR. PICKHARDT:  Yes, we offer 221 into evidence, your

6    Honor.

7              MR. ROLLIN:  No objection.

8              THE COURT:  Received.

9              (Plaintiff's Exhibit 221 received in evidence)

10             MR. PICKHARDT:  Now, if you would turn to the term

11   sheet --

12             THE COURT:  And the prospectus?

13             MR. PICKHARDT:  It's actually, your Honor, it is the

14   Prospectus Supplement that we were discussing earlier, which

15   includes multiple references to the issues here, and you will

16   sometimes in deals you will have subsequent Prospective

17   Supplements that are intended if you need to revise or amend

18   the initial Prospective Supplement.

19             THE COURT:  That's a sticker.

20             MR. PICKHARDT:  A sticker, that's exactly right, your

21   Honor.

22             THE COURT:  What about a term sheet?

23             MR. PICKHARDT:  The term sheet we are getting to.

24             THE COURT:  So this is not a term sheet?

25             MR. PICKHARDT:  That is correct.  The term sheet is

E77PTRU2                           "Stone"

1   something separate.

2            THE COURT:  So this a Prospectus Supplement and a

3   sticker?

4            MR. PICKHARDT:  Yes.

5            THE COURT:  So now you're going to Page 82 and 83?

6            MR. PICKHARDT:  Yes.

7   BY MR. PICKHARDT:

8   "Q. Now, if you turn to Page 82 in the Pro Supp and the section

9   entitles Allocation of Losses on Mortgage Loans, and the

10  paragraph that carries over from 82 to 83.  Do you see at the

11  top of 83 that there is in this description, a description of

12  the allocation of losses as between the class 1-A-3 and the

13  1-A-2 notes?

14  "A. Yes.

15  "Q. And does this description describe the losses as being

16  allocated first to the 1-A-3 notes before the 1-A-2 notes?

17  "A. Yes.

18  "Q. And is this the description that you believe to be -- to

19  accurately reflect the intent on the deal?

20  "A. Yeah."

21           MR. ROLLIN:  Objection, lacks foundation.  This

22  witness doesn't have any personal knowledge as to the intent of

23  anybody --

24           THE COURT:  All you have to do is object.

25           MR. ROLLIN:  Thank you, your Honor.

E77PTRU2                          "Stone"

1            THE COURT:  Objection sustained.

2            MR. ROLLIN:  Thank you.

3    "Q. If you would also turn to Page 27, to the section entitled

4    Some Additional Risks Are Associated With the Notes.  And does

5    this section also include a reference to the allocation of

6    realized losses as between the class 1-A-3 and the 1-A-2 notes?

7    I'll point you directly to a sentence that starts 'Realized

8    losses on the group one mortgage loans,' which is in the middle

9    of the paragraph?

10   "A. Yes, I see it.

11   "Q. And does the description of the allocation of realized

12   losses in this paragraph similarly describe the losses as being

13   allocated to the 1-A-3 notes before the 1-A-2 notes?

14   "A. Yes."

15           MR. ROLLIN:  Same objection with respect to intent.

16   There's no --

17           THE COURT:  Just a minute.  This point here is, it's

18   the objection would be a good one under the best evidence rule,

19   but I find I better understand it this way.  So I'm overruling

20   the objection.  But on the next question, 43, 23, and the

21   answer, the objection is sustained.

22           MR. ROLLIN:  Thank you, your Honor.

23           MR. PICKHARDT:  Your Honor, will you accept argument

24   on that objection?

25           THE COURT:  You don't have a foundation.

E77PTRU2                    "Stone"

1          MR. PICKHARDT:  Okay, your Honor.

2     BY MR. PICKHARDT:

3     "Q. If you would turn to Page 129, to a section entitled Yield

4     Sensitivity of the Class 1-A-2, 1-A-3 and Certain Other Notes?

5     "A. Sure.

6     "Q. The question is whether this provision, as well, includes a

7     reference to the intended allocation of losses as between the

8     class 1-A-2 and 1-A-3 notes?"

9          MR. ROLLIN:  Again, objection.

10     BY MR. PICKHARDT:

11     "Q. And I recognize it's a long provision, and I'm specifically

12     directing you to the sentence that starts probably four-fifths

13     of the way down the page, to the sentence that starts:  If the

14     amount of overcollateralization for the group one, group 2C,

15     and then it goes on."

16          THE COURT:  Objection overruled.

17     "A. Yes.  I see it, yes.

18     "Q. And does that sentence also describe the losses as being

19     intended to be allocated first to the class 1-A-3 notes before

20     the 1-A-2 notes?

21          MR. ROLLIN:  Objection, lacks foundation, best

22     evidence.

23          THE COURT:  Just a minute.  This is just a restatement

24     of the wording of the document?

25          MR. ROLLIN:  It's the question of intent that's

E77PTRU2                              "Stone"

 1    embedded in the question.

 2              THE COURT:  What line does it end?

 3              MR. PICKHARDT:  It is -- the question starts at 45,

 4    11, your Honor, and goes through 45, 14.

 5              MR. ROLLIN:  There are two references to --

 6              THE COURT:  Well, let me look at the document.

 7              (Pause)

 8              THE COURT:  It's the sentence beginning on Line 24; is

 9    it not, Mr. Pickhardt?

10              MR. PICKHARDT:  On Line 24 of which document, your

11    Honor?

12              THE COURT:  This is Exhibit 221.

13              MR. PICKHARDT:  221.

14              THE COURT:  Page 129.

15              MR. PICKHARDT:  Yes, your Honor.  The particular

16    section of this page that is relevant is very close to the

17    bottom.  It is maybe about ten lines up.

18              THE COURT:  Oh, I see it.  I see it.

19              MR. PICKHARDT:  If it's helpful, your Honor, it's

20    highlighted.  It should be highlighted on your screen.

21              THE COURT:  Objection overruled.

22              MS. SHAH:  Could you repeat the question,

23    Mr. Pickhardt?

24    BY MR. PICKHARDT:

25    "Q. And does that sentence also describe the losses as being

E77PTRU2                          "Stone"

1   intended to be allocated first to the class 1-A-3 notes before

2   the class 1-A-2 notes?

3   "A. Yes."

4          MR. ROLLIN:  Same objection, lacks foundation as to

5   intent.  It's not what the document says.

6          THE COURT:  Overruled.  The text will be the best

7   evidence.  This is not an answer that's independent of text.

8   It's rather a summary of the text, and I can take that.

9          MR. ROLLIN:  I understand.  Thank you.

10  BY MR. PICKHARDT:

11  "Q. And that's consistent with your view as to what was

12  intended, correct?"

13         THE COURT:  That's the question that was objected to

14  where the objection is sustained.

15         MR. PICKHARDT:  At this point, your Honor, we would --

16  I would move to have 221 admitted into evidence.

17         THE COURT:  You just did, I think.  And I received it.

18         MR. PICKHARDT:  I think it might have been 222.

19         THE COURT:  No, 221, the Prospectus Supplement and

20  sticker.

21         MR. PICKHARDT:  Okay.

22         THE COURT:  This is what we're reading, right?

23         MR. PICKHARDT:  Yes, that is, your Honor.

24         THE COURT:  221 is in evidence.

25         MR. PICKHARDT:  We want to make sure that the prior

E77PTRU2                        "Stone"

1  document, which was the indenture, got moved into evidence,

2  which was --

3           THE COURT:  I see.  Okay.  So Page 45, Line 16

4  through, 45, Line 22, objection sustained.

5  BY MR. PICKHARDT:

6  "Q. Now, you can set that document aside.

7  "A. Okay.

8  "Q. Now, if you would turn to the next document, which has been

9  labeled as TX218, which is a letter from Deloitte that went to

10  a number of recipients, including Lehman Brothers, as of

11  June 16th, 2005, that is entitled Independent Accountants

12  Report on Applying Agreed Upon Procedures.  What is this?

13  "A. This is the accountant's letter that describes the review

14  of the marketing materials and the offering materials."

15           MR. ROLLIN:  I object to this document.  It lacks

16  foundation.  It's a Deloitte document.

17           MR. PICKHARDT:  Your Honor, it was a document that was

18  sent to Lehman Brothers that the witness recognizes.

19           THE COURT:  I know what it is.  Just be quiet.

20  Overruled.

21  BY MR. PICKHARDT:

22  "Q. Okay.  And so they performed a review of the marketing

23  materials to confirm that, based upon certain procedures, that

24  they were accurate; is that right?

25  "A. Yes."

E77PTRU2                          "Stone"

1          MR. ROLLIN:  Objection, hearsay.

2          THE COURT:  Sustained.

3          MR. ROLLIN:  Thank you.

4   "Q. Now, if you would turn to the document that is at Bates

5   Number" -- the record which reflects Page 9 in this exhibit --

6   "which is appended to the Deloitte letter.  Do you recognize

7   this document?

8   "A. Yes.

9   "Q. What is it?

10  "A. This is a marketing memo term sheet.

11  "Q. And what is the purpose of a term sheet in this context?

12  "A. To describe the transaction for investors, marketing the

13  deal.

14  "Q. And when is the term sheet prepared?

15  "A. Prior to marketing.

16  "Q. In relationship to the preparation of the Prospectus

17  Supplement in the indenture, when is the term sheet prepared?

18  "A. Well, it's finalized typically prior, but it's prepared

19  concurrently with the other deal docs.

20  "Q. And why is it finalized prior?

21  "A. Because it is used earlier.

22  "Q. And for what purpose is -- what purpose is it used?

23  "A. For marketing the transaction.

24  "Q. Why do you market the transaction prior to having a Pro

25  Supp?

E77PTRU2                          "Stone"

1    "A. Because the Pro Supp is often not yet completed, and the

2    marketing materials are -- you know, summarize the information

3    in the Pro Supp.

4    "Q. And is the term sheet intended to reflect the important

5    terms of the deal?

6    "A. Yes.

7    "Q. And so prior to the finalization of the term sheet, is

8    there generally agreement reached on structural characteristics

9    of the deal?

10   "A. Typically, yes.

11   "Q. Who typically prepares a term sheet?

12   "A. The actual sort of drafting is typically done by the

13   banking group, with review by the issuer, as well as issuer's

14   and underwriter's counsel.

15   "Q. When you say the banking group, in this case would that be

16   your group?

17   "A. That would be my team, yes.

18   "Q. So you believe that this is a document that was prepared by

19   your team?

20   "A. Correct.

21   "Q. Where would your team get the information that would be

22   included in the term sheet?

23   "A. Well, if there was another transaction, similar transaction

24   previously done, we would get it from the prior transaction as

25   a base and in discussions with counsel, as well as, you know,

E77PTRU2                          "Stone"

1   the issuer and the traders around how the deal was supposed to

2   work.

3   "Q. And if you would turn to Page 11 of the term sheet, what is

4   the purpose of the information that is displayed on this page?

5   "A. This is just a snapshot of the capital structure of the

6   deal; so a summary of the bonds being offered.

7   "Q. And this summary lists the different classes of bonds that

8   are to be offered; is that right?

9   "A. Yes.

10  "Q. And it includes the class 1-A-2 and the 1-A-3 notes that

11  we've been discussing; is that right?

12  "A. Yes.

13  "Q. Under note type there is a reference to Footnote 10, which

14  is on Page 4 of this document."  Page 12 of the exhibit.  "And

15  does Footnote 10 describe the intended allocation of losses

16  between the class 1-A-2 and 1-A-3?

17          THE COURT:  Before you get to Footnote 10, you have to

18  offer the document.

19          MR. PICKHARDT:  Your Honor, we would offer Exhibit 218

20  into evidence.

21          MR. ROLLIN:  No objection as to that document.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 218 received in evidence)

24  BY MR. PICKHARDT:

25  "Q. And does Footnote 10 describe the intended allocation of

E77PTRU2                           "Stone"

 1   losses between the class 1-A-2 and 1-A-3 notes?

 2              MR. ROLLIN:  Objection, foundation.

 3              THE COURT:  Again, it's summary of the written words,

 4   not independent of it.

 5   "A. It describes what I think the intended allocation was,

 6   yes."

 7              MR. ROLLIN:  Objection, move to strike.

 8              THE COURT:  As indicated by the text.  I'm just taking

 9   these as shorthanded, convenient summaries of the meaning of

10   the text itself.  And what the text says here is that losses

11   allocable to the class 1-A notes will first be allocated, the

12   class 1-A-3 notes and next to 1-A-2 notes.

13   BY MR. PICKHARDT:

14   "Q. And what does it provide?

15   "A. The losses that would be allocated to the 1-A-1 are first

16   allocated to the 1-A-3 and then to the 1-A-2.

17   "Q. And why is that information that would be included in this

18   type of a summary?

19   "A. Because it's important to understanding the risk of the

20   bond.

21   "Q. Now, in the summary table that's at the top of Page 11 of

22   this exhibit, this is a number of columns, including one that

23   is labeled initial CE Percentage.  What does CE stand for?

24   "A. Credit enhancement.

25   "Q. And what does that mean?

E77PTRU2                        "Stone"

1    "A. The amount of subordination below the bond.

2    "Q. There's different numbers for the initial CE for the class

3    1-A-2 and the 1-A-3 notes; is that right?

4    "A. Yes.

5    "Q. Is there any inference you draw from the different numbers

6    that are reflected there as to the order in which these bonds

7    were intended to receive losses?"

8            MR. ROLLIN:  Objection, lacks foundation as to the

9    documents, best evidence.

10           THE COURT:  What line and page number?

11           MR. PICKHARDT:  It's 51, 23 to 52, 2, your Honor.

12           THE COURT:  I think she's testifying as an investment

13   banker and her common understanding as an investment banker.

14   Objection overruled.

15   BY MR. PICKHARDT:

16   "Q. Is there any inference that you draw from the different

17   numbers that are reflected there as to the order in which these

18   bonds were intended to receive losses?

19   "A. Yes.

20   "Q. And what inference do you draw?

21   "A. That the 1-A-3 subordinate to the 1-A-2.

22   "Q. And why is that, based upon this information?

23   "A. Because the 1-A-3 has 7.55 percent enhancement and the

24   1-A-2 is 17.55 percent.

25   "Q. Page 28 of this exhibit there is a section entitled

E77PTRU2                          "Stone"

1   Allocation of Realized Losses.  Does this include a section

2   discussing the allocation of losses for the deal?

3   "A. Yes.

4   "Q. And does this section reiterate that the losses were

5   intended to be allocated first to the 1-A-3 notes before the

6   1-A-2 notes?

7                 MR. ROLLIN:  Objection.

8                 THE COURT:  Same ruling, objection overruled.

9                 MR. ROLLIN:  Your Honor, if I may make one point.  The

10  indenture is a government document.  This is a description.

11                THE COURT:  That's argument.  Objection is overruled.

12  BY MR. PICKHARDT:

13  "Q. Does this section reiterate that the losses were intended

14  to be allocated first to the 1-A-3 notes before the 1-A-2

15  notes?"

16                MR. ROLLIN:  Same objection as to foundation and as to

17  intent.

18                THE COURT:  What page and number?

19                MR. ROLLIN:  53, 12 to 15, your Honor.

20                THE COURT:  Overruled.

21  "Q. Does this section reiterate that the losses were intended

22  to be allocated first to the 1-A-3 notes before the 1-A-2

23  notes?

24  "A. Yes, it does.

25  "Q. Now, this is a document that you said was prepared by your

E77PTRU2                          "Stone"

1   team?

2   "A. I believe so, yes.

3   "Q. And was care taken to make sure that the information that

4   was included in these types of marketing materials was

5   accurate?

6   "A. Yes.

7   "Q. Are these documents that would be reviewed by multiple

8   people on your team?

9   "A. Yes.

10  "Q. Yourself included?

11  "A. Often myself, depending on how busy people were, yes.

12  "Q. Do you believe that you and the members of your team were

13  aware at the time this document was finalized, as to what the

14  intended loss allocation was between the class 1-A-3 and 1-A-2

15  notes?"

16          THE COURT:  Sustained.

17  "Q. Now, if there is information in the term sheets that is

18  still being negotiated or is in flux at the time that the term

19  sheet is finalized, is there a way that that's notated in the

20  term sheet itself?

21  "A. We would typically put brackets around things.  We would

22  put brackets around things, typically.

23  "Q. And is that actually seen on Page 11 and other pages where

24  there is brackets around certain information, including

25  interest rates?

E77PTRU2                        "Stone"

1    "A. Yes.

2    "Q. Is any of the information or sections that we have

3    reviewed, other than the credit enhancement percentage,

4    referenced in brackets?

5    "A. No.

6    "Q. Is there information in the documents that we just

7    reviewed, from which you are able to draw the conclusion that

8    the intent was to have losses allocated to the 1-A-3 notes

9    before the 1-A-2 notes?"

10            THE COURT:  Objection sustained.  What page and line?

11   That's 56, 24 through 57, 6 and the follow-on question 57, 7

12   through 57, 18.

13   "Q. Is there any conclusion that you draw from that with

14   respect to the intended allocation of realized losses as

15   between these two classes of bonds?

16            THE COURT:  Objection sustained.

17   "Q. What were bonds typically sold at at issuance?

18   "A. It depended on the transaction, often par.

19   "Q. Do you recall transactions where it was intended that the

20   issuance be at prices other than par?

21   "A. Yes.

22   "Q. How do you know in this transaction whether the bonds were

23   intended to be offered at par or a different price?

24   "A. Probably was disclosed somewhere in here, the offering

25   memo.  It should be.  The trustee may also have received some

E77PTRU2                          "Stone"

1    scheduled pricing for purposes of tax reporting as well.

2    "Q. Do you believe it may be in the Pro Supp?

3    "A. Yeah, potentially.

4    "Q. Do you know what sections of the Pro Supp it would be in?

5    "A. I don't.  I'd have to look.

6    "Q. If the 1-A-3 notes and the 1-A-2 notes were intended to be

7    sold at par, would you draw an inference in the difference in

8    interest rates between those two bonds as to the intended

9    allocation of losses between them?

10            MR. ROLLIN:  Objection, it calls for opinion.

11            THE COURT:  Overruled.

12   "A. Not necessarily the loss allocation, no.

13   "Q. Do you draw any conclusion with respect to the intended

14   order" --

15            THE COURT:  Why do we need these questions?  She

16   doesn't know.

17            MR. PICKHARDT:  Your Honor, it would be fine moving to

18   65.

19            THE COURT:  So the entire Page 21.  Okay.

20            MR. PICKHARDT:  65, 23?

21            THE COURT:  Yes.

22   "Q. Ms. Stone, you've put in front of you a stack of documents

23   that were previously marked as exhibits.  I'll tell you right

24   now that they're all, as they're all sitting in front of you,

25   in chronological order and relate to the period in which the

E77PTRU2                         "Stone"

1    transactional documents were drafted.  If you could start by

2    looking at the document that is at the top of that stack, which

3    is labeled as TX204, which is an e-mail?"

4              THE COURT:  I have a suggestion.  What you're doing

5    here is putting in a sequence of drafts, right?

6              MR. PICKHARDT:  That's correct, your Honor.

7              THE COURT:  Okay.  Could we abandon the testimony and,

8    by counsel's agreement, establish the sequence?

9              MR. ROLLIN:  First of all, we object to the drafts.

10   The witness does not have foundation for the drafts, and even

11   the declaration that we have from Lehman's custodian does not

12   lay a foundation for the drafts or the redlines in the drafts.

13   So we object to the drafts coming in at all.

14             THE COURT:  You don't know the sequence, Mr. Rollin?

15             MR. ROLLIN:  I'm sorry?

16             THE COURT:  You don't know the sequence?

17             MR. ROLLIN:  With respect to the sequence in which the

18   documents were --

19             THE COURT:  Generated.

20             MR. ROLLIN:  -- drafted?

21             THE COURT:  Or generated, yes.

22             MR. ROLLIN:  Not laid out, no.  And many of them were

23   overlapping in time, and so there isn't a particular sequence

24   in that way, but our objection is to the documents coming in at

25   all, and particularly the redlines about which this witness has

E77PTRU2                         "Stone"

 1    no information.

 2              MR. PICKHARDT:  Your Honor, she is a recipient on

 3    these drafts, which she has already testified it was her

 4    practice of reviewing.  She was the quarterback on this deal.

 5              THE COURT:  But you want to put this in to show

 6    sequence, don't you?

 7              MR. PICKHARDT:  Your Honor, we do want to get these

 8    documents in.

 9              THE COURT:  Why?  What's the relevance?

10              MR. PICKHARDT:  What's the relevance of the documents?

11              THE COURT:  Yes.

12              MR. PICKHARDT:  The relevance of the documents, your

13    Honor, is that it shows the sequence through which the terms

14    were created for the final documents.  It will show the way in

15    which the indenture ended up at variance with the other

16    transaction documents.

17              THE COURT:  I would accept this, but if she doesn't

18    know, how are you going to do it?

19              MR. ROLLIN:  And that's our point, your Honor.  She

20    does not know.

21              THE COURT:  I know your point.  That's why I said it.

22    How do you think I know?  Only from you.

23              MR. ROLLIN:  Thank you.

24              MR. PICKHARDT:  Your Honor, she testifies that she

25    recognizes these documents from looking at them.  That's her

1    testimony.

2             THE COURT:  That's not the issue, though.  The issue

3    is the sequence.  You want to put them all in without saying

4    anything about sequence?

5             MR. PICKHARDT:  Well, your Honor, I mean, the

6    documents on their face include time stamps because they're all

7    e-mails; so as far as the --

8             THE COURT:  I need to see them.  Why don't you bring

9    them in.  I'll reserve, and you can make a motion to strike at

10   the end.  Received.

11            MR. ROLLIN:  Just for sequence, your Honor, so I'm

12   clear.  I don't want to waste your Honor's time.  If it's as to

13   substance --

14            THE COURT:  I don't know what it is for.  We'll see as

15   we go.

16            MR. ROLLIN:  Thank you.

17   BY MR. PICKHARDT:

18   "Q. If you could start by looking at the document at the top of

19   that stack, which is labeled as TX204, which is an e-mail from

20   yourself to a number of recipients on June 2nd, 2005, do you

21   recognize this as an e-mail that you distributed in connection

22   with the AHMIT 2005-2 transaction?

23   "A. I don't remember it, but I recognize it.  It's got my name

24   on it.

25   "Q. And do you recognize it as an e-mail in which you are

E77PTRU2                              "Stone"

1   circulating a preliminary draft of the term sheets that we

2   reviewed in final a little while ago?

3   "A. Yes.

4   "Q. Is the fact that you are circulating a preliminary draft

5   consistent with your belief that this is a document that would

6   have been prepared by Lehman Brothers?

7   "A. Yes.

8   "Q. There's a number of recipients to your e-mail, including

9   recipients at American Home, that appears from the e-mail

10  address Lehman, Thacher Proffitt, McKee Nelson and Deloitte.

11  Do you know what role each of those parties was playing in

12  connection with this transaction?"

13              THE COURT:  Why do I need all of this information?

14              MR. PICKHARDT:  Excuse me, your Honor?

15              THE COURT:  Why do I need all of this information?

16              MR. PICKHARDT:  Your Honor, the role of Thacher

17  Proffitt --

18              THE COURT:  Why don't I just take in 204 as a

19  preliminary draft circulated on or about June 2, 2005?

20              MR. ROLLIN:  Your Honor?

21              THE COURT:  What is it, Mr. Rollin?

22              MR. ROLLIN:  I just want to make it clear.  We object

23  to your Honor admitting it as to the context, on hearsay

24  grounds and lack of foundation.

25              THE COURT:  Overruled.  I receive Exhibit 204 as

E77PTRU2                          "Stone"

1  evidence of the draft of the term sheet distributed to various

2  counsel and other parties on June 2, 2005.

3          (Plaintiff's Exhibit 204 received in evidence)

4          MR. PICKHARDT:  And, your Honor, is it okay if I skip

5  to Line 23 on Page 68?

6          THE COURT:  Yes.

7  "Q. If you would turn to Page 5, do you see that on this page,

8  which is an earlier draft of the summary page that we looked at

9  in final previously, that it includes some information but not

10  all of the information that was on the final.  Do you see that

11  it includes a footnote here numbered 9, that addresses the

12  allocation of losses between the class 1-A-2 and 1-A-3 notes?

13  "A. Yes.

14  "Q. And here it indicates, as it did in the final, that the

15  losses were to be allocated to the 1-A-3 before the 1-A-2

16  notes?

17  "A. Yes.

18  "Q. Now, in preparing the initial term sheet, where did you get

19  the information that went into it with respect to the

20  structure?

21  "A. I don't remember specifically for this transaction.

22  "Q. What would be your general practice?"

23          MR. ROLLIN:  Objection, relevance.

24          THE COURT:  Overruled.

25  "Q. What would be your general practice?

E77PTRU2                         "Stone"

1    "A. It would come from the people working on the transaction;

2    so traders, our team, the customer.

3    "Q. And when you determine what the structure term are for the

4    transaction, who do you determine that with?  Who are the

5    parties that have input into that decision?

6    "A. It's the customer, you know, the underwriter, which would

7    include banking and trading and the legal team."

8                 (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E77JTRU3                          "Stone

1    "Q  And so would this be essentially the distribution group

2    that would be involved in the discussion --

3              THE COURT:  This is not helpful to me.  Why don't we

4    just skip this.

5              MR. PICKHARDT:  If we could go to 70,25.

6              THE COURT:  There is objection to that, right, Mr.

7    Rollin?

8              MR. ROLLIN:  Yes.

9              THE COURT:  Sustained.

10             MR. PICKHARDT:  We can set that document to the side.

11             MR. PICKHARDT:

12   "Q  If you would turn to the next document which is labeled as

13   TX 205, which is an e-mail from Leigh Anne Kuiken, dated June

14   2, 2005 at 2:57, so later in the same day, that attaches a

15   markup of the draft that you had circulated earlier that day.

16   Do you see that?

17   "A  Yes.

18   "Q  Do you see there are notations made or edits made to

19   Footnote 9 on Page 5 but none of them alter the substance as to

20   the ordering of allocation of losses?

21   "A  Yes."

22             MR. ROLLIN:  I object.  These are edits made by --

23             THE COURT:  Overruled.  Overruled.

24             MR. PICKHARDT:

25   "Q  Would that have led you to conclude at the time that

E77JTRU3                         "Stone

1   Thacher Proffitt, as deal counsel, did not have any

2   disagreement with respect to the order in which losses were to

3   be allocated?

4               THE COURT:  What is the difference?

5               MR. ROLLIN:  Objection; lacks foundation, hearsay.

6               THE COURT:  Just a minute.  Just a minute.  The next

7   set of documents is showing that the recipients did not object

8   to the sequence of allocations.

9               MR. PICKHARDT:  That's correct, your Honor.  That lead

10  deal counsel --

11              THE COURT:  I don't think that is relevant.  We can

12  skip all of this.  2005 is not received.  Why don't we get to

13  something that is relevant.

14              MR. PICKHARDT:  If we can resume at 7315, your Honor.

15              MR. PICKHARDT:

16  "Q  If you would turn to TX 206, which is an e-mail dated June

17  2, 2005, at 5:11 pm, so later on that same day from yourself to

18  the recipients, attaching a black line of a term sheet and your

19  e-mail states this is updated to reflect comments received

20  today on the version distributed this morning?"

21              MR. ROLLIN:  Objection; lacks foundation.

22              THE COURT:  Overruled.

23  "A  Yes.

24  "Q  If you turn to Page 7 of the black line, is it correct that

25  Footnote 9 reflects the, reflects edits that have been

E77JTRU3                         "Stone

1   proposed -- strike that -- Footnote 9 is now numbered Footnote

2   10 and reflects non-substantive edits that don't change the

3   statement with respect to allocation of losses?

4   "A   Yes.

5   "Q   Does this also lead you to believe you did not receive any

6   comment from your client American Home indicating that it had a

7   view that losses were to be allocated other than as described

8   in that footnote?

9           THE COURT:   This is not relevant to me.   We have a

10  draft that reflects the same sequence of allocation of losses

11  as on the file term sheet and final prospectus and, of course,

12  the value.

13          MR. PICKHARDT:   The next line of questions would go

14  into edits that were added into this document that reaffirmed

15  the allocation.

16          THE COURT:   Nothing change from the final of this

17  thing.   Go to where you have evidence of the draft of the

18  indenture, that discussion of it.

19          MR. PICKHARDT:   Your Honor, then I would start with

20  what will be some questions about the first transactional

21  document that is circulated, which is the prospectus supplement

22  which establishes that the order in which these documents were

23  drafted.

24          THE COURT:   Go to that

25          MR. PICKHARDT:   76 Line 14:

E77JTRU3                          "Stone

1    "Q  If you would turn to the next document labeled at TX 207,

2    which is e-mail from Jason Ross at Thacher Proffitt to a much

3    longer distribution list than the e-mails we looked at so far

4    dated June 13th, 2005, and you were included as recipient on

5    this e-mail.  Is that right?

6    "A  If I find my name, I presume I was.

7    "Q  So do you recognize this as an e-mail you received related

8    to the AHMIT 2005-2 transaction?

9    "A  Yes."

10              MR. ROLLIN:  Lacks foundation.

11              THE COURT:  Overruled.

12              MR. PICKHARDT:

13   "Q  Do you know Jason Ross?

14   "A  Yes.

15   "Q  Who is he?

16   "A  He is an associate at the time he was at Thacher Proffitt &

17   Wood.  I am not sure where he is right now.

18   "Q  Have you had interactions with Mr. Ross on transactions

19   other than AHMIT 2005-2?

20   "A  Yes.

21   "Q  Approximately how many deals have you worked on with

22   Mr. Ross?

23   "A  Maybe 10.

24   "Q  What was Mr. Ross's role with respect to this transaction

25   to the best you understand it?

E77JTRU3                          "Stone

1    "A   I think he would have been like the associate doing the

2    drafting of the offering document.

3    "Q   Did you interact directly with him?

4    "A   Yes.

5    "Q   Mr. Ross said in his e-mail he is attaching an initial

6    draft of the prospectus supplement marked up to show changes

7    against AMHIT 2005-1.  Was it common when preparing

8    transactional documents to use prior transaction documents as a

9    template?

10   "A   Yes.

11   "Q   Do you know where the lawyers would get the information

12   that they would include in the ProSupp as to specific terms of

13   the deal?"

14           MR. ROLLIN:  Objection; lacks foundation.

15           THE COURT:  Sustained.

16           MR. PICKHARDT:

17   "Q   So this is information that would have come from Nina in

18   this case, to the best of your belief?

19           MR. ROLLIN:  The same objection.

20           THE COURT:  Sustained.  Wait a minute.  Go to 82, 15.

21           MR. PICKHARDT:

22   "Q   If you would turn to Page 99, do you see that this is, this

23   page includes part of the section that starts in the preceding

24   page entitled allocation of losses on the mortgage loans?

25   "A   Yes."

E77JTRU3                          "Stone

1              MR. ROLLIN:  Objection.  I don't think this document

2       is in.

3              THE COURT:  Sorry?  What is it again?

4              MR. PICKHARDT:  207, your Honor.  At this time we

5       would move to have 207 admitted into evidence.

6              MR. ROLLIN:  I don't see 207 has foundation, your

7       Honor.

8              THE COURT:  It is one of the transactional documents.

9       It was covered by the e-mail from the lawyer at Thacher

10      Proffitt to the deal coordinator.

11             MR. ROLLIN:  And for the same reason --

12             THE COURT:  Proceed.

13             MR. PICKHARDT:

14      "Q  If you would turn to Page 99, do you see that this is, this

15      page includes part of the section that starts in the preceding

16      page including allocation of losses on the mortgage loans?

17      "A  Yes.

18      "Q  At the end of the first paragraph on Page 99, there is a

19      section that starts 9th and shows black lining as to what have

20      been numbered 12 in the AMHIT 2005-1 ProSupp?

21      "A  I see it.

22      "Q  And there is a proviso at the end of that section that

23      includes a statement with respect to the allocation of realized

24      losses" --

25             THE COURT:  Overruled objection.

E77JTRU3                          "Stone

1   "Q  -- between the Class I-A-2 and 1-A-3 notes.  Do you

2   understand the proviso as written there as to reflect an intent

3   that losses would be allocated first to 1-A-3 between 1-A-2

4   notes?

5               MR. ROLLIN:  Objection.

6               THE COURT:  Objection overruled.  Summary of the

7   language and nothing more.

8   "A  Yes.

9   "Q  And so as drafted here in the ProSupp, this is consistent

10  with what we saw in the term sheet with respect to the ordering

11  of losses between 1-A-2 and 1-A-3 notes?

12  "A  Yes.

13  "Q  If you could turn to Page 33, the section entitled some

14  additional risks are associated with the notes, do you see the

15  same proviso with respect to the allocation of realized losses

16  between the Class 1-A-2 and 1-A-3 notes in the middle of the

17  paragraph on that page?

18  "A  Yes.

19  "Q  And it similarly indicates losses would be allocated to the

20  1-A-3 notes prior to the 1-A-2 notes.  Is that right?

21              MR. ROLLIN:  Objection; lacks evidence.

22              THE COURT:  Overruled.  It is technically a good

23  objection, but it is a fair summary.

24              MR. ROLLIN:  As to existence of what is in the

25  documents, that is not the objection.

E77JTRU3                              "Stone

1            THE COURT:  That is all I am taking it for.

2            MR. PICKHARDT:

3    "Q  If you please turn to the documents, the page numbered 152,

4    do you see on this page which is in a section entitled yield

5    sensitivity of the Class 1-A-2, Class 1-A-3 and other notes an

6    inclusion of the same proviso near the bottom of Page 152.  It

7    is about twelve lines up?

8    "A  Yes, I see it.

9    "Q  Consistent with the other two proviso, it states realized

10   losses would be allocated first to the 1-A-3 notes before the

11   1-A-2 notes.  Is that right?

12   "A  It says that, yes.

13   "Q  Would Lehman review drafts of the mark of the offering

14   materials circulated by the lawyers?

15   "A  Yes.

16   "Q  Why would Lehman review those?

17   "A  To make sure that they accurately reflected the intent of

18   the deal."

19            MR. ROLLIN:  Objection, lacks foundation.

20            THE COURT:  Overruled.  That is his job.

21            MR. PICKHARDT:

22   "Q  If you could turn to the next document which is numbered TX

23   208, and it is an e-mail from, I was going to say Darius, but I

24   think you said it differently earlier?

25   "A  Darius.

E77JTRU3                        "Stone

1   "Q  Darius Houseal, dated June 13th, 2005 to a number of --

2   "Q  I will note you were not one of the recipients on this

3   e-mail.  It is entitled AHMIT 2005-2 co-manager package and it

4   includes a number of attachments, only one of which is actually

5   included in the exhibit?"

6              THE COURT:  Why are you putting it in evidence.

7              MR. PICKHARDT:  She is able to identify and recognize

8   the document that is attached which is the the final term

9   sheet.

10             THE COURT:  What page?  What line?

11             MR. PICKHARDT:  She then testifies about it in

12  response to questions starting at 87,15, and she recognizes it

13  on -- in response to a question that commences on 87,24.

14             MR. ROLLIN:  I don't believe she recognized.  She says

15  it looks like it, and she is speaking generally about her

16  practice, not about this particular document.  She is being

17  shown the documents and saying it looks like something.

18             THE COURT:  Objection overruled.

19             MR. PICKHARDT:

20  "Q  In this e-mail Mr. Houseal states attached" --

21             THE COURT:  I understand they're all the same, all the

22  term sheets are the same.

23             MR. PICKHARDT:  You're correct.

24             THE COURT:  Whatever was put in, the first one carried

25  through to the other.

E77JTRU3                        "Stone

1              MR. PICKHARDT:  I'll move to have this document

2       admitted in evidence just with respect to the --

3              THE COURT:  Received.

4              (Plaintiff Exhibit 208 received in evidence)

5              MR. PICKHARDT:  Move next, your Honor, to 90, 9.

6              THE COURT:  Yes.

7              MR. PICKHARDT:

8       "Q  If you will turn to the next document which is marked as TX

9       209, there is another e-mail from Mr. Ross to a distribution

10      list, including yourself, dated as of June 14th, 2005.  Do you

11      recognize this as another e-mail from Mr. Ross as the deal

12      counsel related to AMHIT 2005-2?

13      "A  Yes.

14      "Q  In this e-mail Mr. Ross refers to an initial draft of the

15      indenture and appendix definitions.  Do you recognize this as a

16      draft of what would become the AMHIT 2005-2 indenture?

17             MR. ROLLIN:  Objection; lacks foundation.

18             THE COURT:  Overruled.

19      "A  Yes.

20      "Q  This similarly appears to be a black line against the

21      indenture from AMHIT 2005-1.  Is that right?"

22             MR. ROLLIN:  The same objection.  Your Honor, she does

23      not know.

24             THE COURT:  Overruled.

25      "A  Yes, it looks like that way.

E77JTRU3                          "Stone

1    "Q   What was the banker's responsibility with respect to the

2    indenture?

3    "A   Technically, I'm not sure we have responsibility other than

4    sort of just wanting to make sure that the documents are

5    consistent.

6    "Q   Did you understand the responsibility of the lead

7    underwriter to be different with respect to the marketing

8    materials than with respect to the indenture?

9    "A   Yes.

10   "Q   What did you understand to be the difference in

11   responsibility between the marketing documents and the

12   indenture?

13   A.   Well, the disclosure document potentially creates liability

14   for the underwriter so it was more of a focus for us than the

15   other operative documents."

16        THE COURT:  I will point out to you, Mr. Pickhardt,

17   this is nonsense.  The indenture is prior to the offering

18   documents, so if there is anything wrong with it, the

19   underwriter has responsibility, whatever she says.

20        MR. PICKHARDT:  Your Honor, this only goes to the care

21   with which Lehman was taking with respect to this document.

22        THE COURT:  You're saying Lehman?  Lehman is now a

23   wreck.  What do we care?

24        MR. PICKHARDT:  Your Honor, there has been a lot of

25   argument made the indenture is what takes priority and that

E77JTRU3                          "Stone

1   this Court should simply ignore the marketing documents.

2           The purpose of this testimony is to demonstrate that

3   when this deal is put together, if anything, the bank that was

4   focused on this structure has inverted --

5           THE COURT:  It is not credible!  It is all prior to

6   the same package.

7           MR. PICKHARDT:  We certainly agree.

8           THE COURT:  Isn't there a provision in the marketing

9   documents that if there is any doubt, the reader should go to

10  the indenture?

11          MR. PICKHARDT:  Yes, there is.

12          THE COURT:  How can you tell me this?

13          MR. PICKHARDT:  Your Honor, this just goes to the

14  practices at Lehman Brothers.

15          THE COURT:  It goes to making an argument for the sake

16  of an argument.  Lehman didn't have those practices, either.

17          Whatever you say!

18          MR. PICKHARDT:  Your Honor --

19          THE COURT:  I knew lots of people at Lehman, and they

20  were as careful in their business as I hope I was in my mine.

21          MR. PICKHARDT:  We are not in any way meaning to

22  disparage the care with which Lehman took.

23          THE COURT:  This is nonsense argument.  There is no

24  credibility.  The indenture is part of the package.  The

25  indenture, although full of boilerplate and maybe a busy lawyer

1   would sacrifice some care and concern in light of other things,

2   deserves and gets as much respect as any other part of the

3   package that is sent out to investors.

4           It is a critical part of it, and everybody knows if

5   there is ambiguity, the people who read the stuff are supposed

6   to trust the documents themselves that order the rights and

7   obligations of the parties.  The other documents are summary

8   documents.  They tell investors what may be hard to understand

9   in the operative documents.

10          MR. PICKHARDT:  As you will see through testimony, not

11  only does Ms. Stone say that significant care was taken with

12  respect to the operative documents but, in fact, they insist

13  upon opinions being offered by deal counsel with respect to

14  those offering documents fairly characterizing the terms of the

15  deal.  This is not meant to --

16          THE COURT:  I am afraid I've seen too many opinions to

17  place stock.

18          MR. PICKHARDT:  This is not meant to suggest in any

19  manner whatsoever the indenture is not a critical document.

20          THE COURT:  Look, there is a discrepancy among

21  important documents that the investors get, and that's the

22  genesis of this lawsuit.  I have to figure out what it means.

23          MR. PICKHARDT:  Also to be clear, the indenture is not

24  circulated to investors.  Investors receive a copy of the

25  prospectus supplement.  The indenture is not used to market the

E77JTRU3                        "Stone

1   deal.

2            THE COURT:  I would be interested in such testimony.

3   I can't take it on your assertion.

4            MR. PICKHARDT:  You actually will hear, in fact,

5   from --

6            THE COURT:  All right.

7            MR. PICKHARDT:  -- Sceptre's own witness with respect

8   to availability of --

9            THE COURT:  We'll deal with it.

10           MR. PICKHARDT:  If we could recommence on 92,14.

11           THE COURT:  Yes.

12           MR. PICKHARDT:

13   "Q  Who had the primary responsibility for the indenture?

14   "A  Drafting counsel.

15   "Q  If you would turn to Page 77 in the attached document to

16   the section labeled allocation of realized losses, do you see

17   that this section includes a black line against what appears to

18   be the way that losses were against the loss allocation

19   provision from AMHIT 2005-1?

20   "A  It would seem that to be the case."

21           (Off-the-record discussion)

22           THE COURT:  Okay.

23           MR. PICKHARDT:  Before we go into this detail, if I

24   can move to have 209 admitted into evidence.

25           MR. ROLLIN:  We object to 209.  The red lines were not

E77JTRU3                        "Stone

1   made by this witness and she has no foundation to talk about

2   them or the document.  These are drafted by deal counsel.

3              THE COURT:  Where is the provenance of this document?

4              MR. PICKHARDT:  The document was produced by Lehman

5   Brothers from their files, and we have the declaration with

6   respect to the authenticity of the document.

7              THE COURT:  So it is regularly kept in the regular

8   course of business?

9              MR. PICKHARDT:  Yes, that's correct.

10             THE COURT:  Contemporaneous?

11             MR. PICKHARDT:  That's correct.

12             THE COURT:  I'll accept it at this time.

13             MR. ROLLIN:  The declaration from Lehman Brothers does

14  not say, does not say any of those things.  The declaration if

15  your Honor would like a copy, TX 9, states only as to e-mails

16  originating at Lehman Brothers is Lehman Brothers saying

17  they're authentic.

18             As to attachments and red lines, Lehman only got them

19  because they were copied on the e-mails, not because they were

20  maintained in the ordinary course of business or by a Lehman

21  employee having a duty to contemporaneously input the

22  information correctly.  I believe your Honor will benefit from

23  the actual declaration rather than characterization.

24             THE COURT:  I read it.  Your objection is well taken.

25             MR. PICKHARDT:  It is clear from the face of this

E77JTRU3                          "Stone

1    document and from Ms. Stone's prior testimony that there was a

2    process of communicating contemporaneously with deal counsel

3    over the drafting of these documents and that Lehman Brothers

4    was receiving and reviewing documents as they were received in

5    connection with this deal.

6              THE COURT:  No question about that, but this

7    particular document doesn't have any sponsors to it.  Ms. --

8    what's her name?

9              MS. WETZEL:  Ms. Stone, your Honor.

10             THE COURT:  Ms. Stone did not see this document.

11             MR. PICKHARDT:  She did receive it.

12             THE COURT:  She did?

13             MR. PICKHARDT:  She was a recipient of this document

14   along with ever other document we will be using, and she has

15   testified that as quarterback on this deal, that she was

16   receiving and reviewing the documents.

17             THE COURT:  I will receive the document.

18             MR. ROLLIN:  With due respect, receiving a document is

19   not foundational of its authenticity or hearsay within it.

20             THE COURT:  She testifies to sequence of the documents

21   produced in this manner.  I will receive it.

22             (Plaintiff Exhibit 209 received in evidence)

23             MR. PICKHARDT:  93,4:

24   "Q  Do you see on the top of Page 78, there is a section that

25   is now entitled 9th, which is replacing a section that had been

E77JTRU3                              "Stone

1    numbered 12 that includes certain black line provisions to the

2    provision that concerning the allocation of losses as between

3    the Class 1-A-2 and 1-A-3 notes?

4    "A  Yes, I see that.

5    "Q  Do you see at" --

6            THE COURT:  I don't see it.

7            MR. PICKHARDT:  Your Honor, it is on Page 78.  It is

8    the carryover paragraph at the top, and there is black lining,

9    you will see the addition of section starts 9th that previously

10   had been 12th.

11           THE COURT:  Got it.  Thanks.

12           MR. PICKHARDT:

13   "Q  Do you see at the end of that section there is the proviso

14   that appears to be the same in substance as the three provisos

15   that we saw in the draft ProSupp?

16   "A  Yes.

17   "Q  What was the general practice with respect to the order in

18   which changes would be made to the ProSupp or indenture?

19   "A  It would depend on the transaction, but typically since the

20   offering memo was going first, that would be where the initial

21   provisions were built, and then the indenture would follow.

22   "Q  And so the parties would work on -- including the

23   bankers -- would work on the ProSupp to make sure that that

24   accurately and full reflected the deal and the lawyers would

25   ensure that it was conformed in the indenture.  Is that a

E77JTRU3                          "Stone

1     general, a fair characterization of the general practice?

2               MR. ROLLIN:  Objection; relevance.  Objection; this is

3     just a generalized statement, not with respect to this

4     transaction.

5               THE COURT:  I don't need argument when you make an

6     objection.  I just need a moment to balance the exhibits before

7     they fall on the floor.

8               MR. ROLLIN:  My objection would be relevance and

9     hearsay.

10              THE COURT:  What objection?

11              MR. PICKHARDT:  95,6, your Honor, where the question

12    commences.

13              (Pause)

14              THE COURT:  Overruled.

15              MR. PICKHARDT:

16    "Q  And so the parties would be on, including the bankers,

17    would work on the ProSupp to make sure that that accurately and

18    full reflected the deal and the lawyers would ensure that it

19    was conformed in the indenture.  Is that a general, a fair

20    characterization of the general practice?

21    "A  Generally, yes."

22              MR. ROLLIN:  Objection; lacks foundation.

23              THE COURT:  Overruled.

24              MR. PICKHARDT:

25    "Q  You can set that document aside."

E77JTRU3                         "Stone

1              THE COURT:  Let me understand the document.

2              MR. PICKHARDT:  Yes, your Honor.

3              THE COURT:  This has the same sequence of losses as

4    the other documents we have seen?

5              MR. PICKHARDT:  Yes, your Honor.  This is important

6    for a few reasons.  It is important because we saw the ProSupp,

7    the first --

8              THE COURT:  I just need this.  Give me argument later

9    on.  This sequence is not different from what we have seen?

10             MR. PICKHARDT:  That is exactly right.  This includes

11   the same proviso at the end as in the other, in the ProSupp.

12             THE COURT:  Right.

13             MR. PICKHARDT:

14   "Q  If you will turn to the next document which is labeled as

15   TX 210, which is an e-mail from Mr. Ross to a distribution

16   group, including yourself, dated June 17th, 2005, entitled

17   AHMIT 2005-2 prospectus supplement --

18             THE COURT:  Stop.  Is 208 the term sheet?

19             MR. PICKHARDT:  Yes, it is, your Honor.  It is the

20   final term sheet that was circulated to the other

21   sub-underwriters.

22             THE COURT:  Now you're going to 210?

23             MR. PICKHARDT:  210, that's correct, your Honor.

24             MR. PICKHARDT:

25   "Q  If you will turn to the next document labeled TX 210 which

E77JTRU3                          "Stone

1    is an e-mail from Mr. Ross to a distribution group, including

2    yourself, dated June 17th, 2005, entitled AHMIT 2005-2

3    prospectus supplement, and it attaches another black line of

4    the ProSupp, do you recognize this as another e-mail being

5    issuing by Mr. Ross related to AHMIT 2005-2?

6    "A  Yes.

7    "Q  Do you see in his e-mail that he refers to attaching a

8    revised draft of the prospectus supplements marked to show

9    changes against the previously version?

10   "A  Yes.

11   "Q  If you turn to page 91 and you see this page is on the

12   section on the allocation of losses on the mortgage loans" --

13              THE COURT:  Are you offering the document?

14              MR. PICKHARDT:  Yes, your Honor.

15              MR. ROLLIN:  Objection to the document.  She is not

16   the sponsor and lacks foundation.

17              THE COURT:  It is in the sequence of documents.

18              MR. ROLLIN:  Objection.

19              THE COURT:  I receive it as such.

20              (Plaintiff Exhibit 210 received in evidence)

21              MR. PICKHARDT:

22   "Q  If you would turn to Page 91, and you see this page is in

23   the section on the allocation of losses on the mortgage loans?

24   "A  Yes.

25   "Q  In the first full paragraph on Page 91, do you see that

E77JTRU3                          "Stone

1   this is the paragraph that we looked at previously that

2   includes the provision numbered 9th, that includes terms with

3   respect to the allocation of losses between the Class 1-A-2 and

4   1-A-3 notes?

5   "A  Yes, I see it.

6   "Q  Do you recall in the prior draft of the ProSupp that the

7   term concerning the order in which losses would be allocated

8   between the Class 1-A-2 and 1-A-3 notes was in a proviso?

9   "A  Are you asking me about the ProSupp or indenture?

10  "Q  I think probably both, but I was talking specifically about

11  the ProSupp, that the prior draft had a proviso you can

12  actually see in black line here.

13  "A  Yes, I see it.

14  "Q  Do you see that the proviso has been deleted?

15  "A  Yes.

16  "Q  Do you see that there are other edits made right above the

17  deletion of the proviso to the terms concerning the allocation

18  of losses between the Class 1-A-3 notes and 1-A-2 notes?

19          MR. ROLLIN:  Objection; lacks foundation, best

20  evidence.

21          THE COURT:  Overruled.

22  "A  Yes, I see that.

23  "Q  Do you see there are essentially two edits that are made?

24  One is the addition of the words in that order and the second

25  is a transposition of a 2 and a 3?

1          MR. ROLLIN:  The same objection; lacks foundation, she

2     is not the drafter.

3          THE COURT:  Overruled.

4     "A  Yes, I see that.

5     "Q  Now" --

6          THE COURT:  I don't.

7          MR. PICKHARDT:  Your Honor, it is --

8          THE COURT:  We are looking at subparagraph 10 or X?

9          MR. PICKHARDT:  That's correct, your Honor.

10         THE COURT:  "To the extent such realized losses are

11    incurred in respect of the mortgage loans in loan Group I to

12    the Class 1-A-3 --

13         MR. PICKHARDT:  Correct.  The 2 is crossed out from

14    the prior draft.

15         THE COURT:  I see that.

16         MR. PICKHARDT:  The 3 is added.  If you go on you see

17    in the next reference Class 1-A-3, the 3 has been crossed out.

18         THE COURT:  Objection to the sequence of application

19    of losses.

20         MR. PICKHARDT:  The proviso had previously at the end

21    of that section now crossed out, the proviso had previously

22    said that you allocate losses to the 1-A-3 notes before the

23    1-A-2 notes.  That proviso is crossed out and --

24         THE COURT:  Put it to the text.

25         MR. PICKHARDT:  Exactly right, put into the text in a

E77JTRU3                          "Stone

 1   more concise manner than having a proviso at the end.

 2              THE COURT:  The red lines are those you put in

 3   writing?

 4              MR. PICKHARDT:  That's correct.  The red circles, it

 5   is originally a black-line document.  Looking at the screen,

 6   the highlighted and the red circles we added.

 7              THE COURT:  Who is going to testify, if anyone, about

 8   the reason for striking the original language and substituting

 9   the different sequence?

10              MR. PICKHARDT:  Your Honor, Ms. Stone is going to talk

11   about what she understands to be the effect of that edit.

12              Mr. Simonds can testify as to why he believes that was

13   done.  Your Honor, this is an edit that both of them will

14   testify is a wording change in this document.  It also is

15   apparent on its face it is a wording change as opposed to a

16   change in substance.  This edit right here is not the source of

17   the error.

18              MR. ROLLIN:  To answer your question, your Honor,

19   there are no witnesses that have that information and have not

20   been called.

21              THE COURT:  Okay, go on.

22              MR. PICKHARDT:

23   "Q  Do you see that there is essentially two edits that are

24   made.  One is addition of the words in that order and the

25   second is a transposition of a 2 and a 3?

E77JTRU3                              "Stone

1    "A   Yes, I see that.

2    "Q   Is the effect of those two edits to replicate what the

3    proviso had previously provided?

4    "A   Yes.

5    "Q   Do you understand the change that is being made here as

6    being a substantive change or a wording change?

7    "A   A wording change.

8    "Q   Do you see on Page 31 the location where the same proviso

9    concerning the allocation of realized losses that existed in

10   the prior draft?

11   "A   Yes.

12   "Q   Has the proviso been deleted in this section as well with

13   additional edits made to that section?

14   "A   Yes.

15   "Q   Does this appear to be, although the black lining appears

16   slightly differently, does this appear to be the same edit

17   where the proviso is removed and that order is inserted and 2

18   and 3 are transposed to keep the same meaning of the provision

19   yet with different wording?

20          MR. ROLLIN:  Objection to foundation as to what the

21   intent is in terms of keeping the same meaning.

22          THE COURT:  Overruled.

23   "A   Yes.

24   "Q   If you would turn to Page 146 which is in the section that

25   starts on the previous page entitled yield sensitivity of the

E77JTRU3                          "Stone

1    Class 1-A-2, 1-A-3 and other classes of notes, and do you see

2    on Page 146 the same edit being made where the proviso was

3    deleted and other edits are made to maintain the same intent

4    with respect to the allocation of losses between the 1-A-2 and

5    1-A-3 notes?

6    "A  Yes, I see that.

7    "Q  Do you believe members of your team would have reviewed

8    drafts of the ProSupp to ensure they continued to reflect the

9    intent of the transaction as they were generated?"

10            MR. ROLLIN:  Objection; lacks foundation as to intent.

11            THE COURT:  Overruled.

12   "A  Yes, I do.

13   "Q  If you will please turn to the next --

14            (off-the-record discussion)

15   "Q  If you will please turn to the next document which is

16   labeled as TX 212, and is an e-mail from Mr. Ross to a large

17   distribution of people, including yourself, dated June 21st,

18   2005, entitled AHMIT 2005-2 prospectus supplement.  Do you

19   recognize this as another e-mail from Mr. Ross related to the

20   AHMIT 2005-2 transaction?

21   "A  Yes.

22   "Q  In now Mr. Ross's e-mail, he states attached please find a

23   PDF of the printed book.  Do you believe that the second find

24   is a typo and probably meant final?

25   "A  Yes.

E77JTRU3                          "Stone

```
 1    "Q  What is the relevance of having a final printed book?  What

 2    does that mean?

 3    "A  It means all changes have been made and it's complete.

 4    "Q  Is the book printed at a point in time when you are still

 5    negotiating terms?

 6    "A  No.

 7    "Q  Would you not expect to have a final printed PDF book until

 8    final terms have been reached with respect to the structure.

 9    Is that right?

10    "A  Yes.

11    "Q  Would you expect to have continued negotiations with

12    respect to the allocation of losses and have a final printed

13    book?

14    "A  No.

15    "Q  If you will turn to Page 84 which is the section entitled

16    allocation of mortgage loans."

17              MR. PICKHARDT:  At this point, we move to have Exhibit

18    212 moved into evidence.

19              THE COURT:  Received.

20              (Plaintiff Exhibit 212 received in evidence)

21              MR. PICKHARDT:

22    "Q  If you will turn to Page 84 which is the section entitled

23    allocation of losses on the mortgage loans that starts on the

24    previous page, do you see at the top of Page 84 that there is a

25    section that starts 9th and provides for the allocation of
```

E77JTRU3                              "Stone

1    realized loss between Class 1-A-2 and 1-A-3 notes?

2    "A  Yes, I see it.

3    "Q  Does this proviso continue to provide as reflected in the

4    prior drafts the allocation of losses to the 1-A-3 notes before

5    the 1-A-2 notes?

6    "A  Yes.

7    "Q  If you could confirm for me that the corresponding

8    provision on Page 28 similarly reflects the same intent?"

9              MR. ROLLIN:  Objection; foundation as to intent.

10             THE COURT:  What page?

11             MR. PICKHARDT:  The question is at 104,11, your Honor.

12   It is referring to Page 28.

13             THE COURT:  I got it!  Overruled.

14             MR. PICKHARDT:

15   "Q  If you could just confirm for me the corresponding

16   provision on Page 28 similarly reflects the same intent?

17   "A  Yes.

18   "Q  If you could turn to Page 130, the section entitled yield

19   sensitivity of the Class 1-A-2, 1-A-3 and other note classes,

20   does this provision towards the bottom of Page 130 continue

21   also to include the same reference with respect to losses being

22   allocated to the 1-A-3 notes before the 1-A-2 notes?

23   "A  Yes.

24   "Q  Please turn to the next document which has been marked as

25   TX 213.  It is an e-mail from Alicia Sugarman, dated June 21,

1   2005 to a group of recipients, including yourself, entitled

2   AHMIT 2005-2 PPM?  Do you see Ms. Sugarman's e-mail indicates

3   it is attaching an initial draft of the private placement

4   memorandum.  What is a private placement memorandum?

5   "A  It is an offering memo for the nonpublic tranches.

6   "Q  Is this a document that would also be relevant to Lehman?

7   "A  Yes.

8   "Q  Why?

9   "A  Because if we were marketing the private notes, we would be

10  distributing this document to investors.

11  "Q  If you would turn to Page 12 to 13 of this document" --

12          MR. ROLLIN:  Objection to the document on relevance

13  grounds for reasons stated by the court earlier concerning the

14  offering --

15          THE COURT:  Overruled.

16          MR. PICKHARDT:

17  "Q  If you would turn to Page 12 to 13 of this document, in the

18  section entitled allocation of losses, do you see in the third

19  paragraph down in that section there is a discussion commencing

20  in the portion that starts 5th, that concerns the allocation of

21  losses as between the Class 1-A-3 and 1-A-2 notes?

22  "A  Yes.

23  "Q  Is the allocation of losses as described in this provision

24  consistent with how it was described in the final offering

25  circular?

E77JTRU3                              "Stone

1    "A   Yes.

2    "Q   If you would turn to Page 7 of this document, in the first

3    full paragraph on that, second full paragraph on that page that

4    starts the class end notes would be entitled.  Is the portion

5    of that paragraph that starts 5th toward the bottom consistent

6    with respect to its description of the allocation of losses

7    between the Class 1-A-3 and 1-A-2 notes?"

8              MR. PICKHARDT:  At this point, I move to have Exhibit

9    213 moved into evidence.

10             MR. ROLLIN:  Previously I had an objection on

11   foundation and relevance grounds.  I renew it.

12             THE COURT:  Received.

13             (Plaintiff Exhibit 213 received in evidence)

14             MR. PICKHARDT:

15   "Q   If you would turn to the next document which has been

16   marked as Exhibit 51 -- strike that -- marked as TX 214 which

17   is a further e-mail from Mr. Ross, dated June 22, 2005, to a

18   group of recipients, including yourself, that is entitled AHMIT

19   2005-2 indenture, do you recognize this as another e-mail from

20   Mr. Ross related to the AHMIT 2005-2 transaction?

21   "A   Yes.

22   "Q   Do you see that in the body of the e-mail Mr. Ross

23   indicates that he is circulating a revised draft of the

24   indenture and Appendix A definitions?

25   "A   Yes.

E77JTRU3                          "Stone

1    "Q  Why would the indenture still be worked on after the

2    ProSupp was finalized?

3    "A  Because it was typically the other DOCS as we discussed

4    were done after the offering memo.

5    "Q  Typically, would it be the practice to then ensure the

6    indenture confirms to the offering DOCS as they have been

7    finalized?

8    "A  Typically, yes."

9            MR. PICKHARDT:  I move at this time Exhibit TX-214 be

10   accepted into evidence.

11           MR. ROLLIN:  No objection.

12           THE COURT:  Received.

13           (Plaintif Exhibit TX-214 received in evidence)

14   BY MR. PICKHARDT:

15   Q.  If you would turn to the document attached to this e-mail

16   at Page 74 --

17           THE COURT:  The first draft of the indenture?

18           MR. PICKHARDT:  No, your Honor.  This is the second

19   draft of the indenture that we are seeing at this stage.

20           THE COURT:  But the first draft?

21           MR. PICKHARDT:  The first draft of the indenture.  Do

22   you want to know the exhibit number?

23           THE COURT:  Has it been offered yet?

24           MR. PICKHARDT:  Yes.  It was Exhibit 209.

25           THE COURT:  When did you offer that?

E77JTRU3                          "Stone

1              MR. PICKHARDT:  Your Honor, we already had questions

2      posed to Ms. Stone with respect to Exhibit 209.  I believe that

3      it was offered at that time.  Then if it would be helpful, we

4      could --

5              THE COURT:  I have 209.  214 is the second draft?

6              MR. PICKHARDT:  That is correct, your Honor.

7              THE COURT:  Proceed.

8              MR. PICKHARDT:

9      "Q  Is this the section that we looked at previously that

10     corresponded to the description of allocation of realized

11     losses in the ProSupp?

12     "A  I believe so, yes.

13     "Q  Do you recall that we had seen in the ProSupp places where

14     the proviso had been removed from, that concerned the

15     allocation of realized losses in other edits that had been made

16     to keep the same substance?

17     "A  Yes.

18     "Q  Do you see in the black line reflected here the proviso has

19     been removed?

20     "A  Yes, I do."

21              MR. ROLLIN:  Objection; lacks foundation and hearsay

22     with respect to the black lines.

23              THE COURT:  What page are we at?

24              MR. PICKHARDT:  The question is at 110,2, your Honor.

25              THE COURT:  74?

E77JTRU3                          "Stone

1          MR. PICKHARDT:  That's correct, your Honor.

2          THE COURT:  Exhibit 214?

3          MR. PICKHARDT:  Correct.

4          THE COURT:  Okay, I see it.

5          What is the question now?

6          MR. PICKHARDT:  The question starts at 110,2, which is

7    do you see that in the black line reflected here that the

8    proviso has been removed?

9          MR. ROLLIN:  My objection is she lacks foundation.

10   She is not the drafter.

11         THE COURT:  She has seen it.  It doesn't make any

12   difference.  Yes, I noticed that.  The objection is overruled.

13   "A  Yes, I do.

14   "Q  Now, are the edits that were necessary in order to keep the

15   substance of this provision the same made?

16   "A  It does not appear they were.

17   "Q  Does it appear there was one edit made with respect to the

18   addition of the words in that order?

19   "A  Yes.

20   "Q  And yet there was no edit made to transpose the 2 and 3 in

21   order to keep the same meaning with respect to the order in

22   which losses were to be allocated.  Is that right?

23   "A  Correct.

24   "Q  Do you believe this edit was made to, was intended to

25   change the terms of the deal?"

E77JTRU3                           "Stone

 1              MR. ROLLIN:  Objection; lacks foundation.

 2              THE COURT:  That is true.  Objection sustained.

 3              MR. PICKHARDT:

 4    "Q  Does this appear to you to be a drafting error"?

 5              MR. ROLLIN:  Objection; lacks foundation.

 6              THE COURT:  Sustained.

 7              MR. PICKHARDT:

 8    "Q  Now, also we'll note Mr. Ross's e-mail of June 22nd was

 9    sent out at 1:11 am in the morning.  Was it common for drafts

10    of documents to be sent out late in the evening or in this case

11    actually early in the morning?

12    "A  Yes.

13    "Q  You keep work long hours on these deals?

14    "A  Yes.

15    "Q  And were documents sometimes edited well into the night or

16    morning?

17    "A  Yes.

18    "Q  In 2005 what was the structured finance market like?  Was

19    it a busy time period?

20    "A  Yes.

21    "Q  Were there a lot of deals getting done?

22    "A  Yes.

23    Q.  Were people particularly busy during this period with

24    respect to the volume of deals?

25    "A  Yes.

E77JTRU3                    "Stone

1   "Q  If you would turn to the next document which has been

2   marked as TX 215 which is another e-mail from Alicia Sugarman."

3            THE COURT:  For my benefit, this Exhibit 214 is where,

4   according to your allegation, the error took place?

5            MR. PICKHARDT:  That is correct, your Honor.

6            This was 1:11 am on the day of the closing.  This was

7   the first and only draft where we see that error being -- well,

8   what we perceive to be and argue to be an error being made.

9            MR. PICKHARDT:

10  "Q  If you would turn to the next document marked as TX 215

11  which is another e-mail from Alicia Sugarman also dated June

12  22nd at 1:15 am in the morning, so four minutes after

13  Mr. Ross's e-mail, it goes to a group of recipients, including

14  yourself, that is entitled AHMIT 2005-2 offering circular.

15           Do you recognize this as an e-mail circulated by Ms.

16  Sugarman related to the AHMIT 2005-2 transaction?

17  "A  Yes.

18  "Q  What is the offering circular that is referenced in Ms.

19  Sugarman's e-mail?

20  "A  I believe this the PPM for private notes.

21  "Q  This is also a offering document?

22  "A  Yes.

23  "Q  Would this also be a document that would be of particular

24  concern to Lehman?

25  "A  Yes.

1    "Q   If you would turn to Page 51 of this document, to the

2    section entitled allocation of losses on the mortgage loans,

3    and do you see the third paragraph on that page includes a

4    portion of the paragraph that starts 9th?

5    "A   Yes, I see it.

6    "Q   Now, do you see that this provision is a black line against

7    the corresponding document from the AHMIT 2005-1 deal?

8    "A   Yes, I see that.

9    "Q   Do you see that the prior deal also included the proviso

10   concerning the allocation of losses as between the 1-A-2 and

11   1-A-3 notes?

12   "A   Yes, I see it.

13   "Q   And that proviso is removed in this draft and replaced with

14   other language?

15   "A   Yes.

16   "Q   And is the other language it is replaced with consistent

17   with the language that was in the ProSupp, indicating that

18   losses were to be allocated first to the Class 1-A-3 notes

19   before the Class 1-A-2 notes?

20           MR. ROLLIN:   Objection; foundation as to implied

21   intent.

22           THE COURT:   I'll overrule the objection.  Assuming I

23   understand the language, we are now in exhibit --

24           MR. PICKHARDT:   In Exhibit 215, your Honor, and

25   specifically Page 51.

E77JTRU3                          "Stone

1        (Pause)

2        THE COURT:  The language says to the extent such

3   realized losses are incurred in respect of the mortgage loans

4   in Loan Group I, language is added to this effect:

5        To the Class 1-A-3 notes and Class 1-A-2 notes, in

6   that order, in reduction of no principal balance thereof until

7   it reduces to zero.  You're asking me to note that this

8   language was not added in the indenture.  It is added in the

9   PPM and is distributed around the same time.  The inference

10  you're suggesting is that either this document or the other

11  document was in error?

12       MR. PICKHARDT:  Yes, your Honor.  The relevance of

13  this document goes a little bit further than that, in that this

14  included the same proviso that had previously, from the prior

15  deal that had addressed the allocation of losses.

16       THE COURT:  Yes, it is consistent with the other deal,

17  with the other formulations, which the trust indenture of that

18  date was not?

19       MR. PICKHARDT:  That's correct.  The same edits you

20  see reflected here are the same edits that have been made in

21  the ProSupp and the same edits made in the offering circular

22  and the same exact edits were seeing made in this document.

23       THE COURT:  With respect to that language was not

24  amended?

25       MR. PICKHARDT:  Correct, the proviso was crossed out,

E77JTRU3                        "Stone

1   make other edits to keep the same meaning.  Time edits many and

2   time again, and the different one is the indenture draft we

3   looked at in the last item.

4           THE COURT:  Okay.  This is a goood time to break for

5   lunch, I think.

6           MR. PICKHARDT:  Okay, your Honor.

7           THE COURT:  How much more do you have with this

8   deposition?

9           MR. PICKHARDT:  Your Honor, we do not have a

10  significant amount left.

11          THE COURT:  How much are you going to read, Mr.

12  Rollin?

13          MR. ROLLIN:  I have cross-examination, but I don't

14  think it last more than 10 or 15 minutes at the most.

15          THE COURT:  That is probably a half hour before you.

16  We'll take it up after lunch.  Come back at 2:15.

17          (Luncheon recess)

18          (Continued on next page)

19

20

21

22

23

24

25

E77PTRU4                        "Stone"

<pre>
 1                A F T E R N O O N   S E S S I O N

 2                          2:21 P.M.

 3              THE COURT:  Be seated, please.  Please continue.

 4              MR. PICKHARDT:  Your Honor, we are going to continue

 5    in the transcript at 115, Line 5.

 6              THE COURT:  Yes.

 7    BY MR. PICKHARDT:

 8    "Q. Miss Stone, if there had been a decision made to reverse

 9    the order of seniority between the class 1-A-2 and 1-A-3 notes

10    on June 22nd, as reflected in Mr. Ross' e-mail, what do you

11    believe would have been done in addition to that?"

12              MR. ROLLIN:  Objection, lacks foundation, calls for

13    speculation.

14              THE COURT:  Same.  So this goes through 116, Line 6.

15              MR. PICKHARDT:  Your Honor, with due respect, this

16    goes into what Lehman's procedures were with respect to how

17    changes were handled in operative documents during the --

18              THE COURT:  No, this is all speculative.  So that's

19    out.  Next question is now at 116, Line 7.

20    BY MR. PICKHARDT:

21    "Q. Now, you testified earlier that terms concerning the order

22    in which losses are allocated are terms that are important to

23    investors; is that right?

24    "A. Yes.

25    "Q. And so was the type of term that you would expect people
</pre>

E77PTRU4                        "Stone"

1  who were working on this type of deal be attuned to, if there

2  was a change?"

3         THE COURT:  How does this help me at all?  This is all

4  irrelevant.  We're on 116, Line 22.

5  BY MR. PICKHARDT:

6  "Q. Now, did Lehman Brothers get certain assurances from deal

7  counsel in connection with deals like this?"

8         MR. ROLLIN:  Objection lacks foundation, calls for

9  speculation.

10        THE COURT:  Overruled.

11 "A. Typically, yes.

12 "Q. What type of assurances?

13 "A. We would get a 10b-5 opinion on a negative assurance letter

14 from underwriter's counsel and issuer's counsel.

15 "Q. What is a 10b-5 opinion?

16 "A. It basically states that the disclosure is accurate and

17 contains all relevant information, no material omissions, I

18 believe.

19 "Q. Is that an important document, from the lead underwriter's

20 perspective?

21 "A. Yes.

22 "Q. Why is that?

23 "A. Because I think that is the basis on which we can defend

24 ourselves, to the extent that there is an assertion that

25 disclosures were inaccurate later.

E77PTRU4                         "Stone"

1   "Q. If you could please turn to" --

2            THE COURT:  What's the relevance of this?

3            MR. PICKHARDT:  Your Honor, the relevance of this is

4   that, at closing, Thacher Proffitt, as deal counsel, provides

5   opinion letters that attest as to the fairness of the

6   descriptions in the offering materials and the accuracy of the

7   offering materials.  These are --

8            THE COURT:  So what does that go to?

9            MR. PICKHARDT:  It goes to the fact that there was

10  special care taken with respect to the accuracy of the

11  statements that are in the offering materials, including with

12  respect to these issues.

13           THE COURT:  Objection?

14           MR. ROLLIN:  I do object, your Honor.

15           THE COURT:  Sustained.

16           MR. ROLLIN:  Thank you.

17           THE COURT:  That takes us now to 119, Line 12.

18           MR. PICKHARDT:  Your Honor, I was also just advised

19  that I may have overlooked moving Exhibit 215 into the record,

20  which was the last e-mail from Miss Sugarman.

21           THE COURT:  I think you did.  If you didn't, it's

22  admitted.

23           (Plaintiff's Exhibit 215 received in evidence)

24           MR. PICKHARDT:  Thank you.  And, I'm sorry, your

25  Honor, you want us to move to?

E77PTRU4                          "Stone"

1              THE COURT:  127, Line 16.

2    BY MR. PICKHARDT:

3    "Q. Now, having had the opportunity to go through the final

4    documents" --

5              THE COURT:  Wait a minute.  I think Mr. Rollin is

6    going to object to this question.

7              MR. ROLLIN:  Yes, sir, I am.

8              THE COURT:  Sustained.

9    BY MR. PICKHARDT:

10   "Q. But having gone through them today" --

11             THE COURT:  This is now to 128, Line 12.  Are we

12   beyond that, too?  Give me a moment.  It goes through the end.

13             MR. PICKHARDT:  Your Honor, with due respect, given

14   the testimony that has been received from Miss Stone with

15   respect to her role in the deal and, more broadly, with respect

16   to the role of the underwriters with respect to these types of

17   terms, and her knowledge of the terms at the time, we believe

18   that a foundation has been laid for Miss Stone to provide

19   testimony as to what she believes the intent of the transaction

20   to have been.

21             THE COURT:  Sorry, the intent is through -- the

22   written terms are not through somebody who maybe drafted or

23   continued to supervise a subordinate.  Objection is sustained.

24             We're now down to the cross-examination.  Mr. Rollin?

25   129, Line 22.

E77PTRU4                           "Stone"

1           MR. ROLLIN:  Your Honor, I'm actually going to bypass

2      some of the preliminaries in that cross-examination, and with

3      the Court's permission, begin at, it will be at Line 146 --

4      sorry, Page 146, Line 22.

5           THE COURT:  All right.  Begin your cross-examination

6      now.

7           MR. ROLLIN:  Thank you.

8      CROSS-EXAMINATION

9      BY MR. ROLLIN:

10     "Q. Do you have a recollection from that time of the intent of

11     the parties to the transaction?

12     "A. I do not have a recollection.

13     "Q. Or of any party to the transaction; so the parties

14     generally?"

15          THE COURT:  You don't want to waive your objection, do

16     you?  You don't want to ask these questions.

17          MR. ROLLIN:  I understand, your Honor.  If I may, I'll

18     look through this and try to --

19          THE COURT:  I don't think there's anything that she

20     needs.

21          MR. ROLLIN:  Your Honor, mindful of your Honor's

22     comment, at 159, Line 24, I'll strike that.  Why don't we go to

23     Line -- Page 160, Line 22.  May I proceed from that point, your

24     Honor?

25          THE COURT:  Yes.

E77PTRU4                         "Stone"

1    BY MR. ROLLIN:
2    "Q. As to the documents that you looked at today, can you vouch
3    for their authenticity that they are, in fact, the documents
4    related to the transaction?
5    "A. No.
6    "Q. Or that they are complete?
7    "A. I cannot.
8    "Q. Basically, what happened was counsel just walked you
9    through the documents and read you certain sections, right?  I
10   meant, Mr. Pickhardt today in deposition, all he did was walk
11   you through documents and pointed out certain sections to you,
12   right?
13   "A. Yes.
14   "Q. And sometimes he read them, right?
15   "A. Yes.
16   "Q. And sometimes you read them, correct?
17   "A. Yes.
18   "Q. You weren't testifying from your own recollection, right?"
19              MR. PICKHARDT:  Objection, misstates testimony.
20              THE COURT:  Overruled.
21   "A. I was not.
22   "Q. You were testifying as to what was on the piece of paper,
23   correct?
24   "A. Correct.
25   "Q. Do you know when" --

E77PTRU4                          "Stone"

1              MR. ROLLIN:  I'm sorry, your Honor.  I'm at Page 165,

2      Line 21.  Correction, I'll do 165, Line 2.

3      "Q. Is it fair to say that really, for the most part, the

4      underwriters were the -- just put this in sort of simple terms,

5      that they were the initial purchasers of the bond and then they

6      would sell them on to secondary purchasers of the bonds?

7      "A. For those bonds that were being placed with third parties,

8      yes.

9      "Q. And then there could be a chain of sales of bonds over the

10     course of the years, correct?

11     "A. Correct.

12     "Q. So you don't know how many transactions there were between

13     the time that the bonds were originally purchased by the

14     underwriters or placed with third parties, and ultimately

15     finding their way into the hands of the parties in this case?

16     "A. I do not.

17     "Q. Do you know when anybody involved in this case purchased

18     the bonds?

19     "A. I do not.

20     "Q. You would call that, what term would you use, the secondary

21     market or after market, for all of those sales that happened

22     after the underwriter purchases or places the bonds?

23     "A. The secondary market.

24     "Q. So there is a secondary market for these bonds, correct?

25     "A. Yes.

E77PTRU4                        "Stone"

1    "Q. Now, let's say somebody buys into -- buys these bonds in

2    2012 and 2013.  There is a variety of information out there in

3    the market about the bonds at that time, correct?

4    "A. Yes.

5    "Q. For example, the ratings, right?

6    "A. Yes.

7    "Q. And any changes that happened in the ratings over the

8    course of time, correct?

9    "A. Yes.

10   "Q. And the pricing, right?

11   "A. Yes."

12          MR. ROLLIN:  Your Honor, at this point, I believe the

13   questioning is picked up by counsel for Wells Fargo.

14          MR. JOHNSON:  Your Honor, we're not going to read any

15   of the deposition testimony in evidence today.

16          THE COURT:  Thank you.  So we're finished with --

17          MR. PICKHARDT:  Your Honor, then it proceeds with some

18   additional questioning that I had for Miss Stone about the

19   impact of something called Reg AB, if I could ask those

20   questions which commenced at 175, 4?

21          THE COURT:  Go ahead.

22   REDIRECT EXAMINATION

23   BY MR. PICKHARDT:

24   "Q. Miss Stone, during Mr. Rollin's questions, you referred to

25   something called Reg AB; is that right?

1   "A. I think Reg AB, Reg AB II is now like the new version of

2   Reg AB, but yes.

3   "Q. What is Reg AB?

4   "A. A regulation that, I guess, prescribes the manner in which

5   securities are to be offered to investors.  I think it relates

6   specifically to public offerings.

7   "Q. Am I correct that you describe that as being a regulation

8   that would, by regulation, require you to go back to investors

9   if there was a material change post-pricing?"

10          MR. ROLLIN:  Objection, relevance.

11          THE COURT:  Overruled.

12  "Q. Is that a fair characterization, or am I misunderstanding?

13  "A. Yes.  I know there is more to the regulation, but that's

14  the piece that is sort of most relevant to what we do.

15  "Q. Can you infer from the sequence of when documents are

16  finalized, as to when pricing occurred in connection with any

17  particular transaction?

18  "A. Pricing will occur once the offering documents are final

19  and investors have had time to review them and prior to closing

20  a deal.

21  "Q. Now, are the Pro Supp that we looked at today that had the

22  printed book that was described as being final, I think the

23  e-mail was circulated around June 21st of 2005.  Do you know

24  whether or not pricing on AHMIT 2005-2 occurred before or after

25  that date?

E77PTRU4                              "Stone"

1    "A. I don't.

2    "Q. If a Pro Supp was used for purposes of determining pricing"

3    --

4              THE COURT:  I don't think these are useful.

5              MR. PICKHARDT:  Your Honor, the only additional

6    testimony is Miss Stone does provide testimony further in that

7    pricing had occurred by the time that the final printed book

8    was circulated on June 21st.

9              THE COURT:  All right.

10             MR. PICKHARDT:  If I could pick back up on 178, 19,

11   your Honor.

12             THE COURT:  Yes.

13   BY MR. PICKHARDT:

14   "Q. Is the pricing that you determine based upon an expectation

15   as to what price you can sell bonds into the market?

16   "A. Yes.

17   "Q. And if there was a material change to bonds, would you want

18   to check through marketing to know whether that impacted the

19   price at which you could sell the bonds?

20   "A. Yes.

21   "Q. So I guess in the case of AHMIT 2005-2, if there was

22   pricing that was predicated upon an understanding as to sort of

23   the loss allocations and that was changed, would you want to

24   check with the market to see whether that impacted the price at

25   which you could sell the bonds?

1    "A. Yes.

2    "Q. Now, you testified earlier today that you had formed a view

3    that the intent was for the realized losses to be allocated to

4    the class 1-A-3 notes?"

5              THE COURT:  Sustained.

6              MR. PICKHARDT:  Okay.  Your Honor, if I could pick up

7    at 185, 5.

8    "Q. Ms. Stone, just to be clear with respect to the way that

9    the final Pro Supp gets completed, you indicated that at some

10   point pricing gets added to the Pro Supp; is that right?

11   "A. Yes.

12   "Q. And that that then becomes the final Pro Supp; is that

13   right?

14   "A. Yes.

15   "Q. Is it the final Pro Supp that ends up in the closing

16   binder?

17   "A. Yes.

18   "Q. If you could please turn to TX221, which we used at the

19   beginning of today and was produced by Wells Fargo as coming

20   from the closing set for AHMIT 2005-2.  When you referred to

21   pricing, where in here are you referring to?

22   "A. It would typically be the bond spreads, like the LIBOR

23   spreads.

24   "Q. Is that on Page 10?

25   "A. Yes.

E77PTRU4                          "Stone"

1   "Q. So is it correct that this is the pricing that you are

2   referring to?

3   "A. Yes.

4   "Q. Now, if you would please turn back to the document that was

5   marked as Exhibit 49.  Do you recall that this is the

6   e-mail" -- strike that, your Honor.

7          "Now, if you would please turn back to the document

8   that was marked as TX212, do you recall that this is the e-mail

9   from Mr. Ross as of Tuesday, June 21st, at 1:10 in the

10  afternoon, in which he is attaching what he describes as a

11  final PDF of the printed book?

12  "A. Mmm, hmm.

13  "Q. Could you turn to Page 11 in this book?

14  "A. Yeah.

15  "Q. Now, does this version have the pricing already in it?

16  "A. Yes.

17  "Q. So does that lead you to understand that the pricing for

18  this deal had occurred as of or prior to June 21st?

19  "A. Yes, it should have.

20  "Q. And if there had been a change, a material change such as a

21  change as to the allocation of realized losses after this, you

22  would have expected to go back to investors to alert them of

23  that, to reconfirm pricing; is that right?"

24          MR. ROLLIN:  Objection.

25          THE COURT:  Overruled.

1    "A. Yes."

2              MR. PICKHARDT:  That's all I have, your Honor.

3              THE COURT:  Okay.  Thank you.

4              MR. ROLLIN:  Your Honor?

5              THE COURT:  Miss Shah can go back?

6              MR. ROLLIN:  Your Honor, there is one

7    counter-designation that wasn't read, and I had a couple of

8    question -- final cross during the course of the deposition on

9    that last point.  May I?

10             THE COURT:  I thought you read it?

11             MR. ROLLIN:  I did, your Honor, but we were going and

12   we agreed to go in a sequence and by the examining lawyers in

13   the deposition.  And so this is just --

14             THE COURT:  What didn't you read?

15             MR. ROLLIN:  There is the one segment of it, Page 182,

16   Line 7 through 17, which I believe would be in green, your

17   Honor's copy.  And then there's a very brief --

18             THE COURT:  What is it, Line 7?

19             MR. ROLLIN:  187, Line 7 through 17.

20             THE COURT:  I can take judicial notice that prices

21   change all the time.

22             MR. ROLLIN:  And, your Honor, consistent with that was

23   the very last portion in green.

24             THE COURT:  There's two uses of prices here.  One is

25   the price that's set by the underwriter, and the other one is

E77PTRU4                         "Stone"

1    the market price that people actually pay.

2              MR. ROLLIN:  And, your Honor, consistent with that is

3    the very last section of cross-examination, 187, Line 17

4    through 187, Line 25.

5              THE COURT:  Just read it out loud.  Question.  Go

6    ahead.  Question.

7    RECROSS EXAMINATION

8    BY MR. ROLLIN:

9    "Q. The pricing that you just looked at on Page 11 of

10   Exhibit TX212, that's just the pricing that applies to the

11   initial offering, right?

12   "A. Correct.

13   "Q. The parties thereafter in the secondary market priced

14   things -- priced the bonds differently?

15   "A. Yes."

16             MR. ROLLIN:  Nothing further.  Thank you, your Honor.

17             THE COURT:  Thank you.  Miss Shah, thank you.

18             MS. SHAH:  Thank you, your Honor.

19             MR. PICKHARDT:  Your Honor, the next witness is going

20   to be Richard Simonds.  We actually moved a little bit faster

21   than the forecast, and Mr. Simonds is not sitting in the

22   courtroom, and we just sent someone to retrieve him.

23             Your Honor, we'll also note that Mr. Simonds is

24   prepared to go through all the drafts again.  I am cognizant,

25   though, of not being repetitive with the Court's time.

E77PTRU4                         "Stone"

1        THE COURT:  Right.

2        MR. PICKHARDT:  And so these documents have been shown

3   to him at deposition.  With the Court's indulgence, I will not

4   take him back through all of the documents.

5        THE COURT:  Good, don't.

6        MR. PICKHARDT:  At this point, your Honor, I call

7   Richard Simonds.

8        THE COURT:  Welcome, Mr. Simonds.

9    RICHARD SIMONDS,

10       called as a witness by the Plaintiff,

11       having been duly affirmed, testified as follows:

12       MR. PICKHARDT:  Your Honor, may we --

13       THE COURT:  Wait.  Please be seated.  In a loud voice,

14   state your full name and spell it for the reporter.

15       THE WITNESS:  My name is Richard Denis Simonds,

16   Junior.  Richard Denis, D-e-n-i-s, Simonds, S-i-m-o-n-d as in

17   David, -s, Junior, J-r.

18       THE COURT:  Thank you, Mr. Simonds.  Yes.

19       MR. PICKHARDT:  Your Honor, may we approach the

20   witness bench to provide exhibits?

21       THE COURT:  Please.

22       MR. PICKHARDT:  So the witness has a full set of

23   exhibits for this proceeding.

24       THE COURT:  I think it would be better if you were to

25   give him exhibits one by one, rather than having him handle

E77PTRU4                         "Stone"

1    those books.

2              MR. PICKHARDT:  Okay, your Honor.  We'll have them

3    here, but we'll try to hand them up, your Honor, if that's

4    okay.

5              THE COURT:  He feels imprisoned with that.

6              MR. PICKHARDT:  Okay.  We won't do that.

7    DIRECT EXAMINATION

8    BY MR. PICKHARDT:

9    Q.  Good afternoon, Mr. Simonds.  Mr. Simonds, what is your

10   profession?

11   A.  I'm an attorney.

12   Q.  And where are you employed?

13   A.  I'm a partner at the law firm of Alston & Bird.

14   Q.  Is it correct that you're a corporate attorney?

15   A.  Yes.

16   Q.  Now, I note that Alston & Bird is also the law firm that is

17   representing the securities administrator in this case.  Is it

18   correct that you don't have any involvement with respect to

19   Alston & Bird's role in representing a party in this case?

20   A.  That is correct.

21   Q.  You graduated from law school in 1993; is that correct?

22   A.  Yes.

23   Q.  And after law school, you joined the law firm of Thacher

24   Proffitt and Wood?

25   A.  That is correct.

1    Q.  Is it correct you started as an associate?

2    A.  Yes, I started as an associate.

3    Q.  And you worked in the structured finance group; is that

4    right?

5    A.  I'm not sure it was called the structured finance group at

6    the time I joined, but at some point, it was called the

7    structured finance group.

8    Q.  You were elevated to partner in 2001; is that correct?

9    A.  Yes, at the end of 2001.

10   Q.  And did you become a partner in the structured finance

11   group at Thacher Proffitt?

12   A.  I believe at that time it was called the structured finance

13   group.

14   Q.  You remained a partner at Thacher Proffitt until 2008; is

15   that right?

16   A.  Yes, until the end of 2008.

17   Q.  And what happened at that point in time?

18   A.  Thacher Proffitt and Wood went into dissolution at the end

19   of 2008, and a group of myself and about 100 other attorneys at

20   Thacher Proffitt and Wood moved to Sonnenschein Nath &

21   Rosenthal.

22   Q.  And since leaving Thacher Proffitt and Wood, you have

23   worked at two law firms; is that right?

24          THE COURT:  Sonnenschein and Alston?

25   A.  Sonnenschein Nath & Rosenthal changed its name twice.  It

1   became SNR Denton in 2010.

2            THE COURT:  What was the name?

3            THE WITNESS:  SNR Denton.  And then it became –– a

4   month before I left, it became Dentons, and then I left Dentons

5   to go to Alston & Bird.

6   Q.  And at both Sonnenschein, including its subsequent names,

7   and at Alston, you have been a partner; is that right?

8   A.  That is correct.

9   Q.  Is it correct that you have been practicing law for 21

10  years?

11  A.  Yes.

12  Q.  And what areas do you specialize in?

13  A.  Currently, I specialize in a number of areas, mostly

14  involving the sales servicing and securitization of financial

15  assets.

16  Q.  Is it correct that you have been working on structured

17  finance securitizations over your entire 21-year career?

18  A.  Yes.

19  Q.  Approximately how many RMBS securitizations have you worked

20  on over the course of your career?

21            THE COURT:  RMBS?

22            MR. PICKHARDT:  I apologize, your Honor.  I used

23  lingo.  Residential mortgage-backed securities.

24            THE COURT:  Is that an aspect of structured finance?

25            THE WITNESS:  Yes.

E77PTRU4                          Simonds - direct

1              THE COURT:  How many aspects are there?

2              THE WITNESS:  Well, there's a lot of different assets

3    that could be securitized.  They're generally divided into

4    three groups, residential mortgage-backed securities,

5    commercial mortgage-backed securities and asset-backed

6    securities.

7              THE COURT:  Same lawyers do all, or do they

8    specialize?

9              THE WITNESS:  Usually they specialize.  I currently do

10   both residential and asset-backed securitizations; so I do two

11   of them.

12   BY MR. PICKHARDT:

13   Q.  The transaction that's at issue in this case, American Home

14   Mortgage Investment Trust 2005-2, is that a RMBS transaction or

15   a residential mortgage-backed security transaction?

16   A.  Yes, it is.

17   Q.  And approximately how many residential mortgage-backed

18   security transactions have you done over the span of your

19   21-year career?

20   A.  I've been involved with, I estimate, between 300 and 700 of

21   those types of transactions.

22   Q.  Now, as you are aware, this case concerns an American Home

23   Mortgage RMBS securitization.  What relationship did American

24   Home Mortgage have with Thacher Proffitt in 2005?

25   A.  We were counsel to American Home Mortgage Company, which

E77PTRU4                    Simonds - direct

 1   was the public REIT, and then their depositor entities and

 2   various other affiliates of American Home.

 3           THE COURT:  REIT is real estate investment trust?

 4           THE WITNESS:  Yes.  American Home Mortgage Company was

 5   a real estate mortgage investment trust.

 6   BY MR. PICKHARDT:

 7   Q.  Were you the responsible partner for the American Home

 8   Mortgage relationship at Thacher Proffitt?

 9   A.  Yes, I was.

10   Q.  And what does that mean, to be the responsible partner?

11   A.  Well, I was in charge of the client relationship and

12   ensuring that the transactions that we worked on with them as a

13   client were, were done.

14   Q.  And did one of those transactions include the American Home

15   Mortgage Investment Trust 2005-2 transaction?

16   A.  Yes, I believe so.

17   Q.  If I refer to that as AHMIT '05-2, will you understand what

18   I'm referring to?

19   A.  Yes, I will.

20   Q.  And what was Thacher Proffitt's role on the AHMIT '05-2

21   transaction?

22   A.  We were counsel to three entities, one, American Home

23   Mortgage Company, who was the sponsor and the seller of the

24   transaction; the second was the American Home depository

25   entity, whose name escapes me; and then the trust.  I believe

1    we were counsel to the trust as well.

2              THE COURT:  Which trust?

3              THE WITNESS:  The trust that issued the securities in

4    connection with the securitization.

5    BY MR. PICKHARDT:

6    Q.  Was your role something that is sometimes referred to as

7    deal counsel?

8    A.  If you could define that more precisely, I could say.  I

9    mean, we were the -- on that transaction, we were the law firm

10   primarily responsible for drafting the documents in connection

11   with the transaction, and that if that is how deal counsel is

12   defined, which is how it is traditionally defined, then that

13   was our role in that transaction.

14   Q.  And what documents were included within those that Thacher

15   Proffitt had primary drafting responsibility for?

16   A.  As deal counsel, we would have been responsible for

17   drafting the offering documents and the operative documents.

18              THE COURT:  Is there any lawyer adverse to you in that

19   kind of arrangement?

20              THE WITNESS:  Yes, there are several lawyers adverse

21   to us.  There's counsel to the underwriters, there's counsel to

22   the trustees, the servicers.  The rating agencies are

23   technically adverse, sometimes they have counsel.

24              THE COURT:  How are those parties adverse?

25              THE WITNESS:  Well, the issuer and the underwriter are

E77PTRU4                        Simonds - direct

1   separate legal entities, and if you're an issuer, you're hiring

2   an underwriter to go and sell securities, and part of that is

3   negotiating an underwriting agreement, and negotiating the

4   underwriting can be very contentious.

5            THE COURT:  But in terms of the selling documents, you

6   are all aligned, aren't you?

7            THE WITNESS:  Yes, in terms of the selling documents,

8   I would say that our -- we would try to have a meeting of the

9   minds.  We wouldn't -- from a legal perspective, we would not

10  be adverse.  From a business perspective, there may be certain

11  things that the issuer wants to do that the underwriter doesn't

12  want to do with respect to structural features of the

13  transaction.

14           THE COURT:  The larger the fee of the underwriters,

15  the less advantageous potentially to the issuer?

16           THE WITNESS:  Yes, but there's more than that.  When

17  we do these securitizations, including that securitization,

18  there are certain securities that are retained by the issuer;

19  so the payment features of those securities would be material

20  to my client on that transaction.

21  BY MR. PICKHARDT:

22  Q.  Mr. Simonds, were there particular aspects of the

23  transaction that would be of special importance to the

24  underwriter, as opposed to somebody else in the transaction?

25           MR. ROLLIN:  Objection, lacks foundation.

1          THE COURT:  Overruled.

2   A.  Well, the underwriter is trying to sell securities; so

3   they're, you know, at the best possible price.  So they're

4   structuring the transaction in order for that to happen.

5   Q.  And so is it correct that the underwriter is the lead party

6   that is making decisions with respect to the structure of the

7   transaction?

8   A.  Yes.  They're primarily responsible for structuring the

9   transaction, but they do discuss it with the issuer, the

10  sponsor.

11  Q.  Now, you understand specifically that this case concerns

12  provisions related to the allocation of realized losses; is

13  that right?

14  A.  Yes.

15  Q.  And do you include the provisions concerning the allocation

16  of realized losses as being part of the structure that would be

17  primarily driven by the underwriter?

18  A.  Yes.

19  Q.  And so --

20  A.  I'm sorry, I need to sort of qualify that a little bit.  It

21  would depend on what happened to those securities.  So if all

22  the securities were sold to investors, then the allocation of

23  losses would be material among those investors.  In this case,

24  where one of the classes was retained by the sponsor, then --

25  and part of the other class of securities as well, then my

E77PTRU4                         Simonds - direct

client would care about how the realized losses were allocated.

Q.   Okay.  Now, do you understand the use of a term sheet in the context of our residential mortgage-backed securities transactions?

A.   Yes.

Q.   And what's the role of the term sheets?

A.   The term sheet, I would describe as the primary marketing documents used by the underwriter to solicit interest in the securitization.

Q.   Is the term sheet used prior to the time when a prospective supplement has been finalized?

A.   Yes.

Q.   And is the term sheet something that the bankers use to go to check the market to see whether there's a market for the particular structure of that residential mortgage-backed security?

A.   It's one of the things that they use.

Q.   And is the term sheet something that deal counsel or that Thacher Proffitt and Wood, when it was acting in the role it was in this transaction, would see and have an opportunity to comment on?

A.   Yes.

Q.   Now, is the term sheet a document that would typically be drafted by the lawyers, or is that something that's drafted by the underwriter?

1    A.  It would vary, but typically it would be drafted by the

2    underwriter, not the underwriter's counsel, but that varied

3    quite a bit.  So I'm not sure.

4    Q.  Now, how about the Prospectus Supplement, what is the role

5    of the Prospectus Supplement in a residential mortgage-backed

6    securities transaction?

7    A.  Well, a Prospectus Supplement is the offering document,

8    which is used to sell the securities to investors.

9    Q.  And is the Prospectus Supplement for the AHMIT '05-2 deal,

10   one of the documents for which Thacher Proffitt and Wood had

11   primary drafting responsibility?

12   A.  Yes, it was.

13   Q.  Now, when the Prospectus Supplement is used to market the

14   deal, is that distributed along with a copy of the indenture?

15   A.  I'm sorry, the Prospectus Supplement is not used to market

16   the deal.  The term sheet is used to market the deal.

17   Q.  After the Prospectus Supplement is --

18            THE COURT:  Let me double you back because these terms

19   tend to be very loose.  What do you mean, a marketed deal?

20            THE WITNESS:  Well, I'm an attorney; so I'm not

21   entirely clear how the marketing process works.

22            THE COURT:  You're around this long enough.  You have

23   a better idea than I do.

24            THE WITNESS:  You go out with the term sheet to

25   investors to solicit interest.  When you have a general sense

1   of what investors are interested in, you create a Prospectus

2   Supplement, and you provide that to them in connection with the

3   pricing of the securities.

4          So the Prospectus Supplement is kind of like saying

5   we're done marketing, here are the bonds, you know, and it's

6   the official offer, so to speak.  Right?  This is what we're

7   going to sell.  And then the investors come back with prices

8   saying, this is what we'll pay.  And then in the final

9   Prospectus Supplement, we have, you know, the final numbers for

10  that, that transaction.

11         THE COURT:  What's the relationship with the

12  Prospectus and the Prospectus Supplement?  Give me a

13  chronology, Prospectus, term sheet and a Prospectus Supplement?

14         THE WITNESS:  Okay.  First, we have the term sheet,

15  which is used to market the transaction.  Then we have a

16  Prospectus Supplement, which is used to price the transaction.

17  Right?  First we market, then we price.  Then we get the

18  prices.  We put the price numbers into the final Prospectus

19  Supplement, which is used to settle with investors.

20         THE COURT:  Is there a Prospectus before the

21  Prospectus Supplement?

22         THE WITNESS:  Well, on a public transaction like the

23  American Home transaction, the Prospectus Supplement is

24  attached to a Prospectus; so you have two things which are

25  combined together into one offering document.  So when we talk

1   about the Prospectus Supplement, we really mean the completed

2   offering document, including the Prospectus.

3        THE COURT:  So the offering document has, what, a

4   Prospectus and a term sheet, and then you get a Prospectus

5   Supplement and then a final Prospectus?

6        THE WITNESS:  The offering document is a Prospectus

7   Supplement with the Prospectus attached, and that's used to

8   price -- there's usually a preliminary Prospectus Supplement,

9   which has everything except for the pricing information.  And

10  then when, you know, the pricing is done and you're ready to

11  close the transaction, you fill in all those numbers and then

12  you settle with the final Prospectus Supplement with all the

13  information in it.

14  BY MR. PICKHARDT:

15  Q.  There are portions of the Prospectus Supplement which

16  describe terms in the indenture; is that right?

17  A.  Yes.

18  Q.  Now, when the Prospectus Supplement is finalized and it

19  includes pricing, post-close, and that is used to circulate to

20  potential investors, is there a copy of the indenture that is

21  attached?

22  A.  No.

23  Q.  And so what's used for purposes of the offering document is

24  a Prospectus Supplement that includes some description of the

25  indenture, but the indenture itself is not distributed to

1   investors; is that an accurate characterization?

2                   MR. ROLLIN:  Objection, vague as to timing.  If this

3   is an initial issue, no; if it's as to aftermarket, I object.

4                   THE COURT:  Overruled.

5   A.  Well, when you price the securities on a public transaction

6   in 2005, all information that was used in that pricing needs to

7   be publicly filed or publicly filed soon thereafter.  Okay?  So

8   if the indenture was provided to investors, it would violate

9   the securities laws to provide that beforehand, you know, to

10  investors without it having been publicly filed previously.

11  Q.  At times, does the indenture get publicly filed with the

12  SEC?

13  A.  Yes.

14  Q.  Now, we talked about the Pro Supp and the fact that --

15                  THE COURT:  So you have a term sheet which references

16  back to indenture; so is the term sheet distributed before an

17  indenture is distributed?

18                  THE WITNESS:  Yes.  But you probably haven't even

19  started on the indenture before the term sheet is finalized.

20                  THE COURT:  Is the term sheet with the Prospectus

21  Supplement distributed before the indenture is filed?

22                  THE WITNESS:  Usually.

23                  THE COURT:  Not usually or usually?

24                  THE WITNESS:  Usually the indenture is filed -- you

25  don't have to file the indenture until 15 days after closing,

1    under the securities laws in 2005, and I'm not sure when the

2    indenture was filed in this transaction but it was probably

3    filed sometime after.

4             THE COURT:  Is the indenture distributed or merely

5    filed?

6             THE WITNESS:  I believe it's merely filed on an AK

7    filing on EDGAR.  I don't know what the underwriter's practices

8    are with respect to distributing indentures after closing.

9    BY MR. PICKHARDT:

10   Q.  Do you know whether Prospectus Supplements are available

11   through channels other than having to get them from the SEC's

12   website?

13   A.  You wouldn't obtain it through the SEC's website if you

14   were an investor because I think they're not required to be

15   filed until either 24 or 48 hours after first use.  So you

16   would create a final Prospectus Supplement and send that to

17   investors usually in a PDF format before it was filed on EDGAR.

18   Q.  So is it your best understanding that the way the

19   Prospectus Supplement gets disseminated, at least initially, is

20   by the underwriter disseminating the Prospectus Supplement?

21   A.  Yes, the underwriter would distribute the Prospectus

22   Supplement.

23   Q.  And your best understanding is that the underwriters would

24   not include with that distribution a copy of the indenture,

25   correct?

E77PTRU4                    Simonds - direct

1   A.   If they did that, it would be violating the securities

2   laws, unless it had been previously filed, which in my

3   experience is very rare, if ever.

4   Q.   Now, among the deal documents that Thacher Proffitt was

5   taking the lead with respect to drafting, did that include

6   other offering materials beyond the Prospectus Supplement?

7   A.   I think in my deposition I was shown some private placement

8   memorandums, as well as the Prospectus Supplement, which were

9   used to offer classes of securities which were offered

10  privately as opposed to publicly.

11  Q.   Do you recall seeing during your deposition a private

12  placement memorandum related to those transactions; is that

13  correct?

14  A.   I think I saw two of them.

15  Q.   Was one referred to as an offering circular, and the other

16  was referred to as a private placement memorandum; does that

17  refresh your recollection?

18  A.   I believe so, yes.

19  Q.   And were those additional offering documents, documents

20  that Thacher Proffitt had responsibility for taking the lead in

21  drafting?

22  A.   Yes.

23  Q.   Now, in addition to the offering materials, did Thacher

24  Proffitt also have responsibility for taking the lead with

25  respect to the drafting of the indenture?

E77PTRU4                         Simonds - direct

1    A.  Yes.

2    Q.  Now, did you have people at Thacher Proffitt who were

3    working under your supervision in connection with this

4    transaction?

5    A.  Yes, I did.

6    Q.  And did those individuals include Jason Ross?

7    A.  You know, based on the e-mails that I've been shown, it

8    appears that Jason Ross was working on that transaction.

9              THE COURT:  Do you have any memory of him?

10             THE WITNESS:  I have -- I'm sorry, I've no memory of

11   anything about that transaction.

12             THE COURT:  Do you have a memory of him as an

13   associate at Thacher Proffitt?

14             THE WITNESS:  Yes, he came with us to Sonnenschein,

15   and I worked with him until I left Dentons to go to Alston

16   Bird.

17   BY MR. PICKHARDT:

18   Q.  In addition to Mr. Ross, do you also -- are you also aware

19   of an individual named Leigh Anne Kuiken?

20   A.  Yes, I remember her.

21   Q.  And who is Miss Kuiken?

22   A.  She was another associate who worked with me.

23   Q.  And was Miss Kuiken working under your supervision on the

24   AHMIT '05-2 transaction?

25             MR. ROLLIN:  Objection, lacks foundation.  Testified

E77PTRU4                        Simonds – direct

1    as to --

2              THE COURT:   Overruled.

3    A.   I -- you know, just based on the e-mails that I previously

4    looked at, I believe she worked on that transaction.

5    Q.   Did you also recall seeing e-mails from a Alyssa Sugarman?

6    A.   Yes, I believe I saw some from her.

7    Q.   And who is Miss Sugarman?

8    A.   She was another associate working under my supervision.

9    Q.   So Miss Kuiken, Miss Sugarman and Mr. Ross were all

10   attorneys at Thacher Proffitt who were working under your

11   supervision in connection with the AHMIT '05-2 transaction; is

12   that right?

13   A.   I believe so.   I have no reason to believe otherwise, but I

14   don't specifically recall them on the transaction, other than

15   through the e-mails that I've seen.

16   Q.   Now, the e-mails that you have seen, were you shown in your

17   deposition and had the opportunity to review with counsel, if

18   you chose, documents related to the drafting of the Prospectus

19   Supplement?

20   A.   Yes.

21   Q.   Were you shown documents related to the drafting of the

22   private placement memorandum?

23   A.   I think I was shown a copy of them, but I don't recall

24   seeing drafts, just seeing one document.

25   Q.   Do you recall seeing e-mails circulating in a draft of the

1  offering circular?

2  A.  Again, I think I just saw one offering circular, not any

3  drafts.

4  Q.  Do you recall being shown drafts of the indenture?

5  A.  Yes.

6  Q.  Now, do you understand, Mr. Simonds, that this case

7  concerns a discrepancy between how the allocation of realized

8  losses were described in the indenture as compared to how they

9  were described in those other documents, including the

10  Prospectus Supplement, the private placement memorandum and the

11  offering circular?

12        THE COURT:  Are we doing anything but repeating

13  testimony?

14        MR. PICKHARDT:  Sorry, your Honor?

15        THE COURT:  Are we doing anything but repeating

16  testimony?

17        MR. PICKHARDT:  Yes, your Honor.  I'm just laying a

18  foundation, your Honor, for this witness' --

19        THE COURT:  Foundation.  The witness doesn't have any

20  memories.

21        MR. PICKHARDT:  Well, your Honor, he was involved in

22  this transaction at the time.  He's had the opportunity to

23  review documents that were authored by associates who were

24  working under his supervision, and we think that this witness'

25  testimony as to what he believed the intent of the transaction

1   to be --

2          THE COURT:  You're not going to get it in that way.

3          MR. PICKHARDT:  Okay, your Honor.

4   BY MR. PICKHARDT:

5   Q.  Do you recall reviewing a draft of the indenture in which

6   there were changes made that had the effect of reversing the

7   allocation of realized losses?

8          MR. ROLLIN:  Objection, your Honor, lacks foundation

9   and it's hearsay and best evidence rule.

10          THE COURT:  When you rise, there's only one word I

11   want to hear.

12          MR. ROLLIN:  Objection.  Yes, your Honor.

13          THE COURT:  The question is bad as to form.  It's

14   compound.

15          MR. PICKHARDT:  Your Honor, I can go ahead and show

16   him the exhibit.

17          THE COURT:  Do whatever you want to do, but you're not

18   going to get anywhere.

19          MR. PICKHARDT:  Your Honor, I just want to establish

20   one point of sequencing with this witness, your Honor.

21          THE COURT:  Go ahead.

22          MR. PICKHARDT:  Your Honor, may I approach?

23          THE COURT:  Yes.

24   BY MR. PICKHARDT:

25   Q.  Mr. Simonds, I am showing you a document that has been

E77PTRU4                    Simonds – direct

1    marked as Exhibit TX14.  Do you recall this being one of the

2    e-mails that you saw during your deposition?

3              MR. ROLLIN:  Objection.

4              THE COURT:  Overruled.

5    A.  Yes, I do recall seeing this exhibit previously.

6    Q.  And if you would please turn to Page 74 of this exhibit?

7              THE COURT:  Can you put it up?

8    Q.  Mr. Simonds, is this the provision of the indenture that

9    concerns the allocation of realized losses?

10   A.  Yes, it is.

11   Q.  And is this a draft of the indenture that was circulated by

12   Jason Ross at 1:11 a.m. on June 22nd, 2005?

13             THE COURT:  How do you know this information?

14             MR. ROLLIN:  Objection.

15             MR. PICKHARDT:  Do you see on the --

16             THE COURT:  I'm not asking you.  I'm asking the

17   witness.  Mr. Simonds, how do you know this information?

18             THE WITNESS:  Based on the cover page of the e-mail.

19   I mean, I don't remember --

20             THE COURT:  It doesn't refresh your recollection in

21   any way?  Does it refresh your recollection?

22             THE WITNESS:  On -- No.

23             THE COURT:  It's already in evidence.  You don't have

24   to do it again.  Objection sustained.

25   BY MR. PICKHARDT:

1    Q.  Mr. Simonds, you testified earlier that there's a point in

2    time at which pricing occurs; is that right?

3    A.  That's right.

4    Q.  And is it correct that you can tell from the Pro Supp as to

5    whether the prices have been added to the Prospectus

6    Supplement?

7    A.  Right.  That's correct.

8            MR. PICKHARDT:  May I approach, your Honor?

9            THE COURT:  Yes.

10   Q.  Mr. Simonds, I'm showing you a document -- I'm showing you

11   what's been marked as Exhibit 212, which is also a cover page

12   for Mr. Ross, which attaches a printed version of a Pro Supp;

13   do you see that?

14   A.  Yes.

15   Q.  Can you tell from this document whether the prices have

16   been added to this Pro Supp?

17           MR. ROLLIN:  Same as my prior objections, your Honor,

18   lacks foundation.

19   A.  What I can tell you is that price --

20           THE COURT:  Just a minute.

21           THE WITNESS:  I'm sorry.

22           THE COURT:  The answer is yes or no.  Can you tell

23   from this document whether the prices have been added to this

24   Pro Supp?

25           THE WITNESS:  Can I answer differently than yes or no?

E77PTRU4                          Simonds – direct

1   Because there's a difference between prices and pricing

2   information.

3          THE COURT:  Okay.  What's the difference?

4          THE WITNESS:  So the prices paid by the investors are

5   not included in the Prospectus Supplement.  The pricing

6   information, which is used in connection with determining those

7   prices, is included here.  On this type of transaction, the

8   pricing information is reflected in the note margins on the

9   securities and that is included.

10  BY MR. PICKHARDT:

11  Q.  And so pricing information had been added at this point in

12  time in the draft that you see; is that right?

13  A.  Yes.

14  Q.  Now, does the Prospectus Supplement get filed with the SEC?

15  A.  The final Prospectus Supplement is filed with the SEC.

16  Q.  And is the Prospectus Supplement then available through the

17  SEC website?

18  A.  Yes.

19  Q.  And is that something that can be publicly accessed?

20  Right?

21  A.  Yes, but investors wouldn't access it that way.

22  Q.  All right.

23          THE COURT:  How would they access it?

24          THE WITNESS:  Well, it would be delivered to them by

25  the underwriters.

E77PTRU4                        Simonds – direct

1            THE COURT:  In what way, usually?  What medium?

2            THE WITNESS:  In an e-mail PDF format, or sometimes

3     there would actually be a physical printed Prospectus

4     Supplement delivered to them, but I think in 2005 we were doing

5     just electronic delivery.

6            (Continued on next page)

1            MR. PICKHARDT:  Your Honor, may I approach?

2            THE COURT:  Yes.

3            (Pause)

4    BY MR. PICKHARDT:

5    Q.  Mr. Simonds, I've placed in front of you a document that

6    has been marked for identification as Exhibit TX 267.

7            Do you recognize that in form as a printout from the

8    SEC EDGAR system?

9            THE COURT:  The question is do you recognize it?

10   Don't describe it.  Just answer if you recognize it?

11           THE WITNESS:  I am sorry, I don't.

12   BY MR. PICKHARDT:

13   Q.  You don't recognize the form of that document.  Is that

14   correct?

15           MR. ROLLIN:  Asked and answered.

16           THE COURT:  That is not an objection.  I looked in the

17   rule book the other day and never found it.

18           (Pause)

19           THE COURT:  He thanked me for the clarification.

20           MR. PICKHARDT:  Let me lay a little more foundation,

21   your Honor.

22   BY MR. PICKHARDT:

23   Q.  Mr. Simonds, what is EDGAR?

24   A.  EDGAR stands for Electronic Data Gathering & Retrieval

25   System, and that is the system that is used by the Securities &

E77JTRU5                      Simonds - direct

1    Exchange Commission with respect to making filings of public

2    documents with the SEC.  It needs to be filed, this paper by

3    the company, but now thanks to the developments in technology,

4    they can all be filed electronically.

5    Q.  Is the EDGAR system the system through which you can access

6    documents that have been filed with the SEC through a public

7    web site?

8    A.  Yes.

9    Q.  If you look at what has been marked for identification as

10   Exhibit TX 267, do you see a reference at the bottom of that

11   document to American Home Mortgage Investment Trust 2005-2?

12   A.  Yes.

13   Q.  Do you see further up in this document that there is a form

14   and it says, "Prospectus"?

15   A.  Yes.

16   Q.  Do you see --

17            THE COURT:  What do you want to bring out, this is a

18   document that comes out of the web page of the SEC?

19            MR. PICKHARDT:  Yes.  The only thing we are seeking to

20   establish through the use of this document is that a prospectus

21   was filed with the SEC on June 22nd, at 4:23 in the afternoon.

22   That is the only purpose of this document.

23            THE COURT:  Do you so represent?

24            MR. PICKHARDT:  Yes, I represent this has been

25   downloaded from the SEC.

1          THE COURT:  I accept it as such.  267, a copy of the

2     relevant page of the SEC web page dealing with American Home

3     Mortgage Securities, as the issuer and the various references.

4          (Plaintiff Exhibit 267 received in evidence)

5          THE COURT:  What do you want me to understand?

6     BY MR. PICKHARDT:

7     Q.  Mr. Simonds --

8          THE COURT:  What do you wish me to understand from

9     this document?

10         MR. PICKHARDT:  What is important from this document

11    is that it indicates that based upon the sequence we have

12    already seen today --

13         THE COURT:  From this document?  Don't give me

14    document.  Connect it.  What in this document do you want me to

15    notice?

16         MR. PICKHARDT:  Where it says accepted 2005, 6:23,

17    16:23:46.

18         THE COURT:  45, 45.  This document was accepted for

19    the SEC web page on June 22, 2005.

20         MR. PICKHARDT:  That is correct, your Honor.

21         THE COURT:  At almost 4:30 in the afternoon?

22         MR. PICKHARDT:  Correct.

23         THE COURT:  What is this document that was accepted?

24    What else on the document do you want?

25         MR. PICKHARDT:  This is a reference to the prospectus,

1    final prospective supplement.

2              THE COURT:  Where do you see that?

3              MR. PICKHARDT:  That was filed with the SEC.

4              THE COURT:  How do I know that?

5              MR. PICKHARDT:  It refers, your Honor, to prospectus

6    Rule 424 (b)(5) at the top.  If your Honor would like for us to

7    produce and append it to this the document, you would access

8    through this, we can.

9              THE COURT:  No.  So if someone just decided in the

10   securities business seeing that Form 42485, what do they learn

11   by that?

12             THE WITNESS:  That is the form member used for the

13   final prospectus that was filed.

14             THE COURT:  If someone wanted to see the final

15   prospectus, they could reference this document?

16             THE WITNESS:  It would go on the EDGAR web site, look

17   at the document 424 (b)(5), affix it to it, and that would be

18   the final.

19             THE COURT:  What would you learn from this document?

20             THE WITNESS:  You would learn what the final

21   prospectus supplement said, contained.

22             THE COURT:  By downloading it?

23             THE WITNESS:  You could click on the link and you

24   would be able to access it.

25             THE COURT:  And see whatever information was in that

E77JTRU5                          Simonds - direct

1    prospectus, including pricing information?

2              THE WITNESS:  Yes.

3    BY MR. PICKHARDT:

4    Q.  Mr. Simonds, was the accuracy of the ProSupp something that

5    was important in Proffitt's role as deal counsel?

6    A.  Yes, it was.

7    Q.  Did Thacher Proffitt issue certain opinions or assurances

8    with respect to the accuracy of the prospectus supplement?

9    A.  There were two things that were provided by Thacher

10   Proffitt.  One was an opinion in which we gave special comfort

11   to certain sections of the prospectus supplement, and then we

12   also provided something called the negative assurance letter

13   which relates to Rule 10b-5, in which we said there is knowing,

14   to our knowledge, that had come to our attention about there

15   being any misstatement of material fact or omission of material

16   fact.

17             THE COURT:  In what?

18             THE WITNESS:  Or omission of a material fact.

19             THE COURT:  In what?

20             THE WITNESS:  I would have to see the particular 10b-5

21   letter issued on this transaction to be able to answer that

22   specifically.  It could be different versions.  It would not be

23   the term sheet.  It would be the prospectus supplement and a

24   preliminary prospectus supplement for pricing, and then

25   potentially also the final prospectus supplement as well.

1            THE COURT:  And the trust indenture?

2            THE WITNESS:  No.  The 10b-5 letter did not cover the

3    operative documents.

4            MR. PICKHARDT:  May I approach, your Honor?

5            THE COURT:  Yes.

6            (Pause)

7    BY MR. PICKHARDT:

8    Q.  Mr. Simonds, I put in front of you two documents that have

9    been marked for identification as Exhibit TX 216 and TX 217.

10           Do you recognize these as the two documents that you

11   were referring to?

12   A.  Yes.

13   Q.  If you would start with Exhibit TX 216, which is a letter

14   on Thacher Proffitt's stationery, dated June 22nd, 2005, that

15   went to Lehman Brothers, among others.  Is this the 10b-5

16   opinion that you referred to?

17   A.  This is the 10b-5 letter.  It is not an opinion.

18   Q.  What is the purpose of the 10b-5 letter?

19   A.  The 10b-5 letter, as you can see, is is addressed to the

20   underwriters and appears also to the insurer, corporation

21   insured one of the securities, and the purpose of the 10b-5

22   letter is to assist the underwriters with respect to their due

23   diligence defense under Section 11 of the '33 Act.

24           Part of their due diligence is to obtain this letter

25   from counsel to the issuer about the disclosure documents that

1    were created.  It is a letter that is obtained on every public

2    offering with reputable underwriters.  It says what it says in

3    the paragraph at the top of Page 3, and with this, you know, I

4    can read it if you want me to, but it says what it says and --

5              THE COURT:  You don't have to read it.

6              THE WITNESS:  All right.

7    BY MR. PICKHARDT:

8    Q.  Does the paragraph at the top of Page 3 have statements

9    with respect to the prospectus supplements as of the date of

10   this letter?

11             MR. ROLLIN:  Objection.

12             THE COURT:  Overruled.  Do you want to offer this in

13   evidence?

14             MR. PICKHARDT:  I would like to at this time offer

15   Exhibit 216 and Exhibit 217 into evidence.

16             THE COURT:  What is 217?  Do you have a basis for

17   that?

18             MR. PICKHARDT:  217 was the other letter.

19             THE COURT:  Do 216.

20             MR. PICKHARDT:  216.

21             THE COURT:  Any objection?

22             MR. ROLLIN:  Both on best evidence and hearsay

23   grounds.  The court has --

24             THE COURT:  That is the testimony.  The document

25   itself, do you have any objection to the document itself?

1          MR. ROLLIN:  I object for its truth, yes; otherwise,

2     no.

3          THE COURT:  216 is admitted.

4          (Plaintiff Exhibit 216 received in evidence)

5     BY MR. PICKHARDT:

6     Q.  Mr. Simonds, in the paragraph that is at the top of Page 3,

7     are there sections of that paragraph that pertain to the

8     prospectus supplement?

9          THE COURT:  I've read it.  You don't need testimony.

10         MR. PICKHARDT:  Thank your Honor.

11    BY MR. PICKHARDT:

12    Q.  If you would please turn to Exhibit 217.  It is a letter

13    dated as of June 22nd, 2005 also on Thacher Proffitt's

14    letterhead that goes to a number of recipients.  What is this

15    letter?

16    A.  This is what is referred to as the closing opinion, and it

17    covers a number of items.

18    Q.  What is the purpose of a closing letter?

19    A.  Well, the purpose of a closing opinion, it would take me

20    many hours to sort of walk through the whole thing.

21         THE COURT:  Generally?

22         THE WITNESS:  Parts of it cover certain basic things

23    about certain of the legal entities to which we act as counsel.

24    Some of them have to do with the securities that are issued.

25    Some of them cover things about the prospectus supplement.

1    Some things talk about various aspects of the securities laws

2    and --

3              THE COURT:  Okay.

4              THE WITNESS:  -- and other laws.

5    BY MR. PICKHARDT:

6    Q.  Mr. Simonds, if you will please turn to Page 4.  Is it

7    correct on Page 4 there is a section that starts, "Based upon

8    and subject to the foregoing, it is our opinion that," and then

9    there is an enumerated list of paragraphs?

10   A.  Yes.

11   Q.  If you would turn to the paragraph on Page 6 that is

12   enumerated No. 11, is it correct that this paragraph pertains

13   to the prospectus supplement?

14   A.  Yes, the term base prospectus does include the term

15   prospectus supplement.

16   Q.  Is it correct that this paragraph is providing the opinion

17   that certain sections of --

18             THE COURT:  It is what it is.  Are you offering it in

19   evidence?

20             MR. PICKHARDT:  Yes, your Honor.

21             THE COURT:  Objection?

22             MR. ROLLIN:  I object for its truth; otherwise, no.

23             THE COURT:  Received.

24             THE WITNESS:  Your Honor, can I change my testimony?

25             THE COURT:  Yes.

```
 1              THE WITNESS:  The Paragraph 11 refers to the base
 2   prospectus.  It refers to the base prospectus and to the
 3   prospectus supplement.  So when I said the term base prospectus
 4   included prospectus supplement, in fact, it doesn't.  Those are
 5   different terms.
 6   BY MR. PICKHARDT:
 7   Q.  This refers to certain sections that are identified as
 8   description of certain securities?
 9              THE COURT:  It is what it is.  It is what it is.
10              MR. PICKHARDT:  Thank your Honor.
11   BY MR. PICKHARDT:
12   Q.  Mr. Simonds, from your experience, are you aware of -- are
13   there certain attributes, structural attributes of the AHMIT
14   05-2 deal that you think provide any indication as to how
15   losses were to be allocated on different --
16              MR. ROLLIN:  Objection; lacks foundation, calls for
17   speculation.
18              THE COURT:  How do you object in this Court?
19              MR. ROLLIN:  I apologize, your Honor.  Force of habit.
20              Objection.
21              THE WITNESS:  Should I answer?  No, not yet?
22              (Pause)
23              THE COURT:  Sustained as to form.
24   BY MR. PICKHARDT:
25   Q.  Based upon your review of documents related to the AHMIT
```

1    05-2 transaction, have you noted a difference in the principal

2    balance between the 1-A-2 notes and 1-A-3 notes?

3            MR. ROLLIN:  Objection.

4            THE COURT:  You may answer.

5    A.  I was presented with the document that --

6            THE COURT:  The answer is yes or no?

7            THE WITNESS:  Yes.

8    BY MR. PICKHARDT:

9    Q.  Can you recall which was larger, the 1-A-2 principal

10   balance or the 1-A-3 principle balance?

11           THE COURT:  Are you testifying to a certain document,

12   or do you have independent knowledge?

13           THE WITNESS:  I have no independent recollection.

14           THE COURT:  The best evidence rule applies.  Objection

15   sustained.

16   BY MR. PICKHARDT:

17   Q.  Mr. Simonds, are you personally aware of any information

18   from your experience or any knowledge you have with respect to

19   the AHMIT 05-2 deal that in your view would support the

20   conclusion that the 1-A-3 notes were intended to bear losses

21   after the 1-A-2 notes?

22           MR. ROLLIN:  Objection.

23           THE COURT:  Sustained.  That is my job, not his.

24           MR. PICKHARDT:  Your Honor, if I can have a moment to

25   see if I have any further questions.

1           THE COURT:  All right.

2           (Off-the-record discussion)

3           MR. PICKHARDT:  I have no further questions for this

4    witness.

5           THE COURT:  Okay.  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. ROLLIN:

8    Q.  Hello, Mr. Simonds.

9    A.  Hello.

10          MR. ROLLIN:  If I may have a moment to confer with

11   counsel to streamline.

12          (Off-the-record discussion)

13          MR. ROLLIN:  Your Honor, 219 is in as a final version

14   of the indenture, and I intend to refer to that.

15          THE COURT:  All right.

16          MR. ROLLIN:  I will take a copy of it up to the

17   witness, with the Court's permission?

18          THE COURT:  All right.

19          (Pause)

20          MR. ROLLIN:  May I approach, your Honor?

21          THE COURT:  Yes.

22   BY MR. ROLLIN:

23   Q.  Mr. Simonds, I've handed you a document that has been

24   admitted in evidence as TX 219, and will you confirm that is,

25   in fact, it is what it says, it appears to be a copy of the

1    indenture?

2    A.  It appears to be a copy of the indenture, yes.

3    Q.  Would you please turn to Page 60 of that document.

4    A.  I am sorry.  There are two page numbers.  The number of the

5    document or the number at the bottom?

6    Q.  It should be Section 3.38.

7    A.  I found it.

8    Q.  Would you tell me which page number you're looking at so

9    the record is clear?

10   A.  It is Page 60 of the document, but at the bottom it also

11   says Page 67.

12   Q.  Thank you.

13         Referring to Section 3.38, is this the section of the

14   indenture that describes how losses are allocated?

15   A.  Yes, it is.

16   Q.  As drafted, this provision states that the realized losses

17   are allocated first to the 1-A-2 class and then the 1-A-3

18   class, correct?

19         MR. PICKHARDT:  Objection; best evidence.

20         THE COURT:  Overruled.

21   A.  Yes, it does.

22   BY MR. ROLLIN:

23   Q.  That is clear on its face, right?

24   A.  Yes.

25         MR. PICKHARDT:  Objection, your Honor.

1              THE COURT:  Sustained.

2     BY MR. ROLLIN:

3     Q.  Is there any other section in the indenture, to your

4     knowledge, that describes, pertains to the allegation of

5     realized losses?

6              THE COURT:  That would be the best evidence rule.

7              MR. PICKHARDT:  Objection, your Honor.

8              THE COURT:  Sustained.

9     BY MR. ROLLIN:

10    Q.  Will you please turn to Section 5.04.

11    A.  Yes.

12    Q.  Does Section 5.04 pertain to the allocation of realized

13    losses?

14    A.  Not directly, no.

15             THE COURT:  Put it up, please.

16    BY MR. ROLLIN:

17    Q.  What page number are you on, Mr. Simonds?

18             THE COURT:  Page 83.

19             MR. ROLLIN:  Thank your Honor.

20    Q.  In what way does Section 5.04 relate are in any way --

21             THE COURT:  He says it doesn't.

22    A.  Well --

23             MR. ROLLIN:  Sorry, your Honor?

24             THE COURT:  He says it doesn't.

25             MR. ROLLIN:  Does not?

1    BY MR. ROLLIN:

2    Q.   Does Section 5.04 make any reference to the allocation,

3    reimbursement of allocated realized losses?

4              MR. PICKHARDT:  Objection.

5              THE COURT:  Sustained.

6    BY MR. ROLLIN:

7    Q.   Are you familiar, Mr. Simonds, with any provision of the

8    indenture that is inconsistent on the issue of the allocation

9    of realized losses with Section 3.38?

10             MR. PICKHARDT:  Objection.

11             THE COURT:  Sustained.

12   BY MR. ROLLIN:

13   Q.   In the course of deposition you were shown documents --

14   strike that.

15             In May of this year do you recall being contacted by

16   counsel for Sceptre?

17             MR. PICKHARDT:  Objection.

18             THE COURT:  Overruled.

19   A.   My apologies.  I don't recall who was representing whom.

20   BY MR. ROLLIN:

21   Q.   Do you recall having been contacted by counsel for any of

22   the parties?

23   A.   Yes, I was contacted by a gentleman from Quinn Emanuel.

24   Q.   Do you know the name of the gentleman from Quinn Emanuel

25   who contacted you?

1    A.  I do not recall the name of the person.

2    Q.  Do you have an understanding that Quinn Emanuel is counsel

3    for Sceptre?

4    A.  I don't have any understanding about his representing.  I

5    don't know the parties.

6    Q.  Did the gentleman from Quinn Emanuel ask you if you would

7    sign an affidavit related to this case?

8    A.  Yes.

9    Q.  Did the gentleman from Quinn Emanuel ask you if you would

10   sign an affidavit saying there was a mistake?

11   A.  Yes.

12   Q.  And you refused, correct?

13              MR. PICKHARDT:  Objection.

14              THE COURT:  Sustained.

15   BY MR. ROLLIN:

16   Q.  Did refuse to sign an affidavit --

17              THE COURT:  Objection sustained.

18   BY MR. ROLLIN:

19   Q.  You have not given an affidavit?

20              THE COURT:  It is off the table.  People refuse to

21   give affidavits for very good reasons; namely, I don't want to

22   get involved or they just may not want to.

23   BY MR. ROLLIN:

24   Q.  You testified earlier about how investors have access to

25   information.  Do you remember that?

E77JTRU5                          Simonds - cross

1   A.  Yes.

2   Q.  Are you an investor?

3           THE COURT:  That is outside the scope.

4   BY MR. ROLLIN:

5   Q.  Do you know how any of the investors involved in this case

6   access information?

7           MR. PICKHARDT:  Objection.

8           THE COURT:  Sustained.

9   BY MR. ROLLIN:

10  Q.  The lawyers who participated in drafting on the American

11  Home side of this transaction, did they include Jason Ross?

12          MR. PICKHARDT:  Objection.

13          THE COURT:  Overruled.

14  A.  I believe, based on the documents I've been provided that,

15  yes, he was involved.

16  BY MR. ROLLIN:

17  Q.  And Leigh Anne Kuiken?

18  A.  I'm not as certain of her involvement in terms of the

19  drafting of the e-mails, but I have seen her name on the

20  e-mails.

21          THE COURT:  Where are we going with this?

22          MR. ROLLIN:  Only that the drafters are not before

23  your Honor.

24          THE COURT:  I already know that.

25          MR. ROLLIN:  Thank you.

1         THE COURT:  Why are you telling me things that I do

2    know?  I think cross-examination is over.  Thanks.

3         MR. ROLLIN:  One more, your Honor, if I may?

4         May I approach, your Honor, with one exhibit?

5         THE COURT:  Yes.

6         (Pause)

7    BY MR. ROLLIN:

8    Q.  I have placed before you what is marked for identification

9    as Exhibit TX 265.  Do you see that?

10   A.  Yes.

11   Q.  Would you tell the court what Exhibit 265 is.

12   A.  On is face, it appears to be the closing document which

13   would be included at the beginning of the binder that was

14   created in connection with the transaction.

15        MR. ROLLIN:  I move the admission of TX 265.

16        THE COURT:  What?

17        MR. ROLLIN:  I move the admission of TX 265.

18        THE COURT:  What am I going to learn from it?

19        MR. ROLLIN:  All the parties on Page 2 and their

20   lawyers were the people who participated in this transaction.

21        THE COURT:  The cover page and Page 2 will be

22   admitted.  What is the document number?

23        MR. ROLLIN:  TX 265.

24        (Plaintiff Exhibit TX 265, two pages received in

25   evidence)

1    BY MR. ROLLIN:

2    Q.   The drafting lawyers, Mr. Simonds, were at least for the

3    American Home side were from Thacher Proffitt, correct?

4    A.   There was also an in-house lawyer at American Home as well.

5    Q.   Who was involved in the drafting?

6         THE COURT:  The parties to the transaction, not the

7    parties to the drafting?

8         MR. ROLLIN:  My question had to do with the fact that

9    the lawyers involved in the drafting of the American Home side

10   was Thacher Proffitt Wood.  Mr. Simonds was clarifying there

11   was an in-house lawyer involved.

12        THE COURT:  Was the in-house lawyer involved in the

13   drafting, if you know?

14        THE WITNESS:  I don't remember.

15        THE COURT:  Anything else?

16        MR. ROLLIN:  Yes, one, maybe two other questions.

17   BY MR. ROLLIN:

18   Q.   Thacher Proffitt & Wood after dissolution has a liquidating

19   trust, doesn't it?

20        MR. PICKHARDT:  Objection.

21        THE COURT:  Sustained.

22        MR. ROLLIN:  No other questions.  Thank your Honor.

23        THE COURT:  Thank very much.

24        (Witness excused)

25        THE COURT:  First time as a witness?

1          THE WITNESS:  Yes.  This is my first time in a

2     courtroom.

3          THE COURT:  Mr. Pickhardt.

4          MR. PICKHARDT:  Yes, your Honor.  As we discussed this

5     morning, the only potential additional witness that we would

6     call is Mr. Mago.  In light of the discussion we had with the

7     Court this morning, we are inclined to defer him and call him,

8     if at all, as a rebuttal witness.

9          THE COURT:  You rest?

10         MR. PICKHARDT:  We rest.

11         THE COURT:  Mr. Rollin, I suggest that we defer

12    motions until we are all finished.

13         MR. ROLLIN:  If that is your Honor's instruction.  I

14    had one planned, but I will take your Honor's instruction.

15         THE COURT:  Bring on your first witness.

16         MR. ROLLIN:  I do not quite know how to say this.  We

17    thought Mr. Mago was going to be part of the Sceptre's case,

18    and that would go on now and that we would then cross-examine.

19    That may be today or tomorrow, but we do not have a witness

20    available to call because --

21         THE COURT:  Make your motion.

22         MR. ROLLIN:  Sorry?

23         THE COURT:  Then make your motion.

24         MR. ROLLIN:  Thank you.

25         MR. PICKHARDT:  Your Honor, at this time we would move

1    for judgment based upon the evidence.

2              THE COURT:  It is not your motion.  It is his motion.

3              His motion is that you haven't made out your case.

4              MR. ROLLIN:  My motion is they have not made out their

5    case, they have not established the intent of any party, no

6    witness called has any recollection, none of the drafters are

7    before the court, that under New York law, New York Court of

8    Appeals Law, George Backer Management Corp. versus Acme

9    Quilting Company, 46 NYL 2d. 211, a 1978 Court of Appeals case,

10   the burden is to prove by clear, positive and convincing

11   evidence demonstrating not only the probability but the

12   certainty of errors in the making of the contract.

13             Under First Department law, the Stonebridge Capital,

14   LLC versus Nomura International, PLC, 68 Appellate Division

15   third 546, a First Department 2009 case, there is a heavy

16   presumption that it deliberately prepared and executed a

17   written instrument that masks the true intentions of the

18   parties.  The document in question is the indenture.

19             Again not a single witness had a recollection, not a

20   single witness knows what the intent of the parties was.

21   Neither witness confirmed or stated or even believed there was

22   an error.  None of the drafters are before your Honor and

23   the -- our case -- let me add to that.

24             There is a reformation claim, construction case that

25   sounds in equity.  Even though we are a trust in a construction

E77JTRU5                          Simonds - cross

1   proceeding which also sounds in equity, there is a requirement

2   to prove inadequate remedy of law.  There has been no proof of

3   an inadequate remedy at law.  In fact, there are lawyers and

4   there are parties to the transaction for whom if Sceptre can

5   make out a case, damages would be recoverable.  So equity is

6   not available.

7             THE COURT:  Slowly!

8             MR. ROLLIN:  Sorry.

9             THE COURT:  Who would be liable for damages?

10            MR. ROLLIN:  Assuming there are damages that are

11   compensable, then the drafting lawyers would, and the parties

12   to the transaction, not Semper, who had nothing to do with the

13   transaction, but the prima facie case, and this is the point,

14   prima facie case --

15            THE COURT:  Someone would have to find who would be

16   responsible?  Who would be responsible if there were a mistake?

17            Who would be responsible?

18            MR. ROLLIN:  Drafting lawyers and their principals.

19            THE COURT:  You need to have a malpractice lawsuit.

20            MR. ROLLIN:  I am not sure it necessarily has to be

21   malpractice.  I haven't thought exactly what their claims would

22   be.  The point is --

23            THE COURT:  How do you say it is an adequate remedy of

24   law if you haven't thought through who could be responsible?

25            MR. ROLLIN:  It is their burden of proof to prove

1    inadequate remedy at law.

2              THE COURT:  The inadequate remedy of law the court is

3    asked to interpret a document is in behalf of all interested

4    parties, not just those here.  There are likely to be various

5    investors at various stages who bought at various times

6    including original investors, and the primacy is to get it

7    right, and if I don't get it right, someone will get hurt.

8              I don't know what recourse, new recourse that person

9    might have.  To find recourse in terms of the malpractice

10   lawsuit or negligence lawsuit when it is uncertain how this

11   whole thing came about, how many parties were involved.  Is not

12   a very practical remedy.

13             MR. ROLLIN:  Your Honor, that is a different lawsuit.

14   The question here is --

15             THE COURT:  That is what I have to go through to find

16   inadequate remedy at law.

17             MR. ROLLIN:  We can step back.  Is there proof to the

18   high burden required in New York that what the intent of the

19   parties was?

20             THE COURT:  That is the argument you made.

21             MR. ROLLIN:  That's right.  We don't have to get to

22   inadequate remedy at law.  They haven't carried their burden.

23             THE COURT:  Thank you.

24             MR. ROLLIN:  Thank you.

25             THE COURT:  Mr. Pickhardt?

1          MR. PICKHARDT:  Yes, your Honor.

2          Semper is acting as though the only evidence that

3    could be before this Court is the testimony of an individual

4    who has recollection as to something that happened nine years

5    ago, but that is not the only evidence that this Court can

6    consider.  This Court can rather consider the totality of the

7    evidence which has been submitted today and it is fulsome with

8    respect to what the intent was of this transaction.

9          THE COURT:  Let me see if I get it right.  All the

10   deal documents with the exception of trust indenture have a

11   certain sequence of losses starting with 3 going up to 2,

12   right?

13         MR. PICKHARDT:  That's correct.

14         THE COURT:  The original drafting of the trust

15   indenture had a similar provision, right?

16         MR. PICKHARDT:  That is correct.

17         THE COURT:  The pricing occurred, if I remember

18   correctly, in relationship to all those other documents in the

19   earlier draft of the indenture?

20         MR. PICKHARDT:  The pricing occurred on the 21st, at

21   least by the 21st, at 1:10 pm, when the final ProSupp was

22   circulated.

23         THE COURT:  The indenture draft you considered an

24   error occurred after that?

25         MR. PICKHARDT:  Occurred at 1:11 am on the next

1    morning, so about twelve hours after the final ProSupp with

2    pricing was circulated.

3           THE COURT:  And there was no difference in the pricing

4    for that category of holding?

5           MR. ROLLIN:  That's correct.  The next day, 24 hours

6    later, filed with the SEC was the final ProSupp that included

7    the exact same pricing, and at no point since then has there

8    been a sticker or any revision made.

9           THE COURT:  I hold there was at least a triable issue

10   of fact as to the scrivener's error.  Whether it needs to be

11   the form or interpreted, I don't know yet.

12          Motion denied.  Okay.  So tomorrow what do we do?  We

13   should finish tomorrow?

14          MR. ROLLIN:  Well, your Honor, we certainly moved

15   faster today than I anticipated.  We may very well finish

16   tomorrow.  We have a number of witnesses we plan to call.  The

17   witnesses do go to a number of important issues concerning, for

18   example, what Sceptre knew when they bought, the fact they knew

19   of the priorities set forth in the indenture and bought

20   nevertheless.  It goes to what Semper knew.  I am not sure if I

21   misspoke.

22          First Sceptre, then what Semper knew.  There are

23   important issues, as your Honor wrestles with the equity issues

24   concerning Sceptre's plans to reverse the loss allocation and

25   realize a windfall.  There is also testimony concerning the

E77JTRU5                    Simonds - cross

1    lack of ambiguity and the applicable provisions such that the

2    remedy of construction or interpretation would not be available

3    under New York law.

4              There is quite a bit of testimony from Mr. Cohen,

5    from --

6              THE COURT:  We'll go at 10:00 o'clock tomorrow.  I

7    think we'll finish tomorrow.

8              MR. ROLLIN:  Thank you.

9              THE COURT:  Have a good evening.

10             (Court adjourned until Tuesday, July 8, 2014, at 10:00

11   o'clock a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   MARY STONE

 4   Direct By Mr. Pickhardt . . . . . . . . . . .41

 5   Cross By Mr. Rollin . . . . . . . . . . . . 120

 6   Redirect By Mr. Pickhardt . . . . . . . . . 123

 7   Recross By Mr. Rollin . . . . . . . . . . . 129

 8   RICHARD SIMONDS

 9   Direct By Mr. Pickhardt . . . . . . . . . . 131

10   Cross By Mr. Rollin . . . . . . . . . . . . 165

11                       PLAINTIFF EXHIBITS
     Exhibit No.                            Received
12    219C   . . . . . . . . . . . . . . . . . .53

13    221   . . . . . . . . . . . . . . . . . . .57

14    218   . . . . . . . . . . . . . . . . . . .66

15    204   . . . . . . . . . . . . . . . . . . .77

16    208   . . . . . . . . . . . . . . . . . . .88

17    209   . . . . . . . . . . . . . . . . . . .94

18    210   . . . . . . . . . . . . . . . . . . .98

19    212   . . . . . . . . . . . . . . . . . . 104

20    213   . . . . . . . . . . . . . . . . . . 107

21    TX-214   . . . . . . . . . . . . . . . . . 108

22    215   . . . . . . . . . . . . . . . . . . 118

23    267   . . . . . . . . . . . . . . . . . . 156

24    216   . . . . . . . . . . . . . . . . . . 161

25    TX 265, two pages  . . . . . . . . . . . 171
```