E78PTRU1                         Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN THE MATTER OF THE TRUSTEESHIP
    CREATED BY AMERICAN HOME MORTGAGE
4   INVESTMENT TRUST 2005-2 related to      14 Civ. 2494 AKH
    the issuance of Mortgage-Backed
5   Notes pursuant to an Indenture dated
    as of October 1, 2007,
6

7   WELLS FARGO BANK, N.A.,

8                    Petitioner,

9   ------------------------------x

10

11                                          July 8, 2014
                                            10:20 a.m.
12

13

14

15  Before:

16               HON. ALVIN K. HELLERSTEIN,

17                                          District Judge

18

19

20                        APPEARANCES

21

    ALSTON & BIRD, LLP
22       Attorneys for Wells Fargo Bank
    BY:  CAROLYN R. O'LEARY, Esq.
23       MICHAEL EDWARD JOHNSON, Esq.

24

25

E78PTRU1                          Trial

1                     (APPEARANCES CONTINUED)

2

3    QUINN EMANUEL URQUHART & SULLIVAN, LLP
          Attorneys for Sceptre, LLC
4    BY:   JONATHAN E. PICKHARDT, Esq.
          MAAREN A. SHAH, Esq.
5          BLAIR A. ADAMS, Esq.
                    Of counsel

6

7

8    JONES & KELLER
          Attorneys for Semper Capital Mgmt.
9    BY:   MICHAEL A. ROLLIN, Esq.
          MARITZA DOMINGUEZ BRASWELL, Esq.
10         TARA K. WILLIAMS, Esq.
                    Of counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E78PTRU1                    Trial

1              (Trial resumes; in open court)

2              THE COURT:  Good morning, everyone.  Please be seated.

3    Okay.  Defense case.

4              MR. ROLLIN:  Good morning, your Honor.  Thank you.

5              THE COURT:  Good morning.

6              MR. ROLLIN:  I'd like to begin with our first witness,

7    Mr. Akhil Mago, your Honor.

8     AKHIL MAGO,

9         called as a witness by the Defendant,

10        having been duly sworn, testified as follows:

11             THE COURT:  Please be seated.  State your name clearly

12   for the reporters.

13             THE WITNESS:  Akhil Mago.

14             THE COURT:  Spell it, please.

15             THE WITNESS:  A-k-h-i-l, first name.  M-a-g-o, last

16   name.

17             THE COURT:  Okay.  You may inquire.

18             MR. ROLLIN:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MR. ROLLIN:

21   Q.  Mr. Mago, how are you employed?

22   A.  I'm currently an employee at Och-Ziff Capital.

23             THE COURT:  How do you spell that?

24             THE WITNESS:  O-c-h-z-i-f-f.

25   Q.  And what is your position at Och-Ziff?

E78PTRU1                          Mago – direct

1   A.  I'm an executive managing director.

2   Q.  Are you head of trading?

3   A.  No.  I'm a member of the structured products group

4   responsible for investments in mortgage securities.

5   Q.  Including the investments that are now in Scepter?

6   A.  Correct.

7   Q.  Some of the A-2 notes are held by Och-Ziff funds, correct?

8   A.  Correct.

9   Q.  There are other A-2 notes that are hold with Och-Ziff that

10  Och-Ziff didn't place with Scepter, correct?

11  A.  I believe that's correct, yes.

12          THE COURT:  I need you both to speak louder, clearer,

13  slower.

14          MR. ROLLIN:  Yes, your Honor.  Thank you.

15  Q.  And you served as a corporate representative for Scepter in

16  a deposition notice sent to Scepter as a -- as an entity,

17  correct?

18  A.  Correct.

19  Q.  Now, neither Och-Ziff nor Scepter played any role in the

20  drafting of the indenture; is that right?

21  A.  Correct.

22  Q.  And they played no role in the drafting of the Prospectus

23  Supplement, correct?

24  A.  Correct.

25  Q.  And they played no role whatsoever in the underlying

1   transaction that is the creation of the security AHMIT 2005-2,

2   correct?

3   A.  Correct.

4   Q.  And you have no personal knowledge, from your own

5   observation, of anything that happened in connection with that,

6   the drafting of the indenture, correct?

7   A.  Can you repeat the question?

8   Q.  You were not involved in drafting the indenture?

9           THE COURT:  He's not brought for that.  Let's avoid

10  the negatives and get into what he can contribute.

11          MR. ROLLIN:  Very well.  Thank you, your Honor.

12  Q.  Mr. Mago, Och-Ziff made three separate purchases of A-2

13  notes in AHMIT 2005-2; is that right?

14  A.  That's correct.

15  Q.  And in advance of your deposition, you created a document

16  that showed those purchases and the price at which Och-Ziff

17  made those purchases, correct?

18  A.  That's correct.

19  Q.  Please show Exhibit BM.  I now show you what's marked for

20  identification as Exhibit BM.  Will you please tell me whether

21  that is the document that you presented at deposition to show

22  the three purchases by Och-Ziff of A-2 notes?

23          THE COURT:  That's objectionable as to form.  I don't

24  care what happened at the deposition.  Depositions are not

25  evidence.  Let's introduce this document as a document that's

E78PTRU1                          Mago - direct

1    worthy of being admitted.

2           MR. PICKHARDT:  And, your Honor, I would request

3    there's information --

4           THE COURT:  Is that an objection?

5           MR. PICKHARDT:  Objection, your Honor --

6           THE COURT:  Overruled.

7           MR. PICKHARDT:  -- with respect to this document.

8    It's highly confidential.

9           THE COURT:  Overruled.  What's the problem?

10          MR. PICKHARDT:  This contains information that doesn't

11   pertain to this case, and it's highly confidential.  I don't

12   have a problem with the information at the top being read into

13   the record, but the list of funds at the bottom is actually

14   information that's highly confidential and doesn't pertain in

15   any meaningful way to this action.  So if Mr. Mago wants to

16   testify --

17          THE COURT:  Is that so, Mr. Rollin?

18          MR. ROLLIN:  Actually, your Honor, those list of funds

19   are the funds that created and deposited notes into Scepter,

20   and that was going to be my next set of questions.  It is

21   relevant to this case.

22          THE COURT:  You'll have to lay a foundation first.

23          MR. ROLLIN:  I will.

24   BY MR. ROLLIN:

25   Q.  In the top portion, Mr. Mago, under subpart one, does this

1   document list the three purchases of A-2 notes by Och-Ziff?

2   A.  Yes.

3   Q.  It lists the three dates of the purchases, correct?

4   A.  That's correct.

5   Q.  It lists the three original face amounts of the notes

6   purchased on those dates, correct?

7   A.  Correct.

8   Q.  It lists the price at which the notes were purchased?

9           THE COURT:  Are these agreed facts?

10          MR. ROLLIN:  I'm sorry?

11          THE COURT:  Are these agreed facts?

12          MR. PICKHARDT:  They are, your Honor, I believe.

13          THE COURT:  Okay.  I'll accept the facts.

14          MR. ROLLIN:  Thank you.

15          THE COURT:  Give me a minute.

16          MR. ROLLIN:  May I continue, your Honor?

17          THE COURT:  Not yet.

18          MR. ROLLIN:  Okay.

19          THE COURT:  All right.  Continue.

20          MR. ROLLIN:  Thank you.

21  BY MR. ROLLIN:

22  Q.  In section 2, entitled --

23          THE COURT:  Before you get to section 2 --

24          MR. ROLLIN:  Yes.

25          THE COURT:  So these are three trade dates, are they

1    not, Mr. Mago?

2              THE WITNESS:  That's correct, your Honor.

3              THE COURT:  And the next are the par value of the

4    notes you purchased?

5              THE WITNESS:  That's the original amount.  That's not

6    the current amount of the bonds.

7              THE COURT:  Is it the face amount?

8              THE WITNESS:  Original face, correct.

9              THE COURT:  Off the record.

10             (Discussion off the record)

11             THE COURT:  So these are the face amount of the notes?

12             THE WITNESS:  These are the original face amounts.

13             THE COURT:  Those don't change, do they?

14             THE WITNESS:  The original face does not change.

15             THE COURT:  All right.  And the next column is what

16   you paid per unit?

17             THE WITNESS:  That's correct.  That's the --

18             THE COURT:  So the price of 23.406 is what you paid

19   for what?

20             THE WITNESS:  That's the price that is applied on the

21   then-current face.  So if I can explain.  The first line, we

22   bought 50 million original face of the bonds.  I don't have --

23   I don't remember what the current face was, but let's say the

24   bond had factored down or paid down and, at that point, there

25   were only 20 million face outstanding; so then we would have

E78PTRU1                          Mago - direct

1    paid 20 million times --

2              THE COURT:  Off the record.

3              (Discussion off the record)

4              THE COURT:  I'm sorry, go ahead.

5              THE WITNESS:  Sure.  So the first item we bought 50

6    million original face, which I don't have the exact amount, but

7    let's say the factored-down amount was 20 million, meaning --

8              THE COURT:  So some of it is was already paid.  So

9    what you did is buy the unpaid portion of the note?

10             THE WITNESS:  That's correct.

11             THE COURT:  At a price of 23.4006?

12             THE WITNESS:  That's correct.

13             THE COURT:  And what's the unit of measurement?

14             THE WITNESS:  It's $23.406 -- 4006, applied on 20

15   million current face.

16             THE COURT:  Well, whatever the unexpired amount was?

17   I see.

18             THE WITNESS:  Correct.

19             THE COURT:  So what, do you multiply by 20 million to

20   get the --

21             THE WITNESS:  Multiply by 20 million, divide by a

22   hundred would be the dollars paid.

23             THE COURT:  I see.  Okay.  Yes.

24             MR. ROLLIN:  Thank you.

25   BY MR. ROLLIN:

E78PTRU1                          Mago - direct

```
 1   Q.  Turning to section 2, that is where it says Scepter; do you

 2   see that?

 3   A.  I do.

 4   Q.  And the note there says:  Form June 24, 2013.  Is that the

 5   date on which Scepter was formed?

 6              THE COURT:  Why do I need to know that?

 7              MR. ROLLIN:  Well, your Honor, the reason you need to

 8   know the sequence here is that Och-Ziff purchased the notes,

 9   some of them even after the litigation was commenced, and then

10   deposited -- well, the first purchase was deposited into

11   Scepter in 2013, after the failed consent solicitation and

12   before the litigation.

13              THE COURT:  Scepter deposited the notes into Scepter?

14              MR. ROLLIN:  No, your Honor.  I was going to get to

15   that.  The funds listed below are where Och-Ziff placed the

16   notes, and then those funds created Scepter.  Those are the

17   members of Scepter.  And then deposited the notes into Scepter

18   sometime between June 24th, 2013, and October 24th, 2013.

19              THE COURT:  You don't establish it by this document.

20   Establish it as a matter of first course, and whether you need

21   the document or not, we'll see.  So this document is withdrawn.

22   I have the facts on the top as to when Scepter purchased and

23   for how much.  I don't know what it purchased because the

24   unpaid portion of the note is not shown.  Take this down.

25   Continue.
```

E78PTRU1                      Mago - direct

1    BY MR. ROLLIN:

2    Q.  Mr. Mago, did Scepter purchase the notes or did Och-Ziff?

3    A.  Och-Ziff purchased the notes.

4    Q.  And did Och-Ziff place the notes into Och-Ziff managed

5    funds?

6    A.  Och-Ziff purchased these securities on behalf of its funds.

7            THE COURT:  Was Och-Ziff acting as a broker or a

8    dealer?

9            THE WITNESS:  Och-Ziff is an investment management

10   company, which is managing money for its various constituents.

11           THE COURT:  So it buys and sells in the name of

12   Och-Ziff, or are they in the name of the investment advisees of

13   Och-Ziff?

14           THE WITNESS:  I believe they're in the name of

15   Och-Ziff, your Honor.

16   BY MR. ROLLIN:

17   Q.  And then do they transfer the notes into the funds?  Does

18   Och-Ziff transfer the notes into the funds?

19   A.  Those are brought directly into the funds.  They're bought

20   for the funds.

21           THE COURT:  So the buyer is the fund, not Och-Ziff?

22           THE WITNESS:  The buyer is the fund, correct.

23   BY MR. ROLLIN:

24   Q.  And at some point --

25   A.  Which is managed by Och-Ziff.

E78PTRU1                         Mago - direct

1   Q.  At some point before the commencement of this litigation,

2   did those funds transfer the notes into Scepter?

3   A.  I believe that's correct, yes.

4   Q.  And --

5             THE COURT:  Why?

6             THE WITNESS:  We form -- Again, that's an area that's

7   outside my expertise.  We form a number of these SPVs from time

8   to time for various administrative and tax reasons.  Scepter, I

9   believe, was formed along with a number of such other entities,

10  and at the time that Scepter was established, it had no

11  specific purpose.  It was established as a part of a number of

12  such SPVs, your Honor.  At some point later --

13            THE COURT:  SPV, special purpose --

14            THE WITNESS:  SPV, special purpose vehicle.

15            THE COURT:  Special purpose vehicle.

16            THE WITNESS:  And, again, this is largely handled by

17  our administrative and legal team.  There are some

18  efficiencies, from an administrative, sometimes from a tax

19  view.  So I believe Scepter was formed along with a number of

20  other such entities, and at a later date, the HM bonds were

21  transferred into Scepter.

22            THE COURT:  Your employer is Och-Ziff.  Is Semper your

23  client?

24            THE WITNESS:  Is Semper?

25            THE COURT:  Yes.

E78PTRU1                          Mago - direct

1            THE WITNESS:  No.  I don't believe we --

2            THE COURT:  Oh, Scepter was your client?

3            THE WITNESS:  Scepter was the name of the SPV that was

4   formed.

5            THE COURT:  Okay.

6   BY MR. ROLLIN:

7   Q.  Do the proceeds of payment on the bonds go to the funds, or

8   do they go to Scepter?

9            MR. PICKHARDT:  Objection, foundation.

10           THE COURT:  Overruled.

11  A.  Can you repeat the question?

12  Q.  Sure.

13           THE COURT:  He doesn't know.  It's an administrative

14  matter.  The ultimate beneficiaries are your customers, not the

15  special purpose vehicle, right?

16           THE WITNESS:  That is correct, your Honor.

17           MR. ROLLIN:  Thank you, your Honor.

18  BY MR. ROLLIN:

19  Q.  When Och-Ziff purchased --

20           THE COURT:  The truth is, the special purpose vehicles

21  are really holding companies for various securities that you

22  place for your various clients, and the special purpose

23  vehicles are a convenient place to keep these securities?

24           THE WITNESS:  Correct.  I believe there are some

25  administrative efficiencies or tax reasons for them.

E78PTRU1                        Mago - direct

1             THE COURT:  Yes.  And so it's all a bookkeeping

2    enterprise.  You keep on your books the entitlements of your

3    various clients to the securities held in Scepter?

4             THE WITNESS:  That's correct.

5             THE COURT:  Go ahead.

6    BY MR. ROLLIN:

7    Q.  Does Scepter hold an economic interest in the notes?

8             THE COURT:  No.  It's a special purpose vehicle.  The

9    whole idea is it doesn't, right?

10            THE WITNESS:  The funds hold an interest in the SPV,

11   which is just a holding vehicle to keep the bonds.  Eventually

12   the economic interests of the bonds are held by various funds.

13   Scepter is just an intermediary.

14            THE COURT:  They're held for the benefit of the

15   various funds.  The real parties in interest are the

16   beneficiaries?

17            THE WITNESS:  That's correct.

18   BY MR. ROLLIN:

19   Q.  Now, Och-Ziff, when it made its first purchase in January

20   of 2012, was aware of the discrepancy between the indenture and

21   the Prospectus Supplement?

22            THE COURT:  Ask the question without reading the

23   question.  You're not testifying, Mr. Rollin.  The witness is

24   testifying.  The witness has some knowledge to bring, elicit it

25   but don't lead him.

```
 1              MR. ROLLIN:  I believe he's an adverse witness, your
 2     Honor.
 3              THE COURT:  He's not an adverse witness.  He's a
 4     witness you called.  I've not seen any adversity at all.
 5     BY MR. ROLLIN:
 6     Q.  Were you aware of the discrepancy between the indenture and
 7     the Prospectus?
 8              THE COURT:  Don't lead him.
 9     Q.  Did Och-Ziff know that the indenture was drafted to
10     allocate the realized losses per the A-2 notes and then the A-3
11     notes?
12     A.  We did.
13     Q.  And did you know that before Och-Ziff purchased the notes?
14              THE COURT:  Who bought, you?
15              THE WITNESS:  Yes, I was involved.
16              THE COURT:  So what did you know?
17              THE WITNESS:  At the time when we bought our first --
18     when we made our first purchase in January of 2012, during our
19     due diligence process, we looked at a number of things.  One of
20     them --
21              THE COURT:  Try to use "I."  I want to know what you
22     know.
23              THE WITNESS:  Sure.  As a part of the investment
24     process, I follow a number of steps to do various aspects of
25     the bond.
```

1           THE COURT:  Sorry, you follow what?

2           THE WITNESS:  A number of processes to conduct due

3   diligence on the bond.  One of those processes is understanding

4   the structure of the deal.  In this particular deal, I was

5   aware of a discrepancy between the indenture and the Pro Supp.

6           THE COURT:  You were aware of discrepancies between

7   what?

8           THE WITNESS:  The indenture and the Prospectus

9   Supplement.

10          THE COURT:  Between the indenture and the?

11          THE WITNESS:  Prospectus Supplement.

12          THE COURT:  Okay.

13          THE WITNESS:  And there were a number of things that

14  pointed to that and, therefore, in our due diligence we

15  examined that issue in detail.

16  BY MR. ROLLIN:

17  Q.  And was that very discrepancy one of the factors that you

18  considered in choosing to buy --

19          THE COURT:  Mr. Rollin?

20  Q.  -- the note?

21          THE COURT:  You know, ask that question so it's

22  permissible.

23          MR. ROLLIN:  I'm sorry, I didn't understand.

24          THE COURT:  How do you ask that question in an

25  admissible manner?  What do you mean by discrepancy?  That's

E78PTRU1                          Mago - direct

1   how you do.  You listen to the witness, not your notes.  You

2   listen to the witness and you pick up on what the witness said.

3              What do you mean by discrepancy?

4              THE WITNESS:  What I mean is that the allocation of

5   losses, as it was written in the indenture, was different than

6   the allocation of losses in the Prospectus Supplement.

7              THE COURT:  How so?

8              THE WITNESS:  In the indenture, losses are allocated

9   first to the 1-A-2 bonds and then to the 1-A-3's.  Whereas, in

10  the Prospectus Supplement, the order is first with the 1-A-3

11  and then to the 1-A-2.

12             THE COURT:  And what significance, if any, did this

13  have in your decision to invest?

14             THE WITNESS:  It is a very significant difference,

15  given that the underlying credit performance of these mortgages

16  was fairly distressed and, therefore, losses were expected to

17  reach the AAA portion of the capital structure.  And,

18  therefore, it matters whether first losses go to the 1-A-3 or

19  to the 1-A-2.

20             The way that we incorporated that -- or I incorporated

21  that in my investment process is that I looked at the value of

22  the bonds under both those scenarios, with the 1-A-2 being

23  either senior or junior to the 1-A-3, evaluated the price of

24  the bond.

25             THE COURT:  How do you do that?

1                THE WITNESS:  So there are a couple of steps.  The

2      first step is --

3                THE COURT:  Stop a minute.  Do you see what you're

4      doing when you ask questions?

5                MR. ROLLIN:  Thank you, your Honor.

6                THE COURT:  Go ahead.  Continue.

7                THE WITNESS:  There's a couple of steps.  The first

8      starting point is to come up with some assumptions on the

9      underlying collateral itself.  We have a number of models that

10     come up with what are expected prepayment rates, default rates,

11     loss severity rates.

12               THE COURT:  These things, in effect, are fundamental

13     analyses of values of bonds?

14               THE WITNESS:  Correct.  You need to understand what

15     the underlying collateral is worth.  So the starting --

16               THE COURT:  Give you an idea of the chances that there

17     will or will not be enough interest money passing through to

18     pay the holders of the 1-A-2 and 1-A-3 notes?

19               THE WITNESS:  Correct.

20               THE COURT:  And, therefore, the preference or the

21     priority of payment becomes a very important investment

22     consideration?

23               THE WITNESS:  Correct.  So the first step is

24     understanding how much worth you expect from future collateral

25     performance.  The next --

1              THE COURT:  How much worth, did you say?

2              THE WITNESS:  The first step is to understand how much

3      the underlying collateral is worth, or what you expect for

4      future collateral default and severity.

5              The next step is then to translate that to the cash

6      flows of the underlying bond.  Me and other market participants

7      use the industry standard called Intex.

8              THE COURT:  Spell that.

9              THE WITNESS:  I-n-t-e-x, is the name of the tool.  I

10     believe it's used by the vast majority of participants as a

11     tool.  That's a place where you input collateral assumptions,

12     and then what it does is it simulates the waterfall of the

13     deal.  Meaning, it takes the underlying collateral cash flows

14     and distributes that among the various tranches.  In this

15     particular example --

16             THE COURT:  The tranches are the equivalents of the

17     series of notes?

18             THE WITNESS:  Correct.

19             THE COURT:  The 1-A-1, 1-A-2, 1-A-3 each is a tranche?

20             THE WITNESS:  That is correct.  In this particular

21     deal, Intex has information or a series of notes in there which

22     identifies this discrepancy between the indenture and the Pro

23     Supp, and it did have that same information when we made our

24     first purchase.  That was one of the many things that led us to

25     then explore further.  And Intex also gives the user the

E78PTRU1                         Mago - direct

1    ability to toggle that order of seniority between the 1-A-2 and

2    the 1-A-3.

3              THE COURT:  What do you mean by that?

4              THE WITNESS:  Meaning, you can run various scenarios.

5    You can run a first scenario, where you assume that the 1-A-2

6    takes losses after the 1-A-3, and you can run another scenario

7    where you would reverse that and you say that the 1-A-2 takes

8    losses first and 1-A-3 later.

9              And so going back to our analysis, we came up with

10   fundamental collateral assumptions, then input that into this

11   tool called Intex, and then ran it both ways, came up with what

12   the price of the bond would be under both those scenarios and

13   then assigned a possibility to what we thought was a level

14   of -- was a level that we were comfortable paying that -- given

15   our own risk tolerance.

16             THE COURT:  Say that again, "a level that we were

17   comfortable paying that -- given our own risk tolerance," what

18   do you mean by that?

19             THE WITNESS:  Meaning, in effect, assigning some

20   probability to those two outcomes.  And so, in general, the way

21   that we looked at this bond is look at it under both those

22   scenarios, which are the two boundary cases, and then look to

23   pay a price in between those two extreme scenarios, which

24   accounts for the level of risk that we are willing to take.

25             THE COURT:  Was there a market for these bonds?

1           THE WITNESS:  In general, in non-agency RMBS market --

2      RMBS stands for residential mortgage-backed securities -- in

3      that market there is no one place where traders or analysts can

4      go to observe the price of a bond, unlike stocks that are

5      listed on an exchange.  The only price transparency that one

6      gets is when a bond actually trades, and so to the extent that

7      there were some trades that -- in the market, those were the

8      only observations of market price.

9           THE COURT:  Did you have the benefit of seeing any

10     market pricing at the time?

11          THE WITNESS:  No, your Honor.  The first purchase that

12     we made, we were not aware of any other prior trade.

13          THE COURT:  There were no other prior trades you saw?

14          THE WITNESS:  That's correct, not within a certain

15     time period.  Meaning, you don't want to go back two years.

16          THE COURT:  So how do you fix a price, through

17     negotiation?

18          THE WITNESS:  Well, there is some generic -- all

19     market participants have their own margins and their own

20     estimates of what yields what a similar risk is trading at.

21     And so it's largely a process of trademarking versus other

22     similar bonds.

23          THE COURT:  How do you know who has bonds to sell?

24          THE WITNESS:  In this particular case, or in general?

25          THE COURT:  In this particular case.

1              THE WITNESS:  Well, bonds come out to sell -- you

2     can't really go and try to active -- it's generally hard to go

3     out and actively source this fund.

4              THE COURT:  Yes, because if somebody knows you're

5     interested, the price will be jacked up.

6              THE WITNESS:  That's one of the factors, but also,

7     there are holders that just buy as investors, who don't want to

8     sell or don't need to sell.  In general, all the trades that

9     we've been involved with have largely been in response to a

10    seller that came out and was willing to sell.

11             THE COURT:  So some holder of these bonds wanted to

12    sell?

13             THE WITNESS:  Correct.

14             THE COURT:  And was the holder a 1-A-2 holder or 1-A-3

15    holder?

16             THE WITNESS:  In the cases in the bonds that we

17    bought, we always bought the 1-A-2; so the holder was a 1-A-2

18    holder.

19             THE COURT:  The 1-A-2 holder was selling?

20             THE WITNESS:  Correct.

21             THE COURT:  Did you, yourself, learn from some other

22    person that someone was interested to sell, or did someone in

23    your company let you know that?

24             THE WITNESS:  It varied for the three purchases.  In

25    the first purchase, this bond was a part of a large portfolio

1    that we saw from a seller, and so they showed us an entire

2    portfolio of bonds and this was one of them, and we purchased

3    the entire portfolio.

4            I believe in the next two purchases, these were bonds

5    that were put on auction through what is known as a BWIC

6    process.  It means bid wanted in competition, also known as a

7    BWIC.  That's a general process that a number of sellers

8    follow, where if you have a list of bonds to sell, you send out

9    that typically Bloomberg message to a number of broker-dealers.

10   They then, in turn, forward it on to the various clients on

11   their distribution list that there is a particular time for the

12   auction.  The broker-dealer then collects that bid, and then

13   submit it back to the seller, and the seller has the option at

14   that point to decide to sell the bond or not.  So the next two

15   purchases were made in those BWIC processes.

16           THE COURT:  Continue, Mr. Rollin.

17           MR. ROLLIN:  Thank you, your Honor.

18   BY MR. ROLLIN:

19   Q.  You talked, Mr. Mago, about probability of waiting in your

20   response to one of the Court's questions.  What were the two

21   outcomes that you were considering before your first purchase

22   of the A-2 notes?

23   A.  As I mentioned, the two outcomes were -- Intex provides

24   this toggle or the switch, where you can change the priority of

25   losses between the 1-A-2 and the 1-A-3.  And so in addition to

E78PTRU1                        Mago - direct

1    running our various collateral assumptions, we also then, for a

2    given collateral assumption, looked at the structure in those

3    two different ways -- first, with the 1-A-2 being senior;

4    second, with the 1-A-2 being junior -- that then resulted in

5    two different prices, which in our models are two boundary

6    cases.

7              THE COURT:  What does a boundary case mean?

8              THE WITNESS:  Meaning that's the -- those are the two

9    goalposts.  It's either -- it's a binary outcome of whether the

10   1-A-2 is junior or if it's senior.  And so we run the two

11   different bonds two different ways, and then get the two

12   different prices.  And the way that I approached it was taking

13   off where, between those two prices, we feel comfortable from a

14   risk reward standpoint to finally pick.

15             THE COURT:  You found some comfortable mean between

16   the two?

17             THE WITNESS:  Correct.

18   BY MR. ROLLIN:

19   Q.  Do you understand that --

20             THE COURT:  If the price you can get it was better

21   than that, you bought; if it was worse than that, you went

22   away?

23             THE WITNESS:  That's correct.  Theoretically, for

24   example, there are certain cases where, as a buyer, you want to

25   obviously buy it for as low a price as possible, and there are

1    a number of variables that go into this analysis with this

2    structure component being one of them.

3            They put the case where there's a seller of the bond

4    at a price even below our low price and so, obviously, we would

5    buy it as low as possible.  But there was always a max that we

6    were willing to pay up to, which was determined by our own

7    risk-reward analysis.

8            THE COURT:  How much time do you have to do this

9    analysis?

10           THE WITNESS:  It varies depending on the process.  In

11   the first purchase, we bought a large portfolio, and I don't

12   exactly recall, but my guess is we probably had over a day to

13   look at the whole portfolio of bonds.  And so typically on a

14   given bond, it takes anywhere between half an hour to a few

15   hours of work, depending on what the complexity of the bond is.

16           For this particular bond, the higher end of the

17   spectrum, given the additional complexity around the allocation

18   of losses.

19           THE COURT:  I feel this is worth a week in B school.

20   Continue.

21           MR. ROLLIN:  Thank you.

22   BY MR. ROLLIN:

23   Q.  At Och-Ziff, do you maintain a tool called bid history?

24   A.  Yes, that's correct.

25   Q.  And is that an internal tool that was created to store and

1   share information about bonds?

2   A.  It's a tool that was created for the purpose of storing

3   information, information about various bonds, yes.

4            THE COURT:  But you had no information about these

5   bonds, did you?  There was no market that you knew of?

6            THE WITNESS:  Yes, some of the information was our own

7   analysts, how they were analyzing the bonds.  In some cases it

8   was when we put the bonds out to sell, the prices we received

9   or what level we were looking for.  So the idea is whenever an

10  analyst or a trader looks at a bond and wants to memorialize

11  any thoughts, that's one place where people save information,

12  and then that's accessible to a group of users.

13           MR. ROLLIN:  Exhibit BN, please, Page 1.

14  Q.  Mr. Mago, is this --

15           MR. ROLLIN:  Your Honor, may I approach with

16  Exhibit BN?

17           THE COURT:  Yes.

18  BY MR. ROLLIN:

19  Q.  Mr. Mago, I've handed you a copy of a document marked for

20  identification as Exhibit BN, B as in boy, N as in Nora.

21  A.  Yes.

22  Q.  Is this a printout from the bid history tool maintained at

23  Och-Ziff?

24           THE COURT:  Mr. Rollin?

25           MR. ROLLIN:  Yes.

E78PTRU1                         Mago - direct

1          THE COURT:  Did you create this chart?

2     BY MR. ROLLIN:

3     Q.   Did you create this chart?

4     A.   The information that is presented here was created by users

5     at Och-Ziff.

6          THE COURT:  By what?

7          THE WITNESS:  By various analysts and traders at

8     Och-Ziff.

9          THE COURT:  Did you use this chart in your analysis?

10          THE WITNESS:  Yes.

11          THE COURT:  Go ahead.  Continue.

12          MR. ROLLIN:  Thank you, your Honor.  I move the

13     admission of BN.

14          THE COURT:  That's the foundation?

15          MR. ROLLIN:  If I need more, I'll do more.

16          THE COURT:  You need more.

17          MR. ROLLIN:  But I don't believe it's objected to.

18          THE COURT:  I'm telling you, you need more.

19          MR. ROLLIN:  Thank you.

20          THE COURT:  You conduct the B class.  I'll conduct the

21     legal evidence class.  How do you put in a document?

22          MR. ROLLIN:  Your Honor, the parties exchanged

23     documents --

24          THE COURT:  How do you put in a document?

25          MR. ROLLIN:  You lay a foundation.

E78PTRU1                            Mago - direct

1            THE COURT:  Do it.

2            MR. ROLLIN:  Thank you.

3    BY MR. ROLLIN:

4    Q.  Are the notes that are made in exhibit --

5            THE COURT:  Is this document regularly kept in the

6    regular course of business?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  Was it the regular course of business to

9    have such documents?

10           THE WITNESS:  Yes, your Honor.

11           THE COURT:  Is this the actual material you used in

12   analyzing the bonds?

13           THE WITNESS:  This is one of the many things we used.

14           THE COURT:  I offer it into evidence.

15           MR. ROLLIN:  I offer it into evidence.  Thank you.

16           THE COURT:  Any objection?

17           MR. PICKHARDT:  No, your Honor.

18           THE COURT:  Received.

19           (Defendant's Exhibit BN received in evidence)

20   BY MR. ROLLIN:

21   Q.  Can you please turn to Page 4 in this document?

22   A.  Okay.

23   Q.  If it's easier to look at the screen, we've highlighted a

24   couple of boxes, portions of which I will ask you about, but

25   you may also look at the piece of paper in front of you if you

1    prefer.

2    A.   Sure.

3    Q.   Are the top -- do you see column L on Page 4?

4    A.   Yes.

5    Q.   And is column L where the analyst at Och-Ziff reports

6    notes, at least one of the places where some notes are found,

7    with respect to your analysis?

8    A.   That's correct.

9    Q.   And the first note, I'd like to ask you about the first two

10   sentences in the top cell.  Will you please read the first

11   sentence?

12        THE COURT:  We all can read it.  It's in evidence.

13   What do you want to ask?

14        MR. ROLLIN:  Thank you.

15   BY MR. ROLLIN:

16   Q.   Is it true -- Strike that.  Was Och-Ziff working to see if

17   there was a possibility to make the trustee follow the loss

18   allocation language in the Prospectus Supplement?

19        THE COURT:  Come on, don't lead the witness.  Did you

20   notice the discrepancy?  What did you do after you did this

21   analysis?  That's how to ask a question.

22        MR. ROLLIN:  Your Honor, I'm interested in the -- in

23   particular parts of it.  I think they'll be very informative

24   for the Court; so I will try to ask it in a non-leading way.

25   I'd like Mr. Mago to tell us what the first sentence in the

E78PTRU1                      Mago - direct

1    first cell means.

2              THE COURT:  It's of no value to me.

3    BY MR. ROLLIN:

4    Q.  Was Och-Ziff --

5              THE COURT:  Everything you do has to do with

6    credibility.

7              MR. ROLLIN:  I'm sorry?

8              THE COURT:  Everything has to do with credibility.  If

9    you want to score points through a witness, do it in a way that

10   will cause the Court to listen to the witness and assign

11   credibility factors to it.  If you ask the questions in that

12   way, you're testifying, not the witness, and that means zero

13   credibility.

14   BY MR. ROLLIN:

15   Q.  Does the first sentence reflect the discrepancy about which

16   you testified?

17             THE COURT:  Did you have any conversations with anyone

18   who had to do with the issuance of the bonds?

19             THE WITNESS:  We did have a conversation with the

20   truss --

21             THE COURT:  Try to use "I."

22             THE WITNESS:  Your Honor, I had one conversation --

23   actually, a couple of exchanges with Wells Fargo, who is the

24   securities admin.

25             THE COURT:  Okay.  With whom did you speak?

1            THE WITNESS:  Daniel Cohen.

2            THE COURT:  That's how you do it.  What did you say to

3   him, when?  What did you say to him?  What did he say to you?

4            THE WITNESS:  Your Honor, I don't recall the exact

5   date.  I believe that was -- that's available to --

6            THE COURT:  Well, you know you bought in January of

7   2012?

8            THE WITNESS:  Right.

9            THE COURT:  Was it before then?

10           THE WITNESS:  No, your Honor.  It was some point after

11  that we had a conversation with --

12           THE COURT:  You also bought in December 2013.  Was it

13  before then?

14           THE WITNESS:  The conversation I had was in between

15  those two dates.

16           THE COURT:  Between January 2012 and December 2013?

17           THE WITNESS:  Correct, your Honor.  And the

18  conversation was to talk to the trustee to understand -- or I

19  believe it was the securities admin, to understand how they

20  looked at this issue of the discrepancy between the indenture

21  and the Prospectus Supplement.

22           THE COURT:  So what did you say and what did they say?

23           THE WITNESS:  The conversation that I had, we also had

24  our internal counsel on the phone with Dan Cohen.  We pointed

25  out the discrepancy between the indenture and the Pro Supp.

E78PTRU1                         Mago - direct

1              THE COURT:  Dan Cohen is at Wells Fargo?

2              THE WITNESS:  That's correct, your Honor.

3              THE COURT:  You pointed out the discrepancy.  What did

4    Mr. Cohen say?

5              THE WITNESS:  He pointed out the section of the

6    indenture which related to an amendment and mentioned that in

7    order for an amendment of the documents, it would need a

8    hundred percent note holder consent, and so that was the

9    conversation that I had.

10             Subsequent to that, there were other conversations

11   that our internal counsel had with Deutsche Bank, the trustee,

12   and Wells Fargo, the securities admin.  I was not personally

13   involved in those conversations, but that happened at a later

14   point.

15   BY MR. ROLLIN:

16   Q.  Did you advocate for a reversal of the loss allocation

17   priority?

18             THE COURT:  Is that -- Did you tell us everything that

19   you remember from the conversation?

20             THE WITNESS:  Yes, your Honor, in terms of the

21   conversation that I had with Dan Cohen.

22   BY MR. ROLLIN:

23   Q.  In the first cell, the first line, is there a pricing

24   analysis of the A-2 bond at that time?

25   A.  So just to give context, this rule 19 is an entry.  If you

 1    go to Page 3, the user who made this entry is Chen Chen.  He's
 2    one of the analysts that works for me in our group, and so
 3    these are his comments.  And so I would be reading what he's
 4    saying, but I believe the second language is that the current
 5    market level, we think the bond is worth around ML 30 cents to
 6    mid to low 30s, as I believe his estimate of -- based on our
 7    collateral analysis, combined with our analysis and structure,
 8    his best guess, for where if we were to try to sell the bond,
 9    what the price would be.  But that's his estimate of market
10    price.
11    Q.  Now, if you look at the second cell, where it says the
12    sentence that begins "In the case that 1-A-2 is made senior to
13    1-A-3," is that a pricing analysis as to what would happen in
14    the event that the indenture loss allocation priority is
15    reversed?
16    A.  So rule 20, again, is an entry by Chen Chen, and so again
17    I'm integrating what he meant.  I think what he's referring to
18    is, as I mentioned before, the two goalposts, where we run the
19    bond under the two various outcomes of 1-A-2 being either
20    senior or junior.
21         And what that's saying is when the 1-A-2 being senior
22    to the 1-A-3, the price or the value of the 1-A-3 will drop
23    from mid to low 60s -- ML stands for mid to low -- 60s to
24    mid-teens, and that is his analysis of those two prices.
25    That's not an analysis of the market price.  That's just what

1    the two extreme outcomes are.

2            And again, as I mentioned, that's part of our

3    analysis, where for both the 1-A-2 and the 1-A-3, we would look

4    at what do those bonds worth in those two extreme bond cases.

5    Q.  And this says what would happen -- this shows the decrease

6    in the value of the 1-A-3, but what would be the corresponding

7    increase in the value of the 1-A-2 in the event of reversal?

8            MR. PICKHARDT:  Objection, foundation.

9            THE COURT:  Overruled.

10   A.  So if you read the line that says the value of the 1-A-3

11   will develop below 60 to low teens, around -- around 7 million

12   transfer of value from 1-A-3 to 1-A-2.  So by definition, once

13   you determine the underlying collateral value and collateral

14   assumptions, at that point, the only variable is where that

15   value goes.

16           And so what this comment is saying is that if you run

17   the two various -- if you run the two scenarios with 1-A-2

18   being senior or 1-A-3 being senior, the difference in those two

19   boundary conditions is 7 million.  And so the if the 1-A-3

20   loses, the 1-A-2 gains, and the other way around.

21   Q.  I understand this increase, the transfer of $7 million in

22   value from the 1-A-3 to the 1-A-2.  What I'm asking about is

23   the price.  If it was -- if the 1-A-2 was in the mid to low 30s

24   at the time, then based on the information available here, what

25   would be the new price of the 1-A-2 in the event of a reversal?

E78PTRU1                              Mago - direct

1                THE COURT:  He says that there's a 7 million value to

2     switching priorities, right?

3                MR. ROLLIN:  Yes.

4                THE WITNESS:  Correct, your Honor.

5                MR. ROLLIN:  I was asking a slightly -- so that your

6     Honor knows, I was asking just what the price would be

7     measured, using the same units of measurement in terms of

8     percentage of face value.

9     A.  So I don't have the current face at that point in time, but

10    if you take that 7 million and divide it by the current face of

11    the entire 1-A-2 bond, that would be the difference in price

12    between those two scenarios.

13               Again, just to clarify, this is not the change in

14    market price.  This is just -- because, again, I think most

15    investors or prudent investors would look at those two

16    outcomes, and then the market price would be a level in between

17    those two goalposts.  And so this is just stating what those

18    two goalposts are, which is 7 million in value, in market value

19    terms.  If you divide that 7 million by the current face of the

20    1-A-2, you'll get the difference in price terms.  If you divide

21    it by the current face of the 1-A-3, you will get the

22    difference in price terms for the 1-A-3.

23               (Continued on next page)

24

25

E78JTRU2                          Mago - direct

1    Q.  Point of clarification.  In the first line of cell 19, it

2    says at the end of the sentence, PSA.  Does that mean indenture

3    in this case?

4    A.  Correct, we used that interchangeably.

5    Q.  Ordinarily PSA, is that employee servicing agreement?

6    A.  That is correct.

7    Q.  What is your most recent price observation for the 1-A-2

8    class of notes?

9              THE COURT:  On what assumption?  Do you have to know

10   the assumption before you get the price?

11             THE WITNESS:  I believe what he is asking, when we

12   last observed the market price, is that the question?

13             MR. ROLLIN:  That is the question.

14             THE COURT:  When did you last observe a market price

15   on the 1-A-2 notes?

16             THE WITNESS:  The last observed market price would be

17   our last purchase, which I believe was in March of 2014 where

18   we got our last purchase.

19   BY MR. ROLLIN:

20   Q.  That was about 45?

21   A.  In that context.

22             THE COURT:  44.688.

23             MR. ROLLIN:  Thank you.

24   BY MR. ROLLIN:

25   Q.  Does that mean the A-2 notes have appreciated in value

1   since the first purchase until your most recent price

2   observation?

3   A.   That means yes, they are willing to pay more than what we

4   paid more in January 2012.  Again we don't have information

5   what somebody else would pay for the bonds.  In general, the

6   market for non-agency securities has appreciated over that time

7   period.

8           THE COURT:  The entire market?

9           THE WITNESS:  That's correct, your Honor.

10  BY MR. ROLLIN:

11  Q.   In December of 2013 when you made the purchase for 42.6488,

12  was there a second-best bid at the time?

13  A.   Yes, I believe so.

14  Q.   Does that referred to sometimes as a cover?

15  A.   That's correct.

16  Q.   What was the cover?

17          MR. PICKHARDT:  Objection; hearsay.

18  A.   I don't recall.

19          THE COURT:  Overruled.

20  A.   I don't recall an exact cover.

21          THE COURT:  What is a cover?

22          THE WITNESS:  A cover is the second-best price in an

23  auction.  So, for example, it would be in the final bond that

24  42, the cover is the next best paid behind us, and so the

25  purchase that we made in December was a part of the process

1    which is that auction process I said before.

2              We were high bid and we bought the bonds.  There were

3    a number of other bidders.  By that time there is always a

4    cover.  I don't have that cover price handy.

5    BY MR. ROLLIN:

6    Q.  Did you know at one time, but you just don't remember what

7    it is now?

8    A.  Yes, we would have known it at that time.  Typically any

9    buyer, you get the cover information.

10   Q.  Is there anything in Exhibit BN that would refresh your

11   recollection about the cover?

12   A.  Not as it relates to the December purchase.

13   Q.  Do you know who covered the bond?

14   A.  I am sorry.  Is the question what dealer was the cover?

15   Q.  Do you know who the purchaser, the bidder was that provided

16   that second best offer?

17   A.  No, that is not information that is available in the

18   marketplace.

19             MR. ROLLIN:  You can take down that exhibit.  Thank

20   you.

21   BY MR. ROLLIN:

22   Q.  You mentioned a tool earlier called Intex, correct?

23   A.  Correct.

24   Q.  Is Intex a tool you use in your work?

25             THE COURT:  He already said so.

E78JTRU2                          Mago - direct

1                  MR. ROLLIN:  TX-254, please.

2                  MR. ROLLIN:  May I approach with the exhibit, your

3      Honor?

4                  THE COURT:  Yes.

5                  (Pause)

6      BY MR. ROLLIN:

7      Q.  Mr. Mago I have placed before you TX-254.  Do you recognize

8      that document?

9      A.  I do.

10     Q.  What is that document?

11     A.  This is a screen-shot from the Intex application for the

12     AHMIT 2005-2 deal.

13     Q.  Did you produce this screen-shot?

14     A.  Meaning?

15     Q.  Did you take this screen-shot?

16                 THE COURT:  Did you use this information on this

17     screen-shot in your analysis?

18                 THE WITNESS:  We did, your Honor.

19                 MR. ROLLIN:  I move the admission of TX-254.

20                 MR. PICKHARDT:  No objection, your Honor.

21                 THE COURT:  Received.

22                 (Defendant Exhibit TX-254 received in evidence)

23                 THE COURT:  How is this going to help me, Mr. Rollin?

24                 MR. ROLLIN:  If you give me just a moment, your Honor,

25     I think you'll see this document from Intex shows Intex has to

E78JTRU2                          Mago - direct

```
1    perform a fix in its cash flow model to show that the indenture
2    governed the allocation of realized losses.
3              THE COURT:  He said in the testimony that he took a
4    best-case analysis and took a worst-case analysis.  By the
5    1-A-2 notes, he took best-case analysis to see what would be
6    its value if it had priority.  He did a worst-case analysis to
7    see what its value would be if it didn't have priority.  You
8    are just pounding the obvious.
9              MR. ROLLIN:  It is a slightly different point, if I
10   may inquire?
11             THE COURT:  You may inquire.  It is not going to help
12   you.
13   BY MR. ROLLIN:
14   Q.  Is the default in Intex toggled to the indenture?
15             THE COURT:  Do you know what he means?
16             THE WITNESS:  Yes.
17             THE COURT:  Don't guess if you don't know what.
18   A.  What do you mean?
19   Q.  When you run the bond on Intex, pull up this sheet TX-254,
20   it is preset to indenture, and if you want to look at ProSupp
21   you have to toggle up to --
22             THE COURT:  What is the difference?  It is a computer
23   design.
24             MR. ROLLIN:  Intex recognizes, and this is what the
25   market views that the indenture --
```

E78JTRU2                         Mago - direct

```
 1              THE COURT:  Objection?

 2              MR. PICKHARDT:  Yes, your Honor.

 3              THE COURT:  Sustained.

 4    BY MR. ROLLIN:

 5    Q.  Was there a change in Intex based on your observation as to

 6    the way it modeled the cash flows?

 7              THE COURT:  Who created the model?  Who created the

 8    application Intex?

 9              THE WITNESS:  An independent, third-party company.

10              THE COURT:  You are not getting anywhere with it.

11              MR. ROLLIN:  Very well, your Honor.

12    BY MR. ROLLIN:

13    Q.  Did you view the screen that is TX-254 before you made the

14    first purchase?

15    A.  Yes, we viewed the screen.

16              MR. ROLLIN:  Would you take that down.  Thank you.

17              THE COURT:  Is that how you used that document?

18              MR. ROLLIN:  I believe that is how your Honor has let

19    me use that document.  I'll make argument based on its contents

20    now that it is in evidence.

21              THE COURT:  It has no value.  You can make whatever

22    arguments you want, but it has no value.  That is how the Intex

23    is set.  It has to be set on various assumptions.  Apparently,

24    the assumption used was to follow the indenture.  It has no

25    value.
```

E78JTRU2                              Mago - direct

1    BY MR. ROLLIN:

2    Q.  Is the Intex data available to market participants based on

3    what you've seen?

4    A.  Is the Intex application available with --

5    Q.  Yes?

6    A.  You need to be a subscriber once you are --

7    Q.  So somebody who was -- is it true somebody who was?

8              THE COURT:  Anybody who bought the app and was

9    entitled to use it would find the app, and that was what it

10   showed.  It is based on an assumption of the indenture being

11   controlled.  I have it.

12             MR. ROLLIN:  TX-244, please.

13             MR. ROLLIN:  May I approach with 244?

14             THE COURT:  Did you ever read the indenture?

15             THE WITNESS:  Yes, your Honor.

16             THE COURT:  You read the ProSupp?

17             THE WITNESS:  Yes.

18             THE COURT:  How do you get the indenture?

19             THE WITNESS:  Typically, one needs to go to where the

20   indentures are filed.

21             THE COURT:  You take it off the web page?

22             THE WITNESS:  Correct.  It is a little bit of an

23   exercise to find where it is available.

24             THE COURT:  Sorry?

25             THE WITNESS:  It is not easy to find always, but it is

E78JTRU2                        Mago - direct

1    generally available there.

2             THE COURT:  Theoretically, it should be available?

3             THE WITNESS:  Theoretically.  It is not always

4    available.  I am not sure why, but I would say 90 percent of

5    the case you can find it.

6             THE COURT:  90 percent, it is available?

7             THE WITNESS:  Correct.

8             THE COURT:  Okay.

9    BY MR. ROLLIN:

10   Q.  When you run this bond on Blumberg, is the indenture linked

11   right there on the screen?

12   A.  For this particular one, Blumberg has the indenture.

13   Q.  You just click on that link, and it opens the indenture,

14   right?

15   A.  For this bond, correct.

16   Q.  You have access to that?

17   A.  Yes.

18   Q.  Is that what you did?

19            THE COURT:  How did you note the discrepancy with the

20   ProSupp?

21            THE WITNESS:  The process, your Honor, was, in that

22   instance we -- I don't think we have talked about this -- we

23   talked about it at deposition.  We had an over sheet called a

24   lookout sheet.  Given that there are thousands of years in the

25   non-agency universe, whenever there is some nonstandard

E78JTRU2                        Mago - direct

1    language or something to be careful about, we maintain an
2    internal sheet called the lookout sheet.  That gets populated
3    by various analysts that work in my group and occasionally by
4    me.
5           For this particular deal, there was a Moody's report,
6    a rating agency report I believe in the beginning of 2011 which
7    listed this deal amongst others as having conflicting language
8    between the indenture and the ProSupp.
9           Our analysts looked at that report and then entered it
10   into the lookout sheet.  That lookout sheet gets pulled in as
11   one of the main things we look at when we look at a bond.  When
12   we first looked at it in January 2012, the bond was in the
13   lookout sheet, and so we noticed the discrepancy.
14          There was also the price snapshot on the prior
15   exhibit, Exhibit 254, which is a snapshot which highlighted the
16   discrepancy, and there is another screen-shot in Intex where
17   you use puts as options which has the toggles to switch the
18   order of priority.  We noticed all of that.
19          We noticed other things that are convention of the
20   bonds and the coupon of the bonds when the deal is priced which
21   then told us that we need to do more work on that issue.  That
22   then prompted us to go and look at the indenture.
23          THE COURT:  Does the existence of a discrepancy like
24   this add to the risks of an investment?
25          THE WITNESS:  It does.

 1             THE COURT:  Depending on the price, does it a also

 2    enhance the potential rewards of an investment?

 3             THE WITNESS:  Yes, it does.

 4             THE COURT:  So it is important to understand as best

 5    you can all the potential upside and all the potential downside

 6    of an investment like this?

 7             THE WITNESS:  Correct.

 8             THE COURT:  Which is the purpose of your analysis?

 9             THE WITNESS:  Correct.

10             THE COURT:  If the price is above or below a certain

11    point, that may add to the opportunities or detract from the

12    opportunities?

13             THE WITNESS:  That's correct.

14             THE COURT:  Add to the risk or reduce the risk?

15             THE WITNESS:  Correct.

16             THE COURT:  It is all a function of price?

17             THE WITNESS:  Correct.

18    BY MR. ROLLIN:

19    Q.  You mentioned a Moody's press release I think a moment ago?

20    A.  There is a Moody's report which is different from this

21    Exhibit 244.  It even has the same information.

22    Q.  Did you see the information from Moody's prior to making

23    the purchase?

24    A.  Yes, we did.

25    Q.  Did you see the press release that is Exhibit 244 in front

E78JTRU2                      Mago - direct

1    of you?

2    A.  No, we did not look at the press release, but the relevant

3    information here -- give me a second to review it.

4              (Pause)  So under, if you look at Exhibit 244 under

5    "Ratings Rationale," the first paragraph, that information was

6    also available in that Moody's report that was published in

7    2011.  That is something that we had looked at which then made

8    its way to our lookout sheet, and so we had access to this

9    information before we purchased the bond.

10   Q.  That includes the sentence that is three from the bottom

11   that says, "The trustee has confirmed that they will be

12   following the PSA"?

13   A.  I don't recall.  I am not a hundred percent sure it had

14   that sentence.

15   Q.  Are there any other sentences in here that you think may or

16   may not have been what you looked at from Moody's?

17   A.  I don't recall the exact language.  We can pull up that

18   report and see what exactly it says, but I do recall and know

19   that that report noted the discrepancy.

20             So, for example, I don't know if it said it in these

21   exact lines, but it said from the fourth line realized losses

22   with respect to the mortgage bonds and reallocated to 1-A-3 and

23   other -- that basic content was also in that Moody's report and

24   was made us aware of the discrepancy.  I am not sure of the

25   exact language.

1    Q.   Did you have calls with the trustee?

2    A.   As I mentioned, after we purchased the bond, we had a

3    conversation with the trustee.

4    Q.   That was after your purchase, your first purchase, but the

5    second two purchases had not happened yet.  Is that right?

6    A.   That's correct.

7    Q.   Did the trustee tell you they were going to follow the

8    indenture?

9    A.   As I mentioned previously, the discussion was that as per

10   the reading of the documents, the only way that they ordered

11   amendment was possible was with a consent.

12          I don't believe there was any discussion of what

13   future steps they would follow or how it would evolve, but

14   there was more discussion about what the documents said

15   around --

16   Q.   Did you make any purchases after you already knew that a

17   consent solicitation had failed?

18   A.   Yes.

19          MR. PICKHARDT:  Objection, your Honor.

20          THE COURT:  Objection sustained.

21   BY MR. ROLLIN:

22   Q.   Did you come to learn at some point that Wells Fargo sent a

23   consent solicitation for reversal of the loss allocation

24   priority?

25          MR. PICKHARDT:  Objection, your Honor.

E78JTRU2                          Mago - direct

1                    THE COURT:  Overruled.

2                    THE WITNESS:  Can you repeat the question.

3                    THE COURT:  Did you come to know if there had been

4      some solicitation by the trustee to all note-holders to consent

5      to the amendment?

6                    THE WITNESS:  Yes, your Honor.

7                    THE COURT:  When did you find that out?  When did you

8      learn that?

9                    THE WITNESS:  I don't recall the exact date, but it

10     was, I believe, after -- probably after the consent

11     solicitation had been sent out and after it failed.

12                   THE COURT:  Had you made all of your three purchases

13     by then?

14                   THE WITNESS:  No, your Honor.  That happened sometime

15     in 2013, and so we had our first purchase, and the second and

16     third purchases had not happened until then.

17     BY MR. ROLLIN:

18     Q.  Did the third purchase happen after this case was already

19     in litigation?

20     A.  The third purchase happened in March, so I believe, yes,

21     March of 2014.

22     Q.  Even though the consent solicitation failed, you made two

23     purchases anyway?

24                   THE COURT:  Let's not pound the obvious, please.

25                   MR. ROLLIN:  No further questions.

1            THE COURT:  Cross-examination.

2            MR. ROLLIN:  I move the admission of 244.

3            THE COURT:  254.

4            MR. ROLLIN:  244 was the last one.

5            THE COURT:  What was 244?

6            MR. PICKHARDT:  Your Honor, may I approach?

7            THE COURT:  One minute.

8            (Pause)

9            THE COURT:  Did you analyze 244 as part of your due

10   diligence?

11           THE WITNESS:  As I mentioned, your Honor, we didn't

12   look at 244.

13           THE COURT:  You did not?

14           THE WITNESS:  Correct, but we did look at the Moody's

15   report which essentially had similar information pointing out

16   the discrepancy.

17           THE COURT:  What do you want to do?

18           MR. PICKHARDT:  There is no objection from us.

19           THE COURT:  Received.

20           (Defendant Exhibit TX-244 received in evidence)

21           MR. ROLLIN:  For housekeeping, your Honor, do you have

22   254?  I think we moved that in.

23           THE COURT:  You did.

24   CROSS-EXAMINATION

25   BY MR. PICKHARDT:

1    Q.  Good morning, Mr. Mago.

2            Mr. Mago, you were asked some questions about Intex

3    and you were shown one screen out of the Intex application,

4    correct?

5    A.  That's correct.

6    Q.  Are there other screens within the Intex application that

7    you reviewed or relied upon in connection with your investment

8    decisions?

9    A.  We did.

10   Q.  I have put in front of you three exhibits which are labeled

11   as Exhibits TX-255, TX-256 and TX-257.

12           THE COURT:  He already said he toggled both ways, he

13   looked for maximum upside and maximum downside.

14           MR. PICKHARDT:  The only reason we want to put these

15   in evidence --

16           THE COURT:  Why?

17           MR. PICKHARDT:  We don't --

18           THE COURT:  Why?  I know.  I already learned.

19           MR. PICKHARDT:  What these exhibits include is some of

20   the texts that Intex provides to the marketplace describing the

21   discrepancy.

22           THE COURT:  Why should I care?

23           MR. PICKHARDT:  Your Honor, we are going to hear from

24   a witness that they were unaware of this information.  This is

25   the information that is available through the prevalent

1    application.  We to think it is going to be relevant for a

2    future witness.  Again, we are not intending to belabor --

3             THE COURT:  Make sure your witness can put it in.  It

4    is also outside the scope of the direct.  I think it is okay.

5             Do it.

6    BY MR. PICKHARDT:

7    Q.  Mr. Mago, are each of the screens reflected in Exhibits

8    TX-255, TX-256 and TX-257 screens that you reviewed in

9    connection with your purchases of the 1-A-2 bonds?

10   A.  Yes.

11   Q.  Do these screens reflect the toggle -- strike that.

12            Does TX-255 and TX-256 reflect the toggle between the

13   ProSupp and the indenture that you described?

14   A.  It does.

15   Q.  Does TX-257 include notes that are available to investors

16   to review if they are looking at a potential investment in

17   1-A-2 or 1-A-3 bonds?

18            MR. ROLLIN:  Objection; calls for speculation, lacks

19   foundation and relevance.

20            THE COURT:  Overruled.  One word, it is "objection."

21            THE WITNESS:  Yes.

22            MR. PICKHARDT:  Your Honor, at this time I would move

23   to admit Exhibits TX-255, TX-256 and TX-257.

24            THE COURT:  Received.

25            (Plaintiff Exhibits TX-255, TX-256 and TX-257 received

E78JTRU2                         Mago - cross

1    in evidence)

2    BY MR. PICKHARDT:

3    Q.  Mr. Mago, how prevalent is Intex in your industry?

4              MR. ROLLIN:  Objection, foundation -- objection.

5              THE COURT:  Overruled.

6    A.  Again it is the market standard to participants.  My guess

7    is 90 percent of participants have access, and that is the

8    primary force of analyzing structures.

9    BY MR. PICKHARDT:

10   Q.  You were asked a question about when you first made an

11   investment in these securities, your consideration of risk

12   associated with the discrepancy.  Do you recall that question?

13   A.  Yes.

14   Q.  You were asked a question about evaluating potential upside

15   and downside.  Is that right?

16   A.  Yes.

17   Q.  I am not going to ask you the substance of your

18   communications, but can you tell me whether, prior to your

19   investment, did you consult a lawyer with respect to the fact

20   that there was a discrepancy between two transactional

21   documents?

22   A.  Yes, we did.

23   Q.  Is that part of what you used in consideration of your

24   assessment of the potential upside and downside of the

25   investment?

E78JTRU2                          Mago – cross

 1   A.  Yes.

 2              MR. PICKHARDT:  I have no further questions.

 3              THE COURT:  Redirect?

 4              MR. ROLLIN:  Yes, your Honor.

 5   REDIRECT EXAMINATION

 6   BY MR. ROLLIN:

 7   Q.  Mr. Mago, in assessing the investment, what legal advice

 8   did you get?

 9              MR. PICKHARDT:  Objection, your Honor.

10              MR. ROLLIN:  They have put it at issue.  They have

11   opened the door by trying to use the receipt of legal advice.

12              THE COURT:  Objection sustained.

13   BY MR. ROLLIN:

14   Q.  Mr. Mago, do you know from your personal knowledge how any

15   other investors -- let me do it this way -- how all other

16   investors --

17              THE COURT:  He didn't testify.  He just knows what is

18   out there in Intex.  That is all he said.  That is all comes it

19   comes in for.  What other people did or did not do he doesn't

20   know.

21              MR. ROLLIN:  If that is all it comes in for, I have no

22   further questions.

23              THE COURT:  Thank you.

24              (Witness excused)

25              THE COURT:  Next witness.  Would the attorneys please

1    police the witness box.  Take all the stuff away.

2                 (Pause)

3                 MS. BRASWELL:  Your Honor, we would like to call Ms.

4    Davis to the stand.

5     RIA DAVIS,

6         called as a witness by the Defendants,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. BRASWELL:

10   Q.  Ms. Davis, where are you currently employed?

11   A.  I am employed at Semper Capital Management.

12   Q.  Can you tell the court what your position is at Semper

13   Capital Management.

14   A.  I am general counsel and chief compliance officer.

15   Q.  Was Semper formerly known by any other name?

16   A.  Semper has been known as Utendahl Capital Management, U T E

17   N D A H L, Capital Management, and then it was known as UCM

18   Partners, and then it changed its name to Semper Capital

19   Management in May of 2013.

20   Q.  If I refer to Semper today as Semper Utendahl, UCM, you

21   know I am --

22                 THE COURT:  You can do whatever you want as long as we

23   understand the question.

24   BY MS. BRASWELL:

25   Q.  So Semper Capital is Semper.

1           Ms. Davis how long have you been been employed by

2    Semper?

3    A.   A little over seven years.

4    Q.   Can you please describe your role as chief compliance

5    officer for Semper.

6    A.   As chief compliance officer for Semper, one of my jobs is

7    to participate in analysis of the portfolio with respect to

8    risk in the portfolio as well as reviewing marketing materials

9    and publicly-available information about the firm.

10   Q.   In that role, have you gained an understanding of Semper's

11   business decision-making process?

12   A.   Yes, I have.

13   Q.   Have you developed an understanding of how Semper operates

14   in the marketplace?

15   A.   Yes, I have.

16   Q.   Have you developed a general understanding of Semper's

17   investment strategies?

18   A.   Yes, I have.

19   Q.   On what basis have you developed that knowledge and

20   understanding?

21   A.   I participate in regular business meetings with senior

22   management and with the portfolio team.  I also do regular

23   reviews of the portfolio process, and we have weekly firm

24   meetings, marketing meetings and risk management meetings on

25   the portfolio and the investment process.

E78JTRU2                        Davis - direct

1   Q.  Ms. Davis, can you please tell the Court a little bit about

2   what Semper is, what they do and how they manage their funds.

3   A.  Semper is a registered investment advisor.  It is

4   registered with the Securities & Exchange Commission.  We

5   manage approximately $1.1 billion in client assets in various

6   privately-placed funds, public mutual funds and institutional

7   separately managed accounts.

8   Q.  Ms. Davis, without revealing any attorney-client privileged

9   communications can you please tell the court why Semper has

10  appeared as a party in interest in this case?

11              THE COURT:  You dropped your voice at the end.  Why

12  Semper?

13              MS. BRASWELL:  Has appeared as a party of interest in

14  this case.

15              MS. SHAH:  Objection.

16              THE COURT:  What is the objection?

17              MS. SHAH:  We don't think it is relevant, your Honor.

18  We believe this case has to do with --

19              THE COURT:  You are not challenging its standing?

20              MS. SHAH:  No.  It is just objectionable on its terms.

21              THE COURT:  Sustained.  It is a real party in

22  interest, and it is obvious it is acting on behalf of its

23  clients because of it's legal title to the investment.

24  BY MS. BRASWELL:

25  Q.  Ms. Davis, can you tell the court about who your clients

E78JTRU2                          Davis - direct

1    are and their relative interests in this litigation.

2              MS. SHAH:  Objection.

3              THE COURT:  The same objection.  The client is Semper.

4    Semper has beneficial interest in others that it must pay

5    attention to.  Let's move on to another point.

6              MS. BRASWELL:  I understand.

7    BY MS. BRASWELL:

8    Q.  Ms. Davis, I would like to ask you questions about this

9    case.  If I refer to AHMIT 2005-2, you know I am referring to

10   the trust at issue in this case?

11             THE COURT:  Just ask questions, please.

12             MS. BRASWELL:  Yes, your Honor.

13   BY MS. BRASWELL:

14   Q.  When did you first become involved with respect to AHMIT

15   2005-2, Ms. Davis?

16   A.  In May of 2013.

17   Q.  What prompted that involvement?

18   A.  We received a request from Wells Fargo, the securities

19   administrator, for the firm to consent to the amendment of the

20   indenture.

21             MS. BRASWELL:  I would like show TX-OO5, please.  I

22   approach the witness, your Honor?

23             THE COURT:  Yes.

24             (Pause)

25   BY MS. BRASWELL:

E78JTRU2                        Davis - direct

1    Q.  Ms. Davis, is this the consent solicitation you referred to

2    a moment ago?

3    A.  Yes, it is.

4    Q.  Do you recall receiving this on or around May 10th, 2013?

5    A.  Yes, I do.

6    Q.  When you received it, did you read it?

7    A.  Yes, I did.

8    Q.  What did you understand this consent solicitation to mean

9    for Semper?

10   A.  It meant that Semper was being asked as a holder of the

11   Class 1-A-3 note to consent to an amendment of the indenture

12   that would switch the allocation of realized losses from the

13   1-A-2 notes first to the 1-A-3 notes which were held in one of

14   our client funds, the Midas Fund.

15   Q.  Do you know how Semper responded to this consent

16   solicitation?

17   A.  I do.

18   Q.  How did Semper respond to the consent solicitation?

19   A.  We refused to provide our consent.

20   Q.  Why did you refuse to provide consent?

21   A.  That would be not in the best interests of our clients.  We

22   are a fiduciary for our clients.  As a registered investment

23   advisor, we have an obligation to do what is in the best

24   interests of our clients.  We felt having the realized losses

25   switched from the Class A-2 notes to the Class A-3 notes which

E78JTRU2                        Davis - direct

1    are held by our investors would not be in their best interests.

2    Q.  How did you communicate to Wells Fargo your refusal to

3    consent to this amendment?

4    A.  We submitted back the consent form along with our

5    beneficial holder certificate and we also attached a letter

6    expressing our refusal to provide consent.

7              MS. BRASWELL:  Can you please show TX-OO6.  May I

8    approach, your Honor?

9              THE COURT:  Yes.

10             (Pause)

11   BY MS. BRASWELL:

12   Q.  Ms. Davis, do you recognize TX-6?

13   A.  Yes, I do.

14   Q.  Can you describe what it is.

15   A.  This is a cover e-mail from our president and chief

16   operating officer to Wells Fargo, the securities administrator,

17   submitting our consent form and the attached letter.

18   Q.  Can you turn to the attached letter on Page 4 of this

19   exhibit.

20   A.  Yes.

21   Q.  Do you recognize this letter?

22   A.  I do.

23   Q.  Did you have a role in drafting this letter?

24   A.  I was the primary drafter of this letter.

25             MS. BRASWELL:  I would like to move for the admission

E78JTRU2                      Davis - direct

 1   of TX-6 and also TX-5 previously shown to the witness.

 2              THE COURT:  Without objection, received.

 3              (Defendant Exhibit TX-6 and TX-5 received in evidence)

 4   BY MS. BRASWELL:

 5   Q.  Ms. Davis, can we look to the second page of the letter

 6   which is TX-5?

 7              THE COURT:  Is there anything more you want to bring

 8   out that Semper refused consent?

 9              MS. BRASWELL:  Is there something your Honor would

10   like to hear?

11              THE COURT:  No, no.  I already captured that

12   information.  You refused consent?

13              MS. BRASWELL:  I understand.  I believe this letter,

14   your Honor, provides information about not only Semper's

15   position with respect to the consent solicitation, but also the

16   assurances that were made to Semper by Wells Fargo, and Ms.

17   Davis has personal knowledge about that information and --

18              THE COURT:  Just ask her.  Just ask her.

19              MS. SHAH:  We object to the line of questioning.  We

20   don't believe it is relevant.  Relevance!

21              THE COURT:  Overruled.  Ask her.  The letter is

22   hearsay.  You can ask her.

23              MS. BRASWELL:  I will ask her about the contents of

24   the letter.

25              THE COURT:  No.  Ask her about conversation that is

 1    reported in the letter.

 2              MS. BRASWELL:  I understand.  I will ask her about the

 3    conversation that was reported in the letter.

 4              THE COURT:  Did you have a conversation with someone

 5    at the trustee?

 6              THE WITNESS:  No, I never had a conversation with

 7    anyone at Deutsche Bank.

 8              THE COURT:  Or the administrator?

 9              THE WITNESS:  No.  I reviewed the communications

10    between the administrator and our portfolio manager.

11              MS. BRASWELL:  Your Honor, may I explain why I believe

12    this testimony is helpful?  I understand you're seeking --

13              THE COURT:  Tell me why it is admissible.

14              MS. BRASWELL:  Part of the response that Wells Fargo

15    and Sceptre have made to our affirmative defenses is that

16    Semper has essentially held these notes and also purchased

17    these notes knowingly and assumed the risk of Sceptre's

18    arbitrage.

19              The state of mind of Semper's employees and the

20    knowledge they had when they received the consent solicitation

21    from Wells Fargo and responded to that consent solicitation

22    bears directly on those responses and on this concept that we

23    somehow knowingly assumed the risk of Sceptre's arbitrage.

24              MS. SHAH:  We object to this on relevance --

25              THE COURT:  I can't hear you.  You must speak louder.

1          MS. SHAH:  I object on relevance again, and she

2     testified she wasn't a party to those conversations.  We

3     don't --

4          MS. BRASWELL:  This is not about the conversations,

5     but again about the state of mind and the knowledge in Semper's

6     mind by and through its employees, including Ms. Davis.

7          THE COURT:  The knowledge and state of mind of the

8     chief compliance officer doesn't count.  It is the person who

9     made the investment that counts.

10         MS. BRASWELL:  You certainly --

11         THE COURT:  You know what?  Just do it.  Objection

12    overruled.  Just do it.

13    BY MS. BRASWELL:

14    Q.  Ms. Davis, on Page 5 of the letter --

15         THE COURT:  What is the exhibit?

16         MS. BRASWELL:  TX-6.

17    Q.  -- in the last paragraph of your letter, Ms. Davis, you

18    state:

19         "Based on this due diligence, UCM proceeded to acquire

20    $26 million original face amount of the Class 3 notes for the

21    fund's portfolio, and based on the assurances from Wells Fargo,

22    UCM has continued to hold the Class 3 notes in the fund

23    portfolio."

24         Can you explain what you meant by that?

25         THE COURT:  Do you know how much there is in that last

1    statement?

2              MS. BRASWELL:  To the statement?

3              THE COURT:  It is completely hearsay and has zero

4    value, but let's do it.

5    BY MS. BRASWELL:

6    Q.  What did you mean by the statement Wells Fargo had provided

7    Semper with assurances?

8              THE COURT:  What?  How is it important what her

9    private meeting is?  She said it, that is all that counts.

10   That is the communication, what she wrote in the letter.

11             What she thought is of no value.  It is not

12   admissible.  Is there an objection?

13             MS. SHAH:  Yes, your Honor.

14             THE COURT:  Sustained.

15   BY MS. BRASWELL:

16   Q.  Ms. Davis, did Wells Fargo ever tell Semper that it would

17   not file litigation?

18             THE COURT:  Would not what?

19             MS. BRASWELL:  File litigation.

20   A.  No, it never said it wouldn't file litigation.

21   BY MS. BRASWELL:

22   Q.  Did it ever say that it would file a legal action?

23   A.  No.  What it told us was was the only way to amend the

24   indenture was with the consent of all of the note-holders.  We

25   knew we would never consent, so we knew that wasn't a

E78JTRU2                        Davis - direct

1   possibility.

2   Q.  Without disclosing attorney-client communications, can you

3   tell the court what Semper's purpose was in sending this letter

4   to Wells Fargo?

5               MS. SHAH:  Objection, your Honor.

6               THE COURT:  Sustained.

7   BY MS. BRASWELL:

8   Q.  Ms. Davis, did you communicate with Wells Fargo any

9   information concerning Semper's view on how an amendment to the

10  indenture could affect market pricing?

11              MS. SHAH:  Objection, your Honor.

12              THE COURT:  Sustained.

13  BY MS. BRASWELL:

14  Q.  Ms. Davis, do you have knowledge whether Semper held its

15  notes in reliance on Wells Fargo's assurances?

16              MS. SHAH:  Objection, your Honor.

17              THE COURT:  Sustained.

18  BY MS. BRASWELL:

19  Q.  What happened after Semper sent this letter to Wells Fargo?

20  A.  Wells Fargo sent a letter back to us saying that we should

21  not interpret their reservation of rights to mean that they

22  would take any litigation or they wouldn't pursue litigation.

23              MS. BRASWELL:  May we show TX-7, please.  May I

24  approach, your Honor?

25              THE COURT:  Yes.  (Pause)  Ms. Davis sees it on the

 1   screen.  You don't have to give it on paper.

 2              MS. BRASWELL:  It is multiple pages.  I am not sure

 3   she can see the entire document.

 4   BY MS. BRASWELL:

 5   Q.  Ms. Davis, do you recall receiving this letter on or around

 6   the time it was sent?

 7   A.  Yes, I do.

 8   Q.  Did you read the letter?

 9   A.  Yes, I did.

10   Q.  Do you have an understanding whether Wells Fargo reserved

11   their rights in this letter?

12              THE COURT:  The letter is what it is.  It is being

13   offered in evidence and it is not objected to.

14              MS. SHAH:  It is already in evidence, actually.

15              THE COURT:  It is already in evidence?  I'll read it.

16              MS. BRASWELL:  Your Honor, wells Fargo and Sceptre

17   have argued in this case their reservation of rights was

18   sufficient to put Semper on notice they were going to file this

19   litigation and essentially Semper was acting improperly by

20   continuing to hold its notes knowing that --

21              THE COURT:  What relevance is that to anything?

22              People sue if they want to sue and don't sue if they

23   don't want to sue.  Other people do what they want to do.  It

24   is a free country.

25              MS. BRASWELL:  Right, but they are using that

1    information to show that we somehow acted improperly, and

2    this --

3            THE COURT:  Why did you act improperly?

4            MS. BRASWELL:  That is our question.  We don't believe

5    we did.

6            MR. PICKHARDT:  We are not suggesting they acted

7    improperly.  The only thing we are suggesting is they made an

8    investment decision to hold their notes.  The court can

9    observe, and they continued to hold their notes after, as Ms.

10   Davis has confirmed, they had information from the trustee the

11   trustee might file litigation.  That is the only point.

12           THE COURT:  That is enough.  Okay.  What else am I

13   going to learn out of this witness?

14   BY MS. BRASWELL:

15   Q.  Did Semper have an expectation one way or another --

16           THE COURT:  Excuse me.  Mr. Pickhardt, Ms. Shah may

17   want to object to the question.  She can't object when --

18           MS. SHAH:  Objection, your Honor.

19           MS. BRASWELL:  I haven't finished the question, your

20   Honor.

21           THE COURT:  The objection to what?

22   BY MS. BRASWELL:

23   Q.  Ms. Davis --

24           THE COURT:  She is objecting to Mr. Pickhardt filling

25   her ear while --

E78JTRU2                          Davis - direct

1               MR. PICKHARDT:  I assume that is sustained, your

2     Honor.

3               MS. BRASWELL:  May try again?

4               THE COURT:  Sure.

5     BY MS. BRASWELL:

6     Q.  Ms. Davis, did Semper have an expectation one way or

7     another as to whether Wells Fargo would ever provide Semper

8     with notice of filing a litigation prior to filing that

9     litigation?

10              MS. SHAH:  Objection, your Honor.

11              THE COURT:  Sustained.  I think the value of Ms.

12    Davis' testimony has already been had.  There is nothing more

13    here.

14    BY MS. BRASWELL:

15    Q.  Ms. Davis, will reformation inflict harm on Semper?

16              MS. SHAH:  Objection.

17              THE COURT:  It clearly will.  It will benefit one

18    party and will harm another party.  The last witness testified

19    to the $7 million of value on the switch.

20              MS. BRASWELL:  I understand.

21              THE COURT:  I think we are finished.  Thank you very

22    much, Ms. Davis.

23              MS. SHAH:  We just have a few questions.

24              THE COURT:  You don't have any questions, okay?

25              (Witness excused)

```
 1              THE COURT:  Next witness.

 2              MR. ROLLIN:  Your Honor, our next witness will be Dan

 3     Cohen, who is the corporate representative for Wells Fargo, and

 4     that will be by deposition reading.

 5              THE COURT:  Okay.

 6              MR. ROLLIN:  Ms. Braswell will read for Mr. Cohen.

 7     Will that be all right?

 8              THE COURT:  Yes, that will be all right.

 9              MR. ROLLIN:  I have a copy of the transcript for

10     yourself.

11              THE COURT:  Excellent!

12              MR. ROLLIN:

13     "Q   Why don't you tell us a little bit about your job.  What

14     do you do for Wells Fargo?

15     "A   I am a default and restructuring account manager, so we

16     handle defaulted situations with corporate trusts, trusts.  I

17     support all product lines in the company, mortgage-backed

18     securities, asset-backed securities, these transactions, any

19     kind of corporate trust transaction that we have when there is

20     a defaulted situation, it can be a party default, it can be a

21     litigation with a matter, could be a party goes bankrupt, it

22     could be a legal question about the deal documents.  They'll

23     call us in and we help work with counsel and coordinator with

24     our potential operational group to help manage the matter."

25              THE COURT:  It is too hard, too hard for me to observe
```

E78JTRU2                    "Cohen

1      and too hard for Jerry to take it down.  Please slow down.

2                  MR. ROLLIN:  Your Honor, one point.  We have cut as

3      much as we felt we could from the transcript that your Honor

4      has and counsel have.  Therefore, we wil skip over some

5      portions, but I will orient the courtroom to the next line,

6      okay?

7                  THE COURT:  Yes.  I do not mind you skipping.

8                  MR. ROLLIN:  I understood that well yesterday, your

9      Honor.

10                 MR. ROLLIN:  Continuing on the next page, Page 13 Line

11     10 through 13:

12     "A   I give my input to what they say and mean, but as I said,

13     we do usually in these situations pretty much always bring in

14     our counsel as well."

15                 MS. SHAH:  Objection.  I ask the preceding question be

16     read into the record as well.

17                 MR. ROLLIN:  I will be happy to.  I should have done

18     it:

19     "Q   And you report back to the various business units at Wells

20     Fargo about what the various deal documents say and mean,

21     right?"

22                 THE COURT:  We have the answer.  Continue.

23     BY MR. ROLLIN:

24     "Q   Now, you're designated to testify here as a representative

25     of Wells Fargo, right?

E78JTRU2                          "Cohen

1    "A    Yes.

2    "Q    So you understand that you're binding Wells Fargo with

3    your answers, right?"

4              MR. JOHNSON:   Objection.

5              THE COURT:   Overruled.

6    "A    Yes.

7    Q.   Next line was do you understand that?

8    "A    Yes.

9    "Q    But you also happen to have played a personal role in this

10   matter over the course of this last number of years, right?

11   "A    I was involved in the situation in analyzing the documents

12   and consulting with counsel, yes.

13   "Q    So you have personal knowledge as to the events leading up

14   to today, don't you?

15   "A    I would say I have some personal knowledge.

16   "Q    However, Wells Fargo has had a copy of the indenture since

17   the first day it was executed, right?

18   "A    I would say that's a fair statement.

19   "Q    Since June of 2005, somewhere in Wells Fargo there have

20   been one if not many copies of this indenture.  Do you agree?

21   "A    I would say Wells Fargo had possession of the indenture.

22   "Q    So Wells Fargo could have looked at the indenture at any

23   time since June 2005 and found out that the loss allocation was

24   set up such that the A-2 bears" --

25             THE COURT:   This is argumentative and it won't add to

E78JTRU2                          "Cohen

1   anything.

2           MR. ROLLIN:  I'll skip to the next question concerning

3   reading of the indenture.  Page 40 line 11:

4   "Q   And you certainly could have read it?"

5           MR. JOHNSON:  Objection.

6           THE COURT:  The objection is sustained.  The objection

7   is sustained.  One minute, Mr. Rollin.

8           MR. ROLLIN:  Yes, your Honor.

9           (Pause)

10          THE COURT:  Go to 44,2.

11          MR. ROLLIN:

12  "Q   And was that the securities administrator's position that

13  what you ought to be doing is try to amend the indenture

14  without the consent of note-holders?

15  "A   I think at that time, I think at first we were looking at

16  the provisions for amending without consent, and then after

17  further analysis we came to the conclusion that that was not

18  possible and that we would need the consent of affected

19  note-holders.

20  "Q   And that decision was made in consultation with counsel,

21  correct?

22  "A   Yes.

23  "Q   Including counsel at Alston & Bird, right?

24  "A   Yes.

25  "Q   And you concluded you could not alter the allocation of

E78JTRU2                          "Cohen

1    realized losses without the" --

2              MS. SHAH:  Objection, your Honor.

3              THE COURT:  Overruled.

4              MR. ROLLIN:

5    "A    Yes.

6    "Q    What we do know is after consultation with the indenture

7    trustee, the owner trustee and counsel, including counsel for

8    at least the indenture trustee, the conclusion was reached that

9    you could not amend without consent of affected note-holders,

10   right?

11   "A    That's a fair characterization.  I would say we couldn't

12   amend under those amendment procedures.  The amendment

13   procedures which called for amendment without consent, we

14   couldn't use those to amend without consent of the

15   note-holders.

16   "Q    I show you what has been marked for identification as

17   TX-I.  TX-I is a series of e-mails attaching a letter to ING,

18   correct?

19   "A    Yes.

20   "Q    Let's turn to the letter.  The letter that we have

21   beginning on the page Bates marked 6592 is Wells Fargo's

22   response to ING Bank concerning its inquiry into the allocation

23   of losses under the indenture, right?

24   "A    Yes."

25              MR. ROLLIN:  I move the admission of TX-I, your Honor.

E78JTRU2                          "Cohen

1           MS. SHAH:  No objection.

2           THE COURT:  Received.

3           (Defendant Exhibit TX-I received in evidence)

4           MR. ROLLIN:

5   "Q   And on the second page of the letter is a heading in bold

6   and underlined that says amending the indenture to resolve the

7   inconsistency, right?

8   "A   Yes.

9   "Q   Absent an amendment to the indenture, Wells Fargo will

10  allocate realized losses to the Class 1-A-2 and the Class 1-A-3

11  notes in the manner currently set forth in the indenture.  Did

12  I read that correctly?

13  "A   Yes.

14  "Q   That's Wells Fargo's position?

15  "A   At the time that's what we said.

16  "Q   That was Wells Fargo's position at the time?

17  "A   Yes.

18  "Q   And then in the next paragraph it says" --

19          THE COURT:  What is the date of this letter?

20          MR. ROLLIN:  May 2, 2011, I believe, your Honor.  Yes,

21  that's the date.  May I proceed?

22          THE COURT:  Yes.

23          MR. ROLLIN:

24  "Q   And then in the next paragraph it says Wells Fargo

25  consulted with the indenture trustee, the owner trustee and

E78JTRU2                         "Cohen

1   outside counsel to explore whether an amendment to the

2   indenture without the consent of note-holders could be done to

3   rectify the inconsistency, and that happened, right?

4   "A   Yes."

5            THE COURT:  Mr. Rollin, please identify for me the

6   indenture trustee and the owner trustee.

7            MR. ROLLIN:  The indenture trustee is Deutsche Bank

8   National Trust Company, and the owner trustee is at the time

9   was M&T.  I don't know the full name.  It is now I believe

10  Wilmington Trust Company.

11           THE COURT:  M&T used to be a Buffalo bank, I think.

12           MR. ROLLIN:  Sorry?

13           THE COURT:  I think it was a Buffalo bank that was

14  swallowed up by Hong Kong, by Hong Kong and Shanghai, whatever

15  that name was.

16           MR. ROLLIN:  I am not sure.

17           THE COURT:  Anyway, what's the relationship between

18  the owner -- anybody can help me with this -- between the owner

19  trustee, indenture trustee and the administrator?

20           Wells Fargo is the administrator?

21           MR. JOHNSON:  Securities administrator, your Honor.

22           THE COURT:  What is the relationship between the

23  trustee and administrator?

24           MR. JOHNSON:  I am not an expert on that.

25           THE COURT:  You know more than I do, though.

E78JTRU2                         "Cohen

1              MR. JOHNSON:  If that makes me an expert, I will take

2     the compliment.  This is a debt structure, and in debt

3     structures there typically is an indentured trustee, and that

4     is a rule that was held here by Deutsche Bank.

5              In a non-debt deal, there would typically just be a

6     trustee, and the trustee would have the functions that are held

7     here by the securities administrator, that is, collecting the

8     funds each month and paying them out.

9              In this debt structure that we're talking about, the

10    indenture trustee has a much more limited role, so it does not

11    have that responsibility for collecting the funds and then

12    paying them out each month.  That is the securities

13    administrator's job.

14             THE COURT:  Why is this lawsuit brought by the

15    securities administrator rather than the trustee?

16             MR. JOHNSON:  Your Honor, that is because ultimately

17    it will be the securities administrator's responsibility for

18    making payments to holders of the notes that are issued by the

19    issuer here, and it is also the securities administrator's

20    responsibility under this structure to allocate the losses, and

21    it is the allocation of losses in this structure that

22    ultimately has an impact on how much Wells Fargo, as securities

23    administrator, is paying out to holders of the note.

24             THE COURT:  You avail yourself of a statute in

25    Minnesota where the trustee seeks guidance of the court to

E78JTRU2                         "Cohen

1    correct your problem.

2              MR. JOHNSON:  That is true, but is a broad statute and

3    it is available to any interested parties.  So that term has

4    been construed to allow a beneficiary of a trust to commence an

5    action if the beneficiary would be useful for court's guidance

6    as meaning of the trust instrument.

7              THE COURT:  That is helpful.  Tell me the difference

8    between the indenture trustee and owner trustee.  The owner

9    trustee represents the bondholders?

10             MR. JOHNSON:  No.  The owner trustee I think actually

11   holds title to the assets.  I am not positive.  Others in the

12   room may be able to clarify that.  It is fair to say -- and

13   other counsel should speak up if they disagree -- the owner

14   trustee really had virtually no role in this transaction at

15   least with respect to why we're here today.

16             THE COURT:  They own the holding collateral.

17             MR. JOHNSON:  I believe they hold title to the

18   collateral.  The reasons for that I don't know.

19             THE COURT:  Mr. Rollin, do you have any knowledge on

20   that?

21             MR. PICKHARDT:  I don't have knowledge on owner

22   trustees.  There have been owner trustees on other deals.

23             THE COURT:  Mr. Rollin?

24             MR. ROLLIN:  The same.

25             THE COURT:  Sorry to interrupt.

E78JTRU2                          "Cohen

1              MR. ROLLIN:

2      "Q    The consequence of those communications are in the very

3      next sentence.  Such an amendment is not possible under these

4      circumstances.

5      "A    That's what we said.

6              MR. ROLLIN:  Picking up at 17,7, a few lines down:

7      "Q  That was the outcome of those consultations with the

8      indenture trustee?  The owner trustee?"

9              THE COURT:  There is no answer till 71,15 which is,

10     "The conclusion an amendment without consent was not possible."

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E78PTRU3                          "Cohen"

1              MR. ROLLIN:  I'm at 71, 17.  It just looks like the

2       printing job, your Honor, is unhelpful but --

3              THE COURT:  That isn't helpful either.

4              MR. ROLLIN:  Okay, 71, 17.

5       "Q.  And here's what it goes on to say.  It says:  While some

6       RMBS transactions contain a provision allowing the parties to

7       amend an indenture or pooling and servicing agreement to

8       conform such agreement to the offering materials, the indenture

9       in the subject transaction does not contain such a provision.

10      The absence of such a provision in this case prevents the

11      parties from amending the indenture to conform to the Pro Supp.

12             That was your position, right?

13      "A.  That's what it says.

14      "Q.  And that was the product of your legal analysis?

15      "A.  It was a product of talking with counsel, talking with the

16      trustees, reviewing the documents.  That was our position.

17      "Q.  You said a moment ago that was your position.  That was

18      Wells Fargo's position, then, right?

19      "A.  Well, yeah, that's -- that's what we wrote in the letter.

20      "Q.  And then you go on to say in the next paragraph that you

21      could amend the indenture so long as you got one hundred

22      percent consent from the affected note holders?

23      "A.  Yeah, it says, under 9.02, such an amendment would require

24      the consent of one hundred percent of the outstanding balance

25      of class 1-A-3 notes, in addition to the other requirements for

E78PTRU3                        "Cohen"

1   amending.

2   "Q.   And at the bottom of that same paragraph, it says:

3   Because the proposed change to the indenture would affect the

4   class 1-A-3 notes, their consent is required, right?

5   "A.   Yes.

6   "Q.   And that's true?

7   "A.   I think that was -- that was the result of our analysis.

8   That was our conclusion.

9   "Q.   So that's true?

10  "A.   Yes, that's true.

11  "Q.   Now, what you do is you provide ING an opportunity to do

12  something about this in the very last paragraph, and it says:

13  In order to solicit the consent of one hundred percent of the

14  outstanding principal balance of the class 1-A-3 notes, Wells

15  Fargo requires that ING, ii, provide a written direction to

16  Wells Fargo as securities administrator to solicit such

17  consent, and, i, agree in writing to pay the extensions

18  incurred by Wells Fargo and the expenses incurred by any other

19  necessary parties to a supplemental indenture entered into for

20  the purpose of amending the indenture with consent.

21         Did I read that correctly?

22  "A.   Yes.

23  "Q.   So you made that offer to ING?

24  "A.   Yeah.   We said if it would require those things for us to

25  solicit consent.

1   "Q.  And direction and indemnity is often preferred to as D&I,

2   correct?  Can we say D&I today when we're talking about

3   direction and indemnity, as is set forth in this paragraph?

4   "A.  Sure.

5   "Q.  And did you get D&I from" -- I'm sorry.

6           "And did you not get D&I from ING?

7   "A.  No.

8   "Q.  And, therefore, you did not seek to change the loss

9   allocation prior in the indenture on behalf of ING?

10  "A.  Not at this time.

11  "Q.  Mr. Cohen, do you understand that in certain respects

12  indentures are governed by the Trust Indenture Act, right?

13  "A.  I think that's a fair statement.

14  "Q.  That's something that you would have to know in your job?"

15          THE COURT:  This is not going to help me.  Let's go

16  down to -- hold on.  Start at 79, 23.

17          MR. ROLLIN:  Your Honor, in this context, may I ask

18  the Court to take judicial notice of the Trust Indenture Act?

19          MS. SHAH:  Objection, your Honor.

20          THE COURT:  It's law, isn't it?

21          MR. ROLLIN:  It is law.

22          THE COURT:  I take judicial notice of facts, not laws.

23  Laws, you argue.

24          MR. ROLLIN:  Very well, I will.  At 79, 23.

25  "Q.  Follow along with me.  I'll ask you questions as I go

E78PTRU3                        "Cohen"

1    along.  Notwithstanding any other provision of the indenture to

2    be qualified, the right of any holder of any indenture security

3    to receive payment of the principal of and interest on such

4    indentured security on or after the respective due dates

5    expressed" --

6              THE COURT:  Excuse me.  I don't think it's useful to

7    me to read the language of the indenture.  You're going to

8    argue that.

9              MR. ROLLIN:  I have -- it's just foundational to a

10   couple of questions.  I'll skip over it.

11             THE COURT:  What are the questions?

12             MR. ROLLIN:  I'll ask the questions.

13             THE COURT:  Where are you going now?  Your reading of

14   various provisions of the trust indenture is not helpful.

15             MR. ROLLIN:  I'll skip down.  If I may resume at 84,

16   18.

17             THE COURT:  No.

18             MR. ROLLIN:  Judge, this has to do with whether Wells

19   Fargo considered it, not what the law says.

20             THE COURT:  I'm sure it did.

21             MR. ROLLIN:  I'm sorry, your Honor?

22             THE COURT:  I'm sure it did.

23             MR. ROLLIN:  I believe the testimony is --

24             THE COURT:  Is the discussion of Credit Suisse how to

25   handle it, relevant?

E78PTRU3                         "Cohen"

1          MR. ROLLIN:  It's identical to the situation with ING.

2     So if your Honor will accept that, we can move past it.

3          THE COURT:  Move past that, please.  91, 7, what

4     document are you referring to?

5          MR. ROLLIN:  I'll just take a look.  Right.  This

6     looks like the response to ING -- I'm sorry, Credit Suisse.

7     It's on the same issue, materially identical to the response.

8          THE COURT:  You want that, right?

9          MR. ROLLIN:  I'm sorry?

10          THE COURT:  You want that?

11          MR. ROLLIN:  I do want that.

12          THE COURT:  Okay.  So let's just put it in, and it

13     says:  In our letter to Credit Suisse --

14          MR. ROLLIN:  Your Honor, that's TX4, by the way.  May

15     I move the admission of TX4, and then we'll be able to talk

16     about it.

17          THE COURT:  Yes, TX4 is received.

18          MR. ROLLIN:  Thank you.

19          THE COURT:  It's a Wells Fargo letter to Credit

20     Suisse.  What date?

21          MR. ROLLIN:  This is an e-mail dated January 18, 2012.

22          (Defendant's Exhibit TX4 received in evidence)

23          THE COURT:  You can read 91, 7.

24          MR. ROLLIN:  That's the answer; so I'll ask the

25     question at 91, 5.

1          THE COURT:  The question, read it.  So just read it,

2    Miss Braswell.

3          MS. BRASWELL:  The answer?

4          THE COURT:  Yes.

5    "A.  It says:  Our position is that we will allocate losses in

6    accordance with the terms of the indenture, and we won't

7    rewrite the terms of the indenture without a formal amendment.

8    BY MR. ROLLIN:

9    "Q.  Without a formal amendment?

10   "A.  Yes.

11   "Q.  And what you say is you -- in the following sentence, you

12   say 'you.'  When you had been contacted by another holder, you

13   engaged counsel to review the documents and to advise you how

14   best to proceed, right?

15   "A.  That's what it says, yes.

16   "Q.  And that's true, right?

17   "A.  We did seek the advice of counsel.

18   "Q.  Yes.  And it says -- you go into the specifics.  You say:

19   Specifically, we explored whether an indenture amendment

20   without the consent of note holders under section 9.015 or

21   9.016 of the indenture was possible, right?  That's what you

22   told them?

23   "A.  Yes.

24   "Q.  Sure.  What you told the representative from Credit Suisse

25   was based on the advice of counsel and based upon several

1    conversations with the indenture trustee and their counsel and

2    the owner trustee.  We decided at that time that such an

3    indenture amendment was not possible?

4    "A.   That's what the language says.

5    "Q.   And that's what you told them, right?

6    "A.   That's what's in the letter.

7    "Q.   And that was true?

8    "A.   That's what we -- if we wrote it, we believed that was the

9    case.

10   "Q.   And then you talk about the key considerations that the

11   group considered.  The key considerations that led us to that

12   conclusion included, inter alia, the fact that, i, the class

13   1-A-3 note holders would be arguably harmed by the amendment

14   and, ii, the indenture lacked a provision allowing the parties

15   to amend it to conform to the Pro Supp, right?  That's what you

16   told them?

17   "A.   Yes.

18   "Q.   And that's true?"

19              THE COURT:  The objection is sustained.

20              MS. SHAH:  Thank you, your Honor.

21   "Q.   Now, one of the things that you wrote in here is the 1-A-3

22   note holders" --

23              THE COURT:  We've already gone over that.

24              MR. ROLLIN:  This is for their awareness, your Honor.

25              THE COURT:  We know that.  We know that.  Clearly,

1    it's so.  The rest of the page is redundant, or as they say in

2    the trade, cumulative.

3              MR. ROLLIN:  May we begin with what's marked as

4    Exhibit 9, TXV.

5              THE COURT:  Is that page 104, Line 18?

6              MR. ROLLIN:  Yes.  Thank you.

7              THE COURT:  Go ahead.

8              MR. ROLLIN:  Exhibit -- May we show TXV?  Thank you.

9    "Q.  Exhibit TXV is an e-mail chain in which you are copied,

10   right?

11   "A.  Yes.

12   "Q.  And it is an e-mail chain between Wells Fargo, on one

13   hand, and Boris Peresechensky, on the other, right?

14   "A.  Yes.

15   "Q.  And it is an e-mail from Mr. Warble at Wells Fargo back to

16   Mr. Peresechensky, right?

17   "A.  Yes.

18   "Q.  Copying you, right?  Right?

19   "A.  Yes.

20   "Q.  It says:  Hi, Boris.  In regards to your inquiry

21   concerning AHMIT 2005-2, we are bound by the indenture.  Absent

22   an amendment to the indenture, Wells Fargo will allocate

23   realized losses to the class 1-A-2 and class 1-A-3 notes in the

24   manner currently set forth in the indenture.

25              Did I read that correctly?

E78PTRU3                              "Cohen"

1    "A.  Yes."

2              MS. SHAH:  Objection, your Honor.

3              THE COURT:  Where are you?

4              MR. ROLLIN:  Your Honor, I'm on -- that question began

5    at Page 105, Line 12.  I don't know the nature of the

6    objection, but it is an admission by Wells Fargo.

7              THE COURT:  Just a minute.  Just a minute.  I don't

8    see an objection here.

9              MS. SHAH:  We'd like to object to the document on

10   hearsay grounds.

11             THE COURT:  Pardon?

12             MS. SHAH:  We're objecting to the document on hearsay

13   grounds, your Honor.

14             MR. ROLLIN:  Your Honor, I'll ask you to take the --

15             THE COURT:  Can I think for a moment?

16             MR. ROLLIN:  Yes.

17             THE COURT:  It's offered as an admission against Wells

18   Fargo.  I receive the subject.  Overruled.

19             MR. ROLLIN:  I'll re-read the question, Page 105,

20   Line 12.

21   BY MR. ROLLIN:

22   "Q.  It says:  Hi, Boris.  In regards to your inquiry

23   concerning AHMIT 2005-2, we are bound by the indenture.  Absent

24   an amendment to the indenture, Wells Fargo will allocate

25   realized losses to the class 1-A-2 and class 1-A-3 notes in the

E78PTRU3                         "Cohen"

1    manner currently set forth in the indenture.

2             Did I read that correctly?

3    "A.  Yes.

4    "Q.  And that's what Mr. Warble told Mr. Peresechensky?"

5             MS. SHAH:  Objection.

6    "Q.  Right?"

7             THE COURT:  What line?

8             MS. SHAH:  The question is 105, Line 21.

9             THE COURT:  Sustained.

10            MR. ROLLIN:  Your Honor, if I may argue.  That is --

11            THE COURT:  It's redundant.  It's cumulative evidence.

12   The letter speaks for itself.  I don't know why we're doing

13   this.

14            MR. ROLLIN:  I move the admission of TXV.

15            THE COURT:  Received.

16            (Defendant's Exhibit TXV received in evidence)

17            MR. ROLLIN:  I'm picking up at 106.

18            THE COURT:  I see what you're getting at; so maybe I

19   can just say what I'll find here, namely, that Wells Fargo, at

20   this time, was telling all who called, it was going to follow

21   the loss allocation ratios -- priorities, not ratios, set out

22   in the trust indenture and did not think that it would change

23   that unless it received a hundred percent consent of the 1-A-3

24   note holders, that was the position that it expressed.  Is that

25   a --

1          MR. PICKHARDT:  Your Honor?

2          THE COURT:  -- a fair reading of these documents?

3          MR. PICKHARDT:  Your Honor, what is specifically being

4    addressed here is amendments of the indenture.

5          THE COURT:  I understand what's being addressed.  Are

6    the notes telling we're not going to be able to amend until we

7    get a hundred percent, we're not going to get a hundred percent

8    because the note holders are injured by that.  So we can't get

9    consent from them.  And we're going to follow the indenture.

10         MR. PICKHARDT:  I think that's exactly right, your

11   Honor.  It's speaking specifically about amendment and

12   amendment pursuant to the terms of the indenture.

13         THE COURT:  I got the whole thing.

14         MR. ROLLIN:  Your Honor, the one point that I'd like

15   to continue on at Page 110, Line 3, that drills down on that

16   issue in just a couple of lines.

17   BY MR. ROLLIN:

18   "Q.  It does not say a method" --

19         THE COURT:  Where are you?  You're going into

20   negatives.  I've got it all.  All this is stricken.  This

21   clutters up the record.

22         MR. ROLLIN:  I'll carry on, your Honor, with

23   Exhibit TXS and --

24         THE COURT:  Just a minute.

25         MR. ROLLIN:  That's Page 114.

1          THE COURT:  What page are you on now?

2          MR. ROLLIN:  Page 114, Line 18.

3          THE COURT:  Okay.

4          MR. ROLLIN:  Thank you.

5          THE COURT:  Is this another exchange with

6    Peresechensky?

7          MR. ROLLIN:  No, your Honor.  This is an internal

8    exchange about the Peresechensky exchange.

9          THE COURT:  What is this going to add?

10          MR. ROLLIN:  This is going to add that there was a

11    sense of finality even in the minds of the people at Wells

12    Fargo because they are speaking internally about the

13    communication with Mr. Peresechensky and that he would be happy

14    to know that they were following the indenture.  In other

15    words, there wasn't in their mind some alternate way of --

16          THE COURT:  Miss Shah?

17          MS. SHAH:  Objection, your Honor.

18          THE COURT:  Sustained.  Everything is final until an

19    enterprising lawyer figures out a way.

20          MR. ROLLIN:  It goes to, your Honor -- this goes to

21    reliance.

22          THE COURT:  Whose reliance?

23          MR. ROLLIN:  The reliance of Mr. Peresechensky and

24    Semper on the statements and the finality of the statements

25    made by Wells Fargo at that time.

E78PTRU3                          "Cohen"

1          THE COURT:  What's the date?

2          MR. ROLLIN:  The date of that exchange occurs on

3    October 3rd and 4th of 2012.

4          MS. SHAH:  Your Honor, we object both on the ground

5    this is irrelevant because it's after Semper's purchase --

6          THE COURT:  Overruled.

7          MS. SHAH:  -- and on the ground that this is an

8    internal Wells Fargo communication; so it can't speak to

9    Semper's reliance.

10         THE COURT:  Overruled.

11         MR. ROLLIN:  I'll skim through here, your Honor; so I

12   can find a place to continue.

13         THE COURT:  The next several pages reflect agitation

14   from the 1-A-2 holders, Credit Suisse and ING.  Wells Fargo is

15   being pinched.  The 1-A-3 holders want to do one thing and the

16   1-A-2 holders want to do another thing.

17         MR. ROLLIN:  I'm not sure that the record says that

18   1-A-3 holders wanted Wells Fargo to do anything.  They wanted

19   them to do just what they were already doing and said they had

20   been doing.

21         THE COURT:  Exactly.

22         MR. ROLLIN:  I'd like to -- I think the best place to

23   continue here is on Page 124, Line 11.

24         THE COURT:  That doesn't --

25         MR. ROLLIN:  This --

1          THE COURT:  No one gives them a direction indemnity

2    letter.

3          MR. ROLLIN:  That's right.

4          THE COURT:  So everybody's attempt to have Wells Fargo

5    cooked in its own oil.

6          MR. ROLLIN:  Your Honor, I think what this evidence

7    goes to is the fact that, although Wells Fargo had previously

8    conditioned any consent solicitation on receipt of direction

9    indemnity from ING and from Credit Suisse, they proceeded

10   nonetheless to seek consent in its action without having

11   received direction.

12         THE COURT:  Yes, because they're pinched.  They've got

13   to do something.  Whatever they do, someone is going to be

14   unhappy.  If they do nothing, someone is going to be unhappy.

15   So they go to court, which is what happens in these things.  I

16   don't think I have any more to learn from this deposition.

17         MR. ROLLIN:  There's a bit more.  I understand that

18   your Honor has read the next couple of pages.  We'll skip

19   through those and get to something that would be helpful.

20         THE COURT:  What's a TIP?

21         MR. ROLLIN:  Trust instruction proceeding.

22         THE COURT:  All right.  Starts about 140 -- well,

23   start with 139, where the 1-A-2 holders are pushing Cohen to

24   have Wells Fargo follow the loss allocation provided in the Pro

25   Supp.  Start with 139, Line 20.

1          MR. ROLLIN:  I will, and I think the reference here,

2     your Honor, is to not generically 1-A-2 holders, but to

3     Och-Ziff and --

4          THE COURT:  What?

5          MR. ROLLIN:  I believe the reference here is to

6     Och-Ziff and to Scepter.

7          THE COURT:  Och-Ziff?

8          MR. ROLLIN:  Yes.  Yes.  For context, these

9     communications pertain to the notes that are now held by

10    Scepter and purchased by Och-Ziff, as testified about by

11    Mr. Mago.

12         THE COURT:  Och-Ziff doesn't want them to follow the

13    loss indenture -- okay, withdrawn.

14         MR. ROLLIN:  I'm picking up at 139, Line 20, as your

15    Honor directed.

16         THE COURT:  Yes.

17    BY MR. ROLLIN:

18    "Q.  And what they were telling you was that they wanted Wells

19    Fargo to take some action to facilitate that?

20         MS. BRASWELL:  I'm sorry, I didn't pick up at what

21    line you were at.

22         MR. ROLLIN:  You know, for your Honor, just for

23    context, I'll start at 139, 8.

24    BY MR. ROLLIN:

25    "Q.  Yeah.  They were inquiring, in these telephone

1    conversations that we're talking about, about what could be

2    done about reversing the loss allocation as it's set forth in

3    the indenture?

4    "A.  Well, it was their position that they wanted to follow the

5    loss allocation for the Pro Supp.

6    "Q.  And what they were telling you was that they wanted Wells

7    Fargo to take some action to facilitate that?

8    "A.  I guess that's" --

9            MS. SHAH:  Objection.

10           THE COURT:  So they talk about a trust instruction

11   proceeding?

12           MR. ROLLIN:  Right.

13           THE COURT:  Affectionately known as a TIP, and the

14   possibility of interpleader.  And at 141, 3, Mr. Cohen says:

15   "We did file a trust instruction petition," and it was pursuant

16   to the suggestion of Och-Ziff, and it was filed in the State

17   Court of Minnesota.

18           MS. SHAH:  Actually, your Honor, that's not what the

19   testimony reflects.

20           THE COURT:  That's my overlay of the testimony.  I'm

21   trying to cut through it.

22           MS. SHAH:  I understand, but I think that is

23   Mr. Rollin's argument of what the testimony reflects.  I think

24   what the actual testimony Mr. Cohen testified to, is it was not

25   at Och-Ziff's suggestion that they filed a trust instruction

1    proceeding and at their direction.  He actually testifies

2    that --

3          THE COURT:  I got it.  It was not in consultation with

4    Och-Ziff.

5          MS. SHAH:  Nor at their suggestion.

6          THE COURT:  I think he listened to what they had to

7    say, and I can't recall if they suggested a trust instruction

8    proceeding.

9          MS. SHAH:  Right.

10          MR. ROLLIN:  Your Honor, there's actually --

11          THE COURT:  What's the difference?  Who cares who

12    suggested it?  We know that it was done.

13          MR. ROLLIN:  Right.  Your Honor, I think here's the

14    problem.  When each side characterizes what they think the

15    evidence means, and we believe that it was done at the

16    suggestion and, in fact, urging of Och-Ziff and --

17          THE COURT:  So why not cross that -- They benefited by

18    it.  What's wrong with that?

19          MR. ROLLIN:  It's part of the mosaic of the case.

20          THE COURT:  Mr. Rollin, I know that you favor one

21    side, and Mr. Pickhardt is favoring the other side, and Wells

22    Fargo is in the middle.  The only way it benefits is if it does

23    something that alleviates the risk it holds.  It does something

24    one way, you'll sue them.  If he goes another way,

25    Mr. Pickhardt will sue him.  So they want to get some guidance

E78PTRU3                          "Cohen"

1     from the Court.  That's what happened.

2                MR. ROLLIN:  We think it's important for your Honor to

3     see the part of the picture that Wells Fargo is taking action

4     adverse to some holders at the request of other holders, and

5     interestingly --

6                THE COURT:  I so understand.

7                MR. ROLLIN:  But without requiring the direction and

8     indemnity they required from others.

9                THE COURT:  I so understand.

10               MS. SHAH:  Your Honor?

11               THE COURT:  They have a very clear interest to do so

12    because that's the only way they will avoid a lawsuit.

13               MR. ROLLIN:  Well, I think --

14               THE COURT:  Yes, Miss Shah?

15               MS. SHAH:  Respectfully, your Honor, we disagree with

16    the characterization about what Mr. Rollin has said what the

17    evidence shows --

18               THE COURT:  I know, but that's how I find.

19               MS. SHAH:  -- with regard to Wells Fargo taking

20    direction adverse to one or the other.

21               THE COURT:  They're not taking direction.  They find

22    that their holders are oppositely advantaged and disadvantaged.

23               MS. SHAH:  Yes, your Honor.  We believe that there are

24    holders on each side, and Wells Fargo was in the middle.

25               THE COURT:  There are holders on each side.  Pick up

E78PTRU3                        "Cohen"

1   Page 146, Line 38, TX8.  Miss Braswell, 146, Line 13.

2   "A.  This is a notice we sent out in July 2013 informing that,

3   you know, we had sent out the previous notice.  We had asked

4   for consent and that we had received at least one objection; so

5   we didn't receive one hundred percent of the affected class'

6   consent.

7   BY MR. ROLLIN:

8   "Q.  In fact, you received zero percent of the affected class'

9   consent, correct?

10  "A.  I believe that's the case, but I don't want to say for

11  sure because I can't recall.

12  "Q.  That's true to this day, as far as you know?  To this day,

13  not a single 1-A-3 note holder has consented to an amendment,

14  right?

15  "A.  As far as I know, that's correct.

16  "Q.  And this document was dated -- I'm sorry, this information

17  notice, Exhibit TX8, is dated what?

18  "A.  July 11th, 2013."

19          MR. ROLLIN:  Move the admission of TX8.

20          THE COURT:  Received.

21          (Defendant's Exhibit TX8 received in evidence)

22  BY MR. ROLLIN:

23  "Q.  Mr. Cohen, do you have a recollection of Scepter or

24  Och-Ziff urging Wells Fargo to file a TIP in Minnesota?

25  "A.  As I said, we talked about" --

E78PTRU3                        "Cohen"

1          MS. SHAH:  Objection, your Honor.

2          THE COURT:  Overruled.

3   "A.  -- I remember them requesting some kind of legal action,

4   but I don't know if it was specifically a TIP."

5          MR. ROLLIN:  May we show TXBI, please?

6          MS. SHAH:  Your Honor, we object to this exhibit as

7   hearsay.

8          MR. ROLLIN:  It's an admission.

9          MS. SHAH:  It's not an admission, your Honor.  It's a

10  conversation --

11         THE COURT:  Please don't argue.  Miss Shah, if you

12  could just put the microphone closer to you, it will pick up.

13         MS. SHAH:  Thank you, your Honor.

14         THE COURT:  The document is received.  Objection

15  overruled.

16         (Defendant's Exhibit TXBI received in evidence)

17         MR. ROLLIN:  Picking up at Page 169, Line 12.

18  "Q.  Mr. Cohen, do you have a recollection of Scepter or

19  Och-Ziff urging Wells Fargo" --

20         MR. ROLLIN:  Your Honor, I'm just going to rehash the

21  document, and you don't want me to do that; so let me skip.

22         THE COURT:  All right.  So you finally get Cohen to

23  admit that Scepter or Och-Ziff urged Wells Fargo to file a

24  trust instruction procedure.

25         MS. SHAH:  Your Honor, in fact --

E78PTRU3                          "Cohen"

1          THE COURT:  In Line 171, 4, Cohen answers:  "I mean,

2     this is what the language says.  I'm not saying it's not right.

3     I don't have independent recollection if they asked for a TIP.

4     I know a lot of legal action was discussed and interpleader and

5     all that.  I just don't recall that."

6          MS. SHAH:  Yes, your Honor.  What we think Mr. Cohen

7     testifies to is the fact that, even looking at this document,

8     he doesn't know --

9          THE COURT:  What's the difference?

10          MS. SHAH:  Frankly, your Honor, we don't know what the

11     difference is.

12          THE COURT:  What?

13          MS. SHAH:  It's a characterization that Semper has put

14     into the record regarding some kind of collusion here.

15          THE COURT:  Of course the 1-A-2 notes don't want --

16     the note holders don't want you to follow the trust indenture.

17     They claim they bought on the offering documents and that

18     there's a certain regimen that goes with the pricing and

19     everything else, as I said before yesterday.  I know what the

20     demands are.  You're in -- Wells Fargo is in the middle.

21          MR. ROLLIN:  Your Honor, just to be clear, I don't

22     believe that Semper is claiming they bought off the offering

23     documents.  They testified just a little while ago they

24     reviewed the indenture in view of the loss allocation priority.

25          THE COURT:  They did what you did.

1          MR. ROLLIN:  I'm sorry?

2          THE COURT:  They analyzed the situation and figured

3   out it's a good investment.  You analyzed the situation and

4   figured out it's a good investment.  They ended up with 1-A-2's

5   and you ended up with 1-A-3s, and here I am in the middle of

6   the dispute.

7          And Cohen says at 174, 9:

8   "Q.  And you told the people from Och-Ziff before you told any

9   other holders that you filed this, right?

10  "A.  It appears from this that we did send him this e-mail

11  before we circulated a notice.  I'm not sure if any other --

12  there might have been another notice to other investors that

13  were in contact during the interim that we may have told.  I

14  just don't recall."

15         And he answers at 176, 11:  "Well, Wells Fargo did

16  make a decision to file a TIP proceeding in Minnesota.  We did

17  it based on the totality of the circumstances and our

18  discussions internally and with counsel."

19         And we didn't demand that Scepter or Och-Ziff cover

20  the costs associated with the proceeding.  You can pick up at

21  181, 4.

22         MR. ROLLIN:  I will.

23         THE COURT:  Question:  Did you go to Scepter or

24  Och-Ziff indirectly to cover your costs?  And you answer.

25  "A.  No, we didn't go to them at all.

E78PTRU3                         "Cohen"

```
1    BY MR. ROLLIN:
2    "Q.  So who did pay for that?
3    "A.  The legal cost we recover from the trust.
4    "Q.  You take the legal cost from the trust fund?
5    "A.  Yes."
6            THE COURT:  That's what trustees do.
7            MR. ROLLIN:  I'm going to skip over, your Honor, to --
8            THE COURT:  God forbid that trustees should pay.
9            MR. ROLLIN:  Sorry?
10           THE COURT:  No, I said, God forbid that trustees
11   should pay.  But fiduciaries commonly reimburse themselves for
12   their expense.
13           MR. ROLLIN:  Just a follow-up question on that point,
14   your Honor.  Page 202, Line 3.
15           THE COURT:  It's obvious.
16           MS. SHAH:  We already objected to this question.
17           THE COURT:  It's not objectionable.  It's just
18   obvious.  The question:  Now, if the Court reforms the loss
19   allocation priority, are all the bondholders going to benefit
20   from that?
21           And, Miss Braswell, 202, Line 7.
22   "A.  I can't speak for the bondholders, whether they would
23   benefit or not.  I don't know."
24           MR. ROLLIN:  Carrying on at 202, Line 21.
25   "Q.  If the Court reforms the indenture, then the 1-A-3 holders
```

E78PTRU3                        "Cohen"

1   will start to take losses sooner than they otherwise would if

2   the indenture remains currently as it is?

3   "A.  I would say if the Court orders that the language of the

4   Pro Supp should be followed and that the A-3 holders take

5   losses before the A-2 holders, then they would take the losses

6   first.

7   "Q.  And you understand that that would harm -- to use some of

8   your earlier language, adversely effect those A-3 holders,

9   agreed?"

10          MS. SHAH:  Objection, your Honor.

11          THE COURT:  Overruled.

12  "A.  If those holders did not want to take losses before the

13  1-A-2 holders, then it would harm them."

14          THE COURT:  The next question:  "And the inverse is

15  also true, that if the Court reforms the indenture and the A-3

16  holders have to take losses first, then the A-2 holders will

17  not have to take losses as is currently set forth in the

18  indenture, right?

19  "A.  Can you repeat that?  I'm sorry."

20          THE COURT:  We'll skip that.  You can answer, and the

21  answer is:  "I think that's a fair statement."

22          Okay.  I think that finishes it.  Anything more on

23  this deposition?

24          MR. ROLLIN:  Yes, your Honor.  Let me just flip

25  through and cut out as much as I can.  Carrying on at Page 222,

1    Line 5.  Are you ready?

2                THE COURT:  Yes.

3    "Q.  But you did know as far back as the end of 2010, that the

4    ratings agency downgraded the A-2 as a result of the way the

5    indenture allocates losses, correct?

6    "A.  I think we were notified of that by the letter we received

7    from the investor back in 2010.

8    "Q.  From ING?

9    "A.  Yes.

10   "Q.  And then you went and you verified that, you saw that, in

11   fact, the A-2 had been downgraded by the ratings agencies,

12   right?

13   "A.  I believe they -- I believe they attached some

14   communication.  I don't know if we had to independently verify.

15   I think they attached to their correspondence the communication

16   from, I believe it was Moody's.

17   "Q.  Was there a point where Wells Fargo confirmed to Moody's

18   that Wells Fargo, in fact, would be relying on the loss

19   allocation as set forth in the indenture?

20   "A.  I'm not aware of that.

21   "Q.  Who would be responsible for that communication, if it

22   happened?

23   "A.  I don't know that that communication ever happened;

24   so...."

25               MR. ROLLIN:  Let me skip down, your Honor.  224,

E78PTRU3                          "Cohen"

1    Line 10.

2    "Q.  Why then did Wells Fargo not take any action that could

3    lead to a change in the loss allocation priority between the

4    end of 2010 and May of 2013?

5    "A.  I think if you see from our responses to the investors at

6    that time, it was our position that we were following the

7    indenture, and we had -- we had reached out to -- we had

8    responded to these investors who had reached out to us and said

9    if you want to direct and indemnify for a consent solicitation,

10   we'll do it.  And none of the investors so provided."

11          MR. ROLLIN:  Carrying on at Page 225, Line 17.

12   "Q.  Now, you didn't have to initiate this litigation, did you?

13   "A.  I mean, have to?  I mean, I don't know how to answer that

14   question.  I mean, we came to a decision given the totality of

15   the circumstances, all the facts and the imminence of the loss

16   allocation, that we decided it was in the best interest of the

17   trust to bring the action to resolve the issue before it hit."

18          THE COURT:  And the rest of the question on this

19   subject is that Wells Fargo made a decision that even though

20   there was nothing in the trust instruments that required them

21   to file the action, that was a prudent thing for them to do and

22   so they did it.

23          MR. ROLLIN:  The question at 227, Line 18.

24   "Q.  And if you didn't file the action, you would simply follow

25   the indenture?"

E78PTRU3                        "Cohen"

1              THE COURT:  That's it --

2              MS. SHAH:  Objection, your Honor.

3              THE COURT:  Sustained.  I think we're finished with

4     this.

5              MR. ROLLIN:  I'm confirming that there isn't something

6     that might be helpful to your Honor towards the end, but I am

7     flipping through, I'm trying to determine that.  If I may, your

8     Honor.

9              THE COURT:  At 357?

10             MR. ROLLIN:  I'm sorry?

11             THE COURT:  357 -- let's start at 355, 18.  "Do you

12    think it would have been a good use of trust funds to bring a

13    trust instruction proceeding in 2010 before it was apparent

14    that any of the affected classes would begin to be taking

15    losses?

16    "A.  I just don't know if that time, 2010, we were

17    contemplating.  You know, it may have been discussed, but at

18    that point, it was not imminent and the circumstances at that

19    time didn't -- you know, didn't call for us to bring legal

20    action at that time."

21             THE COURT:  Keep going, okay, Mr. Rollin.

22             MR. ROLLIN:  I'm sorry, I don't have that.

23             THE COURT:  357, 9.  The question:  "Was the fact that

24    losses are now imminent to the class 1-A note holders one of

25    the reasons that Wells Fargo decided to bring the trust

1    instruction proceeding now?

2    "A.  I think that was one of the -- you know, a big factor in

3    which the timing for why we brought it, is because the losses

4    were reaching -- the losses were reaching a point where it was

5    going to hit the classes more imminent, and we wanted direction

6    from the Court about how to proceed."

7          THE COURT:  And you go down to Line 25:  "Q.  If you

8    had no idea whether the losses would ever reach a level where

9    it would impact the class 1-A note holders, would you have

10   brought the trust instruction proceeding at this point in time?

11   "A.  Well, I don't -- I think if the losses -- if we didn't

12   know if they would ever hit, then I don't know if there would

13   be a reason to bring the proceedings.  I mean, if it wouldn't

14   -- you know, if it wasn't something that we were going to have

15   to deal with, then I don't see a reason why we would bring a

16   legal proceeding."

17         THE COURT:  And follows up at 359, Line 3:  "So if the

18   losses would never hit that class, then there would be no

19   reason to resolve that discrepancy."  I think we're finished.

20         MR. ROLLIN:  Your Honor, I do have some on that

21   particular topic.

22         THE COURT:  Why don't we break for lunch.  You can go

23   over this and find out if there's anything else you want to

24   deal with.

25         MR. ROLLIN:  It's one line of questions.  It should

E78PTRU3                          "Cohen"

1     just take a moment.

2              THE COURT:  Go ahead.  Go, go.

3              MR. ROLLIN:  Thank you.

4              THE COURT:  What is it, Miss Shah?

5              MS. SHAH:  Your Honor, we may have just a few discrete

6     points on this.

7              THE COURT:  Look it over at lunchtime and make a

8     decision.

9              MS. SHAH:  Thank you.

10             MR. ROLLIN:  Your Honor, I'm carrying on here at Page

11    421, at the very end, Line 11.

12             THE COURT:  Go ahead.

13             MR. ROLLIN:  I'll wait for Miss Braswell.  Okay?

14    "Q.  Did Wells Fargo believe in the end of 2010 that losses

15    were not going to hit the A-2 and A-3 classes of this

16    particular trust?

17    "A.  Oh, I don't think we thought that they were not going to

18    hit the class.

19    "Q.  It was going to hit eventually?

20    "A.  I think it's fair to say that we thought that the losses

21    would eventually reach these classes.  The timing we just did

22    not know about."

23             MR. ROLLIN:  I believe that's all I have, your Honor.

24             THE COURT:  Okay.  We'll break.  We'll resume at 2:15.

25             (Luncheon recess)

E78JTRU4                        "Cohen

1           AFTERNOON SESSION

2           2:15 pm

3           (Trial resumes)

4           (In open court)

5           THE COURT:  Good afternoon.  Be seated.

6           So we broke for lunch.  I think it is Ms. Shah's turn

7    to start?

8           MS. SHAH:  Yes, your Honor.

9           THE COURT:  Mr. Rollin, did you finish?

10          MR. ROLLIN:  I have finished, your Honor.

11          THE COURT:  Ms. Shah.

12          MS. SHAH:  In the interest of expediency, we are going

13   to seek to two do short excerpts.

14          THE COURT:  Could you say it loudly in an stentorian

15   voice.

16          MS. SHAH:  Thank your Honor.

17          THE COURT:  Ms. Shah.

18          MS. SHAH:  129 line 19:

19   "Q   Mr. Cohen, I am showing you what has been marked for

20   identification as Exhibit 129.  Exhibit 129" --

21          THE COURT:  I don't have 129.

22          MS. SHAH:  I am sorry.

23   "Q   I am showing you what has been marked for identification

24   as Exhibit TX-Q.

25          MR. PICKHARDT:  129 is 19, your Honor.

E78JTRU4                         "Cohen

1            THE COURT:  Okay.

2    BY MS. SHAH:

3    Q.  I am showing you what has been marked for identification as

4    Exhibit TX-Q.  TX Q is a series of e-mails between Wells Fargo

5    and a gentleman at Marathon.

6    "A   Yes.

7    "Q   And Marathon is inquiring about the loss allocations as

8    well?

9    "A   It appears so."

10           MS. SHAH:  We seek to move TX-Q into evidence.

11           THE COURT:  We have the testimony.  We don't need it.

12   Denied.  It is clear to me that both Sceptre and Semper were

13   interested oppositely in the problem.

14           One wanted priority in the A-2 notes, the other wanted

15   priority in the A-3 notes.  I know you're fighting about who

16   claims what and who pitched whom.  It is of no interest to me.

17   I know there are cross-claims which, following this phase of

18   the proceeding, are undoubtedly going to be dismissed.

19           MS. SHAH:  Your Honor, we understand that.  It is just

20   this one communication is between the 1-A-1 note-holders and

21   Wells Fargo and there has been testimony about note-holder

22   communications.  We would like to get --

23           THE COURT:  It is in the record.  Marathon is a 1-A-1

24   holder?

25           MS. SHAH:  Yes.

E78JTRU4                          "Cohen

1              THE COURT:  It is in the record.

2              MS. SHAH:  Thank you.

3              MS. SHAH:  If we can turn next to page 259 line 8:

4    "Q   Mr. Cohen, are you aware of any written communication in

5    which Wells Fargo represented to Semper Capital Management it

6    would not institute a trust instruction proceeding in this

7    case?

8    "A   I am not aware of any such communication.

9    "Q   Are you aware of any oral communication in which Wells

10   Fargo represented to Semper Capital Management that it would

11   not institute a trust instruction proceeding in this case?

12   "A   I am not aware of that communication.

13   "Q  Did Semper Capital Management ever ask Wells Fargo whether

14   it would or would not bring a trust instruction proceeding in

15   this case?

16   "A   I don't recall that."

17             MS. SHAH:  If you could turn, please, to 285 Line 2:

18   "Q   I am going to hand you what has been marked as Exhibit

19   TX-253 for identification.  Is this the letter you received

20   from ING?

21   "A   This looks like the letter.

22   "Q   Is this the first time that Wells Fargo received notice

23   about the inconsistency between the ProSupp and indenture, as

24   far as you know?

25   "A   Far as I know."

E78JTRU4                         "Cohen

1              MS. SHAH:  We seek to admit this into evidence as

2       well.

3              THE COURT:  Could I see the document.  What does FBS

4       mean?

5              MS. SHAH:  I believe that's -- sorry?  Where are you

6       looking?

7              THE COURT:  First line.

8              MS. SHAH:  I believe that is the first indication at

9       the end of ING's name.

10             MR. ROLLIN:  It is federal savings bank, I believe.

11             THE COURT:  Thanks.

12             MR. ROLLIN:  We object to this exhibit as hearsay.  As

13      to notice, no problem.

14             THE COURT:  Turn the page, please.

15             (Pause)

16             THE COURT:  Received.

17             (Plaintiff Exhibit TX-253 received in evidence)

18             MS. SHAH:  If you could turn next to Page 424 line 19,

19      please.

20             THE COURT:  One minute, please.

21             (Pause)

22             THE COURT:  Okay.

23             MS. SHAH:  We are at Page 424 line 19.  In the copy

24      you have, I will be reading the green portion.

25      "Q   It's correct, is it not, that Wells Fargo decided to file

E78JTRU4                    "Cohen

1   the trust instruction proceeding at a point in time where it
2   would be the losses were imminently going to hit the 1-A notes?
3   "A   I think that is a fair characterization that the time we
4   filed the petition, we thought losses were imminent, so that we
5   felt the issue needed to be addressed.  We wanted it to be
6   addressed before the losses hit the affected classes."
7               MS. SHAH:  That is all, your Honor.
8               THE COURT:  Anything further?
9               MR. ROLLIN:  No, nothing from me.
10              THE COURT:  Thank you.
11              (Pause)
12              THE COURT:  Mr. Rollin.
13              MR. ROLLIN:  Your Honor, we call our next witness,
14   Boris Peresechensky.
15    BORIS PERESECHENSKY,
16        called as a witness by the Defendants,
17        having been duly sworn, testified as follows:
18   DIRECT EXAMINATION
19   BY MR. ROLLIN:
20   Q.  Mr. Peresechensky, where do you work?
21   A.  I work at Semper Capital Management.
22   Q.  What is your title?
23   A.  My title is portfolio manager.
24   Q.  What are your responsibilities as a portfolio manager?
25   A.  I am responsible for trading and investing in RMBS,

1    residential mortgage-backed securities with Semper Capital

2    Management.

3            THE COURT:  Keep your voice up, please.

4    BY MR. ROLLIN:

5    Q.  How long have you been at Semper?

6    A.  I have been with Semper since 2005.

7    Q.  As part of your responsibilities as a portfolio manager at

8    Semper, do you keep abreast of market information?

9    A.  Absolutely.  It is one of my duties to keep abreast of all

10   market information on a daily basis.

11   Q.  What is the market information that you keep abreast of, if

12   you will just describe that for the court, please.

13           THE COURT:  May I interrupt you for a minute.  The

14   deposition transcript for Daniel Cohen needs to be marked as an

15   exhibit for identification.

16           MS. SHAH:  I believe it can be marked as Exhibit

17   TX-270.

18           THE COURT:  TX-270.

19           MS. SHAH:  TX-270.

20           THE COURT:  I will return this transcript.

21           (Pause)

22           (Plaintiff Exhibit TX-270 was marked for

23   identification)

24           THE COURT:  Please proceed.  I am sorry.

25   BY MR. ROLLIN:

E78JTRU4                        Peresechensky – direct

1   Q.  Will you please describe for the court what market

2   information it is that you keep abreast of as a portfolio

3   manager.

4   A.  We collect prices for all non-agencies securities on a --

5             THE COURT:  You have to keep your voice up.  Make

6   believe you're talking to the clock.  Somebody is standing

7   under the clock, and you're talking to that person.

8             THE WITNESS:  We collect market caller on a spectrum

9   of non-agency RMBS securities on a daily basis.

10            THE COURT:  We collect market caller?

11            THE WITNESS:  Market color information, C O L O R,

12  information.

13            THE COURT:  Market color?

14            THE WITNESS:  Information pertaining to where bonds

15  trade.

16            THE COURT:  Where bonds trade?  Where do they trade?

17  Face the clock.  Where do bonds trade?

18            THE WITNESS:  We obtain prices from a variety of

19  sources, from brokers based on where the bid lists, based on --

20            THE COURT:  Slow, slow.  Where the bid lists are?

21            THE WITNESS:  So we collect market color --

22            THE COURT:  Let me give you a piece of advice.  Are

23  you nervous?  You probably never did this before?

24            THE WITNESS:  No.

25            THE COURT:  You probably never want to do it again.

1  Relax.  You're not involved.  Just give the answers and pay

2  attention to the questions.  Speak slowly.  Take some water.

3           THE WITNESS:  Thanks.

4           THE COURT:  Take a breath and testify.

5           THE WITNESS:  All right.

6           We collect market data from various bid lists.  We

7  interact with over 60 counter-parties and we obtain prices that

8  where bonds are crossed on agency trade, and based on those

9  observations, we are able to determine where the yields the

10  securities clear, and those yields are extremely important

11  input into our evaluation model.

12           THE COURT:  The yields are the interest rate, a

13  fraction of interest rate to the price?

14           THE WITNESS:  Exactly.  You can think of yield as

15  risk-free treasury plus the spread, and the spread reflects

16  either the credit or complexity component of the security.

17           THE COURT:  If you face me -- the most important

18  person in this courtroom is not me; it is the Reporter.  If you

19  face me, he can't hear you.

20           THE WITNESS:  Okay.

21  BY MR. ROLLIN:

22  Q.  When you said a moment ago where bonds trade, does that

23  mean the price at which bonds trade?

24  A.  Correct, the prices where the bonds trade.

25  Q.  And you said non-agency RMBS.  That is jargon.  Can you

1  explain what non-agency RMBS means.

2  A.  Yeah, non-agency RMBS private label mortgage-backed

3  securities that don't have any guarantee from the U.S.

4  Government, and they rely on internal edit enhancement to

5  protect investors from losses, various sectors which in

6  non-agency universe.  There is prime, all day, sub-prime,

7  option arms.  Those are sectors in the non-agency space.

8  Q.  How do you keep apprised of market-related information?

9  What tools do you use?

10 A.  Well, we use Blumberg.  You interact with brokers on

11 Blumberg.  We get data from Blumberg and we collect that data

12 and put it into a market color database where we call color on

13 thousands of securities where they're trading, what yields to

14 do they trade, according to our model and according to other

15 models.

16 Q.  Other than Blumberg, are there other sources that you get

17 market information from?

18 A.  We maintain regular communications with brokers, as I said,

19 interact with over 60 broker-dealers so there are always

20 telephone communications, always meetings with brokers where we

21 obtain pertinent market color.

22 Q.  Do you monitor market trends?

23 A.  Absolutely.  It is one of the most important functions to

24 know where the bonds are trading and what yields, current

25 yields the bonds clear.  It is one of the most loss location

1   inputs into a modeling analysis is to know exactly what yields

2   certain securities should trade.

3   Q.  Is there any literature that you regularly read on issues

4   related to investments?

5   A.  Sure.

6           MR. PICKHARDT:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  Yeah, I read weekly research reports from all major

9   broker-dealers.  I follow housing trends, read real estate

10  publications.

11  Q.  Do you attend industry conferences?

12  A.  Regularly.  I attend the annual ABS East conference usually

13  held in Miami and I attend the ABS West or East ASF conference

14  in Vegas and last month I was globally BS in Barcelona.

15  Q.  What types of, what topics are covered that relate to your

16  trading mortgage-backed securities in general at the

17  conferences?

18  A.  Well, people exchange color trends, and so it is helpful to

19  formulate some ideas and outlooks by talking to other market

20  participants and get their point of view.

21  Q.  We are going to back up a little bit and ask you to tell

22  the court about your education.  Will you please do so.

23  A.  Sure.  I graduated from Colombia with a degree in economics

24  and operation research in 1999.

25          THE COURT:  Colombia College?

1              THE WITNESS:  Columbia College.

2    BY MR. ROLLIN:

3    Q.  Would you tell us about your experience in this profession

4    leading up to your employment at Semper, please.

5    A.  Okay.  I started my career at Lazar Management as junior

6    PM, Jr. portfolio manager supporting MBS --

7              THE COURT:  Slower, slower, slower.

8    A.  -- from there on I moved to HSBC Securities, where I was a

9    market risk analyst overseeing compliance with risk limits for

10   all trading desks, and then I moved to Miami to work for Bay

11   View Financial, one of the major securitization shops of

12   security size deals back then and then I was risk manager

13   managing multi-billion dollar --

14             THE COURT:  The problem, your sentences are too long.

15   You don't breathe in the middle.  Break down the sentence, will

16   you please.

17             THE WITNESS:  Okay.

18   BY MR. ROLLIN:

19   Q.  Will you describe your, in general, your familiarity with

20   mortgage-backed securities.

21   A.  Sure.  I had some exposure right at the start of my career

22   when I was supporting MBS desk at Lazar.  I managed interest

23   rate risk of whole portfolio at Bay View, so I dealt with the

24   loan side of the business and went to Semper in 2005 and

25   started by trading agency MBS products such as TBAs, specified

1    pools, agency most derivitives.

2              MR. ROLLIN:  Show down on those jargon terms

3    specifically.

4              THE COURT:  Are any of your colleagues following the

5    testimony in realtime?

6              MS. BRASWELL:  I can see it here.

7              THE COURT:  And that is so also on the front table?

8              MS. SHAH:  Yes, your Honor.

9              THE COURT:  If there is a problem, stop us, please.

10             MS. SHAH:  Yes, your Honor.

11             MS. BRASWELL:  Yes.

12   BY MR. ROLLIN:

13   Q.  You were describing your experience in mortgage-backed

14   securities, investments and you started to go through a series

15   of things that I think were difficult to hear.  Can you take

16   those one at a time and describe just in a bullet point format

17   slowly the different experiences you have in mortgage-backed

18   securities investment.

19             THE COURT:  What was your first experience?

20             THE WITNESS:  Well, I started my career at Semper as

21   an MBS analyst.

22             THE COURT:  MBS?

23             THE WITNESS:  MBS.

24             THE COURT:  MBS?

25             THE WITNESS:  Agency MBS products.

1              THE COURT:  Agency MBS product is a product that has

2     no government sponsor?

3              THE WITNESS:  No.  It is a product that has government

4     guarantee, whether explicitly Fannie or Freddie.

5              THE COURT:  We can't follow you.  It has government

6     sponsorship?

7              THE WITNESS:  Yes.

8              THE COURT:  What is the government sponsorship?

9              THE WITNESS:  Those profits that guarantee from Ginny

10    Mae, which agency --

11             THE COURT:  What is Ginny Mae?

12             THE WITNESS:  Government national mortgage

13    association.

14             THE COURT:  Mr. Rollin, break it up, ask questions

15    till you you get it right.  Otherwise, it is going to be a

16    jumble.

17             MR. ROLLIN:  I am trying to walk him through.

18             THE COURT:  I know.  You have to interrupt the

19    witness.  As soon as he says something that is not really

20    clear, stop him and ask about it and move on.  Be a little

21    slower.

22             MR. ROLLIN:  Okay.

23    BY MR. ROLLIN:

24    Q.  You also mentioned Fannie Mae.  Is that right?

25    A.  Fannie Mae and Freddie Mac are the two government sponsored

1    enterprises.

2              THE COURT:  Those are part of the agency bonds.  Are

3    all agency bonds government sponsored?

4              THE WITNESS:  They're guaranteed by Ginny Mae,

5    explicit agency of the U.S., part of U.S. Treasury, or they're

6    one of the GS, GSE, one of the government sponsored enterprise,

7    Fannie or Freddie.

8              THE COURT:  Some other government sponsor?

9              THE WITNESS:  Yes.

10             THE COURT:  That is how you define an agency bond, by

11   a bond that is sponsored by one or another government agency?

12             THE WITNESS:  Yes, guaranteed by one of the government

13   agencies.

14   BY MR. ROLLIN:

15   Q.  In addition to the agency mortgage-backed securities, will

16   you please tell us the next experience you have in residential

17   mortgage-backed securities.

18   A.  Yes.  In 2006 I started to acquire several non-agency

19   securities that did not have government guarantee.  Mostly

20   prime deals, season prime deals, issued in 2003, 2004, and they

21   traded back then about two or three points back of government

22   guarantee securities.

23             THE COURT:  Don't give such a complete answer.  The

24   question is, in addition to the agency mortgage-backed

25   securities, what is the next experience?  And you answered in

E78JTRU4                              Peresechensky – direct

1      2006 you started to acquire several non-agency securities?

2                    THE WITNESS:  Right.

3                    THE COURT:  Meaning those that did not have government

4      guarantees?

5                    THE WITNESS:  Ah-huh.

6                    THE COURT:  He said there were prime deals.  What is a

7      prime deal?

8                    THE WITNESS:  That refers to the highest quality of

9      the borrower.  Particularly the FICO score is higher than 730

10     and loan to value is below 73 percent or so.

11                   THE COURT:  And they traded, you said, two or three

12     points back of government guarantee securities?

13                   THE WITNESS:  Correct.

14                   THE COURT:  What does that mean?

15                   THE WITNESS:  They traded below equivalent

16     government -- securities that -- it -- there was Fannie, 4

17     percent, TBA was trading in one of 4, then the prime securities

18     is 4 percent on the traded one or two.

19                   THE COURT:  That is two points below?

20                   THE WITNESS:  Yes.

21     BY MR. ROLLIN:

22     Q.  Is that when you started trading non-agency residential

23     mortgage-backed securities?

24     A.  That was my first experience was non-agency RMBS,

25     residential mortgage back securities, yes.

1    Q.  When did you start trading non-agency residential

2    mortgage-backed securities on a more or less full-time basis?

3    A.  As the housing crisis started to unravel in 2007 and global

4    financial crisis hit in 2008, non-agency securities began to

5    trade at distressed levels.  At that point, that is when our

6    main focus began to shift from agency, MBS to non-MBS, where

7    you find a lot of volume back then.

8    Q.  In the course of your responsibilities as a trader in

9    non-agency mortgage-backed securities, do you have to from time

10   to time familiarize yourself with the terms of an indenture or

11   servicing agreement?

12   A.  Yes.

13   Q.  Do you have to know generally in your experience all of it

14   or there are certain portions that you focus your attention on?

15             MR. PICKHARDT:  Objection.

16             THE COURT:  Overruled.

17   A.  I permanently focus on distribution of payments section and

18   loss location section of the indenture or PSA.

19   BY MR. ROLLIN:

20   Q.  Do you always review either the indenture or the pooling

21   and servicing agreement, whichever might be applicable when

22   considering a trade in residential mortgage-backed securities?

23   A.  Not always.  Only when I'm faced with some uncertainties

24   regarding payment allocation or loss location.

25             THE COURT:  Keep your voice up.

1    BY MR. ROLLIN:

2    Q.  Can you give me a sense, give the court a sense of

3    approximately how many residential mortgage-backed securities

4    trades you engage in every year?

5    A.  Well, we compiled the statistics in 2010 and 2011, and the

6    volume of non-agency trades that I've done in those years was

7    over 2.5 billion per each year.  I traded over a thousand

8    securities each year, and we haven't compiled statistics since

9    2012, so I can't attest to that so we traded many, many if not

10   thousands of agency securities.

11   Q.  Before engaging in a trade, do you analyze the type of

12   market information pertaining to that bond that you previously

13   told the court about?

14   A.  Yes, I try to find as much information on that particular

15   security, where it has traded in the past, what was -- if there

16   was any information, as I call it color released on that

17   security from the past, what sort of price talk.

18          Price talk refers to other broker-dealers'

19   expectations where the bonds will trade on the list, so I

20   collect all the pertinent market color for that securities

21   prior to making a purchase.

22   Q.  I apologize.  I'm going to go back to a previous question.

23          You said sometimes you look for indenture or PSA if

24   there is some uncertainty about the loss allocation.  Let me

25   ask you, do you ever look at the prospectus supplement if there

1    is some uncertainty about the loss allocation?

2    A.  No, I don't.  I only look at prospectus supplements for

3    descriptive reasons, look at collateral information or

4    underwriting process of originators.  I don't look at any

5    crucial aspects of bond violation such as principal

6    distribution or loss location in the ProSupp.

7    Q.  Why?

8    A.  I understand prospective supplement to be a nonbinding

9    market material.

10   Q.  How do you contrast that with a indenture?

11   A.  I understand indenture should be government controlling

12   document.  Intex which is industry standard cash flow, most of

13   the market participants use in the industry always models

14   securities per Intex, per indenture service.  They model

15   securities for indenture as a rule.

16   Q.  When were back to the question of the market data that you

17   look at for a trade, what are the -- you talked about Blumberg

18   earlier.  Let me ask you this -- what are the tools or

19   applications that you use in order to collect that market

20   information?

21   A.  The tools that I use to value, perform valuation of the

22   bonds?

23   Q.  To perform valuation on the bonds, yes.

24   A.  We use Intex, which is industry standard cash flow model --

25   sorry -- industry standard cash flow engine.  Use bond studio,

1   the JP Morgan application that uses Intex as a cash flow engine

2   and we use Bloomberg as well for some deals.

3   Q.  To your knowledge, are those tools that are used by other

4   investment professionals in the industry?

5   A.  Sure, yeah, based on my conversation with other industry

6   professionals, the majority of them use the same tools.

7   Q.  Do you regularly use those tools?

8   A.  Every day.

9   Q.  About how many bonds do you bid on every day?

10  A.  I would say on the average at least 20 per day.

11  Q.  You talked about bond studio, and I asked you to please

12  describe for the Court in a little bit more detail what bond

13  studio is.

14  A.  It is a JP Morgan application that is used to value

15  non-agency securities and it relies on Intex cash flow engine

16  to run bonds.

17  Q.  What is the type of information that you get from bond

18  studio?

19  A.  It has information about, descriptive information about the

20  security and contains the structure of the deal.  It allows

21  users to run as many assumptions as a user wants and pretty

22  much contains most of the pertinent inputs for loss allocation

23  of non-agency securities.

24  Q.  How does running cash flows on bond studio compare to

25  running cash flows on Intex?

 1             MR. PICKHARDT:  Objection, your Honor.

 2             THE COURT:  Overruled.

 3   A.  They're basically identical, like doing a Google search on

 4   Desktop versus doing a Google search on iPhone.  If you

 5   perform -- you will get the same results whether you do a

 6   search on iPhone or you do a search on a Desktop.

 7   Q.  Are there certain features that the Intex application

 8   offers to subscribers that are different from what's available

 9   to bond studio users?

10   A.  Sure.  Intex has a more thorough and easily accessed

11   historical information about bond cash flows.  It is a lot

12   easier to integrate proprietary credit, loan level credit model

13   into Intex than bond studios.  It is a lot easier to run in

14   Intex than it is bond studio.

15   Q.  Do those features make Intex a more convenient application?

16   A.  Yes.

17   Q.  Let me ask you this:  Are those features necessary for you

18   to conduct whatever due diligence you have to before you buy a

19   bond?

20   A.  No, they're not.

21   Q.  Let's talk about this case.  Do you understand that this

22   case concerns notes in AHMIT 2005-2?

23   A.  I do.

24   Q.  Does Semper have holdings in that trust?

25   A.  Correct.  We own 26 million in 1-A-3 tranche.

 1   Q.  When did Semper purchase those notes?

 2   A.  We purchased those notes on September 27th, 2012.

 3   Q.  Who made the decision to purchase those notes?

 4   A.  I did.

 5   Q.  What drew you to purchase the notes?

 6   A.  There were a fit from A risk return prospective for one of

 7   the funds.

 8             THE COURT:  They were fit?

 9             THE WITNESS:  They were fit, a good fit for us.

10             THE COURT:  What is a good fit?

11             THE WITNESS:  They offered a pretty good yield for one

12   of our funds.  We ran them at base case 12 percent yield.

13             MR. ROLLIN:  You have to speak up for the court

14   reporter.

15             THE WITNESS:  I ran those bonds from 10 to 12 percent

16   yields so they fit into a minus view of our securities.

17             THE COURT:  Say that again.

18             THE WITNESS:  I ran those bonds at around 10, 12

19   percent yield.

20             THE COURT:  What does that mean, you ran those bonds?

21             THE WITNESS:  I can go into assumptions?  I ran

22   using --

23             THE COURT:  Slowly, do it slowly.

24             THE WITNESS:  -- I ran the bonds using a proprietary,

25   loan level credit model.  I ran it using third party JP Morgan

1   base and stress case.

2   BY MR. ROLLIN:

3   Q.  You say base and stress-based model?

4   A.  Yes.  They have two variety of models based on housing

5   market scenario.  I based base case housing scenario and stress

6   case housing scenario, and I was able to generate double digit

7   yields at my bid.  So, therefore, for one of the funds, it was

8   a very good fit.

9           Some of our other funds require securities to be rated

10  at least, at least have one investment rating.  The bond did

11  not have any investment grade ratings.

12          THE COURT:  In your analysis, did you assume all the

13  interest would be paid?

14          THE WITNESS:  Sorry?

15          THE COURT:  In your analysis of a good yield, did you

16  assume that all the interest would be paid?

17          THE WITNESS:  I ran the analysis on bonds at issue.

18          THE COURT:  On what?

19          THE WITNESS:  Bond studio, application that uses Intex

20  cash flow engine, and I put very conservative assumptions, so I

21  obtained base case yield around 10 to 12 percent.

22          THE COURT:  Does that assume all interest would be

23  paid?

24          THE WITNESS:  It assumes that as far as all interest,

25  it ran assumptions at projected coupons.  It ran the

1    assumptions going into the prepayment, default rates and

2    service advances.  So there are a myriad of factors that go

3    into the assumptions.  Those are primary factors.  I don't

4    recall exactly how much interest was paid or how much principal

5    was paid, but I obtained 10 to 12 percent yield at my bid.

6              THE COURT:  Did you consider the possibility that the

7    obligor would not have enough money to pay all interest on all

8    categories of notes?

9              THE WITNESS:  We always consider that, the risks there

10   will be a loss.  This deal was going to take a write-down, no

11   question about that.  It was purchased at 47 cents on the

12   dollar.  It obviously assumed that not all principal would be

13   repaid.

14             MR. ROLLIN:  Your Honor, may I proceed?

15             THE COURT:  Yes.

16   BY MR. ROLLIN:

17   Q.  When you analyzed the bond, did you -- I am calling upon

18   the Court's question -- did you assume that although

19   write-downs were definitely going to happen, that they would

20   first be applied to the Class A-2 notes before the Class A-3

21   notes?

22   A.  Well, yes.  At first I pulled up the security on Blumberg.

23   This is just give a background on the purchase.  It was 12-30

24   liquidation list on September 27th, came from many dealers, and

25   I pulled, when I pulled up the security on Blumberg, I looked

1    at the credit enhancement level from 1-A-3 versus 1-A-2.

2    Q.  Stop.  You looked at the credit enhancement levels on

3    Blumberg?

4    A.  Ah-huh.  Credit enhancement refers to how much credit

5    protection from the junior tranches each tranche passed.  1-A-3

6    had 35 percent of credit enhancement, meaning approximately you

7    can take 35 percent of the losses before you start getting

8    write-downs on the 1-A-3 tranche.  1-A-2 tranche had at that

9    time I believe it had around 10 percent credit enhancement.

10   That indicated to me 1-A-3 was the senior bond on Blumberg.

11          Now, I did notice there was abnormality nomenclature

12   because in option arm deals, I looked at prior to this AHMIT

13   bond.  Typically, 1-A-2 is senior mass and --

14   Q.  Let me stop you there for a moment.  You said the term

15   option arm?

16   A.  Yes.

17   Q.  What does option arm stand for?

18   A.  Option arms refer to the collateral type where the interest

19   is basically -- it is based on some Intex, whatever, whether it

20   is treasury CMT or LIBOR, and the initial payment is actually

21   below the full, the full Intex rate.  There is negative

22   amortization going on in the principal.

23   Q.  Is this just a type of mortgage loan?

24   A.  Yes, it is a type of mortgage loan.

25   Q.  You mentioned also in your previous answer, you used the

1   term mez.  What does mez mean?

2   A.  Mez refers to subordinate to senior.  It is not a senior

3   tranche.

4   Q.  You were describing A-3 as a senior mez and A-2 as a junior

5   mez.  I used jargon myself in the question.  I apologize.

6           Will you please describe what you mean when you looked

7   at the anomaly and nomenclature with respect to the relative

8   priority of A-2 and A-3 classes.

9   A.  Yes.  From the Bloomberg page, 1-A-3 had higher level

10  credit enhancement than 1-A-2, confirming it was senior to

11  1-A-2, meaning the losses would hit 1-A-2 before they hit

12  1-A-3.

13  Q.  I will stop you there.  What did you do in response to

14  seeing the anomaly in nomenclature?

15  A.  I must add at the same time I look at credit enhancement, I

16  looked at the rating on the same page, and the rating for 1-A-3

17  was higher than 1-A-2 for the supporting that 1-A-3 was a

18  senior tranche.

19  Q.  By "rating," what do you mean by that?

20  A.  The rating from S&P and Moody's.

21  Q.  Do I understand correctly that the S&P and Moody's rate

22  each tranche.  Is that right?

23  A.  Yes.  Most S&P and Moody's are rating each tranche.

24  Q.  Is there something about what you saw in the ratings that

25  led you to believe that either the A-3 was -- the A-3, what

1   their relative seniority was?

2   A.   Yes, A-3 had higher ratings, and higher ratings allude to

3   the fact it is senior to the fact it is lower ratings.  The

4   bonds are from the same group.

5            THE COURT:  Why did you consider it anomalous?

6            THE WITNESS:  I noticed the anomaly because in my

7   previous experience when I looked at other options on deals --

8   and I haven't looked at many -- there were three tranches in a

9   stack.  It could be 1-A-1, 1 and 2, or it could be named 1-A-1,

10  1-A-2 or 1-A-3, or some other nomenclature such as A-1-A,

11  A-1-B, A-1-C.  The first tranche, the A-1 is a senior bond, and

12  the second tranche is, A-2 is senior mez and the third tranche,

13  A-3 is a junior mez.

14           THE COURT:  The last word?

15           THE WITNESS:  Junior Mez.

16           THE COURT:  What is the top one?

17           THE WITNESS:  The first tranche, A-1 is a senior bond.

18           THE COURT:  Senior bond?

19           THE WITNESS:  Yes.

20           THE COURT:  The second one?

21           THE WITNESS:  The second one is senior mezzanine.

22           THE COURT:  Mezzanine?

23           THE WITNESS:  Yes, mezzanine, and the third is a

24  junior mezzanine.

25           THE COURT:  Junior mezzanine?

1              THE WITNESS:  Yes.

2              THE COURT:  You would expect this to what?  How would

3    you name this?  What is the nomenclature for the senior bond?

4              THE WITNESS:  The nomenclature varies across the

5    deals.  Some deals are 1-A-1 and some deals would be 1-A-2 and

6    3.  That is one of the nomenclatures encountered in option arm

7    deals.  In prime, it could be an incomplete series in

8    sequential order where 1-A-4 or 1-A-3 could be senior to 1-A-2.

9              In prime and Alt-A, a type of collateral deal.

10             THE COURT:  Don't use abbreviations.  Use the big

11   word.

12             THE WITNESS:  Prime loans, loans to prime buyers --

13   less qualified buyers lower.

14             THE COURT:  Less qualified?

15             THE WITNESS:  Less qualified by credit scores, the

16   credit.

17             THE COURT:  What is that called?

18             THE WITNESS:  Credit score, FICO, the FICO score.

19             THE COURT:  What kind of score?

20             THE WITNESS:  FICO.

21             MR. ROLLIN:  F I C 0.

22             THE WITNESS:  F I C 0.  Alt-A loans have --

23             THE COURT:  What kind?

24             THE WITNESS:  A L T dash A, higher Ltd relative to --

25   loan-to-value relative to prime deals, and like I said, it

1    might have less robust documentation.  You might have some

2    missing documents.

3              THE COURT:  In your nomenclature, what is customary,

4    the lower number being more secure or the lower number being

5    less secure?

6              THE WITNESS:  In my experience in option arm deals --

7    and I haven't --

8              THE COURT:  Option arm?

9              THE WITNESS:  Option arm, yes, option arm is a type of

10   loan and this was an option arm deal.

11             In my experience, the lower number corresponds to the

12   more senior bond.  In prime Alt-A deals, it varies.  It can be

13   reverse sequential order.

14   BY MR. ROLLIN:

15   Q.  Does that mean that the nomenclature doesn't necessarily

16   define seniority in mortgage-backed securities?

17             MR. PICKHARDT:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.  No, not at all.  Obviously, I was just -- I took account of

20   that.  I noticed it was somewhat abnormal from other deals I

21   looked at.  Therefore, I wanted to dig further and perform

22   further due diligence on the security.

23   Q.  What did you do?

24   A.  So after I looked at the credit enhancement ratings, I ran

25   both 1-A-2 and 1-A-3 on both bond studio antics and it was

1    Bloomberg to ascertain the seniority of 1-A-3.

2            When I ran them on the same assumptions at the same

3    price, I got the high yield for 1-A-3 tranche which confirms

4    the seniority of 1-A-3 tranche.  Beyond that, when I looked at

5    the Bloomberg page and typed in CF to pull up all the

6    documents, I trust the trust indenture there on Bloomberg and I

7    opened the trust indenture in order to verify the loss

8    allocation language.

9            I looked at the loss allocation language in the trust

10   indenture, I believe it was Section 3.38 and it was clear,

11   unambiguously stated the losses is responsible -- -- the losses

12   will be allocated to 1-A-2 and 1-A-3 in that order.  So it

13   unequivocally confirmed in my mind that 1-A-3 was a senior

14   tranche.

15   BY MR. ROLLIN:

16   Q.  Did you look at any other documents related to the

17   underlying transaction at that time?

18   A.  No.  My main concern was to ascertain the seniority of

19   1-A-3 at that time and I looked at the controlling government

20   document indenture to verify the loss allocation language.

21   Q.  Did you then purchase your A-3 notes?

22   A.  So, yes, I ran it on bond studio using a proprietary credit

23   loan level model and I ran JP Morgan's credit model base case

24   and stress case, and I bid where I was comfortable bidding it,

25   and two hours later I was told I could buy bonds.  I initially

1    bid 47 and a quarter and 47 A ticks and paid A ticks commission
2    to the counter-party through who I bought this security.
3    Q.  Let me break that up a little bit.
4         You said you paid 47 and a quarter.  Can you --
5    A.  That was my bid.  A competitive bid list process where
6    seller, some other investor contacted a number of
7    broker-dealers and sent them a list of bonds they would like to
8    sell, and the broker-dealers distributed the list to end
9    accounts and investors like myself and others, and they
10   collected the bids, and the highest bids were submitted to the
11   seller, and the seller then proceeded to award the bonds.
12   Q.  Okay.  Explain the pricing terminology that you used.  Did
13   you pay 47 and a half?
14   A.  Yes, I paid 47 and a half for the bond.
15   Q.  Does that mean 47 and a half percent of the then current
16   face of the bond?
17   A.  Yes, correct, 47 and a half percent of the current face of
18   the bond.
19        THE COURT:  Meaning you had 52 and a half percent
20   discount from par?
21        THE WITNESS:  Yes, from par.
22   BY MR. ROLLIN:
23   Q.  At any time prior --
24        THE COURT:  Is that considered junk?
25        THE WITNESS:  The bond was going to take losses, so I

 1    ran it around 10, 12 percent and base case 4 percent of stress

 2    case.

 3             THE COURT:  10 to 12 percent is a good yield?

 4             THE WITNESS:  The ratings were certainly below

 5    investment ratings.  The ratings was Double B or Triple C so

 6    yeah, it was junk ratings.

 7    BY MR. ROLLIN:

 8    Q.  Were the ratings higher than the ratings for the A-2 class

 9    at that time?

10    A.  A-2 had lower ratings than A-3.  I must, if you want to

11    know more about diligence, I also looked at, like I said, the

12    price history.

13    Q.  Please do describe that.  I was about to ask it, but go

14    ahead.

15    A.  Like I said, before I put a bid, I look at any price

16    information I have on the bond.  So I went back and looked at

17    my notes and Bloomberg and messages on both 1-A-3 and 1-A-2 and

18    I noticed that back in February, on February 23rd, there was 50

19    million original face of 1-A-3 tranche out for the bid and I

20    was posting --

21    Q.  Give the court reporter a second to catch up.

22             MR. PICKHARDT:  I object on hearsay grounds, your

23    Honor.

24             THE COURT:  Overruled.  He is describing what he did.

25    It is not hearsay.

1    A.   The price talk on that particular list in February, the

2    price talk refers to broker-dealers, traders' expectations of

3    where the bonds will trade on the list, range from 40 to low to

4    mid-40, so you can see from 40 to 43.

5             THE COURT:  For The A-2?

6             THE WITNESS:  No.  For A-3s.  I am referring to the

7    sale, bid list for A-3 and on February 23rd.

8             THE COURT:  Okay.

9    BY MR. ROLLIN:

10   Q.   Of which year?

11   A.   2012.  That was bid list on February 23rd, 2012, 50 million

12   was offered for the bid.  The price talked ranged from 40 to

13   mid-40's.  On the flex day I saw a post the bond traded and

14   there was offer out there stemming from that sale at 39.

15            Now, I don't know where the bond traded, but given the

16   offer was 39 and IDC, a pricing service that monitors the

17   prices of non-agency securities.  Given the IDC price went up

18   from, I don't remember where, to 37 and a half in February, it

19   leads me to believe that the bond traded somewhere around 37

20   and a half on February 23rd, 2012.

21            So that was also one of the inputs into my evaluation

22   of this security, and on September 27th on the day I purchased

23   1-A-3 tranche.

24   Q.   Is the price talk and other market color that you received

25   the type of information that you have to rely on, was it the

1    type of information you rely on in making your investment

2    decisions?

3    A.   It is one of the factors that I look, I consider when

4    making an investment decision for sure.

5    Q.   You started to describe due diligence.

6         Were there any other things that you did in addition

7    to those which you've already told the court about before

8    purchasing the A-2 -- sorry -- A-3 notes?

9    A.   Yes.  I also noticed that the A-2, big block of A-2 traded

10   early that month, early in September, and there was a post that

11   the A-2 traded in low to mid-30's.

12   Q.   At a lower price than where you saw market color for?

13   A.   Yes, at a lower price than where I saw market color for

14   A-3.

15   Q.   Was there significance in that fact to you?

16   A.   Yes.  It just confirmed the seniority of A-3, the market

17   looked at the A-3 as a senior bond relative to A-2.

18           THE COURT:  Would it have been a good strategy to buy

19   both A-2s and A-3s?

20           THE WITNESS:  I will get to that.

21           THE COURT:  You have to do it?  I will wait.

22           THE WITNESS:  Okay.

23           THE COURT:  You can answer now.  Would it have been a

24   good strategy to buy both A-2 and A-3?

25           THE WITNESS:  The block of A-2 traded was way too big

E78JTRU4                         Peresechensky - direct

1    for us.  We couldn't really buy because it was over our -- we

2    have a volume risk limit where key can't put so much

3    concentration into one Q-sip.  It was way too big for us

4    because our fund was only a hundred million at that point.  It

5    wasn't proper.

6              THE COURT:  What was being offered?

7              THE WITNESS:  It wasn't being offered.  It was on a

8    list.

9              THE COURT:  Both A-2 and A-3?

10             THE WITNESS:  The A-2 was on a list in September,

11   early September.

12   BY MR. ROLLIN:

13   Q.  For clarity, are these are on different lists?

14   A.  Yes, from different list.

15   Q.  The A-2 appeared at one time on one?

16             THE COURT:  The A-2 was on one list in September 2012

17   and the A-3 was on a different list, and when was the different

18   list?

19             THE WITNESS:  February 23rd, 2012, I believe, 50

20   million.

21             THE COURT:  February 23rd, what year?

22             THE WITNESS:  2012.

23             (Continued on next page)

24

25

1              THE COURT:  Also 2012?

2              THE WITNESS:  No, I must preface that by stating that

3     the market --

4              THE COURT:  Let's stay with one thing.  You said that

5     A2 was offered September 2012?

6              THE WITNESS:  It traded September 2012.

7              THE COURT:  Traded.

8              THE WITNESS:  Yes.

9              THE COURT:  And you said A-3 was offered

10    February 23rd, 2012.

11             THE WITNESS:  Well, first --

12             THE COURT:  Is it 2012 or 2013?

13             THE WITNESS:  2012, but it -- 50 million was on a bid

14    list.  It traded on a bid list.  I wasn't -- there was no

15    caller information post-trade, but the next day there was an

16    offer on that bond at 39.

17             THE COURT:  The next day there was an offer on that

18    bond at 39?

19             THE WITNESS:  Yes.

20             THE COURT:  What bond was that bond?

21             THE WITNESS:  A-3.

22             THE COURT:  So if you had the neighbor buy both A-2

23    and A-3 within your so-called appetite limits, would it have

24    been a good idea to buy both?

25             THE WITNESS:  I think, I mean, depending on the price,

E78PTRU5                    Peresechensky - direct

1    yeah, I mean, I think it -- you know, there are -- you can buy

2    a lot of -- you can buy many potential investments, and I

3    actually was very close to buying A-2 recently and I can

4    comment on that.

5         THE COURT:  So both have their potential upsides and

6    downsides?

7         THE WITNESS:  Yes, but I must say that I ran both of

8    these bonds in the indenture.  I didn't give any weight to -- I

9    mean, I'll get to it later, but I basically ran them in the

10   Intex the way the model is.

11        THE COURT:  You said that you valued them -- you

12   evaluated them against the indenture?

13        THE WITNESS:  Yes.

14        THE COURT:  And not against the Pro Supp.

15        THE WITNESS:  Yes, by default Intex model --

16        THE COURT:  Right.

17        THE WITNESS:  Exactly, yes.

18        THE COURT:  Okay.

19        THE WITNESS:  So I must also say --

20        THE COURT:  Okay, stop.  You're finished.  Wait for

21   another question.

22   BY MR. ROLLIN:

23   Q.  I want to follow up on the Court's question, I think.

24        Have you seen the prices, based on the available

25   market information, for both the A-2 and the A classes rise

E78PTRU5                    Peresechensky - direct

1    over time?

2    A.  Yes.  There was a -- there was a significant rally from

3    February 2012 to September of 2012.  The market rallied a lot.

4    I would say those type of cash loads to option are mezzanine

5    tranches rise anywhere from 15 to 20 percent from February 2012

6    to September of 2012.

7    Q.  Now, when you won that September 27th, 2012, bid, did you

8    find out whether there was a -- or what the second-best offer

9    was?

10   A.  Yes.  So the second best bid or in the market refers to --

11   in our space, refers as a cover, to cover, it's called a cover

12   bid, it's the second best bid.  Nomura came back to me and told

13   me that I had a very tight cover at 47.

14   Q.  What does a "tight cover" mean?

15   A.  Well, tight it means there's not much distance between the

16   winning bid and the second-best bid because my bid was 47 and a

17   quarter, and I paid Nomura eight-six commission and the

18   second-best bid was 47.

19   Q.  What is the significance of that fact to you?

20   A.  Well, that somebody else thought the bonds were worth

21   around the same price as I did.

22   Q.  When you bought -- Are you now aware of a discrepancy

23   between the indenture and the Prospectus Supplement concerning

24   the allocation of realized losses?

25   A.  Oh, yes.

1          THE COURT:  Were you aware, at the time you were

2    pricing them, of the discrepancy?

3          THE WITNESS:  At the time of purchase?  No.

4          THE COURT:  You were not?

5          THE WITNESS:  No.

6    BY MR. ROLLIN:

7    Q.   When did you first find out about the discrepancy?

8    A.   Okay.  So I find out about the discrepancy the next day.

9    Q.   How did you find out about the discrepancy?

10   A.   I was having a conversation with a trader at Mesirow

11   Financial, Ali Haghighat.  I always call him Ali, I'm sorry.

12   Q.   I will try to spell the last name.  Tell me if you think

13   this is the correct spelling.

14         THE COURT:  Ali somebody.

15   A.   I can spell his last name.  I'm just not really good at

16   pronouncing it.

17         MR. ROLLIN:  Ali somebody is fine, if it's fine with

18   the Court.

19         THE COURT:  Spell the last name.

20         THE WITNESS:  H-a-g-h-i-g-h-a-t, Haghighat.

21   BY MR. ROLLIN:

22   Q.   And what did Ali H tell you?

23   A.   So we had a conversation, and we usually talk on a regular

24   basis where we discuss different bonds, what kind of --

25   Q.   Nice and slow, please.

1    A.   Yeah, and so we had the conversation we usually discuss

2    what type of bonds we buy throughout the week, and I told him

3    that I bought this AHM bond.  And he took a look at it,

4    analyzed the collateral, came back to me and said, yes, he

5    likes the bond, where can I sell the bond to him.  And I said,

6    well --

7    Q.   Let me stop you.  Does that mean he was asking you if he

8    could buy the bond from you that you had just bought?

9    A.   Yes.  He was asking me where he could buy the bonds from me

10   the day after I bought them.

11   Q.   Okay.  Continue about that conversation.

12   A.   So I told him that I just bought them and, you know, I'm

13   typically a long-term investor, but I'm not married to the

14   price, and in order for me to sell the bond, I would need at

15   least 50 to sell the bond.

16        He came back and said the best he can do in this AHM

17   bond was 49 and a half, and I said, well, you know, given this

18   bid came from you and I value your opinion, we do a lot of

19   trading, I will sell it to you at 49 and a half on that date.

20   Q.   Okay.  Was that the end of the conversation?

21   A.   No, no.  About, I'd say, ten minutes later, he said -- you

22   know, I don't remember if it was the same phone call or a

23   different phone call.  He comes back and says, Boris, I need to

24   pull my bid.  The bid is out.  There's some problems with this

25   bond.

1   Q.  And what problem did he tell you there was with the bond?

2   A.  And then he proceeded to explain that there was a

3   difference between -- a difference in allocation -- loss

4   allocation between the indenture and the Pro Supp.

5   Q.  And is that the first time you learned of the discrepancy?

6   A.  Yes.

7   Q.  And you said he pulled his bid.  Does that mean that he

8   asked --

9   A.  He asked to cancel the trade.  So I said -- you know, I

10  told him that he can be done at 49 and a half, and we proceeded

11  to discuss some other matter, and then ten minutes later, he

12  asked to retract his bid and cancel the trade.

13  Q.  You mentioned a moment ago --

14          THE COURT:  Did you agree?

15          THE WITNESS:  Yes.  I mean, out of -- you know, I have

16  very good relationship with Ali.  I value his opinion.  We have

17  mutual respect.  I see him as a person with a lot of integrity,

18  and given the circumstances of this transaction, that he came

19  back ten minutes right after he said it could be done, he could

20  buy -- he wants to buy at 49 and a half, we agree on a trade.

21  In light of these circumstances, I thought it was the proper

22  thing to let him out of the trade.

23  BY MR. ROLLIN:

24  Q.  You used the phrase "can be done at" and then a price?

25  A.  Yes.

1   Q.  Is that a term of art, "can be done at"?

2   A.  Yeah, so typically when, you know, people say "done," in

3   our space, in the trading space, people say done means that

4   they agree to the terms of the transactions.

5   Q.  That's the -- is that the handshake at the end?

6   A.  Yes.  It's basically a handshake, so to speak.  The trade

7   is consummated.

8   Q.  Did you have to let him out?

9   A.  You know, it's not industry standard to let people out on

10  the trade once they both parties agree on the terms; so I

11  didn't have to let him out, but I felt it was the proper thing

12  for me to do.

13  Q.  Did you ever go back to Nomura and ask them to let you out

14  of the purchase that you had just made?

15  A.  No.

16  Q.  Why not?

17  A.  It would have been impossible to cancel, first of all,

18  because it was already a day after the trade was done.  So

19  there's zero chance that they would have canceled the trade.

20          And second of all, I was convinced that given the

21  indenture was the governing document, that the loss allocation

22  was going to apply per indenture, and I wanted to take the next

23  step in my due diligence just to verify it and verify it with

24  the trustee securities administrator.

25  Q.  Okay.  Let me help break that down a little bit.  You

1    learned from Ali of the discrepancy, correct?

2    A.  Yes.

3    Q.  And then you -- what do you do next in relation to the

4    discrepancy?

5    A.  My next step was to talk to the trustee or securities

6    administrators to ascertain whether they're going to file the

7    indenture or the Prospectus Supplement with regard to

8    allocation of losses.

9    Q.  And what specifically -- break it down step by step.  What

10   is the first thing that you did in reaching out to the trustee

11   or the securities administrator?

12   A.  I believe I called the trustee first, and they referred me

13   to -- they said it's Wells Fargo's responsibility to allocate

14   the losses; so Deutsche Bank referred me to Wells Fargo.  I had

15   to register as a note holder in order to speak to somebody at

16   Wells Fargo, and then they referred me to the person who's

17   responsible for monitoring this deal.

18           And then, I believe, I left a voicemail asking them to

19   clarify the loss allocation language, what document they were

20   going to follow for this deal.

21   Q.  Was this communication with the securities administrator in

22   writing?

23   A.  I don't -- I believe I left a voicemail or I had a phone

24   conversation; I can't recall right now.

25   Q.  Were there subsequent conversations on this topic with the

1   securities administrator that were in writing?

2   A.  Absolutely.

3           MR. ROLLIN:  I'm going to bring a copy up to the

4   witness in just a moment.  May I approach?

5           THE COURT:  Yes.

6   Q.  I've placed before you a document marked TXV.  Do you

7   recognize TXV?

8   A.  Yes.

9   Q.  Will you please tell the Court what TXV is?

10  A.  It's an e-mail from Brant Warble at Wells Fargo to myself

11  related to the fact that Wells Fargo is going to file an

12  indenture to allocate losses, and they are going to allocate

13  losses to 1-A-2 before they are going to allocate losses to

14  1-A-3.

15  Q.  Just so we get a sequence, is the first e-mail in time the

16  one that's found on Page 2 of the exhibit at the bottom?  If

17  you look at the very bottom in the middle it says TXV --

18  A.  Yes, yes.

19  Q.  So is the first in time e-mail the one from Wells Fargo to

20  you --

21  A.  Mmm, hmm.

22  Q.  -- at the bottom of Page 2?

23  A.  Yes.

24  Q.  And is your follow-up e-mail to Wells Fargo at the top of

25  Page 2?

1   A.   Yes.

2   Q.   And is there a response to you at the top of Page 1?

3   A.   Correct.

4   Q.   Is that the last of -- is that the entire conversation with

5   Wells Fargo on this topic at that time?

6   A.   As far as I recall, yes.

7   Q.   And what was your -- what did you come away with, with

8   respect to how Wells Fargo was going to allocate the realized

9   losses, after having received Exhibit TXV?

10  A.   Well, I was certain they were going to file an indenture,

11  and I -- when asked about what -- I mean, they said their going

12  to file an indenture absent an amendment.  And I when I asked

13  them what would trigger an amendment, they said the method

14  available to conform the indenture in this case would therefore

15  be -- they said the method available to conform the indenture

16  in this case will, therefore, be an amendment with consent of a

17  hundred percent of the 1-A-3 holders because the 1-A-3

18  holders --

19            THE COURT:  Slow.

20  A.   -- because the 1-A-3 holders would be directly and

21  adversely affected by an amendment to conform the indenture to

22  the Pro Supp.

23  Q.   Did Wells Fargo communicate anything to you that indicated

24  at this time there was a possibility that they might not follow

25  the indenture?

1   A.  Nothing of that sort was ever -- was communicated to me.

2            THE COURT:  This was after you bought the bonds,

3   right?

4            THE WITNESS:  Yes.

5   BY MR. ROLLIN:

6   Q.  Did you rely on the information communicated to you in

7   Exhibit TXV in deciding to hold the bonds?

8            MR. PICKHARDT:  Objection, your Honor.

9            THE COURT:  I'll allow it.  You can answer it.

10           THE WITNESS:  I can answer?

11           THE COURT:  Yes.

12   A.  Absolutely I relied on it.

13           THE COURT:  What was the price at that time?

14           THE WITNESS:  I'm sorry?

15           THE COURT:  What was the price of the bonds at that

16   time?

17           THE WITNESS:  That was just a few days after the

18   purchased.  I purchased the bond at 47 and a half back in

19   September of 2012.

20           THE COURT:  And you already had a bid of 49 and a

21   half?

22           THE WITNESS:  Yes, I had -- the next day I had a bid

23   of 49 and a half from a Mesirow trader, but he pulled his bid.

24           THE COURT:  Right.  And did you receive any other

25   bids?

1          THE WITNESS:  Since?

2          THE COURT:  Around that time.

3          THE WITNESS:  No, not in 2012.

4          THE COURT:  Did you shop for any bids?

5          THE WITNESS:  No.  We decided to hold the bond, given

6    the certainty related to the loss allocation provision.  It was

7    going to be a long-term investment for us.  As a matter of

8    fact, we put it on the repo facility.  We put it on the repo

9    facility.

10   BY MR. ROLLIN:

11   Q.  What does repo mean?

12   A.  Where basically we --

13         THE COURT:  You lend the bond to somebody else?

14         THE WITNESS:  Yeah, you lended -- you pledged this

15   bond and got cash from a party.

16   BY MR. ROLLIN:

17   Q.  Please spell that last word?

18         THE COURT:  Did there come a time when you received

19   notice that the Wells Fargo was seeking to get advice of the

20   Court on how to deal with the question of loss priorities

21   between A-2 and A-3?

22         THE WITNESS:  Do I -- I mean, the next communication

23   from Wells Fargo was the consent solicitation form.

24         THE COURT:  Was the what?

25         THE WITNESS:  The next communication from Wells Fargo

E78PTRU5                         Peresechensky - direct

1    to us was --

2               THE COURT:  Louder, louder.  Face the clock.

3               THE WITNESS:  Sorry.  The next communication from

4    Wells Fargo to us, Semper, was consent solicitation form.  I

5    believe it was filed in May of 2013.

6               THE COURT:  You didn't consent?

7               THE WITNESS:  Yeah.  We objected to that.

8               THE COURT:  And did there come a time when you got

9    advice or you heard in some fashion that Wells Fargo was

10   seeking to get a judicial interpretation of what its

11   responsibilities for loss allocation should be between A-2 and

12   A-3 notes?

13              THE WITNESS:  I'm sorry, could you repeat?

14              MR. ROLLIN:  Yes, if I may?

15              THE COURT:  Mr. Rollin will do it.

16   BY MR. ROLLIN:

17   Q.  When did you first hear about any legal proceedings that --

18   concerning the loss allocation?

19   A.  The trust indenture petition?

20   Q.  Yes.

21   A.  Yeah, I think we found out about it in January of this

22   year, 2014.

23   Q.  Now, when you first found out --

24              THE COURT:  What was the price of the bond then?

25              THE WITNESS:  The last observable price on 1-A-3 was

```
1    low 70s, 71.
2              THE COURT:  So would that have been -- if you sold at
3    that time, would that have been profitable?
4              THE WITNESS:  It would have been.
5              THE COURT:  Then you knew that you could no longer
6    rely on what Wells Fargo told you in this e-mail chain, TXV,
7    dated in October 2012?
8              THE WITNESS:  Yeah, I mean, we were very upset by
9    Wells Fargo backtracking on this statement.
10             THE COURT:  But you could have gotten out then and
11   made a profit?
12             THE WITNESS:  Well, we received a bid of 71 in
13   November of 2013, and we received another indication in
14   December of 2013, prior to the trust indenture petition being
15   filed in January.
16             THE COURT:  And after you got notice of that, you
17   could have sold also and made a profit.
18             THE WITNESS:  Afterwards?  After the proceedings
19   started?
20             THE COURT:  Yes.
21             THE WITNESS:  Well, I didn't -- you know, I didn't
22   even entertain the idea of trying to sell the bond because now
23   the bond was in litigation.  I didn't want to put the bond out
24   there and sell it to somebody who would then find out the bond
25   was in litigation.  It was not proper from ethical --
```

1          THE COURT:  Everybody knew it was in litigation.

2          THE WITNESS:  Not us.

3          THE COURT:  Well, you got notice.

4          THE WITNESS:  I understand we got notice, but now the

5    uncertainty has hit the bond, the value of the bond became

6    impaired, after this trust indenture petition was filed in

7    January.  The volume became impaired because of its

8    uncertainty.  The bond was in litigation, so I would have to

9    disclose to a prospective buyer that the bond was in

10   litigation, upon that disclosure, prospective buyers would back

11   away from purchasing the bond.

12         THE COURT:  It might or might not, but you said at

13   that time the price was in the 70s.

14         THE WITNESS:  Prior to the trust indenture petition.

15         THE COURT:  And after?

16         THE WITNESS:  We didn't test the market to find out

17   because now the litigation started.

18   BY MR. ROLLIN:

19   Q.  Do you believe the litigation has impaired the

20   marketability of the bond?

21   A.  Absolutely.

22   Q.  Would that affect the price of the bond?

23   A.  I --

24         MR. PICKHARDT:  Objection, your Honor.

25         THE COURT:  Overruled.

1    A.   I think it damages liquidity of bond, it affects the price

2    of bond.   In fact, our plan was, basically, we wanted to get 75

3    for this bond back in November or December, and we didn't want

4    to sell it at 71, the bid we received.   And our plan was to

5    wait at least until January or February of this year when we

6    felt the market is going to rally a bit more, as funds get more

7    money and the market goes for those January or first-quarter

8    effect and the price rises.   And then we felt we could sell the

9    security at 75 or above, and this trust indenture petition just

10   pulled the rug out of us and caused us tremendous amount of

11   pain and harm to us.

12             MR. ROLLIN:   I have no further questions at this time,

13   your Honor.

14             THE COURT:   Cross?

15             MR. PICKHARDT:   Your Honor, may I approach with

16   deposition transcripts?

17             THE COURT:   Yes.

18             MR. PICKHARDT:   Your Honor, we have one for the Court

19   and one for the witness.

20             THE COURT:   Okay.   The witness doesn't really need it.

21             MR. PICKHARDT:   Okay, your Honor.   I may ask him to

22   read sections; so he may like it for his reference.   If I read

23   sections of his deposition transcript to him, he may want --

24             THE COURT:   You read the section, you ask him if he

25   testified at a certain place, did you hear this question, did

E78PTRU5                        Peresechensky – direct

1    you give this answer.

2              MR. PICKHARDT:  Okay, your Honor.

3    CROSS-EXAMINATION

4    BY MR. PICKHARDT:

5    Q.  Good afternoon, Mr. Peresechensky.  Mr. Peresechensky, you

6    testified that Semper was trading about two-and-a-half billion

7    dollars in residential mortgage-backed securities per year; is

8    that right?

9    A.  In 2010 and 2011.

10             THE COURT:  What?

11             THE WITNESS:  Huh?

12             THE COURT:  What?  Say it again.

13             THE WITNESS:  In 2010 and 2011 our volume was about

14   two-and-a-half billion dollars.

15   BY MR. PICKHARDT:

16   Q.  And you were still doing very significant volume in 2012

17   when you purchased the 1-A-3 notes in this deal, right?

18   A.  Yes.

19   Q.  Now, you provided detailed testimony about the due

20   diligence that you did prior to making this purchase.  Isn't it

21   correct that you have no documentary record of what due

22   diligence you did or didn't do at that time?

23   A.  Yeah, we didn't save our run assumptions from that time.

24   From the time of the purchase on 27, we didn't save the run.

25   Q.  So the only evidence we have as to what you did prior to

1    when you made your purchase is what you recall in your head and
2    the words that are coming from your mouth, right?
3    A.  Well, I basically related how I approached all these
4    purchases.
5             THE COURT:  So the answer is yes?
6             THE WITNESS:  Yeah, I mean, yes.  It's --
7             THE COURT:  From what you remember?
8             THE WITNESS:  It's from what I remember, from how I
9    approach --
10            THE COURT:  So the answer is yes.
11            THE WITNESS:  Okay.
12   BY MR. PICKHARDT:
13   Q.  You referred to having noticed, prior to when you
14   purchased, a nomenclature abnormality, and I want to make sure
15   I understand that.  This type of deal was something that you
16   referred to as an option-arm deal, which is the type of
17   collateral that supports these notes; is that right?
18   A.  Yes.
19   Q.  And you had seen other option-arm deals, right?
20   A.  Yes.  I haven't been active in option arms space, but I've
21   seen other option-arm deals.
22            THE COURT:  Try to answer the question and not
23   volunteer more.
24            THE WITNESS:  Okay.
25            THE COURT:  The more a witness volunteers, the longer

1    the examination becomes.

2                THE WITNESS:  Okay.

3                THE COURT:  You want to end it?  Answer concisely.

4    Okay?

5                THE WITNESS:  Okay.

6    BY MR. PICKHARDT:

7    Q.  Now, the other option-arm deals that you had seen, with

8    respect to the senior notes, the seniority had always gone,

9    numerically, one, two, three, right?

10   A.  In options deals that I've looked at, yes, that was the

11   case.  The seniority was --

12   Q.  That's all I asked.

13   A.  Yes, the top tranche would be senior, the second would be

14   senior mezz and the third would be junior mezz.

15   Q.  And you saw this deal, and you saw the seniority went one,

16   three, two, right?

17   A.  Correct.

18   Q.  And that set off an alarm bell in your head saying this is

19   a nomenclature abnormality, and that's your words, right?

20   A.  Yes.

21   Q.  Now, you didn't do anything to investigate why there was a

22   nomenclature abnormality, did you, Mr. Peresechensky?

23   A.  My next step was to pull up the indenture and look at the

24   loss allocation language in the indenture.  I understood

25   indenture to be the governing, controlling document and the

1    indenture unambiguously stated that the 1-A-3 was the senior

2    bond relative to 1-A-2.

3    Q.  You're not a lawyer, sir, right?

4    A.  I'm not.

5    Q.  And my question is not whether you looked at the indenture.

6    My question was did you undertake any investigation to try to

7    figure out why this deal went one, three, two?

8          THE COURT:  He answered.  He said he looked at the

9    indenture.

10   Q.  You didn't do anything else to try to investigate that,

11   correct?

12   A.  It's not my job to guess --

13         THE COURT:  Don't argue.  The answer is yes or no.

14   A.  I'm sorry.  No.

15   Q.  You didn't do anything else.  And the indenture didn't give

16   you an answer as to why this was different than other deals,

17   right?

18   A.  Right.

19   Q.  Now, you also testified that you looked on Bloomberg

20   related to this deal, right?

21   A.  Yes.

22   Q.  And one of the things that you are testifying, from your

23   recollection, that you saw at that time on Bloomberg was a copy

24   of the indenture for this residential mortgage-backed security

25   transaction, right?

1    A.  Yes.

2    Q.  And you testified that you downloaded that indenture, you

3    opened it up and you went to section 3.38 and diligently read

4    through that section; that's your testimony, right?

5    A.  Right.

6    Q.  That was unusual for an indenture to be on Bloomberg,

7    wasn't it, Mr. Peresechensky?

8    A.  I have not seen many PSA or indentures.  Typically, I would

9    pull them up from SEC website, or now we pull them up from

10   Intex.

11   Q.  And you have testified to having traded over five billion

12   dollars --

13   A.  Right.

14   Q.  -- in RMBS, and sitting here today, you can't identify a

15   single other instance in which you observed an indenture for an

16   RMBS security on Bloomberg, right?

17   A.  Again, I have not looked for legal documents on Bloomberg

18   in a long time.  And when I needed to look at the indenture, I

19   would pull them out from the SEC website or now, I pull them

20   out from Intex.

21           THE COURT:  It's easier to take it from Bloomberg?

22           THE WITNESS:  Yeah, it's much easier.

23           THE COURT:  Because it's hyperlinked?

24           THE WITNESS:  Yeah, it's just a click away.  Again, I

25   don't really recall --

1            THE COURT:  So the testimony is that he doesn't

2    usually look on Bloomberg, but where he found it, it's easier

3    so he did it that way.

4            THE WITNESS:  Yeah.

5            THE COURT:  Right?

6            THE WITNESS:  Yeah.  It was ready and available; so I

7    just pulled it up and the trust indenture from Bloomberg and

8    look at it.

9            THE COURT:  There it was.

10   BY MR. PICKHARDT:

11   Q.  I just want to understand that in no other instance over

12   your career in billions of dollars of RMBS transactions, have

13   you ever seen an indenture that you observed on Bloomberg

14   before?

15   A.  I don't really recall, no.

16   Q.  Now, you also testified that you looked at the ratings for

17   the 1-A-3 bonds and the 1-A-2 bonds prior to when you

18   purchased, right?

19   A.  Yes.

20   Q.  And you looked at the ratings on Bloomberg --

21   A.  Yes.

22   Q.  -- is that right?  And you pulled up on your screen two

23   different sets of ratings.  You pulled up the ratings for the

24   1-A-3 bonds and the 1-A-2 bonds and had them both sitting up on

25   your screen at the same time so you could compare them; is that

1    right?

2    A.  Yes.

3            MR. PICKHARDT:  Your Honor, may I approach?

4            THE COURT:  You don't have to ask me.  Just do it, as

5    long as you don't abuse it.

6    Q.  Mr. Peresechensky, I am showing you two exhibits that have

7    been marked as Exhibit TX251 and Exhibit TX252, which were

8    produced by your company in the context of this litigation.

9    A.  Okay.

10   Q.  If you would, first focus on TX252.

11   A.  Yes.

12           THE COURT:  Yes.

13   Q.  Do you recognize this as showing the Bloomberg screens that

14   you pulled up next to each other at the time that you reviewed

15   the ratings?

16   A.  I don't recall them being exact Bloomberg screens that I

17   looked at, at the time that I pulled up ratings.  I kind of

18   recall that they were being on the same page as a credit

19   enhancement, the MTCS page.  That's something that they would

20   show the credit enhancement of the bond.  I don't recall the

21   exact same -- the exact screens.

22   Q.  Now, the screens that you pulled up, similar to what Semper

23   has produced in this litigation as coming out of Bloomberg,

24   showed for both current ratings and historical ratings, right?

25   A.  Yes.

```
 1    Q.  And so you had up on your screen both the current and
 2    historical ratings for the 1-A-3 bonds and the current and
 3    historical ratings for the 1-A-2 bonds, right?
 4    A.  Yes.
 5    Q.  And you looked at the current ratings, which showed the
 6    1-A-2 bond as being junior to the 1-A-3 bond, right?
 7    A.  Yeah, I looked at the current ratings and noticed that it
 8    kept on contemporaneously my view of credit --
 9              THE COURT:  Slow, slow, slow.
10    A.  It happened contemporaneously at the time I looked at the
11    credit --
12              THE COURT:  It happened contemporaneously?
13              THE WITNESS:  Yeah, at the same time, like the same
14    screen, and I saw the 1-A-3 was senior to 1-A-2 based on the
15    Moody's and S&P.
16              THE COURT:  Based on what?
17              THE WITNESS:  Based on Moody's, the credit Moody's.
18              THE COURT:  Moody's gave a higher credit rating to
19    1-A-3 than to the 1-A-2?
20              THE WITNESS:  Yes, correct.
21    BY MR. PICKHARDT:
22    Q.  Wand in Exhibit 252, if you look at the top, those are the
23    ratings for the 1-A-3 bond, and at the bottom is the ratings
24    for the 1-A-2 bond, right?
25    A.  Yes.
```

E78PTRU5                          Peresechensky - cross

1   Q.  And the rating for the 1-A-3 bond at the top, CAA-3, is

2   higher than the rating for the 1-A-2 bond, CA, at the bottom;

3   is that right?

4   A.  Yes.

5   Q.  Now, how about the historical ratings that were sitting up

6   on your screen when you were doing the due diligence?  What did

7   the historical ratings show with respect to the relative

8   ratings between the 1-A-2 and the 1-A-3 bonds?

9   A.  Well, I didn't look at the historical ratings at the time

10  of purchase, but I did notice, yeah, they purport the fact that

11  they initially -- initially had the same ratings and then the

12  1-A-2 had higher ratings in 2009.

13  Q.  So, Mr. Peresechensky --

14          THE COURT:  Let me get this over time.  Initially, A-3

15  and A-2 had the same rating?

16          THE WITNESS:  Yeah, right.  They were both rated AAA.

17          THE COURT:  And when did they start to diverge?

18          THE WITNESS:  It looks like the first divergence

19  occurred in 2008, based on this table.

20          THE COURT:  And how do they diverge?

21          THE WITNESS:  Based on this table, 1-A-2 became double

22  A-1, and the 1-A-3 became double A-3.

23          THE COURT:  What does that mean, double A-1 and double

24  A-3?

25          THE WITNESS:  Double A-1 is higher rated than double

1   A-3.

2              THE COURT:  Double A-1 is what, the A-2 or the A-3?

3              THE WITNESS:  A-2.

4              THE COURT:  A-2.

5              THE WITNESS:  That was in 2008.

6              THE COURT:  And double A-3 is A-3.

7              THE WITNESS:  Yes.

8              THE COURT:  So that meant that the A-2 had a higher

9    rating than the A-3.

10             THE WITNESS:  Yes, in 2008, 2009.  Then, in August of

11   2010, the ratings -- the rating on 1-A-3 became higher than the

12   rating in 1-A-2.

13             THE COURT:  In 2010?

14             THE WITNESS:  Yes.

15             THE COURT:  So here, the 1-A-2 was rated higher than 3

16   and then it flipped?

17             MR. PICKHARDT:  That's right, your Honor.

18             THE COURT:  I'm asking the witness.

19             THE WITNESS:  Yeah, in August 2010, the 1-A-3 had --

20   was assigned a higher rating than --

21             THE COURT:  And what were the ratings then, in

22   August 2010?  What was the A-2?

23             THE WITNESS:  A-2 was CA, and A-3 was CAA-3.

24             THE COURT:  What does CAA-3 mean?

25             THE WITNESS:  CA is lower rating than the CAA-3.

1            THE COURT:  CA is worse than CAA-3?

2            THE WITNESS:  Correct.

3            THE COURT:  So A-3 had a higher rating than A-2?

4            THE WITNESS:  Correct.

5            THE COURT:  And both had lower ratings than they had

6     in 2008?

7            THE WITNESS:  Yes.  They were rated junk by both

8     agencies.

9            THE COURT:  When did it become junk, August 2010,

10    according to the Moody's?

11           THE WITNESS:  According to Moody's?  Moody's they

12    rated junk -- they rated 1-A-3 junk in 2009, and they rated

13    junk A-2 in 2010, but then they --

14           THE COURT:  A-3 became junk in 2009?

15           THE WITNESS:  Yeah.

16           THE COURT:  And A-2?

17           THE WITNESS:  Became junk in 2010.

18           THE COURT:  In 2010?

19           THE WITNESS:  But in 2010, the ratings flipped to

20    reflect that A-3 was a senior to A-2.  So both S&P and Moody's

21    had higher rating, current ratings and the ratings of 2010 as

22    for A-2 -- I'm sorry, for A-3 relative to A-2.

23           THE COURT:  Don't mumble.  Both S&P and Moody's had?

24           THE WITNESS:  Higher ratings for A-3 than A-2 at the

25    time of the purchase and since 2011.

1              THE COURT:  Go ahead.

2     BY MR. PICKHARDT:

3     Q.  Now, another piece of due diligence that you recall having

4     done is to have run certain cash flows through an application

5     called Bond Studio, correct?

6     A.  Yes.

7     Q.  Now, today, your firm has a license for Intex, right?

8     A.  Yes.

9     Q.  But your firm didn't purchase a license for Intex for use

10    in 2012 when you made this purchase, right?

11    A.  Correct.

12    Q.  So you were using Bond Studio instead?

13    A.  Yes.

14    Q.  Now, Intex, you are aware, includes a toggle that allows

15    you to run cash flows either based upon the indenture

16    allocation of losses or on the Pro Supp allocation of losses,

17    right?

18    A.  Currently, you're talking about?

19    Q.  Yes.

20    A.  Yeah, I think it's one of the -- you can -- yeah, it's one

21    of the options I think, yeah.

22    Q.  And, in fact, in 2012, when you did your purchase, Intex

23    had that toggle, correct?

24              MR. ROLLIN:  Objection, foundation.

25              THE COURT:  Overruled.  What kind of objection is

1   that?

2          MR. ROLLIN:  I agree.

3   A.  I didn't have Intex in 2012, but I think, based on my

4   conversations with broker-dealers, there was a toggle there.

5   Q.  Okay.  So when you made your purchase, Intex had that

6   toggle.  Now, you also still had Bond Studio in addition to

7   Intex, right?

8   A.  Yes.

9   Q.  And Bond Studio, today, also has that toggle that let's

10  investors run cash flows either based upon the indenture

11  allocation or the Pro Supp allocation, right?

12  A.  If you look -- if you look hard enough, you can find that

13  option, but it doesn't really come up automatically when you

14  pull up a bond.  It's one of these miscellaneous options that

15  they have, I believe.

16  Q.  Now, when you did your cash flows for this transaction in

17  2012, you didn't look at all of the features that were in Bond

18  Studio for this bond, did you?

19  A.  I believe I looked at all the relevant features in 2012.  I

20  mean, what -- I mean, I ran all the assumptions for my credit

21  model.

22          THE COURT:  You what?

23          THE WITNESS:  I ran the assumptions for my proprietary

24  credit model.  I ran --

25          THE COURT:  What model?

1          THE WITNESS:  Proprietary loan-level credit model that

2     we have in Semper.  It's the Semper credit.  So I entered the

3     vectors for repayments, defaults and varies.

4          THE COURT:  So you did your own analysis?

5          THE WITNESS:  Yeah, I did my own analysis.

6          THE COURT:  With whatever tools you had, right?

7          THE WITNESS:  Using Bond Studio, which relied on Intex

8     for the cash model.

9          THE COURT:  Using what?

10          THE WITNESS:  Using Bond Studio that -- Bond Studio

11     basically is an application.  It doesn't have its own cash flow

12     engine.  Bond Studio uses Intex as a cash flow engine.  Intex

13     is the industry standard cash flow engine that contains the

14     structures for the deals.

15          THE COURT:  Did you do a cash flow analysis?

16          THE WITNESS:  Yes.

17     BY MR. PICKHARDT:

18     Q.  It was not clear to you at that time whether Bond Studio

19     had a similar type of toggle that allowed you to run cash flows

20     either pursuant to the indenture or the Pro Supp?

21     A.  I believe, I don't recall there was a toggle at that time

22     in Bond Studio.

23     Q.  It wasn't clear to you, was it?

24     A.  Yeah.  I don't believe there was a toggle.

25     Q.  Well, you were deposed in this matter, right sir?

1   A.   Right.

2   Q.   If we could please play your testimony from 239 --

3              THE COURT:  No, read it.  What page?

4              MR. PICKHARDT:  It's 239, Line 3.

5              THE COURT:  Don't put it up.  Don't put it up.

6              MR. PICKHARDT:  To 240, 22.

7              THE COURT:  One minute.  We're going to go to 4:15.

8    I've got a few matters after this.

9              All right.  So when you testified at deposition, you

10   were under oath, right?

11             THE WITNESS:  Yes.

12             THE COURT:  And were you asked the following questions

13   and did you give the following answers?

14             THE WITNESS:  Yes.

15             THE COURT:  Go ahead, Mr. Pickhardt.

16   BY MR. PICKHARDT:

17   "Q.  And that toggle existed at the time that you purchased the

18   1-A-3 bonds, right?

19   "A.  I didn't have Intex at that time.  I'm not aware of toggle

20   existing on Bond Studio application."

21             THE COURT:  He just said that.  What are you crossing

22   on?  He just said that.  He's consistent.

23   BY MR. PICKHARDT:

24   Q.   Now, the question:

25   "Q.  When you say you were not aware of it existing in Bond

1   Studio, are you saying it did not exist?  Likely did not

2   exist" --

3              THE COURT:  Don't ask what's not inconsistent.  This

4   is not inconsistent.  He said he wasn't aware of a toggle on

5   Bond Studio.

6              MR. PICKHARDT:  Your Honor, what's important is he

7   says here, at deposition, in response to that question, "I

8   didn't look at every single feature.  It was not clear to me."

9              THE COURT:  That's what he said here also.

10             MR. PICKHARDT:  "It wasn't apparent to me that there

11  was a toggle."

12             THE COURT:  He said the same thing.  Don't do it that

13  way, only if there's an inconsistency or if you need to refresh

14  him, and he hasn't needed it and it's not inconsistent.

15  BY MR. PICKHARDT:

16  Q.  Now, Mr. Peresechensky, the due diligence that you did did

17  not include consulting with anyone else at Semper with respect

18  to this purchase, right?

19  A.  At the time of the purchase, prior to the purchase you're

20  talking about?

21  Q.  And you're aware that Moody's publishes a list of bonds

22  that have modeling issues, right?

23  A.  Yeah, I believe I stated that in my deposition.

24  Q.  You've actually --

25             THE COURT:  Don't do that.  You'll just get yourself

1   in trouble.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  Just answer his question.

4            THE WITNESS:  Okay, yeah.

5   BY MR. PICKHARDT:

6   Q.  And you're aware that Moody's had that list of bonds with

7   modeling issues?

8   A.  Right.

9   Q.  And you didn't consult that list at the time that you made

10  this purchase, did you?

11  A.  No.

12           THE COURT:  What's a modeling issue?

13           THE WITNESS:  It's a -- there's some sort of

14  discrepancy between -- you know, there's some sort of

15  structural discrepancy between --

16           THE COURT:  Some what?

17           THE WITNESS:  There's a structural discrepancy, maybe

18  a coupon is not modeled correctly on Intex or something is

19  mis-modeled on Intex, or it could be a variety of things.

20           THE COURT:  So you knew that there was a discrepancy

21  because you consulted the trust indenture?

22           THE WITNESS:  No, I wasn't aware of the discrepancy at

23  the time of the purchase.

24           THE COURT:  What caused you to look at the trust

25  indenture?

1          THE WITNESS:  The nomenclature of the value was --

2     because typically, as I stated in the option-arm deals, the

3     1-A-2 is junior to my 3.  That's why I went to the trust

4     indenture to verify the 1-A-3 was --

5          THE COURT:  The higher the number, the more senior the

6     debt?

7          THE WITNESS:  I'm sorry, the higher -- No.  I mean,

8     the lower the number, the more senior.

9          THE COURT:  The lower the number, the more senior the

10    debt, that's right.  So the next question I asked is that,

11    given this nomenclature discrepancy, was that what caused you

12    to read the indenture itself?

13         THE WITNESS:  Yes.

14         THE COURT:  After reading the indenture, Mr. Pickhardt

15    wants to know if you checked any modeling analysis, which you

16    said is also used when there are discrepancies, and your answer

17    was, no?

18         THE WITNESS:  The modeling analysis pertaining to the

19    Moody's list, or what are you talking about?

20         THE COURT:  Pertaining to this note that you were

21    thinking to buy, the 1-A-3 note.

22         THE WITNESS:  Once I look at the indenture, I was

23    certain that the 1-A-3 was a senior tranche.

24         THE COURT:  So you didn't look at the modeling

25    analysis?

1          THE WITNESS:  No, the modeling is -- I don't know in

2     what context he's referring to.

3          MR. PICKHARDT:  Your Honor, just to clarify, I'm

4     asking about a list that Moody's publishes of bonds that have

5     modeling problems.

6          THE COURT:  Did you look at such a list?

7          THE WITNESS:  No, I didn't look at that list.

8          THE COURT:  Then you can move on.

9     BY MR. PICKHARDT:

10    Q.  When you looked at the indenture, the indenture includes

11    provisions that describes what the coupons are on the various

12    tranches of the bonds, right?

13    A.  Yes.

14    Q.  Did you look at the provision that described the coupons to

15    see whether the coupons for the 1-A-2 bonds and the 1-A-3 bonds

16    were consistent with your understanding as to which of those

17    was senior?

18    A.  I'm sorry, what was the last part of your question?

19    Q.  Did you look at the relative coupons between the 1-A-2

20    bonds and the 1-A-3 bonds when you were perusing the indenture

21    prior to making your purchase?

22    A.  The coupons were stated on Bloomberg.  I could look at the

23    coupon on the 1-A-2 on the Bloomberg.

24         THE COURT:  And did you look?

25         THE WITNESS:  I did.  I mean, there were both LIBOR

1    floaters and LIBOR --

2            THE COURT:  So the answer is yes?

3            THE WITNESS:  Yes.

4            THE COURT:  Okay.  So stop.

5    BY MR. PICKHARDT:

6    Q.  And did you know at that time that the 1-A-3 bond got a

7    higher coupon than the 1-A-2 bond?

8    A.  Yeah.

9    Q.  And was it consistent with your experience that a more

10   junior bond would get a lower coupon?

11   A.  I mean, it varies in -- in a lot of deals it varies.

12   Coupons has nothing to do with seniority.

13   Q.  Have you ever seen that in an option-arms deal, sir?

14   A.  I mean, as I stated in testimony, and option arm -- the

15   only -- what I know about option arm deals is there are three

16   bonds in the group A-1, A-2, A-3.  A-1 is senior bond, A-2 is

17   the senior mezz and A-3 is a junior mezz.

18   Q.  After you did this careful diligence, you testified that

19   you submitted a bid to Nomura.

20           THE COURT:  Wait a minute.  Mezz is short for

21   mezzanine.  Go ahead.

22   A.  Yes.

23   Q.  After this careful diligence, you submitted a bid to Nomura

24   at 12:30 on September 27th, 2012, right?

25   A.  Yeah, around that time.

E78PTRU5                          Peresechensky - cross

1    Q.  And you did that by Bloomberg chat with a number of Nomura

2    representatives, right?

3    A.  Yeah, I did it on Bloomberg terminal.

4    Q.  I'm handing you a document that has been marked as

5    Exhibit TXBT.  Is this the Bloomberg chat that you had with the

6    representatives of Nomura when you submitted your bid on the

7    bond?

8    A.  Yes.

9           MR. PICKHARDT:  Your Honor, I would move at this point

10   this be admitted into evidence.

11          MR. ROLLIN:  No objection.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit TXBT received in evidence)

14   BY MR. PICKHARDT:

15   Q.  Now, if you turn, you'll see that there are sections of

16   this that are blacked out, which concern communications

17   unrelated to this bond.

18   A.  Yes.

19   Q.  If you would, please, turn to Page 12 of this exhibit.

20   A.  Yes.

21   Q.  And there's a message from you at 12:30 p.m.?

22   A.  Yes.

23   Q.  That says AHM2005-2, 1-A-3, 47-8?

24   A.  Yes.

25   Q.  That's reflective of your bid of 47 wand a quarter for this

1    bond, right?

2    A.   Correct.

3    Q.   And then there is a response --

4              THE COURT:   I understand this, this is September 27 of

5    what year?

6              THE WITNESS:   2012.

7              THE COURT:   2012.  Boris one UCM is you?

8              THE WITNESS:   Yeah, it's my Bloomberg ID.

9              THE COURT:   And the AHM2005-2 is the security?

10             THE WITNESS:   Yes.

11             THE COURT:   What does 1-A-3 mean, that's the note?

12             THE WITNESS:   Yeah, that's the note.

13             THE COURT:   47-8, what is that?

14             THE WITNESS:   That was my bid on this list, 47 and a

15   quarter, 86.

16             THE COURT:   Go ahead.

17   BY MR. PICKHARDT:

18   Q.   You immediately got a response from an B. McNamara.  Who is

19   that?

20   A.   Brennan McNamara is a salesperson at Nomura.

21   Q.   And he said:  K.  Will come right back to you on that one,

22   right?

23   A.   Yes.

24   Q.   Then if you forward a few pages, it picks up at 2:24; so

25   about two hours later?

1          THE COURT:  What's the production number?

2          MR. PICKHARDT:  It's at Page 19, your Honor.

3    Q.  There's an E. Horowitz?

4    A.  Yeah.

5    Q.  Mr. Horowitz is a trader at Nomura; is that right?

6    A.  Yeah, Eric Horowitz.

7    Q.  And he gets back to you and he says, AHM2005-2, 183, 47.25?

8          THE COURT:  AHM2005-2, the bond is 183, and the price

9    is 47.25 or 47 and a quarter.

10   Q.  And then he follows up and he asks:  Done?  With a question

11   mark, which was his way of asking do we have a trade, right?

12   A.  Yes.

13   Q.  And your response was:  For real?  With a question mark.

14   The reason you said "for real?" is because you were surprised

15   that you were going to be the winning bidder in his auction,

16   right?

17   A.  Yeah, I thought I was submitted a -- I mean, I thought it

18   was a very attractive purchase at that price, at 47.8, and

19   therefore, I just wanted to make sure that I bought bonds.

20   Q.  Because he comes back and says:  Yes, for real.  And then

21   you respond and say:  Might have ass pulled on it.  Let me

22   check.  Now, "ass pulled" is a term that means you submitted a

23   lowball bid that you never expected to have accepted, right?

24   A.  I wouldn't -- I wouldn't classify it as never.  I would say

25   a lowball bid, there's a low probability of getting it pulled,

1    yeah.

2    Q.  That there was little chance of buying it at that price,

3    right?

4    A.  Yeah, it's just a term we coined.

5    Q.  And that you had to go back and let me check?

6    A.  Yes.

7    Q.  Now, ass pulled is a slang term for pulled out of your

8    butt, right?

9    A.  I don't know.  I mean, it depends on how you refer to it.

10           THE COURT:  How did you understand it?

11   A.  I just -- I understand it as a low -- in the context of the

12   conversation, it was a lowball bid, and we refer to ass pull

13   like just a lowball bid, where the buyer is not really serious

14   about buying and paying the level that requires to buy the

15   bonds.

16           THE COURT:  So you didn't expect your bid of 47 and a

17   quarter to be accepted?

18           THE WITNESS:  I guess, yeah, I guess at that time, I

19   expressed some --

20           THE COURT:  Don't guess.  Was that the truth, you

21   didn't expect your bid to be accepted?

22           THE WITNESS:  Yeah, I thought it was an attractive

23   purchase, yeah.

24           THE COURT:  And when it was accepted, you were

25   surprised?

 1                THE WITNESS:  A little bit, yeah.

 2                THE COURT:  You started to worry, did I do the right

 3      thing?

 4                MR. PICKHARDT:  Well, your Honor, that actually goes

 5      to my next question.  You say:  Let me check.

 6                THE COURT:  Right.

 7      BY MR. PICKHARDT:

 8      Q.  And so at this point, on September 27th, you know you have

 9      seen a bond that, for the first time in your career, you'd seen

10      an option-arm bond that had this nomenclature abnormality; you

11      had for the first time in your career observed a bond that had

12      an indenture on Bloomberg, which you normally couldn't find;

13      you had put in a lowball bid that you didn't expect to be

14      accepted and they had come back and said, done, can we do this

15      deal?  You said let me check?

16      A.  I didn't say it was a lowball bid.  I said it might have

17      been.  That's why I wanted to check.  Two hours had passed from

18      the time I submitted the bid.

19      Q.  Oh, so at that point, you didn't necessarily remember the

20      work you had done two hours previous; is that right?

21      A.  I wanted to check my run from two hours before.

22                THE COURT:  Whatever it is, he wanted to check.  He

23      was not prepared to go ahead, even though his bid had been

24      accepted.

25      Q.  And so you then had an opportunity to go and do a further

E78PTRU5                        Peresechensky - cross

1    check?

2    A.  Yes.

3    Q.  How much time did you spend on that additional diligence,

4    knowing all of the information you knew about the abnormalities

5    in this bond and that you had just had a bid accepted that you

6    did not expect to be accepted?

7    A.  I checked the run.  It was -- it must have been right on my

8    Bond Studio screen; so I looked at the results of the run to

9    see how much collateral was liquidated, how much of a

10   write-down it was, and to make sure that in stress scenarios

11   the bond didn't suffer losses, and it looked attractive across

12   the scenarios.  It looked attractive across the base-case

13   scenarios, the stress-case scenarios, and so when I looked at

14   the results of the run, I felt comfortable with that purchase.

15   Q.  And so that was between the time of 2:24:56, when you said

16   let me check, and 2:26:20 when you said yes?

17   A.  Yeah, I had run --

18   Q.  So you did all of that in a minute and 24 seconds; is that

19   what --

20   A.  I didn't have -- I didn't have --

21             THE COURT:  Let him finish the question before you

22   give the answer.

23   Q.  The extent of your further due diligence on this bond,

24   based upon this information, was contained within a minute and

25   24 seconds, right, sir?

1    A.  No, it's -- I already done the due diligence.  I wanted to

2    check --

3              THE COURT:  The answer is, yes?  You did all this new

4    due diligence?  You reviewed your due diligence --

5              THE WITNESS:  Yes.

6              THE COURT:  -- in a little bit more than a minute?

7              THE WITNESS:  Yes, because I had the bond --

8              THE COURT:  Okay.  You don't have to give a reason.

9    Yes, the answer is yes.

10             THE WITNESS:  Okay.

11   BY MR. PICKHARDT:

12   Q.  And you testified earlier that the next day you had a

13   conversation with a trader from Mesirow, in which you had an

14   agreed-upon sale of this same bond to Mesirow at a price of 49

15   and a half, right?

16   A.  Yes.

17   Q.  And you testified that you had a phone call, where the

18   trader came back to you and asked to get out of the deal,

19   right?

20   A.  Yeah.

21   Q.  Well, in fact, wasn't there Bloomberg chats on this

22   subject?

23   A.  Yeah, I think he -- yes.  He send me a message on Bloomberg

24   as well.

25   Q.  Okay.  And I put in front of you a document that's been

 1   marked as TXBH.  This is a Bloomberg chat that you had with a

 2   trader from Mesirow, Mr. Haghighat, that next day, right?

 3            THE COURT:  Are you offering BT in evidence?

 4            MR. PICKHARDT:  Yes, your Honor, I would.

 5            THE COURT:  Objection?

 6            MR. ROLLIN:  No objection.

 7            THE COURT:  Received.

 8   BY MR. PICKHARDT:

 9   Q.  And is it correct --

10            THE COURT:  And is TXBH the Bloomberg chat with

11   Mesirow on the next day, September 28th?

12            THE WITNESS:  Yes.

13            MR. PICKHARDT:  That's correct, your Honor.

14            THE COURT:  Are you offering?

15            MR. PICKHARDT:  Yes, I'm offering it into evidence.

16            MR. ROLLIN:  No objection.

17            THE COURT:  Received.

18            (Plaintiff's Exhibit TXBH received in evidence)

19   BY MR. PICKHARDT:

20   Q.  Now, on Page 2 of Exhibit TXBH, there's a message from

21   Mr. Haghighat at the bottom of that page, on September 28th at

22   4:42 p.m. in which Mr. Haghighat says to you:  Boris, AHM '05-2

23   1-A-3 is on problem list.  To which you respond, question mark.

24   He goes on to say:  Class 1-A --

25            THE COURT:  I'm not seeing this.

1          MR. PICKHARDT:  It's on at the very bottom of the

2    page, your Honor.

3          THE COURT:  Thank you.

4    BY MR. PICKHARDT:

5    Q.  You go on to respond at the top of the next page with a

6    question mark?

7    A.  Yes.

8    Q.  And Mr. Haghighat, who you testified earlier was a trader

9    that you trusted, came back to you and said:  Class 1-A-3 is

10   junior to 1-A-2, right?

11   A.  That's the -- that's what the message says.

12   Q.  And then you add another question mark, and Mr. Haghighat

13   then provides -- then gives you a number of additional messages

14   that contain information about the discrepancy between the

15   indenture and the Pro Supp, right?

16   A.  Correct.

17   Q.  Now, at this point in time, you decide, knowing this

18   information, that you're not going to enforce the trade that

19   you have with Mr. Haghighat at a profit to your firm, right?

20   A.  Yeah, I thought it was the proper thing to do.

21   Q.  Okay.  So you decided to go ahead and cancel the trade

22   after Mr. Haghighat had given you this information?

23   A.  Yes.

24   Q.  Okay.  Now, you testified at length about having reviewed

25   the indenture off of Bloomberg?

1     A.   Yes.

2     Q.   And you claim that you downloaded that indenture as part of

3     your due diligence before you purchased the bond and went to

4     section 3.38 and read through the allocation of loss

5     provisions, right?

6     A.   Correct.

7     Q.   Now, prior to this litigation, in which your attorneys have

8     put in papers that -- to this Court, that you reviewed the

9     indenture and that provision prior to making this purchase --

10              THE COURT:   Fix up the question.   Don't make it up.

11    Withdraw the question.   Start again.

12              MR. PICKHARDT:   I withdraw that.

13    Q.   Are you aware of any documents that corroborates you having

14    reviewed the indenture prior to when you made this purchase?

15    A.   I downloaded the indenture from the Bloomberg.   It was

16    readily available on Bloomberg's page.

17              THE COURT:   Listen to the question.

18    Q.   Are you aware --

19              THE COURT:   Now, prior to this litigation --

20              MR. PICKHARDT:   I'm sorry.

21              THE COURT:   -- are you aware of any documents that

22    corroborate that you reviewed the indenture prior to your

23    making the purchase?   Do you know of any piece of paper that

24    shows that?

25              THE WITNESS:   Well, the --

1             THE COURT:  Yes, no or what?

2             THE WITNESS:  The indenture was available on

3   Bloomberg.  So I downloaded the indenture from Bloomberg.

4             THE COURT:  So you don't have a piece of paper because

5   it was on the screen?

6             THE WITNESS:  Yes.  It was right on the screen.  I

7   needed to --

8             THE COURT:  That's your answer.

9             THE WITNESS:  Right.

10  BY MR. PICKHARDT:

11  Q.  And there's no statements that you put in e-mails or other

12  communications --

13            THE COURT:  Mr. Pickhardt, we've covered that already.

14  I think this might be a good time to break.

15            MR. PICKHARDT:  We can break, your Honor, or I could

16  finish this subject area, whichever.

17            THE COURT:  Well, I've got three things waiting for

18  me, a sentencing that will take us past 5:00; so I think we'll

19  stop now.  Let's go off the record.

20            (Discussion off the record)

21            THE COURT:  We'll go on the record.  We'll recess now

22  until 1:00 tomorrow, at which time, we'll finish up the

23  testimony.

24            So, Mr. Peresechensky, you're not to talk about the

25  case with anybody until you finish your examination.  Do you

E78PTRU5                          Peresechensky – cross

1   understand?

2              THE WITNESS:  Yes.

3              THE COURT:  And do you understand, counsel?

4              MR. ROLLIN:  Yes.

5              THE COURT:  We'll finish up your testimony.  Both

6   sides plan to rest.  They'll immediately go into an argument,

7   an hour to each side, and probably on Thursday morning I'll ask

8   you to come back in and I'll deliver my findings.  That will be

9   the plan.  Okay?

10             All right.  Now, you see there's a busy courtroom and,

11  of course, everyone came to watch you.  On the chance they

12  might have their own business, see how quickly we can push

13  everything to the side.

14             MR. PICKHARDT:  Thank you, your Honor.

15             (Adjourned to July 9, 2014, at 1:00 p.m.)

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2      Examination of:                              Page

3      AKHIL MAGO

4      Direct By Mr. Rollin . . . . . . . . . . . . 183

5      Cross By Mr. Pickhardt . . . . . . . . . . . 229

6      Redirect By Mr. Rollin . . . . . . . . . . . 233

7      RIA DAVIS

8      Direct By Ms. Braswell . . . . . . . . . . . 234

9      BORIS PERESECHENSKY

10     Direct By Mr. Rollin . . . . . . . . . . . . 291

11     Cross By Mr. Pickhardt . . . . . . . . . . . 337

12                        PLAINTIFF EXHIBITS

13     Exhibit No.                              Received

14      TX-255, TX-256 and TX-257  . . . . . . . . 231

15      TX-253   . . . . . . . . . . . . . . . . . 290

16      TXBT   . . . . . . . . . . . . . . . . . . 357

17      TXBH   . . . . . . . . . . . . . . . . . . 364

18                        DEFENDANT EXHIBITS

19     Exhibit No.                              Received

20      BN   . . . . . . . . . . . . . . . . . . . 208

21      TX-254   . . . . . . . . . . . . . . . . . 219

22      TX-244   . . . . . . . . . . . . . . . . . 229

23      TX-6 and TX-5  . . . . . . . . . . . . . . 240

24      TX-I   . . . . . . . . . . . . . . . . . . 253

25      TX4   . . . . . . . . . . . . . . . . . . . 262
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

370

1    TXV    . . . . . . . . . . . . . . . . . . 267

2    TX8    . . . . . . . . . . . . . . . . . . 276

3    TXBI    . . . . . . . . . . . . . . . . . 277

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25