E79JTRU1                     Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN THE MATTER OF THE TRUSTEESHIP
    CREATED BY AMERICAN HOME MORTGAGE
4   INVESTMENT TRUST 2005-2 related to       14 Civ. 2494 AKH
    the issuance of Mortgage-Backed
5   Notes pursuant to an Indenture dated
    as of October 1, 2007,

6

7   WELLS FARGO BANK, N.A.,

8                   Petitioner,

9   ------------------------------x

10

11                                           July 9, 2014
                                             1:00 p.m.
12

13

14

15  Before:

16                  HON. ALVIN K. HELLERSTEIN,

17                                           District Judge

18

19

20                           APPEARANCES

21

    ALSTON & BIRD, LLP
22       Attorneys for Wells Fargo Bank
    BY:  CAROLYN R. O'LEARY, Esq.
23       MICHAEL EDWARD JOHNSON, Esq.

24

25

E79JTRU1                      Trial

(APPEARANCES CONTINUED)


QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Sceptre, LLC
BY:   JONATHAN E. PICKHARDT, Esq.
        MAAREN A. SHAH, Esq.
        BLAIR A. ADAMS, Esq.
                Of counsel


JONES & KELLER
        Attorneys for Semper Capital Mgmt.
BY:   MICHAEL A. ROLLIN, Esq.
        MARITZA DOMINGUEZ BRASWELL, Esq.
        TARA K. WILLIAMS, Esq.
                Of counsel

1              (Trial resumes)

2              (In open court)

3              THE COURT:  Good afternoon.  Be seated, please so we

4    have not yet completed the cross-examination of

5    Mr. Peresechensky, right?

6              MR. PICKHARDT:  That's correct, your Honor.

7              THE COURT:  Is he here?

8              MR. PICKHARDT:  I believe he is.

9              THE COURT:  Please come up.  I remind you that you

10   remain under oath.

11             MR. PICKHARDT:  Your Honor, one housekeeping matter.

12             I noted that yesterday I asked Mr. Peresechensky some

13   questions, as your Honor may recall, about ratings, and I had

14   two exhibits related to ratings, Exhibits TX-251 and 252, that

15   it showed the current --

16             THE COURT:  Why do we need it?

17             MR. PICKHARDT:  There was obviously testimony provided

18   with respect to that.  It shows the historical ratings.  That

19   is the purpose we would like to have in the record what the

20   historical ratings were with respect to S&P and Moody's with

21   respect to these bonds.

22             MR. ROLLIN:  No objection.

23             THE COURT:  You you're offering 251 and 252?

24             MR. PICKHARDT:  That's correct.

25             THE COURT:  Received.

1              (Plaintiff Exhibits TX-251 and TX-252 received in

2    evidence)

3              THE COURT:  These are Moody's?

4              MR. PICKHARDT:  Moody's and Standard & Poor's.

5              THE COURT:  What is Moody's?

6              MR. PICKHARDT:  Moody's is 252 and Standard & Poor's

7    is 251.

8              THE COURT:  Okay.

9     BORIS PERESECHENSKY,

10   CROSS-EXAMINATION (Continued)

11   BY MR. PICKHARDT:

12   Q.  Mr. Peresechensky, as you testified yesterday, you entered

13   into the trade to purchase your 1-A-3 bonds for $47.50 on

14   September 27th, 2012, right?

15   A.  Correct.

16   Q.  When you entered into that trade, you were not relying on

17   any statements by Wells Fargo at that time, were you?

18   A.  No.

19   Q.  In fact, you made your own investment decision, weighing

20   the risks and benefits of that investment at that time, right?

21   A.  I performed A thorough quantitative analysis based on

22   credit modeling.  I used JP Morgan to perform a thorough -- and

23   I paid a broker of --

24   Q.  Through that process you made an investment decision that

25   weighed the risks and benefits, correct?

```
 1              THE COURT:  Both slow down.

 2              MR. PICKHARDT:  Yes, your Honor.

 3              THE COURT:  Slow down.

 4      BY MR. PICKHARDT:

 5      Q.  The next day, on September 28th, as you testified, you had

 6      the phone call with Mr. Haghighat at Mesirow, in which he

 7      agreed to purchase the bond for $49.50, right?

 8      A.  Correct.

 9              THE COURT:  Didn't we cover this yesterday?

10              MR. PICKHARDT:  Yes, your Honor.  I am covering one

11      piece.

12      BY MR. PICKHARDT:

13      Q.  I believe you testified yesterday that you had the phone

14      call with him, and then 10 minutes later he came back and told

15      you he wanted to cancel the trade because he realized there was

16      a problem.  Is that right?

17      A.  I believe so.

18      Q.  It took Mr. Haghighat at Mesirow 10 minutes to figure out

19      that this bond was a problem, right?

20              MR. ROLLIN:  Objection; speculation.

21              THE COURT:  Sustained.

22      A.  Yeah, yeah.

23              THE COURT:  Don't answer.  "Sustained" means don't

24      answer.

25      BY MR. PICKHARDT:
```

1   Q.  When you decided to let Mr. Haghighat cancel that trade,

2   you were not relying on the statements of Wells Fargo or

3   anybody else, right?

4   A.  I wasn't aware of any statement of Wells Fargo at that

5   time.

6   Q.  Now, on September 28th when you let Mr. Haghighat out of

7   the trade that you had agreed to, you had made the day before a

8   trade with Nomura Securities for your firm Semper to purchase

9   the bond, right?

10  A.  That's correct.

11  Q.  The typical terms for a trade is that the trade occurs on

12  one date and then the settlement of the trade occurs usually

13  three days later, right?

14  A.  Correct.

15  Q.  So at this point in time after you had that communication

16  with Mr. Haghighat, he had indicated he believed that the 1-A-3

17  was junior to the 1-A-2, the status of your trade at that point

18  with Nomura was that you had executed the trade but it had not

19  yet settled, right?

20  A.  I must make a statement that he didn't, he didn't

21  specifically state he believed -- he just stated in a chat that

22  1-A-3 is junior and he used the language because he wanted to

23  get out of the trade.

24          But to answer your question, there was no possibility

25  of me getting out of the trade with Nomura because it had

1    already been a day after the trade had --

2    Q.  Mr. Peresechensky, I am asking you a different question.

3           THE COURT:  Yes, we know the settlement date varies

4    from the trade date, but Mr. Peresechensky anticipated the

5    question and answered it.  Move on.

6    BY MR. PICKHARDT:

7    Q.  The settlement had not yet occurred.  What I want to

8    understand is that after that communication with Mr. Haghighat,

9    and the court can review it, we have it in documentary form --

10          THE COURT:  I have it.

11   Q.  -- you did not go back to Nomura to ask Nomura if they

12   would let you in turn, cancel your trade, right?

13   A.  I did not go back to Nomura.

14          Number one, there was no possibility of canceling the

15   trade after it had been consummated.  The day after the trade,

16   there is no way they would let me out of the trade.

17          Second of all, I felt confident in my analysis when I

18   bought it at 47 and a half, and also my analysis was validated

19   by the second-best bid or covers at 47.  At that point I had

20   absolutely no intention of going to Nomura to try to get out of

21   the trade.

22   Q.  Because there was a very tight cover.  That is what you

23   testified, right, there was a bid at almost the exact same

24   price you bid?

25   A.  Nomura told me it was 47.

1    Q.   You bid at 47 and a quarter, very close?

2    A.   Yes.

3    Q.   You chose not to go back to Nomura to see whether they

4    would be willing to talk to the seller and see if they would

5    transfer the trade to somebody else who was willing to pay

6    virtually the same price?

7    A.   I did not.

8    Q.   Part of the reason you didn't do that as you just testified

9    is because in your view, the indenture was the controlling

10   document, right?

11   A.   It was, yes, it was in my view, indenture was the

12   controlling document and my next thought at that time was to

13   verify the loss allocation with the securities administrator.

14   Q.   When you made that decision not to go back to Nomura

15   because you thought the indenture was the controlling document,

16   that decision was not based on a statement by Wells Fargo, was

17   it?

18   A.   I did not have any communication with Wells Fargo at that

19   time.

20   Q.   That next week you had some communications with Wells

21   Fargo, and you did some further investigation with respect to

22   this discrepancy, right?

23   A.   That's correct.

24   Q.   You testified yesterday about the fact that you had

25   reviewed the indenture prior to making your purchase on

 1   Thursday, September 27th.  Now, I want to ask you some

 2   questions about that.

 3           You're familiar with a person by the name of James

 4   Cognetti, right?

 5   A.  James --

 6           THE COURT:  Why not just answer yes?

 7           THE WITNESS:  Yes.

 8   BY MR. PICKHARDT:

 9   Q.  He was at a broker-dealer named CRT, right?

10   A.  Yes.

11   Q.  Mr. Cognetti was your sales coverage at CRT, and you were a

12   client of his, correct?

13   A.  That's correct.

14   Q.  Mr. Cognetti is someone who you spoke with about the

15   discrepancy between the 1-A-3 and 1-A-2 bond, right?

16   A.  Yes.

17   Q.  And Mr. Cognetti is someone who had access to transactional

18   documents for deals, right?

19   A.  Yes.

20           THE COURT:  Is that so?  Why was that so?

21           THE WITNESS:  I know he had access to transactional

22   documents because he had Intex.  He had the Intex application.

23   I didn't have the Intex application.

24           THE COURT:  Intex gives you access to transactional

25   documents?

1           THE WITNESS:  You have both in indenture and Intex.

2     BY MR. PICKHARDT:

3     Q.  I am showing you a document that has been marked as Exhibit

4     TX-227.

5     A.  Yes.

6     Q.  This is an e-mail from Mr. Cognetti to yourself, dated

7     Monday, October 1st, 2012?

8     A.  Correct.

9     Q.  Correct?

10    A.  Yes.

11          MR. PICKHARDT:  I will ask Exhibit TX-227 be admitted

12    into evidence.

13          MR. ROLLIN:  No objection.

14          THE COURT:  This is what is on the screen?

15          MR. PICKHARDT:  Yes, your Honor.  It also has an

16    attachment.

17          THE COURT:  May I see it?  Next.  Any other pages?

18    What is this, the indenture?

19          MR. PICKHARDT:  Yes, your Honor.

20          THE COURT:  Why are you offering it?

21          MR. PICKHARDT:  Excuse me?

22          THE COURT:  Why is it being offered?

23          MR. PICKHARDT:  It is being offered to demonstrate

24    Mr. Peresechensky received a copy of the indenture by e-mail

25    from Mr. Cognetti, who was his sales coverage several days

1  after Mr. Peresechensky is indicating he had already downloaded

2  the document from Bloomberg.

3         THE COURT:  What do you bring out by that?  Why is

4  that relevant?

5         MR. PICKHARDT:  Because, your Honor, at deposition

6  Mr. Peresechensky testified that the only reason he would be

7  getting a transactional document from Mr. Cognetti is if he

8  wasn't, didn't think he had access to it otherwise.

9         We have testimony from Mr. Peresechensky that he

10 reviewed this document because he found it in a place he had

11 never found a document before several days earlier as part of

12 his due diligence on this deal.  In his deposition he was asked

13 about Mr. Cognetti and the circumstances in which Mr. Cognetti

14 would be sending him a document, and his testimony was:

15 "Q  Question  --

16        THE COURT:  No.  You say you received a copy of the

17 trust indenture simply by clicking on a Bloomberg link, right?

18        THE WITNESS:  Yes.

19        THE COURT:  Did you do that before Monday, October 1?

20        THE WITNESS:  Sorry?

21        THE COURT:  Before Monday, October 1?

22        THE WITNESS:  I reviewed the indenture on the date of

23 the purchase, on September 27th.

24        THE COURT:  What was the purpose of getting this one

25 from Cognetti?

E79JTRU1                     Peresechensky - cross

1           THE WITNESS:  I can explain the story behind this.

2           THE COURT:  Just give me that answer.

3           THE WITNESS:  I just want to rehash the sequence of

4    events leading up to this context.  Mr. Pickhardt, you are well

5    aware there was a bid list on AHMIT September 27.  I noticed

6    abnormal in the nomenclature.  I looked at Bloomberg and

7    Bloomberg confirmed --

8           THE COURT:  Slow, slow, slow.

9           THE WITNESS:  Bloomberg, S&Ped confirm seniority of

10   1-A-3 relative to 1-A-2.  I then noticed a trust indenture

11   right on the first page of Bloomberg filing documents, and I

12   downloaded the trust indenture to verify the loss allocation

13   loss and different Section 3.38 unequivocally stated losses

14   would be applied first to 1-A-2 then 1-A-3.

15           Then I proceeded to analyze the security proprietary

16   loan level credit model and third party credit models from JP

17   Morgan, and I came up with a price of 47 and an 8th.  Two hours

18   later Nomura came back and said it can be done.  I said time

19   passed when I bid on other bonds.  I thought my bid was a bit

20   low, so I didn't expect to get hit on my bid.

21           THE COURT:  You had a long, long story.

22           THE WITNESS:  I will get to the point.

23           THE COURT:  Don't get to it.  Why are you getting this

24   one if you already had it?

25           THE WITNESS:  Here is what drove my thinking.  When I

1    spoke to Mr. Ali, that is the first time I became aware of the

2    discrepancy on Friday afternoon, September 28th.  Although the

3    indenture clearly stated the losses will be applied to 1-A-3

4    before 1-A-2, I wanted to do legal work.

5              I wanted to do some search over the weekend about any

6    other cases where there is a discrepancy between indenture PSA

7    and ProSupp, and during my search I uncovered a case where

8    Citigroup sued Impact over I believe it was the Impact 073

9    deal.

10             MR. PICKHARDT:  Objection; nonresponsive.

11             THE COURT:  We'll find out.  He is taking a long time

12   to answer.  Go ahead.  Why did you ask Cognetti?

13             THE WITNESS:  I will get to it.

14             THE COURT:  Tell me now.  Don't get to it.  Why did

15   you ask Cognetti?

16             THE WITNESS:  In that Impact case, it was similar to

17   this case, in my view, because there was a discrepancy between

18   a PSA controlling document and ProSupp.  In that case --

19             THE COURT:  Excuse me.

20             Did you hear the question?

21             THE WITNESS:  I did.

22             THE COURT:  I don't need the whole process of

23   reasoning.  What was the specific reasoning you asked Cognetti

24   for the trust indenture if you already had the indenture?

25             THE WITNESS:  In that Impact case there were two

 1   controlling PSA, one which was incorrect PSA and --

 2            THE COURT:  You wanted to see if there was another

 3   version?

 4            THE WITNESS:  Yes.

 5            THE COURT:  That is why you got this?

 6            THE WITNESS:  That is why I got this indenture.

 7            THE COURT:  I'll receive it in evidence.

 8            (Plaintiff Exhibit TX-227 received in evidence)

 9   BY MR. PICKHARDT:

10   Q.  Mr. Peresechensky, you were deposed in this matter on June

11   26th?

12   A.  Correct.

13   Q.  A few days ago, correct?

14   A.  Yes.

15   Q.  You were asked questions about why you got this indenture

16   from Mr. --

17   A.  Exactly.

18            THE COURT:  Mr. Pickhardt, there is a form for doing

19   it.  Follow the form.

20   BY MR. PICKHARDT:

21   Q.  Mr. Peresechensky, in your deposition were you asked the

22   following questions and --

23            THE COURT:  What page?

24            MR. PICKHARDT:  It is on Page 174, your Honor,

25   starting at Line 3.

1         THE COURT:  How many lines are you reading to him?

2         MR. PICKHARDT:  Through 18, your Honor.

3         THE COURT:  All right.  Go ahead.

4    BY MR. PICKHARDT:

5    Q.  Mr. Peresechensky, were you asked the following questions

6    and did you provide the following answers:

7         THE COURT:  Break it up.

8         MR. PICKHARDT:

9    "Q  Do you have a recollection why Mr. Cognetti was sending you

10   the AHMIT 05-2 indenture?

11   "A  I don't know."

12        Did you provide that testimony?

13   A.  I did.  I didn't remember at the time of my deposition.

14   Q.  Did you provide the following testimony:

15   "Q  Do you have any recollection of having any discussion with

16   Mr. Cognetti about AHMIT 05-2 around the time you heard from

17   Mr. Ali Haghighat about the discrepancy between the indenture

18   and the ProSupp?

19   "A  I possibly could have talked to him about the discrepancy

20   of the indenture as the one loss allocation provision versus

21   the ProSupp.  It is possible I had talked to him about it."

22        Did you provide that testimony?

23   A.  Yes.

24   "Q  And, in fact, did you ask Mr. Cognetti to send you a copy

25   of the indenture?

 1    "A   I don't believe I did.  I don't remember if I did.  I mean

 2    I don't know why I would ask him if I can get it from

 3    Bloomberg."

 4              Did you provide that testimony, sir?

 5    A.  Yes.

 6              MR. ROLLIN:  As to the rule of completeness, I believe

 7    it should be read through 176, Line 21.

 8              THE COURT:  Denied.  You can take it up on redirect

 9    examination.

10              MR. ROLLIN:  Thank you.

11    BY MR. PICKHARDT:

12    Q.  Mr. Peresechensky, you testified yesterday that based upon

13    your understanding --

14              THE COURT:  When was his deposition?

15              MR. PICKHARDT:  Excuse me?

16              THE COURT:  When was the deposition?

17              MR. PICKHARDT:  The deposition was June 26th, your

18    Honor, so --

19              THE COURT:  This year?

20              MR. PICKHARDT:  Excuse me?

21              THE COURT:  This year, 2014?

22              MR. PICKHARDT:  Correct, of this year.

23              THE COURT:  Thank you.

24    BY MR. PICKHARDT:

25    Q.  Mr. Peresechensky, you provided testimony yesterday in

1   which you stated that Intex, which you admitted the industry

2   standard cash flow tool models securities using the indenture

3   as a rule, right?

4   A.  Yes.

5   Q.  Isn't it true that Intex for the first six years of this

6   transaction modeled it based upon the prospectus supplement?

7   A.  I don't have the knowledge of that at the time.  I didn't

8   have access to Intex because I didn't have the Intex

9   application.  Intex as a policy models the cash flows per

10  indenture.  Now there might -- if they haven't caught it yet,

11  then it is something that needs to be addressed with Intex.  As

12  a policy, they model deals per indenture.

13          THE COURT:  The question was whether Intex for the

14  first six years of this transaction modeled based upon the

15  prospectus supplement?

16          THE WITNESS:  I think the change occurred.

17          THE COURT:  Is it yes or no?

18          THE WITNESS:  The change occurred --

19          THE COURT:  Is it yes or no, the first six years, or

20  do you know?

21          THE WITNESS:  The change occurred on February 2011, so

22  it would be slightly less than six years.

23          THE COURT:  The first five years?

24          THE WITNESS:  Yes.

25          THE COURT:  Modeled on the ProSupp?

E79JTRU1                    Peresechensky - cross

1                  THE WITNESS:  Yes.

2                  THE COURT:  And it changed and became modeled on the

3      trust indenture?

4                  THE WITNESS:  Correct.

5                  THE COURT:  When did you find that out?

6                  THE WITNESS:  When did I find it out?

7            I found it out through Ali because I didn't have

8      access to Intex.

9                  THE COURT:  Through Ali?

10                 THE WITNESS:  Ali, a trader at Mesirow.

11                 THE COURT:  When did you find it out?

12                 THE WITNESS:  I believe I found it it out on Friday,

13     September 28th.

14                 THE COURT:  Right after you did the deal?

15                 THE WITNESS:  Yes.

16     BY MR. PICKHARDT:

17     Q.  Mr. Peresechensky, isn't it also true that for the first

18     five or six years of this deal, as we saw on documents

19     yesterday, that both Moody's and Standard & Poor's follow the

20     prospectus supplement?

21     A.  Yeah, I believe the changes were, Moody's changed the

22     methodology in 2010, and S&P likewise sometime in 2011.

23     Q.  You testified yesterday that you understood yourself to

24     have received certain assurances from Wells Fargo in October of

25     2012 with respect to whether what Wells Fargo would or wouldn't

1    do, right?

2    A.  Yes.

3    Q.  Is it correct when you received what you understood to be

4    these assurances, that you did not at that time consult with

5    Ms. Davis, Semper's in-house lawyer?

6    A.  I did not consult with Ms. Davis.  I am not really sure if

7    Ms. Davis was in-house or out-house.  I didn't have a

8    communication channel to Ms. Davis.  I usually talked to my

9    boss -- Jaime Nosey, who is a CIO, chief investment officer, or

10   Greg Ellis, president.

11            THE COURT:  The question was whether you consulted

12   with Ms. Davis?

13            THE WITNESS:  I did not.

14            THE COURT:  That is the answer.

15   BY MR. PICKHARDT:

16   Q.  And so I also want to make sure, you said earlier in

17   response to one of my prior questions that there was legal

18   analysis being performed around this time.  You're not talking

19   about legal analysis being performed by a lawyer, right?

20   A.  Around September and October of 2012?

21   Q.  Yes.

22   A.  No.  It was legal research, looking at the deals that

23   had --

24            THE COURT:  It was your looking?

25            THE WITNESS:  I was looking.

1    BY MR. PICKHARDT:

2    Q.  Now, that was in October of 2012.

3            You also testified yesterday that there were then

4    events in 2013 in which the securities administrator's position

5    was clarified, right?

6    A.  There were events, further communications between Wells

7    Fargo and other note-holders.

8    Q.  And specifically the events I'm talking about are in May of

9    2013 Wells Fargo sent around a consent solicitation, and that

10   consent solicitation included a specific reservation of rights

11   that Wells Fargo might take legal action even if consent was

12   not provided for an amendment, right?

13   A.  Correct.

14   Q.  And in response to that, which raised concern for you,

15   Semper sent an angry letter to Wells Fargo, right?

16   A.  Yeah, I believe somebody at Semper sent a letter.

17   Q.  In response to your angry letter, Wells Fargo at the end of

18   of May 2013 sends a letter back in which they confirm their

19   reservation of rights that they could bring legal action,

20   right?

21           MR. ROLLIN:  Objection.

22           THE COURT:  What grounds?

23           MR. ROLLIN:  Best evidence.

24           THE COURT:  Sustained.  Are these letters in evidence?

25           MR. PICKHARDT:  They are, your Honor.

1              THE COURT:  Why do we need them?

2              MR. PICKHARDT:  We don't, your Honor.

3              THE COURT:  Then don't bother.

4   BY MR. PICKHARDT:

5   Q.  Mr. Peresechensky, as of May 2013 in the correspondence you

6   received from Wells Fargo at that time and in the next couple

7   of months, you were no longer under any misapprehension that

8   Wells Fargo had not reserved its rights to pursue legal action,

9   right?

10  A.  When we received --

11             THE COURT:  What is the difference?

12             MR. PICKHARDT:  Your Honor, I want to make sure we

13  have a timeline because there are --

14             THE COURT:  You have it in the documents.  You don't

15  need it from the witness.  I think you are pretty much finished

16  with Mr. Peresechensky.

17             MR. PICKHARDT:  If I can confirm there is anything

18  else I would like to wrap up on.

19             THE COURT:  Sure.

20             THE COURT:  Why don't you consult your colleagues.

21             (Off-the-record discussion)

22  BY MR. PICKHARDT:

23  Q.  Mr. Peresechensky, when you testified yesterday, you

24  testified about the fact that you are a regular observer of

25  this market.  Based upon your experience, how many actual

E79JTRU1                          Peresechensky – cross

1    trades in 1-A-3 notes are you aware of?

2    A.  Well, let me qualify first.  What do you think is a market

3    in our place?

4              THE COURT:  No, Mr. Peresechensky.  The question is --

5              THE WITNESS:  How many actual trades?

6              THE COURT:  That you remember?

7              THE WITNESS:  In 1-A-3?

8              THE COURT:  Yes.

9              THE WITNESS:  The actual trades I know there was a

10   trade on February 2012, around February 23rd, 2012 which I

11   believe was around 37 and a half, and there was our trade on

12   September 27th, 2012.

13   BY MR. PICKHARDT:

14   Q.  So you're aware of two actual trades?

15   A.  Yes, correct.

16   Q.  How many actual trades are you aware of in 1-A-2 notes?

17   A.  I am aware of a trade happening in early September 2012 in

18   the low to mid-30's.  I don't remember what size exactly.  I am

19   aware of a trade on December 12, 2013, 20 million trade from

20   ING.  ING list, bond traded around 40, 40 cover.

21              I am also very well aware of a trade on March 6th of

22   this year, 2014, because I was the second-best bid on that

23   bond, on the size slightly less, 200 K when I bid 43, and

24   somebody bid a little bit higher than me.

25   BY MR. PICKHARDT:

1    Q.  Mr. Peresechensky, of all of the trades that you are aware

2    of in 1-A-3 notes which have occurred in the last number of

3    years, what is the highest price at which a trade has occurred?

4    A.  An actual trade?

5    Q.  An actual trade?

6            What is the highest price you are aware of of somebody

7    having actually purchased 1-A-3 notes?

8    A.  Well, that trade took place in September of 2012.

9    Q.  What was the price?

10   A.  You know the price, 47 and a half, what we paid for it.

11   Q.  Of all of the trades you actually know of in 1-A-2 notes,

12   what is the highest price at which you are aware of anyone

13   having actually purchased 1-A-2 notes?

14   A.  We know it was around 43 which happened this year, almost

15   two years later.

16           MR. PICKHARDT:  Thank your Honor.  I have no further

17   questions.

18           THE COURT:  Redirect?

19           MR. JOHNSON:  May I have a brief cross?

20           THE COURT:  Yes, right.

21   CROSS-EXAMINATION

22   BY MR. JOHNSON:

23   Q.  Good afternoon, Mr. Peresechensky.

24   A.  Good afternoon.

25   Q.  Mr. Peresechensky, I'd like to follow up on some

1    questioning that Mr. Pickhardt just did.

2              You testified in response to his questioning that you

3    received a notice from Wells Fargo in May of 2013 concerning a

4    consent solicitation, correct?

5    A.  Correct.

6    Q.  And in response to that, Semper sent Wells Fargo an angry

7    letter concerning Wells Fargo's reservation of rights to bring

8    litigation, correct?

9    A.  I don't know if, I don't know if it was an angry letter.

10   It was an assertive letter.

11   Q.  Your letter objected to --

12   A.  It definitely, did, yes.

13             THE COURT:  Let him finish his question.

14   BY MR. JOHNSON:

15   Q.  Mr. Peresechensky, after Semper objected to Wells Fargo's

16   reservation of rights to bring litigation concerning the

17   discrepancy that brings us to court today, Semper had the

18   opportunity to sell its 1-A-3 notes, correct?

19   A.  The liquidity and marketwise, the bond, the bond has been

20   rated compromised.  As I stated before, the last observable bid

21   we received on the 1-A-3 note is 71, and I wanted, I wanted to

22   get at least 77 from that bond.

23             Since this trust indenture petition has been filed and

24   the notes are in litigation, I cannot really put, not really

25   sell in good conscience to other investors because the notes

1   are in litigation and the litigation will deter any potential

2   prospective buyers from purchasing the security at what we

3   believe is a fair price.

4           THE COURT:  The question was did you have the

5   opportunity to sell your 1-A-3 notes?  Did you have an

6   opportunity?  Whether you exercised or not, did you have an

7   opportunity?

8           THE WITNESS:  I don't believe I had an opportunity to

9   sell them at fair price, what we perceived to be fair price.

10  We had an opportunity to sell them at any price --

11          THE COURT:  You had an opportunity to sell at some

12  price?

13          THE WITNESS:  At some price.

14          THE COURT:  Not a fair price?

15          THE WITNESS:  Yes.

16  BY MR. JOHNSON:

17  Q.  That price you could have sold at was 71, correct?

18  A.  Yes, the last price, 71 in November and December of 2013.

19  Q.  So prior to the commencement of this litigation, but after

20  Wells Fargo had clearly indicated it was reserving its rights

21  to bring this litigation, you had an opportunity to sell the

22  bond for 71 in November of 2013, correct?

23  A.  Correct.

24  Q.  You purchased the bond at 47 and a half, correct?

25  A.  Yes, correct.

1    Q.  Had you sold the bond in November at 71, Semper would have

2    garnered a significant profit, correct?

3    A.  It is significant is a relative term because the market has

4    rated from September 2012 to November of 2013.  The market

5    gyrated tremendously.  Those bonds were up 40 to 60 percent.

6    Some of them doubled in price.  I cannot talk about this in

7    isolation.  I have to talked about in context of similar

8    securities have traded.  They have gyrated substantially from

9    2012 to 2013.

10            THE COURT:  You could have gotten a significant profit

11   on this bond, but you thought not a significant profit in

12   relationship to other activities in the market?

13            THE WITNESS:  Correct.

14            THE COURT:  If you didn't like this bond, you could

15   have gotten out?

16            THE WITNESS:  Yes.

17            THE COURT:  If you didn't like what the trustee was

18   doing, you could have gotten out?

19            THE WITNESS:  Yes.

20            THE COURT:  If you had gotten out, you could have made

21   a profit, but not as big as you wanted?

22            THE WITNESS:  Yes.

23            MR. JOHNSON:  Thank your Honor.  No further questions.

24            THE COURT:  It is not important.  Next.  Redirect.

25            MR. ROLLIN:  Before I begin, I object to the previous

1  line of questions and answers because we put Ms. Davis on in

2  part to deal with the equivocal nature of the reservation of

3  rights and the interpretation at Semper with respect to that.

4          THE COURT:  Noted.  Noted.  Noted.  Continue.

5  REDIRECT EXAMINATION

6  BY MR. ROLLIN:

7  Q.  Mr. Peresechensky, did you know this litigation would be

8  filed before it was filed?

9  A.  No.

10 Q.  Was it a surprise to you?

11 A.  Absolutely a surprise, shock.

12 Q.  Mr. Peresechensky, when we talked about when you spoke with

13 Mr. Pickhardt about gleaning pricing information from the

14 market, are actual trades the only way in which you get pricing

15 information?

16 A.  That is just absurd.  The market is what some, where

17 somebody is offering the bond and what somebody is paying for

18 the bond.  The latest offering was around 77, which I wanted to

19 get for this bond.

20         THE COURT:  You speak so fast, we can't hear you or

21 can't understand you.

22         THE WITNESS:  What I perceived from the market, what

23 somebody, where somebody is willing to offer the side of the

24 market, in this case case this was 77 offer from us, Semper.

25         And the bid side which was 71, the latest bid side in

1   November and December of last year was 71.  That was from

2   Oppenheimer and Barclays.  This was 71 by 77 market.  You could

3   definitely obtain a price of 71, so that would be the market

4   price.

5           I can draw an analogy.  Let's say I bought a house for

6   a hundred thousand dollars five years ago, and today somebody

7   offered to pay me 200,000 for that house, and I decided not to

8   sell that house because I want more.  That doesn't mean the

9   house is a hundred thousand from the last observable

10  transaction five years ago?  That is absurd.  The market is

11  basically the offer side which was 77 and bid side 71.  That

12  was the market on 1-A-3 tranche.  It is not based on the last

13  observable transaction price.

14          THE COURT:  It depends on when that is?

15          THE WITNESS:  Yes.

16          THE COURT:  If it at or around the same time as the

17  bids and asked, you would consider it part of the market,

18  right?

19          THE WITNESS:  Yes.

20          THE COURT:  If it is separated much in time, then it

21  is not part of the market?

22          THE WITNESS:  Right.

23          THE COURT:  It all depends.

24  BY MR. ROLLIN:

25  Q.  Mr. Peresechensky, you were questioned by Mr. Pickhardt

1    about effectively whether or not you reviewed the indenture on

2    Bloomberg before the trade.  Do you remember those questions?

3    A.  Yes, correct.

4    Q.  Mr. Peresechensky, I have handed you what is marked for

5    identification as Exhibit 262.  Please take a look at that.

6    A.  Yes.

7           THE COURT:  Put it up, please.

8    BY MR. ROLLIN:

9    Q.  Can you tell the court, please, what Exhibit TX-262 is.

10   A.  Yes, that is a list of files for this AHMIT American Home

11   deal.  If you look at Line 14, it shows the trust indenture is

12   very visible there among filings and it was filed on Bloomberg

13   sometime in May of 2011.

14   Q.  Is that the screen view that you had at the time that you

15   looked up this bond on Bloomberg before making a purchase?

16   A.  Yeah.

17          MR. PICKHARDT:  Objection, your Honor.  This is not in

18   evidence.

19          MR. ROLLIN:  I'll lay a foundation.

20          THE COURT:  That is okay.  The answer, is it a screen

21   that he looked at when he looked at the Bloomberg screen.  What

22   is next?  We are waiting for a question.

23   BY MR. ROLLIN:

24   Q.  Where it says trust indenture, is that the link to the

25   trust indenture you testified about?

1   A.  Yeah.  So if you --

2           THE COURT:  You answered the question.

3   BY MR. ROLLIN:

4   Q.  Did you click on that link before you bought the bond?

5   A.  Yes.

6   Q.  Did you look at the trust indenture?

7   A.  Yes.

8   Q.  Did you look at Section 3.38?

9   A.  Yes.

10          THE COURT:  He has already said that.

11  BY MR. ROLLIN:

12  Q.  You were asked questions at your deposition about the

13  e-mail from Mr. Cognetti, correct?

14  A.  Correct.

15  Q.  At the time of your deposition, were you unable to remember

16  that?

17  A.  I didn't remember why he sent me that e-mail because I

18  already had the trust indenture from Bloomberg.

19  Q.  Did you tell counsel at the time you didn't remember it?

20  A.  I am sorry?

21  Q.  Did you tell Mr. Pickhardt at the time of the deposition

22  that you did not remember why Mr. Cognetti would have been

23  senting you that document?

24  A.  I believe I stated why I didn't remember.  I said I don't

25  recall why he sent me the document.

1    Q.  After your deposition, was it troubling you you couldn't

2    remember that?

3    A.  It was, definitely was troubling me and I came to you

4    after --

5    Q.  Don't say what you told me.

6    A.  Okay.

7    Q.  Did you scour your memory and try to remember what

8    happened?

9    A.  Yes, I did, yes.

10   Q.  Is your memory you testified about today that the --

11   A.  Yes, I had that recollection on the same day or after

12   the -- yeah.

13   Q.  Did you accurately testify today what your recollection

14   was?

15   A.  I believe so.

16           (Off-the-record discussion)

17   BY MR. ROLLIN:

18   Q.  You were asked questions about your visibility into pricing

19   for both the A-2 and A-3 notes.  Do you have a view of the

20   current market value of the A-2 notes?

21   A.  Yes, I have a very good view because when I actually

22   analyzed ING's transaction from December 2012, when the price

23   was 40, I saw the price, how cheap the bond was.  I didn't

24   assign any probability --

25   Q.  You did not?

1   A.  -- I didn't assign any probability for indenture to be

2   changed to ProSupp.  When I got a chance to bid on that 1-A-2

3   bond again because it was a small size in March, I stepped up

4   several times to try to acquire a piece less than 200,000.

5           THE COURT:  Acquire what?

6           THE WITNESS:  I tried to acquire the 1-A-2 tranche at

7   a price up to 43, $43.

8           THE COURT:  What happened?

9           THE WITNESS:  Somebody outbid me.

10          MR. ROLLIN:  No further questions.

11          THE COURT:  Thank you.

12          MR. PICKHARDT:  Your Honor, just one question?

13          THE COURT:  Go ahead.

14  RECROSS EXAMINATION

15  BY MR. PICKHARDT:

16  Q.  Mr. Peresechensky, if you could please look back at Exhibit

17  262 which Mr. Rollin showed you.

18  A.  Yes.

19  Q.  You testified that this document accurately reflects the

20  Bloomberg screen that you looked at and found the indenture on,

21  right?

22  A.  It was similar to this screen.  I don't remember if the

23  dates were exactly the same.  I remember the trust indenture

24  was on the first page of that screen.

25  Q.  This says company filings, and what page does this appear

1   on?

2   A.  It was --

3   Q.  I want you to read what it says in the upper-right-hand

4   corner with respect to the page, Mr. Peresechensky.

5   A.  Mr. Upper-right corner?

6   Q.  Next to --

7           THE COURT:  Draw it to his attention.  What page is

8   it?

9           MR. PICKHARDT:  It is on this Exhibit 262 in the

10  upper-right-hand corner.

11          THE COURT:  Page 3?

12          MR. PICKHARDT:  Correct.

13          THE COURT:  Mr. Pickhardt is drawing to your attention

14  that this screen is Page 3.

15          THE WITNESS:  Page 3.

16          THE COURT:  Yes.  Do you see that, Page 3, company

17  filings?

18          THE WITNESS:  Page 3?  Yes, yes.  Because we looked at

19  the current, as two years have passed, there have been more

20  files.  At the time of, at the time I looked at the deal, I

21  remember it was on the first page.

22  BY MR. PICKHARDT:

23  Q.  This exhibit doesn't accurately reflect what you looked at

24  at the time?

25          THE COURT:  That is objectionable.  Objection

1    sustained.

2              MR. PICKHARDT:  No further questions.

3              THE COURT:  You're excused.

4              (Witness excused)

5              THE COURT:  Next.  Mr. Rollin?

6              MR. ROLLIN:  We rest.

7              THE COURT:  Anything more from the --

8              MR. PICKHARDT:  No, your Honor.

9              THE COURT:  Anything more from Wells Fargo?

10             MR. JOHNSON:  No, your Honor.

11             THE COURT:  All sides rest.

12        All motions previously made by any party are deemed

13   made now and the argument will be incorporated in the final

14   arguments.

15             MR. PICKHARDT:  I have one housekeeping issue.

16        I believe I'll need to confirm with my team there were

17   three exhibits which inadvertently did not get admitted.  I

18   don't know when you would like us to address that?

19             THE COURT:  Yes, do it now.

20             (Pause)

21             MR. PICKHARDT:  Your Honor, the first two exhibits are

22   Exhibits TX-205 and Exhibit TX-206.  These are documents that

23   related to the drafting process and specifically drafts with

24   respect to the term sheets which your Honor will recall there

25   was testimony.

```
 1              THE COURT:  I do recall.  I thought they were in.  If
 2     they're not in and you offer them, is there any objection?
 3              MR. ROLLIN:  Yes, your Honor.  I interposed objections
 4     with respect to these draft documents on hearsay and --
 5              THE COURT:  Put up 205, please.  These are comments by
 6     others in the drafting process?
 7              MR. PICKHARDT:  These are comments that were received
 8     by Ms. Stone, as she testified about.
 9              THE COURT:  Based on these comments, she produced the
10     next draft?
11              MR. PICKHARDT:  That's correct.
12              THE COURT:  And there is no issue whether comments
13     were taken up or not.  The next draft in terms of the
14     distribution of losses is exactly the same as the first, prior
15     draft?
16              MR. PICKHARDT:  Not exactly, your Honor.
17              There was a comment that came from Thacher Proffitt in
18     the comments that are attached here which asked that Lehman
19     Brothers elaborate with respect to the discussion of allocation
20     of losses, and in the next draft within that elaboration is
21     further discussion and description of the allocation of
22     realized losses specifically with respect to the 1-A-2 and
23     1-A-3, and so it is not simply a repetition of what had been
24     the previous draft, but actually addition of more description
25     of that allocation.
```

E79JTRU1                          Peresecensky - recross

1             THE COURT:  Who was the witness who put this on?

2             MR. PICKHARDT:  Ms. Stone.

3             THE COURT:  So she was testifying in her records?

4             MR. PICKHARDT:  That's correct, your Honor, the

5     documents she received.  I am offering them for sequence just

6     so we have a sequence of the drafting.

7             THE COURT:  What is the objection?

8             MR. ROLLIN:  The objection is that she specifically

9     stated she could not authenticate any of the documents or any

10    of the revisions to the documents.

11            THE COURT:  They came from her files.

12            MR. ROLLIN:  It no evidence they came from her files.

13            THE COURT:  Can you tell from the production number?

14            MR. ROLLIN:  Sorry?

15            THE COURT:  Can you tell from the production number?

16            MR. ROLLIN:  I have a declaration from --

17            THE COURT:  The production from LEM.

18            MR. ROLLIN:  L E H, Lehman.  The parties previously

19    agreed to a declaration from Lehman Brothers concerning these

20    documents which I, as part of the housekeeping at the end, tend

21    to offer.  It was also negotiated and agreed upon by the

22    parties, and it explains the documents that came from Lehman

23    Brothers and it is very important to the court's analysis on

24    this issue.  Your Honor should see Lehman Brothers evidence in

25    that regard.

E79PTRU2                      Trial

1              THE COURT:  Let me see.

2              MR. ROLLIN:  May I approach?

3              THE COURT:  Yes.

4              MR. ROLLIN:  This will be TX9.  It's an agreed joint

5     exhibit.

6              THE COURT:  Mr. Rollin, what can I understand from

7     this?

8              MR. ROLLIN:  Your Honor, paragraph 9, in particular,

9     Lehman says -- the Lehman representative says:  I am informed

10    that many of the documents in the LBHI production are drafts

11    and may reflect handwritten notes or electronic note taking and

12    change track in functionality.  LBHI does not have information

13    sufficient to state who made any such notes or changes, the

14    reason for any such changes, or when such notes or changes were

15    made.

16             THE COURT:  Well, I can take 205 and 206 in the

17    sequence in which they came because it could be reconstructed.

18    I'll receive 205, 206 and TX9 in evidence.

19             MR. ROLLIN:  Thank you.

20             (Defendant's Exhibits 205, 206 and TX9 received in

21    evidence)

22             MR. PICKHARDT:  Your Honor, the other document was

23    TX220, which was the final offering memorandum in connection

24    with this deal.  And to be clear, the offering memorandum is

25    distinct from the Prospectus Supplement.  The offering

1   memorandum is for some of the privately issued notes.  It also

2   includes --

3           THE COURT:  What's the relevance?

4           MR. PICKHARDT:  It includes a description of the

5   allocation of losses between the 1-A-3 and the 1-A-2 notes and

6   is part of the final documents.

7           THE COURT:  I'll receive the note.

8           (Plaintiff's Exhibit TX220 received in evidence)

9           MR. ROLLIN:  Your Honor, we don't object to the final

10  documents, but it only describes the indenture and, therefore,

11  is subject to the best evidence rule.

12          THE COURT:  Well, that is the best evidence.

13          MR. ROLLIN:  The indenture.

14          THE COURT:  It is part of the closing binder.  It's

15  part of the materials that are used to understand the deal.  I

16  receive it all.  Okay.  Who's going to go first?

17          MR. JOHNSON:  Your Honor, may I ask one thing before

18  we move to closings?  This just pertains to scheduling.  If I

19  understood your Honor yesterday, the Court's intention is to

20  announce the decision tomorrow morning.  Unfortunately, your

21  Honor, that presents a significant scheduling conflict for me.

22          THE COURT:  Let's do this off the record.

23          MR. JOHNSON:  Okay.

24          (Discussion off the record)

25          THE COURT:  So I had scheduled tomorrow morning as the

1    time to deliver the Court's decision in the case.  That is now

2    postponed until 2:15 -- let's say 2:30 on Friday.

3              MR. JOHNSON:  Thank you, your Honor.

4              THE COURT:  2:30 on Friday.  Okay.  Are you ready for

5    summations?

6              MR. PICKHARDT:  Yes, we are, your Honor.

7              THE COURT:  Okay.  Are you going to start?

8              MR. PICKHARDT:  Yes, your Honor.

9              THE COURT:  What's the plan?

10             MR. PICKHARDT:  Well, your Honor, it wasn't completely

11   clear to me yesterday as to whether the Court would allow us to

12   reserve a period for rebuttal following --

13             THE COURT:  Yes, you have your hour.

14             MR. PICKHARDT:  Can we split our hour?

15             THE COURT:  You can split your hour any way you want.

16             MR. PICKHARDT:  Okay.  Then if we could please split

17   our hour, we'll go for about 50 minutes.  Frankly, I think,

18   your Honor, it will be less than that.

19             THE COURT:  Let's say 45, 15.

20             MR. PICKHARDT:  45, 15 would be good, your Honor.

21             THE COURT:  And that would assign Mr. Johnson time as

22   well.

23             MR. JOHNSON:  Your Honor, there will be no closing on

24   behalf of the securities administrator.

25             THE COURT:  I want to make sure I have the notices.

E79PTRU2                          Trial

1   Mr. Pickhardt is going to pick up the notices.

2            MR. JOHNSON:  The notices, your Honor, from 2013

3   concerning the consent solicitation in which Wells Fargo

4   reserved its rights?

5            THE COURT:  The beginning of the lawsuit, the notice

6   that you were beginning the lawsuit in Minnesota.

7            MR. JOHNSON:  Yes, your Honor.  I don't think those

8   have been offered into evidence.

9            THE COURT:  It should be.

10            MR. JOHNSON:  Okay.  Well, then, your Honor --

11            THE COURT:  They were joint exhibits.  I said that I

12   would receive the joint exhibits.

13            MR. JOHNSON:  Your Honor, they are not joint exhibits.

14   They are actually Exhibits 101, 102, 103 and 104.

15            THE COURT:  I would like you to take five minutes.

16   I'll receive those in evidence, and I'd like you to take five

17   minutes on your own time to develop that, and like you to do it

18   first.

19            (Plaintiff's Exhibits 101, 102, 103 and 10 received in

20   evidence)

21            MR. JOHNSON:  I'm sorry, to develop?

22            THE COURT:  To tell me what happened.  I want to see

23   the sequence of events.  I want to examine the letters.  I've

24   not seen them or focused on them.

25            MR. JOHNSON:  Yes, your Honor.

1              THE COURT:  You will go first on your own time.  Off

2    the record.

3              (Discussion off the record)

4              THE COURT:  Okay.

5              MR. JOHNSON:  May it please the Court.  Your Honor,

6    again, Michael Johnson on behalf of the securities

7    administrator.  I will briefly address the sequence of events

8    that occurred at the beginning of this year when Wells Fargo

9    commenced this action and the notice that was provided to

10   investors in this action at that time.

11             Wells Fargo commenced a trust instruction proceeding

12   in Minnesota State Court on January 17th, 2014.  In its

13   petition, Wells Fargo sought relief.  In the alternative, it

14   sought an order either confirming the existing loss allocation

15   as appears in the indenture or, alternatively, that the loss

16   allocation appearing in the indenture be reformed so as to

17   conform to the sequence of loss allocation in the Pro Supp.

18             On January 27 --

19             THE COURT:  In other words, taking a position

20   favorable to neither side, simply saying just tell me how to go

21   and I'll go?

22             MR. JOHNSON:  Correct, your Honor.  And that was a

23   filing that was made pursuant to Minnesota statute that permits

24   a trustee or other interested party to commence an action

25   seeking judicial guidance in respect of a trust instrument,

 1    which this indenture is, of course.

 2          On January 27th, your Honor, the securities

 3    administrator caused to be delivered to holders, a notice

 4    informing holders of the commencement of the trust instruction

 5    petition.  That notice appears at Exhibit 101, TX101.  Your

 6    Honor, in that exhibit, the securities administrator notified

 7    investors of the commencement of the action and included a copy

 8    of the petition.

 9          And the securities administrator further advised

10    investors of the scheduling of a hearing by the Minnesota State

11    Court.  Of course, your Honor, that hearing never did occur,

12    but we did inform investors when it was scheduled at the time.

13          THE COURT:  Didn't occur because the case was removed.

14          MR. JOHNSON:  That's correct, your Honor, and that,

15    your Honor, is effectively what the subsequent notices that

16    have been admitted into evidence show.  On February 20th, 2014,

17    the securities administrator caused to be delivered to

18    investors a notice informing investors that the action had been

19    removed to Federal District Court for the District of

20    Minnesota.  That removal was affected by Scepter, a party in

21    interest here today, your Honor.

22          THE COURT:  Did Scepter intervene before it removed?

23          MR. JOHNSON:  Your Honor, I'm not sure if it was a

24    formal intervention because it was a matter of state court

25    procedure.  I think I'm understanding from counsel for Scepter

1    that it was a formal intervention.  It did certainly appear as

2    a party in interest, and according to Minnesota procedure, a

3    party in interest is entitled to appear in a trust instruction

4    proceeding.  And there was certainly no objection on the part

5    of the securities administrator to Scepter's appearance in the

6    action.

7              A copy of that notice informing investors of the

8    removal of the action to Minnesota District Court is

9    Exhibit TX102.

10             THE COURT:  May I see it?

11             MR. JOHNSON:  Yes, and a copy of the notice of removal

12   here is at Page 8 of Exhibit 102.  And, your Honor, to follow

13   through, there was, I believe, in this notification -- yes, if

14   you turn to Page 4, your Honor --

15             THE COURT:  One minute, one minute.  Okay.

16             MR. JOHNSON:  Page 4, your Honor, the securities

17   administrator did inform investors of a cancellation of the

18   State Court hearing.

19             Your Honor, on March 14th, 2014 --

20             THE COURT:  These notices, the two notices, TX101 and

21   102, were they sent to all the note holders?

22             MR. JOHNSON:  Your Honor, the manner of delivery is as

23   follows for all of the notices, 101, 102, 103 and 104.  This is

24   where the role of the trustee actually comes into play.  The

25   securities administrator prepares the notice and delivers the

1    notice to the trustee, which is Deutsche Bank.

2            Deutsche Bank, in turn, delivers the notice through

3    its normal means, which is actually by e-mail in this era, to

4    the Depository Trust Company.  The reason that they are

5    delivered to DTC is that DTC is the registered holder for all

6    of the notes.  The DTC, in turn, has information about the

7    participant banks at which the actual notes are held, so as to

8    be able to deliver notices out to the participant banks, who,

9    in turn, are able to deliver the notes to the beneficial

10   holders.

11           The securities administrator's procedure also, your

12   Honor, is to post copies of the notices to its own website, and

13   holders of notes in the transaction are entitled to access that

14   website, which has this type of information in it and certain

15   other information in it, most importantly, your Honor, the

16   regular reporting that the securities administrator does for

17   the transaction.

18           THE COURT:  Thank you.

19           MR. JOHNSON:  On March 14th of 2013, the securities

20   administrator caused to be delivered to holders a further

21   notice, this time notifying investors of the scheduling of a

22   hearing in Minnesota Federal District Court, and that hearing

23   had been scheduled for April 17th, 2014.  A copy of that

24   notice, your Honor, is Exhibit TX103.

25           THE COURT:  Okay.

1          MR. JOHNSON:  And, your Honor, subsequent to the

2    delivery of TX103, this action was transferred to this court,

3    and that transfer was affected pursuant to a stipulation among

4    the interested parties, Scepter and Semper, as well as the

5    securities administrator.  And a notice dated April 9th, 2014,

6    which appears as TX104, informed investors of the transfer of

7    this action to this court.

8          THE COURT:  Thank you.

9          MR. JOHNSON:  And, your Honor, of course, at Page 4 of

10   TX104, the securities administrator informed investors of the

11   cancellation of the hearing that had been scheduled in

12   Minnesota District Court.

13         THE COURT:  Thank you.

14         MR. JOHNSON:  Unless your Honor has anything further,

15   I will cede to the court.

16         THE COURT:  Thank you.

17         MR. JOHNSON:  Thank you, your Honor.

18         THE COURT:  Okay, Mr. Pickhardt.

19         MR. PICKHARDT:  Your Honor, we have some slides that

20   accompany the closing.  They will come up on the screen.  I

21   also have hard copies, if I could hand them up.

22         THE COURT:  Fine.  Copies for Mr. Rollin?

23         MR. PICKHARDT:  Yes.

24         THE COURT:  So it's a quarter past 2:00.

25         MR. PICKHARDT:  Your Honor, Mr. Johnson has,

1    obviously, explained the context of this proceeding, which is a

2    trust instruction proceeding.  The additional point that I

3    would make with respect to the context is that in addition to

4    the action being filed by the trustee, or the securities

5    administrator, in addition, Scepter has filed its own claims

6    that it is entitled to have either the indenture reformed or,

7    separately, a claim that the indenture should be construed so

8    as to interpret it as providing for the allocation of losses to

9    the 1-A-3 notes before the 1-A-2 notes.

10        My intention in closing is to address the evidence

11   that has been offered in support of the claim for reformation.

12   We believe that to have been firmly established.  Secondly, to

13   discuss the construction claim, as well, and to explain why we

14   also believe that has been established.  And then there have

15   been a number of defenses that have been asserted by Semper,

16   and my intent is to address those defenses.

17        With respect to the affirmative evidence, your Honor,

18   obviously, we've all sat through a couple of days of evidence,

19   and I really don't intend to belabor points that your Honor

20   already understands.  And so, you know, if your Honor would

21   like for me to either focus in more detail on particular points

22   or move in a higher gloss over particular areas, I'll certainly

23   be happy to do that.

24        Now, with respect to the reformation claim, which is

25   where I will start, the standard for reformation is that where

1    there has been no mistake about the agreements but there has

2    been a mistake with respect to the memorialization of that

3    agreement, then a claim for reformation will stand.

4           Some of the arguments that have been made in defense

5    of this is that reformation just doesn't apply in the indenture

6    context and that simply is not true.  And we have identified

7    for you on this slide, and it's included in our papers, the

8    Aristocrat Leisure case, which, in fact, an indenture was

9    reformed, and it is an indenture that, like this indenture, is

10   subject to the Trust Indenture Act.

11          And that case it, frankly, was somewhat similar.  What

12   you had was an indenture that had Australian dollars and U.S.

13   dollars, and the indenture had accidentally transposed -- the

14   drafters had actually transposed the references to Australian

15   dollars and U.S. dollars.  And what the courts in that case

16   said is where there was no question about that it was in error,

17   is that it was subject to reformation, and that's exactly what

18   they did.

19          THE COURT:  Is there an integration clause in this

20   indenture?

21          MR. PICKHARDT:  I believe there is.  Well, actually,

22   what I would say is I trust that there likely is.  I don't have

23   an immediate answer to your question, but we can certainly

24   look.

25          THE COURT:  Would that appear with your statement?

1    Namely, can you form a memorialization of an agreement if the

2    memorialization itself says that this is only an agreement of

3    the parties?

4            MR. PICKHARDT:  Yes, your Honor.  There's no --

5    agreements, as the Court understands, commonly include

6    integration clauses, and I'm not aware of any authority that

7    would suggest that the inclusion of an integration clause

8    precludes a reformation.  A reformation goes to whether there

9    is an error, not as to whether the parties intended that the

10   parole evidence be generally included with respect to

11   additional terms that are included in the agreement.

12           Now, your Honor, reformation is supposed to only occur

13   when there is a high showing of proof.  It's a clear and

14   convincing standard, and we concede that that is the standard

15   that has to be met in this case.  But clear and convincing does

16   not mean absolute certainty.  What clear and convincing means

17   is that the evidence must demonstrate that the thing to be

18   proved is highly probable or reasonably certain.

19           So that is the standard that this Court must apply

20   when thinking about the evidence that is before it.  In other

21   words, we must adduce evidence that makes it highly probable

22   that there was an error, and we think that we have easily met

23   that standard, as we will describe.

24           There also is no one form of evidence that the Court

25   must find in order to reach that standard.  The Court can take

1    oral evidence, documentary evidence or contextual evidence, and

2    we think that you have all three here.  The first, as we just

3    talked about --

4            THE COURT:  If the written agreement is clear on its

5    face, albeit possibly in error, can the Court take parole

6    evidence?

7            MR. PICKHARDT:  No, your Honor.  If the agreement --

8    if the agreement is clear on its face, it -- Well, let me

9    explain that.  It cannot take parole evidence with respect to

10   construction.  It can take parole evidence with respect to the

11   intent of the parties for purposes of a reformation claim.  It

12   can take --

13           THE COURT:  In other words, it can consult parole

14   evidence, define an intent of the parties vary from the written

15   expression.

16           MR. PICKHARDT:  Absolutely, your Honor.  And that's

17   what courts regularly do.  In fact, it's kind of the purpose

18   for the standard because if a contract is ambiguous on its

19   face, as your Honor understands --

20           THE COURT:  That's different.  But let's say that the

21   contract is clear on its face but in error, it's contrary to

22   the intent that can be found from all other surrounding

23   documents.

24           MR. PICKHARDT:  That's the reason why you have

25   reformation.  It is for the Court to be able to fulfill the

1  intent of the parties, notwithstanding that there is a

2  scrivener's error.

3            THE COURT:  And I can take parole evidence?

4            MR. PICKHARDT:  Absolutely, your Honor.

5            THE COURT:  But I can't construe the clear expression

6  of the written agreement to be consonant with all other

7  contextual documents?

8            MR. PICKHARDT:  Well, your Honor, as a general

9  principle, yes, but in this case, as we will explain, we think

10  that you could construe the indenture because it was created as

11  a suite of transactional documents.  And, in fact, there is a

12  Second Circuit case which has said that, in looking at an

13  indenture, you can consider what the Prospectus Supplement says

14  in understanding the terms of the indenture.

15            And, in fact, this indenture has specific references

16  where it incorporates things that only appear in the Prospectus

17  Supplement.  So, in fact, if you wanted to understand the full

18  indenture here, you can't, without going and picking up a copy

19  of the Prospectus Supplement and looking at information that is

20  in the Prospectus Supplement.

21            THE COURT:  Point this out to me as we go along.

22            MR. PICKHARDT:  Yes, your Honor.  We will point you

23  out where that is.  Yes.  And, in fact, the Aristocrat Leisure

24  case that I referred to, specifically addresses the fact that

25  courts can look to parole evidence in considering the parties'

1    intent in support of reformation.  And the parole evidence

2    here, if in fact it is parole evidence, because as we will

3    argue, some of this doesn't constitute parole evidence but

4    rather is within the confines of the agreement itself, includes

5    the final document.

6           As you have seen, the final Prospectus Supplement in

7    three different places talks about the allocation of realized

8    losses and consistently describes it as being the losses going

9    first to the 1-A-3 notes before the 1-A-2 notes.  This is a

10   document that is widely available and used by authoritative

11   sources, including Intex, including Moody's, including Standard

12   and Poor's, subject to them finding that there is some

13   discrepancy.  But this is a very formalized document that

14   people in the marketplace used and understand in connection

15   with these transactions.

16          THE COURT:  What document is that?

17          MR. PICKHARDT:  It's a Prospectus Supplement.  It

18   is -- As Mr. Peresechensky indicated, normally when you go onto

19   Bloomberg and you want to find out about this transaction,

20   that's the document that's on Bloomberg.  It's not the

21   indenture.

22          THE COURT:  I don't think he said that.

23          MR. PICKHARDT:  Your Honor, he said that he had never

24   before seen on Bloomberg, when he had looked, an indenture.

25          THE COURT:  Yes, but he also said -- he suggested, I

1    think, that other documents also don't appear; that Bloomberg

2    does its summary from whatever source it does its summary.  If

3    he wants to get beyond the summary provided by Bloomberg, he

4    has to go to something else.  And the deal document, he said,

5    was the trust indenture and, lo and behold, it was there.

6           MR. PICKHARDT:  Your Honor, the Prospectus

7    Supplements -- We can go back and look in the record.  The

8    Prospectus Supplement is available through Bloomberg.  It's

9    available through Intex.  You may remember, Mr. Simonds

10   testimony where he, in fact, says that when the deal first gets

11   done, you have to use, as a legal matter, the Prospectus

12   because you're not, as a matter of law, allowed to use the

13   indenture.  And I think the Court can take --

14          THE COURT:  I can understand that.  He said that, but

15   I didn't understand that.  It seems to me it's part of the

16   deal.

17          MR. PICKHARDT:  It is part of the deal, your Honor,

18   and there's no question --

19          THE COURT:  The anomaly is here because there was an

20   inconsistency between the deal document, or the indenture, and

21   the Pro Supp.  Normally, a summary would be used to give

22   disclosure, and registration statements will have the complete

23   documents.

24          MR. PICKHARDT:  Yes.

25          THE COURT:  But here, the summary is tainted because

1    the sources for the summary are inconsistent, and we don't know

2    what the summary is based on.

3        MR. PICKHARDT:  Well, your Honor, when you refer to

4    the summary --

5        THE COURT:  I may be using old and antiquated

6    memories.

7        MR. PICKHARDT:  As Mr. Mago testified, you may recall,

8    he talked about these documents, and he agreed that the

9    indentures are available but they're not always available.  And

10   if you want them, you have to usually go and dig around on the

11   SEC's website.

12       These are deals that are commonly used and understood

13   and marketed based upon the Pro Supp.  And it is important for

14   the Court to understand that in this deal, which closed in

15   2005, that there is no indication that anyone in the market had

16   an understanding about this discrepancy until August of 2010,

17   five years this deal is out in the marketplace.  And Moody's

18   and Standard & Poor's and Intex are all operating based upon

19   the assumption that the 1-A-3 notes bear losses before the

20   1-A-2 notes.

21       And the reason why that is, is because people do rely

22   on the Prospectus Supplement, and that is why, as you heard

23   from Mary Stone, that there's a lot of care taken with respect

24   to that document.  It's why there's opinions.  It's why there's

25   legal liability if there are misstatements in those documents

 1    and so forth.

 2              So this is a context in which the descriptive

 3    document, the Prospectus Supplement, is actually the document

 4    that people in the marketplace, not just investors but also

 5    institutions that have duties for reporting accurate

 6    information, rely upon.  And that document, three places, says

 7    that the 1-A-3 notes take losses before the 1-A-2 notes.

 8              THE COURT:  Is there a stip in the Pro Supp that, in

 9    case of doubt, readers are referred to the trust indenture?

10              MR. PICKHARDT:  Yes, your Honor, there is.  There is.

11              THE COURT:  Is that typical boilerplate?

12              MR. PICKHARDT:  It's typical boilerplate that is

13    included in there for the lawyers as protection, but I can tell

14    your Honor, as a matter of practice, and as Mr. Mago said, that

15    doesn't mean that people pick up the Pro Supp, see that and

16    throw it out the window.

17              THE COURT:  It explains why the discrepancy was noted,

18    the notices, the descriptions about these securities switched

19    the priorities from that described in the Pro Supp to that

20    described in the indentures.

21              MR. PICKHARDT:  That is right, your Honor.

22              THE COURT:  And so it sets up the critical nature of

23    this proceeding from the point of view -- your point of view

24    and, in effect, Mr. Johnson's point of view, that there has to

25    be a consistency; otherwise, there's confusion.

1              And the second thing that I note from this is that the

2      first time there's a real case of controversy, a real dispute,

3      is August 2010.

4              MR. PICKHARDT:  August 2010 is the first time when

5      there is any signal of anybody in the marketplace being aware

6      of this issue, and at that point in time, and from August 2010

7      forward, not only does Moody's change its ratings but it

8      actually issues a press release.  That press release is in the

9      record.  So anybody, at that point in time, who is investing in

10     these bonds that's out there, as far as, you know, information

11     about this discrepancy, it's available for them to locate and

12     to understand that that discrepancy is out there.

13             Prior to that, there's no signal that anybody is, in

14     fact, aware of this.

15             THE COURT:  I'm not sure there's an exhibit reflecting

16     Moody's press release.

17             MR. PICKHARDT:  It's 244, I believe, your Honor.

18             THE COURT:  It is?  Okay.

19             MR. PICKHARDT:  And what you'll see in that exhibit is

20     actually somewhat interesting because what you will see --

21             THE COURT:  You can put it up.

22             MR. PICKHARDT:  Curt, if you could blow up the first

23     textual paragraph.

24             THE COURT:  Okay, thanks.

25             MR. PICKHARDT:  What's interesting about that

1    paragraph, your Honor, and worth noting is that even Moody's is

2    not saying that simply because of that discrepancy, we're

3    automatically going to follow the indenture.  What they

4    actually say is they have heard from the trustee, and the

5    trustee has indicated that, pending some other change, that

6    they are going to follow the indenture, and in as such, Moody's

7    will change its ratings.

8            So I think there's even a conditional sense in the

9    marketplace as to whether the rating agencies would

10   automatically assume that you would switch over to the

11   indenture in the face of the discrepancy.

12           THE COURT:  What's the date of this?

13           MR. PICKHARDT:  This is August 2010.  August 23rd,

14   2010.  And then, your Honor, it is also certainly important,

15   you've heard a lot of testimony about this application called

16   Intex.  Intex is the standard modeling tool that is used by

17   people in Mr. Mago's and Mr. Peresechensky's business.

18           And that tool, when they were faced with this issue,

19   you have an indenture that goes one way and a Pro Supp that

20   goes another way, doesn't simply say, okay, that means we have

21   to change our model and everybody from now on, of course, will

22   be valuing this based upon the indenture.  They rather include

23   functionality, and they allow investors to see it both ways.

24           So that investors, like the ones who are before you,

25   can do what Mr. Mago did and said, you know, they can assess

1    the risk as between, you know, the discrepancy in the documents

2    and can perform their analysis as such.

3           Your Honor, the drafting history, I think, is

4    completely clear.  If your Honor would like me to take you

5    through the high-level what the drafting history shows, I'm

6    happy to do it.

7           THE COURT:  Particularly on the PSA.

8           MR. PICKHARDT:  Take it up at the time of the PSA,

9    your Honor?

10          THE COURT:  I want to see where the error in the PSA

11   appears.

12          MR. PICKHARDT:  Okay.  Well, your Honor, I'm going to

13   jump into the middle.  As I described before, there was 20 days

14   of drafting history that started with a term sheet and then

15   went to the Pro Supp and then went to the indenture, and the

16   important piece is -- Curt, please go to slide 22.

17          And, your Honor, just before I go to the error, I'm

18   going to show you the edit that was made in the Pro Supp on day

19   15 of this 20-day drafting process because, as you may recall

20   from the testimony, this deal and the documents for this deal

21   had been built off of a template, which was the AHM2005-1

22   transaction.  The AHM2005-1 transaction uniformly provided

23   within the transaction documents that the 1-A-3's bear losses

24   before the 1-A-2's.

25          But the allocation of loss provision was more

1    complicated in that deal, and it ended up getting streamlined

2    in this deal.  And whereas in the prior deal there had been in

3    all of the provisions that talked about this, this proviso at

4    the end of the provision that said provided whatever else

5    happens 1-A-3 notes get losses before the 1-A-2 notes.

6             During the drafting process of this deal, on day 15 of

7    20, that provision is streamlined.  The lawyers cross out the

8    proviso and make two other changes that keep the same meaning.

9    The two other changes are the words "in that order" and a swap

10   of the two and the three that's in the preceding sentence, and

11   this shows you, your Honor, that edit.  The same edit is made

12   elsewhere.  And then, on --

13            THE COURT:  Wait.  Let me look at it.

14            MR. PICKHARDT:  Sure.

15            THE COURT:  This lends itself to interpretation.  Each

16   one of them logically is possible, but the first is that there

17   was an intent to change substantively the sequence of

18   allocation of losses.  So that would explain why, in the second

19   line, class 1-A-2 is changed to class 1-A-3, and the next line,

20   the class 1-A-3 is changed to class 1-A-2, and the phrase "in

21   that order" is then substituted.

22            The second possibility, focusing on the elimination of

23   the proviso clause, would suggest an error in terms of the

24   allocation of losses.  If the phrase "in that order" were not

25   inserted and a word like "respectively" would be used, the

1    losses would first go to 1-A-3 and then to 1-A-2.  All right?

2              MR. PICKHARDT:  Your Honor, I think under either

3    phrasing and as this document is -- this language has actually

4    been understood with these edits, this states that the losses

5    shall go first to the 1-A-3 notes and second to the 1-A-2

6    notes.  That was consistent with the same meaning in the

7    underlying --

8              THE COURT:  That means that 1-A-2 is a higher

9    seniority?

10             MR. PICKHARDT:  That's correct.  That's correct.

11             THE COURT:  And that was the deal.

12             MR. PICKHARDT:  That was the deal.  That's what that

13   proviso says at the end.  If you look at the crossed-out

14   proviso, the losses go first to the 1-A-3 and then to the

15   1-A-2.  And then when you cross out that proviso and you add

16   "in that order," it would change the meaning of this provision,

17   unless you swap the three and the two.  Because as it is

18   phrased here, you know, this says "To the extent such realized

19   losses are incurred with respect to mortgage loans in loan

20   group one to the class 1-A-3 notes and the class 1-A-2 notes,

21   in that order..." meaning it goes to the 1-A-3 notes and then

22   to the 1-A-2 notes.

23             THE COURT:  And that's consistent with the deal.  So

24   where is the error?  Where does that come in?

25             MR. PICKHARDT:  The error is made when this same note

1   is made in the indenture.

2           THE COURT:  What you have up now, which exhibit is

3   this, 210?

4           MR. PICKHARDT:  This is Exhibit 210.

5           THE COURT:  And this is a term note?

6           MR. PICKHARDT:  This is a Prospectus Supplement.  So

7   this is the document that was created after the term sheet.

8   This is consistent with what the term sheet said, and this is

9   four days before this document, the Pro Supp -- the Prospectus

10  Supplement is finalized.

11          So day 19, at 1:10 in the afternoon, June 21st, 2005,

12  there's a final version of the Pro Supp that is circulated that

13  has exactly that language that your Honor had in front of you

14  but, obviously, without the black lining because it's now

15  final.  And then between 1:10 in the afternoon on that day and

16  1:15 in the morning on the next day, which is June 22nd, 2005,

17  there was a flurry of documents that were circulated because

18  June 22nd was the closing.

19          That was the closing date, and the flurry of

20  documents -- I'm going to jump to the document that your Honor

21  wants to see, but I will note that there were three documents

22  that were circulated.  There was a document of a private

23  placement memorandum, then the indenture, and then the offering

24  memorandum.  The private placement memorandum provides the same

25  edit.  It essentially conforms itself to the final of the

1    Prospectus Supplement, which had been circulated at 1:10, but

2    then we get to the error -- and this is on slide 25 -- and this

3    is the document that was circulated at 1:11 a.m. in the morning

4    on the day of closing, the document that previously had in it

5    that same proviso.

6            If you look at the very bottom of the call out that we

7    have here, which states that losses will go first to the 1-A-3

8    notes and then to the 1-A-2 notes.  And you see towards the top

9    that in that order, although that shows up in that order in,

10   but the words "in that order" are added to actually give effect

11   to the ordering in which class 1-A-2 and 1-A-3 play in that

12   particular provision, except that the two and the three are not

13   swapped.

14           THE COURT:  The change that was made crossed out the

15   two and crossed out the three is not carried through?

16           MR. PICKHARDT:  That's exactly right.

17           THE COURT:  Now --

18           MR. PICKHARDT:  Now, it was carried through in other

19   documents.  I can show you four minutes after this --

20           THE COURT:  I saw that, but it wasn't carried through

21   in this document.

22           MR. PICKHARDT:  I just want to be clear.  The

23   Prospectus Supplement, which we were looking at, that was done

24   in three places.  It was not carried through to this document,

25   but we also talked about some of the other offering documents,

E79PTRU2                    Summation - Mr. Pickhardt

1   and it was carried through those other documents.

2           THE COURT:  Yes, I saw that.

3           MR. PICKHARDT:  So this same change is made in three

4   documents, I think in eight places, and the only place that

5   that change is not made, with the swapping of the two and the

6   three, is in this document.

7           THE COURT:  Yes.

8           MR. PICKHARDT:  And this is the error and there's

9   nothing else.  I'll note, your Honor, both Lehman Brothers and

10  JP Morgan produced the entire history of this transaction that

11  they could find.  So we had access to all of the e-mails back

12  and forth with respect to the drafting, and we have deposed you

13  know the witnesses on this.

14          We have gone through -- Mr. Rollin and his team have

15  had equal access to that entire history, and you will note that

16  there is no document that is being put in front of you that

17  sort of draws doubt on the sequence as we have described it and

18  the relevance of that sequence.

19          We're, obviously, not taking you through, and you

20  would take our heads off if we sought to take you through, the

21  entire drafting process.  We are showing you particular pieces,

22  but I think it's relevant that there's nothing else that

23  someone can put in front of you that would suggest to you, wait

24  a minute, maybe there's some other conclusion that I should be

25  drawing here.  It really is clear.

1              You have the Pro Supp finalized.  You have a flurry of

2    documents that are then finalized after that.  The change is

3    made uniformly throughout those documents except in one place.

4    That next day, the closing day, they then file the Pro Supp

5    with the SEC.  That's a pretty serious event here, where you're

6    filing it with the SEC.

7              If there had been a change in deal terms at 1:10 in

8    the morning on closing, you have to believe that the lawyers

9    are not going to then send off a Prospectus Supplement

10   knowingly to the SEC that is inconsistent with the changed deal

11   terms.  There is simply no reasonable explanation that could

12   explain what we see, other than this was an error that was made

13   by lawyers working late into the night, and they didn't catch

14   it.

15             And it's also notable that not only did they not catch

16   it, but nobody in the market caught it.  This deal operated

17   based upon how everybody understood it was supposed to operate

18   for five years, which is further indication --

19             THE COURT:  And that's reflected in the market

20   pricing, isn't it?

21             MR. PICKHARDT:  That is correct, your Honor, for the

22   first five years.  You know, I don't know that there's evidence

23   that has come in with respect to what the market pricing was

24   during that time period, but there was no information available

25   if anybody --

1           THE COURT:  There is evidence in summary, not in --

2           MR. PICKHARDT:  Correct.

3           THE COURT:  -- in detail.

4           MR. PICKHARDT:  Correct, correct.  And so then what

5    you have is that, for that span of time, you have investors who

6    are buying this security and they're looking at the ratings,

7    their looking at Bloomberg, and I would submit to you that --

8           THE COURT:  The ratings are equal, I think.

9           MR. PICKHARDT:  Well, no.  No, they're not, your

10   Honor.

11          THE COURT:  I'm sorry, they're not.

12          MR. PICKHARDT:  They start equal, and this is quite

13   pertinent, and as you remember Mr. Peresechensky telling you,

14   this is one of the things that he did when he was looking at

15   this bond, is he put the ratings for both up on his screen and

16   you see them start out equal.  And then you see the 1-A-2 have

17   higher ratings when this becomes a relevant provision because

18   the deal's in a little bit of trouble.  And then in 2010, you

19   know, they're going up like this.  It does that.

20          THE COURT:  They switch.

21          MR. PICKHARDT:  That's Exhibit 252, your Honor.

22          THE COURT:  That's the ratings history?

23          MR. PICKHARDT:  That's the ratings history.  And not

24   only is that something that's available, it's something that

25   even Mr. Peresechensky, who is claiming to have been under some

 1    misapprehension, admits he has up before his eyes when he is

 2    thinking about this.  And it shows something very unusual,

 3    which is that these two bonds are in a particular relationship,

 4    rating-wise, and then that relationship swaps.

 5             And so up until that time, until 2010, people who are

 6    investing in the marketplace certainly could, theoretically --

 7    well, I'll say during that time period it's reasonable to

 8    assume that parties are operating on the assumption that this

 9    deal operates as it's described in the Pro Supp.

10             Now, your Honor, there have been a number of defenses

11    that have been raised.  I'm happy to continue addressing --

12             THE COURT:  No, you've gone a half hour so far.

13             MR. PICKHARDT:  Okay.  Well, actually, let me just

14    note, before I get to defenses, we think that there is a high

15    probability of an error here.  We think this clears it by a

16    wide margin, but we also think that the Court, for the reasons

17    I described earlier, can just construe this contract as

18    providing for the fact that losses are to hit the 1-A-3 before

19    the 1-A-2.

20             THE COURT:  And that's a notion that because of the

21    nature of this transaction, the contextual documents all have

22    to be considered.

23             MR. PICKHARDT:  That's correct.

24             THE COURT:  You call it a suite of documents.

25             MR. PICKHARDT:  That's correct.

1          THE COURT:  And that will be a construction issue with

2     a reformation following the construction issue.

3          MR. PICKHARDT:  That's correct.  That's correct.  And

4     what we have on slide 29 --

5          THE COURT:  In effect, if I were to construe, rather

6     than to reform, my opinion, assuming it is affirmed, would be

7     the new reformation because the market would then consider the

8     interpretation of the document in light of judicial construct.

9     So whether I construe it or reform it, it comes to be the same.

10         MR. PICKHARDT:  It comes to the same place.  I believe

11    that the securities administrator will likely tell you that

12    they would follow this Court's findings regardless of whether

13    it was by construction or reformation.

14         THE COURT:  That's why they seek guidance.

15         MR. PICKHARDT:  That's exactly right.  But both roads

16    lead to the same place.  It is worth noting that there are

17    different evidentiary standards with respect to those two

18    claims.  A construction claim does not require clear and

19    convincing evidence.  We just would have to show, as soon as

20    you agree that there is an ambiguity, that a preponderance of

21    the evidence suggests the intent from parole evidence.

22         THE COURT:  I think it's hard to find an ambiguity

23    from the text itself.

24         MR. PICKHARDT:  I agree with your Honor, to the extent

25    that you are looking purely within the terms of the indenture.

1    Although, there are other terms in the indenture, for example,

2    the coupons.

3              THE COURT:  You allude to that.  I would like you to

4    take me through that.

5              MR. PICKHARDT:  The coupons -- and, Curt, if we could

6    go back to slide 14.  There are distinctions between the three

7    classes of bonds that are in the 1-A category.  There's 1-A-1,

8    1-A-2 and 1-A-3.  There could be, theoretically, three

9    different types of distinctions.  There could be the loans that

10   back them; in other words, what loans provide the cash that

11   they are entitled to and what loans can be subject to losses.

12   There also can be the way in which that cash is distributed

13   among these three classes.  Or, third, there could be

14   differences in the way that losses are allocated to these three

15   classes.

16             Now, in this indenture, the first two are exactly the

17   same for these three classes.  They're both subject to group

18   one loans; so they're backed by the same loans, and they get a

19   pro rata distribution of cash.  So the only difference between

20   class one, class two and class three notes is the order in

21   which they get losses.

22             Now, the class 1-A-1 notes never get losses.  Under no

23   circumstances do they ever get allocated losses, and obviously,

24   the matter before your Honor, in what order do the losses go to

25   the 1-A-2 and the 1-A-3?  Now, the relevance of the coupons is

1    that when that's the only distinction that you have in the

2    indenture and you look at the coupons, this shows that the

3    1-A-3 gets a higher interest rate, higher coupon, than the

4    1-A-2.

5         The only reason why that makes sense is if it's more

6    risk.  I think the Court can understand that coupons, or

7    interest rates, are a function of risk.

8         THE COURT:  All right.  So in these columns, the one

9    on the left shows the class of note, 1-A-1, 1-A-2 or 1-A-3, and

10   what are the percentages in the column marked one, Note Margin,

11   and the column marked two, both under Note Margin?

12        MR. PICKHARDT:  They're referred to as Note Margin

13   because that is -- when these notes get payments, that is the

14   excess on top of LIBOR, or a risk-free rate that these notes

15   receive.  That's why it's called margin, because it's the

16   amount on top.  And at certain points of the deal, you get the

17   note margin that's under column one, and then after a certain

18   event happens, it switches over to column two.

19        Now, column one and column two, I don't think, is

20   relevant for your purposes because you see the same

21   relationship.  The 1-A-1 has the lowest interest rate, 1-A-2

22   has the second, and 1-A-3 has the highest interest rate.

23        THE COURT:  Where do I find these coupons in the PSA?

24        MR. PICKHARDT:  These coupons are described in the

25   PSA.  This particular, for illustrative purposes, is taken from

1    the Prospectus Supplement, but the coupons are listed in the

2    PSA.

3               THE COURT:  Where?

4               MR. PICKHARDT:  It's in the appendix.  I believe it

5    is -- your Honor, I'm going to have to get you -- it's on Pages

6    48 to 49 of the appendix, but I'm going to have to get you the

7    record cite because I have my --

8               THE COURT:  Do it, please.

9               MR. PICKHARDT:  Your Honor, it's going to be TX2 --

10   your Honor, it's at TX2, Pages 262 to 263.

11              THE COURT:  What is TX2?

12              MR. PICKHARDT:  TX2 is the final indenture.

13              THE COURT:  And what page is it on?

14              MR. PICKHARDT:  It's on 262 and 263.  It starts at the

15   bottom of 262 and carries over to the top of 263.

16              THE COURT:  I see.  Does section 3.38 refer to these

17   coupons?

18              MR. PICKHARDT:  No.  These are completely separate

19   provisions in the indenture, your Honor.

20              THE COURT:  It's hard to find ambiguity that way.

21              MR. PICKHARDT:  Your Honor, I believe that the -- that

22   the greatest form of ambiguity that you would find in the

23   indenture is by understanding it as also referring to and

24   incorporating the Prospectus Supplement and looking at it as a

25   suite of documents.

1          THE COURT:  I understand.

2          MR. PICKHARDT:  I note this because I think an

3    investor --

4          THE COURT:  I understand.  I understand the rationale

5    for it, also, if I were to adopt it.  And the only ambiguity I

6    could think of here is the number because the sequence is one,

7    three, two, rather than one, two, three.

8          MR. PICKHARDT:  Yes, and you heard --

9          THE COURT:  And if you assign the numbers as a

10   reflection of a certain sequence, an ambiguity is created

11   because of the jump in number.  Did you say that the indenture

12   incorporated the Pro Supp?

13         MR. PICKHARDT:  The indenture does have provisions

14   that incorporate the Pro Supp, which is, for example, at TX2,

15   at Page 17.  If you look at the top of that page, under

16   subsection X in the carryover paragraph, you see a reference to

17   certain mortgage loans having needed to be underwritten in

18   accordance with the criteria set forth in the mortgage pool

19   underwriting standards in the Prospectus Supplement.

20         THE COURT:  Okay.  I think if there's ambiguity, it

21   has to be in the document itself.  It has to be in the sequence

22   of numbering and, more plainly, in the context of all the

23   settle documents.

24         MR. PICKHARDT:  I don't disagree with that, your

25   Honor.  I will note two things, one, with respect to the

1    sequence of numbers, the other thing that I think the Court

2    could take recognition of is that section 3.38 includes a

3    broader scheme with respect to the allocation of realized

4    losses.  It's, obviously, just not these three classes, and in

5    all other instances, although it is a rather complicated

6    provision, if you follow through, in every single instance,

7    losses only move up the capital structure numerically.  In no

8    other instance among the 26 classes of notes that were issued

9    would there be another instance where losses went down

10   numerically.

11            THE COURT:  Well, it's not that they go up or down.

12   It's that they jump, one, three, two, rather than one, two,

13   three.

14            MR. PICKHARDT:  I mean, I guess technically, your

15   Honor, the losses would go to two and then three and never hit

16   one.  So essentially, in every other instance, to simplify it,

17   losses are described as going ten, nine, eight, seven, six,

18   five, four, two, three, and never getting to one.  And so you

19   see a sequence, and then you see a reversal in that sequence,

20   and that could be a basis for finding that there was ambiguity.

21            THE COURT:  Right.  Okay.  Defenses?

22            MR. PICKHARDT:  Your Honor, there have been a number

23   of defenses that have been raised.  I know one that we started

24   out the trial and then got postponed because of the discussion

25   as to whether or not this action was timely, and there's really

1    two issues.  One, is whether the trustee's action was timely,

2    and we think for reasons that Mr. Johnson has put in his

3    papers, the trustee's action -- excuse me, security

4    administrator's action was timely.

5          But in any event, it's crystal clear under controlling

6    Second Circuit law that Scepter's claim to the res was timely.

7    The reason being, that this indenture, like other indentures,

8    includes what's referred to as a no-action clause, which I

9    suspect your Honor may have encountered, if not in this case

10   but in other cases, where note holders are precluded from

11   bringing actions that relate to the indenture until certain

12   events occur.

13         And those events are two things, either there's a

14   default as defined under the indenture and other stuff happens,

15   or there's a failure to get -- to receive a payment.  And at

16   that such time, they are then unshackled from the no-action

17   clause and are, at that point, and the first time, able to

18   actually file a litigation related to the indenture.

19         This indenture, your Honor, includes a no-action

20   clause at section 5.06, which clearly would have precluded

21   Scepter from bringing a reformation claim until it could

22   satisfy the terms of that no-action clause.  What that really

23   means is that in most situations a note holder wouldn't be able

24   to bring a reformation claim until they don't get a payment,

25   and at such time as they don't get a payment, section 5.07 of

1    the indenture provides they then have a right.

2              Now, in this case, the securities administrator

3    instituted a suit, and what the no-action clause says is that

4    note holders are just precluded from instituting suits.  So we

5    believe that in this instance, because a suit was instituted,

6    that Scepter was able to make its claim for the res.

7              But the important part, your Honor, is the controlling

8    Second Circuit precedent in *Cruden v. Bank of New York*.

9    Because what the Second Circuit said in Cruden is that a

10   plaintiff's cause of action in this context cannot be deemed to

11   have accrued until they had a remedy, and they don't have a

12   remedy until they are allowed to bring a claim consistent with

13   the restrictions of the no-action clause.

14             So from Scepter's perspective in our claim that we

15   have asserted, that first became a claim that we could file in

16   January, when the securities administrator filed this action.

17   And so there's no question but that that claim is timely,

18   frankly, regardless of whether the security administrator's

19   claim was.  But what the securities administrator did here was,

20   frankly, consistent with what they're supposed to do, which is

21   to not burden the Court with needless litigation.  And we think

22   that trust instruction proceedings, for that reason, do not

23   need to be prematurely brought and that this one was

24   appropriately timed.

25             THE COURT:  Where is the no-suit clause?
               (Continued on next page)

1          MR. PICKHARDT:  It is on Page 87 of Exhibit TX-2.  It

2     is entitled, "Limitation of suits Section 5.06."  It reads:

3          "No holder of any note other than the insurer acting

4     pursuant to Section 4.12 hereof shall have any right to

5     institute any proceeding, judicial or otherwise, with respect

6     to the indenture," and then it goes on and says unless and

7     subject to the provisions below.

8          THE COURT:  You can't bring a proceeding seeking

9     guidance.  Only the trustee can.  You can sue for breach of

10    contract.  You can sue for declaratory judgment, but you can't

11    sue for trust guidance.

12         MR. PICKHARDT:  I'm not aware of us being able to do

13    that, your Honor.

14         THE COURT:  What is the nature of your claim?

15         MR. PICKHARDT:  The nature of our claim is a claim for

16    reformation.  Naturally, your Honor --

17         THE COURT:  You're not an original holder.

18         MR. PICKHARDT:  That's correct.  We are a third-party

19    beneficiary under this agreement.

20         THE COURT:  I don't know how you can have a claim.

21    You have no standing for reformation.  You bought the bonds

22    subject to all the risks including the risks of poor

23    draftsmanship.

24         MR. PICKHARDT:  Your Honor, as the intended

25    third-party beneficiary of this --

1          THE COURT:  You couldn't have been because you weren't

2     there.  Unless there is a holder in due course, you take

3     whatever rights in reformation the original holder might have

4     had, but I can't see that coming on margin.

5          I think what you have here is a right to a declaratory

6     judgment based on status of the purchaser, of the instruments

7     that you had, and it goes back on American history, as early as

8     Alexander Hamilton and his decision to honor the holders of

9     government bonds even those that were bought up for pennies on

10    the dollar.  It is the same thing now.  You hold a bond, you're

11    entitled to whatever rights exist in the bond.

12         MR. PICKHARDT:  That's correct, your Honor.  We don't

13    disagree with that.

14         THE COURT:  So because you're threatened with a

15    statement by the securities administrator that losses will be

16    allocated as stated in the indenture rather than the intent of

17    the documents, you have a declaratory judgment action.

18         MR. PICKHARDT:  Whatever form that that takes --

19         THE COURT:  I think I can go directly to the trust

20    guidance, trust proceeding itself because I don't think that

21    trustee could have sued before August 2010.  It was faced with

22    a different allocation of loss.

23         MR. PICKHARDT:  Your Honor, we think this can be

24    decided based upon our claims are not necessary for the

25    resolution of this action.  Obviously, the securities

1    administrator has filed their claims.  We do believe that as a

2    note-holder, we do have the ability to file the claims that we

3    have because Section 5.07.

4              THE COURT:  If I rule for guidance the way you think I

5    should rule, do you have any claim left?

6              MR. PICKHARDT:  I am not sure I understand, your

7    Honor.

8              THE COURT:  If I reform the trust indenture to be

9    consistent with the ProSupp and other documents, is there

10   anything left to your cross-claim?

11             MR. PICKHARDT:  No, no.  We would have no claim at

12   that point.

13             THE COURT:  It is 5 after 3:00.  We have gone 15

14   minutes.  Do you want to reserve 10?

15             MR. PICKHARDT:  Please, your Honor.

16             THE COURT:  Mr. Rollin.

17             MR. ROLLIN:  Please, your Honor.

18             THE COURT:  It is 3:05.

19             MR. ROLLIN:  Your Honor, I have slides as well.

20             THE COURT:  I was worried you might have it.

21             (Off-the-record discussion)

22             MR. ROLLIN:  May it please the court.

23             The court is, as your Honor just noted, presented with

24   two separate issues that should be viewed separately.  The

25   first is the securities administrator's request for an

E79JTRU3                         Summation - Mr. Rollin

1    instruction and the second is Sceptre's efforts to have the

2    contract reformed in its favor, and as the court has noted, at

3    the expense of Semper.

4           While Semper agrees the securities administrator is

5    entitled to an instruction because, as the court noted

6    yesterday, it is pinched, Sceptre is not entitled to piggyback

7    onto that request for instruction and the trust instruction

8    statutes that the securities administrator has used in its

9    application for relief.

10          It certainly should not be able to do so in part of a

11   calculated effort to transfer the $7 million in value from

12   other people's investments.  As to the instruction, the

13   administrator noted is agnostic.  It simply wants and needs a

14   ruling from the court, and it has put in no evidence suggesting

15   or supporting the notion that it ought not follow the

16   indenture.

17          In fact, to the contrary.  The evidence from the

18   administrator, through Mr. Cohen, which was read by Ms.

19   Braswell, was it should follow the indenture for three reasons:

20          Because amendment, one, amendment requires 100 percent

21   consent of the affected note-holders, and that is consistent

22   with, as I will talk about shortly, the requirements of federal

23   law in the Trust Indenture Act;

24          Two, a reformation or change in loss allocation would

25   harm one class of note-holders.  It noted in its correspondent

1    the note-holders the A-3 class can be adversely affected;

2            Three, and very important, the indenture, this is

3    where the documents provided by the securities administrator to

4    the various note-holders they contacted over time, the

5    indenture does not contain a provision that indentures

6    sometimes contain, and that is the ability to conform the

7    indenture to the prospectus supplement in the event of

8    inconsistency.

9            If the drafters wanted, they certainly could have

10   included that provision, as they have done on other occasions.

11           THE COURT:  Maybe they thought they didn't make a

12   mistake.

13           MR. ROLLIN:  I am sure they don't think they make a

14   mistake in the ones where they do include the provision.

15           THE COURT:  I generally think my work is perfect until

16   I read it again.  That is why I don't read it again!

17           MR. ROLLIN:  But the point is that the words in the

18   document govern.  The words in this document don't contain a

19   provision that words in other documents contain, and that is

20   that you can conform without consent.

21           THE COURT:  I don't think that is a crucial part of it

22   because if it is not a construction but rather a reformation,

23   the assumption is that there is an error.  It is normal for

24   people not to draft in contemplation of their being an error.

25           MR. ROLLIN:  It was important to the securities

1      administrator and it was one of the points that the securities

2      administrator made to note-holders as to why it would require

3      100 percent consent of affected note-holders.

4                  THE COURT:  Because that has to do with amendments.

5      Amendments is different than reformation.

6                  MR. ROLLIN:  We'll get to that.  I'll preview.

7                  The Trust Indenture Act which is the law that requires

8      the inclusion of language concerning consent of note-holders in

9      every indenture does not make that distinction.  What the Trust

10     Indenture Act says, in Section 316 (b), is that any impairment

11     of the right to payment of principal and interest is subject to

12     consent of 100 percent of the affected note-holders.  That is

13     the legal overlay atop the indenture, and --

14                 THE COURT:  It begs the question, Mr. Rollin.  If the

15     trust indenture is to be applied, and you want to take money

16     away from a group, you're right; but if the money flowing to

17     the group is really consistent with the intent of the parties,

18     it doesn't affect Section 316 (b).

19                 Apropos of that, it seems to me that both your client

20     and Mr. Pickhardt's client, having bought their securities in

21     2012, were on notice of the drafting discrepancy and assumed

22     the risk, looking for the benefit.  They both sought a

23     heavily-discounted instrument which had a protectable down-side

24     and a very substantial up-side, according to how the court

25     interprets the documents.  I don't think it is a case of taking

1    money away from one and switching it to another.  It is a

2    matter of how much profit each one is going to make on the

3    deal.

4                MR. ROLLIN:  I don't think that that recitation is

5    consistent with the evidence in its nuance because while both

6    parties purchased at a discount, that was because the bonds

7    were affected by non-payment by borrowers.

8                THE COURT:  Substantially so, but also who is going to

9    feel the impact of that loss more?

10                MR. ROLLIN:  That is an important distinction to make.

11                If you know from Mr. Mago's testimony and Exhibit BN,

12    where Och-Ziff is doing its internal analysis, what it is

13    acknowledging at that time is that the Class A-3 notes are at,

14    should be at the mid to low 60's while the A-2 notes are in the

15    30's.

16                So each party is purchasing at a price that reflects

17    the -- and this analysis is based on the loss allocation

18    priority in the indenture, so, yes, Semper wanted the up-side

19    of the surge in the market, absolutely, but what Semper was

20    looking for was the up-side in the surge of the market and the

21    ability to flip the priorities so that the price they bought

22    something at an extreme discount price, 20's, 30's, 40's and

23    elevates up into the 70s through this arbitrage, and this is a

24    very different investment strategy than ours.

25                THE COURT:  You both have it.  By the time you bought,

1     the market discrepancy was known.

2              MR. ROLLIN:  Sure, but the price we bought, if there

3     was reversal, we would have lost a substantial amount of money.

4              It would make no rational sense to buy with the

5     expectation there would be some change to the indenture.  The

6     expectation would be that the indenture would stay the same.

7     There is no economic rationale for Semper to have been behaving

8     as Sceptre did.

9              THE COURT:  I don't think that is true.

10             MR. ROLLIN:  Your Honor, I appreciate that.  I think

11    that is how the evidence is for the parties.  I want to move on

12    and talk --

13             THE COURT:  We didn't have an economic analysis of

14    this.  This is not a major point.  I cannot assume that either

15    party is going to have a windfall profit or windfall loss.  I

16    think they're both sophisticated and entering a market which

17    not only had the risk of the mortgage losses but had the risk

18    of the interpretation as well.

19             MR. ROLLIN:  I don't think you have to assume the

20    windfall versus the loss manner at all.

21             THE COURT:  I am not assuming.  I am not going to be

22    influenced by the potential for profit or loss by the --

23             MR. ROLLIN:  I understand.  I appreciate that.  I will

24    point out Och-Ziff's internal analysis, they would receive a

25    substantial --

1          THE COURT:  The value of $7 million, it has been

2     valued at $7 million.

3          MR. ROLLIN:  That's right, 5M, and there would be

4     corresponding loss to us.

5          THE COURT:  Yes.

6          MR. ROLLIN:  Going back --

7          THE COURT:  Not necessarily loss, but it could be

8     diminished profit.

9          MR. ROLLIN:  No, that is not true, your Honor, and

10    here is why --

11         THE COURT:  There has been no economic analysis of

12    profit and loss, only a $7 million value to the switch.

13         MR. ROLLIN:  When looking at the price that was paid

14    in the 40's, if Semper paid in the 40's and this would convert

15    the value and drop it down into the teens based on the analysis

16    performed by Och-Ziff, that would actually effectuate a

17    substantial loss.

18         THE COURT:  I have had no expert analysis here and I

19    can't credit that.  That is relevant for what they did to

20    understand their investment, but it is not relevant to how much

21    profitability or losses would exist, and I just can't do it.

22         I am going to interpret what I have to do based on the

23    law and based on the facts, but not affecting who makes money

24    and who loses money.

25         MR. ROLLIN:  I will point out only two additional

1      points.  One is that there are facts in the record that do

2      support that analysis and there has been testimony by Mr. Mago

3      and by Mr. Peresechensky that supports that analysis.

4              THE COURT:  Peresechensky agreed if he sold, he could

5      have sold and made a very substantial 30 basis point profit,

6      though he wanted more.  He thought it was not fully priced.

7      The record is confused on the subject, Mr. Rollin.  I think you

8      have better arguments than that.

9              MR. ROLLIN:  The other point I want to make is a

10     procedural one.  In that regard, as your Honor knows, we were

11     brought in and had this trial on very very short basis.  There

12     were not even 26 (a)(1) disclosures much less 26 (a)(2) and

13     opportunity to develop an expert case.

14             I would be glad to do that because the facts in the

15     case do bear out the analysis as I'm explaining to your Honor.

16     I think it is an important point.  This should be considered.

17             THE COURT:  You had an opportunity for the time you

18     were given notice, first notice, according to Mr. Johnson, in

19     Exhibit 101, was January 27th, 2014 when you had notice that

20     there was a lawsuit in the state courts of Minnesota.  You

21     could have taken the position from then on.  The fact you chose

22     to wait doesn't change anything.

23             When I scheduled argument, it was in relationship to

24     Mr. Johnson's argument of irreparable damage that will be

25     suffered by the trustee and by various classes of investors if

1    guidance were not given quickly; and, thus, this case was

2    scheduled in response to that and in response to the need of

3    many investors for early resolution.  These are potentially

4    volatile securities that people may not want to hold and they

5    need to have accurate information as to the meaning of the

6    governing documents in order to make wise decisions whether to

7    buy or hold or sell.

8             And so the need for speed was great, and the fact that

9    you were on notice from January means that you couldn't have

10   suffered prejudice.  At least that was my wisdom.

11            MR. ROLLIN:  Your Honor --

12            THE COURT:  Once I scheduled it, it was not possible

13   for me to adjust the date because there was great risk that you

14   would be pushed off into 2015.  I have a criminal case that

15   follows, a copyright case to follow that, and we get close to

16   trials that are scheduled for 9/11 cases that would go on from

17   there well into 2015.  So it is just not possible for me to

18   adjust the date and I gave you these dates and I had to keep

19   them.

20            MR. ROLLIN:  Perhaps your Honor will consider, pending

21   a ruling, allowing us an opportunity to put in an expert

22   report?

23            THE COURT:  No.

24            MR. ROLLIN:  I had to ask.

25            THE COURT:  You could so ask, but I can't.

1          MR. ROLLIN:  Your Honor, back to the two cases, it is

2     equitable for the court to give the securities administrator an

3     instruction.  We do not believe it is equitable to give Sceptre

4     reformation that it seeks.  As your Honor noted, it doesn't

5     have standing, and it would result in economic harm to SCM, to

6     Semper, and gain to Sceptre.  I understand your Honor's

7     comments, but that is what the facts bear out.

8          Now, we have argued in our trial brief and other

9     motions a number of reasons -- sorry.  There is a lot of

10    feedback.  I don't know if you can hear it.  I am trying to

11    stay away from the microphone if I can.

12          THE COURT:  Are you okay, Mr. Rollin?

13          MR. ROLLIN:  Fine, thank you, yes.

14          We briefed a number of reasons why the court ought not

15    order reformation or construction and instead instruct the

16    administrator to follow the indenture.  I want to focus in on

17    three because they share a unifying thread:

18          The three are, there is a high burden for reformation,

19    and I'll go into the detail about why, but it is our position

20    Sceptre has not met that high burden;

21          Two, a second consideration is the manner in which the

22    law protects bona fide purchasers; and

23          Three, as we started to talk about the Trust Indenture

24    Act and the thread that unifies the three is that each of these

25    doctrines embodies or is part of the need for predictability in

E79JTRU3                    Summation - Mr. Rollin

1    commercial transactions so that markets remain stable and

2    predictable and liquid and vibrant and certain.

3             The law has evolved to contain certain default rules

4    that help guide courts to dispute resolution outcomes that

5    support and promote predictability in commercial transactions,

6    and these are three of them.

7             I'll speak first about the burden on a reformation

8    claim, and this is one of those default rules that imposes a

9    high burden precisely because it would be -- precisely because

10   the parties ought not be subject to having the terms of a

11   transaction changed after-the-fact.  It is not a burden for

12   burden's sake.  It is a burden that fosters predictability in

13   commercial transactions so the party to a contract doesn't have

14   the rug pulled out from under them.

15            A party seeking reformation must put forth clear,

16   positive and convincing evidence demonstrating not only the

17   probability, but the certainty of error in the making of a

18   contract.  That's the George Backer case from the Court of

19   Appeals.

20            May I see TX-265, Page 2.

21            THE COURT:  Do you think Backer really meant

22   certainty?

23            MR. ROLLIN:  I am sorry?

24            THE COURT:  Do you think Backer really meant

25   certainty?

1           MR. ROLLIN:  I think Backer met a very high burden of

2      proof that requires -- and I will talk about this briefly in a

3      moment -- that requires that witnesses come in and tell the

4      court what happened and tell the court what the mistake was.

5           What I noted this morning during Mr. Pickhardt's

6      presentation was how he walked the court through and said

7      here's this document, here is where the switch was.  Your Honor

8      should have heard that from a witness, not from Mr. Pickhardt

9      interpreting the documents.  A witness should have come in and

10     said well, this is what I did and that's what I did.

11          Of all of the parties that were part of this

12     transaction, they're on Exhibit TX-265 before your Honor, and

13     of all of these institutions and their lawyers, two witnesses

14     came.  Neither one had any recollection.  Neither one knew any

15     of the intent of the parties.  Neither one could authenticate

16     any of the documents.  Neither said they made any of the red

17     lines.  The presentation Mr. Pickhardt made should have been

18     done by a fact witness, not by a lawyer.

19          In fact, the drafting lawyers, one of whom I believe

20     was mentioned -- well, Mr. Ross is one lawyer who circulated

21     the e-mails, but that doesn't really tell us who the drafting

22     lawyers were.  That would have been a helpful piece of

23     information, and I think the explanation for why the scriveners

24     weren't here was that at least one of them was out of state and

25     there was no mention of the others, at least the four from

1    Thacher Proffitt.

2            Well, your Honor hears witnesses and evidence from

3    depositions taken out of state all the time.  In fact, in this

4    case you heard from Mr. Cohen.  We wanted to present evidence

5    from Mr. Cohen, so we took his deposition, and he is an

6    out-of-state resident, and we read it into evidence.  That is

7    the way it works.  The fact a witness is outside the subpoena

8    power of the court doesn't mean that evidence is excused from

9    having to come in primarily when it is potentially at least we

10   don't know from a fact witness, one of the principal drafters,

11   a drafter.  We know he circulated e-mails.

12           THE COURT:  We do know the sequence of documents

13   because it can be easily reconstructed, and the chain of

14   documents and drafts is evident, and one doesn't necessarily

15   have to have a witness because the witnesses may not have good

16   recollection either what happened at 1:15 in the morning, but

17   they may not.  I will decide to call the witness or take the

18   deposition.

19           MR. ROLLIN:  That is true.  We are not trying to prove

20   a reformation.  The burden is such the proponent of a

21   reformation brings in the witnesses.

22           THE COURT:  Generally speaking, but sometimes the

23   depositions, the adverse party takes the depositions and knows

24   what the witness was saying.  Either side could have taken the

25   deposition if anyone thought that there would be any useful

E79JTRU3                    Summation - Mr. Rollin

1     memory.

2               MR. ROLLIN:  And there wasn't, there wasn't, your

3     Honor.  That is the important point.

4               What you don't know from any evidence is what

5     conversations took place.  Why did people do what they did?

6     Are these all of the documents?

7               THE COURT:  The document doesn't make sense.  The

8     draft doesn't make sense.  The failure to conform the cross-out

9     of the 3 and the 2 doesn't make sense.  I think Mr. Pickhardt

10    makes a very good argument, if there was an intent to change

11    the sequence of the losses, that would have been a deal change

12    that would have to be disclosed and summarized in the ProSupp,

13    and it wasn't.

14              That didn't change the deal materially, and it wasn't

15    discussed, which leads me in a very clear way to believe this

16    was a scrivener's error, and the error was in the failure to

17    cross out two numbers and change them, which had been done in

18    the previous drafts.  I can understand because I've been there

19    myself.  You come in at 1:30 in the morning in a highly

20    pressurized situation and you're trying to conform documents

21    and they're flying all around the table and you miss one, the

22    most important one.

23              MR. ROLLIN:  And everything you just said is not

24    evidence in the case.

25              THE COURT:  It is not evidence.  It is a fair

E79JTRU3                     Summation - Mr. Rollin

```
1    inference to take.  Would it have been better if a witness was
2    here to say that?  Yes, yes, I agree with you on that, but the
3    absence of witness doesn't necessarily mean I have to take your
4    point.
5            MR. ROLLIN:  Even with that sequence, you don't know,
6    and there is no evidence of it was a mutual mistake.  There is
7    no evidence if it was a unilateral mistake.
8            THE COURT:  Whether it was mutual or unilateral --
9    first of all, the concept of mutuality in this kind of
10   arrangement is illusory.  It is like the drafting of a set of
11   cooperative documents.  You have the sponsor and you have the
12   lender and you do not have anybody who is going to be buying
13   the apartments.  It is the same thing, you don't have any of
14   the investors.  You have the sponsor, you have the trustee, you
15   have the issuer.  They're all on the same page.  There is not
16   anybody adverse here.  Everybody is trying to do the best
17   coming out with a fair deal and a proper deal.
18           If there had been an intent to change, it would have
19   had to have been disclosed.  Otherwise, there would be a
20   material omission, misleading statement in violation of 10b-5.
21           MR. ROLLIN:  Mr. Simonds testified that there were --
22   I don't want to quibble with your Honor.  There was testimony
23   there were adversarial relationships between the many lawyers.
24           THE COURT:  I know.  It is all right to quibble with
25   me.  I believe oral argument is most useful if you know where
```

1    my mind is so you have an opportunity to change it.  So it is

2    my habit to freely comment during the course of argument,

3    engage lawyers in discussion.  So I don't mind you quibbling.

4             MR. ROLLIN:  I quibble then, your Honor.  Mr. Simonds

5    testified that there were --

6             THE COURT:  Persuasive argument is a quibble to

7    another.

8             MR. ROLLIN:  In any event, I believe the testimony is

9    with respect to Mr. Simonds, in addition to that there were

10   many other parties to the transaction as shown on Exhibit 265.

11   We heard from none of them what their intent was, what their

12   role was.  I will move on.

13            The point I was trying to make with respect to

14   reformation, it is a very high burden because --

15            THE COURT:  In these kinds of deals as they're

16   drafted, there is usually one associate who is left with the

17   idea of conforming the drafts, putting them together and moving

18   onto the next draft.  Supposedly, it should be a partner with

19   you, but it is imperfect.

20            MR. ROLLIN:  If we were the drafter, I suppose --

21            THE COURT:  You never would make a mistake, right?

22            MR. ROLLIN:  I am not saying --

23            THE COURT:  That is the big advantage of being a

24   litigator, you pick up the pieces.

25            MR. ROLLIN:  We are the second-guessers, your Honor.

1          It is important to know in this context that this

2     shouldn't be a claim against Semper and what it purchased.  I

3     am going to talk in a moment about I think it is very important

4     to draw that distinction.  There are parties against whom

5     Sceptre, if it is aggrieved, can sue.  That is actually the

6     Cruden case.  The Cruden case in the Second Circuit isn't about

7     this situation.

8          THE COURT:  How can it sue anybody?

9          MR. ROLLIN:  Sorry?

10         THE COURT:  How can it sue anybody except its own

11    people for putting it into an investment?

12         MR. ROLLIN:  That is a good point.  That is a risk

13    they took.  If they have a good-faith basis to sue somebody for

14    the error that your Honor is discussing --

15         THE COURT:  No, they don't.  They don't.  They can't

16    because they bought like you bought in 2012.

17         MR. ROLLIN:  Which is exactly why they ought not have

18    a claim on assets, investment value held by somebody else who

19    was not a party to any wrongdoing.

20         THE COURT:  Like all the people who bought up the

21    Revolutionary War bonds of a fledgling United States and cashed

22    it in at par when Alexander Hamilton decided that was the right

23    thing to do, it is the same thing here, the same thing over

24    time.  People who buy take the instruments for what they are.

25    Either you are entitled to reform them in terms of making them

1    consistent with the overall selling documents or you're not.

2    That is this lawsuit.

3             I don't think that the potential gain, as I said

4    before, for one party or the potential loss for another enters

5    into it.  Everybody bought knowing the situation.

6             MR. ROLLIN:  Your Honor, reformation claims and

7    reformation, request for reformation is an equitable

8    consideration, and the fact that if there was some harm

9    suffered, they could look to whoever committed the error is

10   part of your Honor's analysis before entering equitable relief.

11            THE COURT:  Who?  Who could Sceptre have sued?

12            MR. ROLLIN:  Sceptre has a right --

13            THE COURT:  Who could you sue?  If I hold that way,

14   you could sue also.

15            MR. ROLLIN:  I would be concerned about collusive

16   effect of your holding on this issue.

17            THE COURT:  Say I hold in a way that is comfortable to

18   them.  You could sue.  By the same token, they could sue.  That

19   doesn't make a difference.  Your argument is that since a party

20   can sue, it has a remedy at lawful law; therefore, I should not

21   give --

22            MR. ROLLIN:  That is one of my arguments.

23            THE COURT:  So who could be sued?

24            MR. ROLLIN:  The drafters, the parties who missed the

25   error until 2010, anybody who didn't report the error in such a

1    way that investors --

2                THE COURT:  Suppose the parties knew when they bought,

3    knew or should have known about the discrepancy?  They can't

4    then sue people for the discrepancy?

5                MR. ROLLIN:  That is an analysis of that underlying

6    lawsuit.  The indenture gives a party who doesn't receive their

7    payment, gives that party a right to sue.

8                THE COURT:  There is no active remedy at law.

9                MR. ROLLIN:  I would like to talk briefly about the

10   construction claim because under New York law, Fiori versus

11   Fiori, 46 N.Y.2d 971 (1979).

12               THE COURT:  Talk to me about this.

13               MR. ROLLIN:  Yes, sir.

14               THE COURT:  The indenture is the primary document.

15               MR. ROLLIN:  Absolutely.

16               THE COURT:  It is the document that sets out the legal

17   rights and obligations of the securities administrator or the

18   trustee and every party who becomes or was a note-holder.

19               How can I reform that document even though every other

20   document says something different?

21               MR. ROLLIN:  I think the point your Honor made is

22   precisely the point.  It is the governing document.  Other

23   documents refer to it for a statement of the rights and

24   responsibilities.  It is the document that is qualified under

25   and subject to the Trust Indenture Act.

1          THE COURT:  Does that mean there can be no mistake

2     worth reforming in a PSA?

3          MR. ROLLIN:  Not -- and this is an important

4     distinction and goes to the distinction in the Aristocrat

5     case -- not a reformation that affects the right to payment.

6     There are other aspects of it that you can reform.

7          THE COURT:  Why is that right so hallowed?

8          MR. ROLLIN:  Your Honor, that is the Trust Indenture

9     Act.  The Trust Indenture Act is a product of the Great

10    Depression.

11         THE COURT:  But if I don't make an order that

12    adversely impacts one, the order will adversely Impact another.

13    This is zero sum gain.

14         MR. ROLLIN:  I don't agree with the premise.

15         The parties, and Sceptre included, filed a notice and

16    has seen an investment gain in the price and value.  There is a

17    resolution in which nobody is harmed, and that is why you

18    follow the indenture because everybody realized the investment

19    gain based on the way the market understood and valued the

20    notes based on the indenture.

21         The one way where you can cause harm through

22    reformation is by reversing because it up-ends all of the

23    market's expectations that have been reflected until the raise,

24    the prices, the credit enhancement and is set forth in the one

25    document that matters, the indenture.

1          THE COURT:  Your argument is that Sceptre can't lose

2     no matter how I rule?

3          MR. ROLLIN:  I do not believe that Sceptre will lose

4     money because just as your Honor noted --

5          THE COURT:  But it loses $7 million of the transferred

6     of value?

7          MR. ROLLIN:  No.

8          THE COURT:  That is what your guy said.

9          MR. ROLLIN:  First of all, that is what they said.

10    That is their analysis, but that is not value that is theirs to

11    have under the indenture.

12         THE COURT:  Someone is going to have it, either you or

13    they.

14         MR. ROLLIN:  That is just the value from the market

15    pricing when you follow the indenture as the market has handled

16    it.  When you don't follow the indenture -- because the market

17    has different expectations about how losses will be

18    allocated -- if you don't follow the indenture, then it up-ends

19    the expectations of the parties who purchased on secondary

20    market -- namely, Semper -- and the value is transferred from

21    the A-3s to the A-2s.

22         THE COURT:  So Peresechensky said that he had a deal

23    where he could have flipped the instruments a few days after he

24    bought it and made a neat profit, but the potential buyer from

25    him found out that there was a discrepancy and wanted to stay

1    away from it, and Peresechensky honored it.

2           So he said that he honored it because the other fellow

3    was a nice and honorable fellow, but one could also find that

4    Peresechensky, even with the discrepancy, was looking for a

5    much larger profit and was dissatisfied with the price that was

6    offered.

7           MR. ROLLIN:  But not a profit because of the

8    discrepancy.  I think that is the important distinction.  A

9    property because of the rising tides --

10          THE COURT:  He had confidence he would guess right and

11   he would win.  It seems to me from his testimony, as I infer

12   it, that just as you say Sceptre ought to win, so does Semper

13   want to win.

14          MR. ROLLIN:  Through very different investment

15   strategies.

16          THE COURT:  These are people who are very used to risk

17   and are looking to maximize potential profits as they minimize

18   the potential loss.  I don't see it.  It is a legal question

19   and it is a troublesome question because the most important

20   document is the contract, and the others are descriptive of the

21   contract.

22          And so the proposition that the trustee wants, the

23   securities administrator wants me to take is to reform the

24   basic documents to make them consistent with the subordinate

25   documents.  I asked that question to Mr. Pickhardt, and he

1     cited me to a case which said that reformation could be done.

2     So this is your chance to distinguish that case.

3           MR. ROLLIN:  That is the Aristocrat case.  Here is

4     what is important about that distinction.  In that case the

5     parties agree there was a scrivener's error.  The question

6     would be what would be the consequence of that scrivener's

7     other error?

8           What that case did not involve was an effect on the

9     payment, the right to payment that is guaranteed by Section 316

10    (b) of the Trust Indenture Act.  That is the key part and that

11    is why the Aristocrat case is not on point because this case

12    has to do with affecting a payment.

13          For example, the YRC case which we cited to your Honor

14    in our motion to dismiss papers, and we incorporated it by

15    reference in our trial brief, that is a situation where they

16    couldn't get 100 percent of the note-holders to agree to delete

17    a provision of the indenture.  It required 100 percent.  The

18    trustees said I am not going to do it, I am not going to sign

19    it.

20          So the vast majority who wanted it changed came to

21    court, and the court said no.  It requires a hundred percent,

22    and the Trust Indenture Act doesn't let me do it because it

23    requires 100 percent.  That is the key distinction between the

24    Aristocrat case and the situation we have here.  If it does not

25    affect the rights of payment and it's appropriate otherwise

1   under the law, reform away; but where it affects the rights of

2   payment, neither TIA nor the indenture allow you to do it.

3           In fact, there is a provision in the indenture that

4   says in the event of any conflict, 10.08, in the event of any

5   conflict between a portion of this indenture and the

6   requirements of the Trust Indenture Act, the Trust Indenture

7   Act shall prevail.  That is the difference.

8           Mr. Peresechensky went to the one document that

9   mattered.  He went to the indenture.

10          THE COURT:  Does that mean you can reform any minor

11  element, but you can't reform a material element?

12          MR. ROLLIN:  It is specific as to those provisions

13  that are required under the Trust Indenture Act.

14          THE COURT:  You can't be right.  If you are out to

15  reform, then you have to reform that which is material more so

16  than that which is subordinate.

17          MR. ROLLIN:  This is a very specific provision.  It is

18  the impairment of payment.  Whether reformation or amendment,

19  it doesn't matter under the Act.  That requires consent as a

20  matter of federal law, and that only applies to certain

21  portions of the indenture, and so while your Honor could, a

22  very material term, but it doesn't affect the rights of

23  payment, the Trust Indenture Act has nothing to say about that.

24          On the right to payment and the language that it uses

25  is on that indenture security under the indenture that the TIA

1     permits and that the indenture permits.

2              THE COURT:  Got it!

3              MR. ROLLIN:  That applies equally to the construction

4     or interpretation claim.  It is exactly the same issue whether

5     you're looking at it from a reformation perspective or

6     construction perspective, the same, the same issue arises.

7     What you cannot do is impair or affect payment under the Trust

8     Indenture Act.

9              I do want to make a couple of points with respect to

10    that.  The Fiori case, as you began to mention, says the courts

11    may not rewrite a term of a contract by interpretation when it

12    is clear and unambiguous on its face.  I took note of your

13    Honor's comments earlier about the 132, 123.  You'll note that

14    there was testimony that the nomenclature varies across deals,

15    and so it is not necessarily the case.

16             THE COURT:  It could be 321 and 123, but not likely to

17    be 132.

18             MR. ROLLIN:  It is really 2-3 or 3-2, and the reason

19    is because, as Mr. Pickhardt said earlier, the 1 class, the

20    1-A-1 doesn't take losses.  So as to the allocation of losses,

21    it would be equally logical in terms of the nomenclature to be

22    2 then 3, or 3 then 2 precisely because the 1 doesn't take

23    losses.  So that issue doesn't apply to 1.

24             THE COURT:  History:  1, no loss; 2, a little loss; 3,

25    a lot of loss.

1           MR. ROLLIN:  Where do you go to find out?  You go to

2      the indenture.  Where else was Mr. Peresechensky supposed to

3      adduce the evidence of all of the drafts, that should he have

4      looked at the draft?  Is that the burden we are going to place

5      on a bona fide purchaser, that they have to find the draft

6      documents?

7           There is a case called Citigroup versus Impact.  It

8      was decided in federal court in California.

9           THE COURT:  He knew there was a discrepancy.  He could

10     not resolve the discrepancy by looking at one instrument.

11     There was a discrepancy, meaning an inconsistency, so he had to

12     see what was inconsistent, and he didn't.  He said he didn't.

13     It is hard for me to believe that.

14          MR. ROLLIN:  So let's take it to that level, your

15     Honor.

16          THE COURT:  This fellow is a smart fellow.  It is his

17     business to look into it.  He looked at every essential piece

18     of information to find it.  He learned there was a discrepancy.

19     That meant he had to get to know what was the discrepancy.

20          MR. ROLLIN:  Sure.  Let's go there.

21          THE COURT:  He looks at the trust indenture which is

22     free and clear, so I'll go by that.  That doesn't teach him

23     what the discrepancy was.

24          MR. ROLLIN:  There are two points on that:

25          First, let's go down that last path.  Let's say he got

1   the prospective supplement and was looking at both of them, and

2   one shows allocated losses one way and another one shows

3   allocated losses in another.  What does the prospective

4   supplement tell him to do?  It tells him to look at the

5   indenture.  Even if he had done that, he would have been

6   referred back to the governing document, and he followed the

7   governing document.  That is the point of the Citigroup v.

8   Impact case we cited.

9          The judge says the suggestion you should have to go to

10  the prospective supplement and look at it to find out what the

11  governing document means, the court says is fallacious.  There

12  is one document.  Certainty in commercial documents require

13  there be one governing document, and there is and the law

14  recognizes it.  He did exactly what he should have done even if

15  he found both the prospectus supplement and the indenture.

16         He would have followed the instructions with respect

17  to supplement, looked at the indenture, seen the allocation of

18  realized losses, and beyond that what else could he have done?

19  That is the what law says he is supposed to do and that is what

20  he did.

21         THE COURT:  You have 15 minutes if you want to pay

22  attention to the defenses.

23         MR. ROLLIN:  I note, your Honor, in the context of the

24  Impact case, that is a case which I think is on all fours with

25  this one certainly in all material respects, and it notes that

1    there is an adequate remedy of law, and that adequate remedy of

2    law is a goes against the party who made the mistake.

3              THE COURT:  What is there to the laches defense?

4              MR. ROLLIN:  Sure.  Thank you, your Honor.  The laches

5    defense is as follows:

6              Both the indenture trustee and the securities

7    administrator were on notice at the end of 2010 of the

8    discrepancy.  They intentionally did not -- well, let me go

9    back.  They did not take action until 2014, and what happened

10   in-between was that we bought.  In 2010 when the discrepancy

11   came to light, and as Mr. Cohen testified, they knew the losses

12   would eventually hit.  They didn't know when, but they knew

13   they would hit.  If they would have taken action, this action

14   at that time, then we would have bought or not bought based on

15   whatever the outcome of that was.

16             But having waited and not taken this action until

17   years later and years after Semper's purchase, that is

18   quintessentially laches.

19             Now, during that course of time, as your Honor saw

20   through the testimony of Mr. Cohen, there were a number of

21   note-holders who were approaching both the indenture trustee

22   and the securities administrator, telling them about this,

23   asking them to do something about it, and they didn't do it.

24   They conditioned it upon receiving direction and indemnity, and

25   they chose not to do it over and over again, in consultation

1    with counsel, consultation with the indenture trustee and the

2    owner trustee and all of their very good lawyers.

3         They chose not to do it.

4         THE COURT:  What is the test of laches?

5         MR. ROLLIN:  Your Honor, the test of laches is that

6    the amount of time waited was unreasonable and that the party

7    was prejudiced by it.  These facts are quintessentially that.

8    They knew it was that.  They knew it was a problem in 2010.

9    They didn't do something about it.

10        THE COURT:  You didn't wait between 2010 and 2012 and

11   said ah-huh, there has been no cause of action in the court.

12   That means I can go in and say goodbye.  That doesn't describe

13   what you did.  You were presented with an investment

14   opportunity in 2012.  Peresechensky did his analysis.  He

15   concluded that he would come out okay, and he took the

16   investment.  There is no laches.

17        MR. ROLLIN:  Had they come to court and asked for this

18   instruction, then the discrepancy that is at the heart of this

19   issue and without which we wouldn't be here wouldn't exist

20   because it would have been rectified timely and before we

21   purchased.  Because we purchased, we are now faced with the

22   situation where the value of our notes could go from the 70's

23   all the way down to the teens.  That's prejudice.  That would

24   not have happened.

25        THE COURT:  Tell me about equitable estoppel.

1             MR. ROLLIN:  The equitable estoppel defense is

2    principally with respect to the notice, the communications that

3    Mr. Peresechensky had with the securities administrator after

4    the purchase on October 3 and October 4, 2012.

5             I think it is important to distinguish that sort from

6    the bona fide purchaser analysis.  The bona fide purchaser

7    analysis is what happened at the time of the purchase, the

8    reliance on the indenture, the fact if you had the ProSupp and

9    indenture in front of him, he would have been referred to the

10   indenture.  That is what he did.  That is a bona fide

11   purchaser.

12            Here the discrepancy comes to him, and he learns of

13   the discrepancy through Mr. Haghighat the next day and confirms

14   with the securities administrator what are you going to do?  He

15   leaves a message, I think he said, and there is a series of

16   e-mails.  I believe it is Exhibit TX-V, and in those e-mails he

17   asked are you going to follow the indenture?  And the

18   securities administrator said absent an amendment, we are going

19   to follow the indenture.

20            Mr. Peresechensky says well, what is going to trigger

21   an amendment?  And they come back and say consent from 100

22   percent of the affected note-holders.  Mr. Peresechensky says

23   I'm not going to consent.

24            THE COURT:  Do you think that Wells Fargo had a legal

25   obligation not to bring this lawsuit?

1              MR. ROLLIN:  A legal obligation not to bring this

2     lawsuit?  We have no qualm with the need for guidance and

3     instruction, but the available remedies are determined by the

4     equities and by the law.

5              THE COURT:  So they could possibly pay out according

6     to the trust indenture by delaying issuing guidance.

7              Once they get guidance from me, if it is contrary to

8     what they have been doing before, they'll have a choice, either

9     follow my holding or do what they have been doing.  Where is

10    the equitable estoppel?

11             MR. ROLLIN:  The estoppel is in seeking this form of

12    relief, not bringing the action.  It is asking for relief that

13    it told us, right, it would not -- that this would not happen

14    not in terms of bringing the action, but in terms of unwinding

15    the loss allocation priority in the indenture.

16             THE COURT:  What they were worried about if I don't

17    give them guidance, they may have to pay out according to the

18    trust indenture and they'll get sued by Mr. Pickhardt.  They

19    want me to give them guidance.

20             MR. ROLLIN:  That's right.  We think your Honor should

21    give them guidance, and the guidance is to follow the

22    indenture.

23             THE COURT:  If I give them guidance, there is no

24    longer equitable estoppel.

25             MR. ROLLIN:  If you give them guidance?

1          THE COURT:  And they follow my guidance, there is no

2    equitable estoppel.  Equitable estoppel would be paying out

3    differently without guidance.  They can't do that.

4          MR. ROLLIN:  I believe the estoppel came in --

5          THE COURT:  You can't say there is estoppel because

6    they went to court.

7          MR. ROLLIN:  If the guidance sought to the extent that

8    it asked to follow the indenture, no problem.  But, yes, I

9    don't believe they should have come to court and ask for

10   guidance.  They could potentially reverse the loss allocation

11   in the indenture because they had previously told Semper that

12   they wouldn't do that, that they would not -- that the only way

13   to reverse the loss allocation in the indenture was by

14   amendment.  It is more nuanced.  That is the part they have not

15   asked for.  I don't believe that is the part your Honor can --

16         THE COURT:  I don't think it can prevent them from

17   asking whatever guidance they think they need.  Your next one

18   is unclean hands and unjust enrichment.

19         MR. ROLLIN:  And these have to do with Sceptre, and

20   this is Exhibit BN and this is the test that came in through

21   Mr. Mago.  This is an effort to take investment value through

22   litigation.

23         THE COURT:  This is not against Wells Fargo.

24         MR. ROLLIN:  No.  Sceptre.  That's right.  If a party

25   wants to do equity --

1          THE COURT:  What would happen if I dismiss their

2     claims but the guidance was beneficial to them?  Is the trustee

3     disabled from giving them that extra benefit?

4          MR. ROLLIN:  I don't think that having engineered the

5     process and filed the claim and brought in the evidence, the

6     only evidence, to the extent that it is evidence, that Sceptre

7     should obtain the benefit of such an outcome or that, more

8     importantly, whatever benefit they gain is one thing, more

9     importantly that we don't suffer the detriment from that.  That

10    is our objection, is that be don't suffer a detriment that

11    would be unwarranted in law or in equity.

12         Your Honor, the document that is before you on the

13    screen is the evidence that's in with respect to the pricing

14    across time, the various price observations, and this goes

15    exactly to the issue we have been talking about both with

16    respect to unclean hands and the windfall to one and/or

17    detriment to the other and why in equity it ought not happen.

18         The A-3 --

19         THE COURT:  What is the assumption here?  These are

20    actual market prices?

21         MR. ROLLIN:  These are the market prices.  These are

22    the market color that we have been talking about of observable

23    market prices, offers, bids, trades that inform where these two

24    sets of notes are at in the market at particular times.

25         You'll notice, draw specific attention to the A-3

1    class in green in July of 2013 and the A-2 class in the red at

2    that same time.  Those two points in July of 2013 reflect the

3    analysis performed by Och-Ziff about what will happen, the

4    observable prices at the time and then what would happen if

5    your Honor reversed it.  Those two lines at that point in time

6    would be switched and all of the --

7             THE COURT:  The red would become green and green would

8    become red.

9             MR. ROLLIN:  Because the tranche sizes are different,

10   that is not exactly right.  It actually means because the A-2

11   class is three times bigger than the A-3 class, the detriment

12   to the A-3 would be three times more dramatic than the benefit

13   to the A-2.

14            If if they go up by 20 points, we go down by 60

15   points, that is what their analysis is, Och-Ziff analysis.

16   That is why we are here.  That is why they have a claim to the

17   res.  That is what they want.  They want what they bought.

18            THE COURT:  Do that again.  The red is the 1-A-2

19   notes?

20            MR. ROLLIN:  Yes.

21            THE COURT:  You have A-3?

22            MR. ROLLIN:  Yes.

23            THE COURT:  So I note that 1-A-2 from 2012 is selling

24   below 1-A-3.  That must mean that the market reflects 1-A-3 of

25   the senior notes to 1-A-2?

1          MR. ROLLIN:  Exactly.

2          THE COURT:  However, 1-A-3 is ascending in value to

3     July of 2013 while 1-A-2 is barely moving.

4          MR. ROLLIN:  Those are the observable points.  It is

5     difficult to know what the intermediate points would be.  Yes,

6     you see they're both ascending in value because of the market

7     surge Mr. Peresechensky testified about.  The market for these

8     bonds is getting better, and so the rising tide lifts both

9     boats.

10          THE COURT:  Because the mortgages are performing

11     better.  Is that right?

12          MR. ROLLIN:  There are various factors.  The servicing

13     of the mortgages has definitely improved in the industry over

14     time, and I don't know whether the mortgages are performing

15     better per se.  I think that is right.  The losses still

16     haven't hit.

17          THE COURT:  The only thing I can see here is that the

18     market between February 2012 and November 2013 is treating the

19     three bonds as senior to the two bonds.

20          MR. ROLLIN:  Which means it is following the

21     indenture.

22          THE COURT:  Yes.

23          MR. ROLLIN:  Exactly.  Those are the reasonable market

24     expectations of all of the participants.

25          THE COURT:  Yes.

1           MR. ROLLIN:  That is what the credit rating agencies

2      say.

3           THE COURT:  And so the import of your remarks, Mr.

4      Rollin, forgetting about Semper and Sceptre, is that all the

5      holders of the 3 class will be adversely affected in relation

6      to the 2 class?

7           MR. ROLLIN:  Exactly, yes.

8           THE COURT:  And since investors have been purchasing

9      in reliance on them, it will be inequitable to deal them a blow

10     while enhancing the value of the 2 class.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             MR. ROLLIN:  Exactly.

2             THE COURT:  Okay.  You still have five minutes.  You

3    don't have to use it.

4             MR. ROLLIN:  I won't.  Thank you.

5             THE COURT:  Thank you.  Mr. Pickhardt, he's not ceding

6    you five.

7             MR. PICKHARDT:  I won't take it, your Honor.

8             THE COURT:  Leave that one up, will you?

9             MR. PICKHARDT:  Actually, your Honor, I would

10   appreciate it if you would leave that up.

11            THE COURT:  Is this an exhibit or is this a chart?

12            MR. ROLLIN:  It's a chart that we made, but it's all

13   based off of testimony and exhibits in the record.

14            THE COURT:  Most from Mr. Peresechensky?

15            MR. ROLLIN:  No, your Honor.  Quite a bit of it comes

16   from Mr. Mago, and the Exhibit BN came in through Mr. Mago.

17            MR. PICKHARDT:  Your Honor, there's actually three

18   spots on this chart that reflect actual trades and only three.

19   All of the rest of this is supposition, and it also -- to the

20   extent that there was going to be analysis on this and what the

21   impact would be to certain bondholders -- would be the subject

22   of expert testimony.

23            What you heard from Mr. Peresechensky, as well as from

24   Mr. Mago, is that, in fact, people don't know where these bonds

25   trade in the market because this is not a stock exchange where

1   people can go out and can see exactly where trades are changing

2   hands.  The only trades that we know about in these two bonds

3   during the entire time line reflected on these charts, are

4   trades by the two parties who are in front of you.  And that

5   includes Semper's purchase in September of 2012 at 47 and a

6   half, and Scepter's purchases in January of 2012 and then again

7   in December of 2013 and March of 2014, at which they purchased

8   at 42 and a half and 44 and a half.  Those are the only trades,

9   your Honor.

10          THE COURT:  What was the first one?

11          MR. PICKHARDT:  The first one is Semper's purchase in

12  September of 2012, when they purchased at 47 and a half.

13          THE COURT:  And a quarter.

14          MR. PICKHARDT:  Well, what it says here is 47 and a

15  quarter.  They then paid another quarter to the broker; so you

16  sometimes see it referred to as 47 and a quarter, but the

17  actual cash out-of-pocket was 47 and a half.

18          THE COURT:  Okay.

19          MR. PICKHARDT:  And then you have some trades that

20  were by Scepter, including one in January of 2012, which you

21  heard Mr. Mago, that was not an auction.  That was, rather, a

22  bond that was purchased as a part of a larger portfolio, where

23  the portfolio was bought in price, not this bond.  And then you

24  have two more recent purchases, one in December of 2013 and the

25  other one in March of 2014, and those two purchases were at

1   around 42 and a half and 44 and a half.

2            THE COURT:  I got it.

3            MR. PICKHARDT:  That's it.

4            THE COURT:  But the relationship is still pretty much

5   as is shown.  The market seems to be valuing the three series

6   higher than the two series.

7            MR. PICKHARDT:  Well, your Honor, I don't know, when

8   you say "the market," who you're referring to.

9            THE COURT:  Whoever is buying and selling in the

10  market or offering to buy and sell.

11           MR. PICKHARDT:  Well, there's actually no evidence of

12  anybody actually buying and selling in this market.  That's why

13  I think it's a little bit of a misnomer to talk about this as

14  being a market.  These are bonds that come available for sale

15  very rarely, and when they do, it's idiosyncratic as to how

16  they get priced.

17           And so to talk about a market, that's why you've heard

18  testimony about market color and what is market color.  Well,

19  market color is not trades.  It's not trades.

20           THE COURT:  What's market color?

21           MR. PICKHARDT:  Market color is somebody sending

22  around information saying this is where I think something might

23  trade.  It's information.  It's rumor.  It's innuendo.  It is

24  speculation.  It is not actual trades.

25           THE COURT:  It's stuff that forms bids, and bids are

1   offers to buy or sell, and if they're matched, there's a

2   transaction, unless the guy wants out, and the other party

3   says, okay, I'll let you out.

4            MR. PICKHARDT:  The reason why this is important, your

5   Honor, is because what's being suggested is that there are

6   people out there who have been purchasing 1-A-3 bonds in the

7   60s and in the 70s, and depending on how this Court rules, it

8   could have an impact on the value of their purchases.  There's

9   a few problems with that.

10           THE COURT:  People could make a lot of money.  People

11  could lose a lot of money.

12           MR. PICKHARDT:  That's the first problem.  Look, I'm

13  not asking for sympathy for my client, your Honor.  My client

14  is a sophisticated fund who makes complicated determinations

15  with respect to risk based upon all kinds of determinations.

16           THE COURT:  But I should understand that they pay your

17  bill?

18           MR. PICKHARDT:  And they pay my bill.  Unfortunately,

19  the smart ones are back at the company; so they're the ones

20  actually assessing risk, and they just ask me to do things like

21  this.

22           THE COURT:  We have the fun, and they make the money.

23           MR. PICKHARDT:  But there's no reason for you to have

24  sympathy for my client.  My client purchased at a period of

25  time --

1          THE COURT:  As I said before, I don't think this is a

2     case of tea and sympathy.  It's a case of law, whether I do or

3     I don't reform the document.

4          MR. PICKHARDT:  I agree with that, your Honor.  And on

5     the point of law, there were a couple of cases that were

6     mentioned, YRC and Impact.

7          THE COURT:  Yes, tell me about that.

8          MR. PICKHARDT:  They're not reformation cases.  The

9     Impact case is a securities fraud case, where there was intent

10    talked about, as far as what could be the basis for a

11    securities fraud case.  It's not a reformation case.  It

12    doesn't say one syllable about reformation.

13         The YRC case, similarly, is not a reformation case

14    because what Mr. Rollin suggested is that YRC stands for the

15    proposition that if you have a hundred percent note holder

16    support, that you're precluded from reforming an indenture.  It

17    actually says something different, which is, if you don't have

18    a hundred percent support, you can't amend, if that's what the

19    provision in the indenture says.  Well, that's exactly what we

20    saw here.

21         THE COURT:  It's not an amendment.

22         MR. PICKHARDT:  Exactly, you're right.  It's not an

23    amendment, and that's why YRC --

24         THE COURT:  What do you think of the Trust Indenture

25    Act?

1          MR. PICKHARDT:  The Trust Indenture Act, there is not

2     a single piece of authority to suggest that the Trust Indenture

3     Act is meant to preclude reformation.  And the point that I

4     would make there, your Honor, is the Aristocrat case was a

5     trust indenture case covered by the Trust Indenture Act.

6          I also would like to address what would be the

7     implications of the arguments being made here.  If we could

8     pull up slide 14, Curt.  Your Honor, I'd like you to imagine

9     that this case was slightly different.  If instead of the error

10    that we're facing, we had an error with respect to the coupon

11    rates.  And imagine if this case was that someone made a

12    mistake at 1:15 in the morning, and instead of 0.35 percent for

13    the 1-A-2 bond, wrote 3.5 percent.

14         And you had the lawyer come in and give you testimony

15    saying, you know what, your Honor, I screwed up, I was up too

16    late, I accidentally put the decimal point in the wrong place,

17    no question that was an error.  The implication of Mr. Rollin's

18    argument is that your hands would be tied as long as the 1-A-2

19    holder was in here saying, hey, Judge, I don't consent to this

20    because I'm going to get the benefit of that 3.5 instead of

21    that 0.35.

22         That's the implication of Mr. Rollin's argument, is

23    that the Trust Indenture Act would divest you of the ability to

24    fix an error no matter how clear and no matter what the

25    equities.  It's an absurd reading of the Trust Indenture Act as

1   being intended to preclude a court, in its powers, from being

2   able to fix wrongs where it encounters them.

3           And the last thing I would note, your Honor, is that

4   if you're thinking about the equities in this case, there's

5   been a lot of, you know, talk about the two parties who are in

6   front of you.  It's important to note neither of us are

7   actually even majority holders in the class that's at issue.

8   Your decision is going to impact more people who are on the

9   outside of this courtroom than it's going to impact on the

10  inside of this courtroom.

11          THE COURT:  Frankly, I don't know how the impacts

12  would run.  There must be people who have held onto these bonds

13  from inception, and there may be speculators as well.

14          MR. PICKHARDT:  Yes, and so let's --

15          THE COURT:  It's probably true about most things in

16  the market, some people hold on, some people buy and sell.

17          MR. PICKHARDT:  I think that's absolutely right.  So

18  let's talk about those two categories.

19          THE COURT:  And that's why I say that I can't make

20  this decision on the basis of who's going to make money and

21  who's going to lose money.  I have to make this decision by

22  doing the right thing.

23          MR. PICKHARDT:  I think you're right, your Honor, and,

24  frankly, you will not be doing the wrong thing by any investor.

25  Either you have classes of investors who, like us, are

1    essentially speculators based upon risk, or you have classes of

2    investors who bought before the information about this

3    discrepancy had come out, and at that point, they're buying on

4    ratings, they're buying on Intex, they're buying on the

5    Prospectus Supplement, and all of those would have lead buyers

6    to buy believing in how the indenture is requested to be

7    reformed.

8             THE COURT:  That's right.

9             MR. PICKHARDT:  Either you have a class of

10   speculators, who aren't entitled to have their interests

11   protected because they were speculating and buying based on

12   risk --

13            THE COURT:  I agree with that.  Let me give Mr. Rollin

14   the last comment based on this last argument that Mr. Pickhardt

15   made in terms of the Trust Indenture Act --

16            MR. ROLLIN:  I'll be glad to.

17            THE COURT:  -- and the decimal error.

18            MR. ROLLIN:  I'll be glad to.  A person who is harmed

19   by the mistake or intentional conduct of somebody else can

20   certainly sue that person, and the Trust Indenture Act

21   guarantees that right.  So does the indenture.

22            THE COURT:  So that would be --

23            MR. ROLLIN:  That is not this case.

24            THE COURT:  That would be an act of remedy of law.

25            MR. ROLLIN:  That is not this case.  That is a case

1    that has not arisen yet because the losses have not hit, either

2    one, yet, but the Trust Indenture Act allows --

3              THE COURT:  That's why it's styled as a guidance case

4    by the trustee because the trustee knows with certainty that

5    there's not enough money to pay all the coupon holders and some

6    are going to be without interest.  And it's going to affect the

7    price, and he needs to know whether it should impact the threes

8    or the twos.  And then you guys will be able to sue, but you'll

9    have a different judge.

10             MR. ROLLIN:  If a party --

11             THE COURT:  I hope.

12             MR. ROLLIN:  You haven't enjoyed yourself, your Honor?

13             THE COURT:  Immensely.  I think I got your point.

14             Okay.  I want to tell you that it's been a nice case,

15   and I apologize for being harsh from time to time, but you've

16   taught me a lot.  So we'll convene -- what time did we say,

17   Friday at 2:30?  Okay.  Have a nice, relaxed time while I work.

18             MR. PICKHARDT:  Thank you, your Honor.

19             MR. ROLLIN:  Thank you, your Honor.

20             MR. JOHNSON:  Thank you, your Honor.

21             (Adjourned to July 11, 2014, at 2:30 p.m.)

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                               Page

3    BORIS PERESECHENSKY

4    Cross By Mr. Pickhardt . . . . . . . . . . . 374

5    Cross By Mr. Johnson . . . . . . . . . . . . 393

6    Redirect By Mr. Rollin . . . . . . . . . . . 397

7    Recross By Mr. Pickhardt . . . . . . . . . . 402

8                        PLAINTIFF EXHIBITS

9    Exhibit No.                                Received

10    TX-251 and TX-252  . . . . . . . . . . . . 374

11    TX-227   . . . . . . . . . . . . . . . . . 384

12    TX220  . . . . . . . . . . . . . . . . . . 408

13    101, 102, 103 and 10   . . . . . . . . . . 410

14                        DEFENDANT EXHIBITS

15    Exhibit No.                                Received

16    205, 206 and TX9 . . . . . . . . . . . . . 407
```

17

18

19

20

21

22

23

24

25