E7BJTRU1                          Decision

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN THE MATTER OF THE TRUSTEESHIP
     CREATED BY AMERICAN HOME MORTGAGE
4    INVESTMENT TRUST 2005-2 related to       14 Civ. 2494 AKH
     the issuance of Mortgage-Backed
5    Notes pursuant to an Indenture dated
     as of October 1, 2007,
6

7    WELLS FARGO BANK, N.A.,

8                    Petitioner,

9    ------------------------------x

10

11                                            July 11, 2014
                                              2:45 p.m.
12

13

14

15   Before:

16                   HON. ALVIN K. HELLERSTEIN,

17                                            District Judge

18

19

20                        APPEARANCES

21

     ALSTON & BIRD, LLP
22        Attorneys for Wells Fargo Bank
     BY:  CAROLYN R. O'LEARY, Esq.
23        MICHAEL EDWARD JOHNSON, Esq.

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                          (APPEARANCES CONTINUED)


QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Sceptre, LLC
BY:   JONATHAN E. PICKHARDT, Esq.
        MAAREN A. SHAH, Esq.
        BLAIR A. ADAMS, Esq.
                    Of counsel


JONES & KELLER
        Attorneys for Semper Capital Mgmt.
BY:   MICHAEL A. ROLLIN, Esq.
        MARITZA DOMINGUEZ BRASWELL, Esq.
        TARA K. WILLIAMS, Esq.
                    Of counsel

1          (Trial resumes)

2          (In open court)

3          THE COURT:  Good afternoon, all.  Be seated, please.

4      This proceeding is the result of a bifurcation.  I am

5  focusing on the trustee's request for guidance and instructions

6  how to apply the trustee's obligation with regard to allocation

7  of losses to various categories of security.  There are various

8  counterclaims and cross-claims as well to which I'll turn at

9  the conclusion of my remarks today.

10         The findings of fact and the conclusions of law are

11 lengthy.  Rather than hold up everything today, burden the

12 Court Reporter, I will deliver a summary, with the idea, which

13 I hope is realistic, to file the complete findings of fact and

14 conclusions of law within a week.  That will be my decision.

15 This is, in effect, an advance praecipe of it.

16         In June 2005, American Home Mortgage Investment Trust,

17 2005-2 issued a series of notes valued at $5.8 billion, secured

18 by residential home mortgage loans.  The notes were divided

19 into 26 classes, with different classes having different rates

20 of interest, different rights to payment, and different

21 measures of seniority.

22         In the event that the trust suffered losses or failed

23 to generate sufficient income to cover all the various classes

24 in the variety of priorities, the underlying agreements treated

25 the classes in a waterfall effect.  In other words, if the

1    trust was unable to make all promised interest and principal

2    payments, the holders of junior notes would stop receiving

3    payments before payments to the holders of more serious notes.

4             We focus in the proceedings that came before me,

5    classes of notes labeled 1-A-1, 1-A-2 and 1-A-3.  The indenture

6    agreement between American Home Mortgage, Wells Fargo Bank and

7    Deutsche Bank, dated June 22, 2005, which governed the

8    allocation of payments to the note-holders allocated losses to

9    1-A-2 notes and then to 1-A-3 notes, providing in its operative

10   clause, Section 3.38 (a)(ninth), as follows:

11            "To the extent such realized losses are incurred in

12   respect of the Group I loans, they're allocated to the Class

13   1-A-2 notes and Class 1-A-3 notes in that order."

14            Because of an underlying dispute and inconsistency

15   among the terms of the suite of documents that govern the

16   issuance and rights and obligations of note-holders, Wells

17   Fargo has requested instructions regarding the allocation of

18   losses.

19            Wells Fargo, the petitioner, is a National Banking

20   Association.  Its main office is in South Dakota.  It

21   functioned as securities administrator for the trust.  As such,

22   it is responsible for organizing payments to note-holders and

23   allocating losses to different classes of notes.

24            Sceptre, a Delaware limited liability company, has its

25   principal place of business in New York.  It intervened in this

1    action as a party in interest.  Sceptre is a holder of Class

2    1-A-2 notes.

3              Semper also intervened.  It is investment manager for

4    a fund having the same name and holds Class 1-A-3 notes.  There

5    were four documents in the suite of documents which were issued

6    to investors:  A private offering memorandum; a prospectus

7    supplement, dated June 20, 2005; a term sheet; and an indenture

8    agreement.

9              The offering documents, that is, the private offering

10   memorandum, prospectus supplement and the term sheet, are the

11   documents distributed to potential investors, were inconsistent

12   with the indenture in one material respect:

13             While Section 3.38 of the indenture provided that

14   losses should be allocated first to the Class 1-A-2 notes and

15   then to the Class 1-A-3 notes, the prospectus and term sheet

16   provided that losses should be allocated first to the Class

17   1-A-3 notes and then to the Class 1-A-2 notes.

18             The indenture was created after the offering documents

19   were created.  The various drafts of the offering documents and

20   the final version introduced into evidence provided

21   consistently that losses would be attributed to Class 1-A-3

22   note-holders first and then to Class 1-A-2 note-holders.  Each

23   used the following language in the drafting:

24             "Realized losses will be allocated to the Class 1-A-2

25   notes and Class 1-A-3 notes in reduction of the note principal

1    balance thereof, until reduced to zero; provided, however, that

2    any realized losses allocated to the Class 1-A-2 notes and the

3    Class 1-A-3 notes shall be allocated first, to the Class 1-A-3

4    notes, and second to the Class 1-A-2 notes."

5           During the drafting process, the language conveying

6    this proposition was changed to eliminate the proviso clause.

7    The drafts provided realized losses will be allocated to the

8    Class 1-A-3 notes and Class 1-A-2 notes in that order, in

9    reduction of the note principal balance thereof, until reduced

10   to zero.  The concision of language carrying the same idea made

11   the proposition to be advanced simpler and clearer, in fewer

12   words, without intending to change the substance.  The final

13   version will produce the language in more detail, showing the

14   intent.

15          The initial drafts of the indenture conformed to the

16   initial drafts of the offering documents with the same proviso

17   clause.  However, as the changes went forward, the indenture

18   came to be revised to conform or to attempt to conform with the

19   changes in the other documents.

20          The appropriate draft of the indenture was worked on

21   at 1:11 am on the morning of June 22, 2005 by the lawyers from

22   Thacher Proffitt & Wood, LLP.  In making the changes, an error

23   cropped in specifically in a way that 1-A-2 and 1-A-3 were

24   crossed out to accomplish the change.  In order to make the

25   language more concise and to follow this sequence of losses, it

1    was necessary to reverse the order appearing in the clause of

2    the documents.

3           However, in effecting that change, the strike-out and

4    replacement that was accomplished in the drafts was not carried

5    through into the indenture.  There was no explanation why this

6    should be an inconsistency between the indenture and the

7    offering documents that preceded it.

8           In any event, the final version of the indenture

9    created this inconsistency by failing to be conformed to the

10   offering document.  I find that the structure of the

11   transaction indicates that the allocation of the losses

12   described in the indenture was the consequence of a mistake,

13   and I'll carry this indication forward under three categories:

14          The first, nomenclature.  The indenture, in the way it

15   describes the various classes of notes, consistently refers to

16   a lower numbered note as senior to a higher numbered note in

17   respect of loss allocations.  Thus Class I-M notes are senior

18   to Class I-M-2 notes, and Class I-M-2 notes are senior to class

19   M-3 notes.  Class 1-A-1 notes are the most senior notes, but

20   the sequence between the seniority of 2 and that of 3 has been

21   flipped, so the indenture 3 became more senior to 2 and 2

22   junior to 3, which was inconsistent with the sequences of the

23   other classes.

24          With regard to interest rates, I can take judicial

25   notice that in issuance of debentures in comparison of risks,

E7BJTRU1                       Decision

1  higher interest rates are provided for securities of greater

2  risk.  However, the Class 1-A-2 notes were assigned a lower

3  interest rate than a Class 1-A-3 notes, suggesting that the

4  Class 1-A-3 notes should be ones with greater risk or junior to

5  the Class 1-A-2 notes.  The indenture was opposite to that;

6        Third, with respect to credit enhancement, the final

7  term sheet described the credit enhancement of each set of

8  notes, reflecting the percentage of the total value of the

9  transaction that must suffer losses before those notes will

10 suffer losses.  The higher the credit enhancement, the more

11 senior the note.  The final term sheet gave a Class 1-A-2 notes

12 a credit enhancement of 17.55 percent, higher than the credit

13 enhancement given to Class 1-A-3 notes of 7.55 percent, thereby

14 suggesting that the 1-A-2 notes were supposed to be more senior

15 to the 1-A-3 notes.  The indenture became drafted to be

16 inconsistent with this.

17       No one seems to have noticed the inconsistency between

18 the indenture and the offering documents until the press

19 release was issued by Moody's on or about August 23, 2010.

20 Moody's press release stated that it had corrected the ratings

21 of two tranches of these notes, the Class 1-A-2 and the Class

22 1-A-3.

23       It described the condition earlier when the 1-A-3

24 notes were given a lower classification than 1-A-2 notes.

25 However, Moody's disclosure went on, the pooling and service

1    agreement which was the indenture reversed that, and the

2    trustee, it said, confirmed that it would follow the terms of

3    the PSA.  Moody's stated that its ratings had been adjusted to

4    reflect this change, giving the A-2 notes a lower rating than

5    the A-3 notes.

6          In August 2011, Intex, another company that advised

7    investors, notified its customers that there was a conflict

8    between the offering documents and the indenture.  It offered

9    an ability to model cash flows depending on whether the

10   offering document proved to be correct or the indenture or PSA

11   proved to be correct.

12         In January 2012 after these notices, Och-Ziff Capital

13   bought 50 million original face value Class 1-A-2 notes from

14   from Credit Agricole, previous holder of the notes at 23.4

15   percent of their face value.  Och-Ziff was aware of the

16   discrepancy when it made its purpose and took that discrepancy

17   into account.  It considered the value of the Class 1-A-2 notes

18   as if they were senior to the Class 1-A-3 notes.

19         It also hypothesizes the situation where the value

20   will be junior, thus creating an upside bend and a downside

21   bend to the investment.  Analyzing both upside and downside

22   potential by reason of this inconsistency, Och-Ziff was

23   satisfied with the value of its investment, and in December

24   2013 bought additional Class 1-A-2 notes.  Originally it had

25   purchased 50 million face value, then it bought 20 million face

E7BJTRU1                          Decision

value.  In March 2014, it bought $1 million of face value at

prices that varied between 23.4 percent to 42.4 percent, to

44.4 percent.

            In June 2013, Och-Ziff created Sceptre as a special

purpose vehicle to hold notes.  The other beneficiaries of the

holding were investors in Och-Ziff.  After Sceptre, it

purchased 26 million original face value of Class 1-A-3 notes

in late September or early October 2012, purchasing done for

from the previous holder, Nomura Securities.

            Semper's trader, Mr. Peresechensky, testified that on

September 27, 2012, he submitted a bid for the Class 1-A-3

notes.  Peresechensky claimed he was not aware of the

discrepancy between the indenture and the offering documents.

He acknowledged, however, that he actually looked at the

indenture because he had become aware of a nomenclature

abnormality, as he termed it, about the seniority of the Class

1-A-3 and Class 1-A-2 notes.

            He testified that after reviewing the indenture and

market data, he concluded that the Class 1-A-3 notes were

senior to the Class 1-A-2 notes, but in coming to this view, I

find he had to consider what he called the nomenclature

abnormality; and, thus, was aware of the inconsistency between

the terms of the indenture and the terms of the related

documents.  Semper's bid reflected 47.25 percent of face value,

and it was accepted by Nomura the same day.

1           Peresechensky testified that on September 28th, 2012,

2    after Semper's bid on the notes had been accepted, but before

3    it was final, he learned about the discrepancy from another

4    trader, Ali Haghighat.  He learned that the discrepancy, about

5    this discrepancy because Peresechensky had attempted to sell

6    Class 1-A-3 notes to Haghighat on that same day of September

7    28, 2012, and Haghighat agreed to buy at a price higher than

8    Semper had paid.

9           But 10 minutes Haghighat retracted his bid because, as

10   he termed it, a problem existed with the 1-A-3 notes.

11   Haghighat told Peresechensky that the Class 1-A-3 notes were

12   junior to the Class 1-A-2 notes and sent Peresechensky some

13   language describing the discrepancy between the indenture and

14   the prospectus.

15          Peresechensky allowed Haghighat to back out of the

16   deal, claiming it had not been finalized and because he had a

17   good relationship with Haghighat.  He did not try to back out

18   of the purchase of the notes, claiming that it was less

19   opportunity to do that because of the passage of a day or so,

20   whereas Haghighat wanted to back out on the same day that he

21   had purchased.  However, both trades had actually become

22   effected.

23          I find that Semper's decision to invest and remain

24   invested was based on an evaluation of what the value of the

25   Class 1-A-3 notes would be if those notes were treated as

1    senior and what their value would be if they were treated as

2    junior and that the investment decision they made was a knowing

3    evaluation of the benefits and detriments of each position.

4           In 2011, before either Sceptre or Semper had bought

5    any notes, Wells Fargo had received communications from various

6    holders of Class 1-A-2 notes, requesting that Wells Fargo

7    allocate losses according to the terms of the offering

8    documents rather than the indenture.

9           In response, Wells Fargo wrote to one holder to

10   explain its position, stating that absent an amendment to the

11   indenture, it would allocate losses to Class 1-A-2 and 1-A-3 as

12   described in the indenture.  That is first to 1-A-2 and then to

13   1-A-3, and would not amend the indenture, they could not amend

14   the indenture without the consent of all affected note-holders.

15   That is what Section 5.07 of the indenture funds.  However,

16   Section 9.01 provides the indenture may be modified by a

17   supplemental indenture without the consent of holders to cure

18   any ambiguity, to correct or supplement any provision in that

19   document or any supplemental indenture that may be inconsistent

20   with other provisions in that document or any supplemental

21   condition.

22          There was also provision for modification with a

23   consent of holders that required a hundred percent.  Wells

24   Fargo stated that it would not solicit the consent of other

25   note-holders unless the first note-holder indemnify Wells Fargo

1    for costs associated with the solicitation.

2            Various solicitations occurred between Wells Fargo and

3    Och-Ziff.  Wells Fargo tried to rescind the solicitation.

4    Semper refused, and eventually on May 10, 2013, Wells Fargo

5    stated that if it could not get a hundred percent consent, it

6    reserved the right, but assumed no obligation to take further

7    action to resolve the inconsistency.

8            Semper objected to the consent solicitation and

9    requested Wells Fargo that it reconfirm that losses would be

10   allocated first to Class 1-A-2 and then to 1-A-3.

11           On January 17th, 2013, Wells Fargo began this case by

12   filing a petition in Minnesota District Court, 4th Judicial

13   District, Hennepin County, asking for an order of the Court

14   regarding the proper allocation of losses between the Class

15   1-A-2 and 1-A-3 note-holders.  In both Minnesota Statute

16   501B.16, Wells Fargo stated that it was driven to file the

17   petition because for the first time the trust would experience

18   losses that would necessarily affect the junior note-holder,

19   and it was required to determine which note, which class of

20   note was more senior and more junior in order properly to

21   allocate losses.

22           (Continued on next page)

23

24

25

E7BPTRU2                        Decision

1          THE COURT:  Wells Fargo gave notice of the petition to

2     all affected note holders.  Scepter intervened and then

3     promptly removed the case to the United States District Court

4     for the district of Minnesota.  Semper intervened as a party in

5     interest.  All parties stipulated that this action would be

6     transferred to the United States District Court for the

7     Southern District of New York, where unhappily I became the

8     judge by random selection of the case.

9          Wells Fargo sent notices concerning this proceeding

10    was dated January 27, February 20, March 14 and April 9, 2014,

11    and all exhibits to this proceeding.

12         Wells Fargo asked the Court to instruct it how the

13    indentureship should be interpreted and whether it should be

14    reformed because of a mutual mistake.  It did not argue in

15    favor of either version.  Semper argued that a trust

16    instruction proceeding was improper, that the indenture could

17    not be reformed and it favored an instruction in favor of its

18    position.

19         It's the obligation of the Court to represent the

20    interests of all parties in interest, even those not

21    ascertained and not in being.  I find that I have jurisdiction,

22    that there is complete diversity between the plaintiff and all

23    defendants, and that there is proper venue pursuant to a forum

24    selection clause.

25         Since this is a diversity case, transferred to me from

E7BPTRU2                          Decision

1   the United States District Court for the District of Minnesota,

2   I apply the law of the transferor court.  As a matter of

3   constitutional application, in the *Erie Thompson v. York* and

4   *Klaxon v. Stentor*, the transferor court must apply the law of

5   the State court, since this is an adversity case.

6          So I applied the law that would be applied in the

7   United States District Court, the District of Minnesota, and

8   the District of Minnesota applies the law of the State court in

9   terms of substantive issues.  For this purpose, tax limitations

10  is considered substantive.  However, under Minnesota

11  choice-of-law rules, statutes of limitations are considered

12  procedural unless a circumstance arises which requires them not

13  to do so.  The citations for these propositions will be in the

14  findings and conclusions that are filed next week.

15         This dispute or conflict in choice of law, however, is

16  a conflict without any meaning because, as I find and as I will

17  soon develop, the law of Minnesota and the law of New York,

18  which is the law that's supposed to govern under the forum

19  selection clause and the choice-of-law clause in the parties'

20  agreement in the indenture, come out to be the same.

21         Minnesota's trust instruction proceeding is a

22  well-established procedure at which trustees can seek judicial

23  guidance from a court about how to resolve different questions

24  of judgment, and by giving notice to all affected parties,

25  obtain a reliable and authoritative decision of the court,

1   authoritative on the trustee and authoritative on the parties

2   affected.

3          The Restatement (Third) of Trusts, statement 71,

4   described trust instruction proceedings as follows:  "A trustee

5   or beneficiary may apply to an appropriate court for

6   instructions regarding the administration or distribution of a

7   trust if there is reasonable doubt about the powers or duties

8   of the trusteeship or about the proper interpretation of the

9   trust proceedings."

10         Minnesota recognizes these proceedings under its

11  statute law, section 501B.16, but the roots of such proceedings

12  go back to equity, the Court's equity.  Thus, a "petition for

13  instructions gives the Court supervisory control over the

14  trustee to protect the trustee when the meaning of the trust

15  instrument is in doubt and to protect beneficiaries against the

16  trustee's inefficiency, incompetency or neglect."

17         Under the Minnesota statutes, notice is provided for

18  all affected beneficiaries.  Affected beneficiaries may appear

19  as interested parties.  If they don't appear, they are,

20  nevertheless, bound by the Court's determination.

21         Semper has moved to dismiss the action or portions of

22  the action, as barred by New York's statute of limitations on

23  actions based on reformation or mistake.  The statute of

24  limitations in New York on an action to reform a contract

25  begins to run on the date when the mistake is made, not when it

1    was discovered.

2              Semper argues that the action is really an action for

3    reformation based on mutual mistake and that a six-year statute

4    of limitations governs.  I found, however, that a trust

5    instruction procedure, which this is and which it was labeled,

6    may or may not encompass a reformation but revise its own

7    statute of limitations to guide the parties.

8              Under both New York and Minnesota, statute of

9    limitations are procedural, as I said before.  Minnesota has a

10   borrowing statute, based on the Uniform Conflict of Laws

11   Limitations Act, codified in Minnesota statute Section 541.30.

12   The borrowing statute applies to claims which are substantively

13   based upon the law of one or more state other than Minnesota.

14   If the claim is substantively based on the law of another

15   state, here in New York, the limitation period of that other

16   state applies.  But where it's procedural, as Minnesota calls

17   it, Minnesota applies its own statute of limitations.

18             The issue becomes complicated because if a strong

19   policy exists as, for example, a policy to apply the intent of

20   the parties expressed in an agreement, courts will sometimes

21   forego the notion of applying its own procedural statute of

22   limitations and look to the statute in an agreement.  Here,

23   pointing to New York.

24             But whether in New York or in Minnesota, I hold, the

25   statute of limitations that would be applied will be that

1    applicable to a proceeding brought by a trustee to seek

2    instructions how to interpret conflicting clauses in an

3    instrument.  If it's necessary in giving the answer or as a

4    consequence of giving the answer to reform the document, that

5    doesn't mean that the statute of limitations for a contract

6    reformation necessarily applies because the statute that

7    applies is determined by the nature of the cause of action.

8    And the nature of the cause of action, whether in Minnesota or

9    in New York is the common law notion of courts supervising

10   trusts and giving guidance where a trustee lacks guidance in

11   the application of law to an instrument.

12         A trust instruction proceeding, in its very nature, is

13   not an adversary action.  When Wells Fargo commenced this

14   proceeding, it was the only party in the case and did not

15   assert a right or claim to anything.  Subject matter

16   jurisdiction, which depends on an existing case or controversy,

17   arose when Scepter LLC intervened as a party in interest

18   because, at that point in time, as occurred in the removal

19   proceeding that brought this action from a State court to the

20   United States District Court in Minnesota, an adversary

21   relationship was created between Scepter and the neutral Wells

22   Fargo.

23         Scepter was arguing for a specific application.  Wells

24   Fargo was seeking instruction as between two competing

25   applications.  And the adversary nature of the proceeding was

1    confirmed and made clear when Semper also intervened because,

2    at that point in time, a true and complete adversary

3    relationship arose between Scepter and Semper.

4           Now, I will acknowledge that subject matter

5    jurisdiction attaches at the outset of a proceeding, and were

6    this a question that was put to the United States District

7    Court in Minnesota or to me before the parties intervened, I

8    might have felt differently about subject matter jurisdiction.

9    But when the case came to me, it was fully adversary; and

10   second, there was a compelling need, because of the need to

11   effect distributions, for the trustee to obtain guidance and to

12   act on the guidance.

13          It was necessary to quiet the markets and to apply an

14   authoritative rule to govern the trust allocation.  Otherwise,

15   there would be irreparable damage to the trustee and to all the

16   investors.  The job of sorting out who was entitled to what,

17   after a distribution was made, when there could be additional

18   sales hypothecations and other kinds of disposals of various

19   kinds of investments would have created havoc for all the

20   investors.  From a practical point of view, this Court has

21   subject matter jurisdiction.

22          In researching the law of the statute of limitations,

23   I found no case, neither in Minnesota nor New York, which

24   applied a statute of limitations to a trust instruction

25   proceeding.  Semper argued that there was one in Minnesota in a

1    case called *In re:  Trusteeship of Trust Created Under Trust*

2    *Agreement Dated December 31, 1974*, reported at 674 N.W.2d 222,

3    (Min. Ct. App. 2004).

4              In that case, the Minnesota Court of Appeals applied a

5    statute of limitations to a trust instruction proceeding, but

6    that case was a case that had to determine the paternity of

7    children.  The Minnesota Parentage Act created a presumption

8    that a husband is the biological father of a child born to his

9    wife, and provides that the presumption could be rebutted only

10   before the child reached three years of age.

11             The Minnesota Court of Appeals held that the trust

12   instruction proceeding would be governed by this irrebuttable

13   presumption because the children at issue were older than

14   three.  The statute of limitations was one dealing with

15   contests of paternity, which is governed by a different rule

16   from the law governing instructions to trustees and one where

17   the importance of settling paternity is crucial.  The statute

18   is in a different part of the statute book, it's codified in a

19   different way, and it doesn't apply to a proceeding of the

20   nature we have here.

21             The trust instruction proceedings are not proceedings

22   to give general advice to trustees.  A trust instruction

23   proceeding can be brought only when a trustee is confronted

24   with an actual, concrete problem.  It cannot be brought before

25   that.

1          This case could not have been brought before the

2     allocation of losses that would be necessarily affected,

3     whether a class 1-A-3 note holder or a class 1-A-2 note holder

4     would suffer the application of a loss.  That occurred, as I

5     understand it, now, in 2014.  It was not until 2011, 2012 that

6     the trustee was even aware of the contradiction between the

7     offering documents and the trust indenture.

8          So since the action could be brought only currently,

9     there has been no running of a statute of limitations.  Even

10    the customary six-year statute that applies to actions on the

11    contracts or, as in New York, where there is no other cause of

12    action.

13          The accrual date is crucial, and the accrual date is

14    one when the real case or controversy applies.  And certainly,

15    the trustee could not have brought it before it was brought

16    home to him by the Moody's disclosure and by inquiries from

17    various note holders, which occurred in 2011 and 2012, that

18    there was a contradiction which required a special application

19    as to one class or another.

20          I conclude that Minnesota courts would follow the

21    statement rule that a party can begin a trust instruction

22    proceeding only when faced with a concrete problem.  The

23    language is as follows, and it's from section 71, Restatement

24    (Third) of Trusts:

25          "Because of concern regarding burdens on the judicial

1    system and unwarranted costs and delays in the trust

2    administration, a trustee or beneficiary normally is not

3    entitled to instructions with respect to the administration of

4    a trust unless there is some reasonable doubt about the extent

5    of the trustee's powers or duties or about proper

6    interpretation of the trust provisions.

7                "Nor will the Court instruct the trustee as to a

8    question that may never arise, or that may arise only in the

9    future, unless some need is shown for current resolution of the

10   matter.  Thus, a court ordinarily will not instruct a trustee

11   on the distribution of trust property before the time arrives

12   for making, or at least planning, that distribution."

13               That makes this action timely under Minnesota.  The

14   situation is the same, as I said before, in New York.  A trust

15   instruction proceeding in New York would have been brought as a

16   special proceeding under CPLR article 77.  There is no specific

17   statute of limitations for trust instruction proceedings under

18   the article 2 of the CPLR, the governing statutes of

19   limitations.  A six-year statute of limitations is provided for

20   action based on contracts or actions for which no other

21   limitation is specifically prescribed by law.  That's CPLR 213.

22               New York statute of limitations begins to run when the

23   causes of action accrues, and that's provided by CPLR section

24   203(a).  A cause of action accrues when a party can first bring

25   suit.  That occurred when there was something real about the

1    allocation, not something far off in the future, and it makes

2    the action current when it was brought.

3         I, therefore, hold that the proceedings timely under

4    both New York and Minnesota law.  I deny the motion to dismiss

5    based on statutes of limitations.

6         There are various equitable defenses that Semper

7    advances.  None of them has merit.  There was no laches.  There

8    was no delay in bringing the lawsuit.  There was a period of

9    time where Wells Fargo considered the possibility of amendment

10   and thought through what it could do, but there was no

11   prejudice to anyone's interest.  If Semper wanted to get out or

12   if Scepter wanted to get out of its investment, it could have

13   done so at a profit, maybe not full profit that it would have

14   liked, but a profit.  And there was no laches.

15        There was no equitable estoppel because there was no

16   assertion of a position, which the party had to reverse.  It's

17   true that the trustee proceeded under the indenture, rather

18   than the conflicting disclosure statements in the offering

19   documents, but when the contradiction was pointed out to it,

20   the trustee ultimately was asked to resolve the issue, could

21   not resolve the issue and brought the lawsuit.  That does not

22   make out an estoppel.

23        And there was no unclean hands nor unjust enrichment.

24   Both parties, Scepter and Semper, bought on their own analyses

25   of the upside and the downside of the various interpretations

E7BPTRU2                       Decision

1    and took the risk of what occurred.

2            As I indicated before, these documents are

3    contradictory.  It's clear to me that the intent manifested by

4    the indenture could not have been the intent of the parties.

5    If it had been the intent of the parties, materially different

6    from the intent that was displayed in the offering documents

7    distributed to the public, it would have required an amendment

8    that would be publicly disclosed presumably in the supplement

9    to the prospectus.

10           The fact that there was no change in the supplement

11   prospectus indicates that the parties contemplated the intent

12   disclosed in the offering documents was the operative intent.

13   Without an amendment to conform to the indenture, assuming that

14   the indenture accurately reflected the intent of the parties,

15   there would have been a material misrepresentation of fact in

16   violation of section 10b of the Securities Exchange Act and

17   like provisions of the Trust Indenture Act.

18           Only if one proceeds in the realization that there was

19   a scrivener's error with regard to the trust indenture, does

20   this case make sense, and that is consistent with the

21   nomenclature, with the coupons, with the way that security is

22   enhanced and all other features of these notes.

23           I construe the suite of documents that has been used,

24   not just the trust indenture, and I hold that the trust

25   indenture must be reformed so that the intent it describes is

E7BPTRU2                      Decision

1     consistent with the intent of the parties in creating this

2     suite of documents that was disclosed to the public and that no

3     one is hurt by this because all investors were aware of the

4     discrepancy.

5           Semper argues that a decision of the United States

6     District Court for the Central District of California holds

7     that investors who rely on an indenture, standing alone, cannot

8     be disturbed from their reasonable expectations.  The case is

9     *Citigroup Global Markets, Inc. v. Impac Secured Assets Corp.*,

10    11 Civ. 4514 (C.D. Cal. May 3, 2012).

11          That case was an action of the Federal Securities Law.

12    Plaintiff had bought securities based on its reading of a

13    publicly filed pooling and services agreement or trust

14    indenture.  The problem was that the defendant had publicly

15    filed an inaccurate version of the pooling and services

16    agreement.  As a defense to an action against it, the defendant

17    argued that it was unreasonable for the plaintiff to have

18    relied on an inaccurate version of the PSA because the offering

19    documents gave different information.

20          The court rejected this argument, concluding that it

21    was irrelevant under the Federal Securities Law whether the

22    plaintiffs' reliance on the incorrect PSA was reasonable.  The

23    court stated that, in any event, the plaintiffs' reliance on an

24    incorrect PSA was reasonable, even though the PSA conflicted

25    with the offering documents, it superseded.  The court stated

1   that the differences between a PSA and a prospectus supplement

2   are not conflicts because the document are clear that any such

3   differences redound in favor of the PSA.  And there is a

4   similar clause in the prospectus in this case.

5          But even assuming that the California court was

6   correct in its interpretation of the securities laws, and even

7   assuming that it also expressed New York law, Semper's argument

8   about articulating a rule describing how a suite of documents

9   should be construed is not something I would follow.  The

10  purpose of reformation in connection with a suite of documents

11  is to create or cause consistency to override inconsistency.

12         It's not tolerable in a disclosure regime for

13  important disclosure documents, like prospectuses and term

14  sheets and private placement memoranda, to be inconsistent with

15  even a fundamental contract like an indenture.  If an indenture

16  overrode that which was disclosed to the public, as I pointed

17  out before, a material undisclosed change is made in the

18  offering documents, creating the opportunity for discrepancy

19  among buyers, favoring some and prejudicing others.  The basis

20  of the security laws is to create consistency, so that all

21  investors are on an equal footing.

22         If Citigroup Global Markets is interpreted to allow

23  inconsistencies of this nature, other than the special point of

24  reliance in terms of a defendant, it creates the potential for

25  inequality and creates potential for liability where there

E7BPTRU2                       Decision

1    should be none.

2           We did not have a case where reasonable expectations

3    of a good-faith purchase of a value has to be protected.  As I

4    held, Peresechensky was aware of the risks, depending on the

5    interpretation to be favored either of the indenture or of the

6    offering documents.  He made an investment decision based on

7    his analysis of upside and downside.

8           Neither am I persuaded that another investor might be

9    favored and another investor lose out.  What I have to do is

10   the right thing, and that is to create a consistency with a

11   clear intent, clear intent to have consistency.

12          Accordingly, the trustee is instructed to apply loss

13   allocation as disclosed in the term sheet, the prospectus and

14   the private offering memorandum.  The indenture will be

15   reformed to carry out the change that should have been made at

16   1:11 a.m. on January 21, I think, 2005, and thereby create

17   consistency among all the operating documents.

18          These expressions are not final.  The final version

19   will be that which is filed, presumably, this week.

20          Now, I note that there are various counterclaims and

21   cross-claims, which for the purpose of obtaining a speedy

22   resolution that was needed in this case, we left for another

23   date.  I have a strong feeling that the decision I delivered

24   today, and which will be solidified with the final papers to be

25   filed later, will make these counterclaims and cross-claims

1   academic.

2          I think the parties probably need finality because one

3   or the other might wish to appeal.  They won't be able to

4   appeal as long as the counterclaims and cross-claims are here.

5   So I'm wondering how we should proceed.  Mr. Rollin?  If you

6   haven't thought about it and want time to think about it, I

7   wouldn't mind that.

8          MR. ROLLIN:  No, I think that's right, your Honor.  I

9   think we need some time to think about it, particularly after

10  we see your Honor's final rulings and any post-judgment

11  considerations we may have.

12         THE COURT:  What's your time pressure, Mr. Johnson?

13         MR. JOHNSON:  Your Honor, we do not yet know how this

14  month is turning out, but we suspect that the losses will not

15  hit these classes this month.  It is possible they will hit in

16  August.  So, you know, ideally, we would like to have

17  resolution of this within the next 30 days.

18         THE COURT:  I can do that.  So what I will do is when

19  I issue the findings and conclusions, I have a last paragraph

20  called first status conference, and at that time, we'll figure

21  out how we approach the rest of the case.  And that status

22  conference will be a week or so after the decision.  Will that

23  be satisfactory?

24         MR. ROLLIN:  Yes, your Honor.

25         THE COURT:  Have I missed anything?  Do I need to make

E7BPTRU2                          Decision

1   any more rulings?  I want to thank you again for an excellently

2   presented case.

3            MR. PICKHARDT:  Thank you, your Honor.

4            MR. ROLLIN:  Thank you, your Honor.

5            MR. JOHNSON:  Thank you, your Honor.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25