USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/24/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                      :

In the Matter of the Trusteeship Created by    :
American Home Mortgage Investment Trust 2005-   :
2, relating to the issuance of Mortgage-Backed   :
Notes pursuant to an Indenture dated as of October   :
1, 2007                                     :
                                      :
---------------------------------------------------------- X

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

14 Civ. 2494 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Petitioner Wells Fargo Bank, N.A. ("Wells Fargo") brought this case, under Minnesota law, as the securities administrator for a trust, to request instructions as to the interpretation of the governing trust instrument. Two parties have intervened, each affected in opposite ways by the possible interpretations, Sceptre, LLC's ("Sceptre") and Semper Capital Management, L.P.'s ("Semper"). Sceptre also filed an affirmative claim to income from the trust. And Semper also alleged counterclaims against Wells Fargo and cross-claims against Sceptre. With the consent of the parties, I ordered Wells Fargo's complaint for instructions and Sceptre's affirmative claim be severed for early trial. I conduct a trial, by the court without a jury, on July 7, 8 and 9, 2014. My findings of fact, conclusions of law, and instructions to Wells Fargo follow, supplanting those I delivered extemporaneously as a précis and summary at the conclusion of the evidence.

## FINDINGS OF FACT

1.      In June 2005, American Home Mortgage Investment Trust, 2005-2 (the "Trust") issued a series of Notes, with an aggregate face value of $5.8 billion, secured by residential home mortgage loans.

1

2.     The Notes were divided into 26 classes, with different classes having different
       rates of interest and different rights to priorities of payment arising from the home
       mortgage loans.

3.     The following classes of Notes were publicly offered: Class I-A-1, Class I-A-2,
       Class I-A-3, Class II-A-1, Class II-A-2, Class II-A-3, Class III-A, Class IV-A-1,
       Class IV-A-2, Class IV-A-3, Class V-A-1, Class V-A-2, Class V-A-3, Class V-A-
       4-A, Class V-A-4-B, Class V-A-4-C, Class V-A-4-D, Class VI-A, Class M-1,
       Class M-2, Class M-3, Class M-4, Class M-5, Class V-M-1, Class V-M-2, Class
       V-M-3, and Class V-M-4. The following classes were not publicly offered: Class
       V-M-5, Class B, Class V-B, Class N-1, and Class N-2.

4.     In the event that the home mortgages failed to generate sufficient income to
       enable the Trust to make the payments due to the classes of Notes, the underlying
       documents provided for the allocation of losses to certain classes before others, in
       a waterfall effect. In other words, if the Trust was unable to make all of its
       promised interest and principal payments, the Holders of "junior" Notes would
       stop receiving payments before the payments to the Holders of more "senior"
       Notes are reduced. The sequence of allocations established the seniority of the
       different classes of Notes.

5.     Among the Notes issued by the Trust were Class I-A-1 Notes, Class I-A-2 Notes,
       and Class I-A-3 Notes.

6.     The Indenture Agreement (the "Indenture"), between American Home Mortgage
       Investment Trust 2005-2, as Issuer, Wells Fargo, as Securities Administrator, and
       Deutsche Bank National Trust Company as Indenture Trustee, dated June 22,

2

2005, which governed the allocation of payments to the Noteholders, allocates losses to I-A-2 Notes, and then to I-A-3 Notes. It provides as follows: "to the extent such Realized Losses are incurred in respect of the Group I Loans, [they are allocated] to the Class I-A-2 Notes and Class I-A-3 Notes, in that order." Indenture § 3.38(a) (*ninth*)." The term Realized Losses is defined by the Indenture.

7.    While § 3.38 of the Indenture provided that losses should be allocated first to the Class 1-A-2 Notes and then to the Class 1-A-3 Notes, the documents by which the Notes were marketed provided that losses should be allocated first to the Class 1-A-3 Notes and then to the Class 1-A-2 Notes.

8.    Because of this inconsistency in the suite of document underlying the Trust, Wells Fargo has, in this trust instruction proceeding, requested instructions as to how losses should be allocated between the holders of the Class I-A-2 Notes and the Class I-A-3 Notes.

## The Parties

9.    The petitioner in this action is Wells Fargo, a national banking association with its main office in South Dakota. Wells Fargo filed this petition in its capacity as Securities Administrator for the Trust. As Securities Administrator, Wells Fargo performs certain administrative duties with respect to the Notes. It is responsible for preparing distribution statements and tax information for Noteholders, and preparing tax and Securities and Exchange Commission ("SEC") filings for the Trust. Thus Wells Fargo is responsible for organizing payments to Noteholders

3

and allocating losses to different classes of Notes. Wells Fargo performs these duties on behalf of the Indenture Trustee and Owner Trustee.

10.     Sceptre, a limited liability company organized under Delaware law, with its principal place of business in New York, has intervened in this action as a party in interest. Sceptre is a holder of Class I-A-2 Notes.

11.     Semper, a limited partnership, with its principal place of business in New York, has intervened in this action as a party in interest. Semper is Investment Manager for Semper MIDAS Fund, L.P., which is a holder of Class I-A-3 Notes.

**The Deal Documents**

12.     The Trust and the Notes were created by a suite of documents: a Private Offering Memorandum; a Prospectus Supplement dated June 20, 2005 (the "Prospectus"); a Term Sheet dated June 13, 2005; and an Indenture Agreement dated June 22, 2005 (together, the "Deal Documents").

13.     The Private Offering Memorandum, the Prospectus and the Term Sheet (together, the "Offering Documents") were intended to provide full disclosure in marketing the Notes to potential investors, in accordance with the federal securities laws.

14.     The Indenture governed the Trust and accordingly described the terms under which the Trust would make payments to Note Holders.

15.     The Offering Documents were inconsistent with the Indenture a material respect. While § 3.38 of the Indenture provided that losses should be allocated first to the Class 1-A-2 Notes and then to the Class 1-A-3 Notes, the Prospectus and Term Sheet provided that losses should be allocated first to the Class 1-A-3 Notes and then to the Class 1-A-2 Notes.

4

## Drafting History

16.     The Offering Documents were drafted and finalized first.  When these documents were finalized, they were supposed to reflect the contracting parties' understanding as to the nature of the deal pursuant to which the Notes were being offered.  The Term Sheet was finalized on June 13, 2005 and the Prospectus, on June 20, 2005.

17.     After the Offering Documents were finalized and distributed to potential investors, the contracting parties then prepared the Indenture.  The Indenture was drafted to conform to the Offering Documents.

18.     The draft and final versions of the Offering Documents consistently provided that losses would be attributed to the Class I-A-3 Notes first, and then to the Class I-A-2 Notes.

19.     Each of the initial drafts of the Offering Documents that were circulated between the contracting parties and their attorneys used the following language to provide for that distribution: "[Realized losses will be allocated] to the Class I-A-2 Notes and Class I-A-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; *provided, however, that any Realized Losses allocated to the Class I-A-2 Notes and the Class I-A-3 Notes shall be allocated first, to the Class I-A-3 Notes, and second to the Class I-A-2 Notes.*"

20.     During the drafting process, the language in the Offering Documents conveying this proposition was made more concise, to provide as follows:  "[Realized losses will be allocated] to the Class I-A-3 Notes and Class I-A-2 Notes, in that order, in reduction of the Note Principal Balance thereof, until reduced to zero."  The

5

proviso clause was eliminated; the direct statement had made it redundant.  The

change was stylistic and did not change the substance.

21.    The mechanic of the change is shown in the blacklined draft of the Prospectus

circulated at 10:32pm on June 17, 2005:

> Any Realized Losses on the mortgage loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV will be allocated or covered on any payment date as follows: first, to the related Net Monthly Excess Cashflow, by an increase in the related Overcollateralization Increase Amount for that payment date; second, in reduction of the related Overcollateralized Amount, until reduced to zero (meaning, no losses will be allocated to the Class B Notes or Class M Notes until the aggregate Note Principal Balance of the Class I-A, Class II-A, Class III-A and Class IV-A, Class M and Class B Notes equals the aggregate Stated Principal Balance of the Mortgage Loans in Loan Group I, Loan Group II-C, Loan Group II-NC, Loan Group III and Loan Group IV); third, to the Class B Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fourth, to the Class M-5 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; fifth, to the Class M-4 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; sixth, to the Class M-3 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; seventh, to the Class M-2 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; eighth, to the Class M-1 Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; and ninth, (x) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group I, to the Class I-A-2 3 Notes and Class I-A-3 2 Notes, in that order, in reduction of the Note Principal Balance thereof, until reduced to zero; provided, however, that any Realized Losses allocated to the Class I-A-2 Notes and Class I-A-3 Notes shall be allocated first, to the Class I-A-3 Notes, and second, to the Class I-A-2 Notes and (y) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group IV, to the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-3 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes, in reduction of the Note Principal Balance thereof, until reduced to zero.

**Exhibit TX 210 at 91.**

22.    The revised language was used in the final versions of the Offering Documents,

and distributed to all those involved in the drafting process, for comments.

23.    The initial drafts of the Indenture conformed with the initial drafts of the Offering

Documents in providing that losses would be allocated first to the Class I-A-3

Notes and then to the Class I-A-2 Notes using the same language as in the initial

drafts of the Term Sheet and the Prospectus: "[Realized losses will be allocated]

to the Class I-A-2 Notes and Class I-A-3 Notes, in reduction of the Note Principal

Balance thereof, until reduced to zero; *provided, however, that any Realized*

*Losses allocated to the Class I-A-2 Notes and the Class I-A-3 Notes shall be allocated first, to the Class I-A-3 Notes, and second to the Class I-A-2 Notes.*"

24.    The changes in the draft of the Prospectus made at 10:32 pm on June 17, 2005 were intended to be made as well in the Indenture in order that all the operative documents would conform, one to the others. A draft of the Indenture, intended to conform to the Prospectus and Term Sheet, was prepared at 1:11am on the morning of June 22, 2005 by an attorney from the law firm of Thacher Proffitt & Wood, LLP, containing this stylistic change.  However, the new draft contained a typographical error.

25.    The draft made the following change:

> Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; and *ninth*, (i) to the extent such Realized Losses are incurred in respect of the Group 1 Loans, to the Class I-A-2 Notes and Class I-A-3 Notes, in that order, in reduction of the Note Principal Balance thereof and (ii) to the extent such Realized Losses are incurred in respect of the mortgage loans in Loan Group IV, to the Class IV-A-3 Notes, to the extent of a fraction of such loss equal to (x) the aggregate Note Balance of the Class IV-A-2 Notes and Class IV-A-3 Notes divided by (y) the aggregate Note Principal Balance of all of the Class IV-A Notes, in reduction of the Note Principal Balance thereof, until reduced to zero; provided, however, that any Realized Losses allocated to the Class I-A-2 Notes and the Class I-A-3 Notes shall be allocated first, to the Class I-A-3 Notes, and second, to the Class I-A-2 Notes.

**Exhibit TX 214 at 74**.

26.    The Thacher Proffitt attorney made three of the four changes made in the Prospectus. He inserted the phrase "in that order," and he deleted the proviso clause, but he failed to cross out the "2" in "Class I-A-2" and make it a "3", and he failed to cross out the "3" in "Class I-A-3" and make it a "2." The error was not noticed by the participants in the drafting process, and the error in conforming the Indenture became fixed in the final version of the Indenture.

7

27.     There was no evidence of any intention to change the sequence of allocating

losses. Had there been such an intention, the parties would have known that they

were required by the federal securities laws to disclose the changed intent in a

supplement to the Prospectus and in all other disclosure documents filed with the

SEC.

28.     The portion of the Prospectus purporting to summarize the Indenture's terms

contained the following provision referring readers to the Indenture: "The

following summary describes the terms of the Indenture. The summary does not

purport to be complete and is subject to, and qualified in its entirety by reference

to, the provisions of the Trust Agreement and Indenture." **Exhibit TX-1 at 136**.

## The Structure of the Transaction

29.     The structure of the transaction suggests that the allocation of losses was intended

to be as described in the Term Sheet and the Prospectus, and not as in the

Indenture.

30.     **Nomenclature.** The Indenture consistently refers to a lower numbered note as

senior to a higher number note in respect of loss allocations. (A note is senior, all

other things being equal, when loss allocations are applied first to more junior

notes.) Thus, Class M-1 Notes are senior to Class M-2 Notes, which are senior to

Class M-3 Notes. Similarly, Class II-A-1 Notes are senior to Class II-A-2 Notes,

which are senior to Class II-A-3 Notes. All classes of notes follow this sequence

of seniority. Only the Class I-A-1, Class I-A-2, and Class I-A-3 Notes, and only

in the Indentures, provide for different seniority. And, in the case of Class I-A

8

Notes, the sequence provided by the Indenture with respect to seniority is asymmetrical, viz., Class I-A-1, Class I-A-3, Class I-A-2.

31.  **Interest Rates.** All other things being equal, interest rates are higher for more junior securities, and lower for more senior securities, reflecting that losses are more likely to be incurred in junior securities. The Class I-A-2 Notes were assigned a lower interest rate than the Class I-A-3 Notes (LIBOR[1] plus 0.350% interest compared with LIBOR plus 0.380%), suggesting that the Class I-A-3 Notes were intended to be junior to the Class I-A-2 Notes. The interest rate differentials reflect the sequence of loss allocations provided by the Prospectus and the early drafts of the Indenture, but not the sequence of loss allocations provided by the final version of the Indenture.

32.  **Credit Enhancement in the Term Sheet**. The final Term Sheet describes the Credit Enhancement of each set of notes. This number reflects the percentage of the total value of the transaction that must suffer losses before those notes will suffer losses. The higher the Credit Enhancement, the more senior is the note. The final Term Sheet gave the Class I-A-2 Notes a Credit Enhancement of 17.55%, and 7.55% for the Class I-A-3 Notes, consistent with the Prospectus, but contradicted by the final version of the Indenture.

**The Inconsistency between the Indenture and the Offering Documents is Discovered**

33.  The inconsistency between the Indenture and the Offering Documents regarding the allocation of losses between the Class I-A-2 Notes and the Class I-A-3 Notes

---

[1]      The London Interbank Offered Rate.

was first publicly disclosed on August 23, 2010 by a press release released by Moody's.

34.    The press release included the following statement:

> "... Moody's has corrected the ratings of 2 tranches [from American Home Mortgage Investment Trust 2005-2]: Class I-A-2 and I-A-3. Previously, Moody's calculated loss allocation to these tranches based on the [Prospectus], which states that when the subordinate certificates are depleted, realized losses in respect of the mortgage loans in Loan Group I will be allocated to the Class I-A-3 and I-A-2 in that order. However, per the Pooling and Servicing agreement (PSA) [*i.e.*, the Indenture], the realized losses in Loan Group I will be allocated first to I-A-2 and I-A-3. The Trustee has confirmed that they will be following the PSA. As such our ratings have been adjusted to reflect the loss allocation rules described in the PSA. As a result, Class I-A-2 has a lower rating than I-A-3 reflecting the lower levels of enhancements."

35.    Following the press release, several investors contacted Wells Fargo regarding the discrepancy.

36.    In August 2011, Intex, another company providing services to investors, notified its customers that there was a conflict between the Offering Documents and the Indenture. Intex provided a modeling capability to its customers, enabling then to analyze cash flows according to both the provisions in the Offering Documents, and those in the Indenture. This enabled risk evaluations of investments in either or both the Class I-A-2 and the Class I-A-3 Notes.

10

### Investors in the Class I-A-2 and Class I-A-3 Notes

37.    All investors in the Class I-A-2 Notes and the Class I-A-3 Notes either bought the
       Notes before the discrepancy between the Indenture and the Offering Documents
       was discovered in August 2010, or after.

38.    The Prospectus indicated that Class I-A-3 Notes were junior to Class I-A-2 Notes.
       Thus, according to the Prospectus, those who purchased the Class I-A-2 Notes
       before August 2010 reasonably expected their Notes to be treated as senior; those
       who purchased Class I-A-3 Notes reasonably expected their Notes to be treated as
       junior.

39.    Those who purchased Notes after August 2010, when the market became aware of
       the discrepancy, in the exercise of due diligence, should have been aware of the
       discrepancy between the Indenture and the Offering Documents and the
       concomitant uncertainty over the seniority of the Notes. Accordingly, anyone
       who purchased Notes after August 2010 was, in part, speculating on their priority.

40.    As discussed below, Semper and Sceptre both were aware of the inconsistency.

### Och-Ziff Capital Buys Class I-A-2 Notes and Transfers Them to Sceptre

41.    In January 2012, Och-Ziff Capital ("Och-Ziff") bought $50 million original face
       value Class I-A-2 Notes from Credit Agricole at 23.4006% of their face value.

42.    Och-Ziff was aware of the discrepancy between the Indenture and the Offering
       Documents when it made this purchase. It took this discrepancy into account
       when it made its decision, since it considered both the value of the Class I-A-2
       Notes if they were considered senior to the Class I-A-3 Notes and their value if

11

they were considered junior, thus creating an upside value to their investments
and a downside value. After considering the price of the Notes, the risks, the
upside and the downside, Och-Ziff determined that the Notes it purchased were a
good investment.

43.     In December 2013, Och-Ziff bought more Class I-A-2 Notes, with a face value
        of $20,000,000 at 42.4688% of their face value.

44.     In March 2014, Och-Ziff bought more Class I-A-2 Notes, with a face value of
        $1,000,000 at 44.4688% of their face value.

45.     In June 2013, Och-Ziff created Sceptre as a special purpose vehicle to hold its
        Notes. The ultimate beneficiaries of the Notes held by Sceptre are investors in
        Och-Ziff.

### Semper Buys Class I-A-3 Notes

46.     In late September or early October 2012, Semper bought $26 million original face
        value Class I-A-3 Notes from Nomura Securities.

47.     Semper's trader responsible for the deal, Boris Peresechensky, testified that on
        September 27, 2012 he submitted his bid for the Class I-A-3 Notes. He claims
        that at that time he was not aware of the discrepancy between the Indenture and
        the Offering Documents. He acknowledged, however, that he had noticed a
        "nomenclature abnormality" as to the relativity priority of Class I-A-3 and Class
        I-A-2 Notes. He testified that before submitting his bid he reviewed the Indenture
        and related market data, and concluded that the Class I-A-3 Notes were senior to
        the Class I-A-2 Notes.

12

48.   Peresechensky's awareness of a "nomenclature abnormality" indicates that he was
aware of the uncertainty in priority, between Class I-A-2 and 3 Notes. His
decision to purchase the Class I-A-3 Notes reflected his bet that the Class I-A-3
Notes would be treated as senior to the Class I-A-2 Notes.

49.   Semper's bid on the Class I-A-3 Notes at a price of 47.25% of face value was
accepted the same day it was made, September 27, 2012.

50.   Peresechensky testified that on September 28, 2012—the day after his bid on
behalf of Semper had been accepted but before it was settled—he learned from
another trader, Ali Haghighat, about the inconsistency between the Deal
Documents regarding the priority of the Class I-A-2 and 3 Notes.

51.   Peresechensky had attempted to flip the Class I-A-3 Notes to Haghighat on
September 28, 2012. Haghighat agreed to buy the notes at 49.50% of face value,
a higher price than the 47.25% that Semper had paid for them. But ten minutes
later, Haghighat retracted his bid because, as he termed it, a "problem" existed
with the Class I-A-3 Notes. Haghighat told Peresechensky that the Class I-A-3
Notes were junior to the Class I-A-2 Notes and sent Peresechensky some
language reflecting the discrepancy between the Indenture and the Prospectus.

52.   Peresechensky allowed Haghighat to back out of the deal. Peresechensky claims
that the deal had not been finalized and that he allowed Haghighat to back out
because of their ongoing business relationship.

53.   Peresechensky did not try to back out of Semper's purchase of the Notes from
Nomura Securities, claiming that there was less opportunity to retract because a
day had passed. Semper's bid on the Notes became final on October 1, 2012.

13

54.    Semper's decision to invest, and to remain invested, in the Class I-A-3 Notes was
       based on an evaluation of what the value of would be if those Notes were treated
       as senior and what their value would be if they were treated as junior.  After
       considering the upside and the downside, Semper made a knowing decision,
       based on the advantages and disadvantages of the Notes, to take a long position
       on the Class I-A-3 Notes.

55.    Semper does not hold a majority of the Class I-A-3 Notes.

**Wells Fargo's Communications with Noteholders and Consent Solicitation**

56.    In 2011, before either Semper or Sceptre had bought any Notes, Wells Fargo
       received communications from holders of Class I-A-2 Notes, requesting that
       Wells Fargo allocate losses according to the terms of the Offering Documents
       instead of the Indenture.

57.    On May 2, 2011, Wells Fargo wrote to one holder of Class I-A-2 Notes to explain
       its position.  Wells Fargo stated that "[a]bsent an amendment to the Indenture," it
       would "allocate Realized Losses to the Class 1-A-2 and Class 1-A-3 Notes in the
       manner currently set forth in the Indenture," and that it could not amend the
       Indenture without the consent of all affected Noteholders.  Wells Fargo also
       advised the Noteholder that it would have to be indemnified for the costs of a
       solicitation if it were to undertake a solicitation.

58.    Wells Fargo's statements regarding the procedure for amending the Indenture
       were a reference to the following sections of the Indenture.

59.    Section 5.07 of the Indenture provides:

14

"Notwithstanding any other provisions in this Indenture, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder."

60.    Section 9.01 provides that the Indenture may be modified, by a Supplemental Indenture, without the consent of Holders, to cure ambiguities and inconsistencies. Specifically, Section 9.01(a)(v) provides that the Indenture may be modified "to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture."

61.    Section 9.02, however, requires the consent of Holders substantively affected by a modification or supplementation of the Indenture. Specifically, section 9.02 provides "that no such supplemental indenture shall, without the consent of the Holder of each Note affected thereby: . . . (vi) modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation)."

62.    On October 3, 2012, Semper[2] contacted Wells Fargo by e-mail to confirm that Wells Fargo would adhere to the loss allocation priority set forth in the Indenture.

---

[2]    At the time, Semper was known as UCM Partners, LP.

63. By e-mail dated October 4, 2012, Wells Fargo advised that that it would follow the terms in the Indenture absent an amendment, and that an amendment required the consent of 100% of the Class I-A-3 Noteholders.

64. In or around February 2013, Och-Ziff and Sceptre communicated with Wells Fargo and requested that Wells Fargo allocate losses to the Class I-A-3 Noteholders before allocating them to the Class I-A-2 Noteholders.

65. On May 10, 2013, Wells Fargo sent a solicitation to the Class I-A-2 and Class I-A-3 Noteholders for an amendment of the Indenture by consent, pursuant to Indenture § 9.02. Wells Fargo did not require that Och-Ziff, Sceptre, or any other Noteholder pay the costs associated with the solicitation.

66. In its May 10, 2013 solicitation notice, Wells Fargo stated that: "If the consent of 100% of the Class I-A-2 and Class I-A-3 Noteholders is not received, [Wells Fargo and certain other entities] reserve the right (but assume no obligation) to take further action to resolve the inconsistency between the Indenture and the [Prospectus], including legal action."

67. On May 23, 2013, Semper sent to Wells Fargo a letter objecting to the consent solicitation and requesting that Wells Fargo reconfirm that losses would be allocated first to the Class I-A-2 Notes and then to the Class I-A-3 Notes. The letter stated that Semper would vigorously oppose any attempt to "unilaterally or judicially amend the Indenture in any way that would change the order of allocating Realized Losses or otherwise adversely affect the value of the Class [I-A-]3 Notes." The letter also threatened that Semper would take legal action if the matter is not resolved quickly.

16

68.    Because Semper did not consent, the Indenture was not amended.

69.    On May 31, 2013, Wells Fargo sent Semper a letter in response to Semper's May

       23, 2013 letter. Wells Fargo's letter stated that its Notice did not state that Wells

       Fargo or other entities "*will definitely* take legal action to resolve the

       inconsistency between the Indenture and the [Prospectus]. On the contrary, it

       says that such parties *reserve their rights* to take legal action. A reader should

       neither interpret such statement as an indication that legal action will definitely be

       commenced nor as an indication that legal action will not be commenced. It is

       simply a reservation of rights." (Emphasis in original.)

70.    Semper had an opportunity to and did not sell its Class I-A-3 Notes after learning

       of Wells Fargo's reservation of rights.

## Wells Fargo's Trust Instruction Proceeding

71.    On January 17, 2014, Wells Fargo filed a petition in Minnesota District Court,

       Fourth Judicial District, Hennepin County, for an order instructing it as to the

       allocation of losses between Class I-A-2 and Class I-A-3 Noteholders. See Minn.

       Stat. § 501B.16 *et seq.* It filed suit in the Fourth Judicial District because it

       administered the Trust from its office in that District.

72.    Prior to the filing of the petition, the flow of income from the pool of mortgages

       held by the Trust had covered all principal and interest due to Classes I-A-2 and 3,

       without need to allocate losses, or shortfalls, between these classes. Wells Fargo

       determined, however, that shortfalls in principal and interest likely would arise by

       the spring or summer of 2014 and that the loses, or deficiencies in principal and

17

losses, would have to be allocated between Class I-A-2 and Class I-A-3 Noteholders.

73. Sceptre intervened and removed the case to the United States District Court for the District of Minnesota, invoking, *inter alia*, the court's diversity jurisdiction.

74. Semper also intervened.

75. Semper, Sceptre and Wells Fargo stipulated, and the U.S. District Court ordered, that the case be transferred to the United States District Court for the Southern District of New York.

76. Wells Fargo sent Notices concerning the trust instruction proceeding to all Noteholders, on or about January 27, 2014, February 20, 2014, March 14, 2014, and April 9, 2014.

## CONCLUSIONS OF LAW

77. This trial involves the following claims and issues: Wells Fargo, without adopting a substantive position, petitions for judicial instructions as to how the Indenture should be interpreted and if it should be reformed. Semper argues that the proceeding is improper and that the Indenture cannot be reformed. Alternatively, and as a party-in-interest, Semper suggested instructions that it urged the Court to adopt. Sceptre, also as a party-in-interest, suggested its own set of instructions that it argued the Court should give to Wells Fargo, and claimed its right to receive full payments from the Trust. Semper opposed Sceptre's claim.

18

78.   In a trust instruction proceeding, the court represents the interests of all parties,
      including those who are not represented and who may be unascertained. *See*
      Minn. Stat. §§ 501B.19, 501B.21.

## Jurisdiction

79.   The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332.
      As discussed in my Order finding that Sceptre established jurisdiction, there was
      complete diversity of citizenship when Sceptre removed the case to the United
      States District Court for the District of Minnesota. *See* Dkt. No. 48 (May 13,
      2014) (Order finding that Sceptre, LLC established subject matter jurisdiction).

80.   Section 1332(a) "gives federal district courts original jurisdiction of all civil
      actions 'between ... citizens of different States' where the amount in controversy
      exceeds $75,000." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005) (quoting
      28 U.S.C. § 1332(a)(1)).

81.   "Diversity jurisdiction is determined at the time of removal." *Philip v. Deutsche
      Bank Nat. Trust Co.*, 11 CIV. 8960 PGG, 2012 WL 2354242, at *2 (S.D.N.Y.
      June 20, 2012).

82.   When Wells Fargo commenced its trust instruction proceeding it was the only
      party to the proceeding and it had no adverse party.

83.   However, Sceptre then intervened, transforming the case into an adversary action,
      and removed the case to federal court. At that time, Sceptre and Wells Fargo
      were the only parties in the case. Since Sceptre and Wells Fargo had different
      legal interests, they were considered opposing parties for diversity purposes. *See
      Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 743 F. Supp. 2d 117, 121 (E.D.N.Y.

19

2010) ("[I]t is the duty of the Court to look beyond the pleadings, and arrange the
parties according to their sides in the dispute.").

84.   Sceptre and Wells Fargo are citizens of different states. Wells Fargo, as a
      national banking association, having its main office in South Dakota, is a citizen
      of South Dakota for diversity purposes.[3] Sceptre is a limited liability company,
      and "an LLC is a citizen of all the states where its members are citizens."
      *Colorado Energy Mgmt., LLC v. Lea Power Partners, LLC*, 12 CIV. 0528 TPG,
      2012 WL 760192, at *1 (S.D.N.Y. Mar. 8, 2012). Sceptre has submitted an
      affidavit stating that none of its members is a citizen of South Dakota.

85.   The amount in controversy requirement is met here since this action will resolve
      the distribution of approximately $30 million.

## Choice of Law

86.   When a case has been transferred from one district court to another – here, from
      the United States District Court for the District of Minnesota to the United States
      District Court for the Southern District of New York – the transferee court applies
      the choice of law rules of the transferor court. *See Gary Friedrich Enterprises,
      LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013); *Van Dusen v.
      Barrack*, 376 U.S. 612, 639 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516, 531
      (1990). Thus, this Court must apply the choice of law rules that would be applied

---

[3]      In *World Trade Ctr. Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 161 (2d
Cir. 2003), the Second Circuit ruled that Wells Fargo was "deemed [by 28 U.S.C. § 1348] to be a
citizen of every state in which it has offices." However, the United States Supreme Court ruled,
in a later decision, that a national banking association is a citizen of "the State designated in its
articles of association as its main office." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006).

by the Minnesota federal court. In a diversity case, the Minnesota federal court applies the choice of law rules of the State of Minnesota. *Varga v. U.S. Bank Nat. Ass'n*, 952 F.Supp.2d 850, 856 n.5 (D. Minn. 2013); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

87.     Under Minnesota choice of law rules, courts must apply Minnesota procedural law, unless some other circumstance requires them not to. *See Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn. 1983).

88.     Under Minnesota choice of law rules, parties may, through a choice of law clause, enter into an agreement providing that a different state's laws will apply to their agreement. *See U.S. Leasing Corp. v. Biba Info. Processing Servs., Inc.,* 436 N.W.2d 823, 826 (Minn. App. 1989); *Midland Funding, LLC v. Schlick*, No. A13–0804, 2013 WL 6223571, at *3 (Minn. App. 2013) (unpublished). Because Minnesota courts operate on the presumption that Minnesota procedural rules will apply, they also presume that choice of law clauses govern only the question of how to interpret a contract, and not procedural issues, unless the choice of law clause expressly states that it applies to procedure. *U.S. Leasing Corp.,* 436 N.W.2d at 826; *Midland Funding, LLC*, 2013 WL 6223571, at *3.

89.     In this case, the Indenture has a choice of law clause, which provides as follows: "THE INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK . . . AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS." Indenture § 10.12.

21

90.     Since the choice of law clause provides for the application of New York

        substantive law, but does not explicitly require the application of New York

        procedural rules, this Court will apply Minnesota procedural law and New York

        substantive law.

### The Nature of the Trust Instruction Proceeding

91.     Trust instruction proceedings are a well-established procedure by which trustees

        (and other affected parties) can seek judicial guidance from the court about how

        to resolve immediate and difficult issues of interpretation of governing

        documents. *Moser v. Darrow*, 341 U.S. 267, 274 (1951).  By giving notice to the

        affected parties, the trustee can ensure that all affected parties receive

        authoritative and binding judicial instruction.  *See* Restatement (Third), Trusts §

        71 (2007) ("A trustee or beneficiary may apply to an appropriate court for

        instructions regarding the administration or distribution of the trust if there is

        reasonable doubt about the powers or duties of the trusteeship or about the proper

        interpretation of the trust provisions.")

92.     In Minnesota, trust instruction proceedings are authorized by statute. *See* Minn.

        Stat. § 501B.16 *et seq.*  But they have their roots in equity. *See Congdon v.*

        *Congdon*, 160 Minn. 343, 355 (1924).

93.     "The petition for instructions gives the court supervisory control over the trustee

        to protect the trustee when the meaning of the trust instrument is in doubt. . . .

        [and] to protect beneficiaries against the trustee's inefficiency, incompetency or

        neglect." *First Trust Co., Inc. v. Union Depot Place Ltd. P'ship*, 476 N.W.2d

        178, 183 (Minn. Ct. App. 1991). "The purpose for such judicial guidance is to

22

protect the trustees under circumstances where, in the opinion of competent lawyers, the meaning of the trust instrument may be in doubt or, as in this case, where there was uncertainty as to the proper application of the law." *In re Warner's Trust*, 275 Minn. 174, 179-80 (1966).

94.    A trust instruction proceeding can be brought by a trustee or any person interested in a trust. *See* Minn. Stat. § 501B.16. Here, Wells Fargo, the Securities Administrator of the Trust, entrusted with the responsibility to allocate losses and to make distributions to the proper noteholders, has a role akin to that of a trustee. It is the proper party to bring this action because it is interested in the Trust's administration and needs judicial instructions.

95.    The party filing the action must provide notice to affected beneficiaries. Minn. Stat. § 501B.18. The affected beneficiaries may then appear as interested parties. Those having notice who do not appear are bound by the Court's determination. Minn. Stat. § 501B.21.

### Semper's Statute of Limitations Defense

96.    Semper has moved to dismiss this action, or the portions of this action requesting reformation, as barred by New York's statute of limitations for actions based on reformation or mistake. *See* CPLR § 213(6); *Porwick v. Fortis Benefits Ins. Co.*, 99 CV 10122 (GBD), 2004 WL 2793186, at *4 (S.D.N.Y. Dec. 6, 2004) (noting that New York's statute of limitations on an action to reform a contract because of a mistake begins to run on the date when a mistake is made, not when it was discovered). Semper has also raised the statute of limitations as an affirmative defense.

97.   Semper's statute of limitations defense is premised on the theory that this action is
      an action for reformation based on mutual mistake.  However, the nature of a trust
      proceeding is a request for instructions.  This is grounded in a court's continuing
      equitable supervision over a trust.  A trust is a continuing document.  If there is an
      error or uncertainty, it cannot be allowed to lurk.  Thus, while a trust instruction
      proceeding may or may not encompass reformation, the applicable statute of
      limitations is determined by the nature of the petitioner's request.  In this case,
      petitioner's request is that of a Securities Administrator acting on behalf of a
      trustee, as to the continuing performance of the Securities Administrator's duties
      under the trust.  Accordingly, trust instruction proceedings are governed by their
      own statutes of limitations.

98.   Under both New York and Minnesota laws, statutes of limitations are procedural.
      *Parkhill v. Minnesota Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 957 n.1 (D. Minn.
      2000), *aff'd*, 286 F.3d 1051 (8th Cir. 2002) ("Statutes of limitations are
      procedural in nature and therefore governed by the law of the forum, Minnesota.")
      (citing *Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn. 1983)); *Tanges v.
      Heidelberg N. Am., Inc.*, 93 N.Y.2d 48, 54 (1999) ("In New York, Statutes of
      Limitation are generally considered procedural[.]").

99.   Since a procedural matter is involved, a Minnesota court, in the first instance,
      would apply its own statute of limitations.

100.  But, Minnesota has a borrowing statute based on the Uniform Conflict of Laws-
      Limitations Act, codified at Minn. Stat. § 541.30 *et seq.*  The borrowing statute
      applies to "claim[s]" which are "substantively based" upon the law of one or more

24

state other than Minnesota.  Minn. Stat. § 541.31 Subdiv. 1(a).  Since the choice

of law clause in the Indenture provides that New York law should apply, the

terms and conditions of the Indenture, including a judicial instruction regarding

such terms and conditions, are governed by New York law.  Wells Fargo's claim

for judicial instruction, therefore, is a claim that is substantively based on the law

of New York State.  However, the issue of borrowing is in doubt.  No Minnesota

judicial decision has ruled on whether the borrowing statutes should apply to a

trust instruction proceeding.

101.    There is no need to decide whether New York's or Minnesota's laws concerning

timeliness apply because Wells Fargo's trust instruction proceeding was timely

under either state's laws.

## A.    Minnesota Does Not Apply A Statute of Limitations to Trust Instruction Proceedings.

102.    Under Minnesota law, statutes of limitations apply only to actions involving the

assertion of claims against an adversary.  The Minnesota code prescribes various

statutes of limitations for different "actions."  *See* Minn. Stat. § 541.01 *et seq.*

The Minnesota Supreme Court has stated that the definition of action used in

those statutes of limitations was an adoption of the common law definition of

action: "the prosecution in a court of justice of some demand or assertion of right

by one person against another."  *Har-Mar, Inc. v. Thorsen & Thorshov, Inc.*, 300

Minn. 149, 153 (1974).

103.    A trust instruction proceeding does not necessarily involve the assertion of claims

against another party.  When Wells Fargo commenced this proceeding, it was the

25

only party to this case and it did not assert a right or claim to anything. This action became an adversary proceeding only when Sceptre intervened as a party-in-interest.

104.    In commencing this action, Wells Fargo has merely asked the Court, through its equitable authority, to direct the future distribution of the Trust's property because of uncertainty in light of the conflicting claims of the Class I-A-2 and Class I-A-3 noteholders. *See Congdon*, 160 Minn. at 355 ("A court of equity has power to direct the execution of an express trust upon request from the trustees for guidance in the performance of their duties.").

105.    No Minnesota court has applied a statute of limitations to a trust instruction proceeding.

106.    Semper argues that in *In re Trusteeship of Trust Created Under Trust Agreement Dated Dec. 31, 1974*, 674 N.W.2d 222 (Minn. Ct. App. 2004) ("*In re 1974 Trust*"), the Minnesota Court of Appeals applied a statute of limitations to a trust instruction proceeding. Semper misreads the case. In *In re 1974*, the court was called on to determine the paternity of children. The Minnesota Parentage Act created a presumption that a husband is the biological father of a child born to his wife, and provides that this presumption can be rebutted only before the child reaches three years of age. The Minnesota Court of Appeals held that the Trust Instruction Proceeding would be governed by this irrebuttable presumption because the children at issue were older than three. The court described this as a statute of limitations on attacking a father's paternity. 674 N.W.2d at 231. But, this statute of limitations is not a general statute of limitations—it is a special

26

procedural rule applicable only to paternity issues, and the special policy issues
relating to issues of paternity. Minnesota's statutes of limitations are located in
Chapter 541 of the Minnesota Statutes, which is captioned "Limitation of Time,
Commencing Actions," whereas the rule regarding when a presumption of
paternity becomes irrebuttable is located in Chapter 257 of the Minnesota
Statutes, which is captioned "Children; Custody, Legitimacy." *See* Minn. Statute
§ 257.57 Subdiv. 2(3). Thus, *In re 1974 Trust*'s application of a rule regarding
when presumptions about paternity become irrebutable does not indicate that
Minnesota courts would apply that special rule to trust instruction proceedings.

107.    There are strong policies supporting Minnesota courts' decision not to apply
        statutes of limitations to trust instruction proceedings.

108.    A trust is a continuing document, under continuing judicial supervision. A trust
        instruction proceeding is a well-established procedure by which trustees can seek
        judicial guidance about how to resolve "difficult questions of judgment." *Moser*,
        341 U.S. at 274. Trust instruction proceedings allow courts to resolve errors
        when they become concrete.

109.    Trustees and related parties may seek judicial guidance only when faced with
        concrete problems that need immediate resolution, such as how to allocate money
        between two groups of beneficiaries. *See* Restatement (Third) of Trusts, § 71,
        Comment (d) ("[A] court [will not] instruct the trustee as to a question that may
        never arise. . . . Thus, a court ordinarily will not instruct a trustee on the
        distribution of trust property before the time arrives for making, or at least
        planning, that distribution."). Imposing a statute of limitations on proceedings for

trust instruction would change the nature of these proceedings, by forcing trustees to file petitions for guidance about hypothetical future issues in order to avoid letting the statute of limitations run.

110. Accordingly, I conclude that Minnesota does not have a statute of limitations applicable to trust instruction proceedings because they are not actions based on the assertion of claims against other parties. *See Har-Mar, Inc.*, 300 Minn. at 153. Should there be unreasonable delay, the doctrine of laches would be available to dismiss such an inappropriate proceeding.

111. In any event, if Minnesota's six-year statute of limitations for actions based on contract were to be applied to this trust instruction proceeding, *See* Minn. Stat. § 541.05, subd. 1(1) (providing a six year statute of limitations for actions on "contracts or other obligation, express or implied"); *see also Sargent v. State Farm Mut. Auto. Ins. Co.*, 486 N.W.2d 14, 16 (Minn. Ct. App. 1992), the action brought by Wells Fargo still would be timely.

112. Under Minnesota law an action generally accrues "at such time as it could be brought in a court of law without dismissal for failure to state a claim." *See Dalton v. Dow Chem. Co.*, 280 Minn. 147, 152-53 (1968).

113. Comment (d) to Section 71 of the Restatement (Third) of Trusts states that:

> Because of concern regarding burdens on the judicial system and unwarranted costs and delays in trust administration, a trustee or beneficiary normally is not entitled to instructions with respect to the administration of a trust unless there is some reasonable doubt about the extent of the trustee's powers or duties or about proper interpretation of the trust provisions. Nor will the court instruct the trustee as to a question that may never arise, or that may arise only in the future, unless some need is shown for current resolution of the matter. **Thus, a court ordinarily will not instruct a trustee on the**

28

> **distribution of trust property before the time arrives for making, or at least planning, that distribution.**

(Emphasis added.) Thus, under the Restatement, a party can begin a trust instruction proceeding only when faced with a concrete dispute about how to distribute property.

114.    In the absence of Minnesota case law on point, I conclude that Minnesota's courts would follow the Restatement's rule as to when suit could be brought, in determining when the cause of action for a trust instruction proceeding can be said to accrue. Restatement (Third) of Trusts § 71 Comment (d) (a party can begin a trust instruction proceeding only when faced with a concrete problem, and when "before the time arrives for making, or at least planning, that distribution.") Thus, Wells Fargo's cause of action did not accrue until it was faced with the prospect of being unable to distribute money due to a class of noteholder and being unable to make such payment because of the need to allocate losses to that class, or to another class of noteholder.

115.    Here, Wells Fargo filed its petition for trust instruction because it anticipated that the Trust will, in the next few months and for the first time, begin to sustain losses that need to be allocated to the holders of either the Class I-A-2 Notes or the holders of the Class I-A-3 Notes. This action could not have been brought until early 2014, when Wells Fargo was faced with that concrete problem.

116.    Accordingly, I find that under Minnesota law Wells Fargo's trust instruction proceeding was timely.

29

**B.      This Proceeding is Timely Under New York's Statute of Limitations.**

117.    I reach a similar result under New York law.  Had the trust instruction proceeding
        been brought in New York, it would have been brought as a special proceeding
        under New York's Civil Procedure Law and Rules ("CPLR") Article 77.

118.    Since the CPLR provides no specific statute of limitations for trust instruction
        proceedings, such actions are governed either by the six-year statute of limitations
        for actions based on contracts, or the six-year statute of limitations where no other
        limitation is specifically prescribed by law.  *See* CPLR § 213 ("The following
        actions must be commenced within six years: (1) an action for which no limitation
        is specifically prescribed by law; (2) an action upon a contractual obligation or
        liability, express or implied, except as provided in section two hundred thirteen-a
        of this article or article 2 of the uniform commercial code or article 36-B of the
        general business law . . .").  *See also* Siegel, N.Y. Prac. § 36 (5th ed.) (2014)
        (noting that the six-year catch-all statute of limitations applies to most actions in
        equity).

119.    However, while the six-year statute of limitations applies, there is no case law
        addressing when a cause of action for a trust instruction proceeding arises.

120.    New York's statutes of limitations begin to run when causes of action accrue.
        CPLR § 203(a) ("The time within which an action must be commenced, except as
        otherwise expressly prescribed, shall be computed from the time the cause of
        action accrued to the time the claim is interposed.").

121.    Generally, a cause of action accrues on the date when a party first can bring suit.
        *See, e.g., Charney v. N. Jersey Trading Corp.*, 172 A.D.2d 390 (1st Dep't 1991)

30

("the limitation period on commencement of a declaratory judgment action should not begin until the right to bring an action for coercive relief accrues"); *Brown v. Brown*, 93 N.Y.S.2d 63, 75 (N.Y. Sup. Ct. 1948) *aff'd as modified*, 275 A.D. 1068 (4th Dep't 1949) *aff'd*, 302 N.Y. 556 (1951) ("it must be clear that the statute of limitations will not begin to run until there is someone capable of suing").

122.   In the absence of New York case law about when a trust instruction proceeding accrues, I conclude that New York courts likely would follow the rule articulated in Comment (d) to Restatement (Third) of Trusts § 71, that "a court ordinarily will not instruct a trustee on the distribution of trust property before the time arrives for making, or at least planning, that distribution."

123.   This conclusion accords with the discussion in Professor David Siegel's treatise on New York Practice concerning the timeliness of special proceedings.

Professor Siegel has written that:

> In most categories of special proceeding, problems of timeliness seldom arise. This is probably because the special proceeding has been primarily designed by the legislature for situations calling for speed and dispatch, and it would be especially perverse for the petitioner—the one who presumably needs the relief quickly—to let it ride for any time at all, much less for a time adequate to raise a limitations' problem.

Siegel, N.Y. Prac. § 548 (5th ed.). Trust instruction proceedings, under Article 77, are exactly this type of special proceeding. They are designed to provide relief to a party administrating a trust who is confronted with a concrete problem about how to distribute property.

124.   As discussed above, Wells Fargo filed its petition soon after it anticipated the need to distribute losses between the two groups of Noteholders. Accordingly, I

31

find that under New York law Wells Fargo's trust instruction proceeding was timely.

## C. Semper's Statute of Limitations Defenses are Rejected

125. Since the trust instruction proceeding is timely under both New York and Minnesota law, I will give guidance to Wells Fargo as to how losses should be distributed under the Indenture. In giving that guidance, I will consider arguments about the interpretation of the Indenture and also equitable arguments about whether it should be reformed. *See* Minn. Stat. § 501B.16 ("A trustee of an express trust by will or other written instrument or a person interested in the trust may petition the district court for an order . . . (4) to construe, interpret, or reform the terms of a trust, or authorize a deviation from the terms of a trust, including a proceeding involving section 501B.31").

### Semper's Other Affirmative Defenses

126. Semper also asserts a litany of equitable affirmative defenses against the trust instruction proceeding. They have no merit.

127. Semper asserts that Wells Fargo is barred from acting by laches and by equitable estoppel, based on Wells Fargo's communications with Semper. It asserts that the Indenture should not be construed against its interests, because it was a *bona fide* purchaser. And it asserts that this Court should not give instructions that benefit Sceptre under the principles of unclean hands and unjust enrichment.

128. As Semper argues, a trust instruction proceeding sounds in equity. *See Congdon*, 160 Minn. at 355. However, these equitable defenses have no place here because

32

they depend on the relationship between the parties before me: Wells Fargo's relationship with Semper and Sceptre and Semper's status as a purchaser. In giving guidance to Wells Fargo regarding how to act under the Indenture, I must take into account the interests of all Noteholders who might be affected by my order, not only the interests of Sceptre and Semper. Semper's equitable defenses based on conduct particular to Semper or Sceptre are without merit.

A.    **Laches**

129.    In order to invoke laches, Semper must establish that Wells Fargo's delay in bringing this proceeding was unreasonable. *See Waldman v. 853 St. Nicholas Realty Corp.*, 64 A.D.3d 585, 588 (2d Dep't 2009) ("In order for laches to apply, there must be an unreasonable and inexcusable delay.").

130.    As discussed above, Wells Fargo brought this proceeding in a timely fashion when it determined that the Trust would soon face losses that would need to be allocated to either the Class I-A-2 or Class I-A-3 Notes. In doing so, Wells Fargo was acting consistently with the Restatement's guidance that trust instruction proceedings should not be brought unless a trustee needs to make, or plan for, a distribution of property. Restatement (Third) of Trusts § 71 Comment (d).

131.    Thus, Semper has not established an unreasonable delay.

B.    **Equitable Estoppel**

132.    The doctrine of "[e]quitable estoppel prevents one from denying his own expressed or implied admission which has in good faith been accepted and acted upon by another." *Airco Alloys Div. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 81, 430 N.Y.S.2d 179 (4th Dep't 1980).

133.  "In order to prevail on the theory of equitable estoppel, the party seeking estoppel must demonstrate a lack of knowledge of the true facts; reliance upon the conduct of the party estopped; and a prejudicial change in position." *River Seafoods, Inc. v. JPMorgan Chase Bank*, 19 A.D.3d 120, 122 (1st Dep't 2005). That reliance must be "rightful[]." *Kobre v. Camp Mogen Avraham*, 293 A.D.2d 893, 895 (1st Dep't 2002).

134.  Additionally, "[t]he party seeking estoppel must also show, by clear and convincing evidence, with respect to the party being estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently seeks to assert; (2) intention, or at least expectation, that such conduct will be acted upon by the other party; and, in some situations, knowledge, actual or constructive, of the real facts." *Coggins v. Cnty. of Nassau*, 615 F. Supp. 2d 11, 22 (E.D.N.Y. 2009) (quotations and alteration omitted).

135.  Semper argues that Wells Fargo is equitably estopped from bringing this trust instruction proceeding because Wells Fargo represented to Semper that the *only* means of amending the Indenture was through an amendment pursuant to the consent of all Noteholders.

136.  This is not an accurate summary of Wells Fargo's communications with Semper, as Wells Fargo did not represent to Semper that it would not bring a legal action. To the contrary, in May 2013, Wells Fargo explicitly reserved the right to bring a

legal action.  Semper continued to hold its Class I-A-3 Notes after that time, even though it could have sold them at a profit.

137.    Since Wells Fargo did not make statements to Semper indicating that Wells Fargo would not commence a trust instruction proceeding, Semper's reliance on Wells Fargo's statements as an implicit promise that it would not commence such a proceeding was not "rightful."  *See Kobre*, 293 A.D.2d at 895.  Accordingly, Semper's equitable estoppel defense fails.

## C.    Unclean Hands and Unjust Enrichment

138.    To establish either unclean hands or unjust enrichment, Semper must demonstrate unjust, unconscionable or inequitable conduct by Sceptre.  *See Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (unjust enrichment); *Hytko v. Hennessey*, 62 A.D.3d 1081, 1082 (3d Dep't 2009) (unclean hands).

139.    Semper argues that Sceptre improperly colluded with Wells Fargo and induced Wells Fargo to commence this trust instruction proceeding in order to benefit Sceptre and other holders of Class 1-A-2 Notes at the expense of Semper and other holders of Class 1-A-3 Notes.

140.    The record does not support Semper's allegations of collusion.  Wells Fargo received conflicting demands from different groups of noteholders.  The holders of Class I-A-3 Notes, including Semper, wanted Wells Fargo to follow the language of the Indenture, and allocate losses first to Class I-A-2 notes.  The holders of Class I-A-2 notes, including Sceptre, wanted Wells Fargo to honor the Offering Documents, and allocate losses first to Class I-A-3.

35

141.   Nothing suggests that Sceptre's request that Wells Fargo honor the Offering
       Documents or commence a trust instruction proceeding was improper.

**D.     Good Faith Purchaser**

142.   Semper also argues that it should be protected from the reformation of the
       Indenture by the fact that it is a *bona fide* purchaser. The Restatement (Second)
       of Contracts § 155 provides that reformation will not be granted if the "rights of
       third parties such as good faith purchasers for value will be unfairly affected."

143.   Semper, however, was not a good faith purchaser because at the time it purchased
       its Class I-A-3 notes, it knew (or in the exercise of reasonable due diligence
       should have known) that there was uncertainty as to whether the Class I-A-3
       Notes were senior to the Class I-A-2 Notes. *Cf.* New York Commercial Code § 8-
       303(a) (providing that a purchaser of a security can qualify as a *bona fide*
       purchaser only where he does not have notice of any adverse claim to the security
       when he purchases it).

144.   Indeed, nothing about reforming the Indenture so that it treated Class I-A-2 Notes
       as senior to Class I-A-3 Notes could be characterized as unfair to the holders of
       Class I-A-3 Notes.

145.   Those who purchased the Class I-A-3 Notes before August 2010 reasonably relied
       on the Offering Documents, and not the Indenture. The Prospectus indicated that
       Class I-A-3 Notes were junior to Class I-A-2 Notes. Thus, those who purchased
       the Class I-A-3 Notes before August 2010 would not have their expectations
       disappointed by an order directing Wells Fargo to treat the Class I-A-3 Notes as
       junior.

146.    Those who purchased the Class I-A-3 Notes after August 2010, had they
        exercised due diligence, should have been aware of the discrepancy between the
        Indenture and the Offering Documents and the concomitant uncertainty over the
        seniority of the Notes. Accordingly, anyone who purchased the Class I-A-3 Notes
        in that time was, in part, speculating on their priority.

147.    As such, an order directing Wells Fargo to treat the Class I-A-3 Notes as junior
        would not disturb the reasonable expectations of any good faith purchaser.

## Interpreting the Indenture

### A.    Contract Interpretation under New York Law

148.    "Under New York law, written agreements are construed in accordance with the
        [contracting] parties' intent and the best evidence of what parties to a written
        agreement intend is what they say in their writing. As such, a written agreement
        that is complete, clear and unambiguous on its face must be enforced according to
        the plain meaning of its terms." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d
        430, 436 (2013) (quotations, citations, and alteration omitted).

149.    "Parol evidence—evidence outside the four corners of the document—is
        admissible only if a court finds an ambiguity in the contract." *Id.*

150.    Standing alone, § 3.38 of the Indenture unambiguously provides for the allocation
        of losses first to the Class I-A-2 Notes and then to the Class I-A-3 Notes.

151.    However, the Indenture does not stand alone. "Under New York law, all writings
        forming part of a single transaction are to be read together." *This Is Me, Inc. v.
        Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). "Contract language is ambiguous if it

37

is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and citation omitted) (applying New York law).

152. Thus courts reading one document from a deal will consider other documents from the same deal in deciding whether it is ambiguous. For example, in *Wells Fargo Bank, N.A. v. ESM Fund I, LP* this Court construed a Pooling Service Agreement based on language in the Prospectus. 785 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2011) *aff'd sub nom. Wells Fargo Bank, N.A. v. Fin. Sec. Assur. Inc.*, 504 F. App'x 38 (2d Cir. 2012) (unpublished).

153. Here, it is necessary for me to consider the Offering Documents when I read the Indenture because the Indenture cannot be read without them, since it explicitly referenced and incorporated the Prospectus. *See* Indenture § 2.07(c)(x) (providing that "Group II-NC Subsequent Mortgage Loan[s] shall have been underwritten in accordance with the criteria set forth under 'The Mortgage Pool—Underwriting Standards' in the Prospectus Supplement.").

154. Of even more importance, the Prospectus and the Term Sheet are the instruments disclosing all material terms and conditions of the placements of the Notes. Unless material discrepancies in the documents are fully revealed to all potential

38

investors, an issuance can be materially misleading, and fraudulent, in violation of the securities laws.

155.    Accordingly, in construing the Indenture, I am required to read it alongside the Prospectus and the Term Sheet, from the perspective of the reasonable understanding of all potential investors. *See This Is Me, Inc.*, 157 F.3d at 143; *Wells Fargo Bank*, 785 F. Supp. 2d at 195-96.

156.    Semper argues that I should not read the Indenture in conjunction with the Offering Documents because doing so would have the effect of creating uncertainty. Semper contends that, to avoid uncertainty, a reader should, in the event of any discrepancy, be able to look to and rely on the Indenture as the controlling document. Semper therefore argues that an order finding the Indenture ambiguous based on a reading of the Prospectus would have the unwelcome effect of interjecting uncertainty and disturbing investors' expectation that they can rely on the Indenture.

157.    This argument is not persuasive. Where there is a conflict between the Offering Documents and the Indenture, that conflict suggests to anyone reading the suite of documents that there has been a mistake in either the Offering Documents or the Indenture. Otherwise a material difference, as between the Indenture and the Offering Documents, principally the Prospectus, would need to be disclosed in the publicly filed documents describing the deal. Because there was no disclosure that the Indenture differed from the Offering Documents, a conflict within the Deal Documents indicated a mistake.

158.    The conflict thus creates uncertainty: it raises the specter that the Indenture does
        not accurately reflect the intent of the contracting parties, and contains a mistake,
        such as a scrivener's error.  No one aware of the conflict between the documents
        could rely on the Indenture with absolute certainty.  The inconsistency creates
        doubts and ambiguities.

159.    Semper cites the Central District of California's decision in *Citigroup Global
        Markets Inc. v. Impac Secured Assets Corp. et al.*, 11 Civ. 4514 (C.D. Cal. May 3,
        2012) (ECF Doc. No. 100), in support of its argument that investors would rely on
        the Indenture standing alone.

160.    That decision is inapposite and the *dicta* that Semper relies on is unpersuasive.
        The *Citigroup Global Markets* case was an action under federal securities law.
        The plaintiff had bought securities based on its reading of a publicly filed Pooling
        and Services Agreement ("PSA"), the equivalent to an indenture.  The problem
        was that the defendant had publicly filed an inaccurate version of the PSA.  As a
        defense to the securities action, the defendant argued that plaintiff's reliance on an
        inaccurate version of the PSA was unreasonable.  Defendant argued that the
        plaintiff should have relied on the prospectus. The court rejected this defense,
        holding that it was irrelevant under the federal securities law whether the
        plaintiff's reliance on the incorrect PSA was reasonable.  *See* ECF Doc. No. 100
        at 14-17.  The court also ruled that in any event the plaintiff's reliance on the
        incorrect PSA was appropriate, because the PSA superceded the offering
        documents.  *Id.* at 20-21.

161.   The case before me does not involve a plaintiff's suit against an issuer for
       damages, but a Securities Administrator's need to obtain judicial guidance
       regarding how to proceed in applying inconsistent documents. In any event,
       Semper cannot claim reasonable reliance. Its reliance, by its trader Boris
       Peresechensky, was calculated seeking arbitrate profits based on the
       "nomenclature abnormality" Peresechensky noted in the deal documents. The
       case before me is different from *Citigroup Global Markets*.

162.   It is not tolerable in a disclosure regime for a governing document to be materially
       inconsistent with other governing documents. Giving effect to an inconsistency
       would defeat the disclosure regime's purpose, by creating undisclosed changes:
       disappointing the expectations of investors who relied on the disclosure
       documents. In order to avoid such uncertainty, it is necessary to read disclosure
       documents and governing documents together, as a single suite of documents,
       consistent one with the others. Failure to do so would create material
       misstatements in an issuance of securities, in violation of the securities laws.

## B.     Reading the Transactional Documents Together

163.   When all of the Deal Documents are read in conjunction, there is an ambiguity as
       to how losses should be allocated: because the statement in § 3.38 of the
       Indenture that losses should first be allocated to Class I-A-2 Notes directly
       contradicts provisions in the Prospectus and the Term Sheet that losses should
       first be allocated to Class I-A-3 Notes. *See CP III Rincon Towers, Inc. v. Cohen*,
       10 CIV. 4638 DAB, 2014 WL 1357323, at *12 (S.D.N.Y. Apr. 7, 2014) (applying
       New York law and concluding that an agreement was ambiguous, because all of

41

the transactional documents could not be reconciled); *see also Wells Fargo Bank*, 504 App'x at 40.

164.   It is clear that the drafters intended consistency between the Deal Documents, since any changes in the Indenture would need to be disclosed in supplemental disclosures under the federal securities laws and there were no such supplemental disclosures.

165.   Since the transactional documents are ambiguous, I may consider parol evidence to determine the contracting parties' intent. *Schron*, 20 N.Y.3d at 436.

166.   In this case, it is clear that the parties to the Indenture intended for losses to be allocated as the Prospectus provides: first to the Class I-A-3 Notes and then to the Class I-A-2 Notes.

167.   The drafting history shows that the contracting parties finalized the terms of the Prospectus and the Offering documents—which both provided that Class I-A-2 Notes were senior to Class I-A-3 Notes—before they drafted the Indenture. The drafting history also shows that the Indenture reversed the allocation of losses between the Class I-A-2 Notes and the Class I-A-3 Notes as a result of a drafter's error made in the early morning (1:11am) of June 22, 2005, in conforming changes made in the then current draft of the Indenture with changes previously made in the then current drafts of the Prospectus and Term Sheet.

168.   Additionally the structure of the deal—the nomenclature given to the Notes, the interest rates assigned to the Notes, and the Credit Enhancement given to the Notes in the Term Sheet—all indicate that the contracting parties intended for the Class I-A-2 Notes to be senior.

42

169.   In sum, the evidence is clear that the drafters intended for the Class I-A-2 Notes to
be senior to the Class I-A-3 Notes.

170.   Accordingly, section 3.38 of the Indenture must be construed in accordance with
the Offering Documents to allocate Realized Losses first to the Class I-A-3 Notes
and then to the Class I-A-2 Notes.   Wells Fargo is hereby ordered to allocate
Realized Losses consistent with that construction.

171.   Since the instruction of this Order benefits Sceptre and the noteholders of the
same class, Sceptre's affirmative claim is denied as moot.   Semper's counterclaim
and cross-claim remain open, with such merit, if any, as may appear.

## Reformation

172.   Under New York law, the doctrine of scrivener's error allows contracts to be
reformed when there is a mistake in the writing that memorialized the contract.
"Where there is no mistake about the agreement and the only mistake alleged is in
the reduction of that agreement to writing, such mistake of the scrivener, or of
either party, no matter how it occurred, may be corrected." *Harris v. Uhlendorf*,
24 N.Y.2d 463, 467 (1969) (quoting *Born v. Schrenkeisen*, 110 N.Y. 55 (1888)).

173.   Scrivener's error must be shown by "clear and convincing evidence. *Nash v.
Kornblum*, 12 N.Y.2d 42, 46 (1962); *Aristocrat Leisure Ltd. v. Deutsche Bank
Trust Co. Americas*, 04 Civ. 10014 (PKL), 2005 WL 1950116, at *4 (S.D.N.Y.
Aug. 12, 2005).   That requirement has been satisfied.   Clear and convincing error
regarding the failure of the Thacher Proffitt lawyer to conform the Indenture to
the prospectus and term sheet has been shown.

174.    Semper argues that there is not clear and convincing evidence of a mistake, since
        neither the Thacher Proffitt lawyer nor any other witness testified that there was a
        mistake in the Indenture regarding the relative seniority of Class I-A-2 and Class
        I-A-3 Notes. I find, however, that scrivener's error was proved clearly and
        convincingly without such testimony, from the Offering Documents, the
        Indenture itself, and the drafting history of the documents. *See* Findings ¶¶ 16-32,
        supra. Any of the parties could have called, or deposed, that witness. And it is
        not necessary to produce a witness who directly recalls the mistake when the
        drafting history and structure of the Deal Documents already show that there was
        a mistake.

175.    Semper argues that the Indenture may not be reformed based on the Trust
        Indenture Act ("TIA") and the provisions of the Indenture limiting amendment.
        These arguments are meritless.

176.    Section 316(b) of the TIA provides that: "Notwithstanding any other provision of
        the indenture to be qualified, *the right* of any holder of any indenture security to
        receive payment of the principal of and interest on such indenture security, on or
        after the respective due dates . . . shall not be impaired or affected without the
        consent of such holder." 15 U.S.C. § 77ppp(b) (emphasis added). That section
        was designed to prevent changes to the terms of an indenture by a majority of
        shareholders, to the detriment of the minority. *See In re Bd. Of Directors of
        Multicanal S.A.*, 307 B.R. 384, 391-92 (Bankr. S.D.N.Y. 2004) ("[T]he Trust
        Indenture Act governs the rights of individual holders under a qualified indenture
        and provides that certain of these rights cannot be impaired by a majority or

44

supermajority of other holders."); *Upic & Co. v. Kinder-Care Learning Centers, Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992) (noting that TIA § 316(b)'s prohibition on the amendment of core terms of a trust, was prompted by the SEC's concerns "about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control").

177.    Semper cites *YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*, 10-2106-JWL, 2010 WL 2680336 (D. Kan. July 1, 2010). In that case, the court held that the attempt of a supermajority of holders to amend a trust over the opposition of a minority was barred by the TIA. Semper argues that *YRC Worldwide* teaches that the TIA bars reformation actions. It does nothing of the sort; since the case did not involve a drafting error responsible for material contradictions in governing documents.

178.    The TIA has no application to reformation actions to correct a mistake in a contract, because the reformation action does not have the effect of changing a holder's "right[s]" to securities. A reformation action is instead a judicial declaration that the language of the contract did not accurately reflect the contracting parties' intentions as to the rights of holders at the time they executed the contract. *See Harris*, 24 N.Y.2d at 467. It was the contracting parties' meeting of the minds that created a holder's right to securities, not the written words of the indenture that they signed. Thus, reforming a contract does not alter anyone's rights.

179.    Similarly, the provisions of the Indenture which limit amendments to the Indenture that modify payment provisions without the consent of all affected

noteholders have no application here.  As discussed above, a reformation action does not amend a contract or affect a noteholders' rights to payments.  It instead ensures that the written language of the contract reflects the intent of the contracting parties regarding those rights.

### Notice Pursuant to Minn. Stat. § 501B.16

180.   Having given Wells Fargo instructions as to how to interpret the Indenture, I now turn to Wells Fargo's request for an order providing that the instructions I give is to be binding on all Noteholders.

181.   Wells Fargo commenced this trust instruction proceeding under Minnesota law and petitioned the court for an order pursuant to Minn. Stat. §§ 501B.16(4) and (23).

182.   Minn. Stat. § 501B.18 provides that once a petition is filed under § 501B.16, the court shall fix "a time and place for a hearing."  It further provides that affected beneficiaries shall be given notice of the hearing as follows: "(1) by publishing, at least 20 days before the date of the hearing, a copy of the order for hearing one time in a legal newspaper for the county in which the petition is filed; and (2) by mailing, at least 15 days before the date of the hearing, a copy of the order for hearing to those beneficiaries of the trust who are known to or reasonably ascertainable by the petitioner."  Notice may also be given "in any other manner the court orders."  *In re H & A Neumann Revocable Trust*, A13-1150, 2014 WL 1407951, at *6-7 (Minn. Ct. App. Apr. 14, 2014) (quoting Minn. Stat. § 501B.18). This type of notice must be given to every interested person or to one who can bind an interested person.  *See* Minn. Stat. § 501B.155 subd. 4(1).

46

183.    Here, Wells Fargo properly satisfied the notice requirement by sending Notices to

the affected Noteholders dated January 27, 2014, February 20, 2014, March 14,

2014, and April 9, 2014.  These Notices were given to the Noteholders, through

Deutsche Bank, the Trustee, which delivered the Notice to the Depository Trust

Company, which is the registered holder of all of the Notes.  The Depository

Trust Company delivered the notices to banks, which deliver them to their

beneficiaries.  Wells Fargo also published the Notices on its website, which

Noteholders can access for information about the Trust.  While Wells Fargo did

not publish the notice in any legal paper as required by Minn. Stat. § 501B.18,

this was an effective and appropriate means of notifying affected beneficiaries.  I

accordingly find that the method Wells Fargo used to deliver notice was best

calculated to make all interested parties aware of the proceeding.  *See* Minn. Stat.

§ 501B.18 (providing that Notice may be given "in any other manner the court

orders"); *In re H & A Neumann Revocable Trust*, 2014 WL 1407951 at *6-7.

184.    Accordingly, this Court's order "is final as to all matters determined by it and

binding *in rem* upon the trust estate and upon the interests of all beneficiaries,

vested or contingent, even though unascertained or not in being."  Minn. Stat. §

501B.21.  This order is thus binding on all Noteholders, including Noteholders

that did not appear in this action.

185.    Having instructed Wells Fargo how to construe the Indenture, there is no reason

for the Court to exercise a continuing supervision over the Trust or Wells Fargo's

actions as Securities Administrator pursuant to Minn. Stat. § 501B.23 or General

Rule of Practice 417.02.

## CONCLUSION

186.  For the foregoing reasons, it is hereby ordered that Section 3.38 of the Indenture

shall be construed as providing that, to the extent Realized Losses must be

allocated to either the Class I-A-2 Notes or the Class I-A-3 Notes, such Realized

Losses are to be allocated first to the Class I-A-3 Notes and then, sequentially, to

the Class I-A-2 Notes.

187.  The Indenture shall also be reformed according to this instruction.

188.  Wells Fargo shall henceforth make distributions to Noteholders in accordance

with this Order.

189.  This Order is binding on all Noteholders, including Noteholders who did not

appear in this action.

190.  Sceptre's affirmative claim to the *res* is denied.

191.  The parties are directed to appear for a status conference at 2:30pm on August 6,

2014, to address Semper's counterclaims and cross-claims.

SO ORDERED.

Dated:      July 24, 2014
            New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

48